## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) |
| ROGER J. STONE, JR., | ) |
| Defendant. | ) |

*Leave to file granted ABJ 2/12/19*

Case No.: 1:19-CR-00018-ABJ

### MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF

Movant Dr. Jerome Corsi ("Dr. Corsi") through counsel,  hereby moves this Court for leave to file an *amici curiae* brief in support of entry of an order pursuant to Local Criminal Rule 57.7(c), or colloquially, a "gag order."

Dr. Corsi's *amicus* brief, attached hereto as <u>Exhibit 1</u>, sets forth the compelling reasons why a "gag order" is necessary in this case, as he is named as Person 1, a material witness, in Defendant Roger Stone's ("Defendant Stone") indictment. Defendant Stone has engaged in a public relations campaign to defame, smear, intimidate and threaten both Dr. Corsi and his counsel, Mr. Larry Klayman, which is the same conduct that he was indicted for in the first place. Because Defendant Stone's defamation, witness tampering, intimidation, and threats with regard to Dr. Corsi and his counsel Mr. Klayman are not technically part of this criminal prosecution, Dr. Corsi's interests and position are not adequately represented by any party. Dr. Corsi's *amicus* brief will aid this Court in ruling upon the entry of an order pursuant to LCrR 57.7(c)

The United States has taken no position with regard to filing of an *amicus* brief, and

1

counsel for Defendant Stone has not substantively responded to Dr. Corsi's request for consent.

Dated: February 8, 2019                    Respectfully submitted,

                                           /s/ Larry Klayman_____
                                           Larry Klayman, Esq.
                                           K L A Y M A N  L A W  G R O U P, P A
                                           D.C. Bar No:
                                           2020  Pennsylvania  Ave  NW  #800
                                           Washington, DC 20006
                                           Email: lcklayman@gmail.com
                                           Tel: 310-595-0800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on February 8, 2019

                                           /s/ Larry Klayman_____
                                           Larry Klayman, Esq.

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 1:19-CR-00018-ABJ** |
| | ) | |
| ROGER J. STONE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## *AMICI CURIAE* BRIEF OF DR. JEROME CORSI

Under Local Criminal Rule 57.7(b)(1):

> [i]t is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Furthermore, LCrR 57.7(c), which offers additional specific guidance with regard to highly publicized cases - which this instant case certainly qualifies as – grants the Court with authority to issue a "special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."

As set forth in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991):

> The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

Here, Defendant Roger Stone ("Defendant Stone") has *already begun* a public relations

1

campaign meant specifically to influence the outcome of his upcoming trial and which are meant to prejudice the jury venire. Defendant Stone is doing so by engaging in witness tampering, defamation, and intimidation and coercion with regard to Dr. Corsi, who is named as Person 1 in Defendant Stone's indictment. As such, Dr. Corsi will likely subpoenaed to be called as a material witness in Defendant Stone's upcoming trial. Again he is Person 1 in the Mueller Indictment.

Defendant Stone is attempting to smear, defame, and discredit, tamper and threaten Dr. Corsi so that when Dr. Corsi is called as a witness, the jurors will have a false impression of Dr. Corsi as a liar, perjurer, and alcoholic. This would, obviously, improperly and unethically benefit Defendant Stone. In fact, Defendant Stone's targeted efforts to defame, coerce, intimidate and threaten Dr. Corsi have resulted in a lawsuit filed in the U.S. District Court for the District of Columbia, which is attached hereto as Exhibit A and incorporated by reference.

Should this Court have any doubt as to Defendant Stone's improper motivations and already implemented and continuing designs to taint the jury venire, the content and article written by Sara Murray and Sam Fossum  titled, *Roger Stone, facing gag order, launches counterattack*, should put any such doubts to bed. Exhibit B. It is only one of many such analyses and accounts.  It is clear that Defendant Stone's strategy will be to use the media and publicity to argue his case and to try to get public sentiment on his side, as well as to tamper with witnesses like Dr. Corsi, which is exactly the type of conduct that LCrR 57.7 was meant to preclude.

Accordingly, Movant Dr. Corsi respectfully requests that this Court issue an order pursuant to LCrR 57.7(c) ordering Defendant Stone and his counsel from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case and which in the context of Stone himself and in their ferocity also amount to witness tampering

2

and obstruction of justice. See Exbibit A – Corsi Complaint.

Dated:  February 8, 2019

Respectfully submitted,

/s/ Larry Klayman
Larry Klayman, Esq.
KLAYMAN LAW GROUP, PA
D.C. Bar No:  334581
2020  Pennsylvania  Ave  NW  #800
Washington, DC 20006
Email: lcklayman@gmail.com
Tel: 310-595-0800

3

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. JEROME CORSI, Individually
Denville, NJ, 07834

        Plaintiff

      v.

ROGER STONE, Individually



        Defendant.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff, DR. JEROME CORSI ("Plaintiff" or "Corsi") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress and Assault

## JURISDICTION AND VENUE

1.    This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.    Plaintiff, Dr. Jerome Corsi, is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.    Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation. His address is

## **GENERAL ALLEGATIONS**

5.      Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

6.      Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

7.      Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation. Plaintiff Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury and in interviews.

8.      To the contrary, Plaintiff Corsi has never defamed or disparaged Defendant Stone.

9.      Defendant Stone knew that he was going to be indicted, and therefore began this

public relations campaign to smear, defame, intimidate and threaten Plaintiff Corsi, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming, intimidating and threatening Plaintiff Corsi, and his legal counsel, is ongoing, so Plaintiff Corsi reserves the right to amend this Complaint.

10.     Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty

3

trickster." *See* "Get Me Roger Stone" on Netflix.

11.  Plaintiff Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Plaintiff Corsi by defaming him and threatening him with physical violence, which is ironically what he was criminally indicted for, in part.

12.  By defaming Plaintiff Corsi, Defendant Stone is hoping to not only intimidate Plaintiff Corsi to severely harm and damage his reputation, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial. He is also trying divert funds away from Plaintiff Corsi's legal defense fund, while boosting his own legal defense fund.

13.  Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Corsi, such as his "friend" Michael Caputo, Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, and reporter Chuck Ross of The Daily Caller, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiff Corsi. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Stone's criminal trial.

14.  Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui

4

on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[1]

15. Defendant Stone has therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely he was indicted for by Special Counsel Robert Mueller.

## DEFENDANT STONE'S DEFAMATORY STATEMENTS

16. Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district, nationally and internationally regarding Plaintiff Corsi (the "InfoWars Video").[2] The same video was published on Defendant Stone's YouTube channel, *Stone Cold Truth*," on January 18, 2019.[3]

17. At 2:09 in the InfoWars Video, Defendant Stone falsely publishes that Plaintiff Corsi was "fired from World Net Daily."

18. At 2:27 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

19. At 2:55 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

---

[1] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926

[2] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4

[3] https://www.youtube.com/watch?v=cJyfgdvtFx8

20.     At 3:35 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

21.     At 4:20 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

22.     At 6:26 in the InfoWars Video, Defendant Stone falsely publishes that "you can always tell when Jerry Corsi is lying because his lips are moving…."

23.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person.

24.     On January 2, 2019, Defendant Stone published an article on www.infowars.com titled *"ROGER STONE BELIEVES JEROME CORSI WORKS FOR MUELLER[4]"* in which Defendant Stone falsely, misleadingly, and maliciously writes, "Before you decide that Corsi is a hero you should be well aware of the fact that the good doctor was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin."

25.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that

---

[4] https://www.infowars.com/roger-stone-the-treachery-of-jerome-corsi/

Plaintiff Corsi committed perjury (a federal offense), and that he is an untruthful person.

26. In another appearance on InfoWars, which was posted to YouTube[5] on January 17, 2019, Defendant Stone at 6:22 falsely and misleadingly publishes that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

27. In another appearance on InfoWars, which was posted to YouTube[6] on January 24, 2019, Defendant Stone at 5:58 falsely and misleadingly publishes that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr. Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed."

28. In the same appearance, Defendant Stone at 8:34 falsely and misleadingly publishes that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's dog.

29. Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a

---

[5] https://www.youtube.com/watch?v=GJd8YBDvm1Q
[6] https://www.youtube.com/watch?v=fXUlJZRxe6E

reckless disregard for their truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff Corsi.

## FIRST CAUSE OF ACTION
### *Defamation*

30.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31.     Defendant Stone published malicious, false, misleading and defamatory statements of and concerning Plaintiff Corsi in this judicial district, nationwide, and worldwide.

32.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

33.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

34.     Plaintiff Corsi has been damaged by these false and misleading statements because they injured Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as severely injured and damaged him personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

35.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

36.     Defendant Stone, as alleged herein, published numerous false, misleading and

defamatory statements to severely harm and damage Plaintiff Corsi, which were republished elsewhere, and through surrogates, which publish the falsity that Plaintiff Corsi has committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, as set forth in the preceding paragraphs.

37.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and specifically Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

38.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

39.     This statements are *per se* defamatory because they falsely and misleadingly publish that Plaintiff Corsi committed perjury, which is a federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the false and misleading statements.

40.     These false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as personally.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

41.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42.     Defendant Stone published numerous false, misleading and defamatory statements about Plaintiff Corsi, as set forth in the preceding paragraphs.

43.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, among other false and misleading statements as pled in the preceding paragraphs.

46.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47.     Plaintiff Corsi has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi in his profession as a journalist and author, whose credibility is the most important trait, as well as personally.

## FOURTH CAUSE OF ACTION
### *Intentional Infliction of Emotional Distress*

48.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

49.     Defendant Stone engaged in extreme and outrageous conduct by threatening Plaintiff Corsi, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico.

50.     Defendant Stone knowingly and intentionally threatened Plaintiff Corsi, in a manner similar to other death threats he made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment.

51.     Defendant Stone's extreme and outrageous conduct directly caused Plaintiff Corsi severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

52.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

53.     Defendant Stone placed Plaintiff Corsi in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiff Corsi, in a similar manner he has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico.

54.     The threats issued by Defendant Stone are credible, as he portrays himself as a "mafia" figure, as set forth above.

55.     Plaintiff Corsi did not consent to Defendant Stone' conduct.

56.     As a direct and proximate result of Defendant Stone's wrongful conduct, Plaintiff Corsi suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiff was severely harmed and damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Jerome Corsi prays for judgment against Defendant Stone as

follows:

a.      Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, perhaps hiding his wealth in overseas bank accounts.

b.      Awarding Plaintiff Corsi attorney's fees and costs.

c.      Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief, as well as the entry of a gag order against Defendant Stone in his criminal prosecution before this Court in order that he be prevented from intimidating, coercing and threatening material witnesses, such as Plaintiff Corsi, who are likely to be subpoenaed to testify at his trial. In this regard, Plaintiff Corsi will also, with leave of court requested, file an amicus brief arguing for a gag order on Defendant Stone in the related criminal case *United States of America v. Stone*, 19-cr-18 (D.D.C).

Dated: February 7, 2019                                    Respectfully Submitted,

                                                            */s/ Larry Klayman*
                                                            Larry Klayman, Esq.
                                                            KLAYMAN LAW GROUP, P.A.
                                                            D.C. Bar Number: 334581
                                                            2020 Pennsylvania Ave NW #800
                                                            Washington, DC, 20006
                                                            Telephone: (310)-595-0800
                                                            Email: leklayman@gmail.com
                                                            *Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |

*******

## INDICTMENT

The Grand Jury for the District of Columbia charges:

### Introduction

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a. On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b. Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4. ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5. During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6. By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7. After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.     In response, STONE took steps to obstruct these investigations. Among other steps to obstruct the investigations, STONE:

    a.     Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

    b.     Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

## Other Relevant Individuals

9.     Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign. Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.     Person 2 was a radio host who had known STONE for more than a decade. In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1. In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

## Background

### STONE's Communications About Organization 1 During the Campaign

11.     By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign. The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.     After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign. STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.     STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

       a.     On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]." The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly." On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

       b.     On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON." The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

       c.     On or about August 2, 2016, Person 1 emailed STONE. Person 1 wrote that he was currently in Europe and planned to return in or around mid-August. Person 1 stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging." The phrase "friend in embassy" referred to the head of Organization 1. Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14. Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.     On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight? Is there an October surprise happening?" STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.    Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.     On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.     On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time. On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night." STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.     On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project. In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.  On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]." Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

   i.  On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

   ii.  On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did." On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1. Person 2 blind-copied STONE on the forwarded email.

e.  On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.      On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week." In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.      On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns." Person 2 responded to STONE, "head fake."

h.      On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off." On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it." After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow." Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.     In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him. For example:

a.      On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

b.      Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got? Hope it's good." STONE responded in part, "It is. I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.    On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign. Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1. STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.    Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London." STONE replied, "Yes - want to talk on a secure line - got Whatsapp?" STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.    On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman. Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done." In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

The Investigations

18.    In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a. On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b. On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c. On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d. By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19. In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20. On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation. In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]." STONE further stated that "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21. In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

### STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation

22. During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]? You have no emails, no texts, no documents whatsoever, any kind of that nature?" STONE falsely and misleadingly answered, "That is correct.

11

Not to my knowledge."

23.    In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails. At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.    The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.    The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.    The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging.";

d.    Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.    The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

f.    The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24. By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

STONE's False and Misleading Testimony About His Early August 2016 Statements

25. During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26. STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27. On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

13

28. STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading. In tut h and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements. Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1. And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October. At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1. STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

### STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1

29. During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?" STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them." STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?" STONE falsely and misleadingly responded, "I did not." STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?" STONE falsely and misleadingly responded, "I did not."

30. In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign. For example:

    a. As described above, on or about July 25, 2016, STONE sent Person 1 an email that

14

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.　On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30— particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c.　On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

### STONE's False and Misleading Testimony About Communications with His Identified Intermediary

31.　During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary. STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way. During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:　[H]ow did you communicate with the intermediary?

A:　Over the phone.

Q:　And did you have any other means of communicating with the intermediary?

A:　No.

Q:　No text messages, no – none of the list, right?

15

A:    No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:    So you never communicated with your intermediary in writing in any way?
>
> A:    No.
>
> Q:    Never emailed him or texted him?
>
> A:    He's not an email guy.
>
> Q:    So all your conversations with him were in person or over the phone.
>
> A:    Correct.

32.    In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.    Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.    Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

a.    In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

b.    In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

c.    On or about January 6, 2017, Person 2 sent STONE an email that had the subject

16

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

STONE's False and Misleading Testimony About Communications with the Trump Campaign

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

      a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

      b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

      c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

17

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.     In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

    a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

    b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

    c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

    d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now? Why not wait to see what [Person 2] does. You may be defending yourself too much—raising new questions that will fuel new inquiries. This may be a time to say less, not more." STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.      On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony. Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.      On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool." Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th." STONE responded, "If you testify you're a fool. Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can. I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.     On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena. Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.     Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations For example:

    a.    On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

    b.    On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

    c.    On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42. Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43. On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|-------|-----------------|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|---|---|
| | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.　Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.　Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:

Foreperson

Date: January 24, 2019

EXHIBIT B

Case 1:19-cr-00018-ABJ   Document 32-3   Filed 02/12/19   Page 2 of 4
2/8/2019
Roger Stone, facing gag order, launches counterattack - CNNPolitics

# Roger Stone, facing gag order, launches counterattack

By Sara Murray and Sam Fossum, CNN

Updated 6:30 PM ET, Thu February 7, 2019

**Washington (CNN)** — In the days since a federal judge warned Roger Stone that he could soon face a gag order, Stone has peddled conspiracy theories, claimed he can't get a fair trial and criticized the judge.

"This is a lynching. This is a legal lynching of me," Stone said in a recent interview on the fringe right-wing website Infowars.

Stone was arrested last month in a pre-dawn raid and charged with obstruction of justice, making false statements and witness tampering as part of special counsel Robert Mueller's Russia investigation. On Friday, federal prosecutors and Stone's legal team are due to submit briefs on the merits of a gag order.

But rather than toning down his rhetoric, Stone appears to be abiding by the principles he espouses in his books. For instance, Stone's Rule #81: "Admit Nothing; Deny Everything; Launch Counterattack."

It's a dubious legal strategy.

"I would say that it's a terrible idea for Stone to be doing this," said CNN legal analyst Shan Wu. "I can't imagine a worse idea."

Judge Amy Berman Jackson informed Stone last week that she was considering a gag order. She was quick to put similar restrictions on former Trump campaign chairman Paul Manafort's case, which she is also presiding over in Washington. Jackson, an appointee of President Barack Obama, said she was cognizant of Stone's First Amendment right to free speech, but she wanted to protect his right to a fair trial and ensure it was possible to select an unbiased jury.

Stone's response, delivered via an Instagram post this week: "I will continue to defend myself unless an Obama appointed judge decides to suspend my first amendment rights." In another post, Stone exclaimed, "Fair Trial in DC? Impossible."

Stone, in his public diatribes, has claimed he is being targeted because he works for Infowars and supported Trump. And he has continued his long tradition of hyping fact-free conspiracy theories.

In one Instagram post, Stone is shaking hands William Binney, a former National Security Agency official who has turned into a vocal critic of the agency. "Bill Binney explained to me why the forensic evidence shows the DNC was never hacked by anyone including the Russians," Stone wrote.

US intelligence agencies have concluded Russian intelligence hacked the DNC and other top Democrats, and used platforms like WikiLeaks to disseminate the stolen material.

Stone concluded his post with a series of hashtags including "#sethrich."

Seth Rich was a Democratic National Committee staffer who was fatally shot in Washington in 2016. Police said evidence indicates Rich was the victim of a robbery gone wrong. But far-right activists and news organizations spread a conspiracy theory -- with no evidence -- that Rich was killed for leaking a trove of DNC emails to WikiLeaks.

Both Fox News and the Washington Times ended up retracting stories based on the murder-as-leaking-retribution conspiracy plot, but the lore has lived on, to the devastation of Rich's family.

As for Stone, he recently settled a lawsuit (unrelated to the Mueller probe) in which he admitted to making false statements on Infowars about a Chinese businessman and apologized for his commentary.

Stone's attorney and Mueller's office declined to comment.

Prior legal woes aside, Stone's eagerness to discuss his case publicly -- and in colorful fashion -- could make the judge more inclined to put a gag order on the case.

Stone and his attorneys have vowed to fight any such effort and are expected to make the case that Stone's livelihood depends on his ability to speak freely.

"I make a living writing and speaking," Stone argued in a recent Infowars appearance. "So they would be depriving me of making a living if I am entirely gagged."

Jackson appears to have anticipated that defense. In court last Friday, the judge said she was only considering limiting Stone's ability to talk about the case.

"He would still be free to discuss foreign relations, immigration or Tom Brady," Jackson said.

If she does crack down on public comments on the case, Stone's legal team could also appeal the move. Last year, Stone added First Amendment and constitutional law expert Bruce Rogow to his legal team.



rogerjs...
40.2k followers

View More on Instagram

Stone may have a solid legal premise for an appeal, Wu said, although most defendants consider it a risky move.

"Most defendants don't want to do that because they don't want to run afoul of the judge," Wu said. "He doesn't care."

Indeed, Stone is still racking up appearances and using nearly all of them to hammer the tactics used in the pre-dawn raid at his Florida home.

"This was a show of force, this was something you would expect from Nazi Germany or Soviet Russia. It was chilling," Stone told Infowars.

Stone has also compared the law enforcement presence the morning of his arrest to the forces deployed against drug lord Joaquín Guzmán, known as "El Chapo," and Osama bin Laden, the former al Qaeda leader who was killed by US Special Forces in a 2011 raid.

Stone's vocal complaints even sparked a response from ex-convict and former football star O.J. Simpson, who drew on his own experience with FBI raids, according to a video posted on celebrity news website TMZ.

"The FBI can be wrong," Simpson said, "But to try to compare to El Chapo and Bin Laden? Hey man, Bin Laden was carried out in a bag, not walked out in handcuffs."

Simpson's parting words for Stone: "Man up. Stop crying."