1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

2

3
United States of America,          ) Criminal Action
                                   ) No. 19-CR-018
4                    Plaintiff,     )
                                   ) SHOW CAUSE HEARING
5    vs.                            )
                                   ) Washington, DC
6    Roger Jason Stone, Jr.,        ) February 21, 2019
                                   ) Time:  2:30 p.m.
7                    Defendant.     )
    _____
8
                TRANSCRIPT OF SHOW CAUSE HEARING
9                      HELD BEFORE
          THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
    _____
11
                   A P P E A R A N C E S
12

13   For the Plaintiff: **Michael John Marando**
                        **Jonathan Ian Kravis**
14                      U.S. ATTORNEY'S OFFICE FOR THE
                           DISTRICT OF COLUMBIA
15                      555 Fourth Street, NW
                        Washington, DC 20530
16                      (202) 252-7068
                        Email:  Michael.marando@usdoj.gov
17                      Email:  Jonathan.kravis3@usdoj.gov
                        **Jeannie Sclafani Rhee**
18                      **Aaron Jon Zelinsky**
                        U.S. DEPARTMENT OF JUSTICE
19                      Special Counsel's Office
                        950 Pennsylvania Avenue, NW
20                      Washington, DC 20530
                        (202) 616-0800
21                      Email:  Jsr@usdoj.gov
                        Email:  Asjz@usdoj.gov

22   For the Defendant: **BRUCE S. ROGOW**
                        LAW OFFICE OF BRUCE S. ROGOW, P.A.
23                      100 NE 3rd Avenue
                        Suite 1000
24                      Fort Lauderdale, FL 33301
                        (954) 767-8909
25                      Email:  Brogow@rogowlaw.com

1                            **Robert C. Buschel**
                             BUSCHEL & GIBBONS, P.A.
2                            One Financial Plaza
                             100 S.E. Third Avenue
3                            Suite 1300
                             Ft. Lauderdale, FL 33394
4                            (954) 530-5301
                             Email:  Buschel@bglaw-pa.com
5                            **L. Peter Farkas**
                             HALLORAN FARKAS & KITTILA LLP
6                            1101 30th Street, NW
                             Suite 500
7                            Washington, DC 20007
                             (202) 559-1700 ext 102
8                            Email:  Pf@hfk.law
                             **Grant J. Smith**
9                            STRATEGYSMITH, P.A.
                             401 East Las Olas Boulevard
10                           Suite 130-120
                             Fort Lauderdale, FL 33301
11                           (954) 328-9064
                             Email:  Gsmith@strategysmith.com
12
       Also present:        FBI Case Agent Michelle Taylor
13                           FBI Case Agent Curtis Heide

14     _____

       Court Reporter:          Janice E. Dickman, RMR, CRR
15                              Official Court Reporter
                                United States Courthouse, Room 6523
16                              333 Constitution Avenue, NW
                                Washington, DC  20001
17                              202-354-3267

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2    This afternoon we have criminal case number 19-18, United

3    States of America v. Roger Stone, Jr.

4          Mr. Stone is present in the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6    lectern, identify yourself for the record.

7          MR. KRAVIS:  Good afternoon, Your Honor.  Jonathan

8    Kravis for the United States.

9          THE COURT:  Good afternoon.

10          MR. KRAVIS:  With me at counsel table is Michael

11    Marando, also from the D.C. U.S. Attorney's Office.  And

12    Jeannie Rhee and Aaron Zelinsky from the Special Counsel's

13    Office.

14          THE COURT:  All right.  Good afternoon.

15          MR. KRAVIS:  Thank you.

16          MR. ROGOW:  Good afternoon, Your Honor.

17          THE COURT:  Wait.  One at a time, using the

18    microphone, please.

19          MR. ROGOW:  May it please the Court, Bruce Rogow and

20    Peter Farkas for Roger Stone.  And Grant Smith and Rob Buschel

21    at counsel table also with Mr. Stone.

22          THE COURT:  And I note that the defendant is present.

23          Who's going to be handling the argument for the

24    defendant?

25          MR. ROGOW:  I am, Your Honor.

1              THE COURT:  Okay.  Well, why don't you remain there.

2     And you can be seated, Mr. Farkas.

3              Mr. Haley, could you please provide a copy of

4     something that I've marked as Exhibit A to Mr. Rogow?

5              MR. ROGOW:  Received, Your Honor.  I have a copy.

6              THE COURT:  I would like to know if Exhibit 1 is the

7     Instagram post for which the defendant docketed the notice of

8     apology, found at docket 38, on February 18, 2019?

9              MR. ROGOW:  It is, Your Honor.

10             THE COURT:  So, Roger J. Stone, Jr. is the

11    defendant's Instagram account?

12             MR. ROGOW:  Yes, sir -- yes, ma'am.  I'm sorry.

13             THE COURT:  And the post depicted in Exhibit 1 was

14    posted and later removed on that Instagram account on or about

15    February 18?

16             MR. ROGOW:  It was.

17             THE COURT:  Okay.  You can return the exhibit to the

18    deputy clerk.  And it will be sealed and made a part of the

19    record in this proceeding.

20             I'm not done with you.

21             So what is your position on behalf of the defendant

22    on whether the media contact order in this case should be

23    modified?

24             MR. ROGOW:  My position is that it should not be

25    modified, that Mr. Stone should have another opportunity to

1    comply.  And I want to put Mr. Stone on the witness stand so

2    that he can -- you can hear him, Your Honor, and hear him

3    explain what happened, why it happened, and how he apologizes

4    for it, as he did in that filing a couple of days ago.  But he

5    would like to have another opportunity to comply with this

6    Court's original order.  And I think that is our position with

7    regard to that.

8              THE COURT:  All right.  Well, if you choose to put

9    Mr. Stone on the stand, I'm going to give you that opportunity.

10   I do have a few questions for you first, and then I may save my

11   other questions for Mr. Stone.

12             In docket 28, your submission in response to my

13   solicitation of submissions about the media contact order, you

14   relied heavily on *Nebraska Press Association*, a case involving

15   prior restraints on the press.  Does the -- and I don't know if

16   it's pronounced *Gentile* or *Gentile* or *Gentile* case -- indicate

17   that *Nebraska* -- the *Nebraska Press* test, the clear and present

18   danger test that you hung your hat on, has to be applied when

19   the restraint is on a participant in a criminal trial?

20             MR. ROGOW:  It does not.

21             THE COURT:  All right.  So how does it apply then in

22   this situation?

23             MR. ROGOW:  It applies by analogy.  And I think even

24   stronger with regard to a defendant which is on trial for his

25   or her freedom.  The *Nebraska Press* case, of course, deals with

1    restraints upon the press.  In a situation with Mr. Stone,

2    we're talking about a restraint upon the defendant.  The

3    Supreme Court has never addressed the restraint upon the

4    defendant in the First Amendment context, as far as I'm aware,

5    which is what I said in my filing to the Court.

6            THE COURT:  All right.  He's currently on bond

7    pending trial on an indictment charging multiple felonies, and

8    subject to conditions of pretrial release.  How do the

9    principles that you're talking about operate in connection with

10   the Bail Reform Act?

11           MR. ROGOW:  Well, they operate to the extent that the

12   Bail Reform Act focuses on whether or not there is a risk of

13   flight or a threat to the community, for the most part.  And in

14   this situation there is neither a risk of flight nor a threat

15   to the community.

16           The question in this case is whether or not there was

17   a violation of this Court's order, an order that the Court

18   entered, with warnings.  And Mr. Stone will address that.  But

19   our position is that the Bail Reform Act is not the issue in

20   this case in terms of revocation of the conditions of his

21   release.

22           THE COURT:  Well, what if I want to modify the

23   conditions of release?  What's the test for what a Court has to

24   find to impose a condition of pretrial release that's necessary

25   to protect another person or the community?

1              MR. ROGOW:  Well, if you found that there is a real

2     threat to another person in the community, an actual clear and

3     present threat to that person, then of course you could apply

4     Your Honor's power to restrain that person, including

5     revocation of the conditions of release, or change of the

6     conditions of release.

7              THE COURT:  Where does the Bail Reform Act require a

8     clear and specific threat to a specific person?

9              MR. ROGOW:  It doesn't require in those terms, a

10    clear and present threat, Your Honor, but --

11             THE COURT:  Right.  You keep using those terms, and

12    now you've told me that it hasn't been applied in this

13    situation to a participant in the trial and it doesn't apply in

14    the case of the Bail Reform Act.  So why do you keep using that

15    test?

16             MR. ROGOW:  Because I think the test is the proper

17    test to use in a situation where a person is about to go on

18    trial, and is a defendant in a case, and has a right to bail, a

19    right to release on conditions that the Court sets.  And so it

20    seems to me that at that point, if the Court is going to not

21    allow him or her to be released, that there ought to be very

22    specific facts.  I use clear and present because clear and

23    present seems to be a test that gets applied in many situations

24    where important liberty interests are at stake.

25             THE COURT:  All right.  And what is the best legal

1    authority you have for the theory that you've just laid out?

2         MR. ROGOW:  Well, I didn't have any legal authority

3    on that issue because that was not the subject of my response

4    with regard to the gag order.  So I really don't have any

5    authority off the top of my head, Your Honor, to tell you what

6    case or what statute holds with regard to the conditions of

7    release in a situation like this.  And I'm focusing on a

8    situation like this, where you have a specific single instance

9    where this occurred.

10        THE COURT:  You said the following in your very

11   impassioned submission about the proposed media contact order:

12   You said, "While it is true that most criminal defendants do

13   not wish to be heard, either publicly or in the course of their

14   trial, Mr. Stone is not such a defendant.  His work, for more

15   than 40 years, has been talking and writing about matters of

16   public interest.

17        "He's published half a dozen books, many stating

18   controversial viewpoints.  He's penned many hundreds of

19   articles and has been the subject of many hundreds more,

20   published in myriad publications.  Whether it is his pursuit of

21   a posthumous pardon for Marcus Garvey or the style of his

22   clothes or the state of the nation, Roger Stone is a voice.

23        "Given those realities, a prior restraint of Roger

24   Stones's free speech rights would be an unconstitutional

25   violation of Stone's right to work, to pursue his livelihood,

1    and be a part of the public discourse."

2           That raised some questions in my mind, particularly

3    in the wake of the recent events and his explanations for them

4    that may bear on his conditions of release.  And so my first

5    question is:  How exactly does he pursue his livelihood?

6           MR. ROGOW:  He consults with different business and

7    other political persons.  That is one of his kinds of work.

8    The other is he comments, obviously, and gets paid for his

9    commentary.  He speaks and gets paid for his speaking.

10          THE COURT:  All right.  So when he consults, he

11   consults on the subject of communications or public relations?

12   Is that his --

13          MR. ROGOW:  It could be.  It could be both.

14          THE COURT:  -- field of expertise?

15          All right.  Now, he told Pretrial Services Agency he

16   was employed at Drake Ventures, LLC.  So what is the nature of

17   the work for which he reported an income of $47,000 a month?

18   Is that the communications consulting?

19          MR. ROGOW:  That's -- as I understand it, yes, Your

20   Honor.

21          THE COURT:  Okay.  Now, I take it the LLC is his

22   company?

23          MR. ROGOW:  I think it is, Your Honor.  But I cannot

24   speak distinctly with that; I've not been prepared to address

25   that issue.

1      THE COURT:  Do you know if he has any employees?

2      MR. ROGOW:  He may have an employee.  Again, these

3  are questions I'm happy to ask him on the witness stand.  I

4  intend to put Mr. Stone on for my questioning, for the

5  government's questioning, and for Your Honor's questioning.

6      THE COURT:  All right.  So as long as you understand

7  he's going to be subject to cross-examination.

8      I have a number of questions.  If you are saying to

9  me that you would like me to pose them directly to your client,

10  instead of to you, I will do that; he will be sworn.

11      MR. ROGOW:  I am saying that, Your Honor.

12      THE COURT:  All right.  You can call Mr. Stone to the

13  stand.

14      I may still have questions for you after, since you

15  entered your appearance in this case.

16      MR. ROGOW:  I understand, Your Honor.

17      THE COURT:  And I expect you to be able to answer my

18  questions.

19      All right.  You can call your client to the stand.

20  Understand that the United States will have the right to cross-

21  examine him in the scope of his direct.

22      MR. ROGOW:  I do.  I do.

23      THE COURT:  All right.

24              ROGER JASON STONE, JR.,

25  having been first duly sworn, was examined and testified as

```
1     follows:
2               MR. ROGOW:  Thank you.
3               THE COURT:  You may proceed.
4               MR. ROGOW:  May I remain?  I thought Your Honor was
5     going to ask the questions.
6               THE COURT:  You can start.
7                         DIRECT EXAMINATION
8     BY MR. ROGOW:
9     Q.  Mr. Stone, you are the defendant in this criminal case, are
10    you not?
11    A.  Yes, I am.
12    Q.  Is this a serious matter for you?
13    A.  Yes, it is.
14    Q.  Does this matter threaten your liberty?
15    A.  Yes, it does.
16    Q.  Does it threaten your family?
17    A.  Yes, it does.
18    Q.  Are your wife and your daughter in the courtroom today?
19    A.  Yes, they are.
20    Q.  Mr. Stone, did you abuse the Judge's trust in you when you
21    posted the Instagram that has now become Exhibit 1?
22    A.  Yes, I did.  Your Honor gave me a wide berth, for which I
23    am grateful.  She also gave me an admonition, which I regret
24    that I did not take to heart.  I believe I abused the order,
25    for which I am heartfully sorry.  I am kicking myself over my
```

1    own stupidity.  But not more than my wife is kicking me.

2           I offer no excuse for it, no justification.  I

3    believe it is the outgrowth of -- I believe the lapse of

4    judgment was the outgrowth of the extreme stress of the

5    situation.  I have been in political combat, but I have never

6    been the subject of a seven-count criminal indictment; never

7    even had a speeding ticket.

8           I'm being treated for emotional stress.  I should

9    also say that I have acute financial stress.  Your Honor,

10   the -- my consulting business has dried up and is virtually

11   nonexistent.  So, I really make my living from speaking,

12   writing, book sales, and speeches.  I have exhausted my

13   savings.

14          I am being treated for the emotional stress, per the

15   judge's order.  I don't offer any rationalization or excuse or

16   justification.  This is just a stupid lapse of judgment.

17   Q.  Mr. Stone, in a posting that followed the original posting,

18   you mentioned something about a volunteer may have posted the

19   posting.  Is that accurate?

20   A.  I did not select the image.  But I did not review it, and I

21   didn't take into consideration the implications.  The posting

22   is my responsibility.  I regretted it.  There was an immediate

23   media firestorm.  I took it down and I issued an apology.  My

24   apology is sincere and it is heartfelt.  This was an egregious,

25   stupid error, for which I apologize again to the Court.

1    Q.  Do you understand that the posting could be viewed as a

2    threat to the Court?

3    A.  I now realize that.  That was not my intention.  I didn't

4    recognize the Celtic cross in the corner.  I just glanced at

5    it.  I didn't think.  So I can't rationalize my thinking

6    because I wasn't thinking, and that's my own fault.

7    Q.  Do you understand that the text can be viewed as an attack

8    upon the integrity of the Court?

9    A.  I recognize that.  I regret it.  It is, as I said -- again,

10   I think my bad judgment is borne on the -- from the emotional

11   stress of this situation.  I can only say I am sorry yet again.

12   It was an egregious mistake.  I would, obviously, wish I could

13   do it over again, but I cannot.

14   Q.  How could we be assured, Mr. Stone, if the Judge remains

15   with the order that she had entered allowing you to speak

16   freely, how can we be assured that there will not be a

17   recurrence of something like this, or anything like this?

18   A.  First of all, I'm very grateful to Your Honor for the

19   initial order, because I do have to make a living.  And I am

20   sorry that I abused your trust.  I --

21           THE COURT:  Is anybody paying you to speak about this

22   case?

23           THE DEFENDANT:  No.

24           THE COURT:  Okay.  So an order that you couldn't

25   speak about this case wouldn't affect your ability to make a

1    living?

2                 THE DEFENDANT:  That is correct.

3                 THE COURT:  All right, continue.

4    A.  I recognize that I let the Court down.  I let you down.  I

5    let myself down.  I let my family down.  I let my attorneys

6    down.  I can only say that I'm sorry.  It was a momentary lapse

7    in judgment.  Perhaps I talk too much.

8                 But, I am under enormous pressure.  I now have

9    television commentators talking about the likelihood that I

10   will be raped in prison if I am -- if I am convicted.  This is

11   a stressful situation for me and my family.  And in all

12   honesty, I'm having trouble putting food on the table and

13   paying the rent.  I've exhausted my little savings.  I cannot

14   use anything I raise for my legal defense for my personal

15   expenses.  That goes strictly for my attorneys.

16                Your Honor, I can only beseech you to give me a

17   second chance.  Forgive me the trespass.  I'm heartfully sorry.

18   This is a sincere apology.  I will treat the Court and all your

19   orders scrupulously for the dignity and authority you deserve.

20   I am -- I hope you'll consider my plea because it is sincere

21   and heartfelt.

22                THE COURT:  All right.  Mr. Rogow, do you --

23                MR. ROGOW:  Nothing further, Your Honor.

24                THE COURT:  -- have further questions?

25                All right.  Let me ask you a question, Mr. Stone.

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  The notice of apology said the post,

3     quote, was a random photo selected from the internet, posted at

4     my direction.  What do you mean by, "posted at my direction"

5     when just now you said, "I didn't select the image, I didn't

6     review it"?

7          THE DEFENDANT:  Well, I just said, Get a photo -- I

8     am responsible for the posting.  I just did not look at it.  I

9     didn't review it properly; that was my fault.  I'm not offering

10     a rationalization.  I'm taking responsibility for the action.

11          In all honesty, we wanted to get the apology to you

12     as quickly as possible.  I recognized that I'd made an error.

13     I was at a doctor's appointment, the apology was read to me.  I

14     rushed home to sign it.  And it was sent, I guess,

15     electronically.

16          THE COURT:  I'm just interested in this concept that

17     you don't see what gets posted on Roger J. Stone before Roger

18     J.  Stone posts it.  Is it --

19          THE DEFENDANT:  No, I didn't say --

20          THE COURT:  -- anybody else's Instagram account

21     besides yours?

22          THE DEFENDANT:  I'm not sure I understand your

23     question, Your Honor.

24          THE COURT:  It's your Instagram account.

25          THE DEFENDANT:  Yes.  I am responsible.

1          THE COURT:  And it is fair to say that you are

2     100 percent responsible for anything that gets posted and it's

3     not anybody else's fault?

4          THE DEFENDANT:  That is correct.  I take

5     responsibility.  I don't have any employees.  I do have

6     volunteers helping because of my financial circumstances.  They

7     do a lot of the clerical work.  I am, in all honesty, not very

8     technologically proficient.  But I accept responsibility.  It

9     is my fault.

10          THE COURT:  Do you know how to do a Google search?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do the volunteers that work for you know

13     how to do a Google search?

14          THE DEFENDANT:  Yes.

15          THE COURT:  How hard was it to come up with a

16     photograph that didn't have a crosshairs in the corner?

17          THE DEFENDANT:  Your Honor, I didn't recognize it as

18     a crosshairs.  I thought it -- I didn't even notice it until it

19     was brought to my attention by a reporter.

20          THE COURT:  Well, and at that point you said, What

21     some say are crosshairs are in fact a logo of the organization

22     that originally posted it.  Is that your explanation for that?

23          THE DEFENDANT:  That's the truth, Your Honor.  I had

24     to go back and look at it.

25          THE COURT:  All right.  But being a logo and being

1    crosshairs are not mutually exclusive, are they?

2              THE DEFENDANT:  Well, but I think in this case it's

3    supposed to be -- it's a Celtic symbol, as I understand it.

4              THE COURT:  Why are you now saying it's a Celtic

5    symbol?

6              THE DEFENDANT:  Because I researched it and that's

7    how it comes up.

8              THE COURT:  Haven't you also said publicly that it

9    was actually an occult symbol?

10             THE DEFENDANT:  It's a Celtic occult symbol.  It's

11   the same thing.

12             THE COURT:  What does it mean?

13             THE DEFENDANT:  I don't know, Your Honor.  I'm not

14   into the occult.

15             THE COURT:  And haven't you also said, on InfoWars,

16   on Tuesday, after you took the post down, that this whole set

17   of circumstances is just another example of the media making

18   you a target?

19             THE DEFENDANT:  Well, the media, just as in the

20   question --

21             THE COURT:  Excuse me.

22             (Pause.)

23             THE COURT:  All right.  I'm sorry.

24             Mr. Stone.

25             THE DEFENDANT:  I apologize, Your Honor.

1        THE COURT:  You can answer the question.

2        THE DEFENDANT:  Yes.  As in the -- as an example of

3   your gag order, it was widely misreported almost immediately.

4   I think people read the headline but didn't read the specifics.

5   And it was misreported.  I honestly did not believe that these

6   were crosshairs.  I honestly thought it was a

7   misrepresentation.  And I took it down.  And I apologize

8   because I recognized it could be misinterpreted that way.

9        THE COURT:  Well, according to the apology, the post

10   was improper.  What was improper about it?

11        THE DEFENDANT:  My attorneys wrote that and I signed

12   it because it was improper for me to criticize at all; I

13   recognize that.

14        THE COURT:  Well, at the time I imposed the order

15   there were no restrictions on your talking about the case.  So,

16   my questions to you are not about the fact that you criticized

17   the office of special counsel, that you criticized me, that you

18   criticized an opinion in the case that I had written earlier.

19   My question to you is what is it that you said was improper

20   when you told me it was improper.

21        THE DEFENDANT:  Again, I did not write that, I signed

22   it on the advice of counsel.  I would have --

23        THE COURT:  Well, wait.

24        THE DEFENDANT:  Yes.

25        THE COURT:  You said to me, "I abused your trust."

1          THE DEFENDANT:  Yes.

2          THE COURT:  "I'm heartfully sorry."

3          THE DEFENDANT:  It was --

4          THE COURT:  Let me finish my question.

5          THE DEFENDANT:  I'm sorry.

6          THE COURT:  "I'm kicking myself for my own

7     stupidity."

8          THE DEFENDANT:  Yes.

9          THE COURT:  "I have no excuse.  It was my stupidity.

10    It was a lapse of judgment.  I regretted it."  What was the

11    lapse of judgment that you regret?

12         THE DEFENDANT:  I shouldn't have posted any of it at

13    all.  It was a mistake for which I seriously apologize.  It was

14    an egregious, stupid mistake.

15         THE COURT:  Why is it consistent with how sorry you

16    were, when you sent the apology, to continue for the next two

17    days to speak publicly about the fact that you're being treated

18    unfairly in this situation as well, that it's really this

19    symbol, that it's really that symbol, it's the media going

20    after you.  How is that consistent with your telling me that

21    you're deeply and sincerely sorry?

22         THE DEFENDANT:  Because that was a reference to what

23    I believe was a media distortion of my intent.  It was -- I did

24    not have a malicious intent, Your Honor.

25         THE COURT:  Do you understand that what you did could

1    have a malicious impact, notwithstanding your intent?

2           THE DEFENDANT:  That's why I abjectly apologized and

3    I have no rationalization or excuse.  I'm not seeking to

4    justify it.  It was just an error.

5           THE COURT:  Does the Office of Special Counsel have

6    any questions they would like to ask the defendant?

7           MR. KRAVIS:  Yes, Your Honor.  May I just have one

8    moment to confer with my colleagues?

9           THE COURT:  Yes.

10          MR. KRAVIS:  Thank you.

11                        CROSS-EXAMINATION

12   BY MR. KRAVIS:

13   Q.  Good afternoon, Mr. Stone.

14   A.  Yes, sir.

15   Q.  I would like to start by asking you a few questions about

16   the facts of this Instagram post that we have been discussing.

17   A.  Yes.

18   Q.  Who exactly posted this photo on your Instagram account?

19   A.  I did.

20   Q.  It was not a volunteer?

21   A.  No.  Initially I thought it was.  I do many posts a day.  I

22   had to go back and look at it.  I didn't think about this

23   appropriately, as I said.

24          THE COURT:  Excuse me.  Did you not just tell me,

25   under oath, less than five minutes ago, that someone else

1    posted it?

2           THE DEFENDANT:  No.  No, Your Honor.  I said someone

3    else selected the image.

4           THE COURT:  You saw the image that was posted before

5    it was posted?

6           THE DEFENDANT:  Yes, Your Honor.  But that's not

7    inconsistent.  I didn't choose the image.  I did post it.

8           THE COURT:  Go ahead.

9    BY MR. KRAVIS:

10   Q.  So, Mr. Stone, to make sure I understand your testimony, it

11   was another person, a volunteer, who selected the image, is

12   that correct?

13   A.  That is correct.

14   Q.  And you saw the image before it was actually posted on the

15   Instagram account?

16   A.  Yes, but I did not recognize the inappropriate -- or, the

17   potential implications of it.

18   Q.  Who picked this image?

19   A.  Well, nobody who works for me will live up to it, so I'm

20   uncertain.

21   Q.  So you don't know?

22   A.  I do not know.

23   Q.  How was the image conveyed to you by the person who

24   selected it?

25   A.  It was emailed to me or text-messaged to me.  I'm not

1    certain.

2    Q.  Who sent the email?

3    A.  I would have to go back and look.  I don't recognize.  I

4    don't know.  Somebody else uses my --

5              THE COURT:  How big is your staff, Mr. Stone?

6              THE DEFENDANT:  I don't have a staff, Your Honor.  I

7    have a few volunteers.  I also -- others use my phone, so I'm

8    not the only one texting, because it is my account and,

9    therefore, it's registered to me.  So I'm uncertain how I got

10   the image.  I think it is conceivable that it was selected on

11   my phone.  I believe that is the case, but I'm uncertain.

12             THE COURT:  So individuals, whom you cannot identify,

13   provide you with material to be posted on your personal

14   Instagram account and you post it, even if you don't know who

15   it came from?

16             THE DEFENDANT:  Everybody who works for me is a

17   volunteer.  My phone is used by numerous people because it can

18   only be posted to the person to whom it is registered.

19             THE COURT:  How large is your volunteer core?

20             THE DEFENDANT:  I have five or six people.

21             THE COURT:  And you're telling us that with all of

22   this attention that has been paid to this post, and the fact

23   that you're coming in here and testifying about it under oath,

24   and the fact that you say you received it electronically --

25             THE DEFENDANT:  Well, I think it was saved

1    electronically.

2              THE COURT:  And you don't know who gave it to you to

3    post?

4              THE DEFENDANT:  I do not, Your Honor.

5              THE COURT:  But you saw it and you said, "Okay, I'm

6    going to post this"?

7              THE DEFENDANT:  I didn't really recognize the

8    implications, as I said.  It was thoughtless.

9              THE COURT:  But you saw it and you said, "Okay, I'm

10   going to post this"?

11             THE DEFENDANT:  Yes.  It was an error, Your Honor.

12             THE COURT:  Proceed.

13   BY MR. KRAVIS:

14   Q.  Mr. Stone, did I hear you say a moment ago that you

15   believed the photo was emailed or texted?

16   A.  It was either emailed, texted, or just saved on my phone.

17   I'm really not certain.

18   Q.  Did you save those e-mails or texts?

19   A.  Prob -- well, I'm not certain how it was transmitted.  It

20   may have been saved on my phone.  When I post on Facebook or

21   Instagram -- I'm banned on Twitter -- my cell phone is used

22   because I'm the only one registered.  So, the image would be

23   saved on my phone and it would be posted.  I don't know, in all

24   honesty, how it was saved.

25             THE COURT:  When you say, "My phone is used," who's

1   the subject of that sentence?  The passive voice is not

2   helpful.  Who uses your phone to post?

3           THE DEFENDANT:  All of the people who work for me.

4           THE COURT:  They all have license to post on your

5   Ins --

6           THE DEFENDANT:  If I have them doing shares on

7   Facebook or working on Instagram, yes, Your Honor.

8           THE COURT:  All right.

9   BY MR. KRAVIS:

10  Q.  Have you gone back -- since the time that this post was put

11  up and taken down, have you gone back and asked the five or six

12  people who work for you --

13  A.  Who saved the images, and nobody will admit to it.

14  Q.  But you believe that you may have either the underlying

15  image --

16  A.  I --

17  Q.  Let me finish my question.  You believe that you may still

18  have either the underlying image saved to your phone or an

19  email or text message transmitting the image to you, is that

20  correct?

21  A.  It is possible.  I erased all the images of Your Honor

22  because I did not want to make the same mistake twice.

23  Q.  How many images did you have?

24  A.  They gave me two or three.

25  Q.  What were the others?

1    A.  I don't recall.

2              THE COURT:  You had a choice?

3              THE DEFENDANT:  It was random.  It was an error, Your

4    Honor.

5              THE COURT:  Okay.  I'm just trying to get to the

6    facts here.  We started with somebody else did it and you

7    didn't see it.  Then it was, "No, somebody else found it, but I

8    posted it."  Now you're telling me somebody else found more

9    than one image and you chose this one, is that correct?

10             THE DEFENDANT:  Just randomly, yes, Your Honor.

11             THE COURT:  You closed your eyes and picked?

12             THE DEFENDANT:  No, I just -- I do ten of these a

13   day.  I'm -- I'm trying to struggle with the situation.

14             THE COURT:  Randomly does not involve the application

15   of human intelligence.  You looked at multiple pictures and you

16   chose one, is that correct --

17             THE DEFENDANT:  Yes, but --

18             THE COURT:  -- or not correct?

19             THE DEFENDANT:  That is correct.

20             THE COURT:  All right.  Ask your next question.

21   BY MR. KRAVIS:

22   Q.  What are the names of the five or six volunteers that

23   you're referring to?

24   A.  I would -- Jacob Engles, Enrique Tarrio.  I would have to

25   go back and look.  I've had an influx of people helping me

1    since my indictment.

2    Q.  And your testimony is that since the time of this post you

3    went back and asked these people and have they all denied --

4    A.  I said, Who got me the photo?  Where did the photos come

5    from?  And nobody will own up to it.

6    Q.  But your testimony is that you were provided, in some form

7    or fashion, with multiple photographs of the judge, and you

8    selected the one that went on the post, is that correct?

9    A.  That is correct.

10   Q.  How about the text of the post?  Who wrote that?

11   A.  I wrote that.

12   Q.  The hashtag "fixisin," you wrote that?

13   A.  Yes, I did.

14   Q.  And the phrase "Obama-appointed judge," you wrote that,

15   too?

16   A.  Yes.  Yes, I did.

17   Q.  Now, Mr. Stone, you've described earlier -- oh, I'm sorry.

18   How -- what device was used to post this message on Instagram?

19   Was it your phone --

20   A.  My cell phone.

21   Q.  -- or other device?

22   A.  My cell phone.  Because all my other devices are in the

23   possession of the FBI.

24   Q.  And so your testimony is that there may have been another

25   volunteer who had access to your phone who put the images on

1    there and you selected from them, to use the phone to post the

2    message on Instagram?

3    A.  I'm sorry.  Ask the question again, please.

4    Q.  Your testimony is that someone else may have used your

5    phone to obtain the images --

6    A.  Yes.  Yes.

7    Q.  -- and then you used the same device to post the message on

8    Instagram?

9    A.  Yes.  Yes.  I do not exclusively use my own phone.  That's

10   what I'm saying.

11   Q.  Now, Mr. Stone, a moment ago I think I heard you

12   characterize the post here as a lapse in judgment.  Do I have

13   that correct?

14   A.  That is correct.

15   Q.  But what we're talking about here, it wasn't just one

16   isolated incident, was it?

17   A.  I'm not sure what you refer to.

18   Q.  On the same day of this post, after the post went up and

19   came down, you did an interview with a program called InfoWars.

20   Do I have that correct?

21   A.  Yes.  Yes.

22   Q.  And in that interview, you repeated the phrase Obama-

23   pointed judge, right?

24   A.  Yes, I did.

25   Q.  And in the interview you again referenced the Paul Manafort

1    case?

2    A.  I'm not certain.

3    Q.  And in that interview you again referenced, what you called

4    in the post, the Benghazi charges against Hillary Clinton?  You

5    used that phrase in the InfoWars interview again?

6    A.  It is likely, but I do not recall.

7    Q.  And the InfoWars interview was not the only interview you

8    gave in the time after the Instagram post, is that right?

9    A.  I don't recall another interview.

10   Q.  You gave an interview with CBS News, is that right?

11   A.  I did not.

12   Q.  Did you make a statement to CBS News?

13   A.  I put a statement out on my Instagram feed in which I tried

14   to explain the circumstances as I saw them.

15   Q.  Did you make a statement to CBS News that the statements in

16   the post were within your rights and factual?

17   A.  I don't believe I said the first part.  Perhaps the second

18   part.

19   Q.  Did you give a statement to the *Washington Post* that said

20   that you took down the -- you took down the post only because

21   the photograph was open to misinterpretation?

22   A.  I don't recall.

23   Q.  Did you give an interview or make a statement to the *Daily*

24   *Mail*?

25   A.  I did not.

1    Q.   In total, between the time that that Instagram post went up

2    and this hearing, how many statements have you made to media

3    organizations about the Instagram post?

4    A.   I'm aware of no others.

5              MR. KRAVIS:  May I have just a moment, Your Honor?

6              THE COURT:  Yes.

7              MR. KRAVIS:  Thank you.

8              THE COURT:  I do just want to confirm, Mr. Stone,

9    that in your --

10             THE DEFENDANT:  Your Honor, may I pour some water?

11             THE COURT:  Absolutely.  There should be some in

12   there.

13             THE DEFENDANT:  Thank you, Your Honor.

14             THE COURT:  Did you, in fact, during the InfoWars

15   interview, after you took the post down, state that this whole

16   set of circumstances was just an example of the media making

17   you a target?

18             THE DEFENDANT:  Well, I felt the media was falsely

19   saying that I was posing a danger, which was not my intention.

20   And this was not a crosshair from -- in my opinion.  And I did

21   not want to be blamed for something that was not my intention.

22   I had no malicious intention.  The words were poorly chosen.  I

23   explained the circumstances as -- I explained my lapse in

24   judgment and what cased it.

25             THE COURT:  I'm just saying, asking you:  Did you

1   tell InfoWars that this whole dispute over what had happened

2   with the post and all the attention that had been drawn to the

3   post was just another example of the media making you a target?

4   That's very different than saying, "It was a terrible, horrible

5   lapse of judgment for which I'm deeply sorry."  So I want to

6   know if you said that, as has been reported publicly, during

7   your InfoWars interview.

8          THE DEFENDANT:  What I said was I thought it was a

9   misinterpretation of my intention.  Nobody wanted to know -- I

10  was allowed no opportunity to defend myself.  It was just

11  immediately assumed that this was a crosshair, which I did not

12  believe it is.

13         Look, I regret the entire thing.  It was just an

14  error.  I did not have a malicious intent.  That was not my

15  intention.  It was inappropriate.  I realize it abused the

16  latitude you gave me.

17         THE COURT:  Can you just answer.  I've --

18         THE DEFENDANT:  Yes.  Yes.

19         THE COURT:  I've heard you say that and I'm going to

20  take everything you say into consideration --

21         THE DEFENDANT:  Okay.  Thank you, Your Honor.

22         THE COURT:  -- but I would really like an answer to

23  my specific question, which is:  Did you say in the interview

24  on InfoWars that this was just another example of the media

25  making you a target?

1              THE DEFENDANT:  Yes, because I didn't feel --

2              THE COURT:  That's a yes?

3              THE DEFENDANT:  Yes, Your Honor.  Yes.

4              THE COURT:  All right.  Go ahead.

5              THE DEFENDANT:  Thank you.

6    BY MR. KRAVIS:

7    Q.  Mr. Stone, I just have a few final questions about this

8    phone.  Who was with you, in your physical proximity, at the

9    time you posted the message to Instagram?  Was anyone?

10   A.  I would think so, yes.

11   Q.  Who?

12   A.  I don't recall.  I would have to go back and think about

13   it.

14   Q.  On the day of your Instagram post, did you give anyone else

15   your phone?

16   A.  Yes.

17   Q.  Who?

18   A.  Multiple people.

19   Q.  Name them.

20   A.  Let's see.  At some point Jacob Engles, I believe, had it.

21   I really don't -- I'm not certain.  I'm sorry.  I -- my house

22   is a -- like a headquarters.  I have many volunteers.

23              THE COURT:  I thought you said you had five.

24              THE DEFENDANT:  Five is a lot.

25              THE COURT:  Okay.  I just want to make sure that I

1    understood.

2                THE DEFENDANT:  Five is a lot for coming and going.

3                THE COURT:  All right.

4    BY MR. KRAVIS:

5    Q.  Mr. Stone, finally, does anyone have your Instagram login

6    and password information?

7    A.  Yes, I believe so.

8    Q.  Who?

9    A.  Mr. Engles.

10   Q.  Is Mr. Engles the only person?  Or is there someone else?

11   A.  He's the only one that I'm certain of.

12   Q.  What other social media accounts do you use besides

13   Instagram?

14   A.  Just Facebook.

15   Q.  Does anyone else have your login on Facebook?

16   A.  I'm uncertain.

17   Q.  Mr. Stone, you've mentioned a couple of times now the five

18   or six volunteers, but I've only heard two names.  Can you give

19   us the list of the five or six volunteers?

20   A.  I have Raymond Peres -- I can't really recall.  People come

21   and go.  They're all part of the same group.  Tyler White does

22   some posting for me, mostly on Facebook.  I'm sorry, I don't

23   recall the others.  It's a revolving situation.

24   Q.  You say it's a revolving situation, but we're talking about

25   a post from four days ago.  What was the list as of four days

1    ago?

2    A.  I've given you the names that I recall.

3    Q.  You're saying there are other names that you don't recall?

4    A.  I have had -- I would have to go back and examine -- I

5    mean, it has been a whirlwind, sir.  I would have to go back

6    and examine it.  I would have to think about who was there and

7    try to reconstruct it.

8    Q.  So as you sit here today you cannot remember the names of

9    all of the volunteers --

10   A.  Everybody who's --

11   Q.  Let me finish the question.  You cannot remember the names

12   of all the volunteers who were working for you four days ago?

13   A.  Correct.

14   Q.  You cannot remember the names of all the people who had

15   access to your cell phone four days ago?

16   A.  Correct.

17            MR. KRAVIS:  I have no further questions.

18            THE COURT:  All right.  Any redirect?

19                     REDIRECT EXAMINATION

20   BY MR. ROGOW:

21   Q.  Mr. Stone, when did you realize that this was a terrible

22   mistake that you made?

23   A.  After I got a text message from a *Daily Caller* reporter.

24   Not -- pardon me.  That's incorrect.  From a *Daily News*

25   reporter who said, "Why is there a crosshairs in the photo of

1    the judge that you posted?"  And I didn't know what he was

2    talking about.  I had to go back and look.  And I said that's

3    not what that is, because I didn't believe it is what it is --

4    was.

5    Q.  And what did you do once you got that call and you got that

6    look and you saw what appeared?

7    A.  First, I asked that it be cropped so there be no

8    misunderstanding, then I ordered it taken down.

9    Q.  And why did you order it taken down?

10    A.  Because I realized it was a stupid mistake and it was

11    abusing the judge's order.

12    Q.  So I come back to a question that I think I asked you

13    earlier:  What assurance can you give the Court, or any of us,

14    that something like this will not happen again?

15    A.  I can only beseech Your Honor that I will be more judicious

16    in my actions.  I will understand the order better.  I

17    obviously recognize that I'll be held responsible.  I owe you a

18    personal apology.  I've given you that, it's heartfelt and it

19    is sincere.  This was a screw-up.  I admit it.

20           MR. ROGOW:  Nothing further, Your Honor.

21           THE COURT:  Is it your position that he violated

22    either the order that was in place or the conditions of his

23    release?

24           MR. ROGOW:  No.

25           THE COURT:  What is your position on whether the

1    conditions of his release need to be modified?

2             MR. ROGOW:  They do not need to be modified, Your

3    Honor.  He has met all the probation requirements.  The

4    probation reports which have been filed with this Court show

5    that he has assiduously followed all the restraints imposed by

6    probation.  This is the only thing that has come up that has

7    caused him, and all of us, the concern that brings us to the

8    court this morning -- this afternoon.

9             THE COURT:  And what would you say to me the answer

10   to the question is about why I should be assured that incidents

11   like this would not happen in the future?

12            MR. ROGOW:  Sometimes a person gets a lesson, a

13   lesson that is very hard, especially a person who is used to

14   talking, who sometimes is unrestrained in his talking.  And a

15   lesson sometimes learned is a lesson that can be learned in the

16   future.

17            Obviously, Your Honor has power, if he violates the

18   concept here today that we're talking about, to take further

19   action.  But what we're asking is, is that he be allowed to

20   continue speaking, be allowed to remain under this Court's

21   order, with the warnings that this Court had.  And I think that

22   that's an important aspect of this.  He was warned.  And so,

23   really, what he's asking for is a second chance to conform to

24   what he should have conformed to from the very beginning.

25            There's no question -- you've heard him say it, you

1    hear me say it, you saw the notice of apology -- it was

2    completely inappropriate.  It should not have been done.  It's

3    not even close.  It is indefensible.  That's the simple part,

4    it's indefensible.

5              THE COURT:  I agree with you there.

6              All right.  Let me hear from the government.

7              You may step down, Mr. Stone.

8              THE DEFENDANT:  Thank you, Your Honor.

9              THE COURT:  I just want to make sure you've had the

10   opportunity to say everything you want to say on this subject.

11             THE DEFENDANT:  Yes, Your Honor.  Thank you.

12             THE COURT:  All right.

13             Do you have a position on what steps, if any, I

14   should take at this time?

15             MR. KRAVIS:  Your Honor, the government believes that

16   the facts of this case do warrant a further restriction on the

17   extrajudicial statements of the parties pursuant to Local

18   Criminal Rule 57.7(c).

19             Not a week ago the Court entered a very narrowly

20   tailored order that had very limited restrictions on those

21   extrajudicial statements, and a few days later here we are.

22   The government believes that in light of the facts that have

23   developed over the last few days, that those facts do support a

24   further restriction on the extrajudicial statements of the

25   parties.  And I would like to briefly just make a few points

1      about those facts.

2             The first is that we're not just talking here about

3      the photograph; there is also the text that accompanied the

4      Instagram post.  And that text amounted to an attack on the

5      integrity of this proceeding and this forum.  And the

6      defendant, even after he removed the post, continued to amplify

7      that message in the media by giving interviews, including the

8      interview to InfoWars, the statement to CBS News, the

9      statements to other media outlets to continue to amplify -- to

10     continue to amplify that message.  That conduct amounts to what

11     the Court in *United States versus Brown* referred to as, quote,

12     a desire to manipulate media coverage to gain favorable

13     attention, unquote, thereby threatening to taint the jury pool.

14            The defendant, even after the Instagram post was

15     taken down, continued to give interviews where he reiterated

16     the statements that appeared in the text of the message.  He

17     gave varying accounts of who was responsible for the post, what

18     the symbol meant, where it came from, so on and so forth.  And

19     every time the defendant gave another one of those interviews,

20     he continued to amplify the media coverage and increase the

21     risk -- increase the risk to the jury pool.

22            I would submit that the defendant's testimony at this

23     hearing was not credible.  I believe that the defendant's

24     testimony, that he -- and I wrote down the quotations:  That he

25     committed a lapse in judgment, that he was sorry, that he

1    regretted it, are belied by the facts that the defendant

2    himself testified to, which were that even after he supposedly

3    realized that the post was a mistake, he continued to give

4    interviews where he used the same phrases and put out the same

5    message, and continued to make statements to the media that

6    would amplify and continue to draw attention to that message.

7           Because the defendant's testimony at this hearing

8    about his -- about his conduct was not credible, and because

9    the defendant's conduct over the last few days has shown a

10   desire to manipulate media coverage to amplify public attention

11   to the messages that he is putting out, that run a risk of

12   tainting the jury pool, the government believes that those

13   facts would support a further restriction on extrajudicial

14   statements of the parties in this case.

15          THE COURT:  All right.  Looking at the Bail Reform

16   Act, however, under 18 U.S.C. Section 3142(g), when I'm

17   considering imposing conditions on someone's release, I'm

18   supposed to consider the available information concerning the

19   nature and circumstances of the charged offenses, the weight of

20   the evidence against the defendant, the history and

21   characteristics of the defendant, and the nature and

22   seriousness of the danger to any person or to the community

23   that would be posed by the defendant's release, or release

24   without certain conditions.

25          Is there anything you would like to bring to my

1    attention in that regard, assuming that I would be considering

2    making any restrictions on speech a condition of his release?

3             MR. KRAVIS:  Your Honor, the facts that I would bring

4    to the Court's attention are the facts and circumstances

5    surrounding the content of the post, in that whatever the

6    defendant's testimony about his subjective intentions may have

7    been, the result of his conduct was the wide dissemination of

8    an image that could be construed, could reasonably be construed

9    by people as a threatening image, and that introduces a new

10   threat of -- a new threat of taint to the -- taint to the jury

11   pool.

12            And because the conduct we're talking about now,

13   because the message we're talking about now are not just

14   messages about proclaiming innocence or articulating a defense,

15   but are messages that could be construed as threatening, the

16   government believes that the restriction on extrajudicial

17   statements would be appropriate under the Bail Reform Act.  But

18   to be clear, the government also believes that those

19   restrictions would be consistent with the First Amendment under

20   the Supreme Court's decision in *Gentile* and the cases that we

21   cited in our filing, applying *Gentile* to restrictions on

22   parties, as opposed to just attorneys.

23            THE COURT:  All right.  Thank you.

24            MR. KRAVIS:  Thank you, Your Honor.

25            THE COURT:  Mr. Rogow, is there anything you want to

1    say about the factors that I just listed that apply under 18

2    U.S. Code Section 3142(g).

3              MR. ROGOW:  Your Honor, I think that using 3146 as

4    the vehicle for further restraining him would not be

5    appropriate.  I understand that there are factors that can be

6    interpreted in a fashion, as the government has interpreted

7    them, to call for some further restraint on him.  But, I think

8    the jury pool argument, for example, I don't think is a

9    credible argument, now that we're months away from a jury

10   trial.  And I think that this one incident, with all of the

11   attention that it's gotten, has served the purpose of letting

12   everybody know that this kind of conduct is not defensible

13   conduct anywhere.

14             THE COURT:  In your original pleading you told me,

15   Don't worry, the attention to the original arrest and the

16   search warrant is going to subside.  And he has, he has

17   insisted that his name be in the paper every single day since

18   then.  So what possible basis would I have to conclude that the

19   media attention is going to subside?

20             MR. ROGOW:  I don't think media attention will

21   subside.  I was talking about that specific event, in terms of

22   the -- his arrest and the invasion of his home by the police

23   officers to arrest him, the FBI.  That's all I was talking

24   about then, because that was what was pertinent at the moment.

25             THE COURT:  No, you specifically said that I don't

1    have to worry about the jury pool being tainted because the

2    trial is a long time away, and there's been a rush of publicity

3    at the start, but it's going to subside.  And then he said

4    something publicly about every single one of those topics,

5    every single day thereafter.  So on what basis would that

6    forecast be believable?

7          MR. ROGOW:  It would be believable now, given that

8    he's brought before the Court --

9          THE COURT:  After he apologized, he continued talking

10   every single day.  So what will get him to stop talking, other

11   than a court order?

12         MR. ROGOW:  You and me telling him no more talking --

13         THE COURT:  I'm the court order.

14         MR. ROGOW:  Well, yes, but in a limited way.  There's

15   no question --

16         THE COURT:  How would you craft an order that he

17   would find clear enough to follow?

18         MR. ROGOW:  Will you give me some time to do it, Your

19   Honor?  Because it can be done.  It can be done by refining

20   what -- he should not be talking about this Court.  He should

21   not be talking about the special prosecutor.  He should not be

22   impugning the integrity of the Court.  That's what should be

23   done.  That's the nature of the order that I'm suggesting.

24         There are a lot of reasons why somebody may feel like

25   they should be talking about things like that.  But you and I

1    know, as officers of the court, judge of the court, this is not

2    appropriate.  And that, if we're going to have an order, that's

3    what I ask the Court to do.  If the Court is intent on crafting

4    something, then that is what should be crafted.

5            The press will talk about all kinds of things all the

6    time.  I mean, there's no question that they --

7            THE COURT:  I'm not trying to impose an order on the

8    press.

9            MR. ROGOW:  I understand.  But they are interested in

10   him, they're interested in this case.  And what I'm saying

11   is -- and that's what prompted -- I mean, it was outrageous to

12   see that picture, to see that text.  It was outrageous.  And

13   that's why, within hours, Your Honor had that apology on her

14   desk.

15           What I'm saying is if Your Honor is asking me to

16   craft an order, then that is what the order should say:  This

17   Court should not be criticized by Mr. Stone.  The government

18   should not be impugned by Mr. Stone.  The integrity of this

19   case should not be impugned by Mr. Stone.  We will defend this

20   case at the trial.  That's the time to defend this case.  And

21   that is the kind of nature of an order that I would suggest the

22   Court should craft that would address the specific needs that

23   we're talking about.

24           THE COURT:  All right.  I'm going to take a break to

25   try to absorb this, but I'm going to come back and rule.

1          You can all remain seated.  I expect that I will be

2     back in 15 minutes.  Thank you.

3          MR. ROGOW:  Thank you, Your Honor.

4          (Recess.)

5          THE COURTROOM DEPUTY:  Your Honor, recalling criminal

6     case No. 19-18, United States of America v. Roger Stone, Jr.

7          THE COURT:  All right.  Under the Bail Reform Act, 18

8     U.S. Code Section 3142(c), If the judicial officer determines

9     that release on personal recognizance or with an unsecured

10    appearance bond will not reasonably ensure the appearance of

11    the person as required -- which isn't an issue here -- or will

12    endanger the safety of any other person or the community, such

13    judicial officer shall order the pretrial release of the

14    person:  (A), subject to the condition that the person not

15    commit a federal, state, or local crime, and subject to the

16    least restrictive further condition, or combination of

17    conditions, that the judge determines will reasonably assure

18    the appearance of the person and the safety of any other person

19    and the community.

20         Those conditions can include any of 13 possible

21    conditions listed.  Among them are restrictions on

22    associations, which has First Amendment implications;

23    restrictions on contacts with witnesses, which has First

24    Amendment implications, and, also; (xiv) says the judge may

25    include an order that he satisfy any other condition that is

1      reasonably necessary to assure the safety of any other person

2      and the community.

3              Under Section 3142(g), in determining whether there

4      are conditions that will reasonably assure the safety of other

5      persons or the community, I'm supposed to take into account a

6      number of things, including the nature and circumstances of the

7      charged offenses, the weight of the evidence against the

8      defendant, the history and characteristics of the defendant,

9      and the nature and seriousness of the danger to any person, or

10     to the community, that would be posed by the defendant's

11     release.

12             In connection with that assessment, you can't

13     overlook the fact that this indictment does not charge the

14     defendant with financial or regulatory irregularities in

15     connection with some business deal a long time ago.  It's not

16     even limited to the allegations that he lied to the

17     United States Congress.  It specifically charges him with

18     threatening witnesses, within the past year.

19             Now, it's true those allegations have yet to be

20     proven.  But for purposes of Section 3142, the evidence

21     detailed in the indictment alone is quite compelling.  And the

22     evidence of the past few days indicates that this defendant has

23     not been chastened by the pendency of those charges, and that

24     in connection with this matter, he has decided to pursue a

25     strategy of attacking others.

1          Let me be clear, at the time of his post he was

2     permitted to criticize the special counsel, the designation of

3     the cases related, and the previous decisions of the judge to

4     whom the case had been assigned.  But I am not reassured by the

5     defense suggestion that Mr. Stone is just all talk and no

6     action and this was just a big mistake.

7          What concerns me is the fact that he chose to use his

8     public platform, and chose to express himself in a manner that

9     can incite others who may feel less constrained.  The approach

10    he chose posed a very real risk that others with extreme views

11    and violent inclinations would be inflamed.  You don't have to

12    read the paper beyond today to know that that's a possibility.

13         And these were, let there be no mistake, deliberate

14    choices.  I do not find any of the evolving and contradictory

15    explanations credible.  Mr. Stone could not even keep his story

16    straight on the stand, much less from one day to another.

17    There is some inconsistency in his telling me on the one hand

18    that these public communications are an existential endeavor,

19    essential not only to his income but his very identity, and

20    then, on the other hand, telling us, It wasn't me.

21         There was no discernible purpose to be served by

22    including any photograph in the post, if the full object of the

23    communication was to challenge the Office of Special Counsel's

24    related case filing, or to take issue with the Court's record

25    in a previous matter, or to solicit donations to a defense

1    fund.

2           But more to the point, the picture that was picked

3    was not selected randomly.  If the Judge's appearance alone was

4    important to convey some message, a Google search brings up

5    many unaltered photographs.  And a perfectly neutral photograph

6    can be found on the Court's website.

7           The defendant himself told me he had more than one to

8    choose from.  And so what he chose, particularly when paired

9    with the sorts of incendiary comments included in the text, the

10   comments that not only can lead to disrespect for the

11   judiciary, but threats on the judiciary, the post had a more

12   sinister message.  As a man who, according to his own account,

13   has made communication his forté, his raison d'être, his life's

14   work, Roger Stone fully understands the power of words and the

15   power of symbols.  And there's nothing ambiguous about

16   crosshairs.

17          And while, yes, it was appropriate that the post was

18   replaced, in the world of social media there really is no such

19   thing as a take-back.  Given the business he's in, the

20   defendant understands well that once you put something out

21   there, it's out there.  He's undoubtedly aware that even after

22   other individuals who have propagated incendiary allegations

23   have, quote, unquote, apologized for them, they have remained

24   in the public domain and consciousness and they have been

25   repeated and disseminated by others and they have inspired

1    violent reactions.

2         Defendant tells me this was a momentary lapse in

3    judgment, an egregious mistake.  I can't believe I was so

4    stupid.  Took it down the instant it dawned on me it could

5    possibly pose a problem, and I apologized right away.  And it's

6    true, yes, he signed the apology his lawyers wrote that day.

7         But he, admittedly, continued to adamantly defend the

8    post, even after he took it down, thereby enhancing the risk

9    that it would appeal to and stoke the passions of an angry

10   crowd, and demonstrating to me that it was the lawyers and not

11   Mr. Stone who were appalled.  So thank you, but the apology

12   rings quite hollow.

13        Now, the context of this behavior is important when

14   considering what to do about it.  Notwithstanding the

15   overwrought inaccurate news accounts that followed my order

16   last Friday, the order I imposed only prohibited lawyers from

17   making public statements about the case.  I did not impose an

18   order on the defendant, or the witnesses, restricting them from

19   making public statements about the case.  With the very limited

20   exception of a ban on pronouncements from the courthouse steps

21   and a gentle reminder that contacting witnesses and threats

22   fell outside the range of permissible speech in this case.

23        And, as he noted, I then accorded the defendant some

24   respect.  I gave him the chance to demonstrate that he

25   recognized the seriousness of these proceedings and the need

1    for them to proceed fairly and unimpeded.  The defendant

2    himself acknowledged this, stating publicly in an email that I

3    believe he sent to Politico.com:  I am pleased that the Judge's

4    order leaves my First Amendment right to defend myself in

5    public intact.  I will, of course, continue to be judicious

6    about my comments regarding the case.

7              That didn't last three days.  The privilege, the

8    liberty he was afforded was promptly abused.

9              You were right about that, Mr. Stone.

10             If the conduct of the past weekend is what Mr. Stone

11   would call judicious, it would be foolhardy for the Court to

12   take no action and wait around to see what injudicious looks

13   like.

14             For all these reasons, then, I find, pursuant to 18

15   U.S. Code Section 3142(c)(1), based on this record and the

16   Instagram post that will be entered under seal as part of the

17   record, that released under the current set of conditions

18   without modification does pose a danger to the safety of other

19   persons associated with this case or the community.

20             In addition, as the case law set forth in the

21   February 15 media communications order, at docket 36, explains,

22   I have a number of duties and responsibilities.  I have the

23   duty -- notwithstanding any steps that defendant takes to

24   frustrate this goal -- to preserve his right to a fair trial by

25   an impartial jury.

1        The publicity generated by the defendant's own

2    actions had precisely the effect I warned him about.  The

3    attempt to stoke up his followers also stoked up those who

4    disagree with his views.  And by continuing to ensure that he

5    would be the subject of a story, he provoked a series of

6    unflattering posts and comments in response to those stories.

7        When the defense asked me not to impose any

8    restrictions on the defendant, it assured me, on page 7 of its

9    submission, that, quote, the first wave of publicity, close

10   quote, considering the indictment and the execution of the

11   search warrant, quote, will subside, close quote.  And that the

12   Court's ability to seat a fair jury will not be compromised by

13   the press or by Mr. Stone.

14       That turned out quickly to be a highly inaccurate

15   prediction.  The publicity cannot possibly subside if it's the

16   defendant out there fanning the flames.  The Supreme Court case

17   law cited in my order also makes it clear that the

18   responsibility lies with me in the first instance to craft

19   appropriate rules to ensure that the trial does not devolve

20   into a circus.

21       The *Gentile* case and cases cited by the Office of

22   Special Counsel in its submission support the Court's ability

23   to impose restrictions on all participants, not just attorneys.

24   And the Supreme Court and the D.C. Circuit have also emphasized

25   the Court's responsibility.  It notes that order and decorum

1    and dignity are not just old fashioned pleasantries, they're

2    fundamental to the fair administration of justice, which enures

3    to the benefit of everyone, including the defendant.  And it's

4    my responsibility to uphold that order.  And it includes making

5    sure that the people who work in this building, the people who

6    need to access the building for their own cases, and

7    prosecutors, jurors, witnesses, parties -- and, yes, judges --

8    can come and go from this building safely.

9           So, no, Mr. Stone, I am not giving you another

10   chance.  I have serious doubts about whether you've learned any

11   lesson at all.  Therefore, the conditions of the defendant's

12   pretrial release are hereby modified to include the condition

13   that, and the February 15th, 2019 media communications order is

14   hereby modified to provide that, from this moment on, the

15   defendant may not speak publicly about the investigation or the

16   case or any of the participants in the investigation or the

17   case.  Period.

18          The prohibition includes, but is not limited to, no

19   statements about the case during radio broadcasts of his own.

20   No statements about the case during interviews on TV, on the

21   radio, with print reporters or on internet-based media.  No

22   press releases or press conferences.  No blogs or letters to

23   the editor.  No posts on Facebook, Twitter, Instagram, Snapchat

24   or any other form of social media.  And the defendant may not

25   comment publicly about the case indirectly, by having

1    statements made on his behalf by surrogates, family members,

2    spokespersons, representatives, or his, quote, many volunteers,

3    close quote.

4           You may send out as many emails, Tweets, posts as you

5    choose that say, Please donate to the Roger Stone defense fund

6    to help me defend myself against these charges.  And you may

7    add that you deny or are innocent of the charges, but that's

8    the extent of it.  You apparently need clear boundaries, so

9    there they are.

10          Please note that I am not prohibiting you from being

11   part of the public discourse or from earning a living.  You

12   told me yourself that you will not lose a cent of income if I

13   bar you from speaking about this case.  You may continue to

14   publish, to write, and to speak, and to be, as your lawyer put

15   it, a voice about any other matter of public interest; not this

16   case, not the people in it.  Not while you're under my

17   supervision.

18          Under U.S. Code Section 3142(c)(1) and (3), I find

19   that this additional condition is necessary and that it is the

20   least restrictive means possible to reasonably assure the

21   safety of persons associated with the case and the community.

22   I also find that the order is supported by all the reasons and

23   authority set out in my original media communication order.

24          Under Local Rule 57.7(c), I find that extrajudicial

25   statements by the defendant are likely to interfere with his

1    right to have a fair trial by an impartial jury.  And I further

2    find, based on this record, that additional public comments

3    about the case by this defendant pose a substantial risk of

4    material prejudice to the case and the due administration of

5    justice.

6              I agree with the special counsel that the effect and

7    very likely the intent of the post was to denigrate this

8    process and taint the jury pool.

9              What all this means, Mr. Stone, is that any violation

10   of this order will be a basis for revoking your bond and

11   detaining you pending trial.  So I want to be clear, today I

12   gave you a second chance.  But this is not baseball.  There

13   will not be a third chance.  If you cannot or will not or do

14   not comply with today's orders, I will find it necessary to

15   adjust your environment so that you don't have access to the

16   temptations posed by cameras, phones, computers and

17   microphones.

18             I fully recognize that you have, as you've

19   emphasized, the right to defend yourself.  But the charges are

20   not pending out there; they're pending in here.  I was told

21   that the government turned over a large volume of material, a

22   huge volume of material to the defense team, and there's a

23   considerable amount to review and it's going to take a lot of

24   effort.  Engaging with your lawyers in that effort is

25   fundamental to defending yourself.  So there's plenty of that

1    that you can do.  I will set a schedule for the filing of

2    motions and a trial date at the next status conference and that

3    should help you focus your attention on activities that do not

4    run afoul of my order.

5              Is there anything else I need to take up today on

6    behalf of the government?

7              MR. KRAVIS:  Nothing from the government, Your Honor.

8    Thank you.

9              THE COURT:  Anything further on behalf of the

10   defendant?

11             MR. ROGOW:  Nothing, Your Honor.

12             THE COURT:  Okay.  Thank you very much.

13                              *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6      and foregoing constitutes a true and accurate transcript of my

7      stenograph notes and is a full, true and complete transcript of

8      the proceedings to the best of my ability.

9                              Dated this 21st day of February 2019

10

11

12                          /s/_____

13                          Janice E. Dickman, CRR, RMR, CRC
                            Official Court Reporter
14                          Room 6523
                            333 Constitution Avenue NW
15                          Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25