## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ROGER J. STONE, JR.,

           Defendant.

**Case No.: 1:19-CR-00018-ABJ**

## DEFENDANT ROGER STONE'S MOTION TO DISMISS

Defendant, Roger Stone, moves to dismiss the Indictment against him on the following grounds:

1. Separation of Powers prevents the Special Counsel from indicting Mr. Stone for allegedly making materially false statements to the Legislative Branch, absent a Congressional referral;

2. The Special Counsel's actions *vis a vis* Roger Stone impermissibly violate the Appropriations Clause of the Constitution;

3. The Special Counsel Appointment violates the Vesting Clause of the Constitution;

4. The Special Counsel Appointment impermissibly encroaches upon the Executive Power in violation of the Take Care Clause of the Constitution;

5. The Special Counsel Appointment violates the Appointments Clause of the Constitution;

6. The Special Counsel Appointment is invalid because it was not commissioned by the President of the United States.

Dated: April 12, 2019

Respectfully submitted,

By: */s/*_____

L. PETER FARKAS
HALLORAN FARKAS & KITTILA, LLP
DDC Bar No.: 99673
1101 30th Street, NW
Suite 500
Washington, DC 20007
Telephone: (202) 559-1700
Fax: (202) 257-2019
pf@hfk.law


ROBERT C. BUSCHEL
BUSCHEL GIBBONS, P.A.
FL Bar No.: 006436
One Financial Plaza, Suite 1300
100 S.E. Third Avenue
Fort Lauderdale, FL 33394
Telephone: (954) 530-5301
Fax: (954) 320-6932
Buschel@BGlaw-pa.com
    *Admitted pro hac vice*


BRUCE S. ROGOW
FL Bar No.: 067999
TARA A. CAMPION
FL Bar: 90944
BRUCE S. ROGOW, P.A.
100 N.E. Third Avenue, Ste. 1000
Fort Lauderdale, FL  33301
Telephone: (954) 767-8909
Fax: (954) 764-1530
brogow@rogowlaw.com
tcampion@rogowlaw.com
    *Admitted pro hac vice*


GRANT J. SMITH
STRATEGYSMITH, PA
D.D.C. Bar No.: FL0036
FL Bar No.: 935212
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
Telephone: (954) 328-9064
gsmith@strategysmith.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No.: 1:19-CR-00018-ABJ |
| ROGER J. STONE, JR., | |
| Defendant. | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT ROGER STONE'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities

Prologue………………………………………………………………………………………...1

I.      Separation of Powers Prevents the Executive Branch Special Prosecutor from Prosecuting
        Stone for Allegedly Making False Statements to the Legislative Branch, Absent
        Congressional Referral………………………………………………………….……2

        A.   Prosecution Absent a Referral Invades the Investigative and Oversight Powers of
             Congress in Violation of Separation of Powers……………………….…………..…3

II.     The Appointment of the Special Counsel Violates the Appropriations Clause…………..4

        A.   The Independent Counsel Statute……………………………………………….…5

        B.   The Special Counsel Statute……………………………………………………..8

III.    The Executive Branch Investigating the President Violates the Vesting Clause………...16

IV.     Mueller's Appointment Impermissibly Encroaches Upon the Executive Power in
        Violation of the Take Care Clause……………………………….…………………18

        A.   Legal Background on the Take Care Clause………………………………………20

        B.   The Take Care Clause's Application to This Case…………………..…………24

        C.   Mueller's Investigation Encroaches Upon the President's Ability to Conduct Foreign
             Policy…………………………………..…………………………………………24

        D.   The Mueller Appointment Divides the Executive Branch Against Itself,
             Unconstitutionally Encroaching Upon the President's Ability to Take Care that the
             Laws are Faithfully Executed……………………………………………….…27

        E.   The Mueller Appointment is Invalid as it has Not Been Commissioned by the
             President……………………………………………………………..……29

V.      The Mueller Appointment is Invalid Because it Violates the Appointments Clause……30

VI.     Mueller's Appointment was Made Without Requisite Statutory Authority…………..31

        A.   In 1978, Congress Created a Detailed Law Addressing the Constitutional Issues
             Related to Appointing a Special Prosecutor to Investigate a Sitting President and
             Presidential Campaign………………………………………………………31

B. In 1999, Congress Determined that Title VI Should Expire, Ending the Role of Special Prosecutors Capable of Investigating Presidents and Their Campaigns…….32

C. The General Statutes Relied Upon by Acting Attorney General Rosenstein do not Authorize the Appointment of a Special Counsel Capable of Investigating President Trump and his Campaign……………………………………………………………34

    i.       Logic……………………………………………………………………35

    ii.      Statutory Construction…………………………………………………36

D. The Most Reasonable Interpretation of 28 U.S.C. §§ 509, 510, and 515……………37

E. The Constitution Provides the Remedy…………………………………………...37

Conclusion…...……………………………………………………………………………..41

Certificate of Service………………………………………………………………………43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. Wright,*
    468 U.S. 737, 104 S.Ct. 3315 (1984)…………………………………………...17, 22

*Anderson v. Dunn,*
    19 U.S. 204 (1821)………………………………………………………………...4

*Barenblatt v. United States,*
    360 U.S. 109, 79 S.Ct. 1081 (1959)…………………………………………...............3

*Bowsher v. Synar,*
    478 U.S. 714, 106 S.Ct. 3181(1986)………………………………………………..17

*Brady v. Maryland*,
    3737 U.S. 83, 83 S.Ct. 1194 (1964)………………………………………………….1

*Clinton v. Jones,*
    520 U.S. 681, 117 S.Ct. 1636 (1997)………………………………………………22

*Clinton v. New York,*
    524 U.S. 417, 118 S.Ct. 2091 (1998)………...…………………………………………..2

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249, 112 S. Ct. 1146 (1992)………………………………………………36

*Dames & Moore v. Regan,*
    453 U.S. 654, 101 S.Ct. 2972 (1981)………………………………………..………25

*Dep't of the Air Force v. FLRA,*
    648 F.3d 841 (D.C. Cir. 2005)……………………………………………...………14

*Dep't of the Navy v. Egan,*
    484 U.S. 518, 108 S.Ct. 818 (1988)…………………………………..……………25

*\*Edmond v. United States*,
    520 U.S. 651, 117 S.Ct. 1573 (1997)………………………………………………30

*Franklin v. Massachusetts,*
    501 U.S. 788, 112 S.Ct. 2767 (1992)……………………………………...…18, 34

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477, 130 S.Ct. 3138 (2010)……………………………………………17, 22, 28

*Haig v. Agee,*
    453 U.S. 280, 101 S.Ct. 2766 (1981)………………………………………………25

*Harlow v. Fitzgerald,*
    457 U.S. 800, 102 S.Ct. 2727 (1982)……………………………………..……..25

*Heckler v. Chaney,*
    470 U.S. 821, 105 S.Ct. 1649 (1985)………………………………………...……..23

\*In re Grand Jury Investigation,
    315 F.Supp.3d 602 (D.D.C. 2018)…………………..…..…………………………….8, 10

\*In re Grand Jury Investigation,
    916 F.3d 1047 (D.C. Cir. 2019)……………………………………………...8, 13, 30

\*Lucia v SEC,
    138 S. Ct. 2044 (2018)…………………………………………………………...31

*Lujan v. Def. of Wildlife,*
    504 U.S. 555, 112 S.Ct. 2130 (1992)…………………………………..…………17, 22

*Marbury v. Madison,*
     5 U.S. 137 (1803)……………………………………………………...…29, 30

*McGrain v. Daugherty,*
    273 U.S. 135, 47 S.Ct. 319 (1927)………………………………………………...3

\*Morrison v. Olson,
    487 U.S. 654, 108 S.Ct. 2597 (1988)……………………………………...6, 7, 24, 32

\*Myers v. United States,
    272 U.S. 52, 47 S.Ct. 21 (1926)………………………………………………20, 21, 22

*Nardone v. United States,*
    308 U.S. 338, 60 S.Ct. 266 (1938)……………………………………..………27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519, 132 S.Ct. 2566 (2012)…………………………………………...…..27

*Nevada v. Dep't. of Energy,*
    400 F.3d 9 (D.C. Cir. 2005)………………………………………………..……14

*New York v. United States*,
　　505 U.S. 144, 112 S.Ct. 2408 (1992)……………………………………………………27

*\*Office of Personnel Mgmt., v. Richmond*
　　494 U.S. 414, 110 S.Ct. 2465 (1990)………...………………………………5, 12, 13, 14

*Printz v. United States,*
　　521 U.S. 898, 117 S.Ct. 2365 (1997)……………………………………….....17, 23, 28

*Rochester Pure Waters Dist. v. EPA*
　　960 F.2d 180 (D.C. Cir. 1992)…………………………………………………...…14

*Rogers v. United States,*
　　185 U.S. 83, 37 S.Ct. 582(1902)……………………………………………………37

*United States v. Armstrong,*
　　517 U.S. 456, 116 S.Ct. 1480 (1996)………………………………………….......23

*United States v. Concord Mgmt. & Consulting, LLC,*
　　317 F.Supp.3d 598 (D.D.C. 2018)…………………………………………………30

*United States v. Curtiss-Wright Exp. Corp.,*
　　299 U.S. 304, 57 S.Ct. 216 (1936)…………………………………………………25

*\*United States v. Libby*,
　　429 F. Supp. 2d 27 (D.D.C. 2006)………………………………………...…12, 37

*United States v. Manafort,*
　　312 F.Supp.3d 60 (D.D.C. 2018)……………………………………………....8, 9

*United States v. Manafort,*
　　321 F.Supp.3d 640 (E.D. Va. 2018)………………………………...………9, 10

*\*United States v. McIntosh,*
　　833 F.3d 1163 (9th Cir. 2016)……………………………………...…4, 5, 16

*United States v. Nixon,*
　　418 U.S. 683, 94 S.Ct. 3090 (1974)……………………………………..…………17

*\*U.S. Dep't of Navy v. Fed. Labor Relations Auth.,*
　　665 F.3d 1339 (D.C. Cir. 2012)……………………………………...…………13, 15

*United States House of Representatives v. Burwell,*
　　185 F.Supp.3d 165 (D.D.C. 2016)………………………………………....14, 15

*Watkins v. United States,*
 354 U.S. 178, 77 S.Ct. 1173 (1957)………………………………………............3

*Wong Sun v. United States,*
 371 U.S. 471, 83 S.Ct. 407 (1963)………………………………………….....27

**STATUTES**

18 U.S.C. § 922(s)(2)……………………………………………………….…23

28 U.S.C. § 49………………………………………………………………5, 31

28 U.S.C. § 509……………………………………………...8, 19, 20, 25, 26, 34, 35, 36, 37

28 U.S.C. § 510……………………………………………....19, 20 , 25, 26, 34, 35, 36, 37

28 U.S.C. § 515………………………………………………19, 20, 25, 26, 34, 35, 36, 37

28 U.S.C. § 591……………………………………………5, 8, 12, 13, 15, 16, 31

28 U.S.C. § 592………………………………………………………….5, 8, 31

28 U.S.C. § 592(b)(1)………………………………………………………….6

28 U.S.C. § 592(d) ……………………………………………………………..6

28 U.S.C. § 592(g)(1)……………………………………………………….…..7

28 U.S.C. § 592(g)(2)…………………………………………………………..7

28 U.S.C. § 593……………………………………………………….5, 8, 31

28 U.S.C. § 593(b)………………………………………………………….....6

28 U.S.C. § 593(b)(2)………………………………………………………….13

28 U.S.C. § 594……………………………………………………….5, 8, 31

28 U.S.C. § 594(a)……………………………………………………………...6

28 U.S.C. § 594(a)(1)………………………………………………………….6

28 U.S.C. § 594(a)(2)………………………………………………………….6

28 U.S.C. § 594(a)(3)………………………………………………………….6

28 U.S.C. § 594(a)(4)……………………………………………….……………..6

28 U.S.C. § 594(a)(5)……………………………………………….……………..6

28 U.S.C. § 594(a)(6)……………………………………………….……………..6

28 U.S.C. § 594(a)(7)……………………………………………….……………..6

28 U.S.C. § 594(a)(9)……………………………………………….……………..6

28 U.S.C. § 594(a)(9)……………………………………………….……………..6

28 U.S.C. § 594(d)……………………………………………….………………..6

28 U.S.C. § 595………………………………………………..……………5, 8, 31

28 U.S.C. § 595(a)(1)……………………………………………….……………..7

28 U.S.C. § 595(a)(2)……………………………………………….……………..7

28 U.S.C. § 595(c)……………………………………………….………………...7

28 U.S.C. § 596……………………………………………………..…….5, 8, 31

28 U.S.C. § 597……………………………………………………....…5, 8, 31

28 U.S.C. § 598………………………………………………………..……5, 8, 31

28 U.S.C. § 599…………………………………………………………….…5, 8

28 U.S.C. §1406(a)…………………………………………………..……...8

31 U.S.C. § 1301…………………………………………………………...….13

31 U.S.C. § 1301(d)…………………………………………………………....13

31 U.S.C. § 1304(a)…………………………………………………………….15

31 U.S.C. § 1305(2)…………………………………………………………….15

31 U.S.C. § 1341…………………………………………………………..……15

31 U.S.C. § 1341(a)(1)(A)…………………………………………………….15

31 U.S.C. § 1341(a)(1)(B)…………………………………………………....15

31 U.S.C. § 1350……………………………………………………………………....15

**OTHER AUTHORITIES**

Att'y Gen. Order No. 554-73, reprinted in Special Prosecutor: Hearings Before the Senate
Comm. on the Judiciary, 93d Cong., 1st Sess. 575 (1973)……………………………………38

Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 GEO. L.J. 2133
(1998)…………………………………………………………………………………....39, 40

Cynthia Brown & Jared P. Cole, Cong. Research Serv., R44857, Special Counsel Investigations:
History, Authority, Appointment and Removal at 8 (2019)……………………………………7

Dep. Att'y. Gen. Rod Rosenstein, Appointment of Special Counsel to Investigate Russian
Interference with the 2016 Presidential Election and Related Matters, Order No. 3915-2017 (May
17, 2017)……………………………………………………………………………………11

Dep't of Justice, Special Counsel's Office Statement of Expenditures October 1, 2017 through
March 31, 2018……………………………………………………………...……………11, 12

Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction,* 11 HARV. J.L. &
PUB. POL'Y 59 (1988)……………………………………………………………………36

Franklin Foer, *The Collusion With Russia Is in Plain Sight: What did Donald Trump say to
Vladimir Putin when no one else could hear them?,* THE ATLANTIC (Jan. 13, 2019),……..25

Joseph Story, Commentaries on the Constitution of the United States (3d 1858)…………..….5

L. Elaine Halchin & Frederick M. Kaiser, Cong. Research Serv., 97-936, Congressional
Oversight (2012)……………………………………………………………………………..4

Matthew Rosenberg, *Ex-Chief of C.I.A. Suggests Putin May Have Compromising Information on
Trump,* THE NEW YORK TIMES (Mar. 21, 2018),……………………………...……………25

Memorandum from Bill Barr on Mueller's "Obstruction" Theory to Deputy Att'y Gen. Rod
Rosenstein and Assistant Att'y Gen. Steve Engel (June 8 2018)……………...…………18, 19

*Oversight of the State Dep't, Hearing Before the Comm. on Oversight and Reform,* 114th
Congress (2016) (statement of James B. Comey, Dir. Federal Bureau of Investigation)………...2

P.L. 79-601, The Legislative Reorganization Act of 1946……………………………………4

P.L. 97-409, January 3, 1983……………………………………………………….…………33

P.L. 100-191, December 15, 1987……………………………………………………………33

P.L. 100-202 (1987)……………………………………………………..…………………….15

P.L. 103-270, June 30, 1994……………………………………………………………...…..33

Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 102 (1984)……………………………………..3

Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Unlawful*, 95 NOTRE DAME L. REV – (2019)……………………………………………………..41

THE FEDERALIST NO. 51 (James Madison)……………………………………………………14

THE FEDERALIST NO. 70 (Alexander Hamilton)………………………………………...…27, 28

THE FEDERALIST NO. 74 (Alexander Hamilton)……………………………………………25

*The Independent Counsel Act, Hearing Before the Subcomm. on Commercial and Administrative Law, on the Judiciary*, 106th Congress (1999) (prepared remarks of Dep. Att'y. Gen. Eric Holder). ..……………………………………………………………………………………….7

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO B302582, SPECIAL COUNSEL AND PERMANENT INDEFINITE APPROPRIATION (2004)…………………………………………………..………11, 13

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-04-261SP, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, (Vol. I) (3d ed. 2004)………………………………………………..…..14

U.S. GOV'T PRINTING OFFICE, WATERGATE SPECIAL PROSECUTION FORCE: REPORT (1975)…….40

Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress, 32 Op. O.L.C. 65 (2008)…………………………………………………………………….3

**REGULATIONS**

28 C.F.R. Part 600…………………………………………………………………8, 11, 12, 13

28 C.F.R. § 600.1………………………………………………...……………………………8, 9, 37

28 C.F.R. § 600.3………………………………………………………………………………8, 9

28 C.F.R. § 600.4………………………………………………………………………………8, 9

28 C.F.R. § 600.5………………………………………………………………...……………..8, 9

28 C.F.R. § 600.6………………………………………………………………………...…..8, 9

28 C.F.R. § 600.7…………………………………………………………….….8, 9, 10

28 C.F.R. § 600.7(b)…………………………………………………………...10

28 C.F.R. § 600.8………………………………………………………...…..8, 9

28 C.F.R. § 600.8(a)(1)…………………………………………………….…11

28 C.F.R. § 600.8(a)(2)…………………………………………………….…11

28 C.F.R. § 600.9………………………………………...………………..8, 9

28 C.F.R. § 600.10……………………………………………….………..8, 9

28 C.F.R. Part 601……………………………………………………………..8

28 C.F.R. Part 602……………………………………………………………...9

28 C.F.R. Part 603……………………………………………………………..9

Office of Special Counsel, 64 Fed. Reg. 37,038-01 (July 9, 1999) (codified as 28 U.S.C. §§ 600.1-600.10)……………………………………………………………...8, 9

## CONSTITUTIONAL PROVISIONS

 U.S. CONST. art. I, § 2, cl. 5……………………………………………………..38

U.S. CONST. art. I, § 3, cl. 6………………………………………………...38

U.S. CONST. art. I, § 2, cl. 7………………………………………………...38

U.S. CONST. art. I, § 8……………………………………………….…4, 22, 27, 30, 31

U.S. CONST. art. 1, § 9, cl. 7.  ………………………………….......………4, 13, 14, 16

U.S. CONST. art. II……………………………………………………………..25

U.S. CONST. art. II, ¶ 1…………………………………..………………16, 18, 20

U.S. CONST. art. II, § 2…………………………………………………..23

U.S. CONST. art. II, § 3…………………………………17, 18, 20, 21, 22, 23, 24, 27, 29, 30

U.S. CONST. art. II, § 4………………………………………………………...38

U.S. Const. art. III………………………………………………………………………....…..22

**PROLOGUE**

Roger Stone is entitled to access to the full, unredacted Report of Special Counsel Robert

S. Muller, III, pursuant to the Fifth and Sixth Amendments to the Constitution of the United States

and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). No other person, Committee, or entity

has Stone's constitutionally based standing to demand the complete, unredacted Report.

The Fifth Amendment guarantees Stone "due process of law." The Sixth Amendment

guarantees Stone the right "to be informed of the nature and cause of the accusation; to be

confronted with the witnesses against him; to have compulsory process for obtaining witnesses in

his favor." *Brady* and its progeny require that evidence favorable to the accused be provided to

him or her.

Stone's prosecution is the direct outgrowth of the Special Counsel Investigation. He is the

last vestige of the investigation; an investigation which employed 19 lawyers, 40 FBI agents and

other staff, an investigation that issued more than 2,800 subpoenas, executed 500 search warrants,

obtained more than 230 orders for communication records, 50 pen register authorizations, and

interviewed approximately 500 witnesses.

Only by reviewing the full, unredacted Mueller Report can Roger Stone be assured of his

rights to due process, to compulsory process, to know the exculpatory evidence, to determine

whether or not he is being selectively prosecuted. The Special Counsel Report may be of political

interest to many. It may be of commercial interest to others. It may be of public interest to some.

But for Roger Stone, the Special Counsel's Report is a matter of protecting his liberty. Only by

full disclosure to him, can he determine whether the Report contains material which could be

critical to his defense.

Therefore Roger Stone, in addition to the reasons set forth below for dismissing the

Indictment against him, expressly requests that the Court order the government to provide him

with the Special Counsel's full, unredacted Report. In addition, he expressly reserves the right to

add any additional grounds which may arise after publication of the Report, redacted, unredacted,

or otherwise.

I.    **Separation of Powers Prevents the Executive Branch Special Prosecutor from Prosecuting Stone for Allegedly Making Material False Statements to the Legislative Branch, Absent Congressional Referral.**

The separation of powers between the legislative, executive and judicial branches is

fundamental to our constitutional system. *Clinton v. New York,* 524 U.S. 417, 450, 118 S. Ct. 2091,

2109(1998) (Kennedy, J.,) (concurring). Each branch is required to respect the scope of power of

the other two branches.  Part of this mutual respect has traditionally been that the Executive Branch

not act as if on "road patrol" looking to police proceedings of the Legislative Branch for criminal

behavior. It may only act upon alleged criminal activity impacting the Legislative Branch upon

the receipt of a "referral" from Congress. As stated by former FBI Director James Comey in his

July, 2016 testimony before a House Oversight and Government Reform Committee hearing

regarding the Federal Bureau of Investigation's ("FBI") inquiry of the potential mishandling of

classified information:

> We, out of respect for the legislative branch being a separate branch,
> we do not commence investigations that focus on activities before
> Congress without Congress asking us to get involved. That's a long-
> standing practice of the Department of Justice and the FBI.  So we
> don't watch on TV and say we ought to investigate that, Joe Smith
> said this -- in front of the committee. It requires the committee to
> say, "We think we have an issue here; would you all take a look at
> it?"[1]

---

[1]    *Oversight of the State Dep't, Hearing Before the Comm. on Oversight and Reform,* 114th
Congress (2016) (statement of James B. Comey, Dir. Federal Bureau of Investigation).

### A. Prosecution Absent a Referral Invades the Investigative and Oversight Powers of Congress in Violation of Separation of Powers.

The Department of Justice has long taken the position that prosecutorial discretion rests solely with the Executive Branch, and that Congress cannot force the FBI to conduct an investigation, or force the Department to institute a prosecution.[2]   Comity among the three coequal branches supports the proposition that the Department cannot police Congress, and prosecute potential violations which Congress has not referred for prosecution.   To do so would allow the Executive Branch to invade and impede Congress' right to conduct inquiries, a key aspect of the legislative function.

*McGrain v. Daugherty*, 273 U.S. 135, 174, 47 S. Ct. 319 (1927), held that "the power of inquiry -- with process to enforce it -- is an essential and appropriate auxiliary to the legislative function." *See also Watkins v. United States*, 354 U.S. 178, 187, 77 S. Ct. 1173, 1179 (1957), and *Barenblatt v. United States*, 360 U.S. 109, 111, 79 S. Ct. 1081, 1085 (1959). The investigative power of Congress goes hand in hand with Congress' oversight power.   Numerous committees and subcommittees of the House and Senate engage in investigative and oversight hearings on a routine

---

[2]      *See* Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress, 32 Op. O.L.C. 65 (2008), which states that "as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred." (quoting Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 102 (1984)).

3

basis.[3]  These Congressional powers are implied from both the Article I, Section 8 enumerated powers, as well as the necessary and proper clause.  Investigation and oversight have been upheld by a series of cases dating back to at least 1821, and have been explicitly authorized by statute since 1946.[4] To allow the Executive Branch to roam the Halls of Congress to look for prosecutable offenses *sans* a referral from the Legislative Brach would violate the separation of powers doctrine. There has been no referral by the Legislative Branch. Indeed, the alleged offense occurred nearly two years ago and nary a word was ever said by the Committee before which the alleged false statement was made.

## II.        The Appointment of the Special Counsel Violates the Appropriations Clause.

The Appropriations Clause provides: "No money shall be drawn from the Treasury, but in Consequences of Appropriations made by Law." Article I, Section 9, Clause 7. This Special Counsel's Office was not funded by monies approved by Congress; rather, the Department of Justice is funding the investigation from an unlimited account established in 1987 to pay for *independent* counsels.

This Special Counsel's Office budget and funding were not congressionally approved. Because it was not congressionally approved, its funding is in violation of the Constitution. Since the investigation violates a fundamental clause of the Constitution authorizing congressional oversight, it lacks authority to investigate and prosecute Roger Stone. The law provides that the

---

[3]        *See generally*, L. Elaine Halchin & Frederick M. Kaiser, Cong. Research Serv., 97-936, Congressional Oversight (2012), available at: https://fas.org/sgp/crs/misc/97-936.pdf.

[4]        *Anderson v. Dunn, 19 U.S. 204 (1821); See also*, The Legislative Reorganization Act of 1946 (P.L. 79-601).

indictment should be dismissed and the prosecution enjoined. *See United States v. McIntosh,* 833

F.3d 1163, 1175 (9th Cir. 2016):

> The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425, 110 S. Ct. 2465. The Clause has a "fundamental and comprehensive purpose … to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Id.* at 427-28, 110 S. Ct. 2465. Without it, Justice Story explained, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure." *Id.* at 427, 110 S. Ct. 2465 (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

**A.  The Independent Counsel Statute.**

The Supreme Court described the appointment, investigative, and prosecutorial procedures

of the Independent Counsel statute as follows:

> Title VI of the Ethics in Government Act (Title VI or the Act), 28 U.S.C. §§ 591–599 (1982 ed., Supp. V), allows for the appointment of an "independent counsel" to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws.

>  The Act requires the Attorney General, upon receipt of information that he determines is "sufficient to constitute grounds to investigate whether any person [covered by the Act] may have violated any Federal criminal law," to conduct a preliminary investigation of the matter. When the Attorney General has completed this investigation, or 90 days has elapsed, he is required to report to a special court (the Special Division) created by the Act "for the purpose of appointing independent counsels." 28 U.S.C. § 49 (1982 ed., Supp. V).

> If the Attorney General determines that "there are no reasonable

5

grounds to believe that further investigation is warranted," then he must notify the Special Division of this result. In such a case, "the division of the court shall have no power to appoint an independent counsel." § 592(b)(1). If, however, the Attorney General has determined that there are "reasonable grounds to believe that further investigation or prosecution is warranted," then he "shall apply to the division of the court for the appointment of an independent counsel."

The Attorney General's application to the court "shall contain sufficient information to assist the [court] in selecting an independent counsel and in defining that independent counsel's prosecutorial jurisdiction." § 592(d). Upon receiving this application, the Special Division "shall appoint an appropriate independent counsel and shall define that independent counsel's prosecutorial jurisdiction." § 593(b).

*Morrison v. Olson,* 487 U.S. 654, 660-661, 108 S.Ct. 2597, 2603(1988).

Title VI was at the time, and remained until its expiration, the only law that specifically allowed the investigation of a sitting President and Presidential Campaign. But Congress determined that the law should expire in 1999, and has not reenacted it. The independent counsel was vested with "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice" with respect to matters within their jurisdiction. *Id.* at 662; 28 U.S.C. § 594(a). The independent counsel has authority to conduct investigations and grand jury proceedings, to obtaining and reviewing tax returns, to carrying out prosecutions. *Id.*; 28 U.S.C. §§ 594 (1)-(9). The independent counsel could request assistance from the Department in the course of the investigation, including access to materials relevant to the relevant inquiry and necessary resources and personnel. *Id.*; 28 U.S.C. §594(d).

Even with controversy about the over-extension of power to and insufficient supervision and oversight of the independent counsel, congressional oversight was in place.

6

> Finally, the Act provides for congressional oversight of the activities of independent counsel. An independent counsel may from time to time send Congress statements or reports on his or her activities. § 595(a)(2). The "appropriate committees of the Congress" are given oversight jurisdiction in regard to the official conduct of an independent counsel, and the counsel is required by the Act to cooperate with Congress in the exercise of this jurisdiction. § 595(a)(1). The counsel is required to inform the House of Representatives of "substantial and credible information which [the counsel] receives ... that may constitute grounds for an impeachment." § 595(c). In addition, the Act gives certain congressional committee members the power to "request in writing that the Attorney General apply for the appointment of an independent counsel." § 592(g)(1). The Attorney General is required to respond to this request within a specified time but is not required to accede to the request. § 592(g)(2).

*Morrison*, 487 U.S. at 665.

Over the years, there were concerns over whether the independent counsel possessed too much power after the Iran-Contra and Whitewater investigations. *See* Exhibit 1, *Special Counsel Investigations: History, Authority, Appointment and Removal,* at 8.[5] Even the then-Deputy Attorney General Eric Holder testified: "Independent counsel are largely insulated from any meaningful budget process, competing public duties, time limits, accountability to superiors and identification with the traditional long-term interests of the Department of Justice. *See* Exhibit 2, *[t[he Independent Counsel Act, Hearing Before the Subcomm. on Commercial and Administrative Law, on the Judiciary*[6].

---

[5]     Cynthia Brown & Jared P. Cole, Cong. Research Serv., R44857, Special Counsel Investigations: History, Authority, Appointment and Removal at 8 (2019).

[6]     *The Independent Counsel Act, Hearing Before the Subcomm. on Commercial and Administrative Law, on the Judiciary*, 106th Congress (1999) (prepared remarks of Dep. Att'y. Gen. Eric Holder).

The Special Counsel statute provides a different framework but enables the Special Counsel to investigate and prosecute without providing the direct and ongoing congressional oversight as required by the independent counsel's statute under § 591. Title 28 U.S.C. Sections 509, 510, and 515, passed into law in 1966, remain general provisions that do not contemplate the appointment of a Special Counsel to investigate potential criminal actions by the President of the United States or a Presidential Campaign.

Congress presently must subpoena a copy of the Mueller report and will receive a version at the discretion of the Attorney General. Thus, the only oversight provided to Congress by the Special Counsel statute and accompanying regulations would be the power to appropriate spending.

## B. The Special Counsel Statute.

"There is a federal statute that governs who may litigate cases in the name of the United States, and provides for the appointment of the Special Counsel." *United States v. Manafort,* 312 F.Supp.3d 60, 68-69 (D.D.C. 2018) (Berman Jackson, J.,) (citing 28 U.S.C. § 509). As described earlier, prior to the enactment of the special counsel statute, there was an independent counsel statute. *In re Grand Jury Investigation,* 916 F.3d 1047, 1050 (D.C. Cir. 2019), aff'd, 916 F.3d 1047 (D.C. Cir. 2019) (citing 28 U.S.C. §§ 591-599 (expired)). Then as the independent counsel provisions of the Ethics in Government Act expired in 1999, the Attorney General promulgated the Office of the Special Counsel regulations to "replace" the Act. *Id.* (citing Office of Special Counsel, 64 Fed. Reg. 37,038, 37,038 (July 9, 1999) (published at 28 C.F.R. §§ 600.1–600.10).[7]

---

[7]     Part 600, Title 28 of the Code of Federal Regulations govern the general power of the special counsel. Part 601 governed the jurisdiction of the independent counsel for *Iran/Contra* investigation; part 602 governed the jurisdiction of *Franklyn C. Nofziger*; part 603 governed the jurisdiction of the independent counsel re: *Madison Guaranty Saving & Loan Association.*

*See also Manafort,* 312 F.Supp.3d at 68-69 (Berman Jackson, J.,). The Independent Counsel statute was permitted to sunset in the hopes that the use of the statute would not be used to pursue politically partisan agendas, rather than a means of assuring accountability in government. *United States v. Manafort*, 321 F. Supp. 3d 640, 647–48 (E.D. Va. 2018) (Ellis, J.,).

"The Department of Justice has promulgated a set of regulations concerning the appointment and supervision of Special Counsel appointed pursuant to section 515." *Manafort,* 312 F.Supp.3d at 69 (citing General Powers of Special Counsel, 28 C.F.R. §§ 600.1-600.10, citing 5 U.S.C. §301; 28 U.S.C. §§ 509, 510, 515-519)). "The Department published the regulations in 1999 to 'replace the procedures set out in the Independent Counsel Reauthorization Act of 1994.'" *Id.* (citation omitted). The regulations provide that a Special Counsel be appointed when the Attorney General determines there is a criminal investigation of a person or matter is warranted, that assigning a United States Attorney or other lawyer within the Department would present a conflict of interest for the Department, or "other extraordinary circumstances." *Id.* (citing 28 C.F.R. §600.1)). The Special Counsel must be appointed from outside the Department, with a "reputation for integrity and impartial decision-making," with "appropriate experience" to conduct the specific investigation, and understands the criminal law and the Department's policies." *Id.* (citing 28 C.F.R. §600.3)).

The Attorney General or in this case, his designee, defined the scope of the Special Counsel's jurisdiction. *Id.* (citing 28 C.F.R. § 600.4)). Once the Special Counsel's jurisdiction has been established, he has "full power and independent authority" to exercise all investigative and prosecutorial functions of a United States Attorney." *Id.* at 70. (citing 28 C.F.R. § 600.6)). As opposed to the prior Independent Counsel, the Special Counsel "remains subject to oversight by

the Attorney General." *Id.* "The Special Counsel's authority is not clearly greater than the Independent Counsel's, and arguably is lesser." *In re Grand Jury Investigation,* 315 F.Supp.3d at 641. What is clear, however, is that the authority given is different.

The Special Counsel should consult with the Department for "guidance with respect to practices and procedures" within the Department or Attorney General, unless such consultation would be "inappropriate." *Manafort,* 312 F.Supp.3d at 68-69 (citing 28 C.F.R. § 600.7). The Special Counsel is not subject to day-to-day supervision of the Attorney General; however, the Special Counsel has to explain "any investigative or prosecutorial step" taken. *Id.* (citing 28 C.F.R. § 600.7(b)). If deemed inappropriate or unwarranted by the Attorney General, then he can order the Special Counsel not to pursue it. *Id.* The Attorney General has personal enforcement power to discipline or remove the Special Counsel. *Id.* Pursuant to the new statute, the Department announced the new regulations as a means to "strike a balance between independence and accountability in certain sensitive investigations." *Id.* (citing 64 Fed. Reg. at 37,038).

As stated above, the independent counsel statute enacted congressional oversight provisions that the special counsel statute does not. With supervision in place, Congress authorized funding of the independent counsel's office from a designated fund within the Department of Justice. The permanent and indefinite independent counsel fund within the Department cannot and was not deemed a Special Counsel fund.

Robert Mueller, III was appointed to be the Special Counsel to investigate Russian interference with the 2016 presidential election and related matters. *United States v. Manafort*, 312 F.Supp.3d 60, 64 (D.D.C. 2018) (Berman Jackson, J.,); *see* Exhibit 3, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and

Related Matters, Order No. 3915-2017.[8]

The Special Counsel's Office is currently funded by the permanent, indefinite appropriation for independent counsels. *See* 28 C.F.R. § 600.8 (a)(1)-(2) (budget); Exhibit 4, Dep't of Justice, Special Counsel's Office Statement of Expenditures October 1, 2017 through March 31, 2018. In title and actuality, Mr. Mueller is not an independent counsel. Mueller's independence is defined and limited by Part 600 of Title 28 of the Code of Federal Regulations. This does not authorize independent funding at the Department's discretion to be used for Mueller's investigation and prosecution.

The Government will claim it has been given authority by Congress to use the independent counsel fund since the General Accounting Office gave its opinion that it was appropriate to do so in a prior investigation in 2004 when a "special counsel" was appointed to investigate the Chief of Staff of the Vice President, I. Lewis, "Scooter" Libby. *See* Exhibit 5, GAO B302582, SPECIAL COUNSEL AND PERMANENT INDEFINITE APPROPRIATION.[9]

Scooter Libby was investigated and prosecuted by a "special counsel" Patrick Fitzgerald. Fitzgerald was the United States Attorney for the Northern District of Illinois and maintained that position while he acted as special counsel prosecuting Libby. *See United States v. Libby,* 498 F.Supp.2d 1, 5-6 (D.D.C. 2007). Fitzgerald was not hired from outside the Department as the Special Counsel statute and regulations require. Fitzgerald was, explicitly in his appointment, not

---

[8]     Dep. Att'y. Gen. Rod Rosenstein, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters, Order No. 3915-2017 (May 17, 2017).

[9]     U.S. GOV'T ACCOUNTABILITY OFFICE, GAO B302582, SPECIAL COUNSEL AND PERMANENT INDEFINITE APPROPRIATION (2004).

limited by Part 600 of the federal regulations. Mueller, however, is limited by Section 600.7(b), which made him accountable to Deputy Attorney General Rosenstein; and now, the Attorney General. Mueller is not an independent counsel in any way. Because Mueller is not an independent counsel, *i.e.* limited by Title 28 Code of Federal Regulations Section 600, he cannot be subject to the indefinite independent Department of Justice Fund – Congress must approve his funding. *See* Exhibit 1 at 1.

The Department has equivocated on the meaning of "independent" and "special" since enactment of Special Counsel statute. Mueller is a different type of counsel conducting this investigation and qualitatively different than the counsel the General Accounting Office required in 2004 when analyzing the last independent counsel, "special counsel," Patrick Fitzgerald. *See* Exhibit 1 at 2. Fitzgerald was truly independent and held the authority of the Attorney General. *Id.* at 2. The GAO Report assumed that the Part 600 regulations were "not substantive" and therefore could be waived by the Department, and were. *Id.* at 8. Acting Attorney General James Comey "clarified" that Fitzgerald's delegation of authority was "plenary." *Id.* at 3. "Further, my conferral on you of the title of 'Special Counsel' in this matter should not be misunderstood to suggest that your position and authorities are defined and limited by 28 CFR Part 600." *Id.* at 3 & n. 4. Mueller is defined and limited by 28 C.F.R. Part 600.

> The authority to appoint independent counsels pursuant to the provisions of 28 U.S.C. §§ 591 *et seq.* expired on June 30, 1999. However, the permanent indefinite appropriation remains available to pay the expenses of an independent counsel (1) who was appointed by the Special Division of the United States Court of Appeals for the District of Columbia pursuant to the provisions of 28 U.S.C. §§ 591 et seq. whose investigation was underway when the law expired (2) who was appointed under "other law." Under the expired law, a person appointed as an independent counsel could not

12

hold "any office of profit or trust under the United States, 28 U.S.C.
§ 593(b)(2) (2000)."

*Id.* at 3.

The present day Special Counsel's relationship to the Department is qualitatively different

than the independent counsel. But, "[t]he Attorney General establishes the budget for the Special

Counsel's investigation, and is to determine whether the investigation should continue at the end

of each fiscal year" nonetheless. *In re Grand Jury,* 916 F.3d at 1050 (citing 28 C.F.R. § 600.8(a)(1),

(a)(2)). The GAO Report never analyzed the effect of the post-1999 regulations on its 1994

memorandum's analysis. It is this misuse of the permanent independent appropriation fund Stone

challenges as unconstitutional in violation of the Appropriations Clause. U.S. CONST. art. 1, § 9,

cl. 7.  Because Part 600 limits the independence of the Special Counsel and the present day statute

limits Congress's oversight role the indefinite independent counsel fund is not a resource for the

Special Counsel that can be used without violating the Appropriations Clause.

"Decisions of the Supreme Court and this Court have strictly enforced the constitutional

requirement, implemented by federal statutes, that uses of appropriated funds be authorized by

Congress." *U.S. Dept. of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1342 (D.C. Cir.

2012) (Kavanaugh, J.,) (Circuit Court) (citing U.S. CONST. art. 1, § 9, cl. 7; 31 U.S.C. § 1301 *et*

*seq.*). The Clause conveys a "straightforward and explicit command": No money "can be paid out

of the Treasury unless it has been appropriated by an act of Congress." *Office of Personnel Mgmt.*

*v. Richmond*, 496 U.S. 414, 424, 110 S.Ct. 2465, 2471 (1990) (citations omitted). "An

appropriation must be expressly stated; it cannot be inferred or implied. 31 U.S.C. § 1301(d) ("A

law may be construed to make an appropriation out of the Treasury ... only if the law specifically

states that an appropriation is made."). It is well established that "a direction to pay without a

designation of the source of funds is not an appropriation." *United States House of Representatives v. Burwell,* 185 F.Supp.3d 165, 169 (D.D.C. 2016) (quoting U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-04-261SP, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (Vol. I) at 2-17 (3d ed. 2004)[10] (hereinafter "GAO PRINCIPLES"). The inverse is also true: the designation of a source, without a specific direction to pay, is not an appropriation. *Id.* The Clause protects Congress's "exclusive power over the federal purse." *Rochester Pure Waters Dist. v. EPA,* 960 F.2d 180, 185 (D.C.Cir.1992). The power over the purse was one of the most important authorities allocated to Congress in the Constitution's "necessary partition of power among the several departments." THE FEDERALIST NO. 51 at 320 (James Madison). The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority. *See Richmond,* 496 U.S. at 416; *see also Dep't of the Air Force v. FLRA,* 648 F.3d 841, 845 (D.C.Cir.2011).

A "permanent" or "continuing" appropriation, once enacted, makes funds available indefinitely for their specified purpose; no further action by Congress is needed. *Nevada v. Dep't of Energy,* 400 F.3d 9, 13 (D.C. Cir. 2005); GAO PRINCIPLES at 2–14. A "current appropriation," by contrast, allows an agency to obligate funds only in the year or years for which they are appropriated. GAO PRINCIPLES at 2–14. Current appropriations often give a particular agency, program, or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s). Most current appropriations are adopted on an annual basis and must be re-authorized for each fiscal year. Such appropriations are an integral part of our

---

[10]     Available at: https://www.gao.gov/special.pubs/3rdeditionvol1.pdf.

constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings. *House of Representatives,* 185 F.Supp.3d at 169-170. Examples of permanent appropriations include the Judgment Fund (31 U.S.C. § 1304(a)) and payment of interest on the national debt (31 U.S.C. § 1305(2)). *House of Representatives,* 185 F.Supp.3d at n. 3.

Title 31 Section 1341, known as the Anti-Deficiency Act, makes it unlawful for government officials to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation" or to involve the Federal Government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." *U.S. Dept. of Navy*, 665 F.3d at 1347 (citing 31 U.S.C. § 1341(a)(1)(A)-(B)). It is a crime to knowingly and willfully violate it. *Id.* (citing 31 U.S.C. § 1350)).

The government's reliance on approved funding without a specific authorization from Congress comes from ". . . a permanent indefinite appropriation is established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 *et seq.* or other law." Pub. L. No. 100-202, § 101(a) [title II], 101 Stat. 1329, 1329-9 (1987). Special Counsel Mueller, however, was not appointed under the expired independent counsel statute pursuant to 28 U.S.C. § 591. Also, there is no "other law" because the Independent Counsel statute was not replaced with another law, *i.e.* another statute enabling a special counsel to have the same role as the Independent Counsel.  The Independent Counsel statute was replaced by Department rules promulgated by itself, not Congress. The Department must argue that the "or other law" clause survives the sunset of Section 591, in order to support the payment of expenses without congressional approval.

Congress must have intended to maintain payment for a different and unique "special" counsel in perpetuity while surrendering the direct oversight it had under the Section 591. The "or other law" does not mean any law. It must mean another law that creates a similar special lawyer with similar authority to investigate and prosecute specified matters. The Special Counsel law does not have sufficient specificity to investigate a president or the campaign.

Because the expenditure of funds supporting the Special Counsel investigation and prosecution violates the Appropriations Clause, an order dismissing the indictment and enjoining the prosecution of him until Congress has made the proper constitutional appropriation is appropriate. *United States v. McIntosh,* 833 F.3d 1163, 1174-1175 (9th Cir. 2016), *supra*. The Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, prohibits the payment of money from the Treasury unless it has been approved by an act of Congress.  Here, the Department violates the Appropriations Clause and the maintenance of the criminal action constitutes a violation of the separation of powers. *See McIntosh*, 833 F.3d at 1175.

**III.      The Executive Branch Investigating the President Violates the Vesting Clause.**

The Constitution, Article II, paragraph 1, mandates that "[t]he executive Power shall be vested in a President of the United States of America."  Often referred to as the "Vesting Clause," the Clause places extraordinary power in one person: the President.

Law enforcement is squarely within the scope of the Executive Power. *See, e.g., United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100 (1974) (The "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). *See also, Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181 (1986) (where the Court struck down a provision

of the Gramm-Rudman Act because it invaded the President's exclusive authority to enforce the laws).

First, where an exclusive province of the Executive Power, such as law enforcement, is encroached upon by Congress, the Court has on several occasions held that such laws violate the Take Care Clause in *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484, 130 S.Ct. 3138, 3147 (2010), the Court stated: "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."

The Court's standing doctrine is also based in part upon ensuring that the Judicial Branch does not encroach upon the Executive Branch's duty to "take Care that the Laws be faithfully executed." In *Lujan v. Def. of Wildlife*, 504 U.S. 555, 577, 112 S.Ct. 2130, 2145 (1992) the Court reasoned that to allow Congress to "convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *See also*, *Allen v. Wright*, 468 U.S. 737, 761, 104 S.Ct. 3315, 3330 (1984), where the Court stated that "The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws be faithfully executed.' We could not recognize respondents' standing in this case without running afoul of that structural principle." (citation omitted) (quoting U.S. CONST. art. II, § 3).

Likewise, in in *Printz v. United States* 521 U.S. 898, 922-23, 117 S.Ct. 2365, 2379 (1997) the Court relied in part on the Take Care Clause to strike down certain provisions of the Brady Act that required local law enforcement to engage in federal enforcement actions. In light of these

17

serious structural constitutional concerns, interpreting a statute to provide for the investigation of the President or a presidential campaign should be undertaken with caution.  Generally, in this setting, in order to interpret a statute in a manner that could encroach upon the President's powers under the Vesting Clause and the Take Care Clause, and with due respect to separation of powers concerns, courts have required a clear statement of Congressional intent.  Guidance is provided by the Court's analysis of whether the Administrative Procedure Act applies to the President.  *See,* for example, *Franklin v. Massachusetts*, 505 U.S. 788, 800-801, 112 S.Ct. 2767, 2775 (1992) (in concluding that the President is not bound by the Administrative Procedure Act).  Accordingly, in construing a statute to provide that the President and Presidential Campaign can be investigated by a special prosecutor appointed by the Attorney General, precedent requires an explicit statement by Congress due to the unique constitutional position of the President, and the serious structural constitutional concerns discussed above.  Such an explicit statement cannot be found in the general statutes upon which the Acting Attorney General relied in the Mueller Appointment.  However, it is clear that Congress can make such an explicit statement because it has done so in the past.

If the President and his presidential campaign cannot be investigated by the Executive Branch's Department of Justice, then the investigation of Roger Stone, which was the direct fruit of that poisoned tree, must fall.

## IV. Mueller's Appointment Impermissibly Encroaches Upon the Executive Power in Violation of the Take Care Clause.

Last year, before becoming Attorney General, William Barr wrote a Memorandum regarding "Mueller's 'Obstruction' Theory to Deputy Attorney General Rosenstein in which he

set forth the constitutional dangers of inhibiting the President's discretion and duty to take care of, and guide, the country.

> In framing a Constitution that entrusts broad discretion to the President, the Framers chose the means they thought best to police the exercise of that discretion. The Framers' idea was that, by placing all discretionary law enforcement authority in the hands of a single "Chief Magistrate" elected by all the People, and by making him politically accountable for all exercises of that discretion by himself or his agents, they were providing the best way of ensuring the "faithful exercise" of these powers. Every four years the people as a whole make a solemn national decision as to the person whom they trust to make these prudential judgments. In the interim, the people's representatives stand watch and have the tools to oversee, discipline, and, if they deem appropriate, remove the President from office. Thus, under the Framers' plan, the determination whether the President is making decisions based on "improper" motives or whether he is "faithfully" discharging his responsibilities is left to the People, through the election process, and the Congress, through the Impeachment process.

Exhibit 6, Memorandum from Bill Barr on Mueller's "Obstruction" Theory[11]

The Mueller Appointment was made pursuant to 28 U.S.C. §§ 509, 510, and 515, which do not mention, authorize or contemplate the appointment of a Special Counsel to investigate or prosecute a President or a Presidential Campaign. Nevertheless, the Mueller Appointment purported to empower Special Prosecutor Mueller and his team to investigate and potentially indict President Trump and members of his campaign.  Indeed, the summary of the Mueller Report issued by Attorney General Barr indicates that a substantial investigation of the President and his Campaign was undertaken by Special Prosecutor Mueller and his team.

---

[11]     Memorandum from Bill Barr on Mueller's "Obstruction" Theory to Deputy Att'y Gen. Rod Rosenstein and Assistant Att'y Gen. Steve Engel (June 8 2018) at 11

Because of the unique position of the President in our constitutional structure, the powers

vested solely in the President by the Vesting Clause, and the obligation of the President to "take

Care that the Laws be faithfully executed," 28 U.S.C. §§ 509, 510, and 515 were unconstitutionally

applied as the basis for the Mueller Appointment, as set forth below.   Therefore, the Mueller

Appointment was unconstitutional, should be held void *ab initio*, and the indictment against Mr.

Stone should be dismissed.

### A.  Legal Background on the Take Care Clause.

The Constitution, art. II, § 1, cl. 1, mandates that "[t]he executive Power shall be vested in

a President of the United States of America."   Often referred to as the "Vesting Clause," this

sentence places extraordinary power in one person: the President.   In contrast to the legislative

power--which is diffused because it vests in the bicameral Congress consisting of two senators

from each of the fifty states together with four hundred and thirty-five congressional seats variably

allocated by the census among the fifty states--the executive power is vested in just one person.[12]

Not only does the Constitution place the entire executive power in the President's hands,

Article II, Section 3, mandates that the President "shall take Care that the Laws be faithfully

---

[12]    See, e.g., *Myers v. United States*, 272 U.S. 52, 123, 47 S.Ct. 21, 27 (1926), where the Court
made this clear:

> The President is a representative of the people just as the members of the Senate
> and of the House are, and it may be, at some times, on some subjects, that the
> President elected by all the people is rather more representative of them all than are
> the members of either body of the Legislature whose constituencies are local and
> not countrywide; and, as the President is elected for four years, with the mandate
> of the people to exercise his executive power under the Constitution, there would
> seem to be no reason for construing that instrument in such a way as to limit and
> hamper that power beyond the limitations of it, expressed or fairly implied.

executed. . . ."  Known as the "Take Care Clause," this provision has been interpreted by the Supreme Court to mean that the President must always have control over the executive branch of government, for without that control the President is denied the means to ensure that the laws are faithfully executed.[13]  The Take Care Clause is followed immediately by the Commission Clause, which requires that the President "shall Commission all the Officers of the United States."  In order for the President to ensure the faithful execution of the laws, he must know who is executing those laws.  Requiring the President to commission all of the officers of the United States is one means to that end.  The commission is also a recognition that since the President alone is vested with the entire executive sovereign power of the United States, only he can pass that sovereign power to officers to validly wield in his name.  The commission serves both to validate the President's assignment of that power to an officer for implementation of various executive tasks, and to document that the President remains responsible for those actions.  In the Executive Branch, final responsibility must rest with the President.  Thus, the President, "though able to delegate duties to others, cannot delegate ultimate responsibility *or the active obligation to supervise that goes with it*." *Free Enter. Fund,* 561 U.S. at 496 (quoting *Clinton v. Jones,* 520 U.S. 681, 712-713, 117 S.Ct. 1636, 1653-1654 (1997) (Breyer, J., concurring)) (emphasis added).

Although the Court has considered the Vesting Clause and the Commission Clause, it is the Take Care Clause to which the Court has primarily turned to define the appropriate role of the

---

[13]     *See, e.g., Myers v. United States*, *supra*, at 127:
It could never have been intended to leave to Congress unlimited discretion to vary fundamentally the operation of the great independent executive branch of government and thus most seriously to weaken it. It would be a delegation by the Convention to Congress of the function of defining the primary boundaries of another of the three great divisions of government.

President in our three-part system of government based upon the separation of powers. The Clause has been used to support the power of the President to remove officers who do not follow the President's directives.[14] The Court has used the Take Care Clause to define the limits of Article III standing to ensure that the President, rather than the federal judiciary, retains primary responsibility for the legality of executive decisions.[15] Similarly, the Court has used the Take Care Clause to strike a law that shifted responsibility for executing federal law to state and local law enforcement agents, whom the President could not control, because to do so would impermissibly encroach upon the President's Take Care Clause power.[16] The Court has relied on the Take Care

---

[14]    The Court stated in *Myers*, at 117 "As [the President] is charged specifically to take care that [the laws] be faithfully executed, the reasonable implication . . . must be, in the absence of any express limitation respecting removals, that as his selection of administrative officers is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible." The removal power was more recently addressed by the Court in *Free Enter. Fund* at 561 U.S. at 484, stating "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."

[15]    *See, e.g., Lujan*, 504 U.S. at 577 (asserting that to allow Congress to "convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed'"); *Allen*, 468 U.S. at 761 ("The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws be faithfully executed.' We could not recognize respondents' standing in this case without running afoul of that structural principle." (citation omitted) (quoting U.S. CONST. art. II, § 3)).

[16]    The Court in *Printz,* 521 U.S. at 922 relied in part on the Take Care Clause to reject congressional power to "commandeer" state officials to enforce federal law. At issue was the validity of the Federal Brady Act, which required state law enforcement officers to conduct background checks of gun purchasers in order to determine whether the putative buyer's receipt or possession of a firearm would be unlawful. *Id.* at 903 (citing 18 U.S.C. §922(s)(2) (1994)). After finding that such a requirement impermissibly intrudes upon state sovereignty, the Court further concluded that Congress's attempt to impress state executive officials into federal service violates "the separation and equilibration of powers between the three branches of the Federal Government itself." *Printz,* 521 U.S. at 922. In the Court's words:

Clause as the source of the President's prosecutorial discretion—a power that may give the President room to reshape the effective reach of laws enacted by Congress.[17] Thus, the Court has repeatedly held that where a law encroaches upon the President's power to effectively run the Executive Branch, or conflicts with a power or duty granted to the President by the Constitution, it conflicts with the architecture of the Constitution and cannot stand.

### B.  The Take Care Clause's Application to This Case.

---

The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, "shall take Care that the Laws be faithfully executed," Art. II, § 3, personally and through officers whom he appoints (save for such inferior officers as Congress may authorize to be appointed by the "Courts of Law" or by "the Heads of Departments" who are themselves Presidential appointees), Art. II, § 2. The Brady Act effectively transfers this responsibility to thousands of [state executive officers] in the 50 States, who are left to implement the program without meaningful Presidential control (if indeed meaningful Presidential control is possible without the power to appoint and remove). The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known. . . That unity would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws.

*Id.* at 922-23 (citations omitted). Accordingly, the Take Care Clause not only constrains control over the execution of federal law within the federal government, but also the allocation of executive responsibilities between federal and state governments.

[17]    *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486 (1996) (concluding that the Attorney General and U.S. Attorneys have wide prosecutorial discretion "because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'" (quoting U.S. CONST. art. II, § 3)); *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 1656 (1985) ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. CONST. art. II, § 3)).

23

The Mueller Appointment encroaches upon the President's powers under the Take Care Clause, and therefore the statutes upon which Acting Attorney General Rosenstein relied to make the appointment were either misconstrued or are unconstitutional as applied.  The existence of the Special Counsel hobbles the President's ability to effectively discharge the duty of his office.

Once a Special Prosecutor is appointed to investigate a President, every action the President takes is viewed through the investigative lens, imbued with criminal intent.  The President is not free to take the best actions for the country, but must act cautiously lest he run afoul of a multitude of possible undisclosed crimes the Special Prosecutor may be investigating.  Nothing could encroach more upon the President's duty to take care that the laws be faithfully executed than having a Special Prosecutor continually looking over his shoulder, threatening him or the members of his executive branch with potential prosecution for every act they take.

Besides weakening the Presidency by reducing the zeal of his staff, the institution of the independent counsel enfeebles him more directly in his constant confrontations with Congress, by eroding his public support. *Morrison,* 487 U.S. at 713 (1988) (Scalia, J., dissenting).

The existence of a Special Prosecutor investigating the President and members of a Presidential Campaign clearly encroaches upon the President's ability to carry out his duties in the domestic arena.  This particular investigation most significantly impacts the President in his critical ability to conduct foreign policy.

### C.  Mueller's Investigation Encroaches Upon the President's Ability to Conduct Foreign Policy.

The current appointment is especially problematic as it has to do with a major hostile foreign power: Russia.  The President is at the zenith of his Article II powers when dealing with

hostile foreign countries as the Commander in Chief.[18]   "Of all the cares or concerns of government," Hamilton wrote in Federalist 74, "the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand."[19]

The Mueller Appointment grants the Special Counsel the authority to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump."  Accordingly, every action taken by President Trump since he formed his campaign with regard to the United States' relationship with Russia has been second guessed as evidence of "collusion," or a conspiracy between Trump and Putin.[20]   Many have asserted that Putin has some form of control over Trump.[21]   The Special Counsel investigation has

---

[18]   *See Dep't of the Navy v. Egan*, 484 U.S. 518, 529-530, 108 S. Ct. 818, 825 (1988) ("The Court … has recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive.'") (quoting *Haig v. Agee*, 453 U.S. 280, 293-294, 101 S. Ct. 2766, 2775 (1981)); *Dames & Moore v. Regan*, 453 U.S. 654, 678, 101 S. Ct. 2972, 2986 (1981) ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act," . . . especially . . . in the areas of foreign policy and national security …") (internal quotation marks and citation omitted); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221 (1936) (citing the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 812, 102 S. Ct. 2727, 2735 (1982) (referring to national security and foreign affairs as "central Presidential domains").

[19]   THE FEDERALIST NO. 74 (Alexander Hamilton).

[20]   Franklin Foer, *The Collusion With Russia Is in Plain Sight: What did Donald Trump say to Vladimir Putin when no one else could hear them?,* THE ATLANTIC (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/vladimir-putin-and-donald-trumps-meeting-at-the-g20/580072/.

[21]   Matthew Rosenberg, *Ex-Chief of C.I.A. Suggests Putin May Have Compromising Information on Trump,* THE NEW YORK TIMES (Mar. 21, 2018), https://www.nytimes.com/2018/03/21/us/politics/john-brennan-trump-putin.html.

stimulated this second guessing, significantly undermining the President's ability to conduct foreign policy with regard to Russia. The Special Counsel investigation hog-ties the President in the execution of his foreign policy.

The Mueller Appointment not only hobbles the President's ability to conduct a rational foreign policy with regard to Russia, it undermines his ability to deal with every world leader. No President can deal effectively with the heads of other nations when he is the subject of a Department of Justice investigation that is prominently being portrayed in the press as imminently removing him from office. Counterparts will be inhibited in reliance on a President who may not serve out his term

Interpreting 28 U.S.C. §§ 509, 510, and 515 as providing the power for the Attorney General to appoint a special prosecutor capable of investigating the President and a Presidential Campaign is particularly insidious. Pursuant to 28 U.S.C. §§ 509, 510, and 515, one unelected person has been granted the power to undermine the single representative elected by the entire nation. The possibility that such power granted to a single unelected official could be abused is far higher than the possibility that impeachment by the House of Representatives--the remedy the Constitution provides--would be so abused. The political calculus required for the House to undertake impeachment acts to ensure that actual crimes have been committed, and that a national consensus in support of impeachment exists. Absent such circumstances, however, for one appointed individual to mandate an investigation of a President serves to undermine his ability to function, and divides and weakens the nation.

The Mueller Appointment, which particularly encroaches upon the President's foreign policy power, unconstitutionally encroaches upon the President's power to take care that the laws

are faithfully executed.  Under the case law interpreting the Take Care Clause discussed above,

the appointment should be struck down, and Mr. Stone's indictment dismissed.  Further, all of the

evidence gathered during the course of Mueller's illegal investigation must be excluded as fruit of

the poisonous tree. *See Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268 (1939);

*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963).

### D. The Mueller Appointment Divides the Executive Branch Against Itself, Unconstitutionally Encroaching Upon the President's Ability to Take Care that the Laws are Faithfully Executed.

The Framers undertook a careful analysis in vesting powers in the three branches of

government. The trick was to devise a government that was effective enough to work, but not

effective enough to threaten individual liberty.  The answer was to break up the sovereign power

in four primary ways: 1) separation of power among three branches; 2) checks and balances on

that power built into the system; 3) granting only specific limited enumerated powers to the central

government; and 4) dual sovereignty achieved by leaving general police powers to the states. Chief

Justice Roberts has referred to it as "the diffusion of sovereign power" that secures individual

liberty. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536, 132 S.Ct. 2566, 2578 (2012)

(quoting *New York v. United States*, 505 U.S. 144, 181, 112 S.Ct. 2408, 2431 (1992)).

The Framers granted the most power to Congress; that is the power to make the laws,

subject to the enumeration of powers set forth in Article I, Section 8.  In order to avoid the abuse

of that power, Congress was broken into an upper and lower house, with complex checks and

balances between the two houses.  In contrast, the entire power of the Executive Branch was vested

in the President.  The Court has most frequently turned to Hamilton's explanation in Federalist 70,

where he opined that vesting the Executive Power solely in the President, i.e., unity in the

27

Executive, was required for three primary reasons: 1) to ensure accountability in government; 2) to empower the President to defend against legislative encroachments on his power; and 3) to ensure that the President could nimbly and vigorously respond to challenges in order to protect the nation. As stated in *Printz v. United States,* 521 U.S. at 922-923:

> The insistence of the Framers upon unity in the Federal Executive--to insure both vigor and accountability--is well known. See The Federalist No. 70 (A. Hamilton) . . . . That unity would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws.

Similarly, in *Free Enter. Fund,* 561 U.S. at 513-514 the Court stated:

> The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else. Such diffusion of authority "would greatly diminish the intended and necessary responsibility of the chief magistrate himself." The Federalist No. 70, at 478.

In sum, the plain language of the Constitution, the explanation provided in Federalist 70 regarding the meaning of that language and why the Framers selected it, as well as the Supreme Court's cases interpreting it, require that the President be the single authority in charge of the Executive Branch, and that his authority must not be "shattered" or "diffused."  While he may delegate powers, he may not escape the responsibility of holding those powers, and accordingly he is held accountable for all that takes place within the Executive Branch.  As he is accountable for all that takes place within his branch, he must have control over it.  And, as he must have control, he is not subject to being undermined by attack from his advisors.

Dividing the Executive Branch against itself by permitting the Attorney General, acting without the knowledge or approval of the President, to appoint a Special Counsel to investigate-- and potentially indict and prosecute--the President, would be an unacceptable departure from the structure of the Constitution devised by the Framers, and would severely undermine the "unique constitutional position of the President." *Franklin,* 505 U.S. at 800-801. Dividing the Executive Branch against itself would encroach upon the President's duty to take care that the laws be faithfully executed. The Mueller Appointment did that.

### E. The Mueller Appointment is Invalid as it has Not Been Commissioned by the President.

Article II, Section 3, of the Constitution provides that the President "shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States." The President has never commissioned Mr. Mueller as an officer of the United States. Indeed, the Court held that the commission is necessary to complete the appointment of an officer of the United States in *Marbury v. Madison,* 5 U.S. 137, 157 (1803),

> Some point of time must be taken when the power of the executive over an officer, not removable at his will, must cease. That point of time must be when the constitutional power of appointment has been exercised. And this power has been exercised when the last act, required from the person possessing the power, has been performed. This last act is the signature of the commission.

The Commission Clause follows on the heels of the Take Care Clause, separated only by a comma. The Take Care Clause requires the President to execute the law of the land. He cannot undertake this on his own, and therefore must appoint officers of the United States to act on his behalf. As explained by Chief Justice Marshall, the commission is the proof of appointment by the President; it shows that the President has in fact delegated his power through the appointment.

29

And, according to the reasoning quoted above, without the President's signature on the commission, that delegation of power is not complete.

The proximity of the Commission Clause to the Take Care Clause strongly suggests that the commission is more than a formality.    The Commission Clause requires that the President's commission acts as the President's seal of approval of the actions taken under his authority, and documents that the President is ultimately responsible for all acts undertaken.  It certifies that the "The Buck Stops Here."  It is not a formality, but a substantive matter, which supports Chief Justice Marshall's conclusion in *Marbury* that absent the President's final seal of approval, an appointment itself is not final.

Since Mueller has not been commissioned by the President, as required by the Constitution, his appointment is incomplete and invalid, and the acts he has taken to date are also invalid, including the indictment of Mr. Stone.

## V.        The Mueller Appointment is Invalid Because it Violates the Appointments Clause.

The Appointments Clause of the Constitution requires *principal* officers of the executive branch be appointed by the president and confirmed by the Senate. *Edmond v. United States*, 520 U.S. 651, 663, 117 S.Ct. 1573, 1581 (1997). The Special Counsel was not appointed through that process. *In re Grand Jury,* 916 F.3d at 1050-51. He has been thus far deemed an *inferior* officer subject to the supervision of the Deputy Attorney General. *See id.* at 1051.

This argument has been fully briefed by Andrew Miller as well as the Concord Company at both the District Court level and the D.C. Circuit level on appeal. *Id.; United States v. Concord Mgmt. & Consulting, LLC,* 317 F.Supp.3d 598 (D.D.C. 2018). Mr. Stone adopts those arguments, and incorporates them as if fully set forth, and specifically preserves those arguments for appeal.

The Special Prosecutor is a principal officer of the United States who must be appointed and commissioned by the President and confirmed by the Senate. Recently in *Lucia v SEC*, 138 S. Ct. 2044, 2051 (2018) the Court indicated a willingness to refine or enhance the "significant authority" test to conclude that certain administrative law judges were subject to the Appointments clause. The Mueller Appointment presents another opportunity to do so, and accordingly, the defense preserves all rights on appeal with regard to the Appointments Clause argument.

## VI.    Mueller's Appointment was Made Without Requisite Statutory Authority

### A. In 1978, Congress Created a Detailed Law Addressing the Constitutional Issues Related to Appointing a Special Prosecutor to Investigate a Sitting President and Presidential Campaign.

In 1978, following Watergate--and the Saturday Night Massacre where Attorneys General Richardson and Ruckelshaus each refused to fire Archibald Cox--Congress created the Ethics in Government Act.[22]   The Act was designed, in part, to create a Special Prosecutor capable of investigating the President or his campaign while respecting the unique position of the President, and the separation of powers among the three branches of government.[23]   The law was designed specifically to create a Special Prosecutor capable of investigating crimes committed by the President and/or his campaign; the precise reason for which the Mueller Appointment was made. The Act carefully involved all three branches: a) Congress to create the law providing for the Special Prosecutor, and to have ongoing oversight in the event a Special Prosecutor was appointed; b) the Attorney General to determine whether a Special Prosecutor was required, and to make the

---

[22]    28 U.S.C. 49 § 101 *et seq.*

[23]    Title VI of the Act, which became 28 U.S.C. 39 §§ 591 – 598, was titled Special Prosecutor.

application for the appointment of a Special Prosecutor; and, c) a special three judge court, called the Special Division, to receive the application and actually appoint the Special Prosecutor.

The law was the result of a thorough legislative process reflected in thousands of pages of legislative history.  It was specifically designed to handle the specific situation for which the Mueller Appointment was undertaken.  Because of that, the carefully crafted law addressed the outcome of most of the issues being hotly debated today regarding the Mueller investigation and resulting report, highlighting the problems that arise when such an investigation is undertaken in the absence of specific underlying statutory authority.

A review of the provisions of Title VI demonstrates the level of attention Congress devoted to achieving the appropriate balance among the branches in order to constitutionally appoint a special prosecutor capable of investigating the President, and/or a campaign to elect the President.

The Supreme Court upheld these Title VI provisions for appointing a special prosecutor in *Morrison v. Olson*, 487 U.S. 654 (1988).  Title VI was at the time, and remained until its expiration, the only law that specifically allowed the investigation of a sitting President and Presidential Campaign.  But Congress determined that the law should expire in 1999, and has not reenacted it since that time.

**B.  In 1999, Congress Determined that Title VI Should Expire, Ending the Role of Special Prosecutors Capable of Investigating Presidents and Their Campaigns.**

The original provisions discussed above were enacted in 1978 as a direct response to the Watergate scandal.  The 1978 law was amended and reauthorized in 1983,[24] and again in 1987.[25] Between 1987 and 1992, due to the breadth, length and expense of the Iran Contra investigation by Special Prosecutor Walsh, the statute came under increased criticism.  In the face of this criticism, Congress determined that the law should not be renewed, and it lapsed on December 15, 1992.

Following the Whitewater scandal in the Clinton Administration, however, in 1994 Congress took the action of reinstating the statute to allow the appointment of Judge Starr to investigate President Clinton.[26] From the standpoint of Congressional intent, it is significant to note that when faced with the investigation of a President Clinton, Congress reenacted Title VI of the Ethics in Government Act.  As with the Walsh investigation, however, the breadth, length and expense of the Starr investigation came under a great deal of public criticism.  Congress therefore once again allowed the statute to lapse on June 30, 1999, and to date it has not been reenacted.[27] Accordingly, there is currently no law on the books that provides for the appointment of a special prosecutor with the authority to investigate a sitting President and his Presidential campaign, as

---

[24]    P.L. 97-409, January 3, 1983.

[25]    P.L. 100-191, December 15, 1987.

[26]    P.L. 103-270, June 30, 1994.

[27]    The law was reauthorized for the last time on June 30, 1994, P.L. 103-270, 108 Stat. 732, and expired under the five- year "sunset" provision on June 30, 1999.

33

Title VI did.  It is clear from past Congressional action that if Congress intended to have such a law in force, it knows how to do so.  Indeed, it reenacted Title VI specifically to support the Starr investigation, and then once again removed it from the books.  The only conclusion that can be drawn is that it is the intent of Congress that there shall be no more special prosecutors investigating the President or Presidential Campaigns.[28]

### C. The General Statutes Relied Upon by Acting Attorney General Rosenstein do not Authorize the Appointment of a Special Counsel Capable of Investigating President Trump and his Campaign.

In the face of the repeal of Title VI, Acting Attorney General Rosenstein based the Mueller Appointment on three general statutes, 28 U.S.C. §§ 509, 510, and 515, which were passed in 1966, none of which mentions the investigation of the President or presidential campaigns. When the general language of these statutes is compared to the extensive and carefully crafted provisions of Title VI, it is clear that they do not provide the explicit statement the Supreme Court has required in the past when considering whether a statute was intended to apply to the unique constitutional position held by the President.[29]

Title 28 United States Code Sections 509 and 510 provide general of statements and all functions of the Department of Justice are vested in the Attorney General with specific exceptions not relevant here. These statutes make no mention of investigating the President of the United States or his campaign, as Title VI specifically did.  It is clear from the Mueller Appointment that

---

[28]  This is not to say that no special prosecutors may ever be appointed.  It is only to say that, given the legislative history and clear intent of Congress, special prosecutors to investigate the President and Presidential Campaigns shall not be appointed.

[29]  *Franklin v. Massachusetts*, 505 U.S. at 800-801.

Special Counsel Mueller was specifically appointed to investigate the President and his Campaign. Accordingly, the issue before the Court is whether three very general 1966 statutes--that make no mention of granting the Attorney General the authority to appoint a special counsel to investigate the President and his campaign--can be construed to authorize the appointment of a special prosecutor to investigate the President and his campaign when the 1978 statute that was specifically designed to allow the appointment of a special prosecutor to investigate the President and his campaign was intentionally abandoned by Congress in 1999.  Logic, the rules of statutory construction, and constitutional considerations mandate an answer in the negative.

      **i)**      <u>**Logic.**</u>

Logic dictates that if the general statutes pre-existing Title VI were sufficient for the job, Congress would not have passed Title VI to begin with.  There would have been no need.  The great care taken with regard to Title VI to arrive at a structure Congress believed would allow the appointment of a prosecutor to investigate the President is not at all evident in 28 U.S.C. §§ 509, 510, and 515.  These general statutes at best allow the Attorney General to enlist special lawyers for special tasks.  They never address the investigation of the President or a Presidential Campaign. Those issues were explicitly addressed by Title VI, but Congress made the determination that Title VI should expire.  It would be illogical to assume that the Acting Attorney General can now achieve the same exact result through reliance on the pre-existing general provisions contained in 28 U.S.C. §§ 509, 510, and 515.

ii)       **Statutory Construction.**

The guiding light of statutory construction is to determine Congressional intent.[30]  As discussed above, Congressional intent is that special prosecutors capable of investigating the President and/or Presidential Campaigns shall no longer exist.  Construing 28 U.S.C. §§ 509, 510, and 515 so as to have the same result as Title VI would therefore be contrary to Congressional intent to abolish such special prosecutors by determining that Title VI should expire.  Congressional intent that any investigation into a President or Presidential Campaign requires a specific law to support the appointment of a Special Prosecutor is illustrated by the fact that when Congress desired the Whitewater investigation to be handled by a Special Prosecutor, it reenacted Title VI.  If Congressional intent was that 28 U.S.C. §§ 509, 510, and 515 were sufficient to appoint a Special Prosecutor to investigate the President, Congress would not have reenacted Title VI.

Moreover, interpreting 28 U.S.C. §§ 509, 510, and 515 to have the same exact result as Title VI of the Ethics in Government Act would contradict the canon of statutory construction that the legislature would not pass meaningless or redundant words into law.[31] As noted above, if 28 U.S.C. §§ 509, 510, and 515 are interpreted to mean the same thing as Title VI, then Title VI were merely redundant, meaningless provisions.  This cannot be the case.  Finally, the canon of statutory construction known as *generalia specialibus non derogant* provides that specific statutes control

---

[30]     *See generally*, Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction,* 11 HARV. J.L. & PUB. POL'Y 59 (1988).

[31]     "[I]n interpreting a statute a court should always turn to one cardinal canon before all others. . . .[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254, 112 S. Ct. 1146, 1149 (1992).

over more general statutes. [32]   Here, Title VI, repealed, is on all fours with the Mueller Appointment, and controls over the more general provisions of 28 U.S.C. §§ 509, 510, and 515. The general and specific cannot be interpreted to mean the same thing.

### D.  The Most Reasonable Interpretation of 28 U.S.C. §§ 509, 510, and 515.

Given the foregoing, the most reasonable interpretation of 28 U.S.C. §§ 509, 510, and 515 is that they allow the Attorney General to appoint a Special Prosecutor capable of investigating crimes within the executive branch in general, but not the unique constitutional position of the President. [33]   Indeed, investigations of crimes within the executive branch, by officers of the executive branch, routinely take place.  The argument here is that when it comes to investigating the President, the one individual vested with the entire power of the Executive Branch, these general statutes are insufficient for the reasons discussed above.  Similarly, while 28 C.F.R. § 600.1 *et seq.* may be sufficient to support the appointment of special prosecutors to investigate subordinate officers of the Executive Branch, they cannot constitutionally be interpreted as a basis for the Mueller Appointment.

### E.  The Constitution Provides the Remedy.

The argument is not that the President cannot be investigated. For example, a President may consent to an investigation undertaken by a subordinate officer of the Executive Branch, as

---

[32]     *See, e.g., Rogers v. United States*, 185 U.S. 83, 88, 37 S.Ct. 552, 583 (1902).

[33]     For example, the District Court for the District of Columbia ruled in 2006 that James Comey had the statutory authority under 28 U.S.C. §§ 509, 510, and 515 to appoint Patrick J. Fitzgerald as Special Counsel to investigate which officer of the executive branch leaked Valery Plame's name to the press.  That matter did not involve the investigation of the President, but of others in the Executive Branch. *United States v. Libby*, 429 F. Supp. 2d 27 (D.D.C. 2006).

President Nixon did in Watergate when he appointed Leon Jaworski, and consented to special regulations regarding Jaworski's removal.[34] However, the primary method for the investigation of the President is through Congress under the Impeachment Power. If Congress truly believes that a President has engaged in high crimes and misdemeanors, the Constitution already provides the remedy: Impeachment. The tortured history of the various special counsels who have undertaken investigations of the President—Cox, Jworski, Walsh and Starr--demonstrates that the Framers got it right from the start.  The power to investigate and impeach the President lies with Congress, not within the Executive Branch.  Article I, Section 2, Clause 5 provides:

> The House of Representatives shall choose their Speaker and other Officers; and shall have the sole Power of Impeachment.

Article I, Section 3, Clauses 6 and 7 state that:

> The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried the Chief Justice shall preside; And no Person shall be convicted without the Concurrence of two thirds of the Members present.
>
> Judgement in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgement and Punishment, according to Law.

Article 2, Section 4 provides:

> The President, Vice President and all Civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

---

[34]    Att'y Gen. Order No. 554-73, reprinted in Special Prosecutor: Hearings Before the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. 575 (1973).

These provisions address under what circumstances, and under what process, the President of the United States may be investigated, impeached, tried in the Senate upon articles of impeachment, and, if removed from office, subsequently prosecuted and held accountable in a court of law.

In his 1998 Georgetown Law Review article, *The President and the Independent Counsel,* Justice Kavanaugh reviewed the practical reasons supporting this conclusion as follows:

> In an investigation of the President himself, *no* Attorney General or special counsel will have the necessary credibility to avoid the inevitable charges that he is politically motivated—whether in favor of the President or against him, depending on the individual leading the investigation and its results. In terms of credibility to large segments of the public (whose support is necessary if a President is to be indicted), the prosecutor may appear too sympathetic or too aggressive, too Republican or too Democrat, too liberal or too conservative.
>
> The reason for such political attacks are obvious. The indictment of a President would be a disabling experience for the government as a whole and for the President's political party—and thus also for the political, economic, social, diplomatic, and military causes that the President champions. The dramatic consequences invite, indeed, beg, an all-out attack by the innumerable actors who would be adversely affected by such a result.  So it is that any number of the President's allies, and even the Presidents themselves, have criticized Messrs. Archibald Cox, Leon Jaworski, Lawrence Walsh, and Kenneth Starr—the four modern special prosecutors to investigate presidents.
>
> The Constitution of the United States contemplated, at least by implication, what modern practice has shown to be the inevitable result. The Framers thus appeared to anticipate that a President who commits serious wrongdoing should be impeached by the House and removed from office by the Senate—and then prosecuted thereafter. The Constitution itself seems to dictate, in addition, that congressional investigation must take place in lieu of criminal investigation when the President is the subject of investigation, and

that criminal prosecution can occur only after the President has left office.[35]

Leon Jaworski came to the same conclusion in the 1975 Report of the Watergate Special Prosecution Task Force:

> [T]he impeachment process should take precedence over a criminal indictment because the Constitution was ambivalent on this point and an indictment provoking a necessarily lengthy legal proceeding would either compel the President's resignation or substantially cripple his ability to function effectively in the domestic and foreign fields as the Nation's Chief Executive Officer. Those consequences, it was argued, should result from the impeachment mechanism explicitly provided by the Constitution, a mechanism in which the elected representatives of the public conduct preliminary inquiries and, in the event of the filing of a bill of impeachment of the President, a trial based upon all the facts.[36]

*Ad hoc* attempts to alter the Framers' vision have repeatedly been determined to be unsatisfactory, which is why Congress determined to sunset Title VI. It also explains the dissatisfaction, dissention and uncertainty surrounding the issuance of the Mueller Report; what it means, who should see it, whether the public can or cannot see some or all of it, and what happens next. This uncertainty demonstrates that the Framers got it right, and the solution they provided to the problem is the one that should be followed today. Indeed, absent the statutory authority formerly provided by Title VI, it is in fact the only available remedy.

---

[35] Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 GEO. L.J. 2133 (1998).

[36] U.S. GOV'T PRINTING OFFICE, WATERGATE SPECIAL PROSECUTION FORCE: REPORT (1975), at 122.

## **CONCLUSION**

No federal statute authorized the Special Counsel Appointment at the level of United States Attorneys. No statute authorized the creation of a Special Counsel to replace, not assist United States Attorneys.[37] Congress has deliberately terminated the only statutory authority designed to appoint a special prosecutor with the power to investigate the President or a presidential campaign.   With that authority no longer in place, there exists no statutory authorization for the Office of Special Counsel Mueller now purports to hold. The appointment was illegal, the resulting office has been a nullity from inception, and all actions taken by this illegally appointed officer should be declared null and void. The indictment of Roger Stone should be dismissed with prejudice.

Respectfully submitted,

By: */s/*_____

L. PETER FARKAS
HALLORAN FARKAS & KITTILA, LLP
DDC Bar No.: 99673
1101 30th Street, NW
Suite 500
Washington, DC 20007
Telephone: (202) 559-1700
Fax: (202) 257-2019
pf@hfk.law

BRUCE S. ROGOW
FL Bar No.: 067999
TARA A. CAMPION
FL Bar: 90944
BRUCE S. ROGOW, P.A.
100 N.E. Third Avenue, Ste. 1000
Fort Lauderdale, FL  33301
Telephone: (954) 767-8909
Fax: (954) 764-1530
brogow@rogowlaw.com
tcampion@rogowlaw.com
*Admitted pro hac vice*

---

[37]     *See* discussion in the forthcoming Calabresi/Lawson article, Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Unlawful*, 95 NOTRE DAME L. REV – (2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3324631.

ROBERT C. BUSCHEL
BUSCHEL GIBBONS, P.A.
FL Bar No.: 006436
One Financial Plaza, Suite 1300
100 S.E. Third Avenue
Fort Lauderdale, FL 33394
Telephone: (954) 530-5301
Fax: (954) 320-6932
Buschel@BGlaw-pa.com
*Admitted pro hac vice*

GRANT J. SMITH
STRATEGYSMITH, PA
D.D.C. Bar No.: FL0036
FL Bar No.: 935212
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
Telephone: (954) 328-9064
gsmith@strategysmith.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 12, 2019, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or pro se parties, via transmission of Notices of Electronic Filing generated by CM/ECF.

BUSCHEL GIBBONS, P.A.

___/s/ Robert Buschel_____
          Robert C. Buschel

*United States Attorney's Office for the District of Columbia*

MICHAEL JOHN MARANDO
JONATHAN IAN KRAVIS
**U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA**
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 252-6886
Fax: (202) 651-3393
michael.marando@usDepartment of Justice.gov
jonathan.kravis3@usDepartment of Justice.gov

*United States Depart of Justice Special Counsel's Office*

AARON SIMCHA JON ZELINSKY
JEANNIE SCLAFANI RHEE
ANDREW DANIEL GOLDSTEIN
LAWRENCE RUSH ATKINSON
**U.S. Department of Justice SPECIAL COUNSEL'S OFFICE**
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 616-0800
Fax: (202) 651-3393
asjz@usDepartment of Justice.gov
jsr@usDepartment of Justice.gov
adg@usDepartment of Justice.gov
lra@usDepartment of Justice.gov



# Special Counsel Investigations: History, Authority, Appointment and Removal

Updated March 13, 2019

Congressional Research Service

https://crsreports.congress.gov

R44857

**CRS REPORT**
Prepared for Members and
Committees of Congress



Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R44857

March 13, 2019

**Cynthia Brown**
Legislative Attorney

**Jared P. Cole**
Legislative Attorney

# Special Counsel Investigations: History, Authority, Appointment and Removal

The Constitution vests Congress with the legislative power, which includes authority to establish federal agencies and conduct oversight of those entities. Criminal investigations and prosecutions, however, are generally regarded as core executive functions assigned to the executive branch. Because of the potential conflicts of interest that may arise when the executive branch investigates itself, there have often been calls for criminal investigations by prosecutors with independence from the executive branch. In response, Congress and the U.S. Department of Justice (DOJ) have used both statutory and regulatory mechanisms to establish a process for such inquiries. These frameworks have aimed to balance the competing goals of independence and accountability with respect to inquiries of executive branch officials.

Under the Ethics in Government Act of 1978, for example, Congress authorized the appointment of "special prosecutors," who later were known as "independent counsels." Under this statutory scheme, the Attorney General could request that a specially appointed three-judge panel appoint an outside individual to investigate and prosecute alleged violations of criminal law. These individuals were vested with "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice" with respect to matters within their jurisdiction. Ultimately, debate over the scope, cost, and effect of the investigations (perhaps most notably the Iran-Contra and the Whitewater investigations) resulted in the law's expiration and nonrenewal in 1999.

Following the lapse of these statutory provisions, DOJ promulgated regulations authorizing the Attorney General (or, if the Attorney General is recused from a matter, the Acting Attorney General) to appoint a "special counsel" from outside the federal government to conduct specific investigations or prosecutions that may be deemed to present a conflict of interest if pursued under the normal procedures of the agency. Special counsels are not subject to "day-to-day supervision" by any official and are vested "within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney."

The independent nature of these investigations has raised constitutional questions about the propriety of the appointment and removal mechanisms provided for the officials leading the inquiries. These concerns were addressed by the Supreme Court in the 1988 case of *Morrison v. Olson*, which upheld the constitutionality of the independent counsel statute. The reasoning of that opinion has been challenged, however, and the Court's subsequent analysis of related issues in the 1997 case of *Edmond v. United States* and the 2010 case of *Free Enterprise Fund v. Public Accounting Oversight Board* did not apply the standard enunciated in *Morrison*. The constitutional status of a statutory framework similar to the independent counsel statute is thus subject to debate. Several bills introduced in the 116th Congress (including S. 71 and H.R. 197, which merge aspects of two preceding bills introduced in the 115th Congress, S. 1735 and S. 1741) would statutorily insulate a special counsel from removal, echoing aspects of the independent counsel statute's provisions. Whether such proposals would withstand constitutional challenge today might ultimately turn on the continued vitality of the analysis applied in *Morrison*.

# Contents

Historical Background on the Use of Independent Investigations of Alleged Wrongdoing ........... 2

Special Prosecutors and Independent Counsels, as Authorized Under the Ethics in
   Government Act ............................................................................................................................... 3
     Appointment Process ............................................................................................................... 4
       Role of the Attorney General ............................................................................................. 5
       Role of the Court ................................................................................................................ 6
     Scope of Authority .................................................................................................................. 6
     Removal .................................................................................................................................. 7
     Termination of Independent Counsel Inquiries ..................................................................... 7
     Statutory Reauthorizations and Eventual Lapse of the Independent Counsel Statute ............. 8

Legal Authority of Special Counsels Under Current Law ..................................................................... 8
     DOJ Special Counsel Regulations ........................................................................................ 10
       Appointment and Selection by the Attorney General or the
         Acting Attorney General ................................................................................................. 10
       Scope of Jurisdiction and Authority ................................................................................. 11
       Oversight and Removal .................................................................................................... 14
     Review and Conclusion of Special Counsel Inquiries ......................................................... 15

Appointing and Removing a Special Counsel: Legal Considerations ........................................... 16
     Appointment of a Special Counsel ....................................................................................... 17
     Removing a Special Counsel ................................................................................................ 19
       Removing a Special Counsel Pursuant to the Regulations ................................................ 19
       Legal Effect of the Regulations ....................................................................................... 20
     Proposed Legislation to Restrict the Ability to Remove a Special Counsel ............................. 22
       Presidential Authority to Oversee Executive Branch Officers .......................................... 23
       Legislation to Establish For-Cause Removal Protection for a Special Counsel .............. 27
       Legislation to Establish Judicial Review of a Removal Decision ...................................... 30
       Retroactive Application of Legislation to Insulate a Special Counsel .............................. 33

Conclusion ........................................................................................................................................ 34

## Tables

Table 1. Glossary of Terms ................................................................................................................ 2

## Contacts

Author Information ............................................................................................................................ 34

The Constitution gives no direct role to Congress in conducting federal law enforcement.[1] While Congress enjoys the legislative power under Article I of the Constitution, which includes substantial authority to investigate the executive branch pursuant to its oversight function,[2] criminal investigations and prosecutions are generally considered core executive functions entrusted with the executive branch under Article II.[3] Because of the potential conflicts of interest that may arise when the executive branch investigates itself, however, there have often been calls for prosecutors with independence from the executive branch.[4] In response, Congress and the U.S. Department of Justice (DOJ) have used both statutory[5] and regulatory[6] mechanisms to establish a process for such inquiries. These responses have attempted, in different ways, to balance the competing goals of independence and accountability with respect to inquiries of executive branch officials. This report first analyzes the use of *special prosecutors* and *independent counsels* that were authorized under now-expired provisions of the Ethics in Government Act of 1978,[7] as well as the use of *special counsels* that are currently authorized by DOJ regulations.[8] A glossary of terms at the beginning of the report briefly defines these italicized terms (see **Table 1**).[9]

The report continues with an examination of various legal questions relevant to these efforts. As a threshold matter, some have challenged the appointment of a special counsel under the current regulations as unconstitutional under the Appointments Clause.[10] More broadly, designing a statutory framework for criminal investigations and prosecutions with independence from the executive branch raises questions about how this can be achieved consistent with the requirements of the Constitution. For instance, the Supreme Court upheld the constitutionality of the since-expired independent counsel statute in the 1988 case of *Morrison v. Olson*,[11] but has not

---

[1] The U.S. Constitution's structure establishes the principle of "separation of powers," which assigns particular functions to each of the three branches of government. *See generally* Buckley v. Valeo, 424 U.S. 1, 123 (1976) (per curiam) ("This Court has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it.").

[2] *See* U.S. CONST. art. I; Clinton v. City of New York, 524 U.S. 417, 437-41 (1998); McGrain v. Daugherty, 273 U.S. 135 (1927) (describing congressional oversight authority as "an essential and appropriate auxiliary to the legislative function"); Watkins v. United States, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad.").

[3] *See* Morrison v. Olson, 487 U.S. 654, 691 (1988) ("There is no real dispute that the functions performed by the independent counsel are 'executive' in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch."); *id*. at 706 (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function.").

[4] *See generally* Kimberly Robinson, *Comey Firing Could Wake a Constitutional Wolf*, BLOOMBERG LAW (May 11, 2017), https://bol.bna.com/comey-firing-could-wake-a-constitutional-wolf/; George D. Brown, *The Ethics Backlash and the Independent Counsel Statute*, 51 RUTGERS L. REV. 433 (1999); Niles L. Godes & Ty E. Howard, *Independent Counsel Investigations*, 35 AM. CRIM. L. REV. 875 (1998).

[5] *See* Ethics in Government Act of 1978, P.L. 95-521, §§ 601-04, 92 Stat. 1824, 1867-75, as *amended by* P.L. 97-409, 96 Stat. 2039 (1983), P.L. 100-191, 101 Stat. 1293 (1987), P.L. 103-270, 108 Stat. 732 (1994).

[6] *See* 28 C.F.R. pt. 600.

[7] *See* P.L. 95-521, §§ 601-04, 92 Stat. at 1867-75, as *amended by* P.L. 97-409, 96 Stat. 2039 (1983).

[8] *See* 28 C.F.R. pt. 600.

[9] Other methods of oversight, including investigations by congressional committees or under the authority of agency inspectors general, may also be available with respect to executive branch investigations, but are beyond the scope of this report.

[10] *See* "Appointment of a Special Counsel."

[11] *See* Morrison v. Olson, 487 U.S. 654, 696-97 (1988).

applied the reasoning of *Morrison* in subsequent cases raising related issues.[12] The constitutional status of a statutory framework analogous to the independent counsel statute is thus subject to debate.[13] Several bills introduced in the 116th Congress (including S. 71[14] and H.R. 197,[15] which merge aspects of two preceding bills introduced in the 115th Congress, S. 1735 and S. 1741[16]) statutorily insulate a special counsel from removal, echoing aspects of the independent counsel statute's provisions. Whether such proposals would withstand constitutional challenge today might ultimately turn on the continued vitality of the analysis applied in *Morrison*.

### Table 1. Glossary of Terms

| | |
|---|---|
| **Independent Counsel** | Now-expired provisions of the Ethics in Government Act of 1978 (P.L. 95-521, as amended) authorized the Attorney General to request that a three-judge panel within the federal judiciary appoint an independent counsel. Independent counsels had more independence than regular DOJ officials and employees, though the breadth of their investigations led to debate and ultimately to the expiration of the statutory authorization. |
| **Special Counsel** | DOJ's general administrative hiring authority (28 C.F.R. Part 600) authorizes the Attorney General to appoint special counsels. Special counsels exercise more independence than regular DOJ officials and employees, but because the Attorney General generally appoints, supervises, and may remove special counsels, they are considered to be less independent than independent counsels were. (The term "special counsel," when used in the context of independent criminal investigations of executive officials, is entirely distinct from the Office of Special Counsel, an independent federal agency, which investigates certain federal personnel practices.) |
| **Special Prosecutor** | The Attorney General historically has appointed special prosecutors to investigate scandals involving public officials. The term "special prosecutor" was also initially used to describe independent investigations authorized by the Ethics in Government Act, though the term was later changed under that statute to "independent counsel." Historically, these appointments were used to provide for the investigation of any related allegations without political interference. |

# Historical Background on the Use of Independent Investigations of Alleged Wrongdoing

In part to counter perceptions that executive officials suspected of criminal wrongdoing may be subject to different standards than individuals outside the government, independent investigations have sometimes been used to determine whether officials have violated the law.[17] The

---

[12] *See* discussion *infra* "Presidential Authority to Oversee Executive Branch Officers."

[13] *See, e.g.*, *Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017).

[14] The Special Counsel Independence and Integrity Act, S. 71, 116th Cong. (2019), reintroduces S. 2644 from the 115th Congress. *See* Special Counsel Independence and Integrity Act, S. 2644, 115th Cong. (2017).

[15] Special Counsel Independence and Integrity Act, H.R. 197, 115th Cong. (2019).

[16] Special Counsel Independence Protection Act, S. 1735, 115th Cong. (2017); Special Counsel Integrity Act, S. 1741, 115th Cong. § 2(b), (e) (2017).

[17] *See* Elliot L. Richardson, *Special Counsels, Petty Cases*, N.Y. TIMES (June 5, 1995), http://www.nytimes.com/1995/06/05/opinion/special-counsels-petty-cases.html; Jim Mokhiber, *A Brief History of the Independent Counsel Law*, FRONTLINE (May 1998), https://www.pbs.org/wgbh/pages/frontline/shows/counsel/office/history.html (describing the use of "special prosecutors" to investigate the Teapot Dome scandal of the 1920s and tax scandals of the 1950s).

government has used a range of options to conduct these types of inquiries: special prosecutors, independent counsels, and special counsels. Executive branch officials have noted, however, that "there is no perfect solution" to achieving the goal of avoiding potential conflicts or the appearance thereof that may arise as a result of the executive branch investigating its own officials.[18]

While special prosecutors investigated executive officials prior to the 1970s, the events commonly known as Watergate led to perhaps the most famous use of an independent investigation in U.S. history.[19] Specifically, the break-in and burglary of the Democratic National Committee Headquarters at the Watergate Hotel in 1972 led to widespread allegations of wrongdoing by senior officials in the executive branch and calls for the appointment of a prosecutor who could conduct an investigation independent of political interference.[20] In the midst of the Watergate controversy, Elliot Richardson, whose nomination to be Attorney General was being considered by the Senate Committee on the Judiciary, agreed to name an independent special prosecutor to pursue the Watergate allegations.[21] Once confirmed by the Senate, the Attorney General, under his own authority, appointed Archibald Cox as special prosecutor for the Watergate investigation in 1973.[22] The President subsequently ordered DOJ officials to fire the special prosecutor later that year,[23] leading to public outcry, the appointment of another special prosecutor, and, ultimately, the initiation of impeachment proceedings by Congress.[24] Following these events, Congress enacted a new mechanism—discussed in the following section—for the use of special prosecutors who would be appointed by a three-judge panel upon the request of the Attorney General.[25]

# Special Prosecutors and Independent Counsels, as Authorized Under the Ethics in Government Act

Congress enacted the Ethics in Government Act of 1978 out of a broad intent "to preserve and promote the integrity of public officials and institutions."[26] The statute addressed a number of concerns about the ethical behavior of some public officials in the wake of the Watergate scandal.[27] Title VI of the statute (hereinafter "the independent counsel statute") established a

---

[18] *See* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999) (codified at 28 C.F.R. pt. 600) (introducing regulations to replace the expired implementing regulations of the independent counsel statute).

[19] *See generally* Joseph S. Hall, Nicholas Pullen, & Kandace Rayos, *Independent Counsel Investigations*, 36 AM. CRIM. L. REV. 809 (1999).

[20] *See* Mokhiber, *supra* note ***.

[21] *Nomination of Elliot L. Richardson, of Massachusetts, to be Attorney General: Hearing Before the S. Comm. on the Judiciary*, 93d Cong. 4-7, 18-20 (1973).

[22] Establishing the Office of Watergate Special Prosecution Force, 38 Fed. Reg. 14,688 (June 4, 1973).

[23] DOJ regulations "gave the Watergate Special Prosecutor very broad power to investigate and prosecute offenses arising out of [the events comprising Watergate]," and provided that the special prosecutor could only be removed "for extraordinary improprieties on his part." *See* Nader v. Bork, 366 F. Supp. 104 (D.D.C. 1973), *vacated sub nom.* Nader v. Levi, No. 1954-73, 1975 U.S. Dist. LEXIS 16791 (D.D.C. 1975) (concluding that the discharge of the special counsel was unlawful under the regulations).

[24] *See* Mokhiber, *supra* note ***.

[25] *See* Ethics in Government Act of 1978, P.L. 95-521, §§ 601-04, 92 Stat. 1824, 1867-75.

[26] *Id.*, 92 Stat. at 1824. For discussion of a challenge to the constitutionality of these provisions, see discussion *infra* "*Morrison v. Olson.*"

[27] In part, the statute required disclosure of certain financial interests by specified government employees; established

mechanism for the appointment of individuals to lead independent investigations and prosecutions in certain circumstances.[28] The statute originally designated these individuals as "special prosecutors"[29] and later renamed them as "independent counsels."[30]

Two of the most commonly known examples of appointments of independent counsels under the statute involved incidents known generally as Iran-Contra and Whitewater.[31] In 1986, Lawrence E. Walsh[32] was appointed as independent counsel[33] to investigate potential criminal misconduct of government officials related to the sale of arms to Iran and alleged diversion of profits from the sale to support the "the military activities of the Nicaraguan contra rebels" in violation of federal law.[34] That investigation resulted in criminal charges for 14 individuals, most of whom were convicted, though some convictions were overturned on various grounds.[35] In 1994, Kenneth Starr[36] was appointed as independent counsel[37] to investigate potential violations of federal criminal or civil law related to President Clinton or First Lady Hillary Rodham Clinton's relationship with Madison Guaranty Savings and Loan Association, Whitewater Development Corporation, or Capital Management Services, as well as any allegations arising out of that investigation.[38] That investigation led to a myriad of charges for a number of individuals, but did not include indictments of the President or First Lady.[39]

## Appointment Process

Appointment of independent counsels under the statute occurred in two steps, requiring the involvement of both the Attorney General and a panel of federal judges.

---

the Office of Government Ethics within the executive branch; and provided criminal regulation of certain outside employment and lobbying activities by former government officials. P.L. 95-521, §§ 101-503, 92 Stat. at 1824-67.

[28] *Id.* §§ 601-04, 92 Stat. at 1867-75.

[29] *See id.* § 601, 92 Stat. at 1867.

[30] *See* Ethics in Government Act Amendments of 1982, P.L. 97-409, § 2(a)(1)(A), 96 Stat. 2039, 2039.

[31] *See generally Records of Independent Counsels*, NAT'L ARCHIVES & RECORDS ADMIN., https://www.archives.gov/research/guide-fed-records/groups/449.html (last updated Aug. 15, 2016).

[32] Walsh formerly served as a federal judge, private litigator, deputy attorney general, and negotiator in peace talks for the Vietnam War. *See* Neil A. Lewis, *Lawrence E. Walsh, Prosecutor in Iran-Contra Scandal, Dies at 102*, N.Y. TIMES (Mar. 20, 2014), https://www.nytimes.com/2014/03/21/us/politics/lawrence-e-walsh-iran-contra-prosecutor-dies-at-102.html?_r=0.

[33] *See* 28 C.F.R. § 601.1.

[34] LAWRENCE E. WALSH, FINAL REPORT OF THE INDEPENDENT COUNSEL FOR IRAN/CONTRA MATTERS, VOL. I: INVESTIGATIONS AND PROSECUTIONS (Aug. 4, 1993), https://archive.org/stream/WalshReport/Walsh%20Report%20volume%201%20Investigations%20and%20Prosecutions#page/n0/mode/2up.

[35] *Id.* at xiv-xv.

[36] Starr formerly served as a law professor, private litigator, federal appellate judge, and as Solicitor General. *Bio of Kenneth Winston Starr, J.D.*, BAYLOR UNIV. (Feb. 15, 2010), https://www.baylor.edu/mediacommunications/news.php?action=story&story=69086. He was later succeeded by Robert W. Ray and Julie F. Thomas as independent counsels related to that investigation. *See Records of Independent Counsel Kenneth I. Starr/Robert Ray/Julie Thomas: 1994-2004*, NAT'L ARCHIVES & RECORDS ADMIN., https://www.archives.gov/research/investigations/starr (last updated Dec. 7, 2016).

[37] 28 C.F.R. § 603.1.

[38] *Id.*

[39] ROBERT RAY, FINAL REPORT OF THE INDEPENDENT COUNSEL *IN RE* MADISON GUARANTY SAVINGS & LOAN ASSOCIATION (Jan. 5, 2001), https://www.gpo.gov/fdsys/pkg/GPO-ICREPORT-MADISON/content-detail.html; Neil A. Lewis, *Final Report By Prosecutor on Clintons is Released*, N.Y. TIMES (Mar. 21, 2002), http://www.nytimes.com/2002/03/21/us/final-report-by-prosecutor-on-clintons-is-released.html.

## Role of the Attorney General

The independent counsel statute generally directed the Attorney General to conduct a preliminary investigation upon receiving information about potential wrongdoing by certain officials in the executive branch or from presidential campaign committees.[40] If, within 30 days of receiving such information, the Attorney General determined that the information was specific and from a credible source,[41] the Attorney General was required to conduct a preliminary investigation for a period of up to 90 days.[42] The statute did not require the Attorney General to acknowledge or notify any other parties that such information had come to his attention, but did require that the Attorney General inform the court that he had commenced a preliminary investigation.[43]

The conclusions reached in that initial investigation determined whether an independent counsel would be appointed to investigate the underlying allegations further.[44] The statute required that the Attorney General request appointment of a special prosecutor by the special division of a federal court (discussed below) under three sets of circumstances. First, if the 90-day window for the preliminary investigation passed without a determination that further investigation or prosecution was not warranted, the Attorney General was required to request the appointment by the court.[45] Second, if the Attorney General's initial investigation determined that further investigation or prosecution was warranted, the Attorney General was also required to request the appointment by the court.[46] Finally, if the preliminary investigation indicated that further action was not warranted, but additional information was subsequently revealed which led the Attorney General to determine that further investigation or prosecution was indeed warranted, the Attorney General was mandated to conduct a preliminary investigation based on that information.[47]

Following that investigation, the statute required the Attorney General to seek appointment of an independent counsel under the same circumstances—*i.e.*, if no determination had been made within 90 days or if the Attorney General determined further investigation was warranted.[48] The Attorney General's decision to request an appointment under the statute was not subject to judicial review.[49] While the Attorney General was not authorized under the statute to appoint the

---

[40] 28 U.S.C. § 591. The individuals subject to investigation generally included the President; Vice President; designated heads of federal agencies; certain high-level officials in the Executive Office of the President; certain senior executive officials in DOJ, the Central Intelligence Agency, or the Internal Revenue Service; and officers of campaign committees for the President. *See id.* § 591(b). Other individuals, including Members of Congress, could be investigated under certain circumstances as well. *See id.* § 591(c). The statute allowed for investigations of potential violations of "any Federal criminal law other than a violation classified as a Class B or C misdemeanor or an infraction." *See id.* § 591(a).

[41] *Id*. § 592(d).

[42] *Id*. § 592(a).

[43] *Id.* § 592(a)(1).

[44] If the Attorney General determined from the initial investigation that "there were no reasonable grounds to believe that further investigation [was] warranted," he or she was required to notify the three-judge panel, which would then have no authority to appoint a special prosecutor for the allegations. *Id*. § 592(b)(1). The Attorney General was required to provide a summary of the information received and the results of the preliminary investigation. *Id.* § 592(b)(2).

[45] *Id*. § 592(c)(1)(B).

[46] *Id*. § 592(c)(1)(A).

[47] *Id*. § 592(c)(2).

[48] *Id.*

[49] *Id*. § 592(f).

independent counsel, he was required to provide the court with "sufficient information to assist" the court in the selection of the appointed individual and to define the jurisdiction of the inquiry.[50]

## Role of the Court

While the Attorney General conducted the initial investigation to determine whether an independent investigation was warranted, the independent counsel statute required that a special division of the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit), composed of three federal judges or Justices, appoint the independent counsel.[51]

The Chief Justice of the U.S. Supreme Court assigned three federal judges or Justices to that division for two-year assignments.[52] The statute's provisions regarding assignment of the three-judge panel required that the panel include a judge from the D.C. Circuit and that not more than one judge or Justice be from any single court.[53] Any judge or Justice serving in the special division of the court that appointed the independent counsel was barred from participating in any judicial proceeding involving the independent counsel while he or she was still serving in that position or any proceeding involving the exercise of the independent counsel's official duties.[54]

Based on recommendations from the Attorney General regarding the selection and jurisdiction of the independent counsel, the three-judge panel had the final authority to make the appointment and define the prosecutorial jurisdiction.[55] The court was expressly barred from appointing "any person who holds or recently held any office of profit or trust under the United States."[56]

# Scope of Authority

"[W]ith respect to all matters in [the] independent counsel's prosecutorial jurisdiction," Congress granted the independent counsel "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice . . . ."[57] Examples of the independent counsel's enumerated authorities included

- conducting investigations and grand jury proceedings;
- engaging in judicial proceedings, including litigation and appeals of court decisions;
- reviewing documentary evidence;
- determining whether to challenge the use of testimonial privileges;
- receiving national security clearances, if appropriate;
- seeking immunity for witnesses, warrants, subpoenas, and other court orders;

---

[50] *Id*. § 592(d).

[51] *Id*. § 593(a) (cross-referencing 28 U.S.C. § 49).

[52] *Id*. § 49.

[53] *Id*. § 49(d).

[54] *Id*. § 49(f).

[55] *Id*. § 593(b).

[56] *Id*. § 593(b)(2).

[57] *Id*. § 594(a).

- obtaining and reviewing any tax return; and
- carrying out prosecutions in court, including filing indictments.[58]

The independent counsel could request DOJ assistance in the course of his or her investigation, including access to materials relevant to the jurisdiction of the inquiry and the necessary resources and personnel to perform his or her assigned duties.[59]

## Removal

Other than impeachment, the independent counsel could be subject to removal "only by the personal action of the Attorney General and only for good cause, physical or mental disability . . ., or any other condition that substantially impairs the performance of such independent counsel's duties."[60] In other words, the independent counsel was generally not subject to the control and oversight of any other official within the executive branch.[61] If the Attorney General exercised his removal authority, he or she was required to notify the special division of the court responsible for the initial appointment and the Committees on the Judiciary of both the House of Representatives and the Senate, identifying the reasons for removal.[62]

## Termination of Independent Counsel Inquiries

The inquiry led by the independent counsel under the statute could be terminated under two methods. First, the statute directed that the office of the independent counsel would terminate upon notification by the independent counsel to the Attorney General that the investigation and any subsequent prosecutions had been completed.[63] Second, the statute permitted the special division of the court—by its own choice or by the recommendation of the Attorney General—to terminate the office at any time if the investigation had been completed or sufficiently completed, allowing DOJ to formally complete the inquiry under its own processes.[64] In either case, the independent counsel was required to submit a report to the special division of the court detailing the work completed.[65] The report was required to include "a description of the work of the independent counsel, including the disposition of all cases brought."[66]

---

[58] *Id.*

[59] *Id.* § 594(d).

[60] *Id.* § 596(a)(1). For a discussion of a challenge to the constitutionality these provisions, see discussion *infra* "*Morrison v. Olson.*"

[61] The standard of removal "for good cause" indicates that the independent counsel could not be removed at will, but rather for reasons related to the specific performance of his or her assigned duties. *See* Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 502-03 (2010) (describing the "good cause" standard as an "unusually high standard" that includes willful violations of law, willful abuse of authority, or failure to comply with rules without reasonable justification). *But see* Morrison v. Olson, 487 U.S. 654, 692 (1988) (explaining that the independent counsel statute's "good cause" requirement for removal nonetheless allows the Attorney General "ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act").

[62] 28 U.S.C. § 596(a)(2).

[63] *Id.* § 596(b)(1). If the investigation or prosecutions were not fully completed, but were sufficiently completed to allow DOJ to complete them under normal processes, the independent counsel could also terminate the inquiry. *Id.*

[64] *Id.* § 596(b)(2).

[65] *See id.* § 596(b).

[66] *Id.* § 594(h)(1)(B).

## Statutory Reauthorizations and Eventual Lapse of the Independent Counsel Statute

When the independent counsel statute was originally enacted in 1978, Congress provided that its authority would lapse five years after enactment.[67] Investigations that had already started pursuant to the provisions were permitted to continue, but no new investigations could be initiated at that time.[68] Rather than allow the statute to lapse, Congress reauthorized the law, with some amendments, several times. It was reauthorized in 1983[69] and 1987,[70] and remained in effect until 1992, when Congress allowed the law to expire. The statute was again reauthorized in 1994, following concerns related to the investigation of the Whitewater controversy during the interim years.[71] However, concerns over whether the independent counsel possessed too much power, which arose after the extensive independent counsel investigations of the Iran-Contra affair and the Whitewater controversy, resulted in the law's ultimate expiration and nonrenewal in 1999.[72]

# Legal Authority of Special Counsels Under Current Law

Following the expiration of the independent counsel statute, DOJ promulgated regulations in 1999, which are currently still in effect, to establish procedures for the appointment of special counsels pursuant to the Attorney General's general administrative hiring authority.[73] DOJ described these regulations as "strik[ing] a balance between independence and accountability in certain sensitive investigations."[74] DOJ acknowledged at the time the regulations were promulgated, however, that "there is no perfect solution" to achieving that goal.[75]

Thus far, it appears the special counsel regulations have been invoked infrequently.[76] In 1999, shortly after the regulations were promulgated, the Attorney General appointed former U.S. Senator John Danforth as special counsel to investigate events related to the government actions that occurred six years earlier at the Branch Davidian compound in Waco, Texas.[77] The special counsel's investigation found no wrongdoing on the part of federal law enforcement officials.[78]

In May 2017, Deputy Attorney General Rod Rosenstein—acting in place of Attorney General Jeff Sessions, who had recused himself from the investigation—issued a publicly-available order (public order) appointing former Federal Bureau of Investigation Director Robert S. Mueller III as special counsel.[79] Rosenstein indicated in the public order that the appointment had been made

---

[67] Ethics in Government Act of 1978, P.L. 95-521, § 601, 92 Stat. 1824, 1867-73 (then codified at 28 U.S.C. § 598).

[68] *Id.*

[69] Ethics in Government Act Amendments of 1982, P.L. 97-409, 96 Stat. 2039 (1983).

[70] Independent Counsel Reauthorization Act of 1987, P.L. 100-191, 101 Stat. 1293 (1987).

[71] Independent Counsel Reauthorization Act of 1994, P.L. 103-270, 108 Stat. 732 (1994).

[72] *See generally supra* notes ***.

[73] 28 C.F.R. pt. 600.

[74] *See* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999) (codified at 28 C.F.R. pt. 600).

[75] *See id.*

[76] Matt Zapotosky, *Explaining the Precedent for and Role of a Special Counsel*, CHI. TRIBUNE, May 19, 2017, at 11.

[77] Lorraine Adams, *Reno Asks Danforth to Run Waco Probe*, WASH. POST, Sept. 8, 1999, at A5.

[78] Jim Yardley, *A Special Counsel Finds Government Faultless at Waco*, N.Y. TIMES, July 22, 2000, at A1.

[79] OFFICE OF DEPUTY ATT'Y GEN., ORDER NO. 3915-2017, APPOINTMENT OF SPECIAL COUNSEL TO INVESTIGATE RUSSIAN

pursuant to general statutory authority to manage DOJ investigations, but directed that the investigation would be subject to the agency's regulations governing the scope and administration of special counsel investigations.[80] Specifically, the public order directed the special counsel to investigate efforts of the Russian government "to influence the 2016 election and related matters."[81] DOJ later issued a non-public memorandum that set forth in more detail the scope of the investigation and definition of the special counsel's authority.[82] That memorandum explained that the public order "was worded categorically in order to permit its public release without confirming specific investigations involving specific individuals."[83]

It should be noted that the Attorney General also possesses general statutory authority to appoint DOJ staff to conduct or coordinate particular investigations.[84] DOJ has used this authority previously to appoint individuals who were referred to as "special counsels" to investigate particular matters.[85] This authority differs from the special counsel regulations because it involves assignment of an internal agency official rather than an individual from outside the government.[86] For example, in 2003, then-Deputy Attorney General James Comey (acting in place of then-Attorney General John Ashcroft, who had recused himself from the investigation) used this statutory authority to appoint Patrick Fitzgerald to lead an investigation of whether White House or other federal officials unlawfully leaked the identity of a Central Intelligence Agency officer to a reporter.[87] While referred to as a special counsel, Fitzgerald was serving as a U.S. Attorney when named to lead the investigation, precluding an appointment under the special counsel regulations.[88] While an individual referred to as a "special counsel" thus may be appointed under either the general statutory authority or under the specific special counsel regulations, those named under the regulations might be viewed as possessing more independence, as they are appointed from outside the agency and are insulated by the regulations from removal except for cause.

---

INTERFERENCE WITH THE 2016 PRESIDENTIAL ELECTION AND RELATED MATTERS (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download (citing authority under 28 U.S.C. §§ 509, 510, and 515).

[80] *Id.*

[81] *Id.*

[82] Memorandum from Rod J. Rosenstein, Acting Attorney Gen., to Robert S. Mueller, III, Special Counsel (Aug. 2, 2017) (Government's Response in Opposition to Motion to Dismiss at Attachment C, United States v. Manafort, No. 17-cr-201-1 (D.D.C. filed Apr. 2, 2018)). For a discussion on this non-public memorandum, see discussion *infra* "Scope of Jurisdiction and Authority."

[83] *Id.* at 1.

[84] 28 U.S.C. §§ 509, 510, 515.

[85] *See* Government's Response in Opposition to Motion to Dismiss at n.2, United States v. Manafort, No. 17-cr-201-1 (D.D.C. filed Apr. 2, 2018). A number of "special counsels" have been appointed under this authority prior to the promulgation of the current regulatory framework. *See, e.g.,* Stephen Labaton, *Reno Is Said To Choose New Yorker As Counsel*, N.Y. TIMES (JAN. 20, 1994), https://www.nytimes.com/1994/01/20/us/reno-is-said-to-choose-new-yorker-as-counsel.html; *Justice in the Inslaw Case*, N.Y. TIMES (DEC. 7, 1991), https://www.nytimes.com/1991/12/07/opinion/justice-in-the-inslaw-case.html; David Johnston, *The 1992 Campaign: The House; Counsel to Review House Overdrafts*, N.Y. TIMES (Mar. 21, 1992), https://www.nytimes.com/1992/03/21/us/the-1992-campaign-the-house-counsel-to-review-house-overdrafts.html; David Johnston, *Prosecutor Who Battled Corruption*, N.Y. TIMES (Oct. 17, 1992), https://www.nytimes.com/1992/10/17/us/prosecutor-who-battled-corruption.html.

[86] 28 C.F.R. § 600.3(a).

[87] Letters from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, U.S. Attorney (Dec. 30, 2003 and Feb. 6, 2004), https://www.justice.gov/archive/osc/documents/2006_03_17_exhibits_a_d.pdf.

[88] *Id.*; *see also* 28 C.F.R. § 600.3 ("The Special Counsel shall be selected from outside the United States Government.").

DOJ may also task other arms of the Justice Department—such as the Office of the Inspector General—to investigate high-profile, sensitive, and resource-intensive matters regarding "the Department's compliance with certain legal requirements and [internal] policies and procedures."[89] For example, recently, in response to concerns raised by some Members of Congress with respect to "certain prosecutorial and investigative determinations made by the [Department of Justice] in 2016 and 2017,"[90] Attorney General Sessions considered, but declined to pursue, a separate special counsel inquiry related to allegations of potential misconduct within the Department, noting that special counsel appointments are "by design, . . . reserved for use in only the most 'extraordinary circumstances.'"[91] Such circumstances, according to Sessions, require the Attorney General to determine that "'the public interest would be served by removing a large degree of responsibility for the matter from the Department of Justice.'"[92] Instead, the Attorney General indicated that DOJ's Inspector General has been tasked with reviewing the actions that the Members had suggested be the subject of the second special counsel inquiry, including allegations about DOJ's compliance with legal requirements and internal policies.[93] Instead, the Attorney General announced that he had tasked John W. Huber, U.S. Attorney for the District of Utah, to lead the investigation into those allegations, emphasizing that Huber would be working "from outside the Washington, D.C. area and in cooperation with the Inspector General."[94]

# DOJ Special Counsel Regulations

## Appointment and Selection by the Attorney General or the Acting Attorney General

Under the DOJ regulations that supplanted the independent counsel provisions, the authority to appoint[95] and select a special counsel resides solely with the Attorney General (or his surrogate, if the Attorney General has recused himself from the matter), rather than with the judicial branch.[96] The regulations generally state that the Attorney General "will appoint a Special Counsel" to conduct certain investigations or prosecutions.[97] To make such an appointment, the Attorney General must determine that (1) a criminal investigation is warranted; (2) the normal processes of investigation or prosecution would present a conflict of interest for DOJ, or other extraordinary circumstances exist; and (3) public interest requires a special counsel to assume those

---

[89] Letter from Jefferson B. Sessions III, Attorney General, to Charles E. Grassley, Chairman, Senate Comm. on the Judiciary, Robert W. Goodlatte, Chairman, House Comm. on the Judiciary, and Trey Gowdy, Chairman, House Comm. on Oversight and Gov't Reform, at 2 (Mar. 29, 2018), https://www.documentcloud.org/documents/4426668-AG-Letter-Re-IG-and-Huber-Reviews.html.

[90] *Id.* at 1.

[91] *Id*. at 3.

[92] *Id*. (quoting Office of Special Counsel, 64 Fed. Reg. 37,038, 37,038 (July 9, 1999) (codified at 28 C.F.R. pt. 600)).

[93] *Id*.

[94] *Id*. at 4.

[95] Issues related to the constitutionality of special counsel appointments under the DOJ regulations are discussed in a later section of this report. *See discussion infra* "Appointment of a Special Counsel."

[96] *See* 28 C.F.R. § 600.1. The statutory authority to appoint special counsels pursuant to these regulations arises from the Attorney General's general authority to appoint subordinate officers. *See In re* Grand Jury Investigation, No. 18-3052, 2019 WL 921692, at *4 (D.C. Cir. Feb. 26, 2019).

[97] 28 C.F.R. § 600.1.

responsibilities.[98] When DOJ promulgated the special counsel regulations, it explained the type of conflicts that might lead to the appointment of a special counsel: "[t]here are occasions when the facts create a conflict so substantial or the exigencies of the situation are such that any initial investigation might taint the subsequent investigation, so that it is appropriate for the Attorney General to immediately appoint a Special Counsel."[99]

After receiving information that could warrant consideration of an independent investigation, the Attorney General generally has discretion under the regulations to determine whether and when the appointment of a special counsel would be appropriate.[100] The Attorney General may appoint a special counsel immediately; may require an initial investigation to inform his decision about whether to appoint a special counsel; or "may direct that appropriate steps be taken to mitigate any conflicts of interest, such as recusal of particular officials," to permit the investigation to be concluded within "the normal processes."[101]

In the event that the Attorney General has recused himself from a particular matter upon which a special counsel appointment might be appropriate, the regulations contemplate that the Acting Attorney General will take responsibility for the appointment process.[102] Federal law provides that the Deputy Attorney General would serve as the Acting Attorney General.[103]

Individuals appointed as special counsels under these regulations must be chosen from outside the federal government.[104] Such individuals must be "a lawyer with a reputation for integrity and impartial decisionmaking, and with appropriate experience to ensure both that the investigation will be conducted ably, expeditiously and thoroughly, and that investigative and prosecutorial decisions will be supported by an informed understanding of the criminal law and Department of Justice policies."[105] The special counsel may hold other professional roles during his or her service, but is required to agree that the duties of the appointment will take "first precedence."[106]

## Scope of Jurisdiction and Authority

Like the appointment and selection process, the sole authority to determine the scope of the special counsel's inquiry rests with the Attorney General.[107] The jurisdiction of the inquiry is determined by "a specific factual statement" about the matter to be investigated, which is provided by the Attorney General to the special counsel at the outset of the appointment.[108] Beyond that general jurisdiction, the special counsel is also authorized "to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and

---

[98] *Id.*

[99] *See* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999) (codified at 28 C.F.R. pt. 600).

[100] 28 C.F.R. § 600.2.

[101] *Id.*

[102] *Id.* § 600.1.

[103] 28 U.S.C. § 508(a). If the Deputy Attorney General is likewise recused, the appointment authority would pass to the Associate Attorney General. *Id.* § 508(b). *See also* Exec. Order 13,787, 3 C.F.R. § 16,723 (Mar. 31, 2017) (identifying the order of succession within DOJ if the Attorney General or other senior officials are unable to serve).

[104] 28 C.F.R. § 600.3(a).

[105] *Id.*

[106] *Id.* The regulations state "that it may be necessary to devote their full time to the investigation, depending on its complexity and the stage of the investigation." *Id.*

[107] *Id.* § 600.4.

[108] *Id.* § 600.4(a).

intimidation of witnesses."[109] While these are the original parameters of a special counsel's jurisdiction, additional matters may be assigned to the special counsel as the inquiry proceeds.[110] To expand the jurisdiction, the special counsel must find such an expansion is necessary to complete the original assignment or necessary "to investigate new matters that come to light in the course of his or her investigation."[111] Upon such finding, the special counsel's jurisdiction may be expanded only after consultation with the Attorney General, who then has the authority to determine whether to assign the additional matters to the special counsel or "elsewhere."[112] Within the jurisdiction identified by the Attorney General, the special counsel has relatively broad authority to carry out his or her inquiry. According to the regulations, "the Special Counsel shall exercise, within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney."[113]

The scope of the special counsel's authority under DOJ regulations has been the subject of legal challenge in the course of Special Counsel Robert Mueller III's investigation that began in 2017.[114] That inquiry resulted in several indictments, including against Paul Manafort, the former chairman of President Trump's 2016 campaign, for crimes such as conspiracy to launder money; tax fraud; obstruction of justice and witness tampering; failure to register as an agent of a foreign principal; false statements; and failure to file reports of foreign bank and financial accounts.[115] Manafort filed a motion to dismiss the criminal indictment lodged against him, challenging the indictment as an unlawful exercise of the special counsel's authority.[116] Specifically Manafort argued that the factual matter named as the special counsel's original jurisdiction in the May 2017 public appointment order (i.e., "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump," as well as "any matters that arose or may arise directly from the investigation, and any other matters within the scope of 28 C.F.R. § 600.4(a)"[117]) would preclude the charges made against him.[118] According to Manafort, because the charges made against him do not relate to links with the Russian

---

[109] *Id.* The special counsel also has authority to appeal any decisions arising in the course of the inquiry. *Id.* The regulations explicitly state that special counsels "shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General." *Id.* § 600.4(c).

[110] *Id.* § 600.4(b).

[111] *Id.*

[112] *Id.*

[113] *Id.* § 600.6.

[114] *See* United States v. Manafort, No. 1:17-cr-00201 (D.D.C. filed Oct. 27, 2017). *See also* Manafort v. U.S. Dep't of Justice, No. 1:18-cv-00011 (D.D.C. filed Jan. 3, 2018); United States v. Manafort, No. 1:18-cr-00083 (E.D. Va. filed Feb. 13, 2018).

[115] *See generally* Indictment, United States v. Manafort, No. 1:17-cr-00201 (D.D.C. filed Oct. 30, 2017); Superseding Criminal Information, No. 17-201-1 (D.D.C. filed Sept. 14, 2018). There have been a number of other indictments resulting from the ongoing special counsel investigation, including charges of, for instance, making false statements, computer crimes, and identity theft. For a summary of cases filed by the special counsel, see U.S. Dep't of Justice, *Special Counsel's Office*, *available at* https://www.justice.gov/sco.

[116] *See* Defendant's Motion to Dismiss the Superseding Indictment, United States v. Manafort, No. 1:17-cr-00201 (D.D.C. filed Mar. 14, 2018) (alleging that the charges made in the indictment are not within the scope of the special counsel's authority to investigate because they do not relate to links between Manafort and the Russian government or to Manafort's role as a campaign manager during the 2016 election); Defendant's Motion to Dismiss, United States v. Manafort, No. 1:18-cr-00083 (E.D. Va. filed Mar. 27, 2018).

[117] Office of Deputy Att'y Gen., Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download (the Appointment Order).

[118] Defendant's Motion to Dismiss at 1-3, No. 1:17-cr-00201.

government or actions taken during his time as a campaign manager in 2016 and because the public order's general authority does not grant authority on sufficiently specific matters as required by DOJ regulations, the special counsel cannot pursue the charges filed against him without seeking additional authority under the regulations.[119]

The government's response to these claims disclosed and explained additional documents outlining the scope of the investigation.[120] DOJ acknowledged that the applicable regulations require the special counsel to be provided a "'specific factual statement of the matter to be investigated,'" but emphasized that "the regulations do not provide that the factual statement must be in an appointment order or otherwise made public."[121] According to a subsequent memorandum from Acting Attorney General Rosenstein that was partially released with the government's filing, while the initial order "was worded categorically in order to permit its public release without confirming specific investigations involving specific individuals," a subsequent memorandum provided "a more specific description" of allegations deemed to be authorized as part of the special counsel investigation.[122] Such development of the parameters of jurisdiction during the course of an investigation, according to DOJ, are necessary for "an effective investigation [which] must have some latitude to extend beyond the known facts at the time of [the appointment]."[123]

Ultimately, the courts that considered Manafort's motion to dismiss his indictments rejected his challenge to the special counsel's authority.[124] For example, a federal district court in Virginia considering Manafort's motion concluded that while many of the charges pursued against Manafort "on their face, appear unrelated to the 2016 Presidential election," the investigation and issues charged in the particular case fell "squarely within the jurisdiction outlined" under the appointment order.[125] The court emphasized that the appointment order's broad grant of authority to investigate "any links" between campaign officials and the Russian government permitted investigation into relationships with individuals supported by, even if not members of, the Russian government, such as members of a pro-Russia Ukrainian political party.[126] Moreover, with respect to charges filed by the special counsel that did not pertain directly to the campaign and Russia, a D.C. federal court held such charges, such as tax evasion with regard to proceeds resulting from Manafort's relationship with pro-Russian entities, fell within the special counsel's

---

[119] *Id.*

[120] *See* Government's Response in Opposition to Motion to Dismiss at 7-9, United States v. Manafort, No. 17-cr-201-1 (D.D.C. filed Apr. 2, 2018).

[121] *Id.* at 13. (quoting 28 C.F.R. § 600.4(a)). The government relied, in part, on a previous case (with similar factual allegations regarding the validity of the scope of an investigation) that had challenged a special counsel appointed outside the framework of the regulations discussed herein. *See id.* at 17 n.7. In *United States v. Libby*, the court held that the original appointment order as well as a supplemental clarification jointly served to identify the legal parameters of the special counsel's investigation. 429 F. Supp. 2d 27, 28-29, 31-32, 39 (D.D.C. 2006).

[122] Government's Response in Opposition to Motion to Dismiss at 9, Attachment C, United States v. Manafort, No. 17-cr-201-1 (D.D.C. filed Apr. 2, 2018) (internal quotations omitted).

[123] *Id.* at 22.

[124] *See, e.g.*, United States v. Manafort, 312 F.Supp.3d 60, 65 (D.D.C. 2018) (denying the motion to dismiss "for a number of reasons"); United States v. Manafort, 321 F.Supp.3d 640, 650 (E.D. Va. 2018) ("[T]he Special Counsel's investigation of defendant falls squarely within the jurisdiction [of the appointment order]"); United States v. Concord Mgmt. & Consulting LLC, 317 F.Supp.3d 598, 624-25 (D.D.C. 2018) (holding that the special counsel regulations do not create judicially enforceable rights and even if they did, "the appointment order does not violate the Special Counsel regulations").

[125] *Manafort*, 321 F.Supp.3d at 642, 650.

[126] *Id.* at 650-51 (emphasizing that "the term 'any' 'has an expansive meaning.'").

jurisdiction as "'matters that arose or may arise *directly* from the investigation.'"[127] A federal district court in Virginia further relied upon the later DOJ memorandum that clarified the scope of the special counsel's original appointment as a source of the special counsel's authority, explaining that the original appointment order was worded categorically so that it could be publicly released and noting that the clarifying memorandum specifically authorized the special counsel to investigate crimes related to these other charges.[128] Accordingly, the D.C. federal court rejected Manafort's argument that the special counsel's authority amounted to a "'blank check'" for limitless investigation, reading the appointment order's language as "tightly drafted" to give "the Special Counsel flexibility from the start to manage the investigation and pursue matters that arose 'directly' from the issues within his purview."[129]

## Oversight and Removal

The DOJ special counsel regulations limit the special counsel's relatively broad authority to conduct an inquiry by first subjecting his or her conduct to DOJ rules, regulations, procedures, practices, and policies.[130] Special counsels are directed to consult with the appropriate offices within DOJ or the Attorney General directly if necessary.[131] Additionally, special counsels are subject to discipline for misconduct and breach of ethical duties that are generally applicable to DOJ employees.[132]

Second, the DOJ regulations contemplate some oversight of the special counsel by the Attorney General.[133] Specifically, they direct the special counsel to "determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities."[134] The regulations expressly require the special counsel to "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports."[135] Under DOJ internal guidance, attorneys must inform DOJ leadership of certain events, including "major developments in significant investigations and litigation" such as the filing of criminal charges.[136] DOJ has explained that conformance with this notification requirement "guarantees a 'resulting opportunity for consultation' between the Attorney General and the Special Counsel about the anticipated action, which 'is a critical part of the mechanism through which the Attorney General can discharge his or her responsibilities with respect to the investigation.'"[137]

---

[127] *Manafort*, 312 F.Supp.3d at 81 (emphasis in original).

[128] *Manafort*, 321 F.Supp.3d at 652.

[129] Manafort, 312 F.Supp.3d at 81.

[130] 28 C.F.R. § 600.7(a).

[131] *Id.*

[132] *Id.* § 600.7(c).

[133] *See id*. § 600.7. Special counsels are required to comply with DOJ rules, regulations, procedures, practices, and policies, and are directed to consult with the appropriate offices within DOJ or the Attorney General directly if necessary. *Id*. § 600.7(a). Additionally, special counsels are subject to discipline for misconduct and breach of ethical duties that are generally applicable to DOJ employees. *Id*. § 600.7(c).

[134] *Id*. § 600.6.

[135] *Id*. § 600.8(b).

[136] U.S. Dep't of Justice, United States Attorneys' Manual §§ 1-13.100, 1-13.120 (1997), https://www.justice.gov/usam/usam-1-13000-urgent-reports.

[137] Government's Response in Opposition to Motion to Dismiss at 7, United States v. Manafort, No. 17-cr-201-1 (D.D.C. filed Apr. 2, 2018) (quoting Office of Special Counsel, 64 Fed. Reg. 37,038, 37,040 (July 9, 1999)).

While the regulations indicate that special counsels "shall not be subject to the day-to-day supervision of any official,"[138] the rules authorize the Attorney General to "request that the Special Counsel provide an explanation for any investigative or prosecutorial step."[139] If, after giving the views of the special counsel "great weight," the Attorney General's review of such actions leads him to "conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued," the Attorney General must notify the Chairman and Ranking Members of the Judiciary Committees in Congress of that decision with an explanation.[140]

Aside from review of particular actions, the regulations also grant the Attorney General authority to discipline or remove the special counsel.[141] This authority may be exercised "only by the personal action of the Attorney General."[142] In other words, to comply with the regulations, the Attorney General himself must remove the special counsel, not the President or a surrogate (unless, as noted previously in this report, the Attorney General has recused himself in the matter under investigation).[143] A decision to remove the special counsel must be made with "good cause," such as misconduct, a dereliction of duty, incapacity, the existence of conflicts of interest, or violation of departmental policies.[144] The Attorney General must report his decision to remove the special counsel, with an explanation of that decision, to both the Chairman and Ranking Members of the Judiciary Committees of Congress.[145]

## Review and Conclusion of Special Counsel Inquiries

Although the special counsel regulations do not provide an explicit timeline for inquiries or a special counsel's tenure, they do require the special counsel to report to DOJ periodically about the budget of operations for the inquiry as well as with status updates in some circumstances. Specifically, the special counsel must provide a proposed budget within 60 days of the appointment.[146] The special counsel must also provide annual reports regarding the status of the investigation and budget requests 90 days prior to the beginning of the fiscal year.[147] The Attorney General is required to review the special counsel's annual report and determine whether the investigation should continue and with what budget.[148]

When the special counsel's inquiry concludes, the special counsel must provide a confidential report to the Attorney General with explanations of the decisions made in the course of the inquiry in favor of or declining to prosecute any charges.[149] The regulations do not expressly provide for disclosure of this report to any other parties, nor do they further identify the

---

[138] 28 C.F.R. § 600.7(b).

[139] *Id.*

[140] *Id.*

[141] For a discussion of efforts to codify a similar provision and potential constitutional questions implicated by such proposals, see discussion *infra* "Proposed Legislation to Restrict the Ability to Remove a Special Counsel."

[142] 28 C.F.R. § 600.7(d).

[143] *Id.*

[144] *Id. See supra* note *** for an explanation of the "good cause" standard.

[145] 28 C.F.R. § 600.9(a)(2).

[146] *Id.* § 600.8(a)(1).

[147] *Id.* § 600.8(a)(2).

[148] *Id.*

[149] *Id.* § 600.8(c).

parameters of the content of that report.[150] The regulations do, however, require the Attorney General to make certain reports to the Chairs and Ranking Members of the Judiciary Committees of each house of Congress, including upon the conclusion of the investigation.[151] The regulations' only guidance regarding the Attorney General's concluding report's content is that the report must include "an explanation for [the] action," "including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued."[152] The regulation's use of the word "including," which generally denotes that the terms that follow are illustrative and not definitional, may suggest that the Attorney General's report to Congress is not necessarily limited to explanations of the Special Counsel's prosecutorial decisions.[153] None of the reporting requirements *mandate* public release of any information shared either between DOJ officials or between DOJ and congressional committees. Instead, the regulations provide the Attorney General with the *discretion* to "determine that public release of [his reports to Congress] would be in the public interest."[154] Moreover, the report's contents need to be "consistent with applicable law,"[155] which may suggest that legal doctrines such as executive privilege and the rules governing the release of grand jury information could restrict[156] what can be included in the report.[157]

# Appointing and Removing a Special Counsel: Legal Considerations

Designing a mechanism to provide for criminal inquiries of executive branch officials by officers independent from the executive branch has raised questions about whether this goal can be accomplished in harmony with the requirements of the Constitution. Under the doctrine of separation of powers, the Constitution assigns each branch of government particular functions that generally may not be delegated to, nor usurped by, another branch.[158] In this vein, Congress is

---

[150] *See id.*

[151] *Id.* § 600.9(a). The Attorney General must also report to Congress upon the appointment and removal of a Special Counsel. *Id.*

[152] *Id.*

[153] *See* Fed. Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 99-100 (1941); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 189 (1941).

[154] 28 C.F.R. § 600.9(c).

[155] *See id.*

[156] CRS Legal Sidebar LSB10271, *The Special Counsel's Report: Can Congress Get It?*, by Michael A. Foster and Todd Garvey. *See generally* Chris Strohm and Shannon Pettypiece, When Mueller Issues a Report, Trump May Try to Suppress Some of It, BLOOMBERG (Jan. 7, 2019, 4:00 A.M.), https://www.bloomberg.com/news/articles/2019-01-07/when-mueller-issues-report-trump-may-try-to-suppress-some-of-it.

[157] Introduced legislation would expand the reporting requirements to require the Special Counsel to report to Congress directly at the conclusion of the investigation, or at any time the special counsel is removed, transferred, or resigns. *See* S. 236, 116th Cong. (2019); H.R. 1356, 116th Cong. (2019).

[158] Under what is commonly known as the nondelegation doctrine, Congress cannot delegate its authority to another branch of government. *See* Touby v. United States, 500 U.S. 160, 165 (1991) ("'The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.'" (quoting Mistretta v. United States, 488 U.S. 361, 371 (1989))). And Congress may not usurp certain executive branch functions by aggrandizing power to itself. *Mistretta*, 488 U.S. at 411 n.35 (citing Bowsher v. Synar, 478 U.S. 714, 726-27 (1986)).

entrusted with the legislative power,[159] and may establish executive branch agencies[160] and conduct oversight of those entities.[161] Congress may not, however, engage in criminal prosecutions on behalf of the United States—a function generally reserved for the executive branch.[162] A crucial bulwark in preserving this separation of powers is the Appointments Clause of Article II. That provision requires "Officers of the United States" to be appointed by the President "with the Advice and Consent of the Senate," although Congress may vest the appointment of "inferior" officers "in the President alone, in the Courts of Law, or in the Heads of Departments."[163] Crucially, Article II also empowers the President to hold executive branch officers accountable, through removal if necessary,[164] which the Supreme Court in *Myers v. United States* explained was essential in order to "maintain administrative control of those executing the laws."[165] The Court has, however, recognized that Congress may in certain situations restrict the President's power of removal over certain discrete offices.[166] The powers of appointment and removal are key to understanding Congress's authority to create independent investigative offices and define their contours.

# Appointment of a Special Counsel

While introduced legislation aimed to insulate a special counsel from executive control raises questions (addressed below) about the President's ability to oversee the executive branch, some

---

[159] *See* U.S. CONST. art. I; Clinton v. City of New York, 524 U.S. 417, 437-41 (1998).

[160] Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."); Myers v. United States, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation . . . .").

[161] *See* Watkins v. United States, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad."); McGrain v. Daugherty, 273 U.S. 135 (1927) (describing congressional oversight authority as "an essential and appropriate auxiliary to the legislative function").

[162] *See* Morrison v. Olson, 487 U.S. 654, 691 (1988) ("There is no real dispute that the functions performed by the independent counsel are 'executive' in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch."); *id.* at 706 (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."); Buckley v. Valeo, 424 U.S. 1, 138 (1976) (per curiam) ("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. CONST. art. II, § 3)); United States v. Nixon, 418 U.S. 683, 694 (1974) ("Under the authority of Art. II, [§] 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government.").

[163] U.S. CONST. art. II, § 2, cl. 2; Edmond v. United States, 520 U.S. 651, 662 (1997) ("[T]he Appointments Clause of Article II is . . . among the significant structural safeguards of the constitutional scheme. By vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches."). Non-officers are not subject to any constitutionally required method of appointment. *See Buckley*, 424 U.S. at 126 ("We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of . . . Article [II].").

[164] Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 483 (2010).

[165] 272 U.S. 52, 164 (1926).

[166] *See, e.g.*, Humphrey's Executor v. United States, 295 U.S. 602, 619-20 (1935) (holding that Congress had the authority to limit the President's ability to remove members of the Federal Trade Commission by providing commissioners with "for cause" removal protections because the commissioners exercised "quasi-legislative" and "quasi-judicial" functions); *Morrison*, 487 U.S. at 659-60 (upholding for-cause removal restrictions for an independent counsel).

have questioned whether the appointment of a special counsel under the current regulations violates the Constitution.[167] Such challenges have been unsuccessful, however, as exemplified by the D.C. Circuit's recent ruling in *In re: Grand Jury Investigation*.[168] In that case, the recipient of multiple grand jury subpoenas issued by Special Counsel Robert Mueller moved to quash those subpoenas on the grounds that the appointment of the special counsel was unlawful under the Appointments Clause.[169]

The D.C. Circuit's panel decision held that the Appointments Clause did not require Special Counsel to be nominated by the President and confirmed by the Senate because the special counsel is not a principal officer.[170] Applying the Supreme Court's test in *Edmond v. United States*,[171] the D.C. Circuit ruled that, because he is subject to the control of a superior who was nominated by the President and confirmed by the Senate (i.e., a principal officer), the special counsel is an inferior officer who may be appointed by a department head.[172] While acknowledging that the special counsel regulations bestowed a measure of independence on the special counsel, the court reasoned that because the Attorney General could rescind these regulations at any time, the special counsel is an inferior officer who "effectively serves at the pleasure" of a principal officer.[173]

Additionally, the court rejected the argument that Congress had not "by law" granted the Attorney General the authority to appoint a special counsel as required by the Appointments Clause.[174] In so doing, the panel relied on the Supreme Court's opinion in *United States v. Nixon*,[175] in which the Court concluded that, because Congress had by statute vested general authority in the Attorney General to appoint subordinate officers, the Attorney General's delegation of power to a special prosecutor was valid.[176]

Finally, the D.C. Circuit panel concluded that a department head properly appointed Special Counsel Mueller in accordance with the Appointments Clause, notwithstanding his appointment by Rod Rosenstein, the Deputy and Acting Attorney General.[177] The panel observed that the relevant statutory scheme provided that, in the case of a "disability" of the Attorney General, the Deputy Attorney General "may exercise all the duties of that office."[178] The D.C. Circuit reasoned that when Attorney General Sessions recused himself from matters concerning presidential campaigns, he had a "disability" under the statute on that issue.[179] Accordingly, Deputy Attorney

---

[167] *See, e.g.*, *In re* Grand Jury Investigation, No. 18-3052, 2019 WL 921692, at *1 (D.C. Cir. Feb. 26, 2019).

[168] *In re* Grand Jury Investigation, No. 18-3052, 2019 WL 921692, at *7 (D.C. Cir. Feb. 26, 2019).

[169] *Id*. at *2-3.

[170] *Id*. at *4.

[171] 520 U.S. 651, 663 (1997) (ruling that an inferior officer is someone "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate").

[172] *In re* Grand Jury Investigation, 2019 WL 921692, at *3-4.

[173] *Id*. at *4. The court also noted that "even if at the time of the appointment of Special Counsel Mueller only the Attorney General could rescind the regulations, the Acting Attorney General could essentially accomplish the same thing with specific regard to Special Counsel Mueller by amending his Appointment Order of May 17, 2017, to eliminate the Order's good cause limitations on the Special Counsel's removal." *Id*. at *3.

[174] *Id*. at *4-5. The Appointments Clause provides that Congress "may by law vest the appointment of such inferior officers" in the President, the courts of law, or department heads. U.S. CONST. art. II, § 2, cl. 2.

[175] 418 U.S. 683, 694 (1974).

[176] *In re* Grand Jury Investigation, 2019 WL 921692, at *3-4.

[177] *Id*. at *5-7; *see supra* note ***.

[178] *See* 28 U.S.C. § 501(a).

[179] *In re* Grand Jury Investigation, 2019 WL 921692, at *6.

General Rosenstein became the acting Attorney General—and was therefore the head of the Department of Justice—on such matters.[180] Acting Attorney General Rosenstein's appointment of Special Counsel Mueller, therefore, was an appointment by the head of a department.[181]

# Removing a Special Counsel

While the legal questions surrounding the *appointment* of a special counsel under the regulations have largely been resolved, the circumstances in which a special counsel may be *removed* by a superior have not been settled by the courts. Consideration of the authority to remove a special counsel under current regulations poses several legal questions. As discussed above, Department of Justice regulations provide that a special counsel may be removed only (1) by the Attorney General; (2) "for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies"; and (3) in writing provided to the special counsel specifying the reason(s) for removal.[182] As a preliminary matter, the specific type of behavior that would constitute grounds for removal under the regulations is largely undetermined. For instance, terms such as "misconduct" and "good cause" are not defined in the regulations or by reference to an accompanying statute, and case law addressing the definition of similar statutory removal restrictions is sparse.[183] More broadly, the manner in which a special counsel might be removed without new legislation itself poses difficult legal issues, including the ultimate efficacy of the regulations in constraining the discretion of the executive branch.

## Removing a Special Counsel Pursuant to the Regulations

The Attorney General (or his surrogate if recused) may, consistent with the governing regulations, remove a special counsel "for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies."[184] Conceivably, the Attorney General's decision could be the result of an order from the President, as the Attorney General serves at the pleasure of the President and, as the Court has recognized, the President's power to appoint executive branch officials is tied to the power of removal.[185] A decision to remove a

---

[180] *Id.* at *6-7.

[181] *Id.*

[182] 28 C.F.R. § 600.7(d).

[183] *Compare* Bowsher v. Synar, 478 U.S. 714, 729 (1986) (noting that a statutory for-cause removal provision, which was applicable to Congress's role in removing the Comptroller General, was "very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will"), *with Free Enter. Fund*, 561 U.S. at 503 (describing as "implausibl[e]" the government's argument that the three specified grounds for removal of Board Members in the Dodd-Frank Act are not exclusive). *See* PHH Corp. v. Consumer Fin. Prot. Bureau, 881 F.3d 75, 130 (D.C. Cir. 2018) (Griffith, J., concurring) ("In sum, although Congress has provided little guidance on the meaning of the [inefficiency, neglect of duty, or malfeasance in office (INM)] standard, the Supreme Court in *Bowsher* nevertheless recognized the general breadth of the INM terms.").

[184] 28 C.F.R. § 600.7(d). If the relevant supervisory official concluded that there are grounds under the regulation to do so, then he could simply remove the special counsel. However, an official could conceivably refuse to carry out this order, perhaps based on disagreement with whether the regulation's grounds for removal were satisfied, which could result in resignation or removal of that official by the President. In that case, the next Department of Justice official in line to oversee the investigation would confront the same question until the special counsel was removed or the President relented on the matter. *See* 28 U.S.C. § 508; Exec. Order 13,787, 82 Fed. Reg. 16,723 (Mar. 31, 2017) ("Providing an Order of Succession Within the Department of Justice"). An analogous situation occurred when President Nixon ordered the Attorney General to fire special prosecutor Archibald Cox. *See supra* notes ***; STANLEY I. KUTLER, THE WARS OF WATERGATE 383-414 (1992).

[185] *See* Myers v. United States, 272 U.S. 52, 164 (1926); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 537 F.3d 667, 686 n.1 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("The Supreme Court has recognized that when the head

special counsel under current regulations could be difficult to challenge in court. Importantly, the current regulations explicitly disclaim the creation of any legal rights.[186] Even without that disclaimer, internal agency rules and guidelines, including those of the Justice Department, have generally not been recognized as creating judicially enforceable rights.[187] Instead, an individual seeking judicial relief against the United States in federal court must usually rely on a cause of action that asserts violation of a recognized legal right or requirement.[188] Consequently, at least under current DOJ regulations, obtaining judicial review of a special counsel's removal by a federal court may be difficult.[189]

## Legal Effect of the Regulations

More broadly, it is uncertain to what extent the regulations ultimately constrain the executive branch. Because no statute appears to *require* the Department to promulgate regulations concerning a special counsel, the Department likely enjoys discretion to rescind them.[190] The special counsel regulations also were not promulgated according to the notice and comment procedures[191] that are typically required by the Administrative Procedure Act (APA) when agencies issue legislative rules.[192] Instead, the Department considered the regulations to be exempt from these requirements, as they concerned agency management or personnel.[193] The Department could thus likely rescind the special counsel regulations without going through notice and comment procedures, meaning that the regulations could likely be repealed immediately.

---

of a department appoints inferior officers in that department, the President technically exercises his removal authority over those inferior officers through his alter ego, the department head." (citing *Myers*, 272 U.S. at 133; Morrison v. Olson, 487 U.S. 654, 692 (1988); *Ex parte* Hennen, 38 U.S. 230, 259-60 (1839))), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010).

[186] 28 C.F.R. § 600.10.

[187] *See* United States v. Concord Mgmt. & Consulting LLC, 317 F.Supp.3d 598, 624-25 (D.D.C. 2018) (holding that special counsel regulations do not create judicially enforceable rights); *see, e.g.*, United States v. Blackley, 167 F.3d 543, 548-49 (D.C. Cir. 1999); United States v. Wilson, 413 F.3d 382, 389 (3d Cir. 2005).

[188] *See, e.g.*, 5 U.S.C. §§ 702, 704; S. Forest Watch, Inc. v. Jewell, 817 F.3d 965, 973 (6th Cir. 2016) ("Our conclusion that Manual 22A does not create legally enforceable rules is in line with other courts that have addressed challenges arising under Park Service guidance documents."); The Wilderness Soc. v. Norton, 434 F.3d 584, 596–97 (D.C. Cir. 2006) ("[T]he Management Policies is exactly what it appears to be, a guidance manual for NPS managers and staff that does not create enforceable regulations or modify existing legal rights."); River Runners for Wilderness v. Martin, 593 F.3d 1064, 1072–73 (9th Cir. 2010); Loa-Herrera v. Trominski, 231 F.3d 984, 989 (5th Cir. 2000) (concluding that "an agency's internal personnel guidelines" do not confer legal rights); United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990) ("But the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party."); Dep't of Health & Human Servs. v. Fed. Labor Relations Auth., 844 F.2d 1087, 1095–96 (4th Cir. 1988); Acevedo v. Nassau Cty., New York, 500 F.2d 1078, 1083–84 (2d Cir. 1974); Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 235–36 (8th Cir. 1975); *see also* Davis v. Passman, 442 U.S. 228, 239 n.18 (1979).

[189] *See S. Forest Watch*, 817 F.3d at 973; *The Wilderness Soc.*, 434 F.3d at 596–97; *Trominski*, 231 F.3d at 898; *Craveiro*, 907 F.2d at 264. *But see* Nader v. Bork, 366 F. Supp. 104 (D.D.C. 1973) (concluding that the discharge of the special counsel was unlawful under the regulations), *vacated sub nom.* Nader v. Levi, No. 1954-73, 1975 U.S. Dist. LEXIS 16791 (D.D.C. 1975).

[190] See In re Grand Jury Investigation, No. 18-3052, 2019 WL 921692, at *3 (D.C. Cir. Feb. 26, 2019) (noting that the Attorney General "has authority to rescind at any time the Office of Special Counsel regulations or otherwise render them inapplicable to the Special Counsel").

[191] *See* Office of Special Counsel, 64 Fed. Reg. 37,038, 37,041 (July 9, 1999).

[192] *See* 5 U.S.C. § 553(a)(2).

[193] *See* 64 Fed. Reg. at 37,041.

Once repealed, a special counsel would no longer be protected by a for-cause removal provision.[194]

While DOJ has noted its adherence to the current special counsel regulations,[195] assuming for the sake of argument a situation where the regulations were left in place, a decision by the Attorney General or President to simply ignore the regulations raises unresolved legal questions.[196] Generally, regulations in force typically bind the executive branch with the force of law.[197] In fact, in *Nixon v. United States*, which concerned a claim of executive privilege by President Nixon against a subpoena issued by a special prosecutor, the Court opined on the regulation in force that insulated the special prosecutor from removal.[198] The Court remarked in dicta that

> So long as this regulation is extant it has the force of law. . . . [I]t is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority. But he has not done so. So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it.[199]

In other words, insofar as this reading continues to characterize the Court's approach to the matter, both the President and Attorney General must comply with the special counsel regulations until they are repealed.[200] However, the concrete result of an order removing a special counsel in violation of applicable regulations is difficult to predict. For instance, there might not be a private right of action authorizing judicial review in this situation, leaving the legal remedy available for violation of the regulations in question.[201]

---

[194] Relatedly, depending on the scope and substance of a Presidential order, one might understand a Presidential directive to eliminate a special counsel's investigation to simultaneously rescind the regulations authorizing the appointment as well as remove him from office. This appears to have been the view of Robert Bork regarding President Nixon's order to fire special prosecutor Archibald Cox. *Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States: Hearings Before the Senate Judiciary Comm.*, 110th Cong. 361-62 (1987) (statement of Robert Bork, Judge of the Federal Court of Appeals for the District of Columbia Circuit).

[195] Government's Response in Opposition to Motion to Dismiss at 12, United States v. Manafort, No. 17-cr-201-1 (D.D.C. Apr. 4, 2018).

[196] In addition, notwithstanding the efficacy of such regulations, the authority of the President to unilaterally remove an officer who he did not appoint himself is uncertain. Typically, the power of removal is understood to accompany the power of appointment. Myers v. United States, 272 U.S. 52, 119 (1926). The officer who appoints a special counsel thus enjoys discretion to remove him, just as agency heads enjoy the power of removal over inferior officers who they are entrusted to appoint. *See* Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 497 (2010) ("*Humphrey's Executor* did not address the removal of inferior officers, whose appointment Congress may vest in heads of departments. If Congress does so, it is ordinarily the department head, rather than the President, who enjoys the power of removal."). Whether the President, as the head of the executive branch, *also* has authority to directly remove an inferior officer who he did not appoint is thus unclear. Instead, the usual practice would be for the President to order the agency head with removal authority to dismiss the inferior officer, as was done in the removal of special prosecutor Archibald Cox by Robert Bork. *See supra* notes ***.

[197] Vitarelli v. Seaton, 359 U.S. 535, 549 (1959); Service v. Dulles, 354 U.S. 363, 388 (1957); Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954).

[198] United States v. Nixon, 418 U.S. 683, 695 (1974). *See* Establishing the Office of Watergate Special Prosecution Force, 38 Fed. Reg. 30,738, 30, 739 (Nov. 7, 1973), amended by Office of Watergate Special Prosecution Force, 38 Fed. Reg. 32,805 (Nov. 28, 1973).

[199] *Nixon*, 418 U.S. at 695.

[200] *See* Nader v. Bork, 366 F. Supp. 104 (D.D.C. 1973) (concluding that the discharge of the special counsel was unlawful under the regulations) *vacated sub nom.* Nader v. Levi, No. 1954-73, 1975 U.S. Dist. LEXIS 16791 (D.D.C. 1975).

[201] *See* United States v. Manafort, 312 F. Supp. 3d 60, 75 (D.D.C. 2018) ("Manafort cannot move to dismiss his complaint under the Federal Rules of Criminal Procedure based upon a claimed violation of the Department of Justice

On the other hand, the matter raises open legal issues regarding the scope of the President's authority to supervise the executive branch. It is unclear to what extent agency regulations restricting the grounds for removal of a constitutional officer engaged in core executive functions can bind the President. One might argue that the special counsel regulations, while binding on the Department of Justice, do not ultimately restrict the President's powers.[202] Article II vests the executive power of the United States in the President;[203] and criminal investigations and prosecutions lie at the very core of this constitutional authority.[204] An argument in favor of a more robust view of the President's authority might be that regulations issued by an executive branch agency nearly 20 years ago that restrict the President's power to remove a high-level officer of the United States who is charged with enforcing the law intrude on the President's authority under Article II. DOJ has in the past asserted authority to decline to follow statutes it deems unconstitutional intrusions on the executive branch's power,[205] and this argument might be extended to the context of similarly viewed regulations, particularly those issued by a prior Administration.[206]

## Proposed Legislation to Restrict the Ability to Remove a Special Counsel

Given the questions regarding the scope and effect of the current DOJ special counsel regulations, a number of legislative proposals aim to impose statutory restrictions on the executive branch's ability to remove a special counsel. Consideration of these proposals requires examination of the Supreme Court's decisions regarding statutory restriction on the removal of certain officers. However, because Congress has not enacted any such bill, analysis of these efforts is necessarily preliminary. As discussed above, current Department of Justice regulations authorize the Attorney General to appoint a special counsel and determine the ultimate scope of his jurisdiction, but limit the Attorney General's discretion to remove a special counsel to certain specified reasons.[207] A number of bills proposed during the 116th and 115th Congresses aim to codify aspects of these regulations.[208] Notably, some would statutorily insulate a special counsel from removal and authorize a federal court to review the removal of a special counsel.[209]

---

Special Counsel Regulations because those regulations are not substantive rules that create individual rights; they are merely statements of internal departmental policy.").

[202] *See* Josh Blackman, *Could Trump Remove Special Counsel Robert Mueller? Lessons From Watergate*, LAWFARE (May 23, 2017), https://www.lawfareblog.com/could-trump-remove-special-counsel-robert-mueller-lessons-watergate.

[203] U.S. CONST. art. II, § 1, cl.1.

[204] *Nixon*, 418 U.S. at 693; Buckley v. Valeo, 424 U.S. 1, 139 (1976) (per curiam); Springer v. Gov't of Philippine Islands, 277 U.S. 189, 201-02 (1928).

[205] Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. O.L.C. 199, 199-203 (1994).

[206] *See generally* Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 497 (2010) ("The President can always choose to restrain himself in his dealings with subordinates. He cannot, however, choose to bind his successors by diminishing their powers . . . .").

[207] 28 C.F.R. § 600.7(d).

[208] *See, e.g.*, H.R. 2444, 115th Cong. (2017); Special Counsel Independence and Integrity Act, S. 71, 116th Cong. (2019).

[209] *See Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017).

For instance, S. 1735, introduced in the 115th Congress, would have provided that in order to remove a special counsel, the Attorney General must first file an action with a three-judge court; if that panel issues a finding of "misconduct, dereliction of duty, incapacity, conflict of interest, or other good cause, including violation of policies of the Department of Justice," then a special counsel may be removed.[210] Similarly, S. 1741, the Special Counsel Integrity Act, would have provided that any special counsel appointed on or after May 17, 2017, may only be removed by the Attorney General, or the highest ranking Justice Department official if the Attorney General is recused, for good cause.[211] S. 1741 further provided that a special counsel who has been removed may challenge this action before a three-judge panel, which is authorized to immediately reinstate the individual if the court finds that the removal violated the legislation's terms.[212] Both bills were introduced in the 115th Congress.

Finally, S. 71 and H.R. 197, introduced in the 116th Congress, merge aspects of both of these proposals.[213] They would similarly require good cause in order for the Attorney General to remove a special counsel, but provide a 10-day window in which the special counsel can challenge a removal decision in federal court.[214] If the court determines that the removal violates that good cause standard, then the removal shall not take effect.[215] Understanding these proposals requires an examination of the significant—and oft-debated—constitutional questions concerning Congress's power to establish executive functions outside the direct control of the President.[216]

## Presidential Authority to Oversee Executive Branch Officers

Article II of the Constitution vests the executive power of the United States in the President.[217] As mentioned above, the Supreme Court has made clear that this power includes authority to hold executive branch officers accountable, through removal if necessary.[218] However, the Court has upheld statutory restrictions on the President's removal power for certain offices.[219] In one such case, *Morrison v. Olson*,[220] the Court upheld restrictions on the removal of an independent counsel, although, as discussed below, the Court has not always followed aspects of that decision in subsequent years. The constitutionality of legislative efforts to statutorily insulate a special counsel from removal will thus likely turn on the continuing vitality of the Court's opinion in

---

[210] S. 1735, 115th Cong. § 2(c) (2017).

[211] S. 1741, 115th Cong. § 2(b), (e) (2017).

[212] *Id.* § 2(d).

[213] Special Counsel Independence and Integrity Act, S. 71, 116th Cong. (2019); Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019).

[214] S. 71 § (a) (adding 28 U.S.C. §599K-8); H.R. 197 (d).

[215] S. 71 § (a) (adding 28 U.S.C. §599K-8); H.R. 197 (e)(3). The bills also provides for the preservation of materials pursuant to a special counsel's investigation during these proceedings. S. 71 § (a) (adding 28 U.S.C. §599K-8); H.R. 197 (e)(4)(B).

[216] U.S. CONST. art II. *See Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017). *Compare* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 2-4 (1994) (asserting that the Framers did not envision a unitary executive), *with* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 547-50 (1994) (arguing that the theory of a unitary executive flows from an originalist interpretation of the Constitution's meaning).

[217] U.S. CONST. art. II, § 1, cl. 1.

[218] Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 483 (2010).

[219] Humphrey's Executor v. United States, 295 U.S. 602, 619-20 (1935).

[220] 487 U.S. 654 (1988).

*Morrison* and, more generally, whether a court would apply a more formalist or functionalist methodology in considering such legislation.[221] Definitive conclusions about such efforts are thus difficult absent further guidance from the Court.

### Morrison v. Olson

In the 1988 case of *Morrison v. Olson*, the Supreme Court addressed the issue of whether a federal prosecutor can be insulated from executive control in the context of the now-expired Independent Counsel Act.[222] *Morrison* upheld the independent counsel statute, which, as discussed above, vested the appointment of an independent counsel outside of the executive branch and limited the removal authority of the President.[223] Writing for the Court, Chief Justice Rehnquist concluded that the independent counsel was an inferior, rather than a principal, officer, whose appointment was not required to be made by the President subject to Senate confirmation.[224] The appointment of such officers was permissible because they (1) were removable by the Attorney General for cause; (2) had a limited scope of duties; and (3) possessed limited jurisdiction.[225]

The Court also held that the Independent Counsel Act's provision limiting the authority of the Attorney General to remove the independent counsel for good cause did not impermissibly intrude on the President's power under Article II.[226] The Court rejected a formalistic rule that would bar statutory for-cause removal protections for an individual tasked with "purely executive" functions; instead, it applied a functional test and asked whether Congress has "interfere[d] with the President's" executive power and his "duty to 'take care that the laws be faithfully executed.'"[227] The Court recognized that the independent counsel operated with a measure of independence from the President, but concluded that the statute gave "the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties."[228]

*Morrison* was decided 7-1, with Justice Scalia dissenting from the Court's opinion and Justice Kennedy not participating in the case. In dissent, Justice Scalia argued that the independent counsel statute violated the separation of powers because the Constitution vested authority for criminal investigations and prosecutions exclusively in the executive branch and the statute deprived the President of exclusive control of that power.[229] Under this rationale, he warned that the Court must be very careful to guard against the "'gradual concentration of the several powers in the same department'" that can be likely to occur as one branch seeks to infringe upon another's distinct constitutional authorities.[230] Justice Scalia emphasized the power and discretion

---

[221] For more on the distinction between functionalism and formalism in constitutional interpretation, see CRS Report R45129, *Modes of Constitutional Interpretation*, by Brandon J. Murrill.

[222] 487 U.S. 654 (1988).

[223] *Id.* at 659-60.

[224] *Id.* at 671.

[225] *Id.* at 671-72.

[226] *Id.* at 686-93. The independent counsel was removable by the Attorney General "only for good cause, physical or mental disability (if not prohibited by law protecting persons from discrimination on the basis of such a disability) or any other condition that substantially impairs the performance of such independent counsel's duties." 28 U.S.C. § 596. The independent counsel provisions have since expired. *Id.* § 599.

[227] 487 U.S. at 690 (quoting U.S. Const. art. II, § 3, cl. 5).

[228] *Id.* at 693-96.

[229] *Id.* at 703-05 (Scalia, J., dissenting).

[230] *Id.* at 699 (quoting The Federalist No. 51 (Alexander Hamilton)); *id.* ("Frequently an issue of this sort will come

typically vested in prosecutors and noted that the key check on prosecutorial abuse is political—prosecutors are accountable to, and can be removed by, the President, who is likewise accountable to the people.[231] But operation of the independent counsel statute, for Justice Scalia, eliminated that constitutional feature by creating an unaccountable prosecutor outside of presidential control.[232]

In the years since *Morrison*, especially in the wake of the Whitewater investigation into President Clinton by an independent counsel that culminated in the President's impeachment on grounds that were tangential to the impetus for the investigation, a number of legal scholars criticized the independent counsel statute on both policy and constitutional grounds.[233] Additionally, members of both political parties have since noted opposition to the law, resulting in relatively widespread agreement to let the Independent Counsel Act expire in 1999.[234]

### Post-*Morrison* *Case Law on Appointments and Removal*

The Supreme Court in the 1997 case of *Edmond v. United States* applied a different standard than that enunciated in *Morrison* in the context of a challenge to the appointment of certain "inferior" officers.[235] The opinion, authored by Justice Scalia, adopted the reasoning he applied in dissent in *Morrison* for determining whether an individual is an inferior officer. In that case, the Court did not apply the functional test used in *Morrison* for determining whether an individual was an inferior officer. Instead, it adopted a formal rule—an inferior officer is one who is "directed and supervised" by a principal officer (officers appointed by the President and confirmed by the Senate).[236] Applying this rule, the Court concluded that the appointment of members of the Coast Guard Court of Criminal Appeals by the Secretary of Transportation was consistent with Article II.[237] Specifically, the Court reasoned that because Members of the Coast Guard Court of Criminal Appeals are removable at will and lack power to render a final decision of the United States unless permitted to do so by a superior in the executive branch they are directed and supervised by principal officers.[238] The appointment of the members of the Coast Guard Court of

---

before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.").

[231] *Id.* at 728-31.

[232] *Id.*

[233] *See* Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747, 802-12 (1999) (arguing that *Morrison* was wrongly decided); *Starr Opposes Independent Counsel Act*, CNN.COM (Apr. 14, 1999), http://www.cnn.com/ALLPOLITICS/stories/1999/04/14/test.top/; Julie O'Sullivan, *The Independent Counsel Statute: Bad Law, Bad Policy*, 33 AM. CRIM. L. REV. 463, 475-509 (1996); Julian A. Cook III, *Mend It or End It? What To Do With the Independent Counsel Statute*, 22 HARV. J. L. & PUB. POL'Y 279, 288-316 (1998); Ken Gormley, *Monica Lewinsky, Impeachment, and the Death of the Independent Counsel Law: What Congress Can Salvage from the Wreckage–A Minimalist View*, 60 MD. L. REV. 97, 113-31 (2001).

[234] *See* Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 525–26 (2005) ("In the wake of Kenneth Starr''s investigation of several Clinton-era scandals, a bipartisan consensus emerged against the use of independent counsels."); MICHAEL GERHARDT, THE FEDERAL IMPEACHMENT PROCESS 189-91 (2000); *see, e.g.*, *Independent Counsel Act: Hearing Before the S. Governmental Affairs Comm.*, 106th Cong. (Mar. 17, 1999) (statement of Janet Reno, Attorney General) ("However, after working with the Act, I have come to believe—after much reflection and with great reluctance—that the Independent Counsel Act is structurally flawed and that those flaws cannot be corrected within our constitutional framework.").

[235] 520 U.S. 651 (1997).

[236] *Id.* at 663.

[237] *Id.* at 663-65.

[238] *Id.* at 664-65.

Criminal Appeals by the Secretary of Transportation was thus constitutional because the members constituted inferior officers and the Secretary was a principal officer.[239]

More recently, in the 2010 case of *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Court invalidated statutory structural provisions providing that members of the Public Company Accounting Oversight Board could be removed only "for cause" by the Securities and Exchange Commission, whose members, in turn, appeared to also be protected from removal by for-cause removal protections.[240] The Court again applied a rather formalist rule in analyzing Congress's attempt to shield executive branch officers from removal, rather than the functional approach followed in *Morrison*.[241] The Court concluded that, while the early 20th century case of *Humphrey's Executor v. United States* had approved such protections for the heads of independent agencies and *Morrison* did the same for certain inferior officers, the combination of dual "for cause" removal protections flatly contradicted the vestment of executive power in the President under Article II.[242] Further, the Court then applied the test it used in *Edmund*, rather than the functional analysis of *Morrison*, in concluding that members of the regulatory board were now—after invalidation of statutory removal protections by the Court—inferior officers because the Securities and Exchange Commission, composed of principal officers, possessed oversight authority over the board and the power to remove its members at will.[243]

However, the Court has not gone so far as to overrule or even explicitly question *Morrison*. As a result, that opinion's holding regarding the constitutionality of for-cause restrictions for an independent counsel binds the lower courts.[244] Moreover, while the Court's decisions in *Edmund* and *Free Enterprise Fund* have not applied the reasoning in *Morrison* concerning the test for who qualifies as an inferior officer, it is not necessarily clear what removal restrictions are appropriate for principal officers or how the determinations about the appointment power concern determinations about the scope of the removal power.[245] Nonetheless, it appears that the *Edmond* test, rather than the *Morrison* analysis, for determining whether an individual is an inferior officer is what will guide the Court going forward.[246] Furthermore, *Free Enterprise Fund* represents a movement toward a more formalist, and possibly more expansive, view of the Presidential power of removal than was expressed in *Morrison*.[247] More fundamentally, no member of the *Morrison*

---

[239] *Id.*

[240] 561 U.S. 477, 491 (2010); *id.* at 487 (noting that the parties agreed the Commissioners could not be removed except for cause).

[241] *See id.* at 519-20 (Breyer, J. dissenting) (arguing for a functional approach to the case as opposed to the "bright-line rule[]" adopted by the majority opinion).

[242] *Id.* at 496.

[243] Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 510 (2010). The Court reached this conclusion after invalidating "for cause" removal restrictions on the Board members on separation of powers grounds. *Id.* at 508.

[244] *See* Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989).

[245] PHH Corp. v. Consumer Fin. Prot. Bureau, 881 F.3d 75, 96 n.2 (D.C. Cir. 2018) (en banc) (arguing that "whether a removal restriction unconstitutionally constrains presidential power thus does not track whether the shielded official is a principal or inferior officer"); *but see* Myers v. United States, 272 U.S. 52, 110 (1926) (describing the removal power as "incident to the power of appointment).

[246] *See Free Enterprise Fund*, 561 U.S. at 496.

[247] *See Justice Kagan and Judges Srinivasan and Kethledge Offer Views from the Bench*, 92 STANFORD LAW. 4 (2015) (quoting Justice Kagan as describing Justice Scalia's *Morrison* dissent as "one of the greatest dissents ever written and every year it gets better"); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2252 (2001) ("I aver that in comparison with other forms of control, the new presidentialization of administration renders the bureaucratic sphere more transparent and responsive to the public, while also better promoting important kinds of regulatory

Court sits on the Supreme Court today.[248] Because of this apparent shift in the Court's general approach to separation-of-powers matters related to appointment and removal, and the current Court's relative silence on *Morrison's* import, whether today's Court would necessarily view a reauthorization of the independent counsel statute or a similar statute in the same manner as it did in *Morrison* is subject to debate.[249]

## Legislation to Establish For-Cause Removal Protection for a Special Counsel

Assuming that the Supreme Court were to follow the functional approach reflected in its *Morrison* decision, efforts to statutorily require good cause to remove a special counsel would likely pass constitutional muster. As noted above, in *Morrison*, the Court examined whether Congress had impermissibly interfered with the President's constitutional duties;[250] it approved of the independent counsel statute's provisions that, among other things, (1) required good cause to remove the independent counsel; (2) largely restricted the Attorney General's discretion in deciding to request the appointment of an independent counsel; and (3) placed the actual power of appointment with a panel of Article III judges.[251] Legislation that would statutorily insulate a future special counsel from removal except for good cause appears roughly analogous to the for-cause removal provisions upheld in *Morrison*.[252] In fact, some proposals appear to be less restrictive of the President's power relative to the independent counsel statute. For instance, S. 1741 (115th Congress) and S. 71 (116th Congress) appear to contemplate the appointment of a special counsel at the discretion of the AG, and they provide that only the Attorney General—or the most senior Justice official who has been confirmed by the Senate if the Attorney General is recused—may remove a special counsel.[253] Under both bills, an executive branch official would retain discretion to appoint and remove a special counsel for cause. Under *Morrison's* functional balancing approach, which examines whether Congress has unduly interfered with the President's executive power and duty to take care that the law is executed faithfully, this framework is less intrusive of executive branch power than was the independent counsel statute because the executive branch would retain control over a special counsel's appointment.[254]

---

competence and dynamism."); *In re* Aiken Cty., 645 F.3d 428, 444 (D.C. Cir. 2011) (Kavanaugh, J., concurring) (highlighting the broad view of executive power under Article II espoused in *Free Enterprise Fund*).

[248] *But see In re* Sealed Case, 838 F.2d 476, 518 (D.C. Cir.) (Ginsburg, J., dissenting) ("Because I conclude that the Ethics Act neither impermissibly transfers an executive function to another branch nor orders an undue displacement of executive prerogatives, I would hold that the legislation withstands appellants' separation of powers challenges."), *rev'd sub nom.* Morrison v. Olson, 487 U.S. 654 (1988).

[249] *See* Adrian Vermeule, Morrison v. Olson *is Bad Law*, LAWFARE (June 9, 2017), https://www.lawfareblog.com/morrison-v-olson-bad-law; *Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) (statement of Professor Akhil Reed Amar) (arguing that "today's Court would most likely . . . either flat-out overrule *Morrison* or treat it as irrelevant" if faced with a statute codifying for-cause protections for a special counsel). *But see id.* (statement of Professor Stephen Vladeck) (asserting that *Morrison* remains good law and "has become deeply rooted in the Court's separation-of-powers jurisprudence").

[250] Morrison v. Olson, 487 U.S. 654, 689-90 (1988).

[251] *Id.* at 693-96.

[252] S. 1741, 115th Cong. § 2 (2017).

[253] S. 1741, 115th Cong. § 2(a) (2017); S. 71, 116th Cong. § (a) (adding 28 U.S.C. §§ 599K-1, K-8) (2019).

[254] *Morrison*, 487 U.S. at 690.

Likewise, insulating a special counsel from removal by the Attorney General except for those reasons outlined in current Justice regulations—"for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies"[255]— would likely permit removal of a special counsel for a broader range of reasons than did the now-expired independent counsel statute, which limited the basis for removal to "good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties."[256] Specifically, several bills would add misconduct, dereliction of duty, and conflict of interest as grounds for removal, and specifically define good cause to include violation of departmental policies.[257] At least considered in isolation, such a provision would be less intrusive into the executive branch's authority under Article II than the statute at issue in *Morrison*, as the proposal would grant the Attorney General—a principal officer directly accountable to the President—greater control of the special counsel than he had under the independent counsel statute.[258] Accordingly, if the Court were to embrace a functionalist balancing approach in a challenge to such a provision, it would likely affirm its constitutionality as the executive branch could remove a special counsel for a broader range of reasons than was permitted in the independent counsel statute.

Nevertheless, bills that aim to insulate a special counsel from removal might be constitutionally suspect if the Court chose to overrule *Morrison* or limit the reach of that case to its facts. In particular, were the Court to face a challenge to a special counsel entrusted with wide-ranging investigative authority who statutorily could not be removed except for cause, application of the approach in *Edmond*, rather than *Morrison*, might result in the Court concluding that a special counsel is a principal officer.[259] As noted above, *Edmond*'s test for inferior officer status is that the individual be directed and supervised by a principal officer.[260] And that test was satisfied because Coast Guard Court of Appeals judges were removable at will and lacked power to render final decisions of the executive branch.[261] A special counsel with statutory removal protection would obviously not be removable at will.[262] As to whether a special counsel renders final decisions, any analysis would likely depend on the scope of authority granted to a special counsel.[263] Were the Court to conclude that a special counsel does constitute a principal officer,

---

[255] 28 C.F.R. § 600.7(d). *See, e.g.*, H.R. 2444, 115th Cong. § 8(d) (2017).

[256] *Morrison*, 487 U.S. at 663.

[257] S. 71, 116th Cong. § (a) (adding 28 U.S.C. §599K-8) (2019); H.R. 197, 116th Cong. § (b) (2019); S. 1741, 115th Cong. § 2(b) (2017); H.R. 2444, 115th Cong. § 8(d) (2017). S. 1735 would permit removal for the same reasons, but place discretion to find those reasons with a judicial body. S. 1735, 115th Cong. § 2(c) (2017). This provision might raise distinct issues under Article II, see discussion *infra* "Judicial Review."

[258] While the Court in *Morrison* upheld a challenge to the independent counsel provisions of the Ethics in Government Act, one might note that the investigation underway in that case was fairly limited in scope—focused as it was on one individual—at least relative to the potentially wide-ranging authority possible under the special counsel regulations. *See Morrison*, 487 U.S. at 665-69. *But see id*. at 715-23 (Scalia, J., dissenting) (emphasizing the power wielded by the independent counsel).

[259] *See supra* "Post-Morrison Case Law on Appointments and Removal"; Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd., Inc, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012) (concluding that severing a for-cause removal provision transformed Copyright Royalty Judges from principal to inferior officers).

[260] Edmond v. United States, 520 U.S. 651, 663 (1997).

[261] *Id*. at 664-65.

[262] *See Intercollegiate Broad. Sys*., 684 F.3d at 1339 (ruling that Copyright Royalty Judges were principal, rather than inferior, officers, because they could only be removed for cause, were not subject to extensive supervision by a superior, and could render final decisions).

[263] The current scope of the special counsel's authority could be viewed as quite broad, as the special counsel enjoys the full power of a United States Attorney and is not subject to day-to-day supervision. *See* 28 C.F.R. § 600.6 ("[T]he

his or her appointment must be made by the President with Senate confirmation, rather than by the Attorney General.[264] Further, any removal restrictions might be questioned as well, as the Court has never approved such restrictions for a principal officer charged with core executive functions.[265] Nonetheless, the Court has not reconciled its holding on the appointments question in *Morrison* with its holding in *Edmond,* meaning that the limits on Congress's power to insulate executive branch officials from removal are subject to debate.[266]

More broadly, a departure from *Morrison* and an application of the Court's more recent formalist approach to separation of powers disputes, as evidenced in *Free Enterprise Fund*, might cast for-cause removal protections for a special counsel in an unfavorable light. The Court's emphasis in that case on the importance of presidential control over executive branch officers and the ability to hold them accountable in order to preserve the constitutional structure envisioned by the Framers could be read to conflict with statutory removal restrictions for government officers carrying out core executive functions.[267]

That said, a middle road is possible. Were Congress to pass legislation insulating a special counsel from removal except for cause, one option might be for the Court to narrowly construe the scope of for-cause removal protections, interpreting them to permit removal for a broad range of reasons.[268] This would avoid overruling *Morrison*, but arguably preserve substantial executive branch authority over the special counsel. Nonetheless, such a reading might authorize more

---

Special Counsel shall exercise, within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney."); *id*. § 600.7(b) ("The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department."); *see also Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) (statement of Professor Akhil Reed Amar) ("The Mueller investigation is thus vastly wider and more consequential for the republic than was Alexia Morrison's."). On the other hand, as discussed earlier in this report, see *supra* "Oversight and Removal," there are a number of decisions that the Special Counsel cannot make without approval of the Attorney General. *See id*. § 600.7(b) ("However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel."); *id*. § 600.4(b) ("[T]he Attorney General . . . will determine whether to include . . . additional matters within the Special Counsel's jurisdiction or assign them elsewhere."). The Special Counsel regulations explicitly note that the Attorney General (or his surrogate) retains "ultimate responsibility" for the investigation. Office of Special Counsel, 64 Fed. Reg. 37,038, 37,038 (July 9, 1999).

[264] U.S. CONST. art. II, § 2, cl. 2.

[265] *See* Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 492-95 (2010); *see also* Myers v. United States, 272 U.S. 52, 164 (1926); *but see* Humphrey's Executor v. United States, 295 U.S. 602, 619-20 (1935) (upholding removal restrictions for members of the Federal Trade Commission because the commissioners exercised "quasi-legislative" and "quasi-judicial" functions); PHH Corp. v. Consumer Fin. Prot. Bureau, 881 F.3d 75, 97 n.2 (D.C. Cir. 2018) (en banc) (arguing that "whether a removal restriction unconstitutionally constrains presidential power thus does not track whether the shielded official is a principal or inferior officer").

[266] Nick Bravin, *Is* Morrison v. Olson *Still Good Law? The Court's New Appointments Clause Jurisprudence*, 98 Colum. L. Rev. 1103, 1106 (1998).

[267] *In re* Aiken Cty., 645 F.3d 428, 444 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("[T]he *Free Enterprise Court* repeatedly emphasized the central role of the President under Article II and the importance of that role to a government that remains accountable to the people. The Court's rhetoric and reasoning are notably in tension with *Humphrey's Executor*.").

[268] *See, e.g.*, *PHH Corp.*, 881 F.3d at 124 (D.C. Cir. 2018) (Griffith, J., concurring in the judgment) (construing for-cause removal protections for the Director of the Consumer Financial Protection Bureau to "provide only a minimal restriction on the President's removal power, even permitting him to remove the Director for ineffective policy choices").

significant control of a special counsel's decisions, ultimately restricting the independence of the office, at least compared to that envisioned by the independent counsel statute.[269]

## Legislation to Establish Judicial Review of a Removal Decision

Certain bills authorizing a judicial role in the removal of a special counsel may raise distinct constitutional questions. As an initial matter, proposals to authorize judicial review of a decision by the Attorney General to remove a special counsel, such as S. 1741 (115th Congress), as well as S. 71 and H.R. 197 (116th Congress),[270] appear somewhat similar to provisions considered by the Court in *Morrison*.[271] And the Supreme Court has otherwise adjudicated suits from government officers who have been removed from their position.[272] It bears mention, however, that the traditional remedy in such situations has been for back pay, rather than reinstatement.[273] Bills that limit available remedies to reinstatement, or require this result, depart from the independent counsel statute's provisions, which provided a reviewing court with the option to order reinstatement or issue "other appropriate relief."[274] One might distinguish between, on the one hand, a court's undisputed power to determine compliance with the law and award damages for violations, and, on the other, a potential judicial order directing an executive branch official to reappoint an individual to an office. In this vein, injunctive relief of this type could be viewed as inserting the judiciary into a role assigned by Article II to the executive branch.[275]

In addition, at least one proposal, S. 1735, might authorize the judiciary to play a more substantial role in the removal of a special counsel.[276] That bill would bar the removal of a special counsel unless the Attorney General first files a petition with a three-judge court, and that court itself finds "misconduct, dereliction of duty, incapacity, conflict of interest, or other good cause, including violation of policies of the Department of Justice."[277] Inserting the judiciary into a removal decision, by requiring a court to determine in the first instance the grounds for the dismissal of an executive branch official before he may be removed, appears to go beyond the restrictions on the President's removal power previously approved by the Supreme Court in

---

[269] *See id*. at 122-23 (Wilkins, J., concurring) (concluding that removal protections for the Director of the Consumer Financial Protection Bureau should not be read to permit removal for policy disagreements as this would undermine the independence of independent agencies).

[270] S. 71, 116th Cong. § (a) (adding 28 U.S.C. § 599K-8) (2019); H.R. 197, 116th Cong. § (e) (2019); S. 1741, 115th Cong. § 2(d) (2017).

[271] Morrison v. Olson, 487 U.S. 654, 663-64 (1988). S. 71 provides that the Attorney General may remove a special counsel, but imposes a ten-day window in which the special counsel may challenge this decision in federal court. If the court finds that the Attorney General does not have good cause to remove the special counsel, the removal shall not take effect. S. 71, 116th Cong. § (a) (adding 28 U.S.C. § 599K-8).

[272] Myers v. United States, 272 U.S. 52, 106-07 (1926).

[273] *See, e.g.*, Humphrey's Executor v. United States, 295 U.S. 602, 619-20 (1935). *But see* Berry v. Reagan, No. 83-3182, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983) (issuing a preliminary injunction barring the removal of members of the U.S. Commission on Civil Rights from their posts).

[274] *Compare* Ethics in Government Act, 28 U.S.C. § 596(a)(3) (authorizing a court reviewing the removal of an independent counsel to grant reinstatement or "other appropriate relief"), *with* S. 1741, 115th Cong. § 2(d)(3) (2017) (providing only that a special counsel shall be reinstated to his position upon a judicial finding that he was removed in violation of the statute), *and* S. 71, 116th Cong. § (a) (adding 28 U.S.C. § 599K-8) ("If a court determines that the removal of the individual who filed an action under this subsection violates this chapter, the removal shall not take effect. The court may also provide other appropriate relief.").

[275] *See* Aziz Z. Huq, *Removal as a Political Question*, 65 Stan. L. Rev. 1, 76 (2013) ("[I]njunctive relief against an executive branch official in the form of a reinstatement order would raise substantial constitutional issues.").

[276] S. 1735, 115th Cong. § 2 (2017).

[277] *Id*. § 2(c).

*Humphrey's Executor* and *Morrison*. As the *Free Enterprise Fund* Court explained, even in the prior cases that "upheld limited restrictions on the President's removal power, it was the President—or a subordinate he could remove at will—who decided whether the officer's conduct merited removal under the good-cause standard."[278] The body charged with determining whether good cause exists to remove a special counsel would not be one that is subordinate to or accountable to the President; indeed, that body is not located in the executive branch at all.[279] Moreover, *Free Enterprise Fund* invalidated two layers of removal protection for executive branch officers as violating Article II.[280] Here, a special counsel could not be removed unless permitted by Article III judges—judicial officers who may not be removed except through the impeachment process.[281] As such, with regards to this proposal, not only would two layers of removal protection shield a special counsel from dismissal, but one layer would be significantly more stringent than the for-cause protection in *Free Enterprise Fund*.

Further, while the Court in *Morrison* saw no issue with the independent counsel statute's provision authorizing ex post judicial review (i.e., after the fact) of a removal decision,[282] that conclusion rested on the understanding that the executive branch retained discretion over the decision to remove an independent counsel.[283] Judicial review in that situation was limited to ensuring compliance with the law.[284] Indeed, the *Morrison* Court narrowly construed that statute to preclude any role for the judicial panel that was entrusted with appointing an independent counsel in removing him during an investigation or judicial proceeding.[285] The Court explained that this move avoided an unconstitutional "intrusion into matters that are more properly within the Executive's authority."[286] Proposals that require an initial judicial finding of good cause in order to authorize removal arguably insert the judiciary into an executive branch function in a manner the *Morrison* Court appeared to consider questionable.

---

[278] Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 495 (2010).

[279] S. 1735, 115th Cong. § 2(c) (2017); U.S. CONST. art. III, § 1.

[280] *Free Enter. Fund*, 561 U.S. at 495.

[281] U.S. CONST. art. III, § 1.

[282] Morrison v. Olson, 487 U.S. 654, 693 n.33 (1988).

[283] *Id.* at 682-83 ("The termination provisions of the Act do not give the Special Division anything approaching the power to remove the counsel while an investigation or court proceeding is still underway—this power is vested solely in the Attorney General. . . . So construed, the Special Division's power to terminate does not pose a sufficient threat of judicial intrusion into matters that are more properly within the Executive's authority to require that the Act be invalidated as inconsistent with Article III.").

[284] *Id.* at 693 n.33 ("The purpose of such review is to ensure that an independent counsel is removed only in accordance with the will of Congress as expressed in the Act. The possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority.").

[285] The independent counsel statute authorized the special division to terminate the office of the independent counsel. 28 U.S.C. § 596(b)(2). The Court rejected the Court of Appeals for the District of Columbia's broader reading of that provision and concluded that termination simply authorized the special division to terminate the office once the investigation was completed. *Morrison*, 487 U.S. at 682-83.

[286] *Morrison*, 487 U.S. at 682-83.

On the other hand, application of a functional approach akin to *Morrison*, which examined a variety of factors in adjudicating the separation of powers dispute, might nevertheless conclude that a requirement of an initial judicial finding of good cause in order to remove a special counsel does not impair the President's core Article II responsibilities. First, under S. 1735, the Attorney General retains discretion to initiate a removal in the first place by petitioning the three-judge panel; that body would lack authority to remove a special counsel independently.[287] Second, the previously upheld independent counsel statute authorized judicial review of a removal of the independent counsel and authorized reinstatement as a remedy.[288] The bill's provision would shift the sequence of the judicial role from an ex post review to an ex ante (i.e., beforehand) authorization. Viewed in this light, it is unclear why that shift would necessarily make a substantive difference, because even if the executive branch ignored the provision allowing for ex ante review and removed a special counsel unilaterally, the special counsel could sue for reinstatement, which would leave the court in largely the same position. Finally, while requiring judicial authorization to remove a special counsel might intrude somewhat on the executive branch's Article II authority other aspects of the bill are less intrusive. For instance, the bill leaves discretion to appoint the special counsel with the Attorney General, and appears to permit removal for a wider range of conduct than did the independent counsel statute.[289] Because the *Morrison* Court balanced a variety of factors and concluded that the independent counsel statute did not impermissibly interfere with the President's duty to execute the law, an application of *Morrison* might mean that these features ameliorate concerns about a judicial body first approving of a removal.

Leaving aside issues arising under Article II of the Constitution, legislation requiring the Attorney General to first petition a federal court for a good cause finding *before* removing a special counsel might raise questions under Article III. The Constitution defines the proper scope of the federal courts' jurisdiction as limited to adjudicating "cases" and "controversies."[290] The Supreme Court has articulated several legal doctrines emanating from Article III that limit the circumstances under which the federal courts will adjudicate disputes.[291] The Court has interpreted Article III to require adversity between the parties, or a live dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests."[292] Further, the Court has made clear that duties of an administrative or executive nature generally may not be vested in Article III judges.[293] Article III courts are permitted to exercise certain non-adjudicatory functions, but these exceptions are generally limited to duties incident to the judicial function, such as supervising grand juries and participating in the issuance of search warrants.[294] With respect to a suit by the Attorney General seeking ex ante judicial authorization to remove a special counsel, these requirements might not necessarily be met.[295] For instance, given this procedural posture, it is not

---

[287] S. 1735, 115th Cong. § 2(a) (2017).

[288] *Morrison*, 487 U.S. at 663-64.

[289] S. 1735, 115th Cong. § 2 (2017).

[290] U.S. CONST. art. III, § 2; *see* Massachusetts v. EPA, 549 U.S. 497, 516 (2007) ("Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'").

[291] *See* Allen v. Wright, 468 U.S. 737, 750 (1984); Bennett v. Spear, 520 U.S. 154, 162 (1997).

[292] Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937).

[293] *Morrison*, 487 U.S. at 677; Mistretta v. United States, 488 U.S. 361, 385-89 (1989); United States v. Ferreira, 54 U.S. 40, 51 (1851).

[294] *See Morrison*, 487 U.S. at 681 n.20; *Mistretta*, 488 U.S. at 385-97.

[295] *See Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) (testimony of Professors John Duffy and Stephen Vladeck) (both noting that such a provision raises issues under Article III).

obvious who the adverse party would be as the legislation does not explicitly authorize the special counsel to participate in the proceedings. Likewise, the supervision of executive branch officers, including discretion to remove them, is traditionally an executive or administrative function, rather than a judicial one.[296]

## Retroactive Application of Legislation to Insulate a Special Counsel

Finally, certain bills that aim to insulate a special counsel from removal might raise unresolved questions concerning their retroactivity. For instance, S. 1741 (115th Congress) would have provided that a special counsel may not be removed except for cause and that this provision retroactively applies to any special counsel appointed on or after May 17, 2017.[297] Likewise, S. 71 and H.R. 197 (116th Congress) contain a similar provision, although it applies to any special counsel appointed on or after January 1, 2017.[298] One might argue that statutorily insulating a currently serving special counsel from removal improperly inserts Congress into the appointments process.[299] The Supreme Court has invalidated legislation that explicitly authorized Members of Congress to appoint executive branch officers[300] and has done the same to legislation authorizing Congress to remove an executive branch officer through a joint resolution.[301] Insulating a currently serving executive branch officer from removal via statute might be seen as an attempt by Congress to subvert the purposes of the Appointments Clause, effectively transforming a particular prosecutor's office from one that is subject to executive branch control into one that is statutorily independent without allowing for a new appointment consistent with the Constitution.[302] In particular, if such a bill were passed immediately, it might be seen to apply exclusively to a single individual in the executive branch, effectively appointing a particular executive branch officer for an indefinite time period. To the extent that this provision is viewed as a legislative aggrandizement of the executive's appointment power, it might raise separation-of-powers concerns.[303]

That said, it does not appear that a Supreme Court case has directly addressed such a statutory provision. In *Myers v. United States*, the Court invalidated a statutory restriction on the removal of an executive branch officer.[304] The pertinent statute in that case bestowed removal protection retroactively on executive branch officers, but the Court's opinion did not hinge on this feature of the statute.[305] Further, such a provision would only codify requirements that already exist in

---

[296] *See* Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 492-95 (2010).

[297] S. 1741, 115th Cong. § 2(b), (e) (2017).

[298] S. 71, 116th Cong. § (c) (2019); H.R. 197, 116th Cong. § (f) (2019).

[299] *See Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) (testimony of Professor John Duffy).

[300] Buckley v. Valeo, 424 U.S. 1, 129 (1976) (per curiam).

[301] Bowsher v. Synar, 478 U.S. 714, 727 (1986).

[302] *See* Weiss v. United States, 510 U.S. 163, 173–74 (1994); Shoemaker v. United States, 147 U.S. 282, 300-01 (1893).

[303] *See* Constitutional Separation of Powers Between President & Cong., 20 Op. O.L.C. 124 (1996) (asserting that "lengthening the term of an officer who may be removed only for cause would be constitutionally questionable").

[304] Myers v. United States, 272 U.S. 52, 126 (1926). *See generally* Glidden Co. v. Zdanok, 370 U.S. 530 (1972).

[305] *See* Tenure of Office Act of March 2, 1867, 14 Stat. 430, ch. 154. Lower courts have approved the extension of terms of bankruptcy judges, who may only be removed for cause under 28 U.S.C. § 152. *See In re* Inv. Bankers, Inc., 4 F.3d 1556, 1563 (10th Cir. 1993). One court cautioned, however, that "a prospective extension of term of office becomes similar to an appointment . . . when it extends the office for a very long time." *In re* Benny, 812 F.2d 1133, 1141 (9th Cir. 1987). Bankruptcy judges are judicial, rather than executive branch officers.

 regulations, which might be seen as a relatively minor adjustment to a special counsel's office that does not require a new appointment.[306] Given the lack of preexisting case law relevant to such a provision, firm conclusions about its merit are likely premature.

# Conclusion

Both Congress and the executive branch have employed a variety of means to establish independence for certain criminal investigations and prosecutions. The use of special prosecutors, independent counsels, and special counsels all have allowed for the investigation of executive branch misconduct. Nonetheless, efforts to provide independence for prosecutors from executive branch control often raise constitutional questions. In turn, proposals to statutorily protect a special counsel from removal thus raise important, but unresolved, constitutional questions about the separation of powers. As a general matter, simply insulating a future special counsel from removal except for specified reasons appears consistent with the Court's opinion in *Morrison*. To the extent the current Court might depart from the functional reasoning of that case and apply a more formal approach to the question, however, such proposals might raise constitutional objections. Likewise, constitutional objections might arise against proposals aimed to insulate a special counsel in a manner beyond the framework approved in *Morrison*.

# Author Information

Cynthia Brown
Legislative Attorney

Jared P. Cole
Legislative Attorney

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

---

[306] *See Weiss*, 510 U.S. at 174-76.



PREPARED REMARKS FOR DEPUTY ATTORNEY GENERAL ERIC HOLDER

HOUSE JUDICIARY SUBCOMMITTE

March 2, 1999

2:00 P.M.

Mr. Chairman, Mr. Nadler and Members of the Subcommittee:

Thank you for inviting me to present the views of the Department of Justice on the Independent Counsel Act. The Justice Department has administered the Act since its inception, and we have developed some opinions about its operation since the last reenactment that I will share with you. But I want to state an important limitation regarding my testimony at the outset -- a limitation that I know each of you understands: I am concerned that my comments not in any way interfere with ongoing investigations or litigation, and therefore I will be unable to give specific examples or direct my remarks to a specific Independent Counsel or a specific investigation.

<u>The Origins of the Act</u>

Let me begin by addressing the reasons that gave rise to the present Independent Counsel Act. Congress passed the Act as a post-Watergate reform, intending to prevent the reoccurrence of the crisis in government that arose when President Nixon directed that Special Prosecutor Archibald Cox be fired. President Nixon's decision ultimately precipitated the resignation of the Attorney General and the Deputy Attorney General.

The Act was based upon the premise that the appearance of a conflict of interest may exist when the Justice Department of any particular Administration investigates the highest ranking officials of that Administration. Therefore, the Act set out to establish a prosecutorial entity to handle such cases that would be separate and apart from the Administration and the Department of Justice. Only in this way, the drafters reasoned, could the investigation have sufficient credibility to provide assurance to the American people that there had been no coverup and no undue political influence exerted in favor of the Administration.

There can be no question that these goals are highly desirable. In fact, by seeking to prevent conflicts of interest, the Independent Counsel Act appeared to be consistent with the long-established practices of the Department of Justice and other prosecutorial offices, in that it provided an alternative prosecutor in those limited circumstances in which the prosecutor with original jurisdiction was forced to recuse himself or his office.

<u>The Act Has Failed in its Goal of Removing Politics from the Process</u>

Despite those good intentions, the Act has failed to accomplish its primary goal: the enhancement of confidence in the rule of law by the American people. Indeed, I have reluctantly concluded that decisions and actions under the Act, both by Independent Counsels and by the Attorney General, inevitably and unavoidably become such targets for attack that public confidence in the administration of justice in these high-profile cases has been undermined rather than enhanced. The Act was supposed to increase trust in our government; unfortunately, it has diminished it.<u>(1)</u> My point does not have to do with any particular inquiry or investigation, it has to do with the fact that the types of decisions we are talking about here can be controversial - and that a climate of politicization pervades the process regardless of which way a specific decision, investigation, or prosecution comes out.

In part, this is because the Independent Counsel Act does not, and constitutionally cannot, bar the participation of persons who have been nominated by the President and confirmed by the Senate from the difficult decision of whether to initiate the investigation and possible prosecution of a crime. The Supreme Court, in *Morrison v. Olson*, tethered its finding that the Act was constitutional to the fact that the Executive Branch - through the Attorney General - played a vital role in several key decisions under the Act, such as whether to seek appointment of an Independent Counsel, what limited jurisdiction to ask the court to confer on him, and whether to remove him.[2] And yet, the fact that Attorneys General must remain key players in the process mean that they will be inevitably second-guessed, no matter what decision they make on the appointment and supervision of any particular independent counsel. An Attorney General is, after all, a member of the President's cabinet, and the Act does not remove that purported conflict of interest. Instead, it creates an artificial process that divides responsibility and fragments accountability.

The Founders set up three branches of government: A Congress that would make the laws, an Executive that would enforce them, and a judiciary that would preside over the momentous decisions of whether a particular party had broken them. The Attorney General, who has been appointed by the President and confirmed by the Senate, is publicly accountable for the decisions she makes and - as all of us in this room know - must answer to Congress in the oversight and budgetary processes for her decisions. Congress' substantial oversight and funding powers, when coupled with the power of the press, constitute a structure of accountability.

It was for this reason that the American republic survived for over 200 years without an Independent Counsel Act.[3] The Act, by contrast, vests this immense prosecutorial power in an inferior officer who is not subject to the ordinary controls of any branch of government; and this officer is someone who has not been confirmed by the Senate and who, as former Attorney General Barr stated, is not subject to the same sort of oversight or budgetary constraints that the publically accountable Department of Justice faces day in and day out.[4] Under such a scheme of diffuse accountability, it can be no surprise that the politicos and pundits attack relentlessly every actor on the stage - the Attorney General, the Independent Counsel, the witnesses, the media, and at times even the public.

<u>The Act Has Major Flaws in that its Structure Removes the Constraints of Prosecutorial Discretion</u>

At the same time that the Act requires politically appointed officials to make decisions that will inevitably be criticized as political, it has exacted a heavy price -- both financially and by creating unintended consequences. You have seen much reported in the media and other hearings about the extraordinary expense of a number of Independent Counsel investigations. I believe that, in part, such costs are inherent in a system that requires a prosecutor to set up an office from scratch (including hiring prosecutors, other attorneys, administrators, clerical staff, and consultants, and securing office space); conduct an investigation in which it is expected that no stone will be left unturned; prepare a comprehensive final report; and litigate attorneys' fees. This is a very expensive way to do business. As the body that passes the federal budget each year, you have the responsibility of deciding whether or not this cost is justified.

With respect to the undesirable consequences of the Act, I begin with the general observation that in seeking to ensure independence the statute removes many of the constraints that normally limit prosecutors -- constraints that exist for good reason under our system of government.[5] In so doing, the Act's structure comes dangerously close to tipping the traditional balance of fairness in the conduct of criminal investigations and prosecutions. Independent counsel are largely insulated from any meaningful budget process, competing public duties, time limits, accountability to superiors and identification with the traditional long-term interests of the Department of Justice. This insulation contributes greatly to the independence of these prosecutors, but it also eliminates the incentive to show restraint in the exercise of prosecutorial power. Such restraint, usually referred to as prosecutorial discretion, is essential to our system of justice, and is a prosecutorial hallmark.[6]

Moreover, there are other factors in Independent Counsel matters that minimize the ordinary constraints that underlie our system of prosecutorial discretion. Among other things, an Independent Counsel often faces: (1) a mandate to investigate a matter that the

statute defines as warranting further investigation; (2) a charged climate in which public figures are demanding prosecution; (3) the reality that the success of his or her endeavor will be measured by whether indictments and convictions are obtained; and (4) the prospect of preparing a final report that will be reviewed by persons with some non-law enforcement interest in the investigation.

All of these provide an impetus to investigate the most trivial matter to an unwarranted extreme, and to resolve all doubt against the subjects of an investigation. These are not problems with individual Independent Counsels, they are simply the incentives that the statutory scheme creates. An independent counsel who does not indict faces criticism for wasting both his time and the taxpayers' good money.[7] As the old adage, adapted from Mark Twain, goes: To a man with a hammer, a lot of things look like nails that need pounding.

Senators McConnell and Dodd have recently discussed these structural problems in a joint Op-Ed. They write:

The Independent Counsel Act was passed in response to Watergate with the admirable goals of promoting good government, policing the executive branch, and restoring public faith in elected officials. Ultimately, however, the law tilted the constitutional balance of powers, squandered taxpayer dollars, and created public cynicism and distrust. The current independent counsel law is opposed by nearly every former living attorney general . . . . The law gives virtually unchecked power, virtually unlimited budgets and completely distorted incentives - all to one man or woman whose sole job is to investigate a public official.[8]

It is for these reasons that the Justice Department has reluctantly come to the conclusion -- and I must emphasize reluctantly -- that there are fundamental structural flaws with the Act. These flaws, we believe, pervade the entire statute. Therefore, the Department opposes the reauthorization of the Independent Counsel Act. The Department believes that the Act does not serve the goals it was designed to serve, and that those goals can be served by utilizing the Attorney General's authority to appoint a special prosecutor whenever necessary. Over the long course of American history, the Department has successfully prosecuted a number of high-level political officials, and has not refrained from appointing a special prosecutor in instances where it would be appropriate.

In some cases, it was not necessary to appoint a special prosecutor. The Department prosecuted Vice President Spiro Agnew while he held office and prosecuted Bert Lance, the former Director of the Office of Management and Budget, soon after he left the Administration. When the Department has deemed it appropriate, it has effectively used its authority to appoint a special prosecutor. Paul Curran investigated matters pertaining to a peanut warehouse owned by President Carter's family while he was still in office. Leon Jaworski investigated President Nixon, some members of his cabinet, and others. Although the President ordered the firing of Mr. Jaworski's predecessor, Archibald Cox, the outstanding results Mr. Jaworski achieved present ample evidence that, in the rare cases that it is necessary, a non-statutory special prosecutor can effectively prosecute high-level members of an Administration even when the President attempts to end the investigation.

Apart from the major structural problems I have discussed, our experience has also persuaded us that other problems with the Act further exacerbate its costs and burdens. These other problems exist in a different category from the ones I have been talking about, as they could be more easily remedied by changes in the wording of the statute if Congress decides to re-authorize it. But the Department of Justice joins the many experts who have concluded that the fundamental flaws in the Act will remain, even if Congress addressed all of the other problems in the Act. Those persons now opposed to reauthorization include two of the original proponents of the Act, former Attorney General Griffin Bell and former Senator Howard Baker, as well as former Attorney General William Barr and former United States Attorney and Independent Counsel Joseph DiGenova.[9] Like the Justice Department, they have concluded that the Act should not be renewed.

<u>The Scope of the Act</u>

First, we have concluded that the group of individuals who are automatically covered by the Act's provisions is too broad. As you know, we do not believe that the Act should

cover anyone because it does not succeed in meeting its goals. Even if the Act did succeed, however, it presumes there to be a conflict of interest where none usually exists when it extends coverage to White House officials at a certain pay level, Cabinet Officers, campaign officers, and others.

The Department of Justice can, in the majority of these cases, effectively and credibly investigate or prosecute any of these public officials. The inclusion of such a large group of individuals within the mandatory provisions is unnecessary, particularly when discretionary provisions allow the Attorney General to invoke the Act if investigation of any individual would constitute a conflict of interest.

<u>The Triggering Mechanism</u>

Another area where the Department of Justice has encountered repeated difficulties involves the mechanisms and standards the Act sets up to "trigger" its provisions. Having dealt with these concepts in actual application, I understand how difficult it is to articulate -- by promulgating an abstract U.S. Code provision -- the kind of intricate standards that prosecutors develop after years of experience. I can only say that the statute, while making a valiant attempt, does not succeed.

During an initial inquiry under the Act, the Attorney General must decide "whether grounds to investigate exist not later than 30 days after the information" that a covered person "may have violated any Federal criminal law" "is first received." In making this decision, the Act requires the Attorney General to decide whether "the information" supporting any such violation "is specific and from a credible source."[10] Now, as a prosecutor of public corruption cases for twelve years, as a judge on the Superior Court of the District of Columbia, and as the United States Attorney for this District, I've had a fair amount of experience with trying to assess the credibility of witnesses. From my various experiences, I can tell you that credible sources are sometimes mistaken. And, similarly, less than credible sources are sometimes accurate. The statute seems to ignore these possibilities. The term "may have violated" a statute is very broad and subject to many interpretations.[11] As a result, the Act sometimes requires the Department to take action that it would never -- and I mean never -- take in an ordinary case against a non-covered person.

The most serious problem with the standards of the Act at this phase of decisionmaking by the Attorney General, however, is its limitation on the consideration of the issue of criminal intent. During this initial period, the Attorney General may not consider the intent of the subject of the allegation, no matter what the evidence of his or her intent - or lack thereof - is. There seems to be no reason or need for this presumption, which requires us to treat our highest ranking officials differently from every other citizen in our country. Forcing the Attorney General to a decision, almost always made publicly, that an allegation against a high government official is both specific and credible, when she has been artificially barred from even considering a critical element of the offense is grossly unfair to the subject and misleading to the public.[12]

<u>The Decision of Whether to Appoint an Independent Counsel</u>

At the next stage of decisionmaking, following a preliminary investigation, an Attorney General must decide whether an Independent Counsel should be appointed. The standard he or she must apply is whether there are reasonable grounds to believe that further investigation is warranted, a standard that is also unclear and subject to differing interpretations. After all, many prosecutors believe that, if they were unconstrained by time and resources, "some" further investigation would be warranted in virtually any matter. Every prosecutor has doubts and additional things that he would like to verify given the time and money. Should investigation be conducted even where there is no reasonable prospect of making a prosecutable case? The answer is not plain from the statutory language, and any effort to develop a reasonable interpretation of this standard in a particular case will be criticized in the highly charged milieu in which these decisions must be made.

The problem of how to assess the evidence concerning the element of criminal intent continues at this phase of the process as well. In making that determination, the Act mandates that the Attorney General may not base a finding that no further investigation is warranted upon a lack of criminal intent, unless there is clear and convincing evidence of

the lack of intent. A standard requiring proof of a negative by clear and convincing evidence is extraordinarily difficult to apply. This standard also stands traditional prosecutorial decisions on their head. In almost every criminal case, we require some positive evidence of intent before we proceed. Here, the opposite is demanded.

Another problem with the statute is the restrictions it places upon the Department in conducting a preliminary investigation. The absence of compulsory process - the subpoena power - greatly handicaps the search for truth, and, when combined with the severe time limits of the Act, could result in the unwarranted appointment of an Independent Counsel simply because the Department was unable to complete a fact finding process that would be quite simple with the availability of proper tools.

<u>The Selection Process for an Independent Counsel</u>

After the Attorney General has decided to seek the appointment of an Independent Counsel under the Act, the next step involves the actual selection process by the three-judge panel known as the Special Division. However, the Act gives the judges no real standards or qualifications to look for in making their choice. It provides for no selection protocol, visible or otherwise. And, as Judge Butzner has stated, in some instances the Special Division has encountered great difficulty in finding someone available for appointment as an Independent Counsel, resulting in a significant delay of the investigation.[13]

<u>Jurisdictional Disputes</u>

Jurisdictional ambiguities inherent in the provisions of the Act have emerged as a serious problem, at times leading to disagreements between Independent Counsels and the Department and often demanding a great deal of time for resolution.[14] While in most cases the disagreements have been resolved cooperatively between the Independent Counsel and the Department, there have been several conflicts between Independent Counsels and the Department over who should handle certain matters. At the heart of these disagreements seems to be a difference in views as to the appropriate role of the Independent Counsel. The Department of Justice views the Act as a limited solution to a particular problem: a conflict of interest with respect to a particular person causing the Department to be unable to perform its usual prosecutorial role in the handling of specific allegations that have been reviewed in the course of a preliminary investigation, and found to warrant further investigation. In our view, matters outside that narrow scope should be handled by the Department in the ordinary course.

The ambiguities in the statute, however, have created a natural tendency for Counsels to view their institutional role as having all the authority that other prosecutors have, and to believe that they should be able to investigate and prosecute all avenues, wherever those avenues may lead. This is, again, a natural reaction created by the structure of the Act, which creates an incentive for independent counsels to expand their authority to increase the probability that one of their investigations will result in a conviction, and thereby justify their expenditures.

Some litigation over this issue has occurred. Rejecting the Department's position that the Attorney General's consent is required, the Special Division has held that it may refer to an Independent Counsel the jurisdiction to investigate matters that are "related" to the original grant of jurisdiction without first obtaining the consent of the Attorney General.[15] In addition, the courts have applied what we view as an unduly expansive interpretation of what is a related matter, with the result that an Independent Counsel can be given jurisdiction to investigate the associates of a covered person for alleged crimes that have the most tangential relationship to the alleged crimes by the covered person.[16] Thus, Independent Counsels may be able to investigate matters for which the Attorney General never contemplated seeking an Independent Counsel, and this may be done in some circumstances without her knowledge or participation. I suggest that this goes far beyond the goals envisioned by the statute's drafters, and I question the need for such an extreme solution to such a limited problem.

In addition to the need for limitation and clarification on the issue of relatedness, there is also confusion about what constitutes a matter "arising out of" an Independent Counsel's investigation. The Department has always taken the position, based on the examples in the Act and the legislative history, that this language refers to crimes

4/11/2019    03-02-CRREMARKS BY DEPUTDBABKSTORNEY GEFEGRAL2HRI41HOLDERRUGSGTHEOUJUDICIARY SUBCOMMI...

Case 1:19-cr-00018-ABJ Document 69-2 Filed 04/17/19 Page 6 of 8

intended to interfere with the investigation itself, like obstruction of justice or
perjury. Some Independent Counsels and some courts interpret the language to mean any
crime uncovered by the Independent Counsel during the course of his or her investigation,
and have expanded their investigations accordingly.

We also believe that the provision of the Act that has been interpreted to allow
Independent Counsels to obtain jurisdiction over related matters from the Special Division
without the knowledge or consent of the Attorney General interferes with executive branch
responsibilities in a manner that raises serious separation of powers concerns, and brings
with it serious practical consequences. The Act should not take from the Attorney General
jurisdiction that she has not knowingly ceded to another, for to do so would trammel upon
the Executive's core prosecution power. Indeed, the fact that the Act allows for such an
ex parte process could result in dual investigations where prosecutors step all over each
other, or wasted resources in investigations of matters already concluded.

Finally, there have been similar disagreements between the Department and Independent
Counsels over the scope of the provision authorizing Counsels to handle civil matters that
they consider necessary. The Department sees serious problems in the empowering of
independent criminal prosecutors to bind the United States in civil suits and settlements.
We believe that this provision was intended to be limited to those instances where the
civil authority is essential to the successful completion of the criminal matter, such as
handling a civil contempt case involving a witness, or intervening to request that a civil
case be stayed pending resolution of the criminal matter.

Removal

My description of these jurisdictional disputes between the Department and the Independent
Counsels causes me to return to the subject of checks and balances, or the lack thereof,
provided by the Act. It is difficult for the Department to litigate or even express these
quite legitimate views without being accused of improper interference with an Independent
Counsel's work -- and I will not be surprised if my observations today are challenged by
some on that ground - though, as I said at the outset of my testimony, my remarks address
the structure of the Act and the incentives it creates, not the actions of any particular
Independent Counsel. If even such generalized testimony can be the subject of criticism, I
would ask you to think about how much more difficult it would be for an Attorney General
to exercise the authority provided in a provision that the Supreme Court highlighted in
its discussion of the constitutionality of the Act, the removal provision.[17] That part
of the Act allows the Attorney General to remove an Independent Counsel for enumerated
causes. Implicit in the Attorney General's authority to remove must be the authority to
investigate serious allegations of misconduct that come to her attention. But how can
the Department investigate an Independent Counsel without facing
allegations of attempting to stifle his or her independence? It
will always be extremely difficult for any Attorney General to
exercise the authority to investigate, let alone remove, an
Independent Counsel.

The Reporting Requirement

A final problem that I wish to address briefly is the Act's requirement that a final
report be prepared by the Independent Counsel. Although there is a legitimate concern that
the American people have a right to know the outcome of an investigation of their highest
officials, the reporting requirement goes directly against most traditions and practices
of law enforcement and American ideals. It is contrary to our concept of a presumption of
innocence, our placing of high value on rights of privacy, and our Departmental tradition
that we reveal offenses in the courtroom during a criminal trial, not by filing a document
that is never filed when we decline to prosecute ordinary criminal cases and that may
reveal information that subjects an individual to public embarrassment. These are all
values that I tried to emphasize when I was a public corruption prosecutor and a United
States Attorney. But worst of all, as I stated earlier, the reporting requirement provides
an incentive for Independent Counsel to over-investigate every detail in order to avoid
criticism that their final reports missed something.

Conclusion

4/11/2019    03-02-00 REMARKS: PREPARED REMARKS FOR DEPUTY ATTORNEY GENERAL ERIC H. HOLDER JR., JUDICIARY SUBCOMMI...

Case 1:19-cv-00018-ABJ Document 69-2 Filed 04/12/19 Page 6 of 8

The concerns of the original drafters of the Act are as valid today as they were in the post-Watergate era. There are a limited number of criminal matters that should be handled in a special way, in order to give the American people confidence that the outcome was not influenced by political considerations from either party.

The experience of the Department over these last five years has been enlightening. It takes a close-up view of the operation of the Independent Counsel Act to understand that it has serious flaws. The Department of Justice has reluctantly come to the conclusion that the structural flaws we have identified here cannot be fixed. Accordingly, we have been giving much thought in the Department of Justice to alternative ways to achieve this goal. We will be happy to work with the Congress in your efforts to accomplish this most difficult task.

<u>REFERENCES</u>

1. Robert Bork, *Dubious Counsel: Independent Counsel Law Should Be Allowed to Lapse*, National Review, Mar. 8, 1999, at 18 ("Given the intense partisanship that too often infects the independent counsel's office, the law is as likely to produce spectacular injustice as it is to achieve justice.").

2. Morrison v. Olson, 487 U.S. 654, 671, 686, 695-96 (1988).

3. See Remarks of Theodore Olson, 54 Wash. & Lee L. Rev. 1515, 1584 (1997) ("We got along in this country for almost 200 years without an independent counsel statute, and I want to make the point . . . that there is nothing wrong with the idea of going outside the Department of Justice to pick someone special to pursue an investigation if public confidence requires it. Bill Barr, when he was Attorney General, did that three times . . . . I think the thing that is bad about the independent counsel statute is that it is mandatory in so many respects. It has so many opportunities for use for political purposes . . ."); Terry Eastland, Ethics, Politics, and the Independent Counsel (1982).

4. See Remarks of Former Attorney General William P. Barr, 54 Wash. & Lee L. Rev. 1515, 1534-35 (1997) ("[W]hat the statute does is it takes [discretion] away from executive branch officials and an institution that is making those judgments every day, and has a track record of making those judgments, and puts it outside and gives it to somebody else to make, someone who I don't feel has enough accountability, someone who has too narrow a scope and loses perspective as to where they are going and to drive against an individual.").

5. See Gerald E. Lynch, *The Independent Counsel: The Problem Isn't in the Starrs but in a Misguided Law*, Wash. Post, Feb. 22, 1998, at C2 ("Independent counsels are not accountable to anyone. Their judgments float free of resource constraints, of the constant comparison of varied cases and of electoral checks. Given the full investigative power of the state, a broad statute book and unlimited resources, a prosecutor can develop at least the suspicion of a criminal case against just about anyone. And the isolated and politicized context of an independent counsel investigation provides an incentive to do just that."); Akhil Reed Amar, *The Unimperial Presidency*, New Republic, March 8, 1999, at 28.

6. See Cass R. Sunstein, *Unchecked and Unbalanced: Why the Independent Counsel Act Must Go*, American Prospect, June 1998, at 22 ("The safeguards that come from the combination of a limited budget and a wide focus are crucial contributors to human liberty under law -- as crucial, perhaps, as any provision of the Bill of Rights. They discourage prosecutors from becoming single-mindedly preoccupied with one target of investigation and therefore tempted to abuse the powers of their office."); *Morrison*, 487 U.S., at 732 (Scalia, J., dissenting) ("How frightening it must be to have your own independent counsel and staff appointed, with nothing else to do but to investigate you until investigation is no longer worthwhile - with whether it is worthwhile not depending upon what such judgments usually hinge on, competing responsibilities. And to have that counsel and staff decide, with no basis for comparison, whether what you have done is bad enough, willful enough, and provable enough, to warrant an indictment.").

7. See Cass R. Sunstein, *Repeal the Independent Counsel Act*, Wash. Post, Feb. 1, 1998, at C9.

8. Mitch McConnell & Christopher Dodd, *No More Independent Counsels*, W.S.J., Feb. 23, 1999, at A22.

9. "The statute is compromised at its very core. It cannot be nit-picked and amended into a satisfactory form. The statute's mere presence in any form politicizes the entire process by which we accuse people, investigate them, and eventually charge them with crimes or exonerate them. The initiation process under this statute invites all the elements that should not be involved when deciding to initiate a criminal investigation of any person, namely personal and political motivations." Joseph E. DiGenova, *The Independent Counsel Act: A Good Time to End a Bad Idea*, 86 Geo. L. J. 2299, 2303 (1998). *See also* Howard Baker, *The Separation of Powers: The Roles of Independent Counsels, Inspectors General, Executive Privilege and Executive Orders, Final Report of the National Commission on the Separation of Powers*, December 7, 1998; Griffin Bell, Prepared Testimony on the Independent Counsel Statute for the Senate Governmental Affairs Committee, February 24, 1999.

10. 28 U.S.C. §591(a),(d)(2).

11. See Remarks of Former Attorney General Barr, supra, at 1529 ("The standard for commencing a preliminary investigation is very low. It is not evidence of a crime. . . . And it is very hard to knock out an allegation on the grounds of lack of credibility because 90% of these things come from the newspapers; there are some facts set forth; congressmen then push it to get an independent counsel named.").

12. See Remarks of Former Attorney General Barr, supra, at 1531 ("That is an area of great mischief, because I would say most of these cases turn on intent and it sort of reverses the burden to say that the Attorney General can't dispose of this unless he has clear and convincing evidence").

13. *How Independent Counsels are Chosen: The Inside View*, Wash. Post, Aug. 11, 1997, at A15.

14. Donald C. Smaltz, *The Independent Counsel: A View From Inside*, 86 Geo. L. J. 2307, 2336 (1998) ("The independent counsel's limited jurisdiction quickly becomes a breeding ground for jurisdictional challenges . . . . These delay the investigation. Often, in peeling the investigatory onion, new crimes are revealed by the investigation that may, in turn, spawn new jurisdictional issues. Jurisdictional disputes sometimes occur between the independent counsel, who naturally desires to fully explore the facts as is his statutory obligation, and the DOJ, which sometimes takes a more limited view of the independent counsel's mandate. When this occurs-more delay.").

15. *In re Espy*, 80 F.3d 501, 504-06 (D.C. Cir. 1996).

16. *See, e.g., United States v. Blackley*, __ F.3d __, __, 1999 WL 26877, *3-6 (D.C. Cir. 1999).

17. *Morrison*, 487 U.S., at 671, 686, 695-96.



## Office of the Deputy Attorney General
### Washington, D.C. 20530

### ORDER NO. 3915-2017

### APPOINTMENT OF SPECIAL COUNSEL
### TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
### 2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)     Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)     The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

   (i)      any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

   (ii)     any matters that arose or may arise directly from the investigation; and

   (iii)    any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)     If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)     Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

_5/17/17_
Date

Rod J. Rosenstein
Acting Attorney General

**U.S. Department of Justice**

Special Counsel's Office
Statement of Expenditures
October 1, 2017 through March 31, 2018



The accompanying Statement of Expenditures summarizes the financial activity of the Special Counsel's Office (SCO) for the period October 1, 2017 through March 31, 2018.  As an organization within the Department of Justice, the SCO is required to comply with the rules, regulations, procedures, practices, and policies of the Department of Justice.[1]  SCO management is responsible for designing, operating, and maintaining a system of internal control to enable the SCO to accurately report its financial information to the Department and meet the requirements of applicable laws and regulations.  In addition, SCO management is responsible for ensuring that controls exist to meet the requirements of DOJ Order 2030.4G, *Control of Funds under Apportionment*.

The Department recognizes the importance of maintaining adequate internal control and is committed to the continuous improvement and oversight of financial management controls.  The Department has a network of internal review groups that provides assistance to components with their internal control programs.  As part of the Department's annual assessment of internal control over financial reporting, the Justice Management Division, Internal Review and Evaluation Office conducted a review of SCO business processes related to budget, obligations, human resources, and financial reporting during the assessment period of October 1, 2017 through March 31, 2018.  The review identified no material weaknesses or significant deficiencies in the design or operation of SCO controls.

The Department will continue to dedicate and leverage resources to maintain strong program and financial management controls.  Management takes its program and financial accountability seriously and is dedicated to ensuring that funds are used in a responsible and transparent manner.

---

[1] 28 CFR 600.7 - Conduct and Accountability.

The Special Counsel's Office
Statement of Expenditures
For the period October 1, 2017 through March 31, 2018

Direct and Reimbursed Expenditures (note 1)

| | |
|---|---|
| Personnel Compensation and Benefits (note 2) | $2,738,131 |
| Travel and Transportation of Persons (note 3) | 532,340 |
| Transportation of Things | 1,345 |
| Rent, Communications, and Utilities | 886,403 |
| Contractual Services (note 4) | 264,114 |
| Supplies and Materials | 29,694 |
| Acquisition of Equipment (note 5) | 54,597 |
| Total SCO Expenditures (note 6) | $ 4,506,624 |

The Special Counsel's Office
Notes to the Statement of Expenditures
For the Period October 1, 2017 through March 31, 2018

Note 1 – Summary of Significant Accounting Policies

A. <u>Reporting entity</u>: On May 17, 2017, Robert S. Mueller III <u>was appointed</u> by acting Attorney General Rod J. Rosenstein to serve as Special Counsel to conduct the previously confirmed FBI investigation of the Russian government's efforts to interfere with the 2016 presidential election and related matters.  The statement presents the expenditures of the Special Counsel's Office (SCO) for the period of October 1, 2017 to March 31, 2018, including direct-funded, reimbursed, and non-reimbursed expenditures.  All amounts shown refer to the aforementioned reporting period only.

B. <u>Funding</u>: SCO expenditures are funded by 1) the permanent, indefinite appropriation for independent counsels (IC Appropriation) (28 U.S.C. § 591 note), which the Department of Justice (DOJ) has determined is legally available to fund this SCO investigation (see also Government Accountability Office opinion agreeing with DOJ that this appropriation was legally available to fund special counsels (B-302582, Sept. 30, 2004)); and 2) the direct appropriations of DOJ components who have incurred non-reimbursed expenditures in support of the SCO.  Expenditures funded through the IC Appropriation are a combination of expenses directly incurred by the SCO and expenses incurred by other components of DOJ and reimbursed by the IC Appropriation.

C. <u>DOJ component expenses</u>: Although neither legally required nor reported in prior Special Counsels' Statements of Expenditures, DOJ components that support the SCO were asked to track expenditures attributable to the investigations.  The expenditures for this period totaled $5,476,000, which approximates expenditures the components would have incurred for the investigations irrespective of the existence of the SCO.

D. <u>Basis of accounting</u>: The statement has been prepared on an accrual basis of accounting, in which expenses are recorded when incurred regardless of when cash is exchanged.

Note 2 – Personnel Compensation and Benefits
- IC Appropriation: $2.7 million was expended for salaries and benefits, including:
    - $874,069 for SCO employees
    - $1.9 million for reimbursable DOJ employees detailed to the SCO

Note 3 – Travel and Transportation of Persons
- IC Appropriation: $532,340 was expended for travel, including:
    - $14,220 for SCO direct-funded travel
    - $518,120 for temporary duty relocation of DOJ employees detailed to the SCO

Note 4 – Contractual Services
- IC Appropriation: $264,114 was expended for contractual services, including:
    - IT Services            $226,730
    - Financial Services     $ 26,572
    - Other                  $ 10,812

The Special Counsel's Office
Notes to the Statement of Expenditures
For the Period October 1, 2017 through March 31, 2018

Note 5 – Acquisition of Equipment
- IC Appropriation: Non-capitalized personal property equipment purchased using IC appropriation funds will remain the property of the federal government at the conclusion of the investigation.

Note 6 – Total SCO Expenditures
- SCO expenditures represent expenditures incurred during the reporting period and standard closing adjustments.



**G A O**
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC  20548**

B-302582

September 30,  2004

The Honorable Ted Stevens
Chairman
Committee on Appropriations
The Honorable Robert C. Byrd
Ranking Minority Member
Committee on Appropriations
United States Senate

The Honorable C.W. Bill Young
Chairman
Committee on Appropriations
The Honorable David Obey
Ranking Minority Member
Committee on Appropriations
House of Representatives

Subject:  *Special Counsel and Permanent Indefinite Appropriation*

The Government Accountability Office (GAO) is required to audit twice a year the
expenditures by independent counsels and certain special counsels paid from the
permanent indefinite appropriation.[1]  In the course of auditing independent counsel
expenditures for the period ending March 31, 2004, we learned that the Department of
Justice was using the permanent indefinite appropriation to pay the expenses of the
investigation by Special Counsel Patrick J. Fitzgerald.  Mr. Fitzgerald continued to
perform his duties as a U.S. Attorney after his appointment as Special Counsel.  This
is the first time that the expenses of an investigation by a United States Attorney

---

[1] The independent counsel law expired in July 1999, although it continues in effect
with respect to matters pending before previously appointed independent counsels.
28 U.S.C. § 599, as amended by Pub. L. No. 103-270, § 2, 108 Stat. 732 (June  30, 1994).
Section 596(c) of title 28 of the United States Code requires covered independent
counsels to report on their expenditures on a semiannual basis and requires GAO to
audit these statements.  In addition, the permanent indefinite appropriation
established by Pub. L. No. 100-202, § 101(a), title II, 101 Stat. 1329, 1329-9 (1987), 28
U.S.C. § 591 note (2000), requires us to perform semiannual financial reviews of the
expenditures from the permanent indefinite appropriation.

appointed to serve as Special Counsel who continues to serve as a United States Attorney have been paid from the permanent indefinite appropriation. In addition, Department of Justice regulations at 28 C.F.R. Part 600 (2003) provide that Special Counsels shall be selected from outside the government.

Given our responsibility to audit the fund, the use of the account to finance Special Counsel Fitzgerald's activities, and the provisions of 28 C.F.R. Part 600 (2003), we initiated inquiries with the Department of Justice to assure ourselves of the availability of this account to defray his expenses.[2]  In considering this matter, we requested and received the written views of the Department of Justice. We also met with officials of the Department to discuss their views and obtained additional comments and information. Finally, we reviewed the laws and their legislative histories, regulations, court decisions, and past practices of the Department of Justice, as they relate to this matter.

For the reasons discussed below, we do not object to the use of the permanent indefinite appropriation to fund Special Counsel Fitzgerald's expenses. Unlike the expired independent counsel law, the permanent indefinite appropriation does not require that a Special Counsel be appointed from outside the government. The Department, in appointing Special Counsel Fitzgerald under "other law", has afforded him independence by delegating all of the Attorney General's authority with respect to the investigation and instructing him to exercise that authority independent of the control of any officer of the Department. Finally, the Part 600 regulations are not substantive and may be waived by the Department.

**Background**

On December 30, 2003, Deputy Attorney General James B. Comey, acting in his capacity as Acting Attorney General, appointed Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, as Special Counsel to investigate the alleged unauthorized disclosure of a CIA employee's identity. Special Counsel Fitzgerald's delegation reads as follows:

> "By the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509, 510, and 515, and in my capacity as Acting Attorney General pursuant to 28 U.S.C. § 508, I hereby delegate to you all the authority of the Attorney General with respect to the Department's investigation into the alleged unauthorized disclosure of a CIA employee's identity, and I direct you to exercise that authority as Special Counsel independent of the supervision or control of any officer of the Department."[3]

---

[2] The Government Accountability Office is authorized by 31 U.S.C. § 3526 (2000) to settle the accounts of the government and may take exception to illegal, improper, or unauthorized payments.

[3] Letter from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, United States Attorney, Dec. 30, 2003.

In February 2004, Acting Attorney General Comey clarified Special Counsel Fitzgerald's delegation of authority to state that the authority previously delegated to him is plenary.  It also states, "Further, my conferral on you of the title of 'Special Counsel' in this matter should not be misunderstood to suggest that your position and authorities are defined and limited by 28 CFR Part 600."[4]

Following his appointment as Special Counsel, Mr. Fitzgerald continued to perform his duties as United States Attorney.  As a result of our activities in connection with the audit of the Independent Counsel expenditures for the six-month period ending March 31, 2004, we learned that the Department of Justice was charging the expenses of Special Counsel Fitzgerald to the permanent indefinite appropriation established " . . . to pay all necessary expenses of investigations and prosecutions by independent counsels appointed pursuant to the provisions of 28 U.S.C. 591 *et seq.* or other law . . ."[5]  In the following section we discuss two issues: whether the permanent indefinite appropriation is available to fund Special Counsel Fitzgerald's expenses and whether the Part 600 regulations, which among other things require the appointment of Special Counsel from outside the government, can be waived.

**Discussion**

As you are aware, the authority to appoint independent counsels pursuant to the provisions of 28 U.S.C. §§ 591 *et seq.* expired on June 30, 1999.  However, the permanent indefinite appropriation remains available to pay the expenses of an independent counsel (1) who was appointed by the Special Division of the United States Court of Appeals for the District of Columbia pursuant to the provisions of 28 U.S.C. §§ 591 *et seq.* whose investigation was underway when the law expired[6] or

---

[4] Letter from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, United States Attorney, Feb. 6, 2004.  The Department of Justice adopted 28 C.F.R. Part 600 (64 Fed. Reg. 37038, July 9, 1999), to replace the procedures of the expired Independent Counsel Reauthorization Act of 1994.  While the Part 600 procedures provide that a Special Counsel appointed by the Attorney General (or in cases when the Attorney General is recused, by the Acting Attorney General) is to be selected from outside the government, the delegation clearly states that Special Counsel Fitzgerald is not a Special Counsel whose appointment is subject to Part 600.

[5] Pub. L. No. 100-202, § 101(a) [title II], 101 Stat. 1329, 1329-9 (1987).

[6] The law continues in effect with respect to matters pending before an independent counsel until the independent counsel determines that such matters have been completed.  28 U.S.C. § 599 (2000).

(2) who was appointed under "other law."[7]  Under the expired law, a person appointed as an independent counsel could not hold "any office of profit or trust under the United States, 28 U.S.C. § 593(b)(2) (2000)."[8]  The purpose of the qualification was to avoid the public perception of an actual or apparent conflict of interest existing between the investigator and those being investigated for alleged violations of law.[9]

The permanent indefinite appropriation is available to pay all necessary expenses of investigations of independent counsels appointed under other law.  However, the term "independent counsel" is not defined in the permanent indefinite appropriation.  About the time the independent counsel law was being considered for reauthorization in 1987, legal challenges were underway regarding the constitutionality of the procedure followed to appoint independent counsels.  Consequently, to avoid interruption of ongoing investigations should the law be ruled unconstitutional by a court, the Attorney General appointed the same persons to serve as independent counsels under the statutory authority that was relied upon to appoint Special

---

[7] The Department has at different times in various regulations characterized individuals appointed under other law (to investigate individuals who may have been proper subjects for investigation under the expired independent counsel law) as independent counsels or special counsels.  *Compare* Justice's current regulation at 28 C.F.R. Part 600—General Powers of Special Counsel (July 1, 2003) with the regulation it replaced at 28 C.F.R. Part 600—General Powers of Independent Counsel (July 1, 1999).  *See* 28 U.S.C. Parts 601 through 603 (July 1, 2003) relating to the Jurisdiction of the three Independent Counsels appointed under other authority for *Iran/Contra*, *In re Franklyn Nofziger* and *In re Madison Guaranty Savings & Loan Association*.  Independent and special counsels are sometimes referred to as regulatory independent counsels

[8] A similar requirement was included in the independent counsel law as first enacted in 1978 and all subsequent reauthorizations.  *See* 28 U.S.C. § 593(d) (Supp. III 1979) as enacted by section 601 of the Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824, 1869 (Oct. 26, 1978); 28 U.S.C. § 593(d) (1982) as amended by section 2(a)(1)(A) of the Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, 96 Stat. 2039 (Jan. 3, 1983); 28 U.S.C. § 593(b)(2) (1988) as amended by section 2 of the Independent Counsel Reauthorization Act of 1987, Pub. L. No. 100-191, 101 Stat. 1293, 1298 (Dec. 15, 1987); and 28 U.S.C. § 593(b)(2) (1994) as amended by the Independent Counsel Reauthorization Act of 1994, Pub. L. No. 103-270, 108 Stat. 732 (June 30, 1994).

[9] *See*, for example, S. Rep. No. 95-170, accompanying S. 555, at 65-66 (1977) discussing the proposed language of 28 U.S.C. § 593(d).  Upon the enactment of S. 555 into law, it became known as the Ethics in Government Act of 1978.  *See also* the Conference Committee Report accompanying S. 555, H.R. Rept. 95-1756, 77 (1978) for discussion on the origin of title VI to the act enacting the special prosecutor provisions into law.  The act was subsequently amended to change the name special prosecutor to independent counsel.

Counsel Fitzgerald.[10]  Thus, the independent counsels appointed under "other law"
around the time that the Congress was considering the Department of Justice
appropriation act for fiscal year 1988 (which enacted the permanent indefinite
appropriation into law) were the independent counsels that also had been appointed
in conformity with the requirements of the independent counsel law.[11]

In a meeting with Department of Justice officials,[12] the Department explained its view
that use of the permanent indefinite appropriation to pay expenses of a U.S. Attorney
appointed to serve as Special Counsel who continues to perform his duty as a U.S.
Attorney is appropriate.  The alleged violation that Special Counsel Fitzgerald is
investigating involves the rank and level of government official that clearly would
have been within the scope of the expired independent counsel law and the
investigation of which could have been funded by the permanent indefinite
appropriation.  Additionally, the Department views the use of the permanent
indefinite appropriation as important to facilitate Special Counsel Fitzgerald's
investigation by freeing him from possible budget constraints that potentially might
serve to limit his activities.

---

[10] *See* Offices of Independent Counsel; General Powers and Establishment of
Independent Counsel—Iran/Contra, 52 Fed. Reg. 7270, Mar. 10, 1987, and Jurisdiction;
Independent Counsel Offices; Regarding Franklyn C. Nofziger, 52 Fed. Reg. 22438,
June 12, 1987, and *In re Sealed Case*, 829 F.2d 50, 52-53 (D.C. Cir. 1987), discussing
the Attorney General's appointment of Lawrence Walsh as regulatory independent
counsel under 28 C.F.R. Part 600 (1987) to mirror the appointment of Lawrence
Walsh under the independent counsel law.  Unlike the court that considered the
effect of the predecessor Part 600, we have been unable to identify support for the
proposition that 28 C.F.R. Part 600 issued in 1999 was intended to mirror the
requirements of the expired independent counsel law.

[11] Heretofore, persons appointed regulatory independent/special counsels whose
expenses have been paid from the permanent indefinite appropriation were not
officers or employees of the United States government, including the first regulatory
special counsel appointed following the 1999 amendment to 28 C.F.R. Part 600.  They
include Robert Fiske, appointed regulatory independent counsel on January 20, 1994,
and John Danforth, appointed regulatory special counsel on September 9, 1999.

[12] Meeting on May 20, 2004, attended by Paul Colborn, Special Counsel, Office of Legal
Counsel, Stuart Frisch, General Counsel, Justice Management Division, and Melinda
Morgan, Acting Director of Finance, Justice Management Division, representing the
Department of Justice, and Susan A. Poling, Associate General Counsel, Richard T.
Cambosos, Senior Attorney, and Hodge Herry, Assistant Director, Financial
Management and Assurance, representing GAO. *See also* letter from Paul R. Corts,
Assistant Attorney General for Administration, Department of Justice, to Anthony H.
Gamboa, General Counsel, GAO, April 1, 2004, p. 2.

Since the permanent indefinite appropriation is available for independent counsels, we looked for indicia of independence of Special Counsel Fitzgerald.  The parameters of his authority and independence are defined in the appointment letters which delegate to Special Counsel Fitzgerald all (plenary) the authority of the Attorney General with respect to the Department's investigation into the alleged unauthorized disclosure of a CIA employee's identity with the direction that he exercise such authority independent of the supervision or control of any officer of the Department.[13] In addition, Department officials informed us that the express exclusion of Special Counsel Fitzgerald from the application of 28 C.F.R. Part 600, which contains provisions that might conflict with the notion that the Special Counsel in this investigation possesses all the power of the Attorney General, contributes to the Special Counsel's independence.[14]  Thus, Special Counsel Fitzgerald need not follow the Department's practices and procedures if they would subject him to the approval of an officer or employee of the Department.  For example, 28 C.F.R. § 600.7 requires that a Special Counsel consult with the Attorney General before taking particular actions.  The consulting requirement would seem to be inconsistent with the notion that Special Counsel Fitzgerald possesses the plenary authority of the Attorney General.   The Department also stated it would continue to provide the financial information for Special Counsel Fitzgerald as it has done with respect to other independent counsels appointed under "other law" whose expenses were paid from the permanent indefinite appropriation.[15]

Acting Attorney General Comey appointed Special Counsel Fitzgerald under 28 U.S.C. §§ 509, 510 and 515.[16]   The Department has relied upon such authority in the past to

---

[13] *See supra* notes 3 and 4.

[14] *See supra* note 12.

[15]The Department has instituted procedures to separately account for costs associated with Special Counsel Fitzgerald's investigation of the alleged unauthorized disclosure of the identity of the CIA operative that are charged to permanent indefinite appropriation. We audited the statement of expenditures for the Office of Special Counsel Fitzgerald and found that (1) the statement of expenditures was presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles, (2) the Special Counsel had effective internal control over financial reporting and compliance with laws and regulations, and (3) there was no reportable noncompliance with laws and regulations we tested.  Additional information on our audit of the Office of Special Counsel Fitzgerald can be obtained from our report, *Financial Audit:  Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2004* (GAO-04-1014, Sept. 30, 2004).

[16] These statutes establish the Attorney General's overall responsibility for Department functions, his authority to delegate Department functions to other Department officers, and authority to direct an individual Department officer or any attorney specially appointed under law to conduct any kind of legal proceeding, civil

appoint regulatory independent counsel from outside the government.  In 1994, the Department first determined that it was authorized to finance the activity of a regulatory independent counsel who was appointed from outside the government pursuant to such authority from the permanent indefinite appropriation.  We agree with the Department that the same statutory authorities that authorize the Attorney General (or Acting Attorney General) to delegate authority to a U.S. Attorney to investigate and prosecute high ranking government officials are "other law" for the purposes of authorizing the Department to finance the investigation and prosecution from the permanent indefinite appropriation.  It should be noted that we have not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government pursuant to such authority. [17]

The remaining issue is whether Part 600 can be waived by the Attorney General or acting Attorney General.  We examined Part 600 and found it was issued in 1999 to replace the procedures of the expired Independent Counsel Reauthorization Act of 1994.  In our view, Part 600 is not a substantive (legal) limitation on the authority of the Acting Attorney General to delegate departmental functions to Special Counsel Fitzgerald.  First, 28 C.F.R. § 600.10 states that the regulations are "not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or equity, by any person or entity, in any matter, civil, criminal, or administrative."  Further, in the supplemental information accompanying the issuance of Part 600, the Department explained that the effective date of the rule did not have to be delayed 30 days after publication because it was not a substantive rule, citing 5 U.S.C. §§ 553(d), 552(a)(1)(D).  64 Fed. Reg. 37038, at 37041 (July 9, 1999).

Finally, the only statute cited as authority for 28 C.F.R. Part 600 that expressly authorizes the Department to issue regulations is 5 U.S.C. § 301 (2000).  It provides that the head of executive agencies may "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers and property…"  The power conferred by 5 U.S.C. § 301 is administrative and not

---

or criminal, including grand jury proceedings whether or not he is a resident of the District in which the proceeding is brought.

[17] Department of Justice, Memorandum to Stephen R. Colgate, Assistant Attorney General for Administration, from Stuart Frisch, Acting General Counsel, *Availability of the Independent Counsel Appropriation to Pay Expenses of an Independent Counsel Appointed by the Attorney General*, Jan. 24, 1994.  The determination related to the investigation by Robert B. Fiske, Jr., who was appointed by Attorney General Janet Reno on January 24, 1994, during a period between the expiration on December 15, 1992 and reauthorization on June 30, 1994, of the independent counsel law.  *See,* GAO, *Financial Audit, Expenditures by Four Independent Counsels for the Six Months Ended March 31, 1994*, GAO/AIMD-95-112 (Washington, D.C.: March 31, 1995).

legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979); *United States v. George*, 228 U.S. 14, 21-22 (1914).  It follows that such regulations governing internal procedures issued under this statute do not have the force and effect of law.  *See Einhorn v. DeWitt*, 618 F. 2d 347 (5th Cir. 1980) (IRS procedural rules issued under 5 U.S.C. § 301 governing the internal affairs of the IRS do not have force and effect of law).  Thus, 28 C.F.R Part 600 does not act as a substantive limitation on the Attorney General's (or Acting Attorney General's) authority to delegate authority to a U.S. Attorney to serve as a Special Counsel to investigate high ranking government officials and it may be waived.  *See*  60 Comp. Gen. 208, 210 (1981) (an agency could waive its internal guidelines prescribing the specific evidence required to demonstrate a grantee's financial responsibility when the agency was otherwise satisfied that the government's interests were adequately protected).   The Department was not limited by 28 C.F.R. Part 600 when it exercised its authority under 28 U.S.C. §§ 508, 509, 510 and 515 and appointed Special Counsel Fitzgerald from within the Department to investigate the alleged unauthorized leak of a CIA employee' identity.

We also note that the Part 600 regulations contemplate an outside Special Counsel when "it would be in the public interest to appoint an outside Special Counsel to assume responsibility" for an investigation and that an investigation by the Department would present a conflict of interest or other extraordinary circumstance. 28 C.F.R. §600.1(b).  We defer to the Department's judgment in this regard.

**Conclusion**

Upon review and consideration, we do not object to the Department's determination that the permanent indefinite appropriation is available to pay the expenses of Special Counsel Fitzgerald's investigation.  Admittedly one might infer from events occurring around the time that the Congress was considering establishing the permanent indefinite appropriation that it was within the Congress' contemplation that the appropriation would be used to pay the expenses of an independent counsel possessing the degree of independence similar to that possessed by an independent counsel appointed under 28 U.S.C. §§ 591 *et seq.*  However, such an inference is insufficient to support our reading into the law a limitation on the use of the permanent indefinite appropriation to pay for investigations solely by Special Counsels appointed from outside the government.  The independence conferred by the delegation of authority to Special Counsel Fitzgerald from the Department of Justice is consistent with a fair reading of the independence required of an "independent counsel" appointed under "other law."  Finally, Part 600 regulations do not have the force and effect of law and may be waived by the Department.  Thus we do not view the payment of the expenses associated with Special Counsel Fitzgerald's investigation from the permanent indefinite appropriation to be improper or unauthorized simply because he was not appointed from outside the government and continues to serve as a United States Attorney.

Should you have any questions regarding this matter, you may contact Susan A. Poling, Associate General Counsel, on 202-512-2667 or Richard T. Cambosos, Senior Attorney, on 202-512-8263.

/SIGNED/

Anthony  H. Gamboa
General Counsel

cc:  Chairman and Ranking Minority Member
     Committee on Governmental Affairs
     United States Senate

     Chairman and Ranking Minority Member
     Committee on the Judiciary
     United States Senate

     Chairman and Ranking Minority Member
     Subcommittee on Commerce, Justice, State and the Judiciary
     Committee on Appropriations
     United States Senate

     Chairman and Ranking Minority Member
     Committee on Government Reform
     House of Representatives

     Chairman and Ranking Minority Member
     Committee on the Judiciary
     House of Representatives

     Chairman and Ranking Minority Member
     Subcommittee on Commerce, Justice, State,
        The Judiciary and Related Agencies
     Committee on Appropriations
     House of Representatives

B-302582

MEMORANDUM                                                   8 June 2018

To:      Deputy Attorney General Rod Rosenstein
         Assistant Attorney General Steve Engel

From:    Bill Barr

Re:      Mueller's "Obstruction" Theory

---

I am writing as a former official deeply concerned with the institutions of the Presidency and the Department of Justice. I realize that I am in the dark about many facts, but I hope my views may be useful.

It appears Mueller's team is investigating a possible case of "obstruction" by the President predicated substantially on his expression of hope that the Comey could eventually "let...go" of its investigation of Flynn and his action in firing Comey. In pursuit of this obstruction theory, it appears that Mueller's team is demanding that the President submit to interrogation about these incidents, using the threat of subpoenas to coerce his submission.

Mueller should not be permitted to demand that the President submit to interrogation about alleged obstruction. Apart from whether Mueller a strong enough factual basis for doing so, Mueller's obstruction theory is fatally misconceived. As I understand it, his theory is premised on a novel and legally insupportable reading of the law. Moreover, in my view, if credited by the Department, it would have grave consequences far beyond the immediate confines of this case and would do lasting damage to the Presidency and to the administration of law within the Executive branch.

As things stand, obstruction laws do not criminalize just any act that can influence a "proceeding." Rather they are concerned with acts intended to have a *particular kind* of impact. A "proceeding" is a formalized process for finding the truth. In general, obstruction laws are meant to protect proceedings from actions designed subvert the integrity of their truth-finding function through compromising the honesty of decision-makers (*e.g.*, judge, jury) or impairing the integrity or availability of evidence – testimonial, documentary, or physical. Thus, obstruction laws prohibit a range of "bad acts" – such as tampering with a witness or juror; or destroying, altering, or falsifying evidence – all of which are inherently wrongful because, by their very nature, they are directed at depriving the proceeding of honest decision-makers or access to full and accurate evidence. In general, then, the *actus reus* of an obstruction offense is the inherently subversive "bad act" of impairing the integrity of a decision-maker or evidence. The requisite *mens rea* is simply intending the wrongful impairment that inexorably flows from the act.

Obviously, the President and any other official can commit obstruction in this classic sense of sabotaging a proceeding's truth-finding function. Thus, for example, if a President knowingly destroys or alters evidence, suborns perjury, or induces a witness to change testimony, or commits

any act deliberately impairing the integrity or availability of evidence, then he, like anyone else, commits the crime of obstruction. Indeed, the acts of obstruction alleged against Presidents Nixon and Clinton in their respective impeachments were all such "bad acts" involving the impairment of evidence. Enforcing these laws against the President in no way infringes on the President's plenary power over law enforcement because exercising this discretion – such as his complete authority to start or stop a law enforcement proceeding -- does not involve commission of any of these inherently wrongful, subversive acts.

The President, as far as I know, is not being accused of engaging in any wrongful act of evidence impairment. Instead, Mueller is proposing an unprecedented expansion of obstruction laws so as to reach facially-lawful actions taken by the President in exercising the discretion vested in him by the Constitution. It appears Mueller is relying on 18 U.S.C. §1512, which generally prohibits acts undermining the integrity of evidence or preventing its production. Section 1512 is relevant here because, unlike other obstruction statutes, it does not require that a proceeding be actually "pending" at the time of an obstruction, but only that a defendant have in mind an anticipated proceeding. Because there were seemingly no relevant proceedings pending when the President allegedly engaged in the alleged obstruction, I believe that Mueller's team is considering the "residual clause" in Section 1512 – subsection (c)(2) – as the potential basis for an obstruction case. Subsection (c) reads:

> (c)   Whoever corruptly-- (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so [is guilty of the crime of obstruction]. [emphasis added].

As I understand the theory, Mueller proposes to give clause (c)(2), which previously has been *exclusively* confined to acts of evidence impairment, a new unbounded interpretation. First, by reading clause (c)(2) in isolation, and glossing over key terms, he construes the clause as a free-standing, all-encompassing provision prohibiting *any act* influencing a proceeding if done with an improper motive. Second, in a further unprecedented step, Mueller would apply this sweeping prohibition to facially-lawful acts taken by public officials exercising of their discretionary powers if those acts influence a proceeding. Thus, under this theory, simply by exercising his Constitutional discretion in a facially-lawful way – for example, by removing or appointing an official; using his prosecutorial discretion to give direction on a case; or using his pardoning power – a President can be accused of committing a crime based solely on his subjective state of mind. As a result, any discretionary act by a President that influences a proceeding can become the subject of a criminal grand jury investigation, probing whether the President acted with an improper motive.

If embraced by the Department, this theory would have potentially disastrous implications, not just for the Presidency, but for the Executive branch as a whole and for the Department in particular. While Mueller's focus is the President's discretionary actions, his theory would apply to *all exercises of prosecutorial discretion* by the President's subordinates, from the Attorney General down to the most junior line prosecutor. Simply by giving direction on a case, or class of

cases, an official opens himself to the charge that he has acted with an "improper" motive and thus becomes subject to a criminal investigation. Moreover, the challenge to Comey's removal shows that not just prosecutorial decisions are at issue. Any personnel or management decisions taken by an official charged with supervising and conducting litigation and enforcement matters in the Executive branch can become grist for the criminal mill based solely on the official's subjective state of mind.  All that is needed is a claim that a supervisor is acting with an improper purpose and any act arguably constraining a case – such as removing a U.S. Attorney -- could be cast as a crime of obstruction.

It is inconceivable to me that the Department could accept Mueller's interpretation of §1512(c)(2).  It is untenable as a matter of law and cannot provide a legitimate basis for interrogating the President. I know you will agree that, if a DOJ investigation is going to take down a democratically-elected President, it is imperative to the health of our system and to our national cohesion that any claim of wrongdoing is solidly based on evidence of a *real* crime – not a debatable one. It is time to travel well-worn paths; not to veer into novel, unsettled or contested areas of the law; and not to indulge the fancies by overly-zealous prosecutors.

As elaborated on below, Mueller's theory should be rejected for the following reasons:

*First*, the sweeping interpretation being proposed for § 1512's residual clause is contrary to the statute's plain meaning and would directly contravene the Department's longstanding and consistent position that generally-worded statutes like § 1512 cannot be applied to the President's exercise of his constitutional powers in the absence of a "clear statement" in the statute that such an application was intended.

*Second*, Mueller's premise that, whenever an investigation touches on the President's own conduct, it is inherently "corrupt" under § 1512 for the President to influence that matter is insupportable. In granting plenary law enforcement powers to the President, the Constitution places no such limit on the President's supervisory authority. Moreover, such a limitation cannot be reconciled with the Department's longstanding position that the "conflict of interest" laws do not, and cannot, apply to the President, since to apply them would impermissibly "disempower" the President from supervising a class of cases that the Constitution grants him the authority to supervise.

*Third*, defining facially-lawful exercises of Executive discretion as potential crimes, based solely on subjective motive, would violate Article II of the Constitution by impermissibly burdening the exercise of core discretionary powers within the Executive branch.

*Fourth*, even if one were to indulge Mueller's obstruction theory, in the particular circumstances here, the President's motive in removing Comey and commenting on Flynn could not have been "corrupt" unless the President and his campaign were actually guilty of illegal collusion. Because the obstruction claim is entirely dependent on first finding collusion, Mueller should not be permitted to interrogate the President about obstruction until has enough evidence to establish collusion.

**I.  The Statute's Plain Meaning, and "the Clear Statement" Rule Long Adhered To By the Department, Preclude Its Application to Facially-Lawful Exercises of the President's Constitutional Discretion.**

The unbounded construction Mueller would give §1512's residual clause is contrary to the provision's text, structure, and legislative history. By its terms, §1512 focuses exclusively on actions that subvert the truth-finding function of a proceeding by impairing the availability or integrity of evidence – testimonial, documentary, or physical. Thus, §1512 proscribes a litany of specifically-defined acts of obstruction, including killing a witness, threatening a witness to prevent or alter testimony, destroying or altering documentary or physical evidence, and harassing a witness to hinder testimony. All of these enumerated acts are "obstructive" in precisely the same way – they interfere with a proceeding's ability to gather complete and reliable evidence.

The question here is whether the phrase – "or corruptly otherwise obstructs" – in clause (c)(2) is divorced from the litany of the specific prohibitions in § 1512, and is thus a free-standing, all-encompassing prohibition reaching *any* act that influences a proceeding, or whether the clause's prohibition against "otherwise" obstructing is somehow tied to, and limited by, the character of all the other forms of obstruction listed in the statute. I think it is clear that use of the word "otherwise" in the residual clause expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. Mueller's interpretation of the residual clause as covering *any and all acts* that influence a proceeding reads the word "otherwise" out of the statute altogether. But any proper interpretation of the clause must give effect to the word "otherwise;" it must do some work.

As the Supreme Court has suggested, *Begay v. United States,* 553 U.S. 137, 142-143 (2008), when Congress enumerates various specific acts constituting a crime and then follows that enumeration with a residual clause, introduced with the words "or otherwise," then the more general action referred to immediately after the word "otherwise" is most naturally understood to cover acts that cause a *similar kind* of result as the preceding listed examples, but cause those results in a *different manner*. In other words, the specific examples enumerated prior to the residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause. *See also Yates v. United States*, 135 S.Ct. 1074, 1085-87 (2015). As the *Begay* Court observed, if Congress meant the residual clause to be so all-encompassing that it subsumes all the preceding enumerated examples, "it is hard to see why it would have needed to include the examples at all." 553 U.S. at 142; *see McDonnell v. United States*, 136 S.Ct. 2355, 2369 (2016). An example suffices to make the point: If a statute prohibits "slapping, punching, kicking, biting, gouging eyes, or otherwise hurting" another person, the word "hurting" in the residual clause would naturally be understood as referring to the same *kind* of physical injury inflicted by the enumerated acts, but inflicted in a different way – *i.e.,* pulling hair. It normally would not be understood as referring to any kind of "hurting," such as hurting another's feelings, or hurting another's economic interests.

Consequently, under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the *same kind of obstructive impact* as the listed forms of obstruction – *i.e.,* impairing the availability or integrity of evidence – but cause this impairment in a different way than the enumerated actions do. Under this construction,

then, the "catch all" language in clause (c)(2) encompasses any conduct, even if not specifically described in 1512, that is directed at undermining a proceeding's truth-finding function through actions impairing the integrity and availability of evidence. Indeed, this is how the residual clause has been applied. From a quick review of the cases, it appears all the cases have involved attempts to interfere with, or render false, the evidence that would become available to a proceeding. Even the more esoteric applications of clause (c)(2) have been directed against attempts to prevent the flow of evidence to a proceeding. *E.g.*, *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014)(soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009)(disclosing identity of undercover agent to subject of grand jury drug investigation). As far as I can tell, no case has ever treated as an "obstruction" an official's exercise of prosecutorial discretion or an official's management or personnel actions collaterally affecting a proceeding.

Further, reading the residual clause as an all-encompassing proscription cannot be reconciled either with the other subsections of § 1512, or with the other obstruction provisions in Title 18 that must be read *in pari passu* with those in § 1512. Given Mueller's sweeping interpretation, clause (c)(2) would render all the specific terms in clause (c)(1) surplusage; moreover, it would swallow up all the specific prohibitions in the remainder of § 1512 -- subsections (a), (b), and (d). More than that, it would subsume virtually all other obstruction provisions in Title 18. For example, it would supervene the omnibus clause in § 1503, applicable to pending judicial proceedings, as well as the omnibus clause in § 1505, applicable to pending proceedings before agencies and Congress. Construing the residual clause in § 1512(c)(2) as supplanting these provisions would eliminate the restrictions Congress built into those provisions -- *i.e.*, the requirement that a proceeding be "pending" -- and would supplant the lower penalties in those provisions with the substantially higher penalties in § 1512(c). It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause.

Needless to say, it is highly implausible that such a revolution in obstruction law was intended, or would have gone uncommented upon, when (c)(2) was enacted. On the contrary, the legislative history makes plain that Congress had a more focused purpose when it enacted (c)(2). That subsection was enacted in 2002 as part of the Sarbanes-Oxley Act. That statute was prompted by Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents. Subsection (c) was added to Section 1512 explicitly as a "loophole" closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly.

As reported to the Senate, the Corporate Fraud Accountability Act was expressly designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15. Section 1512(c) did not exist as part of the original proposal. See S. 2010, 107th Cong. (2002). Instead, it was later introduced as an amendment by Senator Trent Lott in July 2002. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Senator Lott explained that, by adding new § 1512(c), his proposed amendment:

would enact stronger laws against *document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered .... [T]his section would allow the Government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

Id. at S6545 (statement of Sen. Lott) (emphasis supplied). Senator Orrin Hatch, in support of Senator Lott's amendment, explained that it would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. Id. at S6550 (statement of Sen. Hatch). The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence.

Not only is an all-encompassing reading of § 1512(c)(2) contrary to the language and manifest purpose of the statute, but it is precluded by a fundamental canon of statutory construction applicable to statutes of this sort. Statutes must be construed with reference to the constitutional framework within which they operate. *E.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Reading § 1512(c)(2) broadly to criminalize the President's facially-lawful exercises of his removal authority and his prosecutorial discretion, based on probing his subjective state of mind for evidence of an "improper" motive, would obviously intrude deeply into core areas of the President's constitutional powers. It is well-settled that statutes that do not *expressly* apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). OLC has long rigorously enforced this "clear statement" rule to limit the reach of broadly worded statutes so as to prevent undue intrusion into the President's exercise of his Constitutional discretion.

As OLC has explained, the "clear statement" rule has two sources. First, it arises from the long-recognized "cardinal principle" of statutory interpretation that statutes be construed to avoid raising serious constitutional questions. Second, the rule exists to protect the "usual constitutional balance" between the branches contemplated by the Framers by "requir[ing] an express statement by Congress before assuming it intended" to impinge upon Presidential authority. *Franklin*, 505 U.S. at 801; *see, e.g., Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350 (1995).

This clear statement rule has been applied frequently by the Supreme Court as well as the Executive branch with respect to statutes that might otherwise, if one were to ignore the constitutional context, be susceptible of an application that would affect the President's constitutional prerogatives. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act ("APA"), 5 U.S.C §§ 701-706, authorized "abuse of discretion" review of final actions by the President. Even though the statute defined reviewable action in a way that facially could include the President, and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court:

> [t]he President is not [expressly] excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

505 U.S. at 800-01. To amplify, she continued, "[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements." *Id.* at 801.

Similarly, in *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989), the Court held that the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 2, does not apply to the judicial recommendation panels of the American Bar Association because interpreting the statute as applying to them would raise serious constitutional questions relating to the President's constitutional appointment power. By its terms, FACA applied to any advisory committee used by an agency "in the interest of obtaining advice or recommendations for the President." 5 U.S.C. app. § 3(2(c). While acknowledging that a "straightforward reading" of the statute's language would seem to require its application to the ABA committee, *Public Citizen*, 491 U.S. at 453, the Court held that such a reading was precluded by the "cardinal principle" that a statute be interpreted to avoid serious constitutional question." *Id.* at 465-67. Notably, the majority stated, "[o]ur reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government," and "[t]hat construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable." *Id.* at 466.

The Office of Legal Counsel has consistently "adhered to a plain statement rule: statutes that do not expressly apply to the President must be construed as not applying to the President, where applying the statute to the President would pose a significant question regarding the President's constitutional prerogatives." *E.g, The Constitutional Separation of Powers Between the President and Congress,* __ Op. O.L.C. 124, 178 (1996); *Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges,* 19 Op. O.L.C. 350 (1995).

The Department has applied this principle to broadly-worded criminal statutes, like the one at issue here. Thus, in a closely analogous context, the Department has long held that the conflict-of-interest statute, 18 U.S.C § 208, does not apply to the President. That statute prohibits any "officer or employee of the executive branch" from "participat[ing] personally and substantially" in any particular matter in which he or she has a personal financial interest. *Id.* In the leading opinion on the matter, then-Deputy Attorney General Laurence Silberman determined that the legislative history disclosed no intention to cover the President and doing so would raise "serious questions as to the constitutionality" of the statute, because the effect of applying the statute to the President would "disempower" the President from performing his constitutionally-prescribed functions as to certain matters . See *Memorandum for Richard T. Burress, Office of the President,*

*from Laurence H. Silberman, Deputy Attorney General, Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974).

Similarly, OLC opined that the Anti-Lobbying Act, 18 U.S.C. § 1913, does not apply fully against the President. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 304-06 (1989). The Anti-Lobbying Act prohibits any appropriated funds from being "used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress." 18 U.S.C. § 1913. The statute provided an exception for communications by executive branch officers and employees if the communication was made pursuant to a request by a member of Congress or was a request to Congress for legislation or appropriations. OLC concluded that applying the Act as broadly as its terms would otherwise allow would raise serious constitutional questions as an infringement of the President's Recommendations Clause power.

In addition to the "clear statement" rule, other canons of statutory construction preclude giving the residual clause in §1512(c)(2) the unbounded scope proposed by Mueller's obstruction theory. As elaborated on in the ensuing section, to read the residual clause as extending beyond evidence impairment, and to apply it to any that "corruptly" affects a proceeding, would raise serious Due Process issues. Once divorced from the concrete standard of evidence impairment, the residual clause defines neither the crime's *actus reus* (what conduct amounts to obstruction) nor its *mens rea* (what state of mind is "corrupt") "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *See e.g. McDonnell v. United States*, 136 S.Ct. at 2373. This vagueness defect becomes even more pronounced when the statute is applied to a wide range of public officials whose normal duties involve the exercise of prosecutorial discretion and the conduct and management of official proceedings. The "cardinal rule" that a statute be interpreted to avoid serious constitutional questions mandates rejection of the sweeping interpretation of the residual clause proposed by Mueller.

Even if the statute's plain meaning, fortified by the "clear statement" rule, were not dispositive, the fact that § 1512 is a criminal statute dictates a narrower reading than Mueller's all-encompassing interpretation. Even if the scope of § 1512(c)(2) were ambiguous, under the "rule of lenity," that ambiguity must be resolved against the Government's broader reading. *See, e.g., United States v. Granderson*, 511 U.S. 39, 54 (1994) ("In these circumstances -- where text, structure, and history fail to establish that the Government's position is unambiguously correct -- we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor.")

In sum, the sweeping construction of § 1512(c)'s residual clause posited by Mueller's obstruction theory is novel and extravagant. It is contrary to the statute's plain language, structure, and legislative history. Such a broad reading would contravene the "clear statement" rule of statutory construction, which the Department has rigorously adhered to in interpreting statutes, like this one, that would otherwise intrude on Executive authority. By it terms, § 1512 is intended to protect the truth-finding function of a proceeding by prohibiting acts that would impair the availability or integrity of evidence. The cases applying the "residual clause" have fallen within this scope. The clause has never before been applied to facially-lawful discretionary acts of

Executive branch official.  Mueller's overly-aggressive use of the obstruction laws should not be embraced by the Department and cannot support interrogation of the President to evaluate his subjective state of mind.

## II.  Applying §1512(c)(2) to Review Facially-Lawful Exercises of the President's Removal Authority and Prosecutorial Discretion Would Impermissibly Infringe on the President's Constitutional Authority and the Functioning of the Executive Branch.

This case implicates at least two broad discretionary powers vested by the Constitution exclusively in the President. First, in removing Comey as director of the FBI there is no question that the President was exercising one of his core authorities under the Constitution. Because the President has Constitutional responsibility for seeing that the laws are faithfully executed, it is settled that he has "illimitable" discretion to remove principal officers carrying out his Executive functions. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S.Ct. 3138, 3152 (2010); *Myers v. United States*, 272 U.S. 52 (1926).  Similarly, in commenting to Comey about Flynn's situation – to the extent it is taken as the President having placed his thumb on the scale in favor of lenity – the President was plainly within his plenary discretion over the prosecution function.  The Constitution vests *all Federal law enforcement power*, and hence prosecutorial discretion, in the President. The President's discretion in these areas has long been considered "absolute," and his decisions exercising this discretion are presumed to be regular and are generally deemed non-reviewable. *See, e.g., United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see generally* S. Prakash, The Chief Prosecutor, 73 Geo. Wash. L. Rev. 521 (2005)

The central problem with Mueller's interpretation of §1512(c)(2) is that, instead of applying the statute to inherently wrongful acts of evidence impairment, he would now define the *actus reus* of obstruction as *any act,* including facially lawful acts, that influence a proceeding. However, the Constitution vests plenary authority over law enforcement proceedings in the President, and therefore one of the President's core constitutional authorities is precisely to make decisions "influencing" proceedings. In addition, the Constitution vests other discretionary powers in the President that can have a collateral influence on proceedings – including the power of appointment, removal, and pardon. The crux of Mueller's position is that, whenever the President exercises any of these discretionary powers and thereby "influences" a proceeding, he has completed the *actus reus* of the crime of obstruction. To establish guilt, all that remains is evaluation of the President's state of mind to divine whether he acted with a "corrupt" motive.

Construed in this manner, §1512(c)(2) would violate Article II of the Constitution in at least two respects:

*First,* Mueller's premise appears to be that, when a proceeding is looking into the President's own conduct, it would be "corrupt" within the meaning of §1512(c)(2) for the President to attempt to influence that proceeding. In other words, Mueller seems to be claiming that the obstruction statute effectively walls off the President from exercising Constitutional powers over cases in which his own conduct is being scrutinized.  This premise is clearly wrong constitutionally.  Nor can it be

reconciled with the Department's longstanding position that the "conflict of interest" laws do not, and cannot, apply to the President, since to apply them would impermissibly "disempower" the President from supervising a class of cases that the Constitution grants him the authority to supervise. Under the Constitution, the President's authority over law enforcement matters is necessarily all-encompassing, and Congress may not exscind certain matters from the scope of his responsibilities. The Framers' plan contemplates that the President's law enforcement powers extend to all matters, including those in which he had a personal stake, and that the proper mechanism for policing the President's faithful exercise of that discretion is the political process – that is, the People, acting either directly, or through their elected representatives in Congress.

*Second,* quite apart from this misbegotten effort to "disempower" the President from acting on matters in which he has an interest, defining facially-lawful exercises of Executive discretion as potential crimes, based solely on the President's subjective motive, would violate Article II of the Constitution by impermissibly burdening the exercise of core discretionary powers within the Executive branch. The prospect of criminal liability based solely on the official's state of mind, coupled with the indefinite standards of "improper motive" and "obstruction," would cast a pall over a wide range of Executive decision-making, chill the exercise of discretion, and expose to intrusive and free-ranging examination of the President's (and his subordinate's) subjective state of mind in exercising that discretion.

### A. Section 1512(c)(2) May Not "Disempower" the President from Exercising His Law Enforcement Authority Over a Particular Class of Matters.

As discussed further below, a fatal flaw in Mueller's interpretation of §1512(c)(2) is that, while defining obstruction solely as acting "corruptly," Mueller offers no definition of what "corruptly" means. It appears, however, that Mueller has in mind particular circumstances that he feels may give rise to possible "corruptness" in the current matter. His tacit premise appears to be that, when an investigation is looking into the President's own conduct, it would be "corrupt" for the President to attempt to influence that investigation.

On a superficial level, this outlook is unsurprising: at first blush it accords with the old Roman maxim that a man should not be the judge in his own case and, because "conflict-of-interest" laws apply to all the President's subordinates, DOJ prosecutors are steeped in the notion that it is illegal for an official to touch a case in which he has a personal stake. But constitutionally, as applied to the President, this mindset is entirely misconceived: there is no *legal* prohibition – as opposed a political constraint -- against the President's acting on a matter in which he has a personal stake.

The Constitution itself places no limit on the President's authority to act on matters which concern him or his own conduct. On the contrary, the Constitution's grant of law enforcement power to the President is plenary. Constitutionally, it is wrong to conceive of the President as simply the highest officer within the Executive branch hierarchy.  He alone *is* the Executive branch. As such, he is the sole repository of *all Executive powers* conferred by the Constitution. Thus, the full measure of law enforcement authority is placed in the President's hands, and no limit is placed on the kinds of cases subject to his control and supervision. While the President has subordinates --the Attorney General and DOJ lawyers -- who exercise prosecutorial discretion on

his behalf, they are merely "his hand," *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922) – the discretion they exercise is the President's discretion, and their decisions are legitimate precisely because they remain under his supervision, and he is still responsible and politically accountable for them.

Nor does any statute purport to restrict the President's authority over matters in which he has an interest.  On the contrary, in 1974, the Department concluded that the conflict-of interest-laws cannot be construed as applying to the President, expressing "serious doubt as to the constitutionality" of a statute that sought "to disempower" the President from acting over particular matters. *Letter to Honorable Howard W. Cannon from Acting Attorney General Laurence H. Silberman*, dated September 20, 1974; and *Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974). As far as I am aware, this is the only instance in which it has previously been suggested that a statute places a class of law enforcement cases "off limits" to the President's supervision based on his personal interest in the matters.  The Department rejected that suggestion on the ground that Congress could not "disempower" the President from exercising his supervisory authority over such matters.  For all the same reasons, Congress could not make it a crime for the President to exercise supervisory authority over cases in which his own conduct might be at issue.

The illimitable nature of the President's law enforcement discretion stems not just from the Constitution's plenary grant of those powers to the President, but also from the "unitary" character of the Executive branch itself. Because the President alone constitutes the Executive branch, the President cannot "recuse" himself. Just as Congress could not *en masse* recuse itself, leaving no source of the Legislative power, the President cannot take a holiday from his responsibilities. It is in the very nature of discretionary power that ultimate authority for making the choice must be vested in some final decision-maker. At the end of the day, there truly must be a desk at which "the buck stops." In the Executive, final responsibility must rest with the President. Thus, the President, "though able to delegate duties to others, cannot delegate ultimate responsibility or *the active obligation to supervise that goes with it.*" *Free Enterprise Fund v. Public Co. Acctg. Oversight Bd.*, 130 S. Ct. 3138, 3154 (2010) (*quoting Clinton v. Jones,* 520 U.S. 681, 712-713 (1997) (Breyer, J., concurring in judgment)) (emphasis added).

In framing a Constitution that entrusts broad discretion to the President, the Framers chose the means they thought best to police the exercise of that discretion. The Framers' idea was that, by placing all discretionary law enforcement authority in the hands of a single "Chief Magistrate" elected by all the People, and by making him politically accountable for all exercises of that discretion by himself or his agents, they were providing the best way of ensuring the "faithful exercise" of these powers.  Every four years the people as a whole make a solemn national decision as to the person whom they trust to make these prudential judgments. In the interim, the people's representatives stand watch and have the tools to oversee, discipline, and, if they deem appropriate, remove the President from office. Thus, under the Framers' plan, the determination whether the President is making decisions based on "improper" motives or whether he is "faithfully" discharging his responsibilities is left to the People, through the election process, and the Congress, through the Impeachment process.

The Framers' idea of political accountability has proven remarkably successful, far more so than the disastrous experimentation with an "independent" counsel statute, which both parties agreed to purge from our system. By and large, fear of political retribution has ensured that, when confronted with serious allegations of misconduct within an Administration, Presidents have felt it necessary to take practical steps to assure the people that matters will be pursued with integrity. But the measures that Presidents have adopted are voluntary, dictated by political prudence, and adapted to the situation; they are not legally compelled. Moreover, Congress has usually been quick to respond to allegations of wrongdoing in the Executive and has shown itself more than willing to conduct investigations into such allegations. The fact that President is answerable for any abuses of discretion and is ultimately subject to the judgment of Congress through the impeachment process means that the President is *not* the judge in his own cause. *See Nixon v. Harlow*, 457 U.S. 731, 757-58 n.41 (1982)(" The remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office.")

Mueller's core premise -- that the President acts "corruptly" if he attempts to influence a proceeding in which his own conduct is being scrutinized – is untenable. Because the Constitution, and the Department's own rulings, envision that the President may exercise his supervisory authority over cases dealing with his own interests, the President transgresses no legal limitation when he does so. For that reason, the President's exercise of supervisory authority over such a case does not amount to "corruption." It may be in some cases politically unwise; but it is not a crime. Moreover, it cannot be presumed that any decision the President reaches in a case in which he is interested is "improperly" affected by that personal interest. Implicit in the Constitution's grant of authority over such cases, and in the Department's position that the President cannot be "disempowered" from acting in such cases, is the recognition that Presidents have the capacity to decide such matters based on the public's long-term interest.

In today's world, Presidents are frequently accused of wrongdoing. Let us say that an outgoing administration – say, an incumbent U.S. Attorney -- launches a "investigation" of an incoming President. The new President knows it is bogus, is being conducted by political opponents, and is damaging his ability to establish his new Administration and to address urgent matters on behalf of the Nation. It would neither be "corrupt" nor a crime for the new President to terminate the matter and leave any further investigation to Congress. There is no legal principle that would insulate the matter from the President's supervisory authority and mandate that he passively submit while a bogus investigation runs its course.

At the end of the day, I believe Mueller's team would have to concede that a President does not act "corruptly" simply by acting on – even terminating – a matter that relates to his own conduct. But I suspect they would take the only logical fallback position from that – namely, that it would be "corrupt" if the President had actually engaged in unlawful conduct and then blocked an investigation to "cover up" the wrongdoing. In other words, the notion would be that, if an investigation was bogus, the President ultimately had legitimate grounds for exercising his supervisory powers to stop the matter. Conversely, if the President had really engaged in wrongdoing, a decision to stop the case would have been a corrupt cover up. But, in the latter case, the predicate for finding any corruption would be first finding that the President had engaged in the wrongdoing he was allegedly trying to cover up. Under the particular circumstances here, the

issue of obstruction only becomes ripe after the alleged collusion by the President or his campaign is established first. While the distinct crime of obstruction can frequently be committed even if the underlying crime under investigation is never established, that is true only where the obstruction is an act that is wrongful in itself -- such as threatening a witness, or destroying evidence. But here, the only basis for ascribing "wrongfulness" (*i.e.,* an improper motive) to the President's actions is the claim that he was attempting to block the uncovering of wrongdoing by himself or his campaign. Until Mueller can show that there was unlawful collusion, he cannot show that the President had an improper "cover up" motive.

For reasons discussed below, I do not subscribe to this notion. But here it is largely an academic question. Either the President and his campaign engaged in illegal collusion or they did not. If they did, then the issue of "obstruction" is a sideshow. However, if they did not, then the cover up theory is untenable. And, at a practical level, in the absence of some wrongful act of evidence destruction, the Department would have no business pursuing the President where it cannot show any collusion. Mueller should get on with the task at hand and reach a conclusion on collusion. In the meantime, pursuing a novel obstruction theory against the President is not only premature but – because it forces resolution of numerous constitutional issues – grossly irresponsible.

### B. Using Obstruction Laws to Review the President's Motives for Making Facially-Lawful Discretionary Decisions Impermissibly Infringes on the President's Constitutional Powers.

The crux of Mueller's claim here is that, when the President performs a facially-lawful discretionary action that influences a proceeding, he may be criminally investigated to determine whether he acted with an improper motive. It is hard to imagine a more invasive encroachment on Executive authority.

*1. The Constitution Vests Discretion in the President To Decide Whether To Prosecute Cases or To Remove Principal Executive Officers, and Those Decisions are Not Reviewable.*

The authority to decide whether or not to bring prosecutions, as well as the authority to appoint and remove principal Executive officers, and to grant pardons, are quintessentially Executive in character and among the discretionary powers vested exclusively in the President by the Constitution. When the President exercises these discretionary powers, it is presumed he does so lawfully, and his decisions are generally non-reviewable.

The principle of non-reviewability inheres in the very reason for vesting these powers in the President in the first place. In governing any society certain choices must be made that cannot be determined by tidy legal standards but require prudential judgment. The imperative is that there must be some ultimate decision-maker who has the final, authoritative say -- at whose desk the "buck" truly does stop. Any system whereby other officials, not empowered to make the decision themselves, are permitted to review the "final" decision for "improper motives" is antithetical both to the exercise of discretion and its finality. And, even if review can censor a particular choice, it leaves unaddressed the fact that a choice still remains to be made, and the reviewers have no power to make it. The prospect of review itself undermines discretion. *Wayte v. United States,* 470 U. S.

598, 607- 608 (1985); *cf. Franklin v. Massachusetts*, 505 U.S. at 801. But any regime that proposes to review and *punish* decision-makers for "improper motives" ends up doing more harm than good by chilling the exercise of discretion, "dampen[ing] the ardor of all but the most resolute …in the unflinching discharge of their duties." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (2d Cir. 1949)(Learned Hand). In the end, the prospect of punishment chills the exercise of discretion over a far broader range of decisions than the supposedly improper decision being remedied. *McDonnell*, 136 S.Ct. at 2373.

For these reasons, the law has erected an array of protections designed to prevent, or strictly limit, review of the exercise of the Executive discretionary powers. *See, e.g., Nixon v. Fitzgerald*, 457 US 731,749 (1982) (the President's unique discretionary powers require that he have absolute immunity from civil suit for his official acts). An especially strong set of rules has been put in place to insulate those who exercise prosecutorial discretion from second-guessing and the possibility of punishment. *See. e.g., Imbler v. Pachtman*, 424 U. S. 409 (1976); *Yaselli v. Goff*, 275 U. S. 503 (1927), *aff'g* 12 F. 2d 396 (2d Cir. 1926). Thus, "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *See, e.g., ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987); *United States v. Cox*, 342 F.2d 167, 171-72 (5th Cir. 1965) (The U.S. Attorney's decision not to prosecute even where there is probable cause is "a matter of executive discretion which cannot be coerced or reviewed by the courts."); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Even when there is a prosecutorial decision to proceed with a case, the law generally precludes review or, in the narrow circumstances where review is permitted, limits the extent to which the decision-makers' subjective motivations may be examined. Thus, a prosecutor's decision to bring a case is generally protected from civil liability by absolute immunity, even if the prosecutor had a malicious motive. *Yaselli v. Goff*, 275 U. S. 503 (1927), *aff'g* 12 F. 2d 396 (2d Cir. 1926). Even where some review is permitted, absent a claim of selective prosecution based on an impermissible classification, a court ordinarily will not look into the prosecutor's real motivations for bringing the case as long as probable cause existed to support prosecution. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Further, even when there is a claim of selective prosecution based on an impermissible classification, courts do not permit the probing of the prosecutor's subjective state of mind until the plaintiff has first produced objective evidence that the policy under which he has been prosecuted had a discriminatory effect. *United States v. Armstrong*, 517 U.S. 456 (1996). The same considerations undergird the Department's current position in *Hawaii v. Trump*, where the Solicitor General is arguing that, in reviewing the President's travel ban, a court may not look into the President's subjective motivations when the government has stated a facially legitimate basis for the decision. (*SG's Merits Brief* at 61).

In short, the President's exercise of its Constitutional discretion is not subject to review for "improper motivations" by lesser officials or by the courts. The judiciary has no authority "to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made" in the courts. *Marbury v. Madison, 1 Cranch (5 U.S.) 137, 170 (1803)*.

*2.  Threatening criminal liability for facially-lawful exercises of discretion, based solely on the subjective motive, would impermissibly burden the exercise of core Constitutional powers within the Executive branch..*

Mueller is effectively proposing to use the criminal obstruction law as a means of reviewing discretionary acts taken by the President when those acts influence a proceeding. Mueller gets to this point in three steps. First, instead of confining §1512(c)(2) to inherently wrongful acts of evidence impairment, he would now define the *actus reus* of obstruction as *any act* that influences a proceeding. Second, he would include within that category the official discretionary actions taken by the President or other public officials carrying out their Constitutional duties, including their authority to control all law enforcement matters.  The net effect of this is that, once the President or any subordinate takes any action that influences a proceeding, he has completed the *actus reus* of the crime of obstruction. To establish guilt, all that remains is evaluation of the President's or official's subjective state of mind to divine whether he acted with an improper motive.

Wielding §1512(c)(2) in this way preempts the Framers' plan of political accountability and violate Article II of the Constitution by impermissibly burdening the exercise of the core discretionary powers within the Executive branch. The prospect of criminal prosecution based solely on the President's state of mind, coupled with the indefinite standards of "improper motive" and "obstruction," would cast a pall over a wide range of Executive decision-making, chill the exercise of discretion, and expose to intrusive and free-ranging examination the President's (or his subordinate's) subjective state of mind in exercising that discretion

Any system that threatens to punish discretionary actions based on subjective motivation naturally has a substantial chilling effect on the exercise of discretion. But Mueller's proposed regime would mount an especially onerous and unprecedented intrusion on Executive authority. The sanction that is being threatened for improperly-motivated actions is the most severe possible – personal criminal liability.  Inevitably, the prospect of being accused of criminal conduct, and possibly being investigated for such, would cause officials "to shrink" from making potentially controversial decisions and sap the vigor with which they perform their duties. *McDonnell v. United States*, 136 S.Ct. at 2372-73.

Further, the chilling effect is especially powerful where, as here, liability turns solely on the official's subjective state of mind. Because charges of official misconduct based on improper motive are "easy to allege and hard to disprove," *Hartman v. Moore*, 547 U.S. 250, 257-58 (2006), Mueller's regime substantially increases the likelihood of meritless claims, accompanied by the all the risks of defending against them. Moreover, the review contemplated here would be far more intrusive since it does not turn on an objective standard – such as the presence in the record of a reasonable basis for the decision – but rather requires probing to determine the President's actual subjective state of mind in reaching a decision. As the Supreme Court has observed, *Harlow v. Fitzgerald*, 457 U.S. 800, 816-17 (1982), even when faced only with civil liability, such an inquiry is especially disruptive:

> [I]t now is clear that substantial costs attend the litigation of the subjective
> good faith of government officials. Not only are there the general costs of

subjecting officials to the risks of trial — distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. ...[T]he judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables ...frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery .... Inquiries of this kind can be peculiarly disruptive of effective government.

Moreover, the encroachment on the Executive function is especially broad due to the wide range of actors and actions potentially covered. Because Mueller defines the *actus reus* of obstruction as any act that influences a proceeding, he is including not just exercises of prosecutorial discretion directly deciding whether a case will proceed or not, but also exercises of any other Presidential power that might collaterally affect a proceeding, such as a removal, appointment, or grant of pardon. And, while Mueller's immediate target is the President's exercise of his discretionary powers, his obstruction theory reaches all exercises of prosecutorial discretion by the President's subordinates, from the Attorney General, down the most junior line prosecutor. It also necessarily applies to all personnel, management, and operational decision by those who are responsible for supervising and conducting litigation and enforcement matters -- civil, criminal or administrative -- on the President's behalf.

A fatal flaw with Mueller's regime – and one that greatly exacerbates its chilling effect -- is that, while Mueller would criminalize any act "corruptly" influencing a proceeding, Mueller can offer no definition of "corruptly." What is the circumstance that would make an attempt by the President to influence a proceeding "corrupt?" Mueller would construe "corruptly" as referring to one's purpose in seeking to influence a proceeding. But Mueller provides no standard for determining what motives are legal and what motives are illegal. Is an attempt to influence a proceeding based on political motivations "corrupt?" Is an attempt based on self-interest? Based on personal career considerations? Based on partisan considerations? On friendship or personal affinity? Due process requires that the elements of a crime be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *See McDonnell*, 136 S.Ct. at 2373. This, Mueller's construction of §1512(c)(2) utterly fails to do.

It is worth pausing on the word "corruptly," because courts have evinced a lot of confusion over it. It is an adverb, modifying the verbs "influence," "impede," etc. But few courts have deigned to analyze its precise adverbial mission. Does it refer to "how" the influence is accomplished – *i.e.,* the means used to influence? Or does it refer to the ultimate purpose behind the attempt to influence? As an original matter, I think it was clearly used to described the means used to influence. As the D.C. Circuit persuasively suggested, the word was likely used in its 19th century transitive sense, connoting the turning (or corrupting) of something from good and fit for its purpose into something bad and unfit for its purpose – hence, "corrupting" a magistrate; or "corrupting" evidence. *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir.1991). Understood this way, the ideas behind the obstruction laws come more clearly into focus. The thing that is

corrupt is the means being used to influence the proceeding. They are inherently wrong because they involve the corruption of decision-makers or evidence. The culpable intent does not relate to the actor's ultimate motive for using the corrupt means. The culpable state of mind is merely the intent that the corrupt means bring about their immediate purpose, which is to sabotage the proceeding's truth-finding function. The actor's ultimate purpose is irrelevant because the means, and their immediate purpose, are dishonest and malign. Further, if the actor uses lawful means of influencing a proceeding – such as asserting an evidentiary privilege, or bringing public opinion pressure to bear on the prosecutors – then his ultimate motives are likewise irrelevant. *See Arthur Anderson*, 544 U.S. at 703-707. Even if the actor is guilty of a crime and his only reason for acting is to escape justice, his use of lawful means to impede or influence a proceeding are perfectly legitimate.

Courts have gotten themselves into a box whenever they have suggested that "corruptly" is not confined to the use of wrongful means, but can also refer to someone's ultimate motive for using lawful means to influence a proceeding. The problem, however, is that, as the courts have consistently recognized, there is nothing inherently wrong with attempting to influence or impede a proceeding. Both the guilty and innocent have the right to use lawful means to do that. What is the motive that would make the use of lawful means to influence a proceeding "corrupt?" Courts have been thrown back on listing "synonyms" like "depraved, wicked, or bad." But that begs the question. What is depraved – the means or the motive? If the latter, what makes the motive depraved if the means are within one's legal rights? Fortunately for the courts, the cases invariably involve evidence impairment, and so, after stumbling around, they get to a workable conclusion. Congress has also taken this route. *Poindexter* struck down the omnibus clause of §1505 on the grounds that, as the sole definition of obstruction, the word "corruptly" was unconstitutionally vague. 951 F.2d at 377-86.   Tellingly, when Congress sought to "clarify" the meaning of "corruptly" in the wake of *Poindexter*, it settled on even more vague language – "acting with an improper motive" – and then proceeded to qualify this definition further by adding, "including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. §1515(b). The fact that Congress could not define "corruptly" except through a laundry list of acts of evidence impairment strongly confirms that, in the obstruction context, the word has no intrinsic meaning apart from its transitive sense of compromising the honesty of a decision-maker or impairing evidence.

At the end of the day then, as long as §1512 is read as it was intended to be read – *i.e.,* as prohibiting actions designed to sabotage a proceeding's access to complete and accurate evidence -- the term "corruptly" derives meaning from that context. But once the word "corruptly" is deracinated from that context, it becomes essentially meaningless as a standard. While Mueller's failure to define "corruptly" would be a Due Process violation in itself, his application of that "shapeless" prohibition on public officials engaged in the discharge of their duties impermissibly encroach on the Executive function by "cast[ing] the pall of potential prosecution" over a broad range of lawful exercises of Executive discretion. *McDonnell*, 136 S.Ct. at 2373-74.

The chilling effect is magnified still further because Mueller's approach fails to define the kind of impact an action must have to be considered an "obstruction." As long as the concept of obstruction is tied to evidence impairment, the nature of the actions being prohibited is discernable. But once taken out of this context, how does one differentiate between an unobjectionable

"influence" and an illegal "obstruction?" The actions being alleged as obstructions in this case illustrate the point. Assuming arguendo that the President had motives such that, under Mueller's theory, any direct order by him to terminate the investigation would be considered an obstruction, what action short of that would be impermissible?  The removal of Comey is presumably being investigated as "obstructive" due to some *collateral* impact it could have on a proceeding. But removing an agency head does not have the natural and foreseeable consequence of obstructing any proceeding being handled by that agency. How does one gauge whether the collateral effects of one's actions could impermissibly affect a proceeding?

The same problem exists regarding the President's comments about Flynn. Even if the President's motives were such that, under Mueller's theory, he could not have ordered termination of an investigation, to what extent do comments short of that constitute obstruction? On their face, the President's comments to Comey about Flynn seem unobjectionable. He made the accurate observation that Flynn's call with the Russian Ambassador was perfectly proper and made the point that Flynn, who had now suffered public humiliation from losing his job, was a good man. Based on this, he expressed the "hope" that Comey could "see his way clear" to let the matter go. The formulation that Comey "see his way clear," explicitly leaves the decision with Comey. Most normal subordinates would not have found these comments obstructive. Would a superior's questioning the legal merit of a case be obstructive? Would pointing out some consequences of the subordinate's position be obstructive?  Is something really an "obstruction" if it merely is pressure acting upon a prosecutor's psyche?  Is the obstructiveness of pressure gauged objectively or by how a subordinate subjectively apprehends it?

The practical implications of Mueller's approach, especially in light of its "shapeless" concept of obstruction, are astounding.  DOJ lawyers are always making decisions that invite the allegation that they are improperly concluding or constraining an investigation. And these allegations are frequently accompanied by a claim that the official is acting based on some nefarious motive. Under the theory now being advanced, any claim that an exercise of prosecutorial discretion was improperly motived could legitimately be presented as a potential criminal obstruction.  The claim would be made that, unless the subjective motivations of the decision maker are thoroughly explored through a grand jury investigation, the putative "improper motive" could not be ruled out.

In an increasingly partisan environment, these concerns are by no means trivial. For decades, the Department has been routinely attacked both for its failure to pursue certain matters and for its decisions to move forward on others. Especially when a house of Congress is held by an opposing party, the Department is almost constantly being accused of deliberately scuttling enforcement in a particular class of cases, usually involving the environmental laws.  There are claims that cases are not being brought, or are being brought, to appease an Administration's political constituency, or that the Department is failing to investigate a matter in order to cover up its own wrongdoing, or to protect the Administration. Department is bombarded with requests to name a special counsel to pursue this or that matter, and it is frequently claimed that his reluctance to do so is based on an improper motive. When a supervisor intervenes in a case, directing a course of action different from the one preferred by the subordinate, not infrequently there is a tendency for the subordinate to ascribe some nefarious motive. And when personnel changes are made – as

for example, removing a U.S. Attorney – there are sometimes claims that the move was intended to truncate some investigation.

While these controversies have heretofore been waged largely on the field of political combat, Mueller's sweeping obstruction theory would now open the way for the "criminalization" of these disputes. Predictably, challenges to the Department's decisions will be accompanied by claims that the Attorney General, or other supervisory officials, are "obstructing" justice because their directions are improperly motivated.   Whenever the slightest colorable claim of a possible "improper motive" is advanced, there will be calls for a criminal investigation into possible "obstruction." The prospect of being accused of criminal conduct, and possibly being investigated for such, would inevitably cause officials "to shrink" from making potentially controversial decisions.