

PREPARED REMARKS FOR DEPUTY ATTORNEY GENERAL ERIC HOLDER

HOUSE JUDICIARY SUBCOMMITTE

March 2, 1999

2:00 P.M.

Mr. Chairman, Mr. Nadler and Members of the Subcommittee:

Thank you for inviting me to present the views of the Department of Justice on the Independent Counsel Act. The Justice Department has administered the Act since its inception, and we have developed some opinions about its operation since the last reenactment that I will share with you. But I want to state an important limitation regarding my testimony at the outset -- a limitation that I know each of you understands: I am concerned that my comments not in any way interfere with ongoing investigations or litigation, and therefore I will be unable to give specific examples or direct my remarks to a specific Independent Counsel or a specific investigation.

The Origins of the Act

Let me begin by addressing the reasons that gave rise to the present Independent Counsel Act. Congress passed the Act as a post-Watergate reform, intending to prevent the reoccurrence of the crisis in government that arose when President Nixon directed that Special Prosecutor Archibald Cox be fired. President Nixon's decision ultimately precipitated the resignation of the Attorney General and the Deputy Attorney General.

The Act was based upon the premise that the appearance of a conflict of interest may exist when the Justice Department of any particular Administration investigates the highest ranking officials of that Administration. Therefore, the Act set out to establish a prosecutorial entity to handle such cases that would be separate and apart from the Administration and the Department of Justice. Only in this way, the drafters reasoned, could the investigation have sufficient credibility to provide assurance to the American people that there had been no coverup and no undue political influence exerted in favor of the Administration.

There can be no question that these goals are highly desirable. In fact, by seeking to prevent conflicts of interest, the Independent Counsel Act appeared to be consistent with the long-established practices of the Department of Justice and other prosecutorial offices, in that it provided an alternative prosecutor in those limited circumstances in which the prosecutor with original jurisdiction was forced to recuse himself or his office.

The Act Has Failed in its Goal of Removing Politics from the Process

Despite those good intentions, the Act has failed to accomplish its primary goal: the enhancement of confidence in the rule of law by the American people. Indeed, I have reluctantly concluded that decisions and actions under the Act, both by Independent Counsels and by the Attorney General, inevitably and unavoidably become such targets for attack that public confidence in the administration of justice in these high-profile cases has been undermined rather than enhanced. The Act was supposed to increase trust in our government; unfortunately, it has diminished it.[(1)] My point does not have to do with any particular inquiry or investigation, it has to do with the fact that the types of decisions we are talking about here can be controversial - and that a climate of politicization pervades the process regardless of which way a specific decision, investigation, or prosecution comes out.

4/11/2019 03-02-09 REMARKS-PREPARED REMARKS FOR DEPUTY ATTORNEY GENERAL ERIC HOLDER HOUSE JUDICIARY SUBCOMMI...

Case 1:19-cr-00018-ABJ Document 69-2 Filed 04/12/19 Page 2 of 8

In part, this is because the Independent Counsel Act does not, and constitutionally cannot, bar the participation of persons who have been nominated by the President and confirmed by the Senate from the difficult decision of whether to initiate the investigation and possible prosecution of a crime. The Supreme Court, in *Morrison v. Olson*, tethered its finding that the Act was constitutional to the fact that the Executive Branch - through the Attorney General - played a vital role in several key decisions under the Act, such as whether to seek appointment of an Independent Counsel, what limited jurisdiction to ask the court to confer on him, and whether to remove him.[(2)] And yet, the fact that Attorneys General must remain key players in the process mean that they will be inevitably second-guessed, no matter what decision they make on the appointment and supervision of any particular independent counsel. An Attorney General is, after all, a member of the President's cabinet, and the Act does not remove that purported conflict of interest. Instead, it creates an artificial process that divides responsibility and fragments accountability.

The Founders set up three branches of government: A Congress that would make the laws, an Executive that would enforce them, and a judiciary that would preside over the momentous decisions of whether a particular party had broken them. The Attorney General, who has been appointed by the President and confirmed by the Senate, is publicly accountable for the decisions she makes and - as all of us in this room know - must answer to Congress in the oversight and budgetary processes for her decisions. Congress' substantial oversight and funding powers, when coupled with the power of the press, constitute a structure of accountability.

It was for this reason that the American republic survived for over 200 years without an Independent Counsel Act.[(3)] The Act, by contrast, vests this immense prosecutorial power in an inferior officer who is not subject to the ordinary controls of any branch of government; and this officer is someone who has not been confirmed by the Senate and who, as former Attorney General Barr stated, is not subject to the same sort of oversight or budgetary constraints that the publically accountable Department of Justice faces day in and day out.[(4)] Under such a scheme of diffuse accountability, it can be no surprise that the politicos and pundits attack relentlessly every actor on the stage - the Attorney General, the Independent Counsel, the witnesses, the media, and at times even the public.

<u>The Act Has Major Flaws in that its Structure Removes the Constraints of Prosecutorial Discretion</u>

At the same time that the Act requires politically appointed officials to make decisions that will inevitably be criticized as political, it has exacted a heavy price -- both financially and by creating unintended consequences. You have seen much reported in the media and other hearings about the extraordinary expense of a number of Independent Counsel investigations. I believe that, in part, such costs are inherent in a system that requires a prosecutor to set up an office from scratch (including hiring prosecutors, other attorneys, administrators, clerical staff, and consultants, and securing office space); conduct an investigation in which it is expected that no stone will be left unturned; prepare a comprehensive final report; and litigate attorneys' fees. This is a very expensive way to do business. As the body that passes the federal budget each year, you have the responsibility of deciding whether or not this cost is justified.

With respect to the undesirable consequences of the Act, I begin with the general observation that in seeking to ensure independence the statute removes many of the constraints that normally limit prosecutors -- constraints that exist for good reason under our system of government.[(5)] In so doing, the Act's structure comes dangerously close to tipping the traditional balance of fairness in the conduct of criminal investigations and prosecutions. Independent counsel are largely insulated from any meaningful budget process, competing public duties, time limits, accountability to superiors and identification with the traditional long-term interests of the Department of Justice. This insulation contributes greatly to the independence of these prosecutors, but it also eliminates the incentive to show restraint in the exercise of prosecutorial power. Such restraint, usually referred to as prosecutorial discretion, is essential to our system of justice, and is a prosecutorial hallmark.[(6)]

Moreover, there are other factors in Independent Counsel matters that minimize the ordinary constraints that underlie our system of prosecutorial discretion. Among other things, an Independent Counsel often faces: (1) a mandate to investigate a matter that the

statute defines as warranting further investigation; (2) a charged climate in which public figures are demanding prosecution; (3) the reality that the success of his or her endeavor will be measured by whether indictments and convictions are obtained; and (4) the prospect of preparing a final report that will be reviewed by persons with some non-law enforcement interest in the investigation.

All of these provide an impetus to investigate the most trivial matter to an unwarranted extreme, and to resolve all doubt against the subjects of an investigation. These are not problems with individual Independent Counsels, they are simply the incentives that the statutory scheme creates. An independent counsel who does not indict faces criticism for wasting both his time and the taxpayers' good money.[7] As the old adage, adapted from Mark Twain, goes: To a man with a hammer, a lot of things look like nails that need pounding.

Senators McConnell and Dodd have recently discussed these structural problems in a joint Op-Ed. They write:

The Independent Counsel Act was passed in response to Watergate with the admirable goals of promoting good government, policing the executive branch, and restoring public faith in elected officials. Ultimately, however, the law tilted the constitutional balance of powers, squandered taxpayer dollars, and created public cynicism and distrust. The current independent counsel law is opposed by nearly every former living attorney general . . . . The law gives virtually unchecked power, virtually unlimited budgets and completely distorted incentives - all to one man or woman whose sole job is to investigate a public official.[8]

It is for these reasons that the Justice Department has reluctantly come to the conclusion -- and I must emphasize reluctantly -- that there are fundamental structural flaws with the Act. These flaws, we believe, pervade the entire statute. Therefore, the Department opposes the reauthorization of the Independent Counsel Act. The Department believes that the Act does not serve the goals it was designed to serve, and that those goals can be served by utilizing the Attorney General's authority to appoint a special prosecutor whenever necessary. Over the long course of American history, the Department has successfully prosecuted a number of high-level political officials, and has not refrained from appointing a special prosecutor in instances where it would be appropriate.

In some cases, it was not necessary to appoint a special prosecutor. The Department prosecuted Vice President Spiro Agnew while he held office and prosecuted Bert Lance, the former Director of the Office of Management and Budget, soon after he left the Administration. When the Department has deemed it appropriate, it has effectively used its authority to appoint a special prosecutor. Paul Curran investigated matters pertaining to a peanut warehouse owned by President Carter's family while he was still in office. Leon Jaworski investigated President Nixon, some members of his cabinet, and others. Although the President ordered the firing of Mr. Jaworski's predecessor, Archibald Cox, the outstanding results Mr. Jaworski achieved present ample evidence that, in the rare cases that it is necessary, a non-statutory special prosecutor can effectively prosecute high-level members of an Administration even when the President attempts to end the investigation.

Apart from the major structural problems I have discussed, our experience has also persuaded us that other problems with the Act further exacerbate its costs and burdens. These other problems exist in a different category from the ones I have been talking about, as they could be more easily remedied by changes in the wording of the statute if Congress decides to re-authorize it. But the Department of Justice joins the many experts who have concluded that the fundamental flaws in the Act will remain, even if Congress addressed all of the other problems in the Act. Those persons now opposed to reauthorization include two of the original proponents of the Act, former Attorney General Griffin Bell and former Senator Howard Baker, as well as former Attorney General William Barr and former United States Attorney and Independent Counsel Joseph DiGenova.[9] Like the Justice Department, they have concluded that the Act should not be renewed.

The Scope of the Act

First, we have concluded that the group of individuals who are automatically covered by the Act's provisions is too broad. As you know, we do not believe that the Act should

cover anyone because it does not succeed in meeting its goals. Even if the Act did succeed, however, it presumes there to be a conflict of interest where none usually exists when it extends coverage to White House officials at a certain pay level, Cabinet Officers, campaign officers, and others.

The Department of Justice can, in the majority of these cases, effectively and credibly investigate or prosecute any of these public officials. The inclusion of such a large group of individuals within the mandatory provisions is unnecessary, particularly when discretionary provisions allow the Attorney General to invoke the Act if investigation of any individual would constitute a conflict of interest.

<u>The Triggering Mechanism</u>

Another area where the Department of Justice has encountered repeated difficulties involves the mechanisms and standards the Act sets up to "trigger" its provisions. Having dealt with these concepts in actual application, I understand how difficult it is to articulate -- by promulgating an abstract U.S. Code provision -- the kind of intricate standards that prosecutors develop after years of experience. I can only say that the statute, while making a valiant attempt, does not succeed.

During an initial inquiry under the Act, the Attorney General must decide "whether grounds to investigate exist not later than 30 days after the information" that a covered person "may have violated any Federal criminal law" "is first received." In making this decision, the Act requires the Attorney General to decide whether "the information" supporting any such violation "is specific and from a credible source."[(10)] Now, as a prosecutor of public corruption cases for twelve years, as a judge on the Superior Court of the District of Columbia, and as the United States Attorney for this District, I've had a fair amount of experience with trying to assess the credibility of witnesses. From my various experiences, I can tell you that credible sources are sometimes mistaken. And, similarly, less than credible sources are sometimes accurate. The statute seems to ignore these possibilities. The term "may have violated" a statute is very broad and subject to many interpretations.[(11)] As a result, the Act sometimes requires the Department to take action that it would never -- and I mean never -- take in an ordinary case against a non-covered person.

The most serious problem with the standards of the Act at this phase of decisionmaking by the Attorney General, however, is its limitation on the consideration of the issue of criminal intent. During this initial period, the Attorney General may not consider the intent of the subject of the allegation, no matter what the evidence of his or her intent - or lack thereof - is. There seems to be no reason or need for this presumption, which requires us to treat our highest ranking officials differently from every other citizen in our country. Forcing the Attorney General to a decision, almost always made publicly, that an allegation against a high government official is both specific and credible, when she has been artificially barred from even considering a critical element of the offense is grossly unfair to the subject and misleading to the public.[(12)]

<u>The Decision of Whether to Appoint an Independent Counsel</u>

At the next stage of decisionmaking, following a preliminary investigation, an Attorney General must decide whether an Independent Counsel should be appointed. The standard he or she must apply is whether there are reasonable grounds to believe that further investigation is warranted, a standard that is also unclear and subject to differing interpretations. After all, many prosecutors believe that, if they were unconstrained by time and resources, "some" further investigation would be warranted in virtually any matter. Every prosecutor has doubts and additional things that he would like to verify given the time and money. Should investigation be conducted even where there is no reasonable prospect of making a prosecutable case? The answer is not plain from the statutory language, and any effort to develop a reasonable interpretation of this standard in a particular case will be criticized in the highly charged milieu in which these decisions must be made.

The problem of how to assess the evidence concerning the element of criminal intent continues at this phase of the process as well. In making that determination, the Act mandates that the Attorney General may not base a finding that no further investigation is warranted upon a lack of criminal intent, unless there is clear and convincing evidence of

the lack of intent. A standard requiring proof of a negative by clear and convincing evidence is extraordinarily difficult to apply. This standard also stands traditional prosecutorial decisions on their head. In almost every criminal case, we require some positive evidence of intent before we proceed. Here, the opposite is demanded.

Another problem with the statute is the restrictions it places upon the Department in conducting a preliminary investigation. The absence of compulsory process - the subpoena power - greatly handicaps the search for truth, and, when combined with the severe time limits of the Act, could result in the unwarranted appointment of an Independent Counsel simply because the Department was unable to complete a fact finding process that would be quite simple with the availability of proper tools.

The Selection Process for an Independent Counsel

After the Attorney General has decided to seek the appointment of an Independent Counsel under the Act, the next step involves the actual selection process by the three-judge panel known as the Special Division. However, the Act gives the judges no real standards or qualifications to look for in making their choice. It provides for no selection protocol, visible or otherwise. And, as Judge Butzner has stated, in some instances the Special Division has encountered great difficulty in finding someone available for appointment as an Independent Counsel, resulting in a significant delay of the investigation.[(13)]

Jurisdictional Disputes

Jurisdictional ambiguities inherent in the provisions of the Act have emerged as a serious problem, at times leading to disagreements between Independent Counsels and the Department and often demanding a great deal of time for resolution.[(14)] While in most cases the disagreements have been resolved cooperatively between the Independent Counsel and the Department, there have been several conflicts between Independent Counsels and the Department over who should handle certain matters. At the heart of these disagreements seems to be a difference in views as to the appropriate role of the Independent Counsel. The Department of Justice views the Act as a limited solution to a particular problem: a conflict of interest with respect to a particular person causing the Department to be unable to perform its usual prosecutorial role in the handling of specific allegations that have been reviewed in the course of a preliminary investigation, and found to warrant further investigation. In our view, matters outside that narrow scope should be handled by the Department in the ordinary course.

The ambiguities in the statute, however, have created a natural tendency for Counsels to view their institutional role as having all the authority that other prosecutors have, and to believe that they should be able to investigate and prosecute all avenues, wherever those avenues may lead. This is, again, a natural reaction created by the structure of the Act, which creates an incentive for independent counsels to expand their authority to increase the probability that one of their investigations will result in a conviction, and thereby justify their expenditures.

Some litigation over this issue has occurred. Rejecting the Department's position that the Attorney General's consent is required, the Special Division has held that it may refer to an Independent Counsel the jurisdiction to investigate matters that are "related" to the original grant of jurisdiction without first obtaining the consent of the Attorney General.[(15)] In addition, the courts have applied what we view as an unduly expansive interpretation of what is a related matter, with the result that an Independent Counsel can be given jurisdiction to investigate the associates of a covered person for alleged crimes that have the most tangential relationship to the alleged crimes by the covered person.[(16)] Thus, Independent Counsels may be able to investigate matters for which the Attorney General never contemplated seeking an Independent Counsel, and this may be done in some circumstances without her knowledge or participation. I suggest that this goes far beyond the goals envisioned by the statute's drafters, and I question the need for such an extreme solution to such a limited problem.

In addition to the need for limitation and clarification on the issue of relatedness, there is also confusion about what constitutes a matter "arising out of" an Independent Counsel's investigation. The Department has always taken the position, based on the examples in the Act and the legislative history, that this language refers to crimes

intended to interfere with the investigation itself, like obstruction of justice or perjury. Some Independent Counsels and some courts interpret the language to mean any crime uncovered by the Independent Counsel during the course of his or her investigation, and have expanded their investigations accordingly.

We also believe that the provision of the Act that has been interpreted to allow Independent Counsels to obtain jurisdiction over related matters from the Special Division without the knowledge or consent of the Attorney General interferes with executive branch responsibilities in a manner that raises serious separation of powers concerns, and brings with it serious practical consequences. The Act should not take from the Attorney General jurisdiction that she has not knowingly ceded to another, for to do so would trammel upon the Executive's core prosecution power. Indeed, the fact that the Act allows for such an <u>ex parte</u> process could result in dual investigations where prosecutors step all over each other, or wasted resources in investigations of matters already concluded.

Finally, there have been similar disagreements between the Department and Independent Counsels over the scope of the provision authorizing Counsels to handle civil matters that they consider necessary. The Department sees serious problems in the empowering of independent criminal prosecutors to bind the United States in civil suits and settlements. We believe that this provision was intended to be limited to those instances where the civil authority is essential to the successful completion of the criminal matter, such as handling a civil contempt case involving a witness, or intervening to request that a civil case be stayed pending resolution of the criminal matter.

<u>Removal</u>

My description of these jurisdictional disputes between the Department and the Independent Counsels causes me to return to the subject of checks and balances, or the lack thereof, provided by the Act. It is difficult for the Department to litigate or even express these quite legitimate views without being accused of improper interference with an Independent Counsel's work -- and I will not be surprised if my observations today are challenged by some on that ground - though, as I said at the outset of my testimony, my remarks address the structure of the Act and the incentives it creates, not the actions of any particular Independent Counsel. If even such generalized testimony can be the subject of criticism, I would ask you to think about how much more difficult it would be for an Attorney General to exercise the authority provided in a provision that the Supreme Court highlighted in its discussion of the constitutionality of the Act, the removal provision.[(17)] That part of the Act allows the Attorney General to remove an Independent Counsel for enumerated causes. Implicit in the Attorney General's authority to remove must be the authority to investigate serious allegations of misconduct that come to her attention. **But how can the Department investigate an Independent Counsel without facing allegations of attempting to stifle his or her independence? It will always be extremely difficult for any Attorney General to exercise the authority to investigate, let alone remove, an Independent Counsel.**

<u>The Reporting Requirement</u>

A final problem that I wish to address briefly is the Act's requirement that a final report be prepared by the Independent Counsel. Although there is a legitimate concern that the American people have a right to know the outcome of an investigation of their highest officials, the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals. It is contrary to our concept of a presumption of innocence, our placing of high value on rights of privacy, and our Departmental tradition that we reveal offenses in the courtroom during a criminal trial, not by filing a document that is never filed when we decline to prosecute ordinary criminal cases and that may reveal information that subjects an individual to public embarrassment. These are all values that I tried to emphasize when I was a public corruption prosecutor and a United States Attorney. But worst of all, as I stated earlier, the reporting requirement provides an incentive for Independent Counsel to over-investigate every detail in order to avoid criticism that their final reports missed something.

<u>Conclusion</u>

The concerns of the original drafters of the Act are as valid today as they were in the post-Watergate era. There are a limited number of criminal matters that should be handled in a special way, in order to give the American people confidence that the outcome was not influenced by political considerations from either party.

The experience of the Department over these last five years has been enlightening. It takes a close-up view of the operation of the Independent Counsel Act to understand that it has serious flaws. The Department of Justice has reluctantly come to the conclusion that the structural flaws we have identified here cannot be fixed. Accordingly, we have been giving much thought in the Department of Justice to alternative ways to achieve this goal. We will be happy to work with the Congress in your efforts to accomplish this most difficult task.

REFERENCES

1. Robert Bork, *Dubious Counsel: Independent Counsel Law Should Be Allowed to Lapse*, National Review, Mar. 8, 1999, at 18 ("Given the intense partisanship that too often infects the independent counsel's office, the law is as likely to produce spectacular injustice as it is to achieve justice.").

2. Morrison v. Olson, 487 U.S. 654, 671, 686, 695-96 (1988).

3. See Remarks of Theodore Olson, 54 Wash. & Lee L. Rev. 1515, 1584 (1997) ("We got along in this country for almost 200 years without an independent counsel statute, and I want to make the point . . . that there is nothing wrong with the idea of going outside the Department of Justice to pick someone special to pursue an investigation if public confidence requires it. Bill Barr, when he was Attorney General, did that three times . . . . I think the thing that is bad about the independent counsel statute is that it is mandatory in so many respects. It has so many opportunities for use for political purposes . . ."); Terry Eastland, Ethics, Politics, and the Independent Counsel (1982).

4. See Remarks of Former Attorney General William P. Barr, 54 Wash. & Lee L. Rev. 1515, 1534-35 (1997) ("[W]hat the statute does is it takes [discretion] away from executive branch officials and an institution that is making those judgments every day, and has a track record of making those judgments, and puts it outside and gives it to somebody else to make, someone who I don't feel has enough accountability, someone who has too narrow a scope and loses perspective as to where they are going and to drive against an individual.").

5. See Gerald E. Lynch, *The Independent Counsel: The Problem Isn't in the Starrs but in a Misguided Law*, Wash. Post, Feb. 22, 1998, at C2 ("Independent counsels are not accountable to anyone. Their judgments float free of resource constraints, of the constant comparison of varied cases and of electoral checks. Given the full investigative power of the state, a broad statute book and unlimited resources, a prosecutor can develop at least the suspicion of a criminal case against just about anyone. And the isolated and politicized context of an independent counsel investigation provides an incentive to do just that."); Akhil Reed Amar, *The Unimperial Presidency*, New Republic, March 8, 1999, at 28.

6. See Cass R. Sunstein, *Unchecked and Unbalanced: Why the Independent Counsel Act Must Go*, American Prospect, June 1998, at 22 ("The safeguards that come from the combination of a limited budget and a wide focus are crucial contributors to human liberty under law -- as crucial, perhaps, as any provision of the Bill of Rights. They discourage prosecutors from becoming single-mindedly preoccupied with one target of investigation and therefore tempted to abuse the powers of their office."); *Morrison*, 487 U.S., at 732 (Scalia, J., dissenting) ("How frightening it must be to have your own independent counsel and staff appointed, with nothing else to do but to investigate you until investigation is no longer worthwhile - with whether it is worthwhile not depending upon what such judgments usually hinge on, competing responsibilities. And to have that counsel and staff decide, with no basis for comparison, whether what you have done is bad enough, willful enough, and provable enough, to warrant an indictment.").

7. See Cass R. Sunstein, *Repeal the Independent Counsel Act*, Wash. Post, Feb. 1, 1998, at C9.

8. Mitch McConnell & Christopher Dodd, *No More Independent Counsels*, W.S.J., Feb. 23, 1999, at A22.

9. "The statute is compromised at its very core. It cannot be nit-picked and amended into a satisfactory form. The statute's mere presence in any form politicizes the entire process by which we accuse people, investigate them, and eventually charge them with crimes or exonerate them. The initiation process under this statute invites all the elements that should not be involved when deciding to initiate a criminal investigation of any person, namely personal and political motivations." Joseph E. DiGenova, *The Independent Counsel Act: A Good Time to End a Bad Idea*, 86 Geo. L. J. 2299, 2303 (1998). *See also* Howard Baker, *The Separation of Powers: The Roles of Independent Counsels, Inspectors General, Executive Privilege and Executive Orders, Final Report of the National Commission on the Separation of Powers*, December 7, 1998; Griffin Bell, Prepared Testimony on the Independent Counsel Statute for the Senate Governmental Affairs Committee, February 24, 1999.

10. 28 U.S.C. §591(a),(d)(2).

11. See Remarks of Former Attorney General Barr, supra, at 1529 ("The standard for commencing a preliminary investigation is very low. It is not evidence of a crime. . . . And it is very hard to knock out an allegation on the grounds of lack of credibility because 90% of these things come from the newspapers; there are some facts set forth; congressmen then push it to get an independent counsel named.").

12. See Remarks of Former Attorney General Barr, supra, at 1531 ("That is an area of great mischief, because I would say most of these cases turn on intent and it sort of reverses the burden to say that the Attorney General can't dispose of this unless he has clear and convincing evidence").

13. *How Independent Counsels are Chosen: The Inside View*, Wash. Post, Aug. 11, 1997, at A15.

14. Donald C. Smaltz, *The Independent Counsel: A View From Inside*, 86 Geo. L. J. 2307, 2336 (1998) ("The independent counsel's limited jurisdiction quickly becomes a breeding ground for jurisdictional challenges . . . . These delay the investigation. Often, in peeling the investigatory onion, new crimes are revealed by the investigation that may, in turn, spawn new jurisdictional issues. Jurisdictional disputes sometimes occur between the independent counsel, who naturally desires to fully explore the facts as is his statutory obligation, and the DOJ, which sometimes takes a more limited view of the independent counsel's mandate. When this occurs-more delay.").

15. *In re Espy*, 80 F.3d 501, 504-06 (D.C. Cir. 1996).

16. *See, e.g., United States v. Blackley*, __ F.3d __, __, 1999 WL 26877, *3-6 (D.C. Cir. 1999).

17. *Morrison*, 487 U.S., at 671, 686, 695-96.