# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                )
                                         )
        Plaintiff,                    )
                                         )
v.                                       )   **Case No.: 1:19-CR-00018-ABJ**
                                         )
ROGER J. STONE, JR.,                     )
                                         )
        Defendant.                    )
                                         )

*Leave to file this Motion for Leave to File is granted ABJ 4/12/19*

*(The Court will also refile Motion for Leave to File by minute order after it is docketed.)*

### INTERESTED PARTY AND MATERIAL WITNESS'S DR. JEROME CORSI'S MOTION FOR LEAVE TO FILE FURTHER EVIDENCE OF VIOLATION OF GAG ORDER BY ROGER STONE AND SURROGATE MICHAEL CAPUTO

Dr. Jerome Corsi ("Dr. Corsi"), an interested party and material witness (Person 1) as set forth in the indictment of Defendant Roger Stone, hereby moves for leave to file the enclosed Complaint herein that was just recently filed in the District of Columbia Superior Court, styled *Corsi v. Caputo*, that shows that Defendant Roger Stone ("Stone") has continued to violate this Court's Order of February 19, 2019 and prior Order of February 15, 2019. Specifically, the February 19, 2019 Order provides:

> … the conditions of defendant's pretrial release are hereby modified to include the condition that, and the February 15, 2019 media communications order is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

Specifically, the new Complaint shows that Stone is employing surrogates, specifically in this instance his longtime associate Michael Caputo, to continue to smear and defame Dr. Corsi and his counsel Larry Klayman, while directly violating this Court's February 19 "gag" order.

The Special Counsel has indicated that it takes no position on this motion Defendant Stone's counsel of record have not responded to Dr. Corsi's and the undersigned counsel's request to consent to this filing.

Dated:  April 10, 2019

Respectfully submitted,

Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
2020 Pennsylvania Ave NW #800
Washington, DC 20006
Email: leklayman@gmail.com
Tel: 310-595-0800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via Federal Express to the clerk of the court for filing and sent via first class mail mail to the following counsel of record or parties on April 10, 2019:

Robert C. Buschel
BUSCHEL & GIBBONS, P.A.
One Financial Plaza
100 S.E. Third Avenue
Suite 1300
Ft. Lauderdale, FL 33394

Aaron Simcha Jon Zelinsky
U.S. DEPARTMENT OF JUSTICE
Special Counsel's Office
950 Pennsylvania Avenue, NW
Washington, DC 20530

Larry Klayman, Esq.

2

Filed
D.C. Superior Court
04/08/2019 12:03PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

DR. JEROME CORSI, Individually
c/o 2020 Pennsylvania Ave #800
Washington, DC 20006

And

LARRY KLAYMAN, Individually
2020 Pennsylvania Ave #800
Washington, DC 20006

                Plaintiffs

      v.

MICHAEL CAPUTO, Individually
578 Main Street
East Aurora, NY 14052

And

ROGER STONE, Individually
447 Coral Way
Fort Lauderdale FL 33301

              Defendants.

**Case Number:** 2019 CA 002226 B

**COMPLAINT**

### INTRODUCTION

Plaintiffs DR. JEROME CORSI ("Dr. Corsi") and LARRY KLAYMAN ("Mr. Klayman") hereby files this action against MICHAEL CAPUTO ("Defendant Caputo") and ROGER STONE ("Defendant Stone") for Defamation.

### THE PARTIES

1.    Plaintiff Dr. Jerome Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

2.    Plaintiff Larry Klayman is an attorney and public interest advocate, author,

columnist, syndicated radio talk show host ("Special Prosecutor with Larry Klayman" on Radio America) and private attorney who practices and writes and broadcasts in this district and nationally. Plaintiff Klayman is a citizen of Florida.

3.      Defendant Michael Caputo is a Republican political strategist and media consultant. He is a citizen of New York.

4.      Defendant Roger Stone is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation.

## GENERAL ALLEGATIONS

5.      Defendant Caputo is a Republican political consultant and media personality and commentator who has worked on numerous presidential and other political campaigns in the District of Columbia.

6.      Defendant Caputo has worked with Presidents Ronald Regan and George H.W. Bush in the past.

7.      Most recently, Defendant Caputo served as an advisor to President Donald Trump during the 2016 presidential election.

8.      Defendant Caputo has extensive ties to Russia as well, having lived in Russia and served as an advisor to former President Boris Yeltsin and current President Vladamir Putin.

9.      Defendant Caputo frequently appears on television as a political media personality and commentator broadcast in this district, domestically and internationally.

10.     Defendant Caputo, as a political consultant, does substantial business in the District of Columbia and derives a significant portion of his income from the District of Columbia.

11.     Defendant Caputo and Defendant Roger Stone have a long personal history and friendship, with Defendant Stone having been reported as being a "mentor" to Defendant Caputo.[1]

12.     It was Defendant Stone who convinced Defendant Caputo to leave his work in Russia and join him in Miami and South Florida.

13.     Defendant Stone has had, and continues to have, a decades-long career as a lobbyist and political consultant before various federal agencies, Congress, and The White House, and was part of President Trump's campaign team and then was an "informal advisor."

14.     Defendant Stone derives a substantial portion of his income from his services rendered in the District of Columbia.

15.     Defendant Stone's professional conduct, as a political consultant and lobbyist, is primarily, if not entirely centered around the District of Columbia, which is the nation's capitol and, obviously, where The White House and Capitol Hill are located.

16.     Defendant Caputo is now working in concert with self proclaimed "dirty trickster" and at best "Mafia admirer," if not actual Mafia connected Defendant Stone, who was recently indicted on seven felony charges by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation and now prosecution for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

---

[1] Sandra Tan, *The radical adventures of conservative radio host Mike Caputo*, Mar. 5, 2016, The Buffalo News, available at: https://buffalonews.com/2016/03/05/the-radical-adventures-of-conservative-radio-host-mike-caputo/.

17.     Defendant Caputo has publicly called for President Trump to immediately pardon his close friend, mentor, and co-conspirator, Defendant Stone on Fox News. In an appearance on Tucker Carlson, Defendant Caputo said, "pardon Roger Stone right now, Mr. Trump."[2]

18.     This broadcast was made into this district, domestically and internationally.

19.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

20.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation, and Mr. Klayman, his legal counsel.

21.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to smear, defame, intimidate and threaten Plaintiffs Corsi and Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense.

22.     Defendant Stone's efforts were unsuccessful, as he was ultimately indicted, but he has continued to engage in the same defamatory conduct, frequently with the aid of surrogates,

---

[2] Ian Schwartz, *Michael Caputo: Trump Should Pardon Roger Stone Right Now On Twitter, Real Clear Politics*, Mar. 27, 2019, available at:
https://www.realclearpolitics.com/video/2019/03/27/michael_caputo_trump_should_pardon_rog er_stone_right_now_on_twitter.html

such as Defendant Caputo, in order to sway public opinion in his favor, illegally influence the jury at his upcoming criminal trial, and try to raise money for his legal defense fund at the expense of Plaintiff Corsi who has his own legal defense fund.

23.     By defaming Dr. Corsi and Mr. Klayman, Defendants Caputo and Stone - acting in concert as joint tortfeasors, are hoping to not only intimidate Dr. Corsi and his counsel Mr. Klayman to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Stone's ensuing criminal trial.  The are also actively intimidating, coercing, and threatening Dr. Corsi's legal counsel, Plaintiff Klayman, and thus destroying his reputation, standing and ability to practice law and conduct other professional and personal endeavors in this district in particular. They are also trying divert funds away from Dr. Corsi's legal defense fund, while boosting Defendant Stone's legal defense fund. Defendant Corsi's legal defense fund is intended to pay legal fees and costs to Plaintiff Klayman for his services.

24.     Defendants are hoping to taint the jury pool in Defendant Stone's favor at his upcoming criminal trial by attempting to defame and discredit Dr. Corsi, who is likely to be called as a material witness to Defendants Stone's illegal activity, as well as his counsel, Mr. Klayman.

25.     This malicious defamatory conduct, which persons who see and hear the malicious defamatory statements attribute them to be against Mr. Klayman, who is widely known particularly in this district to be legal counsel to Dr. Corsi, harms Mr. Klayman specifically as Dr. Corsi's legal defense counsel, as Defendants are trying to divert money away from Dr. Corsi's legal defense fund, which is how Mr. Klayman gets paid, and into Defendant Stone's legal defense fund. As set forth below it also harms Mr. Klayman's reputation, good will

and standing in the District of Columbia legal community, of which he is a part, as well as his other professional and personal businesses and endeavors as pled in this Complaint.

26.     Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiffs, such as Defendant Caputo. Other surrogates known to be used by Defendant Stone include Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, Tucker Carlson of Fox News, and reporter Chuck Ross of The Daily Caller which not coincidentally was founded by Tucker Carlson and on information and belief continues to have an ownership interest, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiffs Corsi and Klayman. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Defendant Stone's criminal trial. Nor is Plaintiff Klayman, as Dr. Corsi's legal counsel, an adversary of Defendant Stone. But Defendant Stone, using the pliant Defendant Caputo as a surrogate -- who himself is unethical and unscrupulous -- does not care and will break any law and undertake any sleazy act to suit his nefarious ends.

27.     Defendant Stone's use of surrogates is so pervasive that even Judge Amy Berman Jackson, who is presiding over Defendant Stone's criminal prosecution in this judicial district specifically banned him from the use of surrogates in issuing a total gag order after Defendant Stone threatened her via Instagram by posting a picture of her face along with gun crosshairs. Exhibit 2.

28.     Now, Defendant Caputo, at the direction of and working in concert with Defendant Stone, while serving as Defendant Stone's surrogate, appeared on MSNBC on March 29, 2019 to maliciously defame both Dr. Corsi and Mr. Klayman in furtherance of their illegal goals to tamper with the jury pool at Defendant Stone's upcoming criminal trial in this judicial district and to try to discredit Plaintiffs.

29.     Defendants have therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted for by Special Counsel Robert Mueller.

## DEFENDANT CAPUTO'S DEFAMATORY STATEMENTS

30.     On or about March 29, 2019, Defendant Caputo appeared on MSNBC with host Ari Melber, where he made several false, misleading and defamatory statements in this district, nationally and internationally regarding Plaintiffs (the "MSNBC Video").[3] This was done in concert with, and at the direction of Defendant Stone and published in this district, nationally and internationally.

31.     At 8:00 in the MSNBC Video, Defendant Caputo says, "[T]he Mueller team finds themselves at the of the hallway...and they're staring at Jerry Corsi, who believes the most wild conspiracies in the world.... They end at the freak show tent."

32.     When asked about his thoughts as to why Dr. Corsi was not indicted, Defendant Caputo said, "he could be the luckiest man in the world. I think he should buy a lottery ticket or ten. I'm surprised. I also believe that it indicates that Corsi gave them information that they were looking for, probably on Roger Stone. We'll probably see him brought in as a witness in Roger

[3] https://www.msnbc.com/the-beat-with-ari/watch/trump-aide-who-cooperated-bad-things-coming-in-mueller-report-1468136003575

Stone's trial."

33.     In actuality, Dr. Corsi was not indicted because he was truthful; nor did he threaten to kill a material witness and his service dog, as did Stone. He did not give Mueller or his prosecutors "information that they were looking for, probably on Roger Stone," as falsely and maliciously published in this district, nationally and internationally by Defendant Caputo as a surrogate of Defendant Stone.  And neither did Plaintiff Corsi's legal counsel Plaintiff Klayman "give information" to Special Counsel Robert Mueller "that they were looking for, probably on Roger Stone."

34.     These false, malicious and defamatory statements are meant to defame and discredit Plaintiff Corsi, who is a well-known conservative figures and media personality, and by extension, Plaintiff Corsi's attorney, Mr. Klayman who it is understood by viewers and listeners to have worked with Corsi "to give information that they were looking for, probably on Roger Stone."

35.     The goal of these defamatory statements is to create the false implication that Plaintiffs are not true conservatives and not supporters of President Trump and are dishonest and underhanded because they were willing to help Special Counsel Robert Mueller try to take down President Trump by having his adviser Roger Stone indicted, among other false implications. These false statements were intended to divert money from Dr. Corsi's legal defense fund to Defendant Stone's, as well as to maliciously harm the reputations and good will of Plaintiffs Corsi and Klayman in the conservative community in this district, nationally and internationally, as well as harm their trades and professions and income resulting therefrom, as well as to severely damage them personally.

### FIRST CAUSE OF ACTION
#### *Defamation*

36.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

37.     Defendant Caputo published malicious, false, misleading and defamatory statements of and concerning Plaintiffs Corsi and Klayman in this judicial district, nationwide, and worldwide at the direction of, and in concert with Defendant Stone.

38.     These false and misleading statements were published with malice, as Defendant Stone and Defendant Caputo knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

39.     Plaintiffs Corsi and Klayman have been damaged by these false and misleading statements because they injured Plaintiffs Corsi and Klayman in their professions and businesses as conservative journalists, columnists and authors, public and private legal advocates, radio talk show hosts and in their other professional endeavors, where credibility, ethics and honesty are the most important traits, as well as severely injured and damaged Plaintiffs' personally.

40.     Plaintiffs Corsi and Klayman have been damaged by the malicious and false statement, published widely in this district, nationally and internationally that they were cooperating with Special Counsel Mueller to try to take down Defendant Stone and President Trump.

## SECOND CAUSE OF ACTION
### *Defamation by Implication*

41.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42.     Defendant Caputo, in concert with Defendant Stone, published numerous false, misleading and defamatory statements about Plaintiffs Corsi and Klayman, as set forth in the

preceding paragraphs.

43.     These false, misleading and defamatory statements were published on television and on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44.     These false and misleading statements were published with malice, as Defendant Stone and Defendant Caputo knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45.     These statements created the false and misleading implication that Plaintiff Corsi cannot be trusted because he is a "freak show" and believes only "wild conspiracy theories," among the other false and misleading malicious published statements set forth in this Complaint.

46.     Plaintiffs Corsi and Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47.     Plaintiffs Corsi and Klayman have been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi and Klayman in their professions as a journalists, columnists, radio talk show hosts, and as public interest and private legal advocates, where credibility, ethics and honesty are the most important traits, as well as personally.

48.     Plaintiffs have been damaged by the false assertion that they were cooperating with Special Counsel Mueller to try to take down Defendant Stone and President Trump, creating the implication that they are not true conservatives and cannot be trusted, among other severe damage as alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.      Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, hiding his wealth in overseas bank accounts and surreptitiously elsewhere.

b.      Awarding Plaintiffs attorney's fees and costs.

c.      Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief enjoining further defamation, coercion and intimidation, that is witness tampering by Defendants Stone and his surrogate Caputo, against Plaintiff Corsi and his legal counsel Plaintiff Klayman.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Dated: April 5, 2019

Respectfully Submitted,
*/s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C. Bar Number: 334581
2020 Pennsylvania Ave NW #800
Washington, DC, 20006
Telephone:  (310)-595-0800
Email: leklayman@gmail.com

*Counsel for Plaintiffs*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## INDICTMENT

The Grand Jury for the District of Columbia charges:

### Introduction

1.    By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.    On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.    From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

    a.      On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

    b.      Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.      ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.      During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.      By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.      After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.     In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

     a.     Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

     b.     Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

### **Other Relevant Individuals**

9.     Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.     Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

### **Background**

### STONE's Communications About Organization 1 During the Campaign

11.     By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.      After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.      STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

      a.      On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

      b.      On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

      c.      On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that much of next dump focus, setting stage for Foundation debacle."

14.   Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.   On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1].  I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.   On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.   On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]."  In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.   On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

5

e.      On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight?  Is there an October surprise happening?"  STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.    Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.      On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.      On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time.  On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night."  STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.      On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.       On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

        i.       On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

      ii.       On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.       On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.  On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week." In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.  On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns." Person 2 responded to STONE, "head fake."

h.  On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off." On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it." After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow." Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.  In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him. For example:

a.  On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

b.  Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

8

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part,
"It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me
back."

c.      On or about October 4, 2016, the head of Organization 1 held a press conference
but did not release any new materials pertaining to the Clinton Campaign.  Shortly
afterwards, STONE received an email from the high-ranking Trump Campaign
official asking about the status of future releases by Organization 1.  STONE
answered that the head of Organization 1 had a "[s]erious security concern" but that
Organization 1 would release "a load every week going forward."

d.      Later that day, on or about October 4, 2016, the supporter involved with the Trump
Campaign asked STONE via text message if he had "hear[d] anymore from
London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"
STONE subsequently told the supporter that more material would be released and
that it would be damaging to the Clinton Campaign.

17.     On or about October 7, 2016, Organization 1 released the first set of emails stolen from the
Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-
ranking Trump Campaign official sent a text message to STONE that read "well done."  In
subsequent conversations with senior Trump Campaign officials, STONE claimed credit for
having correctly predicted the October 7, 2016 release.

The Investigations

18.     In or around 2017, government officials publicly disclosed investigations into Russian
interference in the 2016 U.S. presidential election and possible links to individuals associated with
the campaigns.

a.      On or about January 13, 2017, the chairman and vice chairman of SSCI announced
the committee would conduct an inquiry that would investigate, among other
things, any intelligence regarding links between Russia and individuals associated
with political campaigns, as well as Russian cyber activity and other "active
measures" directed against the United States in connection with the 2016 election.

b.      On or about January 25, 2017, the chairman and ranking member of HPSCI
announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.      On or about March 20, 2017, the then-director of the FBI testified at a HPSCI
hearing and publicly disclosed that the FBI was investigating Russian interference
in the 2016 election and possible links and coordination between the Trump
Campaign and the Russian government.

d.      By in or around August 2017, news reports stated that a federal grand jury had
opened an investigation into matters relating to Russian government efforts to
interfere in the 2016 election, including possible links and coordination between
the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19.   In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear
before the committee and produce:

> Any documents, records, electronically stored information
> including e-mail, communication, recordings, data and tangible
> things (including, but not limited to, graphs, charts, photographs,
> images and other documents) regardless of form, other than those
> widely available (e.g., newspaper articles) that reasonably could
> lead to the discovery of any facts within the investigation's publicly-
> announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.      The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.      The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.      The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.      Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.      The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

f.      The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred
to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records
in his possession that could have shown that other aspects of his testimony were false and
misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to
explain his statements in early August 2016 about being in contact with the head of Organization 1.
STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually
communicated with [the head of Organization 1]," as well as his statement on or about August 12,
2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to
discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization
1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as
an intermediary, as a mutual friend" of the head of Organization 1.  STONE stated that he asked
this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted,
himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them."  STONE
further stated that the intermediary "was someone I knew had interviewed [the head of
Organization 1].  And I merely wanted confirmation of what he had tweeted on the 21st."  STONE
declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony
that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that
identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of
Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head

of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed

the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and

August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016

statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.

And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12,

2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in

October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE

contacted to serve as a "go-between," "intermediary," or other source of information from

Organization 1.   STONE also never disclosed his exchanges with Person 1 when answering

HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the
Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the

communication with [the intermediary]?"   STONE replied, "I asked him to confirm . . . that the

tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary

Clinton emails and that they would release them."   STONE was then asked, "Did you ask [the

intermediary] to communicate anything else to [the head of Organization 1]?"   STONE falsely and

misleadingly responded, "I did not."   STONE was then asked, "Did you ask [the intermediary] to

do anything on your own behalf?"   STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the

head of Organization 1 for documents that STONE believed would be damaging to the Clinton

Campaign.  For example:

        a.      As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.     On or about September 18, 2016, STONE sent a text message to Person 2 that said,

"I am e-mailing u a request to pass on to [the head of Organization 1]," and then

emailed Person 2 an article with allegations against then-candidate Clinton related

to her service as Secretary of State.   STONE added, "Please ask [the head of

Organization 1] for any State or HRC e-mail from August 10 to August 30—

particularly on August 20, 2011 that mention [the subject of the article] or confirm

this narrative."

c.     On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my

message . . . to [the head of Organization 1]."   Person 2 responded, "I did," and the

next day Person 2, on an email blind-copied to STONE, forwarded the request to

an attorney who had the ability to contact the head of Organization 1.

### STONE's False and Misleading Testimony About Communications with His Identified Intermediary

31.     During his HPSCI testimony, STONE was asked repeatedly about his communications

with the person he identified as his intermediary.   STONE falsely and misleadingly stated that he

had never communicated with his intermediary in writing in any way.   During one exchange,

STONE falsely and misleadingly claimed only to have spoken with the intermediary

telephonically:

Q:     [H]ow did you communicate with the intermediary?

A:     Over the phone.

Q:     And did you have any other means of communicating with
the intermediary?

A:     No.

Q:     No text messages, no – none of the list, right?

      A:      No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

      Q:      So you never communicated with your intermediary in writing in any way?

      A:      No.

      Q:      Never emailed him or texted him?

      A:      He's not an email guy.

      Q:      So all your conversations with him were in person or over the phone.

      A:      Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message.  STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony.  Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI.  For example:

     a.     In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

     b.     In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

     c.     On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

STONE's False and Misleading Testimony About Communications with the Trump Campaign

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

   a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

   b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

   c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.    In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.   On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.   On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.   On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.   Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators.   During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations.  For example:

a.   On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest."  STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.   On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie.  You backstab your friends-run your mouth my lawyers are dying Rip you to shreds."  STONE also said he would "take that dog away from you," referring to Person 2's dog.  On or about the same day, STONE wrote to Person 2, "I am so ready.  Let's get it on.  Prepare to die [expletive]."

c.   On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot."  STONE responded, "You are so full of [expletive].  You got nothing.  Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.    From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|---|---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|---|---|
| | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

### COUNT SEVEN
### (Witness Tampering)

44.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:


_____
Foreperson

Date:  January 24, 2019

EXHIBIT 2

MINUTE ORDER as to ROGER J. STONE, JR. On February 19, 2019, the Court ordered the defendant to show cause at a hearing to be held on February 21, 2019 as to why the media communications order entered in this ase 36 and/or defendant's conditions of release 21 should not be modified or revoked. A hearing was held on this date. For the reasons set forth on the record, and based upon the entire record, including the sealed exhibit to the hearing 42 , the testimony of the defendant, the arguments of counsel, and the submissions of the parties 28 29 filed in connection with the potential imposition of a media communications order, the Court entered the following order at the hearing: the conditions of defendant's pretrial release 21 are hereby modified to include the condition that, and the February 15, 2019 media communications order 36 is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers. The order to show cause is hereby vacated. Signed by Judge Amy Berman Jackson on 2/21/19. (DMK) (Entered: 02/21/2019)