**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 19-CR-00018 (ABJ)** |
| **ROGER J. STONE, JR.,** | |
| **Defendant.** | |

### GOVERNMENT'S MOTION FOR LEAVE TO FILE AMENDED OPPOSITION

The United States of America, by and through Jessie Liu, United States Attorney for the District of Columbia, respectfully requests leave to file an amended version of its opposition to the defendant's motion to dismiss, Doc. 97. The amended opposition corrects some typographical errors but contains no substantive changes. Pursuant to Local Criminal Rule 47(g), the proposed amended filing is attached as an exhibit to this motion.

Respectfully submitted,

JESSIE K. LIU
U.S. Attorney for the District of Columbia

By:  ____/s/_____
Jonathan Kravis
Michael J. Marando
Assistant United States Attorneys

Adam C. Jed
Aaron S.J. Zelinsky
Special Assistant United States Attorney
555 4th Street NW
Washington, D.C. 20530

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

ROGER J. STONE, JR.,

　　　　　　　　　　*Defendant*.

No. 19-cr-18 (ABJ)

## GOVERNMENT'S CORRECTED RESPONSE IN OPPOSITION TO MOTION TO DISMISS

## INTRODUCTION

The United States of America, by and through Jessie Liu, United States Attorney for the District of Columbia, files this response to defendant Roger J. Stone, Jr.'s motion (Doc. 69) to dismiss the Indictment. Stone argues that he cannot be charged with obstructing a congressional proceeding without Congress's referral, that the Department of Justice funded the Special Counsel's investigation from the wrong appropriation, and that the Acting Attorney General lacked the constitutional and statutory authority to appoint the Special Counsel to conduct this investigation. Stone's contentions lack merit.

The central thesis of Stone's argument for a congressional role in prosecution decisions is that prosecuting witnesses who obstruct Congress would, in fact, impede Congress. This claim misunderstands the Constitution's allocation of prosecutorial decisionmaking to the Executive Branch, and Stone provides no basis to believe that this prosecution unconstitutionally impedes Congress. Stone's appropriations argument is equally unsound. The Department of Justice paid for the Special Counsel's investigation through an appropriation that has been repeatedly used to pay similar officials. The text, history, and longstanding practice, as approved by Congress, confirms that view. Stone's arguments would, in any event, not justify the remedies he seeks. Finally, Stone makes a variety of constitutional and statutory challenges to the appointment of the Special Counsel and the conduct of this investigation. These arguments are foreclosed by applicable precedent and, in any event, lack merit. [1]

---

[1] Stone's motion also seeks (Doc. 69, 1-2) an unredacted copy of the Special Counsel's report to the Attorney General. The government separately addresses that question in a response to Stone's motion on the issue.

# BACKGROUND

### A.   The FBI's Russian-Interference Investigation And The Appointment Of The Special Counsel

On March 20, 2017, then-FBI Director James B. Comey testified before the House Permanent Select Committee on Intelligence about the FBI's investigation into Russian interference with the 2016 presidential election.  In open session, Comey stated:

> I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.

Statement of FBI Director James B. Comey, H. Perm. Select Comm. on Intelligence, *Hearing on Russian Active Measures Investigation* (Mar. 20, 2017), https://www.fbi.gov/ news/testimony/hpsci-hearing-titled-russian-active-measures-investigation. Comey further stated that "[a]s with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed." *Id.*

On May 17, 2017, Acting Attorney General Rod J. Rosenstein issued an order appointing Robert S. Mueller, III, as Special Counsel "to investigate Russian interference with the 2016 presidential election and related matters."  Order No. 3915-2017 ("Appointment Order") (capitalization omitted), https://www.justice.gov/opa/press-release/file/967231.[2]  The Order stated that it was made pursuant to "the authority vested in me as Acting Attorney General including

---

[2] Deputy Attorney General Rosenstein was serving as Acting Attorney General for the Russia investigation because, on March 2, 2017, the Attorney General recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  Press Release, U.S. Dep't of Justice, *Attorney General Sessions Statement on Recusal* (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal. As the Attorney General noted, *id.*, the Deputy Attorney General in those circumstances exercises the authority of the Attorney General.  *See* 28 U.S.C. § 508; *In re: Grand Jury Investigation*, 916 F.3d 1047, 1055-1056 (D.C. Cir. 2019), *reh'g en banc denied*, No. 18-3052 (Apr. 29, 2019).

28 U.S.C. §§ 509, 510, and 515." *Id.* "The Special Counsel," the Order stated, "is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including: "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." *Id.* ¶ (b).[3] "If the Special Counsel believes it is necessary and appropriate," the Order provided, "the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters." Id. ¶ (c). And the Order applied the Department of Justice's special counsel regulations to Special Counsel Mueller's investigation. *Id.* ¶ (d).

### B.    The Special Counsel's Investigation And The Present Prosecution

As later alleged, Roger J. Stone, Jr. is a former Campaign official who had maintained regular contact with and supported the Trump Campaign, and who had claimed publicly (and privately) to be communicating with an organization that released documents stolen by the Russian government. *E.g.,* Doc. 1, Indictment ¶¶ 1-6. On October 20, 2017, the Acting Attorney General confirmed that "as part of a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election," the Special Counsel was authorized to investigate the pertinent activities of Stone.

On January 24, 2019, the grand jury returned a seven-count indictment charging Stone with obstructing a House Permanent Select Committee on Intelligence ("HPSCI") investigation in violation of 18 U.S.C. § 1505, making numerous false statements to HPSCI in violation of 18

---

[3] 28 C.F.R. § 600.4(a) confers "the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses" and "to conduct appeals arising out of the matter being investigated and/or prosecuted."

U.S.C. § 1001(a)(2), and witness tampering in violation of 18 U.S.C. § 1512(b)(1).  Following the

return of the Indictment, the U.S. Attorney's Office jointly handled the case with the Special

Counsel's Office.  On March 22, 2019, the Special Counsel notified the Attorney General that he

had completed his investigation into Russian interference in the 2016 presidential election.  The

Special Counsel's Office withdrew from the case, and the prosecution is being conducted by the

U.S. Attorney in this District.  On April 12, 2019, Stone moved to dismiss the Indictment, claiming

that he cannot be charged with obstructing a congressional proceeding without Congress's referral,

that the Department of Justice funded the Special Counsel's investigation from the wrong

appropriation, and that the Acting Attorney General lacked the constitutional and statutory

authority to appoint the Special Counsel to conduct this investigation.  Doc. 69.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12 permits a motion to dismiss the indictment based

on "a defect in instituting the prosecution."  Fed. R. Crim. P. 12(b)(3)(A).  In ruling on a motion

to dismiss the indictment, the court assumes the truth of its factual allegations.  *United States v.*

*Knowles*, 197 F. Supp. 3d 143, 149 (D.D.C. 2016), *aff'd sub nom.*, *United States v. Thompson*, _

F.3d_, 2019 WL 1768931 (D.C. Cir. Apr. 23, 2019).

## ARGUMENT

I.      **The Executive Branch May Prosecute Crimes Against Congress Without A Referral**

Criminal prosecutions are "a core executive constitutional function."  *United States v.*

*Armstrong*, 517 U.S. 456, 465 (1996).  Stone nonetheless argues (Doc. 69, at 2-4), that it is

unconstitutional for the Executive Branch to prosecute the crime of making false statements to

Congress without the Executive's first obtaining a referral from Congress.  It is unclear whether

Stone's theory applies only to the false statement counts (counts 2-6), or also to the obstruction

and witness tampering counts (counts 1 and 7).  It is similarly unclear what, in Stone's view would constitute a sufficient referral.  But in all events, Stone's argument lacks merit.

"The Executive's primacy in criminal charging decisions is long settled."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016).  The Attorney General and his designees have "the power to conduct the criminal litigation of the United States Government," *United States v. Nixon*, 418 U.S. 683, 694 (1974); *see* 28 U.S.C. §§ 503, 509, 510, 515, 516, 519, 547.  And they have "broad discretion," rooted in Article II of the Constitution and their statutory authority, "to enforce the Nation's criminal laws."  *Armstrong*, 517 U.S. at 464 (internal quotation marks omitted); *see, e.g., In re Aiken County*, 725 F.3d 255, 262-263 (D.C. Cir. 2013) (Kavanaugh, J.); *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also Buckley v. Valeo*, 424 U.S. 1, 139 (1976) (per curiam).  Consequently, court after court has held that "the Executive Branch has exclusive authority . . . to decide whether to prosecute a case." *Nixon*, 418 U.S. at 693; *see Fokker Servs.*, 818 F.3d at 741; *Pierce*, 786 F.2d at 1201; *Nader v. Saxbe*, 497 F.2d 676, 679 (D.C. Cir.  1974); *Powell v. Katzenbach*, 359 F.2d 234, 234 (D.C. Cir. 1965) (per curiam).

Stone asserts that prosecuting crimes that concern Congress's oversight function would impermissibly "invade and impede Congress' right to conduct inquiries."  Doc. 69, at 3.  Stone cites no legal authority to support such a sweeping proposition.  The text of the Constitution certainly does not support it.  Unlike the textual protection in the "Speech or Debate Clause," which provides that Members of Congress "shall not be questioned" for "any Speech or Debate in either House" and generally applies to congressional oversight, U.S. Const. Art. I, § 6; *see Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503-507 (1975), the Constitution describes no protection for congressional witnesses, such as the required referral that Stone seeks.

Stone's speculation about impeding congressional inquiries is also flawed both as a general matter and as applied to this very case. Prosecuting crimes involving false statements, obstruction, and witness tampering relating to congressional hearings helps, rather than hinders, Congress's functions and search for information. Any decision to prosecute is also accompanied by a presumption of good faith, *see Armstrong,* 517 U.S. at 464, and the check of an independent grand jury's decision to indict. Additionally, Congress—the very institution that Stone claims to protect—has not legislated itself a role in this process. The statutes that establish the offenses charged here do not contemplate or require a congressional referral. *Cf.* 2 U.S.C. §§ 192, 194 (describing a referral and certification process for contempt of Congress). And in this very case, although there was no express congressional referral, pursuant to a committee vote the House Permanent Select Committee on Intelligence transmitted the relevant congressional transcript and communications to the Department of Justice and made clear that they were doing so "with no restrictions on use by the SCO or other components." Gov't Opp. to Mot. to Dismiss Pursuant to Fed. R. Crim. P. 12(b)(3), Exh. A.

In any event, the Constitution no more requires a congressional referral to prosecute perjury or obstruction of Congress than a judicial referral to prosecute ordinary perjury in court. Even if prosecuting crimes could have an incidental effect on Congress, it would not require a congressional role in prosecutorial decisions. It is a "fundamental constitutional principle that the power to make the necessary laws is in Congress; the power to execute in the President." *Medellin v. Texas*, 552 U.S. 491,526 (2008) (internal quotation marks omitted). The "Separation of powers" does not mean that the branches can have no involvement in each other's affairs—indeed that is inherent to the division of functions between the branches. *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 380-381 (1989). Making false statements to Congress, moreover, harms not only

the members who were targeted for deception but also the other committees of both houses, future Congresses, and society as a whole. *Cf. Moore v. United States House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in result) (Legislators' "personal interest in full and unfettered exercise of their authority" is "no greater than that of all the citizens for whose benefit . . . the authority has been conferred"). It is a quintessentially-executive function to balance the myriad factors that go into the decision whether to prosecute. *See Armstrong,* 517 U.S. at 465; *Fokker Servs.*, 818 F.3d at 741; *Nader*, 497 F.2d at 679 n.18.

If anything, it is Stone's view that would raise serious separation of powers difficulties. The Constitution assigns to Congress specifically enumerated "legislative Powers." U.S. Const. Art. I, § 1. "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them." *Buckley*, 424 U.S. at 139 (citation omitted). For Congress to play an indispensable role in the decision whether to prosecute a federal crime would insert Congress into a quintessentially executive function. By interfering with "[t]he clear assignment of power to a branch," it would also undermine the Executive Branch's accountability, by leaving citizens without a clear answer to "who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." *Loving v. United States*, 517 U.S. 748, 758 (1996); *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 493 (2010). This sort of "encroachment and aggrandizement" poses the greatest threat to the constitutional separation of powers. *See Mistretta*, 488 U.S. at 382. Thus, the Supreme Court has held that Congress cannot exercise approval power over the management of federal properties other than by enacting legislation, explaining that Congress "may not invest 'itself or its Members with . . . executive power.'" *Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991) (quoting *J.W. Hampton, Jr., & Co. v. United States*,

276 U.S. 394, 406 (1928)); *see id.* at 265-277.  The Court has similarly held that Congress may not retain control over an officer involved in budget sequestration, because doing so would "in essence" give Congress a "veto" over "the execution of the laws."  *Bowsher v. Synar*, 478 U.S. 714, 726-727 (1986).  Once Congress "enact[s] legislation, its participation ends," and Congress can "control the execution of its enactment only indirectly—by passing new legislation."  *Id.* at 733-734; *see also INS v. Chadha*, 462 U.S. 919, 951-959 (1983) (holding unconstitutional a congressional veto over the Executive's decision about whether to deport immigrants).  Given these principles, this Court should reject Stone's argument that the Constitution not only permits but also requires a congressional role in criminal charging decisions.[4]

## II.     Stone's Challenge To The Source Of Funds For The Special Counsel's Office Lacks Merit

The Department of Justice determined, consistent with prior practice, to fund the Special Counsel's Office from the permanent appropriation for "independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law."  Pub. L. No. 100-202, § 101(a) (Title II), 101 Stat. 1329, 1329-9 (1987) (28 U.S.C. § 591 note).  Stone contends (Doc. 69, at 4-16) that the

---

[4] Citing testimony by former FBI Director Comey, Stone additionally suggests that as a matter of practice, the FBI does not "commence investigations that focus on activities before Congress without Congress asking [the FBI] to get involved."  Doc. 69, at 2.  Contrary to Stone's suggestion (Doc. 69, at 4), this case did not arise from the Executive Branch's "roam[ing] the Halls of Congress to look for prosecutable offenses."  Rather, in the course of an already-open investigation into Russia's interference in the 2016 presidential election, the government investigated Stone's activities, statements about those activities, and related matters, and discovered these crimes.  And, as noted, HPSCI then transmitted the relevant congressional transcript and communications to the Department of Justice and made clear that it was doing so "with no restrictions on use by the SCO or other components."  To the government's knowledge, the FBI's prior practice has not been to ignore criminal activity uncovered in the course of an investigation.  FBI's practice is, in any event, also distinct from any constitutional rule and does not create any enforceable right.  *See In re Grand Jury Subpoena (Miller)*, 438 F.3d 1141, 1152-1153 (D.C. Cir. 2006); *United States v. Blackley*, 167 F.3d 543, 548-549 (D.C. Cir. 1999).

use of that appropriation was improper and that therefore the Indictment should be dismissed.  He also seeks (Doc. 71, at 1-3) a "permanent injunction" against being prosecuted.[5]   Stone's arguments lack merit.  The Department of Justice used the correct appropriation to fund the Special Counsel's Office, and Stone's challenge to the particular appropriation used to pay those expenses would, in any event, not entitle him to the relief that he seeks.

### A.     The Department Of Justice Funded The Special Counsel's Investigation From The Correct Appropriation

*1.  The text of the permanent appropriation applies here*

When paying the Special Counsel's expenses, the Department of Justice relied on a "permanent, indefinite appropriation . . . within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law."  101 Stat. 1329-9.  The Special Counsel was an "independent counsel" as that term was used in the permanent appropriation, and he was "appointed pursuant to . . . other law."  *Id.*

An "independent counsel" is "[a]n attorney hired to provide an unbiased opinion about a case or to conduct an impartial investigation; esp., an attorney appointed by a governmental branch or agency to investigate alleged misconduct within that branch or agency."   *Black's Law Dictionary* 426 (10th ed. 2014).  That is the role served by the Special Counsel here.  The Special Counsel was retained from outside of the Department to "ensure a full and thorough investigation" of particular, sensitive matters.  Appointment Order; *see* 28 C.F.R. § 600.4.  While he remained subject to Attorney General direction and supervision, he also retained "a substantial degree of independent decisionmaking," *Office of Special Counsel*, 64 Fed. Reg. 37,038, 37,039-37,040

---

[5] The Court authorized the government to respond to that motion in this response to Stone's motion to dismiss.  4/15/19 Minute Order.

(July 9, 1999), and was not part of the regular Department chain of command or "subject to the day-to-day supervision of any official of the Department," 28 C.F.R. § 600.7(b).

The Special Counsel was also "appointed pursuant to the provisions of 28 U.S.C. 591 et seq. *or other law.*" 101 Stat. 1329-9 (emphasis added).  While he was not appointed pursuant to 28 U.S.C. 591 *et seq.* (Title VI of the Ethics in Government Act), the Special Counsel was appointed pursuant to statutory authorities that permit the Attorney General to retain special attorneys to conduct investigations and prosecutions, in particular 28 U.S.C. §§ 515 and 533.  *See In re: Grand Jury Investigation*, 916 F.3d 1047, 1053-1054 (D.C. Cir. 2019), *reh'g en banc denied*, No. 18-3052 (Apr. 29, 2019) (citing *Nixon*, 418 U.S. at 694, and *In re Sealed Case,* 829 F.2d 50, 54-55 (D.C. Cir. 1987)).  By any definition, those statutes are "other law."  *See id.* at 1053-1054 (holding that "Congress has 'by law' vested appointment" in the Attorney General through the statutes used to appoint Special Counsel Mueller).  The Acting Attorney General also applied the Special Counsel regulation (28 C.F.R. part 600), which, while in effect, has "the force of law." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 608 (D.D.C. 2018) (quoting *Nixon*, 418 U.S. at 695 (discussing Watergate Special Prosecutor regulation)).

Stone assumes (Doc. 69, at 15; *see id.* at 5-14) that the permanent appropriation is limited to an Independent Counsel appointed under the Ethics in Government Act or someone in the exact "same role."  The statutory text is not so limited.  In fact, in the very same section, the statute refers both to a (capitalized) "Independent Counsel," under the Ethics in Government Act and, in the permanent appropriation, to a (lowercase) "independent counsel."  101 Stat. 1329-9.  This contemplates that the term "independent counsel" in the permanent appropriation refers to the generic category of independent investigators rather than the particular statutory Independent Counsel.  It would also be anomalous to identify separately some "other law," as Stone suggests,

that is essentially "the same" as the law that appears right before it (*i.e.*, the Ethics in Government Act) in the same sentence.  An attorney can be independent in different ways.  While the Special Counsel did not have the same level of independence as the statutory Independent Counsel, he was brought in from outside of the Department, functioned independently of many Department structures and chains of command, was not subject to "day-to-day supervision." 28 C.F.R. § 600.7(b), and was to be given deference by the Attorney General in supervising his work, *see id.*

Contrary to Stone's interpretation, in legal circles the term "independent counsel" has regularly been used to describe the category of attorneys specially appointed to conduct sensitive investigations with certain assurances (through statutes, regulations, or otherwise) of independence.  *See Black's Law Dictionary* 426.  Thus, in debates about the statutory framework established by the Ethics in Government Act, government officials and other experts have referred to "regulatory Independent Counsel(s)," contrasted them with "statutory Independent Counsel(s)," and explained that the framework of the Independent Counsel statute is not necessary to achieve some of the desired independence.  *E.g.*, *The Future of the Independent Counsel Act, Hearings Before the S. Subcomm. on Gov't Affairs*, 106th Cong., 1st Sess 421-424, 429, 432-433, 470 (Feb. 24, Mar. 3, 17, 24, Apr 14 1999) (Judge Starr); *see id.* at 142 (Sen. Thompson); *id.* at 365-367, 401 (Prof. O'Sullivan).[6]  Robert Fiske, an attorney appointed when the statutory Independent

---

[6] *See also, e.g., Reauthorization of the Independent Counsel Statute, Pt. I, Hearings Before the Subcomm. on Commercial & Admin. Law of the H. Comm. On the Judiciary*, 106th Cong., 1st Sess. 48 (Mar. 2 and 10, 1999) (Deputy Attorney General Holder); *id.* at 73 (former Attorney General Civiletti); *id.* at 96, 97 n.4, 107 (Prof. O'Sullivan); *id.* at 114-115 (former Assistant Attorney General for the Office of Legal Counsel); *1996 Campaign Finance Investigations, Hearings Before the Subcomm. on Admin. Oversight & the Courts of the S. Comm. on the Judiciary*, 106th Cong., 2d Sess, 55 (May 24, June 6, June 21, 2000) (chief of DOJ Public Integrity Section).

Counsel framework had lapsed, was governed by Department of Justice regulations and was widely called a "regulatory independent counsel." *E.g., United States v. Tucker*, 78 F.3d 1313, 1321 (8th Cir. 1996) (distinguishing between "the regulatory Independent Counsel (Fiske)" and "the statutory Independent Counsel (Starr)"); 140 Cong Rec S 6373, 12,809 (May 25, 1994) (Sen. Levin).[7]   And regulations issued by the Office of Government Ethics separately identify any "Independent Counsel appointed by the Attorney General," 5 C.F.R. § 2641 Appx. B, thus using the term "Independent Counsel" to describe attorneys such as Fiske and Mueller who were appointed by the Attorney General, rather than the prior statutory Independent Counsel, who were appointed by a Special Division of the D.C. Circuit, 28 U.S.C. § 593(b) (expired).

   *2.   The permanent appropriation's history confirms its applicability*

   The history of the permanent appropriation removes any doubt that the Department correctly relied on it to fund the Special Counsel's Office.   That history shows that when passing the permanent appropriation, Congress contemplated a broader category of "independent counsel" than that created in the Ethics in Government Act, including attorneys whose formal independence was established only by regulation.   The history also shows that Congress would have understood the phrase "other law" as including the same statutes that the Acting Attorney General cited when appointing the Special Counsel here.

---

   [7] *See also, e.g., Western Journalism Ctr. v. Office of the Indep. Counsel*, 926 F. Supp. 189, 190 n.1 (D.D.C. 1996); *United States v. McDougal*, 906 F. Supp. 499, 500 (E.D. Ark. 1995); Independent Counsel Reauthorization Act, Pub. L. No. 103-270 § 7(h), 108 Stat. 738 (1994); Brett M. Kavanaugh, The President and the Independent Counsel, 86 Geo. L.J. 2133, 2144 n.38 (1998); *Confirmation Hearings on Federal Appointments, Hearings Before The Comm. On the Judiciary*, 108th Cong., 1st Sess 28 (July 22, July 30, Sept. 3, Sept. 17, and Oct. 1, 2003) (Fiske) (questionnaire by Steven Michael Colloton); GAO, *Independent Counsel Expenditures for the Six Months Ended September 30, 1995* at 5 and n.2 (March 1996) (B-271128); GAO, *Expenditures by Four Independent Counsels for the Six Months Ended March 31, 1994*, at 2 (Mar. 31, 1995); CRS, *Independent Counsel or Special Prosecutor For the Enron Investigation*, at 6 (Apr. 15, 2002).

For nearly 140 years, Attorneys General have used many of the same statutory authorities used to appoint Special Counsel Mueller (and those statute's predecessors) to retain special attorneys for sensitive investigations. *See, e.g., In re Persico*, 522 F.2d 41, 54 (2d Cir. 1975). These instances include some of the most notorious scandals in the Nation's history. *See* U.S. Br. 19-20, Doc. 47, *Concord Mgmt. & Consulting LLC*, *supra* (No. 18-cr-32) (July 16, 2018) (listing examples). For example, in 1973, President Nixon's Attorneys General famously appointed Archibald Cox and then Leon Jaworski as special prosecutors for Watergate. U.S. Dep't of Justice Order No. 518-73 (May 31, 1973) (appointing Cox); *First Session on Special Prosecutor: Hearings before the S. Comm. on the Judiciary* Pt. 2, 93rd Cong., 1st Sess., at 449-452 (1973) (testimony of Robert Bork). Many specially appointed attorneys derived independence from operating outside of the chain of command and from assurances made by Presidents and Attorneys General. The Watergate Special Prosecutors were also protected by Department of Justice regulations with certain removal protections. *See* 38 Fed. Reg. 14,668 (June 4, 1973) (Cox); *Nixon*, 418 U.S. at 694-696 & nn. 8-10 (Jaworksi). Although the Attorney General could "amend or revoke [a] regulation defining the Special prosecutor's authority," "so long" as the regulation was "extant," it had "the force of law" and the Department was "bound by it." *Nixon*, 418 U.S. at 695-696.

In 1978, in the wake of Watergate, Congress passed the Ethics in Government Act, Pub. L. No. 95-521, 92 Stat. 1867, establishing what was initially called the "Special Prosecutor" and later relabeled the "Independent Counsel." Questions arose about the constitutionality of that statutory framework. By 1987, there was active litigation about these constitutional issues. *See, e.g., Morrison v. Olson*, 487 U.S. 654, 668 (1988) (describing the history of one such case). In response to challenges arising from the Iran-Contra investigation, the Attorney General executed a parallel

appointment of statutory Independent Counsel Lawrence Walsh under 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515, created a regulatory scheme, and described that parallel appointment as also establishing an "independent counsel." *Offices of Independent Counsel; General Powers and Establishment of Independent Counsel—Iran/Contra*, 52 Fed. Reg. 7270 (Mar. 10, 1987); *see* 28 C.F.R. Part 600 (1988) ("General Powers Of Independent Counsel")[8]; 28 C.F.R. Part 601 ("Jurisdiction of the Independent Counsel: Iran/Contra"); *see also In re Sealed Case,* 829 F.2d at 51-52, 55-56. The Attorney General effected a similar appointment in 1987 of James McKay to investigate certain allegations of illicit lobbying and conflicts of interest.   28 C.F.R. § 602.1 ("Jurisdiction of the Independent Counsel: In re Franklyn C. Nofziger"); *see* 52 Fed. Reg. 22,439 (June 12, 1987); 52 Fed. Reg. 35,543-01 (Sept. 22, 1987); *see also Implementation of the U.S. Dep't of Justice's Special Counsel Regulation, Hearing Before Subcomm. on Commercial & Admin. Law, of the H. Comm. on the Judic.*, 110th Cong., 2d Sess 9 (Feb. 26, 2008) (statement of Carol Elder Bruce) (noting that "the Department of Justice was urging existing Independent Counsel" to have "'parallel appointments'" under the same "'other law' provision[s]" such as 28 U.S.C. § 515 to "ensure the continuity of their investigations, when the Independent Counsel statute was under constitutional attack").[9]

It was against this background that on December 22, 1987, Congress enacted the permanent appropriation "within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law."  101 Stat. 1329-9.  At that time, the statutory Independent Counsel framework

---

[8] The current Special Counsel regulation is now published in 28 C.F.R. Part 600.

[9] During a lapse in the statutory framework, the Attorney General in 1994 effected a similar appointment of Robert B. Fiske Jr. to investigate allegation relating to the Whitewater land deal. 28 C.F.R. § 603.1 ("Jurisdiction of the Independent Counsel: In re Madison Guaranty Savings & Loan Association"); *see* 59 Fed. Reg. 5321 (Feb 4, 1994).

was under attack, and Congress could not assume either that the statute itself or the degree of independence it afforded would survive. But the Department of Justice was making parallel appointments under the same statutory authority used here, with independence protected by Department regulations. Against that background, Congress would have understood the terms "independent counsel" and "other law" as the government understands them here, and would have intended that special attorneys appointed by the Attorney General and provided with certain independence could be funded from the permanent appropriation.[10]

### 3. Longstanding practice underscores the argument

Finally, the propriety of the use of the permanent appropriation to fund the Special Counsel's Office is confirmed by the fact that the Department of Justice has repeatedly used the appropriation to fund other special counsels appointed under the same statutory authority used to appoint Special Counsel Mueller. The Department's submissions to the General Accountability Office ("GAO") and the President's Budgets have been transparent about this understanding. The GAO has approved the Department's interpretation. And Congress has not amended the permanent appropriation or otherwise acted to stop or limit this practice.

a. In 1994, during an earlier expiration of the statutory Independent Counsel framework, Attorney General Reno appointed Robert Fiske pursuant to Department of Justice statutory

---

[10] The government notes that a Conference Report related to the bill that enacted the permanent appropriation described that appropriation as "fund[ing] the expenses of all Independent Counsel appointed pursuant to the Ethics in Government Act" and said that "since the Department of Justice has no effective control over the expenses of Independent Counsel, then those expenses should be funded independent of the Department's other litigation workload." H.R. Rep. No. 498, 100th Cong at 485-486 (1987). The mention only of the Ethics in Government Act is inconsistent with the statutory text, which—even under Stone's reading—applies to "other law." This may reflect imprecision or underinclusiveness when drafting the conference report for an omnibus appropriations bill. Or it may reflect that the statutory independent counsel was simply the most salient example the drafters had in mind. In all events, that passing observation cannot override the plain statutory text and the weight of its surrounding history.

authority to conduct the initial Whitewater investigation and applied the then-extant independent counsel regulations.   28 C.F.R. § 603.1; *see* 59 Fed. Reg. 5321 (Feb 4, 1994).   The Department used the permanent appropriation to fund Fiske's investigation, informed the GAO, and noted it in the President's Budget that year.   *See* GAO, *Independent Counsel Expenditures for the Six Months Ended September 30, 1995* at 5 and n.2 (March 1996) (B-271128); Budget of the U.S. Government Fiscal Year 1996, Appx, at 637.

In 1999, after the Independent Counsel provisions of the Ethics in Government Act again expired, Attorney General Reno appointed former Jack Danforth to investigate a raid of the Branch Davidian compound in Waco, Texas.   Attorney General Order No. 2256-99 (Sept. 9, 1999). Attorney General Reno applied the Special Counsel regulations that had been issued just months before.   *Id.* at 2.   The Department again concluded that the permanent, indefinite appropriation was available, notified the GAO, and relied on that appropriation.[11]

In 2003, pursuant to the same statutes cited in the order that appointed Special Counsel Mueller, Acting Attorney General Comey appointed Patrick Fitzgerald—who was then also serving as a U.S. Attorney—to investigate the leak of Valerie Plame's identity as a covert CIA officer.   *United States v. Libby*, 429 F. Supp. 2d 27, 28-29, 41 (D.D.C. 2006). The Department again concluded that the permanent appropriation was available, funded the investigation from that source, and notified GAO.   *See* GAO, *Special Counsel and Permanent Indefinite Appropriation,* B-302582 (Sept. 30, 2004).

---

[11] GAO, *Independent Counsel Expenditures for the Six Months Ended September 30, 1999*, at 6 (March 2000); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2000*, at 5-6 (Sept. 2000) (B-286132); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2000*, at 5-6 (March 2001); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2001*, at 3, 4 (Sept. 2001); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2001*, at 3-4 (March 2002).

b.  From 1987 to 2009, the permanent appropriation required the Comptroller General—the head of the Government Accountability Office who is tasked with independent supervision of government spending, 31 U.S.C. §§ 702, 712—to "perform semiannual financial reviews of expenditures" from the permanent appropriation "and report their findings to the Committees on Appropriations of the House and Senate."  101 Stat. 1329-9; *see* Pub. L. No. 111-68 § 1501(d), 123 Stat 2023, 2041 (ending the requirement).  During that time, the GAO audited expenses for "regulatory independent counsel" Fisk and special counsels Danforth and Fitzgerald.  The GAO audits, which were submitted to both the House and Senate Appropriations Committees, noted that the Department was using the permanent appropriation to fund these investigations and raised no objection.  *See, e.g.,* GAO, *Expenditures by Four Independent Counsels for the Six Months Ended March 31, 1994,* at 2 (March 31, 1995) (Fiske); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2000,* at 5-6 (Sept. 2000) (B-286132) (Danforth)[12]; GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2004,* at 3, 4 (Sept. 2004) (Fitzgerald).[13]

---

[12] *Accord* GAO, *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2000* (March 2001); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2001,* at 3, 4 (Sept. 2001); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2001* (March 2002).

[13] *Accord* GAO, *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2004,* at 2, 3 (March 2005); GAO, *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2005,* at 2, 3 (September 2005); *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2005,* at 2, 3 (March 2006); *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2006,* at 2, 3 (September 2006); *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2006,* at 3-4 (March 2007); *Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2007,* at 2, 3 (September 2007); *Independent and Special Counsel Expenditures for the Six Months Ended September 30, 2007,* at 2, 3 (March 2008); GAO, *Audit of Special Counsel Expenditures for the 6 Months Ended March 31, 2008* (Sept. 24, 2008) (08-1122R); GAO, *Review of Special Counsel Expenses for the 6 Months Ended September 30, 2008*

As Stone acknowledges (Doc. 69, at 11-12), the GAO issued a detailed legal opinion analyzing the use of the permanent appropriation for Special Counsel Fitzgerald's investigation and submitted that opinion to the House and Senate appropriations committees.  GAO, *Special Counsel and Permanent Indefinite Appropriation,* B-302582 (Sept. 30, 2004) ("GAO Opinion"). That opinion noted that the GAO had "not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government pursuant to" the Attorney General's statutory authority.  *Id.* at 7.  The GAO identified several novel issues in funding the Fitzgerald investigation, including that Fitzgerald "continue[d] to serve as a United States Attorney" and, notwithstanding the Department's special counsel regulations, had not been "selected from outside the government."  *Id.* at 1-2; *see id.* at 5 n.11 (noting that prior special counsels paid from the indefinite appropriation were not separately government employees or officers).  In light of the GAO's statutory "responsibility to audit the fund" and these unusual circumstances, the GAO engaged in a detailed analysis.  *Id.* at 2.

The GAO observed that "[t]he permanent indefinite appropriation is available to pay all necessary expenses of investigations of independent counsels appointed under other law" and that "the term 'independent counsel' is not defined."  *Id.* at 4.  The GAO explained that "[t]he Department has at different times in various regulations characterized individuals appointed under other law (to investigate individuals who may have been proper subjects for investigation under the expired independent counsel law) as independent counsels or special counsels."  *Id.* at 4 n.7; *see id.* ("Independent and special counsels are sometimes referred to as regulatory independent counsels.").  And the GAO went on to note that in light of constitutional challenges in 1987 to the

---

(March 31, 2009) (09-367R); GAO, *Final Review of Expenses from the Department of Justice Permanent Indefinite Appropriation Covering the 7-Month Period Ending September 30, 2009* (March 31, 2010) (10-524R).

Ethics in Government Act, the Attorney General had "appointed the same persons to serve as independent counsels under the statutory authority that was relied upon to appoint Special Counsel Fitzgerald," including 28 U.S.C. § 515.  *Id.* at 4-5; *see id.* at 2, 6.  "Thus," the GAO concluded, "the independent counsels appointed under 'other law' around the time that the Congress was considering the Department of Justice appropriation act for fiscal year 1988 (which enacted the permanent indefinite appropriation into law) were the independent counsels" that had been appointed both by courts under the Ethics in Government Act and by the Attorney General under his statutory authority.  *Id.* at 5.

Because "the permanent indefinite appropriation is available for independent counsels," the GAO looked for "indicia of independence."  *Id.* at 6.  It noted that Fitzgerald had been given "plenary" authority directly by the Acting Attorney General to conduct the defined investigation, and it noted the Department's statement that because Fitzgerald was not governed by the special counsel regulations, he would not be limited by those provisions that might curb the scope of his authority.  *Id.*  The GAO further explained that the Acting Attorney General had appointed Fitzgerald "under 28 U.S.C. §§ 509, 510 and 515," which were the same statutes previously used to "appoint regulatory independent counsel from outside the government."  *Id.* at 6-7.  The GAO "agree[d]" that these were "'other law' for the purposes of . . . the permanent indefinite appropriation."  *Id.* at 7.  The GAO stressed that it had "not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government pursuant to such authority."  *Id.*

Stone ignores the long history, cited with approval in the 2004 GAO Opinion, of funding other special counsels from the permanent appropriation—including Danforth who operated under

the same regulations used here.[14]   Stone also ignores the GAO's conclusion that the same statutes

identified in the order appointing Special Counsel Mueller are "'other law' for the purposes

of . . . the permanent indefinite appropriation."   GAO Opinion 7; *compare id.* at 6-7, *with*

Appointment Order.   Stone suggests that Fitzgerald was different because he "was not hired from

outside the Department."   Doc. 69, at 11.   But that novel fact is why GAO found it necessary to

analyze the issue rather than rely on past practice.   *See* GAO Opinion at 1-2, 5 n.11 (noting that

Fitzgerald had not been "selected from outside the government" and "continue[d] to serve as a

United States Attorney" whereas prior special counsels paid from the indefinite appropriation were

not separately government employees or officers).   Although "independent" in many ways,

Fitzgerald already worked in the Department and had separate responsibilities and accountability

that would outlast the investigation.

Stone also notes that Fitzgerald was "not limited" by the special counsel regulations,

whereas Special Counsel Mueller was "accountable to Deputy Attorney General Rosenstein."

Doc. 69, at 12 (citing 28 C.F.R. § 600.7(b)).   But independence is not an all or nothing proposition.

Mueller was protected by a regulation expressly providing that he "shall not be subject to the day-

to-day supervision of any official of the Department."   28 C.F.R. § 600.7(b).   While that regulation

also envisions certain supervision, it provides for deference to the Special Counsel's decisions and

requires congressional notification if the Special Counsel is overruled.   *Id.*   Moreover, both special

counsels ultimately had only as much independence as the Attorney General continued to give

---

[14]   Stone states that "[t]he GAO Report never analyzed the effect of the post-1999
regulations on its 1994 memorandum's analysis."   Doc. 69, at 13.   The GAO report that he appears
to be discussing is the 2004 opinion, which post-dated the 1999 regulations.   While the opinion
did not specifically address the 1999 regulations, which had not been applied to Fitzgerald, it
appeared to cite with the approval the Department's prior use of the permanent appropriation for
Danforth, who was subject to that regulation.   *See* GAO Opinion 7; *see also id.* at 5 n.11.

them.  *See In re: Grand Jury Investigation*, 916 F.3d at 1052-1053; *Sealed Case*, 829 F.2d at 56; *see also Morrison*, 487 U.S. at 721 (Scalia, J., dissenting) (discussing *Nixon*).   While Acting Attorney General Comey granted Fitzgerald the "plenary" authority to take steps without first seeking permission, Comey nonetheless had the same plenary authority over Fitzgerald as he had over other officers in the Department of Justice.  *See Libby*, 429 F. Supp. 2d at 43 (citing *Sealed Case*); *see also* 28 U.S.C. §§ 509, 510.   Indeed, Comey did not have to go through the separate step of rescinding a formal order or regulation before exercising that authority, if he chose to do so.  *See Libby*, F. Supp. 2d at 43; *see also In re: Grand Jury Investigation*, 916 F.3d at 1052-1053; *Sealed Case*, 829 F.2d at 56.

c.   Beyond the Department's longstanding practice and the GAO's approval, Congress itself has been well aware of the Department's interpretation of the permanent appropriation and has not sought to correct it.   As noted, the many GAO opinions auditing special counsel expenditures from the permanent appropriation were submitted to the House and Senate appropriation committees.  Additionally, since 2010, every President's Budget—including those submitted during Special Counsel Mueller's investigation—has expressly stated that the permanent appropriation covers special counsels.[15]

---

[15] Most have included a line item stating: "INDEPENDENT COUNSEL:  A permanent appropriation is available to fund independent and special counsel activities (28 U.S.C. 591 note)." *E.g.,* Budget of the U.S. Government Fiscal Year 2019, Appx., at 700; Budget of the U.S. Government Fiscal Year 2016, Appx., at 734;  Budget of the U.S. Government Fiscal Year 2013, Appx., at 780; Budget of the U.S. Government Fiscal Year 2012, Appx., at 718; Budget of the U.S. Government Fiscal Year 2011, Appx., at 754.  The 2020 President's Budget described a category called "INDEPENDENT COUNSEL," stating that "[a] permanent appropriation is available to fund independent and special counsel activities (28 U.S.C. 591 note)" and further explaining that "[i]n recent years, special counsels have been appointed to investigate allegations that senior Executive Branch officials violated Federal law" and "[t]his permanent appropriation is used to fund such investigations."  Budget of the U.S. Government Fiscal Year 2020, Appx., at 698; *see*

In that time, Congress has passed numerous appropriations bills—including appropriations for the Justice Department that followed extensive inter-branch discussions.  And, as noted, in a 2009 appropriations law, Congress expressly focused on the permanent appropriation at issue here, which had been subject to GAO auditing, and ended that auditing responsibility.  123 Stat. 2041. But Congress has never amended the language establishing the permanent appropriation or provided a separate annual appropriation for special counsel investigations.  *See Sebelius v. Auburn Reg'l Med. Ctr.,* 568 U.S. 145, 159 (2013) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.")  (alteration in original, internal quotation marks omitted).

## B.  Stone's Argument Cannot Support The Remedies He Seeks

Stone's appropriations arguments not only lack merit, but also would not justify dismissal of the Indictment or a permanent injunction against prosecution.

### 1.  Stone has no right to have the Indictment dismissed

a.  Although Stone asserts (Doc. 69, at 4) that "[t]he Appointment of the Special Counsel Violates the Appropriations Clause," an appointment uses no funds from the permanent appropriation.  Stone does not dispute that the FBI investigators working with the Special Counsel's Office and the U.S. Attorney's Office currently prosecuting this case were and are properly funded.  Nor does Stone dispute that the Department of Justice was able to pay for the Special Counsel's expenses and could have drawn on other appropriations to do so.  *See generally* 28 C.F.R. § 600.8(a)(1) ("A Special Counsel shall be provided all appropriate resources by the

---

*also* Budget of the U.S. Government Fiscal Year 1996, Appx., at 637 (explaining that the appropriation funds the "investigation of the special counsel appointed in January 1994" [Robert Fiske, appointed under DOJ regulations]).

Department of Justice."). Stone's argument therefore concerns only whether the Department relied on the correct appropriation or should have paid certain expenses and salaries for the Special Counsel's Office using a different appropriation.[16]

Stone cites no case where a defendant was permitted to raise that kind of argument in a motion to dismiss an indictment. Courts generally adjudicate claims of legal error only when the asserted error caused the litigant's injury. But Stone's indictment was not caused by the identity of the appropriation that the Department relied on when funding the Special Counsel's Office. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013) ("injuries are not fairly traceable" to a statute where parties likely would have engaged in the same activity absent that statute). Parties also normally cannot invoke legal provisions that are not intended to protect their rights and interests. Thus, in criminal cases, under a rule that is often called "standing" as "a useful shorthand," "a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018); *see Wong Sun v. United States*, 371 U.S. 471, 492 (1963) (seizure "invaded no right of privacy of person or premises which would entitle [defendant] to object"). And, as arises more commonly in civil cases under what used to be called "prudential standing," a claimant's alleged

---

[16] The Department is appropriated close to $1 billion per year for "General Legal Activities" that are "not otherwise provided for" in appropriation acts. *E.g.* Department of Justice Appropriations Act, 2019, Pub. L. No. 116-6, Div. C., Title II. If the permanent appropriation were unavailable and the Department had already established a spending plan for that fiscal year, the Department could have notified Congress and then reprogrammed those funds. *See id.*; Div. C, Tit. V, § 505. The Department also could have transferred a certain amount of funds from another appropriation if necessary through a similar procedure. *See* Div. C, Tit. II, § 205. Additionally, while the Special Counsel's Office reimbursed salaries of personnel detailed from other offices, those salaries could have been funded by home components so long as the detailees' work was "similar or related" to matters handled in their home offices and would accomplish a purpose for which their home offices receive funds. *See Reimbursement for Detail of Judge Advocate General Corps Personnel to a United States Attorney's Office*, 13 Op. O.L.C. 188, 189-190 (1989)

injury must fall within the "zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-132 (2014).  But the rules governing where funds come from—as opposed to whether funds may be used at all—do not exist for the benefit of individuals who may be affected, downstream, by the expenditure of those funds. *Cf. Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (suggesting that a defense contractor cannot assert a claim based on "an appropriations law in order to challenge the Defense Department's decision to purchase one type of weapon rather than another" because the "defense appropriation is not passed in order to benefit defense contractors, benefit them though it may"); *Moore v. Navy Pub. Works Ctr.*, 139 F. Supp. 2d 1349, 1355 (N.D. Fla. 2001) (limit on use of appropriated funds intended to limit costs, not to protect employees).[17]

b.  Stone's arguments also do not call into question the validity of the Indictment returned by the grand jury or provide a basis to dismiss that Indictment.  As noted, while Stone characterizes his argument as a challenge to the Special Counsel's "[a]ppointment" (Doc. 69, at 4), the appointment itself required no funds attributed to the permanent appropriation.  Stone's appropriations argument therefore provides no reason to doubt that the Special Counsel is a

---

[17] Stone seeks to constitutionalize that argument, by alleging that the Department violated the "Appropriations Clause," which states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7.  The label placed on his theory has little effect on the available remedy.  But his allegation likely could not amount to a constitutional violation because he does not dispute that the Department had authority to spend funds on the Special Counsel's investigation, and only disputes whether the Department properly relied on the correct appropriation when doing so.  *See, e.g., OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("the payment of money from the Treasury must be authorized by *a statute*") (emphasis added); *United States Dep't of the Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money *without statutory authority*.") (emphasis added); *United States House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 70 (D.D.C. 2015) (basing standing on a constitutional theory that the Executive spent money "for which *no* annual appropriation was enacted") (emphasis added).

properly appointed Department of Justice attorney who was fully authorized to conduct this investigation and present this indictment.  Federal criminal proceedings are conducted by "officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. § 516; *see* 28 U.S.C. § 519.  The Special Counsel is such an officer.  He was appointed under, *inter alia*, 28 U.S.C. § 515, which allows the Acting Attorney General to "specially retain[]" attorneys, "commissioned as special assistant to the Attorney General or special attorney," and expressly authorizes those attorneys to "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings."  28 U.S.C. § 515; *see In re Grand Jury Investigation*, 916 F.3d at 1053-1054.  The Special Counsel was accordingly both "an authorized assistant" to the Attorney General, Fed. R. Crim. P. 1(b)(1)(A), and an "attorney authorized by law to conduct proceedings under these rules as a prosecutor," Fed. R. Crim. P. 1(b)(1)(D), and was therefore authorized to present evidence to the grand jury and to sign an indictment, Fed. R. Crim. P. 6(d)(1), 7(c)(1).

Stone does not otherwise explain why his appropriations argument could constitute a "defect in instituting the prosecution" or in "the indictment" itself.  *See* Fed. R. Crim. P. 12(b)(3).  His claims about the use of the permanent appropriation, *i.e.,* which appropriation should have funded the Special Counsel's investigation, do not constitute either type of error.  Accordingly, Stone's appropriations argument could not warrant dismissal of the Indictment.

c.  In any event, even if there were any technical error here regarding the funding source, Stone suffered no prejudice.  *See* Fed. R. Crim. P. 52(a).  As a general matter, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  This requirement ensures that the substantial "societal costs" that result from dismissing a grand jury's indictment will not be imposed unjustifiedly.  *Id*. at 255.  Even if the Department of Justice funded the Special

Counsel from the wrong appropriation, and even if that error could call into question an indictment returned by a grand jury, Stone suffered no prejudice for at least two reasons.

First, as discussed, the government was free to expend funds to conduct this investigation and to seek this Indictment. *See supra* pp. 22-23 & n.16. The identity of the appropriation from which the government drew funds does not affect Stone's "substantial rights," Fed. R. Crim. P. 52(a), or otherwise prejudice him. And it requires little speculation to realize that even were Stone's interpretation of the permanent appropriation correct, the Department would have funded the Special Counsel's investigation from other appropriations that were available. *See* 28 C.F.R. § 600.8(a)(1) ("A Special Counsel shall be provided all appropriate resources by the Department of Justice.").

Second, the key steps in this case—including the Indictment itself—have been authorized by the Department of Justice leadership and undertaken in consultation with other government personnel who were not paid from the appropriation now at issue. It is well established that when an attorney lacks authority under statute or rule to conduct grand jury proceedings or to sign an indictment, the supervision and involvement of other government attorneys renders the mistake harmless. *See, e.g., United States v. Fowlie*, 24 F.3d 1059, 1065-1066 (9th Cir. 1994) (supervision by Assistant U.S. Attorney); *United States v. Durham*, 941 F.2d 886, 891-892 (9th Cir. 1991) ("direction and supervision of the United States Attorney"); *United States v. Plesinski*, 912 F.2d 1033, 1038 (9th Cir. 1990) (supervision by Assistant U.S. Attorney); *see also United States v. Vance*, 256 F.2d 82, 83 (6th Cir. 1958) (per curiam) (even if indictment had to be signed by U.S. Attorney, signature by AUSA is a harmless error). Here, the investigative steps were taken by and with FBI investigators who were not paid from the permanent appropriation. The Special Counsel submitted the draft Indictment for review by Department leadership. And the Indictment was

reviewed by this U.S. Attorney's Office, with an understanding that this Office would be involved in the prosecution.   In light of the extensive involvement and ongoing supervision by other government employees that were not funded through the permanent appropriation, any alleged error in instituting this prosecution would be harmless.

d.   Stone's only support for dismissing the Indictment is his citation to *United States v. McIntosh*, 833 F.3d 1163, 1174-1175 (9th Cir. 2016).   That case only underscores the government's arguments.   *McIntosh* concerned a statute that "expressly prohibits DOJ from spending funds" on certain marijuana-related enforcement actions. *Id.* at 1173-1175; *see id.* at 1177-1179.   Before that statute was passed, the government initiated several prosecutions that arguably fell within that category.   *Id.* at 1168-1170, 1179.   With that bar on government spending in place, several defendants moved to dismiss the indictments or to enjoin the ongoing expenditure of funds in violation of that spending restriction.   *Id.* at 1168-1172.

Contrary to Stone's suggestion, the Ninth Circuit took "no view on the precise relief required and le[ft] that issue to the district courts in the first instance." *Id.* at 1172 n.2; *see id.* at 1179.   The only issue was whether courts should permit the ongoing expenditure of funds in violation of the express prohibition. *See id.* at 1172-1173, 1174-1175.   Indeed, the court noted that while "Congress currently restricts the government from spending certain funds to prosecute certain individuals," Congress "could restore funding tomorrow," and that in deciding how to address the issue, courts will have to consider "the temporal nature of the lack of funds along with [defendants'] rights to a speedy trial under the Sixth Amendment and the Speedy Trial Act." *Id.* at 1179 & n.5; *see, e.g., United States v. Carrillo*, No. 12-cr-185, 2018 WL 4638418, at *5 (E.D. Cal. Sept. 26, 2018) (interpreting the issue as whether to "bar[] the DOJ from expending funds on [a] prosecution because to do so would be a violation of the appropriations rider"); *United States*

*v. Pisarski*, 274 F. Supp. 3d 1032, 1034, 1040 (N.D. Cal. 2017) (staying case to prevent ongoing expenditure); *United States v. Campbell*, No. 18-cr-5, 2018 WL 6728062, at *3 (D. Mont. Dec. 21, 2018) (asking "if the Department of Justice could continue with the prosecution").

Here, by contrast, there is no allegation of an ongoing unlawful expenditure of funds, nor a restriction on spending any funds on the investigation as there was in *McIntosh*. This case is now being prosecuted by the U.S. Attorney's Office, and no funds attributed to the permanent appropriation are being used to support this prosecution. Even as to the asserted past error, moreover, the allegation is not that the Department could not spend money on the Special Counsel's work, but just that the Department relied on the incorrect appropriation when doing so. Accordingly, *McIntosh* can provide no basis for dismissal of the Indictment.

### 2. Stone has no right to a permanent injunction

In a separate motion, Stone seeks (Doc. 71, at 1-3) a "permanent injunction" against being prosecuted. Stone acknowledges (Doc. 71, at 3) that this Office is now conducting the prosecution. But he nonetheless urges that "[t]he Special Counsel's Office should not have investigated" him or "presented witnesses to a grand jury" and that an injunction is warranted to remedy the asserted "taint." Doc. 71, at 3. For many of the reasons just discussed, Stone is not positioned to seek this remedy. Indeed, the standing-type arguments should have even greater force when seeking an injunction, which, by its nature, is discretionary, *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006)—particularly an injunction against a criminal prosecution, which intrudes at the heart of the Executive Branch's authority, *see Armstrong*, 517 U.S. at 464-465. In what would effectively be a separate civil action to bar future prosecution, Stone also would have no cause of action. *See Manafort v. U. S. Dep't of Justice*, 311 F. Supp. 3d 22, 32-34 (D.D.C. 2018).

In any event, it is a "basic doctrine of equity jurisprudence" that "courts should not exercise their equitable discretion to enjoin criminal proceedings, as long as the defendant has an adequate legal remedy in the form of trial and direct appeal." *In re Al-Nashiri*, 835 F.3d 110, 118 (D.C. Cir. 2016); *see Deaver v. Seymour*, 822 F.2d 66, 68-69 (D.C. Cir. 1987); *id.*at 71-72 & n.1 (D.H. Ginsburg, J., concurring); *see also O'Shea v. Littleton*, 414 U.S. 488, 499 (1974). If Stone has an argument that a future prosecution is impermissible or improperly "taint[ed]," (Doc. 71, at 3), he can raise that argument at that time. But that can provide no basis to enjoin any such future proceeding. *See Manafort*, 311 F. Supp. 3d at 30-31.

Stone also cannot use a forward looking injunction to remedy what he alleges was a past misuse of an appropriation. Injunctive remedies "look[] to the future" and ordinarily are used to prevent future harm. *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965); *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57-62 (1975). This case is being prosecuted by the U.S. Attorney's Office, funded by an appropriation that is not in dispute. Stone provides no support for transforming his allegation of past error into future harm by declaring that the past spending "taint[s] the continuing case." Doc. 71, at 3. Any past misuse of an appropriation would not merit an exclusionary or "taint" analysis. Statutory errors normally are remedied through statutory schemes. And even if Stone's allegation could amount to a constitutional violations (which it likely could not, *see supra* p.24, n.17), appropriations laws establish the appropriate means to remedy and deter such errors. *See* 31 U.S.C. § 1351 (reports to the President, Congress, and GAO); *see also id.* § 1349(a) (administrative actions); *id.* § 1350 (criminal penalties for willful violations).

Even where a court-created, exclusionary-type remedy is available, it must be applied "prudential[ly]" not to "redress the injury" but to deter future violations. *See Davis v. United States*, 564 U.S. 229, 236-237 (2011) (Fourth Amendment exclusionary rule). Such remedies are

used only when the alleged error was a but-for cause of the later government action at issue, *see Hudson v. Michigan*, 547 U.S. 586, 592 (2006), and only when the error was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system," *Herring v. United States*, 555 U.S. 135, 144 (2009). Here, the government acted based on a longstanding and reasonable interpretation; many of the investigative steps were taken by FBI personnel who were not funded through the permanent appropriation; and use of a different appropriation would likely not have shielded Stone's crimes.

Further, not every downstream consequence of a constitutional error is deemed to be "taint[ed]" as Stone suggests.  In the Fourth Amendment realm, discovery of evidence "can be too attenuated" from the error "to justify exclusion." *Hudson*, 547 U.S. at 592; *see Utah v. Strieff*, 136 S. Ct. 2056, 2061-2063 (2016).  Because any error here was not "flagrant," little attenuation should be needed.  *See id.* at 2063. The discovery of Stone's crimes was not a result of "exploit[ing]" the alleged "illegality"—the use of the permanent appropriation—but rather the result of "means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 488 (citation omitted) —ordinary investigative work.  And barring any later prosecution that was based on the Special Counsel's work "would not serve the purpose" of the rule governing what appropriation funds what office.  *See New York v. Harris*, 495 U.S. 14, 20 (1990) (incriminating statement following warrantless arrest).  There is also a significant intervening cause of the current and any hypothetical future indictment that would be enjoined:  an independent grand jury and another office seeking any future indictment.  Even where improperly appointed officers have conducted proceedings, validly appointed officers may continue with the work and the prior error does not "taint" the later proceedings.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117-121 (D.C. Cir. 2005) (no "taint" after when "a properly appointed official has the

power to conduct an independent evaluation of the merits and does so"); *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 204, 213-214 (D.C. Cir. 1998) (after years of discovery and hearings under improperly-appointed Director, a later validly-appointed Director could issue a final decision); *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987) (no injury where a properly appointed official who had only been in office three days implemented a program that had been extensively planned by his improperly appointed predecessor); *see also Federal Election Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 707-709 (D.C. Cir. 1996) (after agency commenced proceedings using unconstitutional structure, properly structured agency did not have to restart proceedings even though "no matter what course was followed," "some effects" of the earlier constitutional defect would linger).

Stone's reliance on *McIntosh* again underscores his error.  As discussed, *McIntosh* did not concern past expenditure of funds, but only whether the government could continue with prosecutions that were expressly prohibited by an appropriations rider.  833 F.3d at 1173, 1174-1175, 1179.  As to that category of cases, the court observed that Congress could lift that prohibition at any time and only noted the risk that indefinite stays could eventually raise speedy-trial problems.  *Id.* at 1179.  But the court did not suggest that any future proceedings would be tainted by any work done in the interim.  And the government is unaware of any court that has applied such an extreme remedy.[18]

---

[18] The government notes that Stone did not seek to bar any further prosecution by moving to dismiss with prejudice.  This is presumably because dismissal with prejudice is a rare remedy that is warranted only if the government cannot cure the defect.  *See United States v. Gooch*, 23 F. Supp. 3d 32, 41 (D.D.C. 2014).  For the reasons stated, any defect in seeking this indictment would be cured if this Office, funded by an unchallenged appropriation, presented the same indictment to the grand jury.

III.    **Stone's Additional Challenges To The Special Counsel's Appointment And Investigation Lack Merit**

Stone raises a number of other arguments, rooted in Article II of the Constitution and the history of the Ethics in Government Act.  Each lacks merit.

A.    **The Attorney General's Appointment of The Special Counsel Did Not Violate The Vesting Or Take Care Clauses**

Stone makes a number of interrelated arguments, suggesting that the Attorney General's appointment of Special Counsel Mueller ran afoul of various provisions of Article II of the constitution.  Doc. 69, at 16-30.  Specifically, Stone suggests that the Special Counsel's appointment to investigate "the President and his presidential campaign" raises "structural constitutional concerns" under the Vesting Clause, U.S. Const. Art. II, § 1 (Doc. 69, at 16-18, 19-20) and impermissibly interferes with the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3 (Doc. 69, at 18-30).  These arguments are misguided.

As an initial matter, these arguments could not entitle Stone to any relief because Stone is not the President.  Even if there were any "as applied" constitutional problem with investigating the President as Stone suggests (Doc. 69, at 24), that would have no bearing on this case, which arose out of an investigation of "any links and/or coordination between the Russian government and *individuals associated with* the campaign," Appointment Order (emphasis added), ultimately including links between Stone and Organization 1, and culminated in the prosecution of Stone for obstruction, false statements, and witness tampering.  Stone would apparently read Article II to forbid even the investigation of people associated with a successful presidential campaign.  No legal support exists for such a sweeping proposition.

Nor could any asserted constitutional questions about investigating the President mean that "all of the evidence gathered" by the Special Counsel and the FBI "must be excluded as fruit of the poisonous tree."  Doc. 69, at 27; *accord id.* at 18.  Stone does not cite any legal authority to

support such a remarkable proposition.  As discussed, *see supra* pp. 29-31, exclusionary rules are not automatic.  Even as to the Fourth Amendment, exclusion of evidence is not warranted where (as here), the asserted error is far removed from and of a different kind than the later discovered evidence.  Indeed, the grand jury's decision to indict Stone should break any causal chain between the assertedly improper investigation of the President and the later use of evidence of Stone's obstruction of Congress.

Stone's Article II arguments also lack merit.  Contrary to Stone's suggestion (Doc. 69, at 28-29), the Special Counsel's investigation was subject to the Attorney General's direction and supervision.  *See In re: Grand Jury Investigation*, 916 F.3d at 1052-1053; *see also infra* pp. 35-36.  And under the Constitution, an investigation conducted by the Justice Department ultimately remains under the President's control.  Stone provides no support for his claim that the Executive Branch's own investigation "impermissibly encroaches upon the Executive power."  Doc. 69, at 18 (capitalization omitted).  *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441 (1977) ("reject[ing] at the outset [the] argument that . . .  regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the principle of separation of powers").  If anything, it would seem to raise even greater separation of powers issues for courts to superintend the relationship between the President, the Attorney General, and Department of Justice prosecutors, as Stone asks.[19]

The mere existence of an investigation also does not necessarily demand the President's time.  And demands on the President's time are not necessarily unconstitutional.  Despite the

---

[19] Stone's argument (Doc. 69, at 27-29) about "[d]ividing the Executive Branch against itself" confirms the point.  While the Attorney General may take certain steps without involving the President, the Attorney General also remains accountable to the President.  The Executive Branch regularly investigates officials within the Executive Branch.  That the Executive Branch chooses to do so does not impermissibly divide the Branch against itself.

"burden on the President's time and energy," Article II creates no blanket immunity from civil suit while in office.  *Clinton v. Jones*, 520 U.S. 681, 705 (1997); *see also id.* at 703-705 (describing demands on the President in other litigation).  While the Department of Justice's position is that "the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions," it also takes the position that a criminal investigation during the President's term is permissible.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222, 257 n.36, 260 (2000).  Stone's argument also proves too much.  It is not limited to a Special Counsel but would apply to any government investigation.  And it would seem to apply even if the President invited or welcomed the investigation.  *But cf.* Doc. 69, at 37-38 (Stone arguing elsewhere that the Attorney General can appoint a special counsel if the President "consents").   Any burden on the President must be balanced against countervailing need.  *See Clinton v. Jones*, 520 U.S. at 701-703; *Administrator of Gen. Servs.*, 433 U.S. at 443; *see Nixon v. Fitzgerald*, 457 U.S. 731,753-754 (1982); *Nixon*, 418 U.S. at 706-707.  If Article II prevented any investigation of a President or his campaign while he was in office, the government could not preserve evidence while memories are fresh and documentary materials are available.  Nor, it would seem, could the government conduct an investigation that may clear the President of alleged wrongdoing.

The Supreme Court's decision in *United States v. Nixon* underscores the point.  *Nixon* concerned a trial subpoena arising from the prosecution of White House staff and senior members of the President's campaign, where the President was named as an unindicted co-conspirator.  418 U.S. at 686-688 & n.3.   To determine whether the case was a non-justiciable "intra-branch dispute," the Court had to decide whether the special prosecutor acted pursuant to a proper delegation of authority.  *Id.* at 692-695.  The Court began with Article II and explained that the

power to conduct criminal litigation had been delegated to the Attorney General who, in turn, had "delegated the authority to represent the United States in these particular matters to a Special Prosecutor." *Id.* at 694. That delegation occurred through a regulation that granted "authority to control the course of investigations and litigation related to 'all offenses arising out of the 1972 Presidential Election'" including "'allegations involving the President.'" *Id.* at 694 n.8. If Stone were correct that Article II forbids such investigation, then the delegation that was critical to the Court's opinion was invalid, and the Court's tracing of the Article II power was mistaken.

**B.     The Special Counsel Did Not Have To Be Appointed By The President With The Advice And Consent Of The Senate**

Stone next argues (Doc. 69, at 30-31) that the Special Counsel is a principal officer who had to be nominated by the President and confirmed by the Senate. *See* U.S. Const. Art. II, § 2, cl. 2. As Stone acknowledges, the D.C. Circuit has rejected that argument. *In re: Grand Jury Investigation*, 916 F.3d at 1052-1053. That court explained that "[a]n inferior officer is one 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Id.* at 1052 (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). The court reasoned that even if the self-imposed special counsel regulation could be understood as impairing the Attorney General's ability to direct and supervise the Special Counsel, the Special Counsel would be an inferior officer, because the Attorney General retains the ability to lift those constraints. *Id.* at 1052-1053. As the government has argued, the Special Counsel is in any event an inferior officer, because while the regulation provides that a Special Counsel is not subject to "day-to-day supervision," 28 C.F.R. § 600.7(b), it also provides for constitutionally-sufficient direction and control, *see, e.g.,* 28 C.F.R. §§ 600.4, 600.7, 600.8, and ensures "that ultimate responsibility for the matter [the Special Counsel is appointed to investigate and, if appropriate, prosecute] and how it is handled will continue to rest

with the Attorney General," 64 Fed. Reg. at 37,038; *see* U.S. Br. 12-22, 26-30, *In re: Grand Jury Investigation*, *supra*, (No. 18-3052) (Sept. 28, 2018); *see also In re: Grand Jury Investigation*, 315 F. Supp. 3d 602, 626-651 (D.D.C. 2018), *aff'd* 616 F.3d 1047; *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 607-618.

### C.      The Special Counsel Did Not Need A Presidential Commission

Intermixed with his Take Care Clause argument, Stone suggests (Doc. 69, at 29-30) that the Acting Attorney General's appointment of the Special Counsel was "invalid" because he did not receive a Commission from the President.  It is well settled that receipt of a commission is not an essential prerequisite for a valid appointment. The requirements for an appointment are found in the Appointments Clause, and the D.C. Circuit has already held that Special Counsel Mueller was a validly-appointed inferior officer.   *In re Grand Jury Investigation*, 916 F.3d at 1051-1053. Consistent with longstanding practice for officers not appointed by the President, the Special Counsel did not receive a presidential commission. *See generally* 5 U.S.C. § 2901 ("The President may make out and deliver, after adjournment of the Senate, the commission of an officer whose appointment has been confirmed by the Senate."). That does not render the Special Counsel's appointment invalid, any more than it renders invalid the appointments of countless other inferior officers who have not received presidential commissions.

The Appointments Clause provides, among other things, that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, . . . in the Heads of Department." U.S. Const. Art. II, § 2, cl. 2. The statement that the President "shall Commission all the Officers of the United States" appears in a separate section of Article II and is phrased as a directive to the President rather than a qualification of office or necessary step in an appointment.  *See* U.S. Const.

Art. II, § 3.[20]   Indeed, the provision of the Appointments Clause stating that Congress may vest the appointment of inferior officers "in the Heads of Department" would mean little if the appointment were invalid unless and until the President issued a commission.

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 156 (1803), the Supreme Court rejected the contention that the receipt of a presidential commission was a necessary element of an officer's appointment.   The Court expressly distinguished between whether an officer—there a presidential appointee—had been "appointed" and whether he had received his "commission," which serves as "evidence[] of office." *Id.* at 155.   Analyzing Article II's text and structure, the Court concluded that "[t]he acts of appointing to office, and commissioning the person appointed, can scarcely be considered as one and the same." *Id.* at 156.   The Court further observed that, as a matter of practice, the directive that the President shall issue commissions "may never have been applied to officers appointed otherwise than by himself." *Id.*; *see id.* at 155 (noting that an early statutory requirement for presidential commissions applied only to officers "appointed by the President").   The Court stated that Congress would have "the legislative power to apply it to such cases," but did not suggest that absent a statutory command, the President must issue commissions for all officers. *See id.* at 156.

A signed and delivered presidential commission, *Marbury* explained, is evidence that an appointment has been completed, but a commission is not essential to establish that fact. *Id.* at 155-157.   "[I]f an appointment was to be evidenced by any public act other than the commission,

---

[20] This is in contrast to the Recess Appointments power, which appears in the same section as the Appointments Clause and specifies that the President "Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. Art. II, § 2, cl. 3.   But even as to recess appointments, the commission is just evidence of an appointment and not necessary for a valid appointment. *See Nippon Steel Corp. v. United States ITC,* 26 C.I.T. 1025, 1029-1033 (2002).

the performance of such public act would create the officer." *Id.* at 156; *see also Dysart v. United States*, 369 F.3d 1303, 1311-1313 (Fed. Cir. 2004) (appointment complete on transmission of appointment letter because "the granting of a commission is not always required for a Presidential appointment"); *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 26 C.I.T. 1025, 1031 (2002) (no commission necessary to complete recess appointment). Here, the Special Counsel's appointment was evidenced by, among other things, the Acting Attorney General's public order of May 17, 2017. That constituted his "appointment," and "enable[d] him to perform [his] duties without" a presidential commission. *Marbury*, 5 U.S. at 156.

Stone quotes (Doc. 69, at 29) a subsequent statement in *Marbury* that "the constitutional power of appointment has been exercised . . . when the last act, required from the person possessing the power, has been performed. 5 U.S. at 157. "This last act," the Court said, "is the signature of the commission." *Id.* But the Court made clear it was referring to the "last act" in that particular case, which happened to be the signed commission. The case before it involved "an appointment by the President, by and with the advice and consent of the senate, and [wa]s evidenced by no act but the commission itself." *Id.* "*In such a case*," the Court explained, "the commission and the appointment seem inseparable; it being almost impossible to show an appointment otherwise than by proving the existence of a commission." *Id.* (emphases added). "[S]till," the Court emphasized, "the commission is not necessarily the appointment; though conclusive evidence of it." *Id.*

Stone suggests that a presidential commission is necessary for a president to take care that the laws be faithfully executed, because it ensures that the President "know[s] who is executing the laws" (Doc. 69, at 21) and otherwise signals the assignment of responsibility to that officer (*id.* at 21, 30). A valid appointment—which may be evidenced by but does not require a commission— is a sufficient signal. The duty to "take Care that the Laws be faithfully executed" requires that

the President be able to "oversee the faithfulness of the officers who execute them." *Free Enter.*

*Fund*, 561 U.S. at 484. The President has various tools at his disposal, more powerful than issuance

of a commission, to ensure that inferior officers are faithfully executing the law, including the

power to remove that officer or that officer's superior. *See id.* at 492-498; *cf. Morrison v. Olson*,

487 U.S. 654, 696 (1988) (discussing various mechanisms of presidential control, through the

Attorney General, over the statutory independent counsel). Stone's position is also in some tension

with Article II's express authorization to vest appointments of inferior officers in heads of

departments, U.S. Const. Art. II, § 2, cl. 2, which was put in place for "administrative

convenience," *Edmond*, 520 U.S. at 660. Stone's argument also proves too much, by casting doubt

on the President's ability to supervise the myriad inferior officers who, throughout the history of

the Republic, have been appointed by department heads without necessarily possessing a

presidential commission. *See Marbury*, 5 U.S. at 155, 156; 5 U.S.C. §§ 2901, 2902; *see generally*

*NLRB v. Noel Canning*, 573 U.S. 513, 524-526 (2014) ("[l]ong settled and established practice is

a consideration of great weight in a proper interpretation of constitutional provisions").

> **D.** **The Acting Attorney General Had Statutory Authority To Appoint The Special Counsel**

Finally, Stone argues (Doc. 69, at 26, 31-40), that the Acting Attorney General lacked

statutory authority to appoint the Special Counsel. The D.C. Circuit has already held that the 28

U.S.C. §§ 515 and 533 conferred statutory authority to appoint the Special Counsel. *In re: Grand*

*Jury Investigation*, 916 F.3d at 1053-1054. As that court explained, the question "has already been

decided by the Supreme Court." *Id.* at 1053. As noted, in *United States v. Nixon*, 418 U.S. 683,

to determine whether the case was a non-justiciable "intra-branch dispute," the Supreme Court had

to decide whether the special prosecutor acted pursuant to a proper delegation of the Attorney

General's authority. The Court held that the Attorney General had "the power to appoint

subordinate officers to assist him in the discharge of his duties.  28 U.S.C. §§ 509, 510, 515, 533." *Id.* at 694.  The Court further held that, "[a]cting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor."  *Id.*; *see also Sealed Case,* 829 F.2d at 54-55 (similar).

Stone's statutory arguments are, in any event, meritless.  Stone claims that Congress's failure to reauthorize the statutory Independent Counsel framework after it sunset in 1999 signals "the intent . . . that there shall be no more special prosecutors investigating the President or Presidential Campaigns."  Doc. 69, at 31-34, 35-37.  The Special Counsel was not appointed simply to investigate the President and his Campaign; indeed, the charges here concern Stone's obstruction of a congressional inquiry into his interactions with Organization 1 after formally leaving the Campaign.  More to the point, Congress's inaction since 1999 cannot alter the meaning of statutes that have long been used to appoint special attorneys with responsibilities like the Special Counsel's.  *See supra* pp. 13-16.  Stone's suggestion (Doc. 69, at 37-38) that the Attorney General has statutory authority if the President "consents" further illustrates the flaw in his argument.  The statutory meaning cannot change based on whether the President consents or whether, at that particular time, the statutory Independent Counsel framework has lapsed.[21]

Stone's speculation about congressional intent also makes little sense.  The statutory Independent Counsel was not limited to investigating the President or presidential campaigns.  The framework concerned a list of senior government officials and would only have applied to

---

[21] Contrary to Stone's suggestion (Doc. 69, at 35), Congress's decision in 1978 to establish the statutory Independent Counsel in the Ethics in Government Act also does not signal that statutes such as 28 U.S.C. § 515, which had just been approved in *Nixon* (as well as *Sealed Case* and *In re: Grand Jury Investigation*) were never applicable to investigations that could involve the President.  Nor could passing the 1978 Act shed much light on the meaning of those statutes that were already in existence in 1978 and relied on here.  *See Brandt Trust v. United States*, 572 U.S. 93, 109 (2014).

campaigns if the Attorney General determined that there may be a conflict of interest.  *See* 28 U.S.C.  § 591(b), (c) (expired).   More importantly, the question whether to reauthorize that framework is much more of a judgment about the framework itself than it is about who should be investigated.  *See, e.g., Reauthorization of the Independent Counsel Statute, Pt. I, Hearings Before the Subcomm. on Commercial & Admin. Law of the H. Comm. on the Judiciary*, 106th Cong., 1st Sess. 30-37 (Mar. 2 and 10, 1999) (statement of Deputy Attorney General Holder).   Thus, in hearings about whether to reauthorize the statute, many witnesses and members of Congress expressed their preference for appointments by the Attorney General, and some specifically described regulatory protections and referenced Watergate and Fiske.  *Id.* at 60-61 (Rep. Chabot); *id.* at 72-73 (former Attorney General Civiletti); *id.* at 101 (American Bar Association); *see also* Remarks of Theodore Olson, 54 Wash. & Lee L. Rev. 1515, 1584 (1997) ("We got along in this country for almost 200 years without an independent counsel statute, and . . . there is nothing wrong with the idea of going outside the Department of Justice to pick someone special to pursue an investigation if public confidence requires it.").   In fact, on the very day that the Independent Counsel statute expired, the Attorney General issued the Special Counsel regulation "to strike a balance between independence and accountability in certain sensitive investigations."   64 Fed. Reg. at 37,038, 37,044.   The Attorney General's decision to establish that regulatory structure is not a defiance of Congress's judgment but rather represents a return to longstanding executive authority to appoint special prosecutors and an implementation of Congress's choice.   Congress's subsequent inaction more likely reflects agreement with that compromise than any intention that presidential campaigns should never be investigated.

Stone additionally argues that absent a clear statement, a statute could not confer authority to investigate the President.  Doc. 69, at 18, 34-37.  Again, the investigation was not specific to

the President, and the conduct at issue in this indictment was Stone's conduct, not the President's. Stone's statutory argument is also inconsistent with the broad grant of authority to the Attorney General to investigate and prosecute crimes, and with the history of bringing in outside attorneys to investigate high-level officials, including the President, *see, e.g., Nixon*, 418 U.S. at 694, which under Stone's view was never allowed.   In any event, the interpretive rule that Stone invokes concerns whether a statute should apply to the President, not whether a statute can authorize the appointment of an officer who might, in turn, take an action that might have some effect on the President.   It also applies only where a broader interpretation would raise serious constitutional questions or alter the traditional separation of powers.   *See Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455, 462-467 (1989); *Sale v. Haitian Centers Council*, 509 U.S. 155, 188 (1993); *see also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 178 (1996); *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 352 (1995). Merely investigating a president, his campaign, or others who worked with them raises no such difficulties—particularly where the investigator remains accountable to the Attorney General.   *See supra* pp. 32-35.[22]

---

[22] Stone suggests (Doc. 69, at 37-40) that because of the possibility of impeachment, the Attorney General cannot appoint attorneys to investigate matters related to the President.   But he provides no reason to believe that the availability of legislative investigations and impeachment proceedings should limit the Executive Branch's separate authority to conduct criminal and counterintelligence investigations.   The Executive Branch's investigations may also reveal wrongdoing or national security threats that involve individuals who are not subject to impeachment.

**CONCLUSION**

For the foregoing reasons, Stone's motion to dismiss should be denied.


Dated: May 3, 2019                                          Respectfully submitted,

                                                           JESSIE K. LIU
                                                           United States Attorney

                                                           By: */s/*_____
                                                           Jonathan Kravis
                                                           Michael J. Marando
                                                           Assistant United States Attorneys

                                                           Adam C. Jed
                                                           Aaron S.J. Zelinsky
                                                           Special Assistant United States Attorneys

                                                           555 4th Street NW
                                                           Washington, DC 20530

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 19-CR-00018 (ABJ)** |
| **ROGER J. STONE, JR.,** | |
| **Defendant.** | |

## <u>PROPOSED ORDER</u>

Upon consideration of the government's motion for leave to file an amended opposition to the defendant's motion to dismiss, Doc. 97, it is HEREBY ORDERED that the government's motion for leave to file is GRANTED, and it is FURTHER ORDERED that the amended opposition attached as an exhibit to the government's motion shall be substituted for the original filing on the docket.

_____
THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

cc:     ECF Parties of Record

1