IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No.: 1:19-CR-00018-ABJ

UNITED STATES OF AMERICA,

v.

ROGER J. STONE, JR.,

      Defendant.

**REPLY TO CORRECTED RESPONSE [Doc. 99] TO MOTION TO DISMISS [Doc. 69] AND ENJOIN [Doc. 71]**

Roger Stone moved to dismiss or enjoin his prosecution on several grounds. This Reply addresses the government's Response, focusing on the point which took up most of the government's Response: whether the Special Counsel's action violated the Appropriations Clause of the Constitution. *See* Doc. 99 at 8-32.

**I.    The Challenge to the Source of Funds is Meritorious**

The government raises three principal counterarguments:

First, it claims that although the permanent indefinite appropriation is reserved for an "independent counsel," a "special counsel" is functionally close enough to access it. This argument fails because the record shows conclusively that the terms are materially distinct. DOJ revised its regulations in 1999 specifically to create special counsels who would be subject to greater supervision than their independent counsel predecessors.

Second, the government cites historical practice and Congressional acquiescence as proof that using the indefinite appropriation was proper. *See* Doc. 99. The defect in this argument is that

the funding issue only arises with prosecutors appointed under the revised 1999 regulations. Since Mr. Mueller is only the second such appointment ever, and the first one to indict anyone, there is no relevant precedent. There has been no reason to delve into the funding scheme until now. This is a question of first impression.

Finally, the government asserts that an injunction is improper because a funding source error is harmless and cannot taint the current prosecution now that it has been handed off to the U.S. Attorney's Office. Doc. 99 at 28-31. This argument is incorrect because, unlike an Appointments Clause challenge, here DOJ violated laws specifically designed to rein in overzealous prosecutors. A significant factor in Congress and DOJ letting the Independent Counsel statute expire was that the absence of resource constraints provided "an impetus to investigate the most trivial matter to an unwarranted extreme."[1] Stone's prosecution for a derivative process crime is precisely the sort of case that might never have been brought had resource constraints forced DOJ to prioritize. By improperly drawing on the permanent indefinite appropriation, DOJ was never forced to choose. This error infected the entire enterprise of the Special Counsel's Office. An injunction is both necessary and proper.

### A. The Record is Clear that Special Counsels and Independent Counsels are Materially Distinct; The Special Counsel Investigation was Improperly Funded

Under the plain text of the statute, the permanent indefinite appropriation is reserved for "independent counsel" appointed pursuant to law. Pub. L. No. 100-202, § 101(a) (Title II), 101 Stat. 1329, 1329-9 (1987) (28 U.S.C. § 591 note). Nevertheless, the government argues that special counsels may access this fund because they too are appointed from outside the Department to

---

[1] *Reauthorization of the Independent Counsel Statute, Pt. I, Hearings Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 106th Cong. 71 (1999) (statement of Eric Holder, Dep. Att'y Gen. of the United States) [hereinafter Statement of Eric Holder 1999].

provide an unbiased opinion and generally remain outside the chain of command and day-to-day supervision of DOJ leadership. In likening the special counsel to the independent counsel, the government focuses on what unites them. But what is important here is what divides them.

The record is unambiguous that the special counsel regulations under which Mr. Mueller was appointed were specifically designed to create a different kind of prosecutor.[2] This prosecutor was to be more accountable than the old independent counsels in part in response to bipartisan concerns about the unlimited budget that independent counsels enjoyed.

In 1999, then-Deputy Attorney General Eric Holder appeared before the House Judiciary Committee to explain why the Department recommended letting the Independent Counsel statute lapse. He testified that the law "vests this immense prosecutorial power" in someone who "is not subject to the same sort of oversight or budgetary constraints that the publically [sic] accountable Department of Justice faces day in and day out." *See* Statement of Eric Holder 1999 at 62. Mr. Holder emphasized that

> [I]ndependent counsel are largely insulated from any meaningful budget process, [and] accountability to superiors. . . . This insulation contributes greatly to the independence of these prosecutors, but it also eliminates the incentive to show restraint in the exercise of prosecutorial power . . . [These factors] provide an impetus to investigate the most trivial matter to an unwarranted extreme.

*Id.* Mr. Holder then cited an op-ed written by then-Senators McConnell and Dodd: "The law gives virtually unchecked power, virtually unlimited budgets and completely distorted incentives – all to one man or woman whose sole job is to investigate a public official." *Id.* at 72.

Members echoed these concerns at a hearing later that year. Then-Congressman Lindsey Graham stated, "I agree with everyone's concern that you can't give independent counsels blank

---

[2] Dan Huff, *Robert Muller Has a Money Problem: Congress's oversight on how to fund his office casts doubt on every conviction he wins*, Wall Street Journal (March 24, 2019 7:05 p.m.), https://www.wsj.com/articles/robert-mueller-has-a-money-problem-11553468712.

checks." Then Subcommittee Ranking Member Jerrold Nadler observed, "I do not think that you want that much independence in a special prosecutor . . . I think we should rely more on the political and public checks and balances than on trying to criminalize . . . political disputes."[3]

In view of this bipartisan consensus, the Independent Counsel law was permitted to lapse. Instead, DOJ issued regulations creating the Special Prosecutor, a new type of prosecutor who would be more accountable. For example, the 1999 regulations require that a Special Counsel consult with the Attorney General before taking particular actions. *See* 28 C.F.R. § 600.7, U.S. Gov't Accountability Office, GAO B-302582, Special Counsel and Permanent Indefinite Appropriation at 6 (2004).[4]

In the same vein, the D.C. Circuit recently rejected an Appointments Clause challenge to Special Counsel Mueller, finding he was subordinate to the Attorney General. *In re Grand Jury Investigation,* 916 F.3d 1047 (D.C. Cir. 2019). Without delving into the provisions of the revised 1999 regulations, the court noted a major distinction between Mueller and prosecutors appointed under the prior Independent Counsel statute:

> Unlike the independent counsel in *Morrison* . . . whose independence and tenure protection were secured by [Statute], Special Counsel Mueller is subject to greater executive oversight because the limitations on the Attorney General's oversight and removal powers are in regulations that the Attorney General can revise or repeal.

*Id.* at 1052.

---

[3] *To Provide for the Appointment by the Att'y Gen. of a Special Counsel When Investigation or Prosecution of a Person by an Office or Official of the Dept. of Justice May Result in a Personal, Financial, or Political Conflict of Interest: Hearing on H.R. 2083 Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 106th Cong. (1999) (The hearing concerned legislation authorizing DOJ to issue regulations that would differ from the version DOJ promulgated in July 1999. The bill died in Committee.).

[4] Available at https://www.gao.gov/decisions/appro/302582.pdf.

### 1. The History of the Permanent Appropriation Does Not Support the Government's Position

Until 1987, Independent Counsel investigations were funded through the ordinary appropriations process. Congress established the permanent appropriation in 1987 at a time when constitutional challenges were pending against the Independent Counsel statute. At that time, and during previous lapses in the statute, DOJ made appointments under a parallel set of Independent Counsel regulations. Doc. 99 at 13-14. Since Congress was aware of this, the government contends it must have contemplated that the term "Independent Counsel" in the 1987 appropriation would encompass a "broader category" of "attorneys whose formal independence was established only by regulation." Doc. 99 at 12.

The argument fails because the pre-1999 Independent Counsel regulations mirrored the Independent Counsel statute known as the Ethics Act. They say nothing about the availability of that appropriation to the materially distinct special counsel role created via revised regulations in 1999.

Congress enacted the permanent appropriation in 1987 a few months after DOJ promulgated Independent Counsel regulations. In analyzing those pre-1999 regulations, the D.C. Circuit stated that they delegated to the independent counsel "authority identical to that provided to an independent counsel by the Ethics Act." *In re Sealed Case*, 829 F.2d 50, 52 (D.C. Cir. 1987). The regulation "sets forth the same grounds for removal as does the Ethics Act . . . The provisions of the regulation concerning 'reporting and congressional oversight' and 'relationship with components of the Department of Justice' are also virtually identical with parallel provisions in the Ethics Act." *Id.* at 52-53. Accordingly, from the permanent appropriation's inception through 1999, the term "independent counsel" carried the same defined meaning whether used in statute

or regulation. Congress thus had no reason to view the term as encompassing a broader category of attorneys as the government suggests.

### 2. The Longstanding Practice DOJ Cites Is Inapplicable Here

The government contends that DOJ has "repeatedly used the appropriation" to fund other special counsels appointed under the same statutory authority as Mueller. Doc. 99 at 15. That is not so. Consider the government's examples: Robert Fiske, Patrick Fitzgerald and John Danforth. Doc. 99 at 16-17. Fiske was appointed in 1994 at a time when the Independent Counsel regulations still mirrored the statute. Doc. 99 at 15-16. Fitzgerald was appointed in 2004, but under different DOJ authority and not pursuant to the revised 1999 regulations. Doc. 99 at 16. Since the funding issue only arises under the 1999 regulations neither of those precedents are relevant.

John Danforth was appointed pursuant to the 1999 regulations. *Id.* However, he was the first appointment under this brand-new regulatory scheme. It took him less than a year to issue his findings, and he did not indict anyone.[5] *See* U.S. Gov't Accountability Office, GAO-01-1035 Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2001 at 30. Thus, there was no occasion for the funding question to come up. The lone example of Mr. Danforth was simply an oversight, and in any case cannot standing alone establish a pattern of acquiescence.

For the very same reasons it proves noting that the Governmental Accountability Office (GAO) never raised any objections during its required audit of those three investigations. In two of them, the funding issue does not arise because the prosecutor was not appointed pursuant to the 1999 regulations. In the third, there was no one to press it, so it was overlooked.

---

[5] *See also* Susan Schmidt, *Investigation Clears Agents at Waco*, The Washington Post (July 22, 2000), https://www.washingtonpost.com/archive/politics/2000/07/22/investigation-clears-agents-at-waco/11e8f9f1-1963-4646-8e91-136642f17ec3/.

### 3.  The 2004 GAO Analysis In Fact Supports Stone's Position

In 2004, the GAO examined whether the permanent indefinite appropriation was available to pay the expenses of Patrick Fitzgerald, a special prosecutor appointed from within DOJ under separate authority and not the revised 1999 regulations. *See* U.S. Gov't Accountability Office, GAO B-302582, Special Counsel and Permanent Indefinite Appropriation (2004). For that reason, as noted above, the fact that GAO allowed payment is irrelevant to this case. However, as part of its analysis, GAO stated in passing that "we have not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government." *Id.* at 7. The government seizes on this opinion to claim there is a "long history, cited with approval in the 2004 GAO Opinion, of funding other special counsels from the permanent appropriation—including Danforth." Doc. 99 at 19. But there is no "long history." The funding issue only arises with a special counsel appointed pursuant to the 1999 regulations. With the exception of Danforth, no case before GAO ever dealt with that type of special counsel.

This is underscored by the fact that when GAO stated it had not objected to previous uses of the permanent appropriation, it cited a 1994 DOJ memo. GAO B-302582 at 7, n. 17. That memo found that independent counsels appointed pursuant to regulation rather than statute could access the Independent Counsel appropriation.[6] But that memo is irrelevant today.  It is only under the revised 1999 regulations that the funding issue arises, because those rules replaced the previous independent counsel structure with the special counsel, a new type of prosecutor specifically designed to be more accountable than the old independent counsels.

---

[6] Memorandum from Stuart Frisch, Dep't of Justice to Stephen R. Colgate, *Availability of the Independent Counsel Appropriation to Pay Expenses of an Independent Counsel Appointed by the Attorney General* (Jan. 24, 1999).

The GAO audit of the Danforth expenditures that the government cites undertook no legal analysis whatsoever of the funding issue. Doc. 99 at 16, n.11. It simply cited DOJ's assertion that the permanent appropriation was available and proceeded to the financial audit required for expenditures made from that account. *Id*. The Danforth case does not establish a meaningful precedent. It represents an oversight.

Actually, rather than help the government's case, the 2004 GAO report undermines it. GAO explained that because "the permanent indefinite appropriation is available for independent counsels," it looked for "indicia of independence." *See* GAO B-302582 at 6. GAO records that the Justice Department justified the arrangement because the regulation governing special counsels—which contains provisions inconsistent with independence—did not apply in that case. *Id.* at 5-6. The implication is that the fund would not be available when the regulation did apply:

> Department officials informed us that the express exclusion of Special Counsel Fitzgerald from the application of 28 C.F.R. Part 600, which contains provisions that might conflict with the notion that the Special Counsel in this investigation possesses all the power of the Attorney General, contributes to the Special Counsel's independence.

*Id.* at 6. By contrast, DOJ specifically made Mr. Mueller subject to the 1999 special counsel regulations which, by DOJ's own admission, contain provisions inconsistent with independence.[7] The independent counsel fund is unavailable to fund Mr. Mueller's investigation.

### 4. Contrary to DOJ's Assertion, There has Been No Congressional Acquiescence

The government asserts that "Congress itself has been well aware of the Department's interpretation of the permanent appropriation and has not sought to correct it." Doc. 99, at 22. As

---

[7] Rod Rosenstein, Dep. Att'y. Gen., Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters, Order No. 3915-2017 (May 17, 2017).

proof it points to the numerous GAO reports auditing expenditures from the permanent appropriation. Again, the funding issue was not present in those cases, because they did not deal with prosecutors appointed under the 1999 regulations. There was no potential objection for Congress to waive.  The Danforth case is the only one where Congress might have raised the issue, but it was overlooked presumably for the same reasons GAO missed it. Whatever the reason, one case does not establish "'a longstanding administrative interpretation.'" Doc. 99 at 23.

The government's second proof of Congressional scienter is that "since 2010 every President's budget…has expressly stated that the permanent appropriation covers special counsels." Doc. 99 at 21. However, as the government elaborates in a footnote, that budget statement typically looked as follows: "'INDEPENDENT COUNSEL: A permanent appropriation is available to fund independent and special counsel activities (28 U.S.C. 591 note).'" Doc. 99 at 21, n.15. Nothing in that disclosure would alert the reader that the appropriations' express terms include only independent counsels and that the expansion to special counsels is the government's gloss on the underlying text. Nor is it reasonable to assume that Members of Congress reading a budget document that is hundreds of pages long would have had the time to cross-reference the underlying statute and discover the truth.  Even if they did, it might not register as a problem unless they were familiar with the impetus behind the revised 1999 special counsel regulations.

Similarly, a permanent indefinite appropriation is by definition not part of the annual appropriations process and so would not figure in regular interbranch discussions of DOJ funding levels.

In 2009, Congress removed the requirement that GAO audit payments made from the permanent appropriation. *See* Pub. L. No. 111-68 § 1501(d), 123 Stat 2023, 2041. However, this was not part of a reevaluation of the special counsel's role or the permanent appropriation.  Rather,

it was simply one of five GAO reporting burdens Congress eliminated in that year's GAO spending bill that reduced the burden on the agency. *Id*.

In short, Congressional silence is not evidence of acquiescence when Congress does not even know that there are grounds for objection.

### B. Dismissing or Enjoining the Prosecution are the Only Appropriate Remedies

#### 1. Stone Has Standing

The government argues that Stone has no right to relief because he is not within the zone of interests protected by the appropriations laws in question and their violation did not cause his injury. Doc. 99 at 23-24.

In fact, Stone is squarely within the zone of interests protected by barring access to the Independent Counsel fund. The record demonstrates that both DOJ and Congress regard resource constraints on special counsels as protecting defendants by keeping investigations focused and fair.

Mr. Holder testified that an independent counsel's insulation from "any meaningful budget process" provides "an impetus to investigate the most trivial matter to an unwarranted extreme."[8] Representative Nadler later echoed the point bemoaning an Independent Counsel investigation of former HUD Secretary Henry Cisneros for false statements. Cisneros was investigated for eight years at a cost of over 24 million dollars before pleading guilty to a misdemeanor and paying a fine.[9] Rep. Nadler observed:

> [T]he lack of constraints on the special prosecutor to deal with such a small matter as the Cisneros affair. . .The whole thing just seemed out of proportion. . . I

---

[8] Statement of Eric Holder 1999 at 62.
[9] Name Redacted, Cong. Research Serv., 98-19 A, Independent Counsels Appointed Under the Ethics in Government Act of 1978, Costs and Results of Investigations (2006).

suspect without a special prosecutor law most prosecutors would have said *de minimis non curat lex*. You don't deal with it.[10]

DOJ insists there is no causation because, the investigation would have been funded anyway somehow. Doc. 99 at 23 n.16. This is precisely the argument rejected in *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984). There terminated federal employees sued arguing that the agency head had been improperly appointed. *See id.* The government argued there was no standing absent a showing that the layoffs would have been carried out differently, had the official been properly appointed. *See id.* The court rejected the contention:

> The government's argument here asks precisely the wrong question. The causation inquiry cannot be addressed to the question whether the appellants would have lost their jobs if the President had appointed and the Senate had confirmed [the officials], for the purpose of the Appointments Clause is precisely to grant some control over the Executive Branch to Congress, within the framework of the system of checks and balances put in place by the Constitution. The clause would be a nullity if it could be assumed that these very officials *would* in fact have been properly appointed and (especially) confirmed by the Senate.

*Id.* at 1496 (emphasis in original). So too here. The point of the Appropriations Clause is "to grant some control over the Executive Branch to Congress." *Id.* Congress would likely still fund the investigation, but as part of the negotiation it could extract concessions as to scope or direction.

Stone also has standing under *United States. v, McIntosh*, 833 F.3d 1163 (9th Cir. 2016). That precedent established that defendants may challenge their prosecution if it is being funded with money that has not been appropriated. *See id.* While that case involved an outright funding ban, rather than a source of funds defect, that distinction is not relevant to the court's holding.

---

[10] *Special Counsel Act of 1999: Hearing on H.R. 2083 Before the Subcomm. on Commercial & Admin. Law of the H. Comm. on the* Judiciary, 106th Cong. 17 (1999). (statement of Rep. Jerold Nadler, Member, H. Comm. on the Judiciary).

The *McIntosh* court described the defendants' complaint broadly to be "that DOJ is spending funds that have not been appropriated by Congress in violation of the Appropriations Clause of the Constitution." *Id.* at 1174. Similarly, the Court's decision was not limited to violating a funding ban. Rather it rested on the broader Constitutional defect of "drawing funds from the Treasury without authorization by statute" in violation of the Appropriations Clause. *Id.* at 1175. "That Clause constitutes a separation-of-powers limitation that Appellants can invoke to challenge their prosecutions." *Id.* The same defect is at play in this case. The DOJ drew funds from the Treasury without authorization because the permanent appropriation for independent counsels is not available to fund materially distinct special counsels.

### 2. Stone was Prejudiced by DOJ'S Improper Funding

Even if Stone has standing, the government argues that there was no prejudice for two reasons. First, the government offers the breezy assurance that "the Department would have funded the Special Counsel's investigation from other appropriations that were available." Doc. 99 at 26. The broader investigation may well have been funded, but that does not mean the special counsel would have felt free to expend resources pursuing Stone. That would have required DOJ to prioritize the Stone prosecution over other law enforcement efforts. It is not at all clear that DOJ or Congress would have approved diverting funds from ongoing law enforcement priorities, simply to prosecute Stone for lying to Congress in the absence of both a referral from Congress and an underlying election crime. Because DOJ improperly used the permanent indefinite appropriation, it never had to choose. It also allowed DOJ to dodge a potential fight with Congress. In sum, access to the permanent indefinite appropriation allowed DOJ and the Special Counsel to avoid the opportunity cost of pursuing Mr. Stone which ordinarily would have served as an important check on prosecutorial discretion.

The government also claims no prejudice because "the key steps in this case . . . have been . . . undertaken in consultation with other government personnel who were not paid from the appropriation now at issue." Doc. 99 at 26. So having spent pages urging that Mr. Mueller was functionally independent and operated outside the structure of the Department, the government suddenly reverses course and claims the Stone prosecution was a joint venture with the Department.

It is doubtful that many individuals who played a major investigative role were not paid from the permanent appropriation, since the government admits that "the Special Counsel's Office reimbursed salaries of personnel detailed from other offices." Doc. 99 at 23, n.16.

Moreover, although DOJ leadership may have approved it, it was Mr. Mueller's decision to charge Stone in the first instance. Mueller's team convened the grand jury, presented the evidence and drafted the indictment. Certainly, FBI agents and others may have played a supporting role, but Mueller's team, improperly funded by the permanent appropriation, led the effort. That is exactly why Special Counsel Mueller, rather than someone from DOJ leadership, signed the indictment.

### 3. Dismissal is Warranted Because the Lack of an Appropriation Vitiates the Authority

The government contends that dismissal is not warranted because Mr. Mueller was "fully authorized to conduct the investigation." Doc. 99 at 25. But an appropriations defect can vitiate an official's authority. For example, in *Sam Gray Enterprises v. United States*, a contractor sued the government for breach of a lease agreement. 43 Fed. Cl. 596 (1999), *aff'd sub nom. Sam Gray Enterprises v. United States,* 250 F.3d 755 (Fed. Cir. 2000). The Federal Circuit found that the contracting officer had no authority to agree to the lease, because there was no appropriation to cover the five-year lease term. "Without such an appropriation, there can be no contracting

*authority* for anyone, even a contracting officer, to bind the government to any contract." *Sam Gray Enterprises*, 250 F.3d at 755.

Like the contracting officer, Mr. Mueller was duly appointed, but the unavailability of an appropriation vitiated his authority to act. DOJ claims there were other funding sources that could have been used, and so an appropriation was available. But the fact is other funds were not used. Had DOJ told Congress that the special counsel investigation would be funded out of annual appropriations, such as the General Legal Activities account, it would have been subject to significant oversight demands. The permanent indefinite appropriation allowed DOJ to sidestep oversight, avoiding the restraints that Congress felt was needed when it let the Independent Counsel statute lapse.

### 4. At a Minimum, a Temporary Injunction is Necessary to Address the Harm

The government insists "Stone also cannot use a forward looking injunction to remedy what he alleges was a past misuse of an appropriation. Injunctive remedies 'look[] to the future' and ordinarily are used to prevent future harm." Doc. 99 at 29. But there is future harm here – a prosecution – and it is directly linked to the past misuse of funds. Money was drawn from the Treasury without authorization. In so doing, DOJ robbed Stone of a recognized and important shield for defendants against overzealous prosecution.

Even so, the government argues that "appropriations laws establish the appropriate means to remedy and deter such errors," in particular, reports to the President, administrative actions against the responsible officials and criminal penalties. Doc. 99 at 29. The government is half right. These provisions "deter" errors. But none of them do anything to "remedy" the wrong here. The resource constraints that DOJ evaded were specifically designed to protect defendants from overzealous prosecutions. The congressional committee to which Mr. Stone allegedly made false

statements has not sought his prosecution. Doc. 93. He is charged with a process crime produced by an investigation that uncovered no underlying election crime. This is precisely the sort of marginal case that, in the presence of meaningful budget constraints, the special counsel might not have pursued.

This court must fashion an equitable remedy. At a minimum, a preliminary injunction until DOJ secures appropriated funds from Congress to cover the cost of the Mueller investigation. This would force the government to cure the taint of the prior error, which is only fair because that error goes to the heart of whether the defendant would ever have actually been prosecuted.

The government claims that a court-fashioned remedy is unwarranted based on an incorrect analogy to evidence exclusion. As the government acknowledges, evidence exclusion is designed not to rectify, but to deter misconduct, and should be employed only when the error was sufficiently deliberate and culpable to warrant it. By contrast, the objective here is not to punish the government, but to guarantee fairness to the defendant. The level of culpability in the government is irrelevant to Mr. Stone's objection that his prosecution might well never have made it this far if prosecutors had not circumvented the ordinary resource constraints.

The better analogy then is to the standard for seeking a stay. "A district court may grant a stay…upon a showing by the application (1) of a likelihood of success on the merits; (2) that it will be irreparably harmed if a stay is not granted; (3) that a stay will not injure any other parties to the lawsuit; and (4) that the stay furthers the public interest." *United States v. Judicial Watch, Inc.,* 241 F.Supp.2d 15 (D.D.C. 2003). By all these metrics Mr. Stone is entitled to a stay. The improper funding claim is strongly rooted in the legislative history and consistent with the plain text of the statute. Further prosecution will drain Mr. Stone's resources and damage his reputation. By contrast, the harm to the government from a preliminary injunction is merely delay. And, since

the government insists that the Mueller investigation would easily have been funded from other sources, the delay in securing that funding should be brief. Finally, the Separation of Powers principles at issue here are "fundamental" to our democracy. *See McIntosh,* 833 F.3d 1163.

### 5. The Taint Survives Transfer of the Prosecution to the D.C. U.S. Attorney's Office

The government argues that transfer of this case to the U.S. Attorney's Office cures any prior funding defect. It cites four cases holding that "where improperly appointed officers have conducted proceedings, validly appointed officers may continue with the work and the prior error does not 'taint' the later proceedings." Doc. 99 at 30.

Three of the cases dealt with Appointments Clause defects concerning several agency heads and a rate judge.[11] The fourth involved appointment of congressional officials to agency positions in violation of the Separation of Powers.[12]

A defect in the appointment of a senior official does not alter routine enforcement activity by career staff. Here it is not just Special Counsel Mueller that is in question, but his entire apparatus. The whole investigation was improperly funded from start to finish, along with every intervening decision and employee.

Furthermore, none of those four precedents concerned the violation of a Constitutional provision that, if respected, might have prevented the enforcement proceeding from ever commencing. For example, requiring that the head of the Office of Thrift Supervision be Senate confirmed is not a method of ensuring *ongoing* oversight of that individual's enforcement activities. By contrast, resource limitations on prosecutors are specifically designed to force them

---

[11] *Intercollegiate Broad Sys., Inc. v. Copyright Royalty Bd.,* 796 F.3d 111 (D.C. Cir. 2005), *Doolin Sec. Sav. Bank v. Office of Thrift Supervision,* 139 F.3d 203 (D.C. Cir. 1998), and *Andrade v. Regnery,* 824 F.2d 1253 (D.C. Cir. 1987).

[12] *Federal Election Comm'n v. Legi-Tech, Inc.,* 75 F.3d 704 (D.C. Cir. 1996).

to prioritize and deter roving investigations. By misusing the permanent indefinite appropriation, DOJ was able to avoid making any tough choices. Accordingly, it is only fair that the taint transfer.

## II. The Constitutional Arguments: Appointments Clause, Executive Power, Separation of Powers, Take Care Clause, and Vesting Clause

Stone's Motion to Dismiss (Doc. 69) asserted various challenges to the appointment and actions by the Special Counsel. We take issue with the government's dismissal of the arguments and briefly respond in order to narrow the issues.

### A. The Appointments Clause

*In re Grand Jury Investigation*, 916 F.3d 1047, 1051 (D.C. Cir. 2019), rejected the challenge to the Special Counsel's appointment, which was made on the following grounds:

> (1) The Special Counsel is a principal officer who was not appointed by the President with the advice and consent of the Senate; (2) Congress did not "by law" authorize the Special Counsel's appointment; and (3) the Special Counsel was not appointed by a "Head of Department" because the Attorney General's recusal from the subject matter of the Special Counsel's investigation did not make the Deputy Attorney General the Acting Attorney General.

We raised those issues, but we do not reargue them here given the binding precedent in this Circuit. We preserve the issue for further review, if necessary.

### B. The Lack of a Congressional Referral/Separation of Powers

Congress investigates and legislates. The Executive Branch has prosecution powers. A Special Prosecution's intrusion into the Legislative Branch's activities, absent a referral from Congress, intrudes on the Legislative Branch's duties. The Special Counsel, in this particular case was an uninvited guest whose actions disrupted an equal branch of government. We adhere to the contentions make in the Motion to Dismiss. Doc. 69.

### C. The Take Care Clause/Vesting Clause

We stand on Justice Scalia's dissent in *Morrison v. Olson*, 487 U.S. 654, 724 n.4 (Scalia, J. dissenting), in which he states: "What I *do* assert – and what the Constitution seems plainly to prescribe – is that the President must have control over all exercises of the executive power." "The executive power shall be vested in a President o the United States." Art. II, § 1, cl. 1. The Special Counsel's appointment trespassed upon this guarantee.

### CONCLUSION

The indictment should be dismissed or enjoined by the reasons advanced here and in the Motion to Dismiss. Doc. 69.

                        Respectfully submitted,

                        By: */s/*_____

L. PETER FARKAS
HALLORAN FARKAS + KITTILA, LLP
DDC Bar No.: 99673
1101 30th Street, NW
Suite 500
Washington, DC 20007
Telephone: (202) 559-1700
Fax: (302) 257-2019
pf@hfk.law

BRUCE S. ROGOW
FL Bar No.: 067999
TARA A. CAMPION
FL Bar: 90944
BRUCE S. ROGOW, P.A.
100 N.E. Third Avenue, Ste. 1000
Fort Lauderdale, FL 33301
Telephone: (954) 767-8909
Fax: (954) 764-1530
brogow@rogowlaw.com
tcampion@rogowlaw.com
       *Admitted pro hac vice*

ROBERT C. BUSCHEL
BUSCHEL GIBBONS, P.A.
D.D.C. Bar No. FL0039
One Financial Plaza, Suite 1300
100 S.E. Third Avenue
Fort Lauderdale, FL 33394
Telephone: (954) 530-5301
Fax: (954) 320-6932
Buschel@BGlaw-pa.com

GRANT J. SMITH
STRATEGYSMITH, PA
D.D.C. Bar No.: FL0036
FL Bar No.: 935212
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
Telephone: (954) 328-9064
gsmith@strategysmith.com

CHANDLER P. ROUTMAN
D.D.C. Bar No. 1618092
501 East Las Olas Blvd., Suite 331

Fort Lauderdale, FL 33301
Tele: (954) 235-8259
routmanc@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 21, 2019, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or pro se parties, via transmission of Notices of Electronic Filing generated by CM/ECF.

                                              ___/s/ Chandler Routman_____
                                              Chandler P. Routman

*United States Attorney's Office for the District of Columbia*

Jessie K. Liu
**United States Attorney**
Jonathan Kravis
Michael J. Marando
**Assistant United States Attorneys**
Adam C. Jed
Aaron S.J. Zalinsky
**Special Assistant United States Attorneys**
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 252-6886
Fax: (202) 651-3393