## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Case No.: 1:19-CR-00018-ABJ

UNITED STATES OF AMERICA,

v.

ROGER J. STONE, JR.,

        Defendant.

_____

## <u>DEFENDANT ROGER STONE'S NOTICE OF SUPPLEMENTAL AUTHORITY</u>

Defendant Roger Stone brings to this Court's attention the May 24, 2019, ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PREMLINIARY INJUCTION, issued in *Sierra Club, et al. v. Donald J. Trump*, Case no: 4:19-69cv-00892, United States District Court for the Northern District of California. A copy of the Order is attached. This submission relates to the Appropriations Clause argument's made in Stone's Motion to Dismiss (Doc. 69) and Stone's Reply to Opposition to Motion to Dismiss (Doc. 110).

Respectfully submitted,

By: */s/*_____

L. PETER FARKAS                BRUCE S. ROGOW
HALLORAN FARKAS & KITTILA, LLP    FL Bar No.: 067999
DDC Bar No.: 99673              TARA A. CAMPION
1101 30th Street, NW             FL Bar: 90944
Suite 500                    BRUCE S. ROGOW, P.A.
                                 100 N.E. Third Avenue, Ste. 1000

Washington, DC 20007
Telephone: (202) 559-1700
Fax: (202) 257-2019
pf@hfk.law


ROBERT C. BUSCHEL
BUSCHEL GIBBONS, P.A.
D.D.C. Bar No. FL0039
One Financial Plaza, Suite 1300
100 S.E. Third Avenue
Fort Lauderdale, FL 33394
Telephone: (954) 530-5301
Fax: (954) 320-6932
Buschel@BGlaw-pa.com


CHANDLER P. ROUTMAN
D.D.C. Bar No. 1618092
1501 East Las Olas Blvd., Suite 331
Fort Lauderdale, FL 33301
Tele: 954-235-8259
routmanc@gmail.com

Fort Lauderdale, FL  33301
Telephone: (954) 767-8909
Fax: (954) 764-1530
brogow@rogowlaw.com
tcampion@rogowlaw.com
            *Admitted pro hac vice*


GRANT J. SMITH
STRATEGYSMITH, PA
D.D.C. Bar No.: FL0036
FL Bar No.: 935212
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
Telephone: (954) 328-9064
gsmith@strategysmith.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2019, I electronically filed the foregoing with the

Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all

counsel of record or pro se parties, via transmission of Notices of Electronic Filing generated by

CM/ECF.


                ___/s/ Chandler Routman_____
                     Chandler P. Routman

*United States Attorney's Office for the*
*District of Columbia*

Jessie K. Liu
**United States Attorney**
Jonathan Kravis
Michael J. Marando
**Assistant United States Attorneys**
Adam C. Jed
Aaron S.J. Zalinsky
**Special Assistant United States Attorneys**
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 252-6886
Fax: (202) 651-3393

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SIERRA CLUB, et al.,

　　　　　　Plaintiffs,

　　v.

DONALD J. TRUMP, et al.,

　　　　　　Defendants.

Case No. 19-cv-00892-HSG

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 29

On February 19, 2019, Sierra Club and Southern Border Communities Coalition ("SBCC") (collectively, "Citizen Group Plaintiffs" or "Citizen Groups") filed suit against Defendants Donald J. Trump, in his official capacity as President of the United States; Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense; Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security[1]; and Steven T. Mnuchin, in his official capacity as Secretary of the Department of the Treasury (collectively, "Federal Defendants").  Dkt. No. 1. This action followed a related suit brought by a coalition of states (collectively, "Plaintiff States" or "States") against the same—and more—Federal Defendants.  *See* Complaint, *California v. Trump*, No. 4:19-cv-00872-HSG (N.D. Cal. Feb. 18, 2019), ECF No. 1.  Plaintiffs here filed an amended complaint on March 18, 2019.  Dkt. No. 26 ("FAC").

Now pending before the Court is Plaintiffs' motion for a preliminary injunction, briefing for which is complete.  *See* Dkt. Nos. 29 ("Mot."), 64 ("Opp."), 91 ("Reply").  The Court held a hearing on this motion on May 17, 2019.  *See* Dkt. No. 138.  In short, Plaintiffs seek to prevent executive officers from using redirected federal funds for the construction of a barrier on the U.S.-

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Kirstjen M. Nielsen.  *See* Fed. R. Civ. P. 25(d).

Mexico border.

It is important at the outset for the Court to make clear what this case is, and is not, about. The case is not about whether the challenged border barrier construction plan is wise or unwise.  It is not about whether the plan is the right or wrong policy response to existing conditions at the southern border of the United States.  These policy questions are the subject of extensive, and often intense, differences of opinion, and this Court cannot and does not express any view as to them.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (indicating that the Supreme Court "express[ed] no view on the soundness of the policy" at issue there); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1102 (S.D. Cal. 2018) (noting that the court "cannot and does not consider whether underlying decisions to construct the border barriers are politically wise or prudent").  Instead, this case presents strictly legal questions regarding whether the proposed plan for funding border barrier construction exceeds the Executive Branch's lawful authority under the Constitution and a number of statutes duly enacted by Congress.  *See In re Aiken Cty.*, 725 F.3d 255, 257 (D.C. Cir. 2013) ("The underlying policy debate is not our concern. . . .  Our more modest task is to ensure, in justiciable cases, that agencies comply with the law as it has been set by Congress.").

Assessing whether Defendants' actions not only conform to the Framers' contemplated division of powers among co-equal branches of government but also comply with the mandates of Congress set forth in previously unconstrued statutes presents a Gordian knot of sorts.  But the federal courts' duty is to decide cases and controversies, and "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule."  *See Marbury v. Madison*, 1 Cranch 137, 177 (1803).  Rather than cut the proverbial knot, however, the Court aims to untie it—no small task given the number of overlapping legal issues.  And at this stage, the Court then must further decide whether Plaintiffs have met the standard for obtaining the extraordinary remedy of a preliminary injunction pending resolution of the case on the merits.

After carefully considering the parties' arguments, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

//

## I.     FACTUAL BACKGROUND

The President has long voiced support for a physical barrier between the United States and Mexico.  *See, e.g.*, Request for Judicial Notice, *California v. Trump*, No. 4:19-cv-00872-HSG (N.D. Cal. Apr. 8, 2019), ECF No. 59-4 ("States RJN") Ex. 3 (June 16, 2016 Presidential Announcement Speech) ("I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border.  And I will have Mexico pay for that wall.").[2]  Upon taking office in 2017, the President's administration repeatedly sought appropriations from Congress for border barrier construction. *See, e.g.*, *Budget of the U.S. Government: A New Foundation for American Greatness: Fiscal Year 2018*, Office of Mgmt. & Budget 18 (2017), https://www.whitehouse.gov/wp-content/uploads/2017/11/budget.pdf (requesting "$2.6 billion in high-priority tactical infrastructure and border security technology, including funding to plan, design, and construct a physical wall along the southern border").  Congress provided some funding, including $1.571 billion for fiscal year 2018.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) 132 Stat. 348 (2018).  And Congress considered several bills that, if passed, would have authorized or otherwise appropriated billions of dollars more for border barrier construction.  *See* States RJN Exs. 14–20.  None passed.

In December 2018—as Congress and the President were negotiating an appropriations bill to fund various federal departments for what remained of the fiscal year—the President announced that he would not sign any funding legislation that lacked substantial funds for border barrier construction.  *Farm Bill Signing*, C-SPAN (Dec. 20, 2018), https://www.c-

---

[2] Defendants do not oppose the Plaintiff States' request to take judicial notice of various documents.  The Court finds it may take judicial notice of documents from Plaintiff States' request that are cited in this order, all of which are: (1) statements of government officials or entities that are not subject to reasonable dispute; (2) bills considered by Congress or other legislative history; or (3) other public records and government documents available on reliable internet sources, such as government websites.  *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking "judicial notice of government documents, court filings, press releases, and undisputed matters of public record"); *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir. 2017) (taking judicial notice of President's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice.").

United States District Court
Northern District of California

span.org/video/?456189-1/president-government-funding-bill-include-money-border-wall ("I've made my position very clear.  Any measure that funds the government must include border security. . . .  Walls work whether we like it or not.  They work better than anything.").  Congress did not pass a bill with the President's desired border barrier funding and, due to this impasse, the United States entered into the nation's longest partial government shutdown.

The President and those in his administration stated on several occasions before, during, and after the shutdown that, although Congress should make the requisite funds available for border barrier construction, the President was willing to use a national emergency declaration and other reprogramming mechanisms as funding backstops.  For example, during a December 11, 2018 meeting with congressional representatives, the President stated that "if we don't get what we want [for border barrier construction funding], one way or the other – whether it's through [Congress], through a military, through anything you want to call [sic] – I will shut down the government.  Absolutely."  States RJN Ex. 21.  The White House initially requested only $1.6 billion for border barrier construction for the fiscal year 2019 budget, for sixty-five miles of border barrier construction "in south Texas."  *See* Supplemental Request for Judicial Notice, *California v. Trump*, No. 4:19-cv-00872-HSG (N.D. Cal. Apr. 8, 2019), ECF No. 112-1, Ex. 51, at 58.  However, the White House increased its request on January 6, 2019, when the Acting Director of the Office of Management and Budget transmitted a letter to the U.S. Senate Committee on Appropriations, "request[ing] $5.7 billion for construction of a steel barrier for the Southwest border," and explaining that the request "would fund construction of a total of approximately 234 miles of new physical barrier."  *See* Dkt. No. 36 ("Citizen Groups RJN") Ex. A, at 1.[3]  The increased request specified that "[a]ppropriations bills for fiscal year (FY) 2019 that have already been considered by the current and previous Congresses are inadequate to fully address these critical issues," including the need for border barrier construction funds.  *Id.*  Days later, the President explained:  "If we declare a national emergency, we have a tremendous amount of funds

---

[3] The Court takes judicial notice of documents submitted by the Citizen Group Plaintiffs, consideration of which Defendants do not oppose, and the accuracy of the contents of which similarly "cannot be questioned."  *See* discussion *supra* note 2.

United States District Court
Northern District of California

1   – tremendous – if we want to do that, if we want to go that route. Again, there is no reason why

2   we can't come to a deal. . . . [Congress] could stop this problem in 15 minutes if they wanted to."

3   States RJN Ex. 13.

4        After the government shutdown ended, the President and others in his administration

5   reaffirmed their intent to fund a border barrier, with or without Congress's blessing. On February

6   9, 2019, the President explained that even if Congress provided less than the requested funding for

7   a border barrier, the barrier "[would] get built one way or the other!" Citizen Groups RJN Ex. C.

8   The next day, the Acting White House Chief of Staff explained that the Administration intended to

9   accept whatever funding Congress would offer and then use other measures to reach the

10  President's desired funding level for border barrier construction:

11
12
13
14

> The President is going to build a wall. You saw what the Vice-President said there, and that's our attitude at this point, which is: We'll take as much money as you can give us, and then we'll go off and find the money someplace else, legally, in order to secure that southern barrier. But this is going to get built, with or without Congress.

15  *See* Fox News, *Mick Mulvaney on chances of border deal, Democrats ramping up investigation of*

16  *Trump admin*, YouTube (Feb. 10, 2019), https://www.youtube.com/watch?v=l_Z0xx_zS0M. He

17  went on to detail that the Administration was prepared to both reprogram money and declare a

18  national emergency to unlock funds:

19
20
21
22
23

> There are other funds of money that are available to [the President] through what we call reprogramming. There is money that he can get at and is legally allowed to spend, and I think it -- needs to be said again and again that all of this is going to be legal. There are statutes on the books as to how any President can do this. . . . There are certain funds of money that he can get to without declaring a national emergency and other funds that he can only get to after declaring a national emergency.

24  *Id.* All told, the "whole pot" of such funds was "well north of $5.7 billion." *Id.* And with respect

25  to a national emergency declaration in particular, the Acting White House Chief of Staff

26  explained: "The President doesn't want to do it. . . . He would prefer legislation because that's

27  the right way to go, and it's the proper way to spend money in this country." *Id.*

28        On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019

United States District Court
Northern District of California

("CAA"), Pub. L. No. 116-6, 133 Stat. 13 (2019).  The CAA consolidated separate appropriations

acts related to different federal agencies into one bill, including for present purposes the DHS

Appropriations Act for Fiscal Year 2019.  *See id.*, div. A.  The CAA made available $1.375

billion—less than one quarter of the $5.7 billion sought by the President—"for the construction of

primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."

*Id.* § 230(a)(1), 133 Stat. at 28.  Congress limited the use of these funds both as to the type of

pedestrian fencing—only "operationally effective designs deployed as of the date of the

Consolidated Appropriations Act, 2017 . . . such as currently deployed steel bollard designs"—and

geographically—no funds were available for construction within (1) the Santa Ana Wildlife

Refuge, (2) the Bentsen-Rio Grande Valley State Park, (3) La Lomita Historical park, (4) the

National Butterfly Center, or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio

Grande Valley National Wildlife Refuge.  *Id.* §§ 230(b), 231, 133 Stat. at 28.  The CAA further

imposed notice and comment requirements prior to the use of any funds for the construction of

barriers within certain city limits.  *Id.* § 232, 133 Stat. at 28–29.  Section 739 of the CAA

provided:

> None of the funds made available in this or any other appropriations
> Act may be used to increase, eliminate, or reduce funding for a
> program, project, or activity as proposed in the President's budget
> request for a fiscal year until such proposed change is subsequently
> enacted in an appropriation Act, or unless such change is made
> pursuant to the reprogramming or transfer provisions of this or any
> other appropriations Act.

*Id.* § 739, 133 Stat. at 197.

On February 15, 2019, the President not only signed the CAA into law but also issued a

proclamation "declar[ing] that a national emergency exists at the southern border of the United

States."  Proclamation No. 9844, 84 Fed. Reg. 4,949 (Feb. 15, 2019).  In announcing the national

emergency declaration, the President declared that although he "went through Congress" for the

$1.375 billion in funding, he was "not happy with it."  States RJN Ex. 50.  The President added: "I

could do the wall over a longer period of time.  I didn't need to do this.  But I'd rather do it much

faster. . . .  And I think that I just want to get it done faster, that's all."  *Id.*

The proclamation itself provided:

United States District Court
Northern District of California

> The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency. The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate. In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and resources to the Department of Homeland Security at the southern border. Because of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis.

Proclamation No. 9844, 84 Fed. Reg. 4,949. The proclamation then invoked and made available to relevant Department of Defense ("DoD") personnel two statutory authorities. First, the proclamation made available the authority to "order any unit, and any member not assigned to a unit organized to serve as a unit, in the Ready Reserve . . . to active duty for not more than 24 consecutive months," under 10 U.S.C. § 12302. *Id.* Second, the proclamation made available "the construction authority provided in [10 U.S.C. § 2808]." *Id.* As is necessary to invoke Section 2808, the proclamation "declar[ed] that this emergency requires use of the Armed Forces." *Id.*; *see also* 10 U.S.C. § 2808(a) (limiting construction authority to presidential declarations "that require[] use of the armed forces").

As additional information regarding the national emergency declaration, the White House simultaneously issued a "fact sheet[]," which explained that "the Administration [had] so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared." Citizen Groups RJN Ex. G. The White House specifically identified three funding sources, purportedly to be used sequentially:

- "About $601 million from the Treasury Forfeiture Fund" ("TFF");

- "Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities" (10 U.S.C. § 284) ("Section 284"); and

United States District Court
Northern District of California

- "Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency" (10 U.S.C. § 2808) ("Section 2808").

*Id.*

In declaring a national emergency, the President invoked his authority under the National Emergencies Act ("NEA"), Pub. L. 94–412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651). This appears to have been the first time in American history that a President declared a national emergency to secure funding previously withheld by Congress. As another historical first, Congress passed a joint resolution to terminate the President's declaration of a national emergency. *See* H.R.J. Res. 46, 116th Cong. (2019). The President vetoed Congress's joint resolution on March 15, 2019.[4] *See Veto Message to the House of Representatives for H.J. Res. 46*, The White House (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/veto-message-house-representatives-h-j-res-46/. The House voted 248-181 to override the President's veto, which fell short of the required two-thirds majority. 165 Cong. Rec. 2,799, 2,814–15 (2019).

Following the President's national emergency declaration, executive officers reaffirmed what the President and his administration had been saying for months: the Administration was content to first request border barrier construction funding from Congress, and then augment whatever they received with funds from alternative sources. Then-Secretary of Homeland Security Nielsen described this mindset on March 6, 2019, while testifying before the House Homeland Security Committee: "[The President] hoped Congress would act, that it didn't have to come to issuing an emergency declaration, if Congress had met his request to fund the resources that [U.S. Customs and Border Protection ("CBP")] has requested." *3/6/2019 Nielsen Testimony*, C-SPAN (Mar. 6, 2019), https://www.c-span.org/video/?c4787939/362019-nielsen-testimony.

Since the national emergency declaration, Defendants have taken significant steps toward using the funds at issue in this motion for border barrier construction. On February 15, 2019, the

---

[4] As described below, the Congress that passed the NEA did not contemplate the possibility of a presidential veto.

United States District Court
Northern District of California

1    Treasury approved a request from the Department of Homeland Security ("DHS") to make

2    available up to $601 million from the Treasury Forfeiture Fund, which Defendants "intend[] to

3    obligate . . . before the end of Fiscal Year 2019."  *See* Case No. 4:19-cv-00872-HSG, ECF No. 89-

4    8 ("Flossman Second Decl.") ¶¶ 9, 11.  On February 25, 2019, DHS submitted a request to DoD

5    for assistance blocking drug-smuggling corridors under Section 284.  *See* Dkt. No. 64-8

6    ("Rapuano Decl.") ¶ 3; States RJN Ex. 33.  And on March 25, 2019, in response to DHS's request,

7    the Acting Secretary of Defense—Defendant Shanahan—approved the diversion of funds from

8    DoD's counter-narcotics support budget for three "drug-smuggling corridors" identified by DHS:

9    one located in New Mexico—El Paso Project 1—and two located in Arizona—Yuma Sector

10   Projects 1–2.[5]  Rapuano Decl. ¶¶ 4, 7–9.  Construction related to these projects may begin as soon

11   as May 25, 2019.  *See id.* ¶ 10 (providing that construction "will begin no earlier than May 25,

12   2019").

13        To fund the Section 284 diversion, Defendant Shanahan simultaneously invoked Section

14   8005 of the most-recent DoD appropriations act to "reprogram" $1 billion from Army personnel

15   funds to the counter-narcotics support budget.  *See id.* ¶ 5; States RJN Ex. 34; *see also* Department

16   of Defense Appropriations Act, 2019, Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999 (2018).

17   Defendant Shanahan also formally notified Congress of the authorization, explaining that

18   reprogrammed funds under Section 8005 were "required" so that DoD could provide DHS the

19   support it requested under Section 284.  States RJN Ex. 32, at 1; *see also id.* Ex. 33, at 2 (DHS's

20   February 25, 2019 request for support under Section 284).

21        The next day, Defendant Shanahan appeared before the House Armed Services Committee

22   to testify in support of the President's budget request for fiscal year 2020.  *See* Case No. 4:19-cv-

23   00872-HSG, ECF No. 89-12.  The Committee Chairman asked Defendant Shanahan why DoD did

24   not first seek approval from relevant congressional committees before reprogramming funds under

25   Section 8005, as would have been consistent with a "gentlemen's agreement[]" between Congress

26

27   _____

     [5] Defendants have since elected not to fund or construct Yuma Project 2 using funds
28   reprogrammed or diverted under Sections 8005 or 284.  *See* Dkt. No. 118-1 ("Rapuano Second
     Decl.") ¶ 4.

United States District Court
Northern District of California

and the Executive. *Id.* at 13 ("But one of the sort of gentlemen's agreements about [giving reprogramming authority for up to $4 billion last year] was if you reprogram money, you will not do it without first getting the approval of all for [sic] relevant committees . . . . For the first time since we've [given such reprogramming authority] . . . . you are not asking for our permission."). The Chairman noted that "the result of" ignoring the gentlemen's agreement likely would be Congress declining to provide such broad reprogramming authority in the future. *Id.* Defendant Shanahan conceded that "discretionary reprogramming" was "traditionally done in coordination" with Congress, but explained that the Administration discussed unilateral reprogramming "prior to the declaration of a national emergency," recognized "the significant downsides of the [sic] losing what amounts to a privilege," and nonetheless decided to move forward with unilaterally reprogramming funds despite that risk. *Id.* at 14. The same day as the hearing, both the House Committee on Armed Services and the House Committee on Appropriations formally disapproved of the Section 8005 reprogramming. *See* States RJN Ex. 35 ("The committee denies this request. The committee does not approve the proposed use of [DoD] funds to construct additional physical barriers and roads or install lighting in the vicinity of the United States border."); *id.* Ex. 36 ("The Committee has received and reviewed the requested reprogramming action . . . . The Committee denies the request.").

On April 24, 2019, Defendant McAleenan, the Acting Secretary of Homeland Security, published in the Federal Register notices of determination concerning the "construction of barriers and roads in the vicinity of the international land border in Luna County, New Mexico and Doña Ana County, New Mexico," and "in Yuma County, Arizona"—in other words, areas encompassed by the El Paso Sector and Yuma Sector Projects. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 17,185, 17,186 (Apr. 24, 2019); Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 17,187 (Apr. 24, 2019). The Acting Secretary invoked his authority under Section 102(c) of the

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")[6] "to waive all legal requirements that [he], in [his] sole discretion, determine[d] necessary to ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA." *See, e.g.*, 84 Fed. Reg. at 17,186. The waiver asserts that "areas in the vicinity of the United States border, located in [these regions], are areas of high illegal entry," for which "[t]here is presently an acute and immediate need to construct physical barriers and roads." *See id.* The designated "Project Areas" encompass all portions of New Mexico and Arizona for which Defendants presently intend to construct physical barriers. Finding this action "necessary," the Acting Secretary invoked Section 102(c) to waive "in their entirety" numerous federal laws—including the National Environmental Policy Act ("NEPA"), Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. §§ 4321–4370b)—"with respect to the construction of physical barriers and roads . . . in the project area[s]." *See id.*

On May 8, 2019, Defendant Shanahan, appearing before the Senate Defense Appropriations Subcommittee, testified: "We now have on contract sufficient funds to build about 256 miles of barrier," explaining that this funding derived in part from "treasury forfeiture funds, as well as reprogramming." *Acting Defense Secretary Shanahan Testifies on 2020 Budget Request*, C-SPAN (May 8, 2019), https://www.c-span.org/video/?460437-1/acting-defense-secretary-shanahan-testifies-2020-budget-request. Defendant Shanahan estimated that "sixty-three new miles will come online" from these contracts in the next six months, or "half a mile a day." *Id.* The same day, DoD reported selecting twelve companies to compete for up to $5 billion worth of border barrier construction contracts. Contracts for May 8, 2019, U.S. Dep't of Def. (May 8, 2019), https://dod.defense.gov/News/Contracts/Contract-View/Article/1842189/.

The next day, Defendant Shanahan authorized an additional $1.5 billion in funding for border barrier construction, in further response to DHS's February 25, 2019 request for support

---

[6] Pub. L. No. 104–208, div. C, 110 Stat. 3009, 3009–554 (Sept. 30, 1996), as amended by the REAL ID Act of 2005, Pub. L. No. 109–13, div. B, 119 Stat. 231, 302, 306 (May 11, 2005), as amended by the Secure Fence Act of 2006, Pub. L. No. 109–367, § 3, 120 Stat. 2638, 2638–39 (Oct. 26, 2006), as amended by the Department of Homeland Security Appropriations Act, 2008, Pub. L. No. 110–161, div. E, tit. V, § 564, 121 Stat. 1844, 2090–91 (Dec. 26, 2007).

United States District Court
Northern District of California

1  under Section 284, for four projects:  one located in California—El Centro Project 1—and three

2  located in Arizona—Tucson Sector Projects 1–3.  *See* Rapuano Second Decl. ¶ 6; *see also*

3  Rapuano Decl. Ex. A, at 3, 6–7 (describing project locations).  To fund these projects, Defendant

4  Shanahan again invoked Section 8005, "as well as DoD's special transfer authority under section

5  9002 of the Department of Defense Appropriations Act, 2019, and section 1512 of the John S.

6  McCain National Defense Authorization Act for Fiscal Year 2019."[7]  Rapuano Second Decl. ¶ 7.

7  Defendants anticipate that construction will begin with these funds as early as July 2019.  *Id.*

8  ¶¶ 10–11 (noting Defendants' expectation of awarding contracts by May 16, 2019, forty-five days

9  after which construction may begin).  And on May 15, 2019, Defendant McAleenan issued NEPA

10  waivers for the El Centro Sector and Tucson Sector Projects.  *See* Determination Pursuant to

11  Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as

12  Amended, 84 Fed. Reg. 21,798 (May 15, 2019) (waiving NEPA requirements for Tucson Sector

13  Projects); Determination Pursuant to Section 102 of the Illegal Immigration Reform and

14  Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 21,800 (May 15, 2019)

15  (waiving NEPA requirements for El Centro Sector Project).

16       At the hearing on this motion, the parties agreed that the Court need not yet address the

17  lawfulness of Defendants' newly announced reprogramming and subsequent diversion of funds for

18  border barrier construction in the El Centro Sector and Tucson Sector Projects, pending further

19  development of the record as to those projects.

20  //

21  //

22  //

23  //

24

25  _____

26  [7] Defendants' Section 9002 authority is, at a minimum, subject to Section 8005's limitations.  *See* Department of Defense Appropriations Act, 2019, Pub. L. No. 115-245, § 9002, 132 Stat. 2981, 3042 (2018) (providing that "the authority provided in this section is in addition to any other

27  transfer authority available to the Department of Defense and is subject to the same terms and conditions as the authority provided in section 8005 of this Act"); *see also* Dkt. No. 131, at 4

28  (acknowledging that Section 9002 "incorporates the requirements of [Section] 8005 by reference").

## II.      STATUTORY FRAMEWORK

### A.      The National Emergencies Act

In 1976, Congress enacted the National Emergencies Act "to insure that the exercise of national emergency authority is responsible, appropriate, and timely." Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies & Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act (Public Law 94–412) Source Book: Legislative History, Texts, and Other Documents, at 1 (1976) ("NEA Source Book"). The NEA rescinded several existing national emergencies, repealed many statutes, and created procedural guidelines for congressional oversight over future presidents' declarations of national emergencies.

The NEA first permits that after "specifically declar[ing] a national emergency," the president may exercise emergency powers authorized by Congress in other federal statutes. 50 U.S.C. § 1621. To exercise any statutory emergency power, the president must first specify the power or authority under which the president or other officers will act, "either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders published in the Federal Register and transmitted to the Congress." *Id.* § 1631.

Section 1622 then establishes a procedure for Congress to terminate any declared national emergency through a joint resolution.[8] As initially drafted, Congress meant for the joint resolution to terminate the declared national emergency by itself—the NEA did not require a presidential signature on the joint resolution, nor was it subject to a presidential veto. In part because Congress had power under the NEA to terminate national emergencies with a simple majority in both houses, Congress neither defined the term "national emergency," nor "ma[de] any attempt to define when a declaration of national emergency is proper." NEA Source Book at 9, 278–92. In rejecting a proposed amendment to the NEA that would have "spelled out" for the executive what may constitute a national emergency, the House of Representatives observed the "impossibility" of future presidents vetoing any joint resolution. *Id.* at 279–80. House members there observed:

---

[8] The initial version of the NEA referred to a "concurrent resolution." That language was changed to "joint resolution" in 1985. *See* Foreign Relations Authorization Act, "22 USC 2651 note" Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801(1)(A), 99 Stat. 405, 448 (1985). For simplicity's sake, the Court only uses the term "joint resolution," as the statute now reads.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Mr. Conyers. . . .  Mr. Chairman, my final participation in this debate revolves around the reason of this question:  What happens if the President of the United States vetoes the congressional termination of the emergency power?  Is that contemplatable within the purview of this legislation?
>
> . . .
>
> Mr. Flowers.  Mr. Chairman, on the advice of counsel we have researched that thoroughly.  A concurrent resolution would not require Presidential signature of acceptance.  It would be an impossibility that it would be vetoed.
>
> Mr. Conyers.  So there would be no way that the President could interfere with the Congress?
>
> Mr. Flowers.  The gentleman is correct.

*Id.*

Congress's unilateral power under the NEA to terminate national emergency declarations ended in 1983, when the Supreme Court in *INS v. Chadha* ruled that the president must have power to approve or veto congressional acts, such as a terminating joint resolution under the NEA. *See* 462 U.S. 919 (1983).  Two years later, Congress amended the NEA to reflect that the joint resolution must be "enacted into law" to terminate an emergency, thereby rendering the NEA *Chadha*-compliant.  *See* Pub. L. No. 99-93, § 801(1)(A), 99 Stat. 405, 448 (1985).

By some estimates, there are 123 statutory powers available to a president who declares a national emergency.  *See A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Justice (2019), www.brennancenter.org/sites/default/files/legislation/Emergency%20Powers_Printv2.pdf. And in the more than forty years since Congress enacted the NEA, presidents have declared almost sixty national emergencies.  *See Declared National Emergencies Under the National Emergencies Act, 1978-2018*, Brennan Ctr. for Justice (2019), www.brennancenter.org/sites/default/files/analysis/NEA%20Declarations.pdf.

Until now, Congress had never invoked its emergency termination powers.

## B.    Section 284

Under Section 284, "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if "such support is requested . . . by the official who has responsibility for [such] counterdrug activities."  10 U.S.C.

§ 284(a), (a)(1)(A).  Section 284 defines permissible "[t]ypes of support" under the statute, including support for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(b)(7).  The statute also mandates congressional notification before the Secretary of Defense provides certain—but not all—types of support.  *Id.* § 284(h).  For one, Section 284 requires the Secretary of Defense to submit to the appropriate congressional committee "a description of any small scale construction project for which support is provided."  *Id.* § 284(h)(1)(B).  Section 284 defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project."  *Id.* § 284(i)(3).

Congress first provided DoD with authority to support such counterdrug activities in 1991, in what is commonly referred to as "Section 1004."  *See* National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 1004, 104 Stat. 1485, 1629–30 (1990).  The initial iteration of Section 1004 made available $50 million in funds for fiscal year 1991 alone, and contained no congressional notification requirement or per-project cap on the provision of support.  *Id.* § 1004(g), 104 Stat. at 1630.  Congress subsequently renewed Section 1004 on a regular basis.[9] Congress ultimately codified Section 1004 at 10 U.S.C. § 284 in 2016.  *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1011(a)(1), 130 Stat. 2000, 2381 (2016), *renumbered § 284 by id.* § 1241(a)(2), 130 Stat. at 2497.

---

[9] Congress extended the provision of funds under Section 1004 on eight occasions, the last of which provided funds through fiscal year 2017.  *See* National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-190, § 1088(a), 105 Stat. 1290, 1484 (1991) (extending funding through fiscal year 1993); National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 1121, 107 Stat. 1547, 1753–54 (1993) (extending funding through fiscal year 1995); National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, § 1011, 108 Stat. 2663, 2836–37 (1994) (extending funding through fiscal year 1999); Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261, § 1021, 112 Stat. 1920, 2120 (1998) (extending funding through fiscal year 2002); National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 1021, 115 Stat. 1012, 1212–15 (2001) (extending funding through fiscal year 2006); John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 1021, 120 Stat. 2083, 2382 (2006) (extending funding through fiscal year 2011); National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1005, 125 Stat. 1298, 1556–57 (2011) (extending funding through fiscal year 2014); Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 1012, 128 Stat. 3292, 3483–84 (2014) (extending funding through fiscal year 2017).

United States District Court
Northern District of California

In fiscal year 2019, Congress appropriated $881 million in funds to DoD "[f]or drug interdiction and counter-drug activities," $517 million of which was "for counter-narcotics support." *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit. VI, 132 Stat. 2981, 2997 (2018). All funds DoD now purports to make available for support to DHS under Section 284 come from the counter-narcotics support line of appropriation, out of what is known as the "drug interdiction fund." Rapuano Decl. ¶ 5, Ex. D. But when Secretary Shanahan first authorized support to DHS under Section 284 on March 25, 2019, the counter-narcotics support line only contained $238,306,000 in unobligated funds. *See* Dkt. No. 131 at 4 (citing Rapuano Decl. ¶ 5, Ex. D, at 2). Therefore, although DoD seeks to make available $2.5 billion in support to DHS "under Section 284," Defendants have not used—and do not intend to use in the near future—any of the counter-narcotics support funds appropriated by Congress in fiscal year 2019 for border barrier construction. *Id.* (noting that all $2.5 billion in border barrier construction support to DHS under Section 284 is attributable to Section 8005 and 9002 reprogramming). In other words, every dollar of Section 284 support to DHS and its enforcement agency, CBP, is attributable to reprogramming mechanisms.

DoD's provision of support under Section 284 does not require a national emergency declaration.

### C. Section 8005

"An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." 31 U.S.C. § 1532. Section 8005 of the fiscal year 2019 Department of Defense Appropriations Act authorizes the Secretary of Defense to transfer up to $4 billion "of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction)." § 8005, 132 Stat. at 2999. The Secretary must first determine that "such action is necessary in the national interest." *Id.* Section 8005 further provides that such authority to transfer may only be used (1) for higher priority items than those for which originally appropriated, and (2) based on unforeseen military requirements, but (3) in no case where the item

16

for which funds are requested has been denied by the Congress.[10]  *Id.*

DoD's Section 8005 transfer authority has existed in largely the same form since at least fiscal year 1974.  *See* Department of Defense Appropriation Act, 1974, Pub. L. No. 93-238, § 735, 87 Stat. 1026, 1044 (1974).  That year, Congress added the "denied by Congress" provision "to tighten congressional control of the reprogramming process," and in response to incidents where "[DoD] [had] requested that funds which have been specifically deleted in the legislative process be restored through the reprogramming process."  H.R. Rep. No. 93-662, at 16 (1973).  The House Committee on Appropriations "believ[ed] that to concur in such actions would place committees in the position of undoing the work of the Congress," and that "henceforth no such requests will be entertained."  *Id.*

On February 25, 2019, DHS submitted a request to DoD for assistance blocking drug-smuggling corridors under Section 284.  *See* Rapuano Decl. ¶ 3; States RJN Ex. 33.  And on March 25, 2019, DoD invoked Section 8005 to transfer $1 billion from funds Congress previously appropriated for military personnel costs to the drug interdiction fund, which DoD then intends to use to provide DHS's requested "assistance" by constructing border barriers using its Section 284 authority.  *See* Rapuano Decl. ¶ 5, Ex. D.  Despite the recent dispute between the President and Congress over funding for border barrier construction, and although the President had directed DoD nearly a year prior to support DHS "in securing the southern border and taking other necessary actions," including the provision of "military personnel," Federal Defendants purported to invoke Section 8005 "based on unforeseen military requirements."  *Id.*; *see also* States RJN Ex. 27 (April 4, 2018 presidential memorandum).  On May 9, 2019, Defendants invoked Section 8005 and a related reprogramming provision to authorize the transfer of an additional $1.5 billion in funding into the drug interdiction fund, which then is slated to be used under Section 284 for border barrier construction.  *See* Rapuano Second Decl. ¶¶ 6–7, Ex. C.

The reprogramming of funds under Section 8005 does not require a national emergency declaration.

---

[10] 10 U.S.C. § 2214(b) contains identical transfer authority.

### D.      Section 2808

Under Section 2808, the Secretary of Defense "may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law." 10 U.S.C. § 2808(a).  Section 2808 requires that the President first declare a national emergency under the NEA "that requires use of the armed forces."  *Id.*  And the Secretary of Defense must use the funds for "military construction projects . . . that are necessary to support such use of the armed forces."  *Id.*

Congress defined the term "military construction" as it is used in Section 2808 to "include[] any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)." 10 U.S.C. § 2801(a).  And Congress defined the term "military installation" to "mean[] a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control."  *Id.* § 2801(c)(4).

Presidents have twice invoked Section 2808's military construction authority.  In 1990, President George H.W. Bush authorized emergency construction authority "to deal with the threat to the national security and foreign policy of the United States caused by the invasion of Kuwait by Iraq."  Exec. Order No. 12,734, 55 Fed. Reg, 48,099 (Nov. 14, 1990).  President George W. Bush later authorized emergency construction authority in the aftermath of the September 11, 2001 terrorist attacks.  Exec. Order. No. 13,235, 66 Fed. Reg. 58,343 (Nov. 16, 2001).  To date, DoD has only once used its Section 2808 military construction authority domestically, when it authorized $35 million in funds to secure weapons of mass destruction in five states.  *See* Michael J. Vassalotti, Brendan W. McGarry, *Military Construction Funding in the Event of a National Emergency*, Cong. Research Serv. 2 & tbl. 1 (January 11, 2019).

According to Defendants, the Acting Secretary of Defense "has not yet decided to undertake or authorize any barrier construction projects under section 2808."  Rapuano Decl. ¶ 14.

18

1    DoD undertook an internal review process, to identify "existing military construction projects of

2    sufficient value to provide up to $3.6 billion of funding." *Id.* ¶ 15.  The review process identified

3    such funding for border barrier construction, but the Acting Secretary nevertheless "has taken no

4    action on this information and has not yet decided to undertake or authorize any barrier

5    construction projects under section 2808."  *See* Dkt. No. 131-2 ("Rapuano Third Decl.") ¶ 6.

6    Defendants have represented that they "will inform the Court" once a decision is made to use

7    Section 2808 to fund border barrier construction.  *See* Dkt. No. 131 at 3.

8         **E.    Treasury Forfeiture Fund (Section 9705)**

9         Through 31 U.S.C. § 9705, Congress established in the Treasury of the United States a

10   separate fund known as the "Department of the Treasury Forfeiture Fund."  31 U.S.C. § 9705(a).

11   Funds are generally available to the Secretary of the Treasury "with respect to seizures and

12   forfeitures made pursuant to [applicable] law," and for certain "law enforcement purposes."  *Id.*

13   State and local law enforcement agencies that participate in the seizure or forfeiture of property

14   may receive "[e]quitable sharing payments."  *Id.* § 9705(a)(1)(G).  Section 9705(a)(1)(G) details

15   three statutory avenues for the provision of such equitable sharing payments:  "Equitable sharing

16   payments made to other Federal agencies, State and local law enforcement agencies, and foreign

17   countries pursuant to section 616(c) of the Tariff Act of 1930 (19 U.S.C. 1616a(c)), section 981 of

18   title 18, or subsection (h) of this section, and all costs related thereto."  Equitable sharing

19   payments are statutorily capped, however, by the value of seized property.  31 U.S.C.

20   § 9705(b)(2).  After the TFF has accounted for not only the current fiscal year's mandatory

21   expenses—which include equitable sharing payments—but also set aside adequate funds for the

22   following fiscal year's mandatory expenses, unobligated balances are available to the Secretary of

23   the Treasury, to be used "in connection with the law enforcement activities of any Federal

24   agency."  31 U.S.C. § 9705(g)(4)(B).  This is commonly referred to as "Strategic Support."  *See*

25   Case No. 4:19-cv-00872-HSG, ECF No. 89-9 ("Farley Decl.") ¶ 11.

26         In late December 2018[11]—during the government shutdown and just before the

27   ───────────────

28   [11] The exact date of the request is unclear due to Defendants' inconsistent representations.
     *Compare* Flossman Second Decl. ¶ 9 (indicating the request was made on December 26, 2018),

United States District Court
Northern District of California

Administration sought $5.7 billion from Congress to fund border barrier construction—DHS requested $681 million in Strategic Support funding "for border security." *Id.* ¶ 24; *see also* States RJN Ex. 25 (January 6, 2019 request for $5.7 billion in funding for border barrier construction). The Treasury ultimately determined that it could make available to CBP, DHS's enforcement agency, up to $601 million from the TFF, in two tranches. Farley Decl. ¶¶ 24–25; Opp. at 9. The first tranche—$242 million—was made available for obligation on March 14, 2019. *See* Opp. at 9. Save for a small portion "for program support on the TFF funded projects," CBP intends to obligate the first tranche "on an Interagency Agreement (IAA) with the U.S. Army Corps of Engineers . . . by June 2019." Dkt. No. 131-1 ("Flossman Third Decl.") ¶ 4. Defendants represent that "CBP intends to obligate all available TFF funds before the end of Fiscal Year 2019 or, if not, before the end of the 2019 calendar year." Flossman Second Decl. ¶ 11. The second tranche—$359 million—"is expected to be made available for obligation at a later date upon Treasury's receipt of additional anticipated forfeitures." *See* Opp. at 9. CBP intends to use funds from the TFF "exclusively for projects in the Rio Grande Valley Sector," in Texas. *See* Flossman Third Decl. ¶ 5.

The Secretary of Treasury's use of funds in the TFF for Strategic Support does not require a national emergency declaration.

### F. National Environmental Policy Act

NEPA establishes a "national policy which will encourage productive and enjoyable harmony between man and his environment[,] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To this end, NEPA compels federal agencies to assess the environmental impact of agency actions that "significantly affect[ ] the quality of the human environment." *Id.* § 4332(C). NEPA

> serves two fundamental objectives. First, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." And, second, it requires "that the relevant information will

*with* Farley Decl. ¶ 24 (indicating the request was made on December 29, 2018).

United States District Court
Northern District of California

be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*WildEarth Guardians v. Provencio*, No. 17-17373, 2019 WL 1983455, at *7 (9th Cir. May 6, 2019) (quoting *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015)). NEPA does not establish substantive environmental standards; rather, it sets "action-forcing" procedures that compel agencies to take a "hard look" at environmental consequences. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–50 (1989). "NEPA's purpose is to ensure that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)). And the Ninth Circuit commands that courts "strictly interpret" NEPA's procedural requirements "to the fullest extent possible," as consistent with NEPA's policies. *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (quoting *Lathan v. Brinegar*, 506 F.2d 677, 687 (9th Cir. 1974) (en banc)). "[G]rudging, pro forma compliance will not do." *Id.* (quoting *Lathan*, 506 F.2d at 693).

Where an agency's project "*might* significantly affect environmental quality," NEPA compels preparation of what is known as an Environmental Impact Statement ("EIS"). *Provencio*, 2019 WL 1983455, at *7 (emphasis added). To prevail on a claim that an agency violated its duty to prepare an EIS, a plaintiff need only raise "substantial questions whether a project may have a significant [environmental] effect." *Id.* (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). An action's "significance" depends on "both context and intensity." 40 C.F.R. § 1508.27; *see also id.* § 1508.27(b) (setting forth ten factors to "consider[] in evaluating intensity"). Even where a project does not require an EIS, agencies generally must prepare an Environmental Assessment ("EA") which, in part, serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *See* 40 C.F.R. § 1508.9(a)(1).

"[A]gency action taken without observance of the procedure required by law will be set aside." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

//

United States District Court
Northern District of California

## III.    LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Id.* at 20.  Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted).  Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  The most important *Winter* factor is likelihood of success on the merits.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

## IV.    ANALYSIS

In the pending motion, Plaintiffs seek to enjoin Defendants from using certain diverted federal funds and resources for border barrier construction.  Specifically, Plaintiffs move to enjoin Defendants from (1) invoking Section 8005's reprogramming authority to channel funds into DoD's drug interdiction fund, (2) invoking Section 284 to divert monies from DoD's drug interdiction fund for border barrier construction on the southern border of Arizona and New Mexico, (3) invoking Section 2808 to divert monies from appropriated DoD military construction projects for border barrier construction,[12] and (4) taking any further action related to border barrier construction until Defendants comply with NEPA.

Defendants oppose each basis for injunctive relief.  Defendants further contend that the Plaintiffs lack standing to bring their Sections 8005 and 2808 claims.  The Court addresses these

---

[12] Only the Citizen Group Plaintiffs challenge the diversion of funds under Section 2808.

United States District Court
Northern District of California

1  threshold issues first before turning to Plaintiffs' individual bases for injunctive relief.

2  **A.     Article III Standing**

3  A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible

4  constitutional minimum" of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

5  (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  First, the plaintiff must have

6  "suffered an injury in fact."  *Id.*  This requires "an invasion of a legally protected interest" that is

7  concrete, particularized, and actual or imminent, rather than conjectural or hypothetical.  *Lujan*,

8  504 U.S. at 560 (internal quotation marks omitted).  Second, the plaintiff's injury must be "fairly

9  traceable to the challenged conduct of the defendant."  *Spokeo*, 136 S. Ct. at 1547.  Third, the

10  injury must be "likely to be redressed by a favorable judicial decision."  *Id.* (citing *Lujan*, 504 U.S.

11  at 560–61).

12  **1.     Plaintiffs Have Standing for Their 8005 Claim.**

13  Defendants argue that Plaintiffs lack standing to challenge Defendants' invocation of

14  Section 8005 to reprogram funds into the drug interdiction fund, so that Defendants can then

15  divert that money wholesale to border barrier construction using Section 284.  *See* Opp. at 14.[13]

16  Defendants do not dispute that Plaintiffs have standing to challenge the use of funds from the drug

17  interdiction fund for border barrier construction under Section 284.  Defendants nonetheless

18  reason that harm from construction using drug interdiction funds under Section 284 does not

19  establish standing to challenge Defendants' use of Section 8005 to supply those funds.  *Id.*

20  Defendants argue that standing requires that the plaintiff be the "object" of the challenged agency

21  action, but that the Section 8005 augmentation of the drug interdiction fund and the use of that

22  money for construction are two distinct agency actions.  *Id.* (citing *Lujan*, 504 U.S. at 562).

23  According to Defendants, the "object" of the Section 8005 reprogramming was "simply mov[ing]

24  funds among DoD's accounts."  *Id.* (citing *Lujan*, 504 U.S. at 562).

25  Defendants' logic fails in all respects.  As an initial matter, it is not credible to suggest that

26

27  [13] Defendants also argue Plaintiffs lack standing because they fall outside Section 8005's "zone of
interests."  *See* Opp. at 18–19.  Because the Court finds Defendants' "zone of interests" challenge

28  derivative of Defendants' misunderstanding of *ultra vires* review, the Court addresses those
matters together, below.  *See infra* Section IV.B.1.

the "object" of the Section 8005 reprogramming is anything but border barrier construction, even if the reprogrammed funds make a pit stop in the drug interdiction fund.  Since Defendants first announced that they would reprogram funds using Section 8005, they have uniformly described the object of that reprogramming as border barrier construction.  *See* Rapuano Decl. ¶ 5 (providing that "the Acting Secretary of Defense decided to use DoD's general transfer authority under section 8005 . . . to transfer funds between DoD appropriations to fund [border barrier construction in Arizona and New Mexico]"); *id.* Ex. D, at 1 (notifying Congress that the "reprogramming action" under Section 8005 is for "construction of additional physical barriers and roads in the vicinity of the United States border").

Nor does *Lujan* impose Defendants' proffered strict "object" test.  The *Lujan* Court explained that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." 504 U.S. at 562 (internal quotation marks omitted).  And the Supreme Court was concerned in particular with "causation and redressability," which are complicated inquiries when a plaintiff's standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (Kennedy, J.)).  As concerns causation, the Ninth Circuit recently explained that Article III standing only demands a showing that the plaintiff's injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)).  "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain.  As we've said before, what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain."  *Id.* (internal quotation marks and citations omitted).

No complicated causation inquiry is necessary here, as there are no independent absent actors.  More important, if there were ever a case where standing exists even though the

United States District Court
Northern District of California

1    challenged government action is nominally directed to some different "object," this is it.  Neither

2    the parties nor the Court harbor any illusions that the point of reprogramming funds under Section

3    8005 is to use those funds for border barrier construction.  And under Ninth Circuit law, there is

4    no requirement that the challenged conduct be the last link in the causal chain.  Rather, even if

5    there is an intervening link between the Section 8005 reprogramming and the border barrier

6    construction itself, any injury caused by the border barrier construction is nonetheless "fairly

7    traceable" to the Section 8005 reprogramming under the circumstances.  *See id.*  The Court thus

8    cannot accept the Government's "two distinct actions" rationale as a basis for shielding

9    Defendants' actions from review.

10                       **2.      Plaintiffs Have Standing for Their Section 2808 Claim.**

11             Defendants argue that Plaintiffs lack standing to challenge Defendants' diversion of funds

12    under Section 2808 "because the Acting Secretary of Defense has not yet decided to undertake or

13    authorize any barrier construction projects under [Section] 2808."  Opp. at 21.  Defendants

14    describe the status of the Section 2808 diversion as follows:

                    The Acting Secretary of Defense has not yet decided to undertake or
15              authorize any barrier construction projects under section 2808.  To
                inform the Acting Secretary's decision, on March 20, 2019, the
16              Secretary of Homeland Security provided a prioritized list of
                proposed border-barrier-construction projects that DHS assesses
17              would improve the efficiency and effectiveness of the armed forces
                supporting OHS in securing the southern border.  On April 11, 2019,
18              as a follow-up to the Chairman's preliminary assessment of February
                10, 2019, the Acting Secretary instructed the Chairman of the Joint
19              Chiefs of Staff to provide, by May 10, 2019, a detailed assessment of
                whether and how specific military construction projects could support
20              the use of the armed forces in addressing the national emergency at
                the southern border.
21
                    Also on April 11, 2019, the Acting Secretary instructed the DoD
22              Comptroller, in consultation with the Secretaries of the military
                departments, the Chairman of the Joint Chiefs of Staff, the Under
23              Secretary of Defense for Acquisition and Sustainment, the Under
                Secretary of Defense for Policy, and the heads of any other relevant
24              DoD components to identify, by May 10, 2019, existing military
                construction projects of sufficient value to provide up to $3.6 billion
25              of funding for his consideration.

26

27    Rapuano Decl. ¶¶ 14–15.  According to Defendants, absent some express decision to authorize or

28    undertake a particular project, Plaintiffs' injury is speculative:  "It is entirely possible that no

barrier projects will be constructed pursuant to [Section] 2808, and that, if they are, they will be [sic] built in any location where Plaintiffs would have a claim to a cognizable injury." Opp. at 21.

Defendants ask too much of Plaintiffs. A plaintiff need not present undisputable proof of a future harm. The injury-in-fact requirement instead permits standing when a risk of future injury is "at least *imminent*." *See Lujan*, 504 U.S. at 564 n.2. And while courts must ensure that the "actual or imminent" measure of harm is not "stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes," *see id.*, the Ninth Circuit has consistently held that a "'credible threat' that a probabilistic harm will materialize" is enough, *see Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (quoting *Covington v. Jefferson Cty.*, 358 F.3d 626, 641 (9th Cir. 2004)).

At this stage, Plaintiffs have carried their burden to demonstrate that there is a "credible threat" that Defendants will divert funds under Section 2808 for border barrier construction in a location where Plaintiffs would have a claim to a cognizable injury. As detailed in Defendants' supporting declaration, a decision on the use of Section 2808 to authorize border barrier construction is forthcoming, as the DoD has now received necessary information which it intends to use to make decisions. *See* Rapuano Third Decl. ¶ 6. Further, the Court cannot ignore that the President invoked Section 2808 to enable the diversion of funds for border barrier construction. *See* Citizen Groups RJN Ex. D. The White House in fact provided in February 2019 that funds under Section 2808 "will be available." *Id.* Ex. G. There is thus no speculation necessary for the Court to find that Defendants will continue with their current course of conduct and exercise their authority under Section 2808 in the manner directed by the President. *See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) ("Although [*Nelsen v. King County*, 895 F.2d 1248, 1251–52 (9th Cir. 1990)] certainly requires us to consider all the circumstances related to a threatened future harm, including whether the threatened harm may result from a chain of contingencies, the possibility that defendants may change their course of conduct is not the type of contingency to which we referred in *Nelsen*.").

Finally, as to Defendants' claim that they might use Section 2808 funds in a location where Plaintiffs would not have a claim to a cognizable injury, it is highly unlikely that this would be the

1    case, as Plaintiffs have demonstrated that their members span the entire U.S.-Mexico border.  *See,*

2    *e.g.*, Dkt. No. 32 ¶ 3 ("SBCC's membership spans the borderlands from California to Texas.").

3           **B.**      **Plaintiffs Have Shown They Are Entitled to a Preliminary Injunction.**

4          Applying the *Winter* factors, the Court finds Plaintiffs are entitled to a preliminary

5    injunction as to Defendants' use of Section 8005's reprogramming authority to channel funds into

6    the drug interdiction fund so that those funds may be ultimately used for border barrier

7    construction in El Paso Sector Project 1 and Yuma Sector Project 1.

8             **1.**      **Likelihood of Success on the Merits**

9          The crux of Plaintiffs' case is that Defendants' methods for funding border barrier

10   construction are unlawful.  And Plaintiffs package that core challenge in several ways.  For

11   present purposes, Plaintiffs contend that Defendants' actions (1) violate Congress's most-recent

12   appropriations legislation, (2) are unconstitutional, (3) exceed Defendants' statutory authority—in

13   other words, are *ultra vires*—and (4) violate NEPA.

14         The Court begins with a discussion of the law governing the appropriation of federal funds.

15   Under the Appropriations Clause of the Constitution, "No Money shall be drawn from the

16   Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

17   "The Clause's words convey a 'straightforward and explicit command':  No money 'can be paid

18   out of the Treasury unless it has been appropriated by an act of Congress.'"  *U.S. Dep't of Navy v.*

19   *FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *OPM v. Richmond*, 496 U.S. 414, 424

20   (1990)).  "The Clause has a 'fundamental and comprehensive purpose . . . to assure that public

21   funds will be spent according to the letter of the difficult judgments reached by Congress as to the

22   common good and not according to the individual favor of Government agents.'"  *United States v.*

23   *McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Richmond*, 496 U.S. at 427–28).  It

24   "protects Congress's exclusive power over the federal purse," and "prevents Executive Branch

25   officers from even inadvertently obligating the Government to pay money without statutory

26   authority."  *FLRA*, 665 F.3d at 1346–47 (internal quotation marks and citations omitted).

27         "Federal statutes reinforce Congress's control over appropriated funds," and under federal

28   law "appropriated funds may be applied only 'to the objects for which the appropriations were

United States District Court
Northern District of California

made.'" *Id.* at 1347 (quoting 31 U.S.C. § 1301(a)). Moreover, "[a]n amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." 31 U.S.C. § 1532. "[A]ll uses of appropriated funds must be affirmatively approved by Congress," and "the mere absence of a prohibition is not sufficient." *FLRA*, 665 F.3d at 1348. In summary, "Congress's control over federal expenditures is 'absolute.'" *Id.* (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

Rather than dispute these principles, Defendants contend that the challenged conduct complies with them. *See* Opp. at 26 ("The Government is not relying on independent Article II authority to undertake border construction; rather, the actions alleged are being undertaken pursuant to express statutory authority."). Accordingly, one of the key issues in dispute is whether Congress in fact provided "express statutory authority" for Defendants' challenged actions.

Turning to Plaintiffs' claims, it is necessary as a preliminary matter to outline the measure and lens of reviewability the Court applies in assessing such broad challenges to actions by executive officers. As a first principle, the Court finds that it has authority to review each of Plaintiffs' challenges to executive action. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 1 Cranch at 177. In determining what the law is, the Court has a duty to determine whether executive officers invoking statutory authority exceed their statutory power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). And even where executive officers act in conformance with statutory authority, the Court has an independent duty to determine whether authority conferred by act of the legislature nevertheless runs afoul of the Constitution. *See Clinton v. City of New York*, 524 U.S. 417, 448 (1998).

Once a case or controversy is properly before a court, in most instances that court may grant injunctive relief against executive officers to enjoin both *ultra vires* acts—that is, acts exceeding the officers' purported statutory authority—and unconstitutional acts. The Supreme Court recently reaffirmed this core equitable power:

It is true enough that we have long held that federal courts may in

United States District Court
Northern District of California

> some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials. . . . What our cases demonstrate is that, in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.
>
> The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.

*Armstrong*, 135 S. Ct. at 1384 (internal quotation marks and citations omitted).

Misunderstanding the presumptive availability of equitable relief to enforce federal law, Defendants contend that Plaintiffs fail to identify a statutory private right of action, that Plaintiffs must challenge Defendants' conduct through the framework of the APA, and that to the extent *ultra vires* review is available, "Plaintiffs [must] show that the challenged action 'contravene[s] clear and mandatory statutory language.'" *See* Opp. at 12–13. But as Plaintiffs detail at length in their reply brief, *ultra vires* review exists outside of the APA framework, and Defendants' heightened standard for *ultra vires* review only applies where Congress has foreclosed judicial review, which is not the case here. *See* Reply at 2–5; *see also* Dkt. No. 107 (Brief of *Amici Curiae* Federal Courts Scholars).[14]

Due to their mistaken framing of the scope of *ultra vires* review, Defendants also incorrectly posit that Plaintiffs must establish that they fall within the "zone of interests" of a particular statute to challenge actions taken by the government under that statute. *See* Opp. at 14–15. The "zone of interests" test, however, only relates to statutorily-created causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining that "[t]he modern 'zone of interests' formulation . . . . applies to all statutorily created causes of action"). The test has no application in an *ultra vires* challenge, which operates outside of the

---

[14] Congress may displace federal courts' equitable power to enjoin unlawful executive action, but a precluding statute must at least display an "intent to foreclose" injunctive relief. *Armstrong*, 135 S. Ct. at 1385. Courts have found such implied foreclosure where (1) the statute provides an express administrative remedy, and (2) the statute is otherwise judicially unadministrable in nature. *Id.* at 1385–86. No party contends that the statutes at issue in this case either expressly foreclose equitable relief or provide an express administrative remedy, which might warrant a finding of implied foreclosure of equitable relief.

United States District Court
Northern District of California

APA framework.  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) ("Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires.*"); *see also* 33 Charles Alan Wright et al., Federal Practice and Procedure § 8302 (2d ed. 2019) (explaining that the "zone of interests" test is to determine whether a plaintiff "seeks to protect interests that 'arguably' fall within the 'zone of interests' protected by that provision").  In other words, where a plaintiff seeks to vindicate a right protected by a statutory provision, the plaintiff must demonstrate that it arguably falls within the zone of interests Congress meant to protect by enacting that provision.  But where a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test is inapposite.  Any other interpretation would lead to absurd results.  The very nature of an *ultra vires* action posits that an executive officer has gone beyond what the statute permits, and thus beyond what Congress contemplated.  It would not make sense to demand that Plaintiffs—who otherwise have standing—establish that Congress contemplated that the statutes allegedly violated would protect Plaintiffs' interests.  It is no surprise, then, that the Supreme Court's recent discussion of *ultra vires* review in *Armstrong* did not once reference this test.

In reviewing the lawfulness of Defendants' conduct, the Court thus begins each inquiry by determining whether the disputed action exceeds statutory authority.  For unless an animating statute sanctions a challenged action, a court need not reach the second-level question of whether it would be unconstitutional for Congress to sanction such conduct.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (explaining the "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case") (quoting *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)).  This is not to say, however, that the yardstick of statutory authority overlooks constitutional concerns entirely.  "The so-called canon of constitutional avoidance . . . counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Nonetheless, a court presented with both *ultra vires* and constitutional claims

1   should begin by determining whether the statutory authority supports the action challenged, and

2   only reach the constitutional analysis if necessary.

3           **a.**        **Sections 284 and 8005**

4         At the President's direction, Defendants intend to divert $2.5 billion, $1 billion of which is

5   the subject of the pending motion, to the DoD's drug interdiction fund for border barrier

6   construction.[15]  To do so, Defendants rely on Section 284(b)(7), which authorizes the Secretary of

7   Defense to support other federal agencies for the "[c]onstruction of roads and fences and

8   installation of lighting to block drug smuggling corridors across international boundaries of the

9   United States."  *See The Funds Available to Address the National Emergency at Our Border*, The

10  White House, https://www.whitehouse.gov/briefings-statements/funds-available-address-national-

11  emergency-border (Feb. 26, 2019).  To satisfy the President's directive, Defendants intend to rely

12  on their reprogramming authority under Section 8005, and plan to "augment" the drug interdiction

13  fund with the entire $2.5 billion in funds that DoD will then use for the construction.  *Id.*

14        Plaintiffs challenge both the augmentation of the drug interdiction fund through Section

15  8005 and the use of funds from the drug interdiction fund under Section 284.  Turning first to the

16  augmentation of funds, Section 8005 authorizes the reprogramming of up to $4 billion "of

17  working capital funds of the Department of Defense or funds made available in this Act to the

18  Department of Defense."  The transfer must be (1) either (a) DoD working capital funds or (b)

19  "funds made available in this Act to the [DoD] for military functions (except military

20  construction)," (2) first determined by the Secretary of Defense as necessary in the national

21  interest, (3) for higher priority items than those for which originally appropriated, (4) based on

22  unforeseen (5) military requirements, and (6) in no case where the item for which funds are

23

24  [15] The Court here only considers the lawfulness of Defendants' March 25, 2019 invocation of
    Section 8005 to reprogram $1 billion, given the parties' agreement that this order need not address

25  Defendants' recently announced intent to use Sections 8005, 9002, and 284 to fund border barrier
    construction in the El Centro Sector and Tucson Sector Projects.  The parties reached this

26  agreement after counsel for Defendants represented at the hearing on this motion that "no
    construction will start [with those funds] until at least 45 days from" the May 17, 2019 hearing

27  date.  *See* Dkt. No. 138 at 55:16–17.  The parties confirmed that they would agree to a schedule to
    supplement the record, to permit the Court to review in a timely manner the lawfulness of the new

28  reprogramming, under the framework set forth in this order.  *Id.* at 59:14–60:2.  The parties have
    since agreed on a schedule.  *See* Dkt. No. 142.

United States District Court
Northern District of California

1  requested has been denied by Congress.  Plaintiffs argue that Defendants' actions fail the last three

2  requirements.  The Court first considers whether the reprogramming Defendants propose here is

3  for an item for which funds were requested but denied by Congress.

          **i.**       **Plaintiffs are Likely to Show That the Item for Which**
                    **Funds Are Requested Has Been Denied by Congress.**

6       Plaintiffs argue that Defendants are transferring funds for a purpose previously denied by

7  Congress.  Mot. at 16.  Defendants dispute, however, whether Congress's affirmative

8  appropriation of funds in the CAA to DHS constitutes a "denial" of appropriations to DoD's

9  "counter-drug activities in furtherance of DoD's mission under [Section] 284."  Opp. at 16.  In

10  their view, "the item" for which funds are requested, for present purposes, is counterdrug activities

11  under Section 284.  *Id.*  And Defendants maintain that "nothing in the DHS appropriations statute

12  indicates that Congress 'denied' a request to fund DoD's statutorily authorized counter-drug

13  activities, which expressly include fence construction."  *Id.*  In other words, even though DoD's

14  counterdrug authority under Section 284 is merely a pass-through vessel for Defendants to funnel

15  money to construct a border barrier that will be turned over to DHS, Citizen Groups RJN Ex. I, at

16  10, Defendants argue that the Court should only consider whether Congress denied funding to

17  DoD.

18       Plaintiffs have shown a likelihood of success as to their argument that Congress previously

19  denied "the item for which funds are requested," precluding the proposed transfer.  On January 6,

20  2019, the President asked Congress for "\$5.7 billion for construction of a steel barrier for the

21  Southwest border," explaining that the request "would fund construction of a total of

22  approximately 234 miles of new physical barrier."  Citizen Groups RJN Ex. A, at 1.  The request

23  noted that "[a]ppropriations bills for fiscal year (FY) 2019 that have already been considered by

24  the current and previous Congresses are inadequate to fully address these critical issues," to

25  include the need for barrier construction funds.  *Id.*  The President's request did not specify the

26  mechanics of how the \$5.7 billion sought would be used for the proposed steel barrier

27  construction.  *Id.*  Nonetheless, in the CAA passed by Congress and signed by the President,

28  Congress appropriated only \$1.375 billion for the construction of pedestrian fencing, of a specified

United States District Court
Northern District of California

1  type, in a specified sector, and appropriated no other funds for barrier construction. The Court

2  agrees with Plaintiffs that they are likely to show that the proposed transfer is for an item for

3  which Congress denied funding, and that it thus runs afoul of the plain language of Section 8005

4  and 10 U.S.C. § 2214(b) ("Section 2214").[16]

5       As Defendants acknowledge, in interpreting a statute, the Court applies the principle that

6  "the plain language of [the statute] should be enforced according to its terms, in light of its

7  context." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015). In its

8  *amicus* brief, the House recounts legislative history that provides critical context for the Court's

9  interpretative task. The House explains that the "denied by the Congress" restriction was imposed

10  on DoD's transfer authority in 1974 to "tighten congressional control of the reprogramming

11  process." Dkt. No. 47 ("House Br.") at 10 (citing H.R. Rep. No. 93-662, at 16 (1973)). The

12  House committee report on the appropriations bill from that year explained that "[n]ot frequently,

13  but on some occasions, the Department ha[d] requested that funds which have been specifically

14  deleted in the legislative process be restored through the reprogramming process," and that "[t]he

15  Committee believe[d] that to concur in such actions would place committees in the position of

16  undoing the work of the Congress." H.R. Rep. No. 93-662, at 16. Significantly, the Committee

17  stated that such a position would be "untenable." *Id.* Consistent with this purpose, Congress has

18  described its intent that appropriations restrictions of this sort be "construed strictly" to "prevent

19  the funding for programs which have been considered by Congress and for which funding has

20  been denied." *See* H.R. Rep. No. 99-106, at 9 (1985) (discussing analogous appropriations

21  restriction in Pub. L. No. 99-169, § 502(b), 99 Stat. 1005 (codified at 50 U.S.C. § 3094(b)).

22       The Court finds that the language and purpose of Section 8005 and Section 2214(b) likely

23  preclude Defendants' attempt to transfer $1 billion from funds Congress previously appropriated

24  for military personnel costs to the drug interdiction fund for the construction of a border barrier.

25

26  _____

[16] *See* Fox News, *Mick Mulvaney on chances of border deal, Democrats ramping up investigation*
27  *of Trump admin*, YouTube (Feb. 10, 2019), https://www.youtube.com/watch?v=l_Z0xx_zS0M
(statement by Acting White House Chief of Staff that "[w]e'll take as much money as you can
28  give us, and then we'll go off and find the money someplace else, legally, in order to secure that
southern barrier. But this is going to get built, with or without Congress.").

1    Defendants argue that "Congress never denied DoD funding to undertake the [Section] 284

2    projects at issue," Opp. at 16, such that Section 8005 and Section 2214(b) are satisfied.  But in the

3    Court's view, that reading of those sections is likely wrong, when the reality is that Congress was

4    presented with—and declined to grant—a $5.7 billion request for border barrier construction.

5    Border barrier construction, expressly, is the item Defendants now seek to fund via the Section

6    8005 transfer, and Congress denied the requested funds for that item.  *See* 10 U.S.C. § 2214(b)

7    (explaining that transfer authority "may not be used if *the item to which the funds would be*

8    *transferred* is an item for which Congress has denied funds") (emphasis added).  And Defendants

9    point to nothing in the language or legislative history of the statutes in support of their assertion

10   that only explicit congressional denial of funding for "[Section] 284 projects," or even DoD

11   projects generally, would trigger Section 8005's limitation.  Opp. at 16.  It thus would be

12   inconsistent with the purpose of these provisions, and would subvert "the difficult judgments

13   reached by Congress," *McIntosh*, 833 F.3d at 1175, to allow Defendants to circumvent Congress's

14   clear decision to deny the border barrier funding sought here when it appropriated a dramatically

15   lower amount in the CAA.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609

16   (1952) (Frankfurter, J., concurring) ("It is quite impossible . . . when Congress did specifically

17   address itself to a problem . . . to find secreted in the interstices of legislation the very grant of

18   power which Congress consciously withheld.  To find authority so explicitly withheld is not

19   merely to disregard in a particular instance the clear will of Congress.  It is to disrespect the whole

20   legislative process and the constitutional division of authority between President and Congress.").

21               ii.    **Plaintiffs are Likely to Show That the Transfer is Not
                        Based on "Unforeseen Military Requirements."**
22

23        Plaintiffs next argue that any need for border barrier construction—to the extent there is a

24   need—was long "foreseen," noting that the President supported his fiscal year 2019 budget

25   request for border barrier funding with a description that such a barrier "is critical to combating

26   the scourge of drug addiction that leads to thousands of unnecessary deaths."  Mot. at 16 (quoting

27   Citizen Groups RJN Ex. R, at 16).

28        In response, Defendants again seek to minimize the pass-through nature of DoD's counter-

United States District Court
Northern District of California

34

1    drug activities authority under Section 284.  While not disputing that the President requested—and

2    was denied—more-comprehensive funds for border barrier construction, Defendants instead note

3    that "[t]he President's 2019 budget request did not propose additional funding for DoD's

4    counterdrug activities under [Section] 284."  Opp. at 16.  Defendants then argue that because DHS

5    only formally requested Section 284 support in February 2019, the need for Section 284 support

6    only become foreseen in February 2019.  *Id.* at 16–17.

7           Separate and apart from the Court's analysis above regarding whether Congress previously

8    denied funding for the relevant item, Plaintiffs also have shown a likelihood of success as to their

9    argument that Defendants fail to meet the "unforeseen military requirement" condition for the

10   reprogramming of funds under Section 8005.  As the House notes in its *amicus* brief, DoD has

11   used this authority in the past to transfer funds based on unanticipated circumstances (such as

12   hurricane and typhoon damage to military bases) justifying a departure from the scope of spending

13   previously authorized by Congress.  House Br. at 10 (citing Office of the Under Secretary of

14   Defense (Comptroller), DoD Serial No. FY 04-37 PA, Reprogramming Action (Sept. 3, 2004)).

15   Here, however, Defendants claim that what was "unforeseen" was "[t]he need for DoD to exercise

16   its [Section] 284 authority to provide support for counter-drug activities," which "did not arise

17   until February 2019, when DHS requested support from DoD to construct fencing in drug

18   trafficking corridors."  Opp. at 16.

19          Defendants' argument that the need for the requested border barrier construction funding

20   was "unforeseen" cannot logically be squared with the Administration's multiple requests for

21   funding for exactly that purpose dating back to at least early 2018.  *See* Citizen Groups Ex. R

22   (February 2018 White House Budget Request describing "the Administration's proposal for $18

23   billion to fund the border wall"); *see also* States RJN Exs. 14–20 (failed bills); *id.* Ex. 21

24   (December 11, 2018 transcript from a meeting with members of Congress, where the President

25   stated that "if we don't get what we want [for border barrier construction funding], one way or the

26   other – whether it's through you, through a military, through anything you want to call [sic] – I

27   will shut down the government"); Case No. 4:19-cv-00872-HSG, ECF No. 89-12, at 14 (testimony

28   of Defendant Shanahan before the House Armed Services Committee explaining that the

Administration discussed unilateral reprogramming "prior to the declaration of a national emergency"). Further, even the purported need for DoD to provide DHS with support for border security has similarly been long asserted. *See* States RJN Ex. 27 (April 4, 2018 presidential memorandum directing the Secretary of Defense to support DHS "in securing the southern border and taking other necessary actions" due to "[t]he crisis at our southern border"). Defendants' suggestion that by not specifically seeking border barrier funding under Section 284 by name, the Administration can later contend that as far as DoD is concerned, the need for such funding is "unforeseen," is not likely to withstand scrutiny.

Interpreting "unforeseen" to refer to the request for DoD assistance, as opposed to the underlying "requirement" at issue, also is not reasonable. By Defendants' logic, *every* request for Section 284 support would be for an "unforeseen military requirement," because only once the request was made would the "need to exercise authority" under the statute be foreseen. There is no logical reason to stretch the definition of "unforeseen military requirement" from requirements that the government as a whole plainly cannot predict (like the need to repair hurricane damage) to requirements that plainly *were* foreseen by the government as a whole (even if DoD did not realize that it would be asked to pay for them until after Congress declined to appropriate funds requested by another agency). Nothing presented by the Defendants suggests that its interpretation is what Congress had in mind when it imposed the "unforeseen" limitation, especially where, as here, multiple agencies are openly coordinating in an effort to build a project that Congress declined to fund. The Court thus finds it likely that Plaintiffs will succeed on this claim.[17]

### iii. Accepting Defendants' Proposed Interpretation of Section 8005's Requirements Would Likely Raise Serious Constitutional Questions.

The Court also finds it likely that Defendants' reading of these provisions, if accepted, would pose serious problems under the Constitution's separation of powers principles. Statutes must be interpreted to avoid a serious constitutional problem where another "construction of the

---

[17] Because the Court has found that Plaintiffs are likely to succeed on their argument that the reprogramming violates the two Section 8005 conditions discussed above, it need not reach at this stage their argument that the border barrier project is not a "military requirement" at all.

1  statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678,

2  689 (2001) (internal quotation marks and citations omitted). Constitutional avoidance is "thus a

3  means of giving effect to congressional intent," as it is presumed that Congress did not intend to

4  create an alternative interpretation that would raise serious constitutional concerns. *Clark v.*

5  *Martinez*, 543 U.S. 371, 382 (2005). Courts thus "have read significant limitations into . . .

6  statutes in order to avoid their constitutional invalidation." *Zadvydas*, 533 U.S. at 689 (citation

7  omitted).

8         As Plaintiffs point out, the upshot of Defendants' argument is that the Acting Secretary of

9  Defense is authorized to use Section 8005 to funnel an additional $1 billion to the Section 284

10  account for border barrier construction, notwithstanding that (1) Congress decided to appropriate

11  only $1.375 billion for that purpose; (2) Congress's *total* fiscal year 2019 appropriation available

12  under Section 284 for "[c]onstruction of roads and fences and installation of lighting to block drug

13  smuggling corridors across international boundaries of the United States" was $517 million, much

14  of which already has been spent; and (3) Defendants have acknowledged that the Administration

15  considered reprogramming funds for border barrier construction even before the President signed

16  into law Congress's $1.375 billion appropriation. *See* Department of Defense and Labor, Health

17  and Human Services, and Education Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit.

18  VI, 132 Stat. 2981, 2997 (2018) (appropriating $881 million in funds "[f]or drug interdiction and

19  counter-drug activities" in fiscal year 2019, $517 million of which is "for counter-narcotics

20  support"); Dkt. No. 131 at 4 (indicating that Defendants have not used—and do not intend to use

21  in the near future—any funds appropriated by Congress for counter-narcotics support for border

22  barrier construction); Case No. 4:19-cv-00872-HSG, ECF No. 89-12, at 14 (testimony of

23  Defendant Shanahan before the House Armed Services Committee explaining that the

24  Administration discussed unilateral reprogramming "prior to the declaration of a national

25  emergency"). Put differently, according to Defendants, Section 8005 authorizes the Acting

26  Secretary of Defense to essentially triple—or quintuple, when considering the recent additional

27  $1.5 billion reprogramming—the amount Congress allocated to this account for these purposes,

28  notwithstanding Congress's recent and clear actions in passing the CAA, and the relevant

United States District Court
Northern District of California

committees' express disapproval of the proposed reprogramming. *See* States RJN Ex. 35 ("The committee denies this request. The committee does not approve the proposed use of [DoD] funds to construct additional physical barriers and roads or install lighting in the vicinity of the United States border."); *id.* Ex. 36 ("The Committee has received and reviewed the requested reprogramming action . . . . The Committee denies the request."). Moreover, Defendants' decision not to refer specifically to Section 284 in their $5.7 billion funding request deprived Congress of even the *opportunity* to reject or approve this funding item.[18]

The Court agrees with Plaintiffs that reading Section 8005 to permit this massive redirection of funds under these circumstances likely would amount to an "unbounded authorization for Defendants to rewrite the federal budget," Reply at 14, and finds that Defendants' reading likely would violate the Constitution's separation of powers principles. Defendants contend that because Congress did not reject (and, indeed, never had the opportunity to reject) a specific request for an appropriation to the Section 284 drug interdiction fund, DoD can use Section 8005 to route anywhere up to the $4 billion cap set by that statute, to be spent for the benefit of DHS via Section 284. But this reading of DoD's authority under the statute would render meaningless Congress's constitutionally-mandated power to assess proposed spending, then render its binding judgment as to the scope of permissible spending. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (holding that the interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted). This is especially true given that Congress has repeatedly rejected legislation that would

---

[18] Defendants do not convincingly explain why the amount now sought to be transferred under Section 8005 could not have been sought directly from Congress as part of the fiscal year 2019 appropriation to the DoD Section 284 account to cover requests for counterdrug support, given that the President has consistently maintained since before taking office that border barrier funding is necessary. If the answer is that the Administration expected, or hoped, that Congress would appropriate the funds to DHS directly, that highlights rather than mitigates the present problem with Defendants' position.

United States District Court
Northern District of California

have funded substantially broader border barrier construction, as noted above, deciding in the end

to appropriate only $1.375 billion.  *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225,

1234 (9th Cir. 2018) ("In fact, Congress has frequently considered and thus far rejected legislation

accomplishing the goals of the Executive Order.  The sheer amount of failed legislation on this

issue demonstrates the importance and divisiveness of the policies in play, reinforcing the

Constitution's 'unmistakable expression of a determination that legislation by the national

Congress be a step-by-step, deliberate and deliberative process.'") (citing *Chadha*, 462 U.S. at

959).  In short, the Constitution gives Congress the exclusive power "not only to formulate

legislative policies and mandate programs and projects, but also to establish their relative priority

for the Nation," *McIntosh*, 833 F.3d at 1172, and "Congress cannot yield up its own powers" in

this regard, *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring).  Defendants' interpretation of

Section 8005 is inconsistent with these principles.

While Defendants argue that the text and history of Section 284 suggest that their proposed

transfer and use of the funds are within the scope of what Congress has permitted previously, Opp.

at 18, that argument only highlights the serious constitutional questions that accepting their

position would create.  First, Defendants note that in the past DoD has completed what they

characterize as "large-scale fencing projects" with Congress's approval.  Opp. at 18 (citing H.R.

Rep. No. 103-200, at 330–31 (1993)).  But Congress's past approval of relatively small

expenditures, that were well within the total amount allocated by Congress to DoD under Section

284's predecessor, speaks not at all to Defendants' current claim that the Acting Secretary has

authority to redirect sums over a hundred orders of magnitude greater to that account in the face of

Congress's appropriations judgment in the CAA.  Similarly, whether or not Section 284 formally

"limits" the Secretary to "small scale construction" (defined in Section 284(i)(3) as "construction

at a cost not to exceed $750,000 for any project"), reading the statute to suggest that Congress

requires reporting of tiny projects but nonetheless has delegated authority to DoD to conduct the

massive funnel-and-spend project proposed here is implausible, and likely would raise serious

questions as to the constitutionality of such an interpretation.  *See Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 468 (2001) (noting that Congress "does not, one might say, hide elephants

39

1    in mouseholes").

2        Similarly, if "unforeseen" has the meaning that Defendants claim, Section 8005 would

3    give the agency making a request for assistance under Section 284 complete control over whether

4    that condition is met, simply by virtue of the timing of the request. As here, DHS could wait and

5    see whether Congress granted a requested appropriation, then turn to DoD if Congress declined,

6    and DoD could always characterize the resulting request as raising an "unforeseen" requirement

7    because it did not come earlier. Under this interpretation, DoD could in essence make a de facto

8    appropriation to DHS, evading congressional control entirely. The Court finds that this

9    interpretation likely would pose serious problems under the Appropriations Clause, by ceding

10   essentially boundless appropriations judgment to the executive agencies.

11       Finally, the Court has serious concerns with Defendants' theory of appropriations law,

12   which presumes that the Executive Branch can exercise spending authority unless Congress

13   explicitly restricts such authority by statute. Counsel for Defendants advanced this theory at the

14   hearing on this motion, arguing that when Congress passed the recent DoD appropriations act

15   containing Section 8005, it "could have" expressly "restrict[ed] that authority" to preclude

16   reprogramming funds for border barrier construction. *See* Dkt. No. 138 at 76:16–77:3. According

17   to Defendants: "If Congress had wanted to deny DOD this specific use of that [reprogramming]

18   authority, that's something it needed to actually do in an explicit way in the appropriations

19   process. And it didn't." *Id.* at 77:21–24. But it is not Congress's burden to prohibit the Executive

20   from spending the Nation's funds: it is the Executive's burden to show that its desired use of those

21   funds was "affirmatively approved by Congress." *See FLRA*, 665 F.3d at 1348 ("[A]ll uses of

22   appropriated funds must be affirmatively approved by Congress," and "the mere absence of a

23   prohibition is not sufficient."). To have this any other way would deprive Congress of its absolute

24   control over the power of the purse, "one of the most important authorities allocated to Congress

25   in the Constitution's 'necessary partition of power among the several departments.'" *Id.* at 1346–

26   47 (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)).

27       To the extent Defendants believe the Ninth Circuit's decision in *McIntosh* suggests

28   anything to the contrary, the Court disagrees. Defendants appeared to argue at the hearing on this

United States District Court
Northern District of California

United States District Court
Northern District of California

1    motion that *McIntosh* stands for the principle that the Executive enjoys unfettered spending power

2    unless Congress crafts an appropriations rider cabining such authority.  *See* Dkt. No. 138 at 75:5–

3    10.  As counsel for Defendants put it, "[Plaintiffs] want to say that something was denied by

4    Congress if it wasn't funded by Congress. . . .  But that is just not how these statutes are written

5    and that's not how [*McIntosh*] tells us we interpret the appropriations statute."  *Id.* at 75:13–20.

6    But Defendants overlook that no party in *McIntosh* disputed that the government's use of funds

7    was authorized but for the appropriations rider at issue in that case.  *See* 833 F.3d at 1175 ("The

8    parties dispute whether the government's spending money on their prosecutions violates [the

9    appropriations rider].").  It is thus unremarkable that when faced with a dispute exclusively

10    concerning whether the government's otherwise-authorized spending of money violated an

11    appropriations rider, the Ninth Circuit held that "[i]t is a fundamental principle of appropriations

12    law that we may only consider the text of an appropriations rider."  *Id.* at 1178; *see also* Dkt. No.

13    138 at 75:5–10 (defense counsel relying on this language from *McIntosh*).

14        Unlike in *McIntosh*, where the sole dispute concerned the scope of an external limitation

15    on an otherwise-authorized spending of money, the present dispute concerns the scope of

16    limitations within Section 8005 itself on the authorization of reprogramming funds.  Whether

17    Congress gives authority in the first place is not the same issue as whether Congress later restricts

18    that authority.  And it cannot be the case that Congress must draft an appropriations rider to

19    breathe life into the internal limitations in Section 8005 establishing that the Executive may only

20    reprogram money based on unforeseen military requirements, and may not do so where the item

21    for which funds are requested has been denied by Congress.  To adopt Defendants' position would

22    read out these limitations entirely, which the Court cannot do.  *See Life Techs. Corp. v. Promega*

23    *Corp.*, 137 S. Ct. 734, 740 (2017) ("Whenever possible, however, we should favor an

24    interpretation that gives meaning to each statutory provision.").  To give meaning to—and thus to

25    construe the scope of—these internal limitations is wholly consistent with *McIntosh*, which

26    explained that the Executive's authority to spend is at all times limited "by the text of the

27    appropriation."  833 F.3d at 1178 (internal quotation marks omitted).

28        For all of these reasons, the Court finds that Plaintiffs have shown a likelihood of success

as to their argument that the reprogramming of $1 billion under Section 8005 to the Section 284 account for border barrier construction is unlawful.[19]

### b. Section 2808

At the President's direction, the DoD intends to use up to $3.6 billion in military construction funding to facilitate border barrier construction. Defendants rely on Section 2808, under which the Secretary of Defense may "undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law." 10 U.S.C. § 2808(a). As is relevant here, Section 2808 requires that (1) the President first declare a national emergency in accordance with the NEA that "requires use of the armed forces," (2) the use of funds be for "military construction projects," and (3) the military construction projects be "necessary to support such use of the armed forces." *Id.* Plaintiffs contend that Defendants' plan to use Section 2808 to build a barrier on the U.S.-Mexico border fails all three requirements.

Under the circumstances, it is unclear how border barrier construction could reasonably constitute a "military construction project" such that Defendants' invocation of Section 2808 would be lawful. Section 2808 authorizes the Secretary of Defense to "undertake military construction projects." And Congress defined the term "military construction," as it is used in Section 2808, to "include[] any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road." 10 U.S.C.

---

[19] Defendants have now acknowledged that all of the money they plan to spend on border barrier construction under Section 284 is money transferred into that account under Section 8005. *See* Dkt. No. 131 at 4. Given this acknowledgment, and the Court's finding that Plaintiffs are likely to show that the Section 8005 reprogramming is unlawful, the Court need not at this stage decide whether Defendants would have been permitted to use for border barrier construction any remaining funds that Congress appropriated to the Section 284 account for fiscal year 2019. The Court notes that the House confirmed in its own lawsuit that it "does not challenge the expenditure of any remaining appropriated funds under section 284 on the construction of a border wall." United States House of Representatives' Application for a Preliminary Injunction at 30, *U.S. House of Representatives v. Mnuchin*, No. 1:19-cv-00969 (TNM) (D.D.C. Apr. 23, 2019), ECF No. 17; *see also* House Br. at 17 (requesting preliminary injunction "prohibiting defendants from transferring and spending funds in excess of what Congress appropriated for counter-narcotics support under 10 U.S.C. § 284").

United States District Court
Northern District of California

§ 2801(a). Congress in turn defined the term "military installation" to "mean[] a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control." *Id.* § 2801(c)(4).

Plaintiffs reason that border barrier construction does not constitute construction "carried out with respect to a military installation," because (1) the U.S.-Mexico border is not a military "base, camp, post, station, yard, center" or "defense access road;" and (2) securing the border is not an "activity under the jurisdiction of the Secretary of a military department." Mot. at 14. Instead, Congress assigned responsibility for "[s]ecuring the borders" to DHS. *See* 6 U.S.C. § 202. Defendants respond that although the statute defines both "military construction" and its nested term, "military installation," "[b]road terms defining military construction as 'includ[ing]' (but not limited to, *see* 10 U.S.C. § 101(f)(4)) construction with respect to a military installation, and defining military installation to include non-specified 'other activity,' are not the kind of clear and mandatory statutory language that is a necessary predicate to an ultra vires claim." Opp. at 23.

Defendants' arguments prove too much. As explained above, Defendants misunderstand the standard for *ultra vires* review. More to the merits, the plain language of the relevant statutory definitions does not demonstrate the sort of unbounded authority that Defendants suggest. Turning first to the statutory definition of "military construction," that it uses the word "includes" when it provides that military construction "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation" is irrelevant. No one disputes that border barrier construction constitutes "construction." What matters is that Section 2801(a) limits such construction—however broad that term might be—to construction related to a military installation. In other words, the critical language of Section 2801(a) is not the word "includes," it is the condition "with respect to a military installation."

Turning next to the statutory definition of "military installation," Section 2801(c)(4) provides in relevant part that it "means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." And Defendants make no

43

United States District Court
Northern District of California

1   attempt to characterize the U.S.-Mexico border or a border barrier as a "base, camp, post, station,

2   yard, [or] center." Nor could they. Defendants instead contend that border barrier construction is

3   authorized under the catch-all term "other activity." *See* Dkt. No. 138 at 92:9–93:22.

4        In interpreting Section 2801 to determine whether Defendants' plan to construct a barrier

5   on the U.S.-Mexico border falls within the "other activity" category, the Court applies "traditional

6   tools of statutory construction." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d

7   1250, 1257 (9th Cir. 1994), *amended on denial of reh'g by* 99 F.3d 321 (9th Cir. 1996). The Court

8   "begin[s] with the statute's language, which is conclusive unless literally applying the statute's

9   text demonstrably contradicts Congress's intent." *Chemehuevi Indian Tribe v. Newsom*, 919 F.3d

10   1148, 1151 (9th Cir. 2019). "When deciding whether the language is plain, courts must read the

11   words in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting

12   *Rainero v. Archon Corp.*, 844 F.3d 832, 837 (9th Cir. 2016) (internal quotation marks and

13   alterations omitted)).

14        Applying traditional tools of statutory construction, Section 2801 likely precludes treating

15   the southern border as an "other activity." Defendants on this point fail to appreciate that the

16   words immediately preceding "or other activity" in Section 2801(c)(4)— "a base, camp, post,

17   station, yard, [and] center"—provide contextual limits on the catch-all term. The Court thus relies

18   on the doctrine of *noscitur a sociis*, "which is that a word is known by the company it keeps."

19   *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). Courts apply this rule "to avoid ascribing

20   to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving

21   'unintended breadth to the Acts of Congress.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S.

22   303, 307 (1961)). The Supreme Court has relied on this canon of statutory interpretation many

23   times when construing detailed statutory lists followed by catch-all-type terms. Most recently, in

24   *Epic Systems Corp. v. Lewis*, the Court limited the term "other concerted activities" in Section 7 of

25   the National Labor Relations Act to refer to "things employees 'just do' for themselves in the

26   course of exercising their right to free association in the workplace," rather than any concerted

27   activity whatsoever—including class and collective actions—because the term appeared at the end

28   of a detailed list of specific activities, none of which "speak[] to the procedures judges or

44

arbitrators must apply in disputes that leave the workplace and enter the courtroom or arbitral forum." 138 S. Ct. 1612, 1625 (2018). Before that, in *Gustafson*, the Supreme Court construed the word "communication" as used in Section 2(10) of the Securities Act of 1933 to "refer[] to a public communication" and not any communication whatsoever, because the word followed a list of other terms—"prospectus, notice, circular, advertisement, [and] letter"—in consideration of which "it [was] apparent that the list refers to documents of wide dissemination." 513 U.S. at 575.

*Noscitur a sociis* applies with equal force in the present circumstance. The term "other activity" appears after a list of closely related types of discrete and traditional military locations: "a base, camp, post, station, yard, [and] center." It is thus proper to construe "other activity" as referring to similar discrete and traditional military locations. The Court does not readily see how the U.S.-Mexico border could fit this bill.

The Court also finds relevant the *ejusdem generis* canon of statutory interpretation, which counsels that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001)). At the hearing on this motion, Defendants argued that the term "other activity" "capture[s] everything under the jurisdiction of the secretary of a military department." Dkt. No. 138 at 92:9–13. The Court disagrees. Had Congress intended for "other activity" in Section 2801(c)(4) to be so broad as to transform literally any activity conducted by a Secretary of a military department into a "military installation", there would have been no reason to include a list of specific, discrete military locations. *See Yates v. United States*, 135 S. Ct. 1074, 1087 (2015) ("Had Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage."); *CSX Transp., Inc. v. Ala. Dept. of Revenue*, 562 U.S. 277, 295 ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").

45

1        To be clear, "other activity" is not an empty term. Congress undoubtedly contemplated

2    that military installations would encompass more than just "a base, camp, post, station, yard, [or]

3    center." But the Court need not stake out the term's outer limits here. All that matters for present

4    purposes is that, in context and with an eye toward the overall statutory scheme, nothing

5    demonstrates that Congress ever contemplated that "other activity" has such an unbounded reading

6    that it would authorize Defendants to invoke Section 2808 to build a barrier on the southern

7    border.

8        Despite its concerns with Defendants' arguments on this point, the Court need not now

9    address whether Plaintiffs are likely to succeed on the merits of their claim that Defendants'

10   ultimate plan to divert funds under Section 2808 is *ultra vires*. That is because, as discussed

11   below, Plaintiffs have not met their independently necessary burden of showing a likelihood of

12   irreparable harm from the use of funds under Section 2808 for construction at as-yet-unspecified

13   locations so as to be entitled to a preliminary injunction.

14           **c.**    **NEPA**

15       After Plaintiffs filed the instant motion—and one day before Defendants filed their

16   opposition—the Acting Secretary of Homeland Security invoked his authority under Section

17   102(c) of IIRIRA to waive any NEPA requirements for construction in the El Paso and Yuma

18   sectors. *See* Opp. at 25–26; *see also* Determination Pursuant to Section 102 of the Illegal

19   Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg.

20   17185-01 (Apr. 24, 2019); REAL ID Act of 2005, Pub. L. No. 109-13, § 102, 119 Stat. 231, 306

21   (May 11, 2005) (amending Section 102(c) to reflect that the Secretary "ha[s] the authority to

22   waive all legal requirements" that, in the "Secretary's sole discretion," are "necessary to ensure

23   expeditious construction" of barriers and roads). The Acting Secretary later waived NEPA

24   requirements for the El Centro and Tucson Sectors Projects as well, on the same basis. *See*

25   Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant

26   Responsibility Act of 1996, as Amended, 84 Fed. Reg. 21,798 (May 15, 2019); Determination

27   Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of

28   1996, as Amended, 84 Fed. Reg. 21,800 (May 15, 2019).

United States District Court
Northern District of California

1     Defendants contend that such waivers preclude Plaintiffs from advancing a NEPA claim.

2  Opp. at 26 (citing *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019)).

3  Plaintiffs respond that DHS's authority to waive NEPA requirements for construction under

4  IIRIRA does not extend to construction undertaken by DoD under its own spending authority.

5  Reply at 18–19. Plaintiffs further contend that "Defendants' argument is incompatible with their

6  own claim that they are not constructing the El Paso and Yuma sections of border wall under

7  IIRIRA authority, but instead under the wholly separate DoD authority," and suggest that

8  "Defendants cannot have it both ways." Reply at 18–19.

9     Neither set of Plaintiffs appears to contest that the waivers, if applicable, would be

10  dispositive of the NEPA claims. *See, e.g.*, Plaintiff States' Reply at 16, *California v. Trump*, No.

11  4:19-cv-00872-HSG (N.D. Cal. May 2, 2019), ECF No. 112 ("States Reply") ("Plaintiffs do not

12  dispute *DHS's* ability to waive NEPA compliance when constructing barriers pursuant to

13  [IIRIRA], with funds specifically appropriated by Congress to be used for that construction.")

14  (emphasis in original); *see also In re Border Infrastructure Envtl. Litig.*, 915 F.3d at 1221 ("[A]

15  valid waiver of the relevant environmental laws under section 102(c) is an affirmative defense to

16  all the environmental claims [including NEPA claims]," and is "dispositive of [those] claims.").

17  But Plaintiffs contend that "the DHS Secretary's waiver under IIRIRA does not waive *DOD's*

18  obligations to comply with NEPA prior to proceeding with El Paso Project 1 under *DOD's*

19  statutory authority, 10 U.S.C. § 284, and using *DOD's* appropriations," so that "DHS's waiver has

20  no application to this project." States Reply at 16 (emphasis added); *see also* Reply at 19

21  ("Defendants identify no statutory authority for a waiver for 'expeditious construction' under

22  DOD's § 284 authority, and none exists.").

23     The Court finds that Plaintiffs are not likely to succeed on their NEPA argument because

24  of the waivers issued by DHS. DoD's authority under Section 284 is derivative. Under the

25  statute, DoD is limited to providing support (including construction support) to other agencies, and

26  may invoke its authority only in response to a request from such an agency. *See* 10 U.S.C. § 284

27  ("The Secretary of Defense may provide support for the counterdrug activities . . . of any other

28  department or agency of the Federal Government," including support for "[c]onstruction of roads

47

and fences," if "such support is requested . . . by the official who has responsibility for the counterdrug activities."). Here, DHS has made such a request, invoking "its authority under Section 102 of IIRIRA to install additional physical barriers and roads" in designated areas, seeking support for its "ability to impede and deny illegal entry and drug smuggling activities." Citizen Groups RJN Ex. I, at 1. DHS requested DoD's assistance "[t]o support DHS's action under Section 102." *Id.* at 2. Plaintiffs' argument would require the Court to find that even though it is undisputed that DHS could waive NEPA's requirements if it were paying for the projects out of its own budget, that waiver is inoperative when DoD provides support in response to a request from DHS. The Court finds it unlikely that Congress intended to impose different NEPA requirements on DoD when it acts in support of DHS's Section 102 authority in response to a direct request under Section 284 than would apply to DHS itself.[20] *See Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 121, 129 (D.D.C. 2007) (finding DHS's Section 102 waiver authority authorized the DHS Secretary to waive legal requirements where the U.S. Army Corps of Engineers, a federal agency within the DoD, was constructing border fencing "on behalf of DHS").[21]

## 2. Likelihood of Irreparable Injury

Plaintiffs advance three theories of irreparable harm: (1) harm to their members' aesthetic and recreational interests in areas threatened by border barrier construction; (2) constitutional harm; and (3) harm to Plaintiff SBCC and its member organizations' ability to carry out their missions. Mot. at 22–25; Reply at 19–24. Critical to this analysis is that while Defendants have committed to fund border barrier construction in the El Paso Sector 1 and Yuma Sector 1 projects

---

[20] Plaintiff States argue that "[i]n another context, Congress explicitly allows the DOD Secretary to request 'the head of another agency responsible for the administration of navigation or vessel-inspection laws to waive compliance with those laws to the extent the Secretary considers necessary.'" States Reply at 17 (citing 46 U.S.C. § 501(a)). The Court finds this statute to be irrelevant to the issue here. In this case, DoD is acting solely in response to DHS's request for support under Section 102; DHS has undisputed authority to issue waivers under that section; and it would not make sense to make NEPA compliance a condition of DoD's derivative support notwithstanding DHS's waiver.

[21] To the extent Plaintiffs' argument is that the government "cannot have it both ways," the Court agrees, to the extent it found a likelihood of success as to Plaintiffs' Section 8005 argument, as discussed in Section IV.B.1.a, above.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    using funds reprogrammed and subsequently used under Sections 8005 and 284, Defendants have

2    not committed to fund any border barrier construction using Section 2808. Because of this

3    distinction, the Court addresses the two categories separately.

                        **a.**        **Sections 8005 and 284**

5        The Court finds that Plaintiffs have demonstrated a likelihood of irreparable harm to their

6    members' aesthetic and recreational interests in the areas known as El Paso Sector Project 1 and

7    Yuma Sector Project 1.

8        As the Ninth Circuit has explained, "it would be incorrect to hold that all potential

9    environmental injury warrants an injunction." *League of Wilderness Defs./Blue Mountains*

10    *Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014). "Environmental injury,"

11    however, "by its nature, can seldom be adequately remedied by money damages and is often

12    permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell,*

13    *Alaska*, 480 U.S. 531, 545 (1987). Plaintiffs must nonetheless demonstrate that irreparable injury

14    "is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Mere "possibility" of

15    irreparable harm does not merit a preliminary injunction. *Id.* But it is well-established in the

16    Ninth Circuit that an organization can demonstrate irreparable harm by showing that the

17    challenged action will injure its members' enjoyment of public land. *See All. for Wild Rockies*,

18    632 F.3d at 1135.

19        Turning to Plaintiffs' aesthetic and recreational interests, Plaintiffs provide declarations

20    from several members, detailing how Defendants' proposed use of funds reprogrammed under

21    Section 8005 and then used under Section 284 for border barrier construction will harm their

22    ability to recreate in and otherwise enjoy public land along the border. *See* Dkt. No. 30 ("Del Val

23    Decl.") ¶¶ 7–9 (alleging harm from border barrier construction and the accompanying lighting in

24    the Yuma Sector Project 1 to declarant's "ability to fish" and general enjoyment of natural

25    environment); Dkt. No. 31 ("Munro Decl.") ¶ 11 (alleging harm from border barrier construction

26    in El Paso Sector Project 1 to declarant's "happiness and sense of fulfillment," which she

27    "derive[s] from visiting these beautiful landscapes"); Dkt. No. 34 ("Bixby Decl.") ¶¶ 6, 12

28    (alleging harm from border barrier construction in El Paso Sector Project 1 to declarant's hiking

and camping interests); Dkt. No. 35 ("Walsh Decl.") ¶¶ 8–12 (alleging harm from border barrier construction in El Paso Sector Project 1 to declarant's recreational interests, including "bird watching and hiking").

Defendants argue that Plaintiffs' alleged recreational harms are insufficient for two reasons. First, Defendants argue that Plaintiffs have not demonstrated "that any species-level impacts are likely as a result of border wall construction." *See* Opp. at 29. But Defendants here misunderstand Plaintiffs' theory. Plaintiffs' declarants nowhere state that their recreational interest is merely the enjoyment of a particular species. Defendants' second argument is that their planned "replacement of existing pedestrian border infrastructure . . . will not change conditions where Mr. Del Val fishes." *Id.* at 30–31. But Defendants here understate the effects of what they now characterize as mere "replacement of existing pedestrian border infrastructure." By Defendants' own description, they intend to replace four-to-six-foot vehicle barriers in the Yuma Sector Project 1 area with a thirty-foot "bollard wall," where "[t]he bollards are steel-filled concrete that are approximately six inches in diameter and spaced approximately four inches apart" and accompanied by lighting. *See* Dkt. No. 64-9 ("Enriquez Decl.") ¶ 12 & Ex. C, at 2-1. Even if the characteristics of the wall were unchanged—which is not the case—Mr. Del Val alleges recreational harms from not only the bollard wall construction but also the accompanying lighting, which does not currently exist. *See* Del Val Decl. ¶ 9. Because the Court finds that Defendants' proposed construction in Yuma Sector Project 1 constitutes a change in conditions for Mr. Del Val, it rejects Defendants' second challenge to Plaintiffs' alleged recreational harms.

Plaintiffs have shown that Defendants' proposed construction will lead to a substantial change in the environment, the nature of which will harm their members' aesthetic and recreational interests. The funding of border barrier construction, if indeed barred by law, cannot be remedied easily after the fact, and yet Defendants intend to commence construction immediately and complete it expeditiously. Thus, "[t]he harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis." *See League of Wilderness Defenders/Blue Mountains Biodiversity Project*, 752 F.3d at 764.

//

50

b.      Section 2808

Because Defendants have not disclosed a plan for diverting funds under Section 2808 for border barrier construction, the Court cannot now determine a likelihood of harm to Plaintiffs' members' aesthetic and recreational interests.  The Court thus turns to Plaintiffs' other theories of irreparable injury.

To start, to the extent Plaintiffs rely on *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009), for the principle that a constitutional violation alone suffices to show irreparable harm, the Court finds that principle unavailing.  *See* Mot. at 25. Even under that theory of irreparable harm, Plaintiffs must demonstrate some likely irreparable harm in the absence of a preliminary injunction barring the challenged action, and not simply a constitutional violation.  *See id.* (noting that the constitutional violation must be "coupled with the damages incurred," which in that case involved "a good deal of economic harm in the interim").

Plaintiffs primary alternative theory of irreparable injury is that Defendants' invocation of and use of funds under Section 2808 for border barrier construction has harmed and continues to harm Plaintiff SBCC and its member organizations' ability to carry out their missions.  *See* Mot. at 23–25.  To this end, Plaintiffs describe that "several senior SBCC staff have devoted a '*majority*' of their time to analyzing and responding to" Defendants' invocation of Sections 2808 and 284. *Id.* at 24.  Defendants acts purportedly have forced SBCC to "field[] inquiries from members, journalists and elected officials; create[] new educational materials, media toolkits and multimedia content; and host[] trainings for staff and partners." *Id.*  Tending to these activities has frustrated SBCC and its member organizations' ability to focus on their "core missions." *Id.*  In Plaintiffs' view, "[s]uch injuries are sufficient to demonstrate a likelihood of irreparable harm and justify preliminary injunctive relief." *Id.*

But Plaintiffs conflate the type of harm to organizational mission that gives rise to Article III standing and the type of harm necessary for a preliminary injunction.  There is no dispute that the "perceptibl[e] impair[ment]" of an organization's ability to carry out its mission that results in a "drain on the organization's resources" is enough for Article III standing.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  But to warrant a preliminary injunction, Plaintiffs

United States District Court
Northern District of California

must do more than just assert irreparable harm. *Winter* commands that plaintiffs seeking a preliminary injunction establish that they are "likely to suffer irreparable harm *in the absence of preliminary relief*." 555 U.S. at 20 (emphasis added). Plaintiffs ignore the "in the absence of preliminary relief" component, but *Winter* is not complicated on this point. Under *Winter*, Plaintiffs must demonstrate that preliminary injunctive relief will prevent some irreparable injury that is likely to occur before the Court has time to decide the case on the merits. In other words, Plaintiffs must present some persuasive counterfactual analysis showing a likelihood that irreparable harm would occur absent an injunction, but would not occur if an injunction is granted. But as it stands, nothing indicates that Plaintiffs' proffered "diversion" of funds or resources would change at all if the Court were to issue an injunction. With or without an injunction, Plaintiffs will have to continue to litigate this case and otherwise divert resources in the manner they have described until the case is resolved.

All three cases on which Plaintiffs rely to support their mission-frustration theory support the Court's conclusion. First, in *Valle de Sol Inc. v. Whiting*, plaintiffs faced a "credible threat of prosecution" under an allegedly unconstitutional statute, where the resulting injury could not be remedied by monetary damages. 732 F.3d 1006, 1029 (9th Cir. 2013). But that is the quintessential sort of irreparable harm warranting an injunction. *See Ex parte Young*, 209 U.S. 123, 155–56 (1908) ("The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."). Next, in *East Bay Sanctuary Covenant v. Trump*, the plaintiff organizations sufficiently demonstrated that they faced a substantial loss of funding in the absence of an injunction. 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018); *see also Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) ("Without clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to

services.").  Finally, in *League of Women Voters v. Newby*, plaintiffs demonstrated that their mission interest in registering voters faced likely irreparable injury absent a preliminary injunction because registration deadlines would pass before resolution of the case on the merits.  838 F.3d 1, 9 (D.C. Cir. 2016) ("Because, as a result of the Newby Decisions, those new obstacles unquestionably make it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm.  And that harm is irreparable because after the registration deadlines for the November election pass, there can be no do over and no redress.") (internal quotation marks and citations omitted).

In all three cases, a counterfactual existed which demonstrated the need for a preliminary injunction.  In *Valle*, injunctive relief meant the difference between prosecution under an unconstitutional statute or not.  In *East Bay Sanctuary Covenant* and *County of Santa Clara*, injunctive relief meant the difference between organizations losing substantial funding or not.  In *League of Women Voters*, injunctive relief meant the difference between registering voters for an election in keeping with organizations' mission interests or not.  Here, however, Plaintiffs present no evidence that injunctive relief will make any difference to the purported harm to their mission interests, which will continue until this case's resolution.  Plaintiffs thus have not carried their burden to show that the "extraordinary remedy" of a preliminary injunction is warranted in this regard.  *See Winter*, 555 U.S. at 20.

Although the Court finds that Plaintiffs have not yet met their burden of showing irreparable harm in the absence of a preliminary injunction, the Court fully expects that if and when Defendants identify border barrier construction locations where Section 2808 funds will be used, Plaintiffs will have the opportunity to submit materials in support of their irreparable harm claim.  The Court takes Defendants at their word that they "will inform the Court" immediately once a decision is made to use Section 2808 to fund border barrier construction.  *See* Dkt. No. 131 at 3.

### 3.    Balance of Equities and Public Interest

When the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747

United States District Court
Northern District of California

1   F.3d 1073, 1092 (9th Cir. 2014). According to Defendants, these factors tilt in their favor,

2   because their "weighty" interest in border security and immigration-law enforcement, as

3   sanctioned by Congress, outweighs Plaintiffs' "speculative" injuries. Opp. at 34–35. The Ninth

4   Circuit has recognized that "the public has a 'weighty' interest 'in efficient administration of the

5   immigration laws at the border,'" and the Court does not minimize this interest. *See E. Bay*

6   *Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (quoting *Landon v. Plasencia*,

7   459 U.S. 21, 34 (1982)). On the other hand, "the public also has an interest in ensuring that

8   statutes enacted by their representatives are not imperiled by executive fiat." *Id.* (internal

9   quotation marks and brackets omitted). And the Court has found above that Plaintiffs' injuries as

10  to El Paso Sector Project 1 and Yuma Sector Project 1 are not speculative, and will be irreparable

11  in the absence of an injunction. Accordingly, this factor favors Plaintiffs, and counsels in favor of

12  a preliminary injunction, to preserve the status quo until the merits of the case can be promptly

13  resolved.[22]

14  **V.     CONCLUSION**

15          Congress's "absolute" control over federal expenditures—even when that control may

16  frustrate the desires of the Executive Branch regarding initiatives it views as important—is not a

17  bug in our constitutional system. It is a feature of that system, and an essential one. *See FLRA*,

18  665 F.3d at 1346–47 ("The power over the purse was one of the most important authorities

19  allocated to Congress in the Constitution's 'necessary partition of power among the several

20  departments.'") (quoting The Federalist No. 51, at 320 (James Madison)). The Appropriations

21  Clause is "a bulwark of the Constitution's separation of powers among the three branches of the

22  National Government," and is "particularly important as a restraint on Executive Branch officers."

23  *Id.* at 1347. In short, the position that when Congress declines the Executive's request to

24

25  ───────────────
    [22] The Court observes that, although Congress appropriated $1.571 billion for physical barriers
26  and associated technology along the Southwest border for fiscal year 2018, counsel for the House
    has represented to the Court that the Administration has stated as recently as April 30, 2019 that
27  CBP represents it has only constructed 1.7 miles of fencing with that funding. *See* Dkt. No. 139;
    *see also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) 132
28  Stat. 348 (2018). This representation tends to undermine Defendants' claim that irreparable harm
    will result if the funds at issue on this motion are not deployed immediately.

United States District Court
Northern District of California

appropriate funds, the Executive nonetheless may simply find a way to spend those funds "without Congress" does not square with fundamental separation of powers principles dating back to the earliest days of our Republic. *See City & Cty of San Francisco*, 897 F.3d at 1232 ("[I]f the decision to spend is determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened.") (internal quotation marks and brackets omitted) (quoting *Clinton*, 524 U.S. at 451) (Kennedy, J., concurring). Justice Frankfurter wrote in 1952 that "[i]t is not a pleasant judicial duty to find that the President has exceeded his powers," *Youngstown*, 343 U.S. at 614 (Frankfurter, J., concurring), and that remains no less true today. But "if there is a separation-of-powers concern here, it is between the President and Congress, a boundary that [courts] are sometimes called upon to enforce." *E. Bay Sanctuary Covenant*, 909 F.3d at 1250; *see also Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 825–26 (9th Cir. 2017) ("To declare that courts cannot even look to a statute passed by Congress to fulfill international obligations turns on its head the role of the courts and our core respect for a co-equal political branch, Congress."). Because the Court has found that Plaintiffs are likely to show that Defendants' actions exceeded their statutory authority, and that irreparable harm will result from those actions, a preliminary injunction must issue pending a resolution of the merits of the case.

For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART WITHOUT PREJUDICE** Plaintiffs' motion for a preliminary injunction. The terms of the injunction are as follows[23]: Defendants Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense, Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security, Steven T. Mnuchin, in his official capacity as Secretary of the Department of the Treasury, and all persons acting under their direction, are enjoined from taking any action to construct a border barrier in the areas Defendants have identified as Yuma Sector Project 1 and El Paso Sector Project 1 using funds reprogrammed by DoD under Section 8005 of the Department of Defense Appropriations Act, 2019.

A case management conference is set for June 5, 2019 at 2:00 p.m. At the case

---

[23] The Court finds that an injunction against the President personally is not warranted here. *See Cty. of Santa Clara*, 250 F. Supp. 3d at 549–40.

55

management conference, the parties should be prepared to discuss a plan for expeditiously resolving this matter on the merits, whether through a bench trial, cross-motions for summary judgment, or other means. The parties must submit a joint case management statement by May 31, 2019.

**IT IS SO ORDERED.**

Dated: 5/24/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge