IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,      ) Criminal Action
                               ) No. 19-CR-018
          Plaintiff,           )
                               ) MOTIONS HEARING
vs.                            )
                               ) Washington, DC
Roger Jason Stone, Jr.,        ) May 30, 2019
                               ) Time:  10:00 a.m.
          Defendant.           )
_____

TRANSCRIPT OF MOTIONS HEARING
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff: **Michael John Marando**
                   **Jonathan Ian Kravis**
                   **Adam Jed**
                   U.S. ATTORNEY'S OFFICE FOR THE
                     DISTRICT OF COLUMBIA
                   555 Fourth Street, NW
                   Washington, DC 20530
                   (202) 252-7068
                   e-mail:  Michael.marando@usdoj.gov
                   E-mail:  Jonathan.kravis3@usdoj.gov
                   E-mail:  Adam.jed@usdoj.gov
                   **Aaron Jon Zelinsky**
                   U.S. Department of Justice
                   Special Counsel's Office
                   950 Pennsylvania Avenue, NW
                   Washington, DC 20530
                   (202) 616-0800
                   e-mail:  Jsr@usdoj.gov
                   E-mail:  Asjz@usdoj.gov

For the Defendant: **BRUCE S. ROGOW**
                   LAW OFFICE OF BRUCE S. ROGOW, P.A.
                   100 NE 3rd Avenue
                   Suite 1000
                   Fort Lauderdale, FL 33301
                   (954) 767-8909
                   e-mail:  Brogow@rogowlaw.com

1                        **Robert C. Buschel**
                         BUSCHEL & GIBBONS, P.A.
2                        One Financial Plaza
                         100 S.E. Third Avenue
3                        Suite 1300
                         Ft. Lauderdale, FL 33394
4                        (954) 530-5301
                         e-mail:  Buschel@bglaw-pa.com
5                        **L. Peter Farkas**
                         HALLORAN FARKAS & KITTILA LLP
6                        1101 30th Street, NW
                         Suite 500
7                        Washington, DC 20007
                         (202) 559-1700 ext 102
8                        e-mail:  Pf@hfk.law
                         **Grant J. Smith**
9                        STRATEGYSMITH, P.A.
                         401 East Las Olas Boulevard
10                       Suite 130-120
                         Fort Lauderdale, FL 33301
11                       (954) 328-9064
                         e-mail:  Gsmith@strategysmith.com
12                       **Chandler Paige Routman**
                         LAW OFFICE OF CHANDLER P. ROUTMAN
13                       501 East Las Olas Blvd.
                         Suite #331
14                       Ft. Lauderdale, FL 33316
                         (954) 235-8259
15                       e-mail:  Routmanc@gmail.com

16
     Also present:       FBI Case Agent Michelle Taylor
17

18   _____

     Court Reporter:         Janice E. Dickman, RMR, CRR
19                           Official Court Reporter
                             United States Courthouse, Room 6523
20                           333 Constitution Avenue, NW
                             Washington, DC  20001
21                           202-354-3267

22

23

24

25

1              THE CLERK:  Good morning, Your Honor.  This morning

2      we have Criminal Case Number 19-18, the United States of

3      America v. Roger J. Stone, Jr.  Mr. Stone is present in the

4      courtroom, Your Honor.

5              Will counsel for the parties please approach the

6      lectern, identify yourself for the record.

7              MR. KRAVIS:  Good morning, Your Honor.

8              Jonathan Kravis on behalf of the United States.  With

9      me at counsel table are Michael Marando, Aaron Zelinsky, and

10     Adam Jed from the DC U.S. Attorney's Office, and FBI Special

11     Agent Michelle Taylor.

12             THE COURT:  All right.  Good morning.

13             MR. ROGOW:  Good morning, Your Honor.

14             Bruce Rogow for Mr. Stone.  Mr. Stone is present.

15     And we have Rob Buschel, Chandler Routman, Peter Farkas, and

16     Grant Smith, as co-counsel.

17             THE COURT:  All right.  Good morning.

18             There are multiple pending motions to take up today.

19     They're motions to dismiss, motions for discovery, motions for

20     injunctive relief.  The motions to suppress, based on the

21     adequacy of the search warrants, are a subject for another day.

22     That matter is just still being briefed.

23             I have read the motions, the oppositions, and the

24     replies, but, I wanted to give you the opportunity today to

25     answer questions or to explain or highlight issues that may not

1    have been fully explained in the papers.

2           It appears that more than one motion is predicated on

3    the same legal theory.  Certain theories run through all of the

4    motions.  So, I think I'm going to walk through this theory by

5    theory, as opposed to motion by motion.

6           I recognize that you may have divided up

7    responsibility for different issues to different members of the

8    team, so when I get -- when I shift gears from issue to issue,

9    you're welcome to call up someone else to the lectern.

10          So the first thing I wanted to talk about is raised

11   in both Docket 69, the motion to dismiss, and also the motion

12   to dismiss that's at Docket 72, and that is the question of the

13   lack of a congressional referral, and the separation of powers

14   argument based on that.  So, whose ever handling that can come

15   up first.

16          MR. BUSCHEL:  Good morning, Judge.

17          THE COURT:  Good morning.

18          MR. BUSCHEL:  Robert Buschel on behalf of

19   Roger Stone.

20          In essence, that argument is twofold:  There's a

21   separation of powers, and then it intertwines with the

22   selective prosecution argument.  It's basically that each

23   branch of government has to respect the scope and the powers of

24   the other two.

25          The government admits in its filings that there was

1   no referral from Congress, specifically the HPSCI, the House

2   Permanent Select Committee on Intelligence.  The Special

3   Counsel's Office was tasked with the investigation.  It is

4   their -- it's own investigation, the Special Counsel's

5   investigation.

6          In their response to the motion to dismiss, they

7   are -- or particularly in the indictment, the government is

8   suggesting that the FBI had its own investigation, the Senate

9   had its own investigation, the House had its own investigation,

10  which is all true.  But that, in fact, Mr. Stone talking,

11  voluntarily coming over to the Congress and speaking, affects

12  those investigations and obstructed those investigations, as

13  well.  So --

14         THE COURT:  Well, let me ask you a question:  Is it

15  your position that a congressional referral was needed for the

16  obstruction of justice and witness tampering charges, or just

17  the charges of making false statements to Congress?

18         MR. BUSCHEL:  I think, in some sense, the -- well,

19  first, let me answer, not the witness tampering charge.  That,

20  the government can consider on its own.

21         I think the obstruction part relating to lying to

22  Congress, it would require the -- would require it, as well,

23  since it's all the same; you committed perjury to the

24  congressional committee.

25         The only way the government would know about it is

1        if -- a couple areas.  First --

2               THE COURT:  Well, I just really want a specific

3        answer to that question.

4               MR. BUSCHEL:  Okay.

5               THE COURT:  You specifically said:  He is charged

6        under 1001 for making false statements --

7               MR. BUSCHEL:  Yes.

8               THE COURT:  -- and concealing evidence.  And we'll

9        deal with the concealment issue when we get to that issue.  So

10       there's the 1001 charge.

11              MR. BUSCHEL:  Yes.

12              THE COURT:  And that's the one that you specifically

13       talk about in your pleading.

14              MR. BUSCHEL:  Yes.  Yes.

15              THE COURT:  So I'm asking you if you are also saying

16       that a congressional referral was required for the obstruction

17       of justice charge under a different prong of the criminal code?

18              MR. BUSCHEL:  I think, specifically, as to a clause

19       in the obstruction as to lying to Congress --

20              THE COURT:  Okay.

21              MR. BUSCHEL:  -- the answer is yes.

22              THE COURT:  Okay.  So what authority supports your

23       claim that the executive branch doesn't have the authority to

24       prosecute any violation of federal criminal law on its own

25       initiative?

1            MR. BUSCHEL:  Well, I do think we need to start with

2      the director of the FBI, who has said that Mr. Comey has said:

3      We don't do that, that this is a special -- we don't roam the

4      halls of Congress and look for people who are lying to

5      Congress.

6            THE COURT:  Okay.  Well, what legal authority

7      supports your claim that the executive branch doesn't have the

8      authority to prosecute any violation of federal criminal law on

9      its own initiative?

10            MR. BUSCHEL:  I think it -- I think it can -- I think

11      that the Department of Justice can prosecute crimes, but I

12      think the way that they find out, that is so distinct, that the

13      rules of Congress -- and it's specifically Rule 12 -- that the

14      committee members are not supposed to talk about national

15      security matters, witnesses, testimony, anything that comes in

16      front of them, until they have determined and voted on it as a

17      matter of -- as a committee, and refer it to the Department of

18      Justice.

19            That is the separation of powers argument that we're

20      making.

21            THE COURT:  Okay.  I'm just wondering if any court

22      has ever adopted that argument.

23            MR. BUSCHEL:  To be candid, I have not -- I could not

24      find a case.  But every single case that we do review has that

25      referral or -- and if it doesn't -- I'm assuming it has those

1    referrals.  There's mention of congressional referrals.  That's

2    the only way -- typical way that the Department of Justice

3    would find out that someone testified here.  It's:  They are,

4    quote, unquote, the victim of the crime.

5         THE COURT:  Well, if Congress agreed, wouldn't that

6    be a requirement in the statute, since the false statement

7    statute, which specifically says it includes false statements

8    made before legislative branch, as well as executive branch,

9    and doesn't include upon referral, the way the contempt of

10   Congress does specifically include it, what does that suggests,

11   as a matter of statutory interpretation, to you?

12        MR. BUSCHEL:  I don't think it suggests much, because

13   the referral is important because they're the only ones that

14   know their rules require it, and the rules require the

15   referral.  And the Special Counsel's Office -- not the broad

16   Department of Justice, but the Special Counsel's Office -- is

17   limited to its own investigation by its own regulations.

18        The investigation is referring to its Special Counsel

19   investigation, not:  Well, let's go see what others were doing

20   in Congress's investigation.

21        THE COURT:  Well, when the committee, still chaired

22   by Chairman Nunes at that point, transmitted the transcript of

23   Stone's appearance to the Office of Legislative Affairs at the

24   Department of Justice, it said, in the letter attached to your

25   motion, Docket 72-3:  The committee provides these materials to

1    the Department of Justice with no restrictions on use by the

2    Special Counsel's Office or other components of the Department

3    of Justice.

4            Why isn't that the end of it?

5            MR. BUSCHEL:  Well, because it's not a referral for

6    perjury, to start with.  And second --

7            THE COURT:  Well, it says:  With no restrictions on

8    use.  So what -- why --

9            MR. BUSCHEL:  For use in its own investigation, for

10   Special Counsel's investigation, which is the Russian

11   interference with the 2016 election.  And everything else is

12   relating particularly, whether --

13           THE COURT:  But doesn't the Special Counsel

14   appointment order specifically say that anything that arises in

15   particular, anything that obstructs that investigation?  So if

16   you're given a transcript to assist you in your investigation,

17   and you believe that there's false statements in it, why

18   doesn't that fall squarely within the appointment order?

19           MR. BUSCHEL:  Because Mr. Stone wasn't speaking to

20   the Special Counsel; he was speaking to Congress.  And I'm

21   saying it is the investigation, and the investigation is the

22   Special Counsel's investigation, not the investigation the

23   House Intelligence Committee was doing.

24           THE COURT:  Well, why does that make the indictment

25   unlawful, invalid?  You're saying, you know:  This is how it

1    should have been done.  This is how it could have been done.

2    This is how -- but what does that have to do with the

3    lawfulness or the validity of the indictment on its face?

4         MR. BUSCHEL:  I think we have to start that this says

5    that it's a constitute -- about the constitutionality.  If

6    there is a separation of powers, if each branch does its own --

7    that the Congress is doing its own investigation, and --

8         THE COURT:  Well, fundamental, the separation of

9    powers is that Congress gets to legislate what the crimes are.

10   And one of the crimes that Congress legislated was lying to the

11   legislative branch, without any requirement of a referral.  And

12   the responsibility of the executive branch is to enforce every

13   single statute that Congress passed.

14        So, I don't understand how it offends the separation

15   of powers.

16        MR. BUSCHEL:  Other than that the Special Counsel

17   stepped out of the -- its specific parameters from its

18   regulations, and -- since there was no referral to the House.

19        THE COURT:  Okay.  Well, they are two separate

20   things.

21        What if it had been Main Justice and not the Special

22   Counsel?  Do you still say a referral was required.

23        MR. BUSCHEL:  I still think a referral was required

24   because the rules of Congress required it.  And I think the

25   *Yellin* case that we cite to suggests that the Court must

1    enforce those congressional rules, that they're there for a

2    reason; that congressmen shouldn't, you know, go on television

3    and talk about something that the rules of Congress should say:

4    Keep quiet.  It's a matter of national security.

5            It also shouldn't, you know, call --

6            THE COURT:  The courts get to enforce the

7    congressional rules?

8            MR. BUSCHEL:  I think that's what that case stands

9    for, that the --

10           THE COURT:  Well, you assert that certain members of

11   the committee violated the committee rules.  Are you moving to

12   dismiss the indictment on that basis, in particular?

13           MR. BUSCHEL:  I -- I think the Court can dismiss it

14   on that basis, as well.  We certainly cite -- and cite to the

15   footnotes where there are actual videos where there are

16   congressmen who are doing that.  But also, we can assume

17   that --

18           THE COURT:  And once they say what they say -- you're

19   saying they said it on television --

20           MR. BUSCHEL:  Yes.

21           THE COURT:  -- not that the Special Counsel was

22   roaming the halls and asking secret questions, but he happened

23   to catch this on television?  So how does that make his acting

24   on what is now public information improper?

25           MR. BUSCHEL:  Well, I think that some of those

1    interviews suggest that they were speaking to the Department of

2    Justice, as well, directly.  So --

3              THE COURT:  Well, your pleading posits that the

4    reason the Special Counsel asked for the information is that

5    certain members of the committee spoke to him in violation of

6    the rules.  What is that based on?

7              MR. BUSCHEL:  Based upon some references to their

8    interviews, and the fact that there was no official referral

9    from the committee.

10             THE COURT:  What do you mean, "Based on some

11   references to their interviews"?  What --

12             MR. BUSCHEL:  The footnotes in the motion will

13   suggest -- show that certain interviews were made by certain

14   congressmen on television, and in that, they suggest that they

15   were talking to the Department of Justice or Special Counsel.

16             THE COURT:  Well, even if a court could sanction a

17   congressman for violating an internal rule of the Congress --

18   which I think Congress would say would offend separation of

19   powers even more than what you're talking about -- what case

20   law says that congressional rules give rise to any individual

21   rights or cause of action that Mr. Stone can vindicate the

22   violation of the congressional rule?

23             MR. BUSCHEL:  I think at that point we're getting

24   into selective prosecution analysis, that so many different

25   things were done improperly that Mr. Stone is being singled out

1    when others did the same thing in front of the same committee,

2    and that's -- that's how the Court can enforce that.

3          THE COURT:  I'm not sure I understood the answer to

4    that question.  I'm just trying to figure out how the House

5    rules factor into this.

6          MR. BUSCHEL:  If congressmen aren't supposed to be

7    talking about testimony that was presented in front of them,

8    then without a referral, the Special Counsel's Office shouldn't

9    know about what Mr. Stone said to them, or what -- what

10   documents he provided, etcetera.

11         THE COURT:  But once Chairman Nunes says:  Here is

12   the entire transcript, do with it as you will, with no

13   restrictions --

14         MR. BUSCHEL:  I don't think "no restrictions"

15   necessarily means now you can go find him -- go indict him for

16   perjury to us.

17         THE COURT:  Well, they gave it to a prosecutor.

18         MR. BUSCHEL:  They gave it to a prosecutor to help

19   with their investigation on Russian interference with the 2016

20   election.  The specified way they would say we also think he

21   committed perjury is to a vote -- is through a committee vote

22   and a referral.

23         THE COURT:  All right.  Is there anything else you

24   want to say about the lack of a congressional referral?

25         MR. BUSCHEL:  No, Judge.

1          THE COURT:  All right.

2          I don't know what the most efficient way to do this

3     is.  I was -- I have questions on each set of issues, but maybe

4     it makes sense to have the government talk about the

5     congressional referral, and then turn to the Constitution with

6     the defense, so that they don't have to stand up, you know, an

7     hour from now and address everything.

8          MR. BUSCHEL:  Okay.

9          THE COURT:  So I don't think I have too many

10    questions for the government on this issue -- you can be seated

11    and -- but if you would like to be heard.

12          MR. JED:  Good morning, Your Honor.

13          Adam Jed for the United States.

14          It seems like some of these congressional referral

15    arguments are crosscutting.  So, I'm prepared to provide any

16    assistance I can to the Court.  I'm probably most prepared to

17    discuss the constitutional separation of powers argument that

18    they made at the podium.  It seems like my friend was starting

19    to suggest that this also bears on his selective prosecution

20    argument.

21          So depending on what you're interested in knowing

22    about, I may ask one of my colleagues to come up here.

23          THE COURT:  All right.  Well, it won't bear on the

24    selective prosecution issue if we determine that a lack of

25    congressional referral wasn't necessary.  It may or may not if

1    we determine that it was necessary.  So I think right now, I

2    just want to talk about the congressional referral issue.

3              One question I have for you is:  Is materiality a

4    question of law for the Court or a question of fact for the

5    jury?

6              MR. JED:  My understanding is materiality is an

7    application of fact to law.  Although, I apologize, I actually

8    should have said their, sort of, third motion, where they talk

9    about referal and materiality, I think I have a different

10   colleague who would be prepared to address.

11             THE COURT:  All right.

12             MR. JED:  I apologize.  We kind of responded to the

13   motions in the way that they made them.

14             THE COURT:  All right.  Well, because I want to know

15   if it can be established without a witness from the committee,

16   materiality.

17             MR. JED:  Well, why don't I have my colleague come up

18   here and address materiality issues, then.

19             MR. ZELINSKY:  Good morning, Your Honor.

20             Aaron Zelinsky on behalf of the United States.

21             In answer to your question, materiality can be

22   established without a witness from the committee.  It can be

23   established based on the behavior of the committee, the actions

24   it took, the statements it made, and the questions it asked.

25             So, in this case, Mr. Stone gave testimony.  That

1    testimony shows an interest in the committee, just on the face

2    of its testimony alone in learning about those issues.

3    Mr. Stone -- also, the committee took action as a result of

4    certain parts of that testimony.

5            For instance, they subpoenaed an individual that

6    Mr. Stone eventually named as his back channel.  They sought

7    documents, and they issued a report indicating why they were

8    interested in this matter.  And it included in that multiple

9    pages of information drawn, in part, from what the defendant in

10   this case provided to them.

11           So looking at the whole universe of material in this

12   case -- testimony, actions by the committee, reports they put

13   out, subpoenas issued -- the government believes that that does

14   indeed show that there is sufficient materiality here.

15           THE COURT:  All right.  And is materiality a question

16   that the Court is going to have to determine, or is it put to

17   the jury?

18           MR. ZELINSKY:  The materiality is an issue that is

19   ultimately for the jury to decide, Your Honor.

20           THE COURT:  All right.  Is there anything further

21   that you want to say?  As I say, I have read your opposition on

22   whether a congressional referral was necessary and...

23           MR. ZELINSKY:  Just very briefly.

24           Your Honor, I think it's important to understand

25   where the -- where the government substantially disagrees from

1    the defendant.  I want to underline for a moment one thing that

2    came up which had to do with the discussions, or public

3    statements, made by members of Congress on television.

4          The first person that brought Mr. Stone's testimony

5    to the public attention was the defendant himself.  He held a

6    press conference.  He actually released his opening statement

7    prior to having given it.  He then held a press conference in

8    the halls of Congress immediately after his statement.

9          As we say in our pleadings, at the end of that press

10   conference he said:  I don't think there are -- there are those

11   that don't buy what I'm selling, but they have no evidence to

12   the contrary.

13         So the notion that the government was out trolling

14   for this information when, in fact, it was being broadcast by

15   the defendant himself, who brought to the public's widespread

16   attention that there may be contradictions in his report, is

17   just belied by his actions.

18         Unless the Court has any further questions, that's

19   all that I've got.

20         THE COURT:  I don't think so.  Thank you.

21         MR. ZELINSKY:  Thank you, Your Honor.

22         THE COURT:  All right.  Let's go on to the

23   constitutional grounds -- the other constitutional grounds for

24   the motion to dismiss, unless, Mr. Buschel, you just want to --

25   if there's anything you want to address quickly in response to

1   what was just said.

2           It's not your position, certainly, that the Special

3   Counsel wasn't allowed to pay attention to what Mr. Stone

4   himself said on television?

5           MR. BUSCHEL:  No, Judge.  But it still doesn't mean

6   that the congressional rules should be -- you know, were waived

7   at all.

8           THE COURT:  But how does the -- if he did that, how

9   are the congressional rules even implicated in the prosecution

10  here?

11          MR. BUSCHEL:  Well, I don't think that they're just

12  using his public statement outside of the -- after the hearing

13  where he gave testimony.  They're using his transcript of what

14  was in there --

15          THE COURT:  Well, the Department of Legislative

16  Affairs asked for it and the committee gave it.  So that wasn't

17  improper, was it?

18          MR. BUSCHEL:  The Department of -- with the Special

19  Counsel's Office?  I'm sorry.

20          THE COURT:  The committee transmitted the transcript

21  to the Office of Legislative Affairs at the Department of

22  Justice -- which, I guess, handled the request because that's

23  the office within the Department of Justice tasked with

24  communicating with the Hill -- and the committee gave it the

25  transcript.

1          So, reading the transcript didn't violate any House

2     rule, if the chair of the committee -- not some minority

3     member -- passed it on; is that correct?

4          MR. BUSCHEL:  I think that -- that they certainly can

5     share the transcript, sure.

6          THE COURT:  All right.  Okay.

7          With respect to the Constitution, you point to the

8     appropriations clause, the vesting clause, the take-care

9     clause.  There's a number of aspects of it.  So, let's start

10    with the appropriations clause.

11         MR. BUSCHEL:  Okay.  That's -- Mr. Rogow will handle

12    that argument, Judge.

13         THE COURT:  Okay.  Thank you.

14         Do you have the vesting clause and take-care clause

15    and appointments clause, as well?

16         MR. ROGOW:  I do, but it's just a catchall.  And I'm

17    not going to spend a lot of time with those, because my focus

18    is on the appropriations clause as our main argument with

19    regard to the separation of powers.

20         THE COURT:  All right.  Well, I will want to talk

21    about some of your catchall arguments, since you went to the

22    trouble to put them in your motion and I'm going to have to

23    resolve them in my opinion.

24         With respect to the appropriations clause, if the

25    statute authorizes the appropriations to pay, "All necessary

1    expenses of investigations by independent counsel appointed

2    pursuant to 28 U.S. Code Section 591, or other law," why is

3    that language not broad enough to cover this situation?

4         MR. ROGOW:  Because the Special Counsel is not an

5    independent counsel.  And independent counsel is the key to

6    making the analysis in this case with regard to the

7    appropriations clause.

8         THE COURT:  Well, it doesn't say, An independent

9    counsel -- capital I, capital C -- under the Ethics in

10   Government Act.  It just says:  By independent counsel.  And

11   then it goes beyond 28 U.S. Code Section 591, but says:  Or

12   other law.

13        Wouldn't the Special Counsel be an independent person

14   who was appointed pursuant to other law?

15        MR. ROGOW:  He is not independent, Your Honor,

16   because, as the Circuit Court in this circuit has held, he is

17   an inferior officer, and you have to start at the beginning.

18        The permanent, indefinite appropriation for

19   independent counsel was geared to independent counsel,

20   independent counsel who was not answerable to the attorney

21   general, who was acting in a totally independent way.  That's

22   the language.

23        And in the first request for funds -- or, actually,

24   the first report to the GAO with regard to funds, Mr. Mueller

25   represented that he was being funded under the independent

1    counsel appropriation.  Independent counsel.  And the fact that

2    the Circuit Court has held that he, Mr. Mueller, is an inferior

3    officer.  He is not an independent counsel.

4         And in Your Honor's decision at 312 F.Supp., Your

5    Honor talked about the fact he had to consult and confer with

6    the attorney general.

7         This -- this whole inquiry must begin after 1999.

8    Because up until 1999, clearly, the independent counsel statute

9    and the Legal Ethics Act were applicable until June 1999, when

10   they sun-setted.

11        So then, after that, we're talking about:  All right,

12   what appropriation has been made by Congress to pay a Special

13   Counsel?  Now, the government has a syllogism that independent

14   counsel and Special Counsel, they are all the same.  Black's

15   Law Dictionary talks about independent counsel.  But what

16   Black's Law Dictionary says is not what the language of the

17   permanent, indefinite appropriation says.

18        So, the issue for the appropriations clause, it's a

19   novel issue.  No question about it.  It's not too often one

20   gets to talk about appropriation clause arguments.  But this is

21   a situation in which there is nothing that supports, other than

22   the government's longstanding practice.  They talk about some

23   other independent counsels.

24        They talk about the GAO report suggesting that,

25   therefore, Mr. Mueller could be paid.  But the GAO report is

1    very helpful because the GAO report --

2             THE COURT:  Are you talking about the one from the

3    Patrick Fitzgerald situation?

4             MR. ROGOW:  The 2004, yes.  The 2004.

5             THE COURT:  So, are there any reasons why this

6    situation is distinguishable from that situation?

7             MR. ROGOW:  Yes.  Because Mr. Fitzgerald had a

8    plenary power.  He was not subject to anything coming from the

9    Attorney General's Office.  In fact, they make it very clear in

10   that report -- and I'm looking at page 8 of the report, where

11   the GAO talks about just the kind of point we're talking about

12   here.

13            Admittedly, one might infer from events occurring

14   around the time, that the Congress was considering establishing

15   the permanent, independent appropriation -- indefinite

16   appropriation.  That it was with Congress's contemplation that

17   the appropriation would be used to pay the expenses of an

18   independent counsel possessing the degree of independence

19   similar to that possessed by an independent counsel appointed

20   under 28 U.S.C. Section 591.

21            THE COURT:  Well, if this was included in the budget

22   that was submitted to Congress, where is the problem?

23            MR. ROGOW:  These -- well, beginning in 1999, and

24   subsequently, this was in the congressional appropriation.  But

25   it was in it as independent counsel.  And so the --

1          THE COURT:  But knowing that -- if it was in it even

2    after the Ethics in Government Act had sun-setted and there was

3    no longer going to be a, quote, unquote, independent counsel

4    and everyone understood that, why doesn't that suggest that

5    Congress assented to the notion that there would be money

6    available?

7          MR. ROGOW:  I don't think Congress can assent by its

8    silence, or overlooking something that is a permanent -- this

9    is -- because it was a permanent appropriation, there was no

10   need to look at it every year.  But I don't think that Congress

11   can assent, by its silence, to an appropriation that does not

12   meet the plain language of the statute.  And, therefore, it

13   violates the appropriations clause by having these monies being

14   used in violation of any specific congressional appropriation

15   or an independent counsel.

16          And I think that the history that the government

17   uses, if it's pre-1999, it has no relevance here.  And post-

18   1999, we had Fitzgerald, but Fitzgerald had plenary power.  He

19   was an independent counsel.

20          And then you had Danforth, which was a very short --

21   it was the Waco investigation.  That was a very short inquiry.

22   There were no indictments.  Nothing was every raised.

23          So, really, what the government was arguing --

24          THE COURT:  So how long is "short"?

25          MR. ROGOW:  I think it was less than a year.  I think

1    eight or nine months.  Janet Reno was the --

2          THE COURT:  But you wouldn't suggest that it's based

3    on the length of the determination, that that's a determinative

4    factor?  You don't know at the beginning how long it's going to

5    take.

6          MR. ROGOW:  No, I do not suggest that.  But what I do

7    suggest is, is that there was no, kind of, conflict that

8    raised -- that got to the point where this issue would have

9    been raised.

10          I mean, to say that because nobody raised the issue

11    in the Danforth appointment, therefore, it has been accepted

12    and agreed to by Congress that this appropriation was

13    appropriate in this -- in his appointment, I think, goes much

14    too far, because this is a fundamental constitutional issue.  I

15    mean, we've cited two relatively recent cases.

16          THE COURT:  Well, how does it -- even if it is a

17    fundamental constitutional issue, you don't argue that the FBI

18    was funded out of the wrong pot, do you?

19          MR. ROGOW:  Well, some of the FBI was probably funded

20    out of the same pot.  I mean, we would need further discovery.

21    But looking at what I referred to before, the filing -- the

22    May 17 filing, the first filing that was done by Mr. Mueller

23    from May 17 to September 30th lays out the various

24    expenditures, approximately $3 million.

25          If the FBI was paid out of a different pot, that's a

1     different issue.  But the Mueller expenses were the Mueller

2     expenses under the Independent Counsel Act.

3                THE COURT:  Right.  Well, I understand you're

4     concerned about any money that flowed to the employees of the

5     Special Counsel's Office.

6                But I'm asking, you don't argue that the U.S.

7     Attorney's Office or the FBI were improperly funded, do you?

8                MR. ROGOW:  They were not improperly funded, except

9     to the extent that they drew funds through the Special Counsel

10    appropriation.

11               THE COURT:  So my question is, now that the Special

12    Counsel's Office is not involved in this prosecution, what law

13    supports the dismissal of the indictment on this basis?  I

14    mean, if Congress has a beef with the Department of Justice and

15    the Special Counsel, why does the defendant have standing to

16    raise it, and why is it an issue anymore?

17               MR. ROGOW:  Well, if they could pass off the

18    violation of the appropriations clause by merely passing off

19    the prosecution to the Department of Justice, in effect, they

20    would be laundering their violation of the appropriations

21    clause, and using the Department of Justice to conceal the fact

22    that there was an appropriations clause violation.

23               And in terms of standing, Mr. Stone has the ultimate

24    standing.  Who else is a person that is being prosecuted in a

25    situation where there is an appropriations clause violation,

1      and the case against him has been built by the special

2      prosecutor, who was not an independent counsel, as independent

3      counsel was seen both by the Legal Ethics Act and, more

4      importantly, by the permanent, indefinite appropriation?

5              And I think it's very telling that in that May 17

6      report, when Mr. Mueller reports his expenditures, he calls it

7      IC appropriation, independent counsel appropriation.  And the

8      government says:  Well, we've done it this way in the past.

9      It's okay.  It's a Special Counsel.  The Special Counsel is

10     like an independent counsel.

11              But a Special Counsel is not like an independent

12     counsel.  And the fact that we have the benefit of the Circuit

13     Court opinion at 916 F.3d, and Your Honor's opinion showing

14     that he is not an independent counsel, he is answerable to the

15     attorney general.  And that's not the way the independent

16     counsel statute -- independent counsel appropriation was

17     recorded at the beginning or throughout its life.

18              In fact --

19              THE COURT:  Well, that's why I just keep coming back

20     to the statute, which doesn't use independent counsel as a term

21     of art, capitalized, and it specifically says:  Appointed

22     pursuant to Section 591 or other law.  Which seems to suggest a

23     broader notion.

24              When I distinguished the Special Counsel's Office

25     from the independent counsel under the statute, I did it

1    because the argument presented to me was that there was

2    something unconstitutional about an independent counsel under

3    the statute, and that was the same issue that the circuit was

4    dealing with.  It wasn't dealing with this provision.

5            And by not saying an independent counsel, or

6    capital -- I mean, I realize it's not super clear, but I just

7    don't understand why your interpretation is the better

8    interpretation, given the inclusion of the words, "or other

9    law."

10           MR. ROGOW:  If the other law is the 28 CFR 600 group

11   of laws that allows special counsels to be appointed,

12   apparently.  It doesn't --

13           THE COURT:  Well, it's not just regulations.  Isn't

14   there a statute that says the attorney general --

15           MR. ROGOW:  Yes.

16           THE COURT:  Okay.  That's a law.

17           MR. ROGOW:  But the point I'm making is, is that when

18   one looks at what the permanent, indefinite appropriation

19   language is, it's appropriation for independent counsel.

20   That's what they are -- that's what they are tying their ship

21   to, the permanent, indefinite appropriation for independent

22   counsels.  That's the language that's used.

23           So how ever one may try to go around the corners of

24   that, you have to come back to that plain language.  And that

25   plain language, "independent counsel," is the key to our

1    appropriations argument, that if you are an independent -- the

2    fact that Congress has put this language in, reflects the

3    interest in Congress in dealing with, when they made this

4    permanent, indefinite appropriation, with independent counsel,

5    not counsel subject to the supervision of the attorney general.

6           So, I think the fact that it says "other law" doesn't

7    change the analysis when the analysis has to focus on:  What

8    did Congress appropriate money for?

9           THE COURT:  Well, let's say the Special Counsel was

10   funded out of the wrong pot.  What law supports dismissing the

11   indictment on that basis?

12          MR. ROGOW:  *McIntosh* and the *Sierra Club*.  The *Sierra*

13   *Club* case, which we submitted to the Court last week, involved

14   money that was being spent for funding a portion of the wall

15   that was not appropriated Congress.  And so, therefore, there

16   was an injunction issued against that portion of the

17   President's report.

18          And the *McIntosh* is a little different.  Because in

19   *McIntosh*, there was a specific congressional prohibition upon

20   using certain monies for certain kinds of criminal

21   prosecutions.  So, there you have the Congress saying:  Money

22   shall not be used for this purpose.  And the Court, the Ninth

23   Circuit, in *McIntosh* said:  You can dismiss the prosecution

24   because the prosecution should not have been brought to begin

25   with under this provision.  No money was appropriated for it.

1          THE COURT:  Isn't *McIntosh* distinguishable because

2     the Special Counsel is no longer involved here?

3          MR. ROGOW:  No.  Because we come back to my argument

4     that the Special Counsel initiated this, beginning in May 2017,

5     when he was appointed.  Everything the Special Counsel did

6     until yesterday, when the Special Counsel resigned, was under

7     this -- the money that's being sought from Congress was under

8     this permanent, indefinite appropriation for independent

9     counsels.

10         I mean, words have meaning, and when Your Honor says

11    that it's not an easy question, and there are a series of

12    answers, it reminds me of the single right answer syndrome,

13    which is not a good syndrome.  This is Karl Llewellyn, *The*

14    *Common Law Tradition*:  Avoid the single-right-answer syndrome.

15         There is no single right answer here.  The question

16    is, who has the better answer?  And our position is, we have

17    the better answer because of the language of the permanent,

18    indefinite appropriation for independent counsel.

19         You know, my syllogism is an easier one, I think,

20    than the government's syllogism.  The government's syllogism

21    is:  Independent counsel, Special Counsel, it's one and the

22    same.  The fact that the Special Counsel is subject to some

23    supervision doesn't really mean anything.  It's not such a big

24    deal.

25         But it is a big deal.

1          THE COURT:  All right.  Well, let me go back to your

2     new cannon of statutory construction, which is:  Avoid the

3     single right answer, and go with the best answer.

4          If a statute is ambiguous and capable of two

5     readings, which way am I supposed to go here?

6          MR. ROGOW:  You're supposed to go --

7          THE COURT:  If it's a criminal statute, you apply the

8     rule of lenity.  This isn't a criminal statute.

9          What's the authority that says -- if you're basically

10    willing to say:  Their interpretation makes sense, my

11    interpretation makes more sense, what is the legal principle

12    that says I go with yours as opposed to theirs?  What is the --

13    who has the burden here?  To whom do I defer?  Is there some

14    principle that should help me make this choice?

15         MR. ROGOW:  Yes, Your Honor.

16         THE COURT:  What is it?

17         MR. ROGOW:  The principle is Article I of the

18    Constitution and the appropriations clause, which is a

19    restraint upon the spending of any other branch of government.

20    And so, if there is equilibrium -- and I'm not saying there

21    is -- I'm saying we have the better argument on this point.

22         THE COURT:  All right.  So is your position that the

23    *Sierra Club* case was rightly decided?

24         MR. ROGOW:  Yes.

25         THE COURT:  All right.  Let me hear from the

1    government on the appropriations clause, unless there's

2    something else that's not in your papers that you wanted to say

3    this morning on this issue.  And then we'll go on to the

4    vesting clause in the others.

5              MR. ROGOW:  Thank you.

6              THE COURT:  All right.

7              MR. JED:  Good morning, Your Honor.

8              If I could just start out with just one preliminary

9    observations about, I think, a number of the answers that you

10   were getting from my friend.  I think there's one kind of

11   crosscutting problem in the way he's approaching this legal

12   question.

13             THE COURT:  All right.  Can you get a little closer

14   to the microphone?  Thank you.

15             MR. JED:  I apologize.  Can you hear me better now?

16             THE COURT:  Yes.

17             MR. JED:  So I just wanted to start off with one

18   brief observation, which is, it seems as if -- although, my

19   friend is ultimately looking for the best answer, even if not

20   necessarily the single right answer -- that he is actually

21   offering the Court multiple different and incompatible answers

22   when he's answering the Court's questions.

23             So to the extent that he just stands here and says:

24   Independent counsel means independent counsel.  It must mean

25   independent counsel under the Ethics in Government Act because

1    that's what I think independent counsel means -- somewhat

2    circular, but that's a separate issue -- then he really is

3    saying that you need to ignore the history, that the 2004 GAO

4    opinion -- which elsewhere he's willing to embrace -- actually

5    is wrong, that Patrick Fitzgerald should not have been funded

6    from the appropriation.

7         Elsewhere, he seems to say:  Well, maybe someone like

8    Fitzgerald is okay, but a different kind of Special Counsel is

9    not okay.

10        At that point, his kind of formalistic argument about

11   how he understands the term independent counsel to be best

12   interpreted kind of goes out the window, and then it's just a

13   question of who has more independence, or what kind of

14   independence counts as sufficient independence.

15        In his reply brief, at some point, he's willing to

16   limit it to Fisk, and say:  Well, maybe a certain kind of

17   regulation counts, but a different kind of regulation doesn't

18   count.

19        So I do just think it's worth pointing out up-top

20   that a number of his ways to address the Court's various

21   questions just contradict each other, and it's literally

22   impossible for them to all be correct at the same time.

23             THE COURT:  All right.

24             MR. JED:  I'm happy to address any questions that the

25   Court may have.  I think, just as a plain text matter, the term

1    "independent counsel" in the statute is used as a generic term,

2    in contrast to the way that it's used elsewhere in the very

3    same section of this appropriation.  It's lower case.  It

4    doesn't say an independent counsel, it just says independent

5    counsel.  It refers to --

6           THE COURT:  Is it capitalized in the Ethics in

7    Government Act?

8           MR. JED:  It's not capitalized in the Ethics in

9    Government Act.  That's why I think if it just appeared

10   lowercase throughout, I don't know that you would know, one way

11   or the other, whether it was using the term in the generic

12   sense or the specific sense.

13          But here, because in the very same section it both

14   capitalizes it when it's referring to the Ethics in Government

15   Act, and then it uses lowercase independent counsel when it's

16   saying Ethics in Government Act or other law.  Those both show

17   that it's using them in the more generic sense.

18          Essentially, independent counsel isn't just the

19   independent counsel under the Ethics in Government Act.  The

20   Ethics in Government Act called it an independent counsel

21   because that was just a dictionary term.  It meant something.

22          You can find it in Black's Law Dictionary, in debates

23   about whether to renew the Ethics in Government Act, some of

24   which we cite in our brief.  You can find people using that as

25   a generic term.  I apologize.  You can find folks using that as

1    a generic term.

2            And it seems like the crux of my friend's position

3    is, really, it's just whatever it is that was codified in the

4    Ethics in Government Act, and that any change, no matter how

5    small, means that the appropriation doesn't matter.

6            And, among other things, that's just incompatible

7    with the history.  I mean, at the point --

8            THE COURT:  The history of what?

9            MR. JED:  The history of the permanent appropriation.

10   The history of the statute that we're interpreting.  So this

11   statute was passed in December of 1987.  It was passed at a

12   time that the Ethics in Government Act, the statutory

13   independent counsel, was under constitutional attack.

14           The case that eventually became *Morrison v. Olson* was

15   working its way up through the D.C. Circuit, and the D.C.

16   Circuit had just decided one of the Iran-Contra cases, a sealed

17   case which we discussed in the brief.

18           And there, the D.C. Circuit actually avoided having

19   to address some of the constitutional challenges to the

20   statutory independent counsel because the attorney general was

21   making parallel appointments.  He said:  This person who has

22   already been selected by a three-judge court seems very

23   qualified.  I'm also just going to appoint him under the same

24   statutory authority that was used to appoint Special Counsel

25   Mueller.

1          He promulgated a regulation that would provide

2     certain independence to that person.  And so the D.C. Circuit

3     said:  Well, you know, we can avoid addressing the underlying

4     statutory and constitutional questions because we have the

5     structure in place where you have someone who was just acting

6     with certain assurances of independence under the supervision

7     of the attorney general.

8          And it would be very strange, then, when Congress

9     passed this appropriation that specifically referenced other

10    law, that they didn't have in mind the very other law that had

11    just been, according to the D.C. Circuit, the rationale for

12    being able to avoid the constitutional doubts with the Ethics

13    in Government Act framework.

14         THE COURT:  What other law would even fit in that

15    sentence?  What other law involves the appointment of

16    independent counsel?

17         MR. JED:  I mean, obviously, as textual matter,

18    "other law" could be, literally, any other law.  It could be

19    anything that Congress has yet to pass.

20         But in terms of what Congress likely would have had

21    in mind, it's the other law that was already being used to

22    appoint independent counsel; 28 U.S.C. 515, 28 U.S.C. 533.  The

23    same statutes that, in fact, the D.C. Circuit *In Sealed Case*

24    had just pointed to when talking about the appointment of that

25    independent counsel.

1          THE COURT:  All right.  Well, what about *McIntosh*?

2          MR. JED:  So, obviously, *McIntosh* doesn't even come

3     into play, if we are correct in our interpretation of the

4     independent counsel statue -- excuse me -- of the independent

5     counsel appropriation.  *McIntosh* bears on what remedy would be

6     available if we were wrong.

7          And, obviously, *McIntosh* arises in a very different

8     context, both because of the specific appropriation that was at

9     issue there, but also because of the theory that the Court was

10    willing to adopt.  So in *McIntosh* you had an appropriations

11    writer that expressly said no money could be spent on a

12    particular thing.

13         Now, there, the cases had already been initiated

14    before that appropriations writer was put in place, so I don't

15    think there was any conceivable theory that it bore on the

16    validity of the indictment.  And the question, really, was

17    just:  What happens now?  Essentially, should a court provide a

18    forum for what may very well be the continued illegal

19    expenditure of funds?

20         And there, what the Ninth Circuit essentially did is,

21    they interpreted the appropriation to say:  Here is what we

22    think the limits are.

23         And then they said:  Even given that, we don't know

24    what the appropriate remedy is.  We're just remanding it back

25    to the district courts to figure out what the appropriate

1    relief is.

2          And we cite a couple of district court decisions in

3    our brief.  It seems like they've basically understood this --

4    occasionally they use words like injunction, but they basically

5    understood this as whether the government should be allowed to

6    continue spending money illegally.

7          Now, here, I don't think my friend suggests that the

8    U.S. Attorney's Office, which is currently prosecuting this

9    case, has any kind of appropriations problem.  His argument is

10   purely retrospective.

11         THE COURT:  Well, I think he's saying:  Yes, this was

12   tainted, and so it can't continue.

13         But, I don't see any argument that from the day the

14   Special Counsel transferred this case to the U.S. Attorney's

15   Office completely -- and I think there were always some people

16   from the U.S. Attorney's Office involved with this one.  I

17   could be wrong about that -- that money's being inappropriately

18   spent.

19         He's saying that the -- at the time of the indictment

20   and the grand jury investigation, the money was being

21   inappropriately spent, and that invalidates the indictment.

22         MR. JED:  Well, that's certainly *McIntosh*.  And I

23   actually just want to press a little further on the argument

24   that he's making about the validity of the indictment, because

25   he, at no point, has explained why it is that this is either a

1       defect in the indictment itself or defect in instituting the

2       proceeding.

3              In fact, we expressly ask in our bottom side brief:

4       Which theory are you going with, and why does this fit under

5       one of those headers?

6              I mean, those are the bases in Federal Rules of

7       Criminal Procedure for dismissing an indictment.  And the only

8       response that we get in the reply brief, I actually think is

9       quite helpful to the government's position, is they cite -- I

10      believe it is a Court of Claims decision that is affirmed in an

11      unpublished federal circuit decision, where they say that a

12      government contract was invalid where there wasn't a sufficient

13      appropriation to cover the government contract.

14             You actually look at the reasoning of that decision,

15      I actually think that supports the government's theory.

16      Because there the Court wasn't just kind of saying:  Well, if

17      there was some kind of a money problem, therefore, everything

18      that happens is automatically invalid.

19             Instead, there, the Court was actually looking to a

20      particular statutory structure.  There is a statute that says

21      when an individual is allowed to bind the United States to a

22      contract, that statute has terms.  Among other things, it says:

23      You can only bind the United States to a contract if there is

24      an appropriation that will cover the duration of the contract.

25             And so to here, we have a rule which actually says

1    when an indictment should be dismissed.  It's the Federal Rule

2    of Criminal Procedure 12, and you have to figure out whether

3    this actually was a defect in the indictment itself, or a

4    defect in instituting the proceeding.

5           And in *Gray* -- I should actually point out that

6    there, the Court doesn't seem to care about what might the

7    appropriation have been.  They just say, categorically, the

8    problem is, there was no appropriation available.

9           Here, we've pointed out that if the government was

10   mistaken -- we don't think that we were.  We think that the

11   permanent appropriation applies.  But if for some reason the

12   government was mistaken, Mr. Stone has not disputed that there

13   are other appropriations that would fund this.

14          Obviously, the Department of Justice is set up to

15   have flexibility to conduct criminal and national security

16   investigations.

17          And I should actually just point out, I mean, just as

18   a very practical fact, if tomorrow the Department of Justice

19   decided that the permanent appropriation hadn't been

20   available -- we're currently in the middle of fiscal year '19.

21   In fact, the same fiscal year where Mr. Stone were indicted.

22   Tomorrow, the government could just, as a box-checking

23   exercise, say:  Well, the money that the Special Counsel spent

24   during this fiscal year will just count against a different

25   appropriation.

1          And I don't know that anyone would say that

2     government had somehow violated the Constitution earlier in the

3     year.  It would just be:  Well, you know, just as a matter of

4     paperwork, we accidentally relied on the wrong appropriation.

5     And, instead, we're going to rely on a different one.

6          THE COURT:  Well, they would say you violated that.

7          MR. JED:  They would say -- they would say that, but

8     I don't quite understand how they would be able to say that.  I

9     mean, I think the fact that, just as box-checking exercise, we

10    could just point to one appropriation rather than another, kind

11    of goes to show that the appropriation itself doesn't concern

12    the Special Counsel or anyone else in the Department of

13    Justice's ability to function.

14         Again, we have an actual statutory framework, and an

15    framework in the Federal Rules, which say that --

16         THE COURT:  All right.  Okay.  I think you're

17    circling back.

18         Is there anything that you want to add to your papers

19    that you haven't already said this morning?

20         MR. JED:  Nothing further, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         MR. JED:  Thank you.

23         THE COURT:  All right.  Mr. Rogow, I'm going to let

24    you make one or two more points with respect to this, and then

25    we'll go on to your other constitutional arguments.  And I do

1    want to know, specifically, what the legal authority is, in the

2    rules or the statute or somewhere, that says the indictment

3    should be dismissed if the incorrect appropriations were used.

4         MR. ROGOW:  *McIntosh* would be the case that I would

5    rely upon, because in *McIntosh*, the appropriation was

6    specifically prohibited to be used for a certain purpose.

7    Here -- this is an unusual case.  No question about it.  Here,

8    there's an appropriation that was not provided, and, yet, was

9    expended by the Special Counsel.

10        I'm especially troubled by the notion that if we're

11   correct, they can just redo the books and then proceed against

12   Mr. Stone based upon the Department of Justice budget.  I

13   think -- that concerns me because it goes to the heart of what

14   I think is most difficult here.  And that is, if there is no

15   appropriation, then that -- anything that was done pursuant to

16   a non -- to no appropriation violates a separation of powers

17   and really treads on the powers of Congress.

18        And the business about uppercase and lowercase is

19   interesting, because in what I referred to earlier, the Special

20   Counsel's Office notes to the statement of expenditures for the

21   period May 17, 2017, the date of appointment, and

22   September 30, 2017, funding; SCO expenditures are funded by the

23   permanent, indefinite appropriation for independent counsels.

24   And then, in parenthesis, capital I, capital C, appropriation.

25        Even the Special Counsel recognizes that it is a

1    capital letter; a capital I, a capital C.

2            So, the other thing that I want to mention is that in

3    the 2004 Fitzgerald GAO report:  The independence conferred by

4    the delegation -- the independence conferred by the delegation

5    of authority to Special Counsel Fitzgerald from the Department

6    of Justice is consistent with a fair reading of the

7    independence required of a, quote, independent counsel

8    appointed under other law.  Just the question that you are

9    asking.

10           And at that point, of course, in 2004, there had not

11   been the findings of this Court or of the D.C. Circuit that

12   that independence is different from the independence of the

13   independent counsel originally.

14           THE COURT:  Right.  Well, this specifically says --

15   it doesn't say it's the same level of independence as the

16   Ethics in Government Act.  It says it's other law independence,

17   right?

18           MR. ROGOW:  Yes.

19           THE COURT:  Okay.

20           MR. ROGOW:  But plenary --

21           THE COURT:  And what you're saying is that that's

22   less independence -- more independence than Mr. Mueller had.

23           MR. ROGOW:  Yes.  Yes.

24           THE COURT:  All right.  Okay.  Let's go on to the

25   vesting clause.

1           Is that you, also?

2           MR. ROGOW:  It is.

3           THE COURT:  All right.  What's the legal authority

4    for your contention that the executive branch doesn't have the

5    constitutional power to investigate the President?

6           MR. ROGOW:  My authority for, really, the vesting

7    clause, for the other clauses that are at issue now, is,

8    basically, Justice Scalia's dissent in *Morrison v. Olson*.

9           THE COURT:  All right.  Well, you also relied on the

10   OLC opinion, the policy against the indictment of the

11   President.  But you do concede that that didn't -- not only

12   contemplated, but permitted the investigation of a president?

13          MR. ROGOW:  Yes.

14          THE COURT:  All right.  Is there any reason why, as a

15   district court judge, I'm supposed to apply the law of a

16   dissent, no matter how well written or thoughtful one might

17   consider it to be, when there's authority otherwise?  Wouldn't

18   *United States v. Nixon* kind of end your argument before it

19   starts?

20          MR. ROGOW:  It would end my argument under the

21   obligation to follow the appropriate decisions of an appellate

22   court, but it would not end your obligation to make an

23   independent analysis of whether or not the separation of powers

24   argument is a powerful argument, and an argument worthy of

25   consideration.

1          THE COURT:  Well, assuming that I'm not writing a law

2     review article and I'm writing a legal opinion, and the Supreme

3     Court in *United States v. Nixon* specifically said that you can

4     investigate -- that the executive branch can investigate the

5     executive branch, I'm not bound by that?

6          MR. ROGOW:  You are.

7          THE COURT:  All right.  But let's say I agreed with

8     you, that I wanted to write an opinion -- not withstanding its

9     likely prompt reversal -- that said there are constitutional

10    limits on the power of the Justice Department to investigate

11    the President, what does any of that have to do with the

12    legitimacy of this investigation which was authorized to look

13    into links or coordination between the Russian government and

14    individuals associated with the campaign of the President?

15         So, why does the constitutional protection that you

16    want me to glean from Scalia's dissent extend to his campaign

17    or individuals associated with the campaign?

18         MR. ROGOW:  Because those individuals, at least the

19    ones that are within the executive department, as some of them

20    have been shown to be in recent times, would, therefore, also

21    come within the separation of powers executive privilege

22    concerns.

23         THE COURT:  How does an individual who was at one

24    time associated with the campaign, but was not, and did not,

25    take up a role in the executive branch, how would the

1    separation of powers affect him at all?

2          MR. ROGOW:  Only by -- by being able to try to claim

3    the clothing of the executive power, and clothe himself or

4    herself with it to be protected from an investigation, which

5    led to the indictment in this case.

6          But I agree with Your Honor --

7          THE COURT:  Are you saying that the separation of

8    powers are not offended by the investigation of Roger Stone?

9          MR. ROGOW:  I -- I am not saying that.

10          THE COURT:  No matter what he chooses to clothe

11    himself in?

12          MR. ROGOW:  I'm not saying that.  But what I am

13    saying is --

14          THE COURT:  Well, how is it?

15          MR. ROGOW:  Well, Roger Stone is a victim of the

16    violation of the separation of powers by virtue of this

17    investigation, which, for all intents and purposes, was an

18    investigation of the President.  And I think, actually --

19          THE COURT:  Well, the intent and purpose was to look

20    at any links and/or coordination between the Russian government

21    and individuals associated with the campaign of

22    President Donald Trump.  That could go on all day, every day

23    for quite some time without touching the President of the

24    United States; isn't that true?

25          MR. ROGOW:  It could.  But yesterday's press

1    conference, I think, kind of underscores the fact that it did

2    touch upon the President of the United States.  And the fact

3    that representations were made about the President of the

4    United States, and whether or not he violated or possibly

5    violated any kind of obstruction of justice violation brings it

6    squarely within precedent.

7              But let me address the first part of your question,

8    which --

9              THE COURT:  But that wasn't the part that the

10   defendant got caught up in.

11             Didn't he get caught up in the investigation of any

12   links and/or coordination between the Russian government and

13   individuals associated with the campaign?

14             You're not suggesting that there's some separation of

15   powers issue that would bar an investigation of the campaign,

16   are you?

17             MR. ROGOW:  Once the President was elected, yes.

18             THE COURT:  His whole campaign is cloaked with

19   immunity from investigation because there may be some theory

20   that he is?

21             Let's agree that he is.  What does that have to do

22   with someone who did not go into the White House with him?

23             MR. ROGOW:  I'm not sure I understand the question.

24   Let's agree that he is --

25             THE COURT:  Let's say the chairman of his campaign is

1    somebody that then went out into private practice afterwards.

2    Never -- didn't become chief of staff or vice president or

3    attorney general, but just was a campaigner who went back into

4    private practice to be a consultant.

5            MR. ROGOW:  Not protected.

6            THE COURT:  Not --

7            MR. ROGOW:  Not protected.

8            But, I'm going right to the heart, the initiation of

9    the investigation.  And that's where the separation of powers

10   argument is that I'm making, that at the outset this

11   investigation was an investigation, either in whole or in part,

12   of the President of the United States.  And that triggers, in

13   my mind, the Scalia dissent in terms of the use of the Justice

14   Department in this situation.

15           But, let me answer another part of your question.

16   And that is that when you asked the question to begin with

17   about how one could write an opinion, even if you agreed with

18   the Scalia dissent, you couldn't because you are bound by *U.S.*

19   *v. Nixon.*  I understand that.

20           But, what you could do is, you could voice the

21   concerns that are raised by this kind of use of this process,

22   while adhering to *U.S. v. Nixon*, so you would not be reversed

23   by the Court of Appeals.

24           But the issue would be -- because some issues have to

25   be -- just like the appropriations clause issue here, some

1    issues have to be presented.  Some issues have to be discussed.

2    Some issues have to be decided.

3              And, yes, as a district court judge you are bound by

4    the precedent, but you are not bound to not being able to say

5    what you might or might not think about this larger issue.

6              THE COURT:  Well, I appreciate that advice.  I

7    believe I've probably issued opinions where I've said I'm bound

8    by this opinion, but suggested that, perhaps, otherwise, I

9    might rule otherwise.  So if I agree with you, I'll consider

10   that option.

11             I take it we don't have to talk about the take-care

12   clause because it's basically covered by everything you have

13   just said?

14             MR. ROGOW:  Yes.

15             THE COURT:  All right.  Let's go on to the

16   appointments clause, that the Special Counsel was the principal

17   officer who had to be nominated by the President, and Senate

18   confirmed.  The D.C. Circuit has upheld the decision by a court

19   in this district rejecting this argument.

20             Do you have any basis for suggesting that that's not

21   the end of it?

22             MR. ROGOW:  You would be bound by that decision, too.

23   But, I'm just protecting the record on that issue, and making

24   sure that it is clear that we are raising that.

25             THE COURT:  All right.

1          MR. ROGOW:  And the D.C. Circuit opinion, I don't

2     think a cert petition has been filed on that yet, but, I think,

3     probably one will be.  But it is a live issue.

4          THE COURT:  All right.  So your position is not that

5     that opinion doesn't apply to this case, but that that opinion

6     was wrongly decided?

7          MR. ROGOW:  Yes.

8          THE COURT:  Okay.  And your argument that this case

9     should be dismissed because the Special Counsel wasn't

10    appointed by the President, that's the same argument,

11    essentially?

12         MR. ROGOW:  It is.

13         THE COURT:  Okay.  I think, I think we're at the end

14    of the constitutional questions that I had.  And now I want to

15    talk about the *Safavian* theory, which was raised in Docket 72.

16         Is that yours, or is somebody else going to do that?

17         MR. ROGOW:  That's Mr. Buschel's.

18         THE COURT:  All right.  Thank you.

19         MR. BUSCHEL:  So, in short, on that motion, Judge,

20    the -- Mr. Stone was not subpoenaed to appear in front of the

21    House committee.  Any documents that he turned over were purely

22    voluntary.  I think suggesting that because he didn't turn over

23    certain documents or failed to turn over certain documents,

24    that the -- that it cannot be considered obstruction.

25         The government's response is:  Well, we're saying he

1      lied about the particular documents; they did exist, and he

2      didn't turn them over.

3              The indictment doesn't read that way.  The indictment

4      puts it in a list of umbrella clauses of obstruction.  And so

5      the obstruction is failure to turn over documents on a

6      voluntary basis.  That is the *Safavian* opinion.

7              THE COURT:  All right.  Well, first, when you argue

8      that there's no duty to disclose, you said, on page 6 of your

9      motion, that the House committee didn't subpoena him or define

10     the scope of its investigation or the production of documents

11     in any meaningful way.  And you cited to Exhibit 3 to your

12     motion.  But, Exhibit 3 is not the House letter to Mr. Stone

13     requesting his appearance; it's the committee's letter

14     transmitting materials to the Department of Justice.

15             Did you want me to consider the text of the

16     committee's letter to you or to Mr. Stone in connection with

17     this motion?  And, if so, where is it in the record?

18             MR. BUSCHEL:  Okay.  I didn't realize that.  Yes, I

19     do.  And, basically, it is the broad nature of:  Give us

20     relating to what we've publicly disclosed.  And it puts the

21     burden on Mr. Stone to figure out what this committee thinks

22     was publicly disclosed and what we're investigating.

23             THE COURT:  Well, that may very well be, but I have

24     no idea what it said.

25             MR. BUSCHEL:  I'm sorry.  I didn't realize that.

1              THE COURT:  So there was an error there.  And so I

2      would appreciate it, if it is part of your motion, and it

3      seemed to be your intent that it was part of your motion --

4              MR. BUSCHEL:  Yes.

5              THE COURT:  -- if you would docket it --

6              MR. BUSCHEL:  Yes.  We will.

7              THE COURT:  -- that would be helpful.

8              MR. BUSCHEL:  We will.

9              THE COURT:  All right.  You cite *Safavian* for the

10     principal that the statute requires a showing of a duty to

11     disclose.  But *Safavian*, I think we can all agree, was talking

12     about Section 1001 and not the obstruction of justice statute.

13              Has any court applied the principal to an obstruction

14     of count?

15              MR. BUSCHEL:  Not that I've seen.

16              THE COURT:  All right.  And *Safavian* was interpreting

17     the specific principle in 1001 that said:  Whoever falsifies,

18     conceals, or covers up a material fact.

19              And it said to conceal, you can't get somebody for

20     concealing if he didn't have a duty to disclose it in the first

21     place.

22              MR. BUSCHEL:  Correct.

23              THE COURT:  But Section 1505 has different language.

24     It says:  Whoever corruptly influences, obstructs, or impedes,

25     or endeavors to influence, obstruct, or impede the due and

1    proper exercise of power of inquiry by a committee of either

2    House -- and then it goes on to the criminal penalties.

3            So, whether the government can ultimately prove that

4    the defendant did that, doesn't the indictment, on its face,

5    allege that he did that?  And isn't that all that's required at

6    this point?

7            MR. BUSCHEL:  I think that the Court needs, as a

8    matter of law, to consider:  Well, was Mr. Stone required to

9    give over everything or nothing?  And who made that

10   determination, even if he were to voluntarily comply?  And even

11   if the government says:  Well, you agree to voluntarily comply,

12   the parameters are important.

13           And I guess if we didn't file this particular letter

14   to Mr. Stone, it is important.  It just says:  Comply with our

15   publicly stated issues here.  And if -- you can't corruptly not

16   turn something over if you're not subpoenaed, if there's no

17   compulsion.

18           That is the basis of the argument.  There can't be

19   any corruption if you had no legal obligation to clarify or set

20   the House straight on what type of documents were in

21   Mr. Stone's possession.

22           I mean, if they already had it, or it was already out

23   in the public, if it was on the social media, particular

24   documents, Mr. Stone was not obligated to turn it over,

25   according to the voluntarily congressional letter, because it's

1    out there.

2           THE COURT:  All right.  Well, right now we're at the:

3    Is the indictment invalid on its face stage?  As opposed to:

4    Does this case go to the jury, or is the verdict -- a challenge

5    to it after the verdict?

6           Since, in Paragraph 41 of the indictment, the failure

7    to produce documents language doesn't stand alone, but it's

8    coupled with the allegation that he lied about their existence.

9    Quote, Stone failed to turn over and lied about the existence

10   of.  Doesn't that pass muster at this point, given how you're

11   supposed to read an indictment at this stage?

12          MR. BUSCHEL:  I don't think that it's clear enough

13   that they're bracketing those two things together, that he

14   failed to turn over and he lied about it.  I think it's -- it's

15   unclear in the sense that he failed to turn over and he lied

16   about it.

17          And I think we may have some Oxford comma issue.

18          THE COURT:  There is no comma.  It just says --

19   there's no "he."  It says:  He failed to turn over and lied

20   about.

21          MR. BUSCHEL:  Well, at the very least, then, it needs

22   to be considered that it is together, that you didn't turn them

23   over and you lied.  You can't just say:  You didn't turn over

24   something.

25          THE COURT:  If a court, at this stage, is supposed to

1    look at "and" and "or," essentially, as if they're the same,

2    for the purposes of the validity of the indictment, is this

3    good enough?

4         MR. BUSCHEL:  Well, what I'm saying is, one is legal

5    and one is illegal.  If you're not required to voluntarily turn

6    over documents, then it's not illegal conduct.  But if the

7    indictment is being interpreted -- and I'm saying it's not

8    clear -- that you didn't turn it over, and it must be coupled

9    with the fact that you lied about it, then that's sufficient

10   for purposes of what the Court is saying at this stage.  But I

11   don't think that's very clear there.

12        THE COURT:  Well, Section 1515 of the obstruction of

13   justice statute, like 1001(a)(1), includes multiple means in

14   which a statute could be violated.  It defines corruptly.  And

15   it says:  Acting with an improper purpose, including making a

16   false or misleading statement, or withholding, concealing,

17   altering, or destroying a document or other information.

18        If a jury ultimately unanimously found that he acted

19   corruptly, would it have to specify?  Would we have to do, you

20   know, a special verdict form, whether that finding was based on

21   making a false statement or withholding information?

22        MR. BUSCHEL:  That might be the better practice,

23   considering the failing to turn over something voluntary is not

24   illegal.  And if the jury were to convict on a legal conduct,

25   then the Court could not sustain on that conviction.

1          THE COURT:  Well, if there is a problem here, isn't

2     that how you solve it, with jury instructions and special

3     verdict forms that teases out what is the basis -- I mean,

4     that's what happened in *Safavian*, right?  They were given a

5     specific verdict form that said:  Are you saying he concealed?

6     Are you saying he lied?  And they had to check.  And for one

7     count they only checked out concealed, and the Court said:  No

8     good.  No duty to disclose.

9          For the other one, he checked off concealed -- the

10    jury checked off concealed and falsified, and the Court said

11    the conceal is no good.  It didn't say falsify alone wouldn't

12    be enough, because then it found some other problem with the

13    falsified count, which was the inability to use the expert that

14    they wanted to use.

15         So isn't this premature, is my point?

16         MR. BUSCHEL:  No.  I think we're -- we shouldn't have

17    to put off this issue for when we're in front of the jury when,

18    I think, we could take care of it now, and find out is this

19    truly the government's intent?  Are they putting the two -- two

20    clauses together, or are they alleging a legal conduct as a

21    ground for obstruction?

22         THE COURT:  Well, even if they're alleging alternate

23    theories, let's say there was a comma, he obstructed because he

24    failed to turn over, comma, and he obstructed because he lied.

25         If you're saying they would have to prove at trial a

1    duty to disclose, why does that invalidate the indictment?  Why

2    isn't that something that we have to ascertain once we see what

3    the evidence is?  And that was one of my problems with you not

4    giving me the letter, is I couldn't --

5              MR. BUSCHEL:  I'm sorry.

6              THE COURT:  -- even glean whether he had a duty to

7    disclose.

8              MR. BUSCHEL:  An indictment needs to charge a crime.

9    And if the Court agrees that that is not charging a crime, it's

10   legal to voluntarily not turn over compelled documents, then it

11   should never go to a jury.  I -- granted, there are many things

12   that are listed as --

13             THE COURT:  But you're not saying obstruction of

14   justice should never go to the jury.

15             MR. BUSCHEL:  No.  No.  No.  No.

16             THE COURT:  You're saying I need to cut those words

17   out of the obstruction --

18             MR. BUSCHEL:  Sure.  That we need to know which

19   series of --

20             THE COURT:  Is *Safavian* distinguishable on the

21   grounds that it was an ethics inquiry initiated by the

22   defendant, as opposed to an inquiry initiated by the

23   government, which the defendant, whether he had to or not,

24   chose to respond to?

25             MR. BUSCHEL:  I think it comes down to compulsion of

1    any kind, subpoena or any other reason why someone would have

2    to answer -- answer or provide documents in this circumstance.

3    It's about compulsion, not the setting -- specific setting.

4              THE COURT:  All right.  And I think we've talked

5    about this, but *Safavian* was, at the end of the day, a

6    post-trial appeal.

7              And so do you have any case law that supports the

8    notion that count should be dismissed on its face when it, on

9    its face, alleges multiple lawful things that could, even under

10   your theory, whether -- you say factually didn't happen,

11   legally constitute obstruction of justice, what would be the

12   basis for dismissing it now?

13             MR. BUSCHEL:  The clause, I'm saying, on the

14   voluntary.  I'm not suggesting that all the clauses --

15             THE COURT:  All right.

16             MR. BUSCHEL:  Just that.

17             THE COURT:  Okay.  Is there anything further you want

18   to say about the *Safavian* issue?

19             MR. BUSCHEL:  No.  Thank you, Judge.

20             THE COURT:  Okay.  All right.  Thank you.

21             Who's going to handle this one for the government?

22             It's true, obviously, *Safavian* was a 1001 count and

23   not an obstruction of justice count.  But the Court did seem to

24   tease out concealment from a provision in the false statement

25   statute in (a)(1) that says it's a crime to falsify, conceal,

1     or cover up, and considered it separately from the others.

2          Is there any reason why that principal underlying

3     *Safavian* wouldn't also be applied to the obstruction of justice

4     statute?

5          MR. ZELINSKY:  Yes, Your Honor.

6          I want to start where the Court left off, which is

7     just to make an overarching observation that this is a jury

8     instruction issue.  To the extent the defendant is concerned

9     with it at this point of time, this isn't the right juncture to

10    raise this concern, and that I think could be solved through

11    jury instructions.

12         I also want to point out that to the extent the

13    defendant is concerned about ambiguity in the indictment, as

14    the Court noted, the indictment is very clear on its face.  It

15    doesn't have a comma before "and."  It actually has a series of

16    semicolons and the "to whit" clause.

17         The government makes clear in our brief that we view

18    it as a conjunctive act.  That is, withholding documents and

19    lying about them.  And, indeed, the government's position is

20    that an individual may well have the right to withhold

21    documents, but once you choose to engage with Congress, or the

22    investigative body in this circumstance, you can't both

23    withhold and then lie about the absence of the documents that

24    are there.

25         As for *Safavian* and its application to this case, I

1    think that the Court touched upon -- a lot of the analysis that

2    *Safavian* is grounded on, the ethics activity that the

3    individual himself is seeking.  The Court, in *Safavian*, places

4    some emphasis on the fact that the individual with whom the

5    defendant is consulting in that context is in an advisory

6    capacity to the defendant.

7         In this circumstance --

8         THE COURT:  Well, that was in one count, but then it

9    goes on and applied the same principals to when he was meeting

10   within internal investigators.  And they went so far as to say:

11   Just because you start talking, doesn't mean that you have to

12   keep talking.

13        So, with respect to the next count, it went further

14   and applied the same principles without a whole lot of

15   explanation.  There's parts of the opinion that are difficult

16   to understand why they did what they did.  But, they did seem

17   to apply it more broadly than just to the ethics inquiry that

18   he initiated.

19        MR. ZELINSKY:  I think, first, as the Court has just

20   indicated, the analysis is most robust with respect to the

21   ethics inquiry.

22        But as for the circumstances in this case, they're

23   clearly distinguishable from *Safavian*.  This is not a

24   circumstance where the individual engaged and then ceased to

25   provide information.  This is a circumstance where the

1     defendant not only failed to provide information, he then

2     continued to lie and cover up the failure to provide that

3     information.  It was a conjunctive act.

4           And, of course, his failure to provide information

5     would have been undone had he, in fact, told the truth.  Had he

6     told the committee that he had responsive documents they were

7     looking for, then he would have been subpoenaed and would have

8     had to produce them as the committee called other individuals.

9           THE COURT:  I'm not sure I understand what a

10    conjunctive act is, because there's really more than one act

11    that you're talking about.  You're saying that he withheld and

12    he lied.  And I understand that you made a, essentially,

13    conjunctive allegation, but I think that's different from a

14    conjunctive act -- and I don't know if there is such a thing.

15          So, I guess my question is:  Would you agree that

16    under *Safavian*, and the cases that it's based on, that a jury

17    couldn't find corrupt intent based on withholding information

18    alone, if there was no duty to turn it over?

19          MR. ZELINSKY:  It depends on the interaction between

20    the defendant and the body that he's speaking to in that

21    context, Your Honor.

22          For instance, if the body were to ask, in a series of

23    back and forths, whether or not that information existed, and

24    the defendant, rather than merely saying:  I do not wish to

25    provide you with information, or, I have ceased providing you

1      with information, were to make continuing representations that

2      he didn't have any such information, then it would create

3      criminal liability under the statute.

4              THE COURT:  But, then, you are not saying that the

5      finding of corrupt intent is based on withholding information

6      alone?  You're saying it's based on the misrepresentation about

7      the existence.

8              MR. ZELINSKY:  From an evidentiary standpoint, the

9      finding of corrupt intent is supported by the continuing

10     conduct of the defendant.  It's not just that he says:  I'm not

11     going to turn this over; although, one could envision a

12     circumstance in which that alone might give rise to liability

13     under the Obstruction Act.

14              For instance, if the government were to have, in a

15     hypothetical, say, a recording of the defendant saying:  I'm

16     not going to turn this over because I want to frustrate

17     Congress's investigation, and I have no other reason besides

18     corrupt intent -- an admittedly farfetched notion -- then, in

19     that circumstance, it would be distinguishable from *Safavian,*

20     in the government's opinion.

21              Here, the failure to turn over the documents is

22     intertwined with, from an evidentiary standpoint, his

23     subsequent statements to lie.  That indicates his corrupt

24     intent for the failure to turn over documents.

25              THE COURT:  So, while *Safavian,* for each prong of

1    1001, made the jury specify:  Are you basing it on a false

2    statement or are you basing it on concealing?  Do you

3    contemplate that that's going to be necessary for corrupt

4    intent in this case?

5            MR. ZELINSKY:  I think that, as the Court indicated,

6    this is a jury instruction matter.  And we do believe that, as

7    in many cases, there will have to be some explicit jury

8    instructions insofar as what is engaged in here, that's

9    correct.

10           THE COURT:  Well, a jury instruction is a little

11   different than a special verdict form.

12           MR. ZELINSKY:  I'm sorry --

13           THE COURT:  And I don't think we're there yet.

14           But if this count proceeds, everybody is going to

15   have to think very hard about whether what they did in *Safavian*

16   was required, that they did it.  And I didn't -- haven't quite

17   found the legal authority, even on the document -- docket, for

18   why they did it.  I think they just all agreed that that would

19   be the way to go.

20           So whether we would have to do that or whether the

21   wording of this statute is sufficiently different from the

22   1001, that we might not have to.

23           One question, I guess, I also have:  Is duty to

24   disclose a question for the Court or a question for the jury?

25           MR. ZELINSKY:  Obviously, the Court makes a

1    determination as concerning whether or not there is sufficient

2    evidence of that that's been presented to the jury in the

3    course of the motion.  But we believe that that is, in general,

4    a question that will be left to the jury.

5              THE COURT:  All right.  Okay.  Thank you.

6              I don't think I have any further questions on this.

7              MR. ZELINSKY:  Thank you, Your Honor.

8              THE COURT:  Is there any response?  Anything that you

9    want to add?

10             MR. BUSCHEL:  No, Judge.

11             THE COURT:  Okay.  I think we're up to the motion for

12   discovery, and the motion to compel production of the

13   unredacted Special Counsel report, which are based largely on

14   the selective prosecution issue.

15             So before we go into that, though, let me find out if

16   the court reporter would like to take a break.

17             THE COURT REPORTER:  (Nods head.)

18             THE COURT:  All right.  Let's do that -- and everyone

19   else will probably be pleased about that, as well -- and we'll

20   reconvene at 20 of.

21             Thank you very much.

22             (Recess.)

23             THE COURT CLERK:  Your Honor, recalling Criminal Case

24   Number 19-18, the United States of America v.

25   Roger J. Stone, Jr.

1      THE COURT:  All right.  Actually, before I get to the

2  motion on selective prosecution, I had the motion to enjoin the

3  prosecution, Docket 73.

4      It looks like we wore everybody out.  But, we're

5  going to keep going.

6      All right.  Mr. Rogow, this motion is based on the

7  same issues in Docket 69.

8      But what would be the basis for any authority on the

9  part of the Court to enjoin a prosecution, as opposed to

10  dismissing the indictment, anyway?

11      MR. ROGOW:  Well, if the choice is between dismissing

12  the indictment and enjoining the prosecution, I'll take

13  dismissing the indictment.  But, enjoining the prosecution

14  assumes that there's a violation of the appropriations clause,

15  and that the case should not proceed on that basis.

16      But I can see how one would cancel out the need for

17  the other, if the indictment is dismissed with prejudice for a

18  violation of the appropriations clause.

19      But if it is not, then the question would be:  Should

20  the prosecution be enjoined on a preliminary injunction,

21  pending either a fuller hearing and disclosure, because there

22  is an issue, too, that Your Honor has raised, about monies that

23  were spent.  We think that the dye was cast right away, on

24  May 17, with the initial report.  But that could be a subject

25  of further litigation.

1          But, the injunction would be akin to what the

2     *McIntosh* court did, basically, in terms of dismissing the

3     indictment.  It's kind of a play on that.  *McIntosh* dismissed

4     the indictment; we're saying enjoin the prosecution.  I think

5     they can come out the same way.

6          THE COURT:  Well, doesn't the use of a court's

7     equitable powers turn on the unavailability of an adequate

8     remedy at law?  And wouldn't the Federal Rules of Criminal

9     Procedure constitute an adequate remedy at law?  So why are we

10    even talking about injunctions?

11         MR. ROGOW:  I guess I might have been concerned that

12    the Court would not dismiss the indictment, and would enjoin

13    the prosecution.  Perhaps the government --

14         THE COURT:  I don't think adequate remedy at law

15    means that you win --

16         MR. ROGOW:  Yes.

17         THE COURT:  -- your legal motion.  It means that you

18    have a legal argument to bring.  So if the Federal Rules of

19    Criminal Procedure are there and available for us to invoke and

20    apply as appropriate, what law would permit me to enjoin a

21    prosecution, given the *Younger* principles as interpreted by the

22    D.C. Circuit in *Deaver* and *Jarkesy*?  Shouldn't I abstain from

23    doing anything like you're discussing?

24         MR. ROGOW:  Well, there would be no need to enjoin

25    the prosecution if the prosecution is ended by the virtue of

1     dismissal of the indictment.  But, if it is not, in terms of

2     the appropriations clause argument, it may be that the

3     government would want to go to Congress and seek from Congress

4     an appropriation nunc pro tunc to try to correct that which was

5     done improperly.

6          THE COURT:  Well, I thought if they felt like they

7     needed to nunc pro tunc do something, they could just do it.

8     They still are operating under that budget.  I thought you did

9     not like that idea.

10         MR. ROGOW:  I do not like that idea.  But that's a

11    different story than rearranging your budget and having a

12    second set of books in order to avoid the appropriations clause

13    argument.

14         THE COURT:  But, you're not answering my question.

15    You have founded your motion on a legal remedy.  So whether you

16    win it or lose it, a legal remedy exists.  Does not mean

17    that -- there's just no basis for an equitable remedy here.

18         MR. ROGOW:  I do not agree, Your Honor.  But, the

19    *Younger* principles, interfering with an ongoing criminal

20    prosecution, those kind of principles, I don't think, would

21    apply in a situation where you have a fundamental violation of

22    a clause of the constitution that should prevent this from

23    going ahead.

24         But, I am agreeing that if the indictment is

25    dismissed, then there would be no need to get an injunction --

1          THE COURT:  That's not what the D.C. Circuit has said

2     in *Deaver* and *Jarkesy*.  The point isn't:  Did you win your

3     legal motion?  It's if you have legal remedies, you don't get

4     equitable remedies.

5          The D.C. Circuit said there is a basic doctrine of

6     equity jurisprudence.  The courts of equity should not act, and

7     particularly should not act to restrain a criminal prosecution

8     when the moving party has an adequate remedy at law.

9          Why are we not under that?

10         MR. ROGOW:  Because if the dismissal were denied,

11    then there would be no adequate remedy at law at that point.

12    Because if the Court denied the motion to dismiss the

13    indictment, then we are left with a proceeding that would be

14    flawed from the very outset.  And there, the equitable remedies

15    should fall back into place.

16         THE COURT:  Well, but when you talk about adequate

17    remedies at law for purposes of equity jurisprudence and the

18    APA and any other statute where it comes up, you don't

19    automatically get to go to equity because you lost at law.  You

20    had to not have a legal remedy in the first place, isn't that

21    right?

22         Do you have any case that stands for the proposition

23    that you just said?  If I have an adequate remedy at law and I

24    try to invoke it and it's denied because I wasn't entitled to

25    it, according to the court at law, I've still got equity?

1          MR. ROGOW:  The only example I could use would be,

2     perhaps, in the First Amendment area, where you're seeking

3     relief and you want an injunction against enforcement of a

4     statute.

5          And in that situation, you would be able to seek --

6     you have a remedy at law.  You have the First Amendment, your

7     remedy at law.  But, the injunction could prevent the

8     application of the statute.  And, therefore, you would be able

9     to seek injunctive relief -- preliminary injunctive relief.

10         THE COURT:  Preliminary injunctive release is based

11    on a showing that there's a likelihood of success on the

12    merits.

13         MR. ROGOW:  Substantial likelihood of success on the

14    merits and no harm to the opposing party and it's in the public

15    interest.  And in this situation, we would meet all of those

16    requirements, because to have to engage in the defense of a

17    case, if the case is flawed at the outset, and then have to

18    defend.

19         And there's no harm to the government, really, in

20    terms of the delay of the case, if there's a preliminary

21    injunction enjoining the prosecution.  If they want to take it

22    up on appeal, then that could occur.

23         THE COURT:  Can you think of any case where a court

24    has enjoined a criminal prosecution?

25         MR. ROGOW:  Oh, I have.  On the *Younger v. Harris*

1   context, I have, over the years.  Certainly, there have been

2   cases where criminal prosecutions have been enjoined.  And the

3   question is:  At what point has a criminal prosecution begun?

4         Here, it certainly has begun, but the whole *Younger*

5   *v. Harris* line of cases --

6         THE COURT:  Says you shouldn't do that.

7         MR. ROGOW:  Generally, that's right.  But, there are

8   exceptions to *Younger*.  *Gerstein v. Pugh*, for an example, is

9   one of those examples of a case where a criminal prosecution

10  was begun, the party was not brought before a magistrate

11  timely, and the case then went up on appeal.

12        And, actually, by the time the case went to the

13  Supreme Court, the person had already been convicted and served

14  his sentence.  But the injunction against failing to present

15  people to a magistrate within a reasonable time was held by the

16  Supreme Court, nine to nothing, to apply.

17        So there was an injunction against a case that had

18  been pending.

19        THE COURT:  And the reason the *Younger* principles,

20  interpreted by the D.C. Circuit in *Deaver* and *Jarkesy*, don't

21  apply here, and this case is more like *Gerstein*, is?

22        MR. ROGOW:  Because here we're talking about the

23  constitutional prohibition involving separation of powers, and

24  the irreparable injury is to the separation of powers doctrine

25  that's inherent in the appropriations clause.

1          THE COURT:  All right.  Thank you.

2          Now, let's talk about the motion for discovery about

3     selective prosecution, unless there's something further you

4     want to say about that?

5          MR. ROGOW:  Mr. Buschel will talk about that.

6          THE COURT:  Okay.  All right.

7          Besides the Mueller report, which you asked for in a

8     separate motion to compel from Docket 73, which is your motion

9     for discovery regarding selective prosecution, what are you

10    asking for?

11         MR. BUSCHEL:  In a separate motion we ask for the

12    unredacted CrowdStrike reports.  And --

13         THE COURT:  Well, that's a different motion.

14         MR. BUSCHEL:  Same motion.  Okay.

15         THE COURT:  But that was filed with your search

16    warrant motions.

17         MR. BUSCHEL:  Yes.

18         THE COURT:  So I wasn't really taking that up today.

19    I don't even think they've responded to it yet.

20         MR. BUSCHEL:  Very well.

21         THE COURT:  So that one is not ripe.  Okay.

22         MR. BUSCHEL:  Okay.  So --

23         THE COURT:  You filed a motion, Docket 73.  You said:

24    He was selectively prosecuted, and we want discovery.

25         And I want to know what you were asking for in that

1    motion.

2          MR. BUSCHEL:  I think we need to know how many people

3    were considered for lying -- lying to Congress, or lying to the

4    Department of Justice in this investigation.  I know that there

5    was a report that was required to be written, the declinations,

6    reasons why the government did not indict others.  That would

7    be a -- probably a very good start to support our selective

8    prosecution argument.

9          THE COURT:  Do you believe that there's material that

10   relates to any of that that's outside the unredacted Mueller

11   report?

12         MR. BUSCHEL:  I think there's a -- I'm not certain

13   that there were declination decision memos within the Mueller

14   report.

15         THE COURT:  There's discussion about -- even in the

16   unredacted -- even in the redacted, the public version

17   discusses, to certain extents, there are portions that you can

18   read about:  We considered this, we considered that, this

19   person got charged, this person didn't.

20         MR. BUSCHEL:  If that's it, then that would be it.

21   I'm also under the impression there might be something

22   separate; I'm not certain.

23         THE COURT:  All right.

24         MR. BUSCHEL:  So this Court had the minute order

25   regarding turning over, in camera, certain documents.  The --

1  it says:  But not limited to -- related to dissemination of

2  hacked materials.  You mentioned Mr. Stone.  And then, also in

3  that same minute order:  Not limited to pages 41 through 65 of

4  the Mueller report.

5          We don't know -- the government gave us notice, gave

6  everyone notice that it was turned over to the Court in camera.

7  We don't know what they gave to the Court in addition to pages

8  41 through 65.

9          Did they turn over all of Volume I of the Mueller

10  report?

11          THE COURT:  I did not receive the entire Mueller

12  report, and I don't believe I received all of Volume I.  I

13  can't tell you the pages off the top of my head.

14          MR. BUSCHEL:  Okay.  Well --

15          THE COURT:  I received the section that I asked for.

16  And so, I have not read the entire unredacted report.

17          MR. BUSCHEL:  Right.

18          THE COURT:  All right.  Well, let's -- but,

19  basically, it sounds like the two motions are largely one

20  motion; you want to know what they said.

21          MR. BUSCHEL:  I think there are two reasons.  We can

22  find -- the Court -- and it may be worth -- bear reading from

23  the indictment.  Paragraph 2 of the indictment says:  On or

24  been June 14, 2016, the DNC and Company 1 -- which is

25  CrowdStrike -- publicly announced that it had been hacked by

1    Russian government actors.

2          THE COURT:  That's not -- that's in your motion to

3    suppress.  That issue is not up today.

4          MR. BUSCHEL:  Well, I think -- I understand.  But --

5          THE COURT:  All right.  And you never -- you said you

6    needed it for selective prosecution.

7          So what, now, are you telling me you need all this

8    for?

9          MR. BUSCHEL:  No.  Because -- and then the next step

10   is -- well, the purpose of it is, is we're trying to figure

11   out -- it helps in terms of defense of Roger Stone's intent.

12   If he didn't believe, truly didn't believe and there was

13   evidence that he didn't believe that the Russians transmitted

14   DNC data to WikiLeaks, and if WikiLeaks data is not from the

15   Russians, then Roger Stone's belief becomes more believable if

16   it's true.

17         And so, we are trying to get to the bottom of the

18   government's belief.

19         THE COURT:  Well, if you need to -- if we're trying

20   to prove -- and I don't know why we're trying to prove it, what

21   he believed on Day 1 -- why would something he has not read

22   bear on that belief?

23         MR. BUSCHEL:  Because if it ends up that what he was

24   thinking was true, it certainly --

25         THE COURT:  It still doesn't have anything to do with

1    whether he thought it at the time.

2           MR. BUSCHEL:  So he lied about something that didn't

3    happen.

4           THE COURT:  He's not accused about lying about that.

5           MR. BUSCHEL:  He's accused about lying to -- his

6    relationship with WikiLeaks in an investigation about Russians'

7    influence on that election through WikiLeaks.

8           THE COURT:  But he isn't accused about lying about

9    who did the hacking.

10          MR. BUSCHEL:  He is accused of lying about

11   communicating with the people that received the data from

12   Russians.

13          THE COURT:  I'm not even sure that's true.  But, none

14   of that matters because that's not the motion I have in front

15   of me.  I have a motion where you said:  I need discovery to

16   support my claim of selective prosecution.  That's Docket 73.

17   Has nothing to do with Roger Stone's intent.  It has everything

18   to do with the prosecutor's intent.  So let's talk about

19   selective prosecution, and not what you haven't asked for in a

20   motion that's not before me.

21          Do you agree that the test is set out in *Armstrong* --

22          MR. BUSCHEL:  Yes.

23          THE COURT:  -- that selective prosecution requires a

24   demanding showing of both, that similarly situated people were

25   not prosecuted and, second, that there was a discriminatory or

1    improper or arbitrary or unconstitutional motivation for the

2    prosecution?  Those are the two things he has to show, correct?

3              MR. BUSCHEL:  Yes.  Yes.

4              THE COURT:  Okay.  So, who has -- who is similarly

5    situated that wasn't -- that hasn't been prosecuted, as that

6    term has been defined by the case law?

7              MR. BUSCHEL:  We give a couple of examples.

8    Mr. Jerome Corsi and Mr. Randy Credico.

9              We also asked the Court to consider that, even if not

10   as a matter of constitutional law, but the fact there wasn't a

11   referral from Congress leads to evidence -- or, it's showing

12   towards that, that the Special Counsel took interest on its

13   own.  And that in order to get that --

14             THE COURT:  Well, that doesn't go to whether they're

15   similarly situated.  That just goes to the question of whether

16   the prosecution is improper, correct?

17             MR. BUSCHEL:  Yes.

18             THE COURT:  Okay.  So let's talk about similarly

19   situated, first of all.

20             MR. BUSCHEL:  Okay.

21             THE COURT:  The allegation -- and you've said:  I'm

22   charged with lying.  They lied.  So, clearly, I was selected

23   and they weren't.

24             But the allegations here aren't just false statement,

25   but obstruction of justice by withholding evidence, tampering

1    with witnesses.

2            So are they similar or are they not?

3            MR. BUSCHEL:  They're still similar.  I don't know if

4    they withheld evidence or not, but, certainly, they lied about

5    some matters relating to Roger Stone itself.  We provided the

6    certain letter to the motion, that we filed under seal, that

7    the government provided to us, which we consider *Brady*.

8            I think that's a strong showing, since Mr. Credico

9    made public statements that are on YouTube, social media,

10    saying:  Yeah, I'm the guy.  I'm the one between Julian Assange

11   and Roger Stone, the intermediary.  That's who I am.

12           And he did it in a public forum, and it's on a

13   YouTube video.  I think that's a very strong showing, that the

14   government provided that to us already, among other things,

15   within that letter.

16           Mr. Corsi published to the world his plea agreement

17   and statement of facts.

18           THE COURT:  And said:  I don't agree with that.

19   They're making me sign something I don't agree with.

20           Now, I'm not saying that means he lied or he didn't

21   lie.  I think there is some suggestion, even in the unredacted

22   report, that there are things that he said -- I mean, the

23   redacted report, the public report, that there are things that

24   he said that could not be corroborated.

25           But, is that enough to make somebody who may not have

1    been truthful to the Special Counsel, is that similarly

2    situated to somebody who's accused of lying to Congress,

3    withholding documents, tampering with witnesses, obstruction of

4    justice?

5          MR. BUSCHEL:  I think we don't want to be so focused

6    in on just Congress, since they were players and witnesses in

7    this case.  Even in the indictment they're saying:  Well, you

8    know, Roger Stone obstructed the Senate investigation.  And he

9    never appeared in front of the Senate investigation.  He never

10   was debriefed to any Special Counsel or FBI agent.

11         Yet, they're saying that to suggest that:  Well, you

12   didn't lie to the specific committee and this Congress, those

13   two other guys.  Well, then they're not similarly situated.

14         THE COURT:  Okay.  And you said that in your reply.

15         MR. BUSCHEL:  Yes.

16         THE COURT:  I think you said you meet the standard

17   because you were the only person prosecuted without a referral.

18   But you say:  Comparators shouldn't just be limited to people

19   who lie to Congress.  Lying to Congress, lying to federal

20   agents, lying to the grand jury is the same conduct for

21   purposes of the selective prosecution analysis.

22         So it's your position that I should consider this

23   bigger pool in looking for comparators.

24         MR. BUSCHEL:  Yes.

25         THE COURT:  But then what happens to the notion that

1    you were singled out, if you get there?  Then you've got

2    Manafort, Gates, Kilimnik, Patten, Flynn, Papadopoulos,

3    van der Zwaan, Craig.

4          So, now, where -- what happens to your:  Other people

5    weren't charged, and I was singled out?  What happens to it if

6    I follow your advice and look at all alleged lying for purposes

7    of the analysis?

8          MR. BUSCHEL:  Well, I think that none of them lie --

9    well, certainly, the two I mentioned were lying about

10   Roger Stone.  I don't know about the others.  And I guess you

11   can always -- we can pull back even farther -- even further,

12   and then say:  Well, yes, there are always perjury charges.

13   I'm not saying all perjury charges.

14         THE COURT:  Well, we haven't even gotten into how

15   many people have been charged with lying to prosecutors, grand

16   jurors, Congress outside the scope of the Mueller

17   investigation.

18         MR. BUSCHEL:  Right.

19         THE COURT:  We're just talking about the Mueller

20   investigation.  Surely you know other people who have been

21   charged with lying to Congress.

22         MR. BUSCHEL:  Sure.  Sure.

23         THE COURT:  But if the point is:  They grabbed me and

24   charged me with lying, and that's so unfair because they didn't

25   charge anybody else with lying, what do you do with all these

1    other people?

2         MR. BUSCHEL:  Well, I think you have -- he's the only

3    one that hasn't -- to my knowledge, has pled guilty as to that

4    specific charge.  We still have someone who's -- you know, they

5    have this agree -- I can't speak to the others who agreed to

6    plead to that particular charge.

7         THE COURT:  Nobody -- the prosecution doesn't know

8    they're going to plead when they indict them.

9         MR. BUSCHEL:  I'm sorry?

10        THE COURT:  The prosecution doesn't know they're

11   going to plead when they indict them.  They indict the people

12   that they have probable cause to believe and that they can

13   prove beyond a reasonable doubt made a false statement, and

14   they bring a charge.

15        His complaint now isn't that:  Everybody else pled

16   guilty, and I'm still hanging out here.  Which isn't true.

17   Greg Craig hasn't pled guilty.  Mr. Kilimnik hasn't been

18   presented yet.

19        But the point is, how do you make a claim that he's

20   unique under those circumstances?

21        MR. BUSCHEL:  I think, just first step is, we're

22   asking for the discovery.  And I think --

23        THE COURT:  Right.  But the law says you have to make

24   a showing before you get it.  So what's your showing?

25        Let's go back to Corsi and Credico.  Let's say you're

1    saying:  I'm the only one who's been charged about my dealings

2    with them.  Between the three of us, I'm the only one who's

3    been charged with lying about that topic.

4            So, now, despite asking me in the reply to broaden

5    the pool, and saying that it should be broader, as a matter of

6    law, for selective prosecution, you want me to telescope back

7    to them.  So let's go back to them.

8            Let's say I find they are similarly situated.  They

9    lied in the course, allegedly, of this investigation about

10   matters similar to the matters that it's alleged that your

11   client lied about.

12           What showing do you have that he was charged, instead

13   of them, because of an unconstitutional, improper reason, which

14   you say is the fact that he supports the President?

15           MR. BUSCHEL:  Well, I certainly --

16           THE COURT:  Is it fair to say that Jerome Corsi has

17   been pretty vocal, also, about supporting the President?

18           MR. BUSCHEL:  I think he -- it depends -- yeah, I'll

19   generally say so.

20           THE COURT:  All right.  So, then, how can you say

21   that this is the improper reason why Mr. Stone was charged and

22   he wasn't, as opposed to legitimate prosecutive reasons, like

23   the ability, in their view, to prove it?

24           MR. BUSCHEL:  Because I think they're using Mr. Corsi

25   to bolster the prosecution of the perjury on Mr. Stone.  In

1    that -- I mean, he is -- I think he's --

2         THE COURT:  Well, being selected to be prosecuted is

3    different from selective prosecution.

4         MR. BUSCHEL:  Yes.

5         THE COURT:  So, the government's allowed to say:

6    You, and not you, as long as the "you" isn't based on race,

7    gender, something unconstitutional under the Equal Protection

8    Clause, the First Amendment, as you suggested.

9         And you have said that:  The differentiating factor

10   that makes my prosecution unlawful is that it's because of my

11   respect for, public statements in favor of, relationship with

12   the President of the United States.

13        MR. BUSCHEL:  Well, Roger Stone actively campaigned

14   for Donald Trump during the -- in the presidential election.

15   That makes him different than the other two, from Corsi and

16   Credico.  Neither one was directly associated with the

17   campaign.

18        THE COURT:  And what showing is there, anywhere, that

19   that's why he was charged?

20        MR. BUSCHEL:  I think it might be in the -- I -- I

21   don't have it, other than to suggest to the Court that

22   something unique is happening to Roger Stone, that he's --

23        THE COURT:  Well, that's what I don't see.  If all

24   these other people got charged, I don't see what's unique with

25   him.

1              MR. BUSCHEL:  What's unique with him is that he is

2      being charged without having a referral from Congress, that

3      he -- this isn't a conspiracy case where -- that Credico and

4      Corsi are coconspirators flipping on another conspirator.

5              These are independent substantive offenses, and the

6      government has selected -- selected Roger Stone to be

7      prosecuted by these two people who, the government has

8      presented to us, have *Brady* material that could be served to

9      impeach them.  And if we were able to see the evidence against

10     Mr. Stone in the Mueller report, that would certainly allow us

11     to evaluate whether we ultimately file that motion.

12             THE COURT:  Well, does the law permit that?  Does the

13     law say:  Well, I think I might have this?  Or does the law

14     say:  You kind of have to point to something before you get it?

15             MR. BUSCHEL:  I'm pointing to, we know that the

16     government has admitted that there was no congressional

17     referral.  We know that they presented a *Brady* letter that is

18     an exhibit to the Court, where the Court can evaluate that --

19     that both of them lied --

20             THE COURT:  Well, let's assume, for purposes of this

21     discussion, that the prosecutors had some serious concerns

22     about either one or the other's credibility with respect to --

23     I don't know if it was about all matters.  Let's say even with

24     respect to material matters, does that obligate them to charge

25     them?  Or do they have to assess:  Well, do we have a text that

1    we can point to that actually is directly inconsistent with the

2    person's testimony, and, therefore, we feel like we can prove

3    it?

4            MR. BUSCHEL:  The government felt that they could

5    prove it by presenting to Mr. Corsi a statement of facts.

6    Whether he signed it or not, or whether he, apparently, was

7    successful in his gamble by turning it down, you still know

8    what the Special Counsel's Office thought when they presented

9    him those documents.  And I think that's more than a sufficient

10   showing than in most cases where a selective prosecution

11   discovery motion is made.

12           There is something going on here, and I think a

13   little more discovery would assist us in making a determination

14   whether it's a good faith motion.

15           THE COURT:  But doesn't there have to be some

16   indication that the something going on is an unconstitutional

17   something?  And that's what I don't see.

18           MR. BUSCHEL:  That Roger Stone is associated with the

19   Trump campaign, and that is the First Amendment right that -- I

20   can't -- do I have anything that the Special Counsel's Office

21   has said or put in writing?  No, I do not.

22           But I'm sure that the unredacted portions relating to

23   Corsi, Credico, or if there's a separate memo, would --

24   certainly would shed light on that.  And, certainly, it would

25   help us evaluate that.  Maybe they do say something that

1    suggests that this is about, you know, Mr. Stone's campaign

2    activities.

3              THE COURT:  And what if they don't?

4              MR. BUSCHEL:  Then, if they don't, then we don't file

5    the motion.

6              THE COURT:  All right.  Is there anything else you

7    want to say about selective prosecution?

8              MR. BUSCHEL:  No, Judge.  Thank you.

9              THE COURT:  All right.

10             MR. KRAVIS:  Good afternoon, Your Honor.

11             THE COURT:  Is it afternoon already?

12             MR. KRAVIS:  It is.

13             THE COURT:  Okay.

14             MR. KRAVIS:  Time flies.

15             THE COURT:  In your motion -- in your opposition, you

16   seem to insist on a pretty high level of exactitude for

17   similarly situated.  But don't the cases say people who

18   committed the same basic crime, or roughly the same crime...

19             MR. KRAVIS:  Your Honor, I would say that it is

20   roughly, or the same, basic crime, but also committed in the

21   same basic manner.  And that's set forth in the *Smith* opinion

22   from the Eleventh Circuit that we cite in our opposition.

23             And the reason why that's important, that it's not

24   just the same crime, but the crime committed in the same basic

25   manner, is because, as the Court well knows, when crimes are

1    committed in different ways, there are often differing factual

2    circumstances that would justify different prosecutorial

3    decisionmaking.

4         In this instance, as we argued in our opposition, the

5    defendant is charged with obstructing a congressional

6    investigation, not only by making false statements under oath

7    to Congress, but also by engaging in witness tampering.  And

8    that additional conduct serves to distinguish this case from

9    others in which subjects are alleged to have made false

10   statements, but not to have engaged in that additional conduct.

11        And the reason why that's important for purposes of

12   the selective prosecution test is, that is exactly the kind of

13   factor that the executive branch is entitled to consider when

14   making prosecutorial decisions, when making decisions about how

15   to exercise prosecutorial discretion.

16        The executive branch is entitled to consider, is

17   entitled to say:  Because this person obstructed by engaging in

18   witness tampering, in addition to making false statements, this

19   investigation, or this prosecution, warrants prosecutorial

20   resources.  Whereas, another matter in which the only

21   allegation is false statements does not warrant prosecutorial

22   resources.

23        It's because those kinds of differences in how the

24   crime was committed are legitimate considerations for the

25   executive branch in exercising prosecutorial decisionmaking

1    that the *Armstrong* test -- the first prong of the *Armstrong*

2    test requires that the defendant, before he gets discovery, can

3    point to an individual who committed the same basic crime in

4    the same basic manner, and, yet, still was not prosecuted.

5           And as the Court was suggesting in its questions, the

6    defendant just hasn't come anywhere close to making that kind

7    of showing, a showing that would warrant further discovery in

8    this case.  The defendant just hasn't identified anyone who is

9    alleged to have committed the acts of obstruction in the way

10   that he is alleged to have acted, and, yet, was not prosecuted.

11          And it's that kind of showing that *Armstrong* requires

12   before the defendant -- before he's entitled to discovery on a

13   claim of selective prosecution.  I know the defense has said,

14   several sometimes:  Well, we just need the discovery in order

15   to be able to figure it out.

16          But under *Armstrong*, that's just not how this works.

17   The *Armstrong* test says that the reason the defendant doesn't

18   get discovery on this kind of claim in the first instance is

19   because there is a presumption of regularity that attaches to

20   prosecutorial decisionmaking by the executive branch.

21          And so the defendant has to make a preliminary

22   showing to overcome that -- a colorable showing on both prongs,

23   is what the D.C. Circuit has said, to overcome that rigorous

24   standard before the defendant is entitled to any discovery.

25          THE COURT:  Well, when you get to Credico, and not

1    Corsi, you get to the issue of, now, sort of the plus conduct.

2    You know, alleged lies plus threats.  And you say in your

3    opposition:  Well, we talked to that guy, and he didn't take it

4    very seriously.

5              MR. KRAVIS:  Right.

6              THE COURT:  So does that go to whether the situations

7    are similar?  Or does it go to whether, not withstanding the

8    similarity, there's legitimate prosecutive reasons, as opposed

9    to inappropriate reasons?

10             MR. KRAVIS:  I think it goes to the similarity.  I

11   think the strength of the evidence and the nature of the

12   government's evidence, and particularly what the evidence shows

13   about the seriousness of the conduct, and whether the alleged

14   crime could actually be proved in a court of law, is all part

15   of the similarly-situated analysis.

16             Because those are all things that the executive

17   branch is entitled to consider when making these prosecutorial

18   decisions.  The executive branch chose not to prosecute

19   Individual B because the evidence of that conduct just wasn't

20   very good, or because the evidence showed it wasn't very

21   serious, or it wasn't something the government could likely

22   prove in a court of law.

23             That suggests that Individual B is not similarly

24   situated to another person who is alleged to have engaged in

25   conduct that is more readily provable, that is supported by

1      stronger evidence, that appears far more serious.

2              These are factors that the executive branch is

3      entitled to consider when deciding how to allocate its

4      prosecutorial resources.  And that's why it is a factor that

5      the Court can and should consider at the first stage of the

6      *Armstrong* test.

7              THE COURT:  Well, you also said at the first stage of

8      the test, that the information that's been provided by these

9      witnesses has been provided to Stone in discovery.

10             How does the fact that you've been appropriately open

11     in terms of *Brady*, as you're required --

12             MR. KRAVIS:  Right.

13             THE COURT:  -- how does that bear on similarly

14     situated or not?

15             MR. KRAVIS:  I don't think it bears on similarly

16     situated.  The information was being provided to Mr. Stone in

17     discovery for independent -- to comply with independent

18     discovery obligations that do not have anything to do with the

19     selective prosecution motion.

20             With respect to the individual identified as Person 2

21     in the indictment, that individual is a prospective trial

22     witness in the government's case in chief.  And so the

23     government has obligations there about the prior statements of

24     the witness, and about information that could be used to attack

25     the witness's credibility and so on and so forth.

1          I'm not commenting now on the admissibility of any of

2    that evidence, but that's why we're providing it.  But by

3    providing that evidence to the defense to comply with other

4    discovery obligations, we're not conceding that they also have

5    a selective prosecution basis for obtaining that evidence.

6          THE COURT:  Well, how do I find they aren't similarly

7    situated because there are legitimate prosecutive

8    considerations that differentiate them, if we don't have a

9    record about what led you to differentiate them?

10         MR. KRAVIS:  Well, in terms of -- like, in terms of

11   the evidentiary record, that is, the facts, the evidence that

12   distinguishes the -- that distinguishes the cases, we have

13   proffered that information in our opposition.  We've provided

14   it to the defense in discovery, again, for other purposes.

15         We can provide it to the Court to complete the

16   record.  We can provide it to the Court to complete the record,

17   but --

18         THE COURT:  Well, you spelled out why you didn't

19   think the witness tampering rose to the level of prosecutive

20   offense.

21         But with respect to Corsi, who you said:  Well, one

22   reason why they may not be substantially similar is because if

23   you're just talking about false statement, it's not false

24   statement versus false statement.  It's false statement versus

25   false statement plus, all this other stuff.

1          So is that the basis for that?  Or are you saying

2     there's something about the nature of the false statements, the

3     evidence that you have, other things?  Is there anything else

4     in the record, besides that, as what makes them not

5     substantially similar -- or similarly situated?

6          MR. KRAVIS:  In terms of the factual --

7          THE COURT:  Or do you just want to say:  Look at

8     Sealed Exhibit X, Y, Z?

9          You can tell me that.  But --

10          MR. KRAVIS:  Right.  I just want to try to choose the

11     words carefully now.

12          In terms of the record that is before the Court on

13     this motion, that -- that is what we have -- that is what we

14     have -- that is what we have presented.  Of course, there is

15     also the additional argument that the Court alluded to, that

16     this individual identified in the indictment as Person 1 is

17     not -- does not stand outside the arbitrary classification, the

18     arbitrary class that the defendant alleges and, therefore, even

19     if they were similarly situated, this doesn't really help the

20     selective prosecution argument.

21          The thing I wanted to add is, I do not want to

22     suggest that that is -- that what we have written in our

23     filings is the only basis for the government's decisionmaking

24     with respect to these two -- with respect to the people we're

25     talking about now.  But with respect to the record before the

1    Court on this motion, that is correct.

2         THE COURT:  Well, I guess that's my question.  Am I

3    supposed to just decide this based on the record, and then

4    presume under the presumption that you had other legitimate

5    prosecutive reasons?  Is that how this is done?

6         MR. KRAVIS:  I believe it is.  Because the defense is

7    required -- the defense is required to make the -- the defense

8    is required to make the colorable showing before we even get

9    into what else is in the government's possession that might

10   shed light on this issue.

11        Now, with respect to what is in the defense's

12   possession with respect to this individual we're talking about,

13   identified in the indictment as Person 1, the government has

14   provided the defense with those statements, as well, in an

15   abundance of caution, and in an effort to be as forthcoming as

16   possible with respect to our discovery obligations.

17        So, I don't -- so, they have that additional

18   information, and they could use that information, if they

19   wanted to try to -- if they wanted, to try to make their

20   colorable showing.  That is, to point to the information that

21   we, the government, have provided them to say:  This is what

22   shows us that the government's evidence with respect to this

23   witness entitles us to further discovery on a claim of

24   selective prosecution.

25        Now, for the person they're talking about now, I

1    don't think that's going to get them very far.  Because to the

2    extent the allegation is that the defendant was singled out for

3    prosecution because of his political affiliations, and that

4    that's what creates the arbitrary classification, I don't

5    believe that there is any basis for them to allege that this

6    other person stands outside of that class, such that the

7    government's different prosecutorial decisions could be

8    attributed to that arbitrary classification.

9            THE COURT:  All right.  In your motion -- in your

10   opposition, you also hung your hat largely on the principle

11   that Rule 16 doesn't support the production of deliberative

12   materials.

13           MR. KRAVIS:  Yes, Your Honor.

14           THE COURT:  But are we in a somewhat different

15   situation here, since the report, even large portions of it

16   that are deliberative, was prepared with an understanding that

17   it would be shared, and it was, indeed, publicly shared?  So,

18   you know, the usual:  Oh, my gosh, you don't get to see the

19   prosecutor's thought process; we have 445 pages of prosecutor

20   thought process.

21           So is that really a basis anymore?

22           MR. KRAVIS:  I believe it still is.  Two points to

23   make about that.  The first is that with respect to some

24   portions of the Special Counsel's final report to the attorney

25   general, the Justice Department made the decision that the

1    interest in public disclosure outweighed whatever work product

2    or deliberative process privilege it might otherwise hold onto

3    with respect to that material.

4         But this case is on a different footing because, as

5    the Court is aware, the material that relates to the

6    allegations in this indictment, that material is largely

7    redacted from the Special Counsel's report.  And the defense

8    has not pointed to a portion of the report to say:  Because the

9    government selectively disclosed this information about the

10   Roger Stone case, it now has to provide us with all of it.

11        That is to say, the government's decisions about how

12   much of the report to make public with respect to other

13   allegations, with respect to other cases, with respect to other

14   actors, doesn't mean that the defense is now entitled to

15   additional information that was redacted about this case.

16        THE COURT:  No.  And I don't think they're arguing

17   that.  But, I do think it bears on the force of the argument

18   you made, that this motion just fails at the starting gates

19   because Rule 16 doesn't include deliberative materials.  Well,

20   maybe, but I think we're in a slightly different universe here.

21        MR. KRAVIS:  But I would just add to that that in

22   addition to the point about the specific protections for work

23   product in Rule 16, there is the additional point that there is

24   just no legal authority that entitles the defense to these

25   materials.  The government's discovery obligations arise out of

1    rules of criminal procedure and Supreme Court cases, like *Brady*

2    and *Giglio*.

3           And there is no legal authority that the defense can

4    point to that requires the government to produce this kind of

5    material.  And I think that point holds before you even get to

6    the argument about work product and deliberative process and

7    the protections for that material in Rule 16.

8           I think the defense would have a different argument

9    if there were factual material or evidentiary material that was

10   gathered in the course of the investigation that is relevant to

11   the allegations in the indictment that is not being produced to

12   the defense in discovery.

13          But, as the Court saw from the information that we

14   provided ex parte and in camera, the underlying evidentiary

15   material, the 302s, the grand jury transcripts, the emails

16   obtained through search warrants, the other documents, those

17   materials relevant to the allegations in this case are being

18   provided to the defense, and have largely been provided to the

19   defense in discovery.

20          And given that they have received that underlying

21   factual material, there is just no discovery obligation left.

22   There's just no legal principle that entitles them to this

23   further material.  And that's true before we even get to the

24   specific protections for deliberative process and work product

25   in Rule 16.

1          THE COURT:  Let me just talk briefly about the

2    redacted portions of the report that I requested and reviewed.

3          What I received was annotated in a way that the

4    public report is annotated, to indicate the basis for specific

5    redactions.

6          MR. KRAVIS:  The colors of the boxes.

7          THE COURT:  Correct.  And they're all black on the

8    public report, but I think they are all identified as to which

9    reason they're redacted on the public report.

10         There are nods happening over at the defense table.

11    I think I'm correct about that because I was looking at the

12    public report again this morning.

13         So, I'm not sure there's anything that even comes

14    close to what the defense is looking for in anything that is

15    being withheld on the basis of personnel privacy, national

16    security, (6)(E).

17         And at the end of the day, almost everything that was

18    withheld in the sections of the report that relate to this

19    defendant, and the people who relate to the defendant, were

20    withheld on harm to ongoing prosecution in the blue boxes.

21         What is the harm, really, to the defendant seeing

22    what's in the blue boxes?

23         MR. KRAVIS:  I believe that the -- the harm, as I

24    would describe it, is similar to the harm from allowing a

25    defendant to review the factual summary in a prosecution

1    memorandum; that the write-ups reflect how the government takes

2    particular pieces of evidence that it gathers from various

3    places using various means, and assembles them to create a kind

4    of narrative, or to tell a story about the alleged crime and

5    how it is alleged to have been committed and why it's alleged

6    to have been committed and how the government would prove all

7    of that in a criminal trial.

8              In terms of the underlying facts that are in the blue

9    boxes, I don't think there -- in this section -- in the section

10   of the report that relates to the defendant, I don't think

11   there is anything there that -- in terms of facts, that the

12   defense has not already received in the form of the underlying

13   evidence that relates to the charges in the indictment.

14             But, the write-up shows how the government would tell

15   the story.  And it's -- in that sense, it is very similar to a

16   factual background section in a prosecution memorandum, and

17   that's just not something that the defense is entitled to.

18             THE COURT:  It's kind of a work product-like theory.

19             MR. KRAVIS:  It's two things.  It's work product, but

20   it's also, just as I said before, there's no legal principle

21   that requires us to produce it.  There's no Rule of Criminal

22   Procedure.  There's no Supreme Court case.  There's nothing

23   that says this is the kind of thing that the government is

24   obligated to provide to the defense.

25             In contrast to all the various other categories set

1     forth in Rule 16, and the material described in *Brady* and in

2     its progeny, and *Giglio* and its progeny, which we're doing, and

3     we largely have done, there's no legal authority that says:

4     And, by the way, the defense in a criminal case is also

5     entitled to a factual write-up, as the government summarizes

6     it.

7              THE COURT:  Well, I am troubled by the notion that

8     that may be different in a case when half the factual write-up

9     has been publicized.  And so, one thing I may want to do is to

10    identify with some other color, or in some manner, the portions

11    of the blue boxes that I want to ask you -- assuming all of

12    your arguments on the lack of any legal authority for producing

13    them -- what, if anything, would be the harm of producing them?

14    I may want to take it that step.

15             MR. KRAVIS:  Understood.  We'll comply.

16             THE COURT:  I think there were aspects where I could

17    see it crossing the line in terms of deliberativeness.  But, an

18    awful lot of it seemed, given the nature of the discovery that

19    you're providing, to be duplicative, and, therefore, largely

20    harmless.

21             And it seemed that at the end of the day, that that

22    might be preferable to a finding by me saying:  I read it, and

23    there's nothing in there that supports a special selective

24    prosecution claim.

25             And so that would -- if I did that, I think that

1   would have to be -- it would be something that only goes to the

2   government, but I think it would further inform my rulings in

3   this case.  So I may do something like that.

4         Is there anything else you wanted to say about this

5   issue?

6         MR. KRAVIS:  No.  Nothing further from government.

7         THE COURT:  Okay.  All right.

8         MR. KRAVIS:  Thank you, Your Honor.

9         THE COURT:  All right.  I forget who argued this one.

10        Do you have any response to any of this?  And do you

11  see any problem, now that I've been given some portion of the

12  report in camera to review, to then communicate further on --

13  not an ex parte communication, but simply filing something

14  under seal that only they could get, that would say:  Tell me

15  what's wrong with this?

16        MR. BUSCHEL:  I don't want to talk the Court out of

17  what you just said, so --

18        THE COURT:  Okay.  All right.  Well, that's what I

19  wanted to know.  But I don't ever like to communicate with one

20  side and not the other, without at least the other knowing that

21  I'm communicating with the other side.

22        MR. BUSCHEL:  Yes.

23        THE COURT:  All right.  Is there anything further you

24  want to add?

25        MR. BUSCHEL:  At the risk of buying it back, can I

1        say a couple of things?

2               I do want to say, in terms of the Court's analysis of

3        the perjury-plus analysis, on page 3 of the Mueller report,

4        there's a reference to David Lugo, who is a witness, who Mr.

5        Credico says that he was threatened by Mr. Credico (sic).  So I

6        think that should be a part of the analysis.

7               As far as the analysis of what Mr. Credico believed

8        or didn't believe it was a real threat, I want to say there is

9        strong evidence that Mr. Credico does not believe that he --

10       or not reasonably could believe that he was threaten by

11       Mr. Stone.  They do not live in the same state.  They've been

12       friends for -- on and off for decades.

13              And, lastly, as to the -- as to the report itself,

14       the Court is correct, *Brady* and Rule 16 does not contemplate a

15       public report.  And in addition, Congress has seen this

16       unredacted report.  So I think it's --

17              THE COURT:  Some.  Is it the whole Congress or just

18       certain committees?

19              MR. BUSCHEL:  You're correct, some -- some, from my

20       understanding.

21              THE COURT:  All right.  Now, with respect to the

22       report itself, as opposed to the general motion for discovery

23       for selective prosecution that we've been talking about, you

24       said you needed it also in connection with your argument that

25       the indictment is invalid absent the referral.

1          But, there is no dispute about whether there was a

2    referral; is that correct?

3          MR. BUSCHEL:  Correct.  Now we're confident that

4    there is none.

5          THE COURT:  So you don't need the report for that?

6          MR. BUSCHEL:  Correct.

7          THE COURT:  Okay.  You also asserted in your pleading

8    that the Special Counsel would have to prove at trial that a

9    conspiracy existed to interfere with the 2016 presidential

10   election, and that it involved the Russian government, before

11   Stone could be charged with obstructing an investigation into

12   that Russian conspiracy.

13         And you say:  The entire theory of obstruction is --

14   and I think the emphasis is yours -- entirely dependent on,

15   first, finding collusion.

16         But I don't see that argument advanced as a basis for

17   any of your motions to dismiss.  So when and how would this

18   issue come before the Court to resolve?

19         MR. BUSCHEL:  I think it's certainly been brought up

20   in the motion to suppress.  And I think, eventually, that it's

21   something that the government would have to prove at trial, if

22   it were to get that far.

23         THE COURT:  What's the case law that supports this

24   position?

25         MR. BUSCHEL:  The case as to what?  That the

1    government has --

2         THE COURT:  That the entire theory of obstruction is

3    entirely dependent on first finding a conspiracy.

4         MR. BUSCHEL:  I think that that's what the

5    indictment is.  The first eight paragraphs of the indictment

6    say that.  They outline that there was a Russian hack, the hack

7    took away DNC data.  That data was transmitted to WikiLeaks.

8    And WikiLeaks consulted or communicated with Roger Stone, and

9    Roger Stone lied about those communications.  And I think that

10   needs to be -- if the Russians didn't transmit, or WikiLeaks

11   did not receive data from the Russian government --

12        THE COURT:  That's different.  You said the Special

13   Counsel would have to prove that a conspiracy; the collusion,

14   the campaign and the Russians together.

15        MR. BUSCHEL:  Right.

16        THE COURT:  That's different than saying what you're

17   saying -- which I'm also not sure is true, but it's different

18   than what you said in the motion.  Right now you're saying they

19   have to prove a Russian hack before they can prove that he lied

20   about a Russian hack.  Maybe; maybe not.

21        But you asserted in this pleading that they have to

22   prove conspiracy between the campaign and the Russians to

23   charge him with obstruction of justice.  And I would like to

24   know what case law supports that.

25        MR. BUSCHEL:  I think I might be quoting the -- he

1    wasn't an attorney general then, but, the Barr memo.

2          THE COURT:  I think you do quote the Barr memo.  So

3    my question to you is:  What case law supports your legal

4    position?

5          MR. BUSCHEL:  Just the memo, Judge.

6          THE COURT:  All right.  If the obstruction of justice

7    statute specifically includes obstruction of a legislative

8    proceeding as a possible basis for an obstruction of justice

9    charge, and the legislature has no power whatsoever to bring

10   criminal charges, how could the existence of a criminal charge

11   be a prerequisite for prosecution for obstructing Congress?

12         MR. BUSCHEL:  How would it be a prerequisite?

13         THE COURT:  Yeah.  Why would you have to prove that a

14   conspiracy existed to prove that you obstructed a congressional

15   investigation into the Russian interference?

16         MR. BUSCHEL:  Because that was the whole purpose of

17   the congressional investigation, the interference by Russians,

18   and as it relates to the Trump campaign.

19         THE COURT:  You're still missing the link.

20         You said -- you said that you have to prove

21   collusion, which isn't --

22         MR. BUSCHEL:  A conspiracy.

23         THE COURT:  That you have to prove conspiracy to get

24   to obstruction of justice, and you haven't cited me a case that

25   says that.  And I'm asking you to do some statutory analysis

1    now and explain to me how, if the obstruction of justice

2    statute specifically permits and contemplates someone being

3    prosecuted for being -- for obstructing a congressional

4    investigation -- put aside an executive investigation or a

5    grand jury investigation or law enforcement investigation --

6    and Congress can't charge people with conspiracy, how could a

7    charge of a conspiracy be a necessary prerequisite for a charge

8    of obstructing Congress?

9         MR. BUSCHEL:  Oh, I think before -- I think the

10   Special Counsel, before it charges, needs to be able to prove

11   the conspiracy.  I know it's not Congress's job.  They don't

12   have the authority to prosecute, but they do have the power to

13   investigate for their own purposes.  And those stated purposes

14   was the links between the Russian state and the Trump campaign,

15   and that needed to be established before any type of

16   obstruction could be lodged by the Special Counsel's Office.

17        THE COURT:  All right.  Well, why do you need the

18   report to make this argument?  The only place you've made this

19   argument to date in this case is in connection with your motion

20   to compel the unredacted report.

21        And if you're going to advance this legal theory --

22   for which you've told me you have no authority -- that you have

23   to prove conspiracy to be able to prove obstructing an

24   investigation, why do you need the report to make that

25   argument?

1    If there's no indictment for conspiracy, isn't that a

2    matter of public record, and isn't that also in the

3    unredacted -- in the redacted report?

4    MR. BUSCHEL:  I think the way we get to, let's say,

5    materiality as to the perjury is, the entire backdrop is that

6    there was a conspiracy.  Otherwise, what did he lie about?  He

7    lied about whether the light was red.  It doesn't matter if the

8    light was red or green.  It's a matter of:  Well, what are we

9    talking about?

10    In the Congress we were talking about whether the

11    Russian state conspired with the Trump campaign, or any

12    individuals associated.  If none of that happened, then what do

13    any of these Counts 2 through 6 mean, in terms of lying or --

14    or Count 1, obstructing an investigation into something that

15    didn't occur?

16    That's the point we're making.

17    THE COURT:  Well, does the report say it didn't

18    occur?  Or does it just say doesn't have the evidence to

19    establish it, and point out that people lied, deleted things?

20    There was some foreign evidence they weren't able to get?  Does

21    the report say what you just said, that it didn't occur?  Or

22    does it just say:  We're not charging it, we don't have enough

23    evidence to charge it?

24    MR. BUSCHEL:  I think saying that it wasn't charged

25    means they didn't have -- has to be they don't have the

1       evidence, or they've turned it down.

2               THE COURT:  All right.  Well, in any event, as I

3       said, the only place I see this argument is in this motion.

4               So, is this something that's going to be teed up at

5       some point in some fashion to be decided?  Or is it something

6       that you think is going to be brought up as Rule 29 at the

7       close of the government's case?

8               MR. BUSCHEL:  I can't speak yet.  But, sure, those

9       are options.

10              THE COURT:  All right.  Okay.

11              MR. BUSCHEL:  And I'll be acutely aware of that for

12      the Court.

13              THE COURT:  All right.  Well, I mean, we're at a

14      point where any motions based on a defect of the indictment

15      were supposed to have been filed.  And so it's not clear to me

16      why you suddenly -- you know, you just could have threw this in

17      there.  The government has given law for why you're incorrect

18      about that.  But I don't know that I have to decide it to

19      decide any motions before me.

20              Do you agree with that?

21              MR. BUSCHEL:  Except the motion to compel itself,

22      that would be...

23              THE COURT:  All right.  But, as you said, you don't

24      necessarily need the report to make that legal argument that a

25      conspiracy indictment was necessary.

1          MR. BUSCHEL:  The legal argument before the

2     factual -- yes.  I understand what you're saying.  I agree.

3          THE COURT:  All right.  Okay.

4          All right.  I think I've gone through all the motions

5     that are ripe.  I understand that you still have the motion to

6     discover the report about the hacking.  You have motions to

7     suppress.  We've got many things that we're going to continue

8     to talk about, but they're not fully briefed and they're not

9     before me this morning.

10          MR. BUSCHEL:  Not this morning.

11          THE COURT:  Is there anything else that anyone on

12     your side of the room wants to add, based on any of the motions

13     that are fully briefed, and that I have under advisement at

14     this point?

15          MR. BUSCHEL:  The matter is submitted, Judge.

16          THE COURT:  All right.  Thank you.

17          Is there anything else the United States wants to say

18     this morning?

19          MR. KRAVIS:  Nothing further.  Thank you, Your Honor.

20          THE COURT:  Okay.  All right.

21          Thank you, everybody, for your patience and your time

22     this morning.

23                              *   *   *

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                         Dated this 30th day of May, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25