UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROGER J. STONE, JR.,<br><br>　　　　　Defendant. | Criminal No. 19-cr-18-ABJ |

### GOVERNMENT'S MOTION TO ADMIT MOVIE CLIP

The United States of America, by and through Jessie Liu, United States Attorney for the District of Columbia, respectfully moves *in limine* to admit into evidence at trial a short film excerpt that defendant Roger J. Stone, Jr., referenced in communications that are alleged to have constituted witness tampering. The relevant scene is important context for understanding Stone's references—including what Stone intended to communicate to the witness and how Stone would have understood the witness's likely understanding of those messages.

### BACKGROUND

On January 24, 2019, a federal grand jury sitting in this District returned a seven-count indictment charging Stone with obstructing a congressional investigation in violation of 18 U.S.C. § 1505 (count 1); making numerous false statements to Congress in violation of 18 U.S.C. § 1001(a)(2) (counts 2-6); and witness tampering in violation of 18 U.S.C. § 1512(b)(1) (count 7). As relevant to this motion, the Indictment alleges that Stone gave false information to the House Permanent Select Committee on Intelligence ("HPSCI") about his communications with Person 2, including that Person 2 was his sole intermediary to Organization 1. Doc. 1 ¶¶ 25-28.[1] The

---

[1] Stone falsely testified that he possessed no written communications regarding the head of Organization 1. Doc. 1 ¶ 22. In fact, Stone had sent and received numerous text messages and emails with Person 2 on this topic. *Id.* ¶ 23. Stone falsely testified that his public references in

Indictment alleges that when HPSCI then invited Person 2 to testify, Stone began telling Person 2, through conversations, emails, and text messages, either to testify falsely that Person 2 was the identified intermediary, to testify falsely that Person 2 could not remember what he had told Stone, or to invoke his Fifth Amendment privilege against self-incrimination. *Id.* ¶ 37. On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege if required to appear by subpoena, in part to avoid providing the Committee with evidence showing that Stone's testimony was false. *Id.* ¶ 38. Between the fall of 2017 and the spring of 2018, Person 2 repeatedly implored Stone to correct his false testimony about Person 2's involvement in Stone's efforts to communication with the head of Organization 1, to no avail.

Several of Stone's relevant communications to Person 2 on this subject referenced "Frank Pentangeli." *See id.* ¶ 37(e). For example, on November 28, 2017—the day that Person 2 received a subpoena from HPSCI—Person 2 and Stone exchanged text messages about Person 2's refusal to testify before the Committee. Stone wrote, "This whole thing will be worthless unless you find a place to do your Frank Cannon 10 July imitation 'sure sure Roger Stone this Roger Stone that.'" In his next message, Stone clarified, "Frank Pantsgele [sic]." Similarly, on December 1, 2017, in response to a text message from Person 2 saying, "Back-channel my f***** ass," Stone wrote, "Start practicing your Pantagele [sic]," and then forwarded Person 2 links to several articles discussing Stone's identification of Person 2 as his sole intermediary to the head of Organization 1.

---

August 2016 to communicating with the head of Organization 1 through an intermediary referred to a single individual, whom he later falsely identified in a letter to the Committee as Person 2. *Id.* ¶¶ 25-28. Stone also falsely testified that he never asked an intermediary to communicate anything to the head of Organization 1 other than a request to confirm the accuracy of a Twitter message published by the head of Organization 1. *Id.* ¶ 29. In fact, Stone had asked Person 2 to pass on a specific request for information to the head of Organization 1 about documents on a particular subject. *Id.* ¶ 30. Additionally, Stone falsely testified that he never communicated with his intermediary in writing, when in fact Stone had sent and received numerous text messages and emails with Person 2 regarding Organization 1. *Id.* ¶¶ 31-34.

And on March 18, 2018, during an exchange about Person 2's status in the HPSCI investigation, Stone emailed Person 2, "'Sure I know Roger Stone. he [sic] was in the Olive Oil business with my father. But that was a long long time ago. So I told them Roger Stone this, Roger Stone that. You should do Pantagela [sic] on Erin Burnett." (Burnett is a CNN news anchor.)

Frank Pentangeli is a character from the movie *The Godfather Part II*. In the movie, Pentangeli appears to testify before a congressional committee investigating organized crime. At the beginning of the hearing, Michael Corleone, the organized crime figure whom Pentangeli is about to implicate in his testimony, enters the hearing room accompanied by Pentangeli's brother. In the film, Pentangeli sees the two men enter the hearing room. In the next scene, a member of Congress states that Pentangeli's anticipated testimony can "corroborate our charges on enough counts for this committee to recommend a charge of perjury against Michael Corleone." Pentangeli is then asked a question about Corleone's involvement in organized crime. Pentangeli looks behind him, sees Corleone and his brother sitting together, and then claims not to know anything about organized crime. In a dramatic moment, Pentangeli is asked a question about Michael Corleone's connections to organized crime, and answers, "I don't know nothing about that. Oh—I was in the olive oil business with his father but that was a long time ago." Pentangeli then claims that he fabricated his prior testimony regarding Corleone: "I kept saying Michael Corleone did this, Michael Corleone did that, so I said, yeah, sure." The entire scene is approximately four minutes and 20 seconds long.

## DISCUSSION

"The general rule is that relevant evidence is admissible." *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993); *see* Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of

consequence in determining the action." Fed. R. Evid. 401; *see, e.g.*, *Foster*, 986 F.2d at 545; *see also Old Chief v. United States*, 519 U.S. 172, 178-179 (1997) (evidence is relevant if it is "a step on one evidentiary route" to establishing an element of an offense). Relevance is therefore "determined in the context of the facts and arguments in a particular case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

The clip of Pentangeli's testimony is directly relevant to the charge of witness tampering in this case (count 7). To prove that charge, the government must prove that Stone corruptly persuaded or attempted to corruptly persuade a witness (Person 2), intended to interfere in that witness's testimony, and did so with a current or future proceeding in mind. *See* 18 U.S.C. § 1512(b)(1); *United States v. Edlind*, 887 F.3d 166, 172-174 (4th Cir. 2018). Several of the allegedly criminal acts at issue involve Stone's referencing Pentangeli and Pentangeli's testimony before Congress. To understand Stone's messages to Person 2—including what Stone was asking Person 2 to do—it is necessary to understand those references. Taken in context, Stone's references to Pentangeli and to specific lines spoken by Pentangeli are unmistakable. This clip is highly probative of the meaning of Stone's communications to Person 2.

The probative value of the movie clip is all the more obvious given Stone's public explanation for his repeated references to Frank Pentangeli in the communications with Person 2 at issue in this case. In an interview on the day of his arrest, Stone explained that as "far as Frank Pentangeli is concern [sic], [Person 2] is an impressionist. That's what he does and he does a very funny Frank Pentangeli imitation. Certainly not an implication . . . that he should lie." Cuomo Prime Time, (Jan. 25, 2019), http://transcripts.cnn.com/TRANSCRIPTS/1901/25/CPT.01.html. An article several weeks later quoted Stone as similarly stating, "this is all wrong, [Person 2] is an impressionist. He does impressions. I was asking him to his Frank Pentangeli impression. I

wasn't telling [Person 2] to lie." Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel,* New Yorker Magazine, (Feb. 11, 2019), https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel. Watching the movie clip and seeing the context in which Pentangeli delivers the lines that Stone quotes to Person 2 makes clear that Stone's messages were not mere references to Person 2's abilities as an impressionist, but rather were a suggestion that Person 2 testify falsely to Congress. The clip is an important piece of evidence on this critical, disputed issue.

The clip should not be excluded under Federal Rule of Evidence 403, which provides that relevant evidence "may" be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This standard is "somewhat exacting," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 555 (D.C. Cir. 1993), and a decision to exclude otherwise relevant evidence under Rule 403 is "an extraordinary remedy to be used sparingly." *United States v. Libby*, 467 F. Supp. 2d 1, 20 (D.D.C. 2006). For the reasons just discussed, the clip's probative value is substantial. It provides critical context to understand the meaning of messages that are directly at issue in this case. At the same time, the risks that Rule 403 guards against are nonexistent or minimal. As noted, the clip is just a few minutes long. While the film itself concerns the mafia, the proffered clip does not show any violence, and the subject matter of the film and conduct of the main character who instigated Pentangeli's testimony are wholly dissimilar from the conduct charged in this case.[2]

To be sure, the scene depicted in the clip is dramatic, and it bears a similarity to some of

---

[2] The clip contains one reference to violence—one of the questions that prompts Pentangeli that he has no knowledge of organized crime activity includes a reference to "[y]our sworn affidavit that you murdered on the orders of Michael Corleone."

the facts in this case—a witness in a congressional investigation pressured to give false testimony to scuttle a potential perjury referral. But that is not prejudicial or confusing—it is what explains Stone's references to the scene in his messages to Person 2 about how Person 2 should address issues raised in Stone's prior testimony to HPSCI. Rule 403 "does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998). Nor does it "generally require the government to sanitize its case" or "to tell its story in a monotone." *Id.* The government is entitled to present its evidence in a manner that "creat[es] a coherent narrative" of the defendant's "thoughts and actions in perpetrating the offense for which he is being tried." *Old Chief v. United States*, 519 U.S. 172, 192 (1997). Rule 403 "focuses on the 'danger of *unfair* prejudice,' and gives the court discretion to exclude evidence only if that danger '*substantially* outweigh[s]' the evidence's probative value." *Gartmon*, 146 F.3d at 1021 (emphases and alteration in original). For purposes of the Rule, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief*, 519 U.S. at 180. Having engaged in the "outrageous act[]," *Gartmon*, 146 F.3d at 1021, of sending messages to a congressional witness referencing a famous movie character who gave false testimony before a congressional committee, Stone cannot now complain that his own repeated movie reference is too prejudicial for the jury to see.

Applying similar reasoning, courts have regularly admitted excerpts of films where those excerpts elucidate the meaning of relevant communications. In *United States v. Willis*, 346 F.3d 476, 489 (4th Cir. 2003), for example, the defendant described his conduct "by using references to the movie, CASINO." *Id.* at 484 & nn. 6-7. The district court entered the entire film into evidence and let both parties play excerpts to the jury. *Id.* at 486. The Fourth Circuit upheld the district

court's decision to allow the government to play an excerpt because the defendant "mentioned CASINO" in a conversation that was at issue "and the movie undoubtedly explained the meaning of the conversation." *Id.* at 489; *see also United States v. Jayyousi*, 657 F.3d 1085, 1107-1108 (11th Cir. 2001) (upholding admission of clip of CNN interview with Osama bin Laden referenced in conversation between defendants); *United States v. Smith*, 749 F.3d 465, 496-497 (6th Cir. 2014) (upholding admission at trial of movie clips from *The Boiler Room*, a film about a fraud scheme perpetrated by an investment firm, based on evidence that the defendants had distributed copies of the movie to new employees); *United States v. Monsalvatge*, 850 F.3d 483, 494 (2d Cir. 2017) (upholding admission of movie clip from *The Town* to show that the defendants incorporated ideas from the movie into their crimes and noting that "we cannot assume that our jurors . . . are such delicate consumers of media that they would so easily have their passions aroused by short film clips of the sort at issue here").

Here, as in *Willis*, the proffered movie clip is relevant to place the defendant's own statements in context. The movie clip makes clear that in his communications with Person 2, Stone used the name "Frank Pentangeli" and the lines spoken by that character to persuade Person 2 to behave as Frank Pentangeli did in the movie, *i.e.*, to falsely tell a congressional committee that he did not have knowledge of incriminating information that could lead to perjury charges. The movie clip shows the jury the image that Stone intended to evoke in Person 2's mind when he sent those communications. To not show the clip at trial would deprive jurors of significant context for understanding critical messages in this case.

7

**CONCLUSION**

For the foregoing reasons, the government should be permitted to admit a short excerpt from *The Godfather Part II* in which the Frank Pentangeli character testifies before Congress.

    Respectfully submitted,

    JESSIE K. LIU
    U.S. Attorney for the District of Columbia

By: /s/
    Jonathan Kravis
    Michael J. Marando
    Assistant United States Attorneys

    Adam C. Jed
    Aaron S.J. Zelinsky
    Special Assistant United States Attorney
    555 4th Street NW
    Washington, D.C. 20530

July 26, 2019

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ROGER J. STONE, JR.,**<br><br>Defendant. | **Criminal No. 19-cr-18-ABJ** |

## ORDER

This matter having come before the Court on the Government's Motion in Limine to Admit Movie Clip, and the Court having reviewed the parties' submissions, and for good cause shown, it is

On this _____ day of _____, 2019, hereby:

ORDERED that the Government's motion is GRANTED and the movie clip referenced in the government's motion will be admitted into evidence at trial.

_____
HON. AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE