## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                                             )
UNITED STATES OF AMERICA,          )
                                                             )
              v.                                           )          Crim. Action No. 19-0018 (ABJ)
                                                             )
ROGER J. STONE, JR.,                       )
                                                             )
                       Defendant.              )
———————————————————— )

## MEMORANDUM OPINION

Defendant Roger J. Stone, Jr. has filed a number of motions attacking the validity of the indictment pending against him. He asks the Court to dismiss the indictment, to enjoin the prosecution, and to order the government to provide discovery related to the decision to bring this case in the first place.  While the Court will require the government to provide the defendant with the bulk of the material redacted from the Report of the Special Counsel that relates to him, it concludes that the defense has not identified any legal grounds that would support dismissing or enjoining this action or authorizing discovery into the prosecutors' internal deliberations. Indeed, the defendant acknowledged at oral argument that many of his theories for why the indictment is invalid are foreclosed by Supreme Court and D.C. Circuit precedent that this Court is required to follow.  Thus, with the limited exception of the motion to compel the production of the Report of the Special Counsel, which will be granted in part, the motions will be denied. This opinion does not assess, and it should not be interpreted as expressing any point of view about, the strength of the government's case.  Defendant is presumed to be innocent unless and until the government proves his guilt beyond a reasonable doubt.

## BACKGROUND

This case arises out of the investigation conducted by Special Counsel Robert S. Mueller III.  On May 17, 2017, pursuant to 28 U.S.C. §§ 509, 510, and 515, Acting Attorney General Rod J. Rosenstein appointed Mueller to serve as Special Counsel for the United States Department of Justice.  *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters*, Order No. 3915-2017, https://www. justice.gov/opa/press-release/file/967231/download ("Appointment Order").  The Appointment Order authorized the Special Counsel to investigate

> (i)      any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and
>
> (ii)     any matters that arose or may arise directly from the investigation; and
>
> (iii)    any other matters within the scope of 28 C.F.R. § 600.4(a)[1]

and to prosecute federal crimes arising out of them.  *Id.* ¶¶ (b)–(c).

On January 24, 2019, a grand jury returned a seven-count indictment against defendant Roger Stone for obstructing a congressional proceeding, lying to Congress, and tampering with a witness to that proceeding.  *See* Indictment [Dkt. # 1].  According to the indictment, defendant is a political consultant who served as an official on Donald Trump's presidential campaign until approximately August 2015.  *Id.* ¶ 4.

The indictment alleges that in mid-2016, the Democratic National Committee ("DNC") learned that its computer systems had been hacked, *id.* ¶¶ 1–2, and that from approximately July

---

[1]      The "other matters" referenced in paragraph (iii) of the Appointment Order include "federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses."  28 C.F.R. § 600.4(a).

through November of 2016, an entity identified as "Organization 1" released tens of thousands of documents stolen from the DNC and from the personal email account of the campaign chairman of then-presidential candidate Hillary Clinton. *Id.* ¶ 3. During this time period, defendant made public and private statements that he had been in communication with the head of Organization 1 about its releases of information that would be damaging to the Clinton campaign. *Id*. ¶¶ 5, 6, 13, 14.

After the November 2016 election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI") was one of the congressional committees that undertook to investigate Russian interference in the 2016 presidential election. *Id.* ¶¶ 7, 18. As part of its investigation, the Committee asked defendant to appear before it and to produce certain documents. *Id*. ¶ 19. Defendant testified under oath before the Committee on September 26, 2017, and the indictment alleges that he made false statements to the Committee, lied about whether he possessed the documents requested by the Committee, *id*. ¶¶ 20–35, and attempted to prevent another person from contradicting the allegedly false account he had provided to the Committee. *Id.* ¶¶ 36–39. Stone is charged with one count of obstruction of a proceeding of the House Committee (Count One), *id.* ¶¶ 40–41; five counts of making false statements to the Committee (Counts Two through Six), *id.* ¶¶ 42–43; and one count of witness tampering (Count Seven). *Id.* ¶¶ 44–45.

## STANDARD OF REVIEW

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," Fed. R. Crim. P. 12(b)(3)(B), including constitutional challenges. *See United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds,* 898 F.3d 36 (D.C. Cir. 2018); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir.

1973).  "When considering a motion to dismiss an indictment, a court assumes the truth of [the indictment's] factual allegations."  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

## ANALYSIS

In the set of overlapping dispositive and discovery motions to be addressed in this opinion, the defendant raises the following issues:

- In his motion to dismiss, defendant argues that his indictment for making false statements to a Congressional committee violates the principle of **separation of powers** enshrined in the Constitution because the legislative branch did not specifically refer the matter to the executive branch for prosecution.  *See* Def.'s Mot. to Dismiss [Dkt. # 69] and Mem. of P. & A. in Supp. of his Motion to Dismiss ("Def.'s Mem.") at 2–4.[2]  Defendant's motion to dismiss due to defects in the indictment also contends that the indictment is invalid on this basis.  Def.'s Mot. to Dismiss Pursuant to Fed. R. Crim. Proc. 12(b)(3)(B) [Dkt. # 72] ("Defect Mot.") at 1–4.

- Defendant argues that his indictment was unlawfully obtained and should be dismissed because the appointment and funding of the Special Counsel violated the **Appropriations Clause** of the Constitution.  Def.'s Mem. at 4–16.  He also seeks to enjoin the prosecution on this basis.  Mot. to Enjoin the Prosecution [Dkt. # 71] ("Mot. to Enjoin").

- Defendant argues that the **Vesting Clause and the Take Care Clause** of the Constitution prohibit any investigation of a President by the executive branch, and that since his indictment grew out of such an unlawful investigation, it must be dismissed.  Def.'s Mem. at 16–30.

- Defendant submits that his indictment was obtained in violation of the **Appointments Clause** of the Constitution because the Special Counsel was not appointed or commissioned by the President, and therefore, the charges must be dismissed.  Def.'s Mem. at 30–31.

- Under Rule 12(b)(3)(B) and *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008), the defendant seeks the dismissal of that portion of Count One – charging obstruction of a congressional investigation – that alleges he failed to turn over documents to the Committee.  Defect Mot. at 5–6.  He argues that a failure to produce documents voluntarily in the absence of a subpoena cannot be the basis for a criminal charge.  *Id.*

---

2    The memorandum was paginated separately from the motion itself, but it was not docketed separately, and it begins on page 3 of Dkt. # 69.

- Finally, defendant posits that he has been targeted for prosecution due to his support of the President's candidacy and his other First Amendment activities, and he asks the Court to compel the prosecution to provide him with an unredacted copy of the Special Counsel's report and to authorize him to conduct other discovery to uncover evidence related to his claim of **selective prosecution**.  Mot. to Compel Complete Report of the Special Counsel [Dkt. # 70] ("Mot. to Compel"); Mot. for Disc. Regarding Selective Prosecution [Dkt. # 73] ("Disc. Mot.").

As will be set forth in more detail below, none of these theories warrants dismissal of the indictment or an order enjoining the prosecution, and beyond receiving portions of the Mueller Report, the defendant may not embark on discovery concerning the prosecutors' charging decisions.

## I.    The Lack of a Congressional Referral Does Not Require Dismissal of the Case.

Defendant Stone has moved to dismiss Count One, which charges him with obstructing the investigation conducted by the House Permanent Select Committee on Intelligence, and Counts Two through Six, which charge him with falsifying or concealing material facts in his testimony before the Committee, on the grounds that the matter was not referred to the Special Counsel by Congress.[3]  Def.'s Mem. at 2–4; *see also* Defect Mot. at 1–4 (making the same argument).  He proclaims, without citing any legal authority, that the Executive "may only act upon alleged criminal activity impacting the Legislative Branch upon the receipt of a 'referral' from Congress."  Def.'s Mem. at 2.  The motion to dismiss on this basis will be denied.

Defendant contends first that it would violate the separation of powers principles embodied in the Constitution if the Court were to permit this case to proceed.  Def.'s Mem. at 2–4.  "To do so would allow the Executive Branch to invade and impede Congress' right to

[3]    Defendant did not argue in his pleadings that a congressional referral was necessary for Count One.  *See* Def.'s Mem. at 2–4; Defect Mot. at 1–4.  However, at the hearing, defense counsel stated that this principle would also require the dismissal of that count as well.  Tr. of Mot. Hr'g, May 30, 2019 [Dkt. # 121] ("Tr.") at 5:14–6:21.

conduct inquires," in violation of the separation of powers doctrine. *Id.* at 3; *see also id.* at 4 (stating that "[t]o allow the Executive Branch to roam the Halls of Congress to look for prosecutable offenses *sans* a referral from the Legislative Branch would violate the separation of powers doctrine"). But the defendant misapprehends the fundamental allocation of authority established in the Constitution and ignores clear precedent that recognizes the Executive's unfettered responsibility for law enforcement.

The Supreme Court has stated unequivocally: "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). This long-settled authority to initiate charges "lies at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (same). The Attorney General and his designees are authorized to discharge this duty by statute and under the authority of Article II of the Constitution. *Nixon,* 418 U.S. at 694; *see also* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States . . . is interested . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."); 28 U.S.C. §§ 503, 509, 510, 515, 519, 547. Consequently, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996), citing *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Defendant's argument is also inconsistent with the plain text of the charging statutes, which do not specify the need for a congressional referral as an element of the offense or a prerequisite for prosecution. The false statements statute imposes sanctions on:

> *whoever*, in *any* matter within the jurisdiction of the . . . legislative . . . branch of the Government of the United States, knowingly and willfully . . . makes *any* materially false, fictitious, or fraudulent statement or representation . . . .

18 U.S.C. § 1001(a)(2) (emphasis added).   Subsection (c) identifies the particular legislative matters covered by the provision, including:  "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress." 18 U.S.C. § 1001(c)(2).   The repetition of the word "any" reflects the intention to give the provision broad scope, and when Congress enacted the provision, it did not include any requirement that the matter be referred for prosecution by the legislative body involved.   This is telling because Congress has spoken clearly when it did intend to impose such a requirement: the statutory provisions governing prosecution for contempt of Congress expressly provide for a certification by Congress to the United States Attorney for prosecution.   *See* 2 U.S.C. §§ 192, 194.

Similarly, the obstruction statute does not require a congressional referral to prosecute.  It covers:

> [w]hoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress.

18 U.S.C. § 1505.  So there is nothing in the charging statutes curtailing the Attorney General's independent power to investigate and prosecute these crimes.

In the absence of constitutional or statutory support for his position, defendant points the Court to the Rules of Procedure for the Permanent Select Committee on Intelligence.   He speculates that the Special Counsel learned about the substance of his testimony through some

7

improper means, and assumes that the then-minority members of the Committee must have violated its internal Rule 12(a)(1)(D), which prohibits Committee members from disclosing "the substance of any hearing that was closed to the public." Defect Mot. at 2.[4] He posits that "[w]hatever made the Special Counsel's Office aware of Stone's testimony to Congress, or more precisely, characterized it as false and drew attention to it, amounts to a violation of the House rules because it was not formally and explicitly authorized by the Committee." *Id.*

There is no precedent that would authorize the dismissal of an indictment based on pure conjecture; nor has the defendant pointed to any authority that holds that an alleged violation of internal House Committee rules could invalidate an indictment returned by a grand jury. Moreover, defendant's motion fails to mention the fact that the defendant brought attention to the substance of his HPSCI testimony himself, by publicly releasing his written remarks in advance of the hearing and by holding a press conference – while still on Capitol Hill – immediately

---

4      *See* Rules of Procedure for Permanent Select Comm. on Intelligence, United States House of Representatives, 116th Cong., Adopted Feb. 6, 2019, https://docs.house.gov/meetings/ IG/IG00/CPRT-116-HPRT-IG00-CommitteeRules.pdf.

> Rule 12.  Limit on Discussion on Classified Work of the Committee
>     (a)  Prohibition.
>         (1)  Generally.  Except as otherwise provided by these rules and the Rules of the House of Representatives, members of the Committee and Committee Staff shall not at any time, either during that person's tenure as a member of the Committee or as Committee Staff, or anytime thereafter, discuss or disclose, or cause to be discussed or disclosed:
>             (A)  The classified substance of the work of the Committee;
>             (B)  Any information received by the Committee in executive session;
>             (C)  Any classified information received by the Committee from any source; or
>             (D)  The substance of any hearing that was closed to the public pursuant to these rules or the Rules of the House.

8

afterwards.  Gov't Opp. to Defect Mot. [Dkt. # 93] ("Defect Opp.") at 10–11, citing Interview with Roger Stone (Sept. 26, 2017), http://www.cnn.com/TRANSCRIPTS/1709/26/ip.02.html. Indeed, Stone publicly mused that some of the legislators present doubted his credibility: "I don't think that members of the committee buy some of my claims, but they have no evidence to the contrary."  *Id*. at 11, quoting Interview with Roger Stone (Sept. 26, 2017).  Defendant did not deny these facts in his reply brief or at the hearing.  *See* Def.'s Reply to Defect Opp. [Dkt. # 112] ("Defect Reply"); Tr. at 18.

The Court also rejects any suggestion that the HPSCI hearing transcript was improperly disclosed to the Department of Justice.  The record shows that the Department's Office of Legislative Affairs formally requested that the Committee provide the hearing transcript and other materials concerning defendant to the Department of Justice.  Tr. at 18:20–25; Ex. A, Defect Opp. [Dkt. # 93-1] ("HPSCI Letter").  On December 20, 2018, the then-Chair of the Committee, Devin Nunes, transmitted the information to the Department "[p]ursuant to a Committee vote" and "with no restrictions on use by the [Special Counsel's Office] or other components of the Department of Justice."  HPSCI Letter at 1–2; *see also* Tr. at 8:21–9:4.  At the hearing, the defense conceded that there was nothing improper about that exchange:

> THE COURT:  The committee transmitted the transcript to the Office of Legislative Affairs at the Department of Justice . . . . So, reading the transcript didn't violate any House rule, if the chair of the committee – not some minority member – passed it on; is that correct?
>
> MR. BUSCHEL:  I think that – that they certainly can share the transcript, sure.

Tr. at 18:20–19:5.

Therefore, defendant's argument that the prosecution is founded upon an improper disclosure of information is unavailing, and he can hardly claim that the Special Counsel reached out and grabbed this issue without congressional participation or assent.[5]

Finally, defendant argues that in the absence of a congressional referral, the government failed to establish the element of materiality that is necessary to establish a violation of the false statements statute. *See* 18 U.S.C. § 1001(a)(2); Defect Reply at 2. In Stone's view, the indictment fails to state an offense since there was "no allegation that Stone's voluntary testimonies were deemed by the Committee to be 'material,'" Defect Reply at 3, and he insists that the lack of a congressional referral proves his point because "had the [HPSCI's] functions been impeded, a referral would have been called for." *Id.* at 2. Additionally, he argues that the grand jury lacked a basis to find materiality "[a]bsent grand jury testimony representing the Committee's views and an allegation that the Committee communicated to the grand jury that Stone impeded its work." *Id.*; *see also* Defect Mot. at 3 ("Without a referral and without a presentation of any witness in the Committee room when Stone testified, no one testified before the Grand Jury that Stone's testimony was material to the House Committee's investigation.").

Defendant misunderstands the law of materiality and the fundamental nature of a motion to dismiss an indictment. First, the Supreme Court has held that a statement is materially false if

---

5       Defendant cites *Yellin v. United States*, 374 U.S. 109, 114 (1963), in support of his position that the Court can enforce congressional rules. Tr. at 10:23–11:9; Defect Mot. at 2 (stating "the rules of Congress and its committees are judicially cognizable"). In that case, the Supreme Court overturned the defendant's conviction for contempt of Congress in a situation where the House Committee on Un-American Activities had violated its own rules when it insisted on the witness's testimony in a public hearing without considering the potential harm to the witness's reputation. *Yellin,* 374 U.S. at 114–23. But here, it appears that the House Rules are not even implicated since it is undisputed that the HPSCI properly transmitted the hearing testimony to the Department of Justice. The *Yellin* case is also distinguishable because the alleged violation of the rule relating to the confidentiality of the classified work of the Committee did not bring about, and has no bearing upon, the conduct for which Stone is charged.

it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin,* 515 U.S. 506, 509 (1995). "A statement 'need not actually influence an agency in order to be material.'" *United States v. Verrusio*, 762 F.3d 1, 20 (D.C. Cir. 2014), quoting *United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010). So defendant is incorrect as matter of law when he insists that the government must prove that the alleged false statements actually "impeded" the HPSCI's investigation. And there is also no requirement that the government rely on direct evidence to prove this element; it can be inferred by the jury. As the D.C. Circuit explained in *Verrusio*, the government is not obligated to "'present any testimony or other evidence specifically for the purpose of establishing the materiality of [the defendant's] false statement.' Rather, the jury can infer from other evidence that the false statement 'was capable of affecting' the agency's functions." 762 F.3d at 20–21, quoting *Moore,* 612 F.3d. at 702; *see also Gaudin*, 515 U.S. at 512.[6] In any event, defendant's complaints about the sufficiency of the evidence are premature given the allegations in the indictment.

At this stage of the proceedings, the Court "assumes the truth of [the indictment's] factual allegations." *Ballestas*, 795 F.3d at 149. Dismissal "is granted only in unusual circumstances" since it "directly encroaches upon the fundamental role of the grand jury." *Id.* at 148. Importantly, an indictment "need only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* at 149, quoting Fed. R. Crim. P. 7(c).

---

6       In *Gaudin*, the Supreme Court explained that the jury must answer two fact-based questions: "what statement was made?" and "what decision was the agency trying to make?" 515 U.S. at 512. And based on those facts, the jury must determine whether the statement was material to the decision, *id.*, meaning whether the statement had "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 509.

Here the indictment plainly alleges that defendant's false statements to the HPSCI were material.  *See* Indictment ¶ 43 ("[T]he defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictious, and fraudulent statements and representations.").  So the indictment satisfies Rule 7(c).

Moreover, it is not up to the Court to question whether the grand jury had an adequate basis to come to this conclusion.  *See* Defect Reply at 2 (arguing that the grand jury lacked evidence of materiality in the absence of a congressional referral or witness).  It is well established that courts lack the authority to assess the sufficiency of the evidence underlying a finding of probable cause.  The Supreme Court has emphasized:

> "[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,'" . . . "conclusively determines the existence of probable cause" to believe the defendant perpetrated the offense alleged.  And "conclusively" has meant, case in and case out, just that.  We have found no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof."  To the contrary, "the whole history of the grand jury institution" demonstrates that "a challenge to the reliability or competence of the evidence" supporting a grand jury's finding of probable cause "will not be heard."  The grand jury gets to say – without any review, oversight, or second-guessing – whether probable cause exists to think that a person committed a crime.

*Kaley v. United States*, 571 U.S. 320, 328 (2014) (internal citations omitted).

Therefore, the Court finds that that the lack of a congressional referral has no bearing on the materiality element, the indictment satisfies Rule 7(c), and there is no basis for dismissing the false statements counts for failure to state an offense under Rule 12(b)(3)(B)(v).  Since the defendant's contention that a congressional referral was necessary is contrary to both the charging statutes and "long-settled understandings about the independence of the Executive with regard to charging decisions," *Fokker Servs.*, 818 F.3d at 738, and the lack of a referral does not

12

undermine the validity of the indictment, the Court will deny defendant's motion to dismiss Counts One through Six on those grounds.

II.     **The Case Will Not Be Dismissed and the Prosecution Will Not Be Enjoined Because the Special Counsel's Investigation Does Not Violate the Appropriations Clause of the Constitution.**

Defendant next seeks both the dismissal of the indictment and an injunction halting the proceedings against him on the ground that his prosecution violates the Appropriations Clause of the Constitution.  Def.'s Mem. at 4–16; Mot. to Enjoin.  The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  It gives Congress "exclusive power over the federal purse . . . 'mean[ing] simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'"  *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992), quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).  Defendant argues that because funding for the Special Counsel's investigation was not authorized by Congress, the Court must dismiss the indictment obtained in contravention of the Constitution, Def.'s Mem. at 4–16, and issue a permanent injunction against his prosecution.  Mot. to Enjoin.

A.     **Defendant's request for equitable relief is misplaced.**

At the outset, the Court notes that the proper avenue for defendant to mount a legal challenge to the prosecution is through a motion to dismiss under Federal Rule of Criminal Procedure 12.  Thus, the motion for an injunction will be denied in light of traditional abstention principles, the lack of a showing of irreparable harm, and the availability of an adequate remedy at law.

The abstention doctrine was developed in the context of requests to enjoin state criminal proceedings, but it has been applied to attempts to enjoin ongoing federal prosecutions as well. *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987); *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015). In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that a defendant was not entitled to federal equitable relief against a state court prosecution where the injury he faces was "solely that incidental to every criminal proceeding brought lawfully and in good faith." *Id.* at 49 (internal quotation marks omitted). According to the Court, this was not the sort of "irreparable" harm needed to justify extraordinary equitable relief: "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.* at 46. Unless the "irreparable injury" was "both great and immediate," and involved a "threat to the plaintiff's federally protected rights . . . that [could not] be eliminated by his defense against a single criminal prosecution," the Court found that federal courts should abstain from interference with state criminal proceedings. *Id.* Thereafter, the Supreme Court has generally "upheld federal injunctions to restrain state criminal proceedings only where the threatened prosecution chilled exercise of First Amendment rights." *Deaver*, 822 F.2d at 69, citing *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that a federal court was not precluded from granting equitable relief to enjoin prosecution where a state statute made it a crime to obscure the words "Live Free or Die" on a car license plate).[7] And here, defendant is not being prosecuted for violating a law that specifically restricts free expression.

---

7    *See also Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) (where a town ordinance banned topless dancing, a federal court could enjoin future prosecutions); *Dombrowski v. Pfister*, 380 U.S. 479 (1965) (holding that civil rights workers entitled to an injunction against prosecutions under a state law broadly regulating speech).

While it is true that the Supreme Court also premised the *Younger* decision, in part, on principles of federalism, *Younger*, 401 U.S. at 44 ("[T]he National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."), the D.C. Circuit found abstention to be appropriate when it rejected an attempt to use a civil action to stave off a federal criminal prosecution as well.  In *Deaver v. Seymour*, a former White House official who was the subject of an investigation being pursued by an independent counsel appointed under the Ethics in Government Act was informed that the independent counsel was about to ask the grand jury to return an indictment.  822 F.2d at 67.  The next day, he brought a civil action for declaratory and injunctive relief that would stay the prosecution while he challenged the constitutionality of the independent counsel's authority.  *Id.* at 67–68.[8] The trial court denied the motion for a preliminary injunction, and the D.C. Circuit affirmed, citing *Younger*.  *Id.* at 68–69, citing 401 U.S. at 46.

The *Deaver* opinion explained:  "[e]ven were we disposed to agree entirely with appellant's constitutional argument, we think he has no right to an injunction restraining a pending indictment in a federal court," *id.* at 68, and it made it clear that "defendants cannot, by bringing ancillary equitable proceedings, circumvent federal criminal procedure."  *Id*. at 71.

In reaching its decision in *Deaver*, the D.C. Circuit addressed its previous opinion in *Juluke v. Hodel*, 811 F.2d 1553 (D.C. Cir. 1987), in which it had refused to dismiss a federal civil action seeking an injunction to enjoin future prosecutions under allegedly unconstitutional

---

8      This is exactly the relief that Stone is seeking – *see* Tr. at 67:10–15 (explaining that the purpose of the motion to enjoin was to ensure defendant still had the ability to challenge the constitutionality of the indictment in the event his motion to dismiss was denied).

federal regulations.[9]   The *Juluke* Court stated that the *Younger* doctrine does not necessarily control a federal civil proceeding to enjoin a federal criminal prosecution because the same federalism concerns are not present.  *Juluke*, 811 F.2d at 1556–57.  But the Court also observed that a federal court may refuse to consider a claim for injunctive relief if it would be "inefficient to do so, because the same issues – the validity and applicability of the regulations – would be decided in the criminal action."  *Id.* at 1557.  And the Court emphasized the fact that the *Juluke* plaintiffs were not seeking to enjoin any existing prosecutions; they sued to enjoin future arrests for violations of the federal regulations at issue, and therefore, the adjudication of their criminal cases would not afford them the relief they sought.  *Id.*

The *Deaver* Court did not view *Juluke* as an impediment to dismissing Deaver's case. The opinion reported that the Court could find no prior case in which a federal court had enjoined a federal prosecutor's investigation or presentment of an indictment.  *Deaver*, 822 F.2d at 69*.*  More important, the Court observed that when a prosecutor brings a case in federal court, after indictment, defendants have "a federal forum in which to assert their defenses – including those based on the Constitution."  *Id.*  The Court recognized that a federal defendant would be afforded an opportunity under Federal Rule of Criminal Procedure 12(b) to move to dismiss an indictment based on defects in the prosecution.  *Id.* at 70.   And the Court held that because "[t]hese rules provide adequate, although limited, opportunities for defendants to challenge shortcomings in prosecutorial authority," it is through these procedures, not equitable remedies, that a criminal defendant should raise the alleged shortcomings and constitutional concerns regarding his prosecution.  *Id.* at 71.

---

9       The Court ultimately affirmed the district court's denial of the injunction on the merits. *Juluke*, 811 F.2d at 1554–55.

Twenty-eight years after *Deaver*, in *Jarkesy v. SEC*, a case involving an action against the Securities and Exchange Commission by an investment adviser and manager seeking to terminate administrative enforcement proceedings charging them with securities fraud, the D.C. Circuit underscored that the presence of federalism concerns was not a prerequisite for abstaining from interfering in criminal proceedings:

> True, *Younger* abstention is grounded in considerations of federalism not implicated here.  But the rule derives from "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury."

*Jarkesy*, 803 F.3d at 26, quoting *Younger*, 401 U.S. at 43–44.

Stone's motion to enjoin the prosecution falls squarely within the scope of the *Deaver* and *Jarkesy* decisions and the well-established limits on the invocation of equitable remedies. Stone does not seek to enjoin any future prosecution, *see* Stone's Reply to Corrected Response to Motion to Dismiss and Enjoin [Dkt. # 110] ("Def.'s Reply to Mot. to Dismiss") at 14–15, and the issue he raises in his request for an injunction – that the appointment of the Special Counsel violated the Appropriations Clause – is an issue that not only can be, but has been, raised in a motion to dismiss filed under Rule 12(b).   *See* Def.'s Mem. at 4–16.   Stone identifies no constitutional deprivation that he will suffer as a result of the pendency of this case; while defendant states that the "prosecution will drain Mr. Stone's resources and damage his reputation," Def.'s Reply to Mot. to Dismiss at 15, the Supreme Court has expressly rejected the contention that this type of harm warrants federal intervention.  *Younger*, 401 U.S. at 46.  Thus, an injunction enjoining the prosecution or other equitable remedies would be inappropriate, and

the motion will be denied.[10]   The motion would have been denied in any event since, as set forth

below, it fails on legal grounds as well.

**B.      The 1987 permanent appropriation funds investigations by special counsel appointed pursuant to 28 U.S.C. §§ 509, 510, and 515, including those subject to the 1999 Special Counsel Regulation.**

To analyze the defendant's argument, it is necessary to review the statute that authorizes

the appointment of special counsel, the Department of Justice regulations governing the

attorneys after they are appointed, and the history of the now-expired Ethics in Government Act.

In a statute enacted in 1966, Congress vested "[a]ll functions" of the Department of

Justice, and its officers, agencies, and employees, in the Attorney General of the United States.

28 U.S.C. § 509.   The nation's chief law enforcement officer is empowered by this law to

delegate any of those functions:   "[t]he Attorney General may from time to time make such

provisions as he considers appropriate authorizing the performance by any other officer [or]

employee," *id.* § 510, and the statute expressly permits him to appoint and retain an attorney

from outside of the Department to act as "special assistant to the Attorney General or special

attorney." *Id.* § 515(a), (b).   "[A]ny attorney specially appointed by the Attorney General under

law, may, when specifically directed by the Attorney General, conduct any kind of legal

proceeding, civil or criminal, including grand jury proceedings" that United States attorneys are

authorized by law to conduct. *Id.* § 515(a).

---

10      In Stone's reply in support of his motion to dismiss, he argues that "at a minimum," a preliminary injunction is necessary so that the government can secure appropriate funding from Congress to cover the cost of the Special Counsel's investigation.   Def.'s Reply to Mot. to Dismiss at 15.   Defendant then states that an "analogy . . . to the standard for seeking a stay" is appropriate and argues that he is entitled to a stay of the proceedings. *Id.*   Because the Court finds that there has been no violation of the Appropriations Clause, the Court will also deny defendant's request for a stay.

The Supreme Court recognized the Attorney General's authority to appoint special counsel under these statutory provisions when sections 509, 510, and 515 were invoked to specially appoint an independent attorney to investigate the Watergate burglary and the ensuing obstruction of justice allegations.  *See Nixon*, 418 U.S. at 694–95; U.S. Dep't of Justice Order No. 518-73 (May 31, 1973) (appointing Archibald Cox as special prosecutor).  Forty-four years later, the same statute provided the basis for the appointment of Special Counsel Robert Mueller by the then-Acting Attorney General Rod Rosenstein.  Appointment Order at 1, citing 28 U.S.C. §§ 509, 510, and 515.[11]

In the interim, in the wake of Watergate, Congress enacted the Ethics in Government Act of 1978, which has since expired.  28 U.S.C. §§ 591–599 (expired).  The statute authorized the Attorney General to refer criminal matters involving certain high-level government officials, including the President, to a three-judge court, which would be responsible for the appointment of an independent investigating attorney.  *Id.*  The Act, which was originally set to sunset after five years, created the position of "Special Prosecutor."  *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 618 n.4 (D.D.C. 2018), citing Ethics in Government Act of 1978, 28 U.S.C. § 601(a) (expired), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019), *reh'g en banc denied*, No. 18-3052.

Congress reauthorized the Act in 1983, renaming the "Special Prosecutor" position as "Independent Counsel."  *Id.,* citing Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, § 7, 96 Stat. 2039, 2042.

---

11      Because Attorney General Jeff Sessions recused himself from the matter, Acting Attorney General Rosenstein had the authority to appoint the Special Counsel.  *See* 28 C.F.R. § 600.1.

In 1987, Congress established a "permanent indefinite appropriation . . . within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. § 591 *et seq.*[12] or other law." Dep't. of Justice Appropriations Act, 1988, Pub. L. No. 100–202, 101 Stat. 1329 (Dec. 22, 1981).

Before it expired, the Ethics in Government Act was invoked several times to appoint special attorneys to investigate and prosecute crimes allegedly committed by members of the executive branch.   But as defendant points out, the statute was the subject of considerable criticism, *see* Def.'s Mem. at 6–7, citing, e.g., Cynthia Brown & Jared P. Cole, Cong. Research Serv., R44857, Special Counsel Investigations:  History, Authority, Appointment and Removal 8 (2019), and the Act and the appointments of independent counsel made pursuant to it faced legal challenges in the courts.   *See, e.g., In re Sealed Case*, 666 F. Supp. 231 (D.D.C. 1987) (challenging the appointment of Independent Counsel Lawrence Walsh), *aff'd*, 829 F.2d 50 (D.C. Cir. 1987); *Morrison v. Olson*, 487 U.S. 654 (1988) (challenging the appointment of Independent Counsel Alexia Morrison).

Congress reauthorized the Act and its Independent Counsel position twice more, before it allowed the statute to sunset in 1999.   *See In re Grand Jury Investigation*, 315 F. Supp. 3d at 618 n.4 (summarizing reauthorization history), citing Independent Counsel Reauthorization Act of 1987, Pub. L. No. 100-191, § 2, 101 Stat. 1293, 1306; Independent Counsel Reauthorization Act of 1994, Pub. L. No. 103-270, § 2, 108 Stat. 732, 732.

But the Department of Justice recognized that circumstances could still arise in which it would be appropriate to appoint an investigator from outside the Department.   In 1999, shortly

---

12      This refers to the Ethics in Government Act.

before the Act expired, the Department issued a regulation to govern the Attorney General's appointment of special counsel pursuant to the statutory provisions that were in existence before the Ethics in Government Act:  28 U.S.C. §§ 509, 510, and 515.  *See* 28 C.F.R. §§ 600.1–600.10 ("Special Counsel Regulation").   The regulation clearly states that it was promulgated to "replace" the expiring Ethics in Government Act, *see* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999), and it sets forth procedures for the appointment and management of "specially appointed" attorneys under 28 U.S.C. §§ 509, 510, and 515.   In the preamble to the regulation, the Department explained the regulation provided for the appointment of special counsel "when the Attorney General concludes that extraordinary circumstances exist such that the public interest would be served by removing a large degree of responsibility for a matter from the Department of Justice."  64 Fed. Reg. at 37,038.

Special Counsel Robert S. Mueller was appointed pursuant to sections 509, 510, and 515 and the Special Counsel Regulation, and his office was funded by the 1987 permanent appropriation.   Defendant takes the position that Congress established the permanent appropriation to fund only those investigations overseen by independent counsel appointed under the expired Ethics in Government Act or "another statute enabling a special counsel to have the same role as the Independent Counsel," and that special counsel appointed pursuant to sections 509, 510, and 515 do not qualify.  *See* Def.'s Mem. at 15–16; *see also* Mot. to Enjoin.  Thus, he contends that the use of the permanent appropriation to fund Special Counsel Mueller's investigation has not been authorized by Congress and is in violation of the Appropriations Clause.  Def.'s Mem. at 16; Mot. to Enjoin.

21

But defendant's argument ignores the plain language of the legislation:

> [A] permanent indefinite appropriation is established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or *other law.*

101 Stat. 1329 (emphasis added). As the emphasized text makes clear, funds were permanently appropriated not only for independent counsel appointed in the future under the Ethics in Government Act, but also, specifically, for those appointed pursuant to "other law."[13]

Defendant asserts that "there is no 'other law' because the Independent Counsel statute was not replaced with another law, *i.e.* another statute enabling a special counsel to have the same role as the Independent Counsel." Def.'s Mem. at 15–16. Citing no authority aside from the permanent appropriation itself, he insists that for purposes of the Appropriations Clause, any "other law" must be a law that "creates a similar special lawyer with similar authority to investigate and prosecute specified matters," and that "the Special Counsel law does not have

---

[13]     In his motion for an injunction, defendant cites *United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016), for the principle that a violation of the Appropriations Clause provides a basis to challenge a federal prosecution. Mot. to Enjoin at 2–3. But the portion of the opinion cited in defendant's memorandum dealt solely with the issue of whether the appellant had standing to raise the issue. *McIntosh* involved a rider in an appropriations bill that expressly prohibited the Department of Justice from using funds to prevent specific states "from implementing their own state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Id.* at 1175. The Department prosecuted the appellants for various federal marijuana offenses, and appellants maintained that their indictments contravened the appropriations rider and, therefore, the Appropriations Clause. *Id.* at 1169–70. The Ninth Circuit ruled that appellants had standing and could invoke the clause as a basis to challenge their prosecutions, but that was only the beginning of the analysis: the Court then had to rule on the merits of whether the Department had violated the rider. *Id.* at 1174. The Ninth Circuit focused on the text of the statutory rider, *id.* at 1175–78, and it ruled that the rider prohibited the federal prosecution of individuals acting in compliance with their states' laws, but not of those who failed to comply with their states' laws. *Id.* at 1178. So while *McIntosh* supports the principle that a defendant may invoke the Appropriations Clause as grounds to challenge a prosecution, it also makes clear that whether a specific appropriations statute bars a prosecution turns on the text of the statute, and it does not advance defendant's motion here.

sufficient specificity to investigate a president or the campaign." *Id.* at 16.  In other words, in

defendant's view, the use of the term "independent counsel" in the appropriation signaled an

intention to fund only "Independent Counsel" appointed under the Ethics in Government Act or

those with identical powers.

This interpretation is inconsistent with the text of the provision as a whole. In the

permanent appropriation, Congress specifically differentiated between section 591/Ethics in

Government Act "Independent Counsel" and other "independent counsel" to be funded in the

future:

> For expenses necessary for the legal activities of the Department of
> Justice, not otherwise provided for, . . . $1,000,000 may be transferred to
> this appropriation to pay expenses related to the activities of any
> *Independent Counsel* appointed pursuant to 28 U.S.C. 591, et seq., . . .
> *Provided further*, That a permanent indefinite appropriation is established
> within the Department of Justice to pay all necessary expenses of
> investigations and prosecutions by *independent counsel* appointed
> pursuant to the provisions of 28 U.S.C. 591 et seq. or other law . . . .

101 Stat 1329 (emphasis added).  The separate references to "Independent Counsel" (capitalized)

and "independent counsel" (lower case) within the same provision show that Congress

recognized a distinction between the specific "Independent Counsel appointed pursuant to

28 U.S.C. 591" and a general category of independent counsel to be appointed under section

591 or other law.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) (ruling that when a

statute uses specific language in one provision of a statute and general language in another, the

general language is interpreted to have a broader meaning).  The use of the phrase "[p]rovided

further" also reveals the legislature's understanding that it was funding something other than and

in addition to any Independent Counsel appointed under the Ethics in Government Act.

Moreover, defendant's argument ignores the context and legislative history of the appropriation as well as its text. The provision imposes no requirement that an independent counsel funded by the permanent appropriation be appointed under a law that imposes a specific mandate or grants authority identical to that that provided by section 591. The phrase "other law" sweeps broadly, and sections 509, 510, and 515 are surely "other law" under which special attorneys – including special counsel who investigate the President – may be appointed. *See Nixon*, 418 U.S. at 694–95 (Special Prosecutor Cox appointed pursuant to sections 509, 510, and 515). Indeed, these provisions of the U.S. Code were in effect – and the Ethics in Government Act was set to expire – in 1987 when Congress enacted the permanent appropriation. Sections 509, 510, and 515 had been already invoked to appoint a special attorney to investigate allegations against a sitting President, *id.*, and they were being invoked again in 1987 to confirm and reinforce the legal authority for the appointment of an Independent Counsel who had originally been appointed pursuant to the Ethics in Government Act. *See* Offices of Independent Counsel; General Powers and Establishment of Independent Counsel–Iran/Contra, 52 Fed. Reg. 7270 (Mar. 10, 1987) (making parallel appointment of independent counsel pursuant to sections 509, 510, and 515: "This authority is being exercised because of the pending lawsuit captioned *North v. Walsh and Meese*, D.D.C. No. 87-0457, which challenges the constitutionality of the appointment and activities of the Independent Counsel named pursuant to the Ethics in Government Act . . . .").

Defendant further argues that Mueller and other special counsel appointed under sections 509, 510, and 515 cannot be considered to be "independent" within the meaning of the permanent appropriation, because they are accountable to the Attorney General or his designee under the terms of the Special Counsel Regulation. Def.'s Mem. at 11–12, citing 28 C.F.R.

600.7(b).   It is true that "the Department's Special Counsel Regulations call for ongoing communication and consultation, because the ultimate responsibility for the matter continues to rest with the Department hierarchy."  *United States v. Manafort,* 312 F. Supp. 3d 60, 66 (D.D.C. 2018).  But the fact that the regulation calls for a certain level of oversight and compliance with the policies and procedures of the Department of Justice does not mean a special counsel is not "independent" as that term is generally understood and as it was used in the permanent appropriation.[14]

First of all, there is nothing in the language of the provision itself that would support defendant's attempt to narrow the appropriation to cover only specially appointed lawyers who operate under terms identical to those in the much-criticized Ethics in Government Act.  And it is the language of the Congressional authorization, and not the level of autonomy the lawyer enjoys, that controls.  *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 173 (2009) (stating that in analyzing a statute, courts "begin, as always, with the text of the statute"); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  The permanent appropriation funds "independent counsel" appointed under "other law," and nothing about that language dictates that the future independent lawyers operate under the same regime as section 591 counsel.

Second, the Special Counsel Regulation expressly recognizes and provides for the independence of the specially appointed lawyer.

---

14      The Court notes that even counsel appointed under section 591 were not entirely outside the Attorney General's control since the Ethics in Government Act statute gave the Attorney General authority to remove them for good cause.  *See Morrison*, 487 U.S. at 692–93.

> As the Department explained when it issued the Special Counsel
> Regulations, the regulations were designed to "strike a balance between
> independence and accountability in certain sensitive investigations."  Final
> Rule, 64 Fed. Reg. 37,038 (July 9, 1999).  The regulations recognize that
> there will be occasions when the Attorney General or Acting Attorney
> General may determine that it would be in the public interest to appoint an
> outside Special Counsel to assume responsibility for a matter.     In
> recognition of the conflict of interest or other extraordinary circumstances
> that prompted the appointment, the regulations preserve the Special
> Counsel's day-to-day independence to structure the investigation.   They
> expect and require that he or she will exercise prosecutorial discretion
> when determining what charges to bring, informed by both the experience
> and integrity that led to the appointment, as well as the established rules,
> policies, and procedures of the Department.

*Manafort,* 312 F. Supp. 3d at 66.   The appointment of a special counsel would only be appropriate when circumstances arise that call for "removing a large degree of responsibility for a matter from the Department of Justice."  64 Fed. Reg. at 37,038; *see* 28 C.F.R. § 600.1.  To this end, special counsel operate largely outside of the regular Department of Justice structure and hierarchy.  They are not subject to day-to-day supervision by Department officials.  28 C.F.R. § 600.7(b).  They have "the full power and independent authority" of a U.S. Attorney.  *Id.* § 600.6.  And they "determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of [their] duties and responsibilities." *Id*.  While "the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step," he or she must give the special counsel's views on the matter "great weight."  *Id*. § 600.7(b).  This inquiry takes place in the narrow context of when there is a concern that an investigative step is "so inappropriate or unwarranted under established Departmental practices" that it should not be pursued; if the Attorney General concludes that it is, he or she must report that determination to Congress.  *Id*.  Thus, a review of the regulation

does not indicate that an attorney covered by its terms is so hamstrung that he or she cannot be said to fall within the broad category of "independent counsel" Congress intended to fund.

This is borne out by how offices within both the executive and the legislative branches have interpreted the provision in the past.  The Department has used the permanent appropriation to fund special counsel appointed under sections 509, 510, and 515 and governed by the Special Counsel Regulations before.  *See* Attorney General Order No. 2256-99 (Sept. 9, 1999) (appointing a special counsel to investigate the raid of the Branch Davidian compound in Waco, Texas).  And the General Accounting Office ("GAO"),[15] "an independent agency within the legislative branch" that serves Congress, *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983), has conducted audits and reported to Congress that other special attorneys appointed after the expiration of section 591 have been supported with funds from the permanent appropriation.  *See, e.g.*, U.S. Gen. Accounting Office, GAO/AIMD-00-310, Financial Audit: Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2000 5–6 (Sept. 2000) (reporting to Congress that "the Department of Justice determined that the appropriation established by Public Law 100-202 to fund expenditures by independent counsels appointed pursuant to 28 U.S.C. 591–599, or other law, is available to fund the expenditures of John C. Danforth, who was appointed as a Special Counsel within the Department of Justice by the Attorney General"); U.S. Gov't Accountability Office, GAO-04-1014, Financial Audit: Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2004 3–4 (Sept. 2004) (reporting the same for U.S. Attorney Patrick J. Fitzgerald, who was appointed as a

---

15    The General Accounting Office has been renamed the Government Accountability Office.  *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 n.6 (2010).

special counsel to investigate I. Lewis "Scooter" Libby by the Acting Attorney General). Indeed, the GAO has stated, "[w]e agree with the Department that the same statutory authorities that authorize the Attorney General (or Acting Attorney General) to delegate authority to a U.S. Attorney to investigate and prosecute high ranking government officials are 'other law' for the purposes of authorizing the Department to finance the investigation and prosecution from the permanent indefinite appropriation."  Special Counsel and Permanent Indefinite Appropriation, B-302582, 2004 WL 2213560 (Comp. Gen. Sept. 30, 2004) at 7.[16]

For these reasons, the Court concludes that the permanent appropriation was properly used to fund Special Counsel Mueller's investigation, and the Appropriations Clause has not been violated.   So the motion to dismiss on this basis will be denied, and defendant's motion for an injunction fails for the same reasons.

## III.    The Appointment of the Special Counsel Does Not Violate the Appointments Clause of the Constitution.

Defendant also argues that the Special Counsel's appointment violates the Appointments Clause of the Constitution.  Def.'s Mem. at 30–31.  That clause provides that the President "shall nominate, and by and with the advice and consent of the Senate, shall appoint . . . all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law:  but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments."  U.S. Const., art. II, § 2, cl. 2.

Stone maintains that "[t]he Special Prosecutor is a principal officer . . . who must be appointed and commissioned by the President and confirmed by the Senate," Def.'s Mem. at 31,

---

16    This history also suggests that Congress was aware of, and not troubled by, the fact that the Department used the permanent appropriation to fund special counsel investigations.

and he relies on pleadings filed by the defendant in *United States v. Concord Mgmt. & Consulting, LLC*, 317 F. Supp. 3d 598 (D.D.C. 2018), that advanced the same position. *See id.* at 30.

But the D.C. Circuit has already rejected this argument, and it ruled that the Special Counsel's appointment does not violate the Appointments Clause. *See In re Grand Jury Investigation*, 916 F.3d 1047, 1051 (D.C. Cir. 2019) (ruling that the Special Counsel was properly appointed and that this appointment did not violate Appointments Clause); *see also id.* at 1049, 1056 (ruling that Congress has authorized the Attorney General to commission attorneys "specially retained under the authority of the Department" as "special assistant to the Attorney General or special attorney," 28 U.S.C. § 515(b), and that Special Counsel Mueller was properly appointed by a head of the Department pursuant to that authority). This Court is bound to apply that precedent here and deny defendant's motion. *See Gersman v. Grp. Health Ass'n, Inc.*, 975 F.2d 886, 897 (D.C. Cir. 1992) (the D.C. Circuit and district courts are "bound by the decisions of prior panels of this Court unless and until overturned by the court *en banc* or by Higher Authority") (internal quotation marks omitted); *see also* Tr. at 48 (defense acknowledged that this Court is bound by the ruling in *In re Grand Jury Investigation*).

In light of this binding precedent, the Court holds that the appointment of Special Counsel Mueller does not violate the Appointments Clause.

**IV.   The Special Counsel's Appointment and Investigation Do Not Violate the Vesting Clause and Take Care Clause of the Constitution, Nor Do They Violate Statutory Provisions Governing the Appointment of Special Counsel.**

In his motion to dismiss, defendant also advances the novel – and entirely unsupported – theory that it is unconstitutional for the executive branch to investigate the President at all. Def.'s Mem. at 27–29. He points to Article II of the Constitution as well as the statutory

provisions that grant the Attorney General the general authority to delegate matters to attorneys outside of the Department. *Id.; see also id.* at 29–40. According to this theory, both the order appointing the Special Counsel and the investigation he undertook in accordance with that order were unlawful, and therefore, any indictment that grew out of that investigation is tainted and invalid.

Article II, section 1 of the Constitution vests executive power in the President, U.S. Const., art. II, § 1 (the "Vesting Clause"), and section 3 provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3 (the "Take Care Clause"). Pointing to these provisions, defendant asserts that the Special Counsel's appointment and investigation unconstitutionally impinge on the President's ability to carry out his duties as the chief executive. Def.'s Mem. at 16–30.

Defendant also argues that the Special Counsel's appointment violates federal law because sections 509, 510, and 515 do not expressly authorize investigations of "the President or Presidential Campaigns." Def.'s Mem. at 31–34 (arguing that the expiration of the Ethics in Government Act shows that Congress intended to preclude investigations of "the President or Presidential Campaigns"); *see also id.* at 18 (arguing that to avoid improperly encroaching on a President's executive powers, there must be "an explicit statement by Congress" to authorize the investigation of a President, and that no such statement appears in sections 509, 510, and 515).

There are several problems with this attack on the prosecution. First of all, Roger Stone is not the President of the United States. So it is not clear how any prohibition against investigating the chief executive would apply him.

Defendant submits that since the investigation was invalid from the start, his indictment must fall as "fruit of that poisoned tree." Def.'s Mem. at 18. But that argument is problematic as

well because the Appointment Order at issue did not simply initiate an investigation of the President; it called for an investigation into "any links and/or coordination between the Russian government and individuals associated with the campaign," Appointment Order ¶ (b)(i), a group comprised of many private individuals, including the defendant.  *See* Indictment ¶ 4.  More important, the Supreme Court has long since recognized the legitimacy of an investigation of a sitting President carried out by a special prosecutor appointed by the Attorney General under sections 509, 510, and 515, even in the absence of the "explicit statement by Congress" that defendant claims is necessary.  *See* Def.'s Mem. at 18.

In *United States v. Nixon*, the President moved to quash a third-party subpoena duces tecum issued by the United States District Court for the District of Columbia at the behest of the Watergate Special Prosecutor which called for audio tapes and other documents memorializing the President's conversations.  418 U.S. 683.  Nixon resisted the subpoena on separation of powers grounds; he argued that the executive branch exercises "exclusive authority and absolute discretion to decide whether to prosecute a case," and that it was within his sole discretion as head of that branch to determine what evidence would be introduced in a given criminal case. *Id.* at 693.  Thus, he maintained that the courts lacked jurisdiction, and that the judiciary could not weigh in on what was essentially an intra-branch dispute between the President and his subordinate, the Special Prosecutor.  *Id.* at 692–93.

In reaching its conclusion that the case presented a justiciable question, the Supreme Court observed that "[u]nder the authority of Art. II, § 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government," and that it "has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties."  *Id.* at 694, citing 28 U.S.C. §§ 509, 510, 515, 516, and 533.  The Court

recognized that "[a]cting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure." *Id.* The Court then emphasized the breadth of the power accorded to the Special Prosecutor by the regulation issued by the Attorney General pursuant to his statutory authority:

> The regulation . . . vests in the Special Prosecutor plenary authority to control the course of investigations and litigation related to 'all offenses arising out of the 1972 Presidential Election for which the Special Prosecutor deems it necessary and appropriate to assume responsibility, allegations involving the President, members of the White House staff, or Presidential appointees, and any other matters which he consents to have assigned to him by the Attorney General.

*Id.* at 694 n.8, quoting 38 Fed. Reg. 30739, as amended by 38 Fed. Reg. 32805. While the Attorney General could amend or revoke that delegation of authority, he had not, and the Court held that "[s]o long as this regulation is extant it has the force of law." *Id.* at 695; *see also id*. at 96 ("So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it.").

The Court also concluded that the separation of powers doctrine did not preclude the judicial branch from deciding the President's claim of executive privilege; it found instead that the dispute over information "sought by one official of the Executive Branch within the scope of his express authority . . . resisted by the Chief Executive of the ground of his duty" presented "traditionally justiciable" issues. *Id.* at 697; *see also Nixon v. Administrator of Gen. Servs*., 433 U.S. 425, 441 (1977) ("reject[ing] at the outset [the] argument that . . . regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the principle of separation of powers").

Like the Special Prosecutor in *Nixon*, Special Counsel Mueller was duly appointed under 28 U.S.C. §§ 509, 510, and 515.  *See* Appointment Order 1.  He undertook an investigation subject to the Special Counsel Regulation and pursuant to an Appointment Order which had been issued under those statutory sections, both of which have "the force of law."  *See* 418 U.S. at 695–96.  As Stone's counsel conceded at the hearing on this motion, Tr. at 43:3–44:6,[17] since the Supreme Court accepted the proposition that the Special Prosecutor's exercise of his authority to seek criminal process against the President of United States did not offend the separation of powers, this Court is bound to find that Special Counsel Mueller's appointment and investigation, conducted pursuant to the same statutory authority, comports with the Constitution.

## V.     There is No Defect in the Obstruction of Justice Count.

In his motion to dismiss based on defects in the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B), defendant argues that he cannot be charged with obstruction justice for failing to turn over documents when those materials were never the subject of a subpoena compelling their production.   Defect Mot. at 5–6.

In Count One of the indictment, the grand jury charges that Stone "corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry" by the House of Representatives Permanent Select Committee on Intelligence, "to wit:"

> STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE

---

17     Counsel for the defense made it quite clear at the hearing that he understood that his argument – which was based on comments made in a dissent in *Morrison v. Olson* – was entirely foreclosed by *United States v. Nixon*.  Tr. at 43:3–44:6.

> submitted and caused to be submitted a letter to HPSCI falsely and
> misleadingly describing communications with Person 2; and STONE
> attempted to have Person 2 testify falsely before HPSCI or prevent him
> from testifying.

Indictment ¶ 41.   In the second half of his Motion to Dismiss pursuant to Federal Rule of

Criminal Procedure 12(b)(3)(B), defendant challenges just "one allegation embedded in a clause

of Count One," that is, the allegation that he failed to "turn over" responsive records.   Defect

Mot. at 5.   He points out that he was asked, and not compelled or subpoenaed, to provide

information to the Committee, *see* Ex. 4 to Defect Mot., Letter from the U.S. House of

Representatives Permanent Select Committee on Intelligence to Buschel & Gibbons (May 9,

2017) [Dkt. # 120-1] ("HPSCI Letter to Def. Counsel"), and he argues, in reliance on *Safavian,*

528 F. 3d 957, that one cannot obstruct justice by declining to provide documents on a voluntary

basis.

In *Safavian,* the defendant was convicted at trial of three counts of violating 18 U.S.C.

§ 1001(a)(1) and one count of obstructing justice in violation of 18 U.S.C. § 1505.   528 F.3d at

959.   The charges arose out of statements he made concerning a golfing trip to Scotland he took

with lobbyist Jack Abramoff in August of 2002, at a time when Safavian was chief of staff of the

General Services Administration, and Abramoff was asking for information concerning two

GSA-controlled properties in which he or his clients might potentially have an interest.   *Id.*   In

July of 2002, in advance of the trip, Safavian requested an ethics opinion from the general

counsel of the agency concerning whether he could accept the privately chartered air

transportation Abramoff planned to provide.   *Id.* at 960.   In March of 2003, the GSA Office of

Inspector General began investigating the trip, and Safavian was interviewed twice by a GSA

agent who eventually closed the investigation.   *Id.* at 961.   And a year later, in March of 2004,

34

the Senate Committee on Indian Affairs began investigating Abramoff. *Id.* In the course of that broader investigation, the Committee asked Safavian to produce records relating to the 2002 trip, and Safavian responded in writing. *Id.* at 961–62.

Counts One and Four of the indictment alleged obstruction of justice, and Counts Two, Three, and Five of the indictment charged Safavian with violations of section 1001(a)(1). *Id.* at 962. Counts One and Three were based on his interviews with the GSA investigator, Count Two was based on his request for an ethics opinion, and Counts Four and Five were based on his letter to the Senate Committee. *Id.* The jury acquitted the defendant of the charge of obstructing the Senate inquiry in Count Four. *Id.* While Safavian appealed his conviction on all of the other counts, including the obstruction of justice allegation in Count One, *see id.* at 963, the portion of the opinion upon which defendant Stone relies here dealt solely with the charges brought under section 1001.[18]

Section 1001(a)(1) provides for the imposition of criminal sanctions on "whoever . . . knowingly and willfully . . . falsifies, conceals, or covers up by any trick, scheme, or device a material fact[.]" In the *Safavian* case, the jury was asked to identify the particular grounds for its verdict on these counts. *See* Verdict Form, *United States v. Safavian,* 1:05-cr-00370 [Dkt. # 119]. The jury indicated that for Count Two, related to the request for ethics advice, it found the defendant guilty of both Specification A – concealment, and Specification C – false statement. Verdict Form at 2; *see also* 528 F.3d at 962. For Count Three, related to the interview by the GSA inspector, it selected only the concealment offense described in the first specification. Verdict Form at 3; *see also* 528 F.3d at 962.

---

18    The conviction on the obstruction charge in Count One was overturned on other grounds. 528 F.3d at 967–8.

Safavian contended on appeal that his concealment convictions should be overturned based on the undisputed legal principle that "there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1)."  528 F.3d at 964; *see also United States v. White Eagle,* 721 F.3d 1108, 1117 (9th Cir. 2013).  Since Count Two arose out of Savafian's voluntary decision to avail himself of the opportunity to seek ethics advice from the appropriate official within his agency, and since, in that case, with respect to both that request and the interview by the GSA investigator, "the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees[,]" the D.C. Circuit reversed the convictions.  528 F.3d at 964–65.[19]

Based on these cases, defendant Stone maintains that "the count regarding obstruction by way of failure to disclose documents . . . must be dismissed from the indictment."  Def.'s Mem. at 6.  Stone has not cited any authority applying the principles set forth in the *Safavian* false statement case to an obstruction of justice charge.  But more importantly for purposes of defendant's motion, it is not at all clear that the United States is predicating any count on the mere withholding of records in response to a polite request that they be produced voluntarily. The indictment alleges that Stone obstructed the House investigation through multiple means, and even the specific allegation concerning the production of records is contained in a single

---

19    The Court also rejected the government's argument that the concealment convictions under Counts Two and Three should be upheld based on "the principle that once one begins speaking when seeking governmental action or in response to questioning, one must disclose all relevant facts." *Id.* at 965.  Safavian's conviction on Specification C of Count Two, the affirmative false statement made to the ethics official, was reversed on other grounds, and therefore, the Court did not have occasion to address whether that specification would have been sufficient alone to sustain the conviction. *Id.*

clause that he "failed to turn over *and* lied about the existence of responsive records." Indictment ¶ 41 (emphasis added).

At this stage, the case is governed by the well-established principle that "if a criminal statute disjunctively lists multiple acts which constitute violations, 'the prosecution may in a single count of an indictment or information charge several or all of such acts in the conjunctive and under such charge make proof of any one or more of the acts, proof of one alone, however, being sufficient to support a conviction.'" *United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007), quoting *District of Columbia v. Hunt*, 163 F.2d 833, 837–38 (D.C. Cir. 1947). It may be that the Court will eventually conclude that the logic underlying *Safavian* extends to prosecutions under 18 U.S.C. § 1505, and that one cannot be convicted of corruptly acting to impede an inquiry based solely on withholding information if there was no duty to disclose that information. But the remedy is not dismissal of the count; the legal problem – if there is one at the close of the government's case – can be solved with appropriate jury instructions and/or a special verdict form or special interrogatories.

Stone points out, *see* Defect Mot. at 5, that the D.C. Circuit explained in *Safavian*:

> Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information. There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have "fair notice . . . of what conduct is forbidden . . . . [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal."

528 F.3d at 965, quoting *United States v. Kanchanalak,* 192 F.3d 1037, 1046 (D.C. Cir. 1999) (internal citations omitted) (edits in original). But this is an analysis of the prohibition against making false statements to the government in section 1001, not the obstruction of justice

provision in section 1505, and in any event, it would be premature to make a factual determination about what was "reasonably clear at the time" based on an incomplete record. While the letter from the Committee to counsel is plainly phrased in terms of a request, the letter also states:

> In complying with this request, we ask that your client furnish to the Committee, in unredacted form, any and all responsive material in your client's actual or constructive possession . . . .  This request is also made on an ongoing basis:  if after making an initial production to the Committee you or your client find additional responsive material, your client should produce that material to the Committee.

HPSCI Letter to Def. Counsel at 1.[20]  And it is not known at this time what communications, if any, preceded the letter, and whether there were any other communications thereafter or what warnings, if any, they contained.  *See United States v. Bowser,* 318 F. Supp. 3d 154, 168–71 (D.D.C. 2018) (distinguishing *Safavian* on that basis).  Nor is it known at this time whether the defendant responded in a manner that could give rise to a finding that he was on notice of a duty to produce certain materials.  For these reasons, even if the Court will be legally required to consider the sufficiency of the evidence of concealment separate and apart from the evidence supporting the allegation that the defendant falsely denied the existence of the records, this is an assessment that must await the close of the government's case, and the motion to dismiss Count One based on *Safavian* will be denied.

---

20    *See also* the document attached to the letter, entitled "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation."  HPSCI Letter to Def. Counsel at 3 ("To answer these questions, the Committee will seek access to and custody of all relevant information . . . . This investigation is a national security necessity and anything less than a full accounting of all of the facts will be insufficient to protect the country and meet the expectations of the American people.").

## VI.   Defendant is Not Entitled to Discovery on Selective Prosecution Although the Government Must Provide the Defendant with Additional Portions of the Unredacted Report of the Special Counsel.

Defendant has also filed a motion asking the Court to compel unspecified discovery so that he may advance a claim of selective prosecution, *see* Disc. Mot.,[21] and a motion to compel the government to provide the defense with an unredacted version of the March 2019 Report on the Investigation into Russian Interference in the 2016 Presidential Election ("Mueller Report" or "the Report").[22]   *See* Mot. to Compel.   According to the defendant, he is "being selectively prosecuted because he has exercised his First Amendment right to associate with, and through speech, support Donald J. Trump, the President of the United States."   Disc. Mot. at 1.   He maintains he should have access to deliberative materials in the government's possession pertaining to the reasons why other people were not prosecuted, as well as the unredacted Mueller Report so that he can uncover evidence to support this claim.[23]   Tr. at 71:2–22.   For the reasons stated below, the government will be directed to disclose additional portions of the Report, but the motions are otherwise denied.

---

21    At oral argument on this matter, defendant was unable to identify anything he was seeking other than the unredacted report of the Special Counsel requested in a separate motion and declination memoranda, if they exist.  Tr. at 71:2–22.

22    Defendant asserts that he needs the Report "because it contains the government's evidence and conclusions on matters essential to Stone's defense."  Mot. to Compel at 1.  Stone posits that the Report contains information relevant to his contention that the prosecution was unlawful because there was no congressional referral; it will direct him to the likely witnesses in the case; and it will explain why other individuals who allegedly lied under similar circumstances were not prosecuted.  *Id.* at 1–4.

23    Defendant also seeks an unredacted version of the "CrowdStrike Reports" related to the hacking of the Democratic National Committee, *see* Mot. to Compel Unredacted Versions of the CrowdStrike Reports [Dkt. # 103], in part in support of his selective prosecution claim.  Tr. at 70:11–12.  Because that motion to compel was not fully briefed at the time of the hearing on the motions covered by this opinion, the Court will not address it here.

Defendant begins his discovery motions by repeating the same arguments that underlie his motions to dismiss: that "the Special Counsel has prosecuted Roger Stone . . . without a referral [from Congress] to do so," and that this indictment falls "outside the limits" of the Special Counsel's appointment because the Office "was not asked to look into obstruction of Congress and . . . was not authorized to investigate it on its own." Disc. Mot. at 4–5; *see also* Mot. to Compel at 2. These circumstances are unrelated to the selective prosecution issue, and they have already been addressed in this opinion. The defendant then goes on to insist that he was prosecuted when others were not, "despite plenty of evidence that other witnesses have testified and lied in front of Congress," and that therefore, discovery is warranted. Disc. Mot. at 4. But defendant has not made the necessary showing that he has in fact been singled out, or that the decision to charge him has any improper motivation.

A.      **Selective Prosecution**

1.      **What is selective prosecution?**

In *United States v. Armstrong*, the Supreme Court emphasized that "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties . . . . [S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." 517 U.S. at 464 (internal citation marks, citations, and alterations omitted); *see also United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017), *citing Armstrong*, 517 U.S. at 464 ("Prosecutors have broad discretion to enforce the law.").

The Supreme Court has further explained that this deference to the Executive's prosecutorial decision-making "stems from a concern not to unnecessarily impair the

performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.  Thus, "judicial authority is . . . at its most limited" when reviewing the Executive's charging determinations, because the judiciary is generally "not competent to undertake" such an assessment. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016), quoting *Cmty. for Creative Non–Violence v. Pierce,* 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also Wayte*, 470 U.S. at 607.

But this does not mean prosecutors are free to operate without any limitations; "[t]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464, quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962).   And the exercise of prosecutorial discretion is "subject to constitutional constraints," including a prohibition on selectively prosecuting individuals for exercising their constitutional rights.  *Id.*; *see Att'y Gen. of United States v. Irish People, Inc.*, 684 F.2d 928, 932, 932 n.11, 935 (D.C. Cir. 1982).

"In order to prove a selective-prosecution claim, the claimant must demonstrate that the prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 457.  Applying *Armstrong,* the D.C. Circuit has called for a two pronged showing that:  (1) the defendant was "singled out for prosecution from among others similarly situated" and (2) "the prosecution was improperly motivated, *i.e.*, based on race, religion or another arbitrary classification."  *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000), quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983); *see United States v. Blackley*, 986 F. Supp. 616, 617–18 (D.D.C. 1997); *United States v. Palfrey*, 499 F. Supp. 2d 34, 39 (D.D.C. 2007).   "[T]he standard is a demanding one." *Armstrong*, 517 U.S. at 463.

The standard for obtaining discovery regarding selective prosecution is "correspondingly rigorous" because "[i]f discovery is ordered, . . . [i]t will divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468.[24]   Thus, defendant must put forward "some evidence tending to show the existence of the essential elements" of a selective prosecution claim. *Id.* at 470; *see also United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 3–4 (D.D.C. 2018).   This evidence must be "credible," and a defendant must provide something more than mere speculation or "personal conclusions based on anecdotal evidence." *Armstrong*, 517 U.S. at 470.   "If either part of the test is failed," defendant cannot "subject[ ] the Government to discovery." *Irish People*, 684 F.2d at 947; *see also Blackley*, 986 F. Supp. at 618 ("The District of Columbia Circuit requires that this colorable showing be made with respect to both prongs of the test.").

Here, defendant Stone has failed to make a showing that he has been singled out of a group of similarly situated individuals or that he was charged for an improper reason.

---

24     Defendant Stone argues in his motion to compel the Report that the information is "essential to [his] defense." Mot. to Compel at 1.   According to Federal Rule of Criminal Procedure 16, a defendant is entitled to documents as well as other items if "the item is material to preparing the defense" or it is intended to be used in the government's case-in-chief at trial. Fed. R. Crim. P. 16(a)(1)(E)(i), (ii).   But the Supreme Court found that a claim of selective prosecution is not a "defense" that triggers discovery under Rule 16, because a claim of selective prosecution is not a response to the government's case-in-chief. *Armstrong*, 517 U.S. at 461–62. Therefore, the Report is not discoverable under Rule 16.   In any event, deliberative memoranda are not ordinarily covered by Rule 16. *See* Fed. R. Crim. P. 16(a)(2); *United States v. Edelin*, 128 F. Supp. 2d 23, 39 (D.D.C. 2001) (holding that defendant "is not entitled to a disclosure of the internal documents of the United States Attorney's Office, nor is the defendant entitled to knowledge of all aspects of the decisions made in his case").

**2.      Defendant has not shown that that he was singled out for prosecution from other similarly situated individuals.**

The Supreme Court has recognized that there are a variety of considerations that may factor into a prosecutor's decision to prosecute someone:   "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the cases's relationship to the Government's overall enforcement plan."   *Armstrong*, 517 U.S. at 465. "[D]efendants are similarly situated" for purposes of a selective enforcement claim "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."   *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (internal quotation marks and citations omitted), *cited with approval in Branch Ministries*, 211 F.3d at 145.  Or as the Eleventh Circuit put it, an individual may be similarly situated if he or she

> engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan – and against whom the evidence was as strong or stronger than that against the defendant.

*United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000); *see also United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced.").

Courts in this district have interpreted the phrase "similarly situated" narrowly, insisting that a defendant must show that the crimes charged and those allegedly committed by the comparator are the same or similar and arose in the similar circumstances.  In *United States v.*

*Blackley*, the defendant, a public official, was charged with a violation of 18 U.S.C. § 1001 based on his alleged failure to report his receipt of a check from a business associate on his Financial Disclosure Report. 986 F. Supp. at 618–19. Defendant claimed that he had been unfairly selected out of the entire group of individuals who had ever omitted the receipt of a payment on a disclosure form subject to section 1001. *Id.* at 618. The court commented:

> [I]t strains credulity to presume that all of these individuals constitute 'similarly situated' people . . . . Rather, to prevail on this prong, defendant needs to prove that there exist persons who *engaged in similar conduct* and were not prosecuted. . . . If defendant could point to a group of government officials who were alleged to have received checks from persons with business before those officials' agencies, and those individuals were not prosecuted under 18 U.S.C. § 1001 for either their alleged failure to disclose said checks on financial disclosure forms, or for their alleged false statements on sworn declarations, Blackley's claim could theoretically survive the first prong of the selective prosecution test. In the absence of such a showing, it cannot.

*Id.* (emphasis in original).[25]

Here, the defendant points to two individuals who were not prosecuted – Jerome Corsi and Randy Credico – who he maintains are "similarly situated" because they allegedly lied to the Special Counsel. Disc. Mot. at 5–7. But Stone was indicted for obstruction of justice (Count One); knowingly falsifying, concealing, and covering up a material fact in a proceeding (Counts Two though Six); and witness tampering (Count Seven). Indictment ¶¶ 40–45. So his motion fails first and foremost for a lack of comparators.

---

25      *See also United States v. Khanu*, 664 F. Supp. 2d 28, 33 (D.D.C. 2009) (finding that defendant had not met his burden to show that his alleged co-conspirators were similarly situated because defendant was more involved and took a leadership role in the conspiracy); *United States v. Edelin*, 134 F. Supp. 2d 59, 88 (D.D.C. 2001) ("It may be difficult for the defendant to find an individual of another race who has allegedly committed multiple murders, three of them capital, in addition to multiple attempted murders and assaults with intent to murder, and yet had never been prosecuted.").

According to Stone's pleading, Corsi "admit[ted] to lying to the Special Counsel," and published "for the world to see, a draft of a Plea Agreement pushed on him by the Special Counsel." Disc. Mot. at 5–6. But the concerns about witness tampering, withholding evidence, and obstruction of justice present here are absent in Corsi's case. *See* Gov't Opp. to Disc. Mot. [Dkt. # 95] at 7. So while there is some evidence in the record to suggest that at least at one point, with respect to certain matters, the Office of Special Counsel found "little corroboration" for certain statements Corsi made to its investigators, Mueller Report, Vol. I, at 59, that alone does not necessarily make him similarly situated. The presumption of regularity requires the Court to defer to the prosecutors' exercise of their judgment and discretion as to whether he should be charged in the absence of a plea, particularly since the Court does not have sufficient knowledge to second guess their assessment of the strength of the evidence, and it does not know what transpired thereafter. *Armstrong*, 517 U.S. at 464–65. As the Report explains:

> The Office considered whether, during the course of the investigation, other individuals interviewed either omitted material information or provided information determined to be false. Applying the Principles of Federal Prosecution, the Office did not seek criminal charges against any individuals other than those listed above. In some instances, that decision was due to evidentiary hurdles to proving falsity. In others, the Office determined that the witness ultimately provided truthful information and that considerations of culpability, deterrence, and resource reservation weighed against prosecution.

Mueller Report, Vol. I, at 198–99.

Even if one looks at Corsi's alleged violations of section 1001 alone, defendant's showing does not get over the threshold. The draft Information and Statement of Offense submitted as Exhibits 2 and 3 to the discovery motion [Dkt. ## 73-2, 73-3] presumed that Corsi would plead to a violation of a different section of 1001 – making a false statement in violation of section 1001(a)(2), and not (a)(1), which is charged in this case, and the proposed plea

involved a matter pending before the executive branch, rather than the legislature.  And even if this could be enough to show that Corsi is "similarly situated," the defense has not made a colorable showing that the prosecution of Stone, and not Corsi, was motivated by impermissible considerations, as will be explained in more detail below.

Defendant also characterizes Randy Credico as a similarly situated individual.   In reliance upon a sealed transcript of Credico's July 6, 2017 grand jury testimony, Stone identifies two statements Credico made about his communications with Stone that are inconsistent with the indictment and Stone's own text messages.  First, according to the defendant's motion, Credico stated that he never discussed the head of Organization 1 with Stone, yet the Indictment in this case quotes an August 23, 2016 conversation between Stone and Credico in which they discuss the head of Organization 1.[26]  Disc. Mot. at 6; *see* Indictment ¶ 14(e).  Second, Stone asserts that Credico provided information that he had never spoken to Stone about WikiLeaks prior to September 10, 2016, but Stone released text messages from August 19, 2016 in which Credico told Stone that he had a connection to Assange.  Disc. Mem. at 7.

Stone also asserts that Credico can also be characterized as similarly situated with respect to the witness tampering charges in the indictment because another witness allegedly reported that Credico threatened to "put a hole" in the witness's head.  *Id.*  But individuals are similarly situated "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *Hastings*, 126 F.3d at 315.  Here, the government proffers that the witness advised law enforcement that he did

---

26    Defendant asserted that the grand jury may not have been advised about the discrepancies in the Credico testimony, but the government posits that the grand jury was presented with evidence contradicting Credico's prior testimony.   Gov't Opp. to Disc. Mot. at 8 n.1.

not take those words seriously and did not seriously believe that Credico would harm him, and it states that it took those circumstances into consideration when evaluating the strength of the evidence in each case.  Tr. at 91:11–24; Gov't Opp. to Disc. Mot. at 8 n.2.  The government also maintains that "[t]his single statement is not remotely akin to the numerous communications alleged in the indictment in which the defendant repeatedly implored Person 2 to testify falsely or invoke his Fifth Amendment right against self-incrimination."  Gov't Opp. to Disc. Mot. at 8 n.2.  So there are legitimate prosecutorial factors that differentiate the two alleged witness tampering situations, and with respect to § 1001, defendant does not assert that Credico falsified or concealed material information from Congress.

Stone also insists that he must have been singled out because "[o]f the hundreds of witnesses in the House Permanent Select Committee on Intelligence investigation and the other committees of the House and the Senate, only two have been charged."  Disc. Mot. at 7.  But Stone does not proffer any evidence in support of this statement, and he does not allege that any one of the "hundreds" in particular in fact testified falsely.  *See United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (affidavit from defendant and attorney that they "believe[d]" there was improper motive and that "hundreds" of similarly situated individuals went unprosecuted was insufficient).  Nor does he begin to calculate the percentage of congressional witnesses who have been charged with lying in connection with other investigations over any particular period of time, such as defendants in *United States v. Clemens*, 793 F. Supp. 2d 236 (D.D.C. 2011), *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), and *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).

Even if Stone – as he maintains – was not required to come forward with individuals who specifically lied to *Congress*, and individuals who allegedly lied to other investigative bodies

could be deemed to be "similarly situated," defendant's suggestion that his indictment for making false statements and obstruction of justice was unique in the context of the investigation undertaken by the Special Counsel is entirely inconsistent with the record.  To date, eleven other people connected to the investigation have been charged with making false statements, obstruction of justice, or witness tampering in some capacity.[27]  To argue that he was somehow "singled out" has no support, although his counsel attempted to argue that he is the only one that has not pled guilty.  Tr. at 78:23–79:18.  But a number of individuals were indicted without any agreement to enter a plea.  *See* Redacted Indictment [Dkt. # 13], *United States v. Paul Manafort and Richard W. Gates, III*, 17-cr-201 (D.D.C. Oct. 30, 2017); Superseding Indictment [Dkt. # 318], *United States v. Konstantin Kilimnik*, 17-cr-201 (D.D.C. June 8, 2018); Indictment [Dkt. # 1], *United States v. Bijan Rafiekian and Kamil Ekim Alptekin*, 18-cr-457 (E.D. Va. Dec. 12, 2018); Indictment [Dkt. # 1], *United States v. Gregory B. Craig*, 19-cr-125 (D.D.C. Apr. 11, 2019).

Stone argues that the Report of the Special Counsel contains the information that Stone needs to identify similarly situated individuals.  He contends that "[t]he Report advises who has been interviewed, who has been investigated, and why others were not prosecuted for obstruction or perjury . . . .  Further discovery will make clear that others were given preferred treatment, *i.e.*

---

27      *See* Information [Dkt. # 8], *United States v. Papadopoulos*, 17-cr-182 (D.D.C. Oct. 3, 2017); Redacted Indictment [Dkt. # 13], *United States v. Paul Manafort and Richard W. Gates, III*, 17-cr-201 (D.D.C. Oct. 30, 2017); Information [Dkt. # 1], *United States v. Michael T. Flynn*, 17-cr-232 (D.D.C. Nov. 30, 2017); Information [Dkt. # 1], *United States v. Alex Van der Zwaan*, 18-cr-31 (D.D.C. Feb. 16, 2018); Superseding Indictment [Dkt. # 318], *United States v. Konstantin Kilimnik*, 17-cr-201 (D.D.C. June 8, 2018); Information [Dkt. # 1], *United States v. W. Samuel Patten*, 18-cr-260 (D.D.C. Aug. 31, 2018); Information [Dkt. # 2], *United States v. Michael Cohen*, 18-cr-850 (S.D.N.Y. Nov. 29, 2018); Indictment [Dkt. # 1], *United States v. Bijan Rafiekian and Kamil Ekim Alptekin*, 18-cr-457 (E.D. Va. Dec. 12, 2018); Indictment [Dkt. # 1], *United States v. Gregory B. Craig*, 19-cr-125 (D.D.C. Apr. 11, 2019).

not indicted, because they did not support Trump." Disc. Mot. at 6. Defense counsel repeated this assertion again at oral argument, contending that the "first step is . . . asking for the discovery." Tr. at 79:21–22, 82:9–11. But this supposition is made up out of whole cloth, and the Supreme Court has found that to obtain discovery, the defendant must put forward "some evidence" tending to show the elements of selective enforcement – it is not enough to say that evidence will materialize if the discovery is ordered. *See Armstrong*, 517 U.S. at 470 ("In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents."); *see also Edelin*, 134 F. Supp. 2d at 88 (finding that it may be impossible to come up with a similarly situated person, and if that is the case, the court cannot order discovery under the standard set forth in *Armstrong*). And in any event, the defendant's assertion is inconsistent with the fact that there were numerous supporters, associates, and family members of the President who have provided testimony or information and were not charged with making false statements. Moreover, the Court's *in camera* review of that portion of the Report related to the publication of DNC emails on Wikileaks revealed that the material defendant hoped to find under the redactions was not there.

### 3.     Defendant has not shown that his prosecution was improperly motivated.

But even if defendant can point to an individual or individuals who are similarly situated, he must also show that his prosecution was motivated by a discriminatory purpose. *Armstrong*, 517 U.S. at 457. This second prong of the test requires a defendant to come forward with some evidence showing that his prosecution was based upon an unlawful or arbitrary classification.

*See Branch Ministries*, 211 F.3d at 144.   And here, defendant's showing is non-existent – indeed, he does not identify *any* plausible reason why he was charged and Corsi and Credico were not.

Defendant asserts that he was prosecuted because "he has exercised his First Amendment right to associate with, and through speech, support Donald J. Trump, the President of the United States."   Disc. Mot. at 1.   To support this proposition, he marshals no facts, but argues – again – that "Congress did not refer a potential criminal matter to the Department of Justice," and the Special Counsel's office acted beyond the scope of its authority as outlined in the Appointment Order.[28]   Disc. Mot. at 4–5.

As set forth above, neither of these circumstances was improper, and they do not support a finding that defendant's prosecution was improperly motivated.   And Stone points to nothing that would substantiate his attribution of his indictment to his political views.   While Stone argues vociferously that Corsi and Credico are the most significant comparators, he unconvincingly attempts to distinguish Corsi and himself by pointing to the fact that Stone was a member of the Trump Campaign,[29] and Corsi was not.   Tr. at 81:13–17.   But even a casual glance at Corsi's significant online presence would tend to indicate that he too is a supporter of

---

[28]      Defendant Stone asserts that he was the only person charged with lying to Congress without a referral, but while the public record appears to indicate that there was a referral with respect to the allegations that Michael Cohen lied before the House Committee in 2019, *see* Letter from Ranking Member Jim Jordan of the Committee on Oversight and Ranking Member Mark Meadows of the Subcommittee on Government Operations to Attorney General William Barr (Feb. 28, 2019), https://republicans-oversight.house.gov/wp-content/uploads/2019/02/2019-02-28-JDJ-MM-to-Barr-re-Cohen-DOJ-Referral.pdf, the Court was unable to ascertain whether there was a similar referral with respect to the statements before the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence in 2017. Neither side has presented evidence on this issue.

[29]      Stone did not point to this as an improper motivation for the prosecution in his motion for discovery.

the President whose published views overlap considerably with those of defendant Stone.  *See* Jerome Corsi, Facebook; Jerome R. Corsi, Ph.D, Twitter; www.corsination.com.  And he does not even attempt to identify what sort of First Amendment activity might have differentiated him from Credico in the eyes of the prosecution.  Stone puts forth absolutely no evidence that his relationship to the campaign or the candidate motivated the Special Counsel's decision to investigate and prosecute him.

Moreover, while Stone posits that he was charged because of his association with the President, one cannot overlook the fact the Special Counsel's specific charter was to look into any links or coordination between people associated with the campaign and the Russian interference in the election.  *See* Appointment Order.  Thus, the mere fact that an individual who was at one time associated with the campaign became a focus of the Special Counsel's attention is not remarkable, and standing alone, it is not sign of improper motivation.[30]

If one seeks permission to embark on discovery related to selective prosecution, it is not enough to simply state that the prosecutor was biased.  Defendant must *show* that in his case, the

---

30    Based on the allegations in the indictment which are assumed to be true for purposes of these motions, it is fair to say that Roger Stone has no one but himself to blame for the fact that he was investigated by the Department of Justice.  In August 2016, on various occasions, Stone publicly stated that he has "communicated with [the head of Organization 1]."  Indictment ¶ 14. From August to October 2016, Stone sent a number of text messages and emails with Person 2 about Organization 1, and what the head of Organization 1 planned to do.  *Id.* ¶¶ 14–16.  And in October 2016, Stone allegedly made statements about Organization 1's future releases to members or supporters of the Trump Campaign.  *Id.* ¶ 16.  It may well be that the defendant was being more truthful in his later disavowal of those statements than in his original braggadocio. But there is no question that when he chose to take credit for the Wikileaks release and to tantalize the public with hints that he had inside information about more to come, he chose to place himself directly in the vortex of the issues that became the focus of multiple law enforcement, counterintelligence, and congressional investigations.  And he can hardly complain that under those circumstances, once he appeared before the Committee, his veracity, along with the veracity of other witnesses, was subject to scrutiny.

decisionmaker acted with a discriminatory purpose.  *See United States v. Mack*, 53 F. Supp. 3d 179, 188 (D.D.C. 2014) (since the defendant had "not put forth a shred of evidence even hinting at the existence of a discriminatory purpose behind the decision to prosecute him" and not his comparators, the court denied discovery).  Since defendant has failed to produce any evidence that would satisfy the second element of a selective prosecution claim, he may not obtain discovery on this issue.

### B.  Motion to Compel the Unredacted Report

The Court has already determined that defendant has failed to make the showing necessary to embark on discovery related to selective prosecution, and that deliberative materials fall outside of the government's obligations under Rule 16, and therefore, there is no basis to grant the motion to compel or the motion for discovery.[31]  But the Court was of the view that the Report of the Special Counsel should receive separate consideration since a great deal of deliberative material within the Report had already been released to the public.

---

[31]    In the motion to compel, Stone made the additional point that he is entitled to the complete Report of the Special Counsel because he cannot be charged with obstruction of justice in the absence of a determination that a crime under investigation was committed:

> Indeed, the Special Counsel would have to prove at trial that a conspiracy existed to interfere with the 2016 presidential election and that it involved the Russian government, *before* Stone could be charged with obstructing an investigation into that Russian conspiracy.

Mot. to Compel at 2 (emphasis in original).  The government argued in its opposition that this contention is inconsistent with the statute and incorrect as a matter of law, *see* Gov't Opp. to Mot. to Compel [Dkt. # 94] at 6–7, and it is unclear how such a principle would apply to a prosecution for obstructing a legislative proceeding, as opposed to a law enforcement investigation.  But counsel for the defendant acknowledged that the defense does not need to review the unredacted report in order to advance this argument, Tr. at 103:17–106:2, so the Court will address the issue – which was not raised in any of the motions to dismiss – if and when it is presented for its resolution.

On May 9, 2019, the Court ordered the government to submit unredacted portions of the Report that relate to defendant "and/or 'the dissemination of hacked materials,' including, but not limited to, pages 41–65 of Volume 1 of the Report, to the Court for *in camera* review by May 13, 2019." Min. Order (May 9, 2019). The government complied, providing pages 4, 5, and 9 of the Executive Summary of Volume One; pages 12, 27–28, 36, 41–65, 89, 134, 148, 174–80, 183–85, 188–91, 196–97 of Volume One; and pages 3–6, 15–21, 42, 52–55, 74–77, 120, 128–33, 148–52, 157, B-3, B-8, B-10 of Volume Two. *See* Gov't Notice re In Camera Submission, May 13, 2019 [Dkt. # 106]. Material had been redacted on several grounds:

> (1) material subject to Federal Rule of Criminal Procedure 6(e) that by law cannot be made public; (2) material the intelligence community identifies as potentially compromising sensitive sources and methods; (3) material that could affect other ongoing matters, including those that the Special Counsel has referred to other Department offices; and (4) information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties.

Letter from Attorney General William P. Barr to Chairman Lindsey Graham of the U.S. Senate Committee on the Judiciary and Chairman Jerrold Nadler of the U.S. House of Representatives Committee on the Judiciary (Mar. 29, 2019) (transmitting public version of the Report). The Court reviewed all of the redactions carefully with an eye towards the specific reasons the defendant gave for requesting the material and the grounds for the withholdings.

Because it appeared that much of the material that was withheld solely on the basis of potential harm to the prosecution of this case was information that had already been set forth in the indictment or provided to the defendant, the Court issued a second order asking the government to address whether permitting the defense to review particular material identified in an accompanying sealed order would cause harm to the prosecution or any other harm. Min. Order (June 3, 2019). The government filed the requested supplementary submission on June 7.

*See* Gov't Notice re In Camera Submission, June 7, 2019 [Dkt. # 130].  Having considered the defendant's motion, the government's response and supplemental submissions, and the Report itself, the Court has determined that the defense should have the limited access he requested to some, but not all, of the redacted material.[32]

Insofar as defendant's motion to compel seeks any material that was redacted from the public report on the basis that its release would infringe upon the personal privacy of third parties or cause them reputational harm; pursuant to Federal Rule of Criminal Procedure 6(e); or on the basis of national security or law enforcement concerns, including information that if revealed, could potentially compromise sensitive information gathering sources, methods, or techniques or

---

[32]    In his motion to compel, defendant emphasized, "[t]o be clear, Stone is not requesting the Report be disclosed to the world – only to his counsel so that it may aid in preparing his defense," and that "[t]he court has a Protective Order in place regarding discovery that would apply in full force and effect to the Special Counsel's Report. (Dkt. 22)."  Mot. to Compel at 2, 4.

harm ongoing intelligence or law enforcement activities, the Court will deny the motion.[33]   With

respect to material that was withheld solely on the basis that its release could affect the ongoing

---

33      Defendant argues that *In re North*, 16 F.3d 1234 (D.C. Cir. 1994) supports his contention that contents of the Report must be disclosed.  In that case, Independent Counsel for the Iran Contra Matters submitted a report on his investigation pursuant to the now elapsed Ethics in Government Act.  *See* 16 F.3d at 1236.  The statute required the independent counsel to submit the report to a division of the court and provided that the court may make any portion of it "available to any individual named" in it so that the individuals can submit comments.  *Id.* During this "comment period," two journalism organizations and a non-profit filed for public disclosure of the full report.  *Id.*  In support of their motion, they cited to a Senate report, created in relation to the Ethics in Government Act, outlining factors that the Court should consider to determine whether the Report should be publicly released.  *Id.*  Those factors included:

> (1) whether the subjects of the investigations have already been disclosed to the public; (2) whether the subjects do not object to the filings being released to the public; (3) whether the filings contain information which is already publicly known; and (4) whether the court filings consist of legal or factual rulings in a case which should be publicly available to understand the court's rules and precedents or to follow developments in a particular manner.

*Id.* at 1237, quoting Sen. Rep. No. 123, 100th Cong., 1st Sess. 21 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2150, 2170.

        In response, a number of parties filed objections to the release of the Report.  *Id.*  The Court ultimately decided to release it, considering the factors set forth in the Senate report.  *Id.* at 1241.  It based its decision, in part, on the fact that much of the information in the Report was known publicly, and it was known incorrectly, and "the reality of the partial public knowledge of the information in the Report weighs strongly in favor of releasing the whole."  *Id.*  It also decided to release previously redacted grand jury information because much of the information that was redacted was disclosed to certain individuals, and it "ultimately became part of the media accounts."  *Id.* at 1244–45.

        The case is not guiding here.  First, defendant has not asked the Court to release the Report publicly, and the case does not discuss whether one individual is entitled to the unredacted report.  Second, the factors the Court considered in deciding to release the Report have no bearing to whether one individual should have full access to the Report.  And the factors the Court considered stemmed from a Senate report pertaining to a law that has now elapsed. That statute also prescribed that the report had to be filed with a court, and the court had to hold a comment period from those individuals named in the report.  There are no such requirements here, and there is no corresponding statutory guidance or Senate report as to what the Court should consider in deciding whether the Report should be unredacted and released to defendant.

prosecution of this case, the Court has concluded that the material to be specified in the order issued with this opinion should be provided to counsel for the defendant subject to the terms and conditions of the Protective Order in this case.

## CONCLUSION

For the reasons set forth above, defendant's Motion to Dismiss [Dkt. # 69], Motion to Enjoin the Prosecution [Dkt. # 71], Motion to Dismiss Due to Defects in the Indictment Pursuant to Fed. R. Crim. P. 12(b)(3)(B) [Dkt. # 72], and Motion for Discovery based on Selective Prosecution [Dkt. # 73] are hereby DENIED, and his Motion to Compel the Complete Report of the Special Counsel [Dkt. # 70] is hereby GRANTED IN PART and DENIED IN PART.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 1, 2019