```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 19-CR-018
4                    Plaintiff,     )
                                    ) MOTIONS HEARING
5    vs.                            )
                                    ) Washington, DC
6    Roger J. Stone, Jr.,           ) July 16, 2019
                                    ) Time:  10:00 a.m.
7                    Defendant.     )
     _____
8
                     TRANSCRIPT OF MOTIONS HEARING
9                          HELD BEFORE
              THE HONORABLE JUDGE AMY BERMAN JACKSON
10                 UNITED STATES DISTRICT JUDGE
     _____
11
                        A P P E A R A N C E S
12

13   For the Plaintiff: Michael John Marando
                        Jonathan Ian Kravis
                        Adam Jed
14                      U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
15                      555 Fourth Street, NW
                        Washington, DC 20530
16                      (202) 252-7068
                        e-mail:  Michael.marando@usdoj.gov
17                      E-mail:  Jonathan.kravis3@usdoj.gov
                        E-mail:  Adam.jed@usdoj.gov
18                      Aaron Jon Zelinsky
                        U.S. Department of Justice
19                      Special Counsel's Office
                        950 Pennsylvania Avenue, NW
20                      Washington, DC 20530
                        (202) 616-0800
21                      e-mail:  Jsr@usdoj.gov
                        E-mail:  Asjz@usdoj.gov
22
     For the Defendant: BRUCE S. ROGOW
23                      LAW OFFICE OF BRUCE S. ROGOW, P.A.
                        100 NE 3rd Avenue
24                      Suite 1000
                        Fort Lauderdale, FL 33301
25                      (954) 767-8909
                        e-mail:  Brogow@rogowlaw.com
```

**Robert C. Buschel**
BUSCHEL & GIBBONS, P.A.
One Financial Plaza
100 S.E. Third Avenue
Suite 1300
Ft. Lauderdale, FL 33394
(954) 530-5301
e-mail:  Buschel@bglaw-pa.com

**L. Peter Farkas**
HALLORAN FARKAS & KITTILA LLP
1101 30th Street, NW
Suite 500
Washington, DC 20007
(202) 559-1700 ext 102
e-mail:  Pf@hfk.law

**Grant J. Smith**
STRATEGYSMITH, P.A.
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
(954) 328-9064
e-mail:  Gsmith@strategysmith.com

Also present:       FBI Case Agent Michelle Taylor

_____

Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                         Official Court Reporter
                         United States Courthouse, Room 6523
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         202-354-3267

1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

2     This morning we have Criminal Case Number 19-18, the *United*

3     *States of America v. Roger J. Stone, Jr.*  Mr. Stone is present

4     and in the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6     lectern and identify yourself for the record.

7          MR. KRAVIS:  Good morning, Your Honor.

8     Jonathan Kravis on behalf of the United States.  With me at

9     counsel table are Michael Marando, Aaron Zelinsky, and Adam

10    Jed, also on behalf of the United States, and Michelle Taylor,

11    the case agent.

12         THE COURT:  All right.  Good morning.

13         MR. BUSCHEL:  Good morning, Judge.  Robert Buschel on

14    behalf of Roger Stone.  I am with Peter Farkas, Grant Smith,

15    and Bruce Rogow.

16         THE COURT:  All right.  Good morning.  And I know the

17    defendant is present.

18         I have the motions to dismiss and the discovery

19    motions, which have already been argued, under advisement, and

20    I expect to rule on them in writing shortly.  Today is

21    scheduled to be a hearing on the motion to suppress evidence

22    seized pursuant to a number of warrants, that's Docket 101.

23    And there's been an opposition at Docket 122 and a reply at 133

24    and a surreply at 137.

25         There's also a discovery motion concerning redactions

1    in the CrowdStrike report that was provided to the defendant by

2    the government.  That's Docket 103.  There's an opposition at

3    123 and a reply at 134.

4         I'm going to take these up one at a time rather than

5    making you argue them both at once.  And depending on how that

6    goes, we may or may not get to the government's motion

7    concerning the conditions of release.

8         There is now pending -- although I'm not sure if it's

9    fully briefed yet -- a Rule 404(b) evidence dispute, and I'm

10   going to rule on that either at the pretrial conference or

11   before.  And if I want to hear argument before the pretrial

12   conference on that issue, I'll have Mr. Haley contact you to

13   set a date for that, although I'm not sure at this point if

14   that's going to be necessary.

15        All right.  So I would like to start with the motion

16   to suppress.  Who is going to be arguing that on behalf of the

17   defendant?

18        MR. BUSCHEL:  I am, Judge.

19        THE COURT:  All right.  You can come to the lectern.

20        MR. BUSCHEL:  Thank you.

21        THE COURT:  All right.  Mr. Buschel, you've moved to

22   suppress evidence seized or obtained pursuant to 17 different

23   warrants.  Why doesn't the holding in *United States versus*

24   *Leon*, which if the evidence was gathered in good faith reliance

25   on a warrant signed by a judicial officer should not be

1    excluded, why doesn't that Supreme Court precedent control your

2    motion?

3              MR. BUSCHEL:  Well, may it please the Court.  Good

4    morning.

5              THE COURT:  Good morning.

6              MR. BUSCHEL:  We're here to ask for a *Franks* hearing

7    first, before we -- as well -- you know, as a part of the

8    motion to suppress.  And if there's a showing that there was

9    reckless misrepresentation made to secure that warrant, and

10   that reckless misrepresentation tainted the warrant, a *Franks*

11   hearing is called for.

12             To get immediately to a good faith exception under

13   *Leon* goes directly to the second element of what *Franks*

14   requires, and that is, if there was a misrepresentation that

15   was reckless or worse, then there can't be good faith.  Both

16   *Franks* and *Leon* use the term "reckless," and I think the Court

17   needs to explore that the -- and understand that, since we're

18   asking for a *Franks* hearing.

19             And we're claiming, and proving, having a showing of

20   recklessness, a reckless representation, and that recklessness

21   representation is that WikiLeaks received stolen data from the

22   DNC, the relevant data in this case, from the Russian state.

23   And we're claiming that that can't be true, and that the agents

24   and the government should have known that at the outset.  And

25   that's where this lack of good faith and the recklessness comes

1    from.

2            THE COURT:  All right.  Well, let me go back to the

3    *Franks* test.  *Franks* said, "The government" -- "The affidavit

4    has a presumption of validity, unless the defendant makes a

5    substantial preliminary showing that a false statement was

6    knowingly and intentionally, or with reckless disregard for the

7    truth, included in the affidavit, and the alleged false

8    statement is necessary to the finding of probable cause."

9            And the Court said, on page 171 of its opinion, "The

10   attack must be more than conclusory.  It must include

11   allegations of deliberate falsehood or reckless disregard for

12   the truth accompanied by an offer of proof.  And it must point

13   out specifically the portion of the affidavit that is claimed

14   to be false."

15           Now, your motion doesn't specifically point out a

16   single specific statement in a single one of the warrants that

17   you maintain is false.  So why wouldn't I deny the motion on

18   that basis alone?

19           MR. BUSCHEL:  Well, in the reply brief, we do.  I

20   give the list of all the warrants and which paragraphs we're

21   saying are specifically false.  And the specific falsity is

22   that WikiLeaks received the data from the Russian state.  I

23   think it is -- let's say this:  *Franks* also says that the

24   magistrate has no acquaintance with the information that may

25   contradict good faith and a reasonable basis for the affiant's

1   allegations.

2         We have an ex parte nature in the initial hearing

3   when the government applies for a search warrant, and rather

4   than the magistrate's capacity, that there is reason for the

5   review.  And so both *Leon* and *Franks* recognized that the

6   magistrate is at a disadvantage.  That you present these

7   warrants, and the overarching assumption in all 18 warrants,

8   and they all kind of repeat the same story, that this is what's

9   happening --

10         THE COURT:  That's different than the affiant

11   knowingly or recklessly lying to the judicial officer.  The

12   fact that the warrants say, repeatedly, "According to the

13   report prepared by the U.S. Intelligence Community, or the USIC

14   assessed, or the USIC said," what you are attacking is the

15   USIC's conclusion, fundamentally.

16         So, what is the legal authority that permits to you

17   do that, if the agent wasn't lying when he said the USIC said

18   in its report the following?  What is the statement that was

19   knowingly or recklessly false that the affiant made in one

20   affidavit?  Point to one.

21         MR. BUSCHEL:  First, before we get -- they cite to

22   the U.S. Intelligence Service.  They say they have high

23   confidence.  If we read that report, let me tell you, if they

24   put this in the warrant, we can explore whether a magistrate

25   would sign that warrant.

1              "Judgments are not intended to imply we have proof

2       that shows something to be a fact.  Assessments are based on

3       collected information which is often incomplete or fragmentary,

4       as well as logic, argumentation, and precedence."

5              And, by the way, the NSA had low confidence, but the

6       definition in the intelligence report defines high confidence

7       as:  Generally indicates that judgments are based on

8       high-quality information from multiple sources.  It does not

9       imply that the assessment is a fact or a certainty or

10      judgments --

11             THE COURT:  What they said --

12             MR. BUSCHEL:  -- might be wrong.

13             THE COURT:  -- is assess.  They used the word

14      "assess" repeatedly.  Were they lying when they said the USIC

15      assessed?

16             MR. BUSCHEL:  If you were to ask me a question, I

17      would say I have high confidence the answer is yes.  And I say

18      high confidence means that I might be wrong and I'm not saying

19      it was a fact.  If the definitions of those terms of "high

20      confidence" were in a warrant, I think it would cause the

21      magistrate to have pause.

22             Certainly, you know, an agent putting something like

23      that, "high confidence," is fine, but if once we define -- it's

24      real government double speak here.  High confidence doesn't

25      mean high confidence.  It means it's not a fact.  It means we

1    could be wrong.  It could mean a lot of things.  And it has

2    been that way since, you know, we have -- this was not

3    originally an FBI investigation.

4           CrowdStrike, a private company, came in and did this

5    and didn't give access to the FBI.  Mr. Mueller tells

6    Congress -- tells in the report that he is uncertain whether

7    WikiLeaks received the data from a nonhuman source.  It may

8    have been given from a human source, which means it wasn't

9    hacked from outside the DNC.

10          We know Mr. Comey says the same thing to Congress in

11   March of 2017.  He says, "We were never given access to the DNC

12   server."

13          So this wasn't a traditional crime scene.  This is

14   like they gave us pictures of the homicide scene and, by the

15   way, those pictures are redacted in some way, and we determined

16   that somebody, you know, was a homicide based upon the

17   pictures, but not complete pictures.

18          Mr. Rosenstein admits -- as we go through the history

19   backwards, he admitted that the -- he says that no American

20   conspired with any Russian.  And then, later on, said that no

21   one knowingly spoke to any Russian about this.

22          So when you have terms within CrowdStrike, the actual

23   reports themselves that we've seen, they say:  These servers

24   were then, most likely, Fancy Bear as an adversary with a

25   suspected nexus to Russia.  The method of persistence used in

1    Fancy Bear actor is consistent with suspected origin and known

2    Fancy Bear tactics, techniques, and procedures.  Fancy Bear is

3    believed to work for the GRU.

4            THE COURT:  All right.  Let me go back to the

5    predicate for *Franks*.  Before we get to what you believe are

6    reasons to believe that assumptions underlying the warrants may

7    be unfounded, I want you to tell me what statements in the

8    warrants you are alleging were deliberately or recklessly

9    false.

10           MR. BUSCHEL:  And I'm pointing the Court to our

11   reply.  There was a list of 18 warrants with the paragraphs

12   that -- that say --

13           THE COURT:  Well, I'm asking you right now.  I'm

14   sitting with them in a binder that you gave me.  I want you to

15   read me a false sentence.

16           MR. BUSCHEL:  Let me grab a -- I would have to

17   cross-compare the paragraph, too.  I thought I was doing that

18   for the Court --

19           THE COURT:  I had trouble cross-comparing, as you

20   recall, your motion with the warrants, which is why I asked you

21   to give them to me.

22           MR. BUSCHEL:  Right.  But --

23           THE COURT:  And now I'm sitting here with them and I

24   read through them and they all say things like:  The USIC

25   assessed.  It did this.  It did that.  CrowdStrike said

1       "publicly attributed."

2                 It doesn't say:  I, the affiant, am telling you this.

3                 He's saying, I read this information, and they said

4       that.  And based on that, we wanted to investigate further.

5       And when we went to investigate further, or the House went to

6       investigate further --

7                 MR. BUSCHEL:  I don't think the agent gets the

8       benefit of a:  Oh, well, we're given bad intelligence from

9       another agency.  And based upon that, I go forward and I want

10      to get a search warrant.

11                This is Fourth Amendment based, privacy based, to

12      say, well, the assessment was high confidence.  And the

13      major -- the lie is throughout.  Every single one of the

14      warrants cites to the U.S. Intelligence Committee report.

15                THE COURT:  Well, you agree that even if something

16      that was the basis for probable cause later turns out to be

17      incorrect, that doesn't necessarily lead to suppression.

18      *Franks* is all about the affiant lying or saying something

19      recklessly.  So, what did the affiant say that was a lie or

20      reckless?

21                MR. BUSCHEL:  But every --

22                THE COURT:  Was it reckless --

23                MR. BUSCHEL:  To rely on the U.S. Intelligence

24      report.

25                THE COURT:  That's what you're saying?

1          MR. BUSCHEL:  Yes.  It's very simple, that if you

2     take a WikiLeaks document from a DNC email, and you do the --

3     see the metadata from it, instantly anyone can check.  But,

4     particularly a trained agent can check and say the speeds on

5     this, and these are the declarations that we filed with the

6     Court.

7          This is the preliminary showing.  The speeds of the

8     downloads, the signature stamp, that it always ends in an even

9     number; 22 seconds, 24 seconds, 28 seconds.  This is how

10    WikiLeaks got it.  It's a signature of a thumb drive.  It's not

11    a signature of an outside hack breaking in and sucking the data

12    out of the DNC.  These are typical, simple intelligence

13    techniques that we have presented to the Court by people who

14    would know to say that this was a thumb drive.

15         That is the misrepresentation, to say:  Well, we

16    relied on the Intelligence Community's report, when it's very

17    easily verifiable that *Franks* doesn't and *Leon* doesn't give

18    that good faith extension to them.

19         THE COURT:  Let's say you're correct, let's say it

20    was an inside job, and the Russians had nothing to do with it,

21    what does that have to -- why does that undermine the probable

22    cause for the warrants here which seem to relate to, was there

23    any coordination with respect to the dissemination?

24         MR. BUSCHEL:  The coordination with the -- well, if

25    WikiLeaks didn't get its data from Russia, we know what the

1    Congressional investigation was about.  He was charged with

2    making misrepresentation, lying to Congress, and those

3    parameters were set out in a letter from the House Intelligence

4    Committee.  And that was:  Please explain how Russia's cyber

5    activity, you know, was involved in the 2016 election.  And the

6    second thing is, did you talk to anybody in the campaign about

7    Russian cyber activity?

8              It all becomes irrelevant at that point for purposes

9    of a warrant.  If we --

10             THE COURT:  Well, the warrant, the affiant asserts in

11   most of the warrants, there is probable cause to believe a

12   violation of 18 U.S. Code Section 1030, accessing a computer

13   without authorization or exceeding one's authorization in

14   obtaining information.

15             There is allegations that Guccifer 2.0 claimed

16   responsibility and defendant communicated with Guccifer 2.0 and

17   Organization 1, either directly or indirectly.

18             Why is the identity of the hacker necessary to

19   probable cause for exceeding authorization to use a computer?

20   There's nothing international in the crime that they say was

21   probable cause for a warrant.

22             MR. BUSCHEL:  But, there's nothing in the warrant

23   that says Roger Stone tried to break into the DNC, nothing in

24   there that says he wants to try to take the data, nothing in

25   there that he transferred it to WikiLeaks.

1          THE COURT:  They don't have to be investigating

2    Roger Stone to want to see his further communications, do they?

3          MR. BUSCHEL:  Well, I think they --

4          THE COURT:  They have to have probable cause that a

5    crime occurred, and there might be evidence in the locations

6    that they're searching.

7          MR. BUSCHEL:  But they're looking for Roger Stone's

8    data.  They're looking for Roger Stone's emails.  They are

9    looking for things that are personal to Roger Stone.  And

10   that's why they have to make the connection.  And so the -- for

11   a computer fraud --

12         THE COURT:  They have to prove that Roger Stone did

13   the hacking.

14         MR. BUSCHEL:  No.  They just have to do that he aided

15   or abetted or do anything --

16         THE COURT:  The hacking?  What does it matter who

17   hacked, if he was aiding and abetting or encouraging or simply

18   communicating about the dissemination of material that was

19   seized in excess of authorization?

20         MR. BUSCHEL:  Because dissemination is not a crime,

21   dissemination of stolen materials.  That's *Bartnicki*.  If the

22   New York Times were to disseminate a report or publish emails

23   from the DNC, that wouldn't be a crime.  None of that is a

24   crime.  The Pentagon cases show that.

25             So this type of aid that the warrant would have to

1   refer to would have to be something specific.  So, if he didn't

2   aid in the hack or the stealing, how would he aid in the

3   dissemination?  They didn't allege he had early access to the

4   emails and told them strategically, Put this out, that out.  Do

5   it in this order.  This will affect the election in some way.

6   There's no allegations of that.

7        So as far as what is the help that Roger Stone

8   offered WikiLeaks, that is the critical question.  To assume

9   that only the Russians tried to hack the DNC is not the point.

10  The Chinese make have tried to have done it.  The -- Great

11  Britain may have tried to have done it.  But, it's about where

12  WikiLeaks got the data.

13       And if it didn't, we go backwards and say, Hey,

14  Russia didn't give WikiLeaks the data, then Roger Stone is just

15  talking to people, and you're allowed to talk to people about

16  computer data, or predict what they might disseminate next.

17       THE COURT:  Does the same standard or a different

18  standard apply when you're challenges warrants under the

19  Electronics Communications Privacy Act?  Do you have to have

20  the same standard of probable cause, that you have to have a

21  warrant to search a premises?

22       Section 2703(d) says that requirements for a court

23  order say:  A court order for disclosure may be issued by any

24  court, and shall issue only if the governmental entity offers

25  specific and articulable facts showing there are reasonable

1    grounds to believe that the contents of the wire or electronic

2    communication or the records of other information sought are

3    relevant and material to an ongoing criminal investigation.

4            So there has to be an ongoing criminal investigation.

5    Does there have to be this tie-in to probable cause that you're

6    talking about?

7            MR. BUSCHEL:  I think probable -- probable cause is a

8    fluid concept, as we know.  But if there are not full

9    disclosure to the judge considering signing the warrant, then

10   there are problems to say, Rely on this document, we're

11   referencing the Intelligence Community, but, by the way, there

12   are different definitions of what "high confidence" means from

13   our regular conversational English.  And they're -- and the

14   government is -- is, throughout these warrants, arguing from

15   authority, saying, Hey, we see the last time we said the

16   Russians distributed the documents to WikiLeaks, like in the --

17   in the 12-Russian indictment.  There's -- there's no real

18   probable cause.  I think we have to --

19           THE COURT:  An indictment isn't a statement of

20   probable cause?

21           MR. BUSCHEL:  It is, but it's a probable cause that I

22   think the government knew full well none of them were willingly

23   coming here to sit trial -- stand trial.

24           THE COURT:  Where is your argument that the

25   government knew full well -- that the affiant knew fell well or

1    was reckless when he told the Court:  This is what the

2    Intelligence Community has decided?  I understand that you have

3    reasons and you have experts who question and challenge the

4    intelligence conclusion, who point to facts that are more

5    significant to them, that they feel were not paid sufficient

6    attention to by the Intelligence Community, but that is

7    different from saying the affiant lied or was recklessness when

8    he told the court:  This is what he have so far.

9          MR. BUSCHEL:  Well, I think -- I think it's certainly

10   reckless if the agent didn't read the actual intelligence

11   report that -- that is cited in the warrant.  I think it's

12   reckless if -- it is reckless if the FBI didn't look at a

13   WikiLeaks document from the DNC and run the same kind of

14   analysis that takes minutes for -- that -- that our experts

15   showed -- or, testified to, that is recklessness because if it

16   does have that signature quality, if there is a calling into

17   the question of whether the data came from Russia, then there

18   is an overarching assumption in these warrants that a

19   magistrate would be entitled to know:  Wait, you're talking a

20   lot about Russian, what they did in the presidential campaign,

21   what their goals were --

22         THE COURT:  Why is the use of a thumb drive

23   inconsistent with the notion that the DNC computers were

24   penetrated by a foreign sovereign through a phishing scheme?

25   Can somebody have used a thumb drive along the way?  Can't

1     those two things exist?

2              MR. BUSCHEL:  Well, phishing is different than a

3     thumb drive.

4              THE COURT:  I understand that.

5              MR. BUSCHEL:  Okay.  So, well, while the --

6              THE COURT:  But once they're in there and they are

7     able to manipulate or extract data -- when was the thumb drive

8     used, according to you?  Does it to have been the very first

9     instance, or could it have been anywhere along the chain?

10             MR. BUSCHEL:  No, no, no.  It was -- the data that --

11    the way that WikiLeaks received it was from a thumb drive, so

12    when WikiLeaks received it --

13             THE COURT:  When WikiLeaks received it, they got it

14    from a thumb drive?

15             MR. BUSCHEL:  Right.

16             THE COURT:  Why does that mean -- why does that

17    negate the conclusion of the Intelligence Community?

18             MR. BUSCHEL:  Because there's no real evidence in the

19    warrants or explanation as to how it came from the outside and

20    somebody put in a thumb drive and then gave it to WikiLeaks.

21             THE COURT:  Well, why does that have to be in there?

22             MR. BUSCHEL:  Because the language in the warrant

23    says that this was a hack from the outside and disseminated and

24    transferred to WikiLeaks directly from the Russian state.

25    Otherwise, there would be no evidence.  How would they know it

1    came from Russia if someone hands a thumb drive to Julian

2    Assange?  How would -- how would they know that person was

3    Russian?  They would have to explain, We had the Ecuadorian

4    embassy under surveillance.  We saw so and so go inside.  He

5    left and then later that day --

6          THE COURT:  I don't think all the facts that you say

7    are in there are in there.  And I'm still waiting for you to

8    tell me the lie.  I've probably asked you this question 20

9    times.  I didn't see it in your pleading.

10         I'm going to give you an opportunity to go back and

11   look at your reply and then come back up here after the

12   government has argued about this and tell me -- give me one

13   example of one statement that was either false or reckless, and

14   then you can tell me why it was false or reckless and make the

15   substantial preliminary showing.  But I -- you're putting the

16   burden on me, and what you're saying is:  The big picture, the

17   intelligence assessment we think is flawed.  And you're

18   entitled to say that.  I don't know that they're even going to

19   have to prove the hack in their case.  And we're going to talk

20   about that at another point this morning.  But that is a

21   different question from whether agent so-and-so lied to Judge

22   Howell when he asked for warrants or lied down in Florida when

23   they asked for warrants, and that's what you have to make a

24   showing of to get a *Franks* hearing.

25         So, is there anything else that you want to tell me

1   that isn't in your papers about what we've been talking about

2   before I give you a chance to at least point me to some of the

3   statements in particular?

4           MR. BUSCHEL:  I'll point you to the statements in

5   particular.

6           THE COURT:  All right.

7           MR. BUSCHEL:  Thank you.

8           MR. ZELINSKY:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. ZELINSKY:  I want to begin where this Court left

11  off, and that is the alleged falsity by the defense of any

12  statements that were present here in the warrant.  There are

13  none.  The defense has pointed to none.  The statements are not

14  false.  The statements are not recklessly included by --

15  there's no evidence of any reckless disregard by any agent.

16  And even if statements were to be taken out of the warrant,

17  there's no evidence there that probable cause were to fall.  So

18  on every one of the factors the defense's argument is

19  insufficient.

20          THE COURT:  All right.  Well, let me start where he

21  starts, which is that all of these warrants, and indeed the

22  indictment itself, start with the role of the Russians in

23  the -- in the hack.  So, is that an issue that you plan to

24  prove at trial, that you need to prove at trial?  And does the

25  case or do any of these warrants fall like a house of cards if

1     that premise is incorrect or can't be established beyond a

2     reasonable doubt?

3          MR. ZELINSKY:  First, Your Honor, I think it's worth

4     noting we are well beyond the four corners of the warrants,

5     which is what this hearing is supposed to involve and what it's

6     supposed to entail.  And the defense has gone on a long,

7     frolicking detour.

8          Second, the government does not need to -- and as we

9     indicated, we'll be filing a motion in limine regarding proving

10    up the Russian hack at Mr. Stone's trial.  Mr. Stone is not

11    charged in the hack.  Mr. Stone is not charged in conspiring to

12    hack.  There are individuals that carried out that hack.  They

13    have been charged by the United States Department of Justice in

14    the Netyksho indictment, which specifies at some length why

15    Russia in fact did carry out the hack.

16         Mr. Stone is charged with lying to Congress,

17    obstructing their investigation, and with tampering with a

18    witness.  In order to convict Mr. Stone, the government need

19    only show that Mr. Stone was lying in investigation on a matter

20    material to the investigation.  Congress was investigating

21    Russian interference into the 2016 election.  The government

22    will prove that at trial.  Mr. Stone's testimony was material

23    to their investigation.  The government intends to prove that

24    at trial.

25         THE COURT:  Let's roll back, then, to the time when

1    you're getting -- gathering evidence, figure out -- not you

2    personally -- what happened.  And --

3              MR. ZELINSKY:  Well, it was me personally, Your

4    Honor.

5              THE COURT:  -- there are warrants being issued for

6    his email accounts and his Twitter accounts and all the

7    warrants that start with "the Intelligence Community found X."

8              Why is counsel for the defense wrong about whether

9    that infects the allegation that there is -- or, the finding of

10   probable cause -- if it was wrong, why wouldn't that affect

11   probable cause?

12             MR. ZELINSKY:  First, the Intelligence Community's

13   assessment is correct.  The defense here is trying to backdoor

14   a debunked conspiracy theory into a straightforward hearing.

15   There is no indication that the Intelligence Community's

16   assessment was incorrect.  And as later evidence has shown, as

17   detailed in the Netyksho indictment, in fact, there is

18   voluminous evidence that the Russians were responsible for the

19   hacking of the DNC and for the hacking of Podesta's email.

20             In fact, when the defense is quite eager to quote the

21   page from the special counsel's office report, the details, the

22   possibility that there could have been other means of

23   transmitting information, they always neglect to indicate and

24   to read the lines that come just prior to that, which detail at

25   some length in the un -- in the unredacted and public version

1    of the report how information was in fact transmitted from

2    Guccifer 2.0 and DCLeaks to WikiLeaks.  There's -- there's --

3    it's detailed at some length in the report.  And the selective

4    quoting that the defense does in order to try to undermine a

5    very clear and strong case is a misrepresentation of the

6    record.

7              But putting that to -- aside for a moment, assuming

8    for the sake of argument that what is unalterably the facts are

9    not the facts, that is, assuming this conspiracy theory, the

10   warrants themselves do not fall based on the truth or falsity

11   of the underlying Intelligence Community assessment.  Warrants,

12   for instance, can always rely on information provided by a

13   cooperator or a confidential informant all the time.

14             Based on their indicia of reliability, courts have

15   regularly approved of those sorts of warrants and have upheld

16   them even if it turns out that the information initially

17   provided is not accurate.  Surely, if a confidential

18   informant's information can be relied upon, there is nothing

19   wrong with quoting to a judge the Intelligence Community 's

20   assessment of the situation.

21             There was no attempt to hide from the Court what was

22   being presented.  There was no attempt to present -- or,

23   misrepresent information by any of the agents.  The agents told

24   them, as this Court noted, that the Intelligence Community had

25   made a series of assessments regarding information that had

1    been obtained and how it had been obtained.  The inclusion of

2    that information in the warrant, even assuming it were

3    incorrect, would not negate probable cause in the warrant

4    because there's no indication it was reckless for the agent to

5    rely on the Intelligence Community's assessment, or at least to

6    report that assessment to the court.

7              But, moreover, even if that information were to be

8    removed, that is, as this Court has noted, assume for the sake

9    of argument that Russia was not behind the hack, then the

10   warrant still contained very basic information, that there was

11   an entity that claimed responsibility for the hack,

12   Guccifer 2.0; that the defendant was in contact with that

13   entity regarding hacked information; that he was also in

14   contact with Organization 1, which released the hacked

15   information.

16             That's the bare bones, before we even get into

17   what -- the other charges that the defense does not address at

18   all that are included in the warrant, or the false statement

19   warrants, which, from their arguments, I take that the false

20   statement warrants appear to stand because they don't appear to

21   address those at all.

22             But just sticking to the bare bones facts, even

23   assuming it's not Russia -- assume that it's Country A or

24   Entity A that was engaged in the activity -- then the reality

25   is the warrants contain information indicating that the

1      defendant was in contact with the entity that claimed

2      responsibility for the hacking.  There's no -- that is not a

3      matter that is in any way disputed, that the defendant was

4      discussing that information with the entity and that he had

5      contact with other people that released that hacked

6      information.

7              Now, the defense appears to argue and have a little

8      bit of confusion over what is required for a warrant and what

9      is required for trial on charges.  They seem to try to argue

10     that because they believe there is not sufficient information

11     included in some of the warrants to indicate that Mr. Stone

12     himself is involved in the 1030, that the warrants are invalid.

13     But, of course, as this Court noted, warrants are to seek

14     evidence of a crime and contraband.

15             So if the defendant is in contact with individuals

16     who have taken credit for the hack, that are discussing the

17     hack itself or information related to the release of

18     information, he's in contact with Organization 1.  And as a

19     number of warrants also allege, hacks are still ongoing during

20     the time the defendant is in contact with these entities.  Then

21     it is very hard to see in any way why searching the defendant's

22     files would not yield information related to those crimes that

23     are under investigation.

24             So even if the word "Russia" is taken solely and

25     completely out of these warrants -- which it should not, to be

1    clear -- the government's position is unequivocal.  Russia

2    hacked the DNC, and Mr. Podesta's emails, and there is

3    voluminous evidence of that, but that is not an issue in this

4    case.  And it is a side show, and it is an attempt to throw

5    smoke up on the underlying issues of this case, the underlying

6    issues of this case which are straightforward:  Mr. Stone's

7    false statements.  Mr. Stone's witness tampering.  And

8    Mr. Stone's obstruction of justice.

9              THE COURT:  All right.  What is your position about

10   the standard to be applied at this stage to a warrant that's

11   issued under Section 2703(g)?  Is that something different?

12   It's just that there has to be material and relevant evidence,

13   or does there still -- to an ongoing criminal investigation, do

14   you have to have probable cause, or do you just have to have,

15   there's an ongoing investigation, and this is material?

16             MR. ZELINSKY:  Your Honor, the government believes

17   there is probable cause for these warrants, and that is the

18   standard we would seek to have the Court apply here.

19             THE COURT:  All right.  Okay.  All right.  Is there

20   anything else that you want to add?

21             MR. ZELINSKY:  Unless the Court has any questions,

22   nothing further.

23             THE COURT:  Okay.  No, thank you.

24             All right.  Mr. Buschel, I want to give you the

25   opportunity to respond to that briefly without repeating

1      everything that's in your papers.  And then I would be happy to

2      have you direct me to whatever you're telling me is the false

3      statement or reckless statement in some sample affidavits.

4              MR. BUSCHEL:  So, in Exhibit 1 of the motion to

5      suppress, there's a warrant of -- signed by Judge Howell of

6      August 2nd, 2018, paragraph 14:  The Special Counsel's office

7      has determined that individuals associated with the GRU

8      continue to engage in hacking activity -- hacking activity

9      relating to the 2016 presidential election through at least

10     November 1st.

11             Then paragraph 15 is:  These individuals stole these

12     data from cloud-based computers by creating backups of DNC

13     cloud-based systems using the cloud provider's own technology.

14             So, if we're getting specific, if we're saying that a

15     thumb drive was used there at the DNC, and that's what these

16     declarations are saying, that would be a misrepresentation.

17     But again, I don't want to -- I'm not abandoning -- we're not

18     abandoning any overall arching -- overarching assumption that

19     WikiLeaks received the data from the Russian state.

20             Another example that I can cite -- and this is the

21     second -- the 1001 -- it's the search warrant of Mr. Stone's

22     home executed on the day of his arrest and --

23             THE COURT:  Do you know which number that is?

24             MR. BUSCHEL:  Unfortunately, I didn't tag it on this

25     copy.  But it the last warrant.  It's probably 18.

1          THE COURT:  Okay.

2          MR. BUSCHEL:  And they do it -- and the government

3    does it in the --

4          THE COURT:  It's the next to last?  Is that the one?

5          MR. BUSCHEL:  No.  The -- the last.  The arrest of

6    his home, I believe -- at his home.  And that's signed by

7    Magistrate Snow.

8          THE COURT:  Yes.  I have it.

9          MR. BUSCHEL:  And so paragraph 18 is another example

10   of arguing from authority.  They're saying two sophisticated

11   adversaries on the network, Cozy Bear, Fancy Bear.

12          And then, again, paragraph 19.  And then as we get in

13   to paragraph 20:  WikiLeaks released the stolen documents

14   during the presidential campaign.  This is all --

15          THE COURT:  All right.  But the paragraph starts:

16   CrowdStrike issued a public press release which said.  In the

17   statement it said.  Is that knowingly false?

18          MR. BUSCHEL:  If you know what CrowdStrike's report

19   says, it is.  If you don't say that we believe, we think.

20   CrowdStrike got hacked.  There was a second hack, according to

21   the indictment in the 12-Russian Netyksho case, that

22   CrowdStrike was standing there when -- was in the system and

23   they got hacked again.  This is the type of -- that the --

24   that, supposedly, there was another attack and -- and --

25          THE COURT:  I'm saying why is the statement

```
 1        "CrowdStrike said X" false or reckless?
 2             MR. BUSCHEL:  If -- if the government knew that
 3    the -- read the CrowdStrike report and they -- and they know
 4    that it doesn't have the same type of confidence that it's
 5    representing in the warrant, that's a problem.
 6             THE COURT:  Well, they don't represent that it was
 7    the FBI.  They don't claim that somebody else did it.  They do
 8    say it was the DNC vendor who found this in a private report.
 9    They don't mislead the Court and say:  I, the affiant, did it.
10             MR. BUSCHEL:  In paragraph 20:  GRU officers
11    transmitted some of the stolen data to WikiLeaks.  That's --
12    that's our -- that is the main and important crux.
13             THE COURT:  All right.  Okay.
14             MR. BUSCHEL:  I think -- one last remark.  The
15    surreply says that we are mistaken, we don't understand
16    something.  But the surreply itself from the government is an
17    invitation to a *Franks* hearing.  They have all sorts of
18    information.  They just want to say it's not important.  But
19    it's in the indictment.  It's -- it's throughout these
20    warrants, and the Court should consider -- and if we have a
21    *Franks* hearing, the issue of relevancy and -- and suppression
22    can be handled at the same time.
23             THE COURT:  All right.
24             MR. BUSCHEL:  Thank you.
25             THE COURT:  Thank you.
```

1          All right.  Let me then go on, unless you have

2     anything -- I don't think you have anything further.  I think

3     he has the burden on this motion, anyway.

4          MR. ZELINSKY:  Unless the Court has any questions.

5          THE COURT:  All right.  No.  Okay.  I have also

6     been -- had to consider this morning the defendant's motion to

7     discover the unredacted CrowdStrike report.  And I think we've

8     already talked at some length about the relevance of the

9     accuracy of the information, the materiality and accuracy of

10    the information about who hacked, and there's an overlap here.

11    And I had a number of questions about *Brady* and Rule 16, but

12    it's kind of been surpassed by the fact that the government

13    said in its opposition, We gave you what we have, the

14    unredacted report is not actually in our possession.

15         And so, I guess I want to hear from the defense.  Do

16    you accept the representation that the government doesn't have

17    them?  It seems to -- what you said as well.  I guess now we

18    should be allowed to issue a subpoena for it.

19         So are we conceding the motion is moot, and are we

20    talking about a subpoena now?

21         MR. ROGOW:  We certainly accept --

22         THE COURT:  Wait, wait.  With two of you on the feet,

23    and one of you needs to be at the microphone when you answer

24    the question.  So who is -- Mr. Rogow, you're handling this

25    motion, or is Mr. Buschel handling this motion?  As he seemed

1      to be under the impression he was.

2              MR. ROGOW:  We certainly accept the government's

3      representation, but they don't have anything else.

4              THE COURT:  All right.  All right.  So does that make

5      your motion moot, since the motion was to discover it from

6      them?

7              MR. ROGOW:  We could issue a subpoena to CrowdStrike,

8      and that would be a different way to approach the problem, if

9      we could get a subpoena issued to CrowdStrike to see the report

10     that they have that is unredacted.

11             THE COURT:  Okay.  Well, I have a motion to discover

12     an unredacted report that they don't have, that you don't

13     dispute that they don't have.  So --

14             MR. ROGOW:  If they don't have it --

15             THE COURT:  -- is the motion moot?  Let's start with

16     that.

17             MR. ROGOW:  Yes.  Yes.

18             THE COURT:  Okay.

19             MR. ROGOW:  If they don't have it, they can't give it

20     to us.

21             THE COURT:  Okay.  Now, so Rule 17(c) says you go to

22     the clerk and you get a subpoena.  So is there anything pending

23     before me right now with respect to Rule 17(c)?

24             MR. ROGOW:  No.

25             THE COURT:  All right, then.  Is there anything

1      further we need to talk about in connection with this motion?

2                  MR. ROGOW:  No.

3                  THE COURT:  All right.

4                  Mr. Buschel, just to make sure, was there anything

5      further you wanted to say?

6                  MR. BUSCHEL:  No.  Thank you.

7                  THE COURT:  Does the government have anything to say

8      with respect to the motion?

9                  MR. ZELINSKY:  No, Your Honor.

10                 THE COURT:  Okay.  Well, that brings us to the

11     government's motion for an order to show cause, Docket 136, and

12     the opposition, Docket 141.  And before we get into that

13     further, I want to start with an accurate summary of what's

14     taken place in this case to date.

15                 Notwithstanding how fun it is to use colorful verbs,

16     the Court did not slap or otherwise impose any gag order on

17     Roger Stone at the outset of this case.  At the status hearing

18     on February 1st, 2019, I invited the parties to set out their

19     positions concerning the imposition of a media contact order

20     under Local Rule 57.7(c).

21                 The defendant, in Docket 28 filed on February 8th,

22     opposed any order as applied to him personally on grounds of

23     vagueness, overbreadth, and the First Amendment.  And he also

24     emphasized how fundamental making public comments is to his

25     identity and his livelihood.

1          There was no objection to a rule that would apply to

2     the lawyers, and, obviously, there was an understanding that

3     any such rule would apply to both sides.  So I considered what

4     he had to say.  And in an order dated February 15th, 2019, at

5     Docket 36, I found, first of all, that Local Rule 57.7(c)

6     applies to this case, and I issued what I called a narrowly-

7     tailored order.  Counsel were ordered to refrain from

8     statements to the media, but Mr. Stone was not.

9          With respect to Mr. Stone -- and I should note, not

10    just Mr. Stone, but any other witness in the case -- the order

11    prohibited public pronouncements at the courthouse, and at the

12    courthouse only.

13         I said, "All interested participants in the matter,

14    including the parties and any potential witnesses, and counsel

15    for the parties and the witnesses, must refrain, when they are

16    entering or exiting the courthouse, or they are within the

17    immediate vicinity of the courthouse, from making statements to

18    the media or to the public that pose a substantial likelihood

19    of material prejudice to this case or are intended to influence

20    any juror, potential juror, judge, or witness, or interfere

21    with the administration of justice."

22         And I said, "There will be no additional restrictions

23    imposed on the defendant's public statements or appearance at

24    this time."

25         I did, however, add, "This order may be amended in

1   the future, consistent with Local Criminal Rule 57.7(c), if

2   necessary."

3           The order was not challenged on First Amendment

4   grounds or any other.  There was no request that I modify or

5   review my order.

6           The defendant himself acknowledged the narrow nature

7   of the ruling, stating publicly in an email that, I believe, he

8   sent to politico.com, "I am pleased that the Judge's order

9   leaves my First Amendment right to defend myself in public

10  intact.  I will, of course, continue to be judicious about my

11  comments regarding the case."

12          But, as we heard the last time we were here,

13  judicious didn't last three days.  The license he was afforded

14  was promptly abused as the defendant deliberately chose to use

15  his public platform to disseminate an incendiary, threatening

16  communication.

17          On December -- I'm sorry -- February 18th, Docket 38,

18  counsel filed what was entitled a Notice of Apology.  "Counsel

19  hereby apologizes for the improper" -- his words -- "photograph

20  and comment posted on Instagram today.  Mr. Stone recognizes

21  the impropriety" -- again, counsel 's words -- and he had it

22  removed."

23          The filing attached a letter signed by Defendant

24  Stone himself, which defendant later told me his lawyer just

25  drafted for him; he didn't actually write it or read it.  But

1    it said, "Please inform the Court that the photograph and

2    comment today was," quote, "improper and should not have been

3    posted.  I had no intention of disrespecting the Court and

4    humbly apologize to the Court for the," quote, "transgression,"

5    close quote.

6              So, those are at least defense counsel's words.

7              I decided to have a hearing and issued an order to

8    show cause on February 19th, and the hearing was held on

9    February 21st.  At that point, the defendant testified

10   concerning the disturbing posts that had occurred soon after my

11   order, and he had a chance to put it in his own words because

12   the defense team decided that he should testify under oath.

13   The transcript is at Docket 43.

14             Mr. Stone said, at pages 11 to 12, "I believe I

15   abused the order, for which I am heartfully sorry.  I'm kicking

16   myself over my own stupidity.  I offer no excuse for it, no

17   justification."

18             Page 12, he called it a "Stupid lapse of judgment,"

19   and he called it, "An egregious, stupid error."

20             Page 13, he called it "Bad judgment," "An egregious

21   mistake."

22             These are all his words.

23             On page 14, he called it a "trespass."  But he also

24   said to me on page 14, "Your Honor, I can only beseech you to

25   give me a second chance.  Forgive me the trespass.  I'm

1    heartfully sorry.  This is a sincere apology.  I will treat the

2    Court and all your orders scrupulously for the dignity and

3    authority you deserve.  I am -- I hope you'll consider my plea

4    because it is sincere and heartfelt."

5            Well, then I had to wrestle with what to do.  And the

6    defendant did tell me, on pages 13 and 14 of the transcript,

7    that no one was paying him to speak about the case and,

8    therefore, there would be no impact on his ability to make a

9    living if I prohibited him from speaking about the case.

10           So, then I solicited from defense counsel -- who, I

11   believe, is also his First Amendment counsel -- his suggestion.

12   And on page 41, I asked Mr. Rogow, "How would you craft an

13   order that he would find clear enough to follow?"

14           And Mr. Rogow said, "It can be done.  It can be done

15   by refining what -- he should not be talking about this Court.

16   He should not be talking about the special prosecutor.  He

17   should not be impugning the integrity of the Court.  That's

18   what should be done.  That's the nature of the order I'm

19   suggesting.

20           "What I'm saying is, if Your Honor is asking me to

21   craft an order, then that is what the order should say:  This

22   Court should not be criticized by Mr. Stone.  The government

23   should not be impugned by Mr. Stone.  The integrity of this

24   case should not be impugned by Mr. Stone.  We will defend this

25   case at trial.  That's the time to defend this case.  And that

1    is the kind of nature of an order I would suggest the Court

2    should craft that would address the specific needs that we're

3    talking about."

4           And so that is almost exactly what I did.  I didn't

5    craft an order saying you can't impugn the Court or the

6    prosecution.  I said you can't talk about it at all.  But I

7    limited any prohibition to statements about the case and the

8    participants after the specific suggestion of Mr. Stone's own

9    counsel.

10          I issued an order on February 21st, 2019, and said,

11   "The February 15, 2019 media communications order is hereby

12   modified to provide that, the defendant is prohibited from

13   making statements to the media or in public settings about the

14   Special Counsel's investigation or this case or any of the

15   participants in the investigation or the case."

16          That's what the defendant quoted as "the order" in

17   his recent pleading.  But it goes beyond that sentence.

18          I then said, "The prohibition includes but is not

19   limited to, statements made about the case through the

20   following means:  Radio broadcasts, interviews on television,

21   on the radio, with print reporters, or on internet-based media,

22   press releases or press conferences, blogs or letters to the

23   editor, and posts on Facebook, Twitter, Instagram, or any other

24   form of social media.

25          "Furthermore, the defendant may not comment publicly

1    about the case indirectly by having statements made publicly on

2    his behalf by surrogates, family members, spokespersons,

3    representatives, or volunteers."

4              So that was the order that was issued that day.

5              And before I even put it in writing, I said the

6    following to the defendant in court, to his face, in the

7    presence of counsel, transcript page 50:

8              "From this moment on, the defendant may not speak

9    publicly about the investigation or the case or any of the

10   participants in the investigation or in the case."

11             Transcript 51:  "You may send out as many emails,

12   Tweets, posts as you choose that say, Please donate to the

13   Roger Stone Defense Fund to help me defend myself against these

14   charges, and you may add that you deny or are innocent of the

15   charges, but that's the extent of it.  You apparently need

16   clear boundaries, so there they are.

17             "You may continue to publish, to write, and to speak,

18   and to be, as your lawyer put it, a voice about any other

19   matter of public interest; not this case, not the people in it.

20   Not while you're under my supervision."

21             And I note, again, that subsequently, that order was

22   not challenged on First Amendment or any other grounds.

23             The government has now filed a motion for an order to

24   show cause saying that that order was violated.  The defendant

25   calls the government's submission "a disproportional response

1    to Roger Stone's exercise of his first amendments rights within

2    the confines of this Court's order."

3          But the question that is before us is whether it was

4    within the confines of this Court's order.  That's the question

5    we have to answer.  I think it's worth noting that the Court

6    has repeatedly facilitated defendant's request to exercise his

7    individual First Amendment rights.

8          He has filed and I have granted repeated motions to

9    travel, characterized as for business purposes.  And I've let

10   him travel wherever he wanted to go, to speak at whatever type

11   of establishment he chose to patronize, to be accompanied by

12   whatever organization he chose to associate himself with, and

13   to advance whatever point of view he or they chose to sponsor

14   or espouse at those locations.

15         But, throughout the period, you've also been an

16   individual who's subject to a court order imposed not only

17   without objection, but with the concurrence and input of your

18   First Amendment counsel, and no review or reconsideration has

19   been sought.

20         So the question I want to discuss -- and I would like

21   to have whichever counsel is going to handle this matter come

22   to the lectern -- is whether he's lived up to that obligation.

23         All right.  Mr. Rogow, my first question for you was,

24   was there anything unclear about my order?

25         MR. ROGOW:  No.  I would say there was nothing

1    unclear about the order and what your intention was, which was

2    to suppress Mr. Stone talking about the case.  So, I cannot say

3    anything other than that.  But I do think that the -- I think

4    it's five instances -- by the way, I did not know this was

5    going to be set for hearing today and it was a matter to be

6    discussed, but I'm quite happy to discuss it.

7              THE COURT:  Well, if you're not prepared to discuss

8    it today, I'm prepared to reset this.  But you've responded

9    already in writing.

10             MR. ROGOW:  I have.  I have.

11             THE COURT:  All right.  Is it still correct, as the

12   defendant told me under oath on February 21st, transcript pages

13   15 and 16, I asked him, "It's your Instagram account."

14             And he answered, "Yes.  I'm responsible."

15             And I said, "Is it fair to say that you're 100

16   percent responsible for anything that gets posted, and it's not

17   anybody else's fault?"

18             The defendant:  "That is correct.  I take

19   responsibility."

20             So do you agree that he is 100 percent responsible

21   for his Instagram posts?

22             MR. ROGOW:  Yes.

23             THE COURT:  And does he send out his own emails?

24             MR. ROGOW:  To the best -- well, again, I don't have

25   the answer to that question, in terms of all the emails that he

1    sends out, so I cannot answer that candidly without talking to

2    Mr. Stone about it.

3          THE COURT:  All right.  Well, if I ask you any

4    question during this proceeding that you would like to ask

5    Mr. Stone before you answer, he's seated right there.  That's

6    why defendants have a right to be present at any hearing that

7    relates to them.  And all you need to say to me is, I need to

8    confer with my client.  Okay?

9          MR. ROGOW:  Yes.

10          THE COURT:  All right.  I want to go through a number

11    of communications, one by one.

12          Is it correct that in late February, after I issued

13    the order, after Michael Cohen publicly testified or provided

14    information to a House Committee, that Mr. Stone sent a text

15    message to *BuzzFeed News* saying, "Mr. Cohen's statement is not

16    true"?

17          MR. ROGOW:  I can't answer that.  I have to talk to

18    Mr. Stone.

19          THE COURT:  All right.

20          (Off-the-record discussion between Attorney Rogow and

21    defendant.)

22          MR. ROGOW:  Mr. Stone tells me that he sent that to

23    me, and I said that he could send it.  I have no recollection

24    of that.  And I would like to see these instances that you're

25    presenting to me.

```
1              THE COURT:  All right.  Well, this was a report on

2    BuzzFeed News.

3              Mr. Haley, would you hand that to counsel.

4              (Pause.)

5              MR. ROGOW:  Roger Stone pushed back against

6    Michael Cohen's claims that Stone told Trump in July that he'd

7    spoken to WikiLeaks founder Julian Assange.

8              Stone's text, which he made clear was a statement, it

9    was just one sentence, and he did not explain what exactly

10   about Cohen's testimony he maintained was false.

11             THE COURT:  Right.  So I'm just asking you, did he,

12   after I issued my order, send a text message to BuzzFeed News

13   saying Mr. Cohen's statement is not true?

14             MR. ROGOW:  He did, because he just told me he did.

15   And he told me that I had seen it and that I said that it was

16   all right.

17             THE COURT:  Do you recall whether you did that or

18   not?

19             MR. ROGOW:  I do not recall that.  But, looking at it

20   now, it is not a statement about the case or the prosecutor.

21             THE COURT:  It's not a statement that relates to the

22   case or the investigation, that Stone told Trump in July that

23   he'd spoken to WikiLeaks?

24             MR. ROGOW:  This is what Mr. Cohen apparently said:

25   "Mr. Trump put Mr. Stone on a speaker phone," Cohen said in a
```

```
1    statement.  "Mr. Stone told Mr. Trump that he had just gotten

2    off the phone with Julian Assange," etcetera, etcetera.

3              THE COURT:  All right.

4              MR. ROGOW:  And all that Mr. Stone said was, "It is

5    not true."

6              So is that a statement about the investigation?  I

7    don't think so.  I mean, looking at it now -- and, obviously, I

8    know what the Court's order is, and I don't see that as being

9    offensive to the Court order.  And if I gave him that advice,

10   then it was done on the advice the counsel.

11             THE COURT:  If you gave him that advice.

12             MR. ROGOW:  I don't recall it.

13             THE COURT:  All right.  Well, let's talk about the

14   next thing I wanted to ask you about, which is an Instagram

15   post from March 3rd, 2019:  "Who Framed Roger Stone?"

16             Do you remember that one?

17             MR. ROGOW:  I would need to see it.

18             THE COURT:  Did Mr. Stone post that on his Instagram

19   account?

20             (Off-the-record discussion between Attorney Rogow and

21   defendant.)

22             MR. ROGOW:  This, apparently, was an outdated image

23   when the Stone Defense Fund was -- that screenshot was done.

24   It picked up this "Who Framed Roger Stone," which was from some

25   former image.  Again, I'll --
```

```
 1              THE COURT:  Is this an Instagram post that Mr. Stone

 2      posted on his Instagram account?

 3              (Pause.)

 4              MR. ROGOW:  It is an Instagram.

 5              THE COURT:  On Mr. Stone's Instagram account,

 6      Roger Stone, Jr. --

 7              MR. ROGOW:  Yes.

 8              THE COURT:  -- the one he told me he's 100 percent

 9      responsible for?

10              MR. ROGOW:  Yes.

11              THE COURT:  Okay.

12              MR. ROGOW:  May I comment on this?

13              THE COURT:  You can tell me whether you think it's a

14      violation of my order or not, yes.

15              MR. ROGOW:  I don't.  I don't.

16              THE COURT:  All right.  Why not?

17              MR. ROGOW:  Because "Who Framed Roger Stone" is

18      simply a comment on his situation, that he is in court, that

19      he's subject to some action in court.  It's a broad kind of

20      statement, and I don't think that it is an unfair statement in

21      violation of your order.

22              THE COURT:  All right.  But you would also agree that

23      my order said any statement.  It didn't say unfair or impugn.

24      It just said you're not supposed to talk about the case.  And

25      I'm not talking about this one.  I just want to make sure that
```

1    we're clear about what the statement prohibited.

2            MR. ROGOW:  The statement prohibited comments about

3    the case, so --

4            THE COURT:  All right.  And the participants in the

5    case; is that correct?  And the investigation, I think I also

6    said; is that right?

7            MR. ROGOW:  Whatever your language was, yes.

8            THE COURT:  All right.  So, what about the Instagram

9    post from March 29th about Adam Schiff?  Here's a copy.

10           It's a picture of Representative Adam Schiff with a

11   meter, measuring "BULLSCHIFF" and a statement that says, "In 50

12   years in American politics I have never come across a shiftier,

13   more duplicitous con man and charlatan than @repadamschiff.  If

14   it's Schiff, flush it."

15           MR. ROGOW:  And the question?  Is it a comment about

16   Mr. Schiff?  Yes.

17           THE COURT:  Is it a post by Mr. Stone, first?

18           MR. ROGOW:  Yes.

19           THE COURT:  Is it a comment about the investigation

20   or a participant in the investigation or the case?

21           MR. ROGOW:  Well, I don't know if Mr. Schiff is a

22   participant in the investigation of the case.  He's a member of

23   the House.

24           THE COURT:  He's a member of the committee that he is

25   accused of lying to and obstructing; isn't that correct?

```
 1              MR. ROGOW:  Yes.

 2              THE COURT:  And it was the minority members of the

 3    committee at the time who, in your motion -- several of your

 4    motions, you talked about as possibly being behind the

 5    prosecution; isn't that correct?

 6              MR. ROGOW:  I don't recall that.

 7              THE COURT:  Would this Instagram post be in

 8    contravention of my order, in your view?

 9              MR. ROGOW:  No.

10              THE COURT:  And why not?

11              MR. ROGOW:  Because it is a comment about Mr. Schiff

12    and just about Mr. Schiff and the fact -- and the fact that he

13    may have violated rules of the committee.

14              THE COURT:  All right.  I have another Instagram post

15    from April 4th, 2019, where -- this is, I believe, one of the

16    ones the government attached to its pleading.  I'll give you a

17    copy.

18              (Off-the-record discussion between Attorney Rogow and

19    defendant.)

20              MR. ROGOW:  Yes.

21              THE COURT:  Okay.  So, was this a post by Mr. Stone

22    on Mr. Stone's Instagram account?

23              MR. ROGOW:  Yes.

24              THE COURT:  And does this relate to the investigation

25    or the case?
```

1          MR. ROGOW:  No.  It relates to the arrest of

2     Mr. Stone, not the investigation of the case.

3          THE COURT:  Well, isn't his arrest and the search of

4     his house part of the investigation?  Is the FBI part of the

5     investigation?

6          MR. ROGOW:  That investigation actually had been

7     completed by virtue of the indictment.  So they completed the

8     investigation.  The investigation was over.  This is not about

9     the case, not about the trial of the case.

10         THE COURT:  So at that nano second between the

11    investigation in the case and when he's being arrested and

12    searched, we're neither in the investigation anymore or the

13    case?

14         MR. ROGOW:  No.  The case continued, but this

15    reflects the -- the arrest and somebody else's request for

16    records from -- CNN requested the records and why they went in

17    at 6 o'clock in the morning to Mr. Stone's home with 40 agents

18    and arrested him.  And CNN --

19         THE COURT:  And he says, "How curious?  What could

20    they possibly be hiding?"  The "they" in that sentence would be

21    the FBI, correct?

22         MR. ROGOW:  I assume, or the government.

23         THE COURT:  All right.  So it's your --

24         MR. ROGOW:  Or -- let me say, or CNN, by the way,

25    because there's an issue about who was told about the arrest

1    and whether or not CNN was told beforehand.  So, I do not view

2    this as a violation of the court order.

3             THE COURT:  All right.  What about this one from

4    May 8th, 2019?  There's a news article concerning my request to

5    see the unredacted Special Counsel report.  And it's posted as

6    part of an Instagram post by Mr. Stone.

7             (Off-the-record discussion between Attorney Rogow and

8    defendant.)

9             MR. ROGOW:  Yes, he posted this.

10            THE COURT:  All right.  Is this a statement on social

11   media about the case?

12            MR. ROGOW:  It is about a public filing in the case.

13            THE COURT:  Did I say he could talk about public

14   filings in the case?  You can make public filings about the

15   case, but did I say he could talk publicly about public filings

16   in the case?

17            MR. ROGOW:  To merely -- to merely note that such a

18   public filing has been made, I don't think --

19            THE COURT:  Is it merely noting that the public

20   filing has been made to say, "The Judge has ruled, but *Politico*

21   gets most of the story wrong because they are biased, elitist,

22   snot-nosed, fake news shitheads whose specialty is distortion

23   by omitting key facts to create a false narrative"?  And

24   spreading it further, we've got spin on it.  Is that a comment

25   about the case?

1          MR. ROGOW:  It's a comment about *Politico*.  It's a

2    comment about what they did and how they reacted to the public

3    filing in the case.

4          THE COURT:  And that's within my order.

5          MR. ROGOW:  Judge, you know, it's hard.  Your order

6    certainly is very broad, talking about the case.  Yes, I --

7          THE COURT:  Right, and clear as day.

8          MR. ROGOW:  Not -- not as clear as day when you apply

9    it to situations that occur in a situation like this where he

10   was talking about *Politico*.

11         THE COURT:  Okay.  All right.  Let's try this one,

12   then.  This one is dated May 16, 2019.

13         (Off-the-record discussion between Attorney Rogow and

14   defendant.)

15         MR. ROGOW:  This is his posting.  And once again,

16   this is his comment on a public filing.

17         And I understand Your Honor's view that the case

18   basically says he can't say anything, even about things that

19   have been filed publicly in this case.  And if that's Your

20   Honor's view, then I respect Your Honor's view, but I think

21   that is overbroad.  There's no question.  I did not challenge

22   your use of the word "case."  But, to the extent that this is

23   being used as some effort to try to show that he's in violation

24   of the Court's order, I think that is an overbroad reading of

25   the Court's order.

1           THE COURT:  Isn't the point of this to try to

2    disseminate publicly his point of view that my indictment is

3    invalid?  The points that Mr. Buschel is making is my

4    indictment is invalid because the whole Russia thing is a hoax.

5    I want all my Instagram readers to know this, and I want this

6    re-spread and re-posted and re-Tweeted.  And he's using social

7    media to advance his view of the investigation and the case.

8    Isn't that what he's doing?

9           MR. ROGOW:  He is using social media to communicate

10   to others what is happening in the case, but not -- but not

11   doing it in a way that would affect or infect what the whole

12   underlying reason is for the Court's order, and that is to

13   somehow or other create a difficulty for empaneling an

14   impartial jury.

15          I mean, the whole -- the whole theory of any kind of

16   restraint on a person's ability to speak in this kind of

17   situation has to do with whether or not it will affect a fair

18   trial, and none of these are the kind of things that have any

19   reasonable basis for suggesting that this will affect a fair

20   trial.

21          THE COURT:  All right.  Well, how about this one from

22   June 2nd?

23          Mr. Haley.

24          (Off-the-record discussion between Attorney Rogow and

25   defendant.)

1           MR. ROGOW:  Yes, this was Mr. Stone's.  And I was --

2           THE COURT:  Let me just -- for the record, this is an

3    Instagram story.  I believe that says, "This psycho must be

4    charged, tried, convicted and hung for treason," and there's a

5    picture and the name John Brennan.

6           MR. ROGOW:  And it's not a story.  It is a posting

7    simply of Mr. Brennan and the text as you have read it.  That's

8    so.  And this is not a comment about the case.  Mr. Brennan

9    accused the President of treason.  Mr. Stone posted this in a

10   response, in effect, to what Mr. Brennan was saying about the

11   President.

12          THE COURT:  Wasn't Mr. Brennan involved in the

13   investigation that we've been talking about all day?

14          MR. ROGOW:  I don't know if Mr. Brennan was involved

15   in the investigation.

16          THE COURT:  Well, ask Mr. Stone.

17          MR. ROGOW:  Let me say this:  He certainly has

18   commented publicly.  Mr. Brennan has been on television and

19   commented publicly and said some of these things publicly.

20          THE COURT:  Yes.  But wasn't he in a national

21   security position at the time of some of the investigations

22   that we're talking about?

23          MR. ROGOW:  I don't know.  I'll ask Mr. Stone.

24          THE COURT:  All right.

25          (Off-the-record discussion between Attorney Rogow and

1    defendant.)

2              MR. ROGOW:  I don't know.  Mr. Stone doesn't know the

3    dates of Mr. Brennan's tenure in the National Security

4    Administration.  So, I don't know if he had anything to do with

5    this investigation, this case, or Mr. Stone.

6              THE COURT:  I said -- when I'm talking about "the

7    investigation," you don't think he had anything to do with it?

8              MR. ROGOW:  He -- I don't know.  You're asking me a

9    question.  I don't know.

10             THE COURT:  All right.  Well, I just want to make

11   sure that you're not adding qualifiers that -- I want to make

12   sure that we understand each other.

13             All right.  What about this Instagram post from

14   June 18th, 2019?

15             (Off-the-record discussion between Attorney Rogow and

16   defendant.)

17             MR. ROGOW:  Yes.

18             THE COURT:  All right.  So this appears to be

19   something that appeared on truepundit.com that said, "The U.S.

20   Government's entire Russian DNC hacking narrative is based on a

21   redacted draft of the CrowdStrike report."  And Mr. Stone is

22   posting it, sending it out to his Instagram followers to read

23   and adding, "But where is the *New York Times*, the *Washington*

24   *Post*, *Wall Street Journal*, CNN @RogerStone did nothing wrong,

25   et cetera?"

1          So, is this a comment about the investigation or the

2     case?

3          MR. ROGOW:  It's a comment on the *New York Times*, the

4     *Washington Post*, the *Wall Street Journal*, just what it -- just

5     what it says.  It's --

6          THE COURT:  Isn't he also disseminating this point of

7     view that the hacking narrative is flawed?  Isn't that the

8     investigation in the case that he is commenting on with this?

9          MR. ROGOW:  Someone else's point of view.  True

10    Pundit published that, and he just asked the question:  Where

11    is the *New York Times* and *Wall Street Journal*?

12         THE COURT:  So when you see Instagram or Twitter and

13    you see something that somebody else put out there that you

14    agree with and you want other people to see and you send it out

15    under your name, that's not a statement by you and that's just,

16    oh, that's just something somebody else said?

17         MR. ROGOW:  You know, I've addressed all of this in

18    my response, and I address this specifically with the other

19    ones also.  This -- this is a comment.  You know, all

20    Roger Stone has to do is put his picture up and -- of

21    Roger Stone, and that creates, just in and of itself, a

22    reaction from people.  Good reactions, bad reactions,

23    supportive reactions, unsupportive reactions.

24         This is not a violation of the court order, and

25    that's why I framed my response, saying that I thought the

1    government had really taken these things and built them into

2    something that it is not.  Unless Your Honor is saying that all

3    Roger Stone can do is say "Hello, I'm Roger Stone," these are

4    not violations of the court order.  And let me say this,

5    these --

6               THE COURT:  Well, Roger Stone has been saying more

7    than "Hello, I'm Roger Stone."  And he hasn't been brought back

8    to court until today.  That's fair, isn't it?

9               MR. ROGOW:  It is true.

10              THE COURT:  He's been out.  He's been able to raise

11   money for his legal defense fund?

12              MR. ROGOW:  Tried to.

13              THE COURT:  He's very active on social media.  And I

14   don't have every one of his posts here.  I'm not handing them

15   all to you, am I?

16              MR. ROGOW:  I don't know what other quotes there are.

17   So I can't answer that, if you're giving me all of them or not.

18   All I'm saying, Your Honor, is the ones that you've presented

19   to me are not, in my opinion, violations of the court order,

20   unless the court order is viewed as saying that he cannot say

21   anything.  He cannot say, "I'm coming to court today."  Could

22   he post something saying, "I'm coming to court today"?  That

23   would be a comment on -- on the case, if he says that.

24              And that's the difficulty with this.  He has tried to

25   hue to the line that Your Honor drew.  And I understand the

1    government thinks that he crossed the line.  And, apparently,

2    you think that he may have crossed the line.

3              THE COURT:  Don't tell me what I think.  I'm asking

4    questions.

5              MR. ROGOW:  I'm not telling you.  I said:

6    Apparently, you may think.  I don't know.  From the tone of

7    your questions, I get the sense that you're not happy with

8    Mr. Stone in this situation, and I understand that.  And I'm

9    trying to respond to your honest concerns.

10             THE COURT:  All right.  I have another one similar to

11   the last one, which is a re-posting of an article from

12   consortiumnews.com.  Take a look at this.

13             (Off-the-record discussion between Attorney Rogow and

14   defendant.)

15             MR. ROGOW:  He re-posted the *Consortium News*.  It

16   contained a picture of him.  And he asked for help to his

17   defense fund.

18             THE COURT:  All right.  But isn't he, by doing this,

19   saying, Look, everybody, the FBI never even looked at the

20   unredacted CrowdStrike report.  That impugns the investigation.

21   Roger J. Stone, Jr.  Isn't that what he's saying?

22             MR. ROGOW:  He is communicating to others what has

23   been said by others.  So is that impugning the investigation,

24   to the extent that others have come to this conclusion?

25             THE COURT:  What I'm saying is he's not satisfied to

1    let *Consortium News* get the word out.  He's decided to

2    disseminate what *Consortium News* had to say.

3            Is that a statement about the case or the

4    investigation?  You say it's not, and I'm just trying to figure

5    out how that works.

6            MR. ROGOW:  I'm saying it is not Roger Stone's

7    statement.  Is it a re-publication of someone else's statement?

8    So that -- that re-publication would be a violation of your

9    order, which is the way I think this thing is going in terms of

10   how we're looking at it?  I do not think so.  He's

11   re-publishing that.  Look at this --

12           THE COURT:  Isn't that kind of how Twitter and

13   Instagram and Facebook work?  People post their own stuff, but

14   then the reason -- when they talk about things going viral or

15   social media, the reason it works is because people take what

16   somebody else said and then they say it and somebody else takes

17   what they said and then they say it, and that's the power of

18   it, that's the speed of it, that's the multiplication of it.

19           MR. ROGOW:  And that -- and that's what's so

20   interesting about this.  There is no power and no speed.  There

21   are 313 likes of this.  So, the power and speed --

22           THE COURT:  So what you're saying is just because

23   nobody is listening, he's not saying it?

24           MR. ROGOW:  No, I'm not saying that.  What I'm saying

25   is, being realistic about -- going -- going to the whole heart

1   of this, is Roger Stone doing something that will affect the

2   ability of him and the government to get a fair trial in this

3   case?  Are any of these postings something that would have that

4   kind of impact?  The answer --

5          THE COURT:  I think that's an interesting question,

6   but I'm at a different question, which is:  Is the order being

7   violated?

8          MR. ROGOW:  I understand.  I understand.  They're two

9   separate questions.

10          THE COURT:  I'm not sure we have to look at every

11   single violation in terms of would it cause the harm that the

12   order was there to cure, to determine if the order was

13   violated.  It may relate to what you do about it, but I don't

14   know if that answers the question whether it was violated or

15   not.

16          Well, let's keep going.

17          Mr. Haley.

18          (Off-the-record discussion between Attorney Rogow and

19   defendant.)

20          MR. ROGOW:  Yes, he published it.

21          THE COURT:  All right.  So here's and article by

22   another person, not by Mr. Stone, in the *American Thinker*, that

23   says, "As the Russian hoax is being unwound, we are learning

24   some deeply disturbing lessons about the level of corruption at

25   the top levels of the agencies charged with protecting us from

 1    external threats.  One jaw-dropping example has just been

 2    exposed by the legal team defending Roger Stone."

 3              And then he sends that around and tells people to --

 4    you know, anybody who follows him now has read that.  And he

 5    points out:  Even *New York Times* and the *Washington Post* aren't

 6    covering this.

 7              So, is this a statement by him about the level of

 8    corruption at the top levels of the agencies, or not?

 9              MR. ROGOW:  It's the same genre as the other comments

10    on things that have been written by other people, and the fact

11    that the *New York Times*, *Wall Street Journal*, etcetera, had not

12    done anything about this story.  This one, 221 likes.

13              THE COURT:  How many people receive

14    Roger Stone, Jr.'s, Instagram post?  Do you know?

15              MR. ROGOW:  I'm sorry.  I couldn't --

16              THE COURT:  How many people receive the post, whether

17    they take the time to like them or not?

18              MR. ROGOW:  I don't know.

19              THE COURT:  And here's another.

20              Mr. Haley.

21              (Off-the-record discussion between Attorney Rogow and

22    defendant.)

23              THE COURT:  This is a repost from -- I'm not sure --

24    that says, "The FBI never saw CrowdStrike unredacted or final

25    report on alleged Russian hacking because none was produced."

1           Stone posts it on his Instagram feed and says, "The

2   truth is slowly emerging:   No collusion.   Roger Stone did

3   nothing wrong."

4           Is he commenting on the investigation or his case?

5           MR. ROGOW:   He's commenting on what was published by

6   *Commentary*.   It's not the *Commentary* Magazine I'm familiar

7   with, but he's commenting on that.

8           THE COURT:   All right.   So, what do you think I

9   should do in response to all of this, Mr. Rogow?

10          MR. ROGOW:   I think you should let this hearing speak

11  for itself.   And I can consult with Mr. Stone and go over

12  anything.   Anytime he wants to send something out, I will

13  review it.

14          These -- Your Honor, I understand how this got to

15  where it got to.   The initial posting, where we had the hearing

16  and Mr. Stone testified, there's no question that at the

17  outset, there was no restraint on his ability to speak.   And

18  we've gone through this, and I've -- I have tried to and

19  Mr. Stone has tried to conform to the Court's order.

20          I understand the concerns about these things, and I

21  responded in writing to these, each of them, in terms of why I

22  thought they were not --

23          THE COURT:   I read it, but I wanted to talk about

24  them together in court.

25          MR. ROGOW:   I understand.   I understand.

1          -- why they were not a violation.

2          You know, I go back to the *raison d'être* for any kind

3    of restraint on speech, and it has to do with a fair trial.  I

4    think that the threat to any fair trial -- which is -- the

5    trial is going to occur in November -- I don't think any of

6    these things pose any threat to a fair trial.

7          In fact, if anything, I think the government's motion

8    here, and even addressing these situations in this way, in this

9    manner in the court just create more publicity about something

10   that doesn't need to have all of this publicity in order to

11   achieve what the ultimate goal is; it's to be able to pick a

12   jury that has not been influenced by any outside events.  And

13   by the way, I don't think that's going to be hard.  And I think

14   that, over and over again, juries are picked no matter what the

15   kind of publicity is in a case.

16         I am sorry that the Court is offended by these and

17   believes that these things violated the court order.  I don't

18   think they violated the court order.  I understand how one can

19   look at them and come to a conclusion that, yes, they were

20   either at the line or crossed the line.  But Mr. Stone has

21   tried to hue to that line.  And has he done it in a way that

22   has offended the government?  Apparently enough so that the

23   government moved for an order to show cause.

24         THE COURT:  I think you're adding verbs that aren't

25   necessary about who's offended or not offended.  I don't think

1    recognizing or determining whether a line has been crossed has

2    to do with whether a person is personally offended.

3           So, I take your point, that your point of view is

4    that he hasn't crossed the line, and that he's trying to hue to

5    the line, and their point is that it isn't.

6           Is there anything else you want to say right now

7    before I hear from the government?

8           MR. ROGOW:  Nothing, other than he will continue

9    to -- and with the help of myself and Mr. Buschel and

10   Mr. Smith -- make sure that this doesn't happen again, and we

11   don't have to come to the Court, again, to discuss these kind

12   of matters.

13          THE COURT:  All right.  Let me hear from the

14   government on this.

15          MR. KRAVIS:  Good morning, Your Honor.

16          The posts that we have been talking about here this

17   morning clearly violate the order that the Court entered on

18   February 21st.  I don't think there was anything ambiguous or

19   unclear about that order.  And I believe that each of the posts

20   that the Court showed to defense counsel -- most, I think, but

21   not all of them, were attached as exhibits to our motion --

22   violate that order because they amount to speaking publicly

23   about the investigation, the case, and its participants.

24          Defense counsel, in their filing and in their

25   argument here today, seemed to take a very narrow view of the

1     order that was entered on February 21st.  I note that it's

2     interesting that when Mr. Stone was in the hot seat on

3     February 21st, the defense seemed to be arguing for a broad

4     media contact order as a condition of his release so that he

5     could remain at liberty while the case progressed to trial.

6     And then now that we're here --

7            THE COURT:  I think they called it a "broad order"

8     this morning, and then they say they want to be able to

9     interpret it narrowly.

10           MR. KRAVIS:  Right.  And where Mr. Rogow left off

11    was, defense counsel, my co-counsel and I will make sure this

12    doesn't happen again.  I'm not sure what reassurance that's

13    meant to provide if Mr. Rogow doesn't think this violates the

14    order.

15           The government brought this to the Court's attention

16    because we believe that the most recent posts clearly

17    demonstrate that the defendant's conduct in violation of the

18    order both presents a risk to a fair trial, and clearly

19    demonstrates that he is not able to follow the order that the

20    Court entered on February 21st, an order that the Court

21    entered, in part, to protect the safety of the participants in

22    these proceedings.

23           The defense's interpretation of that order seems to

24    be that as long as Mr. Stone phrases his comments in the form

25    of a question, or in the form of a picture of someone else's

1    statement that he attaches to his Instagram account, then that

2    does not constitute a statement by the defendant about the --

3    about the case or its participants.

4           I would note that the very first post that prompted

5    the February 21st hearing was also not Mr. Stone's original

6    content.  That was also something that he found somewhere else

7    and disseminated through his social media account.  The

8    government, obviously, takes a very different view of that

9    order.

10          In legal parlance, we believe that Mr. Stone taking

11   pictures of things that other people say about the case and

12   then posting to a social media account would be an adoption of

13   the statement by Mr. Stone.

14          In common sense parlance, when Mr. Stone does that,

15   he is clearly speaking about the case through his Instagram

16   account, even if he is using pictures to use the words of

17   others.

18          The most recent posts, the ones that prompted the

19   government to file its motion, only highlight the risk to a

20   fair trial from Mr. Stone's continued violation of the Court's

21   order.  As the trial date becomes closer, the parties are going

22   to begin talking more in their filings about evidence, about

23   documents, about witnesses, about what will happen at the

24   trial.

25          And, as the most recent filings in this case show,

1   the parties are going to have some different views about what

2   is and is not coming into evidence at trial, what the trial

3   should and should not be about.

4         These most recent posts are based on what, we

5   believe, are factual misrepresentations in a defense filing

6   about a subject that is not actually relevant to the trial, but

7   that threatens to prejudice the jury pool by spreading

8   information about things that the jury will never hear about in

9   the courtroom.

10        And for the defense to say that this is not a

11  violation of the Court's order because Mr. Stone took a picture

12  of someone else's words, or because Mr. Stone framed his

13  comments in the form of a question, rather than putting a

14  period at the end of a sentence, for the defense to say that, I

15  think, it just shows the defense's lack of regard for the order

16  that the Court entered on February 21st, and for the reasons

17  that supported the order that the Court entered on

18  February 21st.

19        THE COURT:  Well, what seemed to be notably absent

20  from your motion is a request.  What would you like to see me

21  do about it?

22        MR. KRAVIS:  I think that there are a couple of

23  things that the Court can do to address the situation at this

24  stage.

25        The very first, and I think the minimal one is, I

1    think it is obvious from the filings that the Court needs to

2    clarify, for the defendant and for defense counsel, what the

3    February 21st order does and does not include.  And in the

4    government's view, the order clearly does include pictures that

5    Mr. Stone takes of other people's words, that he publishes on

6    his Instagram account.  It includes comments that are phrased

7    in the form of a question.

8             And it includes commentary about public filings.  The

9    February 21st order made no exception for public filings in the

10   case, and it made no exception for public filings in the case

11   for precisely this reason:  Just because a party puts something

12   in a public filing, that doesn't mean that the defendant's

13   further dissemination of that information, or misinformation,

14   or the dissemination of public commentary about that

15   information or misinformation cannot prejudice -- cannot

16   prejudice the jury.

17            In fact, that's the reason why the local rule allows

18   the Court to enter an order, which the Court did at the very

19   beginning, restricting extrajudicial statements of the lawyers

20   themselves.  So I think that, at a minimum, a clarification of

21   the scope of the Court's February 21st order is necessary.

22            It also appears to the government to be necessary,

23   given the defendant's repeated violation of the order, for the

24   Court at least to consider prohibiting the defendant from using

25   his social media account at all.

1          I think the events from February 21st to today show

2     that no matter how clear a line the Court draws, the defendant

3     will cross it, and then will come to court and try to argue

4     that he cannot be held responsible for it because there was

5     some ambiguity when, in fact, there was no ambiguity.

6          Those are the suggestions the government has at this

7     point.

8          THE COURT:  Do you agree that if I wanted to fine him

9     or sanction him for violating the media contact order, that

10    that would require an order to show case and the invocation of

11    all the procedures under Rule 42 for contempt?

12         MR. KRAVIS:  Yes.  We're not asking for the Court to

13    hold the defendant in contempt or to initiate either civil or

14    criminal contempt proceedings at this point.

15         What we are most concerned about is not punishing the

16    defendant for his past transgressions.  What we are most

17    concerned about is protecting the integrity of the jury pool

18    and protecting the fair trial right.  And so what we are here

19    asking for is a consideration of what we do going forward, not

20    for punishment of the defendant's past conduct.

21         THE COURT:  All right.  Thank you.

22         MR. KRAVIS:  Thank you, Your Honor.

23         MR. ROGOW:  May I be heard, Your Honor?

24         THE COURT:  I guess so.

25         MR. ROGOW:  Four or five times, the government has

1    talked about risk to a fair trial.  That is -- that is an

2    overblown, exaggerated claim that does not hold any water in

3    this case and, in fact, in most cases tried in this country.  A

4    fair trial can be had.  This communication by Mr. Stone is no

5    risk to a fair trial.

6          And I think that one has to think about the balance

7    between the First Amendment issues that are here, when they're

8    asking for consideration for him not to be using social media

9    anymore, when they talk about the need to clarify the order.

10   It underscores the danger of these kinds of orders when they're

11   premised upon a false premise of danger to a fair trial.

12         And, you know, over all the years that I've been

13   involved in trying cases, I -- in small communities, where

14   small newspapers repeatedly, every day, talk about a case, the

15   cases find juries and the trials are fair.  So this whole

16   thing, the whole underlying premise, I think, is a false

17   premise to begin with.

18         But, beyond that -- but given that, too, in thinking

19   about this, I'm going to make an *ore tenus* motion that the

20   Court do away with the February 21st order and --

21         THE COURT:  I'm not going to rule on anything that

22   you submit to me orally.  You're going to have to put it in

23   writing.  And I can tell you that given what went into that

24   order, that you've got a tough row to hoe there.

25         MR. ROGOW:  I understand.

1    THE COURT:  I haven't even yet ruled about whether

2    I'm about to make it -- what I'm going to do in response to

3    everything I've heard.  So, it's certainly on the books now.

4    And I didn't go through that whole exercise last time, and the

5    hearing and have listened to his testimony and listened to your

6    argument and listened to your, I thought at the time,

7    well-considered suggestions, only to have you tell me later,

8    never mind.  But you're entitled to put anything in writing,

9    and I will look at it, and I will consider it with an open

10   mind, but I'm not going to consider it right now based on an

11   oral statement.  They have to have the opportunity to respond.

12   I want to see what you're relying on.

13        MR. ROGOW:  I understand.

14        THE COURT:  All right.  I would like some time to

15   think about all of this before I rule, or before I even decide

16   if I'm going to do anything today, and that may take longer

17   than the usual ten-minute break.  I think what I would like to

18   do is come back at 12:30.

19        So, I'm going to recess now and return at 12:30.  So

20   that would also give people a chance to eat an early lunch, if

21   they want to do that.  But we'll be back at 12:30.  Thank you.

22        MR. ROGOW:  Thank you.

23        (Recess.)

24        THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

25   We are recalling Criminal Case Number 19-018, *United States of*

1    *America v. Roger J. Stone, Jr.*  Mr. Stone is present and in the

2    courtroom, Your Honor.

3              THE COURT:  All right.  I've already set forth on

4    this record the background that led up to the issuance of the

5    February 21 order and the reasons behind it, and I'm not going

6    to make you all listen to that entire recitation for a second

7    time.

8              The clarity of my order is undisputed.  The fact that

9    the defense said it was fine and the order was not challenged

10   on First Amendment grounds or any other is a matter of record.

11             It didn't take a week before the defendant was

12   emailing *BuzzFeed*, calling a witness in this investigation a

13   liar.

14             Then, on March 1st, the defense filed what they

15   called a motion to clarify, Docket 52.  "We want to comply with

16   your order, but Mr. Stone has written a new introduction for

17   his book before February 21st.  So you didn't mean that the

18   order would apply to its imminent release after February 21st,

19   did you?"

20             Well, I asked on that day, "What do you mean by

21   imminent release?

22             March 4th, the defense tells me, "Oops.  The use of

23   the word 'imminent' was a," quote/ unquote, "misnomer because

24   the book is already for sale."  That's in Docket 55.  "Indeed,

25   the introduction can be accessed online.  So, we're sorry, but

1    we have a contract, and we can't do anything about it."  Maybe.

2    The Court chose not to delve further into the circumstances,

3    given when the introduction was written.  But there was no

4    excuse for the misnomer, which was a misstatement.

5           In Docket 61-4, there are documents that reveal that

6    counsel asked, on February 21st, and the publisher responded on

7    the 22nd that the books had been shipped to customers across

8    the country a few weeks ago.  It's true that counsel had

9    trouble getting accurate numbers from the publisher, but they

10    told him as of February 28th that the book had been sent in

11    late January.

12           So the pleading on March 1 was either deliberately or

13    recklessly inaccurate.

14           And as I pointed out in my order of March 5th,

15    Docket 56, "While the drafting of the new introduction and the

16    discussion of re-publication may have predated by February 21st

17    order, the defendant briefed and argued all the issues related

18    to the potential communication and told me that the wave of

19    publicity surrounding his arrest was about to subside before

20    February 8th, with full knowledge that he was about to launch

21    his story, a book with a cover that said he has updated the

22    book to respond to Robert Mueller's charges, to the world, and

23    nobody bothered to mention it."

24           And Stone sat on the witness stand telling me he'd

25    adhere to any order, knowing from an email he received from the

1    publisher on February 15th that the books had already been sent

2    to stores and media outlets.  Indeed, the defendant himself had

3    promoted the book on social media, including on February 18,

4    just a few days before the hearing.

5         The whole episode left the strong impression that the

6    original filing seeking, quote/unquote, clarification was just

7    an attempt to get publicity for the book.  It was, otherwise,

8    just sitting there and was just a re-publication of an earlier

9    book.

10        More important, the defense dissembled the multiple

11   times when it supposedly sought clarification that my order

12   wouldn't apply to something to which it clearly applied.  It

13   didn't augur well for the defendant's future scrupulous

14   adherence to the order.

15        And then we get "Who framed Roger Stone" at about the

16   same time.  That one may be a more veiled statement.  Is it

17   clear it crosses the line, it doesn't cross the line?  "Frame"

18   is obviously about the investigation.  But it was certainly a

19   little cute, a little nudge at the line.  But the government

20   didn't overreact, and I continued to wait and see.  And so the

21   defendant continued to test the limits, which brings us to the

22   current posts.

23        Some are plainly statements about the case or the

24   investigation or the people involved, such as the statements

25   about Michael Cohen, Adam Schiff or John Brennan, who was

1   director of the CIA until January 20th, 2017.  In other words,

2   at the time of the USIC assessment the defense is laboring to

3   place in issue.

4          It is correct, because some of the posts were

5   initially statements made by other people.  It was other people

6   who were commenting on the case or on the investigation.  But

7   Mr. Stone wasn't content to leave those comments out there

8   unread, unliked.  He posted and disseminated them himself again

9   on his own Instagram feed, under his own name, to his own

10  followers.  To suggest that Roger Stone's posts are not

11  statements by Roger Stone about the case ignores the essence

12  and exponential power of social media and what makes it

13  different from writing a letter or talking on the phone.  Maybe

14  his lawyers don't understand it, but he does.

15         He was taking what someone else said and spreading it

16  with his imprimatur and, not always, but often adding some

17  rhetorical or provocative flourishes of his own under his own

18  name.

19         I find that he is in violation of his conditions of

20  release and the media communication order.

21         I've heard and I've considered defendant's arguments

22  that these particular statements don't pose a danger on their

23  face to the integrity of the trial, the ability to seat an

24  unbiased jury; this one is not so bad, only 200 people liked

25  that one.  But that is an argument about the impact of the

1    statements, and it doesn't go to the issue of whether they

2    comply with my order.  It also ignores the obvious purpose

3    behind defendant's use of social media here, which is to gin up

4    more public comment and controversy about the legitimacy of the

5    Mueller investigation and the House investigation to get people

6    to question the legitimacy of this prosecution.

7          He complains about the number of articles that have

8    appeared in the press in his pleadings, but that's not really

9    relevant because they don't violate my order.  And he

10   complains, in his complaint, that he's been the subject of so

11   many articles lacks sincerity.  This defendant plainly appears

12   to seek attention, positive or negative.  The posts appear to

13   be attempts to get attention when coverage of the case is

14   flagging, and possibly to prompt me to react in a way that

15   would garner even more attention.  It seems that he is

16   determined to make himself the subject of the story.

17         I specifically warned him, multiple times, including

18   on February 21st, that each time he insists on making himself

19   and his case the subject of a story, that provokes the

20   counter-story and the unflattering posts and comments and

21   articles in response.  I said pretrial publicity cannot subside

22   if it is the defendant fanning the flames.

23         With respect to his alleged violation of the media

24   communication order, though, I will defer issuing an order to

25   show cause triggering formal proceedings pursuant to Rule 42.

1   I think a contempt hearing would be wasteful and unnecessary

2   and counterproductive.  It's not a good use of the court's

3   resources, the government's resources or the defendant's

4   resources at this time, and it could generate more pretrial

5   publicity and more concerning articles for the jury to read.  I

6   can reconsider in the future, if there are continued violations

7   or after the trial in this case.

8         Also, Mr. Stone, I'm not inclined to revoke your bond

9   at this time.  I'm not going to restrict your ability to reside

10  in your home and come and go as you please, to communicate with

11  your lawyers as they prepare for an upcoming trial, and to meet

12  with whomever you like and ask them to donate to your defense.

13  But it is obvious to me that you either can't differentiate

14  between the very broad range of speech that you're entitled to

15  engage in and the limited restriction I imposed on you, or you

16  won't.  Given the clarity of the order, that you may talk about

17  whatever you like, any subject under the sun, except that you

18  may not talk about this case or the investigation or the people

19  involved in it, I fear it's the second.

20        I've twice given you the benefit of the doubt.  I

21  imposed virtually no restrictions at all the first time, but

22  you didn't act responsibly.  And then I imposed what I thought

23  was a very narrowly tailored order to give you as much leeway

24  as possible, but, again, you didn't act responsibly.  You were

25  not scrupulous, as you assured me you would be.  Your lawyer

1    had to twist the facts, twist the plain meaning of the order

2    and twist himself into a pretzel to argue that these posts

3    didn't cross the line.  And in the end, it was unpersuasive.

4          You've shown me that you're unwilling to stop talking

5    about the investigation, which means that you're unwilling to

6    conform your conduct to the orders of the Court.  The goal has

7    been to draw maximum attention to what you view as flaws in the

8    investigation.

9          So what am I supposed to do with you?  It seems as

10   if, once again, I'm wrestling with behavior that has more to do

11   with middle school than a court of law.  It's tempting to

12   ignore it all completely, but if I don't respect and uphold my

13   own orders, why would I expect anyone else to?  Whether the

14   problem is that you can't follow simple orders or you won't, I

15   need to help you out.  And the remedy appears to be to modify

16   the conditions of release and make the restriction even more

17   clear so that it calls for no interpretation on your part

18   whatsoever and compliance will be easier to achieve.

19         Therefore, the conditions of your release and the

20   order of February 21st are hereby modified to include the

21   following additional condition:  During the pendency of this

22   case you may not post or communicate on Instagram, Twitter or

23   Facebook in any way, on any subject.  And that includes, but is

24   not limited to, forwarding, liking, re-posting or re-Tweeting

25   anyone else's posts or Tweets.  All previous restrictions on

1    statements to the media or in public settings and on other

2    social media related to the case and the investigation and the

3    people involved in it remain in effect.

4              That's all I have.

5                              *   *   *

1

2                 CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                        Dated this 16th day of July, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25