```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3     United States of America,      )  Criminal Action
                                     )  No. 19-CR-018
4                     Plaintiff,     )
                                     )  PRETRIAL CONFERENCE
5     vs.                            )  Public Transcript
                                     )
6     Roger Jason Stone, Jr.,        )  Washington, DC
                                     )  September 25, 2019
7                     Defendant.     )  Time:  10:00 a.m.
      _____
8
                   TRANSCRIPT OF PRETRIAL CONFERENCE
9                           HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
      _____
11

12                     A P P E A R A N C E S

13

      For the Plaintiff:  Jonathan Ian Kravis
14                         Michael John Marando
                           Adam Jed
15                         Aaron Simcha Jon Zelinsky
                           U.S. ATTORNEY'S OFFICE FOR THE
16                            DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
17                         Washington, DC 20530
                           (202) 252-7068
18                         Email:  Jonathan.kravis3@usdoj.gov
                           Email:  Asjz@usdoj.gov
19                         Email:  Michael.marando@usdoj.gov

20

      For the Defendant:  Bruce S. Rogow
21                         LAW OFFICE OF BRUCE S. ROGOW, P.A.
                           100 NE 3rd Avenue
22                         Suite 1000
                           Fort Lauderdale, FL 33301
23                         (954) 767-8909
                           Email:  Brogow@rogowlaw.com
24

25
```

```
 1    For the Defendant:  Tara A. Campion
                          BUSCHEL & GIBBONS, P.A.
 2                        One Financial Plaza
                          100 S.E. Third Avenue
 3                        Suite 1300
                          Ft. Lauderdale, FL 33394
 4                        (954) 530-5301
                          Email:  Buschel@bglaw-pa.com
 5                        Grant J. Smith
                          STRATEGYSMITH, P.A.
 6                        401 East Las Olas Boulevard
                          Suite 130-120
 7                        Fort Lauderdale, FL 33301
                          (954) 328-9064
 8                        Email:  Gsmith@strategysmith.com
                          Chandler Paige Routman
 9                        LAW OFFICE OF CHANDLER P. ROUTMAN
                          501 East Las Olas Blvd.
10                        Suite #331
                          Ft. Lauderdale, FL 33316
11                        (954) 235-8259
                          Email: Routmanc@gmail.com
12    _____

13
      Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
14                           Official Court Reporter
                             United States Courthouse, Room 6523
15                           333 Constitution Avenue, NW
                             Washington, DC  20001
16                           202-354-3267

17                              *   *   *

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

2   This morning we have criminal case number 19-18, the United

3   States of America v. Roger Stone.  Mr. Stone is present and in

4   the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6   lectern, identify yourself for the record.

7          MR. ZELINSKY:  Good morning, Your Honor.  Jonathan

8   Kravis for the United States.  With me at counsel table are

9   Michael Marando, Aaron Jed, and -- Adam Jed and Aaron Zelinsky,

10  all from the D.C. U.S. Attorney's Office.

11          I've also been asked to advise the Court that Counsel

12  for the DNC and DCCC are present in the courtroom today.

13          THE COURT:  All right.  Thank you.

14          MR. ROGOW:  Good morning, Your Honor.  Bruce Rogow,

15  Chandler Routman, Tara Campion, and Grant Smith for Mr. Stone,

16  who, of course, is present.

17          THE COURT:  All right.  Good morning.  We have a

18  number of things to accomplish today.  I'd basically like to

19  rule on all of the outstanding discovery-related motions and

20  all of the motions in limine.  There are one or two for which I

21  may have questions for one side or the other, but I'm -- my

22  goal is to try to rule on all of them today.

23          I have had an opportunity to go through what turned

24  out to be a relatively short -- small number of objections to

25  the government's exhibits, so I think I may be able to rule on

1    that today.  I confess that I have not yet gone through all of

2    the objections to the defense's exhibits, and it may be that a

3    lot of them are obviated by the rulings on the motions in

4    limine; we'll see.

5            I also have looked at the jury instructions, but I'm

6    not prepared to get into the meat of those today.  But, I think

7    we still have plenty to do.

8            Starting at the beginning of the trial, with respect

9    to voir dire, the good news is that I think we got more than

10   enough jurors through the process of the jury questionnaire to

11   have the voir dire take place on November 5th, and not have

12   difficulty getting enough jurors to pick a jury.  The strikes

13   for cause have all been ruled upon, so the individuals that

14   were listed in the order will not be present on November 5th,

15   only the remainder of the jurors.

16           There were -- I think it's about 16, I'm not sure

17   what the exact number is, strikes for cause which were denied.

18   And, so, one question I had for the defense is whether you

19   think it would be necessary to docket -- and these could be

20   sealed or they could be docketed without the last page attached

21   with their names -- the jury questionnaires of any jurors for

22   whom the motion to strike was denied, so that the basis, if

23   that's an issue, if there's ultimately an appeal in this case,

24   so that issue would be preserved.

25           Do you think we need to do that?

1          MR. ROGOW:  I don't think we need to have the names

2     attached.  We have the names because we have the

3     questionnaires, so the number of the juror gives us the

4     information.

5          THE COURT:  Okay.  And I think they should be sealed

6     because ordinarily jurors don't know who moves to strike them;

7     that's not something that is revealed.  So, I will figure out

8     how to get this done.  But to preserve your objections, just

9     the questionnaires for which strikes for cause were denied will

10    be docketed.

11         MR. ROGOW:  And those are 15, Your Honor?

12         THE COURT:  It's about 15 or 16.  I don't remember

13    the exact number.  You had something in the range of 50-some,

14    52.  The government had 18.  All of the government's were on

15    your list.  So those were all -- all those people were struck,

16    and then I think there were about 20 more that I granted of

17    yours, leaving, I think, about 16, as I recall.

18         So, that means that anyone who is here on November

19    5th, we have already received a significant amount of

20    information from them and the voir dire is going to be

21    seriously truncated because, essentially, we've already had it.

22    But we will go through and bring them in one at a time.  I will

23    ask each one of them if they have read or heard anything

24    between the time that they filled out the questionnaire and the

25    date that they appear in the courtroom.  And then if there's

1    follow up, for instance, to some of the people that you moved

2    to strike for cause that I didn't strike, there may be

3    questions that we need to ask to clarify a specific answer on

4    the jury questionnaire.

5            And with respect to other jurors, there may be a

6    question or two that you feel was not clear and follow-up is

7    needed.  But we're not going to start from the beginning and

8    we're not going to start asking them open-ended questions about

9    their life experience or what they read or who they watch or

10   what they've heard, that was all covered by the questionnaire.

11   So we're not going to explore new areas.

12           I do want to note that sometimes if there is a

13   follow-up question for one of the jurors, the jurors may seek

14   to give that information in private.  And typically, I have

15   either done that at the bench with the husher or done it in a

16   closed courtroom.  And I've been provided with authority in

17   other cases that indicate that the defendant has a Sixth

18   Amendment right to have the individual voir dire be public.

19   And, so, I would intend to bring each juror in individually and

20   have the courtroom be open, unless, with respect to a

21   particular question, the juror says can I give that answer at

22   the bench because it's private.  In that case, I would do that

23   and Mr. Stone would have the headphones and have the

24   opportunity to hear what's being said.

25           So, does that procedure satisfy everybody?

1          MR. ROGOW:  It does.

2          MR. KRAVIS:  Yes, Your Honor.

3          THE COURT:  Okay.  So I think we're set in terms of

4     picking a jury.

5          There are two discovery-related motions under Federal

6     Rule of Criminal Procedure 17(c).  First, the Defendant moved

7     for an early return subpoena to be issued to CrowdStrike,

8     that's Docket 160, for the unredacted version of the report of

9     their investigation into the DCCC and the DNC computers.  The

10    DNC and the DCCC have opposed the motion at Docket 183.  The

11    motion seeks the early return of the unredacted CrowdStrike

12    report that the government did not have in its possession.

13         The DNC argues that the report, at least, is attorney

14    work product since the forensic expert wasn't retained to

15    assist counsel in anticipation of litigation, and the redacted

16    portions are sensitive recommendations regarding a future

17    cybersecurity and not what took place in the past, and that the

18    materials are not relevant to the litigation.

19         And I, in an abundance of caution, called for the

20    report so that I wasn't simply relying on someone's

21    representations about what was redacted and what wasn't

22    redacted.  And I also called for something that memorialized

23    the fact that CrowdStrike was hired by the lawyers and not by

24    the entities, since that was set forth in the pleading, but I

25    hadn't seen anything to document that.

1            And having reviewed all of that material, and also

2      the motion and the opposition, the motion is going to be

3      denied.

4            For reasons that I'm going to detail later when I

5      take up the question of the relevance of any evidence related

6      to the Russian interference in the election and/or who hacked

7      into or stole the information from the Democratic Campaign

8      Organization's computers, I agree with the movants that the

9      material sought, indeed, even the portion of the CrowdStrike

10     report that's already been provided, is irrelevant.  It doesn't

11     need to be produced early and it doesn't need to be produced on

12     the day of trial.

13            Moreover, the redacted portions, which I have

14     reviewed in camera, are covered by the attorney work product

15     privilege, they do contain sensitive information, and that

16     privilege is not outweighed by any need for the information to

17     advance the defendant's defense.

18            Even if the defendant is correct, that flaws in

19     CrowdStrike's analysis of the hacking bear somehow on the

20     materiality of his alleged false statements to the Committee,

21     nothing that was redacted goes to that analysis.  It all

22     relates to recommendations for enhanced security for the

23     future.  And, for obvious reasons, that should not be made

24     public and, therefore, it has no conceivable bearing on the

25     defendant's defense to these charges.

 1           There was also -- I do have one question, though, and

 2    I guess it would be helpful to have DNC answer this:  The

 3    unredacted report was given to me for my review in camera.  But

 4    in terms of the retention letter that demonstrates that it was

 5    the attorneys that retained CrowdStrike and not the

 6    organizations themselves, is there any reason why they cannot

 7    be docketed in this case?

 8           MR. NKWONTA:  Your Honor, on behalf of --

 9           THE COURTROOM DEPUTY:  Please identify yourself for

10    the record.

11           MR. NKWONTA:  Good morning, Your Honor.  Uzoma

12    Nkwonta on behalf of DNC and DCCC.

13           Your Honor, DNC and DCCC's position is that those

14    documents also contained privileged information to the extent

15    that they set forth materials relating to the scope and the --

16    the purpose of CrowdStrike's investigation.  So we would

17    request that those materials not be docketed.

18           THE COURT:  All right.  Well, I think some sort of

19    redacted version could be docketed as a supplement to your

20    opposition to the early return subpoenas.  You make the

21    representation in the motion that it was the firm that retained

22    the organization, so that information has already been made

23    public.  And you can certainly redact out of the agreement

24    information that you believe is still covered by the privilege.

25    But the fact of the retention is what I would like to have on

1   the record.  So, I would appreciate it if you would do that.  I

2   don't think we should have a record where there's something

3   I've seen that isn't part of the record.

4          MR. NKWONTA:  We can redact that, Your Honor.  And in

5   terms of what specifically we would like redacted, are you

6   referring to the -- to all agreements that have been submitted,

7   or just -- is there a specific agreement that you are referring

8   to?

9          THE COURT:  Well, the agreements that you were

10  referring to in your pleading when you said, We hired them, so

11  they were acting at our direction, in anticipation of

12  litigation, and that's what brings this under the scope of the

13  attorney work product privilege.  I want you to supplement the

14  motion with the documents that reflect that.  And you can file

15  a version with them unredacted, under seal, and then a redacted

16  version on the public docket.

17         MR. NKWONTA:  Certainly.

18         THE COURT:  All right.

19         MR. NKWONTA:  Thank you, Your Honor.

20         THE COURT:  Okay.  All right.  Thank you.

21         And with that, I can let the counsel for the moving

22  parties DNC and DCCC know that I'm not going to return to this

23  issue.  And you're welcome to stay for the rest of the pretrial

24  conference, but you don't have to.

25         The next motion I'm going to take up is the

1    defendant's motion for an early return subpoena issued to the

2    House Permanent Select Committee on Intelligence, it's Docket

3    161, it was opposed at Docket 179, and there was a reply at

4    189.  This was the request for the audio recording of

5    Mr. Stone's testimony to demonstrate the tone and the pace of

6    it, and not just the words.

7          There was a status report filed Friday afternoon,

8    Docket 213, that indicates that the defense and the government

9    have agreed to a transcript and, also, to an audio recording.

10    So, is this issue moot?

11          MR. ROGOW:  It is, Your Honor.  We have so agreed.

12          THE COURT:  Okay.  All right.  So I'm going to deny

13    the motion as moot.  And I take it that also solves the problem

14    of the government's motion in limine to introduce the

15    transcript of the House testimony?

16          MR. KRAVIS:  That's correct, Your Honor.

17          THE COURT:  Okay.  And for some reason, I don't seem

18    to have the docket number of that one.

19          MR. KRAVIS:  Your Honor, that motion was never

20    actually filed.

21          THE COURT:  Okay.

22          MR. KRAVIS:  We had requested several extensions

23    while we worked on obtaining the audio.  Now that we've

24    obtained the audio and an agreement with the defense about the

25    admissibility of all these materials, we do not intend to file

1    any motion.

2         THE COURT:  Okay.  So, good, I don't have to rule on

3    it.

4         That brings us to Docket 159, which is the

5    government's sealed motion in limine to introduce two newspaper

6    articles.  It's been opposed at 167, and the reply is at 187.

7    It relates to the second of two categories of evidence listed

8    in the government's Rule 404(b) notice, which is Docket 139 and

9    140, the opposition at 144, and the reply at 147.

10        I'm going to take that portion of the 404(b) motion

11   and the motion in limine up together, but given the fact that

12   that evidence is sealed, I'm going to take it up at the

13   conclusion of the conference.  What we'll do is close the

14   courtroom at that time, turn off the feed to all the other

15   rooms that are listening in, and deal with the sealed matter at

16   that time.

17        So I'm going to defer ruling on Docket 159 and the

18   second category of evidence in the 404(b) motion.  I'm also

19   going to rule on the government's sealed motion about redacted

20   Jencks material, Docket 176, at that time.

21        There is, though, another category of proposed Rule

22   404(b) evidence, and that relates to other alleged false

23   statements before the Committee.  And I guess I have some

24   questions for the government about that.

25        MR. MARANDO:  Good morning, Your Honor.  Michael

1    Marando on behalf of the United States.

2        THE COURT:  And so, I guess my question is:  How --

3    how can you articulate why it's relevant, as opposed to not an

4    effort to simply show a propensity to lie?  I'm concerned about

5    a risk of time being wasted and unnecessary exhibits and

6    testimony on a collateral issue.

7        MR. MARANDO:  Yes, Your Honor.

8        On September 26th, 2017, when Mr. Stone walked into

9    the congressional hearing room, the government's position is

10   that he went in with the intent to lie.  Lie not only about his

11   contacts or communications through an intermediary with

12   WikiLeaks but, also, as to any other matter, Your Honor, that

13   might lead to the discovery of information related to WikiLeaks

14   or his connections to the campaign, and that's critical, Your

15   Honor.

16       He testified before -- before the House Permanent

17   Select Committee on Intelligence that he had no communications,

18   no text, no written communications, no emails regarding

19   WikiLeaks.  Then, when he was asked whether or not he had any

20   communications with the campaign regarding his PAC-related

21   activities, he said no, because coordination is illegal.

22       Were he to answer that question truthfully, it would

23   have shown a connection to the campaign and the inference could

24   have been that, well, if he discussed PAC-related activities,

25   he could have also discussed the WikiLeaks-related

1   communications, or other statements that he made in the press

2   at around that time, Your Honor.

3           He went in with a calculated plan to lie, to separate

4   himself from the campaign in order to shield the lie about his

5   connections to WikiLeaks.  He had to create that space, Your

6   Honor.  He couldn't say he was close to this on one issue, the

7   PACs, but not close to another issue, as it was to WikiLeaks,

8   Your Honor.

9           THE COURT:  Was that the only -- was there a general

10  question about whether he was in communication with the

11  campaign?  Is that the only other question that related to

12  whether he was in communication with the campaign?

13          MR. MARANDO:  As far as I'm aware, Your Honor, it is.

14  It was WikiLeaks and the PAC.

15          However, the question about the PAC was a blatant

16  lie, Your Honor.  We have voluminous evidence in the terms of

17  emails, text messages and, also, we will have witness

18  testimony, Your Honor, that Mr. Stone communicated with the

19  highest levels of the campaign regarding his PAC-related

20  activities.  This lie was blatant and patent and clear.  And

21  the fact --

22          THE COURT:  And uncharged.

23          MR. MARANDO:  And uncharged, Your Honor.  Right.

24          THE COURT:  So why, then, is -- is it material to

25  what the Committee was investigating?

1          MR. MARANDO:  Your Honor, that is really not

2     necessarily relevant.  Because what he -- he told a lie.  And

3     the lie, if he were -- if he would have told the truth would

4     have put him in direct communications with literally the

5     highest level of the campaign, other than the candidate

6     himself, regarding his PACs.  And if they were to ask for

7     discovery or -- I'm sorry, documents related to that, he would

8     have had these emails, these text messages that we have in our

9     possession with the highest levels of the campaign where he is

10    talking about his PAC-related activities, Your Honor.

11         THE COURT:  Well, how many witnesses is it going to

12    take to establish that this statement was false?

13         MR. MARANDO:  Possibly two witnesses, Your Honor, at

14    the most.  Maybe not even two witnesses.  We might be able to

15    get it all in through the agent's testimony, who -- the agent

16    will be used to introduce a lot of the documentary evidence in

17    this case, Your Honor.

18         But we don't want to dwell on this issue, obviously,

19    Your Honor, because --

20         THE COURT:  I think there's a real risk to taking

21    this trial down a road that doesn't involve the charges.

22         MR. MARANDO:  Well, Your Honor --

23         THE COURT:  The jurors can get exceedingly impatient

24    about that sort of thing.

25         MR. MARANDO:  And, Your Honor, we would -- it's not

1    in our interest to do that, right.  But it is in our interest

2    to tell the truth here of what happened on September 26th.

3              He did not go into the hearing on that date like a

4    surgeon, trying to lie about one specific question with a

5    scalpel, I'm just going to go in and lie about WikiLeaks.  No,

6    he went in with a mindset, Your Honor, and the mindset was, I'm

7    going to obstruct this investigation.  And that's charged in

8    Count 1 of the Indictment.

9              He went in with the same sort of mindset that

10   Ms. Lavelle had in the *Lavelle* case that we cited, that it's on

11   all fours with this case, Your Honor.  She went -- she went in

12   to her hearing before Congress in 1984 with the total mindset

13   to lie, and to make her dealings with the EPA in 1984 seem

14   copacetic, that there were no issues, and that she was above

15   board.

16             Mr. Stone went in here with the idea, with the

17   mindset, with the scienter, and we have to prove his scienter.

18   We have to prove his specific intent.  And he went in there

19   with the specific intent to protect himself, protect the

20   campaign and to distance himself, Your Honor.  This other lie

21   that he told, which shielded communications between Mr. Stone

22   and the highest regions of the campaign, on arguably very

23   politically sensitive issues, corroborates not only the lies

24   that he told to WikiLeaks, because Mr. Stone has claimed on

25   numerous occasions that, well, you know, look, I had a

1    misrecollection of the facts, Your Honor, when I went in there.

2    I went in there, yes, I misrecollected some facts.

3            No, he didn't misrecollect any facts.  He went in

4    there with the idea to lie, and lie on other topics, too, to

5    protect himself and shield himself, and to create distance

6    between himself and the campaign, Your Honor.

7            THE COURT:  All right.  All right.  Let me ask the

8    defendant some questions.

9            Who's handling this for you?  All right.

10           All right.  Mr. Rogow, the government's argument is

11   that this other false statement is -- is not even really 404(b)

12   evidence, it's intrinsic to Count 2.  He's charged with lying

13   to the Committee, and it certainly bears on the truthfulness of

14   the specific alleged false statement, Count 6, that expressly

15   deals with communicating with the campaign.

16           And it bears on the validity of his complaint, his

17   defense that, oh, my false statements were accidental, it was

18   just a mistake when he lied about contacts with the campaign,

19   allegedly, during the very same testimony.

20           So what is your response to that?  Why isn't it

21   intrinsic to Count 2?

22           MR. ROGOW:  It's not intrinsic to Count 2 because if

23   it had been so important to the government, then they would

24   have charged him with that.  Your question about why didn't

25   they charge it, I think, is a very prescient question.  The

1    only reason they want to bring this in is prejudice.  And you

2    heard the argument that he went in with a scalpel on this

3    specific question -- and by the way, this specific question,

4    did you talk to the campaign about your work with the PACs,

5    this opens the door to what talking to the campaign and work

6    with the PACs means.  It's not --

7              THE COURT:  Well, I disagree with you about that and

8    I didn't ask you about that.

9              MR. ROGOW:  You asked me about --

10             THE COURT:  I really want to get to the relevance of

11   this testimony and why it would be irrelevant, that -- that's

12   the threshold issue I have to determine with 404(b) evidence,

13   before we get to whether it's prejudicial and all these other

14   issues.

15             So, why doesn't it bear on whether he was telling the

16   truth when he said that he was just making a mistake when he

17   talked about communicating with the campaign about WikiLeaks?

18             MR. ROGOW:  It is irrelevant because this was not the

19   scope of the investigation.  The scope of the investigation was

20   Russian interference.  That is clear from every aspect of the

21   House Committee four pillars of their investigation and what

22   they were doing, what they were looking for.  They were looking

23   for Russian interference.  They were not looking for

24   communications with the campaign.  So it's not relevant from

25   the very get-go.  The House --

1           THE COURT:  I'm not talking about whether it was

2      relevant to the campaign -- to the -- what the House was doing.

3           My question is:  If he lied to the House about

4      communications, as he allegedly did, why isn't that relevant to

5      the question of whether he lied to the Committee about other

6      communications?

7           MR. ROGOW:  Well, in a grand scheme of things, one, I

8      guess, could say that there is some relevancy to it.  But the

9      relevancy to it, one, is outweighed by the prejudice.  And the

10     argument that you're hearing, that he went in with a scalpel

11     to -- to lie to the Committee with this one question --

12          THE COURT:  I think he said he didn't, that was his

13     point.  That he did not go in with a narrow focus to lie only

14     about WikiLeaks, it was broader.  I believe you missed a "not"

15     in his sentence, but that's okay.  We don't have to worry about

16     his imagery, we're talking about the relevance of the

17     information.

18          MR. ROGOW:  So I -- I start with, as I started

19     before, the relevance is what was the House investigation

20     about?  And I know you've already heard me say that, so I'm not

21     going to repeat myself on that.

22          But I don't think it's relevant from the get-go,

23     because the House investigation was about Russian interference.

24     It was not about communications with the campaign.  That was

25     not one of the areas at all that they enumerated in terms of

1   their investigation.

2   　　　　THE COURT:  So that maybe goes to the question of

3   whether lying in response to that answer was material and

4   actionable.  And so whether it rises to the level of other

5   crimes evidence, because there may not have been a crime

6   because it wasn't material.

7   　　　　Would that be a fair statement of what you're saying?

8   But --

9   　　　　MR. ROGOW:  Relevance -- what they're doing is they

10  are building on this in terms of trying to get to the four

11  statements that they found to be false statements and are the

12  heart of the indictment.  And so, you know, when you do this

13  it's hard to separate out sometimes relevance from prejudicial.

14  There are a lot of things that may be relevant, but they would

15  be prejudicial, and that's why I started --

16  　　　　THE COURT:  So maybe articulate for me what the

17  prejudice is here.  Why is it unduly prejudicial?  Why is the

18  probative value substantially outweighed by the prejudicial

19  value, which is the test under the Federal Rules of Evidence?

20  　　　　MR. ROGOW:  And I think that the argument you just

21  heard helps my argument:  That they are using this as the

22  raison d'être for everything else that they've charged being

23  false, something that they did not charge as being false.

24  That's the danger of this, to -- to bring into the case -- and

25  not only to bring into the case, a question and answer that

1    then opens the door for them to argue that the rest of the

2    answers that they are -- that they've indicted Mr. Stone for

3    are false.  And so, they use this as a building block.

4            If they had indicted him for it, that would be one

5    thing.  They didn't indict him for it, that's why I thought

6    that your question was appropriate to them.  If they thought it

7    was a lie, why not?

8            So they didn't do it because now they come back and

9    they say, maybe we need something more to bolster it.  And they

10   want to bolster it with this question and answer which, of

11   course, then opens the door to a whole other issue, because

12   talking to a campaign about a PAC is not illegal.  Coordination

13   by a PAC with a campaign is illegal.  So now the door is open

14   to this whole issue --

15           THE COURT:  No, they're not seeking to argue that the

16   communications were illegal.  They're seeking to argue that

17   when he denied them, he was lying to the Committee.  And if

18   there's any doubt about that, if this information comes in, the

19   jury will be so instructed.

20           MR. ROGOW:  Well, the question is:  Did you ever talk

21   to anyone on the campaign about your work with the PACs?  So

22   that opens the door to this.  I have to defend it.  I have to

23   say that this is a true answer, it's not a false answer.

24   Because talking to them about work with the PACs, saying I'm

25   working with the PAC is not illegal.  Coordinating with a PAC

1    is illegal.

2           So, now we get into the difference between PACs and

3    other organizations, and what the rules are with regard to

4    that.

5           THE COURT:  No -- okay.  Go on.

6           MR. ROGOW:  So the door -- the door is now open to a

7    much larger scope.

8           THE COURT:  All right.  I understand you made that

9    argument in your pleadings, but that one, I don't -- I'm not

10   persuaded by.

11          All right.  I have a couple more questions for the

12   Government.

13          One of the things they argue -- the Defense argues in

14   their opposition is that to be a false statement it has -- it

15   can't be literally true.  So, who is it that you're planning to

16   prove that he talked to?  Because the question was:  Did you

17   talk to anyone on the campaign about your work with the PAC?

18   And he said, no.  So, if that answer is literally true, then it

19   can't be portrayed as another false statement.

20          So, who is it that you're saying he did talk to on

21   the campaign?

22          MR. MARANDO:  Your Honor, it's not literally true.

23   And I can give you the names of the individuals that he

24   discussed this with.  I could give it at the bench, Your Honor.

25   These are potential witness names, and I would rather not put

1  that on the record.  I can approach under the husher, but what

2  I can tell you is the highest level of the Trump campaign, he

3  sent emails and had communications with regarding his PAC-

4  related activities.  And we have emails that prove this, and we

5  have a witness that would also -- that would also corroborate

6  this, Your Honor.

7          THE COURT:  Are those -- have they been marked as

8  exhibits?

9          MR. MARANDO:  They are, Your Honor.  They're in the

10  exhibits.  And I don't have the exhibit numbers offhand, but

11  they're in the binders that we provided to Your Honor.  There's

12  a section in the exhibit binder around 170 that discusses this

13  sort of -- this sort of evidence, Your Honor, where he was

14  discussing these PACs.

15          THE COURT:  All right.  Well, when I asked you

16  earlier if -- if these were -- if this was false testimony,

17  would it have been material, and you've checked into the

18  relevance of my question.  Now you get to answer it, because

19  doesn't that bear on whether it even falls within 404(b),

20  whether it is uncharged misconduct?  Whether it's misconduct?

21          MR. MARANDO:  Well, Your Honor, materiality would be

22  relevant if we were going to go to trial on this, right?  And

23  if we were to -- if we had charged this, we would have to prove

24  that -- that he lied on this and that the lie was material,

25  right?

1          Your Honor, we're trying to show a simple fact, that

2    he was asked a question of whether or not he communicated in

3    any way with the Trump campaign regarding his PAC-related

4    activities, and we have emails that say -- that show that he

5    did.  Now, look, in congressional testimony congressmen,

6    congresswomen will ask questions of witnesses that are maybe

7    outside of the four corners of -- of what the scope of the

8    inquiry is.

9          So, for instance, they might ask Mr. Stone questions

10   about what his relationship is with the President.  Okay?  If

11   he had lied with that and said I just met him last week, we

12   would want to introduce that as 404(b).  If he said I never met

13   the man, we probably would want to introduce that as 404(b).

14   If he lied about any sort of business dealings he had with the

15   President, we might want to introduce that because it's showing

16   that he's going in with the mindset to lie, just like

17   Ms. Lavelle did in *Lavelle*.

18         So the materiality of this question really misses the

19   point, Your Honor.  The point is that we have to prove this

20   man's intent, and did he go in there with the intent to lie,

21   right?  Whether he met the legal standard to prove a chargeable

22   crime here is really irrelevant under 404(b), Your Honor.  If

23   that were the case, 404(b) wouldn't apply to a whole host of

24   pieces of evidence, Your Honor.  We're just talking about

25   relevance to intent, lack of mistake, lack of accident.

1    Mr. Stone, on numerous occasions following our indictment, went

2    on the press and basically said this was a mistake.  I made a

3    mistake when I said that I didn't have any text messages, I

4    made a mistake when I said I didn't communicate with anybody

5    about WikiLeaks.  But, lo and behold, he made a blatant lie

6    that is totally undercut by the documentary evidence that we

7    have, and it's a lie that goes to the heart of this case, Your

8    Honor, which was his connections with the campaign and what he

9    was doing.

10          THE COURT:  All right.  Okay.  All right.  I don't

11   think I have any more questions.

12          I don't think that the transcript reflects -- the

13   transcript of the hearing reflects that the defendant was

14   uncertain, as he claims in his opposition.  He may have been

15   uncertain about which organizations were PACs and which were

16   still in existence at the time, but he was definitive when he

17   answered the question:  Did you ever talk to anyone on the

18   campaign about your work with the PAC?  Answer:  No, because

19   coordination is illegal.

20          So the answer was not only definitive, he explained

21   it.  The defendant told the Committee why his answer was no.

22   So, I'm not persuaded by one of the arguments that the defense

23   made in opposition to this motion, that the answer was unclear.

24   I think "no" is about as clear a no as a person can give.

25          Nor do I find it persuasive that in endeavoring to

1    show that the "no" was false would somehow implicate the FEC

2    rules governing PACs or defendant's First Amendment rights.  He

3    was either telling the truth when he said "no," or he wasn't,

4    and the jury can be instructed that it shouldn't consider

5    defendant's statement about coordination as suggesting that it

6    would have been illegal if he did talk.  This is something he

7    injected into the conversation, it's not something the

8    government is trying to inject into the case.  The government

9    is not suggesting that the coordination is the bad act, or that

10   talking to the White House is the bad act; just lying about

11   whether you talked to the White House.

12            So once again, this trial is not going to be about

13   the defendant's First Amendment rights, notwithstanding his

14   dogged efforts to turn it into a discussion of that topic.

15            I do find that there is some probative value here,

16   but I think it's less than the government is suggesting that it

17   is.  I am concerned that it's likely to require additional

18   testimony and evidence on an issue that's largely collateral.

19   Although, the defendant could open the door to this if he

20   insists at trial that he was not in communication with the

21   campaign.

22            I'm also a little concerned about making the trial

23   about who Mr. Stone was supporting for President, as opposed to

24   whether he lied.

25            However, I don't find the prejudicial aspects of this

1    testimony to be particularly heavy or to substantially outweigh

2    the probative value.  So, I think it's a very close balance

3    here, because we have some relevance and limited -- limited

4    prejudice and some concerns about expanding the trial beyond

5    what it should be, which I do think is a risk the government

6    needs to think about at all times.

7            I would like to now, having heard both sides, review

8    the *Lavelle* decision.  And so, I'm going to -- I think I've

9    heard enough from everybody, but I'm going to take this one

10   under advisement and let you know what my ruling is and not

11   rule on it today.

12           The government has filed a motion in limine regarding

13   evidence of Russian interference in the campaign, it's Docket

14   153, defendant opposed it at 168.  The government replied at

15   185.  It seeks to exclude any evidence or argument about

16   Russian involvement in the hacks of the DNC and DCCC computer

17   systems, as well as the allegations or argument concerning

18   coordination between Russia and any individuals associated with

19   the presidential campaign.  This is related and substantially

20   overlaps with the defendant's motion in limine, Docket 158,

21   which was opposed at 172, and the reply was at 170 -- 190,

22   seeking to introduce evidence about whether it was, in fact,

23   the Russians who gave the documents to WikiLeaks, and so I'm

24   going to rule on those together.  And I'm going to grant the

25   government's motion in limine and deny the defendant's.

1          The Defendant argues correctly that the government is
2    bound to prosecute the crimes charged in the indictment, and no
3    others, and the defendant is permitted to defend against them
4    and to introduce evidence that is material to his defense.

5          The defendant's pleading is long on the boilerplate
6    law on the subject, and much thinner as to why this evidence
7    could be material or relevant to his defense.  This indictment
8    does not charge Roger Stone with conspiracy related to the
9    hacking, or anything else.

10          Stone says, in his opposition to the motion in
11   limine, in Docket 168, quote, Having alleged Russian
12   interference in the indictment and expressed an intent to
13   introduce a video from Julian Assange saying he had the emails,
14   the government has made apparent the need for Stone to defend
15   himself by establishing that the construct of the investigation
16   and the case against him is built on an unsupportable
17   foundation.

18          He also says, quote, The government has taken a
19   position in the indictment that Russians and Assange and Wiki
20   are relevant to the charges against Stone and that, in effect,
21   the Russians and Assange and Stone are all lying.  This
22   argument is completely unsupported by a reading of the
23   indictment, which does not at any point allege Russian
24   interference or lying by Russia, or anyone other than Roger
25   Stone.

1            The indictment alleges, in Paragraph 7 on Page 2,

2     that after the defendant had publicly and privately claimed to

3     have communicated with WikiLeaks, and after the election, the

4     House Permanent Select Committee, the U.S. Senate Select

5     Committee and the FBI all opened or announced investigations

6     into Russian interference, quote, which included investigating

7     Stone's own claims of conduct.

8            The Russians aren't mentioned again until you get to

9     Paragraph 18 on Page 9, at which point the indictment alleges,

10    quote, In or around 2017, government officials publicly

11    disclosed investigations into Russian interference in the 2016

12    U.S. presidential election and possible links to individuals

13    associated with the campaign.  And subparagraphs A, B, C, and D

14    of that paragraph list investigations that were undergone by

15    the Senate, the House, the FBI, and the grand jury.

16            The only other time the Russians are mentioned is on

17    Page 10, Paragraph 20, which is a quote from the defendant's

18    own opening statement when he appeared before the Committee,

19    and he said, quote, These hearings are largely based on a yet

20    unproven allegation that the Russian state is responsible for

21    the hacking of the DNC and the transfer of that information to

22    WikiLeaks, close quote.  The rest of the indictment then goes

23    on to detail the testimony alleged to be false and the basis

24    for the allegation that each statement is false.  Russia does

25    not appear again ever in the indictment through its end at

1   Paragraph 45, on Page 23.

2          In other words, the Defense is seeking to import the

3   Russian interference allegations that prompted the

4   congressional investigation into the indictment, but they are

5   not there.

6          The government is not required to prove here that the

7   answers to the national security and intelligence-related

8   questions the Committee posed in undertaking its investigation,

9   even if they were described in stone in the letter asking him

10  to appear.  It has not charged him with making a false

11  statement with respect to any of those matters.  He is not

12  charged with lying when he said it was unproven that the

13  Russian state is responsible.

14         There is a separate case in which a number of Russian

15  nationals have been indicted in this court for offenses related

16  to alleged cyber operations that involve the staged releases of

17  documents stolen through computer intrusion.  This means the

18  grand jury found probable cause to believe that those

19  individuals were involved, but it goes without saying they are

20  presumed to be innocent.  And if they wish to contest the

21  charges and appear, the government will be put to its proof,

22  and it must prove them guilty beyond a reasonable doubt.  But

23  this is not that trial, and we are not going to have that trial

24  in this courtroom until the defendants are present.

25         The defendant has opined on the matter in public, and

1   he will be free to do so in the future in the appropriate

2   forum, but that forum is not this courtroom.  And during this

3   trial, the identity of the hacker, the existence or

4   nonexistence of coordination with Russia, while it may have

5   been important to the Committee, it's irrelevant to any issue

6   to be decided or the elements of any offense charged.  The only

7   conceivable purpose for introducing the issue would be to

8   distract, confuse the jury, to invite nullification, or to

9   misuse these proceedings as an opportunity to disseminate the

10  defendant's views.

11        Mr. Stone says, at Docket 158, on Page 7, Stone will

12  present witnesses who can testify and demonstrate to the jury

13  that WikiLeaks did not receive the relevant stolen data from

14  the Russian state.

15        If a jury were to conclude that was the case, then

16  the same jury could conclude that Stone's answers to the stated

17  questions do not meet the element of materiality of the perjury

18  statute under 18 U.S. Code Section 1001.  I am not -- don't

19  think it's clear that the experts he has proffered who say that

20  a thumb drive was involved in the transmission of documents to

21  WikiLeaks goes so far as to eliminate any role by Russian

22  nationals in the intrusion that obtained the documents.

23        But even if they do, with respect to materiality, as

24  I set forth in the opinion denying the motion to suppress with

25  respect to the law enforcement agents, the Committee had a

1   legitimate interest in learning whether there were

2   communications or coordinations with U.S. citizens, the

3   campaign concerning the release of stolen emails by WikiLeaks,

4   no matter who stole them.

5          Were they released at anyone's request?  Was the

6   timing random or was it coordinating?  If Stone had such

7   communications, knowing who he spoke to and when and what

8   could -- and about what, could reasonably have led the

9   Committee to the discovery of facts related to who obtained the

10  emails in the first place, or who provided them to WikiLeaks.

11  Even if what he did or didn't -- even if what he did or knew

12  didn't show it was the Russians, truthful testimony could have

13  simply directed the Committee to others with knowledge.

14         This was an investigation.  Even with respect to the

15  foreign interference or hacking itself, what matters for

16  purposes of materiality is what the committee was investigating

17  when Stone testified, not what conclusions it ultimately

18  reached later or the conclusions of others that were submitted

19  to it.

20         Nothing Stone seeks to introduce undermines the

21  Committee's statement to him about what it was looking into.

22  There's no law to suggest that the Committee was strictly bound

23  by those questions, and that it didn't have a legitimate

24  interest in asking about how or why the materials got released

25  after they were stolen.

1          Chairman Nunez notes in his statement that the

2     Committee provided to Stone that the Committee would follow

3     every lead, wherever it led.  Definition of materiality is

4     whether something has a natural tendency to influence or is

5     capable of influencing either a discrete decision or any other

6     function of the agency to which it was addressed.

7          Actual reliance is not required, the issue is whether

8     the statement had the capacity to influence, the capacity to

9     impair the agency's function, including the investigative steps

10    that might be taken later.  The jury will be so instructed per

11    *United States versus Moore*, 612 F.3d 698, from the D.C. Circuit

12    in 2010, and *United States versus Hansen*, 772 F.2d 940, from

13    the D.C. Circuit in 1985.

14         While the defendant will be completely free to argue

15    that the government has not proved this element beyond a

16    reasonable doubt, it is absolutely not necessary to that

17    analysis whether the investigative body or anyone else later

18    proved what it had set out to investigate at the end of the

19    day.

20         The defendant suggests, well, maybe it goes to his

21    intent because he didn't think the questions were material

22    because he didn't believe the Russians did the hacking.  It's

23    not clear that the defendant even had the access to the

24    evidence that he now wants to introduce concerning his intent

25    at that time.  But more important, this doesn't undermine the

1    knowing and willful element either.  A defendant acted

2    knowingly if he acts knowing that the statement he made was

3    false, fictitious or fraudulent at the time he made it.  That's

4    it.

5            So for those reasons the government's motion in

6    limine is granted, and the Defendant's is denied.

7            The government also moved in limine to exclude

8    certain evidence regarding the investigation of the

9    prosecution, it's Docket 154.  The defendant opposed it at 169,

10   and there was a reply at 188.

11           The government raised the following issue, it said:

12   In both his public statements and several filings in this

13   court, Stone has made a number of allegations of misconduct

14   related to the investigation and prosecution of this and

15   related cases.  These include allegations of wrongdoing by the

16   Intelligence Committee, the FBI, the Special Counsel's Office,

17   and members of Congress in investigating Russian interference

18   in the 2016 presidential election and related matters.  These

19   also include allegations of misconduct concerning the

20   government's decision to investigate the matters charged here

21   and to prosecute Stone, as well as the circumstances of Stone's

22   arrest.

23           I don't believe any of that is relevant or

24   admissible, especially in light of my ruling on the Russian

25   interference and hacking issue, my previous rulings on

1    selective prosecution, and the fact that the defendant's

2    motions to suppress raise absolutely no challenges to the

3    manner in which the search was executed.

4           Well, the defendant responded to the motion, and what

5    he said was the government's motion is premature, at least at

6    the time it was filed, and he reserved the right to present

7    evidence of mistakes or wrongdoing by government agencies,

8    members of Congress, or investigatory methods.

9           So my question for the defense is:  What does that

10   mean?  You can't respond to a motion in limine by saying, well,

11   maybe I will and maybe I won't.  It may have been the case that

12   the motion came early at the time it was filed; you said the

13   Court shouldn't rule on it until closer to the trial when we

14   know what the evidence is going to be.  But you have all the

15   discovery and you have the exhibit list, and no one, after the

16   pretrial statement was filed or -- between then and today, the

17   pretrial conference, when I said I was going to rule on these

18   motions, has given me any more information about your response

19   to the motion in limine.

20          So my question for the defense is:  What are we

21   talking about?  Are you proposing to introduce evidence of

22   misconduct related to the investigation and prosecution of this

23   case by either the intelligence community, the FBI, the Special

24   Counsel's Office, or members of Congress?

25          MR. ROGOW:  Your Honor, if Mr. Corsi testifies, there

1    will be a need to go into the situation with Mr. Corsi, why he

2    was offered a plea agreement, the circumstances under which the

3    plea agreement was initially agreed to by him, his response to

4    the plea agreement, and the nature of the investigation in

5    terms of how it handled Mr. Corsi.  So, that is the focus of

6    our prematurity argument.

7            We don't know what Mr. Credico is going to say.  We

8    don't know what Mr. Credico may offer, other than material that

9    has been given to us by the government.  But that, too, may

10   take us into the nature of the government's investigation.  So,

11   that is why we said it is premature at that point, and we were

12   preserving that objection because I could see that if it goes

13   the way it may go, if Mr. Corsi is to testify, using him as the

14   example, or Mr. Gates, or Mr. Bannon, there may be a need to

15   get into the nature of the investigation and the things that

16   were said to him.

17           THE COURT:  Now, explain to me, Mr. Gates, you have

18   all the information to cross-examine him about, you're

19   certainly fair to cross-examine him to everything he pled

20   guilty to, that he hasn't been sentenced yet, that -- that

21   there are a number of crimes he's not being charged with;

22   typical, classic cross-examination of a cooperating witness.

23   There's no suggestion whatsoever that you're not going to be

24   permitted to cross-examine him as to bias because of those

25   circumstances.  But that's different than saying that there's

1      something infirm about the investigation itself.

2              What are you talking about when you're talking about

3      what could come up if Bannon testifies or Gates testifies?

4              MR. ROGOW:  What could come up are representations

5      made to Bannon during the course of the investigation with

6      regard to perhaps his exposure, depending upon what he says.

7              The same thing with Gates.  I read the Gates

8      cross-examination in the case that you tried two weeks ago, so

9      I understand the scope of that.  But, it could be broader.  And

10     with Mr. Corsi, we have no idea what may happen with regard to

11     Mr. Corsi.

12             So the only point that we're making is these are

13     objections that should be preserved, and when the time comes at

14     trial, if there is a need --

15             THE COURT:  Cross-examining a witness as to promises

16     made in return for their cooperation is not misconduct related

17     to the investigation of a prosecution of a case.  It is typical

18     prosecution conduct, which is grist for cross-examination and

19     absolutely fair game.  But that is different from saying we're

20     going to try the investigators here.  We're not going to try

21     the investigators here, or the investigation.

22             MR. ROGOW:  In the course of cross-examining

23     someone -- and I understand and I agree with Your Honor about

24     the grist of cross-examination with regard to a cooperating

25     witness -- but it may come into a situation in which it's

1    necessary to castigate the conduct of the investigators that

2    were extracting the plea agreement; for example, promises that

3    were made.

4            So I didn't want to run into a problem where Your

5    Honor says, no, you can't go there.  And so the nature of our

6    motion is basically not to investigate the investigation, but

7    in these specific --

8            THE COURT:  Well, that certainly seems to have been a

9    big part of what you were hoping to do.

10           MR. ROGOW:  But, you know -- but in terms of the

11   focus, and I think that we've spelled out in our response --

12   or, in our motion, some of the areas in which we thought there

13   was a need to address these things.  But it's, again --

14           THE COURT:  All right.  Well, there were very narrow

15   ones laid out, and I'm going to talk about those.

16           Is there anything else specific you want to tell me

17   that you have in mind, now that you have read all of the --

18   you've received all of the information, you've received the

19   Jencks, with the exception of the redactions that we'll talk

20   about later, but otherwise you've received the testimony

21   that -- what these people are expected to say at trial.  You

22   know all that.

23           MR. ROGOW:  Yes.

24           THE COURT:  You've got the grand jury testimony.

25           MR. ROGOW:  Yes.

1          THE COURT:  And you've been provided with the *Brady*

2     information, the *Giglio* information about any plea agreements

3     or promises or offers; is that correct?

4          MR. ROGOW:  Yes.

5          THE COURT:  So you know -- you can cross-examine

6     these people tomorrow if you had to, so you know what you're

7     planning to do.  So, are you planning to castigate the

8     investigators, or not?

9          MR. ROGOW:  Certainly with Mr. Corsi I would be, if

10     Mr. Corsi testifies.  And, you know, what I know now doesn't

11     necessarily mean that's the way it will play out at the trial,

12     and so all I'm doing here is preserving this issue.

13          If Your Honor thinks I was too broad in the motion in

14     terms of what I wanted to preserve, I understand that.  But

15     what I'm saying is, and laying the groundwork for, is there may

16     be a need to get into, in effect, trying the investigation,

17     trying the investigators.  But I can't tell you exactly how

18     this testimony is going to play out.

19          Yes, I know what they said.  I know what the 302s

20     are.  I know what the *Brady* information is that's been given

21     us, but that -- that is not necessarily the whole, complete

22     story.  So all I'm doing is saying let me have some latitude,

23     if the need for that latitude arises.

24          THE COURT:  Well, it is usually my hope that through

25     motions in limine and through the pretrial conference, we flesh

1    out issues that keep us from having heated arguments in front

2    of the jury.  So -- or long bench conferences that delay the

3    trial.

4            Obviously, things are going to come up in trial that

5    we're going to have to talk about during the trial, and -- but

6    the reason both of you have filed these motions is to try to

7    get some clarity up front, and that's what I'm trying to do.

8    So I'm going to do the best I can right now in responding to

9    this issue, unless there's anything further you want to say

10   about it.

11           MR. ROGOW:  Nothing further, other than we have, by

12   Your Honor's rulings, narrowed the issues in this case in terms

13   of what we have presented.

14           THE COURT:  Okay.  All right.  You can have a seat.

15           With respect to Mr. Corsi, Mr. Credico, or any other

16   witness, if there is evidence of an agreement by the government

17   to forego prosecution in return for cooperation, that is *Brady*

18   material, that is *Giglio* material and is fair

19   cross-examination.

20           Also, it would be fair cross-examination if you have

21   a factual basis to ask Credico if information that he was aware

22   of at the time about how prior hearings were conducted was what

23   actually motivated him to decline to appear.  Otherwise, if

24   it's your contention that the question of why Corsi wasn't

25   charged may become a subject of both evidence or argument, or

1    why Credico or anyone else was or was not charged, you're going

2    to need to provide me with authority explaining why, before you

3    answer a single question or make a single argument along those

4    lines.

5              Similarly, if you're of the view, as you indicated in

6    your pleading, that other witnesses' testimonies present reason

7    for questioning the government's conduct of the investigation

8    and prosecutorial decisions or alleged violations of House

9    rules by members of the Committee are a proper subject of

10   evidence and argument, that has to be supported in writing in

11   advance before it comes out of anyone's mouth on the defense

12   side.  If not, you'll be in violation of a Court Order because

13   I'm granting the government's motion in limine.

14             The defendant may not cast aspersion on the

15   prosecution's decision-making in declining -- in deciding to

16   prosecute Stone, close quote, or attempt to relitigate his

17   unsubstantiated selective prosecution claim in front of the

18   jury.  You may not question the government's conduct in the

19   investigation.  The only investigation at issue here is the one

20   before the HPSCI.  And you may not present evidence or argument

21   regarding violations of House rules.

22             To the extent you become persuaded at some point

23   during the trial that these issues have become relevant, you

24   can certainly seek reconsideration with some legal support.

25   And before the question is asked in front of the jury you have

1    to come to me and say, Your Honor, the door has been opened to

2    X, Y, Z, and tell me specifically what you want to do and why

3    it's admissible.

4        But I've already ruled that the defense has not

5    established selective prosecution in this case, so selective

6    prosecution is not an issue in this case.  That's a very

7    different question than whether a witness has a deal with the

8    government or the witness is not being prosecuted because the

9    government has made him a promise, which you are allowed to ask

10   about.

11       So, do you understand how we're going to proceed on

12   this, Mr. Rogow?

13       MR. ROGOW:  I do.

14       THE COURT:  Okay.  Now, we have a government motion

15   in limine to admit the creation or upload dates of videos under

16   Federal Rule of Evidence 902(11) and 803(6), Docket 155.  The

17   defense responded at Docket 170.

18       The government took the position that these are

19   self-authenticating business records, and the defendant did not

20   object to the veracity of the business records but reserved its

21   right to object to the admissibility of the videos themselves

22   or to the government's timeline.

23       And, so, I'm granting the motion as to the creation

24   and upload dates, since that's all the motion related to, but

25   note that it is not a ruling on the admissibility of any

1 | particular exhibit, that will be taken up when we get to

2 | exhibits.

3 | All right.  Now we have the government's motion in

4 | limine to introduce a clip from *The Godfather Part II*, it's

5 | Docket 156.  It was opposed at 171, and there's a reply at 186.

6 | The purpose is to show what the defendant was

7 | referring to when he allegedly said that Person 2 should do a

8 | Frank Pentangeli before the Committee.  The indictment alleges,

9 | in Paragraph 37.e., that Mr. -- is it Pentangeli?  I keep

10 | getting the accent wrong.  Pentangeli, is that it?

11 | MR. ROGOW:  Yes.

12 | THE COURT:  All right -- is the character in *The*

13 | *Godfather Part II*, who when testifying before a congressional

14 | committee, claimed not to know information that he in fact

15 | knew, that's how the indictment has described it.

16 | For purposes of Federal Rule of Evidence 401, it's

17 | certainly relevant to the Defendant's intent in making the

18 | statement to the witness, how the witness understood it.  If

19 | the movie is part of their shared shorthand and vocabulary, it

20 | bears on their shared understanding, it bears on the elements

21 | of the obstruction count and the witness tampering count, which

22 | would generally permit its admission under Federal Rule of

23 | Evidence 402.

24 | However, the defense has raised a not insubstantial

25 | concern of prejudice arising out of likening him to Michael

1    Corleone, a fictional Mafia figure, but a well known Mafia

2    figure nonetheless.

3         I believe that this concern may be a little bit

4    overblown.  I'm not sure that the point of introducing the clip

5    is to liken the defendant to Michael Corleone, he's the one to

6    suggest that.  The point appears to be to liken the witness to

7    the witness in the movie and the course that the witness

8    followed.

9         And it is true that to the extent this imagery or

10   this metaphor has been injected into the congressional hearing

11   in this case, it was allegedly injected by the defendant.  But

12   showing the movie itself carries some risk of prejudice, and

13   even if I could ameliorate that to some extent with a limiting

14   instruction, I also have a serious concern that airing the clip

15   could be distracting and misleading to the jury, that the jury

16   could give it undue weight, and that its introduction could run

17   counter to the seriousness I have been consistently insisting

18   upon in connection with these proceedings.

19        And so all of this supports exercising my discretion

20   to exclude it under Rule 403 at this time.

21        So, my first thought and question is:  Is this

22   necessary?  The witness could testify to his familiarity with

23   the film, defendant's pension to quote the film, the mutual

24   understanding of who the witness was and what the reference

25   meant to the witness who heard it -- who the witness was in the

1   movie and what it meant to the witness testifying in court.

2          It's somewhat similar to when a witness gets to

3   testify about the use of coded language in a drug deal and what

4   it meant to him.  The parties could work to craft a stipulation

5   that states something along the lines of exactly what's in the

6   indictment concerning the events in the movie, and I would

7   strongly encourage you to consider doing that.

8          Of course, the defendant has -- doesn't have to

9   assist the government in proving its case at all and I can't

10  make it stipulate to anything, but declining to stipulate could

11  increase the necessity for the evidence.  The government could

12  introduce a transcript of the key scene.  The point is the fact

13  that the witness didn't testify and that Person 2 knew that

14  when the reference was being made to him.

15         Although, it does seem to me that if the witness's

16  characterization of the movie, his representation of what the

17  reference was supposed to mean to him is attacked, either in

18  opening, during cross, or if the defense testifies and disputes

19  it, and potentially if the defendant is not willing to at least

20  forgo disputing the meaning of the reference and whether it's

21  been proved in closing, then the door could be opened and the

22  proof could be necessary, either during cross of the defense or

23  in rebuttal.

24         So, does anyone think this problem can be solved with

25  a stipulation?

1            MR. ROGOW:  We --

2            MR. JED:  May we be heard, Your Honor?

3            THE COURT:  Yes.  I read what you wrote.

4            MR. JED:  Thank you, Your Honor.

5            Obviously, if the Court asks us and the defense to

6    work on a stipulation, we will work with them in good faith to

7    do so.  I do just want to say there's something very important

8    that is captured by seeing the film clip, rather than reading a

9    transcript or having a stipulation of its meaning, which is in

10   contrast to something like a code word or piece of terminology

11   that a drug dealer might use.

12           Here, our point is that referencing the film clip

13   actually conjures that image in the recipient of the message's

14   mind, and so to see that film clip is the best evidence and in

15   some sense the only evidence of what that actual image is.

16           And I should point out, to the extent that evidence

17   is going to come in, that this is a film that concerns the

18   mafia or sort of anything like that, then actually the other

19   side's concern about prejudice are happening either way.  In

20   fact, actually by seeing the film clip, which does not involve

21   any violence, it doesn't leave jurors, maybe some of whom have

22   seen it and some of whom haven't, wondering what else has been

23   concealed by not actually providing the transcript to them.

24           And, finally, I should just say, of course, that

25   limiting instructions are the kind of classic tool used to

1    address the concerns that the Court is asking about.  But, of

2    course, if the Court determines that a stipulation is

3    necessary, we will do our best to work with the defense on one.

4            THE COURT:  All right.  Does the defense want to say

5    anything further?  I mean, I did read what you wrote and I have

6    some concerns, but the relevance is unquestionable and the fact

7    that there is some prejudicial value is also true.  Again, you

8    have to weigh one against the other.  And I think a lot depends

9    on what happens during the direct and cross of this witness.

10           It's arguable that the defendant has already opened

11   the door to the introduction of this testimony by allegedly

12   making the statement, and by disputing what it means.  But, it

13   certainly seems to me that if the witness's characterization of

14   it is attacked, that the government really would have no way to

15   respond without the movie itself.

16           So what would you like to say?

17           MR. ROGOW:  I would like to say that I notice in the

18   government's motion they did not include the clip.  We included

19   the clip in our response so you could see the actual visual,

20   which is very powerful and very prejudicial.  And I think the

21   question you asked was:  Can we work something out, as I

22   recall.  Did I mishear that when you --

23           THE COURT:  Well, I would certainly be interested in

24   knowing whether that's something the defense is willing to

25   entertain.

1          MR. ROGOW:  And the answer to that is yes.

2          THE COURT:  All right.

3          MR. ROGOW:  And so I think given that, I think at the

4    moment you might hold that in abeyance or reserve ruling on

5    that.  But certainly the way it stands now, it would be unduly

6    prejudicial.  But I understood Your Honor's request -- Your

7    Honor's question and we're prepared to deal with it.

8          THE COURT:  All right.  Then what I'm going to do is

9    defer ruling on the motion now, to see if there's a way to

10   obviate the issue, see if there's something that can satisfy

11   the government, at least for the beginning of its case.

12         I will consider, even if I ultimately deny it, if the

13   stipulation is agreed, I will consider that ruling would be

14   without prejudice to my consideration of a renewed motion,

15   either before the government rests or at any point it believes

16   the door has been opened during the defendant's case.

17         I take your point, Mr. Jed, about how a picture is

18   worth a thousands words, but that also gives this evidence

19   maybe more weight than other evidence.  And that's my concern,

20   that the unusual nature of it and the production quality of it

21   and the excitement of it, all of it, could tend to give it

22   undue importance in the trial, when really the point is -- the

23   point was clearly made in a perfectly vanilla paragraph in the

24   indictment.

25         So, I first want to give you two a chance to -- to

1    see if you can come to something that satisfies the government,

2    and say that you're willing to withdraw the motion for right

3    now, with the request to renew it at any time, without

4    prejudice.  Or if you want to continue with the motion, even if

5    you have the stipulation, then I'm going to defer ruling until

6    I see what the stipulation is, and probably until I see the

7    testimony of the witness that it pertains to.  And I will

8    review the clip again in the meantime.

9           And so, I think in your opening you can say this is

10   what it means, but you don't need to promise the jury that

11   they're going to get to see it, because I don't believe it will

12   be clear at that point that they're going to get to see it.

13          All right.  I think I've now talked about every

14   pending motion.  I want to give you a couple other than the

15   ones we have to do with a sealed courtroom.

16          I want to talk to you a little bit about trial

17   procedures in general.  It would be my hope that you would

18   assign one lawyer per witness who handles the objections, who

19   handles the questions.  I don't want multiple people hopping up

20   and down.

21          For openings and closings, I believe the trial

22   lawyers should be able to get out from behind lecterns and be

23   real trial lawyers and talk to juries.  So you do not have to

24   be wired to the lectern for either your opening or closing.  We

25   have body mics, and if you choose to use them, you can use

1    them.

2          Objections, you need to stand up because sometimes

3    I'm really focused on the witness or the person asking the

4    question, and if you just say objection from a seated position,

5    particularly given the odd configuration in this courtroom, I

6    may not be aware you objected.  So stand up, say objection and

7    then one word, compound, form of the question, something.  You

8    may not say, objection, Your Honor, he's trying to get him to

9    say blah, blah, blah.  I don't -- no speaking objections.  If I

10   can't rule based on the question and the objection, I will ask

11   you to come to the bench and explain further.

12         The point of the exercise that we're going to go

13   through ruling on the exhibits is so that anything that I've

14   ruled is in evidence, is in evidence.  You can refer to it as,

15   Mr. Witness, I'm about to show you Government's Exhibit 3.  You

16   don't have to mark it, ask what is it, any of those sorts of

17   things.  If it's in, it's in.  And so, that should make things

18   a lot smoother during the trial.

19         If you need to approach a witness to give them a

20   document, you don't have to ask my permission each time you

21   want to wander away from the lectern and walk up to the

22   witness.  You can just go.

23         We have newish technology in the courtroom for

24   presenting your exhibits to the jury, so they can appear on the

25   screens.  You can't see them right now, they're all folded

1   down, but the jury has screens in the jury box and I have a

2   screen up here, and you'll both have them on your table.  So if

3   you want to use all of that equipment to put on your evidence,

4   you're welcome to confer with John Cramer from the Court, or

5   Mr. Haley, and set up an opportunity to come in here and

6   practice and make sure that you know how to use the equipment

7   and everything works smoothly.

8          So if you just go through Mr. Haley, we can make sure

9   that that all works.

10          I don't think, even if we talk about the government's

11   exhibits right now, that we're going to finish this pretrial

12   conference today, because we're not going to talk about the

13   defense exhibits right now because I am not prepared.

14          And so, one question could be when can we do pretrial

15   conference part two?  So, I could propose October 30th in the

16   afternoon, the 29th in the afternoon is less good, or November

17   4th, if you're all coming here over the weekend anyway.  So,

18   does anybody have a preference for any of that?

19          MR. ROGOW:  We would prefer November 4, Your Honor.

20   And we have one other document, 152, two articles the

21   government --

22          THE COURT:  Yes, that's part of the sealed issue.

23          MR. ROGOW:  I understand.  Okay.

24          THE COURT:  All right.  Well, why don't we say --

25          MR. KRAVIS:  Sorry, Your Honor.  Not to be contrarian

1    about absolutely everything, but if -- if it's possible, we

2    would prefer one of -- either of the earlier dates, just so

3    that we can have an opportunity to prepare -- more time to

4    prepare our exhibits and whatever the defense is going to use

5    and whatever else needs to be resolved.

6              THE COURT:  All right.  Well, I'm going to try to

7    rule on your exhibits today.  So the only question is when we

8    finish up anything that we've left dangling and the defense

9    exhibits.  So under those circumstances, would the 4th work for

10   you?

11             MR. KRAVIS:  Yes, Your Honor.

12             THE COURT:  All right.  Let's reconvene for the

13   pretrial conference then at 10 a.m. on November 4th, and

14   hopefully that will be a very short session and you'll have the

15   rest of your day to prepare.

16             All right.  Okay.  I think I would rather go on and

17   deal with the other evidentiary issues and motions in limine,

18   which we have to do with a sealed courtroom, and then we can

19   take our break, and then we can come back and do the exhibits.

20   So, while that involves closing and reopening the courtroom, I

21   still think that makes sense.

22             So, I'm going to ask, because we're about to talk

23   about sealed matters, anyone who is not with either the defense

24   team or the prosecution team to leave the courtroom at this

25   time.  We're going to close the courtroom at this time and

1       we're going to turn off the feed to the other --

2                 THE COURTROOM DEPUTY:  I'll need about five minutes.

3                 THE COURT:  Okay.

4                 (Pause.)













































22          (Recess.)

23          COURTROOM THE DEPUTY:  Your Honor, recalling criminal

24    case No. 19-18, the United States of America v. Roger Stone.

25          THE COURT:  All right.  Let's see.  How quickly we

1   can get through the exhibits.  All right.  I'm just going to be

2   working from the exhibit list.

3          Exhibit No. 1 was the transcript and there was an

4   objection about that, but that's been resolved, right?  So

5   that's now moot.

6          I do have a question about Exhibit 6.  The report of

7   the House investigation, which takes up a huge percentage of

8   this binder, which is why?

9          MR. KRAVIS:  Your Honor, we are not planning to

10  introduce the entire report into evidence.  We're planning to

11  introduce only a few pages that describe the scope of the

12  investigation, and one section of the report that describes

13  Mr. Stone's testimony, which we believe is relevant to

14  materiality.

15         The reason we included the entire report and not just

16  the selections is because when we were discussing exhibits with

17  the defense, they said that there were portions of the report

18  that they might seek to introduce under the rule of

19  completeness or other grounds.  And so, if the Court has to

20  make those determinations about which parts of the report

21  relate to which other parts, we wanted to make sure that the

22  court had at least one complete copy of the HPSCI report

23  available to it.  But our intention is to introduce only

24  maybe -- I think there's three or four pages from the report in

25  total.

1          THE COURT:  Well, then, along the same schedule that

2     we talked about before, I need you to identify exactly what

3     sections you're planning to introduce.  Have you already told

4     the defense that?

5          MR. KRAVIS:  I can't remember.

6          THE COURT:  Okay.  Well, I need you to tell the

7     defense, and then I need the defense to tell me what, if

8     anything, they believe is necessary to be admitted for

9     completeness, so that I can rule on that the next time we see

10    each other.

11         MR. KRAVIS:  We will.

12         THE COURT:  So I'll let you figure out what the

13    timing of all that is between the two of you.  But, if there is

14    a dispute concerning whether you agree that it's admitted for

15    completeness, or you -- if there's anything to be resolved by

16    me, I would like it to be submitted to me by October 25th.

17         MR. KRAVIS:  We will provide the defense and the

18    Court with the excerpts that we intend to use in our case this

19    week.

20         THE COURT:  Okay.  Well, I'm saying you don't have to

21    give them -- ultimately I need them, instead of this massive

22    thing in my exhibit binder.  But you need to give them to them,

23    let them give you what they think is necessary in completeness.

24    And if you agree, then you give me the whole thing.  If you

25    disagree, then what I need is something that lays it all out

1    for me, for what you're including, what they want to include,

2    so that -- and I guess since I have it, you can say page X,

3    line whatever to line whatever.  But it might be easier if you

4    just lift those pages out and put it together in one document

5    and bracket around the part that you want to introduce that

6    they object to, and vice versa.

7              MR. KRAVIS:  We will.

8              THE COURT:  And if you do all that and submit

9    something by October 25th, then I'll be able to look at it and

10   let you know on the 4th.

11             MR. KRAVIS:  Very well.

12             THE COURT:  Okay.  Good.

13             There are two other objections, Exhibits Nos. 21 and

14   22, that the defense actually said something about

15   completeness.  There may be others, but those came up next.

16             Never give anyone a binder with this many pages in

17   it.  It's impossible to function.

18             All right.  So, I don't understand, I guess, the

19   relevance of 21 and 22.  So maybe the government can explain

20   that first, and then the defense can explain what they mean by

21   completeness.

22             MR. KRAVIS:  Yes, Your Honor.  The individual who is

23   on this email chain is expected to be a government witness at

24   trial.  For one of the exhibits, Exhibit 22, the government

25   expects that that witness will testify that this email

1    communication concerned subjects at issue in the case, namely,

2    Mr. Stone's communications with the campaign about Wikileaks.

3           For Exhibit No. 21, the exhibit is being offered to

4    show more generally that Mr. Stone was in communication with

5    this person by telephone around this time period, because that

6    will corroborate other portions of this person's testimony.

7           THE COURT:  All right.  What is -- you know, again, I

8    do think it's important -- I was actually pleased that there

9    aren't really that many exhibits total.  But, I still think

10   just a lot of little emails back and forth that don't show

11   anything start to overload the jury and waste their time, and

12   it's really worth thinking about.

13          So what is the defense objection?

14          And with these, if you guys can get to a microphone,

15   you don't need to keep popping up and down to the lectern.  But

16   we do need to make sure the court reporter can hear you.

17          Assuming that Gates is going to testify, he's going

18   to be available for cross-examination, and whatever context

19   these have is going to come through his testimony, what's the

20   prejudice and what's the completeness?

21          MR. ROGOW:  Completeness, Your Honor, I really --

22   there's a gap.  If you take a look at 21, there are two

23   different subjects at the bottom.  Subject:  Are you, dot, dot,

24   dot, alive?  And then the other one is:  You're killing me.

25   Subject:  Mr. Gates.  So it doesn't make any sense, it's not

1    complete.  I don't know what the relevance is.  If Gates is

2    going to testify, I guess he can testify to whatever it is, but

3    this is one exhibit that's confusing.

4          THE COURT:  Well, I think that's a fair point.  It's

5    the idea that these are just two separate emails that you've

6    put together on one page in an exhibit to show they were

7    talking to each other that day?

8          MR. KRAVIS:  No, Your Honor.  This is how the email

9    appears in the format in which we received it.  And we provided

10   defense counsel with the native file.  We gave them not just

11   the PDF, but also the -- I believe it's an EML -- the EML file

12   that shows this is just how the emails appeared in the native

13   file that came to us, whether that's because someone changed

14   the subject line in the top email or because of a function of

15   the way that the email program stores and produces the

16   messages.  But we did not alter what we received in any way and

17   what we gave the defense was the native file.

18         THE COURT:  It's certainly possible people can change

19   the subject when they respond to an email, although it's odd

20   that they would change the subject to the name of the person

21   they're responding to.  But why is it prejudicial?

22         MR. ROGOW:  I can't say it's prejudicial because I

23   don't know what it is, other than these two snippets.  There's

24   no context for it.  So it's hard to say, yes, admit it, when I

25   can't figure it out.

1          THE COURT:  All right.  And what about 22?

2          MR. ROGOW:  22, we'll withdraw the objection to 22.

3          THE COURT:  All right.  So 22 will be admitted, and

4     21 can be admitted as well.

5          The next objection is 42.  And what's the relevance?

6     I mean, I realize they are communicating about Assange, but can

7     you shed a little more light on 42 and 43?  And promise me that

8     when you introduce 43, you'll do something so that a person can

9     actually read it?

10          MR. KRAVIS:  Yes, I can make that promise.

11          THE COURT:  All right.

12          MR. KRAVIS:  With respect to the relevance of all

13     three of the emails -- or, excuse me, text messages, 42, 43,

14     44, these are text messages from Corsi to Stone concerning

15     information about Mr. Assange.  Now, these text messages occur

16     after Mr. Stone has testified before the Committee.  However,

17     the government believes they're relevant because other evidence

18     the government is going to introduce that's on the exhibit list

19     will show that Mr. Stone then turns around and relays the

20     information he is getting from Mr. Corsi about Mr. Assange to

21     Mr. Credico.

22          The government believes that those exhibits, in

23     tandem, show that in this time period, after Mr. Stone has

24     testified before HPSCI, while he is continuing to communicate

25     to the Committee, with the Committee, in writing, he is

1  continuing to not only accept, but rely on information that he

2  is receiving from Mr. Corsi about Mr. Assange.

3          THE COURT:  All right.  What's the defendant's point

4  of view about these?

5          MR. ROGOW:  Well, first of all, it's hearsay, "I have

6  reason to believe Assange is getting safe passage."

7          THE COURT:  I don't think they're seeking to

8  introduce it for the truth of the matter asserted.  I'm pretty

9  sure it didn't turn out that way anyway.

10          MR. ROGOW:  Your Honor, it's hard for me to hear you

11  in the microphone.

12          THE COURT:  I'm sorry.  I don't think they're seeking

13  to introduce it for the truth of the matter asserted.  I think

14  they're seeking to introduce just for the fact that Corsi is

15  giving Stone information about Assange.  And the jury can

16  certainly be informed of that and I don't think there's any

17  suggestion that he's -- he made it to Switzerland, in any

18  event.

19          MR. ROGOW:  Our relevance objection, I think, is

20  pretty much moot, given some of your rulings already in terms

21  of what evidence is relevant.  We, of course, take the position

22  that the Assange area was not the area in which the focus was,

23  of the Committee's inquiries.  But Your Honor's already

24  commented on that.  So, I don't think I have a very good

25  defense in keeping these out.

 1           THE COURT:  All right.  So those three will be

 2    admitted but not for the truth of any matter asserted in them,

 3    just for the fact that they were sent to Mr. Stone.

 4           And, obviously, I think that with respect to anything

 5    that's either going to come in or not come in now, because of a

 6    ruling in limine that I've made on another issue, I think your

 7    objection to all of that is preserved for the record, that you

 8    wanted to -- you thought certain things were admissible or

 9    inadmissible and that I've ruled on it.

10           So, you are certainly welcome at any point to note an

11    objection on the record, if you feel it's necessary to preserve

12    the point.  But I think the points are --

13           MR. ROGOW:  Preserved.

14           THE COURT:  -- preserved.

15           I didn't understand Exhibit 132.  It says:  Stone,

16    Credico, additional emails, and there's a stack of them.  And

17    given the lack of clarity about that, the defense just reserved

18    its objection.  So what are those?  Are those things that you

19    might need in cross-examination and you're just providing them

20    for that reason?  Or what are they?

21           MR. KRAVIS:  No.  We're providing them for a

22    different reason.  On the one hand, we wanted to be mindful of

23    the suggestion the Court made a moment ago of not overwhelming

24    the jury with emails that aren't particularly probative.  On

25    the other hand, we did not want to be accused of withholding

1    information from the jury or holding things back or hiding

2    things.  So, what we had elected to do was to create a single

3    exhibit that contains multiple emails between Mr. Stone and

4    Mr. Credico from the relevant time period and then admit

5    them -- admit them as a batch exhibit and not go through all of

6    the emails one by one.  We provided to defense counsel the

7    particular emails that we would include under this exhibit.

8            THE COURT:  I'm sorry.  What was the end of that

9    sentence?

10           MR. KRAVIS:  We provided to defense counsel, and I

11   believe to the Court in the binder, the particular emails that

12   we had intended to include in this exhibit.

13           THE COURT:  In the batch.

14           MR. KRAVIS:  Yes, Your Honor.

15           THE COURT:  But you're planning to introduce the

16   whole batch and just say:  Mr. Credico, you got these from

17   Mr. Stone, and vice versa, and that's it?

18           MR. KRAVIS:  Through the case agent.  But, yes,

19   that's the idea.

20           THE COURT:  Okay.  But the content of them, is the

21   content of them important or relevant in some way?

22           MR. KRAVIS:  The content of the emails is not

23   directly relevant to the allegations in the indictment, but the

24   content of the emails could be construed as relevant to the

25   relationship between Mr. Stone and Mr. Credico.  Again, we

1    don't want to admit -- we don't want to blow up the exhibit

2    list, admit documents that aren't particularly probative.  On

3    the other hand, we don't want to be accused of hiding things or

4    not showing things to the jury.  Our intention was to,

5    therefore, admit these exhibits as a single batch exhibit, and

6    admit them into evidence and move on, without going through

7    every email one-by-one.

8              THE COURT:  Right.  But whether you admit them as a

9    batch or you don't admit them as a batch, they're in evidence,

10   so the jury can spend time looking at all of them.

11             MR. KRAVIS:  Yes.

12             THE COURT:  And if you don't think they're important

13   enough to actually show them to the jury while someone is

14   testifying, then one might want to wonder about why the batch

15   is supposed to be going back to the jury room, if it doesn't

16   eliminate anything.  I'm not going to tell you how to try your

17   case, you get to decide.

18             At this point you've marked all of them as Exhibit

19   132.  But I think the defense, now understanding that they plan

20   to move them in as a batch, should have the opportunity to let

21   me know if the batch as a whole, or any individual documents in

22   it, are particularly prejudicial or irrelevant or inadmissible

23   for some reason.  So as long as you give me that information by

24   October 25th, I will rule on it on November 4th.

25             MR. ROGOW:  That's fine, Your Honor.  And Exhibit 79

1    is a similar situation with the Credico text to Stone.  We

2    received those last week.  And if we could also have that

3    opportunity with regard to 79, which is a continuing batch

4    of --

5              THE COURT:  All right.  That's fine.  I note that you

6    did not object to them in connection with the pretrial

7    statement.  But if there are specific exhibits within the pile

8    that you want to direct my attention to, you may do that by

9    October 25th at the latest.

10             All right.  148 is, I guess, phone records.  Are you

11   planning to move in the whole thing or planning to just

12   highlight certain ones?

13             MR. KRAVIS:  Highlight particular calls on the pages

14   that were provided.

15             THE COURT:  Okay.  And then would you redact out the

16   numbers that you're not highlighting?

17             MR. KRAVIS:  Yes, Your Honor.

18             THE COURT:  All right.  With that, does the defense

19   have any objection?

20             MR. ROGOW:  No.  With the highlighting, so we can

21   know which items are the ones to focus on, we have no

22   objection.

23             THE COURT:  All right.  And if you can let them know

24   beforehand what the redacted and highlighted version of this is

25   going to look like when you give them the three pages that

1    you're planning to use from the other House report, you can

2    show them how this is actually going to look.  And it will be

3    admitted subject to those excisions of the irrelevant material.

4         All right.  154 is the video clip from the *Godfather*,

5    which is under review at this time.

6         All right.  165 is a chart, as is 166 and 167.  Rule

7    1006 certainly permits the creation of such a chart, as long as

8    it accurately reflects the underlying information.  I take it

9    that the defense hasn't been provided with all of the

10   underlying communications so that it can test the accuracy of

11   the summary.

12        MR. KRAVIS:  Yes, Your Honor.

13        THE COURT:  Is there any argument that the summary is

14   inaccurate?

15        MR. ROGOW:  Not on 165, Your Honor.  There is on 166.

16        THE COURT:  Okay.  165 will be admitted.

17        166, what's the problem?

18        MR. ROGOW:  The problem is on September 26, which is

19   a critical time, it's the date that Mr. Stone testified before

20   the House committee, we need to know the hour, the time of

21   these telephone calls, or written communications between Stone

22   and Credico.  It just shows a large chart, 72, I guess -- 73,

23   counting the email.  But, we need to know what time that was

24   because his testimony completed at 12:32 and this would give a

25   misimpression to the jury that these communications had

1    occurred sometime before he testified.  Because one of the

2    issues is when he answered a question about communications,

3    this day becomes important.  Certainly there were

4    communications afterwards, but not before he testified with

5    regard to this date.

6              THE COURT:  All right.  So explain to me why this is

7    important.  I was thinking that it bore on his attempt to

8    affect Mr. Credico's testimony.  Mr. Rogow is suggesting that

9    it's important because it belies the testimony before the House

10   about how many times he had spoken with Mr. Credico.  So if

11   that is correct -- and you're nodding to suggest that it is --

12   then wouldn't whether it happened before or after his testimony

13   matter?

14             MR. KRAVIS:  I mean, whether it -- whether it matters

15   or not as to the weight of the evidence -- the point that I

16   think the defense can make -- but the government's point with

17   this chart is that Mr. Stone, in his testimony before the

18   Committee, described his intermediary as not an email guy, or

19   someone he did not communicate with ever in writing.  And I

20   think it's relevant to the falsity of that statement, that on

21   the very day he made the statement he communicated in writing

22   with that person that he is purporting to describe 73 times.

23             THE COURT:  Well, and there are communications the

24   following two days.  But it seems to me it wouldn't be that

25   difficult to break this bar up into two colors, or a line

1    across the middle, that that's prior to the testimony and after

2    the testimony, if there's a concern that this makes it look

3    like it's overstating how many communications they had before.

4              MR. KRAVIS:  Okay.  We can do that.

5              THE COURT:  So would that cure your objection,

6    Mr. Rogow?

7              MR. ROGOW:  So, it was a summary chart.  So they will

8    be putting in the evidence that justifies a summary chart.

9              THE COURT:  Yes.  But I think, given the

10   impression --

11             MR. KRAVIS:  No.

12             THE COURT:  You're not putting in -- you don't have

13   to put in the underlying calls.  But they have to have them to

14   know, and they have to be on notice that you're planning to do

15   this.

16             MR. KRAVIS:  Right.  Right.

17             THE COURT:  So, no, they don't have to put in all

18   that stuff.  That's the point of the rule.

19             MR. ROGOW:  Pardon me.  I couldn't hear.

20             THE COURT:  He's saying that under the rule, and that

21   is the point of the rule, as long as you've been notified of

22   the plan to summarize with this chart, and you've been provided

23   with the underlying information so you can test the accuracy of

24   the chart, they don't actually have to move in all of the

25   underlying calls.  They may choose to move some of them in, or

 1 | not.  But it's not required for the admissibility of the

 2 | summary.

 3 |          MR. ROGOW:  And this will come in through Miss

 4 | Taylor, is that the idea?

 5 |          MR. KRAVIS:  Yes.

 6 |          MR. ROGOW:  So she can be examined on it.

 7 |          THE COURT:  All right.  But I do think that your

 8 | point about the time of the calls could affect how this chart

 9 | is understood by the jurors.  So they're going to divide it

10 | either by color or with a line to indicate the number before

11 | the hearing and the number after, and not just the total, in

12 | response to your objection.

13 |          MR. ROGOW:  And 167 we have an objection, Your Honor.

14 | Telephonic --

15 |          THE COURT:  I'm talking about 166.  I just ruled on

16 | that.  And with that change it will be admissible.

17 |          167.  All right.  Do you want to explain the chart to

18 | me first?

19 |          MR. KRAVIS:  Yes, Your Honor.  The chart is just

20 | summarizing communications from phone records between Mr. Stone

21 | and certain identified members of the campaign between January

22 | and November of 2016.  The chart is being offered as a summary

23 | to show the volume of those contacts.

24 |          The government will have -- the chart, obviously,

25 | does not show content.  The government will have other evidence

1      that the content of certain communications between Mr. Stone

2      and members of the campaign during this time concerned

3      Wikileaks, which is relevant to one of the allegations in the

4      indictment.  This chart is being offered to show the number of

5      contacts between Mr. Stone and certain campaign officials

6      during the relevant time period.

7              THE COURT:  In general.

8              MR. KRAVIS:  In general.

9              THE COURT:  All right.  And your objection?

10             MR. ROGOW:  That's the trouble; it's in general.  So

11     the mere fact that there have been telephonic communications

12     doesn't go to establishing all of the elements that they want

13     to establish in the charges they brought against Mr. Stone.

14             THE COURT:  That's true.  But it's just the question

15     of whether this is relevant.  The fact that they were in

16     communication at all tends to make it more likely they were in

17     communication about those subjects, so it's relevant.  It is

18     clearly not dispositive, but I don't think they're going to

19     rest on this and say you can tell from this chart that he was

20     lying when he said they didn't talk about Wikileaks.  They

21     still have to prove that.  If this is all they did, then you

22     would be right, they hadn't proved it.

23             MR. ROGOW:  Well, you know, when you have here calls

24     to Mr. Trump, which is the -- I -- the blue line.  Again, that

25     is potentially prejudicial because it raises issues that are

1    not really part of the charges at all.  And all of these

2    telephonic communications with the numbers that they've put up,

3    April 16, 51, it's misleading.  Because if at that point there

4    were communications, the mere fact that there were

5    communications does not mean that they were communications

6    about Wikileaks, about Russian interference, or about anything

7    that has to do with this case.

8            So piling up these numbers and these telephone calls

9    is prejudicial, misleading, and it doesn't tell you anything at

10   all about the content of these telephone calls.  So I think it

11   has a very prejudicial effect in terms of the jury looking at

12   this and seeing if you add all these up, you get a lot of

13   telephone calls.  But this case isn't about all of these

14   telephone calls.  If he made one telephone call that was an

15   inappropriate call in terms of the question that was asked of

16   him, well, they can make their case with that.  But this just

17   piles on, and I think that this is -- it doesn't really help

18   the jury.  All it does is create a picture that's not an

19   accurate picture of the relationship between Mr. Stone and the

20   campaign.

21           THE COURT:  Was part of his testimony, or his

22   explanation subsequently about his testimony, that he really

23   wasn't talking to the people in the campaign?

24           MR. ROGOW:  About?

25           THE COURT:  About anything.  I mean, was part of his

1    explanation for why he didn't talk to them about Wikileaks, is

2    I was not in touch with them, period.  Was he saying that?

3              MR. ROGOW:  To them?

4              THE COURT:  Did he say it to them or did he say it

5    publicly thereafter?

6              MR. ROGOW:  Didn't say it to them.

7              THE COURT:  Is there any suggestion that he did?

8              MR. KRAVIS:  No.  But the subscriber -- I mean, toll

9    records are never dispositive on the content of a call.  The

10   government uses them all the time to corroborate that two

11   people were in touch during a particular time period.  The --

12   it is true that the toll records, by their nature, do not

13   establish alone the content of the communications, but the

14   government has other evidence on that score, and a brick is not

15   a wall.  The subscriber records -- or, the toll records don't

16   have to conclusively prove the point in order to be relevant.

17             THE COURT:  All right.  Well, one thing I would say

18   is that the three blue colors, the three blue-purply colors

19   that create kind of a mess of two lines at the bottom, are very

20   hard to differentiate from each other.  And so I think you need

21   to choose different colors because I can't tell what's going on

22   here and which is which.  The blue and purple are pretty much

23   merged, and then there's a third color.  I can't tell what's

24   happening there.  There should be three clearly differentiated

25   colors.  So there could be a light blue, a red, and something

1    else that is just -- orange, something that you can tell is not

2    blue --

3            MR. KRAVIS:  Yes.

4            THE COURT:  -- or light blue and dark blue.  But the

5    blue, purple, and other color of unknown description is not

6    helpful.

7            I don't see that the defense objection to this

8    exhibit makes it inadmissible.  I agree with you that it

9    doesn't prove the government's case, but each piece of

10   evidence -- it's okay to be a link in a chain.  And I don't see

11   that it's unduly prejudicial either, given his relationship

12   with the campaign, which no one is arguing is improper.

13           So making it less unclear what it actually shows,

14   with that change, I think it's admissible.

15           MR. ROGOW:  Your Honor, it also doesn't show who

16   initiated the contact.  I mean, it has all kinds of potential

17   to be misleading to a jury.

18           THE COURT:  Well, I think if they try to argue from

19   it something that it doesn't represent, you can certainly

20   object.  But this is a phone contact.  I don't think it matters

21   who dialed whom; it's whether they had it.  And some of them

22   are at a very low level, so it may not prove anything at all.

23   It may support the defense.  But I don't see it being

24   inadmissible for any reason that you've identified.

25           168 and 169 were the subject of the motion in limine

1    and they have been excluded.  I will consider a proposed

2    redacted version.  But they're not coming in.

3              And that, I believe, miraculously, brings us to the

4    end of the government's exhibit list.

5              So, I really appreciate the fact that you did the

6    list and the objections in the format that I requested because

7    it made it very easy for me to review them.  And the fact that

8    people are not just objecting willy-nilly to everything makes

9    the objections that are well taken easier to discern, and the

10   whole process has gone pretty well, I think.

11             So I think I've finished everything that we're going

12   to do today.  Unless you are standing up because you have

13   something else?

14             MR. KRAVIS:  I just have two short housekeeping

15   questions.

16             THE COURT:  Okay.

17             MR. KRAVIS:  The first is we would ask if the Court

18   could issue an order unsealing the transcript of the earlier

19   proceeding for the limited purpose of allowing the parties to

20   obtain a copy of the transcript from the court reporter.

21             THE COURT:  Yes, of course.

22             MR. KRAVIS:  Second, I just wanted to confirm the

23   rules of the road, that the Court's review and admission of

24   the -- preadmission of the exhibits means that either party can

25   use at trial any exhibit from the other party's list that has

1    been admitted.  There were things on the defense list that we

2    decided we wanted to use in our case-in-chief.  We don't have

3    to create a separate government exhibit.  Once the Court has

4    ruled on them, it means we can use them.  Do I have that right?

5            THE COURT:  I think if you are planning to use

6    something on the defense list -- and we don't even know if the

7    defense is planning to put on a case -- you could assume that

8    they have no objection and it's admissible, but I think you

9    should mark it as a government exhibit.

10           What do you think, Mr. Rogow?

11           MR. ROGOW:  I do.  I understand --

12           THE COURT:  Just for clarification purposes, we need

13   to know what your case is.  At the end of your case they could

14   rest.  So, I think you need to mark those.  And you can just

15   add to the exhibit list and you can put in parenthesis also

16   defense exhibit whatever, so that they know that they may not

17   have grounds to object to its authenticity or admissibility.

18   But it may be that it's not relevant until their case comes

19   along.

20           So I do believe you need to add them to your exhibit

21   list.  And you can submit that by October 25th, in case there

22   is any issue that arises.  But I just think for the record to

23   be clear at the close of your case, we should know which

24   government exhibits are in evidence.

25           MR. KRAVIS:  All right.  We'll do that, Your Honor.

1          MR. ROGOW:  Your Honor, there are several things.  I

2     mean, the transcript, for example, we've agreed to.  The audio

3     of the transcript, we've agreed to.  So in a way, those are

4     just exhibits.  But I still think it's better for each side to

5     identify them as their own exhibit, too.  Because I will be

6     using the transcript, I will be using the audio, I will be

7     using the --

8          THE COURT:  Yes.  Anything the government has

9     introduced, the defense can walk around the courtroom with.

10    That's a different story than the government pulling something

11    from the defense exhibit binder and showing it to a witness

12    without calling it a government exhibit.  Because at the close

13    of the government's case, you get to make a motion that their

14    evidence has been insufficient and you get to choose to rest

15    and not put on any evidence at all.  So, I want the record to

16    be crystal clear about what they've put in evidence.

17         Now, once it's been in evidence, no, you don't have

18    to re-move it.  You can use it.

19         MR. ROGOW:  Right.

20         THE COURT:  Okay.

21         MR. ROGOW:  But the audio, for example, that we're

22    going to put in, I don't think they're going to -- we've agreed

23    to.

24         THE COURT:  Okay.  Well, then you just mark it as

25    defendant's exhibit whatever on your list.

1              MR. ROGOW:  Right.

2              THE COURT:  I haven't looked at your list yet.  Now

3      that there's a stipulation and there won't be any objection,

4      you can just use it.  But, it will be your exhibit.

5              MR. ROGOW:  Well, it's their exhibit, too.

6              THE COURT:  Well, I don't know -- I mean, is it on

7      the -- right now all that's on the list is the transcript.  If

8      you've agreed to -- you need to maybe update your list, if

9      you've agreed to the audio, and make it exhibit whatever it is

10     at the end.  If you're not planning to introduce it, you don't

11     have to.  There's no rule that says you do.

12             MR. KRAVIS:  No, we are.  And the reason it didn't

13     make the list is because the audio thing got worked out after

14     the lists were due.  But I believe the audio is actually

15     included in the binder as Government's Exhibit 1-A.  And that's

16     helpful.  We will submit a revised exhibit list to address

17     these questions.

18             THE COURT:  1-A will be the audio.

19             MR. KRAVIS:  And that's how we'll plan to use it.

20             THE COURT:  All right.  So now you know, it's

21     Government's Exhibit 1-A.

22             MR. ROGOW:  Then we have by October 25th to work out

23     the portions of the House committee reports that will go in.

24             THE COURT:  Yes.  If there's a dispute, then you'll

25     submit it to me on that date.  If there's no dispute, then you

1    can just submit a document that says this is what's coming in

2    as 6-A, the redacted version of 6, or something, and there's no

3    objection.

4           MR. ROGOW:  And if there are other exhibits that we

5    need or that they need, may we also have leave to offer them to

6    the Court?

7           THE COURT:  Well, I don't want to start all over

8    again.  The whole point of this process was to fix the universe

9    of what's in evidence so that I could rule on it.  I've never

10   had a trial where one or two things didn't come up that

11   somebody tried to move in.  But, you know, I don't want to

12   receive a new whole binder.

13          MR. ROGOW:  I don't mean that, Your Honor.

14          THE COURT:  All right.  So if there's a few things

15   you need to add, you should let them know and they should have

16   the opportunity to object, so I know whether it's objected to

17   by October 25th.

18          MR. ROGOW:  Fine.

19          THE COURT:  All right.  All right.  I appreciate

20   everybody's time and effort getting as much done as we've

21   gotten done.  And I will see you on November 4th at 10 a.m.

22          MR. ROGOW:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24                         *   *   *

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 25th day of September 2019

9

10

11                      _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25