UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROGER J. STONE, JR.,<br><br>        Defendant. | Criminal No. 19-cr-18-ABJ |

## GOVERNMENT'S NOTICE CONCERNING MOVIE CLIP

The Indictment alleges that defendant Roger J. Stone, Jr. obstructed a congressional proceeding and engaged in witness tampering by pressuring Person 2 to testify falsely. Among other things, the Indictment alleges that Stone did so by invoking a scene from *The Godfather Part II*, with which both Stone and Person 2 were familiar. In that scene, a witness is persuaded to testify falsely before a congressional committee to avoid contradicting another witness's false testimony. The government accordingly moved to admit a short clip from that film into evidence, so that the jury could view the very scene that Stone repeatedly invoked in his communications with Person 2.

At the September 25, 2019, pretrial conference, the Court deferred ruling on that motion and directed the parties to discuss whether there is a mutually-agreeable stipulation that would describe that film scene. Although the government respectfully believes that a written stipulation is a poor substitute for the actual scene that Stone and Person 2 were referencing, the government proposed a stipulation to the defense that describes the scene. The defense rejected the stipulation and declined to offer any changes or to propose a stipulation of its own. The defense took the position that the only evidence the government should be permitted to introduce on this point is the testimony of Person 2 about his understanding of Stone's references to the scene.

In the government's view, this confirms the importance of playing the short scene for the jury. That scene played a direct part in the very obstructive acts charged in this case. The question is not just how Person 2 interpreted Stone's references to the scene, but what Stone intended by them. The evidence of Stone's intent when referencing this scene is not limited to Person 2's subjective understanding or recollections but also includes the scene itself, where a congressional witness succumbs to pressure and speaks the lines that Stone quoted to Person 2.

The content of this scene is an objective fact, and the best way for the jury to understand Stone's references is to watch the very scene with which Stone and Person 2 were both familiar. In contrast to the use of coded language, for example, a speaker's reference to a film scene known to both parties conjures that scene in both parties' minds. Although any witness who has viewed the scene can attempt to describe it for the jury, the film clip is the best evidence, and in some sense the only evidence, of the common reference point. Neither party to the critical communications understood references to the scene in light of a description (or stipulation), but rather from having watched that particular film sequence. Playing the scene itself also avoids a witness—or witnesses—having to characterize aspects of the scene, including dialogue, expressions, actions, and camera work, that convey meaning. That is particularly important here, because critical elements of the scene are non-verbal, with relevant meaning communicated visually. In several key moments where Pentangeli succumbs to pressure and testifies falsely, including some quoted by Stone in his messages to Person 2, the film shows Pentangeli's facial expressions, shows Pentangeli looking over at his brother and Corleone, or shifts back and forth between Pentangeli, his brother, and Corleone. Although not captured in dialogue and difficult to describe with precision, the import of these visual cues is unmistakable.

Stone's explanation(s)—in public and to this Court—for referencing the scene in his communications with Person 2 underscore the need for the jury to view that scene for itself. *See* Doc. 156, at 4-5 (quoting interviews where Stone claimed he was merely asking Person 2 to do an impression); Doc. 171, at 3, 7 (making similar claims to the Court). The defense's refusal to agree to a stipulation regarding the content of the scene and its insistence that the government present evidence on this point only through Person 2's testimony is a clear effort to facilitate the defense's argument that Stone had innocent reasons for referencing and quoting this scene and that any malign interpretation is a product of Person 2's imagination. That argument is belied by the film clip itself—relevant, objective, and intrinsic evidence that is probative of Stone's intentions in sending the messages.

Contrary to the defense's claim, playing the short film clip raises little risk of unfair prejudice. The scene does not contain violence. The government does not plan to argue that Roger Stone is an organized crime leader. And it is not unfairly prejudicial to admit evidence of the very charged conduct, even if that conduct includes matters that are distasteful or dramatic. *See United States v. Gartmon*, 146 F.3d 1015, 1020-1021 (D.C. Cir. 1998); *see, e.g., United States v. Smith*, 749 F.3d 465, 496-497 (6th Cir. 2014) (copies of *The Boiler Room* given to employees). If anything, playing the anodyne scene for the jury mitigates the risk of jurors—some of whom may have watched the film and may have varied recollections—wondering if a verbal account is concealing other misconduct.

At the September 25 hearing, the Court raised a question, not urged by the defense, whether the film clip might be treated by the jury with undue importance and thereby distract or mislead the jury. The government respectfully does not believe that this concern warrants excluding this relevant evidence under Rule 403. Although a film clip may in some sense be

attention grabbing, this trial will involve testimony by or about a number of high-profile events and individuals including the 2016 presidential election, WikiLeaks, and the campaign of the sitting President of the United States. And, as the parties recently learned, the trial exhibits will now include audio recordings of Stone's testimony to Congress—recordings of some of the very acts at issue. The government therefore does not believe that a short film clip is likely to be given such undue attention as to risk unfair prejudice, cause the jury to "confus[e] the issues," or otherwise "mislead[] the jury." *See* Fed. R. Evid. 403 (bases on which a court may exclude relevant evidence).

In any event, such risks do not come close to substantially outweighing the probative value of that clip. The D.C. Circuit has correctly explained that Rule 403 "does not generally require the government to sanitize its case" or "to tell its story in a monotone." *Gartmon*, 146 F.3d at 1020. That is what a verbal description or written substitute would tend to do. In particular, "the balance [under Rule 403] should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged," much as it does here. *Id.* at 1021; *see, e.g., Smith*, 749 F.3d at 496-497. As discussed, the short film clip has significant probative value because the clip itself is the common reference point between the two parties to the critical communications. Additionally, as the Court knows, any risk of prejudice or the jury's giving undue weight, attention, or otherwise to this short film clip can be further addressed with an instruction from the Court. *See, e.g., United States v. Monsalvatge*, 850 F.3d 483, 496 (2d Cir. 2017); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011).

The government understands and appreciates the Court's efforts to zealously guard the seriousness of these proceedings. The government takes seriously its duty to do the same. This particular piece of evidence formed a critical part of the obstruction and witness tampering charged

in the Indictment. And the government respectfully believes that the film clip therefore must be admitted.

Respectfully submitted,

JESSIE K. LIU
U.S. Attorney for the District of Columbia

By: /s/_____
    Jonathan Kravis
    Michael J. Marando
    Assistant United States Attorneys

    Adam C. Jed
    Aaron S.J. Zelinsky
    Special Assistant United States Attorney
    555 4th Street NW
    Washington, D.C. 20530

October 17, 2019