**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )     Crim. Action No. 19-0018 (ABJ) |
| | ) |
| ROGER J. STONE, JR., | ) |
| | ) |
| Defendant. | ) |

**ORDER**

At the close of the government's case on November 12, 2019, defendant Roger J. Stone filed a written motion pursuant to Federal Rule of Criminal Procedure 29. Def.'s Mot. for J. of Acquittal [Dkt. # 252] ("Def.'s Mot."). The Court heard argument on the motion, and pursuant to Rule 29(b), it reserved ruling until after the verdict. *See* Tr. of Jury Trial, Nov. 12, 2019 at 1012–37.

The defendant argued that he was entitled to the entry of a judgment of acquittal on Counts 1–6 because the government had failed to prove that either Jerome Corsi or Randy Credico was in fact an "intermediary" between Julian Assange or WikiLeaks and Roger Stone. Def.'s Mot. at 2. The motion did not set forth any other ground for the insufficiency of the government's evidence in support of the charge of obstruction of justice in Count 1, or the evidence introduced in support of Counts 2 through 6, all of which alleged that defendant testified falsely before the House Permanent Subcommittee on Intelligence ("HPSCI") on September 26, 2017. Nor did the defense make any argument with respect to – or ask the Court to enter judgment in the defendant's favor on – the allegation of witness tampering in Count 7. *See* Def.'s Mot. 9–13.

Given the limited focus of the written submission, the Court inquired at the hearing whether the defense had any other arguments to make with respect to any of the false statements counts, and the defense indicated that it had made all of its arguments in the written submission. *See* Tr. of Jury Trial, Nov. 12, 2019 at 1020 ("THE COURT: Are there any of the other false statements that you want – you've made the argument with respect to all of them in your papers? MR. BUSCHEL: Yes."). The Court inquired further:

> THE COURT: With respect to false statements, is there any other element besides proving the intermediary that you want to tell me they haven't introduced evidence to support or are you just going to rest on the record?
>
> MR. BUSCHEL: No, I have stated everything.

> THE COURT:  Okay.  There's nothing in your motion about the witness
> tampering count.  Are you just submitting on the evidence or do you have
> any particular element that you want to argue was not established?
>
> MR. BUSCHEL:  Just submitting on the evidence.
>
> THE COURT:  All right.  Is there any other element of any offense that you
> want me to specifically focus on when I consider whether this case should
> proceed from this point?
>
> MR. BUSCHEL:  No.

*Id.* at 1024–25.  The Court heard from both sides, *id.* at 1012–36, and it reserved ruling on the motion pursuant to Rule 29(b).

After the jury returned a verdict on all counts on November 15, the Court asked the defense if it would like an opportunity to submit further arguments in writing in support of the motion.  Tr. of Jury Trial, Nov. 15, 2019 at 9–10.  The defense declined the invitation.  *Id.*  The government also declined to supplement the record with a written submission.  *Id.* at 10.  The Court informed the parties at that time that it intended to deny the motion, and that a written order would be issued.  *Id.*

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a); Fed. R. Crim. Pro. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.").

Under Rule 29(b), "[t]he court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion . . . after it returns a verdict of guilty . . . .  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. Pro. 29(b).

In reviewing a post-verdict motion for judgment of acquittal under Rule 29, a court "must view the evidence in the light most favorable to the verdict."  *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).  In evaluating the sufficiency of the evidence, "[t]he reviewing court considers only the 'legal' question of 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Musacchio v. United States*, 136 S.Ct. 709, 715 (2016) (emphasis in original), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  *See also United States v. Shmuckler*, 792 F.3d 158, 161–62 (D.C. Cir. 2015).  The standard for a Rule 29 motion

is "very high," and the evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015).

The standard for Rule 29 preserves the jury's role "as weigher of the evidence" and "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. So the "evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt" to suffice to sustain a guilty verdict. *United States v. Bostick*, 791 F.3d 127, 137 (D.C. Cir. 2015), quoting *United States v. Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991).

Applying that legal standard, and basing its ruling solely upon the evidence introduced in the government's case in chief, the Court makes the findings set out below. Since Count 1 is based, in part, on facts underlying the other counts, this order will address it last.

**Counts 2–6:**

With respect to Count 2, there was sufficient evidence for a rational trier of fact to conclude that the defendant knowingly and willfully made a material false statement in violation of 18 U.S.C. §§ 1001 and 2 when he testified falsely before HPSCI on September 26, 2017 that "he did not have emails with third parties about the head of [WikiLeaks], and that he did not have any documents, emails, or text messages that refer to [Julian Assange]." Indictment ¶ 43.

On August 8, 2016, Roger Stone announced publicly that he had been in communication with Julian Assange, and in the days that followed, he clarified that statement with the information that he had done so through an intermediary. *See* GX 142, 143, 144, 145, 146, and 147. At the hearing, the defendant was asked how he communicated with the individual he had publicly described as the go-between, mutual friend or intermediary through whom he communicated with Assange, and he replied, "over the phone." GX 1 at 44–45.

> MR. QUIGLEY: And did you have any other means of communicating with the intermediary?
>
> MR. STONE: No.
>
> MR. QUIGLEY: No text messages, no – none of the list, right?
>
> MR. STONE: No.

GX 1 at 45. *See also* GX 1 at 84 (Q: "So you have no emails to anyone concerning . . . any discussions you have had with third parties about Julian Assange? You have no emails, no texts, no documents whatsoever, any kind of that nature?" A: "That is correct. Not to my knowledge."); *id.* at 109–10 (Q: "So you never communicated with your intermediary in writing in any way?" A: "No." Q: "Never emailed him or texted him?" A: "He's not an email guy." Q: "So all your conversations with him were in person or over the phone." A: "Correct.").

3

The jury could have fairly concluded that those answers were belied by the following exhibits, among others:  GX 35, 36, 37, 38, and 39 (communications with Jerome Corsi); GX 48, 50, 51, 53, 54, 55, 56, 57, 61, 81, 99, 189, 190, and 191 (communications with Randy Credico); and GX 31, 32, and 33 (communications with others).

With respect <u>Count 3</u>, there was sufficient evidence for a rational trier of fact to conclude that the defendant knowingly and willfully made a material false statement in violation of 18 U.S.C. §§ 1001 and 2 when he testified falsely before HPSCI on September 26, 2017 that "his August 2016 references to being in contact with [Julian Assange] were references to communications with a single 'go-between,' 'mutual friend,' and 'intermediary,' who STONE identified as [Randy Credico]."  Indictment ¶ 43.

A rational juror could have concluded that Stone's September 26 testimony was false insofar as he referred to a single point of contact, *see, e.g.*, GX 1 at 80 ("I've always made it pretty clear that I was referring to, . . . a source, an intermediary."), and also in that he falsely identified his point of contact with Assange to be Randy Credico.  The defendant supplied Credico's name in a later letter to the Committee from his lawyer, GX 13, but a rational juror could conclude from the defendant's misleading answers on September 26 that he was referring at that time to Randy Credico.  *See* GX 1 at 40 ("[T]he communication I refer to is through a journalist . . . .  I have sometimes referred to this journalist as a go-between, as an intermediary, as a mutual friend.  It was someone I knew had interviewed Assange.").  Similarly, a juror could conclude that the answer on page 43 of the transcript referred to Credico.  GX 1 at 43 (Q:  "Do you know anyone who has been [to the Ecuadorian Embassy in London]?"  A:  "The journalist that I made aforemention to.").  *See also* GX 1 at 45 ("He's a journalist that I know." . . . Q:  "And he works for?"  A:  "A media organization.").  The evidence was also sufficient for a rational juror to conclude that this attempt at misdirection was false since the source Stone claimed to have on or about August 8 through 18, *see* GX *see* GX 142, 143, 144, 145, 146, and 147, could not have been Credico; Credico's first contact with Assange – and his first communication with Stone about Assange – did not take place until August 25.  GX 189.

With respect to <u>Count 4</u>, there was sufficient evidence for a rational trier of fact to conclude that the defendant knowingly and willfully made a material false statement in violation of 18 U.S.C. §§ 1001 and 2 when he testified falsely before HPSCI on September 26, 2017 that "he did not ask the person he referred to as his 'go-between,' 'mutual friend,' and 'intermediary,' to communicate anything to [Julian Assange] and did not ask the intermediary to do anything on STONE's behalf."  For example, the defendant was asked, "Did you ask him to do anything on behalf of the Trump campaign?"  Answer:  "I did not."  Question:  "Did you ask him to do anything on your own behalf?"  Answer:  "I did not."  GX 1 at 43–44.

A juror could conclude that this answer was false with respect to both Corsi and Credico based on GX 35, 36, 48, 50, 51, 55, and 190.

4

With respect to Count 5, there was sufficient evidence for a rational trier of fact to conclude that the defendant knowingly and willfully made a material false statement in violation of 18 U.S.C. §§ 1001 and 2 when he testified falsely before HPSCI on September 26, 2017 that "he and the person he referred to as his 'go-between,' 'mutual friend,' and 'intermediary' did not communicate via text message or email about [WikiLeaks]." Indictment ¶ 43.

The evidence to support the allegation that this testimony was false includes the many communications concerning WikiLeaks and Assange listed above in connection with Count 2, as well as other communications with the claimed intermediary. *See* GX 165 and 166 (summary charts).

With respect Count 6, there was sufficient evidence for a rational trier of fact to conclude, based on the testimony of both Steven Bannon and Richard Gates, that the defendant knowingly and willfully made a material false statement in violation of 18 U.S.C. §§ 1001 and 2 when he testified falsely before HPSCI on September 26, 2017 that "he had never discussed his conversations with the person he referred to as his 'go-between,' 'mutual friend,' and 'intermediary' with anyone involved in the Trump Campaign." Indictment ¶ 43. *See also* GX 32.

Finally, there was evidence from which a rational trier of fact could conclude that all of these questions and answers were material to the HPSCI investigation. First of all, the Members of the Committee – from both parties – said so themselves. *See* GX 1 at 4 (MR. QUIGLEY: "[T]he most important question anyone can you today is who was the intermediary . . . ."); GX 1 at 58 (MR. GOWDY: "[T]here are Members that would like to write a report that is reflective of the facts. And the only way to do that is to have witnesses like yourself be willing to come in here and answer questions and withstand examination and cross-examination. That is the single best way to elucidate the truth, is to ask someone directly, give them a chance. . . . That is the best system we have for elucidating the truth. But if I cannot examine a witness or a source, then I am denied that information."); GX 1 at 81 ("MR. SCHIFF: We will need to determine which is accurate, whether you were in communication with Assange or you were in communication through an intermediary. So we'll need to determine whether we can corroborate that through your intermediary."). Second, the Committee report supports that inference. *See* GX 6A (excerpts of HPSCI March 22, 2018 Report on Russian Active Measures) at 60 ("Matters investigated by the Committee include allegations pertaining to: . . . involvement in or knowledge about the publication of stolen emails . . . ."); *id.* at 72 ("Particularly in light of candidate Trump's expressed enthusiasm for WikiLeaks, the Committee examined the relationship between his associates and the stolen emails."); *id.* at 75 ("During his testimony to the Committee, Stone addressed three public statements suggesting he might have important information about, and potentially advance knowledge of, disclosures during the 2016 campaign, [including] an August 2016 public speech about purported contacts with Julian Assange . . . .").

Defendant argued in his motion that the evidence failed to establish any of these counts because the government failed to prove that Stone in fact had an "intermediary" transmitting

communications on his behalf to and from Julian Assange.  *See* Def.'s Mot. at 2.  But that was not an element of any offense in the indictment or a fact necessary to any offense in the indictment. Stone was not charged with lying by asserting that he indeed had an intermediary; he was charged with making false statements when he testified that the person he was referring to between August 8 and August 18, 2016, when he publicly announced that he was in communication with Assange through an intermediary or friend, *see* GX 1 at 40, 43, was Randy Credico, *see* GX 13 (letter naming Credico), and that he had not communicated with this claimed intermediary – or anyone else concerning WikiLeaks or Assange – in emails or texts.

### Count 7:

The defendant did not make any argument with respect to this count in his written Rule 29 motion.  The Court finds that at the close of the government's case, a rational juror could have concluded beyond a reasonable doubt that the defendant knowingly and intentionally corruptly persuaded or attempted to corruptly persuade Randy Credico, with the intent to influence, delay, or prevent his testimony in an official proceeding.

The evidence includes the numerous written communications, including emails and texts, in which the defendant urged Credico to assert his Fifth Amendment privilege against self-incrimination, to claim a failure of recollection, to "do" a "Frank Pantangeli,"[1] and/or to advance the false narrative that Credico had been the intermediary between Stone and Julian Assange to whom Stone publicly referred in early August of 2016.  *See, e.g.*, GX 62, 63, 64, 65, 68, 69, 73, 191, and as well as the following communications:  GX 62, 78, 122, 125.  *See also* Tr. of Jury Trial, Nov. 8, 2019 at 683–84 (testimony of Randy Credico:  "Q.  Did he discuss Margaret Kunstler with you at all?  A.  He had – over the year, he had said that if – that he had a email that would prove that Margaret Kunstler would be – would be involved.  That he could prove it through Miss Kunstler that I was the back channel, that he would use that connection with Miss Kunstler.  And whatever text messages that I had with him, that Miss Kunstler was involved.  Thus, I would – that would be his – that would be the linchpin.  Q.  And did it concern you that Mr. Stone was talking about revealing Ms. Kunstler's name?  A.  Yes.  Q.  And why did it concern you?  A.  Well, she's a very close friend of mine and, you know, she's an older woman, and I didn't want to drag her through this.  You know, I didn't want to drag her name through this.").

### Count 1:

Given the Court's findings with respect to Counts 2–6 and Count 7, a reasonable juror could conclude beyond a reasonable doubt that the defendant corruptly influenced, obstructed or

---

[1]  *See* Tr. of Jury Trial, Nov. 8, 2019 at 690–61 (testimony of Credico that to "do" a "Frank Pentangeli" meant to him "[t]o not recall any of the conversations I had with Roger Stone or any of the events that transpired") and GX 214 (transcript of the Frank Pantangeli scene in the *The Godfather: Part II*).

impeded, or endeavored to corruptly influence, obstruct, or impede the due and proper exercise of the power of inquiry under which an inquiry or investigation was being undertaken by a Committee of the United States House of Representatives when:  he testified falsely and misleadingly at a House Permanent Subcommittee on Intelligence hearing on September 26, 2017; he lied about the existence of responsive records in response to HPSCI's requests about documents; and/or he attempted to have Randy Credico testify falsely before HPSCI or to prevent him from testifying. The evidence was also sufficient to enable a reasonable juror to conclude beyond a reasonable doubt that he obstructed the proceedings when he submitted or caused to be submitted a letter to HPSCI, that is, GX 13, falsely and misleadingly describing communications with Randy Credico.

Notwithstanding defendant's arguments about his state of mind, in particular, that he understood the "four pillars" or the "publicly-announced parameters" of the investigation to relate solely to Russia, and that his answers reflect that understanding,[2] the jury had sufficient evidence from which it could find that the defendant acted with the requisite level of intent.  A rational trier of fact could conclude that the defendant's own opening statement to the Committee reveals his understanding that his contacts with, or transmittal of messages or requests to, WikiLeaks or Assange, either directly or through a middleman, would indeed be a subject of the Committee's inquiry.  GX 1 at 10 ("Members of this [C]ommittee have made three basic assertions against me which must be rebutted here today:  the charge that I knew in advance about and predicted the hacking of Clinton campaign chairman John Podesta's email; *that I had advance knowledge of the source or actual content of the WikiLeaks disclosure regarding Hillary Clinton*; or that my now-

---

2       *See* GX 9 at 4 (attachment to letter) ("Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," dated March 1, 2017, stating that the investigation would seek to answer four questions, including:  "What Russian cyber activities and other active measures were directed against the United States and its allies?  Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?").  The announcement went on:  "Chairman Nunes said, 'The Intelligence Committee has been investigating Russia for years and warning about the Putin regime's hostile international actions, its aggression in cyber space, and its influential international propaganda campaigns.  The committee is determined to continue and expand its inquiries into these areas, including Russian activities related to the 2016 U.S. elections.  On a bipartisan basis, we will fully investigate all the evidence we collect and follow that evidence wherever it leads.'"  *Id.*  It concluded, "Ranking Member Schiff stated, '. . . We must follow the facts wherever they may lead, leaving no stone unturned, and that must also include both the Russian hacking and dumping of documents as well as any potential collusion between Russian and U.S. citizens.'"  *Id.*  These references to "active measures," "propaganda campaigns," and the "dumping of documents" support an inference by a rational juror that the announced "parameters of the investigation" were sufficiently broad to include not only the reported hacking of the DNC computers, but also the subsequent dissemination of the stolen material, including by third parties outside of Russia.  *See also* GX 1 at 86 (Question by Mr. Schiff:  "[H]ave you deleted any emails or texts or destroyed any records that pertain to . . . Julian Assange, Wikileaks, or any of the *other* announced parameters of our investigation?") (emphasis added).

public exchange with a persona that our intelligence agencies claim but cannot prove is a Russian asset is anything but innocuous and are entirely false.") (emphasis added). *See also* GX 1 at 86–87 ("MR. SWALWELL: Mr. Stone, earlier you had told me under oath that you had never posted a tweet and then subsequently deleted it. MR. STONE: . . . [I]f I did, then I misspoke. I've certainly tweeted things and then reconsidered them and deleted them but not pertaining to these matters, I don't believe. MR. SWALWELL: I'm going to show you a March 4th, 2017, tweet where you say to @RVAWonk, where she is stating that you deny contact with Assange, you say: You stupid, stupid [expletive]. Never denied. Perfectly legal back channel to Assange . . . . MR. STONE: Back channel, yes. MR. SWALWELL: Do you recognize that tweet? MR. STONE: Yes. MR. SWALWELL: Was it deleted? MR. STONE: I don't really remember. If it was, it was because stupid, stupid [expletive] was intemperate, and I may have reconsidered it . . . . MR. SWALWELL: But you would agree that tweet would relate to this matter that we are talking about? MR. STONE: Yes.").[3] Moreover, GX 1, the transcript of the September 26 hearings includes multiple questions to Stone about Assange and Wikileaks, as well as statements by Members of the Committee made to Stone while he was testifying, emphasizing the importance of any communications with Wikileaks to the inquiry. *See, e.g.*, GX 1 at 28, 31–32, 39–44, 49–50, 57, 59, 70–72, 79–81, 84, 86–87, 89–90, 101–02, 110, 119.

For all of these reasons, and based upon the record in its entirety as of the close of the government's case, defendant's motion for judgment of acquittal has been DENIED.

AMY BERMAN JACKSON
United States District Judge

DATE: November 25, 2019

---

3       This excerpt of the defendant's testimony was not highlighted during the government's case, and it was played to the jury during the defense case. Since the entire transcript was moved in evidence by the government, it may be considered pursuant to Rule 29(b) at this time, but in the event the motion must be decided based solely on the excerpts the government chose to publish to the jury during its case in chief, the Court notes that it would reach the same decision in the absence of this additional, corroborating evidence.