**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 19-cr-18-ABJ** |
| **ROGER J. STONE, JR.,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the United States Attorney for the District of Columbia, hereby submits this memorandum in connection with the sentencing of Roger J. Stone scheduled for February 20, 2020.  On November 15, 2019, a jury found Stone guilty of obstructing a congressional investigation in violation of 18 U.S.C. § 1505 (count 1); making numerous false statements to Congress in violation of 18 U.S.C. § 1001(a)(2) (counts 2-6); and witness tampering in violation of 18 U.S.C. § 1512(b)(1) (count 7).  As explained below, a sentence consistent with the applicable advisory Guidelines would accurately reflect the seriousness of his crimes and promote respect for the law.

**STATEMENT OF FACTS**

**A.      Factual Background**

The jury found Stone guilty of obstructing a congressional investigation, making numerous false statements to Congress, and witness tampering.  This conduct was part of an effort to hide from Congress and to craft a false narrative about Stone's conduct in 2016.  The government briefly summarizes those background events.

In 2016, Stone's longtime associate Donald Trump was running for President of the United States.  In the months leading up to the 2016 presidential election, Stone made repeated efforts to

obtain information from an organization called WikiLeaks that would help the Trump campaign and harm the campaign of Trump's opponent, Hillary Clinton.

On June 12, 2016, the head of WikiLeaks, Julian Assange, publicly announced that WikiLeaks had information about Clinton that was pending publication. Two days later, the Democratic National Committee ("DNC") announced that it had been hacked by the Russians.

On July 22, 2016, WikiLeaks began releasing thousands of emails belonging to the DNC. Three days later, on July 25, Stone e-mailed his associate Jerome Corsi with the subject line "Get to Assange."   In the email, Stone wrote, "At the Ecuadorian Embassy in London and get the pending wikileaks emails…they deal with Foundation, allegedly."  During this time, Assange was living at the Ecuadorian Embassy in London.

Stone emailed Corsi again, this time instructing him that a mutual associate who was living in London, Ted Malloch, should "see Assange."  On August 2, Corsi emailed Stone: "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging. . . Time to let more than Podesta be exposed as in bed w enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about. . .  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that to be much of next dump focus, setting stage for Foundation debacle."   "Friend in embassy" referred to Assange. "HRC" referred to Hillary Clinton. "Podesta" referred to John Podesta, Clinton's Campaign chairman.  "Foundation" referred to the Clinton Foundation.

Soon after he received Corsi's email, Stone made a series of public statements that he was in contact with Assange, and that he knew what information Assange was planning to release.  On at least five occasions between August 8 and August 18, 2016, Stone publicly stated that he had communicated with Assange through an intermediary, whom Stone described as a "back-channel"

or "trusted mutual friend."  The evidence admitted at trial showed that the individual Stone was referencing in these public statements was Corsi, the author of the August 2, 2016 email reporting that "[w]ord is friend in embassy plans 2 more dumps."

During this time period, Stone regularly communicated with senior Trump campaign officials—including Deputy Campaign Chairman Richard Gates and Campaign CEO Steve Bannon—about WikiLeaks' plans to release more information that would be damaging to the Clinton campaign.  Both Gates and Bannon believed that Stone was providing them with non-public information about WikiLeaks' plans.  Indeed, Bannon viewed Stone as the Trump campaign's access point to WikiLeaks.

Stone's efforts to obtain inside information about WikiLeaks' plans were not limited to his communications with Corsi.  On September 18, 2016, Stone emailed his longtime associate Randy Credico with a "request" to pass on to Assange.  Stone chose Credico for this request because Assange had been a guest on Credico's radio show on August 25, 2016.  In the email, Stone asked Credico to find out whether Assange would be releasing messages related to Clinton's handling of a matter in Libya when she was Secretary of State.  In follow-up emails and text messages, Stone repeatedly urged Credico to pass the request to Assange.  Credico told Stone that he would do so, and he wrote to Stone, "just remember, do not name me as your connection to Assange.   You had one that you referred to."  Credico eventually forwarded Stone's request to his friend Margaret Kunstler, a lawyer who did work for WikiLeaks.  Credico blind copied Stone on the email to Kunstler.  Kunstler never responded to the email.

In early October 2016, Credico traveled to London.  On that trip, Credico sent Stone several text messages suggesting that Credico had non-public information about a forthcoming WikiLeaks release.  (In fact, Credico did not have any inside information on this subject.)  When

he received these messages from Credico, Stone relayed information about WikiLeaks' plans to individuals associated with the Trump campaign, including Bannon and Erik Prince.

On Friday, October 7, 2016, at 4:32 PM, WikiLeaks began releasing emails hacked from Clinton Campaign Chairman John Podesta's email account.  Shortly after the release began, Bannon's personal spokesperson messaged Stone, "Well done."  Bannon also heard that weekend from people involved in the Trump Campaign that Stone was involved in the WikiLeaks release of Podesta's hacked emails.

**B.     Offense Conduct**

In January 2017, the United States House of Representatives Permanent Select Committee on Intelligence ("House Intelligence Committee") announced an investigation into allegations of Russian interference in the 2016 presidential election.  As part of that investigation, the House Intelligence Committee was considering Russian involvement in obtaining and transmitting stolen documents that were eventually released by WikiLeaks and any links with the Trump Campaign. Stone testified before the Committee on September 26, 2017.

Prior to Stone's testimony before the Committee, Stone and Credico continued to discuss WikiLeaks.  In several of those conversations, Credico asked Stone about the identity of the intermediary or back-channel with Assange that Stone had referenced in his August 2016 public statements.  Stone told Credico, "That would be you."  Credico repeatedly told Stone that Credico could not have been the intermediary Stone referenced in those statements because Credico's first contact with Assange—to arrange the August 25, 2016 radio interview—occurred after Stone's public statements.  Thus, on January 6, 2017, Credico emailed Stone, "You may as well tell the truth, you had no back channel, or there's the guy you were talking about early August."

When Credico would raise this objection, Stone would respond that he could use the

4

September 2016 email that Credico had sent to Kunstler requesting information about WikiLeaks' holdings to support Stone's account that Credico was Stone's sole intermediary with Assange. Credico was concerned by Stone's suggestion that he would involve Kunstler in the matter, because Kunstler was a very close friend of Credico's, and an older woman, and Credico feared that Stone would bring Kunstler unwanted public attention.

In his testimony before the House Intelligence Committee, Stone told the Committee five categories of lies. Those lies were designed to conceal Stone's communications with Corsi, Credico, and the Trump campaign about WikiLeaks in 2016.

First, Stone testified falsely about the identity of the person he referenced in his August 2016 public statements about having a back-channel to Assange. During the hearing, Stone was repeatedly asked about the identity of this person, and the Committee members stressed the importance of this information over and over again. For instance, Congressman Quigley stated during the hearing: "So perhaps the most important question anyone can ask you today is who was the intermediary…." Ex. 1, p. 41. Likewise, Congressman Gowdy noted, during a back-and-forth with Stone, "the indispensability of interviewing the original source" (*i.e.*, Stone's back-channel) and told Stone "if you're willing to go back and ask your intermediary go-between – that would be helpful." Ex. 1, p. 65. Similarly, Congressman Schiff stated that the House Intelligence Committee "will need to determine which is accurate, whether you were in communication with Assange or you were in communication through an intermediary." Ex. 1, p. 81.

Stone's answer to this question was false. In his testimony before the Committee, Stone told the Committee that his August 2016 references to being in contact with Julian Assange were references to communications with a *single* "go-between," "mutual friend," and "intermediary." In a follow-up letter to the Committee sent in October 2017, Stone told the Committee that this

single intermediary was Credico.  In fact, as Credico had repeatedly pointed out to Stone prior to Stone's testimony, Credico could not have been the person that Stone referenced in August 2016 because Credico had no contact with Assange until after Stone's public statements.  Indeed, Stone and Credico did not even discuss Assange until August 19, 2016, when Credico told Stone that he was trying to book Assange on his radio show.  As discussed above, the intermediary or back-channel that Stone referenced in his August 2016 public statements was Corsi.

Second, Stone testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to Julian Assange and did not ask the intermediary to do anything on Stone's behalf.  In fact, as early as July 2016, Stone told Corsi to "get to Assange" and "get the pending wikileaks emails."  And in September 2016, Stone repeatedly told Credico to ask Assange about whether WikiLeaks had any documents concerning Hillary Clinton and Libya.  Indeed, Stone forwarded that email chain back to Credico in March 2018, six months *after* his testimony before the Committee.

Third, Stone testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual friend," and "intermediary" with anyone involved in the Trump Campaign.  In fact, Stone had conversations with Gates, Bannon, and Trump campaign Chairman Paul Manafort about information that he had received from Corsi and Credico.  And Stone sent emails and text messages to Bannon and Prince about WikiLeaks.

Fourth, Stone testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about WikiLeaks.  In fact, Stone exchanged numerous text messages and emails about WikiLeaks with both Corsi (the actual intermediary) and Credico (the person Stone falsely identified as his intermediary).  Those messages included:  Stone's July 25, 2016 email instructing Corsi to "get

to Assange"; Stone's July 31, 2016 email to Corsi instructing that "Malloch should see Assange"; Corsi's August 2, 2016 email to Stone reporting, "Word is friend in embassy plans two more dumps"; and Stone's emails and text messages to Credico in September 2017 urging him to pass a request for information to Assange.  Indeed, between June 2016 and September 2017, Stone exchanged over 1,500 written communications with Credico.  On the very day that Stone testified before the Committee that he had no written communications with the intermediary, Stone exchanged 72 text messages with Credico.

Fifth, Stone testified falsely that he did not have any emails with third parties about Julian Assange, and that he did not have any documents, emails, or text messages that refer to Assange. In fact, in 2016, Stone exchanged numerous emails and text messages about Assange.  Those messages included the communications with Credico and Corsi discussed above, as well as his emails and text messages with Bannon and Prince about Assange.

Stone's false statements about documents had a significant impact on the Committee's investigation.  After Stone falsely testified that he had no written communications with his intermediary and that he had no written communications referencing Assange, the Committee did not issue a subpoena to Stone for those categories of documents.  When the FBI began investigating Stone's conduct in 2018, the text messages between Stone and Credico from November 2016 to November 2017, which the Committee surely would have subpoenaed if Stone had told the truth about their existence, were gone.

After Stone sent the House Intelligence Committee the letter falsely identifying Credico as the intermediary referenced in Stone's August 2016 public statements, the Committee contacted Credico to request a voluntary interview.  Stone knew that truthful testimony from Credico would expose the many lies that Stone had told the Committee.  And so Stone began a

concerted effort to prevent Credico from testifying truthfully before the Committee.  Between November 2017, when the Committee first contacted Credico requesting an interview, and the spring of 2018, Stone repeatedly emailed and texted Credico urging him either to testify falsely before the Committee or not to testify at all.  For example, on November 19, 2017, Credico wrote to Stone, "My lawyer wants to see me today."  Stone responded, "Stonewall it. Plead the Fifth. Anything to save the plan. Richard Nixon."   That sentence is a paraphrase of a well-known statement by then-President Richard Nixon to aides John Dean and John Mitchell during the Watergate investigation.  The next day, Credico's attorney informed the Committee that Credico would not participate in a voluntary interview.

Similarly, on November 21, 2017, Credico told Stone that he would be getting a subpoena from the Committee.  Stone responded, "That was the point at which your lawyer should have told them you would assert your Fifth Amendment rights if compelled to appear."  Later that day, Credico asked Stone if he would be receiving a subpoena, and Stone told him he was "trying to find out."  Stone then told Credico that "If they know you will take the Fifth if subpoenaed, it makes it less likely."

In total, between November 2017 and May 2018, Stone sent Credico at least seven written communications urging him to plead the Fifth before the Committee.

Stone also used a movie reference that he knew Credico would understand to try to persuade Credico to falsely tell the Committee that he did not remember the relevant events.  On November 27, 2017, the day the Committee issued a subpoena to Credico, Stone wrote to Credico, "This whole thing will be worthless unless you find a place to do your Frank Cannon 10 July imitation: 'Sure.  Sure.  Roger Stone this, Roger Stone that."  Seventeen seconds later, Stone wrote "Frank Pantsgele."  The line Stone quoted to Credico was spoken by a character, Frank Pentangeli,

in a scene from the movie *The Godfather, Part II*.  In that scene, Pentangeli arrives at a Senate hearing to testify against Michael Corleone.  Pentangeli's testimony is expected to establish that another witness before the Senate committee, Michael Corleone, has perjured himself. After Corleone arrives with Pentangeli's brother, Pentangeli lies and claims he doesn't know anything about Corleone's criminal activity. When Pentangeli is confronted with his prior statements about Corleone, Pentangeli tells the Committee that he lied to the FBI, testifying that when the FBI asked about Corleone's criminal activity, Pentangeli said, "Sure, sure, Michael Corleone this, Michael Corleone that."  The import of this message from Stone to Credico was unmistakable. As Credico testified at trial, when Stone told Credico to  "do a Pentangeli," Credico understood Stone to mean that Credico should "throw them off," rebuff," and "divert" the Committee, by falsely claiming not to recall any of the conversations Credico had with Stone or the events that had transpired.

While Stone was pressuring Credico to plead the Fifth or "do a Pentangeli" before the Committee, Stone was keeping the real intermediary, Jerome Corsi, apprised of his efforts.  On November 30, 2017, Stone emailed Corsi.  Stone and Corsi discussed Credico's potential testimony, and Corsi suggested Stone not make further statements about Credico because that could raise "new questions that will fuel new inquiries."  Stone responded, "Credico will take the fifth.  But let's hold a day."

Between December 2017 and May 2018, Stone and Credico continued to communicate about the House Intelligence Committee investigation by email and text messages.  In those communications, Credico repeatedly told Stone that Stone had made a false statement to the Committee and urged Stone to amend his testimony.  In response, Stone pressed Credico either to testify falsely before the Committee to corroborate Stone's own false testimony or to invoke his

Fifth Amendment privilege against self-incrimination to avoid testifying before the Committee altogether.  For example, on December 1, 2017, Credico emailed Stone saying that he was not Stone's backchannel and that he had turned material over to the FBI (even though he had not). Stone responded, "What the fuck is your problem? . . . [Y]ou can get away with asserting your Fifth Amendment rights if you don't want to talk about.  And if you turned over anything to the FBI, you're a fool."   After more back and forth, Stone told Credico: "If you testify, you're a fool. Because of tromp, I could never get away with a certain my Fifth Amendment rights but you can. I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify." Credico again urged Stone to "tell them the truth . . . you never had a backchannel."  Stone wrote back, "You got nothing."  The next day, Stone again told Credico, "You are broke and out of work and your lawyers are morons. Start practicing your Pentangeli."

Similarly, on December 24, 2017, Credico again messaged Stone stating that he had documents to prove that he was not Stone's backchannel, and that Stone "should be honest with FBI."  Stone responded, "I'm not talking to the FBI, and if you're smart, you won't either." Likewise, on January 8, 2018, Credico again told Stone that there was no way he could have been Stone's backchannel, because he "did not have any conversation with Assange until September of last year. Introduced to him August 25th – I have the email – 2016. Certainly clears me."  Stone responded, "No one cares."

Stone also used his knowledge of Credico's relationship with Margaret Kunstler in his witness tampering efforts.  On March 10, 2018, Stone forwarded Credico an email containing Credico's correspondence with Margaret Kunstler regarding WikiLeaks materials relating to Libya.  Stone wrote, "If you go on with Chris Hayes, be sure to mention this."  Credico testified at trial that when he saw this email, he became concerned that Stone could release Credico's email

to Kunstler from September 2017 (on which Stone had been blind-copied) to make it appear as though Kunstler had been involved in WikiLeaks' release of materials regarding Hillary Clinton. As Credico testified at trial, Kunstler is "a very close friend of mine and, you know, she's an older woman, and I didn't want to drag her through this."  Tr. 11/8/19 p. 684.

By the spring of 2018, Stone's efforts to tamper with Credico had escalated from movie lines and Fifth Amendment references to outright threats.  On April 9, 2018, in an email chain about Stone's testimony, Stone wrote to Credico, "I'm going to take that dog away from you.  Not a fucking thing you can do about it either, because you are a weak, broke, piece of shit."  As Credico testified at trial, at the time Credico received the message, he did not believe that Stone would steal his dog, but he worried about "other people get[ting] ideas" if Stone posted a public message to this effect. Tr. 11/8/19, p. 795.  Later that day, Stone wrote to Credico, "I am so ready. Let's get it on.  Prepare to die, cocksucker."

 As urged by Stone, Credico declined the House Intelligence Committee's request for a voluntary interview and invoked his Fifth Amendment privilege against self-incrimination in response to a subpoena, just as Stone had instructed him to do.  As a result, the Committee never heard testimony from Credico and never saw documents in Credico's possession that would have proved that Stone lied to the Committee.

### C.     Post-Indictment Conduct

Stone's post-indictment conduct demonstrated the low regard in which he held these proceedings.  Shortly after the grand jury returned an indictment charging Stone, this Court entered an order prohibiting Stone from making certain statements near the courthouse but declining to impose any further restrictions on Stone's public statements about the case.  Three days later, on February 18, 2019, Stone posted on Instagram a photograph of the presiding judge

in this case with a symbol that appears to be a crosshairs next to her head.   Stone included
commentary alongside the image, including the term "Obama-appointed Judge," with the hashtag
"#fixisin," and referencing Hillary Clinton and Benghazi.  When the post received immediate and
substantial public attention, Stone filed a "Notice of Apology" with the Court, but simultaneously
publicly defended the post and again suggested that the Court was biased against him.

    On February 21, 2019, this Court held a hearing on the matter.  Stone chose to testify at
that hearing.  Initially, Stone testified that he "did not select the image" and "did not review it."
Tr. 2/21/19, p. 12.  On cross-examination, however, Stone admitted that he posted the picture and
that he selected it from among "two or three" images that were sent to him by a "volunteer."  *Id.*
pp. 24-25.  Stone claimed under oath that he did not recall the name of the volunteer or even who
had accessed his phone to obtain the image, even though all of this occurred just a few days before
the hearing.  During his testimony, Stone asked for a "second chance" and promised to "treat the
Court and all [its] orders scrupulously."  *Id.* p. 14.

    The Court discredited Stone's "evolving and contradictory explanations" and found that
Stone "could not even keep his story straight on the stand, much less from one day to another."
*Id.* p. 45.  The Court further found that "the effect and very likely the intent of the post was to
denigrate this process and taint the jury pool," *id.* p. 52, and that Stone's actions "posed a very
real risk that others with extreme views and violent inclinations would be inflamed," *id.* p. 45.
The Court did not revoke the defendant's bail but instead modified Stone's conditions of release
to prohibit public statements about "the investigation or the case or any of the participants in the
investigation or the case. Period."  *Id.* p. 50.

    Soon after, on March 1, the defense moved to "clarify," representing that before the
February 21 hearing, Stone sent material about the relevant investigations to his publisher for a

book with an "imminent" release.  After being required to produce supporting information, the defense represented that the book had in fact been on sale for weeks.  The Court found that "the pleading of March 1 was either deliberately or recklessly inaccurate," and that "[On February 21] Stone sat on the witness stand telling me he'd adhere to any order, knowing from an email he received from the publisher on February 15th that the book had already been sent to stores and media outlets."  The Court concluded that, "The whole episode left the strong impression that the original filing seeking, quote/unquote, clarification was just an attempt to get publicity for the book."

Stone's promise to "scrupulously" obey the Court's orders did not last.  In the months following the February 21 condition of release, Stone repeatedly violated the Court's February 21 order, making numerous public comments—typically on Instagram and Facebook—about the pending case and related matters.  These included a post asking "Who Framed Roger Stone;" a post about Stone's arrest asking what the FBI "could possibly be hiding;" a post touting that Stone had "challenged the entire 'Russia hacked the DNC/CrowdStrike' claim by the Special Counsel;" a photograph of former-CIA Director John Brennan stating that "This psycho must be charged, tried, convicted … and hung for treason" (ellipses in original); and a statement to *Buzzfeed* about whether Stone had told then-candidate Trump about communications with the head of "Organization 1."

Stone also posted statements about the substance of his defense.  For example, on June 18, Stone posted an article about one of his filings in the case:  "US Govt's Entire Russia-DNC Hacking Narrative Based on Redacted Draft of CrowdStrike Report."  Stone tagged the post, "But where is the @NYTimes? @washingtonpost? @WSJ? @CNN?"  Stone posted another article about his filing, titled "FBI Never Saw CrowdStrike Unredacted Final Report on Alleged Russian

Hacking Because None was Produced."  Stone also posted an article titled, "Stone defense team exposes the 'intelligence community's' betrayal of their responsibilities" and quoted this language: "As the Russia Hoax is being unwound, we are learning some deeply disturbing lessons about the level of corruption at the top levels of the agencies charged with protecting us from external threats. One Jaw-dropping example has just been exposed by the legal team defending Roger Stone." Stone again tagged major media outlets.  On June 19, Stone posted a screenshot of an article with the title, "FBI Never Saw CrowdStrike Unredacted or Final Report on Alleged Russian Hacking Because None Was Produced."  He added, "The truth is slowly emerging."

On July 16, 2019, at a hearing on this matter, the Court found that Stone had violated the February 21 order.  While some of Stone's posts may have been a "nudge at the line," Tr. 7/16/19, p. 71, and some "were initially statements made by other people," *id.* p. 72, the Court concluded that Stone's posting and disseminating commentary about the case and investigation, "with his imprimatur" and sometimes added commentary, constituted statements by Stone, *id.*  The Court further found that Stone's "obvious purpose" was "to gin up more public comment and controversy about the legitimacy of the Mueller investigation and the House investigation to get people to question the legitimacy of this prosecution."  *Id.* p. 73.  The Court noted that it had twice given Stone "the benefit of the doubt," *id.* p. 74, but Stone's conduct did not match his assurances and his explanations required "twist[ing] the facts" and "twist[ing] the plain meaning of the order," *id.* p. 75.  The Court found that Stone had shown himself "unwilling" to follow the court's orders and that Stone seemed intent on drawing "maximum attention to what [he] view[s] as flaws in the investigation."  *Id.*  The Court did not revoke his conditions of release but instead added an "additional condition" to the existing order, that Stone "may not post or communicate on Instagram, Twitter or Facebook in any way."  *Id.*

On November 15, 2019, internet broadcaster Alex Jones[1] stated on his broadcast:

> Roger Stone's message is this: He expects to be convicted.  He said 'only a miracle' can save him now.  *That's his exact words to me last night and this morning. And he said to me*, 'Alex, barring a miracle, I appeal to God, and I appeal to your listeners for prayer, and I appeal to the President to pardon me because to do so would be a action that would show these corrupt courts that they're not going to get away with persecuting people for their free speech or for the crime of getting the President elected. If we don't do that, it will embolden their criminal activity.[2] (emphasis added).

Following Stone's conviction on November 15, 2019, Stone's attorney told this Court he had "no personal knowledge" of the accuracy of Jones's statement, but did not deny that Stone had contacted Jones.  Tr. 11/15/19, at 12.  Shortly thereafter, Jones read a message live on air directly from his cell phone, stating that it was a text from one of Stone's "lawyers," that said, "your reporting almost got Roger taken into custody immediately upon the verdicts.  The government cited you and argued for immediate imprisonment.  Please be cautious about your comments concerning private communications."[3]

Jones then reiterated that he had spoken with Stone about the case while it was ongoing, and that Stone had instructed him to "ask for my pardon."[4] Jones further stated, "I need to watch out, the lawyers are telling me, because I'm doing what Roger said."[5]  Jones then stated that he

---

[1] On November 7, 2016, Jones released on his broadcast the name and picture of an alleged prospective juror, claiming that she was a "minion" in a plot against Stone.  *See Alex Jones Goes on Tirade Against Roger Stone Jurors*, November 7, 2019, available at https://www.thedailybeast.com/alex-jones-goes-on-tirade-against-roger-stone-jurors.  On his show, Jones interviewed Jacob Engels, whom Stone had previously identified to this Court as one of his "volunteers," to help "identify" the juror.  *See* Tr. 2/21/19, at 25.  This Court found that Jones's actions were "uniformed" and "false," caused "great consternation among members of the public," and "put[] the safety of all the people associated with this case, on both sides, and including, possibly, the jurors, at risk."  Tr. 11/8/19, at 678.
[2] https://www.mediamatters.org/media/3839486/embed/embed
[3] *See https://www.bitchute.com/video/bDpYzYCRhmgL/* (beginning at 37:20).
[4] *Id* (38:15).
[5] *Id.* (38:30).

was "talking" with one of Stone's lawyers "right now."[6]  Jones held up his phone and stated that there was "tyranny at levels I've never even heard of before."[7]

## GUIDELINES CALCULATION

The government submits that Stone's total offense level is 29 and his Criminal History Category is I, yielding a Guidelines Range of 87-108 months.

Counts 1 through 7 are grouped for Guidelines calculation purposes because they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.  U.S.S.G. § 3D1.2(b).

The applicable Guideline for the Group is § 2J1.2 ("Obstruction of Justice"). The base offense level is 14. U.S.S.G. § 2J1.2(a).

Pursuant to U.S.S.G. § 2J1.2(b)(1)(B), eight levels are added because the offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."   As detailed above, as part of Stone's campaign to keep Credico silent, Stone told Credico in writing, "Prepare to die, cocksucker."   Stone also threatened (again in writing) to "take that dog away from you."  Stone may point to the letter submitted by Credico and argue that he did not have a serious plan to harm Credico or that Credico did not seriously believe that Stone would follow through on his threats.  But Credico testified that Stone's threats concerned him because he was worried that Stone's words, if repeated in public, might make "other people get ideas."  Tr. 11/8/19, at 795.

In any event, it is the threat itself, not the likelihood of carrying out the threat, that triggers the enhancement.  Endeavoring to tamper with a witness can involve a wide range of conduct.

---

[6] *See* *https://www.bitchute.com/video/8alVsp794uVN/* (beginning at 45:10).
[7] *Id.* (46:00).

This enhancement recognizes that when the conduct involves threats of injury or property damage, rather than simple persuasion for example, the base offense level does not accurately capture the seriousness of the crime.  To apply the enhancement, there is no "additional 'seriousness' requirement beyond the fact of a violent threat."  *See United States v. Plumley*, 207 F.3d 1086, 1089-1091 (8th Cir. 2000) (applying § 2J1.2(b)(1)(B) to a defendant who told coconspirators to "'keep our mouth shut,' because if anyone cooperated with the police he would 'kick our ass'"); *United States v. Bakhtairi*, 714 F.3d 1057, 1061 (8th Cir. 2013) (holding there was no seriousness requirement and applying § 2J1.2(b)(1) to a defendant who wrote a menacing email, displayed a loaded rifle to a law partner, and doctored photographs of witnesses children to "add . . . cross-hairs"); *United States v. Smith*, 387 F.3d 826, (9th Cir. 2004) (applying § 2J1.2(b)(1)(B) to a defendant who threatened to kill a witness and "kick [her] ass," and noting that § 2J1.2(b)(1) does not contain a "seriousness requirement").

Pursuant to U.S.S.G. § 2J1.2(b)(2), three levels are added because the offense resulted in substantial interference with the administration of justice.  Because of Stone's conduct, the House Intelligence Committee never received important documents, never heard from Credico (who pled the Fifth), and never heard from Corsi (who was never identified to the Committee as the real "back-channel" that Stone had referenced in August 2016).  The Committee's report even wrongly stated that there was no evidence contradicting Stone's claim that all his information about WikiLeaks was from publicly available sources.

Pursuant to U.S.S.G. § 2B1.2(b)(3)(C), two levels are added because the offense was otherwise extensive in scope, planning, or preparation.  Stone engaged in a multi-year scheme involving (1) false statements in sworn testimony; (2) the concealment of important documentary evidence; (3) further lies in a written submission to Congress; and (4) a relentless and elaborate

campaign to silence Credico that involved cajoling, flattering, crafting forged documents, badgering, and threatening Credico's reputation, friend, life, and dog. Stone's efforts were as extensive, if not more extensive, than those of other defendants who received this two-level enhancement at sentencing. *See, e.g.*, *United States v. Petruk*, 836 F.3d 974 (8th Cir. 2016) (enlisting a friend to create a false alibi and scripting a false confession); *United States v. Jensen*, 248 Fed. Appx. 849 (10th Cir. 2007) (giving advance notice of testing and falsifying results of tests).

Finally, pursuant to U.S.S.G. § 3C1.1, two levels are added because the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution of the instant offense of conviction." Shortly after the case was indicted, Stone posted an image of the presiding judge with a crosshair next to her head. In a hearing to address, among other things, Stone's ongoing pretrial release, Stone gave sworn testimony about this matter that was not credible. Stone then repeatedly violated a more specific court order by posting messages on social media about matters related to the case.

This enhancement is warranted based on that conduct. *See* U.S.S.G. § 3C1.C Cmt. 4(F) ("providing materially false information to a magistrate or judge"); *see, e.g., United States v. Lassequ*, 806 F.3d 618, 625 (1st Cir. 2015) ("Providing false information to a judge in the course of a bail hearing can serve as a basis for the obstruction of justice enhancement."); *United States v. Jones*, 911 F. Supp. 54 (S.D.N.Y. 1996) (applying §3C1.1 enhancement to a defendant who submitted false information at hearing on modifying defendant's conditions of release).

Accordingly, Stone's total offense level is 29 (14 + 8 + 3 + 2 + 2), and his Criminal History Category is I. His Guidelines Range is therefore 87-108 months.

## DISCUSSION

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2006).  Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered.  Section 3553(a) directs Courts to impose a sentence "sufficient, but not greater than necessary" to comply with the following purposes:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Guidelines; (5) the Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).   Each of these matters is addressed further below.

### 1.   The Seriousness of the Offense

Foreign election interference is the "most deadly adversar[y] of republican government." Federalist Papers No. 68 (Hamilton).   Investigations into election interference concern our national security, the integrity of our democratic processes, and the enforcement of our nation's

criminal laws.   These are issues of paramount concern to every citizen of the United States.
Obstructing such critical investigations thus strikes at the very heart of our American democracy.

The House Intelligence Committee investigation that Stone obstructed was examining
allegations that "the Russian government, at the direction of President Vladimir Putin, sought to
sow discord in American society and undermine our faith in the democratic process."   In
particular, the Committee was investigating allegations of Russian involvement in WikiLeaks'
publication of documents related to the 2016 presidential election.   The Committee was also
investigating whether "WikiLeaks played a key role in Russia's malign influence campaign and
served as a third party intermediary for Russian intelligence during the period leading up to the
2016 U.S. presidential election."

It is against this backdrop that Stone's crimes – his obstruction, lies, and witness tampering
– must be judged.   Stone knew the gravity of the House Intelligence Committee's investigation
when he obstructed it by giving false testimony and tampering with a witness.   Indeed, Stone
acknowledged as much in his opening statement before the Committee.   Stone chose—
consciously, repeatedly, and flagrantly – to obstruct and interfere with the search for the truth on
an issue of vital importance to all Americans.   This Court should impose a sentence that accurately
reflects the value the judicial system places on the need to allow witnesses to testify truthfully
without threat or interference, and the importance of testifying truthfully under oath.

## 2.   The Need to Promote Respect for the Law

Stone was not compelled to testify falsely before Congress.   He could have told the truth,
or he could have declined the invitation to testify altogether.   Instead, Stone chose another option:
he lied to Congress and then he tampered with a witness who could expose those lies.   Stone's
goal, at the outset, was to obstruct the Committee's search for the truth.   Stone's lies to Congress

and his obstructive conduct are a direct and brazen attack on the rule of law.

### 3. The Need for Just Punishment

Of crucial importance to the determination of an appropriate sentence here is that Stone decided to double – and triple – down on his criminal conduct by tampering with a witness for months in order to make sure his obstruction would be successful.  Over a year passed from the date of Stone's false testimony to an unsolicited December 2018 letter to the Committee falsely claiming that everything he had said before Congress was accurate.  During this time, Stone engaged in a flurry of continuing criminal conduct, telling Randy Credico to do a "Pentangeli"; threatening Credico; and sending further false statements to Congress.

Stone's actions were not a one-off mistake in judgment.  Nor were his false statements made in the heat of the moment.  They were nowhere close to that.  Indeed, in a statement made on Stone's behalf immediately after his testimony, in the U.S. Capitol Welcome Center, Stone's own attorney claimed that Stone had spent "a lot of time preparing for" his testimony and that the House Intelligence Committee did not ask "any questions that we were not prepared for."[8]  In other words, from the very beginning, Stone anticipated the questions he would be asked by Congress, and came in with a plan to lie and obstruct their inquiry.  Stone then continued to implement that plan over the months that followed by tampering with Randy Credico.

Stone also never undertook any action to correct his false statements.  Nowhere is this more apparent than in an email exchange from April 2018 admitted into evidence at trial.  On April 4, 2018, Stone's attorney sent Stone and Corsi an email, attaching "the only two emails on

---

[8] Roger Stone on Russian and 2016 Presidential Election Investigation, September 26, 2017, available at https://www.c-span.org/video/?434664-1/roger-stone-special-counsel-fired (beginning at 1:15).

the subject between the two of you."  Attached to that email were Stone's July 2016 directives to Corsi to see Assange.  On the very same day he received that email with attachments clearly showing that his intermediary was Corsi, Stone  pressured  Randy Credico, emailing Credico yet another false claim that Credico was his only source.  Stone's conduct took place over an extended period of time, and it was intentional, extensive, and brazen.

### 4.   The Need for Adequate Deterrence

Stone's conduct over the past two years shows the low regard in which he holds the House Intelligence Committee's investigation and this very criminal case.  That conduct suggests that a period of incarceration is warranted to achieve adequate deterrence.

A period of incarceration would also achieve the goal of general deterrence.   In this jurisdiction, Congressional committees hear witnesses testify on a host of topics critical to our country, such as national security, public health and safety, and commerce.  A sentence that includes a period of incarceration would serve as a powerful reminder that our democratic processes can function only if those called to testify tell the truth, and that serious consequences lie in store for those who do not.

### 5.   The Characteristics of the Defendant

Stone's criminal conduct was not an act of desperation.  He is a man of substantial means, and he has enjoyed a modicum of fame from his years of being a political advisor and confidant to powerful politicians, and from being an author and host of his own political radio show.  Rather, his conduct was undertaken purposefully, by someone who knew exactly what he was doing.

### 6.   A Guidelines Sentence Would Avoid Unwarranted Sentencing Disparities

A sentence consistent with the applicable Guidelines range is just and adequate deterrence. It will send the message that tampering with a witness, obstructing justice, and lying in the context of a congressional investigation on matters of critical national importance are not crimes to be taken lightly.  The Court should consider this in light of sentences imposed on other defendants.

For example, Scooter Libby, who was the Chief of Staff of former Vice President Dick Cheney, was convicted of obstruction of justice, false statements, and perjury in the investigation of disclosure of classified information concerning a CIA employee.  After he was convicted at trial, Libby received a sentence of 30 months, which fell within the applicable sentencing guidelines range.  *See United States v. Libby*, 05-CR-394 (D.D.C. 2005).  But unlike Stone, Libby did not engage in witness tampering, let alone extended witness tampering over many months involving pressure, threats, and cajoling.  And while the investigation into the disclosure of a CIA operative was undoubtedly of a serious nature, the investigation into Russian interference in the 2016 U.S. Presidential Election concerned grave issues with more far-reaching implications to our democracy and national security.

This Court sentenced Paul Manafort to thirteen months incarceration for a single count of conspiracy to tamper with witnesses.  *See United States v. Manafort*, 17-cr-201.  However, the tampering Manafort committed was an attempt to induce witnesses "to say falsely that they did not work in the United States as part of the lobbying campaign" Manafort had carried out.  Stone's conduct – lying about his interactions concerning WikiLeaks and the Trump Campaign – concerns a matter substantially more serious.  And Manafort pled guilty to that charge and took responsibility for his actions.  Moreover, Manafort's tampering involved no threats to the witnesses and took place over a far more limited period of time.  And it did not result in a

substantial interference with the administration of justice, as did Stone's criminal conduct here.

This Court has sentenced other defendants to incarceration in cases involving lying and obstruction of justice in matters involving Congress that were much less significant than the instant one.  For instance, in *United States v. Lavelle*, 751 F.2d 1266 (D.C. Cir. 1985), *reversed on other grounds*, *Huddleston v. United States*, 485 U.S. 681 (1988), the former Assistant Administrator of the Environmental Protection Agency ("EPA"), Rita Lavelle, was convicted by a jury of perjury and obstruction of justice for lying to Congress about her administration of the EPA's "Superfund" program in matters affecting her former employer, an airline company.  *Id*. at 1286.  Lavelle's case was clearly of much less significance than Stone's case, and her case involved no witness tampering.  Nonetheless, the District Court sentenced Lavelle to six months in prison.  *Id*. at 1271.

Similarly, in *United States v. Hansen*, 83-cr-0075 (D.D.C.), George Hansen, a former United States Congressman, was convicted by a jury of four counts of making false statements, in violation of 18 U.S.C. § 1001, for failing to disclose, respectively, a $50,000 bank loan to his wife on his congressional financial disclosure form for 1978, an $87,475 silver commodities profit on his disclosure form for 1979, a $61,503.42 loan on his disclosure form for 1980, and $135,000 in loans from private individuals on his disclosure form for 1981.  Hansen's false statements were clearly not as significant as Stone's, and Hansen did not engage in witness tampering or obstruction of a proceeding.  Nonetheless, Hansen served 12 months in prison for his false statements.  *See, e.g., United States v. Hansen*, 906 F. Supp. 668, 691 (D.D.C. 1995).

In *United States v. Solofa*, 10-cr-250 (RBW), the defendant was sentenced to 35 months imprisonment on charges of obstruction of justice and witness tampering.  The charges stemmed from a scheme whereby another defendant, Nauer, who worked for the U.S. Department of

Education ("DOE"), submitted fraudulent invoices for school bus parts to another defendant, Mayer, who kicked back part of the money to Nauer.  Mayer cooperated with law enforcement and recorded conversations with Solofa, who was DOE's Chief Financial Officer.  Solofa was recorded telling Mayer to tell the FBI that he never gave cash to Nauer and that Solofa had no other dealings with anyone else regarding school bus parts. Mayer also made another recording of a conversation with Solofa, telling Solofa that he received a subpoena from the FBI for emails. Solofa told Mayer not to hide anything but "only you know everything...So don't give them any copy you don't want to give them."  A grand jury indicted Solofa on witness tampering, in violation of 18 U.S.C. § 1512(b)(3), and obstruction of justice, in violation of 18 U.S.C. § 1503.  Solofa was convicted following a jury trial and his Guidelines range was 41-51 months.  *United States v. Solofa*, 745 F.3d 1226, 1228 (D.C. Cir. 2014).  The Court ultimately varied downward and sentenced Solofa to 35 months in prison, which the Court of Appeals affirmed.  Clearly, Solofa's conduct was much less extensive than Stone's conduct, and involved a matter of lesser public significance.  Nevertheless, the Court sentenced Solofa to considerable jail time.

In all, the government submits that a sentence consistent with the Guidelines is appropriate based on the nature and extent of Stone's conduct, the length of time it transpired (nearly two years), and the matter of significant national importance that it centered upon.  A sentence consistent with the Guidelines is also appropriate to deter others who intend to lie before Congress, obstruct a Congressional proceeding, or tamper with a witness (or, in Stone's case, those who intend to commit all three criminal acts).  Such a sentence will also take into account Stone's conduct on pre-trial release, where he openly lied to this Court about matters directly affecting the integrity of these proceedings.

The government recognizes that Section 2J1.2(b)(1)(B) covers a range of conduct, from

making threatening statements to actually causing harm to a witness, and that the resulting increase in the applicable guideline range—50 months on the low end and 62 months on the high end—is significant.   The government acknowledges that it is appropriate for the Court to consider the impact that the 8-point upward adjustment Section 2J1.2(b)(1)(B) has on the overall sentencing range, alongside Credico's own acknowledgement at trial that he and Stone routinely exchanged text messages with hyperbolic language and Credico's post-trial contention that he did not seriously believe that Stone intended to do him physical harm.   The government further recognizes that several of the enhancements discussed above—in particular Section 2J1.2(b)(2) and 2J1.2(b)(3)(c)—cover similar aspects of the offense conduct.   The Court may properly consider these things in fashioning a reasonable and just sentence under 18 U.S.C. § 3553(a).

## CONCLUSION

Roger Stone obstructed Congress's investigation into Russian interference in the 2016 election, lied under oath, and tampered with a witness.  And when his crimes were revealed by the indictment in this case, he displayed contempt for this Court and the rule of law.  For that, he should be punished in accord with the advisory Guidelines.

Respectfully submitted,

TIMOTHY SHEA
U.S. Attorney for the District of Columbia

By:  /s/
Jonathan Kravis
Michael J. Marando
Assistant United States Attorneys

Adam C. Jed
Aaron S.J. Zelinsky
Special Assistant United States Attorney
555 4th Street NW
Washington, D.C. 20530