**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Case 1:19-cr-00018-ABJ**

UNITED STATES OF AMERICA,

     v.

ROGER J. STONE, JR.,

     Defendant.

_____/

**DEFENDANT ROGER STONE'S SENTENCING MEMORANDUM AND
MOTION FOR VARIANCE FROM ADVISORY GUIDELINES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION ....................................................................................................................1

  I.   THE COURT SHOULD FIND THAT STONE'S TOTAL GUIDELINES
      OFFENSE LEVEL IS 14 ..............................................................................................2

      A.  An Eight Level Increase for Threatening Physical Injury or Property
          Damage (§ 2J1.2(b)(1)(B)) Is Unjustified ................................................2

      B.  A Three Level Increase for Substantial Interference with the Administration
          of Justice (§ 2J1.2(b)(2)) Is Unjustified .................................................. 5

      C.  A Two-Level Increase for Obstruction of Justice (§ 3C1.1) Is Unjustified...........11

      D.  A Two Level Increase for Conduct Extensive in Scope, Planning, or
          Preparation (§ 2J1.2(b)(3)(C)) Is Unjustified. .......................................14

  II.  THE 18 U.S.C. §3553(a) FACTORS FAVOR A SENTENCE BELOW THE
      ADVISORY RANGE OF 15-21 MONTHS IMPRISONMENT. ....................................15

      A.  The Nature and Circumstances of the Offense Favor a Sentence Below
          the Advisory Guidelines Range. ...........................................................17

      B.  The History and Characteristics of the Defendant Favor a Sentence Below
          the Advisory Guidelines Range. ...........................................................19

      C.  The Need for the Sentence to Reflect the Seriousness of the Offense, to Serve
          as a Deterrent, and to Provide Medical Care in the Most Effective Manner
          Warrant a Sentence Below the Advisory Guidelines Range. ...............................21

          1.  A Non-Guidelines Sentence Would Adequately Reflect the Seriousness
              of the Offense and Promote Respect for the Law. ....................................21

          2.  A Non-Guidelines Sentence Would Provide an Adequate General
              and Specific Deterrent...............................................................23

          3.  A Non-Guidelines Sentence Would Provide Medical Care in the
              Most Effective Manner. ...........................................................24

      D.  The Kinds of Sentences Available.....................................................25

      E.  The Need to Avoid Unwarranted Disparities Favors a Non-Guidelines
          Sentence. .................................................................................26

CONCLUSION............................................................................................................................27

CERTIFICATE OF SERVICE ..................................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Kimbrough v. United States*,
    552 U.S. 85 (2007)................................................................................................................2, 16

*Koon v. United States*,
    518 U.S. 81 (1996)................................................................................................................16, 17

*Pepper v. United States*,
    562 U.S. 476 (2011)..................................................................................................................16

*Rita v. United States*,
    551 U.S. 338 (2007)..................................................................................................................16

*Spears v. United States*,
    555 U.S. 261 (2009)..................................................................................................................16

*United States v. Autery,*
    555 F.3d 864 (9th Cir. 2009) ...............................................................................................23, 24

*United States v. Bender,*
    927 F.3d 1031 (8th Cir. 2019) ...................................................................................................4

*United States v. Booker,*
    543 U.S. 220 (2005).......................................................................................................2, 16, 24, 25

*United States v. Brooke,*
    308 F.3d 17 (D.C. Cir. 2002) ...............................................................................................24, 25

*United States v. Bullion,*
    466 F.3d 574 (7th Cir. 2006) ....................................................................................................24

*United States v. Calvert,*
    511 F.3d 1237 (9th Cir. 2008) ..........................................................................................3, 4, 5, 12

*United States v. Cataldo,*
    171 F.3d 1316 (11th Cir. 1999) .................................................................................................7

*United States v. Chase,*
    367 Fed. Appx. 979 (11th Cir. 2010).........................................................................................24

*United States v. Davis,*
    458 F.3d 491 (6th Cir.2006) .....................................................................................................25

*United States v. Denham*,
    436 Fed. App'x 627 (6th Cir. 2011) ....................................................................4

*United States v. Duarte*,
    28 F.3d 47 (7th Cir. 1994) ...............................................................................3

*United States v. Gall*,
    128 S. Ct. 586 (2007)..................................................................................2, 16

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)..............................................................22

*United States v. Hayes*,
    358 Fed. App'x 685 (7th Cir. 2009) ...............................................................14

*United States v. Irey*,
    612 F.3d 1160 (11th Cir. 2010) .....................................................................25

*United States v. Jensen*,
    248 Fed. App'x 849 (10th Cir. 2007) .............................................................14

*United States v. Lee,*
    454 F.3d 836 (8th Cir.2006) ..........................................................................25

*United States v. Makki*,
    47 F. Supp. 2d 25 (D.D.C. 1999) ..................................................................13

*United States v. Mallory*,
    525 F. Supp. 2d 1316 (S.D. Fla. 2007) .........................................................6, 9

*United States v. McSherry*,
    226 F.3d 153 (2d Cir. 2000).........................................................................7, 11

*United States v. Newman*,
    614 F.3d 1232 (11th Cir. 2010) .....................................................................14

*United States v. Petruk*,
    836 F.3d 974 (8th Cir. 2016) ....................................................................14, 15

*United States v. Powell*,
    576 F.3d 482 (7th Cir. 2009) .........................................................................25

*United States v. Rodriguez*,
    499 Fed. App'x 904 (11th Cir. 2012) .........................................................14, 15

*United States v. Sanchez*,
    676 F.3d 627 (8th Cir. 2012) ..............................................................................4

*United States v. Serfass*,
    684 F.3d 548 (5th Cir. 2012) ...........................................................................4, 5

*United States v. Simmons*,
    470 F.3d 1115 (5th Cir. 2006) ...........................................................................25

*United States v. Smith*,
    445 F.3d 1 (1st Cir.2006) ...................................................................................25

*United States v. Stumpner*,
    174 Fed. App'x 522 (11th Cir. 2006) (unpublished) ...................................24, 25

*United States v. Tomko*,
    562 F.3d 558 (3d Cir. 2009)...........................................................................23, 24

*United States v. Weissman*,
    22 F. Supp. 2d 187 (S.D.N.Y. 1998)..................................................................5, 6

## Additional Sources

United States Sentencing Commission, Measuring Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016), available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf
..........................................................................................................................24

**DEFENDANT ROGER STONE'S SENTENCING MEMORANDUM AND
MOTION FOR VARIANCE FROM ADVISORY GUIDELINES**

Defendant, Roger J. Stone, Jr., files this Sentencing Memorandum, pursuant to 18 U.S.C.

§ 3553 and 18 U.S.C. § 3661, in advance of his sentencing, which is scheduled for February 20,

2020.

## INTRODUCTION

Roger Stone stands before the Court for sentencing, having been convicted by a jury of

Count I, Obstruction of Proceeding (18 U.S.C. § 1505); Counts II – VI, False Statements (18

U.S.C. § 1001(a)(2)); and Count VII, Witness Tampering (18 U.S.C. § 1512(b)(1)).

Stone, United States Probation, and the Government agree that, under the United States

Sentencing Guidelines, the offenses of conviction are grouped, pursuant to U.S.S.G. § 3D1.2(b),

and that the controlling guideline is U.S.S.G. § 2J1.2.  The parties further agree that the base

offense level is 14, which, for Stone, who the parties agree is in Criminal History Category I, has

a corresponding advisory range of imprisonment of 15-21 months.

Probation and the Government, however, incorrectly maintain that the following offense

level increases are applicable:

| | | | |
|---|---|---|---|
| Specific Offense Characteristics | U.S.S.G. §2J1.2(b)(1)(B) | 8 level increase | ¶76[1] |
| Specific Offense Characteristics | U.S.S.G. §2J1.2(b)(1)(2) | 3 level increase | ¶77 |
| Obstruction of Justice | U.S.S.G. §3C1.1 | 2 level increase | ¶80 |
| Obstruction of Justice[2] | U.S.S.G. §2J1.2(b)(3)(C) | 2 level increase | ¶77 |

---

[1]      Paragraph references are to the Presentence Investigation Report, dated January 16, 2020,
("PSR"). [Dkt. #272].

[2]      Government's Objection to Presentence Investigation Report, dated January 30, 2020.

For the reasons set forth below, Stone maintains that the total offense level is 14 and that the 15 offense-level increases for which Probation and the Government advocate are inapplicable under the law and the facts of this case.  Accordingly, Stone submits that the Court should find that his total offense level is 14 with a corresponding range of imprisonment of 15-21 months. Stone further respectfully submits that a sentence below the advisory Guidelines range of 15-21 months would be "sufficient but not greater than necessary to comply with the purposes of sentencing."  18 U.S.C. § 3553(a); *See Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220, 125, S. Ct. 738, 765, 160 L. Ed. 2d 621 (2005).

In the sections that follow, we address (a) the calculation of the sentencing Guidelines and the reasons that the offense level increases that Probation and the Government seek are inapplicable (the offense conduct is discussed as relevant throughout this section); and (b) the factors under 18 U.S.C. § 3553(a) that warrant a downward variance from the applicable Guidelines range of 15-21 months imprisonment.

I.      **The Court Should Find that Stone's Total Guidelines Offense Level is 14**.

As noted above, the parties agree that, pursuant to U.S.S.G. § 3D1.2, the seven counts of conviction constitute a single group and that § 2J1.2 is the applicable guideline, which has a base offense level of 14.  For the reasons discussed below, the facts of this case do not warrant the application of any offense level increases.

### A.  An Eight Level Increase for Threatening Physical Injury or Property Damage (§ 2J1.2(b)(1)(B)) Is Unjustified.

An eight-level increase, pursuant to U.S.S.G. § 2J1.2(b)(1)(B), is inapplicable here because Roger Stone did not threaten to physically injure Randy Credico or damage Credico's property, in the manner contemplated by the guideline and relevant case law.

United States Sentencing Guidelines § 2J1.2(b)(1)(B) provides "[i]f the offense involved causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels."  The function of § 2J1.2(b)(1) is "to distinguish threats of physical injury or property damage from lesser threats." *United States v. Duarte*, 28 F.3d 47 (7th Cir. 1994). The eight-level increase does not apply to the facts here, because, as explained in *United States v. Calvert*, 511 F.3d 1237 (9th Cir. 2008), the increase is applicable in only those cases that involve more serious forms of obstruction:

> [I]t must not be forgotten that for the eight-level enhancement to apply, the Guideline requires that the intent to retaliate have been carried out in a particular manner; The defendant must have caused or threatened to cause property damage or physical injury to the witness. Trivial retaliatory acts will not do; the enhancement is reserved for serious acts used "as a means of intimidation." U.S.S.G. §2J1.2 cmt. application note 5. This point is picked up by the Guideline's commentary that "[t]he specific offense characteristics [found in section 2J1.2(b)(1)-(2)] reflect the *more serious forms of obstruction."* U.S.S.G. §2J1 cmt. background (emphasis added). Indeed, even this "serious form" of obstruction captured in §2J1.2(b)(1) is considered a floor, as the Guideline's application notes reference the possibility for a further upward departure "[i]f a weapon was used, or bodily injury or significant property damage resulted." U.S.S.G. §2J1.2 cmt. application note 4.

*Id*. at 1242 (9th Cir. 2008) (emphasis in original).

Randy Credico made it clear, in both a post-trial letter to the Court and in his trial testimony that he did not consider anything that Stone said to constitute a threat.  In his letter to the Court for consideration at sentencing, Credico wrote: "*I never in any way felt that Stone himself posed a direct physical threat to me or to my dog. I chalked up his bellicose tirades to 'Stone being Stone.' All bark and no bite!"* [Dkt. #273] (emphasis supplied).

Similarly, his trial testimony makes plain that there can be no serious dispute as to the fact that Roger Stone did not threaten Credico's dog:

> I think [Stone] loves all dogs, I don't think [Stone] would steal a
> dog, no. . . . dog lovers like dogs, you know what I mean? . . . I
> don't think [Stone] was going to steal the dog, no, I don't. . . . I know
> [Stone] would have never touched that dog. All right? So it was
> hyperbole by [Stone].

TT 795:11 – 796:16. Plainly conceding the point, the Government, thereafter, dropped any

reference to Credico's dog in its arguments to the jury.

The facts of this case are also readily distinguishable from cases involving real threats of

the kind that the guideline is intended to address.  Indeed, this is not *Calvert, supra*, (shooting an

elderly witness in the stomach as revenge for his testimony); nor is it *United States v. Bender*, 927

F.3d 1031, 1032 (8th Cir. 2019) (instructing inmates in another prison to "smash" witnesses); or

*United States v. Sanchez*, 676 F.3d 627, 629 (8th Cir. 2012) (witness's husband confronted and

asked "Where's [your wife]?," "What would you think that [*sic*] if one of your children were

killed?" "What would you think if something happened to [your brother]?"); and this is most

certainly not *United States v. Denham*, 436 Fed. App'x 627 (6th Cir. 2011), where the following

chilling threats of unmistakable physical harm were delivered to the witness:

> You know what happens to rats? You think you're safe? Huh? Do
> you really think you're safe? You'll be found. Judy is fifty-five years
> fuck old, do you know that? You mother fuckers are dead. You're
> dead. Do you understand me? You're dead. Do you hear that?
> You're fucking dead. And you won't know where it's coming from.
> Next thing you know you'll be fucking laying with your God-damn
> hands cut off.

*Id*. at 627.

Stone's indecorous conversations with Randy Credico were many things, but here, in the

circumstances of this nearly 20-year relationship between eccentric men, where crude language

was the norm, "prepare to die cocksucker" and conversations of similar ilk, were not threats of

physical harm, "serious acts" used as a means of intimidation, or "the more serious forms of

4

obstruction" contemplated by the Guidelines.  *Calvert, supra*; U.S.S.G. § 2J1.2 cmt.; *United States v. Serfass*, 684 F.3d 548, 550 (5th Cir. 2012) (taking consideration of the record as a whole when determining applicability of level enhancements).   Stone and Credico engaged in an ongoing dialogue in which each used harsh language as a matter of course and it was understood between them that, as Credico put it, it was "all bark and no bite."

Consequently, we respectfully submit that the Court should find that an eight-level increase under § 2J1.2(b)(1)(B) is inapplicable in the instant matter.

### B. A Three Level Increase for Substantial Interference with the Administration of Justice (§ 2J1.2(b)(2)) Is Unjustified.

A three-level increase, pursuant to U.S.S.G. § 2J1.2(b)(2) is inapplicable here because (1) Stone's testimony before, and conduct in connection with, the House Permanent Select Committee on Intelligence ("HPSCI") falls outside the scope of the guideline; (2) there has been no showing that Stone's testimony or conduct caused the unnecessary expenditure of substantial governmental or court resources; and (3) even were Stone's testimony and other conduct within the scope of the guideline, it did not cause substantial interference with the administration of justice.

The plain language of the commentary to the guideline makes clear that this offense level increase is unwarranted here:

> "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. § 2J1.2 cmt. 1.  Accordingly, the court in *United States v. Weissman*, 22 F. Supp. 2d 187, 194 (S.D.N.Y. 1998), found that—absent a finding that the conduct caused the unnecessary expenditure of substantial governmental or court resources—the offense level increase does not apply to testimony before Congress:

> Because Weissman's conduct occurred within the context of a
> congressional inquiry, rather than a criminal investigation or a
> judicial proceeding, the only circumstance specified in the
> Application Notes pertinent to the case at bar is "the unnecessary
> expenditure of substantial governmental or court resources."

*Weissman*, 22 F. Supp. 2d at 194.

Thus, here, as in *Weissman*, because Stone's testimony and conduct occurred in the context

of a congressional investigation, and not a criminal investigation or judicial proceeding, the offense

level increase under § 2J1.2(b)(2) is unwarranted.  Consequently, given that neither Probation nor

the government has offered any evidence, or even suggested, that Stone's conduct caused the

unnecessary expenditure of substantial government or court resources, there is no basis to apply

an increase under this section in Stone's Guidelines calculation.

Moreover, even were Stone's actions within the scope of the guideline—and they are not—

there is no basis to support a conclusion that they "resulted in substantial interference with the

administration of justice" warranting a three level increase, pursuant to U.S.S.G. § 2J1.2(b)(2).

Indeed, to find that conduct caused "substantial" interference, the conduct in question must have

had an impact of real importance or considerable value, and its impact must not be speculative,

imaginary, or illusive:

> The Application Notes for §§ 2J1.2(b)(2) [] do[es] not define the
> term "substantial." Therefore, the Court will ascribe to the term its
> "ordinary or natural meaning." . . .  Black's Law Dictionary defines
> substantial as "[o]f real importance; of considerable value; valuable.
> Something worthwhile as distinguished from something without
> value or merely nominal." Black's Law Dictionary 1428 (6th
> ed.1990).  In Webster's Third New International Dictionary
> substantial is defined as "(c) of substance, real, not imaginary or
> illusive." Webster's Third New International Dictionary 2280
> (Merriam Webster 1981).

*United States v. Mallory*, 525 F. Supp. 2d 1316, 1319 (S.D. Fla. 2007).

"Courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." *United States v. Cataldo*, 171 F.3d 1316, 1321 (11th Cir. 1999) (internal citations omitted).  Speculation is defined as "the practice or an instance of theorizing about matters over which there is no certain knowledge" (Black's Law Dictionary, 11th ed. 2019); "the contemplation or consideration of some subject" (Dictionary.com); "ideas or guesses about something that is not known." (Merriam-Webster, 2019).  *See United States v. McSherry*, 226 F.3d 153, 157-158 (2d Cir. 2000) ("In the absence of persuasive reasons to the contrary, terms in the Guidelines are given their ordinary meanings.").

Here, Probation offers a rationale for the application of this offense level increase that is purely speculative and which is, therefore, deficient.[3]  In the PSR, Probation states that "[i]n this case, the defendant's obstruction of justice and witness tampering caused HPSCI to release a report on its investigation into Russian interference in the 2016 election which was erroneous and lacked valuable information which would have been provided by witnesses who chose not to testify." PSR ¶ 77. This statement is unreliable, non-specific, and too speculative to satisfy the requisite burden of proof.  *Cataldo*, 171 F.3d at 1321.

It is speculation that HPSCI's Report on Russian Active Measures, released March 22, 2018, is "erroneous."  To the contrary, the "Report of the Select Committee on Intelligence United States Senate on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election,"

---

[3] In its Receipt and Acknowledgement of the PSR, the government adopted Probation's findings without elaboration.  The government did, however, claim to reserve the right to make additional arguments in its sentencing submission regarding the Guidelines.  Should the government submit any rationale for the Guidelines calculations beyond those identified in the PSR and the government's objections to the PSR, Stone respectfully requests that the Court provide ample opportunity to prepare a written response.  The government's unilateral reservation of a right to offer additional justifications for the Guidelines calculation should not be permitted to undercut Stone's right to a full and fair opportunity to address these critical issues in advance of sentencing.

Volumes 1 and 2, and the Special Counsel's "Report on the Investigation Into Russian Interference in the 2016 Presidential Election," Volumes I and II, made findings consistent with those found in the publicly available, redacted HPSCI Report.  In other words, even had Stone testified differently and even had Credico testified before HPSCI, the conclusions drawn in its report would not have been materially different.

Thus, Probation's claim that the HPSCI Report "lacked valuable information which would have been provided by witnesses who chose not to testify" (PSR ¶77) grossly overstates the importance and significance of Roger Stone (and Randy Credico).  The HPSCI Report states "[s]ix of the witnesses the Committee requested to interview invoked their Fifth amendment protections from self-incrimination, which resulted in the Committee not being able to obtain pertinent information from those particular individuals" (Report, Appendix A – Scope and Methodology, p. 131).  Of those six witnesses, only Credico is at issue here and the record is clear that any claim that any effort by Stone to dissuade Credico from appearing before HPSCI substantially interfered with the administration of justice is untenable because Credico knew nothing pertinent to the investigation.

First, over a two-year time period, at least five government entities conducted investigations into Russian interference in the 2016 election.  Before it was over, Randy Credico testified before the Grand Jury in the Special Counsel's investigation; was interviewed by the Federal Bureau of Investigations six times; and produced documents in response to subpoenas that include his Facebook messages, his Signal messages, his text messages, and several email accounts.  In the end, Credico was mentioned on five pages of the Special Counsel's Report, not mentioned in either volume of the Senate Intelligence Report, and not mentioned at all in the

HPSCI Majority Report.  He was mentioned on two pages of the HPSCI Minority Report, where they noted that Stone identified Credico to the Committee.

Thus, the record is clear that if Credico had testified before HPSCI, he would have made the same claim to the Committee as he did to the FBI, the Office of Special Counsel, the Grand Jury, and this Court: He was not an intermediary for Roger Stone and did not know anything about Julian Assange or WikiLeaks *vis a vis* Russian interference with the election.  Whatever information HPSCI may have been provided had Credico testified before it can hardly be considered valuable, much less substantial, *i.e.*, "important," "of considerable value," "distinguished from something . . . merely nominal," "of substance, real, not imaginary or illusive." *See*, *Mallory*, *supra*, at 6.  To say otherwise is mere conjecture and to increase Stone's offense level based on such speculation would be error.

Second, Credico, in his testimony and other statements (both public and private) has made clear that, regardless of Stone, Credico had no intention of testifying before HPSCI:

- o   I'm a journalist. I'm not speaking in front of the committee.
- o   I have first amendment protection.
- o   If they want to cite me for a contempt that's fine but the bigger picture is [] to protect freedom of the press.
- o   I will not be talking to them
- o   For the last 2 years I've been a journalist at WBAI and I have First Amendment protections
- o   You can trust me on behalf of the First Amendment that many people died to protect none of whom sit on that committee I will be willing to be cited for contempt and spend a few months in jail
- o   Rest assured I will not communicate with the house Intel committee about any of my communications with anybody because I am protected by the First Amendment
- o   I've already got 10 lawyers who were working on it

Government Exhibit 065.  In addition, Credico was represented by counsel who responded on his behalf to the HPSCI subpoena and asserted his Fifth Amendment protections.  Letter from Martin

Stolar, Esq., dated December 12, 2017, to HPSCI. At trial, Credico testified regarding invoking

his Fifth Amendment rights this way during direct examination:

> Q:   Did you write a message to Mr. Stone about lawyers wanting you to take the Fifth?
>
> A.   Yes.
>
> Q.   Did you receive some advice from people telling you you should take the Fifth?
>
> A.   Some lawyers told me to take the Fifth and some lawyers told me to note take the Fifth.
>
> ***
>
> Q.   And was Mr. Stone a reason for you taking the Fifth?
>
> A.   He's one of many reasons why I took the Fifth. You know, what - - I finally did, but there's a thousand reasons why I took the Fifth. I got advice from him.

TT 707:19 – 708:6.

On cross examination, he further testified:

> Q.   So, without saying, Mr. Credico, what your lawyer said to you, did you authorize your lawyer to write a letter to the House Intelligence Committee, invoking your Fifth Amendment right?
>
> A.   Yes, I did.
>
> Q.   In fact, you publicly have stated one of the reasons why you asserted your Fifth Amendment is that you thought the House investigation was a witch hunt?
>
> A.   Yes.
>
> Q.   And in addition to consulting with lawyers and many people, you've consulted with Betsy Woodruff, a journalist.
>
> ***
>
> A.   I talked to her about it, yes. I talked to a lot of people about it. I didn't ask her for advice.
>
> Q.   And, in fact, you publicly have stated that you have said so many versions of the events, that it was in your best interest to take the Fifth Amendment.

10

A.    Well, somebody said that when I was on *The Intercept[]* radio show, that - - you know, best that you take; that was one person.

People had - - I was encouraged by other people to take - - to go out and say [assert 5th Amendment], otherwise I was going to have this being held over my head for a long time, even if, in fact, you know, there was the deal. David Corn had put something out. This is suspicious that Credico took the Fifth.

I didn't want that out there. So, I knew there was going to be some kind of repercussions by taking the Fifth Amendment. Even though you have the right to do it, people do speculate, they extrapolate - -

TT 781:25 – 783:4.

Accordingly, "there is not basis under Guideline[] § 2J1.2(b)(2) to increase those levels for attenuated consequences that (if they occurred) did not result from the charged conduct." *United States v. McSherry*, 226 F.3d 153, 159 (2d Cir. 2000).

There is, therefore, no factual basis for an offense level increase pursuant to U.S.S.G. § 2J1.2(b)(2). Any harm caused by the conduct that forms the basis for Stone's convictions for obstruction of justice and witness tampering are adequately reflected in the guideline's base offense level.

**C. A Two-Level Increase for Obstruction of Justice (§ 3C1.1) Is Unjustified**.

An offense level increase, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice is inapplicable, given that Stone did not "willfully obstruct[], impede[],or attempt[] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." *Id*. Such an adjustment "is not to be applied to the offense level for [obstruction of justice] except if a significant further obstruction occurred" during the prosecution. § 3C1.1, Note 7. "[The Guidelines'] commentary is generally authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous

11

reading of, that guideline" (internal quotation marks omitted)." *United States v. Calvert*, 511 F.3d 1237, 1245 (9th Cir. 2008).

For the reasons discussed below, the litany of conduct outlined in the PSR did not cause significant, further obstructions of the prosecution of this case. Those issues ceased well before the trial began, were contemporaneously managed by the Court, and had no impact on the jury. In fact, the Court repeatedly found during jury selection that, despite general knowledge among the jury pool regarding the circumstances of this case, there was an ample pool of qualified jurors who were not rendered biased by the publicly available information about the case.

The facts relevant to this issue are as follows: On February 21, 2019, after some questionable posts on social media contrary to the Court's standing "gag" order, the Court held a hearing to address Stone's most recent misstep. Stone testified during the hearing and the Court heard argument from counsel. At the close of the hearing, the Court issued a ruling prohibiting Stone from any further discussion about "the Special Counsel's investigation or this case or any of the participants in the investigation of the case." Shortly thereafter, upon realizing there may be a possible conflict with the Court's February 21 order, Defense counsel filed a Motion to Clarify.

As the Motion explained, Stone had numerous attorneys representing his various interests in the early part of 2019, as well as in 2018, when he first wrote an Introduction to a book titled "The Myth of Russian Collusion." It was also in 2018 that the business transaction with the publisher occurred. Unfortunately, the existence of the book's Introduction was known by certain defense counsel and not by others. It was not until after the February 21, 2019 court hearing that the import of the Introduction was realized. As far as the statements in the Motion to Clarify are concerned, Stone did not willfully obstruct the proceedings, as this was error on the part of defense

counsel. Furthermore, counsels' use of "imminent" was an oversight and should not have been included. The Motion to Clarify was, however, filed in good faith and should not, in any case, negatively affect Stone.

In addition, Stone did obtain the advice of counsel prior to commenting that "Mr. Cohen's statement is not true." Defense counsel did not specifically recall Stone's February 27 email request for guidance during the July 16, 2019 hearing. Counsel, however, affirms that a review of relevant communications reflects that the comment was approved. It is, therefore, submitted that defense counsel's lack of recall at the July hearing should not be held against Stone.

Furthermore, as was made plain during the relevant proceedings, the conduct in question resulted in large measure from the exacerbation of a longstanding battle with anxiety that was heightened during the pendency of this action, which Stone subsequently corrected with therapeutic treatment. This fact cuts against a finding that the conduct was designed to have a significant obstructive effect and, therefore, weighs against a finding that the conduct at issue warrants an offense level increase under the § 3C1.1.

With respect to the Court's Minute Order dated February 3, 2020, it is respectfully submitted that following the proceedings discussed above, Stone has complied with the Court's orders and conditions of release.

Accordingly, it is respectfully submitted that none of the identified conduct was material or supports the contention that Stone acted purposely to obstruct the proceedings. *See United States v. Makki*, 47 F. Supp. 2d 25, 29 (D.D.C. 1999).

**D. A Two Level Increase for Conduct Extensive in Scope, Planning, or Preparation (§ 2J1.2(b)(3)(C)) Is Unjustified**.

A two level increase, pursuant to § 2J1.2(b)(3)(C), is unjustified because Stone's conduct does not rise to the requisite level of "extensive in scope, planning, or preparation." "[D]uration of [an] offense is not equivalent to its 'scope' for purposes of § 2J1.2(b)(3)(C)." *United States v. Newman*, 614 F.3d 1232, 1239 (11th Cir. 2010) ("The district court's reliance on the eight-year duration of the offense to find that it was 'extensive in scope' was [] error.").

The conduct here differs both qualitatively and quantitatively from the actions taken in cases where the offense level increase has been affirmed. Indeed, the conduct here stands in stark contrast to that in *United States v. Jensen*, 248 Fed. App'x 849 (10th Cir. 2007), in which the court found conduct of corrections officer extensive in scope because it was "extreme and repetitive" and included supplying inmates with clean urine samples, advance notice of random drug testing, failing to record positive drug tests, and allowing inmates to leave the institution, all in return for sexual favors or money. *Id.*

The instant case similarly lacks the extensive planning and preparation found in *United States v. Hayes*, 358 Fed. App'x 685 (7th Cir. 2009), which involves a defendant who spent months preparing to kidnap a child by fraudulently "obtaining a passport and other identification documents, closing bank accounts, ceasing her mortgage and car payments, and recruiting her friend to assist in the kidnapping." *Id.* at 687.

Furthermore, the cases relied upon by the Government, *United States v. Petruk*, 836 F.3d 974 (8th Cir. 2016), and *United States v. Rodriguez*, 499 Fed. App'x 904 (11th Cir. 2012), do not carry the weight assigned to them and are not applicable here. Indeed, both of the cases on which the government relies involve extensive planning and conduct—including, as the court found in one case, smuggling sperm into a secure prison facility to falsely implicate a corrections officer

14

(*Rodriguez*) and the use of an elaborate scheme to create false exculpatory evidence for introduction at trial in the other case (*Petruk*).

Accordingly, for the reasons set forth above, an offense level increase under U.S.S.G. § 2J1.2(b)(3)(C) is unjustified.

## II.     THE 18 U.S.C. §3553(a) FACTORS FAVOR A SENTENCE BELOW THE ADVISORY RANGE OF 15-21 MONTHS IMPRISONMENT.

For the reasons discussed below, the factors set forth in 18 U.S.C. §3553(a), militate in favor of a sentence below the advisory Guidelines range of 15-21 months imprisonment.

"The Court shall impose a sentence sufficient, but not greater than necessary, to comply" with the general purposes of sentencing." 18 U.S.C. § 3553(a). In determining an appropriate sentence, the Court must consider the following:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The need for the sentence imposed—

   a.     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   b.     to afford adequate deterrence to criminal conduct;

   c.     to protect the public from further crimes of the defendant; and

   d.     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. The kinds of sentences available;

4. The [Sentencing Guidelines];

5. Any pertinent policy statement . . .;

> 6. The need to avoid unwarranted disparities among similarly situated defendants . . .; and
>
> 7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (some minor alterations not noted).

Though the Guidelines are an important factor in the sentencing analysis, they are only advisory and the court is generally free to impose non-Guidelines sentences. *United States v. Gall*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005). This authority is consistent with the fundamental principle that a sentencing court should consider the full scope of a person's life in an effort to sentence the individual as opposed to the crime:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 . . . (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams [v. New York],* 337 U.S. [241,] 247 [(1949)] . . . .

*Pepper v. United States*, 562 U.S. 476, 487-88, 131 S. Ct. 1229, 1239-40 (2011) (holding that post-sentencing rehabilitation is an acceptable basis for non-Guidelines sentence on resentencing after appeal).

The Supreme Court and Circuit Courts across the country encourage sentencing courts to exercise great discretion in imposing a just and fair sentence. *See e.g., Spears v. United States*, 555 U.S. 261 (2009); *Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Booker*, 543 U.S. at 220. In exercising its utmost discretion to fashion an appropriate sentence, "the sentencing judge [must] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

As we demonstrate in the sections that follow, imposing a non-Guidelines sentence on Stone will be sufficient but not greater than necessary to achieve the goals enumerated in 18 U.S.C. § 3553(a).

**A.  The Nature and Circumstances of the Offense Favor a Sentence Below the Advisory Guidelines Range**.

Roger Stone was charged and convicted on Count 1, Obstruction of Proceeding (18 U.S.C. §1505(2)); Counts 2-6, False Statements (18 U.S.C. §1001(a)(2)); and Count 7, Witness Tampering (18 U.S.C. § 1512(b)(1)). He voluntarily testified before the House Permanent Select Committee on Intelligence regarding the Russian state's interference in the 2016 presidential election.  In hindsight, notwithstanding the offense conduct, it is apparent that he had no substantive evidence to offer.

While Stone does not seek to minimize the seriousness of the charges, it is important to understand the circumstances in which they arose.

In March 2016, in the midst of the 2016 presidential election campaign, the Democratic campaign chairman's email accounts were compromised. In April 2016, both the Democratic National Convention (DNC) and the Democratic Congressional Campaign Committee's (DCCC) files and email accounts were compromised.  DNC and DCCC officials learned of the compromise in May, but, by July 2016, the entire globe had found out.  Julian Assange, and his library of documents, WikiLeaks, became the repository for the emails.

Several government agencies opened investigations into Russian interference in the 2016 election," for example: the House Permanent Select Committee on Intelligence ("HPSCI"), the

Senate Select Committee on Intelligence, the House Committee on the Judiciary, the Senate Judiciary Committee, the Federal Bureau of Investigation, and the Office of the Special Counsel.

In the end, the investigations yielded no evidence of the involvement of any American with the Russian government or any agent operating on its behalf to interfere in the 2016 election.  It is also undisputed that Roger Stone had nothing to do with obtaining the compromised emails or providing them to WikiLeaks.

Notwithstanding the context under which this case arose, the Court narrowed the scope of the trial to all but eliminate any reference to its genesis.  With that in mind, Stone now submits that the Court should not lose sight of the fact that, with respect to the five statements upon which Stone's convictions under 18 U.S.C § 1001 are based, while the government argued and the jury found that the HPSCI Report was impacted by those statements, the conclusions in the report issued by the Office of the Special Counsel make inescapable the fact that the information that Stone failed to provide to HPSCI was insignificant in the broader context of the investigation into Russian interference in the 2016 election.

As discussed above, the Office of the Special Counsel had access to both Jerome Corsi and Randy Credico, as well as to the communications between Stone and each of them, and found no evidence of any connection to Russia.  Stone's convictions for obstruction of justice and witness tampering should similarly be viewed in the broader context of the investigation.  In other words, Stone stands convicted for having sought to conceal information ultimately determined to be of no investigative value.  Neither Corsi, nor Credico, nor any of their communications provided any useful information in the investigation into election interference.

Stone submits further that, even were the Court to find that any of the offense level increases challenged above are applicable—and Stone maintains that they are not—the Court

18

should look beyond the technical prescriptions of the Guidelines and find that, in the circumstances of this case, Stone's conduct does not fall within the range of cases for which punishment of the magnitude reflected in the Guidelines calculations in the PSR is warranted.

Thus, though Stone does not seek to minimize the seriousness of the charges of which he has been convicted—indeed, he is painfully aware of the severity of the situation—it is respectfully submitted that the nature and circumstances of the conduct at issue would be amply punished with a sentence below the advisory range of 15-21 months imprisonment.

### B. The History and Characteristics of the Defendant Favor a Sentence Below the Advisory Guidelines Range.

As a 67-year-old first time offender convicted of serious but non-violent crimes, Roger Stone's history and characteristics support a sentence below the advisory Guidelines range of imprisonment. As detailed in the accompanying letters from his family and friends, Roger Stone is far more than the persona he projects in the media. As those who know him well attest, he is a man devoted to his friends and family, but also someone who has repeatedly extended himself well beyond the normal range to assist virtual strangers.

The quality of his character is seen in the way he and his wife have opened their home to care for someone too poor and sick to manage on his own; the personal interest Stone has taken in the problems of others whom he has aided selflessly; and the strong connections he has made with his wife's children, whom he considers his own and who have proudly taken his name in acknowledgment of the love and support he has provided. These details and many more are provided in the accompanying letters, which the Court is urged to read and consider in fashioning a sentence that takes into account the full scope Stone's history and characteristics and not simply the narrow public persona he has adopted to further his professional endeavors.

Toward that end, the following is a synopsis of Stone's personal and professional history. Roger Stone was born in Norwalk, Connecticut on August 27, 1952. His father, Roger, a well driller, passed away at the age of 82 in 2013. His mother, Gloria, was a homemaker and passed away in 2016 at the age of 91. Roger has two sisters, Lisa Nicholson and Wendy Cox.

Roger's story begins in rural Connecticut where, other than school, his life was all about his family. Roger faithfully attended church with his parents and sisters and participated in community events where they lived. Growing up in a rural area, Roger was not able to join organized team sports, but to keep in shape and he began running and lifting weights, two activities he continues today.

His first exposure to politics was through elections in his primary and secondary schools. It was there his eyes were opened to politics on a local, state, and national level. With a desire to satisfy his curiosity about politics, he applied to and was admitted to the George Washington University where he enrolled in 1970. In order to help pay his way through school, he found a job on Capitol Hill that ultimately led to his hiring in 1971 at the President Richard Nixon re-election campaign and a lifelong obsession with politics and the political process. As a result of this start of his career in politics, before graduating, Roger left George Washington University and has never stopped working in politics.

Ever since landing in D.C., Roger worked very hard to succeed. Along the way, Roger worked for U.S. Senator Bob Dole, the Ronald Reagan presidential campaign, the campaign for both Presidents Bush, and on behalf of countless other candidates. He also played an important role in the post-presidency reputational rehabilitation of President Richard Nixon.

After his efforts in government and as integral parts of campaigns, Roger co-founded Black, Manafort, and Stone, a political affairs company in Washington, DC. After the partners

sold the company to a national public affairs company, Roger was largely self-employed and worked on behalf of causes and people who had interests in front of the government and candidates who wanted to be part of the government.

Through Roger's work in Washington, he met his first wife, Anne (Wesche) Stone. The two were married in 1974. They had no children. They remained married until 1990 when they divorced in Alexandria, Virginia. They remain friends to this day.

Soon thereafter Roger met Nydia Bertran and the two married in 1991. Although, by that year Nydia's children, Adria and Scott, were largely grown, Roger took them under his wing and helped guide them. The children thought so much of Roger and what he did for them and their mother that, without adoption, they changed their last names to be his.

Roger and Nydia now make their home in Fort Lauderdale, near Adria (a trauma nurse) and also close to Scott (a Broward County Sheriff Deputy), his wife, and their minor children, who are the grandchildren of Roger and Nydia.

Many believe they know Roger because of his public persona, but few really know the man. Throughout his life, it has been the things that have largely gone unnoticed that are a part of Roger Stone.

**C.  The Need for the Sentence to Reflect the Seriousness of the Offense, to Serve as a Deterrent, and to Provide Medical Care in the Most Effective Manner Warrant a Sentence Below the Advisory Guidelines Range**.

**1.  A Non-Guidelines Sentence Would Adequately Reflect the Seriousness of the Offense and Promote Respect for the Law.**

A non-Guidelines sentence will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Roger Stone was arrested under terrifying circumstances that traumatized him and his family. He has since been the focus of public scrutiny and vilification on a constant basis. Long

a public figure with influence in the political arena, he now stands a convicted felon.  There is,

therefore, no denying the severe and swift consequences that his actions have brought upon him,

even prior to the formal imposition of sentence.

Respect for the law, however, is not furthered by rigid adherence to formulaic calculations,

which is why the Court must consider the larger picture:

> Imposing a sentence on a fellow human being is a formidable
> responsibility.  It requires a court to consider, with great care and
> sensitivity, a large complex of facts and factors. **The notion that
> this complicated analysis, and moral responsibility, can be
> reduced to the mechanical adding-up of a small set of numbers
> artificially assigned to a few arbitrarily-selected variables wars
> with common sense.** Whereas apples and oranges may have but a
> few salient qualities, human beings in their interactions with society
> are too complicated to be treated like commodities, and the attempt
> to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) aff'd, 747 F.3d 111 (2d Cir.

2014) (emphasis supplied).

In addition to the stress and strains described above, there is also a need for Stone to defend

and respond to a barrage of civil litigation actions brought against him by a would-be witness, and

his lawyer. The list below outlines the history of litigation against Stone in the past two years:

| Case Name | Case Number | Type of Case | Status |
|---|---|---|---|
| *DNC v Russian Federation, Stone et. al.* | 18-cv-03501 (SDNY) | RICO conspiracy | Dismissed |
| *Cockrum v Trump Campaign & Stone* | 17-cv-1370 (DDC) | Civil rights conspiracy | Dismissed |
| *Klayman v Stone et. al.* | 2019-CA-015104 (Palm Beach) | defamation | Motion To Dismiss Pending |
| *Klayman v Stone* | 19-011394 (Broward) | Tortious Interference | In Discovery |
| *Klayman v Stone* | 19-002672 (Broward) | defamation | In Discovery |
| *Klayman & Corsi v Stone* | 19-cv-1573 (DDC) | defamation | Motion To Dismiss Pending |

22

| | | | |
|---|---|---|---|
| *Corsi v Stone & Newsmax* | 19-13711 (Palm Beach) | defamation | Motion To Dismiss Pending |
| *Corsi v Stone* | 19-cv-324 (DDC) | defamation | Motion To Dismiss Pending |

It is with the above-described considerations in mind that the Court is urged to conclude that, in the instant matter, a sentence below the advisory Guidelines range is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.  § 3353(a)(2)(a).

### 2.   A Non-Guidelines Sentence Would Provide an Adequate General and Specific Deterrent.

Correspondingly, a non-Guidelines sentence would be sufficient to satisfy the need for the sentence imposed to provide both a general and specific deterrent.  With the respect to the public at large, as indicated above, the prosecution of this case and the attendant hardships on Stone and his family are such that, taking all of the circumstances of this case into account, no one could seriously contend that a sentence below the advisory Guidelines range would cause anyone to walk away from these proceedings believing that one can commit the offenses at issue here with impunity.  In this case, including a trial more public than most and the corresponding loss of his professional standing, the process is itself significant punishment.

Moreover, as for Stone himself, at 67-years-old, he stands before the Court having no criminal history whatsoever.  Despite his decades in the public eye and his often brash behavior, his prior conformity with the law reflects the near certainty that he will never again find himself the subject of criminal prosecution.  It is all but guaranteed that the "perfect storm" that led to Stone's actions at the heart of this case are unlikely ever again to materialize in his orbit.

Stone's lack of any criminal history, combined with his age are strong indicators that Stone has no likelihood of recidivism.  His lack of criminal history standing alone justifies a variance.

*See United States v. Tomko,* 562 F.3d 558 (3d Cir. 2009) (*en banc*) (tax offense); *United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (sentencing defendant guilty of possession of pornography to supervised release).

Empirical data show that defendants with no prior criminal history have the lowest rate of recidivism.  United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016).[4]  Similarly, recidivism rates drop considerably for defendants sentenced for their first conviction over the age of 60.  *Id.* at 23; *see also United States v. Bullion*, 466 F.3d 574, 576 (7th Cir. 2006).

Accordingly, it is respectfully submitted that Stone's exceptionally low risk of recidivism favors a sentence below the advisory Guidelines range.

### 3.   A Non-Guidelines Sentence Would Provide Medical Care in the Most Effective Manner.

In addition to the fact that his age renders him a low risk of recidivism, his health is a further factor that weighs in favor a sentence below the advisory Guidelines range.  § 3553(a)(2)(d) (a sentence should take into account the need to provide medical care in the most effective manner).  Even in the pre-*Booker* landscape, serious medical conditions provided the basis for a below Guidelines sentence:

> (1) Age may be a reason to depart downward only if and to the extent permitted by § 5H1.1." U.S.S.G. § 5K2.22. Under § 5H1.1, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1.

---

[4]      Available      at:      https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

*United States v. Chase*, 367 Fed. Appx. 979, 983 (11th Cir. 2010) *cert. denied,* 131 S. Ct. 167 (U.S. 2010) (unpublished).   Thus, the Guidelines recognize the need to account for older defendants who suffer from serious medical problems.  U.S.S.G. § 5H1.1; *United States v. Brooke*, 308 F.3d 17, 20 n. 2 (D.C. Cir. 2002); *United States v. Irey*, 612 F.3d 1160, 1218 (11th Cir. 2010) *cert. denied,* 131 S. Ct. 1813 (U.S. 2011); *United States v. Stumpner,* 174 Fed. App'x 522, 524 (11th Cir. 2006) (unpublished); *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009); *United States v. Lee*, 454 F.3d 836, 839 (8th Cir. 2006).

Post-*Booker,* courts have routinely found that a sentencing court is free to impose a non-Guidelines sentence based upon the health needs of a defendant.  *See, e.g., United States v. Davis,* 458 F.3d 491, 498 (6th Cir.2006) ("[A] trial court ... has a freer hand to account for the defendant's age in its sentencing calculus under § 3353(a) than it had before *Booker*".); *United States v. Smith,* 445 F.3d 1, 5 (1st Cir.2006) (holding district court did not err, *inter alia,* by considering age because "[t]hat a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant").  *United States v. Lee,* 454 F.3d 836, 839 (8th Cir.2006); *United States v. Simmons*, 470 F.3d 1115, 1130-31 (5th Cir. 2006).

Accordingly, as detailed in the PSR, it is respectfully submitted that Stone's medical conditions warrant the imposition of a non-Guidelines sentence.  PSR ¶¶ 103.

**D.  The Kinds of Sentences Available**.

As an alternative to prison, probation or probation with a special condition of home detention for a period of time are viable alternatives in the instant matter.  In light of the numerous factors discussed above that render this case outside the heartland of the run-of-the-mill case, it is respectfully submitted that a non-incarceratory sentence is appropriate here.  The nature and circumstances of the offense, Stone's history and characteristics, including his low likelihood of

recidivism and significant health concerns, all favor a sentence that provides punishment without incarceration.

**E.  The Need to Avoid Unwarranted Disparities Favors a Non-Guidelines Sentence**.

Roger Stone is but one of approximately 38 individuals or entities to face charges stemming from the investigations into interference in the 2016 election.  Of those who have been sentenced, the following warrant consideration:

| Defendant | Case Number | Description | Sentence |
|---|---|---|---|
| *Paul Manafort* | 17-CR-0020 (D.D.C) | Manafort was charged with seven counts in the District of Columbia and pleaded guilty to conspiracy against the United States and to witness tampering in the D.C. case. | 73 months (30 months concurrent to E.D.V.A.) |
| *Paul Manafort* | 18-CR-00083 (E.D.Va.) | A jury found Manafort guilty on eight of 18 counts within the Eastern District of Virginia. The guilty charges included multiple counts of false income tax returns, failure to file reports of foreign bank accounts, and bank fraud. | 47 months  Total between both is 7.5 years. |
| *Michael Cohen* | 18-CR-00850 (S.D.N.Y.) | Pleaded guilty to making false statements to Congress and campaign finance and tax and banking charges. | 2 months for the false statement to Congress  and 36 months on other tax and banking  charges. Time to be served concurrently. |
| *Richard Pinedo* | 18-CR- 00024 (D.D.C) | Pinedo pleaded guilty to one count of identity fraud and was sentenced to serve six months in prison, followed by six months of home confinement and 100 hours of community service. (Helped the Russian Troll Farm) | 6 months in prison and 6 months home confinement |
| *Rick Gates* | 17-CR-00201 (D.D.C) | Was charged in two separate federal courts in connection to financial crimes, unregistered foreign lobbying and on allegations that he made false statements to federal prosecutors. Gates pleaded guilty in Washington, D.C. in February 2018 on counts of conspiracy against the United States and lying to federal prosecutors. | 45 days in jail followed by 3 years probation |

| *Alexander Vanderzwann* | 18-CR-00031 (D.D.C.) | He had pleaded guilty to lying to federal agents about his contacts with Trump campaign deputy chair Rick Gates in September 2016. 30 Day sentence | 30 days |
| --- | --- | --- | --- |
| *George Papadopoulos* | 17-CR-00182 (D.D.C.) | Arrested for lying to FBI investigators about his correspondence with foreign nationals with close ties to senior Russian government officials. He pleaded guilty in October 2017. In September 2018, Papadopoulos was sentenced to 14 days incarceration, 200 hours of community service and a $9,500 fine. | 14 days |
| *Sam Patten* | 18-CR-00260 (D.D.C.) | An American lobbyist admitted brokering access to President Trump's inauguration for a pro-Russian Ukrainian oligarch, a violation of FARA. | 3 years probation |

When viewed in the context of the other defendants sentenced for similar offenses stemming from the same investigation, the need to avoid disparities between similarly situated defendants indicates the applicability of a non-Guidelines sentence in the instant matter.

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that the Court should impose a non-Guidelines sentence of probation with any conditions that the Court deems reasonable under the circumstances.

Respectfully submitted,

By: */s/*_____

ROBERT C. BUSCHEL                         BRUCE S. ROGOW
**BUSCHEL GIBBONS, P.A.**                  FL Bar No.: 067999
D.D.C. Bar No. FL0039                      TARA A. CAMPION
One Financial Plaza, Suite 1300            FL Bar: 90944
100 S.E. Third Avenue                      **BRUCE S. ROGOW, P.A.**
Fort Lauderdale, FL 33394                  100 N.E. Third Avenue, Ste. 1000
Telephone: (954) 530-5301                  Fort Lauderdale, FL  33301
Fax: (954) 320-6932                        Telephone: (954) 767-8909
Buschel@BGlaw-pa.com                       brogow@rogowlaw.com
                                           tcampion@rogowlaw.com
                                           *Admitted pro hac vice*


                                           GRANT J. SMITH
                                           **STRATEGYSMITH, PA**
                                           D.D.C. Bar No.: FL0036
                                           401 East Las Olas Boulevard
                                           Suite 130-120
                                           Fort Lauderdale, FL 33301
                                           Telephone: (954) 328-9064
                                           gsmith@strategysmith.com

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2020, I electronically filed the foregoing with the

Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day

on all counsel of record parties identified on the attached service list in the manner specified, either

via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized

manner for those counsel or parties who are not authorized to receive electronically Notice of

Electronic filing.


*United States Attorney's Office for the*
*District of Columbia*

Timothy Shea
**United States Attorney**
Jonathan Kravis
Michael J. Marando
**Assistant United States Attorneys**
Adam C. Jed
Aaron S.J. Zelinsky
**Special Assistant United States Attorneys**
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 252-6886
Fax: (202) 651-3393


By: */s/ Robert Buschel*

# Nydia B. Stone

February 9, 2020

The Honorable Amy Berman Jackson
U.S District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Ave, N.W.
Washington, D.C.  20001

Dear Judge Jackson:

I have been married to Roger Stone for 28 years and believe I know him better than anyone on this earth.

While Roger has created a persona for himself which has led to public prominence, public affairs consulting, book sales, speaking opportunities, a syndicated radio show, media presence and an award-winning documentary, that is not the Roger Stone I know.

The real Roger Stone is loyal, kind, loving, considerate, generous and good natured, funny and sentimental. I have read the letters othes have submitted about his work volunteering to aid family members, veterans, animals, and friends who are down on their luck or going through a rough patch, and I can tell you it's all true.

He is also articulate, hyper-active, competitive, and deeply committed to President Trump, his reform agenda, and his re-election.

I can't tell you that Roger is a saint – he pushes everything to the limit even with you.  I want to thank you for giving him (more than) a second chance and letting him redeem himself by adhering to his conditions of release.

As you can imagine, this entire ordeal has taken a heavy toll on us and our family. We have lost virtually everything including my husband's ability to make a living. At 72 years old, very hard of hearing, and mobility ailments of my own, if Roger is sent to jail, I will have no means to support myself and there are no savings to fall back on, everything having been expended to pay lawyers and there is little income. I do not qualify for a maximum social security payment and Roger's will be suspended if he is in jail.  While I have adult children with their own families they have their own financial challenges and I simply can not burden them.

This entire matter has caused my husband to renew his faith in God, to accept Jesus Christ as his savior and to return to the Catholic church. I know there will be some cynics who will see this as a ploy, but that does not concern me because He knows what is in my husbands heart. All this trauma has made us stronger as a family and a couple. I love Roger deeply and completely and hope we can spend time with our first great-grandchild scheduled for birth March 8th.

This truly comes from the heart.  I have a hard time envisioning life without my husband. I agree with Randy Credico that Roger's incarceration will serve no good purpose. I respectfully ask you to be merciful in your sentencing of Roger Stone.

Respectfully submitted,

Nydia B. Stone

February 4, 2020

The Honorable Amy Berman Jackson

U.S District Judge

E. Barrett Prettyman Federal Courthouse

333 Constitution Ave, N.W.

Washington, D.C.  20001


Honorable Judge Jackson:

Roger Jason Stone, Jr. is my step father and I have known him for 40 years.

He has been there for me from the moment I met him. He has always provided me with guidance and advice through every stage of my life, from my teenage years through middle age.  From sad boyfriend break ups to getting married, from raising my kids to watching them leave home as adults, from career changes to religion choices, he listened to all the trials and joys of my life. Roger has always supported my choices even if he didn't agree with them and provided the encouragement to live a peaceful, happy and follow my dreams.

When I was in my twenties and a single parent that survived four years of domestic abuse, he provided everything I needed to leave that relationship, at gun point, and start a new life. He took me in with my baby daughter Katelyn, although he

and my mother had recently married and were living together for the first time. We became an amazingly close, loving and fun family. For six years, until I was married, Roger was the paternal figure in my daughter's life as well. He attended school functions, babysat, played, laughed and loved, just like any other father or grandfather in a family does. This has been our personal life that has been private until the FBI raid recorded and broadcast on CNN for International News on January 25, 2019.

My hope is that you see and understand that Roger Jason Stone, Jr. has a family side of him that most people don't see. His absence would greatly affect our family emotionally and be financially devastating for my mother, who is 72. Leaving my brother, a Fort Lauderdale policeman raising his own family and I, with a single income as a Registered Nurse at a Fort Lauderdale hospital, to take on responsibility for her needs in Roger's absence.

I respectfully request our family as a whole be considered when deliberating Roger's sentence this month.

Sincerely,


Adria Stone

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Honorable Judge Jackson,

My name is Katelyn Yeatts, I am 30 years old the eldest grandchild of
Roger and Nydia Stone. To the rest of the world he is Roger Stone but to me he
is my Popop. My mother and I lived with my grandparents for the first 6 years of
my life and so Roger and I are much closer than the rest of the grandchildren
and his own children. Though we may not see eye to eye politically he is still one
of the standing pillars of my life.

He taught me about slap stick comedy, and the three stooges and the
beauty of old cinema. Old jazz and blues music and how to properly dance. He
taught me how to make homemade pasta sauce aka "Sunday Gravy" and he still
scolds me when I put parmesan cheese on seafood it because he says it ruins
the dish. He taught me how to never follow a trend and to always stand up for
myself no matter what.

My grandfather has always been a busy man but when he is home with us
he is a different person. He loves comedy shows and watching old movies like
Blazing Saddles with my grandmother on the couch. Some of my favorite
memories of him are just that, being home as a family.  Cooking dinner together
while jazz music blares on the speaker, watching my grandparents dance with

each other, sitting on the back porch watching the sun go down with full bellies and him smoking a cigar.

My grandparents have been together many years. My grandmother is older than Roger and her age is starting to catch up with her. She is slowing down and Roger is her sole source of financial support. It is sad to say but this trial has financially crippled and ruined my family. My grandmother tore her meniscus in her knee and instead of getting the surgery she needs to fix it she keeps getting shots in it as a temporary fix because she can't afford the surgery right now. One of my biggest fears with this whole process is what will happen to her if Roger goes away? My grandmother is one of the sweetest, most generous, kindhearted people you will ever meet. She is always taking care of other people, but who is going to support her if Roger gets hard jail time? They have lost everything. The house, the car, the security that in her old age she will always have a roof over her head won't have to find a job at 72 years old.

This whole trial has been devastating and heartbreaking. I love my grandfather deeply. I am now 9 months pregnant and Roger is about to become a Great Grandfather for the very first time in early March. Please please, please have leniency and mercy. I need my son to know his Popop and I need Popop to know my son.

Sincerely,

Katelyn Yeatts

January 20, 2020

Randy Credico
New York, New York

The Honorable Amy Berman Jackson
United States District Court for
The District of Columbia
333 Constitution Avenue, NW
Washington D.C. 20001

Dear Judge Jackson,

I am writing to respectfully yet fervently implore you not to send Roger Stone to prison when he is sentenced before your Honor. I feel so strongly about this for a number of reasons.

Let me begin by saying I stand by my testimony in your courtroom on November 7-8, 2019. In fact, I stand by all of my testimony throughout the Mueller investigation and the pre-trial conversations I had with the DC prosecution team.  That being said, there was more that I wish I had the opportunity to express had I not been limited by the questions asked of me.

Most notably was after Mr. Stone's defense attorney asked if I had ever thought Mr. Stone was going to steal or harm my dog Bianca. My answer was an emphatic "No." At the time I was hoping he would follow that question with another asking if I had ever personally felt threatened by Mr. Stone. The answer would have been the same.  I never in any way felt that Stone himself posed a direct physical threat to me or to my dog. I chalked up his bellicose tirades to "Stone being Stone." All bark and no bite!

As I said in the courtroom, I met Mr. Stone in 2002 during my organization's struggle to repeal New York's racist and Draconian Rockefeller Drug Laws. Stone was an invaluable benefit to the movement. He played a critical role in propelling the movement forward when he convinced his candidate to make the drug law a key issue in the Governor's race. That campaign spent millions of dollars focusing on the effects of these harsh and discriminatory laws.  After the election Stone continued his commitment to the movement for at least another year. The laws were changed in 2004 and many of those serving ungodly life sentences were released and reunited with their families.

During those years of working to change the Rockefeller Drug Laws and other criminal justice inequities, I visited countless prisoners behind bars and their families. The damage done to the incarcerated is magnified tenfold by the damage done to their family members.

I know this damage firsthand.  I am the son of a survivor of the U.S. prison system. My father spent 10 years of his life behind bars before he married and had children. The mental scars of those years never left my father's soul. As kids, my brother, sister and I

could feel the pain radiating from him as though it were our own. As adults, we all struggled with addiction and/or alcoholism. It has taken a long time to heal those wounds and live a sober life.

I was told that when fashioning a sentence, federal judges look to what is "sufficient, but not greater than necessary" to meet the goals of sentencing. I understand that Roger Stone has broken federal laws, but a prison sentence is beyond what is required in this case. It is not justice. It is cruelty. Indeed, with all of his talent and knowledge, Mr. Stone would be an ideal candidate for participation in an alternative to incarceration program that would serve and benefit needy organizations or distressed communities.

Roger Stone certainly rubs a lot of people the wrong way, particularly those on the receiving end of his wee hour lowbrow character attacks. Stone enjoys playing adolescent mind games and pulling off juvenile stunts, gags and pranks. He shamelessly invents and promotes outlandish and invidious conspiracy tales. But the bottom line is Mr. Stone, at his core, is an insecure person who craves and recklessly pursues attention. Like Billy Wilder's tragic fictional character Norma Desmond, Stone is always at the ready for that "close-up." Prison is no remedy.

When I think of my father and others in prison, I think of these words in a letter written by a tormented Oscar Wilde from his prison cell: "We who live in prison, and in whose lives there is no event but sorrow, have to measure time by throbs of pain, and the record of bitter moments."

Thank you for your kind consideration of my letter.

Respectfully yours,

Randy Credico

February 4, 2020

The Honorable Amy Berman Jackson

US District Judge

E. Barrett Prettyman Federal Courthouse

333 Constitution Avenue, N.W.

Washington, DC 20001

Dear Judge Jackson:

I am writing to you in hopes that you will consider this letter as a character reference for Roger Stone personally and more importantly clarify the dire situation that this case has put him, his wife Nydia and the family as a whole. I've known Roger Stone for over 25 years, he is a man of great character and genuinely a very good person.  Roger has shown to be a loving husband, father and grandfather to his family and for as long as I have known him has shown to be a loving family man. Roger is a man of his word and has been benevolent to those around him in need and loyal to those of us show consider him family. The case against him and his defense has left him, and his family fiscally destroyed. These costs have all but wiped out everything they owned and has put them in a very difficult financial predicament, especially his wife Nydia, who's only source of financial and emotional support comes from Roger.

 Over the years I've known Roger, I have had the pleasure of taking part in yearly family gatherings at his home, something that was key in keeping our family ties strong. Roger and Nydia opened their home yearly to the entire family for some quality time together, members traveled from California, Boston, Florida, Georgia and other parts of the country to make this gathering every year!

I have also enjoyed time with both Roger and Nydia and their kids and grand kids attending social events, theater shows, and dining outings, and just family visits and gathering.

Over the years I have also experienced some very real times when I saw Roger's true sole come to light. His exemplary humanity and loving character showed best during the very difficult period when Nydia's father, Juaquin, developed severe Alzheimer's disease. Roger stepped in to help during the early stages of the disease by helping to update the Bertran home. During this time Roger helped financially and emotionally in getting the best of home care and facilities to his in-law's Olga and Juaquin. When Juaquin's condition worsened, he was basically the one who shouldered the burden of costs to put Juaquin in the best Alzheimer's care facility he could find and did so till the day Juaquin passed.  His support continued bringing Olga to live with them after the loss of Joaquin, there she lived happily till the day she passed. Since then Roger and Nydia live quietly together and dedicate most of their time to their children and grandchildren who have been devastated by this entire ordeal.

In closing, I would like to thank you for your time and again ask that this letter serve to assist in better understanding the man that I know, and respect known as Roger Stone.

Kindest Regards.

Rolando Conesa

635 San Antonio Avenue

Coral Gables, FL 33146

# MORGAN & MORGAN®

––– *Attorneys At Law* –––

20 N. ORANGE AVENUE, 16TH FLOOR
POST OFFICE BOX 4979
ORLANDO, FL 32802-4979
(407) 420-1414
FAX: (407) 425-8171

February 7, 2020

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Jackson:

Before I knew Roger Stone, I knew of Roger Stone. Roger has had a long career on the national stage as well here in Florida.  From what I knew of his public persona, I could not believe there would ever be anything we would agree upon.  I mean, at every turn, he was on the opposite side of things I supported.  I have been a trial lawyer here in Florida for 36 years and have been involved in advocacy for issues I deeply care about for equally as long. It is through advocacy on one particular issue that I became a friend of Roger Stone and learned about the person, not the urban legend.

Many years ago, I educated myself on the benefits of marijuana to those suffering with medical ailments.  The research and the results were stunning, and I could not understand why our politics and laws outlawed its use for those who could truly, scientifically benefit by its use for a better life.  I began a campaign to do what I could, with my resources to try and aid those who needed the help.  It is through this cause I met Roger Stone.

I have to admit, at the first suggestion that I meet with him, I was hesitant, but I met with him anyway, I am willing to talk with anyone who can help me reach my goals.  This meeting was nothing like what I anticipated.  Roger was a regular person and very easy to get to know.  What surprised me the most was the depth of knowledge that Roger had on the subject of the medical applications of marijuana.  This was not some passing fancy, this was well researched and a deeply held belief of Roger's.

Throughout the course of our first chat, I learned that Roger's advocacy for the compassionate use of marijuana goes back decades.  Not only that, I learned that he opposed his mentor, President Richard Nixon, on the "War on Drugs."  Not only because Roger had seen first-hand the benefit marijuana had on those suffering, but because those Nixon era drug laws disproportionately targeted minorities, another community that Roger cared deeply about.

Going into this meeting I thought I knew the man but coming out of the meeting I realized that he was nothing like what I expected.

It turns out Roger and I agree on many issues, not just the use of marijuana to ease suffering.  It also turns out that Roger supports and works on issues most people would not expect and actual good happens from their success.   Roger has worked pro-bono to end inhumane medical experiments on animals by the federal government. Roger has advocated pro-bono for justice and medical support by the NFL's retired players suffering from brain injuries.  He has actively advocated for a posthumous presidential pardon for the early civil rights leader Marcus Garvey. The problem is that people tend to focus on the negative instead of the positive.  There is good in his life and there is plenty of good left to give.

It is my opinion that Roger was a provocateur who enjoyed, even relished, the spotlight. This need for attention led him down this road. Not as a criminal but as a guy seeking attention. We agree on almost nothing politically. However, I believe that mercy is always superior to justice, especially in a case like this. Roger is not a criminal but a man with an ego that wanted to be more than he was. He has suffered enough. What can be gained by a prison sentence? I am asking for your mercy for this man.

Please do the compassionate thing, the right thing and permit Roger to spend his remaining years with his family.

Thank you for your consideration.

Respectfully submitted,

John Morgan

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Honorable Judge Jackson:

My name is Jan Webster. I am the wife of retired NFL football player Cornell Webster.

My husband played 4 seasons in the NFL, for the Seattle Seahawks, from 1977-1980.

Sadly he now suffers from Alzheimer's disease due to repeated head trauma he

suffered during his career in the NFL.

I do not personally know Roger Stone nor have I ever met, or spoken to him. But I felt

compelled to write you, and let you know what he did for my husband, and all retired

players seeking remedy in the NFL Concussion Settlement.

You may not be aware but many NFL families feel a bait and switch was pulled in the

NFL Concussion Settlement, leaving families who opted into the settlement wishing they

had not, and ultimately not receiving the remedy they were promised.

Mr. Stone took up the mantle of these families and raised awareness about the issues

they faced. He wrote countless articles and spurred on debate, in many national media

outlets, concerning our cause. Mr. Stone selflessly sought to give a voice, to the families

of brain injured victims, when others were fearful and would not speak out against the

NFL media juggernaut.

My politics may not align with Mr. Stone's but I am grateful that he chose to speak on my family's behalf, and for many people that may not agree with him politically, because he believes in our cause. At this time, in our bitterly divided nation, we need more people who will stand up for what the believe in, politics aside.

Sincerely,



**SHEINKOPF LTD**

January 30, 2020

Honorable Judge Jackson:

For almost forty years Roger Stone has been my friend. We have worked together on projects domestically throughout the nation. He has always been direct, honorable, and fair in our business dealings. Roger Stone is a brilliant strategist and political thinker. He has also advocated for criminal justice system reform including sentence review for non-white Americans convicted of offenses for which non-minority citizens receive lighter sentences. Further, Roger Stone has been vocal in the battle to end discrimination based upon sexual orientation.

Yes, I have been a reasonably well-known political professional. I am also a teacher of political science at the graduate school level, and I am a member of the clergy. As such, an ordained orthodox Rabbi, I ask the Court to please have mercy in its decisions on Roger Stone's future. He has on issues of significance as noted taken less than popular stands within his own political community. I do not often agree with his politics. I do agree with all who attest to that which is best in his character.

Thank you.

Respectfully,

Rabbi Dr. Henry A. Sheinkopf

*152 Madison Ave, Suite 1603, New York, NY , 10016*
*TEL: 212.725.2378*



The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Jackson:

My name is Christian Josi, I run a small Public Relations Firm based in Virginia Beach, Virginia. I have known Roger Stone for over 15 years and while we are frequent colleagues, I consider him a close friend first and foremost.

From the colleague front, here is an example of the Roger Stone most people don't see:

When I was retained by the White Coat Waste Project to help spearhead a campaign to identify and end the inhumane, scientifically worthless and costly medical experiments being conducted by the federal government on helpless dogs and cats as well as other animals, I reached out to Roger for help. I knew he was a devoted animal lover and advocate who had taken in stray dogs and often spoken of his adoration for them. He is / was also a fan of this extraordinary organization and its gifted, effective leadership.

Roger made our cause the topic of two of his columns for the widely read Daily Caller as well as featuring our effort in two segments of his syndicated radio show. He advised us pro bono. It was with Roger's help, for example, that we were able to get the US Department of Agriculture and the Veteran's Administration to end certain cruel and barbaric experimentation of helpless animals. In fact, many believe it was that campaign that drove VA Secretary Shulkin from office after he publicly defended their indefensible program.

Also, with Roger's megaphone in the mix, The Environmental Protection Agency announced they would end animal testing by 2035.

I stress that there was nothing in this for Roger but I believe his help was determinative in terms of achieving these significant results.

I would respectfully ask that this information—and that Roger Stone has used his power for good much, much more often than people know-- be taken into consideration as you contemplate a sentence for my friend.

Respectfully submitted,

Christian Josi
office@cjosi.com
(804) 709-9222

**Subject:** Stone Letter
**Date:**  Tuesday, February 4, 2020 at 1:19:20 PM Eastern Standard Time
**From:**  Norm Kent
**To:**   Grant Smith

LAW OFFICES OF NORM KENT
2520 NORTH DIXIE HIGHWAY
WILTON MANORS, FL 33305

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Ave., NW
Washington, D.C. 20001

February 4, 2020

The Honorable Judge Jackson,

The Washington Post has correctly defined Roger Stone as a "colorful and maligned figure… who relishes political combat." He is that, and more.

Roger Stone is an individual willing to challenge the status quo and push the envelope, whose voice and vitriol gives life and meaning to an amendment that reads 'Congress shall pass no law abridging freedom of the press.'

One of the most famous adages of American political theory simply voices the axiom, "I may not agree with what you say, but I will fight to the death your right to say it." It is a quote that has withstood the test of time for good reason.

Roger Stone's presence on the American political scene preserves diversity, insures breadth, and creates the very controversies that allowed people to stand at the corner of a street and and shout from a soapbox. We should embrace that behavior, not censure it.

Mr. Stone, for all the hoopla, is the kind of voice that belongs in the public arena. At different times, Roger has spoken out against the public tide for the legalization of marijuana and gay rights equality. These were once non-traditional advocacies, and even illegal. Now they are the norm. Those types of voices can be courageous, if at times cantankerous.

Mr. Stone's guilty verdict on multiple felonies can't be downplayed. The conduct was of course wrong, and so said a jury of his peers. However, words of deception do not necessarily warrant months of incarceration. He has spoken out for causes he believes in deeply and dearly.

Society would best be served by sentencing Roger Stone to supervised release, allowing him to continue to serve his wife and community. He has done that crime free for six decades. He is an established author, commentator and public figure, hiding from no one, open to all.

After forty years of practicing law, I have watched America's rate of incarceration, in both federal and state jails, soar to one of the highest in the world. We need to do a better job of employing sentencing alternatives. This is one of those instances.

Mr. Stone's continuing criticism of the established order and his edgy political gamesmanship is no threat to public safety. Rather, like him or not, his contrarian expression inspires the very type of debate, discussion, and dissent that are all so important to protecting our first amendment and democracy.

Sincerely,

Norm Kent
Attorney at Law

**Norm Kent**
**Criminal Defense Law Center of South Florida**
**2520 North Dixie Highway**
**Wilton Manors, Florida 33305**
**(954) 763-1900**

**norm@normkent.com**
**Cel # 954-661-3361**

### Saint Anthony Catholic Church



Since 1921

January 29, 2020


The Honorable Amy Berman Jackson
U. S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, NW
Washington, DC  2001

Dear Judge Jackson,

This letter is to confirm that Mr. Roger Stone is an active and supporting parishioner at our parish here.  He regularly attends Sunday Mass here, and his grandchildren attend our parochial school.

I write to ask for your consideration in his sentencing next month.  This has been a difficult time for Roger, and I believe he has grown spiritually as a result of it.  As I don't find him a credible threat to our community, I hope that his punishment will not include prison time.

Judge Jackson, I appreciate your consideration in this matter.  If I may be of any further assistance, please do not hesitate to contact me.

Sincerely,

Rev. Michael J. Grady
Pastor

The Honorable Amy Berman Jackson
U.S. District Judge
 E. Barrett Prettyman Federal Courthouse
 333 Constitution Avenue, N.W.
 Washington, D.C. 20001


Dear Judge Jackson

August Juris, I am writing on behalf of my spiritual brother and friend Mr. Roger Stone to implore that to you draw upon all the understanding and compassion that you can muster to show mercy and forbearance on this man whose fate rests in your hands. I have known Roger for four years and have several close friends who know him well. He matters to us, and we are greatly aggrieved by the great injury that this ordeal has inflicted on his family.

I met Roger via a mutual friend who wanted to build bridges to Black Americans during the height of the Black Lives Matter protests. I wanted the Republican Party to take a fresh look at the issues facing Black America. Roger and I worked with some other concerned people to come up with some meaningful tangible actions that could be taken to bring mutual understanding and social cohesion. Roger shared this vision to unite Americans with major stakeholders. The plan encouraged increased funding to HBCUs and Black farmers and abolishing the civic death sentence that felony convictions imposed on Black ex-convicts. Another aspect of the work was encouraging important elected officials to amends in order to reconcile past racial injustices and atrocities ( i.e. Marcus Garvey, Abraham Bolden, Adam Clayton Power, Jr.).  Another part of our plan was to promote human rights and justice for people in Haiti, and West Papua and post-conflict Libya. Roger's efforts in these areas belie the press he receives.  I am particularly proud of having worked with him promoting human rights in Haiti, Libya, as well as all parts of our  country where there is a lack of safe drinking water in communities of color.  He has always lent his ear and his hand to help and encourage me.


 On the private side of things, Mr. Stone is a family man who loves his wife,  a generous and loyal friend, is very energetic and always open to encourage others. What I love most about this man most is his love for people, his love for America, his encyclopedic knowledge of people of all kinds, and his love for the little people.


Yours in Prayer for Mercy and Justice,


Dr. W. Randy Short, M.Div., Ph.D.



**RUPP**
**BAASE**
**PFALZGRAF**
**CUNNINGHAM** LLC
**ATTORNEYS**

1600 Liberty Building, 424 Main Street, Buffalo, NY 14202
716.854.3400 ⟨ ruppbaase.com

**R. ANTHONY RUPP III**
rupp@ruppbaase.com

February 6, 2020

The Honorable Amy Berman Jackson
United States District Court for
The District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Jackson:

> Re: Roger Stone Sentence
> Docket No.: 19-CR-018 (ABJ)

I am an attorney at law and I write this letter in response to the January 28, 2020 letter of Gerard Houser relating to the sentencing of Roger Stone. In his letter, Mr. Houser contends that Mr. Stone was behind a "propaganda poster" (actually a mailer) that cast aspersions on one Warren Redlich, who was, at the time (2012), the endorsed Libertarian Party candidate for governor of New York.

In fact, Mr. Redlich sued Mr. Stone and several others whom he believed were responsible for preparing and distributing the mailer. I served as Mr. Stone's trial attorney in the December, 2017 State Supreme Court (New York County) jury trial in the case of *Redlich v. Stone, et al.* in which the jury returned a unanimous verdict against Mr. Redlich and in favor of Mr. Stone. The jury found no proof that Mr. Stone had prepared or distributed the mailer.

Mr. Houser's display of his uninformed opinions relating to Mr. Stone is a perfect example of why this Court should exercise leniency in sentencing. Mr. Stone has been a controversial and polarizing public figure for the last half century and the country is full of Gerard Housers who disagree with him and would love to see a lengthy sentence imposed on general principles. I believe the opposite is true, and that Mr. Stone's lifetime of devotion and service to our country and its political health should be lauded, not punished.

Sincerely,

R. Anthony Rupp III

/kmm

# PALADINO, CAVAN, QUINLIVAN & PIERCE

ATTORNEYS AT LAW

CARL P. PALADINO*
JOE R.CAVAN
PATRICK J. QUINLIVAN
ROBERT J. PIERCE
PAUL M. GREGORY**

295 MAIN STREET, SUITE 210
BUFFALO, NEW YORK 14203-2402
(716) 852-8222
FAX: (716) 852-2829

KATHLEEN A. LINHARDT
WENDY K. HARTNETT
LORI CARBAUGH
LEANNA M. PILARSKI
CHANDY Z. KEMP ***

February 6, 2020

*ALSO ADMITTED IN PENNSYLVANIA
**ALSO ADMITTED IN FLORIDA
***ALSO ADMITTED IN MASSACHUSETTS

Hon. Amy Berman Jackson
US District Court
E. Barrett Prettyman Federal Court House
333 Constitution Avenue, NW
Washington, DC 20001

                    Re:     **Roger Stone**

Dear Judge Jackson:

I am an attorney admitted to the Courts of the States of New York and Pennsylvania as well as the Western District of New York and the Supreme Court of the United States.

I am also the Chairman of the Board of Ellicott Development Company, a real estate, development, leasing and management firm based in Buffalo, New York.

In 2010, I decided to run for the office of Governor of the State of New York.

At that time, I consulted with Roger Stone who had been introduced to me by a mutual friend. Mr. Stone took a liking to my effort and periodically during the campaign offered me advice on how to proceed. This was my very first experience with the darkest and brightest sides of the political effort I undertook.

Politics is, to say the least, "cutthroat", full of characters without character and devoid of reasonable integrity. During my campaign and in subsequent exercises with Mr. Stone, I found him to be a breath of fresh air. He always pointed out and warned me of the dark side, helping me maneuver only on the right side, the side of honor and integrity.

He commanded a respect among the political types we encountered. He always drew a line so everyone could see what was right and what was wrong. Unfortunately, in politics a successful person doing all the right things for all the right reasons can be and will be vilified and maligned in on a high-profile way by adversaries to get political advantage.

In my opinion, that is what happened and what is happening to Roger Stone. People that he confronted with his talents rightfully placed sought to derogate him, call him names and accuse him of doing things improperly.

In my experience with him, Roger always presented a sense of fair judgment and an ability to stand above the fray and do the right thing, not only for himself but for the candidate that he was representing. He had power and he applied it judiciously. It was on this basis of loyalty and trust that I

forged a lasting relationship with Roger Stone that allowed us to provide many benefits to our community and to the American people. Together, we were proud to be Americans and proud to participate on the bright side in American politics.

Roger Stone may have made mistakes getting too close to the line between good and bad. We all do that. It is those who live on that edge that became our heros. The unfairness will be in sentencing Roger to serve time in jail based on political activities that fall outside of the mainstream understanding.

Roger Stone is a man of character and integrity whose word is his bond.

I know of no instance at any time in the history of our relationship where Roger Stone acted with any intent other than honesty and honor. He commanded the respect of all those who worked for him inspiring them to go on and do great things and to commit to their enterprises. Over the years, I was able to argue, laugh, relax and do business with Roger Stone. He was always able to transcend the emotions and confusions and bring incisive logic to whatever effort we were on. I admired that skill. He was a good American who knew his trade inside out.

I have taken note that you are about to sentence Roger Stone with respect to his plea to a criminal charge having to do with political activity. I urge you to look sensitively and favorably on Roger Stone when imposing sentence.

Thank you for your attention to the above.

Very truly yours,

Carl P. Paladino

CPP/pg

January 29, 2020

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman
Federal Courthouse
333 Constitution Avenue, N.W.
Washington D.C. 20001

Honorable Judge Jackson:

I am writing you on behalf of Mr. Roger Stone.  I though you may be interested in a side of Roger's life that many people are not aware of.

I met Roger and Rogers's wife through a mutual friend Bob Priebe several years ago.  Bob was my flight instructor in the 1970's and Bob and I had remained close throughout the years.  Bob was getting on in years, he was in his mid-80's, and was not able to live by himself on his sailboat anymore.  This is when Roger and his wife stepped in and provided housing for Bob for several years.  During this time the Stones moved to a new residence and brought Bob right along with them.  When Bob's condition had gotten to the point where they were unable care for him, the Stones found an adult care facility for him.  Over the past year Roger and his wife still took care of Bob making sure he got to doctor's appointments and helping him navigate the health care system.  When Bob's conditioned worsened, they went to the hospital as well as hospice to be with him.  Unfortunately, Bob passed away this last Christmas morning.

Based on this it indicates to me, that Roger is a kind man who cares for others with no expectation of thanks or reward.  Out of the kindness of Roger's heart, he took in a veritable stranger and provided food and shelter.  That stranger was a good friend of mine who's final years were made more comfortable by the kindness and generosity of Roger Stone.

Thank you for your time and consideration.

Respectfully,

Albert Owler

December 11, 2019

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Jackson,

My name is Sharon Kaplan.  From the moment I met Roger Stone in 2005, he has been a friend; in fact, a good friend who was consistent in helping me in my struggles through a very rough time in my life.   I had become ill two years before meeting Roger:  previous back injuries had, over time, developed complications that inhibited my ability to walk.  Also, I had been diagnosed with Major Depressive Disorder. I had to stop working and eventually lost my apartment. I was then homeless.

I had previously heard of Roger through media outlets.  He was completely opposite of what one would have expected.  He cared about where I was living.  Thanks to Roger I never spent a night on the street.  He offered a place for me to stay.  Anyone who knows Roger Stone knows it was a very nice place.

In some of my most difficult times. Roger and his wife Nydia  helped me financially as I was not always able to work because of my disabilities.

When I was able to move into my own small apartment, I expressed a desire to have a computer because I had no television.  Roger gave me one of his desktops with monitor.

I enjoyed our conversations.  I always look for someone to talk with about current events and politics.  Roger was the perfect foil for me.  I'm a third generation Democrat which made our conversations quite animated. I enjoyed those matches of knowledge and opinion because Roger is only person I know who can challenge me in politics and American history.

I look forward to having more such conversations with my friend, Roger Stone.


Yours truly,

Sharon J Kaplan

February 1, 2020

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Jackson:

I am writing to ask you to show mercy on Roger J. Stone, who will stand before you soon for sentencing. It hardly seems possible that I'm sending you this letter at all.

I've known Roger since 1985, when I worked with him on the presidential campaign of Rep. Jack Kemp. I looked up to Roger then, on the top of the world, working in support of his clients and President Ronald Reagan. I admired his innate sense of the political battlefield and his uncanny grasp of what voters expected from their candidates and elected officials. Roger introduced me to many American legends, including his longtime friend and client, Donald Trump.

As the years went on, Roger and I became close friends. I learned important lessons from him: to listen more than talk, to keep driving forward during hard times, to keep my friends and family close. He loved friendly but hard-hitting banter, and I learned to give as well as I got. He was the big brother I never had, and I feel fortunate.

Roger cultivated a career image of a bare-knuckle brawler in politics, a reputation he embraced. But I knew him and his wife Nydia as dear friends and reliable allies. The Stones have often advised me through personal and professional difficulties. I'd like to think I've been similarly helpful, but I know he helped me far more than I helped him.

People think they know Roger Stone: he plays hardball; he's Machiavellian. But he is at his center a caring man, devoted to his family and friends. I know him as the man who called me as my marriage fell apart to invite me to restart my life at his Miami home. I know him as the dad to a half dozen rescue dogs, galloping around his house. I know him as the Sunday chef, cooking his family gravy, our kids and grandkids nearby.

Roger has been in political trenches for decades, on the scene at many American events. I just cannot fathom how incarcerating him at his age, taking him away from his family, will serve the interests of justice. I am writing to implore you to show mercy on him, on his family, and on his friends as you consider this grave matter. Thank you.

Sincerely,

Michael R. Caputo



**JENSEN & ASSOCIATES,** *Trial Lawyers*

650 TOWN CENTER DRIVE • TWELFTH FLOOR • COSTA MESA, CA 92626
(714) 662-5528 VOICE • WWW.JENSENLAWYERS.COM

February 6, 2020

The Honorable Amy Berman Jackson
United States District Court
333 Constitution Avenue N.W.
Washington D.C. 20001

RE:   *USA v. Roger Stone*
       19-cr-00018

Your Honor:

I ask that you receive this letter, and permit it to be filed, as a sentencing letter.

I am an attorney whose practice includes federal election law.  I have long represented Mr. Stone.  I am not counsel of record in this case, of course, and I write today not in any sense as his lawyer, but as his friend.  Put differently, I write as someone who knows Mr. Stone extremely well.  I have worked closely with him, off and on, for more than 15 years.  He is a loving family man, intensely devoted to his family, and yes, his friends.

Contrary to how some –who do not know him– describe Mr. Stone, I know him to be a caring and generous man, and charitable almost to a fault, someone who never fails to help those less fortunate than himself.  In my personal observation (more times than I can count) I have witnessed him go out of his way to care for, to help, to encourage or to uplift someone in need, in a myriad of different ways.  Many times have I heard him say, only somewhat in jest, "don't let anyone know [about this]–it will ruin my reputation".

Undoubtedly you are aware of that reputation.  There is no gainsaying that Mr. Stone has made a career taking full advantage of the First Amendment in pursuing his client's electoral aims.  In so doing, Mr. Stone has engendered many enemies.  Indeed, I suspect you will hear from more than a few of them in this sentencing process.  I write to respectfully call to your attention that, by definition, these efforts have been despised because they are effective.  Therefore, with humility, I submit that you should not hold against Mr. Stone the fact that his career has pushed the bounds of political license, because however distasteful some have found Mr. Stone's work to be, it is fully protected by our Constitution.

In conclusion, Your Honor, because I know the <u>real</u> Roger Stone to be a man of sterling character, *despite the reputation he himself has developed to the contrary*, I urge you to be lenient to Mr. Stone and to refrain from any custodial sentence.

Respectfully yours,

PAUL ROLF JENSEN

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001


Dear Honorable Berman:

   Please allow me to take a moment of your time to write you on behalf of Roger Stone.  I first became acquainted with Roger in the late 1970's when he was working for a political strategist. He was highly respected and sought after in his field.

   I worked for two Members of Congress that passed away while in office. Roger advised us on this difficult transition, as we worked with the Clerk of the House of Representatives. Roger developed, and maintained, the respect of many Members of Congress that I worked for throughout my years while serving in the House of Representatives.

   Roger was meticulous in regard to teaching us about opposition research, filing FEC reports, the use of the media, and the Hatch Act. I personally learned a lot from Roger, though I doubt he realizes how much people like myself learned from him.

   Due to his knowledge, each time we utilized his services and energy we had a successful campaign. The only exception was the Dole-Kemp bid for the presidency. They won the nomination, but not the election, which I still count as a win.

   Roger was always a welcome visitor in our offices.  He partook in our State Society parties as a welcome guest.  I always found Roger as a  man  that could relate well to each staff member. Roger acknowledged that each person on the staff was a spoke that kept the wheel strong and moving. No job was too small, and no one person was too important to lend a hand when needed. It was always my pleasure to acknowledge that I knew Roger. I was raised by two parents that taught me to lend support to my friends, especially when they needed it most.

   Once again, I thank you for allowing me to take a moment of your time.  Regardless, of your decision, please know the respect I hold for you, and our judicial process.


Respectfully,


Jane Bennett

*Lynn M. Conforti*

*7610 Swinks Court*

*McLean, VA  22102*

January 22, 2020

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Jackson,

My name is Lynn Conforti and I am writing this letter to you in support of my longtime friend and former boss, Roger Stone.

I had the pleasure and privilege of working for Mr. Stone as his Executive Assistant at Black, Manafort, Stone & Kelly (BMS&K) from 1987-1991. During that time, I was solely responsible for managing his professional and personal calendars and maintaining all of his correspondence. Roger and I enjoyed a respectful and friendly working relationship and because of that, Roger also entrusted me with much of his personal affairs. After leaving his employ, Roger and Nydia asked me to be their wedding coordinator in December of 1991 and then years later hired me again in May of 1994 to be the wedding coordinator for their daughter Adria's wedding.

When I worked for Roger, I witnessed a very professional, hard-working, charismatic, and compassionate man. Roger was considered to be one of the best political consultants/strategists of his time.  It was a fascinating environment to work in and I admired him greatly. BMS&K employed many young adults in various positions, myself included.  To many of us, Roger was a mentor. He was passionate about his work, fervent of his love for his country and very devoted to his family and friends.  He enjoyed sharing his personal and professional experiences and his keen political insight with these young minds and embraced the role of mentor. To this day, many of those friendships still exist because of that special bond.

I'm truly grateful that I had the opportunity to work for this remarkable man as it was life-changing for me. I'm proud to call Roger my friend and prouder yet that we are "family".  Roger's life and his work are a reflection of what he considers to be of utmost importance:  he is a true patriot, he has passion for his work, he is loyal to friends, and he remains steadfastly devoted to his family.

I respectfully ask for leniency when sentencing Roger and for you to consider his family first and foremost.  Allow him to make a living, provide for them and to continue to be their "rock" as his daughter Adria has so emotionally stated.  His family continues to receive threats and are under duress - he should be able to be present and protect them from such harassment.  As you acknowledged at Roger's trial upon his conviction, he is no threat to society and has been compliant with all the courts' orders. Throughout this ordeal, Roger has demonstrated respect for the court and to the judicial process. Thank you for your consideration.

Sincerely,

Lynn M. Conforti

The Honorable Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

January, 31st, 2020


Honorable Judge Jackson:


I've had the good fortune to know Roger Stone for over 20 years.  In the time we've known one another, I've become privy to Roger's dirty little secret.  One aspect of Roger's life that seems to elude both his admirers and detractors is this…. He's actually an incredibly good man.  While he hasn't shied away from the media portrayal of him as "a dirty trickster" or "political hit man" and has at times even seemed to embrace it.  This is an aspect of his persona that I really haven't seen.

I first became acquainted with Roger, when he was heading an exploratory committee for a potential Presidential candidate back in 1999 and got to know him very well in the ensuing years working on political campaigns in New York State and around the country.  We also became incredibly close friends personally- socializing on a regular basis, sharing our histories, hopes for the future, personal and professional triumphs and set-backs and enjoying the sorts of conversations you'd only have with an incredibly intimate acquaintance.  I also served as a producer of the Netflix original documentary, "Get Me Roger Stone".

In all the time we've known one another, I've never seen, nor heard any credible first-hand account of Roger doing anything illegal or unethical.  To the contrary, I've seen repeated instances of him making significant personal sacrifices (generally involving his time or money)

to help his friends, his family and sometimes even people he barely knows. In every campaign, there seem to be those willing to push the envelope to the boundaries of what's legal (and sometimes beyond). I can tell you in working with Roger on over a dozen campaigns, I've never seen Roger be one of those people.

Additionally, while Roger is occasionally portrayed by his critics as a soulless, money-hungry, amoral political mercenary, I've actually seen him sacrifice financial gain and notoriety in the name of principal. I'm sure you can imagine how difficult it was for one of the most prominent Republican consultants in the country to come out in favor of same-sex marriage, long before even Pres. Obama and Hillary Clinton did. That's the sort of devotion to principle, without regard to the political or professional consequences I've seen again and again. When we worked together on Tom Golisano's campaign for Governor of NY in 2002, it was Roger who pushed the campaign to embrace the issue of legalizing medical marijuana, something that was incredibly progressive and forward thinking, particularly among Republicans at that time.

Aside from being independent and principled though, the thing that most comes to mind when thinking of Roger is the joy he takes in bringing joy to others and offering assistance when times were down. Without betraying any confidences, I've seen Roger make the recovery of someone's lost pet a priority for him, while he was running gubernatorial campaigns. The same goes for people battling addiction, those in poor relationships, those in dire financial straits, those in the throws of addiction and those managing clinical depression. I've seen Roger time and again, give of himself, his time and his money (even when he's faced pretty lean financial times himself). I've seen repeated instances of him traveling to an event sick (completely unpaid) just so that he can keep his word to someone he made a commitment to.

I myself, have been the beneficiary of Roger's generosity of time and spirit time and time again.  To incarcerate him for any length of time would be a tremendous disservice not only to his friends and family, but to the public.

I hope and pray that you'll take all of these factors into account when you sentence Roger Stone.  Please consider sentencing him to probation, home confinement or suspending his sentence entirely.

Thank you in advance for taking the time to review this.

Sincerely,

Frank Morano

JOHN B. McGOWAN, Jr.
P.O. Box 437
Royal Oak, MD  21662

January 28, 2020

The Honorable Amy Berman Jackson
U.S. District Court Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Honorable Judge Jackson:

I write to you today to speak to the character of my longtime friend, Roger Stone.

I first came to know Roger in the mid-1970's when I was a University student in Washington, D.C.
We were both involved in political organizations focused on policy, voter registration and election
strategy. Upon my graduation from college, I left Washington to take a job with a private sector
manufacturing company.

In the ensuing years, Roger and I would occasionally see each other in New York City as I spent
considerable time there on business. In fact, for many years we both belonged to the same social
club in Manhattan.

In the early 1990's, I turned to Roger for advice, and counsel, regarding the development of a
strategy to promote to the federal government a product to improve natural gas safety which was
very much in the news at that time. His advice was spot on and I came to trust his judgment
implicitly. Our organization hired his Public Affairs Company to guide us through the maze of
Washington government and political institutions to get our ideas put forward. While Roger did not
directly work on our project we continued to have occasional conversations about the strategy
being deployed by his subordinates. His instincts were always very keen and I found his integrity
involving our project to be above reproach.

The Honorable Amy Berman Jackson

January 30, 2020

Page two

Many years later, the product was deemed by the US Government as an essential safety enhancement to protect property and human life. It became the subject of a mandated Federal Safety Standard more than ten years ago and is now in use on millions of homes, and businesses, throughout the United States, as well as many other countries around the world. This impactful safety improvement is in large part attributable to Rogers' initial efforts to move the issue forward all those many years ago.

In the years that I have had personal and professional dealings with Roger I have always found him to be honest and forthright. He was never quick to judgment and always fair in his dealings with our organization and our opposition. His firm always performed its work to the highest professional standards.

Roger has always been a character and has revelled being in the public eye. As a result, he has, sometimes, not been portrayed in the best of light by those who do not wish him well. This does not necessary make him a bad man.

Roger has always done well by me and I will continue to stand by him.

Sincerely,

## ITZHAK BAK

January 19, 2020

Leave to file GRANTED
1/28/20

Amy B. Jackson    Date
United States District Judge

District Judge Amy Berman Jackson
The U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Re: United States v. Roger Stone
Case No. 1:19-cr-00018-ABJ

Dear Judge Jackson:

The purpose of my letter is to bring to your attention a side of Mr. Stone that is not well known. In 1973, while advising President Nixon, Roger Stone helped save the State of Israel from what some say was total annihilation by Syria and Egypt during the Yom Kippur War. The Syrians crossed the border and advanced to within 4 hours from Haifa. The Egyptians crossed the Suez Canal and were rapidly advancing toward southern Israel. The situation was getting worse as Israel's armaments were being depleted hourly. Mr. Kissinger held up re-supplies because he was in the midst of trying to negotiate a truce and was pressuring Israel for concessions to please President Sadat of Egypt. Prime Minister Golda Meir called President Nixon directly and conveyed to him the grave situation Israel was facing.    Roger Stone immediately sided with Nixon to send the weapons Israel needed.

Judge Jackson, my family arrived in 1830 to help and re-build the home for the Jewish people. We are part of the first 50 families that help build the modern state of Israel. The Library of Congress recognized our contribution to Israel. Politics was always discussed in my grandfather's house and in our home. I learned early in my life that politics certainly has the ability to turns good people into bad.

The jury has spoken, the Government got their pound of flesh, and Roger Stone will forever walk with a dark cloud hanging above his head, however Roger Stone is not a malicious man. His action in 1973 clearly showed that he is a compassionate man. My family and I will be forever grateful to him for standing along side President Nixon and save Israel from destruction.

Please find compassion and afford Roger Stone all possible discretion when pronouncing your ruling at sentencing.

Respectfully,

Itzhak Bak

# The Book of the People of the Book: Hebrew Press Returns to the Holy Land

As we have noted, Hebrew printing in the Holy Land began in Safed in 1577. Six books and a few years later it came to an end. The end of the sixteenth century saw the decline of the flourishing Jewish community of that city of scholars and mystics. in the last decades of the eighteenth century and the first of the nineteenth, a small migration of some disciples of the Baal Shem Tov and some followers of the Gaon of Vilna restored to this Galilean city some of its earlier spiritual luster. Among those who arrived in their wake was one Israel Bak who came in 1831. In his native city, Berdichev in the Ukraine, he had published some thirty books; and now, in Safed, he reestablished publishing in the Holy Land.

First off the press, in 1832, was a Sefardi prayer book, the first Hebrew book printed in the Holy Land after a hiatus of 245 years. The publisher notes on the title page that the book contains some of the *Kavanot* (mystical statements of intentions of worship) of Safed's greatest luminary, Isaac Luria, and further assures that all of the workers engaged in this holy endeavour are pious Jews, and that prayers recited from a book printed in this holy city would be most efficacious. This was followed in 1833 by the *Book of Leviticus*, with the commentaries of Rashi and Hayim Joseph David Azulai, a favorite of Sefardi Jews. No traces remain of either *Genesis* or *Exodus*, if indeed they were ever published, but it is possible that they were destroyed during the peasant revolt against Muhammad Ali in 1834, in which Bak's press was destroyed and Bak himself was wounded. More likely only *Leviticus* was published, the first of a projected five-volume edition of the Pentateuch, because it was the custom to begin instruction of the *Humash* in the schools not with Genesis but with Leviticus. The school year began in the spring, when the Book of Leviticus was being read in the synagogue, and it made good sense to synchronize Bible study in the school with Bible reading in the synagogue.



**After a hiatus of 246 years, Israel Bak reestablished the Hebrew press in Eretz Yisrael, and he, like his predecessor, chose the city of Safed. His first published work, in 1832, was a Sefardi prayer book, the second, the Book of Leviticus, the first printing of a book of the Bible in the Holy Land. The title page describes the contents and the enterprise:**

**The Book of Leviticus, the third of the Five Books of the Torah with the commentary of Rashi, *Ba'al ha-Turim* (Jacob ben Asher), *Siftei Hahamim* (the Lips of the Wise) and ... on the *Haftarot* and the Five Scrolls by the illustrious godly man, Hayim Yosef David Azulai ... printed by the eminent and wise Israel Bak ... of Berditchev. Here in Upper Galilee, in the holy city, Safed ... under the sovereignty of the noble Mohammed Ali Basha (1833) (Hebraic Section, Library of Congress Photo)**

Bak turned to agriculture but continued printing, even after the earthquake of 1837 devastated his shop. The Druze revolt in 1838 destroyed both his farm and press, and Bak departed for Jerusalem where, in 1841, he once again established his press, the first Hebrew press in Jerusalem.

Among the many early Jerusalem imprints, the Library contains a fine copy of the rare *Sefer Hatakanot* ... (The Book of Ordinances and Enactments and Customs ... of the Holy City, Jerusalem), 1842. It was the second book printed there, but was the first in importance as the single most valuable source book for Jewish religious and communal life in that city. For thirty-three years, Bak continued to print books in Jerusalem, some 130 volumes in all, but he never completed the Pentateuch edition he had launched in Safed in 1833.

## Sources:

Abraham J. Karp, *From the Ends of the Earth: Judaic Treasures of the Library of Congress*, (DC: Library of Congress, 1991).