1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 19-CR-018
4                    Plaintiff,     )
                                    ) PRETRIAL CONFERENCE
5    vs.                            ) PUBLIC
                                    )
6    Roger Jason Stone, Jr.,        ) Washington, DC
                                    ) November 4, 2019
7                    Defendant.     ) Time:  10:00 a.m.
     _____
8
               TRANSCRIPT OF PRETRIAL CONFERENCE
9                      HELD BEFORE
          THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
     _____
11

12                 A P P E A R A N C E S

13

     For the Plaintiff: **Jonathan Ian Kravis**
14                      **Michael John Marando**
                        **Adam Jed**
15                      **Aaron Simcha Jon Zelinsky**
                        U.S. ATTORNEY'S OFFICE FOR THE
16                         DISTRICT OF COLUMBIA
                        555 Fourth Street, NW
17                      Washington, DC 20530
                        (202) 252-7068
18                      Email:  Jonathan.kravis3@usdoj.gov
                        Email:  Asjz@usdoj.gov
19                      Email:  Michael.marando@usdoj.gov

20

     For the Defendant: **Bruce S. Rogow**
21                      LAW OFFICE OF BRUCE S. ROGOW, P.A.
                        100 NE 3rd Avenue
22                      Suite 1000
                        Fort Lauderdale, FL 33301
23                      (954) 767-8909
                        Email:  Brogow@rogowlaw.com

24

25

```
 1     For the Defendant:  Robert C. Buschel
                           Tara A. Campion
 2                         BUSCHEL & GIBBONS, P.A.
                           One Financial Plaza
 3                         100 S.E. Third Avenue
                           Suite 1300
 4                         Ft. Lauderdale, FL 33394
                           (954) 530-5301
 5                         Email:  Buschel@bglaw-pa.com
                           Grant J. Smith
 6                         STRATEGYSMITH, P.A.
                           401 East Las Olas Boulevard
 7                         Suite 130-120
                           Fort Lauderdale, FL 33301
 8                         (954) 328-9064
                           Email:  Gsmith@strategysmith.com
 9                         Chandler Paige Routman
                           LAW OFFICE OF CHANDLER P. ROUTMAN
10                         501 East Las Olas Blvd.
                           Suite #331
11                         Ft. Lauderdale, FL 33316
                           (954) 235-8259
12                         Email:  Routmanc@gmail.com

13     _____

14     Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
                                  Official Court Reporter
15                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
16                                Washington, DC  20001
                                  202-354-3267
17
                                      *   *   *
18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this morning we
 2     have Criminal Case Number 19-18, United States of America v.
 3     Roger Stone.  Mr. Stone is present and in the courtroom, Your
 4     Honor.
 5              Will counsel for the parties please approach the
 6     lectern and identify yourself for the record.
 7              MR. KRAVIS:  Good morning, Your Honor.
 8              Jonathan Kravis for the United States.  With me at
 9     counsel table are Michael Marando, Adam Jed, and Aaron
10     Zelinsky, also from the D.C. U.S. Attorney's Office, and the
11     FBI case agent, Christopher Keefe.
12              THE COURT:  All right.  Good morning.
13              MR. BUSCHEL:  Good morning, Judge.
14              Robert Buschel on behalf of Roger Stone.  Chandler
15     Routman, Tara Campion, Grant Smith, and Bruce Rogow on behalf
16     of Mr. Stone.
17              THE COURT:  All right.  Good morning.  I want to say,
18     first, that I appreciate the significant amount of work that
19     both sides have done to narrow the issues to produce the
20     exhibit lists that were shorter than the ones we received at
21     the beginning, and to largely agree on the jury instructions.
22     I think we're in excellent shape this morning to be prepared to
23     move forward tomorrow.  And, as I say, I appreciate all the
24     work that's been done.
25              So I just want to go over the things that I think are
```

 1    still left open.  I'll hear from you if we have anything left

 2    open, and hopefully you all will have most of the afternoon to

 3    do the work that you probably would prefer to do, instead of

 4    sitting here.

 5              The first thing I want to do is talk about the

 6    schedule.  We're going to start tomorrow morning with the

 7    completion of the jury selection, which I am hoping we should

 8    be able to complete tomorrow.  If it carries over to the next

 9    day, it will carry over to the next day.

10              But, if we complete it tomorrow, I won't expect you

11    to open tomorrow.  You won't have to open until the next day,

12    first thing in the morning.  But, if the jury selection

13    continues from Tuesday to Wednesday, then as soon as we've got

14    the jury in the box, I will probably call upon you to open.  So

15    that gives you an idea about how that's going to work.

16              Not tomorrow, but beginning with the openings, we're

17    going to have an overflow courtroom available, and we're going

18    to have the media room available, where there will be a live

19    feed of the sound from this courtroom going to other places.

20              I tell you that because while sometimes we can be

21    careful about the microphones in the courtroom, you should

22    always assume that the microphone on that table is live, and so

23    if you're having a conversation, it can be heard in the media

24    room or the overflow room.  So just be cautious about that.

25              We will start tomorrow morning with the continuation

 1    of the voir dire.  I think we've given out instructions to both

 2    sides that explain the procedure that I'm going to follow.

 3    It's the procedure I pretty much follow in every case.

 4            Since the jury has already received the

 5    questionnaire, though, I'm not going to ask the jury questions

 6    or use the index cards the way I ordinarily do.  Tomorrow I'll

 7    have them all seated here.  I will give them the same

 8    instructions I gave them at the time of the completion of the

 9    jury questionnaire about the importance of their candor and

10    their being unbiassed and their inability to talk about the

11    case among themselves or anyone else.

12            So I'll give them some cautionary instructions.  And

13    then they'll all be moved to another location while we put a

14    group of them in the jury room, and then bring them in one at a

15    time.  They will sit there in the witness stand so that

16    everyone can hear what they're saying.  If, in response to a

17    particular question, they ask to come to the bench with the

18    husher on to give their answer in private, we'll do that, but,

19    otherwise, they'll be giving the follow-up voir dire from the

20    witness stand.

21            You should have already received the list that will

22    tell you the order in which the jurors are going to appear.  My

23    plan is to ask each juror, when they take the seat, whether

24    they've read or heard anything else about the case since the

25    time they filled out the jury questionnaire or if there are any

1    updates to their answer in the jury questionnaire.  And then if

2    I've identified something in the questionnaire that I think is

3    unclear or requires a follow-up question, I'll ask it, and then

4    I'll give the parties the opportunity to ask follow-up

5    questions.

6            And that is supposed to be follow-up questions.  You

7    can't start with open-ended questions, like what TV stations do

8    you watch?  Who do you read?  That's not what we're going to

9    do.  The idea is just to zero in on anything that's unclear in

10   the questionnaire that you need to know to resolve the

11   decisions you're going to make.  If I feel that the parties are

12   abusing the opportunity, then I'll just take over and do all

13   the voir dire myself.  And then you have the rules that we're

14   going to be operating by.

15           Once we've qualified enough jurors, we're going to

16   stop.  We'll excuse the other jurors, we'll bring all the

17   jurors in here, and then you'll exercise your preemptories in

18   accordance with the procedure that I set out.

19           Does anybody have any questions about how that's

20   going to work?

21           MR. KRAVIS:  No, Your Honor.

22           MR. BUSCHEL:  No, Judge.

23           THE COURT:  Okay.  With respect to any legal issues

24   that were left open after the initial pretrial conference, I

25   asked the parties to see if they could work out something

1          related to the movie clip; that didn't happen so I've ruled on

2          that.

3                    I believe that the government can move the

4          information in through a witness, through the transcript,

5          potentially even through a request that I take judicial notice.

6          But, I'm not going to permit the clip of the movie to be played

7          unless something arises in the cross-examination of government

8          witnesses or in the testimony of Mr. Stone that makes that

9          appropriate, at which time you can renew your request.

10                   Yes?

11                   MR. KRAVIS:  Your Honor, just briefly on that.  I

12         wanted to flag the government's intention on this, because I

13         think the defense may have an objection to it.

14                   Our intention at this point, in light of the Court's

15         ruling, was not to introduce the transcript at the beginning of

16         our case, but, rather, when we call Ms. Taylor, the former case

17         agent, when she gets to the relevant messages, to just briefly

18         describe -- very briefly to describe their context, and then

19         wait until the conclusion of the government's case to see where

20         we are with respect to cross-examination of witnesses.  And

21         then, at that point, either move to introduce the transcript or

22         renew our motion to introduce the clip, or do none of those

23         things if the record seems sufficiently clear.  That's our

24         intention at this point.

25                   THE COURT:  All right.  Well, do you intend to ask

1    the witness who received the email what the references meant to

2    him?

3                MR. KRAVIS:  What he understood the references to be,

4    in addition, yes.

5                THE COURT:  And so then the idea with the case agent

6    is to ask if that person has seen the movie and --

7                MR. KRAVIS:  Do you recognize --

8                THE COURT:  -- what --

9                MR. KRAVIS:  Do you recognize -- yes.  Do you

10   recognize the name that appears in this message?  Do you

11   recognize the quotation that appears in this message?  Where is

12   it from?  Because we will be calling that witness at the

13   beginning of our case, introducing much of the documentary

14   evidence through that witness, just to provide a little bit of

15   context to the messages as they come in.  Again, with respect

16   to facts that, I think, are not in dispute about, like, what

17   the movie is.  And then to ask the witness who received the

18   messages what he understood the messages to mean.  And then,

19   when we get to the conclusion of our case, to sort of see where

20   we are with respect to asking the Court to then admit either

21   the transcript or the clip or neither of those things.

22               THE COURT:  Well, are you going to lay the foundation

23   for the witness's knowledge subsequent to reading the emails or

24   the text that the agent viewed --

25               MR. KRAVIS:  Yes.

1          THE COURT:  -- of the movie?

2          MR. KRAVIS:  Yes.

3          THE COURT:  I mean, I think we'd have to have a basis

4    for the testimony.

5          MR. KRAVIS:  Viewed the movie, viewed the clip, and

6    has compared the messages with the scene from the movie.  And

7    then is prepared to say, This quotation appears in this scene

8    of this movie, I know because I saw it.

9          THE COURT:  All right.  And what is the defendant's

10   objection to that?  I mean, I don't think this witness can

11   testify to what Mr. Stone meant --

12         MR. ROGOW:  Good morning, Your Honor.

13         THE COURT:  -- or what the recipient of the text

14   interpreted it as meaning.  But, they can certainly say, This

15   name is a character in this movie.  And in this scene, this

16   happens.  And I know that because I've seen the movie.

17         MR. ROGOW:  We object to anything other than

18   Mr. Credico testifying about his receipt of the text mentioning

19   the Pentangeli name.  And to make this something that the

20   government witness, who -- I don't know, I assume she's seen

21   the movie.  Maybe she hasn't.  Maybe she saw it only for this

22   purpose.

23         But we think it makes it a feature of the case, and

24   it should not be a feature of the case.  It was said -- it was

25   said to Mr. Pentangeli.  And to have the government use its

1    witness -- its first witness to explain the text and to have

2    this transcript that they have created with, at the end,

3    there's a comment that Tom Hagen, Robert Duvall whispers in the

4    ear of the brother of Mr. Pentangeli.  I think that it's just a

5    mistake to let anything like that come in, other than the

6    witness to whom it was said.

7         So, our objection is maintained about anything with

8    regard to the Pentangeli statements, to the Don Corleone

9    *Godfather* tape, other than Mr. Credico speaking of it, because

10   he received the text.

11        THE COURT:  All right.  Well, I understand that.  And

12   I granted the motion in limine because of the sensational

13   nature of the movie clip itself and the undue impact of seeing

14   the tape and all the drama in the scene in the tape in the

15   courtroom.

16        I think that the primary testimony is from the person

17   who received the text, who said, When I saw the text, this is

18   what it meant to me.  This is the -- this is what I knew about

19   what we -- our shared understanding of this movie.  This is

20   what it meant to me.

21        But, I think the government is permitted to introduce

22   evidence that shows the fact that, indeed, there was such a

23   character in the movie, and that, indeed, that character did

24   not testify before the committee at issue in the movie.  I

25   think that supports the inference that they're asking the jury

1    to draw from the statements that were made to the witness, and

2    I don't think that is too sensational or irrelevant to be

3    admitted.

4           Whether the testimony comes in before the recipient

5    of the text testimony testifies or after, you know, it seems to

6    me it would be better to have the content of the movie

7    described after the witness has testified.  But, if the case

8    agent is going to start by moving all the text into evidence,

9    other than by breaking their testimony in two and making them

10   come back, wouldn't be able to do it that way.  So I'm not sure

11   there's a legal reason why they can't do it in the order that

12   they think is most efficient.

13          So, I appreciate your objection, but I did rule

14   that -- when I excluded the clip, that they could introduce the

15   fact that this event transpired with a witness by that name in

16   that movie.

17          MR. ROGOW:  You know, I don't want to keep arguing

18   and beating something you've already ruled on.  But, even the

19   discussion you are having now in explaining it, I think,

20   underscores the fact that now you have the government,

21   basically, standing behind *The Godfather* transcript and, in a

22   sense, explaining *The Godfather* transcript.  And I just think

23   that's a terrible mistake, because it's one thing --

24          THE COURT:  Well, I asked the parties to see if they

25   could stipulate to a vanilla description of what transpired in

 1     the movie, and you couldn't do that.  And you don't have to do

 2     that.  You don't have to agree to any evidence that the

 3     government is trying to introduce.  So, I gave you the

 4     opportunity, but you didn't agree to a version that was

 5     acceptable to you.

 6             I have said they can do a transcript.  They can do a

 7     witness.  I wouldn't have a problem with a request that I take

 8     judicial notice of it.  It is a fact that there is this movie

 9     and that this scene occurred in the movie.  They can't say

10     that's what Mr. Stone was referring to.  They can't say that

11     was what the witness took it to be referring to.  But, after

12     the witness says, this is what I thought it meant, they can

13     introduce the fact that this, in fact, happened in this movie.

14             And, so, the question is, how can they do that in the

15     least sensational method possible?  And I think having the

16     agent say, I saw the movie and there was a character by that

17     name and that person was called to testify and then did not

18     testify, I think they can do that, if we can't get a

19     stipulation.  And so --

20             MR. ROGOW:  I hear you.  I hear you.

21             THE COURT:  -- I'm going to allow them to do that.

22     All right.

23             The only other outstanding issue dealt with the

24     cross-examination of a witness.  It was Docket 235.  It was

25     opposed at Docket 239.  The initial motion was sealed, but I

1  think some of the discussion of the motion has not been sealed.

2  So can I talk about this in open court at this point?

3  Or is this a sealed motion that we need to discuss at the

4  bench?

5  MR. KRAVIS:  Your Honor, the government had moved to

6  seal this motion, mostly because of the identification of the

7  witness.  I think, without using the witness's name, we can

8  talk about it in open court.  I think, at this point, we all

9  know what we're talking about.

10  THE COURT:  Well, and I believe the witness's name in

11  the pendency of this motion has been published, at least I've

12  seen articles about it.  But, without mentioning the name of

13  the witness, the government filed a motion seeking to limit the

14  scope of the cross of the witness in Docket 235.

15  And I believe the defense has indicated in its

16  response, without naming the witness, that it didn't intend to

17  cross-examine the witness on issues related to after the

18  current president became the president or planning for the

19  transition prior to the inauguration.  And if that is true,

20  that largely obviates the motion.

21  But, the defense did say in its opposition, there may

22  be matters involving nongovernmental actors which may become

23  relevant with regard to this witness.

24  I don't know what that means.  So, I don't know what

25  you're reserving the right to do in that statement.  I will

1    limit the cross-examination of this witness and any witness to

2    the scope of direct and to bias.  And so that should take care

3    of it.  If they only ask him about things that took place

4    during the campaign, you're only going to be able to cross

5    about the campaign and any agreements made with the witness or

6    things that go towards bias.

7           So, if you can discuss this here without referring to

8    the witness specifically, please come and let me know what's

9    going on.  Otherwise, if you need to come to the bench, we'll

10   do that.

11          MR. ROGOW:  This will be cross-examination, Your

12   Honor.  There may be issues about the credibility of the

13   witness, in terms of things that he has done and said outside

14   of the context of the transition, outside of his work that

15   we've agreed not to question him about.  But, to foreclose us

16   at this point from asking him questions, even recent questions,

17   questions dealing with recent kinds of conduct, that may impact

18   his credibility.

19          And so I can live with Your Honor's ruling --

20          THE COURT:  I haven't ruled on anything.

21          MR. ROGOW:  No, but you -- but you have --

22          THE COURT:  I'm trying to understand your response to

23   the motion.

24          MR. ROGOW:  Well, what you have said, Your Honor, is

25   that our cross-examination will be limited to the direct.  And

1    I understand that.  But --

2              THE COURT:  That's the rule.

3              MR. ROGOW:  Yes.  But on the direct, if there are

4    issues that become relevant in terms of his credibility, things

5    that have occurred since the time period that we're talking

6    about, we need to feel free to -- or, be free to cross-examine

7    him with regard to that.  So when credibility is at stake, I

8    think it's important that we have that latitude.

9              THE COURT:  Well, not everything that a witness has

10   ever said and done gets brought up in cross-examination because

11   it's based on credibility.  The Rules of Evidence are pretty

12   strict about other bad acts.  So, I don't know what you're

13   referring to.

14             The motion specifically said, we want to know,

15   because it could raise privilege issues, if you're planning to

16   ask questions that relate to service in the White House or

17   transition planning prior to the inauguration and after the

18   election.

19             I don't know what transpired after the election that

20   could be relevant in this case.  And so if you don't intend to

21   cross-examine him on issues related to that, then we don't have

22   to deal with the motion.  And I think that's what you're

23   saying.

24             If you're saying he may have said something, let's

25   say, last week, which is inconsistent with his in-court

1    testimony, well, you're not bound -- of course you can ask him

2    about that.  But I'm not sure what you're saying.  It's just

3    generally, we get to ask about his credibility.  If that tends

4    to be, well, you did this, that, and the other when you were in

5    the White House, that's a problem, according to the government.

6              MR. ROGOW:  I thought that we were very precise in

7    saying what we would not be questioning him about, the two

8    areas that Your Honor just mentioned.

9              THE COURT:  Okay.

10             MR. ROGOW:  But what I heard Your Honor saying

11   seemed, to me, to limit our ability, if, indeed, the kind of

12   example you just gave occurs.  If he said something last week

13   that's inconsistent with what the testimony is -- his direct

14   testimony is or what his other statements were when he's

15   cross-examined, then we should, obviously, be free to question

16   him that way.

17             THE COURT:  Yes, you can question people about prior

18   inconsistent statements.  You can question people about bias.

19   What you said that I asked you to explain was, "There are

20   matters involving nongovernmental actors which may become

21   relevant with regard to him."

22             Can you tell me what that sentence means?

23             MR. ROGOW:  It means that subsequent to the time

24   periods that we've agreed not to question him about, there have

25   been statements made, there have been actions taken that we

1    think may be inconsistent with what he's going to say on his

2    direct testimony.

3         So all I was doing was leaving the door open for that

4    possibility.  The government's motion wanted to limit it to --

5    it's cut off at the time that President Trump becomes the

6    president.  It's cut off when the transition team goes into

7    place.  And our position was, you can't cut it off at that

8    point.  We're not going to agree to cut it off at that point.

9         But, on the other hand, we are agreeing not to go

10   into these areas that they think would raise executive

11   privilege problems and issues that they said they can't

12   resolve.

13        So, all I was doing was keeping a door open.  If I

14   ask a question or if Mr. Buschel asks a question on

15   cross-examination and there's some objection to it, we're aware

16   of what the Court has ruled, and we're aware of how we have to

17   conduct ourselves with regard to the cross-examination.

18        So, to me, it wasn't a big issue.  The only issue was

19   their wanting to say you can't ask about anything that happens

20   after he assumed a position in the White House.  That was an

21   overbroad position, and that's what we were objecting to.

22        THE COURT:  All right.  I think the motion, then, is

23   largely moot.  And it's largely been conceded that they don't

24   intend to ask him about things that took place during his White

25   House service or during the transition period.

1          And, yes, you're entitled to cross-examine someone to

2      the extent it relates to their credibility or their bias or it

3      undermines their in-court testimony.  But, when you say "things

4      he did," I'm not sure everything he did or anything he did,

5      unless it bears directly on his direct -- the credibility of

6      his in-court testimony, is going to come in.  So -- but we're

7      going to have to take it question by question.

8          But, certainly, if he did or said something that

9      relates to issues that I've already said are not relevant to

10     this case, you don't get to cross-examine him about those.

11         MR. ROGOW:  We understand.  Your Honor, may I ask

12     that both the government and Your Honor speak more directly

13     into the microphone?  Because back in the -- where I'm sitting,

14     sometimes I have trouble hearing.  It's a little more muffled

15     and --

16         THE COURT:  All right.  I'll do my best.  No one has

17     ever told me they couldn't hear me before.  So that's a new

18     piece of information, and I will do the best I can.

19         MR. ROGOW:  Thank you, Your Honor.

20         THE COURT:  All right.

21         One other matter that was left after the September

22     25th pretrial conference, I summarized in my order the next day

23     as follows:  I said, with respect to the exhibits, the parties

24     were ordered to meet and confer concerning the excerpts of

25     Government Exhibit 6, that the government intended to

 1    introduce, instead of the entire document.

 2            And then the defense was permitted to propose any

 3    additional excerpts that it submitted had to be introduced for

 4    completeness pursuant to Federal Rule of Evidence 106.  And the

 5    parties were supposed to submit any disputes about those issues

 6    to the Court by October 25th.

 7            I also said that the defense has to inform the Court

 8    of any objections it had to the admission of any of the

 9    individual communications included in Government's Exhibits 79

10    and 132 by October 25th, 2019.

11            October 25th has come and gone.  So, can I assume

12    that there are no issues for me to resolve with respect to

13    those matters?

14            MR. KRAVIS:  Sort of.  With respect to Government's

15    Exhibit 132, we withdrew the larger exhibit and submitted in

16    its place a single email.  My understanding is that the defense

17    has no objection to the revised, much slimmed-down version of

18    Government's 132.

19            The defense has not raised any objections to us with

20    respect to the contents of the other government exhibit the

21    Court referenced.

22            With respect to Exhibit 6, the defense didn't -- does

23    not object to any of the portions of the report that the

24    government seeks to introduce, but the defense included some

25    additional portions of the report in their revised exhibit

 1    list, which we filed with the Court, I think, last week.

 2            The government has objected to some of the additional

 3    portions of the report that the defense seeks to introduce on

 4    relevance and prejudice grounds.

 5            THE COURT:  All right.  Does somebody have -- I think

 6    it would be helpful -- and this is what I had wanted --

 7    something that gives me the entire document, but then shows,

 8    these are the portions we want; these are the portions that

 9    they want for completeness?  Or it's just, your portions are in

10    their exhibit binder and their portions are in their exhibit

11    binder?

12            MR. KRAVIS:  At the moment, it's the latter.  We can

13    certainly prepare a document that shows the former.  But, the

14    report itself is over 400 pages long.

15            THE COURT:  Right.

16            MR. KRAVIS:  I think there are a fairly limited

17    number of pages that are still in disagreement between the

18    parties, and I think those points of disagreement are only with

19    respect to certain portions that are in the defense exhibit.

20            THE COURT:  Okay.  But, is the defendant seeking to

21    introduce those portions on the grounds of completeness?

22            MR. ROGOW:  Yes, Your Honor.

23            THE COURT:  Well, then, you know, it would just be

24    easier to see them juxtaposed to yours, so that I can rule on

25    it.  So if somebody, before -- you know, maybe later today can

1    just transmit to us -- you don't have to give me all 400 pages.

2    I think they're in your original exhibit binder anyway.  But,

3    your pages and bracket them in one color, and their pages in

4    another color, so that I know how they fit together.

5              MR. KRAVIS:  I mean, the sections that the defense

6    wants to introduce that the government objects to are in

7    entirely different portions of the report.  Like, different

8    appendices, things from the minority report.  There's nothing

9    on the same page or even in the same section of the report that

10   either side is seeking to introduce that the other side objects

11   to.

12             THE COURT:  Okay.

13             MR. KRAVIS:  So we can provide that to you.

14             THE COURT:  Okay.

15             MR. KRAVIS:  But there's not going to be anything

16   where there's a single page or even a single section of the

17   report where the parties have any disagreement.  The

18   disagreement revolves around other portions that appear in

19   other appendices in the minority version of the report that the

20   defense wants to introduce that the government objects to.

21             THE COURT:  All right.  Well, I saw those when I went

22   through the exhibits for today.  How does that fall under Rule

23   106?

24             MR. ROGOW:  Your Honor, we understand that excerpts

25   are what Your Honor has authorized.  And, so, what we have

1    tailored, we think, are excerpts that are relevant to the case.

2         I want to make clear, though, that we have a standing

3    objection -- although it's already been overruled, I think --

4    to both the House committee majority report and the minority

5    report on the grounds of completeness, on the theory that this

6    case is about five apparent alleged lies that Mr. Stone,

7    according to the government, made.  And the question of

8    materiality is, obviously, an important question.

9         And, so, for the jury to see and have access to the

10   whole report, we think, is important.  In order to determine

11   materiality, the jury ought to know what the report said when,

12   in March, the committee, both the majority and the minority,

13   issued its report.  But, you've already ruled on that, and, so,

14   we're at excerpts.

15        So, we do have a dispute about certain excerpts.  I

16   think we've tailored it down very well.  And it's not a dispute

17   that covers many pages, but it is an important dispute.  So I

18   think Your Honor has offered to have us send something to you

19   this afternoon.  Or we can talk to the government and tailor it

20   for you so you can see exactly what's at issue, is the smart

21   way to do this.

22        THE COURT:  All right.  There was a lot of emotion

23   displayed at the government's counsel table when you said you

24   had a standing objection to the introduction of the report.

25   So, can someone explain --

 1          MR. ROGOW:  No.  I didn't -- I've had a standing

 2     objection to not being able to introduce the report.

 3          THE COURT:  Did you designate the entire report as a

 4     defense exhibit?

 5          MR. ROGOW:  We did.  We did.  Initially, we wanted --

 6     Your Honor, as I recall, issued an order saying that only

 7     excerpts could be used, and that we should get together and see

 8     what the excerpts were.

 9          THE COURT:  Well, I'm not -- I'm not sure that's what

10     I did.  I'll look back at what I did.

11          But, what is it that the government wants to say in

12     response to his characterization of what's taken place so far?

13          MR. KRAVIS:  So, just two brief points.  The first

14     is, I mean, our understanding was that that exhibit was not

15     objected to and was being admitted.

16          THE COURT:  You moved the whole report in, as I

17     recall.  But, then you said to me, we're not actually planning

18     to introduce the whole report; we're only planning to use

19     excerpts.  Is that correct?

20          MR. KRAVIS:  Our -- our expectation was that only the

21     excerpts that we introduced would be coming into evidence in

22     the government's case, not the entire report coming in.

23          THE COURT:  Right.  And that was why I said, then, if

24     that's what you're going to do, then they get to decide what

25     else is necessary for completeness.

1          MR. KRAVIS:  Right.  So the thing -- I just want to

2     make sure the --

3          THE COURT:  I mean, the report itself is full of

4     hearsay and conclusions, and I don't think it would be

5     admissible as a whole.

6          MR. KRAVIS:  Right.  The thing that I think is maybe

7     not totally clear from this discussion is, there is nothing in

8     the body of the report, the 200-some pages that the majority of

9     the House Intelligence Committee prepared that anyone is

10    objecting to at this point.

11          What the government is objecting to is, the defense

12    has asked to introduce Appendix G to the report, which concerns

13    1001 referral for Christopher Steele; Appendix H of the report,

14    which concerns allegations of FISA abuses; sections of the

15    minority report that deal with other aspects of Russian

16    election interference that don't have anything to do with

17    Mr. Stone's statements.

18          THE COURT:  Well, I've already ruled that we're not

19    trying the investigation.  We're not trying the hacking.  That

20    none of that is relevant.

21          MR. KRAVIS:  And so this is my point, is that we're

22    not really talking about the rule of completeness here; we're

23    talking about other appendices that contain information about

24    things that do not relate to the facts of this case, the

25    defense trying to choose.  It's not really a rule of

 1    completeness issue.  That was the only point I wanted to make.

 2              THE COURT:  All right.  Yes?

 3              MR. ROGOW:  So, we actually already agreed that H,

 4    the H appendix, we were not going to seek it to be admitted.

 5    But, again, I want to couch all of this in the context of our

 6    objection.  We think that the whole report should be admitted,

 7    but, it's already ruled on.

 8              So, what we're talking about now is G.  That's the

 9    only dispute that we have, is Subsection G of the report.  And

10    that, to us, is an important aspect of the report and it is

11    relevant.  And the relevance has to do with the fact that it

12    reflects a 1001 reference -- matter being referred to the

13    Justice Department for prosecution where a false statement was

14    made.

15              THE COURT:  Is it of a witness in this case?

16              MR. ROGOW:  Not a witness in this case.

17              THE COURT:  Then what does it have to do with this

18    case?

19              MR. ROGOW:  Because it was a witness that was

20    testifying to -- with regard to the Russian aspect of the case

21    with --

22              THE COURT:  Right, which is not part of this trial.

23              MR. ROGOW:  And we're not trying the Russian aspect

24    of the case, except that, Judge, it's quite clear that the

25    parameters, the criteria of the whole investigation were about

1    Russia.  We're not saying that they made bad findings.  We're

2    not arguing that.  We're saying that this House committee, the

3    criteria, the four parameters, had to -- two of the parameters

4    had to do with an investigation of Russian interference.  So,

5    it's relevant.  It's relevant because --

6            THE COURT:  All right.  I don't believe -- well,

7    we'll go through exhibit by exhibit.  But, the fact that the

8    minority or even the majority decided that another witness

9    should be referred for making a false statement to the

10   committee, in and of itself, if that person is not testifying

11   in this case and their credibility is not an issue in this

12   case, is not relevant in this case.

13           MR. ROGOW:  The materiality of the questions and

14   answers of Mr. Stone is at the heart of this case.

15           THE COURT:  Right.  I don't believe that that bears

16   on it.

17           MR. ROGOW:  I understand.

18           THE COURT:  All right.  Well, let's go through --

19   well, actually, before we get to the exhibits, let me just go

20   through the rest of the things that I wanted to talk about.

21           With respect to the jury instructions, there are, I'm

22   pleased to say, very few in dispute.  Most of the disputes

23   concern various parties' proposed rifts on the standard

24   instructions.  I'm likely to go with the standard instructions.

25   I will look at it all more closely when we get to this point,

1    but I doubt I'm going to need more briefing or argument on the

2    instructions.

3           There is one legal issue that was raised in

4    connection with one instruction, and that was the elements of

5    the obstruction of justice count.  And the question was whether

6    obstruction of justice after *Safavian* can, even in part, be

7    based on the concealment of records, if the defendant was not

8    under legal compulsion to produce them.

9           As you noted in the footnotes to the instructions

10   that you submitted, the defense objected to the inclusion of

11   that language in the instruction for the same reasons it had

12   raised in its motion to dismiss.  I ruled on the motion to

13   dismiss, but at that time we were dealing with the standard

14   applicable to an indictment at that stage.

15          I am very familiar with *Safavian.*  It is entirely

16   possible, at this point, that I have it memorized.  But, the

17   differences between the case dealing with the scheme to conceal

18   for 1001 purposes and an obstruction of justice count is not

19   something that I've gone into in great detail previously.  And,

20   so, I think that would be a very important issue for the

21   parties to brief.  And I think it needs to be briefed by the

22   close of the government's case, which I'm not sure when that's

23   going to be.

24          But, in any event, I would like to ask each side to

25   submit something in writing to me on that narrow issue, no more

1   than ten pages, by noon on Friday, November 15th.  But, I think

2   it's clear when you go to the instructions.  There's bold

3   language where you disagree and there's a footnote were the

4   defense says, we disagree for the reasons stated on page

5   whatever.  And I want a submission just on that issue.

6          Yes?

7          MR. KRAVIS:  Your Honor, we're prepared to agree with

8   the defense on this point.

9          THE COURT:  You're prepared to agree with the

10  defense?

11         MR. KRAVIS:  Yes.  We went back and looked at it in

12  preparation for this hearing.  We're prepared to agree to

13  remove the language that they objected to that's in bold.

14         THE COURT:  Okay.  Well, it would help me, then, if

15  you could just submit to me a revised jury instruction that you

16  agree to.  And if I don't have to rule on this, then you don't

17  have to brief it.

18         MR. KRAVIS:  We will.  Thank you.

19         THE COURT:  All right.

20         MR. ROGOW:  Your Honor, if I may.

21         Did I understand you to say that you're going with

22  the standard instruction with reasonable doubt and not the

23  instruction you gave in the Craig case?

24         THE COURT:  I didn't say.  I said that I don't need

25  briefing with respect to those instructions, and I'll be able

1    to rule on it based on my review of the two proposals and the

2    standard jury instructions and what I think is appropriate at

3    the time.  Just had this one issue that I thought was

4    sufficiently weighty that I wanted both sides to brief it.

5    But, otherwise, we'll take up the jury instructions at the

6    appropriate time.

7           What I gave in another case may have been based on

8    what the two parties proposed or agreed to in another case.  I

9    haven't compared the extent to which they varied from the

10   standard jury instructions, and so I'll let you know.  But, I

11   don't need more briefing was my only point.  I haven't ruled.

12          All right.  When we get to trial, there are lots of

13   you, so I want to remind you that we're going to have one

14   lawyer per witness.  One person questions them, one person

15   cross-examines them, and one person -- the cross-examiner is

16   the one who will object to the questions.

17          As I've told you before, when you give your openings

18   or your closings, you can wear a body mic and do it from the

19   well of the courtroom.

20          When you're questioning a witness, however, you must

21   be at the lectern, primarily so we can be sure that we are

22   maintaining an accurate record and you're speaking into the

23   microphone.

24          If you want to show a witness a document, you don't

25   need to ask my permission to approach the witness.  You can

1   walk up to the witness and hand them a document, unless you're

2   using our electronic system and just putting it on a screen.

3          If an exhibit has already been moved in evidence, you

4   don't need to move it in evidence.  If I've already admit it,

5   you can just say, Sir, I'm showing you what's been marked as

6   Exhibit 3 in evidence.

7          I'm going to assume that by the time we start the

8   trial, both sides have done what is necessary to familiarize

9   themselves with the courtroom technology before they stand up

10  and try to use it.  If you haven't done so yet, please make

11  sure that you meet with John Cramer, today, to be comfortable

12  with either the Elmo or attaching your computers to our system.

13  But, I want everything to work smoothly at that point.

14         I want to make sure that Mr. Haley has, by the end of

15  today, your exhibit lists, your witness lists, and the thumb

16  drive with the current version of all of the exhibits so that

17  he will be able to enter those into the Jurist System and the

18  jury will have access to them during their deliberations.

19         As I told you before, objections to questions, you

20  have to stand up because there's a lot going on.  I'm often

21  looking at the lawyer and I'm looking at the witness.  So, just

22  seated saying, Objection, you may not draw my attention.

23  Please stand up and say, Objection.  But, then, that's about

24  it.  Objection, hearsay.  Objection, argumentative.

25         But, you may not stand there and say, Objection,

1    Judge.  He's asking them dah, dah, dah, it's inconsistent with

2    the evidence.  You cannot make speeches from counsel table.

3    Just let me know the basis for your objection in one word.  If

4    I need to hear more, I'll bring you up to the bench.

5              There are a number of matters that I know are of

6    great interest to both parties that I have ruled are excluded

7    and irrelevant.  If you go there anyway in your openings or in

8    your questions, I will stop you.  I will politely call you to

9    the bench.  But, if you continue to disobey orders, then I'm

10   not necessarily going to give you the courtesy of letting you

11   come to the bench.  We're going to follow the rules.

12             I've been very clear about what this trial is about

13   and what it's not about, and there's plenty to try within the

14   confines of that -- those boundaries.  There have been many

15   matters, though, that I said I would reconsider if the evidence

16   warrants it, and I will do that with an open mind.

17             But, before you ask the question or refer to the

18   evidence, you have to come to the bench and say, Your Honor,

19   based on X, Y, and Z, I think the door has now been opened, and

20   I want to inquire about this.  And preclear it before you ask

21   the question in front of the jury.  I don't want to end up with

22   a mistrial unnecessarily.

23             So those are, basically, the rules of the game.  And

24   other than ruling on the defense exhibits that I haven't ruled

25   on yet, I think that's everything I wanted to take up today.

1            Are there any issues that the government wanted me to

2    resolve today?

3            MR. KRAVIS:  Not necessarily resolve, Your Honor, but

4    there were just a few logistical matters that we wanted to make

5    the Court aware of in the interest of everything moving

6    smoothly once the trial begins.

7            First, for the government's opening and for one of

8    our witnesses, we would like, with the Court's permission, to

9    use an easel in the courtroom to put up a demonstrative that is

10   like a physical blowup, in addition to the documents that

11   appear on the screen.

12           We will make sure that the easel is placed in such a

13   way that it doesn't interfere with the jury coming in and out,

14   and that everyone can see it who needs to see it.  And we've

15   provided defense counsel with the demonstratives --

16           MR. ROGOW:  Right.

17           MR. KRAVIS:  -- that we intend to use, and they

18   haven't registered any objection with us.

19           THE COURT:  All right.  And you can't put the

20   demonstratives on the screen because -- I mean, I know where

21   you're going to have put the easel, and people in the audience

22   will be unhappy about that.  But, you have to do what you have

23   to do.  I'm not going to bar an easel.

24           MR. KRAVIS:  The reason we're doing it that way is

25   because there are times, both in the opening and for one of our

1    witnesses, where we would like the witness and the jury to see

2    an exhibit on the screen at the same time that they are looking

3    at the demonstrative; that things make sense together.  And

4    we've tried, and there's really no way to do it all on the

5    screen.  So that's why we're using the easel.

6         THE COURT:  All right.  Well, I would just encourage

7    you that whatever is on the easel should have either as few

8    words or as large print that you're actually being helpful to

9    the jury, as opposed to having everybody squint at something

10   they can't read.

11        MR. KRAVIS:  We got the largest print we could get.

12        THE COURT:  All right.

13        MR. KRAVIS:  For the government's first witness, the

14   government intends to call, I mentioned earlier, the former

15   case agent, Ms. Taylor.  We're going to use a bunch of

16   documents with Ms. Taylor during her testimony.

17        We prepared a binder that has the exhibits that we

18   plan to use with Ms. Taylor in the order we plan to use them,

19   just because its easier.  They're not all in the numerical

20   order they appear on the witness list.  We have a copy of the

21   binder for the Court and for defense counsel, if the Court and

22   defense counsel would like it.  These are all things that were

23   already on the exhibit list, that are already in the exhibit

24   binder, and electronic --

25        THE COURT:  Are you planning to provide one to the

```
 1    witness during their testimony?
 2                MR. KRAVIS:  Yes, Your Honor.
 3                THE COURT:  But, while you're discussing the
 4    exhibits, you're also going to put them on the screen?
 5                MR. KRAVIS:  Yes, Your Honor.
 6                THE COURT:  All right.  Well, I've done that in
 7    multiple trials before.  I think it's helpful as long -- that
 8    you give the defense a binder and you give me a binder and then
 9    you proceed.
10                MR. KRAVIS:  We will.
11                There was one other matter -- one other logistical
12    matter that we were hoping we could discuss with defense
13    counsel at the bench?
14                THE COURT:  All right.
15                MR. KRAVIS:  Thank you.
16                THE COURT:  And then I think the -- you know, we do
17    have a feed to the media room.  So, should we turn that off
18    while we're --
19                THE COURTROOM DEPUTY:  (Shakes head.)
20                THE COURT:  We don't?
21                THE COURTROOM DEPUTY:  Once we go to bench
22    conference, it won't go to the medial room.
23                THE COURT:  All right.  Let's just wait until
24    everybody gets here.
25                Yes, get Mr. Stone the headphones.
```

1    (Bench discussion:)

2    MR. KRAVIS:  We would ask for this to be sealed.

















13        (Open court:)

14        THE COURT:  All right.  Are there any other

15   procedural matters, any other issues that I haven't said we're

16   going to talk about, besides the defendant's exhibits, that we

17   need to talk about this morning?

18        The government just raised its issues.  And,

19   Mr. Rogow, do you have anything that we haven't talked about

20   yet that I need to know that we're talking about today?

21        MR. ROGOW:  There are other exhibits to which there

22   have been some objections.

23        THE COURT:  No.  I said, except we haven't been

24   through the exhibits yet.  That's left.  I want to know -- I

25   went through all of my topics.  That's the one I haven't done

1   yet.  But, I want to know if there's any other topic that I

2   left off that we have to resolve today?

3            MR. ROGOW:  Not for us.

4            THE COURT:  Okay.  Great.

5            All right.  Let's talk about exhibits, then.

6            All right.  The first exhibit to which there was an

7   objection was 65.  This is an email dated September 28th, in

8   which witness -- someone who is going to be a witness,

9   essentially, Person 2, is complaining about what's going on in

10  one of the congressional hearings, or what he thinks is going

11  on.

12           Why is this relevant to anything?

13           MR. ROGOW:  Anything that Mr. Credico said with

14  relation to investigations, with relation to Roger Stone we

15  think is relevant, because Mr. Credico's credibility,

16  Mr. Credico's thinking about what Mr. Stone is saying or doing

17  is relevant.  And so to exclude it, we think, would be error.

18  There's no prejudice --

19           THE COURT:  This doesn't say anything -- he's

20  complaining about Representative Nadler.

21           Was he on the House Intelligence Committee?  Or is he

22  on some other committee at the time of this?

23           MR. ROGOW:  On some other committee, as I recall.

24           THE COURT:  Okay.

25           MR. ROGOW:  But, he says something about, I

1   interviewed Assange --

2          THE COURT:  It's a statement of opinion that he

3   thought what was going on, the fact that Nadler wanted to know

4   something about Mr. Stone, was unfair.  But, that's just his

5   opinion.  And I don't understand why something he wrote, why

6   that -- how does that bear on his testimony before this Court?

7          You said, Anything he's ever said about the

8   investigation of Roger is relevant.  That's just not true.

9          MR. ROGOW:  But he's also talking about WikiLeaks.

10  WikiLeaks is a publisher, not a hacker.  I interviewed

11  Assange -- I mean, Assange, and WikiLeaks are featured in this

12  case.

13         THE COURT:  WikiLeaks isn't accused of hacking in

14  this case.  So, I don't know why that statement, which is

15  hearsay anyway, you're seeking to use it for the truth of the

16  matter asserted.

17         Why is his opinion about all these things relevant to

18  anything?

19         MR. ROGOW:  Because it places him in a position of

20  having his own information, and whether or not he was going to

21  testify.  Of course, the Credico issue has to do with whether

22  or not his testimony was attempted to be tampered.  And, so,

23  his --

24         THE COURT:  Yes, but he's referring to something that

25  doesn't relate to this case.  First of all, I don't know if

1    Representative Nadler asked the Federal Bureau of Investigation

2    to try to put someone in jail or not.  He's talking about some

3    question, allegedly, that he read about.

4            And, so, first, he's transmitting an article, and

5    he's reacting to what's in the article.  So, we've got hearsay

6    within hearsay.  I don't see how this comes in evidence or what

7    it bears on at this point.  Its just his opinion about

8    something that was in the newspaper, that we don't know if it's

9    true or not, that doesn't relate to this case.

10           It's confusing because it talks about putting someone

11   in jail, and it doesn't relate to whether Mr. Stone's testimony

12   before the House committee was relevant.  It's talking about

13   something else completely.  And it's just a random opinion of

14   his that asserts facts and transmits an article that isn't

15   here.  So, we don't even know what the article is that he's

16   related to.

17           And if something comes up in his testimony that you

18   think you should be able to cross-examine him about in light of

19   this email, then you can come up and say, This is how I would

20   use this email right now.

21           But, just as an exhibit, it's hearsay within hearsay,

22   and, so, the exhibit will be excluded.

23           MR. ROGOW:  The next is Number 71, Your Honor.

24           THE COURT:  All right.  Okay.  Again, these people

25   had a relationship where they would -- well, actually, I don't

1    even know who this is to -- but, send links to themselves or

2    others or among each other commenting on something that's in a

3    newspaper article.  So the first question is:  There's facts in

4    the newspaper article which are then repeated in the article.

5            So, again, we have hearsay within hearsay.  This --

6    and I can't even tell, with the exclamation point, if he's

7    transmitting this as a joke or he's transmitting it seriously.

8    But, it all relates to, again, where the emails came from.

9            So, to the extent he's -- all he's saying is this is

10   what's in the other article.  He's not purporting to have any

11   knowledge of these facts.  So, again, I think it's hearsay and

12   it's irrelevant and I don't see how it comes in evidence.

13           How would this come in evidence?  And who was it sent

14   to?

15           MR. ROGOW:  It does not show who it was sent to.

16           THE COURT:  Okay.

17           MR. ROGOW:  But it shows -- it shows it's Credico

18   speaking -- or, Credico emailing.

19           THE COURT:  Right.  And what Credico is saying is --

20   in this article that he attaches, someone is saying "X."  So

21   he's transmitting hearsay and just sending it with an

22   exclamation point, like, Look at this.

23           So, no.  I mean, you can question him about facts,

24   but this exhibit itself is hearsay within hearsay and it's

25   irrelevant.  If he says something on the witness stand that you

1    think this would then provide grist for cross-examination, you

2    can come back to me and say, Now, see, I need to show him this

3    email because it's contradictory to what he says, or it's

4    different.

5              But, what this is about is who did the hacking?  Who

6    did the transmitting?  Who did the leaking?  And that's not the

7    issue in the trial.

8              All right.  So, 71, for now, will be excluded.

9              76 and 77 relate to someone who, I don't think, has

10   any bearing on this trial at all.  He's talking about having

11   Mr. Stone on his radio show.

12             MR. ROGOW:  Yes.

13             THE COURT:  Is that the aspect of it that you want,

14   the fact that the two of them were still talking back then and

15   he was inviting him on his show?

16             MR. ROGOW:  Yes.

17             THE COURT:  Okay.  All right.  I think these can be

18   redacted to take out the references to the person they're

19   talking about, Irwin Corey, who, I guess, was the subject of

20   the show that either Mr. Credico was seeking to have Stone

21   participate in or Stone was seeking to participate in.  He

22   says, What about me?  So, I don't know who initiated the

23   conversation.

24             I understand that you're trying to show that

25   notwithstanding the allegations in the complaint, these two

1    people were still having ongoing discussions and they were

2    friendly and he wanted him on his show.

3            But, I think references to, you know, Will you be

4    admitted -- willing to admit activities with Irwin or Roseanne

5    Barr or -- that's not relevant.  Just the question that they're

6    talking about having him be on the air on his show, you can --

7    you can submit redacted versions of these and you can use these

8    in your case.

9            MR. ROGOW:  We shall redact it, then, Your Honor.

10           THE COURT:  All right.

11           MR. ROGOW:  77.

12           MR. KRAVIS:  If this is the purpose for which the

13   next two exhibits are being admitted, we don't object to them

14   being handled in the same fashion.

15           THE COURT:  Okay.  Yeah, 77 I was including in that

16   conversation, what I just said.  So 76 and 77 will be admitted,

17   if the extraneous material is redacted.

18           78 -- 79 is the same thing.  He's asking him to be on

19   his show.  Right.  And that one, there's nothing to be

20   redacted.  Can you be on?  What time?  I need to be finished by

21   a certain time.

22           79 will be admitted.

23           Why is 170, the subpoena to Grant Smith, relevant?

24           MR. ROGOW:  Because the documents that the government

25   claims were never produced by Mr. Stone were never sought from

1    Mr. Stone until this subpoena was issued to Mr. Smith.

2              THE COURT:  Well, you have the letter where he's --

3    the letter that initiates the conversation about his appearing

4    before the committee.  I don't think the fact -- what is the

5    date of this compared to the date of --

6              MR. ROGOW:  The subpoena, October 23rd, 2019.

7              THE COURT:  So this is -- this is -- the first page

8    of the document is a subpoena transmitted to Mr. Smith, asking

9    him to bring documents.  I'm not sure I see the list of

10   documents -- all right.  There's one -- they ask for one email.

11   Says, "You must bring with you the following document:  Email

12   referenced in the attached letter."  And then there's a long,

13   essentially, self-serving letter from counsel for Mr. Stone,

14   written to the committee.

15             So I just don't -- I don't understand how this bears

16   on the truth of his testimony before the committee.  This is

17   like follow-up communication, the committee saying, Well --

18   explain this.  This is a trial subpoena, anyway.  This isn't

19   even from the committee.

20             MR. ROGOW:  I understand.  But what it reflects is

21   that there never was any follow-up from the committee.  And the

22   government now, trying to fill that gap, sends his subpoena to

23   Mr. Smith to produce the documents that they thought should

24   have been produced before.

25             So what it reflects is, in terms of materiality, in

1    terms of the committee's response, in terms of the exchanges

2    between Mr. Buschel and the committee, this is a recent effort

3    by the government to get documents that they're saying should

4    have been given before, which underscores our argument that the

5    committee didn't really need these documents, didn't want these

6    documents.  These documents weren't material to what they were

7    seeking.

8              THE COURT:  Well, I think you can ask that -- this

9    doesn't show that.  This is their effort to get ready for

10   trial.  I think the point is that the committee never asked for

11   the documents that they're saying he concealed.  But, now I

12   think they're saying they're taking concealment out, and

13   they're just predicating --

14             Are you now only predicating the obstruction charge

15   on false statements, and not concealment?

16             MR. KRAVIS:  False statements and witness tampering.

17             THE COURT:  Okay.

18             MR. KRAVIS:  To be clear, we are arguing the

19   indictment alleges and the evidence will show that some of the

20   false statements were about documents.

21             THE COURT:  About the existence of the documents.

22             MR. KRAVIS:  Yes.

23             THE COURT:  But not the failure to produce them?

24             MR. KRAVIS:  In and of itself is an act of

25   obstruction, correct.

1          THE COURT:  Okay.  So, what difference does it

2     make --

3          MR. ROGOW:  Are you asking me what difference it

4     makes?

5          THE COURT:  -- if they asked for the documents --

6     that these people asked for the document later?  I don't think

7     that bears on Congress's intent.

8          But, if the failure to produce documents is no longer

9     an alleged aspect of the obstruction of the congressional

10    investigation, then why would this matter?

11         MR. ROGOW:  Well, I don't understand it to be as

12    narrow as Your Honor is describing it.

13         THE COURT:  Well, you objected to including

14    concealment of records.  You said, That can't be part of this

15    case.  Let's move to dismiss.  The jury instruction is wrong.

16         And they've now agreed with you.  And they said,

17    We're not going to ask the jury to consider that.

18         So you won that point.  So --

19         MR. ROGOW:  So, it shows, in the larger sense, the

20    scope of the investigation, the actions of the House committee,

21    or inactions of the House committee, and the fact that the

22    government, on this date, October 23, was trying to fill one of

23    those gaps.  I mean --

24         THE COURT:  I don't think what these prosecutors were

25    doing and what they asked for bears on the question.  If you

1    want to question congressional witnesses about the fact that

2    you asked them these questions, but, yet, you never sent any

3    follow-up, you didn't ask for this, you didn't ask for that,

4    after he testified you didn't ask for this and that, that's

5    grist for cross-examination.

6            But, this doesn't prove that they didn't ask for it.

7    This is what the prosecutors asked for.  So I'm not saying that

8    the underlying facts about whether Congress followed up or

9    didn't follow up are inadmissible, but I think Exhibit 170 is

10   not admissible.  So it will be excluded.

11           And then we've got the issues about the House

12   reports.  And I think what you've told me earlier is that with

13   respect to Exhibit 177, there are aspects of Appendix G and

14   Appendix H you're seeking to introduce.

15           And is there a dispute about G?  Or one has been

16   withdrawn?  I don't know where we are.

17           MR. ROGOW:  Only G is in dispute.

18           THE COURT:  All right.  So, H is not in dispute, or

19   has been withdrawn?

20           MR. ROGOW:  Correct.

21           THE COURT:  Which?

22           MR. ROGOW:  H is withdrawn.

23           THE COURT:  Okay.  So we have to rule on your

24   proposed excerpts of Appendix G.

25           And is the government objecting to those?

```
 1          MR. KRAVIS:  Yes, Your Honor.

 2          THE COURT:  And then with respect to 178, the

 3   government objects to all of the excerpts from the minority

 4   report; is that correct?

 5          MR. KRAVIS:  Some of them, Your Honor.  There is a

 6   portion of the minority report that does relate to Mr. Stone

 7   and WikiLeaks.  I'm not really sure exactly what the relevance

 8   of that is, but we're not objecting to that.  But, there are

 9   other portions of the section of the minority report that the

10   defense gave us that talks about other aspects of the

11   investigation.  We object to those.

12          THE COURT:  Okay.  Can you tell me the pages that you

13   don't object to?

14          MR. KRAVIS:  Yes.  Starting at the bottom of page 34,

15   there's a section that begins, "Roger Stone, WikiLeaks, and

16   Guccifer 2.0."

17          That section goes to -- up to page 39.  We don't

18   object to any of that.

19          THE COURT:  Okay.  So that will be admitted.

20          But, then the question is, what goes on from pages 41

21   to 54?

22          MR. KRAVIS:  Yeah.  There's also a section that

23   begins, on the bottom of page 40, that says, "majority report,"

24   that goes on to 41, up to where it says, "July 2016 Carter Page

25   travel to Moscow."
```

1           We don't object to that portion either.  But, we

2     object to the remainder of the exhibit.

3           THE COURT:  So, 40 to 41, you do not object to.  So

4     that will be admitted.

5           MR. KRAVIS:  Correct.

6           THE COURT:  So it's 41 through 54 that you have the

7     problem with?

8           MR. KRAVIS:  The -- from 33 to --

9           THE COURT:  33 to 34, prior to the heading, you have

10     a problem with that, also?

11           MR. KRAVIS:  Yes.  And then 33, 34, 39 to 40, and the

12     bottom of 41 on.

13           THE COURT:  All right.  I'm looking at Exhibit 177,

14     and it starts with page 1.  And it says -- it has a "U" in

15     parenthesis.  I can't -- is that Appendix G?  Where does

16     Appendix G stop and start?

17           MR. KRAVIS:  Appendix G starts on page 156.  If you

18     look at the numbers in the bottom right corner.

19           THE COURT:  Okay.  All right.  So, pages 1 to 155 are

20     not Appendix G.  So, you're not seeking to introduce them?  You

21     just put them there to put it all in context for me?

22           MR. ROGOW:  Well, 1 to 155 in -- we are, obviously.

23     It's part of the report.

24           THE COURT:  Well, I'm asking you.  You said all you

25     wanted to move in was Appendix G, and that starts on page 156.

```
1              MR. ROGOW:  That was the --

2              THE COURT:  So, you want the entire -- you --

3              MR. ROGOW:  Appendix G is the only disputed part, as

4    I understood the government's position.

5              MR. KRAVIS:  Yes.  Everything up to Appendix G the

6    government has no objection to.

7              THE COURT:  Okay.  All right.

8              MR. ROGOW:  Yes.

9              THE COURT:  I'm just trying to figure out where we

10   are.

11             All right.  So, the first 155 pages are admitted.

12             So the question is, 156 through -- where does H

13   start?

14             MR. ROGOW:  H starts at 185.

15             THE COURT:  Okay.  And it relates to the subject of

16   Mr. Steele's testimony?

17             MR. ROGOW:  Mr. Steele's testimony, yes.  Different

18   attachments, also.

19             THE COURT:  All right.  I will take a look at it.

20   I'm skeptical about the relevance, but I will let you know

21   tomorrow morning how I've ruled.  But, tell me why it's

22   relevant.

23             MR. ROGOW:  It's relevant because it shows the scope

24   of the committee's investigation, their reactions to some of

25   the information that it received.  And it puts in context the
```

1    answers that Mr. Stone gave in terms of what his defense is to

2    why his answers were not corrupt or in any way seeking to

3    mislead the committee.

4            THE COURT:  All right.  I'll look at it with that in

5    mind.

6            MR. ROGOW:  Now, in the minority record, Your Honor,

7    page 33 and 34, I'm looking at the bottom of the page, where it

8    has the minority report.  The part that leads up to Mr. Stone

9    at page 34.

10           THE COURT:  All right.  And this material is relevant

11   for what reason?

12           MR. ROGOW:  It underscores the fact that

13   communicating with WikiLeaks is not a crime.  Communicating

14   with WikiLeaks does not mean that somehow or other someone was

15   violating any kind of obligation --

16           THE COURT:  Mr. Stone is not charged with committing

17   a crime of communicating with WikiLeaks.  He is charged with

18   not telling the truth when he was asked about communications or

19   attempted communications.

20           MR. ROGOW:  And the reason why he did not respond the

21   way he did is what I've told the Court before, because he

22   understood the questions to be in the context of Russian

23   interference.  And the -- what's happened here is because

24   anything that shows communications with WikiLeaks has been --

25   has morphed into, somehow or other, that involves Russian

1      interference.

2              THE COURT:  No.  You're the one who keeps putting

3      Russian interference in play.  They were trying to figure out

4      how these materials ended up in the public domain.  Their

5      investigation was not quite as narrow as you keep

6      characterizing it.  They asked him open-ended questions, to

7      which he gave definitive denials.  And you're trying to say

8      that there was a predicate to those questions -- an unstated

9      predicate to those questions.

10             But, why does that make any of this admissible?  If

11     he says, I heard a question, Did you talk to WikiLeaks? as Did

12     you talk to WikiLeaks about Russian hacking, if he wants to say

13     that, that's one thing.  But, what does this have to do with

14     it?

15             MR. ROGOW:  What this has to do with it is this

16     person who's mentioned here had these conversations with regard

17     to Assange, with regard to WikiLeaks, and it was not about

18     Russian hacking.

19             And, so, it underscores for us, and puts in some

20     context, the -- the questions and answers to Mr. -- the

21     questions to Mr. Stone and the answers by Mr. Stone, that they

22     are not, because I think the jury may very well feel that some

23     connection to Assange, some communication with Assange or

24     attempted communication with Assange, somehow or other, makes

25     Mr. Stone guilty of a misstatement.  And in the context of how

1    Mr. Stone was hearing --

2             THE COURT:  He's guilty of a misstatement if it's --

3    if it was a knowingly false statement, not because the subject

4    matter of the communication was illegal or not illegal.  No one

5    is charging him with that.  No one -- so, I'll read this.  I

6    understand what you're saying, I think.

7             I'm not sure I understand the admissibility of all of

8    this, essentially, hearsay in the minority report, about other

9    people's activities, has any bearing on whether he was telling

10   the truth or he wasn't telling the truth.  But, I will look at

11   it.

12            So, I just want to make sure I understand, with

13   respect to Exhibit 178, I need to figure out whether pages 33

14   up to the heading on 34 are admissible, and pages -- what

15   happens on 41 through 54?  So you've explained 33 to 34.

16            What is admissible about 41 to 54?  What is that

17   about?  And what does that have to do -- we've got Carter Page,

18   we've got Deutsche Bank, what does any of that have to do with

19   Mr. Stone?

20            MR. ROGOW:  The same argument with regard to 41 to

21   54 -- to 44, reflects, again, the scope of the committee's

22   investigation, the kinds of questions they were asking of

23   people, and how Mr. Stone's responses to the committee's

24   questions did not fall within what later on we become clear --

25   it becomes clear when you look at 41 to 44, and the other

1    parties who they're referring to, that it was not really

2    material to what they needed to know.

3              So, I mean, our position from the beginning has been,

4    put it all in.  Put the whole report in.

5              THE COURT:  But, they found out later.  What they

6    ultimately concluded doesn't mean that what they asked at the

7    time they asked it wasn't relevant to their inquiry.  It was an

8    inquiry.  They're trying to find out information.  At the end

9    of the day, they reach certain conclusions.  And this isn't

10   even the committee.  This is the --

11             MR. ROGOW:  This is the minority.

12             THE COURT:  -- minority response to what the

13   committee found.  I'll look at it.  I think it's very strained

14   that it has anything to do with -- I think we've talked about

15   materiality and what's material and what's not.

16             And I don't know that these pages -- I think the

17   pages of the minority report that relate to him and how he fit

18   into their investigation bears on materiality.  But, how

19   Carter Page fit into their investigation or how Deutsche Bank

20   or how Gates or how Manafort fit into their investigation may

21   not bear on the materiality of what Mr. Stone had to say.  So,

22   I'll look at it with that in mind.

23             MR. ROGOW:  There's one exhibit that's been skipped

24   over, that's 176.

25             THE COURT:  Oh.  No.

1          MR. ROGOW:  I believe the government is objecting to

2     that.

3          THE COURT:  Yes.  Mr. Corsi's book contains a lot of

4     hearsay, a lot of opinions about the investigation.  I've

5     already ruled the investigation is off limits, and I'm going to

6     exclude it.

7          If Mr. Corsi testifies, and if he says something

8     factual that's inconsistent with a factual representation he

9     makes in the book, then that might open the door to saying,

10    Well, you said X today, but when you published a book, you said

11    Y, that's another story.

12         But, certainly, if he doesn't testify, it's not

13    coming in evidence at all.  And if he does testify, the book as

14    a whole won't be an exhibit, but there may be aspects of it

15    that you could use for cross-examination purposes anyway.

16         Were you planning to use it for anything other than

17    cross-examination?

18         MR. ROGOW:  No.

19         THE COURT:  All right.  So, that's my ruling on that.

20         All right.  I will take the rulings with respect to

21    177 and 178 under advisement.  Based on this conversation, and

22    now that I understand what's in issue and what's not in issue,

23    I don't think I need to get something further because we're

24    really not talking about completeness.  So, I don't know if I

25    need a chart that shows me what's in and what's out.

1          We've agreed to what you want to introduce.  The only

2    question is these disputed aspects of what the defense wants to

3    introduce; is that correct?

4          MR. KRAVIS:  I believe that's correct.

5          THE COURT:  Okay.

6          MR. KRAVIS:  And the government's objections are

7    limited to the Appendix G --

8          THE COURT:  Okay.

9          MR. KRAVIS:  -- and the portions of the minority

10   report.

11         THE COURT:  All right.  So, I'm going to take those

12   under advisement, and I'll rule on them later, after I reread

13   them, with understanding, now, what the alleged purpose is of

14   their admission.  I think I've ruled on all the other exhibits.

15   I think I've ruled on everything now that was in dispute.  And

16   I think we're ready to proceed tomorrow.

17         Is there anything further I need to do right now?

18         MR. KRAVIS:  Nothing further from the government.

19   Thank you, Your Honor.

20         MR. ROGOW:  Now, there are a couple of things we

21   object to, Your Honor, with regard to the charts at 179.  I

22   think that's 179?

23         THE COURT:  Whose charts?

24         MR. ROGOW:  I'm sorry.  165 and 166.

25         THE COURT:  Are we talking about government exhibits

1    now?

2                MR. ROGOW:  Yes.  These charts (indicating).

3                THE COURT:  Okay.  Didn't I rule on those last time?

4                MR. ROGOW:  You did.  But, one was supposed to be

5    changed and it wasn't.  This is 166-1, where this is a date of

6    September 26th, the date of the testimony before the House

7    committee.  It is misleading.  It does not show the time that

8    these communications were made.

9                THE COURT:  All right.

10               MR. ROGOW:  And I thought it was being corrected.

11               THE COURT:  All right.  Well, I did rule on that.

12   So, if it's been changed, you need to give them and the Court

13   the new version.  But, I don't have anything in front of me

14   right now.  I wasn't prepared to take up the government's

15   charts.

16               But, do -- why don't the parties try to talk about

17   this among themselves.  And if there's still a dispute, you can

18   tell me about it after we've got a jury and we're ready to go.

19   But, I think I was pretty clear on what I thought I understood

20   your objection was and what I thought they needed to do.  And

21   if they haven't done it yet, they need to do it.  I don't know

22   if you're looking at an old version or what.

23               Is there anything else that we need to talk about?

24               MR. ROGOW:  Other than I want to renew our

25   objections, although you've already ruled, obviously.  But, so

1    that the record is clear, that one of the troubles with these

2    charts is, it doesn't show the content of whatever the

3    communications were.

4            So it has a misleading effect, to the extent that if

5    they were communicating by text, by Twitter, by Facebook,

6    whatever it was, about things completely unrelated to the

7    investigation, unrelated to the charges, it burdens the defense

8    with having to overcome all of these large numbers of

9    communications on certain number of dates without any context

10   for what -- or, content for what the communications were.

11           THE COURT:  All right.  But, you have received all of

12   the communications, and you can certainly cross-examine the

13   witnesses about them; is that correct?

14           MR. ROGOW:  Yes.

15           THE COURT:  All right.  All right.  I think --

16   appreciate your restating your objection on the record.  I

17   think I've ruled on all of that.  There were changes that I

18   thought, in light of your objections, needed to be made, and I

19   expect them to be made.

20           Other than that, I will plan to see everyone tomorrow

21   morning.

22           Are we starting at 9:30, Mr. Haley?

23           THE COURTROOM DEPUTY:  (Nods head.)

24           THE COURT:  At 9:30 tomorrow morning.

25           If you need access to the courtroom this afternoon to

1     make sure that you are able to get your exhibits up on all

2     screens, please work with Mr. Haley and make sure you have it.

3     I want to make sure everybody has the opportunity to test their

4     technology in this courtroom, and to be comfortable and ready

5     to go when we start after we pick the jury.

6               And then please make sure that Mr. Haley has what he

7     needs before we start.

8               So, thank you everyone.  I'll see you tomorrow

9     morning.

10                              *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4         I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                             Dated this 4th day of October 2019

9

10

11                    _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25