```
 1                     IN THE UNITED STATES DISTRICT COURT.
                       FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Criminal Action
                                      ) No. 19-CR-018
 4                    Plaintiff,      )
                                      ) JURY TRIAL
 5     vs.                            )
                                      )
 6     Roger Jason Stone, Jr.,        ) Washington, DC
                                      ) Date:  November 6, 2019
 7                    Defendant       ) Time:  9:30 a.m.
       _____
 8
                        TRANSCRIPT OF JURY TRIAL
 9                          HELD BEFORE
              THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
       _____
11

12                      A P P E A R A N C E S

13
       For the Plaintiff:     Jonathan Ian Kravis
14                            Michael John Marando
                              Adam Jed
15                            Aaron Simcha Jon Zelinsky
                              U.S. ATTORNEY'S OFFICE FOR THE
16                               DISTRICT OF COLUMBIA
                              555 Fourth Street, NW
17                            Washington, DC 20530
                              (202) 252-7068
18                            Email:  Jonathan.kravis3@usdoj.gov
                              Email:  Asjz@usdoj.gov
19                            Email:  Michael.marando@usdoj.gov

20
       For the Defendant:     Bruce S. Rogow
21                            LAW OFFICE OF BRUCE S. ROGOW, P.A.
                              100 NE 3rd Avenue
22                            Suite 1000
                              Fort Lauderdale, FL 33301
23                            (954) 767-8909
                              Email:  Brogow@rogowlaw.com
24

25
```

1   For the Defendant:          **Robert C. Buschel**
                                **Tara A. Campion**
2                               BUSCHEL & GIBBONS, P.A.
                                One Financial Plaza
3                               100 S.E. Third Avenue
                                Suite 1300
4                               Ft. Lauderdale, FL 33394
                                (954) 530-5301
5                               Email:  Buschel@bglaw-pa.com
                                **Grant J. Smith**
6                               STRATEGYSMITH, P.A.
                                401 East Las Olas Boulevard
7                               Suite 130-120
                                Fort Lauderdale, FL 33301
8                               (954) 328-9064
                                Email:  Gsmith@strategysmith.com
9                               **Chandler Paige Routman**
                                LAW OFFICE OF CHANDLER P. ROUTMAN
10                              501 East Las Olas Blvd.
                                Suite #331
11                              Ft. Lauderdale, FL 33316
                                (954) 235-8259
12                              Email:  Routmanc@gmail.com

13  _____

14  Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                        Official Court Reporter
15                      United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
16                      Washington, DC  20001
                        202-354-3267
17                      Email:  JaniceDickmanDCD@gmail.com

18                              *   *   *

19

20

21

22

23

24

25

1            THE COURT:  First thing I want to do is call the

2      case.

3            THE COURTROOM DEPUTY:  Your Honor, we have Criminal

4      Case Number 19-18, the *United States of America v. Roger J.*

5      *Stone, Jr.*  Mr. Stone is present in the courtroom.

6            Will counsel for the parties please approach the

7      lectern, identify yourself for the record.

8            MR. KRAVIS:  Good morning, Your Honor.  Jonathan

9      Kravis for the United States.  With me at counsel table are

10     Michael Marando, Aaron Zelinsky, Adam Jed, and Amanda Rohde

11     from the D.C. U.S. Attorney's Office, and Special Agent

12     Christopher Keefe from the FBI.

13            THE COURT:  Good morning.

14            MR. BUSCHEL:  Good morning, Judge.  Robert Buschel,

15     Tara Campion, Grant Smith, Bruce Rogow on behalf of Robert

16     Stone.

17            THE COURT:  All right.  Good morning.  Can I see

18     counsel at the bench very briefly?

19            (Bench discussion:)

20            THE COURT:  I just want to make sure Mr. Stone is

21     ready to go this morning.  He's okay?

22            MR. BUSCHEL:  He is.

23            THE COURT:  All right.  What we're going to do then

24     is I'm going to have Mr. Haley just call the roll to ensure

25     that our 34 jurors are here -- but they are here -- and then

1    we'll proceed immediately to the process of exercising the

2    preemptory strikes.

3         After we seat them in the box, Mr. Haley will take

4    them out and orient them to the jury room and the procedures

5    we're going to follow before we bring them back in, at which

6    point I'll give the preliminary instructions that I shared with

7    you yesterday, and then we'll open.

8         MR. KRAVIS:  Very well.

9         THE COURT:  Thank you.

10        MR. KRAVIS:  Thank you.

11        MR. BUSCHEL:  Thank you.

12        (Open court:)

13        THE COURT:  All right.  Mr. Haley, can you call the

14   roll by jury number of the jurors who are present?

15        THE COURTROOM DEPUTY:  Ladies and gentlemen of the

16   jury, potential juror, as your juror number is called, please

17   rise and say, Here.

18        Juror Number 1576.

19        THE PROSPECTIVE JUROR:  Here.

20        THE COURTROOM DEPUTY:  Juror Number 0972.

21        THE PROSPECTIVE JUROR:  Here.

22        THE COURTROOM DEPUTY:  Juror Number 1089.

23        THE PROSPECTIVE JUROR:  Here.

24        THE COURTROOM DEPUTY:  Juror Number 0938.

25        THE PROSPECTIVE JUROR:  Here.

```
 1                    THE COURTROOM DEPUTY:  Juror Number 0685.

 2                    THE PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 0014.

 4                    THE PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror Number 0560.

 6                    THE PROSPECTIVE JUROR:  Here.

 7                    THE COURTROOM DEPUTY:  Juror Number 0048.

 8                    THE PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror number 1201.

10                    THE PROSPECTIVE JUROR:  Here.

11                    THE COURTROOM DEPUTY:  Juror number 1261.

12                    THE PROSPECTIVE JUROR:  Here.

13                    THE COURTROOM DEPUTY:  Juror Number 1650.

14                    THE PROSPECTIVE JUROR:  Here.

15                    THE COURTROOM DEPUTY:  Juror Number 0910.

16                    THE PROSPECTIVE JUROR:  Here.

17                    THE COURTROOM DEPUTY:  Juror Number 1070.

18                    THE PROSPECTIVE JUROR:  Here.

19                    THE COURTROOM DEPUTY:  Juror Number 1598.

20                    THE PROSPECTIVE JUROR:  Here.

21                    THE COURTROOM DEPUTY:  Juror Number 0706.

22                    THE PROSPECTIVE JUROR:  Here.

23                    THE COURTROOM DEPUTY:  Juror Number 0617.

24                    THE PROSPECTIVE JUROR:  Here.

25                    THE COURTROOM DEPUTY:  Juror Number 0772.
```

```
 1                    THE PROSPECTIVE JUROR:  Here.

 2                    THE COURTROOM DEPUTY:  Juror Number 0394.

 3                    THE JUROR:  Here.

 4                    THE COURTROOM DEPUTY:  Juror Number 1126.

 5                    THE PROSPECTIVE JUROR:  Here.

 6                    THE COURTROOM DEPUTY:  Juror Number 0998.

 7                    THE PROSPECTIVE JUROR:  Here.

 8                    THE COURTROOM DEPUTY:  Juror Number 0172.

 9                    THE PROSPECTIVE JUROR:  Here.

10                    THE COURTROOM DEPUTY:  Juror Number 0686.

11                    THE PROSPECTIVE JUROR:  Here.

12                    THE COURTROOM DEPUTY:  Juror Number 0900.

13                    THE PROSPECTIVE JUROR:  Here.

14                    THE COURTROOM DEPUTY:  Juror Number 1048.

15                    THE PROSPECTIVE JUROR:  Here.

16                    THE COURTROOM DEPUTY:  Juror Number 1498.

17                    THE PROSPECTIVE JUROR:  Here.

18                    THE COURTROOM DEPUTY:  Juror Number 0721.

19                    THE PROSPECTIVE JUROR:  Here.

20                    THE COURTROOM DEPUTY:  Juror Number 1586.

21                    THE PROSPECTIVE JUROR:  Here.

22                    THE COURTROOM DEPUTY:  Juror Number 1224.

23                    THE PROSPECTIVE JUROR:  Here.

24                    THE COURTROOM DEPUTY:  Juror Number 0030.

25                    THE PROSPECTIVE JUROR:  Here.
```

```
 1                    THE COURTROOM DEPUTY:  Juror Number 1466.

 2                    THE PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 1694.

 4                    THE PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror Number 0944.

 6                    THE PROSPECTIVE JUROR:  Here.

 7                    THE COURTROOM DEPUTY:  Juror Number 1218.

 8                    THE PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror Number 0705.

10                    THE PROSPECTIVE JUROR:  Here.

11                    THE COURTROOM DEPUTY:  All present, Your Honor.

12                    THE COURT:  Okay.  Mr. Haley, I have a question for

13      you.

14                    (Off-the-record discussion.)

15                    THE COURT:  All right.  I apologize.  Can I have

16      counsel return briefly.

17                    (Bench discussion:)

18                    THE COURT:  Yesterday, as the jury left, we finished

19      the voir dire process, one of the jurors expressed to Mr. Haley

20      concerns that he hadn't been asked about changes in his

21      schedule.

22                    Mr. Haley, could you just come and tell us which

23      juror it is and what he said?

24                    THE COURTROOM DEPUTY:  Juror Line Number 49, 0944, is

25      a gentleman in the back row, blue shirt, light pants.
```

```
 1                    THE COURT:  1498?
 2                    THE COURTROOM DEPUTY:  0944, Line Number 49.
 3                    THE COURT:  49.  Oh, I'm sorry.  I thought you said
 4        39.  Okay.
 5                    THE COURTROOM DEPUTY:  0944.  He indicated to me,
 6        when they were actually leaving for the day, when we excused
 7        everybody else, he says, When will I tell the Judge that I have
 8        got business meetings on the 15th and the 20th?
 9                    And I said, Probably when you were on the stand.
10                    And he said, Well, she didn't ask me.
11                    I don't remember that.  All I know is he said he has
12        business meetings on the 15th and 20th.
13                    I said, I will bring it up to the Judge, and she will
14        take care of it tomorrow morning.
15                    THE COURT:  All right.  So, one question is, we do
16        have more than the number of people we need, and we may not
17        have gotten this far down the list anyway, but should we just
18        skip over him?  Or do you want to question him further?
19                    MR. BUSCHEL:  He's pretty far down.  Do you want to
20        wait and see?
21                    MR. KRAVIS:  I don't want to wait until we get into
22        the strikes to --
23                    THE COURT:  Well, you do have the right to strike
24        from anywhere on the list.  So, I think we should decide
25        whether he's coming or going.  We can bring him up to the bench
```

```
 1    and ask the questions.

 2              MR. BUSCHEL:  Okay.

 3              THE COURT:  And then we can decide whether he's to be

 4    excused.  So why don't we stay here.

 5              Mr. Haley, can you ask him to come to the bench?

 6              MR. KRAVIS:  I'm sorry.  While we're at the bench, I

 7    just wanted to confirm, when the clerk called the roll, that

 8    the clerk called Juror 1047, the third from the end.  I just

 9    didn't hear the number.

10              THE COURTROOM DEPUTY:  She's not on the panel.

11              THE COURT:  She's been --

12              MR. KRAVIS:  She's excused.  Okay.

13              MR. BUSCHEL:  Oh, Mr. Rogow doesn't have a headset

14    and he likes to feel like he's part of --

15              MR. KRAVIS:  I get it.  I feel the same way.

16              (Prospective juror approaches bench.)

17              THE COURT:  Can you come stand here, so the

18    microphone can pick you up?

19              Good morning.

20              THE PROSPECTIVE JUROR:  Good morning.

21              THE COURT:  We understand that after you left the

22    witness stand, you had indicated to Mr. Haley that you might

23    have some scheduling issues.  So, we wanted to make sure we

24    knew what they were before we complete the process of jury

25    selection this morning.  I don't mean to call you out in front
```

1    of everyone.

2              THE PROSPECTIVE JUROR:  That's fine.

3              THE COURT:  But what is the nature of the conflict?

4              THE PROSPECTIVE JUROR:  I've got a briefing to some

5    senior people at Defense Department, my director of my

6    division, as well as the third in command at Cyber Com, on the

7    15th.  And then on the 20th, we've had a meeting that we were

8    trying to schedule for about seven months, and we finally got

9    it scheduled on the 20th -- morning of the 20th.

10             THE COURT:  And would it be a hardship for you?  Or

11   could anybody cover for you at the first meeting?

12             THE PROSPECTIVE JUROR:  Not the same qualifications.

13   I mean, there are other people who could help deliver the

14   brief, but I'm the actual project manager on the brief.

15             THE COURT:  So, if you were here on that day, is that

16   something that would distract you from sitting here and

17   participating in the trial?

18             THE PROSPECTIVE JUROR:  No.  I mean, that ship would

19   have sailed by then.  If I was here, then the briefing would be

20   going on without me then.

21             THE COURT:  I'm just trying to figure out -- I mean,

22   are you, essentially, asking that you be excused because of

23   these conflicts?  We're trying -- we want to make sure that you

24   get to do your job, but we also want to make sure that anyone

25   that's qualified to be a juror is available to be a juror.

```
 1              So, do you feel that these really make you
 2      unavailable or --
 3              THE PROSPECTIVE JUROR:  I think I need to be there
 4      for those meetings, but I understand it's your discretion what
 5      constitutes, so --
 6              THE COURT:  Okay.  Do you have any questions?
 7              MR. KRAVIS:  I do not.
 8              THE COURT:  Do you have any questions?
 9              MR. BUSCHEL:  No.
10              THE COURT:  Okay.  You can go back to your seat.
11              And, counsel, stay here.
12              Thank you.
13              (Juror leaves the bench.)
14              THE COURT:  Does anybody have a point of view about
15      what we should do with this gentleman?
16              MR. KRAVIS:  I think it's reasonable to excuse the
17      prospective juror at this point.  As the Court noted, we
18      qualified more jurors than we need.  And I noticed that the
19      prospective juror hesitated several times when the Court asked
20      questions about whether he could fully be here, whether he
21      would be focused, and whether it was a hardship.  And I think
22      his last answer was sufficiently equivocal that it warrants
23      removing him.
24              THE COURT:  I think he is a person who has a sense of
25      duty, and that was reflected in both his desire to be at the
```

1   meeting and his desire to fulfil the demands of the justice

2   system.  But, he certainly did seem to hesitate, and I would

3   favor excusing him, as well.

4           MR. BUSCHEL:  Whatever the Court pleases.

5           THE COURT:  All right.  That's what we'll do.

6           MR. BUSCHEL:  Can I get his number again, please?

7           THE COURT:  It's 0944.  Okay.  So he can just sit

8   there for now, but we're not going to include him.

9           And so we're going to proceed with the strikes at

10  this time.

11          All right.  Thank you.

12          MR. BUSCHEL:  Thank you, Your Honor.

13          (Open court:)

14          THE COURT:  All right.  Members of the potential jury

15  panel, we're now about to begin the final process of selecting

16  who the jurors in this case will be.  We do that in a manner

17  that makes it look like we're not doing anything at all, except

18  handing pieces of paper around the courtroom.  But, in fact, a

19  tremendous amount of work is going to be done at counsel table,

20  but we're doing it in a way that enables you to remain in your

21  seats, rather than coming and going from the jury box.

22          So it will look like secret signals and pieces of

23  paper are being handed around for the next however long it

24  takes, but I can assure you that we are now all about to engage

25  in a very serious and important part of the trial and the jury

1   selection process.

2            (Pause.)

3            THE COURT:  All right.  Can I have counsel for both

4   sides at the bench?

5            (Bench discussion:)

6            THE COURT:  According to my records and those of

7   Mr. Haley, you've both exhausted your preemptory strikes, and

8   the following people will be seated in this order in the jury

9   box:

10           Seat Number 1, for Juror Number 1, will be the second

11  person on the list, 0972.

12           Juror Number 2 would be the third person on the list,

13  1089.

14           And we skip down several lines, to Juror Number 0560.

15  That would be Juror Number 3.

16           MR. KRAVIS:  Juror 0560?

17           THE COURT:  Juror 560 is line 10.

18           MR. KRAVIS:  Okay.

19           THE COURT:  Then, we go down to line 13, 1201, would

20  be Juror Number 4.

21           The one immediately under that, on line 14, 1261,

22  would be Juror Number 5.

23           Skip a line, and then go to line 16.  Juror Number

24  1650 is Number 6.

25           And immediately below her, 0910 is Juror Number 7.

```
 1              Then you drop all the way down to line 27, and 0617

 2      is Juror Number 8.

 3              And on the next page, the second line, line 30, 0394

 4      is Juror Number 9.

 5              Immediately under him, 1126 is juror 10.

 6              Skip a line, down to line 33.  0998 is Juror Number

 7      11.

 8              And Juror Number 12 is on line 35, 0172.

 9              We would seat, as Alternate Number 1, line 37, 0900.

10              And the other alternate would be 1224, on line 45.

11              And you each will have an opportunity to exercise one

12      strike of the alternates.  And if they are stricken, we'll

13      continue to move down in order.  And, again, you have the

14      opportunity to either strike an alternate or strike from the

15      list.  So, I'll give you both the opportunity to exercise those

16      strikes.

17              We'll come back to the bench, just to confirm that we

18      all agree as to who the alternates are, and then they will be

19      seated in the jury box and won't be told who the alternates

20      are.

21              MR. BUSCHEL:  Okay.

22              THE COURT:  And then we'll excuse everyone else.

23              MR. BUSCHEL:  Sounds good.

24              MR. KRAVIS:  Thank you, Your Honor.

25              THE COURT:  Thank you.
```

```
 1                    (Open court:)

 2                    (Pause.)

 3                    THE COURT:  All right.  Just to confirm that the

 4       process is complete, could I have counsel briefly at the bench?

 5                    (Bench discussion:)

 6                    THE COURT:  We're going to sit the Juror Number 37,

 7       0900, in Seat Number 13.

 8                    Seat Number 14 will be occupied by Number 0030 on

 9       line 46.

10                    MR. KRAVIS:  I agree.

11                    MR. BUSCHEL:  Yes.

12                    THE COURT:  Okay.  Okay.  We're going to seat them

13       now, and we'll excuse the rest.  And then Mr. Haley will take

14       them out and we'll take a break.

15                    And then during the break, whoever is going to give

16       the opening, if they want to get the body mic and get that

17       ready so that when I finish my instructions we can go straight

18       into that, you can do that, if you're planning to leave the

19       lectern.

20                    All right.  Thank you.

21                    MR. KRAVIS:  Thank you.

22                    MR. BUSCHEL:  Thank you.

23                    (Open court:)

24                    THE COURTROOM DEPUTY:  Ladies and gentlemen of the

25       potential jury, as your four-digit juror number is called,
```

```
 1     please bring all of your belongings and come forward.  I will
 2     seat you in the jury.  This will be Seat 1 through 7, and 8
 3     through 14 on the back row.
 4               So, in Seat Number 1, please bring your belongings
 5     and bring your things, Juror Number 0972.
 6               In Seat Number 2, will be Juror Number 1089.
 7               In Juror Seat Number 3, please bring your belongings
 8     and come forward, Juror Number 0560.
 9               In Juror Seat Number 4, Juror Number 1201.
10               In Juror Seat Number 5, Juror Number 1261.
11               In Juror Seat Number 6, Juror Number 1650.
12               In Juror Seat Number 7, Juror Number 0910.
13               In the last row, going back that way, in Juror Seat
14     Number 8, Juror Number 0617.
15               Juror Seat Number 9, Juror Number 0394.
16               In Juror Seat Number 10, Juror Number 1126.
17               Juror Seat Number 11, 0998.
18               Juror Seat Number 12, Juror Number 0172.
19               In Juror Seat Number 13, Juror Number 0900.
20               And in Juror Seat Number 14, Juror Number 0030.
21               Remaining jurors, you may return to the jury office
22     on the fourth floor to get any documentation that you need.
23     You can tell them you've been excused from this panel.
24               THE COURT:  Mr. Haley got one step ahead of me.
25               I do want to thank you for your participation in the
```

 1      process.  Being here yesterday, being candid with us in your

 2      answers, coming back this morning on time, all of those played

 3      on important role in our system of justice, and we appreciate

 4      your service.

 5              And as I said yesterday, if you were not selected,

 6      it's not because we didn't like you or found something wrong

 7      with you, but as you can see, we have no more seats in the jury

 8      box.

 9              Thank you very much.

10              Before we swear the jury or continue this morning's

11      proceedings, I'm going to ask Mr. Haley to show you where

12      your -- I know you know where the jury room is.  You were in

13      there yesterday.  But, he's going to take you back and show you

14      how you're going to come and go.

15              And then when we're ready to start, he'll bring you

16      back in.  I'll have some introductory instructions, and then

17      we'll begin with the trial.

18              THE COURTROOM DEPUTY:  You can leave the notebooks on

19      your chair, but you can bring everything else with you.

20              (Jurors leave the courtroom.)

21              THE COURT:  All right.  For the rest of you, we're

22      going to take approximately a ten-minute recess.  You can

23      remain seated or you can be excused.  And we'll resume in about

24      ten minutes.

25              (Recess.)

1          THE COURTROOM DEPUTY:  Your Honor, recalling Criminal

2     Case Number 19-18, the United States of America v. Roger Stone,

3     Jr.

4          THE COURT:  All right.  Good morning.  It's my plan

5     to bring the jury in, swear the jury, give them some

6     preliminary instructions about how the trial will proceed, and

7     then to move to opening statements.

8          I want to say to the many people who are in the

9     gallery:  This is a public proceeding and you are entitled to

10     be here.  There is, on the court's docket, Number 242, an order

11     about maintaining fair and orderly proceedings in this

12     courtroom.

13          So one thing everybody needs to understand is that

14     beyond the members of the defense team and the members of the

15     government's team, no one is guaranteed a seat.  We try to seat

16     as many of you as we can.  There is an overflow courtroom where

17     these proceedings are being broadcast.  And there is a media

18     room for members of the media who wish to take advantage of it.

19          If during the course of these proceedings you would

20     like to react, talk among yourselves, come and go, then we

21     encourage you to take advantage of the overflow courtroom.

22          Here, we expect everyone in the audience to

23     demonstrate appropriate demeanor.  We're not going to have

24     visible or audible reactions to what transpires in the

25     courtroom.  You're not going to be talking among yourselves or

1    attempting to communicate with or signal any of the

2    participants of the trial.  If that takes place, then you will

3    be directed to enjoy the proceedings from the overflow

4    courtroom.

5          Also, as is noted on the door and in the order,

6    electronic devices, including your phones, have to be turned

7    off while you're in the courtroom.  Anyone who enters the

8    courtroom and gives the court security officers resistance on

9    that point will also be directed to enjoy the overflow

10   courtroom.

11         We're not going to debate that point at the door

12   because, as you can see, there are a lot of people who are

13   willing to follow the rules for the opportunity to have a seat

14   in the courtroom.

15         Phones also have to be turned off, though, in the

16   overflow courtroom, as well.  We're not going to be

17   photographing or live streaming what's going on in that room

18   either.

19         Members of the media who wish to be transmitting to

20   their organizations in real time what's going on can listen to

21   the proceedings in the media room, which is established for you

22   for that purpose.

23         Finally, I want to point out that our order regarding

24   the orderly proceedings in this courtroom specifically notes

25   that attempts to contact or identify jurors are strictly

1    prohibited.

2          It is possible that that line has already been

3    crossed by someone who was in the courtroom yesterday.

4    Fortunately, the information that was publicly disseminated,

5    either explicitly or implicitly, was riddled with inaccuracies,

6    including the supposed occupation of the potential juror, the

7    name of the potential juror, and what had actually happened.

8    But -- because no one was actually selected to serve on this

9    jury yesterday; they were selected today.

10         But, that rule remains in effect.  You know jurors'

11   numbers.  They are Juror Number 1, Juror Number 2.  But, no

12   other efforts to communicate with them, to contact them, to

13   identify them, to speak to them outside this courtroom will be

14   condoned.

15         With that, I'm going to ask Mr. Haley to bring the

16   jurors in.

17              (Jurors enter the courtroom.)

18              THE COURTROOM DEPUTY:  Jury panel, Your Honor.

19              All present, Your Honor.

20              THE COURT:  All right.  Thank you.

21              Can you swear the jurors?

22              THE COURTROOM DEPUTY:  Members of the jury, will you

23   all please rise and raise your right hands?

24              (Whereupon, the juror panel was duly sworn.)

25              THE COURT:  All right.  Good morning, again, to all

1    of you.

2         Before we begin the trial, I'm going to explain how

3    the trial will work and what some of the legal rules are that

4    will be important during the trial.  I want to emphasize that

5    these remarks aren't meant to be a substitute for the detailed

6    instructions that I'll give at the end of the trial, just

7    before your deliberations.  The preliminary instructions are

8    intended to give you a sense of what's going to be going on in

9    the courtroom and what your responsibility as a juror will be.

10        As I said at the beginning of jury selection, this is

11   a criminal case that began when the grand jury returned an

12   indictment against the defendant, Roger Stone.  As I said at

13   the jury selection process, in January 2017 the United States

14   House of Representatives Permanent Select Committee on

15   Intelligence, the HPSCI, announced an investigation into

16   Russian interference in the 2016 U.S. presidential election,

17   which included investigation of links between Russian

18   individuals associated with political campaigns.

19        In the summer of 2016, an organization called

20   WikiLeaks released tens of thousands of documents stolen from

21   the Democratic National Committee, and the personal email

22   account of the chairman of the U.S. presidential campaign of

23   Hillary Clinton.  The HPSCI investigation examined Russian

24   cyber activity and other active measures directed at the 2016

25   U.S. election.

1               On or about September 26, 2017 Stone testified before

2      the HPSCI in Washington, D.C.  The grand jury has charged

3      Mr. Stone in a seven-count indictment.

4               Count 1 alleges that from May 17th to December 2017

5      Mr. Stone obstructed the HPSCI investigation by testifying

6      falsely at the HPSCI hearing, by making false statements about

7      the existence of records relevant to the committee's

8      investigation, by submitting a false and misleading letter to

9      the committee, and by tampering with another witness in the

10     investigation named Randy Credico.

11              Counts 2 through 6 allege that Mr. Stone knowingly

12     and willfully made false statements to the committee in his

13     September 2017 testimony.

14              Count 7 alleges that Mr. Stone knowingly and

15     intentionally corruptly persuaded another witness in the

16     investigation, named Randy Credico, by attempting to persuade

17     Credico to testify falsely before the committee or not to

18     testify at all.

19              The indictment returned by the grand jury is not

20     evidence.  It is merely the way a person is charged with a

21     crime in order to bring him to trial.

22              The defendant has pleaded not guilty to all charges

23     in the indictment.  He is presumed to be innocent of the

24     charges filed against him.  The government is required to prove

25     that Mr. Stone committed the crimes with which he's charged

1    beyond a reasonable doubt.

2           At the end of the trial, you will have to decide

3    whether or not the evidence presented has convinced you beyond

4    a reasonable doubt that the defendant committed any of the

5    offenses with which he has been charged.

6           I will provide you with more detailed instructions

7    about the legal elements of the charges against the defendant

8    at the end of the presentation of all the evidence.  But, for

9    now, I do want to give you a brief summary of some of the legal

10   concepts.

11          First of all, every defendant in a criminal case is

12   presumed to be innocent.  This presumption of innocence remains

13   with the defendant throughout the trial unless and until he's

14   proven guilty beyond a reasonable doubt.

15          The burden is on the government to prove the

16   defendant guilty beyond a reasonable doubt, and that burden of

17   proof never shifts throughout the trial.  The law does not

18   require the defendant to prove his innocence or to produce any

19   evidence.

20          If you find that the government has proven beyond a

21   reasonable doubt every element of an offense with which the

22   defendant is charged, it's your duty to find him guilty of that

23   offense.  On the other hand, if you find that the government

24   has failed to prove any element of a particular offense beyond

25   a reasonable doubt, you must find the defendant not guilty of

1    that offense.

2         As the first step in the trial, the government -- the

3    government and the defense will each have an opportunity to

4    make opening statements.  The defendant may make an opening

5    statement immediately after the government's opening statement

6    or he may wait until the beginning of the defendant's case or

7    he may choose not to make an opening statement at all.  You

8    should understand that the opening statements are not evidence.

9    They are only intended to help you understand the evidence that

10   the lawyers expect will be introduced.

11        After the opening statement or statements, the

12   government will put on what is called its case-in-chief.  This

13   means that the lawyers for the government will call witnesses

14   to the witness stand and ask them questions.  This is called

15   direct examination.

16        When the government is finished, the defense may ask

17   the witnesses questions.  This is called cross-examination.

18        When the defense is finished, the government may have

19   brief redirect examination.

20        After the government presents all of its evidence,

21   the defense may present evidence, but he's not required to do

22   so.  The law does not require the defendant, as I said, to

23   prove his innocence or to produce any evidence in the case.

24        At the end of all the evidence, each side will have

25   an opportunity to make a closing argument in support of its

1    case.  The lawyers' closing arguments, just like their opening

2    statements, are not evidence in the case.  They're only

3    intended to help you understand the evidence.

4          Finally, at the end of the evidence, and after both

5    sides have finished closing arguments, I will tell you in

6    detail about the rules of law that you must follow when you

7    consider what your verdict should be.  Your verdict must be

8    unanimous.  That means all 12 jurors must agree on the verdict.

9          Right now, I want to also go on and briefly describe

10   what my responsibilities are as the judge in this case, and

11   what your responsibilities are as the jury.

12         My responsibility is to conduct the trial in an

13   orderly, fair, and efficient manner, to rule on legal questions

14   that come up in the course of the trial, and to instruct you

15   about the law that applies to this case.

16         It's your sworn duty as jurors to accept and apply

17   the law as I state it to you.  Your responsibility as jurors is

18   to determine the facts in this case.  You and only you are the

19   judges of the facts.  You alone determine the weight and the

20   credibility and the value and the effect of the evidence, as

21   well as the credibility or believability of the witnesses.

22         You must consider and weigh the testimony of all

23   witnesses who appear before you.  You alone must decide the

24   extent to which you believe any witness.  You must pay very

25   careful attention to the testimony of all the witnesses,

 1   because you won't have transcripts or summaries of the

 2   testimony available to you during deliberations.  You're going

 3   to have to rely on your memory.

 4        During this trial I may rule on motions or objections

 5   by lawyers, make comments to lawyers, even ask a question to

 6   the witnesses, or instruct you on the law.  You shouldn't take

 7   any of my statements or actions as any indication of my opinion

 8   about how you should decide the facts.

 9        If you think that somehow I've expressed, even hinted

10   at any opinion as to the facts in this case, you should

11   disregard it.  The verdict in this case is your sole and

12   exclusive responsibility.

13        When you reach your verdict, you can only consider

14   the evidence properly admitted in this case.  Evidence includes

15   the sworn testimony of witnesses and exhibits admitted in

16   evidence.  Sometimes the lawyer's question suggests the

17   existence of a fact, but the lawyer's question alone is not

18   evidence.  If the evidence includes anything other than

19   testimony or exhibits, I will instruct you about those other

20   types of evidence when they're admitted during the trial.

21        During the trial if I or a lawyer makes a statement

22   or asks a question that refers to evidence and you remember the

23   evidence differently, you should rely on your memory of the

24   evidence during your deliberations.

25        Lawyers may object when the other side asks a

1    question, makes an argument, or offers evidence that the

2    objecting lawyer believes is not properly admissible.  You

3    shouldn't hold those objections against the lawyer who makes

4    them or the party that he or she represents.  It's the lawyer's

5    responsibility to object to evidence that they believe is not

6    admissible.

7            If I sustain an objection to a question asked by a

8    lawyer, that means the question must be withdrawn, and you

9    can't guess or speculate what the answer to the question would

10   have been.

11           If a question is asked and answered, and then I rule

12   that the answer should be stricken from the record, you have to

13   disregard both the question and the answer in your

14   deliberations.  And you should follow this same rule if I

15   instruct you that an exhibit has been stricken.

16           Now, let's talk about your conduct during the trial.

17   As I've been telling you all along, you are not permitted to

18   discuss this case with anyone until the case is submitted to

19   you for your decision at the end of my final instructions.

20   That means, until the case is submitted to you, you may not

21   talk about it, even with your fellow jurors.  This is because

22   we don't want you making decisions until you've heard all the

23   evidence and my instructions.

24           In addition, you may not talk about the case with

25   anyone else, including people at home or at work.  This is

 1     because you must decide the case based on what happens here in

 2     the courtroom, and not what someone else may tell you outside

 3     the courtroom.

 4           I'm sure that at some point you may need to inform

 5     people at home or at work that you've been selected for a jury.

 6     They will undoubtedly ask you, Well, what kind of case is it?

 7     You may tell those who need to know that you've been picked for

 8     a jury and that it's a criminal case and how long it may take.

 9     However, you shouldn't give anyone any information about the

10     case itself or the people involved in the case.

11           You must also warn people not to try to say anything

12     to you or to write to you about your jury service or the case.

13     When the case is over, you may discuss any part of it with

14     anyone you wish, but until then, you may not do so.

15           And when I tell you that you can't discuss the case,

16     that also means that you must not use electronic devices, such

17     as phones or computers, to communicate or talk about the case.

18     You may not send an email or on instant message or text about

19     it or write or Tweet about the case electronically through any

20     blog, posting, chat room, instant message, or other

21     communication, including social networking sites, such as

22     Facebook, Twitter, LinkedIn, Instagram, Snapchat, YouTube, or

23     anything that's been invented that I haven't heard of yet until

24     you have delivered your verdict and the case is over.

25           Do not send or accept any messages, including email

1    and text messages, about your jury service.  You must not

2    disclose your thoughts about your jury service or ask for

3    advice about how to decide the case.

4              What about while you're in the courtroom --

5    courthouse?  Although it's a natural human tendency to talk

6    with people with whom you may come in contact, you must not

7    talk to any of the parties, their attorneys, or any witnesses

8    in this case during the time that you serve on this jury.  If

9    you encounter anyone connected with the case outside the

10   courtroom, you should avoid having any conversation with them,

11   overhearing their conversation, or having any contact with them

12   at all.

13             For example, if you find yourself in a courthouse

14   corridor, elevator, or any other location where the case is

15   being discussed by attorneys, parties, witnesses, or anyone

16   else, you should immediately leave the area to avoid hearing

17   the discussion.  If you do overhear a discussion about the

18   case, you should report that to me, through Mr. Haley, as soon

19   as you can.

20             Finally, if you see any of the attorneys or witnesses

21   involved in the case and they turn and walk away from you,

22   they're not being rude.  They're merely following the same

23   instruction that I gave to them.

24             It is very unlikely, but if someone tries to talk to

25   you about the case, you should refuse to do so.  And you should

1    immediately let me know by telling Mr. Haley or the marshal

2    that you've been approached.  Don't tell the other jurors.

3    Just let us know, and we'll bring you in individually to

4    discuss it.

5            You must decide the facts based on the evidence

6    presented in court and according to the legal principles that

7    I'm going to instruct you about.  You're not permitted, during

8    the course of the trial, to conduct any independent

9    investigation or do research about the case.

10           That means, as I've told you before, you can't use

11   the internet or newspapers to do research about the facts or

12   the law or the people involved in the case.  Research includes

13   something even as simple or seemingly harmless as using the

14   internet to look up a legal term or address.  You might want to

15   search the web or recent newspapers to get some background you

16   may have missed, but I'm specifically instructing you not to do

17   that.

18           And there's a reason why we have this rule.  All

19   parties have the right to have the case decided based only on

20   the evidence and the legal rules that they know about and that

21   they have a chance to respond to.  Relying on information you

22   get outside the courtroom is unfair because the parties

23   wouldn't have a chance to refute, correct, or explain it.  And

24   it's also unfair because not all jurors would have the same set

25   of information, and that's very important in a trial.

1          Also, unfortunately, information that we get over the

2     internet or from other sources may be incomplete or misleading

3     or just plain wrong.  It's up to you to decide whether to

4     credit any evidence presented in court.  And only the evidence

5     presented in court may be considered.  If evidence or legal

6     information has not been presented in court, you can't rely on

7     it.

8          Moreover, if any of you do your own research about

9     the facts of the law, this may result in different jurors

10    basing their decision on different information.  Each juror

11    must make his or her own decision, but it has to be based on

12    the same evidence and under the same rules.

13          In some cases, there may be reports in the newspaper

14    or on the radio or the internet or television concerning the

15    case while the trial is ongoing.  In the event there's media

16    coverage in this case, you may be tempted to read it or listen

17    to it or watch it.  But, you must not read or listen to or

18    watch those reports because you must decide this case solely on

19    the evidence presented in the courtroom.

20          If any publicity about the trial inadvertently comes

21    to your attention during the trial, please don't discuss it

22    with other jurors or anyone else.  Just let me or Mr. Haley

23    know as soon as it happens, and then we can briefly discuss it

24    with you.

25          Now, when you all took your seats, you probably

1    noticed -- unless you're still sitting on them -- that each of

2    you had a notebook and a pencil waiting for you.  That's

3    because I permit jurors to take notes during the trial, if they

4    wish.  Whether you take notes or not is entirely up to you.

5    Many people find that note-taking helps them remember testimony

6    and evidence.  Others find it distracts them from listening to

7    the witnesses.

8          You'll be permitted to take your notebooks back with

9    you into the jury room during deliberations.  You should

10   remember, however, that your notes are only an aid to your

11   memory.  They're not evidence in the case, and they shouldn't

12   replace your own memory of the evidence.  Those jurors who do

13   not take notes should rely on their memory of the evidence and

14   shouldn't be influenced by other people's notes.

15         Other than during your deliberations, the notebooks

16   are going to remain locked in the courtroom during recesses and

17   overnight.  You'll not be able to take the notebooks with you

18   as you come and go, and you will not be permitted to take them

19   home with you overnight.

20         At the end of the trial, when you come back to the

21   courtroom to deliver your verdict, your notebooks will be

22   collected, the pages torn out and destroyed.  No one, including

23   myself, will ever look at the notes you have taken.

24         You've probably noticed that there are 14 of you

25   sitting in the jury box.  Only 12 of you will retire to

1    deliberate in this manner.  I'm not going to disclose who the

2    alternate jurors are until the end of my final instructions,

3    just before you begin your deliberations.

4            As any seat might turn out to be an alternate seat,

5    it's important that each of you think of yourself as regular

6    jurors throughout the trial, and that all of you give this case

7    your full and serious attention.

8            At the beginning of the jury selection process, we

9    gave you names of individuals that might be called to testify

10   in this case.  If at any time during the trial you suddenly

11   realize that you recognize or might know a witness or lawyer or

12   someone who's mentioned in the testimony or evidence or anyone

13   else connected with this case in any way, you should raise your

14   hand immediately and ask to speak to me.

15           After I submit the case to you, you may discuss it

16   only when I instruct you to do so, only in the jury room, and

17   only in the presence of all of your fellow jurors.

18           It's important that you keep an open mind and not

19   decide any issue in the case until after I submit the entire

20   case to you with my final instructions.

21           The schedule we're going to try to follow during the

22   trial is that we'll try to start promptly at 9:30 a.m., take a

23   short break at approximately 11:00 a.m., lunch break somewhere

24   around 12:30 or 1:00 p.m., resume the trial in about an hour,

25   take a short mid-afternoon break at approximately 3:00, and try

```
 1    to end by approximately 4:30 or 5:00.

 2            If you need a break at any other time, please feel

 3    free to raise your hand or give me some other signal, like a

 4    time-out, to let me know that you need a break, and we will be

 5    sure to take one.

 6            You will spend most of your time during this trial

 7    either in the courtroom or in the two jury rooms that are going

 8    to be available to you.  I urge you not to leave any valuables

 9    in the jury rooms.  Please bring your purses, wallets, or

10    anything with value with you as you come and go.

11            I want to thank you for your attention and your

12    patience, and we're going to proceed with the opening

13    statements after I briefly confer with counsel at the bench.

14            (Bench discussion:)

15            THE COURT:  All right.  Any objections or concerns

16    about the preliminary instructions?

17            MR. KRAVIS:  No objections.

18            MR. BUSCHEL:  No.

19            THE COURT:  Okay.  Are we ready to proceed?

20            MR. BUSCHEL:  Yes.

21            MR. KRAVIS:  Yes, Your Honor.

22            THE COURT:  All right.  How long is your opening

23    going to be?

24            MR. KRAVIS:  Mr. Zelinsky is going to be delivering

25    the opening.  It will be approximately 40 minutes long.
```

1          THE COURT:  Okay.  We'll see.  If he sticks with

2     that, then I think it might be appropriate to go back-to-back,

3     rather than having a lunch break in between.

4          How long do you anticipate the defense opening?

5          MR. ROGOW:  45 minutes to an hour.  Mr. Zelinsky told

6     me it could be 45 minutes to an hour for him, too, so --

7          THE COURT:  All right.  Well, we'll make a call about

8     whether to keep going or we need a break when he's done.  Okay.

9     All right.

10          (Open court:)

11          THE COURT:  All right.  You can proceed.

12          MR. ZELINSKY:  We are here today because one man

13     obstructed Congress's investigation into Russian interference

14     in the 2016 election.  In a critical investigation of national

15     importance, the defendant, Roger Stone, repeatedly lied under

16     oath to a congressional committee, and then tampered with a

17     witness to cover up his tracks.

18          Now, you'll hear that in 2016, the Democratic

19     National Committee, which is the organization that runs the

20     Democratic Party in the United States, announced that its

21     computer system had been hacked by the Russian government.  And

22     you'll hear that not long after that, a website called

23     WikiLeaks began to release thousands of emails related to the

24     Democratic National Committee.

25          WikiLeaks, you'll hear, is an organization that

1    publishes nonpublic material, usually material that has been

2    leaked or hacked.  After WikiLeaks began releasing these

3    emails, you'll also hear that the defendant, Roger Stone,

4    started bragging that he was in contact with WikiLeaks and he

5    knew what WikiLeaks's plans were.

6         At the time, the defendant's longtime confidant and

7    friend -- I'm sorry -- the defendant's longtime friend and

8    associate, Donald Trump, was running for president of the

9    United States against Hillary Clinton.  And the defendant

10   thought that those emails would help his friend Trump and they

11   would hurt Clinton.

12        So you'll hear in August of 2016, that Roger Stone

13   proclaimed over and over and over again, that he was in contact

14   with WikiLeaks, and that he had information about what was

15   coming.  And you'll hear that Mr. Stone publicly said that he

16   knew this information because he had an intermediary, a

17   go-between, somebody that he was talking to that was talking to

18   the head of WikiLeaks.

19        One year later, you'll hear that the United States

20   Congress, in particular, the House Intelligence Committee, was

21   undertaking an investigation into Russian interference in the

22   2016 election.

23        And because of the allegation that Russia was

24   responsible for the hacking of the Democratic National

25   Committee's server and the emails that were subsequently

1    released by WikiLeaks, the House Intelligence Committee focused

2    on WikiLeaks, and they focused on Roger Stone.  And the House

3    Intelligence Committee wanted to know what information

4    Roger Stone had gotten from WikiLeaks, how they had gotten it,

5    and who he was talking to on the Trump campaign about it.

6            Now, Roger Stone, you'll hear, testified before the

7    committee, under oath, on September 26th, 2017.  And you will

8    hear that when Mr. Stone testified, he told the committee five

9    categories of lies.

10           The first category of lies that Mr. Stone told the

11   House Intelligence Committee had to do with his emails.

12           Mr. Stone testified under oath that he didn't have

13   any emails, any text messages, or any documents that related to

14   Julian Assange, the head of WikiLeaks.

15           The second category -- and he had many, as you'll see

16   in this trial, such documents.

17           The second category of lies that Mr. Stone told was

18   about his intermediary.  Mr. Stone told the House Intelligence

19   Committee that he had only one intermediary, and that

20   intermediary was a man named Randy Credico.  But you will hear

21   that Mr. Stone actually had two intermediaries during that time

22   period to WikiLeaks.  And the person that he was talking about

23   in August, when Stone kept referring to his "back channel" that

24   was providing him with information, that was not Randy Credico.

25   That was another man named Jerome Corsi.  And you will hear

1    that Roger Stone sought to cover up that Jerome Corsi was his

2    back channel.  And that, instead, he tried to pin everything on

3    Randy Credico.

4            The third set of lies that Mr. Stone told the

5    committee had to do with his requests.  He was asked by the

6    House Intelligence Committee whether he had made any requests

7    of his intermediary, he had asked his intermediary to do

8    anything on his behalf.  Stone, again, lied.  He said that he

9    had made no requests for his intermediary to do anything.

10           But, you will hear, and the evidence will show, that

11   Roger Stone requested that Jerome Corsi go to London and get

12   the pending WikiLeaks emails from Julian Assange.

13           And you will hear that Roger Stone asked

14   Randy Credico to confirm with Julian Assange that Assange had

15   certain information related to Libya and then Secretary of

16   State Hillary Clinton that Assange would be publishing.

17           The fourth lie that Roger Stone told to the House

18   Intelligence Committee was that he had no records of any kind

19   about his communications with his intermediary.  And you will

20   hear and you will see that Stone had hundreds and hundreds and

21   hundreds of text messages, emails, written communications with

22   both Jerry Corsi and with Randy Credico.  And you will see that

23   those written communications, if they had come out, would have

24   unraveled all of the other lies that Roger Stone told.

25           So he said to the committee that he didn't have any

1    written communications of any kind.

2         The last lie that Roger Stone told the committee was

3    about the Trump campaign.  He was asked by the committee

4    whether he had ever discussed what he learned from his

5    intermediary and his intermediary with the Trump campaign, and

6    Roger Stone told them he hadn't.  You will hear that

7    Roger Stone discussed what he was learning with the senior

8    levels of the Trump campaign, both in regards to Jerome Corsi

9    and in regards to Randy Credico.

10        And then you'll hear that when a witness to the House

11   Intelligence Committee, Randy Credico, threatened to tell the

12   truth, when it sounded like he might derail Roger Stone's

13   plans, Roger Stone pressured the witness, he pressured

14   Randy Credico, to stay quiet.  Roger Stone threatened

15   Mr. Credico.  He threatened Mr. Credico's friend.  You'll hear

16   he even threatened Mr. Credico's dog.

17        Now, you might ask, Why didn't Roger Stone just tell

18   the truth to the House Intelligence Committee?

19        The evidence in this case will show that Roger Stone

20   lied to the House Intelligence Committee because the truth

21   looked bad.  The truth looked bad for the Trump campaign, and

22   the truth looked bad for Donald Trump.

23        Today I'm going to walk you through some of the

24   evidence you'll hear in this case and I'm going to tell you a

25   little bit about what you'll hear and show you how Roger Stone

 1    testified falsely before the House Intelligence Committee and

 2    how he obstructed justice and how he tampered with a witness.

 3            But, before I jump into the evidence in more detail,

 4    I want to speak with you for a moment about what this case is

 5    not about.

 6            This case is not about who hacked the Democratic

 7    National Committee's servers.  This case is not about whether

 8    Roger Stone had any communications with any Russians.  And this

 9    case is not about politics.  This case is about Roger Stone's

10    false testimony to the House Intelligence Committee in his

11    efforts to obstruct the investigation and to tamper with a

12    witness.

13            Now, I'm going to go through the facts with you in a

14    little more detail.

15            As you'll hear, in June of 2016, the Democratic

16    National Committee announced that it had been hacked.  And at

17    that time, Donald Trump was running against Hillary Clinton for

18    president of the United States.  And Julian Assange, the head

19    of WikiLeaks, was living in the Ecuadorian embassy in London.

20            Now, you'll hear that on June 12th, 2016,

21    Julian Assange announced that he had materials related to

22    Hillary Clinton that WikiLeaks was planning to publish.

23            And you'll hear that two days after that, on June

24    14th, 2016, the Democratic National Committee announced that

25    its servers had been hacked earlier that year by Russian

1   government actors.  And then you'll hear that same day, several

2   hours after the Democratic National Committee's announcement,

3   Roger Stone made a phone call.  Now, you'll hear we don't know

4   the content of that phone call.  But we do know who he called.

5   And we do know that the call went through.  And we do know that

6   there was a conversation.

7        Just after that evening when the Democratic National

8   Committee had announced that it had been hacked by the Russian

9   government, Roger Stone called his longtime friend and

10  associate, then-candidate Donald Trump, and the two of them

11  spoke on the phone.

12       Almost a week -- almost a month later, on

13  July 22nd, 2016, WikiLeaks released thousands of emails related

14  to the Democratic National Committee.

15       What comes next is an important three-week period in

16  this case.  Because this period, as you'll hear, was of

17  particular interest to the House Intelligence Committee.

18  Because when WikiLeaks started dumping those emails from the

19  Democratic National Committee, Roger Stone saw an opportunity

20  and he took it.

21       Stone emailed an associate of his, Jerry Corsi, and

22  he asked him for help in getting to Julian Assange.  Stone told

23  Corsi -- you'll see this email -- that he needed to get to

24  Assange at the Ecuadorian embassy in London and get the pending

25  WikiLeaks emails.

1          You will hear that Julian Assange, as I said, is the

2     head of -- I'm sorry -- is the head of WikiLeaks.  You will

3     hear that he was living in the Ecuadorian embassy in London.

4     And you will hear that Roger Stone and others were interested

5     in what information Assange might have.  So, Stone was asking

6     Corsi to get to Assange and to figure out what was happening

7     and to get the pending WikiLeaks emails.

8          Now, you'll hear, also, that a few days later, on

9     July 31, 2016, Roger Stone again contacted then-candidate

10    Trump.  And just like that call on June 14th, after the

11    DNC's -- Democratic National Committee's -- announcement, we do

12    not know the content of the call that took place on July 31st,

13    2016.  But, we do know that Roger Stone called then-candidate

14    Trump and we do know that they spoke for approximately ten

15    minutes on then-candidate Trump's personal lines.

16         And the other thing that we know is that about an

17    hour after that call that Roger Stone had with then-candidate

18    Donald Trump, Roger Stone sent another email.  He emailed

19    Jerry Corsi again, and he told Corsi that a friend of theirs

20    living in London should see Julian Assange.

21         The next thing you'll hear is that approximately two

22    days after Roger Stone dispatched Jerry Corsi, Jerry Corsi sent

23    him an email back.  On August 2nd, 2016, you'll see that

24    Jerry Corsi wrote to Roger Stone, "Word is, friend in embassy

25    plans two more dumps; one shortly after I'm back, second in

1    October.  Impact planned to be very damaging.  That appears to

2    be the game hackers are now about."

3         Now, as you'll hear in the course of this trial, he

4    said Julian Assange is living in an embassy.

5         "Two more dumps."  Everyone wanted to know what

6    Julian Assange was planning to do.  And you'll hear that there

7    was information indicating one of those dumps would be in

8    October, and that Corsi told Stone that the impact of those

9    dumps was planned to be very damaging, that Corsi knew about

10   the plans for those dumps.  They were planned to be damaging to

11   then-candidate Clinton.  And Corsi indicated that that was the

12   game hackers were about now.  Hackers, you'll hear, are people

13   who gain unauthorized access to computer systems.

14        Now the very next day you'll hear that Roger Stone

15   sent another email.  Just after he got this message from

16   Jerry Corsi, Roger Stone emailed the chairman of the Trump

17   campaign, Paul Manafort.  And you'll hear that Paul Manafort

18   wasn't just the chairman of the Trump campaign, he was also a

19   long-time friend of Roger Stone.  And Roger Stone wrote to

20   Manafort on August 3rd, that he had an idea, in his words, to

21   save Trump's ass, and he asked that Manafort call him.

22        You'll also hear that Roger Stone emailed the Trump

23   campaign's CEO, Steve Bannon.  And when Stone emailed Bannon,

24   he told Bannon that Trump could still win, but time was running

25   out, and that he knew how to win this, but it ain't pretty.

1          Roger Stone knew how to win this and he was telling

2     that to the Trump campaign CEO.  But his way, in his own words,

3     ain't pretty.

4          Now, at that same time in August, you'll hear

5     Roger Stone was bragging, he was bragging publicly and he was

6     bragging loudly and he was bragging repeatedly that he was in

7     contact with WikiLeaks, that he had a go-between that was

8     telling him information about what was coming, that he had an

9     intermediary.

10          And you'll see those statements.  The evidence will

11     show that in a ten-day period in August, Roger Stone, on at

12     least six public occasions, said that he had an intermediary to

13     WikiLeaks, and that he was getting information, over and over

14     and over again.

15          First, you'll see that Roger Stone, on

16     August 8th, 2016, told an audience in Broward County that he

17     actually had communicated with Julian Assange.  And then you'll

18     see that four days later, in an interview, he said that he

19     wasn't at liberty to discuss what he had, but he had a, kind

20     of, foreshadowing of what WikiLeaks planned to do.  And then

21     you'll see that on the 16th, he said that he had back-channel

22     communications with WikiLeaks and Julian Assange.

23          And as I said before, these statements continued over

24     that time period.

25          On the 16th, he said, again, he'd communicated with

1    Julian Assange through a mutual acquaintance.

2            On August 18th, he said he communicated through an

3    intermediary.  And on August 18th, he said, again, I don't

4    think, I know -- I don't think, I know Mr. Assange has those

5    emails because I have had a back-channel communication.

6            But, as we discussed before, when Roger Stone

7    testified before the House Intelligence Committee about all of

8    this and they asked him about many of these things, he

9    straight-up lied to them.

10           Roger Stone wanted to hide what he'd done because the

11   truth looked bad.  And we're going to go through, now, his

12   testimony in a little more detail, where you will see these

13   five lies.

14           Now, first, Stone lied about his emails.  He was

15   asked by the committee, Do you have any discussions with third

16   parties about Julian Assange?  You have no emails, no text, no

17   documents whatsoever, any kind of that nature?

18           And Stone responded, That is correct, not to my

19   knowledge.

20           He's being asked this by Congressman Schiff in his

21   sworn testimony in the House Intelligence Committee, and he is

22   denying that he has any emails with any third parties about

23   Julian Assange.

24           But, you will see at trial that Mr. Stone had many,

25   many such emails, including the ones we just reviewed, where he

1    told Jerome Corsi to go, get to the embassy to get the pending

2    WikiLeaks emails, where he then heard back from Corsi that, in

3    fact, there would be, "Dump coming in October.  Impact planned

4    to be very damaging.  That's word from friend in the embassy."

5          But, Stone denied all of that.  He said he had no

6    emails of any kind referring to Julian Assange, including that

7    email about the game that hackers are now about.

8          In a second lie, Roger Stone lied about his

9    intermediary to the committee.  He was asked to identify his

10   intermediary to the committee, and you'll hear that he would

11   not in his original testimony.  But then he sent a follow-up

12   letter to them, saying that his intermediary is Randy Credico.

13         And, as you will hear, he was asked at the committee

14   if there was only one person that he was referring to.  And the

15   committee explicitly asked about those August statements, the

16   one that followed Jerome Corsi's email to him.  And Roger Stone

17   said no, there was only one person he ever referred to as his

18   intermediary, and that was Randy Credico.

19         But you know that, in fact, as you'll see and the

20   evidence will show, Roger Stone wasn't referring to

21   Randy Credico at all in that August bragging, he was referring

22   to Jerome Corsi, who had sent him the email telling him what

23   the game that hackers were now about.

24         In his third lie, Roger Stone lied to the House

25   Intelligence Committee in his sworn testimony about the request

1    that he'd made to his intermediary.  He was asked by

2    Congressman Quigley whether he'd ever asked his intermediary to

3    do anything on Stone's behalf, and Stone said he did not.  And

4    then he was asked if his intermediary ever suggested he was

5    going to do anything on his behalf, and Stone said he did not.

6           Stone was also asked, again by Congressman Quigley,

7    whether he'd ever asked his intermediary to communicate

8    anything else to Julian Assange, and Stone said he did not.

9           And then Stone was asked by Quigley, Did you ever ask

10   him to do anything on behalf of the Trump campaign?  And Stone

11   said he did not.

12          But, the evidence will show that, in fact, Stone

13   asked Jerry Corsi, as you saw, to do something very specific.

14   He asked Jerry Corsi to get to London and to get the pending

15   WikiLeaks emails.

16          The fourth lie that Roger Stone told was about his

17   record.  Roger Stone lied in his sworn testimony to the House

18   Intelligence Committee, and claimed that he had no records, no

19   written communications with his intermediary.

20          He was asked by Congressman Schiff if he ever texted

21   his intermediary or emailed him, and Mr. Stone said he's not an

22   email guy.

23          Mr. Schiff followed up.  Congressman asked Stone:

24   So, all your conversations with him were in person or over the

25   phone?

 1          And Stone said, Correct.

 2          And you'll hear that Congressman Quigley, another

 3   member of the House Intelligence Committee, followed up.  And

 4   he ask Stone:  How did you communicate with the intermediary?

 5          And Stone said:  Over the phone.

 6          And Quigley asked:  Do you have any other means of

 7   communicating with the intermediary?

 8          Roger Stone said:  No.

 9          Congressman asked:  Any text messages?  Anything

10   else?

11          Roger Stone:  No.

12          Nothing direct?

13          Roger Stone:  No.

14          And what you'll hear and what you've already seen is

15   that, in fact, Roger Stone communicated extensively in writing

16   with Jerome Corsi.  He texted.  But, he also emailed those

17   three emails that you just saw.  Three emails that if the

18   committee had seen them, would have disproven the other lies he

19   just told.  But, instead, Roger Stone pretended that the only

20   way that he communicated with Jerry Corsi was over the phone.

21          Lastly, Roger Stone lied about his communications

22   with Jerry Corsi in the Trump campaign.  He was asked by

23   Congressman Schiff if he ever discussed any conversation he had

24   with the intermediary with anyone involved in the Trump

25   campaign, and he said, No.

1            But, in fact, you saw that the day after getting that

2     email from Jerome Corsi, Roger Stone emailed Campaign Chairman

3     Paul Manafort about his plan to save, in Stone's words,

4     "Trump's ass."  And he emailed Bannon about a way that he had

5     to win this, but it wasn't pretty.

6            Now, Stone testified falsely to cover up the truth,

7     that he dispatched Jerry Corsi to WikiLeaks an hour after he

8     spoke with then-candidate Trump, and that Corsi had provided

9     him with information about what WikiLeaks was planning to do,

10    about the game that hackers are now about, and that Stone had

11    found that information to be credible.

12           Stone had written communications in his possession

13    that showed this, and would have showed the House Committee the

14    truth, but he lied about it.  And Roger Stone's lies didn't

15    just stop there.  They didn't stop with Jerome Corsi.

16           Roger Stone also lied about what he tried to do with

17    another person, with Randy Credico, and what he talked about

18    with the campaign and WikiLeaks.

19           After everything I've just described to you, after

20    Roger Stone had asked Corsi to get to Assange, and then after

21    he'd asked Corsi to have someone else go see Assange, after

22    Corsi had written back, after Stone had sent that email about

23    his plans, after Stone was publicly bragging about all of this

24    back-channel intermediary he had, you will hear that

25    Randy Credico sent him a message.

1              In 2016, you'll hear Randy Credico was a political

2       activist, a former comedian, an impressionist who was hosting a

3       public access morning radio show in New York City.  And you'll

4       hear that Stone and Credico had a rocky relationship,

5       tumultuous one that went back many, many years.

6              And you'll also see, when you see Randy Credico, that

7       if you were looking for someone to pin something on,

8       Randy Credico is a pretty good person to pick.  Randy Credico

9       will tell you that he has struggled in his past with alcohol.

10      And Randy Credico will tell you that he is excitable.  And

11      Randy Credico will tell you that Roger Stone knew all of this.

12             So, a few weeks after Jerry Corsi sent that email,

13      and after Stone was bragging everywhere about how he was in

14      contact with WikiLeaks, Randy Credico sent Stone a message.

15      Credico told Stone that he would be planning to have the head

16      of WikiLeaks, Julian Assange, on his own radio show.

17             Assange, as you'll hear, gave interviews.  He didn't

18      leave the Ecuadorian embassy, but he could call in or Skype.

19      And Credico told Stone that that's what he would be doing.

20      And, in fact, Credico eventually did have Julian Assange on his

21      radio show.  But, the evidence will show that Credico didn't

22      get any information from Assange at that point.  They just

23      discussed matters of general interest.  He just interviewed

24      Assange on the radio.  He didn't get any inside information.

25             Then, almost a month later, Roger Stone sent

 1   Randy Credico a request.  Roger Stone asked Randy Credico to

 2   reach out to WikiLeaks and Julian Assange, and to see if

 3   Assange had information related to then-Secretary of State

 4   Hillary Clinton's involvement in Libya, back from when

 5   Hillary Clinton had been secretary of state years before.

 6          Stone asked Credico to check with Assange and see if

 7   there were hacked emails, nonpublic emails that Assange had in

 8   his possession that he was planning to release about Libya and

 9   Secretary of State Clinton.

10          And you'll hear that, actually, Credico did pass

11   along Stone's request to a person he knew that was associated

12   with WikiLeaks.

13          And you'll hear that when Credico passed along that

14   request on September 19th, 2016, he texted Roger Stone.  And he

15   told Roger Stone:  Just remember, do not name me as your

16   connection to Assange.  You had one before that you referred

17   to.

18          In other words, in September of 2016, when Stone was

19   leaning on Credico to pass a message to Julian Assange, Credico

20   was willing to do so, but he put down a marker:  He was not the

21   person Roger Stone was talking about in August.  And he told

22   that to Roger Stone.

23          And, in fact, you know and you will see why that was

24   the case.  It's because in early August, Roger Stone wasn't

25   talking about Randy Credico; the evidence will show that he was

 1    talking about Jerome Corsi.  Randy Credico only came into the

 2    picture later.

 3           Then, in early October, you'll hear that Credico flew

 4    to London for a comedy event.  And you'll hear that while in

 5    London, Credico tried to meet Julian Assange; he didn't.  And

 6    you'll hear that Credico told Stone that he had a meeting

 7    scheduled with Julian Assange; he didn't.

 8           And you'll hear that Credico kept talking to

 9    Roger Stone about Julian Assange, and that Stone was being told

10    by Credico that there would be information coming shortly.  And

11    Stone was very interested in what he was hearing from Credico.

12           Now, as you'll hear, Stone didn't just sit on this

13    information that he was hearing from Randy Credico, just like

14    he didn't sit on the information he'd heard in August from

15    Jerry Corsi.

16           No.  Stone regularly updated people involved in the

17    Trump campaign about what he was hearing from Randy Credico.

18    Stone regularly updated people on the Trump campaign, at the

19    senior levels, about whatever information he thought he had

20    about WikiLeaks.

21           And you'll see that in October, Roger Stone was going

22    to the very top of the Trump campaign, the CEO of the Trump

23    campaign, a man named Steve Bannon.

24           Right after Julian Assange gave a press conference on

25    October 4th, 2016, where a lot of people, you'll hear,

1   including Steve Bannon and members of the Trump campaign, were

2   very hopeful that Julian Assange would be releasing new,

3   damaging information to Hillary Clinton.

4           You'll hear that that conference that Assange gave

5   was a bust.  He didn't release any new information.  And it was

6   very early in the morning, United States time.  And a lot of

7   people were actually pretty unhappy that they had to wait up in

8   the morning for this much-hyped press conference that turned

9   out to be a dud.

10          And you'll hear that when this press conference was a

11  dud, when Julian Assange failed to release the information,

12  that right after that press conference, Steve Bannon, the Trump

13  campaign's CEO, sent an email, and he reached out to

14  Roger Stone.  And you'll see it there at the bottom.

15  Steve Bannon said, "What was that this morning?"

16          And you'll hear that that was just after

17  Julian Assange's dud of a press conference, where everyone had

18  been hoping that Assange would release more information about

19  Hillary Clinton.

20          And Stone wrote back.  He wrote back that Assange was

21  afraid, that he had a serious security concern, and that there

22  would be a load every week going forward.  That's what he sent

23  to Steve Bannon.

24          And you will hear that a source of that information

25  that Stone was passing on to Bannon was information he was

1    getting from his other intermediary, from Randy Credico.

2         And as you'll hear, Roger Stone didn't email the

3    Trump campaign CEO about WikiLeaks out of the blue.  You'll

4    hear that he and Bannon had actually been talking all summer

5    long about WikiLeaks, about Julian Assange.  And that Stone had

6    been telling Bannon the same thing he'd been telling other

7    people publicly; that he had an intermediary, that he had

8    inside information about what Julian Assange was planning and

9    what Julian Assange was doing.

10        So, when Roger Stone told that to Bannon, it wasn't

11   an isolated, off-the-cuff email that Bannon sent.  You'll hear

12   that, in fact, that was part of a longer conversation that had

13   been taking place throughout the summer of 2016.

14        Now, you'll also hear that Roger Stone updated

15   another person involved with the Trump campaign about what was

16   going on with Julian Assange.

17        You'll hear that Roger Stone emailed a guy named

18   Erik Prince about Julian Assange's plans.  And you'll see that

19   on October 3rd, Roger Stone told Prince that he'd spoken to his

20   friend in London last night, and that the payload was still

21   coming.

22        You'll also see that the next day, after that press

23   conference that turned out to be a dud, Erik Prince wrote to

24   Stone.  He asked him, Did Julian Assange chicken out?  And

25   Stone wrote back he wasn't sure.  That was set as of Monday,

 1    but he would check.

 2              Prince followed up.  He asked Stone, Did you hear

 3    anything more from London?

 4              And Stone wrote back, Yes.  Want to talk on a secure

 5    line?

 6              And then asked him to switch to another form of

 7    communication, WhatsApp.

 8              Now, as you'll remember, at this time Julian Assange

 9    was living in London, the Ecuadorian embassy.  And everyone was

10    asking about whether he was going to release more information.

11              And just like Roger Stone lied to the House

12    Intelligence Committee about Jerry Corsi in all those August

13    communications we looked at, Roger Stone also lied to the House

14    Intelligence Committee about Randy Credico and about these

15    communications.

16              Stone had many messages with Randy Credico -- text

17    messages, emails, a lot more than what you'll see here -- about

18    Julian Assange.  But, Stone lied, and he told the House

19    Intelligence Committee that he didn't have any emails or any

20    text messages or any documents that referred in any way to

21    Julian Assange.

22              You just saw some of them.  You will see a lot more

23    that he had with Randy Credico, just like he lied about his

24    messages with Jerry Corsi.

25              You'll also see that Stone lied to the House

1    Intelligence Committee about Randy Credico.  He tried to pin

2    all of the back-channel statements he was making, all of the

3    times he said he had an intermediary, on Randy Credico.  But,

4    as you'll see, that intermediary in August, that was not

5    Randy Credico.  It was Jerry Corsi.  Randy Credico came into

6    the picture later.  Stone lied and tried to use Randy Credico

7    as the fall guy for everything.

8          The third lie that Roger Stone told is that he didn't

9    make any requests to any intermediary.  As you saw, he made a

10   request to Randy Credico.  He asked him to pass along

11   information in a request -- he even says, Request to

12   Julian Assange -- asking if Assange had information that he

13   would be publishing about then-candidate Hillary Clinton and

14   what she had done when she was secretary of state related to

15   WikiLeaks.  But, as you saw, Stone denied that he had ever made

16   any such requests.

17         The fourth lie that Roger Stone told was about his

18   records.  He denied that he had any written communication with

19   an intermediary.  Except, you'll see Roger Stone and

20   Randy Credico text and email each other all the time.

21         You will see that on the day Roger Stone testified,

22   September 26th, 2017, that after Roger Stone walked out of the

23   House Intelligence Committee hearing room, where he denied to

24   Congress, under oath, that he had any written communications

25   with his intermediary, and where he said he doesn't have any

1    text messages, he's not a guy that puts stuff in writing, you

2    will see that Roger Stone and Randy Credico text each other 70

3    times that day.  70 times after he walked out of that House

4    Intelligence Committee hearing.

5           And you'll see that it wasn't like that was the first

6    day that Randy Credico and Roger Stone learned to use text

7    messages.  You will see that there's voluminous records of

8    Roger Stone and Randy Credico communicating in writing.  But,

9    Roger Stone did not want that information to see the light of

10   day because it would have unraveled all of the other lies that

11   he told.

12          It would have meant that messages, like the one that

13   Randy Credico sent saying that he was not the back channel in

14   August, that those could have come to light.  And that wasn't

15   good because that would have exposed Jerry Corsi.

16          And, finally, Roger Stone lied about his discussions

17   with the Trump campaign.  Roger Stone said he never discussed

18   his intermediary with the Trump campaign.  But, just like

19   Roger Stone lied about having not discussed Jerry Corsi and

20   what he learned with the Trump campaign, so, too, Roger Stone

21   lied and claimed to the House Intelligence Committee he never

22   discussed what he learned from Randy Credico.

23          But, you'll see those very emails we just went over,

24   the ones where he's telling Steve Bannon there is a serious

25   security concern, but don't worry, there's more coming.  It

1    might have been a dud on October 4th, but, trust me, Assange is

2    going to start dropping material.

3            Stone didn't tell the House Intelligence Committee

4    that he had any of those messages or that he'd had any of those

5    conversations.

6            And then, just as Roger Stone promised, on

7    October 7th, 2016, WikiLeaks began releasing a massive amount

8    of hacked emails belonging to Clinton campaign chairman

9    John Podesta.  And you will hear that those releases began on

10   October 7th, 2016, and that they continued all the way up

11   through election day.

12           And on Tuesday, November 8th, 2016, Donald Trump was

13   elected president of the United States.

14           Now, you'll hear that in the months after the

15   election, United States Congress, in particular, the Senate

16   Select Committee on Intelligence and the House Intelligence

17   Committee, launched investigations into Russian interference in

18   the 2016 election.

19           And you'll also hear that the FBI announced that they

20   had an investigation, as well, into Russian interference in the

21   2016 election.

22           And you'll hear that these investigations focused, in

23   large part, on the hacked emails released by WikiLeaks and the

24   allegation that those emails had been hacked by the Russian

25   government.

1          And you'll hear that those investigations, and in

2     particular, the House Intelligence Committee investigation, was

3     examining any possible links between WikiLeaks, who dumped that

4     hacked information, and the Trump campaign.

5          And, as I said at the start, this trial is about

6     Roger Stone's obstruction of the House Intelligence Committee's

7     investigation.

8          Now, right around the same time that all these other

9     investigations were announced, Roger Stone realized that he had

10    a problem.  And his problem was a man named Randy Credico.

11    Because Randy Credico was worried that Roger Stone was saying

12    things that weren't true.

13         Roger Stone was being asked who his back channel was

14    to WikiLeaks.  A lot of people were interested in that in

15    January of 2017.  Randy Credico asked Roger Stone, you will

16    hear, who he was referring to in August, because Credico knew

17    it wasn't him.  But Roger Stone lied and told Credico that

18    Credico was that August back channel.

19         You will hear Randy Credico has no idea, at this

20    point, who Jerry Corsi is.  He's never heard of him.  But,

21    Randy Credico knows one thing:  He knows that he's not the guy

22    Roger Stone's talking about in August.  He knows that because

23    he doesn't have Julian Assange on his radio show until later,

24    after all of Stone's bragging.

25         And he knows that because he doesn't get the kind of

 1    information that Stone is telling people that he's getting from

 2    his intermediary.  Stone was getting that, as you saw, from

 3    Jerome Corsi.

 4          So in January of 2017, Randy Credico tries to set the

 5    record straight.  He tries to get Roger Stone to tell the

 6    truth.  And what you'll hear is that Randy Credico sent

 7    Roger Stone an email after looking through his own written

 8    records.  And Credico told Stone that he'd put together

 9    timelines, and that when Stone said he had a back channel a

10    month before Credico had Assange on his show, that couldn't be

11    the case.

12          Credico told Stone he'd pieced it all together.

13    Stone might as well tell the truth.  Either he didn't have a

14    back channel in August, or there was somebody else, That other

15    guy you were talking about.

16          But it surely wasn't Randy Credico.

17          Now, you will see that that was Jerome Corsi, because

18    of the message we just saw.  Randy Credico didn't know

19    Jerry Corsi's name.  At this point, he didn't even know if

20    Jerry Corsi actually existed or if he'd sent any information.

21    What Randy Credico did know in January 2017 was he was not the

22    guy that was telling Stone this stuff back in early August.

23          Now, Roger Stone's response to this, you'll hear, was

24    not hesitation or concern.  It was an immediate response to

25    Credico that nobody would care about what happened.  Nobody

1    would believe Randy Credico and that Credico should just go

2    along with Roger Stone's fake story.

3              That's what Roger Stone told Randy Credico in January

4    of 2017, when he tried to set the record straight.

5              And then you'll hear, on September 26, 2017,

6    Roger Stone testified under oath, before the House Intelligence

7    Committee, in its investigation into Russian interference in

8    the 2016 election.

9              And as you'll hear during the trial, the main focus

10   of the House Intelligence Committee, a bipartisan investigation

11   into Russian interference, were questions to Stone about

12   WikiLeaks, about his intermediary, and about his claims that he

13   had a back channel to Julian Assange, and what he told the

14   Trump campaign.

15             Now, make no mistake, Roger Stone could easily have

16   told the truth to the House Intelligence Committee.

17   Roger Stone could have testified that he had many emails and

18   messages and texts about Julian Assange, including the ones

19   that you've seen here today.

20             He could have said he had many messages with

21   Steve Bannon, with Paul Manafort, with Randy Credico, with

22   Jerome Corsi about Julian Assange.  And he could have said that

23   his August references were not to Randy Credico; they were to

24   Jerome Corsi.

25             And Roger Stone could have told the truth, that he

1    told Corsi to get to Assange to get the pending WikiLeaks

2    emails, and that he then told Corsi to have an associate of

3    theirs, living in London, get to Julian Assange.

4          And Roger Stone could have told the House

5    Intelligence Committee the truth, that, in fact, Corsi had

6    responded back to him and told him that there would be, "Dumps

7    coming in October.  Impact planned to be very damaging."  That

8    was the game hackers were about now.  And Stone could have told

9    the committee he had all of this in writing, in his email

10   accounts, in his text messages, at the time of his testimony.

11         And Stone could have told the committee the truth

12   about Randy Credico.  He could have said that he asked

13   Randy Credico to pass along a question to Julian Assange.  That

14   he requested information about whether or not Assange had

15   emails concerning Hillary Clinton and Libya.

16         And Stone could have told the committee that he spoke

17   with Steve Bannon and others about what he was learning

18   regarding WikiLeaks.

19         And Stone could have truthfully stated that he had

20   hundreds of messages, emails, texts that would show the truth

21   of what happened in 2016.  That he had many written records

22   that could help the committee to establish what had actually

23   happened.

24         But, Roger Stone didn't do that.  He didn't even come

25   close.  Instead, he repeatedly lied to the House Intelligence

1    Committee.  He did it because if he'd told the truth, as he

2    said before, it wasn't pretty.  It would look bad.  And, so,

3    instead, he told these five lies.

4         Now, you'll also see that Stone knew at the time of

5    his testimony that these lies were important to the House

6    Intelligence Committee's investigation.  You'll see that Stone

7    knew that because the congressmen tell Stone that explicitly.

8    At one point they say, It's important.  We need to know this.

9         And you'll see it's important because they asked

10   about it in his sworn testimony, and they asked often about

11   things repeatedly.

12        And you'll know it's important because the committee

13   of the House Intelligence, that was investigating Russian

14   interference in the 2016 election, saw fit to question a

15   witness because they were looking into any links or

16   coordination involving the Trump campaign and the individuals

17   associated with the alleged Russian hacking.

18        Now, the evidence is going to show that after

19   Roger Stone repeatedly lied to the House Intelligence Committee

20   on September 26, 2017, he had one more loose end left to tie

21   up.  And that loose end was named Randy Credico, because Stone

22   was concerned that Credico was going to tell the House

23   Intelligence Committee the truth.

24        Credico was going to tell the House Intelligence

25   Committee that he was not the August back channel.  Credico was

1   going to tell the House Intelligence Committee that he had lots

2   of written communications, and that those written

3   communications would show that there was no way he could have

4   been the person Stone was talking about in August.

5        And, so, you'll hear that Stone tried to get Credico

6   to go along with his false testimony, that Stone wanted Credico

7   to take up the lies that Credico -- that Stone told to the

8   House Intelligence Committee as his own.  But Randy Credico

9   wasn't willing to do that.  Randy Credico didn't want to commit

10  perjury for Roger Stone.

11       So, you'll hear Stone tried to get Credico to pretend

12  he didn't remember anything about that time period.  You'll

13  hear that Stone even told Credico to do a Frank Pentangeli, in

14  writing.

15       I don't know if you know who Frank Pentangeli is.

16  But, you'll hear at this trial that he's a character in the

17  movie *The Godfather Part II*.  And you'll hear when

18  Frank Pentangeli is called before a congressional committee,

19  Frank Pentangeli, in order to spare his associate a perjury

20  charge, pretends he doesn't remember anything.  And Stone put

21  in writing that Randy Credico should do his Frank Pentangeli to

22  the House Intelligence Committee.

23       And even that didn't work.  Randy Credico didn't want

24  to go along and claim he didn't remember anything.  He didn't

25  want to do his Frank Pentangeli, because pretending you don't

1   remember anything when you really do, that's also lying under

2   oath.

3           So, instead, Stone tried to get Randy Credico to clam

4   up, to stay quiet.  You will see that Roger Stone started

5   telling Randy Credico that he should assert his Fifth Amendment

6   rights against self-incrimination, that he should stay quiet,

7   that he should take the Fifth and not talk to the House

8   Intelligence Committee.  Because if Randy Credico spoke to the

9   House Intelligence Committee, things weren't going to look very

10  pretty for Roger Stone.

11          And, ultimately, you'll hear that Roger Stone kept

12  pressing Credico.  He kept pressing him to take the Fifth in

13  front of the House Intelligence Committee.  And you'll see that

14  Stone even told him why he had to do it.  Stone said to

15  Randy Credico, Because of Trump -- Stone misspelled "Trump" in

16  that message -- I could never get away with a certain --

17  asserting my Fifth Amendment rights, but you can.

18          Roger Stone needed Randy Credico to take the fall,

19  because if Roger Stone asserted his Fifth Amendment rights in

20  front of the House Intelligence Committee, it wouldn't look

21  pretty.  It wouldn't look pretty for then-President

22  Donald Trump.

23          Now, you will hear that Randy Credico eventually

24  buckled, and he did assert his Fifth Amendment rights, and he

25  didn't speak to the House Intelligence Committee.

1           And you'll hear that after that, whenever Credico

2     threatened to go public, whenever he talked about telling what

3     actually happened in the media, you'll hear that whenever he

4     talked about saying he wasn't that August back channel, and

5     that Roger Stone had lied in his congressional testimony, that

6     Stone would tell Credico the same set of things:  Who cares?

7     No one will believe you.

8           Or, failing that, Stone would tell Credico that he

9     should go on television and do his Frank Pentangeli; to pretend

10    that he remembered nothing, and to make himself look like

11    someone that could not be believed.

12          And Stone's actions, you'll hear, were not limited to

13    the House Intelligence Committee's investigation.  You'll hear

14    that Special Counsel Robert Mueller was also investigating

15    Russian interference in the 2016 election.  And you'll hear

16    that Robert Mueller's investigation was also looking at

17    Roger Stone.

18          And what did Roger Stone tell Randy Credico to do

19    about the Mueller investigation?  Did Roger Stone tell him to

20    tell the truth?  To be forthcoming?  To just say what he knew?

21          My guess is, you probably have a good guess as to

22    what the answer to that question is.  But, what he told

23    Roger Stone, in his own words, Roger Stone told Randy Credico,

24    on January 25th, 2018, that Randy Credico should tell

25    Robert Mueller, in Stone's words, that "Robert Mueller could go

1    fuck himself."

2            That was what Roger Stone told Randy Credico to do

3    about the investigation.

4            Now, as the spring wore on, you will hear that

5    Roger Stone kept trying -- that Credico, I'm sorry, kept trying

6    to get Stone to tell the truth in 2018, even after Stone tells

7    him what Credico should do.

8            You'll hear that Randy Credico kept trying to get

9    Roger Stone to come clean about what had happened.  You'll see

10   that Credico told Stone, on 15 separate occasions, that he

11   needed to do the right thing.  He needed to tell the truth.

12   And that Credico was not the person he'd been talking about in

13   August.

14           But, Stone continued to put pressure on

15   Randy Credico.  He continued to do that to try to get him to go

16   on -- along with Stone's false testimony.  Or, barring that, to

17   go on national television and to do a Frank Pentangeli.

18           And you'll hear that Roger Stone threatened

19   Randy Credico.  He threatened his friend.  He even, as I said

20   before, threatened his dog.

21           And you'll hear that Stone's barrage of verbal

22   attacks on Randy Credico in the spring of 2018 worked.  As the

23   spring wore on, Randy Credico got worn down by the threats and

24   the lies and the verbal attacks of Roger Stone.  And you're

25   going to see that Randy Credico became angry and confused by

1    the awful position that Roger Stone had put him in.

2         Randy Credico will testify at this trial.  You will

3    see him on that witness stand.  And you're going to hear him

4    explain to you how Roger Stone tampered with him.  And you're

5    going to see a bunch of emails and text messages between

6    Roger Stone and Randy Credico from 2016 and 2017 and 2018,

7    messages Roger Stone lied and told the House Intelligence

8    Committee didn't exist.

9         And Randy Credico is going to tell you, and the

10   emails and texts are going to show, that as 2018 wore on,

11   Roger Stone put him in an awful position.  And he is going to

12   tell you that Randy Credico just didn't know what to do.

13   Sometimes he went along with Stone's lies, to try to get out of

14   it.  Sometimes he told some lies of his own to Roger Stone.

15   And sometimes, you'll see, he called Roger Stone some pretty

16   terrible names.

17        But, here's the thing:  After you see all the

18   evidence, what you will see is that what Randy Credico is

19   telling you is backed up by the documents, the documents that

20   you will review in this case.  And it's backed up by the

21   threats that Stone emailed him.  And it's backed up by the text

22   messages that Stone sent him about doing a Frank Pentangeli.

23        And in the days to come, you'll read documents, many,

24   many documents, and they will show the story that I've just

25   laid out for you.  Because, amazingly, most of the evidence in

1    this case is in the written record.  It's emails, it's text

2    messages showing what really happened.

3              That's part of why Lie Number 4 is so critical.

4    Because if those records would have come out, then the truth

5    would have been exposed.

6              And you'll hear from witnesses in this case who are

7    going to explain some of those documents to you.  You're going

8    to hear from Steve Bannon, the Trump campaign CEO.

9              You're going to hear from Rick Gates, the deputy

10   chairman of the Trump campaign.  And as you'll hear, Rick Gates

11   pled guilty to a variety of financial crimes that Gates

12   committed.  And you'll hear that he also pled guilty to lying

13   to the FBI in a separate case.  And he's testifying here today

14   under a cooperation agreement.

15             And you'll have a chance to learn more about what a

16   cooperation agreement means during the trial.  And you'll have

17   a chance and an opportunity to assess for yourself what you

18   think of Mr. Gates' testimony.

19             But, over and over and over again, what you will see

20   is that the testimony in this case matches the documents that

21   will be shown to you.  Because the written record proves that

22   Roger Stone testified falsely, that he obstructed the House

23   Intelligence Committee's investigation into Russian

24   interference in the 2016 election.

25             And, as I said at the beginning, this case boils down

1    to a few very clear facts:

2           Roger Stone told five types of lies to the House

3    Intelligence Committee.  He lied and said he had no emails,

4    texts, or documents that referred to Julian Assange.

5           He lied and said that he had only one intermediary,

6    and that intermediary was Randy Credico.

7           He lied and he said that he hadn't made any requests

8    to his intermediary.

9           He lied and he said that he had no written

10   communications of any kind, that his intermediary was not the

11   kind of person that would send texts or emails, even though

12   both Jerry Corsi and Randy Credico sent a lot of texts and

13   emails to Roger Stone.

14          And then he lied about the discussions that he had

15   with the Trump campaign about his intermediary.

16          Five categories of lies:  Emails, intermediary,

17   requests, records, Trump campaign.

18          And then you'll hear Roger Stone leaned hard on

19   Randy Credico to get him to go along with his story.  Or, if

20   that didn't work, to do a Frank Pentangeli, or to take the

21   Fifth.

22          Now, Roger Stone did all of this to obstruct an

23   investigation by the House Intelligence Committee into Russian

24   interference in the 2016 election.  You will hear the committee

25   was undertaking a critical investigation about an important

1    moment in our nation's history.  The House Intelligence

2    Committee was trying to learn the truth about what had happened

3    in the 2016 election.  And Roger Stone, he was doing his best

4    to stop it.

5           And that is why, after you have listened to all of

6    the evidence in this case and you have examined the documents

7    and heard the witnesses, we are confident that you will return

8    the only verdict justified on these facts, a verdict of guilty

9    on all counts.

10          Thank you.

11          THE COURT:  All right.  Counsel, can you approach the

12   bench briefly.

13          (Bench discussion:)

14          THE COURT:  I assume you'd like to start after lunch?

15          MR. ROGOW:  I need a break, yes.

16          THE COURT:  You want to take a lunch break, not just

17   a break, break?

18          MR. ROGOW:  Probably a lunch.  I'm not going to eat,

19   but --

20          THE COURT:  Well, that's a different issue.

21          MR. ROGOW:  Right.  So whatever you would like.

22          THE COURT:  The question is whether you want the

23   jurors to eat, rather than be hungry.

24          MR. ROGOW:  I would say yes.

25          THE COURT:  Okay.  I would think so, too.  So, we're

1    going to excuse everybody and say we will pick up again at

2    2 p.m.

3              All right.  Thank you.

4              MR. KRAVIS:  Thank you, Your Honor.

5              MR. BUSCHEL:  Before we go there, can we just invoke

6    the rule, before I forget, about witness --

7              THE COURT:  Are there any witnesses in the courtroom,

8    besides the case agent?

9              MR. KRAVIS:  No.  Besides, I don't even think it's

10   likely that Special Agent Keefe will testify.

11             THE COURT:  All right.  Thank you.  All right.

12             (Open court:)

13             THE COURT:  Members of the jury, as helpful as it

14   might be to hear the two opening statements immediately, back

15   to back, it's lunchtime.  And so I would prefer to give you the

16   opportunity to not be hungry while you listen to the next

17   statement, since you've been here all morning.

18             So, we're going to take a break now.  Your lunch is

19   going to be brought to you.  Mr. Haley will explain all of

20   that.  Because the cafeteria, otherwise, will be somewhat of a

21   crowded gauntlet to get through.  And we're going to resume at

22   2 p.m.

23             I want to encourage you, once again, and I will tell

24   you this, I can warn you now, every time you come and go from

25   the courtroom, number one, you can leave your notebooks on your

1    chairs.

2              Number two, the case has not been submitted to you.

3    You haven't heard a scrap of evidence yet.  All you've heard is

4    the lawyer's introduction.  You may not discuss the case with

5    each other or with anyone else during the break.

6              Have a good lunch, and we'll see you at 2 p.m.

7              (Jurors leave the courtroom.)

8              THE COURT:  All right.  Court is adjourned until

9    2 p.m.

10             (Recess.)

11                              *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 6th day of November, 2019

9

10

11                    _____

12                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue, N.W.
14                    Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25