```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      )  Criminal Action
                                    )  No. 19-CR-018
4                    Plaintiff,     )
                                    )  JURY TRIAL
5    vs.                            )  DAY 4 - MORNING
                                    )
6    Roger Jason Stone, Jr.,        )  Washington, DC
                                    )  Date:  November 8, 2019
7                    Defendant      )  Time:  9:30 a.m.
     _____

8
                      TRANSCRIPT OF JURY TRIAL
9                          HELD BEFORE
            THE HONORABLE JUDGE AMY BERMAN JACKSON
10                 UNITED STATES DISTRICT JUDGE
     _____

11

12                   A P P E A R A N C E S

13

     For the Plaintiff:      Jonathan Ian Kravis
14                           Michael John Marando
                             Adam Jed
15                           Aaron Simcha Jon Zelinsky
                             U.S. ATTORNEY'S OFFICE FOR THE
16                              DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
17                           Washington, DC 20530
                             (202) 252-7068
18                           Email:  Jonathan.kravis3@usdoj.gov
                             Email:  Asjz@usdoj.gov
19                           Email:  Michael.marando@usdoj.gov

20
     For the Defendant:      Bruce S. Rogow
21                           LAW OFFICE OF BRUCE S. ROGOW, P.A.
                             100 NE 3rd Avenue
22                           Suite 1000
                             Fort Lauderdale, FL 33301
23                           (954) 767-8909
                             Email:  Brogow@rogowlaw.com
24

25
```

```
1    For the Defendant:       Robert C. Buschel
                              Tara A. Campion
2                             BUSCHEL & GIBBONS, P.A.
                              One Financial Plaza
3                             100 S.E. Third Avenue
                              Suite 1300
4                             Ft. Lauderdale, FL 33394
                              (954) 530-5301
5                             Email:  Buschel@bglaw-pa.com
                              Grant J. Smith
6                             STRATEGYSMITH, P.A.
                              401 East Las Olas Boulevard
7                             Suite 130-120
                              Fort Lauderdale, FL 33301
8                             (954) 328-9064
                              Email:  Gsmith@strategysmith.com
9                             Chandler Paige Routman
                              LAW OFFICE OF CHANDLER P. ROUTMAN
10                            501 East Las Olas Blvd.
                              Suite #331
11                            Ft. Lauderdale, FL 33316
                              (954) 235-8259
12                            Email:  Routmanc@gmail.com

13   _____

14   Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
15                            United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
16                            Washington, DC  20001
                              202-354-3267
17                            Email:  JaniceDickmanDCD@gmail.com

18                                  *   *   *

19
                                    INDEX
20
     Randolph Credico
21       Direct Examination (cont.) By Mr. Zelinsky.......... 681
         Cross-Examination By Mr. Buschel................... 731
22       Redirect Examination By Mr. Zelinsky............... 797

23                                  *   *   *

24

25
```

 1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2   This morning we have Criminal Case Number 19-18, *United States*

 3   *of America v. Roger Stone*.  Mr. Stone is present and in the

 4   courtroom.

 5          Will counsel for the parties please approach the

 6   lectern, identify yourself for the record.

 7          MR. KRAVIS:  Good morning, Your Honor.

 8   Jonathan Kravis for the United States.  With me at counsel

 9   table are Michael Marando, Aaron Zelinsky, Adam Jed,

10   Amanda Rohde from the D.C. U.S. Attorney's Office, and FBI

11   Special agent Christopher Keefe.

12          THE COURT:  All right.  Good morning.

13          MR. BUSCHEL:  Good morning, Judge.  Robert Buschel,

14   Tara Campion, Grant Smith, Bruce Rogow, and Chandler Routman on

15   behalf of Roger Stone.

16          THE COURT:  All right.  And I note for the record

17   that he is present as well.

18          Are both sides ready?  Do you have any preliminary

19   matters you want me to take up?

20          MR. ZELINSKY:  No.

21          MR. BUSCHEL:  No.

22          THE COURT:  All right.  Before we start, I think it's

23   worth noting this morning, after several days of being here

24   together, that everyone within the well of this court has been

25   conducting themselves with complete commitment to their

1    respective sides of the case, but also completely,

2    appropriately, and professionally, and I appreciate it.

3           I also feel compelled to observe that there has been

4    reporting by others, who are not here, about this case and

5    about what has transpired in this courtroom, and particularly

6    concerning the selection and composition of the jury, but also

7    with respect to other matters.

8           It is uninformed and, unfortunately, false.  It's

9    caused great consternation among members of the public, who

10   would have a very good reason to be upset if the information

11   was true.

12          It's concerning to me because it's not only

13   inaccurate and irresponsible, but it puts the safety of all the

14   people associated with this case, on both sides, and including,

15   possibly, the jurors, at risk.

16          Since everyone has a right to express their views, I

17   just have this reminder, and that is that these are public

18   proceedings and people can observe them with their own eyes.

19   And members of the press who need to communicate in real-time

20   have also been provided with a room specifically reserved for

21   the media.

22          If you can't be here in the building, transcripts

23   being created on a daily basis can be ordered.  So individuals

24   and entities who choose to get it right can easily do so.

25          With respect to the gallery, I appreciate the decorum

1    with which members of the public have approached these

2    proceedings over the past several days, and I'm sure that that

3    will continue.

4             I do want to underscore that these are serious

5    proceedings.  They're not an opportunity to meet and greet the

6    other people in the rows.  They're not an opportunity to draw

7    attention to yourselves.

8             And so I would like things to continue the way

9    they've been going to this point.

10            Mr. Zelinsky, are you ready?  Can we bring in

11   Mr. Credico?

12            MR. ZELINSKY:  Yes, Your Honor.

13            THE COURT:  All right.

14            (Witness enters the courtroom.)

15            THE COURT:  All right.  Mr. Credico, you can be

16   seated again.

17            THE WITNESS:  Okay.

18            THE COURT:  All right.  You were wearing glasses

19   yesterday.  Do you need them?

20            THE WITNESS:  Yes.  I left them in the -- in the --

21            THE COURT:  In the witness room?

22            THE WITNESS:  Yes.

23            MR. ZELINSKY:  Your Honor, we will send someone to go

24   get those glasses.

25            THE COURT:  All right.  Okay.

1        I want to let you know that what's going to happen at

2    this point is Mr. Zelinsky is going to resume asking you

3    questions, then one of the lawyers for Mr. Stone has the

4    opportunity to ask you questions, and then Mr. Zelinsky will or

5    won't ask you a few follow-up questions after that.

6        It will go smoothly, I think, if you listen to the

7    question and answer it.  If more is needed, or if some

8    elaboration is requested, the lawyer for either side that's

9    asking you the questions will ask for it.

10        All right.  Let's bring in the jurors.

11        (Jurors enter the courtroom.)

12        THE COURTROOM DEPUTY:  All present, Your Honor.

13        THE COURT:  Good morning.  Glad to see you're all

14    present.  And I hope you all had a pleasant evening.  And I

15    trust that everyone was able to continue to follow my

16    instructions and not do any research about the case or discuss

17    the case.

18        I did want to tell you one thing before we began.  I

19    told you on Tuesday, in the long instructions that I gave you,

20    that if you see people associated with the trial in the hallway

21    and they don't greet you, they're not being rude; they're just

22    following the rules.  And it occurs to me that I should

23    specifically tell you that that means me as well.  While

24    ordinarily, if I pass someone in the relatively tight hallways

25    that we're occupying, I would say hello and how are you; I'm

```
1    not interacting with you at all.  And it's not because I have

2    anything against you or I'm being rude, but it wouldn't be

3    appropriate for me to have individual conversations with you

4    while the trial is ongoing.  So if I walk past you and ignore

5    you, I am doing that for a reason.

6              Also, I don't know if you know this, but you should

7    probably -- I should probably advise you at this point, that

8    the court is going to be closed on Monday for Veterans Day.  So

9    after today's proceedings, the next time we will gather in this

10   building will be Tuesday.

11             All right.  Mr. Credico, I would like to remind you

12   that you're still under oath.

13             And you can proceed.

14             MR. ZELINSKY:  Thank you, Your Honor.

15                  DIRECT EXAMINATION (Continued)

16   BY MR. ZELINSKY:

17   Q.  Good morning, Mr. Credico.

18   A.  Good morning.

19             MR. ZELINSKY:  If we could put Exhibit 61 back on the

20   screen, please.

21   BY MR. ZELINSKY:

22   Q.  Mr. Credico --

23             THE JURORS:  Can we get it a little bigger?

24   BY MR. ZELINSKY:

25   Q.  Mr. Credico, when we finished yesterday, we were talking
```

1    about an email that you sent on January 6, 2017.

2              Do you remember that, sir?

3    A.  Yes.

4    Q.  And is it the email in front of us?

5    A.  Yes.

6    Q.  We had talked about that you had looked at your emails to

7    determine that you were not the person that Mr. Stone was

8    talking about in early August; is that right?

9    A.  Yes, sir.

10   Q.  And that you had told that to Mr. Stone; is that correct?

11   A.  Yes, sir.

12             MR. ZELINSKY:  I want to turn now to Exhibit 194.

13   BY MR. ZELINSKY:

14   Q.  If you look at the email at the bottom, sent on

15   January 16th, 2017, who is that email from?

16             If you could read the top line that's been enlarged,

17   please, sir.

18   A.  Roger Stone.

19   Q.  Thank you.

20             And down there, there is a list.  And you'll see it

21   says, "Randy, You can riff beyond these.  I need."

22             And on the top it says, "Frank, Please arrange to

23   meet Randy to tape the following promos."

24             Do you see that?

25   A.  Yes.

1  Q.  After the email you sent on January 6th, did you tape

2  promotional tag lines for Mr. Stone?

3  A.  Yes, sir.

4  Q.  And why did you do that?

5  A.  I was paid for it.

6  Q.  And how much, approximately, were you paid?

7  A.  Yeah.  You know, I don't remember; 1,000 or 2,000.  I'm not

8  sure.  I'm really not sure exactly.

9  Q.  Thank you, sir.

10          I want to move you now to September of 2017.

11          Do you remember Roger Stone appearing before the

12  House Intelligence Committee on September 26th, 2017?

13  A.  Yes.

14  Q.  In the time immediately prior to Mr. Stone's testimony, did

15  you and he have any conversations about his claims that you

16  were his back channel?

17  A.  Yes.

18  Q.  And what did he say to you?

19  A.  What did he say to me?  That I was his back channel.

20  Q.  And what did you say to him?

21  A.  I said that I wasn't his back channel.

22  Q.  Did he discuss Margaret Kunstler with you at all?

23  A.  He had -- over the year, he had said that if -- that he had

24  a email that would prove that Margaret Kunstler would be --

25  would be involved.  That he could prove it through

1    Miss Kunstler that I was the back channel, that he would use

2    that connection with Miss Kunstler.  And whatever text messages

3    that I had with him, that Miss Kunstler was involved.  Thus, I

4    would -- that would be his -- that would be the linchpin.

5    Q.  And did it concern you that Mr. Stone was talking about

6    revealing Ms. Kunstler's name?

7    A.  Yes.

8    Q.  And why did it concern you?

9    A.  Well, she's a very close friend of mine and, you know,

10   she's an older woman, and I didn't want to drag her through

11   this.  You know, I didn't want to drag her name through this.

12   You know, she has always lived a very quiet, productive life.

13   Unlike her husband, who was productive but liked the press, she

14   did not like to be -- you know, she didn't like the fanfare,

15   and here she was going to be -- and, ultimately, she is dragged

16   through it.  But --

17   Q.  Thank you, sir.

18   A.  -- I wanted to keep her out of it.

19   Q.  Thank you.

20        After Mr. Stone testified, did Mr. Stone ever ask or

21   seek your permission to name you as his intermediary?

22   A.  No.

23   Q.  Thank you.

24        MR. ZELINSKY:  I want to turn now to Exhibit 62.  If

25   we could enlarge the header, the second header in this exhibit,

1    please.

2    BY MR. ZELINSKY:

3    Q.  Do you see the subject of that email that's been forwarded,

4    sir?

5    A.  Yes.

6    Q.  And what is the subject?

7    A.  "Credico paragraph."

8    Q.  And if you could go to the top of the header, please, the

9    header above that.

10   A.  Yes.  "Thursday, October 19, 2017.  Fwd:  Credico

11   paragraph."

12   Q.  And who is the email from?

13   A.  Roger Stone.

14   Q.  And who is the email to?

15   A.  Randy Credico, at two different accounts.

16   Q.  Those are your e-mails; is that right, sir?

17   A.  Yes.

18          MR. ZELINSKY:  If we could turn now to the first

19   paragraph in that message.

20   BY MR. ZELINSKY:

21   Q.  Do you see the line there, sir, at the end, where it says,

22   "Mr. Stone has contemplated the disclosure, and is now

23   prepared, only reluctantly, to identify his source"?

24   A.  Yes.

25   Q.  Did it make you, at the time when you received this e-mail,

1    feel better that Mr. Stone expressed reluctance to you to

2    identify his source?

3    A.  A little, maybe.

4    Q.  Thank you.

5         MR. ZELINSKY:  Let's move on to the next paragraph.

6    BY MR. ZELINSKY:

7    Q.  I want you to take a moment, sir, to read this paragraph.

8    You need not read it aloud.  You can just look up when you've

9    finished reading it.

10        (Pause.)

11   A.  Yes.

12   Q.  Sir, is this paragraph true and accurate?

13   A.  Most of the stuff is true.

14   Q.  And are these matters that you care about?

15   A.  Yes.

16   Q.  And are these matters that you have spent much of your life

17   working on?

18   A.  Yes.

19        MR. ZELINSKY:  I want to move now to the line further

20   down, if you see the top -- I'm sorry -- the first line of that

21   paragraph, "The gentleman who confirmed for Mr. Stone."

22   BY MR. ZELINSKY:

23   Q.  Now, you just said, sir, that the descriptions of your work

24   on the Rockefeller Drug Laws and for the Mothers of Disappeared

25   were accurate; is that right?

1    A.  Yes.

2    Q.  But you said that only most of this paragraph is accurate.

3    I would like you to read that first line that begins, "The

4    gentleman who confirmed."  If you could read that aloud,

5    please.

6    A.  "The gentleman who confirmed for Mr. Stone the accuracy of

7    Julian Assange's interview of June 12, 2016 with the British

8    ITV network, when Assange said he had emails related to

9    Hilary Clinton, which are pending publications, is

10   Randy Credico."

11   Q.  Was that true, sir?

12   A.  No.

13   Q.  Did Mr. Stone ever talk to you about the June 12th

14   interview?

15   A.  No.

16   Q.  After Mr. Stone sent you this e-mail -- I'm sorry.

17         Around the time that Mr. Stone sent you this e-mail,

18   did you and Mr. Stone have a discussion about what you should

19   do if you were approached by the House Intelligence Committee?

20   A.  Yes.  Once I got this, yes, there were discussions about

21   it, text messages.

22   Q.  And what did Mr. Stone tell you you should do?

23   A.  Well, what he -- whatever he texted me.  You know,

24   whatever -- I have to look at the text messages.  I think he

25   wanted me to go along with this, or to -- or -- I could take

```
1    the Fifth Amendment -- take the Fifth Amendment.

2    Q.  When you said, sir, he wanted you to go along with this,

3    did you understand that to be that he wanted you to go along

4    with something that was not true?

5    A.  Well, basically, to follow this narrative here, that's laid

6    out here in this paragraph.

7    Q.  Thank you.

8            MR. ZELINSKY:  Let's turn to Exhibit 63.

9            THE COURT:  Mr. Zelinsky, can I just have counsel at

10   the bench for a brief moment?

11           (Bench discussion:)

12           THE COURT:  I realize that you're trying to punctuate

13   the end of his answers to keep him from talking too much.  But,

14   you have a bit of a verbal tick of, when he answers, you go,

15   "Thank you."

16           MR. ZELINSKY:  Okay.

17           THE COURT:  And that signals that, You gave the right

18   answer.

19           MR. ZELINSKY:  Understood, Your Honor.

20           THE COURT:  And that's not an appropriate thing for

21   counsel to be doing when somebody is testifying.

22           MR. ZELINSKY:  Thank you, Your Honor.  I appreciate

23   that.

24           MR. BUSCHEL:  She said don't do that.  Thank you,

25   Your Honor.
```

1              (Open court:)

2              MR. ZELINSKY:  If we could turn to Exhibit 63.  If

3     you could enlarge the two messages, please, Ms. Rohde, that are

4     at the top of the page.

5     BY MR. ZELINSKY:

6     Q.  Mr. Credico, do you see the message marked 11?

7     A.  Yes.

8     Q.  Could you read the message that you sent on

9     November 17th, 2017 to Mr. Stone?

10    A.  "I flew back from London.  I saw *Godfather II*."

11    Q.  And what did you send after that?

12    A.  "Frank Pentangeli -- Frankie Five Angels."

13    Q.  This reference to Frankie Five Angels, who were you

14    referencing?

15    A.  A character from *Godfather II*, a Frank Pentangeli.

16    Q.  And as -- you mentioned him earlier, in your testimony

17    yesterday, is that correct?

18    A.  Yes.

19    Q.  Had you and Stone, prior to this message, discussed

20    Frank Pentangeli?

21    A.  I don't remember if we did talk about it before or after,

22    if there were text messages before.  I don't exactly remember.

23    Q.  Whose idea -- what does this message refer to?

24    A.  To Frankie Five Angels.  To *Godfather II*.  The guy --

25    Q.  Did Mr. Stone ever request that you do a Frank Pentangeli?

1    A.  Yes.  A couple of times.

2    Q.  And what did you understand that to mean?

3    A.  Well, you know, just -- can I elaborate on this, or do I

4    have to say yes or no here?  I just would like to say,

5    Frank Pentangeli is a guy who stone -- doesn't stonewall.  He

6    goes out there and says that he doesn't remember or doesn't

7    know the guy behind a Michael Corleone.

8          The problem with that is, is that in that movie -- in

9    1953 it takes place -- there are no text messages between

10   Michael Corleone and Frank Pentangeli, no photos.

11         There's a ton of photos and text messages, and I've

12   done radio shows.  If I did a Frank Pentangeli and I said -- I

13   got up and said -- in front of any committee and said, I don't

14   know Roger Stone, it didn't make any sense.

15         But, I think, if I did a Frank Pentangeli, I would

16   look like a fool, you know.  But, I think, basically, it was to

17   throw them off, you know.

18   Q.  When you say "them," do you mean the House Intelligence

19   Committee, sir?

20   A.  Yeah.  To really rebuff.  To -- you know.  You know, but he

21   has a twisted sense of humor as well --

22         THE COURT:  All right.  Well, let me -- before we get

23   into whether you wanted to do it or it made sense to you, I

24   think the question was, what did you understand "Do a

25   Frank Pentangeli" to mean?  If you could just answer that much.

 1          THE WITNESS:  All right.  Okay.  Well, I guess it
 2     would be to not -- to divert -- to not -- to not recall.  To
 3     not recall any of the conversations I had with Roger Stone or
 4     any of the events that transpired.
 5          MR. ZELINSKY:  I would like to move now to Exhibit
 6     14.  If we could move on to the next page of Exhibit 14 and
 7     enlarge the document.
 8     BY MR. ZELINSKY:
 9     Q.  Sir, did you receive a letter from the House Intelligence
10     Committee on November 9th, 2017?
11     A.  Yes.
12     Q.  Did they request an interview with you?
13     A.  Yes.
14          MR. ZELINSKY:  I would like to move back to Exhibit
15     63.
16          And I'm sorry.  If we could go back for just a moment
17     to Exhibit 14.
18          The next page.  If we could enlarge the date, please.
19     BY MR. ZELINSKY:
20     Q.  What was the date that the House Intelligence Committee
21     requested an interview with you?
22     A.  November 9th, 2017.
23          MR. ZELINSKY:  If we could go back to Exhibit 63.
24          And we could go to the messages at the bottom of the
25     page.

1   BY MR. ZELINSKY:

2   Q.  Sir, did you send a message on November 19th, 2017 to

3   Mr. Stone?

4   A.  Yes.

5   Q.  And what did you write?

6   A.  "My lawyer wants to see me today."

7   Q.  What did Mr. Stone respond?

8   A.  "Stonewall it.  Pleads the fifth.  Anything to save the

9   plan" --

10   Q.  And then there's a --

11   A.  -- "Richard Nixon."

12   Q.  Did you respond to that message?

13   A.  Yeah.  I laughed, "Ha, ha."

14   Q.  How did you take the message that Mr. Stone sent when you

15   wrote "Ha, ha"?

16   A.  Not serious -- you know, not seriously.  I mean, I got a

17   letter, and he's telling me to do this.  And, you know, what am

18   I supposed to do?  I -- you know, I got to talk to my lawyer,

19   obviously.  So, saying "Ha ha" was not like a real laugh.

20   Q.  You said it "was not like a real laugh," sir?

21   A.  No.  A sarcastic laugh.

22        MR. ZELINSKY:  Let's move to Exhibit 15.

23        Page 2, please.

24   BY MR. ZELINSKY:

25   Q.  Did you ultimately decline to be interviewed by the House

1    Intelligence Committee?

2    A.  Yes.

3    Q.  And what was the date on which you had your counsel notify

4    the House Intelligence Committee that you declined to be

5    interviewed?

6    A.  November 20th.

7    Q.  Did Mr. Stone's discussions with you and his instructions

8    play a role in your declining to be interviewed?

9    A.  A lot of people played the role, Mr. Stone amongst them,

10   yes.

11           MR. ZELINSKY:  Let's move now to Exhibit 64.

12           If we could enlarge the top eight messages.

13   BY MR. ZELINSKY:

14   Q.  Sir, after you declined to be interviewed by the House

15   Intelligence Committee, were you concerned about getting

16   subpoenaed?

17   A.  Yes.

18   Q.  And you sent messages to that effect to Mr. Stone; is that

19   correct?

20   A.  Yes.

21   Q.  Are these messages at the top accurate?  That is, that you

22   were -- told the House Committee lawyer that "I will be getting

23   a subpoena"?

24   A.  Yes.

25   Q.  And what did Mr. Stone tell you?

1    A.  "When was your deadline?"

2    Q.  And what did you respond?

3    A.  "I was told that the House Committee lawyer told my lawyer

4    that I will be getting a subpoena."

5    Q.  What did Mr. Stone tell you?

6    A.  "That was the point at which your lawyers should have

7    said -- have told them you would assert your Fifth Amendment

8    rights, if compelled to appear."

9    Q.  After you received word that you would be getting a

10   subpoena, did that make you more concerned about what

11   happened -- might happen with the House Intelligence Committee?

12   A.  Yes.

13            MR. ZELINSKY:  Let's move to the next set of text

14   messages, please, further down on the page.

15   BY MR. ZELINSKY:

16   Q.  Did you contact Mr. Stone to see about whether the House

17   Intelligence Committee would be sending you a subpoena?

18   A.  What -- 93, here?

19   Q.  Yeah.

20   A.  "House Committee lawyers said I am getting a subpoena.  Is

21   that a bluff?"

22   Q.  And what else did you ask Mr. Stone?

23   A.  "They won't send me a subpoena because republican won't

24   agree" --

25   Q.  And what did Mr. --

1    A.  -- "right?"

2    Q.  And what did Mr. Stone respond?

3    A.  "I am trying to find out."

4    Q.  And did you write to him?

5    A.  "How does it work?"

6    Q.  And what else did you say?

7    A.  "If Adam Schiff says, We want him, or we're going to make a

8    big stink of it, they're going to say yes."

9    Q.  Who, sir, at that time, was Adam Schiff?

10   A.  He was the ranking chairman of the House Intel Committee.

11   Q.  And what did Mr. Stone respond?

12   A.  "Majority of the committee would have to vote to subpoena

13   you.  Given the limited area they want to ask you about, it's

14   not clear they will do this.  If they know you will take the

15   Fifth, if subpoenaed, it makes it less likely."

16           MR. ZELINSKY:  Let's move now to Exhibit 65, page 1.

17   BY MR. ZELINSKY:

18   Q.  Would you read the messages that you sent on

19   November 24th, 2017 to Roger Stone?

20   A.  "I got a subpoena.  So, I'm going to talk about it and then

21   I'm off to a trial in London.  I'll be back for the 11th, to

22   appear in front of the Intel Committee."

23   Q.  At that point were you planning that you might appear in

24   front of the House Intelligence Committee?

25   A.  If we -- I was contemplating.

1          MR. ZELINSKY:  If we could enlarge the messages

2      further down.

3      BY MR. ZELINSKY:

4      Q.  If you could begin reading the messages that say, that

5      begin at, "All the stuff came."

6      A.  All the -- yes.  136?

7      Q.  Well, let's start at the top --

8      A.  Okay.

9      Q.  -- please, sir, "At any rate."

10     A.  "At any rate, this is not about you.  They don't care about

11     my so-called back-channel status.  They don't like the fact

12     that I've met with Assange three times."

13     Q.  I'm going to stop you there for a moment, sir.

14          Had you, at that point, met with Assange?

15     A.  I had met with Assange in September of 2017.  I had gone

16     there to cover a trial for KPFA, and I did get in to see

17     Assange.

18     Q.  And September 2017, that was after --

19     A.  A year after the election.

20     Q.  -- the events we've been discussing?

21     A.  Yes.  Yes.

22     Q.  You talk about three times that you met with Assange.

23     A.  Yes, I did.  I met him on November 6 and 13th, I believe;

24     6, I -- I met him twice.  Because when I went back there for

25     the trial, there was a -- not a trial, but a court action

1    bought by an Italian journalist against the Crown Prosecutor

2    Services in London, and I attended that for three days.  And I

3    saw Mr. Assange during that period of time, twice.

4    Q.  And that was all in 2017?

5    A.  Yes.  A year afterwards.

6    Q.  And were those the meetings you were referring to in these

7    messages?

8    A.  Probably, yes.  Yes.  Of course.  You know, that's the

9    first time I met him.

10   Q.  And at the bottom, what did Mr. Stone respond to you?

11   A.  "So the f-u-c-k what?  Assange is a journalist, and a damn

12   good one.  Meeting with him is perfectly legal.  And all you

13   ever told me was he had the goods on -- in Hillary and would

14   publish them, which he, himself, said he -- in public before

15   you told me.  It's a friggin' [sic] witch hunt."

16          MR. ZELINSKY:  If we could move to page 2, please.

17   BY MR. ZELINSKY:

18   Q.  What did you respond to Mr. Stone?

19   A.  "I told you to watch his Tweets."

20   Q.  What else did you say, sir?

21   A.  "That's what I was basing it on.  I told you to watch his

22   Tweets in October, not before that.  I knew nothing about the

23   DNC stuff.  I told you to watch his Tweets in October."

24          Okay.  "I just followed his Tweets, but was not

25   following him before the Democratic Convention.  I didn't even

1    follow his Tweets before the Democratic Convention, but I did

2    in October.

3    Q.  And then what did Mr. Stone respond?

4    A.  "You never said anything about the DNC, but it was August."

5    Q.  And you responded?

6    A.  "It was not August because I didn't interview him or meet

7    him until August 26th."

8            Actually, it was 25th.

9            "That was my first communication with his secretary

10   in London, August 26th.  I have the email with him.  A week

11   later you asked me how I was able to get Assange on the show."

12   Q.  And what did Mr. Stone respond?

13   A.  "Not the way I remember it.  Oh, well, I guess Schiff will

14   try to get one of us indicted for perjury."

15   Q.  And, Mr. Credico, you had earlier discussed, and we had

16   seen, text messages with Mr. Stone in August; is that correct?

17   A.  I -- I'm sorry.  Would you repeat it?

18   Q.  We went over yesterday --

19   A.  Yes.

20   Q.  -- some text messages --

21   A.  Yes.

22   Q.  -- you sent in August?

23   A.  Yes.

24   Q.  And in particular, there was a text message you sent to

25   Mr. Stone saying Assange had kryptonite on Hilary Clinton; is

1      that right?

2      A.  Yes.

3      Q.  You remember Mr. Stone did not respond to that message --

4      A.  Yes.

5      Q.  -- is that correct?

6              When you say below, on November 24th, that "A week

7      later, you asked me how I was able to get Assange on the

8      show" --

9      A.  Yes.

10     Q.  -- was that the first time Mr. Stone had asked you anything

11     about Julian Assange?

12     A.  Yes.  It was actually more than a week later.  It was when

13     I was talking about Gary Johnson.

14             MR. ZELINSKY:  If we could move now to the next --

15     further down on the same document.

16     BY MR. ZELINSKY:

17     Q.  You write there, "I'm a journalist.  I'm not speaking in

18     front of the committee.  I have" --

19     A.  Yes.

20     Q.  -- "First Amendment protection."

21     A.  Right.

22     Q.  Do you see that, sir?

23     A.  Yes.

24     Q.  And then you say -- you wrote -- or, you see the line on

25     the page, "If they want to cite me for contempt, that's fine.

1    The bigger picture is to protect the freedom of the press"?

2    A.  Right.

3    Q.  "I will not be talking to them."

4    A.  Right.

5    Q.  Did you write that?

6    A.  Yes.

7    Q.  And why did you write that to Mr. Stone?

8    A.  So he would think that I would not be talking to 'em.  I

9    would use that as a way not to -- a way to avoid taking the

10   Fifth would be to use my First Amendment rights as a

11   journalist.

12   Q.  And further down you note --

13          MR. ZELINSKY:  If we go to page 3, line 204.

14   BY MR. ZELINSKY:

15   Q.  -- you write -- do you see that at 1:13 a.m., 11-24-17,

16   sir?

17   A.  11-24, at 6:31 a.m.?

18   Q.  No, sir.  The bottom message, "At any rate."

19   A.  Yes.  At 1:13:53.

20   Q.  Would you read that message, please, sir?

21   A.  "At any rate, I'm on so much heavy medication that I don't

22   remember any of the dates from last year."

23   Q.  And the message there about -- is that message true, sir?

24   A.  No.

25   Q.  Why did you write it?

1    A.  I just -- why did I write it?  I just wanted to get it -- I

2    didn't want to discuss it.

3    Q.  You didn't want to discuss what?

4    A.  About the Fifth Amendment.  About the First Amendment.

5    About anything.  You know, I -- I don't remember any of the

6    dates.

7           You know, I can't tell you specifically why I wrote

8    that.

9           MR. ZELINSKY:  Let's move to Exhibit 65, page 4.

10   This is line 211.

11   BY MR. ZELINSKY:

12   Q.  Did you send Mr. Stone a message that said, "You are clear

13   now with forensic evidence that you had no connection to

14   WikiLeaks"?

15   A.  Yes.

16   Q.  When you refer to "forensic evidence," what do you mean?

17   A.  I mean that he had no connection.  Because I -- my emails,

18   my text messages, he definitely -- I was not some kind of back

19   channel.  And I supposed he had no back channel.  So, he was

20   clear.

21           MR. ZELINSKY:  If we could move to Exhibit 16, page

22   3.

23           If we could enlarge that, please, Ms. Rohde.

24   BY MR. ZELINSKY:

25   Q.  Did there come a time after these messages when you were

1    subpoenaed by the House Intelligence Committee?

2    A.  Yes.

3    Q.  And when was the subpoena dated?

4        If you could --

5    A.  I can't -- could I get a napkin to wipe these glasses off?

6        Thank you.

7        THE COURT:  You've got Kleenex.

8        MR. ZELINSKY:  Mr. Haley.

9        THE WITNESS:  Thanks.  Thank you.

10   A.  The date is 27th of November, 2017.

11   BY MR. ZELINSKY:

12   Q.  Did you discuss the subpoena with Mr. Stone?

13   A.  Yes.

14       MR. ZELINSKY:  Could we go to Exhibit 69, please?

15   BY MR. ZELINSKY:

16   Q.  You'll see there, the text message begins on line 291.

17       Could you read that, please, sir?

18   A.  "I told your friend, Frank Morano, I would do his show, but

19   you have to get this idiot Morgan not to talk about this."

20   Q.  Who is Morgan?

21   A.  Morgan is the producer of a show -- a movie called *Get Me*

22   *Roger Stone.*  He was also guy I was working with in 2017.

23   Q.  Thank -- thank you.

24   A.  Yes.

25   Q.  If we could move to the next question, please, Mr. Credico.

```
 1            Line 292, could you read that sentence that Mr. Stone
 2    wrote you in response?
 3    A.  "Impossible.  You are talking about it.  You will be
 4    accused of being the back channel, what [sic] do you like" --
 5    whether you like it -- "you would be accused of being the back
 6    channel, what do you like it or not.  I will visit you in
 7    prison."
 8    Q.  What did you respond to Mr. Stone?
 9    A.  "I won't spend the [sic] day in prison.  I'm forensically
10    clean."
11    Q.  What did Mr. Stone respond?
12    A.  "Which means nothing."
13            "Whatever.  I'll sleep real well tonight."
14            MR. ZELINSKY:  I would like to move, now, to line 311
15    of this exhibit.
16    A.  311, yes.
17            MR. ZELINSKY:  I'm sorry.  Actually, 310 of this
18    exhibit.
19    BY MR. ZELINSKY:
20    Q.  You'll see there, you sent a message on 11-28-17.
21            Do you see that, sir?
22    A.  Yes.
23    Q.  What did the message say?
24    A.  "Did you watch?"
25    Q.  Why were you asking Roger Stone whether he'd watched
```

1    something?

2    A.  I don't know what I'm referring to here, "Did you watch?"

3    "Did you watch" --

4    Q.  What did Mr. Stone write in response, on line 312?

5    A.  Oh, yes.  I'm sorry.  This is the previous -- yes.

6          Did you -- "you did well.  Louis" -- Errol Louis --

7    "misspeaks when he says I said you were my source.  You could

8    at least say, I don't agree with Roger Stone on much, but we

9    have worked together for drug law reform."

10          MR. ZELINSKY:  Let's turn now to Exhibit 69, line

11    316.

12    BY MR. ZELINSKY:

13    Q.  Do you see the line at the top, sir?

14    A.  Yes.

15    Q.  Would you read it, please?

16    A.  "The whole thing will be worthless unless you find a place

17    to do your Frank -- your Frank Cannon -- your Frank Cannon 10

18    July imitation.  Sure.  Sure.  Roger Stone this, Roger Stone

19    that."

20    Q.  Sir, are you familiar with anybody named Frank Cannon 10

21    July?

22    A.  Frank Cannon 10 July?  No.  But, Frank --

23    Q.  Could you read the next line, please?

24    A.  Yes.  "Frank Pantsgele [sic]."

25          MR. ZELINSKY:  Let's move now to Exhibit 69, page 2.

```
1    BY MR. ZELINSKY:

2    Q.  Sir, did you continue to try to tell Mr. Stone what had

3    actually happened?

4    A.  Repeatedly.

5    Q.  If you could read line 344.

6    A.  "Some guy by the name of Lizza quoted you tonight."

7    Q.  Keep reading, please.

8    A.  "I don't know why you had to lie and say you had a back

9    channel.  Now I had to give all of my forensic evidence to the

10   FBI.  What a headache."

11   Q.  Sir, at that point, had you turned anything over to the

12   FBI?

13   A.  No.

14   Q.  Why did you tell Mr. Stone you had?

15   A.  I was -- out of frustration that I was still -- this was

16   still hanging over my head.  And, so --

17   Q.  What else, on line 345, did you tell Mr. Stone?

18   A.  "You could have just told him the truth, that you didn't

19   have a back channel.  They now know that I was not in London

20   until September of this year."

21   Q.  What else did you tell Mr. Stone?

22   A.  "You had no back channel, and you could have just told the

23   truth.  Forensic experts agree, you had no back channel.  Why

24   couldn't have you just told the truth?  You want me to cover

25   you for perjury now."
```

1            MR. ZELINSKY:  If we could turn to the next page of

2      the exhibit.

3      BY MR. ZELINSKY:

4      Q.  After you wrote the lines you just read, what did Mr. Stone

5      respond?

6      A.  Do I have to pronounce these four-letter words?

7      Q.  Sir, you may just omit them in your response.

8      A.  Okay.  "What the" blank "is your problem?  Neither of us

9      has done anything wrong on illegal.  You got the best press of

10     your" -- I can't see the whole thing.  I guess, "life, and you

11     can get away with asserting Fifth Amendment rights if you don't

12     want talk about."

13     Q.  And then what else did Mr. Stone say regarding the FBI?

14     A.  "And if you turned over anything to the FBI, you are a

15     fool."

16     Q.  What did you respond to Mr. Stone?

17     A.  "You open yourself up to six counts of perjury.  But, I'm

18     sure that wasn't sworn testimony, so you're probably clear."

19            MR. ZELINSKY:  If we could move further down this

20     exhibit, to line 386 -- I'm sorry -- line 369.

21            And, actually, Ms. Rohde, line 368 as well.

22     BY MR. ZELINSKY:

23     Q.  On December 1st, 2017, had you responded to the House

24     Intelligence Committee in any way?

25     A.  I don't know what date.  We did respond.  We did respond.

1   I think not yet, to that subpoena.

2   Q.  On December 1st, 2017, what did you tell Mr. Stone to do?

3   A.  "You need to amend your testimony before I testify on the

4   15th."

5            That was the date, yes.

6   Q.  What did Mr. Stone tell you in response?

7   A.  "If you testify, you are a fool because of Tromp" -- Trump

8   "I could never get away with a certain [sic]" -- with a

9   certain -- asserting "my Fifth Amendment rights, but you can.

10   I guarantee you you are the one who gets indicted for perjury,

11   if you're stupid enough to testify."

12            MR. ZELINSKY:  Could we move to line 386 of the

13   exhibit, on page 2.

14   BY MR. ZELINSKY:

15   Q.  In that same time period, what did Mr. Stone tell you to

16   do?

17   A.  Here we go again.  "Start practicing your Pantagele [sic]."

18            MR. ZELINSKY:  Let's move now, to line 404.

19   BY MR. ZELINSKY:

20   Q.  Did you write a message to Mr. Stone about lawyers wanting

21   you to take the Fifth?

22   A.  Yes.

23   Q.  Did you receive some advice from people telling you you

24   should take the Fifth?

25   A.  Some lawyers told me to take the Fifth and some lawyers

1    told me to not take the Fifth.

2    Q.  Let's move on.

3            At that time, did you want to testify in order to

4    clear the air?

5    A.  I certainly did not want to be stuck as the guy that helped

6    out Trump win the election.

7    Q.  And if you testified, did you think that would help you?

8    A.  If I testify, I could clear it up.

9    Q.  And how would you have cleared it up?

10   A.  I would have said that I wasn't a back channel.  I had

11   nothing to do with this.  And then I wouldn't have the problems

12   that ensued once I did take the Fifth.

13   Q.  And was Mr. Stone a reason for you taking the Fifth?

14   A.  He's one of many reasons why I took the Fifth.  You know,

15   what -- I finally did, but there's a thousand reasons why I

16   took the Fifth.  I got advice from him.

17           One of the reasons, and I've said this before, is

18   because I did not want to drag in Mrs. Kunstler into this

19   process.  I was walking a Flying Wallenda-type of thing,

20   walking a tightrope.  I didn't know what to do at that point.

21           Do I protect myself being associated with

22   Donald Trump?  If I -- if I do that, then I sacrifice

23   Mrs. Kunstler's reputation.

24           So, that's the line I was walking at that particular

25   point.

1    Q.  Were you afraid that Roger Stone would disclose

2    Mrs. Kunstler?

3    A.  Well, he had been saying it, yes.

4    Q.  And you were afraid that that would harm her reputation?

5    A.  Yes.

6    Q.  Was that part of the reason you took the Fifth?

7    A.  Yes.

8                MR. ZELINSKY:  If we could move to line 433, on the

9    following page.

10   BY MR. ZELINSKY:

11   Q.  Do you see line 433, sir?  It begins, "I told *The*

12   *Intercept*"?

13   A.  -33?  "I told *The Intercept* that I was in the olive oil

14   business with Roger Stone's father, but that was a long time

15   ago."

16   Q.  What is *"The Intercept"*?

17   A.  *Intercept* is a -- it's an online liberal magazine run by

18   Glenn Greenwald and Jeremy Scahill.  That was a radio show,

19   radio *Intercepted*.  I did that show, yes.

20   Q.  And did you -- this reference, "I was in the olive oil

21   business with Roger Stone's father, but that was a long time

22   ago," what is it a reference to?

23   A.  It's reference to Frank Pentangeli's testimony in front of

24   the -- from *The Godfather,* congressional testimony.

25               MR. ZELINSKY:  Let's move now to Exhibit 17, page 3.

1    BY MR. ZELINSKY:

2    Q.  On December 12th, 2017, did you ultimately communicate to

3    the House Intelligence Committee that you were taking the

4    Fifth?

5    A.  Yes.

6    Q.  Following this communication --

7              MR. ZELINSKY:  Moving to Exhibit 69.

8    BY MR. ZELINSKY:

9    Q.  -- did you discuss --

10             MR. ZELINSKY:  Thank you.  This is going to be page

11   8.

12   BY MR. ZELINSKY:

13   Q.  -- did there come a time when you continued to discuss

14   ongoing investigations with Mr. Stone?

15   A.  I'm sorry?

16             MR. ZELINSKY:  If we could move one more page,

17   please, Ms. Rohde, to 552.

18   BY MR. ZELINSKY:

19   Q.  So you just testified that you took the Fifth?

20   A.  Right.

21   Q.  After that, did there come a time when you continued to

22   discuss these matters with Mr. Stone?

23   A.  Yes.

24   Q.  On December 24th, 2017, what did you write to Mr. Stone?

25   A.  "I met Assange for first time this year, September 7th.

1    Documents prove that."

2    Q.  And what did you tell Mr. Stone to do?

3    A.  "You should be honest with FBI.  There was no back channel.

4    Be honest."

5    Q.  What did Mr. Stone tell you in response to being hon- --

6    your statement about being honest to the FBI?

7    A.  "I'm not talking to the FBI.  And if you are smart, you

8    won't either.

9            MR. ZELINSKY:  Let's move to Exhibit 74, page 2.

10   BY MR. ZELINSKY:

11   Q.  Shortly thereafter, on January 11th, 2018, you'll see a

12   message at the bottom that begins, "Maybe."

13           Do you see that?

14   A.  Yes.  "Maybe your back channel knows more than I do."

15   Q.  Sir, that reference to "your back channel," who -- are you

16   referencing yourself in that message?

17   A.  No.

18   Q.  Are you referencing the individual Mr. Stone had referred

19   to in August?

20   A.  Yes.

21   Q.  Moving now to --

22   A.  Actually, September, yes.

23           Oh, yes, in August.  I'm sorry, yes.

24   Q.  Moving now, to Exhibit 78.  You'll see at the bottom --

25   A.  Yeah.

1    Q.  -- you wrote a message to Mr. Stone on January 25th, 2018.

2    A.  "I got Mueller subpoena.  Did you?"

3    Q.  Who is referred to as "Mueller"?

4    A.  He is -- Mueller is the head of the Mueller investigation.

5    Q.  Special Counsel Robert Mueller?

6    A.  Special Counsel Robert Mueller, yes.  I'm sorry.

7    Q.  And did Roger Stone respond -- first, let's say, did you

8    actually have a subpoena at that point, sir?

9    A.  No, I did not.

10   Q.  Why did you tell that to Roger Stone?

11   A.  Because I really wanted to -- I was very frustrated at that

12   time, that here I am, stuck.  I answered and I took the Fifth

13   and now I am the guy who is the back channel, basically.

14   Everyone's extrapolating.  Once you say that, no matter what,

15   you have your right to take the Fifth Amendment, but people

16   extrapolate that you're hiding something.  And there you go, I

17   am now going to be connected with the guy who is -- whatever.

18   Q.  What did Roger Stone respond when you told him you had

19   gotten the subpoena from Special Counsel Mueller?

20   A.  "Waste of your time.  Tell him to go" blank "himself."

21           "Who?"

22           "Mueller."

23   Q.  If we could turn now, to Exhibit 79, page 12.  Sir, these

24   are additional text messages.  Do you recognize them?

25   A.  Yeah.

1    Q.  You appear in purple, the messages you send; is that

2    correct?

3    A.  Yes.

4    Q.  On March 5th, 2018, did you send a message to Roger Stone

5    that began, "You had nothing"?

6    A.  At the very top it says, "I'm sure Trump" -- that one?

7    Q.  No, sir.  There is a --

8    A.  Oh, "You had" -- I'm sorry.  Yes.

9    Q.  -- March 5th that you also sent; is that correct?

10   A.  May [sic] 5th, yes.  "You had nothing to do with it.

11   Assange never spoke to you.  You are a liar.  But try to be

12   honest from this point on, because you purge [sic] yourself" --

13   you purge -- you -- didn't "purge yourself."  What is the word?

14   You perjured yourself -- "in front of the House Committee."

15            MR. ZELINSKY:  If we could move to Exhibit 79, page

16   12.

17   A.  Yeah.

18   BY MR. ZELINSKY:

19   Q.  You write, "You weasel your way."

20            Do you see that, sir?

21   A.  Yes.

22   Q.  And what did you say to Mr. Stone?

23   A.  "You weasel your way into this story in which you are not

24   part of.  And Trump can't stand you, and you know that."

25            MR. ZELINSKY:  Let's move on to page 12 of this

 1    exhibit.

 2              Ms. Rohde, if we could continue to scroll down.

 3              Keep going, please.

 4    BY MR. ZELINSKY:

 5    Q.  Did you, again, tell Mr. Stone that you had issues with

 6    what he had said to Congress?

 7    A.  Repeatedly I did.

 8    Q.  And, sir, how did you know what Mr. Stone had told

 9    Congress?

10    A.  Because he sent me a letter -- what he told Congress, he

11    sent me that email back in -- back in -- before -- the one that

12    he submitted, I got the email from him.

13              MR. ZELINSKY:  Let's move on to the next -- further

14    down on the same slide.

15              Keep going further down, please, Ms. Rohde.

16    BY MR. ZELINSKY:

17    Q.  Do you see the sentence -- the message that begins on

18    March 5th, 2018, at 6:33 p.m.?

19    A.  Yes.

20    Q.  Not the first one, but the one that begins, "I decided"?

21    A.  "I decided not to be your patsy, again.  You are in

22    trouble, my friend."

23    Q.  Without getting into the details at this point, when you

24    wrote this message, did you feel that you had been

25    Roger Stone's patsy in the past?

1    A.  Yes.

2    Q.  And did you feel that he was making you into his patsy

3    again?

4    A.  Yes.

5              MR. ZELINSKY:  Let's go to Exhibit 81.

6    BY MR. ZELINSKY:

7    Q.  If you look at the message on the bottom, on

8    March 9th, 2018, did you send an email to Mr. Stone?

9    A.  No.  It says "From Roger Stone" here.

10   Q.  Sir, if you could look at the bottom --

11   A.  Oh, the bottom.

12   Q.  -- March 9, 2018.

13   A.  Yes.  "You are hitting below the belt."

14   Q.  And did you attach a hyperlink to an article?

15   A.  Yes.

16   Q.  Let's move to the next page of the exhibit.  Was that

17   article something that had been written by Mr. Stone on his

18   website that same day?

19   A.  Yes.

20             MR. ZELINSKY:  Let's move to page 4 of this exhibit.

21             If we could enlarge the paragraph that begins,

22   "Credico's talents as an impressionist."

23   BY MR. ZELINSKY:

24   Q.  If you could read that paragraph, sir?

25   A.  "Credico's talents as an impressionist were such that

1     during Tom Golisano's campaign, Randy called the campaign

2     manager, as Tom, and fired the young man.  Golisano's

3     temperament made the gag believable.

4             "I continued to maintain that Credico, who has heard

5     me rant over martinis and cigars, can be heard in the voice

6     message to Governor Eliot Spitzer's father, warning him that

7     his son's corruption would soon bring him down.  Credico

8     impression of me is incredible."

9     Q.  Sir, there's a reference there to a voice message to

10    Governor Eliot Spitzer's father.  Do you see that?

11    A.  Yes.

12    Q.  What is Mr. Stone -- did you understand Mr. Stone to be

13    referring to when he wrote those lines?

14             MR. BUSCHEL:  Objection.  The grounds are in the

15    brief, Your Honor.

16             THE COURT:  All right.  The record is complete on

17    that, and your objection is noted.

18             You can answer the question.

19    A.  Yes, that was a phone call that Mr. Stone made to Eliot

20    Spitzer's father, Bernard, sometime in 2007.

21    BY MR. ZELINSKY:

22    Q.  And what, to your knowledge, did the phone call consist of?

23    A.  Well, it was a late-night phone call, you know, like

24    2 o'clock in the morning, I believe.  And it was a very vile,

25    nasty, sordid, semi-threatening phone call to Old Man Spitzer.

1    Q.  And were there press reports that said Mr. Stone had made

2    this phone call?

3    A.  Yes.

4    Q.  And what, if anything, did Mr. Stone say about you in

5    relation to the phone call?

6    A.  Well, immediately, he said it was -- it couldn't have been

7    him; he was at the theater.  And then that --

8    Q.  Sir, if you could just say what he said about you.

9    A.  Okay.  He said that I called up.  He said I got -- I was in

10   Argentina.  I remember this.  I had flown in to Daytona through

11   Miami; Daytona, to see a woman who was dying of cancer.  I

12   remember this.  We were doing a documentary on her.  She was a

13   Rockefeller Drug Law former prisoner.

14          And so when I arrived there, I got a call from

15   Elizabeth Benjamin from the *Daily News*, saying that, Are

16   you" -- Roger said that you're the one that imitated him and

17   called up Spitzer's father, that was you on the phone, and

18   spoofed the number.

19          Whatever spoofing is, I spoofed his number and called

20   up and left this message, at 3 o'clock in the morning,

21   imitating him.  That's what he --

22   Q.  And, sir, had you left a message in doing an imitation of

23   him?

24   A.  No.

25   Q.  And was there a lot of unwanted publicity concerning this

1   matter surrounding you?

2   A.  Yes.  It was -- first, it was so absurd.  And, you know,

3   who would want to do something like that?  I don't even know

4   the guy.

5   Q.  And how did that make you feel at the time?

6   A.  Feel 12 years ago?  Most likely, not very good.

7   Q.  And was that one of other negative incidents that you have

8   had in the past with Mr. Stone?

9   A.  Well, we've had many -- many, you know, squabbles.

10  We've had squabbles.  We've had -- you know, there's been

11  some --

12              MR. ZELINSKY:  Let's move now --

13              THE COURT:  You asked him a question.

14              THE WITNESS:  Okay.

15              THE COURT:  So you've had squabbles before --

16              THE WITNESS:  Yeah.  Yeah, over the years, you know.

17  I'd see him every three or four years.  This is 2007, and I was

18  not very happy with that and --

19              THE COURT:  All right.  So --

20              THE WITNESS:  I don't know.  Yes, we've had -- this

21  is just one of many over the years, yeah.

22              THE COURT:  So let's go back to this article that you

23  were talking about.

24              Ask your next question.

25              MR. ZELINSKY:  Thank you, Your Honor.

1    BY MR. ZELINSKY:

2    Q.  You referred earlier to a message that we saw where you

3    said you didn't want to be Mr. Stone's patsy again.  Do you

4    remember that?

5    A.  Yes.  Yes.

6    Q.  Was this occasion with Mr. Spitzer one of the times that

7    you were referencing?

8    A.  Yes.  That was the big one, yes.

9    Q.  Let's move to the fourth page of this article, the

10   paragraph that begins, "It was Randy Credico."

11   A.  Yes.

12   Q.  Could you read that paragraph aloud, sir?

13   A.  All right.  "It was Randy Credico who first brought my

14   attention, in mid-July 2016, the public claim of WikiLeaks'

15   publisher, Julian Assange, that he had significant material on

16   the democrats and Hilary Clinton and would publish those

17   documents.  Up until this time, I had not been paying much

18   attention to WikiLeaks and was not following the WikiLeaks or

19   Assange feeds on Twitter."

20   Q.  Sir, the top of that message, where it says -- the top of

21   that article, where it says that "It was Randy Credico who

22   brought to my attention, in mid-July 2016, that the publisher

23   of -- the public claim of WikiLeaks' publisher,

24   Julian Assange" -- was that true?

25   A.  No.

 1   Q.  Did you bring that to Mr. Stone's attention in mid-July?

 2   A.  Absolutely not true.

 3   Q.  How did it make you feel at the time, that Mr. Stone was

 4   publicly claiming this?

 5   A.  That -- in that article, yes, I was not very happy with

 6   that.

 7   Q.  Let's move now to page 9 of the exhibit.  The paragraph

 8   that begins, "When the House Intelligence Committee sought to

 9   question."

10   A.  Yes.

11   Q.  Could you read that, sir?

12   A.  "When the House Select Committee on Intelligence sought to

13   question Credico regarding what he considered to be a perfectly

14   legal activity, well within his scope of operating as a

15   journalist, the veteran comic asserted his Fifth Amendment

16   rights.  I, on the other hand, testified for four and a half

17   hours, under oath, explaining my comments."

18   Q.  Sir, had Roger Stone -- we just looked at the messages --

19   urged you to take the Fifth?

20   A.  Yes.

21   Q.  Let's move to the next paragraph.

22           Could you read that, please, sir?

23   A.  "Sadly, Credico, having dodged under-oath testimony in

24   front of the Congress, is now having amnesia regarding what

25   really transpired.  Perhaps the out-of-work comedian is

1    embarrassed that he was talking out of school prior to his

2    landing Assange as a big-get on his radio show."

3    Q.  Sir, how did it make you feel at the time when you read

4    this message -- this article?

5    A.  I don't remember the exact emotion.  Obviously, I was not

6    pleased with this.

7          MR. ZELINSKY:  Let's move to Exhibit 82.

8    BY MR. ZELINSKY:

9    Q.  In March of 2018, did you consider publicly proclaiming

10   what had happened?

11   A.  Yes.

12         MR. ZELINSKY:  If you could pull up -- enlarge the

13   first part there, Ms. Rohde.

14         Thank you.

15   BY MR. ZELINSKY:

16   Q.  What is the date of this email?

17   A.  March 10th.

18   Q.  And who is it from?

19   A.  Roger Stone.

20   Q.  And who is it to?

21   A.  To Randy Credico.

22   Q.  And what did Mr. Stone write?

23   A.  "If you go on with Chris Hayes, be sure to mention this."

24   Q.  Who is Chris Hayes?

25   A.  Chris Hayes is the host of MSNBC show, *All in with*

1    *Chris Hayes.*

2    Q.  At that time, were you considering going on Chris Hayes and

3    telling the truth about what had happened?

4    A.  I was considering doing Hayes.  I was considering doing

5    several shows, Erin Burnett and Ari Melber.

6              MR. ZELINSKY:  Let's look a little further down this

7    exhibit.

8              If you can enlarge it please, Ms. Rohde, the rest of

9    the text.

10   BY MR. ZELINSKY:

11   Q.  Sir, is this the message that you sent regarding trying to

12   get information related to Libya for Mr. Stone?

13   A.  Yes.

14   Q.  And did you send that email to Ms. Kunstler?

15   A.  Yes.

16   Q.  How did you interpret Roger Stone forwarding this message

17   to you regarding Ms. Kunstler?

18   A.  Well, a reminder that he had this email that had

19   Mrs. Kunstler involved in it.

20   Q.  At that time, were you still -- were you concerned about

21   Mr. Stone?

22   A.  Yes.

23   Q.  What -- let's move to Exhibit 84.

24   A.  Concerned about him doing this, yes.

25   Q.  Did you continue to speak with Mr. Stone?

1    A.  Yes.

2              MR. ZELINSKY:  Could we enlarge the message that

3    says -- yes, Ms. Rohde.  Perfect.

4    BY MR. ZELINSKY:

5    Q.  Do you see this email on March 10th, 2018?

6    A.  Yes.

7    Q.  Do you see where Mr. Stone writes, "I have no interest in

8    fighting with you.  Want to go to Sparks"?

9    A.  Yes.

10   Q.  What is Sparks?

11   A.  Sparks is a steak restaurant -- upper echelon steak

12   restaurant on the -- somewhere midtown.

13   Q.  During this time that you said you were frustrated with

14   Mr. Stone and unhappy with what he was doing, did you continue

15   to maintain contact with him?

16   A.  Yes.

17   Q.  Why did you maintain contact?

18   A.  You know, I certainly did -- I wanted to neutralize all of

19   this.  I did not want this to -- you know, I want to maintain

20   some kind of -- you know, this is 2018.  I really -- I didn't

21   want to escalate this.  But, at the same time, I knew I had to

22   talk about it.  And I was trying to keep him neutralized so he

23   would not go like that previous email that he sent regarding --

24   that Libya email.

25             MR. ZELINSKY:  Let's move to Exhibit 89.

```
 1    BY MR. ZELINSKY:

 2    Q.  Who is this email from?

 3    A.  From me.

 4    Q.  And when was it sent?

 5    A.  Wednesday, March 14th.

 6    Q.  And what is the subject line?

 7    A.  "I'm being misquoted."

 8    Q.  And who is it to?

 9    A.  To Roger.

10    Q.  And you see the last line of the email, that begins, "You"?

11    A.  Last line?

12    Q.  Yes, sir.  "You did not commit perjury"?

13    A.  Where am I?  "I told them that" -- that one there?

14    Q.  Yes.  If you keep reading.

15    A.  "I told them that you have plausible deniability, and I

16    told you that.  Check out the Tweets to confirm.  They totally

17    miss, on purpose, what I was trying to say.  You did not commit

18    perjury, and I can attest to that."

19    Q.  Is that -- at the time you sent that message, did you

20    believe it to be true, that Mr. Stone had not committed

21    perjury?

22    A.  No, I did not believe it was true.

23    Q.  Why did you send this message to Mr. Stone?

24    A.  Because I didn't want to be bombarded with, you know, a

25    bunch of negative stories and nasty text messages and email.  I
```

1    wanted to -- you know, I didn't want him to get upset.  You

2    know, look, I didn't want to be a victim of some kind of smear

3    job at that point.

4            So, when I said this, I told him, you know, "You have

5    plausible deniability," which he did.  He could say this.  He

6    could say that.  He could check out my -- I gave him an out.

7            MR. ZELINSKY:  Turning now to Exhibit 91.

8            If you could enlarge the message there, Ms. Rohde,

9    from where the text is, all the way down to "you should do."

10           No.  Where you were before, Ms. Rohde, please.

11           Thank you.

12   BY MR. ZELINSKY:

13   Q.  At that point, you mentioned earlier that you were

14   considering doing an interview to set the record straight with

15   someone named Erin Burnett; is that right?

16   A.  Yes.

17   Q.  Who is Erin Burnett?

18   A.  Erin Burnett is the host of *Out Front with Erin Burnett*,

19   7 o'clock, Monday through Friday, on CNN.

20   Q.  And what, on March 18th, 2018, all the way at the bottom,

21   did Mr. Stone tell you you should do on Erin Burnett?

22   A.  Frank Pentangeli.

23           MR. ZELINSKY:  Moving now, to Exhibit 93.

24   BY MR. ZELINSKY:

25   Q.  Five days later, on March 23rd, 2018, what did Mr. Stone

1   tell you you should do?

2   A.  "Very good.  Use Pantangela" -- Pentangeli.

3   Q.  Did you continue to be concerned about Mr. Stone during

4   this time?

5   A.  I did not want to rile Mr. Stone.

6           MR. ZELINSKY:  Moving to Exhibit 112.

7   BY MR. ZELINSKY:

8   Q.  Did Mr. Stone send you an email on April 9th, 2018?

9   A.  Yes.

10  Q.  And do you see the part there that begins, "You are a rat"?

11  A.  Yes.

12  Q.  And could you read that?  Begin reading there, please, sir.

13  A.  "You are a rat.  A stoolie.  You backstab your friends, run

14  your mouth.  My lawyers are dying to rip you to shreds.  I'm

15  going to take that dog away from you.  Not a frigging [sic]

16  thing you can do about it either, because you are a weak, broke

17  piece of S-H-I-T.  I will prove to the world you're a liar."

18  Q.  At that time were you angry, as you said before, with

19  Mr. Stone?

20  A.  Yes.

21  Q.  And about the position he'd put you in?

22  A.  Yes.

23  Q.  There's a reference there, sir, to a dog, "I'm going to

24  take that dog away from you."

25  A.  Yes.

1    Q.  Do you see that?

2    A.  Yes.

3    Q.  Do you have a dog?

4    A.  Yes.

5    Q.  And are you close to the dog?

6    A.  Yes.

7    Q.  And do you have any other family or anything besides the

8    dog?

9    A.  I have no wife and no kids.

10   Q.  Did Mr. --

11   A.  I have a sister, a sister that's still alive.

12   Q.  Did Mr. Stone know what the dog meant to you?

13   A.  Well, people -- I'm sure -- I'm sure he did.  I'm -- you

14   know --

15   Q.  To your knowledge?

16   A.  I was with the dog for the -- I'd been around the dog for

17   the previous 12 years.  I had the dog since 2006, January of

18   2006.

19            MR. ZELINSKY:  Moving to Exhibit 121.

20   BY MR. ZELINSKY:

21   Q.  In this time period, did you continue to discuss these

22   matters with Mr. Stone?

23   A.  Yes.

24   Q.  And did Mr. Stone continue to discuss Ms. Kunstler with

25   you?

```
1    A.  Yes.

2              MR. ZELINSKY:  Moving to Exhibit 125.

3    BY MR. ZELINSKY:

4    Q.  What did you write to Mr. Stone on May 21st, 2018?

5    A.  "Go right ahead.  She's not Assange's lawyer."

6    Q.  I'm sorry.  Below that.  Let's start at the first message,

7    "You should have."  All the way at the bottom.

8    A.  Where?  Where am I?  Here, "You should have."

9              "You should have just been honest with the House

10   Intel Committee.  You've opened yourself up to perjury charges

11   like an idiot.  You have different versions.  Maybe you need to

12   get into rehab and get that memory straight."

13   Q.  What did Mr. Stone respond?

14   A.  I don't see it here.

15   Q.  Just above that, do you see --

16   A.  Oh, yes.  "You are so full of S-H-I-T.  You got nothing.

17   Keep running your mouth and I'll file a bar complaint against

18   your friend Margaret."

19   Q.  And when he says "your friend Margaret," who is he

20   referring to?

21   A.  Margaret Ratner Kunstler.

22   Q.  Had you put Mr. Stone directly in touch with Ms. Kunstler

23   after the election?

24   A.  Yes, I did.

25   Q.  And why had you done that?
```

1   A.  Well, sometime after the election, he wanted me to contact

2   Mrs. Kunstler.  He called me up and said that he had spoken to

3   Judge Napolitano about getting Julian Assange a pardon and

4   needed to talk to Mrs. Kunstler about it.  So I said, Okay.

5   And I sat on it.  And I told her -- I told her -- she didn't

6   act on it.  And then, eventually, she did, and they had a

7   conversation.

8   Q.  And at this time period, in May of 2018, how did you feel

9   about having put Ms. Kunstler directly in touch with Mr. Stone?

10  A.  I was -- I was ashamed of myself that I had done that.  I

11  should have never done that, you know.  I don't blame him; I

12  blame me for doing that.

13  Q.  For the remainder of 2018, did you continue to be concerned

14  about Mr. Stone?

15  A.  Remainder of 2018?

16  Q.  Yes, sir.

17  A.  Well, yes, I did.

18  Q.  Why were you concerned about Mr. Stone?

19  A.  Well, this is it, right here.  This is the crux of it, is

20  bringing Margaret into this, Mrs. Kunstler into it.  That was

21  the crux of it.

22  Q.  Were you also concerned that he would make you his patsy

23  again?

24  A.  That already happened.  I was the patsy at that point.

25          MR. ZELINSKY:  Moving, now, to government's

1    demonstrative exhibit only, 204.

2    BY MR. ZELINSKY:

3    Q.  Sir, do you see the first line of that exhibit?  Could you

4    read the highlighted section?

5    A.  "You had one before that you referred to."

6    Q.  And that is sent on September 18th, 2016; is that right?

7    A.  Yes.

8    Q.  Could you read the next highlighted --

9    A.  Wait.  September 18, 2016, yes.

10   Q.  Can you read the next highlighted section, please, sir?

11   A.  "And, by the way, your friend did not have a meeting with

12   Julian Assange.  That's a complete lie."

13   Q.  That was sent on October 3rd, 2016; is that right?

14   A.  Yes.

15   Q.  Did you also send a message that's highlighted on

16   January 6, 2017?

17   A.  January 6, yes.

18   Q.  What did it say?

19   A.  "There's a guy -- there's the guy you were talking about

20   early August."

21   Q.  And one year later, on January 11, 2018, what did you tell

22   Mr. Stone?

23   A.  January 11 -- I don't see anything here.

24   Q.  It's highlighted there on the bottom there, sir.

25   A.  Oh.  "Maybe your back channel knows more than I do."

1    Q.  Sir, were any of these messages supposed to be a reference

2    to yourself?

3    A.  No.

4              MR. ZELINSKY:  That's all.

5              Thank you, Your Honor.

6              THE COURT:  All right.  Why don't we take our

7    mid-morning break before we begin any cross-examination.

8              I'm going to caution the jurors not to talk about the

9    case with each other or with anyone else, and we'll resume at

10   approximately 10 after 11.

11             (Jurors leave the courtroom.)

12             THE COURT:  The witness and everyone is excused, and

13   we'll resume, beginning with the defense asking Mr. Credico

14   questions after the break, at 10 after 11.

15             (Recess.)

16             THE COURTROOM DEPUTY:  Your Honor, recalling Criminal

17   Case Number 19-18, *United States of America v. Roger Stone*.

18             THE COURT:  All right.  Can we bring the jury in?

19             (Jurors enter the courtroom.)

20             THE COURT:  All right.  Mr. Buschel, you can proceed.

21             MR. BUSCHEL:  Thank you, Judge.

22             May it please the Court.

23                          CROSS-EXAMINATION

24   BY MR. BUSCHEL:

25   Q.  Good morning.

1    A.  Good morning, sir.

2    Q.  Good morning.

3            To be clear, Mr. Credico, you did not deliver any

4    messages from Julian Assange to Roger Stone?

5    A.  No.

6    Q.  Correct?

7    A.  Yeah, you're correct, sir.

8    Q.  And, likewise, you did not deliver any messages from

9    Roger Stone to Julian Assange, true?

10   A.  Exactly.

11   Q.  You were not an intermediary between -- to or for WikiLeaks

12   and Roger Stone?

13   A.  Exactly.

14   Q.  Even though you led, in all fairness, Roger Stone to

15   believe that you were one?

16   A.  I disagree.

17   Q.  Fair enough.  We'll go through some items together.

18            You will agree with me, though, that you have, in the

19   past, lied to Roger Stone?

20   A.  Yes.

21   Q.  In fact, you went through some of those lies during your

22   direct examination, didn't you?

23   A.  Probably.

24   Q.  Do you recall that you did this morning?

25   A.  You'll have to show me the individual lies.

1    Q.  But you know that you have?

2    A.  Over the years or specifically?

3    Q.  From this morning.  Just from this morning.

4    A.  From this morning?  Did I lie to the prosecutors this

5    morning?

6    Q.  No.  No.  That there are lies to Roger Stone that the

7    prosecutors have identified.

8    A.  There were exaggerations.  There were lies.  There were

9    rebuffs, yes.

10   Q.  Fair enough.  Let's start with your relationship with

11   Roger Stone.

12            It began in 2002, didn't it?

13   A.  Yes.

14   Q.  You met him while you were working for the William Moses

15   Kunstler Fund for Racial Justice, true?

16   A.  Yes.

17   Q.  New York Mothers for the Disappeared, an activist

18   organization, correct?

19   A.  The Kunstler Fund was the organization, and the subset was

20   the Mothers of the New York Disappeared.

21   Q.  And you sought to have the Rockefeller laws repealed?

22   A.  Yes, I did.

23   Q.  Those were drug laws?

24   A.  Those were the drug laws in New York state, yes.

25   Q.  You felt they were oppressive drug laws?

1   A.  They're racist, draconian, and repressive.

2   Q.  And Roger Stone helped you with that?

3   A.  Roger Stone enlisted me with the Golisano campaign.  And

4   they used that as a campaign issue.  Put a lot of money into

5   it.  And I was very grateful for that work.

6   Q.  In 2004 you and he worked on Al Sharpton's presidential

7   campaign, true?

8   A.  No, not really true.  I introduced him to Al Sharpton, but

9   I did no work -- you know, I was supposed to work on the

10  Al Sharpton campaign, but he took it over.

11  Q.  So, you introduced him, and he helped Al Sharpton, correct?

12  A.  He took over the campaign.

13  Q.  Fair enough.  You two have a relationship based on that you

14  both like impressions, correct?

15  A.  Yes.  He is a big fan of John Byner.

16  Q.  Okay.  And you have a like of -- a mutual like of smoking

17  cigars?

18  A.  Cigars and -- I know where you're going to go next --

19  martinis, yes.

20  Q.  But we got to be -- you're careful of that now.

21  A.  Right.

22  Q.  As you testified, correct?

23  A.  I would love to have one, but, I can't.

24  Q.  Okay.  Fair enough.

25          And we'll get into this, but in 2007 was this

1   voicemail message to Mr. Spitzer's -- Governor Spitzer's father

2   that was referenced, correct?

3   A.  Yes.

4   Q.  That was 12 years ago, correct?

5   A.  It was sometime September, October, 2007, yes.

6   Q.  And 19 minus 7; 12?

7   A.  12 years ago, yes.

8   Q.  Good.  In 2008, Roger Stone recruited you to do some

9   voiceover work for a Broward Sheriff's Office race in Broward

10  County, Florida?

11  A.  Yes.

12  Q.  You did that work, didn't you?

13  A.  Yes.

14  Q.  And you got paid for that work?

15  A.  Yes.

16  Q.  In 2012 he asked you to participate in another Broward

17  County Sheriff's race, correct?

18  A.  No, he didn't.  He did not.  I did do it, thinking I was

19  working against him, but I ended up working with him.  I was

20  inveigled into that one.

21          Would you like me to explain?

22  Q.  Not really.

23  A.  Okay.

24  Q.  Let's continue.

25          In 2016, you would frequently have Roger Stone on

1    your show, true?

2    A.  Yes.

3    Q.  And overall, before your testimony today, you had been

4    interviewed many times by the FBI and the Special Counsel's

5    Office?

6    A.  Over the last couple -- let me see.  First time, the FBI,

7    was last year.  Wait a second.  What -- let me see.  2018,

8    towards the end, yes.

9    Q.  So, many times?

10   A.  Not many times.

11   Q.  More than once?

12   A.  I can count -- the FBI or the Mueller investigation

13   investigators?  Which one do you want?

14   Q.  Let's do them collectively.

15   A.  Okay.  So, I can tell you that I was interviewed one time

16   before I testified before the grand jury, another time -- a

17   few in October of 2018, and then, again, December 6th of 2018.

18   Q.  You hired lawyers to give you advice throughout this entire

19   process, haven't you?

20   A.  I haven't paid them, but I've hired them.

21   Q.  You have lawyers working for you?

22   A.  Yes.

23   Q.  They gave you advice throughout this entire process?

24   A.  Yes.

25   Q.  Practiced and prepared with them and with the government,

1    true?

2    A.  With my lawyers, did I practice and prepare?

3           MR. ZELINSKY:  Objection.

4    A.  No.

5           THE COURT:  I think he can answer the question if he

6    prepared.

7    A.  Yes, I prepared for this day prior.  Yes.

8    BY MR. BUSCHEL:

9    Q.  Your relationship with Roger Stone throughout the years,

10   not just what happened this morning, is, is you have lied to

11   him throughout the years?

12   A.  Throughout the years?

13   Q.  Yes.

14   A.  Throughout the years?

15   Q.  Yes, since 2002.

16   A.  Well, give me some instances and I'll tell you if they're

17   lies.  Okay?  I can tell --

18   Q.  Since 2002.

19   A.  Since 2002?  You really want to go into that, about lies?

20          We can go into lies.  We can start in 2002, if you

21   want, sir.

22          THE COURT:  All right.  I think you need to ask

23   focused questions.  So, ask a specific question and let him

24   answer it.

25          MR. BUSCHEL:  Very good.  Yes, Judge.

1    BY MR. BUSCHEL:

2    Q.  You originally testified to the Special Counsel's Office,

3    on August 29th interview, that you did not speak to

4    Julian Assange -- about Julian Assange with Roger Stone until

5    in or around September of 2016.

6    A.  Any conversation over the phone, yes.  I sent him a text

7    message prior to that, but there was no conversation.  I didn't

8    get a text message back.

9    Q.  So when they asked you that, that was confusing to you?

10   A.  I had not seen my -- well, because there was no

11   conversation.  I distinctly remember the conversation on

12   September 9th, when he wanted Julian Assange on his radio show.

13   And that's what I remember.  That was the first conversation

14   that we had about it.  But, he had -- I sent him a text message

15   saying that I had Assange on my show the following week, but

16   there was no response to it.

17           So, it wasn't a conversation.  And I didn't see those

18   emails until December 6, 2018.

19   Q.  So --

20   A.  Or text messages.

21   Q.  Without those emails, without --

22   A.  Text messages.

23   Q.  -- those texts, your testimony was incorrect?

24   A.  On that particular -- well, it depends.  You want to split

25   hairs on what a conversation is?  A conversation is a

1    conversation.  A text message was not a conversation.  On

2    August 19th, I forgot that I sent him a text message -- which I

3    did to a lot of other people, too -- that Assange was going to

4    be on my show the following week.

5              So, the first conversation that we had, correctly, I

6    identified that on September 9, 2016, when he got me

7    Gary Johnson on the phone, and he wanted something in

8    reciprocation.

9              And I said, Yeah, what do you want?

10             He wanted Julian Assange, and I said I would look

11   into it.  So, that was the conversation that we had about

12   Julian Assange.  Everything else was a one-way, braggadocio

13   thing, that I was going to have Assange on my show, which I

14   also sent to --

15   Q.  Mr. Credico --

16   A.  Yes?

17   Q.  -- let me ask you another question.

18   A.  All right.  Well, just wanted to straighten that out.  All

19   right.

20   Q.  You have a Twitter account, which is a form of social

21   media, correct?

22   A.  Yes.

23   Q.  It's @Credico2016?

24   A.  There's two of them.

25   Q.  One of them is @Credico2016?

1     A.  Yes.  Yes.

2     Q.  And do you remember the first time that you Tweeted about

3     Assange?

4     A.  Well, it was pointed out to me by Jeremy Scahill.  I think

5     it was sometime in June, yes.

6     Q.  June of 2016?

7     A.  Yes.

8     Q.  And is it true that you disseminated "Assange to drop

9     coup de grâce hammer on career criminal Clinton"?

10    A.  Yes, probably.  I mean, I don't know exactly what I said,

11    but I did send some stuff out.

12              By the way, I was blocked at that time, by Mr. Stone,

13    on Twitter.

14    Q.  So you're saying he didn't read it?

15    A.  He could have read it.  A million different ways he could

16    have read it.  But, I don't -- you know, I'm telling you --

17    Q.  Usually, on Twitter -- if I may --

18    A.  Yeah, you can find it.  Listen, I know people got 50

19    Twitter accounts.

20    Q.  If -- let me --

21    A.  You can block one specific person, but you can't block all

22    50 accounts.

23    Q.  Do you -- do you --

24              THE COURT:  All right.  Let me just say one thing.

25    The person with the most difficult job in this courtroom is the

1    court reporter.

2                 THE WITNESS:  Yes, I know.

3                 THE COURT:  She has to type what he's asking and what

4    you're saying.

5                 THE WITNESS:  I'm sorry.

6                 THE COURT:  So, it would help if you didn't start to

7    re-ask the question while he's still talking.

8                 And it would help if you waited until he finished

9    asking before you answer, so that she can do her job.  All

10   right.

11                THE WITNESS:  Okay.  I'm sorry.  I apologize.

12   BY MR. BUSCHEL:

13   Q.  It is true that a Twitter user cannot see who has blocked

14   that person, correct?

15   A.  Right.

16   Q.  You also, on July 22nd, 2016, Tweeted about WikiLeaks,

17   didn't you?

18   A.  I would have to look at the Tweet.  Do you have it?

19   Q.  Just not --

20   A.  I'm going to take your word for it.  If it's Credico2016, I

21   probably Tweeted about WikiLeaks because something probably

22   came out that day.

23                MR. BUSCHEL:  Not for the jury.

24   BY MR. BUSCHEL:

25   Q.  Let me ask you to look at --

1    THE COURT:  So you're just showing it to refresh his

2    recollection?

3        MR. BUSCHEL:  Yes, ma'am.

4        THE COURT:  So it's not in evidence yet?

5        MR. BUSCHEL:  It's not.

6        THE COURT:  So only the witness is looking at it.

7        THE WITNESS:  July 22nd.  I know Luis Miranda --

8        THE COURT:  Don't read it.  Just read it to yourself.

9        THE WITNESS:  Oh.

10   BY MR. BUSCHEL:

11   Q.  Do you see it, Mr. Credico?

12   A.  Yes.

13   Q.  Does this fairly refresh your memory --

14   A.  Oh, yes.  I remember that.

15       THE COURT:  What was the question?  The question

16   was --

17       THE WITNESS:  Yes, what was the question?

18       THE COURT:  -- did you Tweet about WikiLeaks on July

19   2016?

20       MR. BUSCHEL:  Yes.

21       THE COURT:  All right.  So?

22       THE WITNESS:  Yes, I remember that.

23   BY MR. BUSCHEL:

24   Q.  And --

25       THE COURT:  Did you say anything substantive about --

1          THE WITNESS:  No.  All I said was something about

2     Luis Miranda.  I had the wrong Miranda down, by the way.  It

3     was corrected.  It wasn't the Miranda I was thinking of.  That

4     Gerson Borrero of NY1 corrected me.  It was the wrong --

5     whatever I was doing there.

6          THE COURT:  You used the word "WikiLeaks" in a Tweet.

7          THE WITNESS:  Yes.

8          THE COURT:  All right.

9          THE WITNESS:  At the very end --

10          THE COURT:  And what's the next question?

11          THE WITNESS:  -- I said, Thank you, WikiLeaks for

12     whatever they said about Miranda.

13     BY MR. BUSCHEL:

14     Q.  And two days later, on July 24th, 2016, you talk about

15     Mr. Assange, correct?

16     A.  Let me see it.

17          Oh, yeah.  Yeah, I'm forwarding Assange there.

18     That's all.

19     Q.  So you're re-Tweeting what Mr. Assange was putting out?

20     A.  Yes.

21     Q.  Okay.  And that was during the time period of the

22     Democratic National Convention?

23     A.  Yes.  Yes.

24     Q.  Margaret Kunstler is one of WikiLeaks's lawyers?

25     A.  You'll let -- she's going to have to describe her role as

744

1    a -- what her role is with WikiLeaks.  You know, I don't -- he

2    has -- Julian Assange has about 1,000 lawyers.  You know,

3    Michael Ratner was one of his lawyers.  Alan Dershowitz was one

4    of his lawyers.

5    Q.  Thank you.

6    A.  There are a lot of lawyers.  All right?  But, that -- you

7    know, who's a lawyer --

8              THE COURT:  The question is, do you know --

9              THE WITNESS:  I don't consider --

10             THE COURT:  -- do you have personal --

11             THE WITNESS:  -- her to be his lawyer.  I consider

12   her to be -- to know people, be part of a team.

13   BY MR. BUSCHEL:

14   Q.  That was --

15   A.  Yes.

16   Q.  -- giving legal advice to WikiLeaks?

17   A.  I don't know if they gave to WikiLeaks or somebody else.  I

18   think it was somebody else, Sarah Harrison, maybe, but not -- I

19   don't think she was giving legal advice.

20             She wrote op-ed pieces in *Newsweek*.  And the legal

21   advice where?  Where would the legal advice be?  She was not

22   the representative in the U.S. against -- with the Justice

23   Department here.  So, I don't know -- I don't -- I really

24   didn't consider her to be the lawyer or even one of the

25   lawyers; just someone that was in that circle.

1   Q.  But you knew she was communicating with people that were --

2   A.  Yes.  Yes.

3   Q.  -- at WikiLeaks?

4   A.  Yes.  That's how I got Julian Assange on my show on August

5   19th.

6   Q.  And you bragged about that?

7   A.  Yes.  It was a big deal.

8   Q.  And you bragged about that relationship with

9   Ms. Kunstler --

10  A.  Did I brag about the relationship?  I just said that that

11  was how I was able to get -- did I brag that she's a friend of

12  mine?  Yes.  Did I brag that she helped me get -- was that

13  really bragging?  That was my way of getting him on the show.

14  Q.  She was a lawyer for you at some point during these

15  proceedings, correct?

16  A.  I don't know if she was -- she gave me advice.  Lawyers

17  that I had is right over there.  And there were some other

18  people that gave me advice.  There was nobody that I had on a

19  retainer except for Marty Stolar, who's in the courtroom.  That

20  was it.

21  Q.  You told Mr. Stone that you know things about WikiLeaks

22  because you are best friends with Assange's lawyer.  Let's

23  leave it at that.

24  A.  Is that exactly what I said?  Is that the exact words?

25  Is that the exact wording?  It's not the exact wording of

```
 1    Twitter.

 2    Q.  You went over it this morning --

 3              THE COURT:  Now, look, if you want to confront him

 4    with something, you can put it on the screen.

 5              THE WITNESS:  Right.

 6              You're paraphrasing.  Why don't you just give it to

 7    me directly?

 8              THE COURT:  You can ask him if he said that.  But, if

 9    he doesn't know, then you can't -- you have to either show it

10    to him -- but, you can't testify about what he said this

11    morning.

12    BY MR. BUSCHEL:

13    Q.  Was that accurate?  Do you remember that?

14    A.  Could you just show me exactly?  Because it's not the way

15    you are paraphrasing it.

16    Q.  Just in general, did you imply --

17    A.  No.  You have to show it to me because you're phrasing.

18              THE COURT:  All right.  You don't get to argue --

19              THE WITNESS:  Oh, I'm sorry.

20              THE COURT:  -- with the lawyer or object to his

21    questions.

22              THE WITNESS:  All right.  Is that it, then?  I would

23    have to see it.

24              THE COURT:  Did you say something to the effect of --

25              What's your question?
```

1    BY MR. BUSCHEL:

2    Q.  Did you say something to the effect of that you are best

3    friends with Julian Assange's lawyer, to Roger Stone?

4    A.  That would be some -- you know, you're in the ballpark,

5    yes.

6    Q.  And Julian Assange is the founder of WikiLeaks?

7    A.  Yes.

8    Q.  He is the leader of WikiLeaks?

9    A.  The leader?  He is the publisher of WikiLeaks.

10   Q.  And in reality, you say that you did not have any

11   communication with Julian Assange until your radio show?

12   A.  August 25th, that day -- or, wait -- August 25th, on my

13   radio show, had no communication and nothing until six months

14   later.

15   Q.  But you told Roger Stone you spoke to Assange prior to the

16   radio show, didn't you?

17   A.  No, I didn't.  Where did I say that?  Prior to my

18   August 25th, that I spoke to Assange?

19   Q.  Well, you wanted to --

20   A.  I had him on my radio show.  That was the only time that I

21   had him on.  And I let him know that he was on my show on

22   September 9th, when I told him that Assange was going -- was on

23   my show.

24   Q.  You wanted to believe -- you wanted Roger Stone to believe

25   that you had an in with WikiLeaks and Julian Assange, didn't

1    you?

2    A.  I was one-upping him because he had a back channel to

3    Julian Assange, or he's communicated with Julian Assange.  And

4    so I was -- I had my own Julian Assange connection.

5    Q.  You were attempting to fool him, weren't you?

6    A.  Not -- was I trying to fool him?  No.  I was -- I was

7    one-upping him; I did have Assange coming on my show.

8    Q.  Do you remember going to National Press Club Correspondents

9    Dinner in April of 2018?

10   A.  Yes, I do.

11   Q.  Do you remember standing outside of that theater?

12   A.  Yes, I do.

13   Q.  And the National Press Club Correspondents Dinner is a

14   yearly event, isn't it?

15   A.  Yes.  I got kicked out of that event.

16   Q.  It is a yearly event with the press and politicians in

17   Washington, D.C., isn't it?

18   A.  Yes.  Everybody's is there.  It's a huge gathering.  I was

19   doing something for Jimmy Dore's radio show.

20   Q.  And you were doing the radio show outside of --

21   A.  Everywhere there --

22   Q.  -- outside of the correspondents' dinner?

23   A.  I was going everywhere there, wearing, inside of my tuxedo

24   pocket, a cell phone, and interviewing people for Jimmy Dore's

25   radio show.

1   Q.  And you were introducing yourself to those people as

2   Roger Stone's back channel, weren't you?

3   A.  With a wink.  I introduced one person there.  First of all,

4   I spoke to Nancy Pelosi.  And I spoke to a bunch of others in

5   the -- what room was it -- the Yahoo newsroom, telling them

6   just the opposite.

7           When I was outside trying to get Tom Steyer's

8   attention, I said I'm -- you know, he didn't know who I was.

9   So, I'm trying to get him to interview with me.  And I'm the

10  guy -- because nobody could figure out why I was even there,

11  except for I was the guy that was elevated in the news because

12  of this false claim, that I was Julian Assange's connection to

13  Roger Stone.  So, that's how I introduced myself to Tom Steyer,

14  to get him to say something on the show.

15  Q.  And you perpetuated that false claim, didn't you?

16  A.  Throughout that -- no.  I told a whole bunch of people.  I

17  was up there with Nancy Pelosi and Adam Schiff, explaining that

18  I wasn't.  And the -- John Kasich was there, telling him that I

19  wasn't, and a whole bunch of others, that I wasn't the back

20  channel.

21          What you got was just a little excerpt that -- if you

22  watch the entire Jimmy Dore show, you will see that I told

23  everybody that I wasn't the back channel.  But, a few people, I

24  did.  But, it was with a wink and a nod, I am Roger Stone's

25  back channel.  You know, one of those things.

1    Q.  Did you wink?

2    A.  I didn't probably wink, but you don't have to wink.  You

3    can tell them Roger Stone -- or, do a -- you know, you got to

4    see it.  He's got the whole video.  Maybe he'll give you the

5    entire video of it, and you will see the entire video.  And a

6    lot of it he put away and didn't put on the channel.

7    Q.  On August 27th, 2016, you sent a text message to

8    Roger Stone saying, Julian Assange has kryptonite on Hillary.

9    A.  Right.

10   Q.  Do you recall that?

11   A.  Yes, I do.  I believe that he did.

12   Q.  And Trump is the Silky Sullivan of this race?

13   A.  Yes.

14   Q.  The purpose -- you realize that when you did that -- or,

15   your purpose was to convince Roger Stone that Julian Assange

16   has kryptonite, has information on Hillary?

17   A.  I'm going by public statements by Julian Assange that he

18   was going to come out with something.  That was just a

19   matter-of-fact conversation -- or, text message.  I'm not even

20   sure he responded to that, that -- when you're watching this,

21   I'm -- I am a spectator -- which I thought Mr. Stone was -- a

22   spectator in all of this.  I'm not a participant; I'm a

23   spectator, watching Assange.

24   Q.  A spectator --

25   A.  A spectator, watching everything that's going on around me.

1    Q.  A spectator that -- in 2016, at some point, you lived with

2    Margaret Kunstler, didn't you?

3    A.  Did I live with her?  I was living with -- on 36th Street.

4    Q.  Is that where she lives?

5    A.  No.

6              THE COURT:  All right.  You don't need to say where

7    someone lives.

8              MR. BUSCHEL:  No, not at all.  I was --

9              THE WITNESS:  No.  No.  No.  I was living --

10             THE COURT:  No.  Just stop.

11             THE WITNESS:  No.  I --

12             THE COURT:  Mr. Credico --

13             THE WITNESS:  I'm sorry.

14             THE COURT:  -- we're not telling where witnesses

15   live --

16             THE WITNESS:  Right.

17             THE COURT:  -- in this case.  That is personal

18   information.

19             MR. BUSCHEL:  I apologize, Judge.

20             THE COURT:  That's fine.  Just, you don't need to

21   tell her address or yours.

22             THE WITNESS:  I'm not even going to say anything

23   about that.

24   BY MR. BUSCHEL:

25   Q.  Simply just answer this question:  Did you live in her

1   apartment in New York City at some point in 2016?

2   A.  Did I stay there for a little bit?  Yes.  I was also

3   spending that time on the West Coast, working on a television

4   show for Nickelodeon.  And I was also watching Professor

5   Irwin Corey, who was dying of cancer --

6   Q.  Mr. Credico --

7   A.  -- for most of that year.  So I was moving around a lot.

8   Q.  Mr. Credico, do --

9   A.  Yes?

10  Q.  -- you remember my question I just asked you?

11  A.  Yes.  Yes.

12  Q.  You've also described that at a time, that you had lunch

13  with Julian Assange.

14  A.  Yes, I have.

15  Q.  And you've --

16  A.  2017.

17  Q.  Okay.  And you've bragged about that?

18  A.  I had lunch with Julian Assange in 2017.  I brought food in

19  from Harrods, when I was there covering the legal proceedings.

20  Q.  Mr. Credico, do you remember my question?

21  A.  Where did I brag about having lunch with Julian Assange?

22  Just show me the -- please, show me the --

23  Q.  Did you tell Roger Stone --

24  A.  Can you show me where I said that?

25                  THE COURT:  All right.  He now has asked you another

```
1    question.  Did you tell Roger --
2    BY MR. BUSCHEL:
3    Q.  Did you tell Roger Stone you had lunch with Julian Assange?
4    A.  I could have.
5    Q.  And when you say you had lunch with Julian Assange --
6    A.  2017, you're talking about?
7    Q.  Whenever it was.
8    A.  Well, you got to show me the date, please.
9            THE COURT:  Finish your question.  You said when you
10   had it, you --
11   BY MR. BUSCHEL:
12   Q.  When you had lunch with Julian Assange, was it just you and
13   he?
14   A.  I had lunch inside of the embassy, when I took food over
15   from Harrods.  That was the lunch that I had in 2017.
16   Q.  Was it just you and he?
17   A.  Yes.
18   Q.  There was no one else in the room?
19   A.  Me and Assange in the embassy in London, yes.
20   Q.  And you probably told Roger Stone that you had done that?
21   A.  Could have.  You've got to show me the text message.
22   Q.  And your goal was never, it is your testimony --
23   A.  This was 2017.  This is a year after the election.
24   Q.  I understand.  And your testimony to this Court is, you
25   never meant to imply to Roger Stone you had some type of
```

```
 1    special relationship with Julian Assange?

 2    A.  You're talking about a year after the election, not --

 3    Q.  Ever, sir?

 4    A.  We're talking about the year of the election.  I had no

 5    special relationship.  I did a year later.  So, it was

 6    irrelevant to bring that up.

 7    Q.  Do you recall when Mr. Stone testified and --

 8    A.  Yes, I recall when he voluntarily testified and read a

 9    47-page statement.

10    Q.  Okay.  And that was in 2017, correct?

11    A.  Yes.

12              MR. BUSCHEL:  Government's Exhibit 48, please, on

13    page 2.

14              Whoa, right there.

15              Thank you.

16              Yes.  "It's part of the agenda."

17    BY MR. BUSCHEL:

18    Q.  Do you remember this text --

19    A.  Yes, I do.

20    Q.  -- Mr. Credico?

21    A.  Yes.  Didn't I see this yesterday?  Yes.

22    Q.  Yes, you did.

23    A.  Yes.

24    Q.  And where it says "It's part of the agenda," you were

25    telling Roger Stone, in September 2016, that it was part of
```

1    your agenda to see Julian Assange, wasn't it?

2    A.  It was part of my agenda to -- he was still holding over my

3    head this thing about Gary Johnson reciprocation.  He wanted me

4    to get Assange on, and he wanted me to show them the Dr. Paul

5    thing.  So, I said, "It's part of my agenda."  Yes, I would do

6    that as a reciprocation for the Gary Johnson.

7    Q.  And is your testimony to this Court that you did not mean

8    to imply to Mr. Stone that you had a special relationship or

9    you are planning to meet with Mr. Credico in London in the

10   Ecuadorian --

11   A.  With Mr. Assange, yes.

12   Q.  -- embassy?

13             Mr. Assange.

14   A.  Yes.  Yes.  Well, yes.  I was going.  And I was planning to

15   give the letter and, hopefully, see him and get him on my

16   radio -- or, start a radio show.  When I was going to see

17   Barry Crimmins, yes.

18             MR. BUSCHEL:  Government's 51.

19   A.  You see this stuff about Dr. Paul?  That was part of the

20   agenda, was to get him.  But, that never happened.

21             MR. BUSCHEL:  Right there, please.

22   BY MR. BUSCHEL:

23   Q.  And during that time period, you -- during September 19th,

24   2016, you wrote to Roger Stone that, "That batch probably

25   coming out in the next drop.  I can't ask them for favors every

1    other day."

2    A.  Yes.

3    Q.  You are telling Roger Stone that there are more

4    publications of WikiLeaks coming?

5    A.  I said, "That batch is probably coming out."

6            I said I was a spectator at that particular point.

7    I'm speculating that they are coming out.  He wanted this stuff

8    on Dr. Paul.  He was upset that I had not -- not upset, but he

9    wanted me to do something in reciprocation.  This is what it

10   was at that point.

11   Q.  Mr. Credico, all I asked you is if that's what the e-mail

12   said.

13   A.  Yes, it does.  "I can't ask," yes.

14   Q.  You are implying -- by saying, "I can't ask them for favors

15   every other day," you are implying that you had the ability to

16   ask for favors from Julian Assange, aren't you?

17   A.  I could not ask him.  Whatever you want to say, sir.  If

18   that's how you interpret it, that's fine.  I know how I

19   interpret it.  I was asking them to get Assange back on my show

20   every day, and I didn't get him back on for six months.  Those

21   were the favors I was trying to get for myself.

22   Q.  "I asked one of his lawyers.  They have major legal

23   headaches" --

24   A.  Yes.

25   Q.  I don't know what Rggi -- "right now.  Relax."

1    A.  I just wanted to rebuff him.  He was pounding me with this

2    stuff here.  I'm trying to neutralize it.  Can you read that

3    and see for yourself?

4    Q.  When he's "pounding" you, sir, he sent you an e-mail,

5    right?

6    A.  Yeah.  Well --

7    Q.  Mr. Stone lives in Florida, right?  You know that?

8    A.  Does he live in Florida?  He lives in Florida.  He lives in

9    New York, you know, that time, yes.

10   Q.  He sent you an e-mail?

11   A.  Yes.

12   Q.  "One of his lawyers."

13              You're referring to Margaret Kunstler, aren't you?

14   A.  Probably.  This is the one that I forwarded, right, to

15   Margaret Kunstler.  I could have forwarded that to the person I

16   already knew in London, but I didn't.  I gave it to her just to

17   satisfy him and get him off my back.

18   Q.  You did not -- speaking of that e-mail that you're

19   referring to about Libya, you really -- you didn't really

20   expect Ms. Kunstler to receive that e-mail, did you?

21   A.  To receive it?  I just sent it to her AOL address.

22   Q.  Which you knew she didn't read?

23   A.  Probably not.

24   Q.  And you told --

25   A.  Could have.

1   Q.  -- the government that when they asked you for those

2   emails?

3   A.  I do not remember if I -- AOL is not her main -- she has

4   three or four accounts.  That would not be her main account.

5   So, that was my way of, Here, I gave it, and get off my back

6   with this Libya stuff and Dr. Paul.

7   Q.  Do you see the -- see the document I put in front of you,

8   Mr. Credico?

9   A.  Yes.

10  Q.  I'll ask you to read this portion here (indicating).

11          Does this refresh your recollection about your motive

12  or what you did?  You sent it to an e-mail address that

13  Ms. Kunstler --

14          THE COURT:  I believe he testified to that, that he

15  knew it wasn't her main account, and it was a way to tell --

16  you can take it off the screen for a second -- to tell

17  Mr. Stone he had and get him off his back.  So, he answered

18  your question "yes."

19          MR. BUSCHEL:  Government 58, please.

20  BY MR. BUSCHEL:

21  Q.  Do you see yourself in government -- I'm sorry.

22          THE COURTROOM DEPUTY:  Give me a thumbs up when it

23  comes on.

24          THE JURORS:  (Thumbs up.)

25  A.  Yes, I've seen it.  Yes.

1    BY MR. BUSCHEL:

2    Q.  That is you in front of the Ecuadorian embassy in London,

3    correct?

4    A.  Yes.  Looks like me, yes.

5    Q.  Okay.  And you texted this to Roger Stone, correct?

6    A.  Yes.

7    Q.  And --

8    A.  Well, I texted it to a lot of people.  But, him, too.

9    Q.  And you were telling a lot of people then, including

10   Roger Stone, that you were outside the building where

11   Julian Assange was living at the time, right?

12   A.  Yes.

13   Q.  And it is still your testimony to this Court that you did

14   not mean to imply to Roger Stone that you had a special

15   relationship with Julian Assange, you were still a spectator?

16   A.  At that point I was -- the whole time -- at that point,

17   after I went in, and my -- my general manager from WBAI was

18   hoping I would get that letter over to him and talk to him; I

19   never got in.  I was there to see Barry Crimmins for three

20   days.

21              I went out there, put that in, took the picture in

22   front of the MI6, MI5, or metropolitan police guy outside, and

23   I put it on Facebook.  And then the next day I sent it to other

24   people, including Mr. Stone.  And, so --

25   Q.  So, yes, you meant to imply to Mr. Stone you had a special

1   relationship with Julian Assange?

2   A.  On -- I -- a special relationship?  A special -- I got in

3   that day.  But, one of the reasons why is, I was -- I put that

4   out there because I was never able to satisfy the Libya deal.

5   So, this was the whole deal with Dr. Paul, Hillary Clinton

6   sabotaging the Libya peace talks.  I was never able to do that.

7   So, I sent that.

8   Q.  So you meant to fool Roger Stone?

9   A.  Look, I was still indebted to him for the Gary Johnson get.

10  That was --

11  Q.  So as --

12  A.  Because he brings it up several times, previously.

13  Q.  And as a favor, you took a picture of yourself outside the

14  embassy to imply to Roger Stone --

15  A.  Not Roger Stone.  To a lot of people.  I took that picture.

16  I was there.  I put it on Facebook a day before.  On September

17  28th to 29th, I already -- the day I took the picture, I put it

18  on Facebook.  And I don't know where that exhibit is.  But, I

19  could show you that I put that out there.  The following day, I

20  sent it to Roger Stone.

21          MR. BUSCHEL:  The next page, please.

22  A.  And if he has Facebook, he could have seen it as well.

23  But, I broadcast that around the world.  Yes, I was implying

24  that -- whatever.

25          MR. BUSCHEL:  Right there, please.  6 -- or 8-11 --

```
 1      8-11.

 2              There you go.

 3      BY MR. BUSCHEL:

 4      Q.  And on the same day --

 5      A.  Yeah.

 6      Q.  -- after you take your -- you take your picture outside the

 7      embassy, you write to Roger Stone, "Big news Wednesday.  Now

 8      pretend you don't know me."

 9      A.  Right.

10      Q.  It is still your testimony to this Court that you did not

11      mean to imply that you had a special relationship with

12      Julian Assange?

13      A.  My intent -- I still will imply to this Court I was not a

14      back channel to Julian Assange.  Never was.

15              THE COURT:  That wasn't his question.

16              THE WITNESS:  What was the question?

17              THE COURT:  I think you're trying to rope his whole

18      testimony into more -- it's the foundation that keeps confusing

19      him.

20              When you said this to Roger Stone, were you trying to

21      imply that you had a relationship and information from

22      Mr. Assange?  Is that what you were trying --

23              THE WITNESS:  Probably.

24              THE COURT:  -- to convey to Mr. Stone with this text?

25              THE WITNESS:  Probably.  At that point, I may have
```

1    known, but it was based on information that was already out

2    there, that something was coming out.

3           THE COURT:  But, you wanted him to think that you got

4    it from Mr. Assange, is --

5           THE WITNESS:  You know what, do I know what I was

6    thinking three years ago?  Possibly I did.  Maybe I did.  Good

7    chance that I did, that I had information, based on public

8    information, that it was out there.  It could have been anybody

9    sending that, that something is coming out this week.  I mean,

10    I'd been seeing it.  Sarah Harrison had come out at the end of

11    September saying that something was coming out.  There was a

12    lot of information that Assange was coming out with something.

13           So, at this point, to satisfy Mr. Stone, I sent him

14    that.

15    BY MR. BUSCHEL:

16    Q.  So when Roger Stone got the impression that you were an

17    intermediary, or a go-between between --

18    A.  Whoa.

19    Q.  -- WikiLeaks, you played him, didn't you?

20           MR. ZELINSKY:  Objection.

21           THE COURT:  Sustained.

22           THE WITNESS:  I never --

23           THE COURT:  This question has been -- you can ask him

24    what was in his head; you can't ask him what was in Mr. Stone's

25    head.

1        MR. BUSCHEL:  Yes, Judge.

2   BY MR. BUSCHEL:

3   Q.  That was in your head?

4   A.  Was that in my head?

5   Q.  You thought that you played Roger Stone?

6   A.  That I played Roger Stone?  I wanted Roger Stone off of my

7   back, my friend.

8   Q.  You gave an interview with a woman named Abby Martin,

9   didn't you?

10  A.  Yes.

11  Q.  She is a reporter for?

12  A.  She's a reporter for -- she was with *Telesur* and *Empire*

13  *Files*, yes.

14  Q.  And you gave her an extended interview --

15  A.  Yes.

16  Q.  -- about WikiLeaks and Roger Stone --

17  A.  Yes.

18  Q.  -- and Randy Credico --

19  A.  Yes.

20  Q.  -- about yourself --

21  A.  Yes, I did.

22  Q.  -- didn't you?

23  A.  Yes.

24  Q.  And the year that you did that?

25  A.  It was last year, 2018.  It was sometime in November or --

1    yeah, it was around Thanksgiving time.

2    Q.  So around this time last year?

3    A.  Yes.

4    Q.  And you had already spoken to the Special Counsel's Office?

5    A.  This is -- I spoke to them December 6th.

6    Q.  So, not yet?

7    A.  I'd spoken to them once, and I came back later.

8    Q.  You told her that you played Roger Stone.  You were playing

9    Roger Stone --

10   A.  Whatever I said -- do you want to play the video?  I can --

11   if you just show me the video here, whatever I was saying to

12   her that had come out.  There were a lot of text messages that

13   were released.  And, so, she wanted to get the full story.  I

14   had not done a full interview.  And I gave her history of

15   Roger Stone.

16              Maybe we can play the whole -- if you want to play

17   the whole video?

18   Q.  No.  Let me ask you another question.

19              You have -- it is clear that you have testified,

20   based on your first questions in direct examination, that you

21   were not the back channel.  We understand that.

22              My next question is this --

23              MR. ZELINSKY:  Objection.

24              THE COURT:  All right.  Okay.  He can lay the

25   foundation.  He's already elicited -- it's your testimony that

```
 1          you were not a back channel to Julian Assange, correct?

 2                    THE WITNESS:  Exactly.

 3                    THE COURT:  Okay.  Next question.

 4          BY MR. BUSCHEL:

 5          Q.  You did, however, speak to Julian Assange about talking

 6          with Congressman Adam Schiff, didn't you?

 7          A.  Did I talk to him about it?

 8          Q.  Yes.

 9          A.  Yes.  Yes.  Somebody within his -- within -- he was

10          already -- wait a second.  He was cut off at that point.  He

11          was cut off in March of 2018.  He was -- he could not have any

12          more communication.

13                    So, I did speak to somebody else, but not with

14          Mr. Assange anymore by text message.  It was only with somebody

15          else.  He was totally cut off by the Ecuadorian government

16          sometime in late March.  So, we're talking about after the

17          White House Correspondents Dinner.  I met Schiff in April.  So,

18          sometimes in June, yes.

19          Q.  So, you didn't speak to him directly.  You spoke to

20          somebody who works for Julian Assange?

21          A.  I let them know that I was going to meet with Mr. Schiff,

22          because he had invited me at the event that we did at the White

23          House Correspondents Dinner, where I was invited by *Yahoo News*.

24          And he came in there, and he said he would like to talk to me.

25          You know, and I grew up, like, five miles from where he
```

1    represents Pasadena.  I'm from Pomona, California.  So, I said,

2    Sure, we'll talk about it.  He wanted to talk to me, and we

3    finally did speak.

4            But, I did not speak to Julian Assange about it.  I

5    did speak to somebody else about that I am going to talk to

6    Adam Schiff.

7    Q.  So did -- let's do it this way:  The person that you spoke

8    to, who you claim represented Julian Assange, told you that he

9    was willing to speak to Adam Schiff?

10           THE COURT:  Can we use some time frames here?

11           THE WITNESS:  Yeah.  Do you have the dates of that?

12   BY MR. BUSCHEL:

13   Q.  That was in 2019.

14   A.  2019?  We're in 2019.

15   Q.  Yes.  Did you speak to anyone --

16   A.  Adam Schiff was 2018.

17   Q.  Okay.

18   A.  So we're in 2019 now.  You're a year off.

19   Q.  So this is in 2018, that you're delivering messages from

20   Julian Assange --

21   A.  Not delivering messages from Julian Assange.  He said he

22   was cut off in March of 2018 from all communications.

23           And then sometime after I spoke to Adam Schiff at the

24   White House Correspondents Dinner in April, he invited me to

25   have a conversation with him.  And, so, we set it up.  And I

（空白）

1    came down to D.C. two months letter and met, not with him, but

2    his staff.  And had the okay to say, Well, Schiff, you can go

3    in there, and Mr. Assange would be happy to be interviewed.

4              Because nobody had interviewed him yet.

5    Q.  And so you told Adam Schiff that, Assange wanted to meet

6    with you?

7    A.  Didn't say "wanted to."  But, he would meet with him if he

8    made the request.  If he made the request, he would talk with

9    him.

10   Q.  And Mr. Schiff replied to you?

11   A.  He wasn't there, Mr. Schiff.  Mr. Schiff, he ended up being

12   on the House floor, and everybody in his office was there

13   taking notes.  And that was the message that I conveyed.  And

14   then he conveyed a message back to Ari Melber when I finally

15   brought that up a month later.

16   Q.  Right.  So you gave an interview to Ari Melber?

17   A.  Several.

18   Q.  And during one of those interviews, you told him that

19   Julian Assange was willing to meet with Congressman Schiff?

20   A.  Yes.

21   Q.  And that you told Congressman Schiff that?

22   A.  I told Congressman Schiff's office --

23   Q.  You didn't --

24   A.  In the office -- he wasn't there.  I told the office.  I

25   went in there and there were, like, 30 people.  His counsel

1    were there.  I was supposed to see Schiff.  He couldn't make

2    it.  So, that was the message, that Mr. Assange, I said, would

3    meet with Adam Schiff.

4           Now, I did Mr. Melber's show, I think, a week later

5    or ten days later, and he thought it was big news when I told

6    him that.  I pretty much kept it to myself.

7    Q.  You told him that you were kind of an intermediary

8    between --

9    A.  I did not say I was a intermediary.  I said that someone in

10   his office said it was okay to -- gave me the okay to tell

11   Schiff -- I'm going to meet with Schiff.  They knew it, this

12   guy.  Should I say that Assange -- and they said, Yeah, go

13   ahead.

14          MR. BUSCHEL:  Judge, I do have that video clip, if I

15   may offer it as impeachment.  It's 20, 30 seconds, the

16   interview with Mr. Melber.

17          THE COURT:  All right.  I'm not sure --

18          MR. ZELINSKY:  Your Honor --

19          THE COURT:  Approach the bench.

20          (Bench discussion:)

21          THE COURT:  You're certainly allowed to ask him

22   questions about whether at any point in time he was -- conveyed

23   a message back and forth to people who were connected to

24   Assange and conveyed them to people in the United States.  But,

25   your predicate for the question was, You told this jury that

1     you weren't the back channel.  Period.

2              And what he told the jury, over and over again, and

3     what every single e-mail and text was about was, Mr. Stone,

4     when you said I was your intermediary in July and August, that

5     was not true, because I had never met him to that point.

6              So try -- so juxtaposing he's doing something a year

7     later with that to suggest that he lied to this jury about

8     being an intermediary is, I think, what Mr. Zelinsky is

9     continuing to object to.

10             So, I don't have any problem with your asking him

11    about this.  I think he has admitted, essentially, what you

12    just asked him, which is, did he serve as some kind of a

13    go-between.  And, so, I don't know if you need to impeach him

14    with the transcript because I'm not sure he's denied it.

15             But, if you keep setting it up with this, You've told

16    everybody you weren't the back channel, without -- it's an

17    overstatement; he's never said, I never sent any messages to

18    Assange about anything.  He said, I wasn't the one that

19    Roger Stone said he had on TV.  And -- or that he said that he

20    told the House that he had.  And that's the one he's saying he

21    wasn't, not that he never spoke to him.

22             So, if you think it's relevant to the credibility of

23    that, that on other occasions he did convey messages, I'm not

24    going to stop you from asking about it.  But, it's not fair to

25    ask foundational questions that give a false impression of an

1      inconsistency that isn't an inconsistency.

2              MR. BUSCHEL:  This clip of Ari Melber is about

3      delivering a message from Julian Assange to Congressman Schiff.

4              THE COURT:  Okay.

5              MR. BUSCHEL:  He's saying, I sent somebody in

6      Assange's office to somebody in Schiff's office.

7              But, to Ari Melber he says, I spoke to

8      Congressman Schiff, and I told him right away, I said,

9      Julian Assange is willing to meet with him.

10              I think that's...

11              MR. ZELINSKY:  Your Honor, just very briefly.

12              First of all, I'll adopt what the Court has just been

13      saying; it's better put than I would have on what our objection

14      is.

15              The first thing I want to raise is, the government

16      does have a concern that the cross-examination has potential to

17      mislead the jury because its characterizations of the witness's

18      testimony are inaccurate.  There's been a lot of

19      characterization here by -- on cross-examination about a

20      special relationship, about never claiming he had a special

21      relationship to anyone.

22              That was not at all the witness's testimony on

23      direct.  It's now run on.  It was not a mere slip or an

24      accident.  It's become a central focus of the

25      cross-examination.

1          The government is very concerned that that

2     mischaracterization of the testimony has the potential to

3     mislead the jury.

4          As to this most recent thing, Mr. Credico has

5     acknowledged that he took a message from WikiLeaks to

6     Adam Schiff, years later, that he passed it along.

7          It's not clear why playing a statement of what

8     Mr. Credico has already said and already agreed to would in any

9     way help the jury, besides just playing a video of Mr. Credico.

10    It's not a prior inconsistency.  It's fairly consistent with

11    what Mr. Credico said he's done.

12         THE COURT:  Well, I think that you can ask him, Did

13    you represent publicly, at this time period, that you had

14    conveyed a message from Assange to Schiff?  And if he says no,

15    then he did represent publicly that he did.

16         But, I do think you have tried to summarize his

17    entire testimony with overgeneralizations that aren't fair --

18    aren't quite fair.

19         And you've also kind of been commenting at the end of

20    his testimony in a way that I stopped Mr. Zelinsky from doing.

21    If you get what you think is or is not the correct answer --

22         MR. BUSCHEL:  I'm seriously asking what I'm doing.

23    Am I saying thank you or --

24         THE COURT:  No.  Sometimes it will be "yes" or "no"

25    or you'll correct him.  You know, This is what your testimony

1    was.  So, just want you to be careful about that.

2              But, I think the point is, if you're going to add an

3    introductory clause or lay a foundational predicate for your

4    next question, that you need to be, essentially, quoting his

5    testimony exactly.  And then -- but, not generally paraphrasing

6    it in a way that isn't fair.

7              I think it's certainly fair to cross-examine him

8    about the fact that in these texts he tried to lead Roger Stone

9    to believe that he was getting through to Assange.  I think he

10   admitted that on direct.  I think he admitted that on cross.

11             But, if you paraphrase it differently or you try to

12   say you were, you know, an ongoing back channel, you denied

13   that, that's not quite fair.  What he -- what he has said to

14   this jury and to -- over and over again, and what all the

15   emails were about, was saying to Mr. Stone, Why did you name me

16   as the one you were referring to when you were on TV, before I

17   ever talked to Assange?  That's not fair.  That's not what my

18   documents reflect.

19             It is true that they are after he tried to lead Stone

20   to believe that he could get a message to him, and that he had.

21   And that's all grist for cross, how these two communicate with

22   each other, which, I think, you've already covered.

23             But, I think if you want to talk about this, you

24   can't juxtapose it with something that is not inconsistent.

25   That's my concern.  And I don't know that this tape is

1    inconsistent with his testimony.  But, I think the best way to

2    do it is try to pin down what his in-court testimony is, the

3    yes-or-no question.

4         If he says, No, I never said on TV that I had

5    conveyed a message to Schiff from Assange, then you can show

6    him that.  But, again, I'm not sure what the relevance is,

7    given the time period.

8         MR. BUSCHEL:  I'll probably move on.

9         THE COURT:  All right.

10        MR. BUSCHEL:  Thank you.

11        (Open court:)

12        THE COURT:  I do apologize for when the jury has to

13   sit and listen to the husher.  It's more convenient than having

14   you leave the room and come back.  Sometimes we need to discuss

15   legal issues at the bench.  It isn't anyone's fault.  No one is

16   doing anything wrong by either objecting or asking the

17   questions.  We need to talk through whether they're proper or

18   they're not proper.

19        So, to the extent you have to sit there and listen to

20   it, if you hold that against anyone, hold it against me, and

21   neither party.  I once heard a judge, when I was trying a case,

22   say to the jury, Well, you can pretend you're listening to the

23   sound of the ocean.

24        I don't think it sounds like the ocean.  I know it's

25   annoying.  But, it's not because anyone is not doing what

1     they're supposed to do.

2              All right.  Mr. Buschel, you can proceed.

3              MR. BUSCHEL:  Thank you, Judge.

4     BY MR. BUSCHEL:

5     Q.  Now, when Roger Stone has -- you told Roger Stone to forget

6     your name, don't use it as a connection.

7     A.  Yes.

8     Q.  That you did not want him to mention your name publicly,

9     correct?

10    A.  I did not want him to confuse me as the back channel that

11    he had been referred to.  I did not want to be pulled into

12    this, some kind of, you know, retroactively pushing me in as

13    the back channel that he had been touting for the previous two

14    months.

15    Q.  And you did not -- and one of the other reasons is, you did

16    not want to be associated with the Donald Trump campaign?

17    A.  Absolutely.  Would you?

18    Q.  This is because you are friends with democrats, correct?

19    A.  Am I friends with democrats?  Mostly left-wingers.  A lot

20    of left-wingers.  But as far as Trump goes, no.  Because I do

21    not like kids in cages.  I don't like --

22    Q.  Mr. Credico --

23    A.  I -- I --

24    Q.  Mr. Credico --

25              THE COURT:  All right.  That was a yes-or-no

1    question.

2              THE WITNESS:  Well, you want to know about Trump,

3    this is the reason why.

4              THE COURT:  He's answered the question.  Next

5    question.

6    BY MR. BUSCHEL:

7    Q.  You're friends with Hillary supporters, correct, at the

8    time?

9    A.  Was I friends with Hillary supporters?  No.  I was against

10   Hillary.  I was a Bernie Carrot -- Bernie Carrot --

11   Bernie Sanders supporter.  I was not happy with Hillary being

12   the nominee.  I wanted Bernie Sanders.

13   Q.  But you were helping Roger Stone, who was helping

14   Donald Trump's campaign, correct?

15   A.  That's what people might have thought, that I was -- by

16   being someone that at the same time was a spectator, I didn't

17   want him to put it out there that I was helping out -- first of

18   all, I didn't even think -- I wasn't even sure he was working

19   for the Trump campaign because he got bounced in August of

20   2015.  I wasn't sure.  You know what I mean?  We were

21   spectators.  I didn't know he was taking this stuff, whatever I

22   just sent there.  It was already out there.

23   Q.  You knew that he did, in 2015 --

24   A.  I know that he worked for him, and Trump came out and said

25   whatever and dumped him, yes.

1    Q.  And you said on direct examination, and moments ago, that

2    you did not want to be perceived as helping Donald Trump's

3    campaign --

4    A.  It was not good for a guy who had worked -- well, yes.

5    Okay.  Yes, I did not want to be connected to Donald Trump at

6    all.

7    Q.  You did not want to lose your friendships with the people

8    that supported --

9    A.  Hillary Clinton --

10   Q.  -- Bernie Sanders?

11   A.  -- no. That's not -- Bernie Sanders.  No.  Hillary Clinton

12   people, they all thought that I was -- in 2017, they all

13   thought that I helped out Donald Trump, which is, like, the

14   most ridiculous thing ever.

15   Q.  So when you asked Roger Stone to -- you know, when he said,

16   you know, just, Don't know me, and he replied, Say I'm -- you

17   died five years ago, that was the communication?

18   A.  Wait a second.  I don't know what the motivation was there

19   in 2016.  If you're going 2016 to 2017 --

20               THE COURT:  Okay.  All right.

21               What's your objection?

22               MR. ZELINSKY:  There was no question, Your Honor.  It

23   was just a statement.

24               THE COURT:  All right.  All right.

25               Why don't you ask your next question.  If you're

1    directing him to a specific text, then if you could specify the

2    time period so we all know what we're talking about.

3                MR. BUSCHEL:  The last one.

4                Right there.  If you blow that up.

5    BY MR. BUSCHEL:

6    Q.  Right there, where Roger Stone said, "You died five years

7    ago" --

8    A.  Right.

9    Q.  -- that's communicating to you.  Your response to it is,

10   "Great," right?

11   A.  Let's see.  Let me see the time.  I died five years ago.

12   Yeah, "Great."  Yeah, "Great."

13   Q.  And then, on top of that, you write, "Hillary's campaign

14   will die this week."

15   A.  Right.  Just talk.

16                THE COURT:  All right.  Is that a question?

17                MR. BUSCHEL:  Yes.

18                THE WITNESS:  Yes.

19                THE COURT:  You wrote that?  Yes?

20                THE WITNESS:  Yes.

21                THE COURT:  Okay.  Your next question.

22   BY MR. BUSCHEL:

23   Q.  Mr. Credico --

24   A.  Yes, sir.

25   Q.  -- you had many lawyers giving you advice on whether to

```
 1    testify in front of the House Committee on Intelligence --
 2    A.  I had many people, including lawyers.
 3    Q.  And this morning you said that there were 1,000 reasons why
 4    you invoked the Fifth Amendment, correct?
 5    A.  At the end of the day, there were a lot of reasons why --
 6    you know.
 7    Q.  And you even consulted -- you consulted Roger Stone to get
 8    his advice, right?
 9    A.  Yes, I did.
10    Q.  And one of your options was that -- Fifth Amendment was an
11    option to you, correct?
12    A.  Yes.
13    Q.  It is an option that you elected, correct?
14    A.  It's the option, at the end of the day, I selected.  But, I
15    didn't know what I was going to do until that last day.
16    Q.  Okay.
17    A.  Really drove my lawyer crazy.
18    Q.  And you consulted with your lawyer, who you just pointed
19    at, correct?
20    A.  Yes.
21    Q.  And together you decided to do that?
22    A.  To get -- at the end of the day I decided, not my lawyer.
23    I decided what to do.
24    Q.  Very good.
25    A.  Whatever reasoning that I had.
```

```
1              MR. ZELINSKY:  Objection.

2              THE COURT:  Well --

3              MR. ZELINSKY:  If I could approach?

4              THE COURT:  Yes.  Can you approach the bench.

5              (Bench discussion:)

6              MR. ZELINSKY:  Your Honor, it's --

7              THE COURT:  Just a second.

8              Number one, I was shocked you went into this on

9     direct, but you did.  I don't think -- I don't have any reason

10    to believe, no one has suggested to me that he waives his

11    privilege as to the substance of what his lawyer told him to

12    do.  I think you can ask, as you did, that he had people that

13    he could turn to for advice.  He did, in fact, do that.

14             But, I don't think, if this was where you were going

15    with your decision to ask him, Was that consistent with your

16    lawyer's advice --

17             MR. BUSCHEL:  I wouldn't say that.

18             THE COURT:  Well --

19             MR. BUSCHEL:  I mean, I'll say, You authorized your

20    lawyer to write that letter.  That's not privilege.

21             THE COURT:  That's fine.  But, I just think these are

22    questions that should be tight.

23             MR. ZELINSKY:  One additional matter while we're at

24    the bench, Your Honor.

25             After that last colloquy, probably as a slip of the
```

1    tongue, when Mr. Credico said that he had consulted with his

2    lawyer, Mr. Buschel said, "very good" in response.  That's

3    probably accidental, but I think that's an indication of what

4    the Court was talking about.

5              THE COURT:  Right.  Well, we have a number of people

6    in this courtroom who have that habit.

7              MR. ZELINSKY:  As a problem child myself --

8              THE COURT:  Okay.

9              MR. ZELINSKY:  -- I just wanted to bring it to

10   Mr. Buschel's --

11             MR. BUSCHEL:  In our defense, the witness --

12             THE COURT:  Is difficult.  I'm doing the best I can.

13             MR. BUSCHEL:  And my "very good" is not approval of

14   the answer.  It's, Very good, you answered the question.

15             THE COURT:  I understand.  I understand that.  But

16   sometimes it seems that the lawyer knows what the facts are,

17   and that's why we should all avoid it.

18             MR. BUSCHEL:  I was conscious of it after I did it.

19             THE COURT:  Believe me, I think everybody is doing

20   the best under difficult circumstances.  I don't usually insert

21   myself in examinations as often as I have.  And it isn't

22   because I'm trying to stop you from doing what you're doing.

23   I'm trying to facilitate what you're doing, and focusing in

24   ways that maybe are less threatening to him so that he can

25   actually answer the question.

```
 1              But, I think, hopefully, we're getting near the end
 2      of this.  I don't know.  Okay.  All right.  Well --
 3              MR. ZELINSKY:  We anticipate redirect to be fairly
 4      short.
 5              THE COURT:  Good.  Very good.  So --
 6              MR. BUSCHEL:  Still be long.
 7              THE COURT:  -- why don't we -- I would like to try to
 8      finish it before lunch, if that's possible.  If we didn't get
 9      there, we don't get there.
10              MR. BUSCHEL:  Is lunch at 12:30?
11              THE COURT:  No, lunch is usually at 1:00.  So, why
12      don't you just keep going.  But, I think you just need to be
13      careful about asking a question that seems to call for what his
14      lawyer told him, as opposed to asking yes-and-no questions.
15              MR. BUSCHEL:  Would you like me to tell him that?
16      Would you like me to tell him not to do that?
17              THE COURT:  Well, you can certainly start with,
18      Without telling me what your lawyer told you or what the two of
19      you discussed, did you agree that this letter should be sent?
20      And then he will understood.
21              Okay.  Thank you.
22              MR. BUSCHEL:  Very good.  Thank you.
23              (Open court:)
24      BY MR. BUSCHEL:
25      Q.  So, without saying, Mr. Credico, what your lawyer said to
```

1     you, you did authorize your lawyer to write a letter to the

2     House Intelligence Committee, invoking your Fifth Amendment

3     right?

4     A.  Yes, I did.

5     Q.  In fact, you publicly have stated one of the reasons why

6     you asserted your Fifth Amendment is that you thought the House

7     investigation was a witch hunt?

8     A.  Yes.

9     Q.  And in addition to consulting with lawyers and many people,

10    you've consulted with Betsy Woodruff, a journalist.

11    A.  Did I consult with her?

12    Q.  You talked to her about it?

13    A.  I talked to her about it, yes.  I talked to a lot of people

14    about it.  I didn't ask for her advice.

15    Q.  And, in fact, you publicly have stated that you have said

16    so many versions of the events, that it was in your best

17    interest to take the Fifth Amendment?

18    A.  Well, somebody said that when I was on *The Intercepted*

19    radio show, that -- you know, best that you take; that was one

20    person.

21          People had -- I was encouraged by other people to

22    take -- to go out and say it, otherwise I was going to have

23    this being held over my head for a long time, even if, in fact,

24    you know, that was the deal.  David Corn had put something out.

25    This is suspicious that Credico took the Fifth.

1              I didn't want that out there.  So, I knew there was

2     going to be some kind of repercussions by taking the Fifth

3     Amendment.  Even though you have the right to do it, people do

4     speculate, they extrapolate --

5              MR. ZELINSKY:  Objection.

6              THE WITNESS:  Yes.

7              MR. BUSCHEL:  Objection.  Nonresponsive.

8              THE COURT:  All right.  Go ahead and ask your next

9     question.

10    BY MR. BUSCHEL:

11    Q.  Mr. Credico, isn't it true that the first person in your

12    text communications with Roger Stone to bring up Frankie Five

13    Angels was you?

14    A.  I brought up that coming back from -- I know I brought it

15    up.  I don't know when that came up chronologically, but I had

16    seen the movie coming back from London.

17    Q.  And you were in London on November -- November --

18    mid-November of 2017?

19    A.  Well, I was coming back somewhere around that time.

20    Q.  You remember that?

21    A.  I remember being in London, yes.

22    Q.  And you remember writing that to Roger Stone?

23    A.  I remember watching *The Godfather II* on the plane.

24    Q.  And that's an ongoing back and forth with you and

25    Roger Stone, talking about *The Godfather II*, correct?

1    A.  Well, I think -- well, ongoing?  I mean, I don't know what

2    the genesis of it is here, in the exchanges.  But, I'm sure

3    over the years, every Italian that I know knows every scene

4    from *Godfather I* and *II*.  I'm one of them and he's one of them.

5    Q.  And, in fact, during this time period of text messaging

6    with Roger Stone, you refer to Hillary Clinton as Luca Brasi.

7    A.  I do.

8    Q.  And Luca Brasi was a hit man in *The Godfather*, correct?

9    A.  I'd have to see the -- do you have the document here, where

10   I say that?  You could put that up for me.

11   Q.  Do you remember that?

12   A.  If you could put it up for me, I could see the context of

13   it.

14   Q.  Okay.  Let's move on.

15           MR. BUSCHEL:  Government 148, please.  The exhibit of

16   the phone calls.  The graphs of the number of phone calls, the

17   Government's Exhibit -- is that 200?

18           MR. KRAVIS:  167.

19           MR. BUSCHEL:  167.

20           THE COURTROOM DEPUTY:  167?

21           MR. BUSCHEL:  167.

22           THE COURTROOM DEPUTY:  Thank you.

23   BY MR. BUSCHEL:

24   Q.  In the meantime -- this exhibit is not for you.

25           In the meantime, you recall Roger Stone testified in

1    September 2017?

2    A.  Yes, I do.

3    Q.  In front of the House?

4    A.  Yes, I do.

5    Q.  And on that day, after the hearing, you called him many,

6    many times, didn't you?

7    A.  Yes, I did.

8              MR. BUSCHEL:  And just take this down.

9    BY MR. BUSCHEL:

10   Q.  And --

11   A.  And texted him, as well.

12   Q.  And most of those messages that day are you calling him,

13   right?

14   A.  After he had testified?

15   Q.  Yes.

16   A.  Yes.

17   Q.  Okay.  Now --

18   A.  To dangle the back channel deal.  And that's what I was --

19   Q.  He didn't name you on that day, though?

20   A.  But, he told me he was going to name me, and we had a lot

21   of back and forth about him naming me.

22   Q.  You called him --

23   A.  He did not get a -- he did not get a subpoena.  He just

24   named me without a subpoena.

25   Q.  Is it true, sir, that on that day that Roger Stone

1    testified, you called him upwards of 62 times?

2    A.  62 times, yeah.  I -- maybe.  Maybe trying to get ahold of

3    him because he wasn't answering the phone.  And he dangled out

4    there that there was -- that he had a back channel.  He put

5    that out there.  Just volunteered it.  I think the whole thing

6    was voluntary.  Right.

7    Q.  Since -- so you're upset with Roger Stone that he

8    voluntarily --

9    A.  That he voluntarily.  They didn't ask him to testify.  He

10   just showed up and testified.

11   Q.  And had he --

12   A.  And then he puts me into the middle of it.  All right?

13   Q.  Had he --

14   A.  I didn't ask for this.  I'm the bystander.  He's driving

15   the car.  I got hit on the side of the road.

16   Q.  Had he been subpoenaed, you would have felt better about

17   this?

18              MR. ZELINSKY:  Objection.  Speculation.

19              THE COURT:  Well, that was one of the aspects of it

20   that bothered you?

21              THE WITNESS:  What bothered me, that my name was

22   going to be thrown out there, yes.  That he was going to put my

23   name out there.  And I tried to -- Please, don't put my name

24   out there.  I wasn't the guy.  Exactly -- but, this is

25   something that I knew going back, circumstantially, he was

1    going to put my name.  And I -- and we had conversations, and

2    he said to me, Why should I go to jail for you?

3    BY MR. BUSCHEL:

4    Q.  And another thing that was bothering you is that he

5    voluntarily did it, as opposed to being compelled to do it by

6    subpoena?

7    A.  He voluntarily went up there and put it on YouTube.

8    Listen, he was showing off there.  Okay?  That's what he was

9    doing.  He put it on YouTube.  He delivered a 47-page screed

10   that he read.

11          Look, did you see it?

12   Q.  Mr. Credico --

13   A.  He simultaneously put it on YouTube.  He was showing off.

14   Q.  My question is this:  Would you have felt better if he was

15   subpoenaed, rather than volunteered?

16   A.  Well, when he starts calling me a rat the following year--

17          MR. ZELINSKY:  Objection.

18   A.  -- and he volunteers my name, yes.

19   BY MR. BUSCHEL:

20   Q.  Since that time you have made dozens and dozens of

21   television appearances talking about this publicly, haven't

22   you?

23   A.  Dozens and dozens?  Dozens and dozens?

24   Q.  Yes.

25   A.  Yes.

1    Q.  Radio shows?

2    A.  Radio shows?  I've done my radio show, yes.  I have a radio

3    show I've been doing out of KPFA.  I haven't done any

4    television in a while.

5    Q.  In fact, you even asked Roger Stone for advice on which

6    shows were better to do because of your involvement in this

7    case?

8    A.  Which shows would be better to do?

9    Q.  Erin Burnett, Ari Melber, this one, that one, right?

10   A.  Maybe.  Maybe.  If you'd just show me what it is that I --

11   in 2018, after I was named, yes, we had communications.  I will

12   admit we had communications back then because, once again, I

13   did not want to rile the guy.  I did not want to -- I can't --

14   I can't work on his level.  All right?  He plays hardball, he

15   throws a lot of junk, and I didn't want to get hit.

16   Q.  For someone who didn't -- who wanted to keep a low

17   profile --

18   A.  Yeah --

19   Q.  -- you went on a lot of television?

20   A.  I went on the shows to try to middle this.  Do you

21   understand?  I went on Ari Melber's show.  Taking the Fifth,

22   you got this guy Ackerman accusing me of hiding something.  I

23   was in a box there.  I was in a box at that particular point

24   because I took the Fifth.  He, Mr. Ackerman, extrapolating that

25   I had some kind of knowledge from Julian Assange, and I was

1    trying to clarify it.

2                    MR. ZELINSKY:  Objection.

3                    THE COURT:  All right.

4    BY MR. BUSCHEL:

5    Q.  That's what happens when you go on television and talk

6    about something, right?

7    A.  When you go, a lot of people want you to go on and try

8    to -- I'm trying to explain myself, to extricate the perception

9    that I was a back channel.  And that finally happened when I

10   saw Michael Isikoff.

11   Q.  And today you told the jury, in addition to the Fifth

12   Amendment, you are asserting your First Amendment rights as a

13   journalist, true?

14   A.  I wanted to use -- I had seen Assange in September of 2017,

15   again in November of 2017.  I certainly did not want to talk to

16   the House Intel Committee about those meetings.  I didn't mind

17   talking about 2016, when I didn't see him.  But, if I had gone

18   before the House Intel Committee and I had seen Assange a

19   couple of times unrelated to this, you know, that was one of

20   my -- I could use that.  I could use that.

21                    I'm not really a journalist.  I'm a comedian that had

22   a radio show.  So, you know, that was one of the options.

23   Q.  Do you know who David Lugo is?

24   A.  Yes, I do.

25   Q.  And is it true that you told him that you were the back

1    channel --

2    A.  It was one of those things when --

3    Q.  -- for Roger Stone?

4    A.  Can I explain that?

5    Q.  Can you answer my question first?

6    A.  I don't know if I told him that or not.  I did one of

7    those, wink, I'm the so-called back channel, yes, when I booked

8    Roger on a documentary that Mr. Lugo asked me to book.  And I

9    booked Mr. Stone on there.  We went up there and we taped him.

10   And before we got there I said, I'm the so-called back -- you

11   know, it's one of those things.

12   Q.  Did you threatened Mr. Lugo, if he were to say that you

13   were the back channel?

14   A.  Right then?  No, not then.  Did I threaten him right then?

15   A year later or four months later, when he started writing

16   stuff out, when he started putting hit pieces on me, did I

17   threaten him?  Well, show me what I threatened him with.

18   Q.  Come on, Mr. Credico.  Did you or didn't you?

19          THE COURT:  Okay.

20   A.  Show me what I threatened him with.

21          THE COURT:  That's argumentative.  You cannot put it

22   that way.  If you have a question, ask a question.  You can't

23   argue with the witness.

24   BY MR. BUSCHEL:

25   Q.  Did you or didn't you, sir?

1   A.  Did I threaten him?  Show me what you're -- show me

2   something specific I threatened him with.

3   Q.  Did you verbally threaten him?

4   A.  I had an argument with him, a long argument, because he was

5   saying I was the back channel.  He went on one of these shows

6   out of Buffalo, out of the West Palm Beach or Palm Coast or

7   whatever, saying that I was the back channel.

8   Q.  Did you --

9   A.  And he totally double-cross -- I'm the one who got

10  Mr. Stone on his show, yes.

11  Q.  So you --

12  A.  Okay.  I'm the back channel.  I'm the big back channel.  I

13  went to Julian Assange and got material to give them.

14          MR. ZELINSKY:  Objection.

15  A.  I mean, come on, buddy.

16          THE COURT:  Just -- Mr. Credico.

17          Can you ask a specific question with a date and time

18  and some words in it so he can answer your question?

19  BY MR. BUSCHEL:

20  Q.  At the time you're referring to --

21          THE COURT:  No.  Do you --

22          MR. BUSCHEL:  I don't know the date, Judge, when he

23  did it.

24          THE COURT:  Okay.

25          MR. ZELINSKY:  Your Honor, may we approach?

1          THE COURT:  Yes.

2          (Bench discussion:)

3          THE COURT:  You have suggested through your

4    questions, repeatedly, that you have knowledge of a specific

5    threat when you said, Come on, you did it, didn't you?"

6          Now, I want -- if you want him to answer that

7    question, I think you need to say, On or about this -- some

8    specific period of time -- you said something specific to the

9    person.  Otherwise, you are just arguing with him and we're

10   done and you need to go on to your next question.

11         MR. BUSCHEL:  Okay.

12         (Open court:)

13   BY MR. BUSCHEL:

14   Q.  This conversation that you were having with Mr. Lugo, do

15   you recall what year it was?

16   A.  I had a hundred conversations with Mr. Lugo because I was

17   booking his show.  And I went up there, to Mr. Stone's

18   apartment with him that day, and we stopped at a coffee shop,

19   at Starbucks, while we were waiting for Mr. Stone to show up at

20   his Morningside apartment at the time.

21         So -- and I was dragging Mr. Lugo around.  I was his

22   booker.  And he ended up being closer to Mr. Stone and

23   Alex Jones and alt-right people than me.

24   Q.  And during one of these conversations you had with him at

25   that time, did you get into an argument?

1   A.  Did I threaten him?  I don't know what you mean, threaten

2   him.  What do you have there?  What do you have written there?

3          THE COURT:  The question was, Did you get in an

4   argument?

5          THE WITNESS:  We got into many arguments, yes.

6          THE COURT:  Yes?

7          THE WITNESS:  Yes.  We did get into an argument, yes.

8          THE COURT:  Next question.

9          THE WITNESS:  But, not the day I took him up to

10  interview Mr. Stone.

11  BY MR. BUSCHEL:

12  Q.  Regarding -- you were asked a few questions about

13  Mr. Spitzer and the grandfather.

14  A.  Yes.

15  Q.  You claim that you did not do -- leave that voicemail

16  message, correct?

17  A.  It's the most absurd allegation I've ever heard in my

18  entire life.

19  Q.  But, you actually -- you publicly, on YouTube, did an

20  impression of Roger Stone doing the Spitzer voice?

21  A.  Come on.  Don't even -- it's so absurd.  He's not a famous

22  person.  To do Roger Stone?  So you think that I called up,

23  spoofed the number at 3 o'clock in the morning -- I don't even

24  know what spoofing is -- put in his number?

25          This is beyond the theater of the absurd when you

1    bring something like that up.  It's not even worth talking

2    about.

3    Q.  Did you do the YouTube video?

4    A.  Somebody asked me to do a Roger Stone impression.  I think

5    it was his friend, Frank Morano, or one of these guys, try to

6    do it.  They gave to me a script to read because they were

7    doing a documentary, *Get Me Roger Stone*, which I was later cut

8    out off, just to prove that it wasn't me.

9            Why don't you play that and see how well I do his

10   voice?  Play that YouTube so they can hear how great it is.

11           MR. ZELINSKY:  Objection.

12           THE COURT:  Again, I'm not sure what you're objecting

13   to.

14           But, can you try -- I know this is an intense

15   experience -- to not argue with the lawyer?

16           THE WITNESS:  All right.

17           THE COURT:  He'll ask questions.  Answer the

18   question.

19           THE WITNESS:  Sorry.

20           THE COURT:  If it's an improper question, there are

21   people whose job it is to object to the question, and we'll

22   take it question by question.

23           THE WITNESS:  Okay.

24           THE COURT:  All right.  So, next question.

25           THE WITNESS:  Right.  I'm sorry.  Excuse me, again.

1              THE COURT:  I'm not saying you did anything wrong.

2      I'm just trying to calm things down here.

3      BY MR. BUSCHEL:

4      Q.  You'll agree that you know that Roger Stone has dogs, loves

5      dogs?

6      A.  Yes, I do.  He's got three -- I've met the dogs.  And he's

7      a dog lover.  I acknowledge that.

8      Q.  Okay.  And he rescues dogs?

9      A.  Yes.  He's good with dogs, you know.

10     Q.  And he loves your dogs?

11     A.  Does he love my dog?  I think he loves all dogs.  I don't

12     think he would steal a dog, no.  I'm sure he likes -- you're a

13     dog lover, dog lovers like dogs.  You know what I mean?

14     Q.  So in reference to your dog and the text message you were

15     shown, you didn't think he was going to hurt your dog, did you?

16     A.  I don't think he was going to steal the dog, no, I don't.

17     I think he was, you know, like, pretty riled up at that time,

18     and he was -- you know, didn't like what I was saying,

19     rebutting what was untrue by him, and, so, he -- you know,

20     that's what he -- he talked about the dog.

21             But, you know the problem is, is that when this gets

22     out there, that I don't take care of the dog, other people get

23     ideas.  So I didn't want that to go out there, that I wasn't

24     taking care of my dog.

25     Q.  I mean, this was just an e-mail between you and him?

```
 1    A.  Yes.  Yes.  It was, yes.  And I don't think he was ever --
 2    in fact, I know he would have never touched that dog.  All
 3    right?  So it was hyperbole by him.
 4              MR. BUSCHEL:  Government Exhibit 84, please.
 5              The top, please.
 6              No.  No.  Just the top.  Just "Attention," et al.
 7    Just "To."
 8              Okay.
 9    BY MR. BUSCHEL:
10    Q.  Mr. Credico, on March 10th, 2018, you write to Roger Stone,
11    "This whole back-channel nonsense is much ado about nothing.  I
12    find it amazing that it gets any attention at all."
13              You wrote that?
14    A.  Looks like I did.  Looks like from my e-mail.
15    Q.  Did you mean it at the time that you wrote it?
16    A.  Did I mean that I thought the back-channel thing was a
17    joke, for there to be a back channel?  Yes, of course I thought
18    it was a joke that I was the back channel.
19    Q.  Much ado about nothing?
20    A.  Much ado about nothing.  About me being a back channel,
21    much ado about nothing because I wasn't the back channel.
22    Q.  Very good.
23              MR. BUSCHEL:  Thanks.  Thank you, sir.
24              Thank you, Judge.
25              THE COURT:  About how much --
```

```
 1                    MR. ZELINSKY:  (Indicating.)

 2                    THE COURT:  Okay.  We'll complete the redirect, and

 3         then we'll break for lunch.

 4                              REDIRECT EXAMINATION

 5         BY MR. ZELINSKY:

 6         Q.  Mr. Credico, at the beginning of your cross-examination

 7         just now you were asked some questions about some Twitter posts

 8         that you made.  Do you remember that?

 9         A.  Yes.

10         Q.  I would like to go back to those posts for just a minute.

11                    MR. ZELINSKY:  Mr. Haley, if you could make sure the

12         jurors' screens are on.

13                    This is government --

14                    THE COURTROOM DEPUTY:  Is it something previously

15         admitted?

16                    MR. ZELINSKY:  No.  But, there's no objection from

17         the defense to admitting this.

18                    THE COURTROOM DEPUTY:  Are you moving it in?

19                    MR. ZELINSKY:  We're about to.

20                    THE COURT:  We need to have a name and number at some

21         point.

22                    MR. ZELINSKY:  Well, it's about to get one because it

23         hasn't been provided to the government until just now.

24                    THE COURT:  Okay.  That's fine.  All right.

25                    MR. ZELINSKY:  This is Government's Exhibit 211.
```

1          THE COURT:  Any objection to its admission?

2          MR. BUSCHEL:  No.

3          THE COURT:  All right.  You can show it to the jury.

4          MR. ZELINSKY:  Thank you, Your Honor.

5    BY MR. ZELINSKY:

6    Q.  Mr. Credico -- please wait a moment.

7          This is Government's Exhibit 211.

8          Mr. Credico, is this the text message -- one of the

9    Tweets that you were presented with in your testimony?

10   A.  Yes.

11   Q.  And it says, "Assange to drop coup de grâce hammer on

12   career criminal Clinton"?

13   A.  Yes.

14   Q.  That was a public Tweet?

15   A.  Yes.

16   Q.  And you testified at the time you believed, for that

17   matter, you were blocked by Mr. Stone?

18   A.  I think so, yes.

19          MR. ZELINSKY:  This is Government's Exhibit 212 that

20   we now move in.

21          THE COURT:  All right.  Any objection to 212?

22          MR. BUSCHEL:  None.

23          THE COURT:  All right.  You can show it to the jury.

24          MR. ZELINSKY:  Can we publish it to the jury, Your

25   Honor?

```
1              THE COURT:  Yes.
2    BY MR. ZELINSKY:
3    Q.  Mr. Credico, is this the second text message you were
4    shown earlier -- or, the second Tweet that you were shown
5    earlier?
6    A.  Yes.
7    Q.  And this is another public Tweet?
8    A.  Yes.
9    Q.  Is it sent in any way to Roger Stone?
10   A.  No.
11   Q.  Directed in any way to Roger Stone?
12   A.  No.
13   Q.  This is Government's Exhibit 213.
14              Mr. Credico, is this the third Tweet that you were
15   shown at the beginning of your testimony?
16   A.  Yes.
17   Q.  And is it, in fact, a re-Tweet of a public article from
18   NewsPunch.com?
19   A.  Yes.
20   Q.  Is it directed in any way to Roger Stone?
21   A.  No.
22   Q.  Do any of these three Tweets that you reviewed this morning
23   in any way indicate that you were sending information to
24   Roger Stone?
25   A.  No.
```

1    Q.  Do any of these Tweets in any way indicate that you had

2    inside information you were seeking to convey to Roger Stone?

3    A.  No.

4              THE COURTROOM DEPUTY:  Move in?

5              THE COURT:  They've already been admitted.

6              MR. ZELINSKY:  They've been admitted.

7    BY MR. ZELINSKY:

8    Q.  I want to turn your attention now to August of 2016.

9              You were asked a lot of questions about 2018, 2019;

10   is that correct, sir?

11   A.  Yes.

12   Q.  I want to focus you on August of 2016.

13   A.  Okay.

14   Q.  When Roger -- you heard Roger Stone say he had a back

15   channel on or about August 8th, 2016; is that correct?

16   A.  Yes.  Yes.

17   Q.  At that time had you provided Roger Stone with any

18   information about WikiLeaks?

19   A.  No, sir.

20   Q.  Do you believe that Roger Stone was talking about you on

21   August 8th?

22   A.  No, sir.

23   Q.  Did you tell Roger Stone, repeatedly, you were not the back

24   channel he was referring to on August 8th?

25   A.  Yes.

1    Q.  Did you ever tell Roger Stone that you -- in fact, that was

2    you, you were the guy he was talking about on August 8th?

3    A.  No, I never did.

4    Q.  Did you try to set the record straight with Mr. Stone

5    repeatedly, including prior to his testimony, that you were not

6    the person he referred to on August 8th?

7    A.  Endlessly, yes.

8                MR. ZELINSKY:  If we could put up Government's

9    Exhibit 204.

10   BY MR. ZELINSKY:

11   Q.  Sir, you saw this earlier.  This demonstrative, it's a

12   series of clips from the exhibit you reviewed, the exhibits

13   that were put in today, where you referenced Roger Stone's back

14   channel from August of 2016; is that right?

15   A.  Yes.

16   Q.  And when you consistent -- you began referring, in the top

17   there, it's September 18th, 2016; is that correct?

18   A.  Yes.

19   Q.  And there's another message in October of 2016; is that

20   correct?

21   A.  Yes.

22   Q.  There's another message in January of 2017; is that

23   correct?

24   A.  Yes.

25   Q.  And another one in January of 2018; is that correct?

1    A.  Yes.

2    Q.  All of those references to Mr. Stone's back channel, sir,

3    are they references to yourself?

4    A.  No.

5    Q.  Were you trying to make sure that the truth was clear, that

6    you were not Roger Stone's back channel in August, repeatedly,

7    to Mr. Stone?

8    A.  Yes.

9    Q.  Did you tell that to him well before his testimony in the

10   House?

11   A.  Yes.

12   Q.  Did you continue to tell that to him after his testimony

13   before the House?

14   A.  Yes.

15              MR. ZELINSKY:  No further questions.

16              THE COURT:  All right.  Mr. Credico, you are excused

17   as a witness in this case, and you can step down.

18              Members of the jury, we're going to take our lunch

19   break now.  Seems like the appropriate time.

20              You've got everything?  All right.

21              And we'll return -- we'll resume at -- let's say,

22   1:45.  We'll start with the next government witness.

23              During your lunch, again, you've heard some evidence,

24   but you haven't heard all the evidence.  So, please don't

25   discuss the case among yourselves or with anyone else.

1            Thank you.  Have a pleasant lunch.

2            (Jurors leave.)

3            THE COURT:  All right.  Mr. Zelinsky, I would note

4    that the defense gave you a lot of leeway, did not object.

5    But, redirect is not cross and redirect is not closing

6    argument.  And you don't -- you have license to ask focused

7    questions, but probably not questions as leading as those in

8    future redirect examinations.

9            All right.  Everybody have a good lunch.

10           (Recess.)

11                              *   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                         Dated this 8th day of November 2019




                    _____

                    Janice E. Dickman, CRR, CMR, CCR
                    Official Court Reporter
                    Room 6523
                    333 Constitution Avenue, N.W.
                    Washington, D.C.  20001

## #

**#331** [1] - 676:10

**'**

**'em** [1] - 700:8

## 1

**1** [1] - 695:16
**1,000** [3] - 683:7, 744:2, 778:3
**10** [5] - 704:17, 704:20, 704:22, 731:10, 731:14
**100** [2] - 675:21, 676:3
**1000** [1] - 675:22
**10th** [3] - 721:17, 723:5, 796:10
**11** [5] - 689:6, 730:21, 730:23, 731:10, 731:14
**11-24** [1] - 700:17
**11-24-17** [1] - 700:15
**11-28-17** [1] - 703:20
**112** [1] - 726:6
**11th** [2] - 695:21, 711:11
**12** [9] - 687:7, 712:23, 713:16, 713:25, 718:6, 727:17, 735:4, 735:6, 735:7
**121** [1] - 727:19
**125** [1] - 728:2
**12:30** [1] - 781:10
**12th** [2] - 687:13, 710:2
**130-120** [1] - 676:7
**1300** [1] - 676:3
**136** [1] - 696:6
**13th** [1] - 696:23
**14** [3] - 691:6, 691:17
**148** [1] - 784:15
**14th** [1] - 724:5
**15** [1] - 692:22
**15th** [1] - 707:4
**16** [1] - 701:21
**167** [4] - 784:18, 784:19, 784:20, 784:21
**16th** [1] - 682:15
**17** [1] - 709:25
**17th** [1] - 689:9
**18** [1] - 730:9
**18th** [3] - 725:20, 730:6, 801:17
**19** [2] - 685:10, 735:6
**19-18** [2] - 677:2, 731:17
**19-CR-018** [1] - 675:3
**194** [1] - 682:12
**1953** [1] - 690:9
**19th** [4] - 692:2, 739:2, 745:5, 755:23
**1:00** [1] - 781:11
**1:13** [1] - 700:15
**1:13:53** [1] - 700:19
**1:45** [1] - 802:22

**1st** [2] - 706:23, 707:2

## 2

**2** [7] - 692:23, 697:16, 704:25, 707:13, 711:9, 716:24, 754:13
**2,000** [1] - 683:7
**20** [1] - 768:15
**200** [1] - 784:17
**20001** [2] - 676:16, 804:14
**2002** [5] - 733:12, 737:15, 737:18, 737:19, 737:20
**2004** [1] - 734:6
**2006** [2] - 727:17, 727:18
**2007** [4] - 716:20, 718:17, 734:25, 735:5
**2008** [1] - 735:8
**2012** [1] - 735:16
**2015** [2] - 775:20, 775:23
**2016** [27] - 687:7, 719:14, 719:22, 730:6, 730:9, 730:13, 735:25, 738:5, 739:6, 740:6, 741:16, 742:19, 743:14, 750:7, 751:1, 752:1, 754:25, 755:24, 776:19, 789:17, 800:8, 800:12, 800:15, 801:14, 801:17, 801:19
**2017** [33] - 682:1, 682:15, 683:10, 683:12, 685:10, 689:9, 691:10, 691:22, 692:2, 695:19, 696:15, 696:18, 697:4, 702:10, 702:22, 706:23, 707:2, 710:2, 710:24, 730:16, 752:16, 752:18, 753:6, 753:15, 753:23, 754:10, 776:12, 776:19, 783:18, 785:1, 789:14, 789:15, 801:22
**2018** [31] - 711:11, 712:1, 713:4, 714:18, 715:8, 715:12, 721:9, 723:5, 723:20, 725:20, 725:25, 726:8, 728:4, 729:8, 729:13, 729:15, 730:21, 736:7, 736:17, 738:18, 748:9, 763:25, 765:11, 766:16, 766:19, 766:22, 788:11, 796:10, 800:9, 801:25
**2019** [7] - 675:6, 766:13, 766:14, 766:18, 800:9, 804:8
**202** [1] - 675:17
**202-354-3267** [1] - 676:16
**204** [3] - 700:13, 730:1, 801:9
**20530** [1] - 675:17
**20th** [1] - 693:6
**211** [3] - 701:10, 797:25, 798:7
**212** [2] - 798:19, 798:21
**213** [1] - 799:13
**21st** [1] - 728:4
**22nd** [2] - 741:16, 742:7
**235-8259** [1] - 676:11
**23rd** [1] - 725:25
**24th** [4] - 695:19, 699:6, 710:24, 743:14
**252-7068** [1] - 675:17

**25th** [5] - 698:8, 712:1, 747:12, 747:18
**26th** [3] - 683:12, 698:7, 698:10
**27th** [2] - 702:10, 750:7
**28th** [1] - 760:17
**291** [1] - 702:16
**292** [1] - 703:1
**29th** [2] - 738:3, 760:17

## 3

**3** [5] - 700:13, 701:22, 709:25, 717:20, 793:23
**30** [2] - 767:25, 768:15
**310** [1] - 703:17
**311** [2] - 703:14, 703:16
**312** [1] - 704:4
**316** [1] - 704:11
**328-9064** [1] - 676:8
**33** [1] - 709:13
**333** [2] - 676:15, 804:13
**33301** [2] - 675:22, 676:7
**33316** [1] - 676:11
**33394** [1] - 676:4
**344** [1] - 705:5
**345** [1] - 705:17
**368** [1] - 706:21
**369** [1] - 706:20
**36th** [1] - 751:3
**386** [2] - 706:20, 707:12
**3rd** [2] - 675:21, 730:13

## 4

**4** [3] - 675:5, 701:9, 715:20
**401** [1] - 676:6
**404** [1] - 707:18
**433** [2] - 709:8, 709:11
**47-page** [2] - 754:9, 787:9
**48** [1] - 754:12

## 5

**50** [2] - 740:18, 740:22
**501** [1] - 676:10
**51** [1] - 755:18
**530-5301** [1] - 676:4
**552** [1] - 710:17
**555** [1] - 675:16
**58** [1] - 758:19
**5th** [4] - 713:4, 713:9, 713:10, 714:18

## 6

**6** [7] - 682:1, 696:23, 696:24, 730:16, 730:17, 738:18, 760:25
**61** [1] - 681:19
**62** [3] - 684:24, 786:1, 786:2
**63** [4] - 688:8, 689:2, 691:15,

806

691:23
**64** [1] - 693:11
**65** [2] - 695:16, 701:9
**6523** [2] - 676:15, 804:13
**681** [1] - 676:21
**69** [4] - 702:14, 704:10, 704:25, 710:7
**6:31** [1] - 700:17
**6:33** [1] - 714:18
**6th** [3] - 683:1, 736:17, 764:5

## 7

**7** [2] - 725:19, 735:6
**731** [1] - 676:21
**74** [1] - 711:9
**767-8909** [1] - 675:23
**78** [1] - 711:24
**79** [2] - 712:23, 713:15
**797** [1] - 676:22
**7th** [1] - 710:25

## 8

**8** [2] - 675:6, 710:11
**8-11** [2] - 760:25, 761:1
**81** [1] - 715:5
**82** [1] - 721:7
**84** [2] - 722:23, 796:4
**89** [1] - 723:25
**8th** [6] - 800:15, 800:21, 800:24, 801:2, 801:6, 804:8

## 9

**9** [3] - 715:12, 720:7, 739:6
**91** [1] - 725:7
**93** [2] - 694:18, 725:23
**954** [4] - 675:23, 676:4, 676:8, 676:11
**9:30** [1] - 675:7
**9th** [6] - 691:10, 691:22, 715:8, 726:8, 738:12, 747:22

## A

**a.m** [3] - 675:7, 700:15, 700:17
**Aaron** [2] - 675:15, 677:9
**Abby** [1] - 763:8
**ability** [2] - 756:15, 804:7
**able** [6] - 680:15, 698:11, 699:7, 745:11, 760:4, 760:6
**absolutely** [2] - 720:2, 774:17
**absurd** [4] - 718:2, 793:17, 793:21, 793:25
**accident** [1] - 770:24
**accidental** [1] - 780:3
**account** [3] - 739:20, 758:4, 758:15
**accounts** [4] - 685:15, 740:19,

740:22, 758:4
**accuracy** [1] - 687:6
**accurate** [6] - 686:12, 686:25, 687:2, 693:21, 746:13, 804:5
**accused** [2] - 703:4, 703:5
**accusing** [1] - 788:22
**Ackerman** [1] - 788:22
**ackerman** [1] - 788:24
**acknowledge** [1] - 795:7
**acknowledged** [1] - 771:5
**act** [1] - 729:6
**Action** [1] - 675:3
**action** [1] - 696:25
**activist** [1] - 733:17
**activity** [1] - 720:14
**Adam** [13] - 675:14, 677:9, 695:7, 695:9, 749:17, 765:6, 766:6, 766:9, 766:16, 766:23, 767:5, 768:3, 771:6
**add** [1] - 772:2
**addition** [2] - 782:9, 789:11
**additional** [2] - 712:24, 779:23
**address** [3] - 751:21, 757:21, 758:12
**admission** [1] - 798:1
**admit** [1] - 788:12
**admitted** [6] - 769:11, 772:10, 797:15, 800:5, 800:6
**admitting** [1] - 797:17
**ado** [4] - 796:11, 796:19, 796:20, 796:21
**adopt** [1] - 770:12
**advice** [16] - 707:23, 708:16, 736:18, 736:23, 744:16, 744:19, 744:21, 745:16, 745:18, 777:25, 778:8, 779:13, 779:16, 782:14, 788:5
**advise** [1] - 681:7
**afraid** [2] - 709:1, 709:4
**afterwards** [1] - 697:5
**agenda** [6] - 754:16, 754:24, 755:1, 755:2, 755:5, 755:20
**agent** [1] - 677:11
**ago** [10] - 709:15, 709:22, 718:6, 735:4, 735:7, 762:6, 776:1, 776:17, 777:7, 777:11
**agree** [6] - 694:24, 704:8, 705:23, 732:18, 781:19, 795:4
**agreed** [1] - 771:8
**ahead** [3] - 728:5, 768:13, 783:8
**ahold** [1] - 786:2
**air** [1] - 708:4
**al** [1] - 796:6
**Al** [4] - 734:6, 734:8, 734:10, 734:11
**Alan** [1] - 744:3
**Alex** [1] - 792:23
**alive** [1] - 727:11
**allegation** [1] - 793:17

**allowed** [1] - 768:21
**aloud** [3] - 686:8, 687:4, 719:12
**alt** [1] - 792:23
**alt-right** [1] - 792:23
**Amanda** [1] - 677:10
**amazing** [1] - 796:12
**amend** [1] - 707:3
**Amendment** [19] - 688:1, 694:7, 699:20, 700:10, 701:4, 706:11, 707:9, 712:15, 720:15, 778:4, 778:10, 782:2, 782:6, 782:17, 783:3, 789:12
**America** [3] - 675:3, 677:3, 731:17
**amnesia** [1] - 720:24
**AMY** [1] - 675:9
**Angels** [4] - 689:12, 689:13, 689:24, 783:13
**angry** [1] - 726:18
**annoying** [1] - 773:25
**answer** [15] - 680:7, 688:18, 690:25, 716:18, 737:5, 737:24, 741:9, 751:25, 771:21, 780:14, 780:25, 790:5, 791:18, 792:6, 794:17
**answered** [4] - 712:12, 758:17, 775:4, 780:14
**answering** [1] - 786:3
**answers** [2] - 688:13, 688:14
**anticipate** [1] - 781:3
**AOL** [2] - 757:21, 758:3
**apartment** [3] - 752:1, 792:18, 792:20
**apologize** [3] - 741:11, 751:19, 773:12
**appear** [4] - 694:8, 695:22, 695:23, 713:1
**appearances** [1] - 787:21
**appearing** [1] - 683:11
**appreciate** [3] - 678:2, 678:25, 688:22
**approach** [5] - 677:5, 768:19, 779:3, 779:4, 791:25
**approached** [2] - 679:1, 687:19
**appropriate** [3] - 681:3, 688:20, 802:19
**appropriately** [1] - 678:2
**approval** [1] - 780:13
**April** [4] - 726:8, 748:9, 765:17, 766:24
**area** [1] - 695:13
**Argentina** [1] - 717:10
**argue** [3] - 746:18, 790:23, 794:15
**arguing** [1] - 792:9
**argument** [6] - 791:4, 792:25, 793:4, 793:7, 803:6
**argumentative** [1] - 790:21
**arguments** [1] - 793:5
**Ari** [7] - 722:5, 767:14, 767:16,

770:2, 770:7, 788:9, 788:21
**arrange** [1] - 682:22
**arrived** [1] - 717:14
**article** [8] - 715:14, 715:17,
718:22, 719:9, 719:21, 720:5,
721:4, 799:17
**ashamed** [1] - 729:10
**asjz@usdoj.gov** [1] - 675:18
**aspects** [1] - 786:19
**Assange** [99] - 687:8, 696:12,
696:14, 696:15, 696:17, 696:22,
697:3, 697:11, 698:11, 698:25,
699:7, 699:11, 710:25, 713:11,
719:15, 719:19, 719:24, 721:2,
729:3, 730:12, 732:4, 732:9,
738:4, 738:12, 738:15, 739:3,
739:10, 739:12, 739:13, 740:3,
740:8, 743:15, 743:17, 743:19,
744:2, 745:4, 747:6, 747:11,
747:15, 747:18, 747:22, 747:25,
748:3, 748:4, 748:7, 750:8,
750:15, 750:17, 750:23, 752:13,
752:18, 752:21, 753:3, 753:5,
753:12, 753:19, 754:1, 755:1,
755:4, 755:11, 755:13, 756:16,
756:19, 759:11, 759:15, 760:1,
761:12, 761:14, 761:22, 762:4,
762:12, 765:1, 765:5, 765:14,
765:20, 766:4, 766:8, 766:20,
766:21, 767:3, 767:5, 767:19,
768:2, 768:12, 768:24, 769:18,
770:3, 770:9, 771:14, 772:9,
772:17, 773:5, 788:25, 789:14,
789:18, 791:13, 798:11
**Assange's** [6] - 687:7, 728:5,
745:22, 747:3, 749:12, 770:6
**assert** [1] - 694:7
**asserted** [2] - 720:15, 782:6
**asserting** [3] - 706:11, 707:9,
789:12
**associated** [4] - 678:14, 680:20,
708:21, 774:16
**attach** [1] - 715:14
**attempting** [1] - 748:5
**attended** [1] - 697:2
**attention** [8] - 679:7, 719:14,
719:18, 719:22, 720:1, 749:8,
796:12, 800:8
**Attention** [1] - 796:6
**attest** [1] - 724:18
**ATTORNEY'S** [1] - 675:15
**Attorney's** [1] - 677:10
**August** [28] - 682:8, 698:4,
698:6, 698:7, 698:10, 698:16,
698:22, 711:19, 711:23, 730:20,
738:3, 739:2, 745:4, 747:12,
747:18, 750:7, 769:4, 775:19,
800:8, 800:12, 800:15, 800:21,
800:24, 801:2, 801:6, 801:14,
802:6

**authorize** [1] - 782:1
**authorized** [1] - 779:19
**Avenue** [4] - 675:21, 676:3,
676:15, 804:13
**avoid** [2] - 700:9, 780:17

**B**

**back-channel** [3] - 696:11,
796:11, 796:16
**backstab** [1] - 726:13
**ballpark** [1] - 747:4
**bar** [1] - 728:17
**Barry** [2] - 755:17, 759:19
**based** [4] - 734:13, 762:1,
762:7, 764:20
**basing** [1] - 697:21
**basis** [1] - 678:23
**batch** [2] - 755:24, 756:5
**Beach** [1] - 791:6
**become** [1] - 770:24
**BEFORE** [1] - 675:9
**began** [4] - 680:18, 713:5,
733:12, 801:16
**begin** [4] - 696:4, 696:5, 726:12,
731:7
**beginning** [3] - 731:13, 797:6,
799:15
**begins** [11] - 687:3, 702:16,
709:11, 711:12, 714:17, 714:20,
715:21, 719:10, 720:8, 724:10,
726:10
**behalf** [1] - 677:15
**behind** [1] - 690:7
**believable** [1] - 716:3
**below** [3] - 699:6, 715:13, 728:6
**belt** [1] - 715:13
**bench** [9] - 688:10, 688:11,
768:19, 768:20, 773:15, 779:4,
779:5, 779:24, 792:2
**Benjamin** [1] - 717:15
**BERMAN** [1] - 675:9
**Bernard** [1] - 716:20
**Bernie** [6] - 775:10, 775:11,
775:12, 776:10, 776:11
**best** [9] - 706:9, 745:22, 747:2,
773:1, 780:12, 780:20, 782:16,
782:19, 804:7
**Betsy** [1] - 782:10
**better** [6] - 686:1, 770:13,
786:16, 787:14, 788:6, 788:8
**between** [4] - 690:9, 732:11,
762:17, 768:8, 769:13, 795:25
**beyond** [2] - 682:21, 793:25
**Big** [1] - 761:7
**big** [7] - 695:8, 719:8, 721:2,
734:15, 745:7, 768:5, 791:12
**big-get** [1] - 721:2
**bigger** [2] - 681:23, 700:1
**bit** [2] - 688:14, 752:2

**blame** [2] - 729:11, 729:12
**blank** [2] - 706:8, 712:20
**block** [2] - 740:21
**blocked** [3] - 740:12, 741:13,
798:17
**blow** [1] - 777:4
**bluff** [1] - 694:21
**Blvd** [1] - 676:10
**bombarded** [1] - 724:24
**book** [1] - 790:8
**booked** [2] - 790:7, 790:9
**booker** [1] - 792:22
**booking** [1] - 792:17
**Borrero** [1] - 743:4
**bothered** [2] - 786:20, 786:21
**bothering** [1] - 787:4
**bottom** [12] - 682:14, 691:24,
697:10, 700:18, 711:12, 711:24,
715:7, 715:10, 715:11, 725:20,
728:7, 730:24
**bought** [1] - 697:1
**Boulevard** [1] - 676:6
**bounced** [1] - 775:19
**box** [2] - 788:23
**brag** [4] - 745:10, 745:11,
745:12, 752:21
**braggadocio** [1] - 739:12
**bragged** [3] - 745:6, 745:8,
752:17
**bragging** [1] - 745:13
**Brasi** [2] - 784:6, 784:8
**break** [4] - 731:7, 731:14, 797:3,
802:19
**brief** [2] - 688:10, 716:15
**briefly** [1] - 770:11
**bring** [9] - 679:10, 680:10,
716:7, 720:1, 731:18, 754:6,
780:9, 783:12, 794:1
**bringing** [1] - 729:20
**brings** [1] - 760:12
**British** [1] - 687:7
**broadcast** [1] - 760:23
**brogow@rogowlaw.com** [1] -
675:23
**broke** [1] - 726:16
**brought** [6] - 719:13, 719:22,
752:18, 767:15, 783:14
**Broward** [3] - 735:9, 735:16
**Bruce** [2] - 675:20, 677:14
**BRUCE** [1] - 675:21
**buddy** [1] - 791:15
**Buffalo** [1] - 791:6
**building** [3] - 678:22, 681:10,
759:10
**bunch** [4] - 724:25, 749:4,
749:16, 749:19
**Burnett** [7] - 722:5, 725:15,
725:17, 725:18, 725:21, 788:9
**buschel** [1] - 780:2

**Buschel** [4] - 676:1, 677:13, 731:20, 774:2
**BUSCHEL** [89] - 676:2, 677:13, 677:21, 688:24, 716:14, 731:21, 731:24, 737:8, 737:25, 738:1, 741:12, 741:23, 741:24, 742:3, 742:5, 742:10, 742:20, 742:23, 743:13, 744:13, 746:12, 747:1, 751:8, 751:19, 751:24, 753:2, 753:11, 754:12, 754:17, 755:18, 755:21, 755:22, 758:19, 758:20, 759:1, 760:21, 760:25, 761:3, 762:15, 763:1, 763:2, 765:4, 766:12, 768:14, 770:2, 770:5, 771:22, 773:8, 773:10, 774:3, 774:4, 775:6, 777:3, 777:5, 777:17, 777:22, 779:17, 779:19, 780:11, 780:13, 780:18, 781:6, 781:10, 781:15, 781:22, 781:24, 783:7, 783:10, 784:15, 784:19, 784:21, 784:23, 785:8, 785:9, 787:3, 787:19, 789:4, 790:24, 791:19, 791:22, 792:11, 792:13, 793:11, 795:3, 796:4, 796:9, 796:23, 798:2, 798:22
**Buschel's** [1] - 780:10
**Buschel..................** [1] - 676:21
**buschel@bglaw** [1] - 676:5
**buschel@bglaw-pa.com** [1] - 676:5
**business** [2] - 709:14, 709:21
**BY** [99] - 681:16, 681:21, 681:24, 682:13, 685:2, 685:20, 686:6, 686:22, 689:5, 691:8, 691:19, 692:1, 692:24, 693:13, 694:15, 695:17, 696:3, 697:17, 699:16, 700:14, 701:11, 701:24, 702:11, 702:15, 703:19, 704:12, 705:1, 706:3, 706:22, 707:14, 707:19, 709:10, 710:1, 710:8, 710:12, 710:18, 711:10, 713:18, 714:4, 714:16, 715:6, 715:23, 716:21, 719:1, 721:8, 721:15, 722:10, 723:4, 724:1, 725:12, 725:24, 726:7, 727:20, 728:3, 730:2, 731:24, 737:8, 738:1, 741:12, 742:10, 742:23, 743:13, 744:13, 746:12, 747:1, 751:24, 753:2, 753:11, 754:17, 755:22, 758:20, 759:1, 761:3, 762:15, 763:2, 765:4, 766:12, 774:4, 775:6, 777:5, 777:22, 781:24, 783:10, 784:23, 785:9, 787:3, 787:19, 789:4, 790:24, 791:19, 792:13, 793:11, 795:3, 796:9, 797:5, 798:5, 799:2, 800:7, 801:10
**Byner** [1] - 734:15
**bystander** [1] - 786:14

**C**

**cages** [1] - 774:21
**California** [1] - 766:1
**calm** [1] - 795:2
**campaign** [12] - 716:1, 734:3, 734:4, 734:7, 734:10, 734:12, 774:16, 775:14, 775:19, 776:3, 777:13
**Campion** [2] - 676:1, 677:14
**cancer** [2] - 717:11, 752:5
**Cannon** [4] - 704:17, 704:20, 704:22
**cannot** [2] - 741:13, 790:21
**car** [1] - 786:15
**care** [4] - 686:14, 696:10, 795:22, 795:24
**career** [2] - 740:9, 798:12
**careful** [3] - 734:20, 772:1, 781:13
**Carrot** [2] - 775:10
**case** [11] - 678:1, 678:4, 678:14, 680:16, 680:17, 731:9, 751:17, 773:21, 788:7, 802:17, 802:25
**Case** [2] - 677:2, 731:17
**caused** [1] - 678:9
**caution** [1] - 731:8
**CCR** [1] - 804:12
**cell** [1] - 748:24
**central** [1] - 770:24
**certain** [2] - 707:8, 707:9
**certainly** [6] - 708:5, 723:18, 768:21, 772:7, 781:17, 789:15
**CERTIFICATE** [1] - 804:2
**certify** [1] - 804:4
**chairman** [1] - 695:10
**chance** [1] - 762:7
**Chandler** [2] - 676:9, 677:14
**CHANDLER** [1] - 676:9
**channel** [54] - 683:16, 683:19, 683:21, 684:1, 696:11, 701:19, 703:4, 703:6, 705:9, 705:19, 705:22, 705:23, 708:10, 711:3, 711:14, 711:15, 712:13, 730:25, 748:2, 749:2, 749:20, 749:23, 749:25, 750:6, 761:14, 764:21, 765:1, 769:1, 769:16, 772:12, 774:10, 774:13, 785:18, 786:4, 789:9, 790:1, 790:7, 790:13, 791:5, 791:7, 791:12, 796:11, 796:16, 796:17, 796:18, 796:20, 796:21, 800:15, 800:24, 801:14, 802:2, 802:6
**character** [1] - 689:15
**characterization** [1] - 770:19
**characterizations** [1] - 770:17
**charges** [1] - 728:10
**check** [2] - 724:16, 725:6
**child** [1] - 780:7
**choose** [1] - 678:24

**Chris** [5] - 721:23, 721:24, 721:25, 722:1, 722:2
**Christopher** [1] - 677:11
**chronologically** [1] - 783:15
**cigars** [3] - 716:5, 734:17, 734:18
**circle** [1] - 744:25
**circumstances** [1] - 780:20
**circumstantially** [1] - 786:25
**cite** [1] - 699:25
**City** [1] - 752:1
**claim** [6] - 719:14, 719:23, 749:12, 749:15, 766:8, 793:15
**claiming** [2] - 720:4, 770:20
**claims** [1] - 683:15
**clarify** [1] - 789:1
**clause** [1] - 772:3
**clean** [1] - 703:10
**clear** [10] - 695:14, 701:12, 701:20, 706:18, 708:4, 708:8, 732:3, 764:19, 771:7, 802:5
**cleared** [1] - 708:9
**Clinton** [9] - 687:9, 698:25, 719:16, 740:9, 760:5, 776:9, 776:11, 784:6, 798:12
**clip** [2] - 768:14, 770:2
**clips** [1] - 801:12
**close** [2] - 684:9, 727:5
**closed** [1] - 681:8
**closer** [1] - 792:22
**closing** [1] - 803:5
**Club** [2] - 748:8, 748:13
**CMR** [1] - 804:12
**CNN** [1] - 725:19
**Coast** [2] - 752:3, 791:6
**coffee** [1] - 792:18
**collectively** [1] - 736:14
**colloquy** [1] - 779:25
**COLUMBIA** [2] - 675:1, 675:16
**comedian** [2] - 720:25, 789:21
**comic** [1] - 720:15
**coming** [12] - 748:7, 755:25, 756:4, 756:5, 756:7, 762:2, 762:9, 762:11, 762:12, 783:14, 783:16, 783:19
**commenting** [1] - 771:19
**comments** [1] - 720:17
**commit** [2] - 724:12, 724:17
**commitment** [1] - 677:25
**committed** [1] - 724:20
**Committee** [27] - 683:12, 687:19, 690:19, 691:10, 691:20, 693:1, 693:4, 693:15, 693:22, 694:3, 694:11, 694:17, 694:20, 695:10, 695:22, 695:24, 702:1, 706:24, 710:3, 713:14, 720:8, 720:12, 728:10, 778:1, 782:2, 789:16, 789:18
**committee** [3] - 690:13, 695:12,

699:18
**communicate** [3] - 678:19, 710:2, 772:21
**communicated** [1] - 748:3
**communicating** [2] - 745:1, 777:9
**communication** [6] - 698:9, 710:6, 747:11, 747:13, 765:12, 776:17
**communications** [4] - 766:22, 783:12, 788:11, 788:12
**compelled** [3] - 678:3, 694:8, 787:5
**complaint** [1] - 728:17
**complete** [5] - 677:25, 716:16, 730:12, 797:2, 804:6
**completely** [1] - 678:1
**composition** [1] - 678:6
**concern** [4] - 684:5, 684:8, 770:16, 772:25
**concerned** [9] - 693:15, 694:10, 722:20, 722:24, 726:3, 729:13, 729:18, 729:22, 771:1
**concerning** [3] - 678:6, 678:12, 717:25
**conducting** [1] - 677:25
**confirm** [1] - 724:16
**confirmed** [3] - 686:21, 687:4, 687:6
**confront** [1] - 746:3
**confuse** [1] - 774:10
**confusing** [2] - 738:9, 761:18
**Congress** [4] - 714:6, 714:9, 714:10, 720:24
**congressional** [1] - 709:24
**Congressman** [6] - 765:6, 767:19, 767:21, 767:22, 770:3, 770:8
**connected** [3] - 712:17, 768:23, 776:5
**connection** [6] - 684:2, 701:13, 701:17, 748:4, 749:12, 774:6
**conscious** [1] - 780:18
**consider** [4] - 721:9, 744:9, 744:11, 744:24
**considered** [1] - 720:13
**considering** [4] - 722:2, 722:4, 725:14
**consist** [1] - 716:22
**consistent** [3] - 771:10, 779:15, 801:16
**consternation** [1] - 678:9
**constitutes** [1] - 804:5
**Constitution** [2] - 676:15, 804:13
**consult** [1] - 782:11
**consulted** [5] - 778:7, 778:18, 780:1, 782:10
**consulting** [1] - 782:9
**cont** [1] - 676:21

**contact** [4] - 694:16, 723:15, 723:17, 729:1
**contemplated** [1] - 685:22
**contemplating** [1] - 695:25
**contempt** [1] - 699:25
**context** [1] - 784:12
**continue** [13] - 679:3, 679:8, 680:15, 705:2, 714:2, 722:25, 723:14, 726:3, 727:21, 727:24, 729:13, 735:24, 802:12
**continued** [3] - 710:13, 710:21, 716:4
**Continued** [1] - 681:15
**continuing** [1] - 769:9
**convenient** [1] - 773:13
**Convention** [3] - 697:25, 698:1, 743:22
**conversation** [16] - 729:7, 738:6, 738:7, 738:11, 738:13, 738:17, 738:25, 739:1, 739:5, 739:11, 750:19, 766:25, 792:14
**conversations** [6] - 681:3, 683:15, 691:3, 787:1, 792:16, 792:24
**convey** [3] - 761:24, 769:23, 800:2
**conveyed** [6] - 767:13, 767:14, 768:22, 768:24, 771:14, 773:5
**convince** [1] - 750:15
**Corey** [1] - 752:5
**Corleone** [2] - 690:7, 690:10
**Corn** [1] - 782:24
**correct** [43] - 682:10, 689:17, 693:19, 698:16, 699:5, 713:2, 713:9, 732:6, 732:7, 733:18, 734:11, 734:14, 734:22, 735:2, 735:4, 735:17, 739:21, 741:14, 743:15, 745:15, 754:10, 759:3, 759:5, 765:1, 771:21, 771:25, 774:9, 774:18, 775:7, 775:14, 778:4, 778:11, 778:13, 778:19, 783:25, 784:8, 793:16, 800:10, 800:15, 801:17, 801:20, 801:23, 801:25
**corrected** [2] - 743:3, 743:4
**correctly** [1] - 739:5
**Correspondents** [5] - 748:8, 748:13, 765:17, 765:23, 766:24
**correspondents'** [1] - 748:22
**corruption** [1] - 716:7
**counsel** [6] - 677:5, 677:8, 688:9, 688:21, 693:3, 767:25
**Counsel** [2] - 712:5, 712:6, 712:19
**Counsel's** [3] - 736:4, 738:2, 764:4
**count** [1] - 736:12
**counts** [1] - 706:17
**County** [2] - 735:10, 735:17
**coup** [2] - 740:9, 798:11

**couple** [3] - 690:1, 736:6, 789:19
**course** [2] - 697:8, 796:17
**court** [9] - 677:24, 681:8, 689:1, 696:25, 741:1, 773:2, 773:11, 781:23, 792:12
**Court** [11] - 676:14, 676:14, 731:22, 753:24, 755:7, 759:13, 761:10, 761:13, 770:12, 780:4, 804:12
**COURT** [126] - 675:1, 677:12, 677:16, 677:22, 679:13, 679:15, 679:18, 679:21, 679:25, 680:13, 688:9, 688:12, 688:17, 688:20, 690:22, 702:7, 716:16, 718:13, 718:15, 718:19, 718:22, 731:6, 731:12, 731:18, 731:20, 737:5, 737:22, 740:24, 741:3, 741:6, 742:1, 742:4, 742:6, 742:8, 742:15, 742:18, 742:21, 742:25, 743:6, 743:8, 743:10, 744:8, 744:10, 746:3, 746:8, 746:18, 746:20, 746:24, 751:6, 751:10, 751:12, 751:14, 751:17, 751:20, 752:25, 753:9, 758:14, 761:15, 761:17, 761:24, 762:3, 762:21, 762:23, 764:24, 765:3, 766:10, 768:17, 768:19, 768:21, 770:4, 771:12, 771:24, 773:9, 773:12, 774:25, 775:4, 776:20, 776:24, 777:16, 777:19, 777:21, 779:2, 779:4, 779:7, 779:18, 779:21, 780:5, 780:8, 780:12, 780:15, 780:19, 781:5, 781:7, 781:11, 781:17, 783:8, 786:19, 789:3, 790:19, 790:21, 791:16, 791:21, 791:24, 792:1, 792:3, 793:3, 793:6, 793:8, 794:12, 794:17, 794:20, 794:24, 795:1, 796:25, 797:2, 797:20, 797:24, 798:1, 798:3, 798:21, 798:23, 799:1, 800:5, 802:16, 803:3, 804:2
**Courthouse** [1] - 676:15
**COURTROOM** [9] - 677:1, 680:12, 731:16, 758:22, 784:20, 784:22, 797:14, 797:18, 800:4
**courtroom** [9] - 677:4, 678:5, 679:14, 680:11, 731:11, 731:19, 740:25, 745:19, 780:6
**cover** [2] - 696:16, 705:24
**covered** [1] - 772:22
**covering** [1] - 752:19
**crazy** [1] - 778:17
**CRC** [1] - 676:14
**created** [1] - 678:23
**credibility** [1] - 769:22
**credico** [2] - 742:11, 752:6
**Credico** [54] - 676:20, 679:11, 679:15, 681:11, 681:17, 681:22, 681:25, 685:7, 685:10, 685:15,

687:10, 689:6, 698:15, 702:25, 716:4, 716:7, 719:10, 719:13, 719:21, 720:13, 720:23, 721:21, 731:13, 732:3, 739:15, 751:12, 752:8, 752:20, 754:20, 755:9, 756:11, 758:8, 763:18, 771:4, 771:8, 771:9, 771:11, 774:22, 774:24, 777:23, 780:1, 781:25, 782:25, 783:11, 787:12, 790:18, 791:16, 796:10, 797:6, 798:6, 798:8, 799:3, 799:14, 802:16
**Credico's** [2] - 715:22, 715:25
**Credico2016** [3] - 739:23, 739:25, 741:20
**Criminal** [3] - 675:3, 677:2, 731:16
**criminal** [2] - 740:9, 798:12
**Crimmins** [2] - 755:17, 759:19
**Cross** [1] - 676:21
**cross** [10] - 731:7, 770:16, 770:19, 770:25, 772:7, 772:10, 772:21, 791:9, 797:6, 803:5
**CROSS** [1] - 731:23
**Cross-Examination** [1] - 676:21
**cross-examination** [5] - 731:7, 770:16, 770:19, 770:25, 797:6
**CROSS-EXAMINATION** [1] - 731:23
**cross-examine** [1] - 772:7
**Crown** [1] - 697:1
**CRR** [2] - 676:14, 804:12
**crux** [2] - 729:19, 729:21
**cut** [5] - 765:10, 765:11, 765:15, 766:22, 794:7

# D

**D.C** [4] - 677:10, 748:17, 767:1, 804:14
**daily** [1] - 678:23
**Daily** [1] - 717:15
**damn** [1] - 697:11
**dangle** [1] - 785:18
**dangled** [1] - 786:3
**date** [10] - 691:18, 691:20, 693:3, 702:10, 706:25, 707:5, 721:16, 753:8, 791:17, 791:22
**Date** [1] - 675:6
**Dated** [1] - 804:8
**dated** [1] - 702:3
**dates** [3] - 700:22, 701:6, 766:11
**David** [2] - 782:24, 789:23
**DAY** [1] - 675:5
**days** [7] - 677:23, 679:2, 697:2, 725:25, 743:14, 759:20, 768:5
**Daytona** [2] - 717:10, 717:11
**DC** [3] - 675:6, 675:17, 676:16
**de** [2] - 740:9, 798:11

**deadline** [1] - 694:1
**deal** [5] - 745:7, 760:4, 760:5, 782:24, 785:18
**December** [7] - 706:23, 707:2, 710:2, 710:24, 736:17, 738:18, 764:5
**decided** [5] - 714:20, 714:21, 778:21, 778:22, 778:23
**decision** [1] - 779:15
**decline** [1] - 692:25
**declined** [2] - 693:4, 693:14
**declining** [1] - 693:8
**decorum** [1] - 678:25
**Defendant** [3] - 675:7, 675:20, 676:1
**defense** [4] - 731:13, 780:11, 797:17, 803:4
**definitely** [1] - 701:18
**deliver** [2] - 732:3, 732:8
**delivered** [1] - 787:9
**delivering** [3] - 766:19, 766:21, 770:3
**Democratic** [3] - 697:25, 698:1, 743:22
**democrats** [3] - 719:16, 774:18, 774:19
**demonstrative** [2] - 730:1, 801:11
**deniability** [2] - 724:15, 725:5
**denied** [2] - 769:14, 772:12
**Department** [1] - 744:23
**DEPUTY** [9] - 677:1, 680:12, 731:16, 758:22, 784:20, 784:22, 797:14, 797:18, 800:4
**Dershowitz** [1] - 744:3
**describe** [1] - 743:25
**described** [1] - 752:12
**descriptions** [1] - 686:23
**details** [1] - 714:23
**determine** [1] - 682:7
**Dickman** [2] - 676:14, 804:12
**DICKMAN** [1] - 804:4
**die** [1] - 777:14
**died** [3] - 776:17, 777:6, 777:11
**different** [3] - 685:15, 728:11, 740:15
**differently** [1] - 772:11
**difficult** [3] - 740:25, 780:12, 780:20
**Dinner** [5] - 748:9, 748:13, 765:17, 765:23, 766:24
**dinner** [1] - 748:22
**direct** [6] - 732:22, 764:20, 770:23, 772:10, 776:1, 779:9
**DIRECT** [1] - 681:15
**Direct** [1] - 676:21
**directed** [2] - 799:11, 799:20
**directing** [1] - 777:1
**directly** [4] - 728:22, 729:9,

746:7, 765:19
**disagree** [1] - 732:16
**Disappeared** [3] - 686:24, 733:17, 733:20
**disclose** [1] - 709:1
**disclosure** [1] - 685:22
**discuss** [12] - 680:16, 683:22, 701:2, 701:3, 702:12, 710:9, 710:13, 710:22, 727:21, 727:24, 773:14, 802:25
**discussed** [3] - 689:19, 698:15, 781:19
**discussing** [1] - 696:20
**discussion** [5] - 687:18, 688:11, 768:20, 779:5, 792:2
**discussions** [2] - 687:20, 693:7
**disseminated** [1] - 740:8
**distinctly** [1] - 738:11
**DISTRICT** [4] - 675:1, 675:1, 675:10, 675:16
**divert** [1] - 691:2
**DNC** [2] - 697:23, 698:4
**document** [4] - 691:7, 699:15, 758:7, 784:9
**documentary** [3] - 717:12, 790:8, 794:7
**documents** [3] - 711:1, 719:17, 772:18
**dodged** [1] - 720:23
**dog** [22] - 726:15, 726:23, 726:24, 727:3, 727:5, 727:8, 727:12, 727:16, 727:17, 795:7, 795:11, 795:12, 795:13, 795:14, 795:15, 795:16, 795:20, 795:22, 795:24, 796:2
**dogs** [8] - 795:4, 795:5, 795:6, 795:8, 795:9, 795:10, 795:11, 795:13
**Donald** [6] - 708:22, 774:16, 775:14, 776:2, 776:5, 776:13
**done** [11] - 690:12, 706:9, 728:25, 729:10, 729:11, 753:20, 764:14, 771:11, 788:2, 788:3, 792:10
**Dore** [1] - 749:22
**Dore's** [2] - 748:19, 748:24
**double** [1] - 791:9
**double-cross** [1] - 791:9
**down** [19] - 682:20, 686:20, 694:14, 696:2, 699:15, 700:12, 706:19, 714:2, 714:14, 714:15, 716:7, 722:6, 725:9, 743:2, 767:1, 773:2, 785:8, 795:2, 802:17
**dozens** [1] - 787:20, 787:23
**Dr** [5] - 754:5, 755:19, 756:8, 758:6, 760:5
**draconian** [1] - 734:1
**drag** [3] - 684:10, 684:11, 708:18

dragged [1] - 684:15
dragging [1] - 792:21
draw [1] - 679:6
driving [1] - 786:14
drop [3] - 740:8, 755:25, 798:11
drove [1] - 778:17
drug [4] - 704:9, 733:23, 733:24, 733:25
Drug [2] - 686:24, 717:13
dumped [1] - 775:25
during [13] - 697:3, 716:1, 723:13, 726:3, 732:21, 743:21, 745:14, 755:23, 767:18, 784:5, 792:24, 802:23
dying [3] - 717:11, 726:14, 752:5

## E

e-mail [12] - 685:25, 687:16, 687:17, 756:11, 757:4, 757:10, 757:18, 757:20, 758:12, 769:3, 795:25, 796:14
e-mails [1] - 685:16
early [2] - 682:8, 730:20
easily [1] - 678:24
East [2] - 676:6, 676:10
echelon [1] - 723:11
Ecuadorian [3] - 755:10, 759:2, 765:15
ed [1] - 744:20
effect [3] - 693:18, 746:24, 747:2
eight [1] - 693:12
either [5] - 680:8, 711:8, 726:16, 746:9, 773:16
elaborate [1] - 690:3
elaboration [1] - 680:8
elected [1] - 778:13
election [7] - 696:19, 708:6, 728:23, 729:1, 753:23, 754:2, 754:4
elevated [1] - 749:11
elicited [1] - 764:25
Eliot [3] - 716:6, 716:10, 716:19
Elizabeth [1] - 717:15
Email [8] - 675:18, 675:18, 675:19, 675:23, 676:5, 676:8, 676:12, 676:17
email [23] - 682:1, 682:4, 682:14, 682:15, 683:1, 683:24, 685:3, 685:12, 685:14, 698:10, 714:11, 714:12, 715:8, 721:16, 722:14, 722:18, 723:5, 723:23, 723:24, 724:2, 724:10, 724:25, 726:8
emails [7] - 682:6, 687:8, 701:17, 738:18, 738:21, 758:2, 772:15
embarrassed [1] - 721:1

embassy [6] - 753:14, 753:19, 755:12, 759:2, 760:14, 761:7
emotion [1] - 721:5
Empire [1] - 763:12
encouraged [1] - 782:21
end [10] - 685:21, 688:13, 736:8, 743:9, 762:10, 771:19, 778:5, 778:14, 778:22, 781:1
ended [3] - 735:19, 767:11, 792:22
endlessly [1] - 801:7
enlarge [12] - 684:25, 689:3, 691:7, 691:18, 693:12, 696:1, 701:23, 715:21, 721:12, 722:8, 723:2, 725:8
enlarged [1] - 682:16
enlisted [1] - 734:3
ensued [1] - 708:12
enter [2] - 680:11, 731:19
enters [1] - 679:14
entire [7] - 736:18, 736:23, 749:22, 750:5, 771:17, 793:18
entities [1] - 678:24
Erin [7] - 722:5, 725:15, 725:17, 725:18, 725:21, 788:9
Errol [1] - 704:6
escalate [1] - 723:21
essentially [2] - 769:11, 772:4
et [1] - 796:6
evening [1] - 680:14
event [4] - 748:14, 748:15, 748:16, 765:22
events [3] - 691:4, 696:20, 782:16
eventually [1] - 729:6
everywhere [2] - 748:21, 748:23
evidence [6] - 701:13, 701:16, 705:9, 742:4, 802:23, 802:24
exact [4] - 721:5, 745:24, 745:25
exactly [10] - 683:8, 689:22, 732:10, 732:13, 740:10, 745:24, 746:14, 765:2, 772:5, 786:24
exaggerations [1] - 733:8
EXAMINATION [3] - 681:15, 731:23, 797:4
examination [8] - 731:7, 732:22, 764:20, 770:16, 770:19, 770:25, 776:1, 797:6
Examination [3] - 676:21, 676:21, 676:22
examinations [2] - 780:21, 803:8
examine [1] - 772:7
except [2] - 745:19, 749:11
excerpt [1] - 749:21
exchanges [1] - 784:2
excuse [1] - 794:25
excused [2] - 731:12, 802:16
Exhibit [41] - 681:19, 682:12,

684:24, 688:8, 689:2, 691:5, 691:6, 691:14, 691:17, 691:23, 692:22, 693:11, 695:16, 701:9, 701:21, 702:14, 704:10, 704:25, 709:25, 710:7, 711:9, 711:24, 712:23, 713:15, 715:5, 721:7, 722:23, 723:25, 725:7, 725:23, 726:6, 727:19, 728:2, 754:12, 784:17, 796:4, 797:25, 798:7, 798:19, 799:13, 801:9
exhibit [17] - 684:25, 703:15, 703:18, 706:2, 706:20, 707:13, 714:1, 715:16, 715:20, 720:7, 722:7, 730:1, 730:3, 760:18, 784:15, 784:24, 801:12
exhibits [1] - 801:12
expect [1] - 757:20
experience [1] - 794:15
experts [1] - 705:23
explain [3] - 735:21, 789:8, 790:4
explaining [2] - 720:17, 749:17
express [1] - 678:16
expressed [1] - 686:1
extended [1] - 763:14
extent [1] - 773:19
extrapolate [2] - 712:16, 783:4
extrapolating [2] - 712:14, 788:24
extricate [1] - 789:8
eyes [1] - 678:18

## F

Facebook [4] - 759:23, 760:16, 760:18, 760:22
facilitate [1] - 780:23
fact [13] - 696:11, 732:21, 750:19, 772:8, 779:13, 782:5, 782:15, 782:23, 784:5, 788:5, 796:2, 799:17, 801:1
facts [1] - 780:16
fair [11] - 732:17, 733:10, 734:13, 734:24, 769:24, 771:17, 771:18, 772:6, 772:7, 772:13, 772:17
fairly [3] - 742:13, 771:10, 781:3
fairness [1] - 732:14
false [4] - 678:8, 749:12, 749:15, 769:25
familiar [1] - 704:20
family [1] - 727:7
famous [1] - 793:21
fan [1] - 734:15
fanfare [1] - 684:14
far [1] - 774:20
father [7] - 709:14, 709:21, 716:6, 716:10, 716:20, 717:17, 735:1
fault [1] - 773:15

812

**favor** [1] - 760:13
**favors** [4] - 755:25, 756:14, 756:16, 756:21
**FBI** [11] - 677:10, 705:10, 705:12, 706:13, 706:14, 711:3, 711:6, 711:7, 736:4, 736:6, 736:12
**feeds** [1] - 719:19
**felt** [3] - 733:25, 786:16, 787:14
**few** [4] - 680:5, 736:17, 749:23, 793:12
**fifth** [1] - 692:8
**Fifth** [33] - 688:1, 694:7, 695:15, 700:10, 701:4, 706:11, 707:9, 707:21, 707:24, 707:25, 708:1, 708:12, 708:13, 708:14, 708:16, 709:6, 710:4, 710:19, 712:12, 712:15, 720:15, 720:19, 778:4, 778:10, 782:2, 782:6, 782:17, 782:25, 783:2, 788:21, 788:24, 789:11
**fighting** [1] - 723:8
**figure** [1] - 749:10
**file** [1] - 728:17
**Files** [1] - 763:13
**finally** [4] - 708:15, 766:3, 767:14, 789:9
**Financial** [1] - 676:2
**fine** [5] - 699:25, 751:20, 756:18, 779:21, 797:24
**finish** [2] - 753:9, 781:8
**finished** [3] - 681:25, 686:9, 741:8
**fired** [1] - 716:2
**first** [25] - 685:18, 686:20, 687:3, 697:9, 698:9, 699:10, 710:25, 712:7, 714:20, 718:2, 719:13, 721:13, 728:6, 730:3, 736:6, 738:13, 739:5, 740:2, 749:3, 764:20, 770:12, 770:15, 775:17, 783:11, 790:5
**First** [4] - 699:20, 700:10, 701:4, 789:12
**Five** [4] - 689:12, 689:13, 689:24, 783:12
**five** [5] - 725:25, 765:25, 776:17, 777:6, 777:11
**FL** [4] - 675:22, 676:4, 676:7, 676:11
**flew** [1] - 689:10
**floor** [1] - 767:12
**Florida** [4] - 735:10, 757:7, 757:8
**flown** [1] - 717:10
**Flying** [1] - 708:19
**focus** [2] - 770:24, 800:12
**focused** [2] - 737:23, 803:6
**focusing** [1] - 780:23
**follow** [4] - 680:5, 680:15, 688:5, 698:1

**follow-up** [1] - 680:5
**followed** [1] - 697:24
**following** [10] - 680:22, 682:23, 697:25, 709:9, 710:6, 719:18, 738:15, 739:4, 760:19, 787:16
**food** [2] - 752:18, 753:14
**fool** [6] - 690:16, 706:15, 707:7, 748:5, 748:6, 760:8
**FOR** [2] - 675:1, 675:15
**foregoing** [1] - 804:5
**forensic** [4] - 701:13, 701:16, 705:9, 705:23
**forensically** [1] - 703:9
**forget** [1] - 774:5
**forgot** [1] - 739:2
**form** [1] - 739:20
**former** [1] - 717:13
**Fort** [2] - 675:22, 676:7
**forth** [3] - 768:23, 783:24, 785:21
**forwarded** [3] - 685:3, 757:14, 757:15
**forwarding** [2] - 722:16, 743:17
**foundation** [2] - 761:18, 764:25
**foundational** [2] - 769:25, 772:3
**founder** [1] - 747:6
**four** [5] - 706:6, 718:17, 720:16, 758:4, 790:15
**four-letter** [1] - 706:6
**Fourth** [1] - 675:16
**fourth** [1] - 719:9
**frames** [1] - 766:10
**frank** [1] - 704:24
**Frank** [20] - 682:22, 689:12, 689:15, 689:20, 689:25, 690:5, 690:10, 690:12, 690:15, 690:25, 702:18, 704:17, 704:20, 704:22, 709:23, 725:22, 794:5
**Frankie** [4] - 689:12, 689:13, 689:24, 783:12
**freedom** [1] - 700:1
**frequently** [1] - 735:25
**Friday** [1] - 725:19
**friend** [9] - 684:9, 702:18, 714:22, 728:18, 728:19, 730:11, 745:11, 763:7, 794:5
**friends** [7] - 726:13, 745:22, 747:3, 774:18, 774:19, 775:7, 775:9
**friendships** [1] - 776:7
**friggin'** [1] - 697:15
**frigging** [1] - 726:15
**front** [13] - 682:4, 690:13, 695:22, 695:24, 699:18, 709:23, 713:14, 720:24, 758:7, 759:2, 759:22, 778:1, 785:3
**Front** [1] - 725:18
**frustrated** [2] - 712:11, 723:13
**frustration** [1] - 705:15

**Ft** [2] - 676:4, 676:11
**FUCK** [1] - 697:11
**full** [4] - 728:16, 764:13, 764:14, 804:6
**Fund** [2] - 733:15, 733:19
**future** [1] - 803:8
**Fwd** [1] - 685:10

## G

**gag** [1] - 716:3
**gallery** [1] - 678:25
**Gary** [5] - 699:13, 739:7, 755:3, 755:6, 760:9
**gather** [1] - 681:9
**gathering** [1] - 748:18
**general** [2] - 746:16, 759:17
**generally** [1] - 772:5
**genesis** [1] - 784:2
**gentleman** [3] - 686:21, 687:4, 687:6
**Gerson** [1] - 743:4
**GIBBONS** [1] - 676:2
**given** [2] - 695:13, 773:7
**glad** [1] - 680:13
**glasses** [3] - 679:18, 679:24, 702:5
**Glenn** [1] - 709:18
**go-between** [2] - 762:17, 769:13
**goal** [1] - 753:22
**Godfather** [8] - 689:10, 689:15, 689:24, 709:24, 783:23, 783:25, 784:4, 784:8
**Golisano** [1] - 734:3
**Golisano's** [2] - 716:1, 716:2
**goods** [1] - 697:13
**government** [12] - 736:25, 758:1, 758:19, 758:21, 765:15, 770:15, 771:1, 784:15, 796:4, 797:13, 797:23, 802:22
**Government's** [7] - 754:12, 784:17, 797:25, 798:7, 798:19, 799:13, 801:8
**government's** [2] - 729:25, 755:18
**Governor** [3] - 716:6, 716:10, 735:1
**grand** [1] - 736:16
**grandfather** [1] - 793:13
**Grant** [2] - 676:5, 677:14
**graphs** [1] - 784:16
**grateful** [1] - 734:5
**Great** [3] - 777:10, 777:12
**great** [2] - 678:9, 794:10
**Greenwald** [1] - 709:18
**greet** [2] - 679:5, 680:21
**grew** [1] - 765:25
**grist** [1] - 772:21
**grounds** [1] - 716:14

813

**grâce** [2] - 740:9, 798:11
**gsmith@strategysmith.com** [1] - 676:8
**guarantee** [1] - 707:10
**guess** [3] - 691:1, 698:13, 706:10
**guy** [20] - 689:24, 690:5, 690:7, 702:22, 705:6, 708:5, 712:13, 712:17, 718:4, 730:19, 749:10, 749:11, 759:22, 768:12, 776:4, 786:24, 788:13, 788:22, 801:2
**guys** [1] - 794:5

# H

**habit** [1] - 780:6
**hairs** [1] - 738:25
**Haley** [2] - 702:8, 797:11
**half** [1] - 720:16
**hallway** [1] - 680:20
**hallways** [1] - 680:24
**hammer** [2] - 740:9, 798:11
**hand** [1] - 720:16
**hanging** [1] - 705:16
**happy** [4] - 718:18, 720:5, 767:3, 775:11
**hardball** [1] - 788:14
**harm** [1] - 709:4
**Harrison** [2] - 744:18, 762:10
**Harrods** [2] - 752:19, 753:15
**Hayes** [6] - 721:23, 721:24, 721:25, 722:1, 722:2, 722:4
**head** [8] - 705:16, 712:4, 755:3, 762:24, 762:25, 763:3, 763:4, 782:23
**headache** [1] - 705:10
**headaches** [1] - 756:23
**header** [4] - 684:25, 685:8, 685:9
**hear** [1] - 794:10
**heard** [7] - 716:4, 716:5, 773:21, 793:17, 800:14, 802:23, 802:24
**hearing** [1] - 785:5
**heavy** [1] - 700:21
**HELD** [1] - 675:9
**held** [1] - 782:23
**hello** [1] - 680:25
**help** [4] - 708:7, 741:6, 741:8, 771:9
**helped** [5] - 708:5, 734:2, 734:11, 745:12, 776:13
**helping** [4] - 775:13, 775:17, 776:2
**hereby** [1] - 804:4
**hiding** [2] - 712:16, 788:22
**highlighted** [5] - 730:4, 730:8, 730:10, 730:15, 730:24
**Hilary** [3] - 687:9, 698:25, 719:16

**Hillary** [11] - 697:13, 750:8, 750:16, 760:5, 775:7, 775:9, 775:10, 775:11, 776:9, 776:11, 784:6
**Hillary's** [1] - 777:13
**himself** [2] - 697:14, 712:20
**hired** [2] - 736:18, 736:20
**history** [1] - 764:14
**hit** [4] - 784:8, 786:15, 788:15, 790:16
**hitting** [1] - 715:13
**hold** [2] - 773:20
**holding** [1] - 755:2
**hon** [1] - 711:5
**honest** [5] - 711:3, 711:4, 711:6, 713:12, 728:9
**Honor** [21] - 677:1, 677:7, 679:12, 679:23, 680:12, 681:14, 688:19, 688:22, 688:25, 716:15, 718:25, 731:5, 731:16, 768:18, 770:11, 776:22, 779:6, 779:24, 791:25, 798:4, 798:25
**HONORABLE** [1] - 675:9
**hope** [1] - 680:14
**hopefully** [2] - 755:15, 781:1
**hoping** [1] - 759:18
**host** [2] - 721:25, 725:18
**hours** [1] - 720:17
**House** [35] - 683:12, 687:19, 690:18, 691:9, 691:20, 692:25, 693:4, 693:14, 693:22, 694:3, 694:11, 694:16, 694:20, 695:10, 695:24, 702:1, 706:23, 710:3, 713:14, 720:8, 720:12, 728:9, 765:17, 765:23, 766:24, 767:12, 769:20, 778:1, 782:2, 782:6, 785:3, 789:16, 789:18, 802:10, 802:13
**huge** [1] - 748:18
**humor** [1] - 690:21
**hundred** [1] - 792:16
**hunt** [2] - 697:15, 782:7
**hurt** [1] - 795:15
**husband** [1] - 684:13
**husher** [1] - 773:13
**hyperbole** [1] - 796:3
**hyperlink** [1] - 715:14

# I

**Ian** [1] - 675:13
**idea** [1] - 689:23
**ideas** [1] - 795:23
**identified** [2] - 733:7, 739:6
**identify** [3] - 677:6, 685:23, 686:2
**idiot** [2] - 702:19, 728:11
**ignore** [1] - 681:4
**II** [6] - 689:10, 689:15, 689:24, 783:23, 783:25, 784:4

**illegal** [1] - 706:9
**imitated** [1] - 717:16
**imitating** [1] - 717:21
**imitation** [2] - 704:18, 717:22
**immediately** [2] - 683:14, 717:6
**impeach** [1] - 769:13
**impeachment** [1] - 768:15
**imply** [9] - 746:16, 753:25, 755:8, 759:14, 759:25, 760:14, 761:11, 761:13, 761:21
**implying** [3] - 756:14, 756:15, 760:23
**impossible** [1] - 703:3
**impression** [5] - 716:8, 762:16, 769:25, 793:20, 794:4
**impressionist** [2] - 715:22, 715:25
**impressions** [1] - 734:14
**improper** [1] - 794:20
**IN** [1] - 675:1
**in-court** [1] - 773:2
**inaccurate** [2] - 678:13, 770:18
**incidents** [1] - 718:7
**including** [5] - 678:14, 759:9, 759:24, 778:2, 801:5
**inconsistency** [3] - 770:1, 771:10
**inconsistent** [2] - 772:24, 773:1
**incorrect** [1] - 738:23
**incredible** [1] - 716:8
**indebted** [1] - 760:9
**INDEX** [1] - 676:19
**indicate** [2] - 799:23, 800:1
**indicating** [1] - 797:1
**indicating)** [1] - 758:10
**indication** [1] - 780:3
**indicted** [2] - 698:14, 707:10
**individual** [3] - 681:3, 711:18, 732:25
**individuals** [1] - 678:23
**information** [12] - 678:10, 722:12, 750:16, 751:18, 761:21, 762:1, 762:7, 762:8, 762:12, 799:23, 800:2, 800:18
**insert** [1] - 780:20
**inside** [3] - 748:23, 753:14, 800:2
**instances** [1] - 737:16
**instructions** [3] - 680:16, 680:19, 693:7
**Intel** [5] - 695:10, 695:22, 728:10, 789:16, 789:18
**Intelligence** [18] - 683:12, 687:19, 690:18, 691:9, 691:20, 693:1, 693:4, 693:15, 694:11, 694:17, 695:24, 702:1, 706:24, 710:3, 720:8, 720:12, 778:1, 782:2
**intense** [1] - 794:14

814

**intent** [1] - 761:13
**interacting** [1] - 681:1
**Intercept** [3] - 709:12, 709:13, 709:16
**intercept** [1] - 709:17
**Intercepted** [2] - 709:19, 782:18
**interest** [2] - 723:7, 782:17
**intermediary** [7] - 684:21, 732:11, 762:17, 768:7, 768:9, 769:4, 769:8
**interpret** [3] - 722:16, 756:18, 756:19
**interview** [14] - 687:7, 687:14, 691:12, 691:21, 698:6, 725:14, 738:3, 749:9, 763:8, 763:14, 764:14, 767:16, 768:16, 793:10
**interviewed** [8] - 692:25, 693:5, 693:8, 693:14, 736:4, 736:15, 767:3, 767:4
**interviewing** [1] - 748:24
**interviews** [1] - 767:18
**introduced** [4] - 734:8, 734:11, 749:3, 749:13
**introducing** [1] - 749:1
**introductory** [1] - 772:3
**inveigled** [1] - 735:20
**investigation** [3] - 712:4, 736:12, 782:7
**investigations** [1] - 710:14
**investigators** [1] - 736:13
**invited** [3] - 765:22, 765:23, 766:24
**invoked** [1] - 778:4
**invoking** [1] - 782:2
**involved** [3] - 683:25, 684:3, 722:19
**involvement** [1] - 788:6
**irrelevant** [1] - 754:6
**irresponsible** [1] - 678:13
**Irwin** [1] - 752:5
**Isikoff** [1] - 789:10
**issue** [1] - 734:4
**issues** [2] - 714:5, 773:15
**Italian** [2] - 697:1, 784:3
**items** [1] - 732:17
**ITV** [1] - 687:8

## J

**JACKSON** [1] - 675:9
**jail** [1] - 787:2
**Janice** [2] - 676:14, 804:12
**JANICE** [1] - 804:4
**JaniceDickmanDCD@gmail. com** [1] - 676:17
**January** [12] - 682:1, 682:15, 683:1, 711:11, 712:1, 727:17, 730:16, 730:17, 730:21, 730:23, 801:22, 801:25
**Jason** [1] - 675:6

**Jed** [2] - 675:14, 677:9
**Jeremy** [2] - 709:18, 740:4
**Jimmy** [3] - 748:19, 748:24, 749:22
**job** [4] - 725:3, 740:25, 741:9, 794:21
**John** [3] - 675:14, 734:15, 749:18
**Johnson** [5] - 699:13, 739:7, 755:3, 755:6, 760:9
**joke** [2] - 796:17, 796:18
**Jon** [1] - 675:15
**Jonathan** [2] - 675:13, 677:8
**jonathan. kravis3@usdoj.gov** [1] - 675:18
**Jones** [1] - 792:23
**journalist** [8] - 697:1, 697:11, 699:17, 700:11, 720:15, 782:10, 789:13, 789:21
**Jr** [1] - 675:6
**Judge** [9] - 677:13, 729:3, 731:21, 737:25, 751:19, 763:1, 774:3, 791:22, 796:24
**JUDGE** [2] - 675:9, 675:10
**judge** [2] - 768:14, 773:21
**Julian** [52] - 687:7, 699:11, 719:15, 719:24, 729:3, 730:12, 732:4, 732:9, 738:4, 738:12, 739:10, 739:12, 744:2, 745:4, 747:3, 747:6, 747:11, 747:25, 748:3, 748:4, 749:12, 750:8, 750:15, 750:17, 752:13, 752:18, 752:21, 753:3, 753:5, 753:12, 754:1, 755:1, 756:16, 759:11, 759:15, 760:1, 761:12, 761:14, 765:1, 765:5, 765:20, 766:4, 766:8, 766:20, 766:21, 767:19, 770:3, 770:9, 788:25, 791:13
**July** [11] - 704:18, 704:21, 704:22, 719:14, 719:22, 720:1, 741:16, 742:7, 742:18, 743:14, 769:4
**June** [5] - 687:7, 687:13, 740:5, 740:6, 765:18
**junk** [1] - 788:15
**JURORS** [2] - 681:23, 758:24
**jurors** [7] - 678:15, 680:10, 680:11, 731:8, 731:11, 731:19, 803:2
**jurors'** [1] - 797:12
**JURY** [2] - 675:4, 675:8
**jury** [18] - 678:6, 731:18, 736:16, 741:23, 768:25, 769:2, 769:7, 770:17, 771:3, 771:9, 772:14, 773:12, 773:22, 789:11, 798:3, 798:23, 798:24, 802:18
**Justice** [2] - 733:15, 744:22
**juxtapose** [1] - 772:24
**juxtaposing** [1] - 769:6

## K

**Kasich** [1] - 749:18
**Keefe** [1] - 677:11
**keep** [11] - 684:18, 688:13, 705:7, 714:3, 714:15, 723:22, 724:14, 728:17, 769:15, 781:12, 788:16
**keeps** [1] - 761:18
**kept** [1] - 768:6
**kicked** [1] - 748:15
**kids** [2] - 727:9, 774:21
**kind** [9] - 701:18, 723:20, 725:2, 768:7, 769:12, 771:19, 774:12, 783:2, 788:25
**Kleenex** [1] - 702:7
**knowledge** [4] - 716:22, 727:15, 788:25, 792:4
**known** [1] - 762:1
**knows** [4] - 711:14, 730:25, 780:16, 784:3
**KPFA** [2] - 696:16, 788:3
**Kravis** [2] - 675:13, 677:8
**KRAVIS** [2] - 677:7, 784:18
**kryptonite** [3] - 698:25, 750:8, 750:16
**kunstler** [1] - 745:9
**Kunstler** [25] - 683:22, 683:24, 684:1, 684:2, 684:3, 708:18, 709:2, 722:14, 722:17, 722:19, 727:24, 728:21, 728:22, 729:2, 729:4, 729:9, 729:20, 733:15, 733:19, 743:24, 751:2, 757:13, 757:15, 757:20, 758:13
**Kunstler's** [2] - 684:6, 708:23

## L

**laid** [1] - 688:5
**landing** [1] - 721:2
**Las** [2] - 676:6, 676:10
**last** [10] - 700:22, 724:10, 724:11, 736:6, 736:7, 763:25, 764:2, 777:3, 778:15, 779:25
**late** [2] - 716:23, 765:16
**late-night** [1] - 716:23
**Lauderdale** [4] - 675:22, 676:4, 676:7, 676:11
**laugh** [3] - 692:19, 692:20, 692:21
**laughed** [1] - 692:13
**law** [1] - 704:9
**LAW** [2] - 675:21, 676:9
**Law** [1] - 717:13
**Laws** [1] - 686:24
**laws** [4] - 733:21, 733:23, 733:24, 733:25
**lawyer** [26] - 680:8, 692:6, 692:18, 693:22, 694:3, 728:5, 744:7, 744:11, 744:24, 745:14,

815

745:22, 746:20, 747:3, 778:17,
778:18, 778:22, 779:11, 779:20,
780:2, 780:16, 781:14, 781:18,
781:25, 782:1, 794:15
  **lawyer's** [1] - 779:16
  **lawyers** [22] - 680:3, 694:6,
694:20, 707:20, 707:25, 726:14,
736:18, 736:21, 737:2, 743:24,
744:2, 744:3, 744:4, 744:6,
744:25, 745:16, 756:22, 757:12,
777:25, 778:2, 782:9
  **lay** [2] - 764:24, 772:3
  **lead** [2] - 772:8, 772:19
  **leader** [2] - 747:8, 747:9
  **leading** [1] - 803:7
  **least** [1] - 704:8
  **leave** [3] - 731:11, 745:23,
773:14, 793:15, 803:2
  **lectern** [1] - 677:6
  **led** [1] - 732:14
  **leeway** [1] - 803:4
  **left** [5] - 679:20, 717:20, 717:22,
774:19, 774:20
  **left-wingers** [2] - 774:19,
774:20
  **legal** [9] - 697:12, 720:14,
744:16, 744:19, 744:20, 744:21,
752:19, 756:22, 773:15
  **less** [2] - 695:15, 780:24
  **letter** [10] - 691:9, 692:17,
706:6, 714:10, 755:15, 759:18,
767:1, 779:20, 781:19, 782:1
  **level** [1] - 788:14
  **liar** [2] - 713:11, 726:17
  **liberal** [1] - 709:17
  **Libya** [6] - 722:12, 723:24,
757:19, 758:6, 760:4, 760:6
  **license** [1] - 803:6
  **lie** [3] - 705:8, 730:12, 733:4
  **lied** [3] - 732:19, 737:10, 769:7
  **lies** [7] - 732:21, 732:25, 733:6,
733:8, 737:17, 737:19, 737:20
  **life** [4] - 684:12, 686:16, 706:10,
793:18
  **likely** [2] - 695:15, 718:6
  **likewise** [1] - 732:8
  **limited** [1] - 695:13
  **linchpin** [1] - 684:4
  **line** [29] - 682:16, 685:21,
686:19, 686:20, 687:3, 699:24,
700:13, 701:10, 702:16, 703:1,
703:14, 704:4, 704:10, 704:13,
704:23, 705:5, 705:17, 706:20,
706:21, 707:12, 707:18, 708:24,
709:8, 709:11, 724:6, 724:10,
724:11, 730:3
  **lines** [3] - 683:2, 706:4, 716:13
  **list** [1] - 682:20
  **listen** [5] - 680:6, 740:18,
773:13, 773:19, 787:8

  **listening** [1] - 773:22
  **live** [4] - 751:3, 751:15, 751:25,
757:8
  **lived** [2] - 684:12, 751:1
  **lives** [5] - 751:4, 751:7, 757:7,
757:8
  **living** [3] - 751:3, 751:9, 759:11
  **Lizza** [1] - 705:6
  **London** [12] - 689:10, 695:21,
697:2, 698:10, 705:19, 753:19,
755:9, 757:16, 759:2, 783:16,
783:17, 783:21
  **look** [14] - 682:14, 686:8,
687:24, 690:16, 715:7, 715:10,
722:6, 725:2, 739:10, 741:18,
741:25, 746:3, 760:9, 787:11
  **looked** [2] - 682:6, 720:18
  **looking** [1] - 742:6
  **looks** [3] - 759:4, 796:14
  **lose** [1] - 776:7
  **Louis** [2] - 704:6
  **love** [2] - 734:23, 795:11
  **lover** [2] - 795:7, 795:13
  **lovers** [1] - 795:13
  **loves** [3] - 795:4, 795:10,
795:11
  **low** [1] - 788:16
  **Luca** [2] - 784:6, 784:8
  **Lugo** [4] - 789:23, 790:12,
792:16, 792:21
  **lugo** [2] - 790:8, 792:14
  **Luis** [2] - 742:7, 743:2
  **lunch** [16] - 752:12, 752:18,
752:21, 753:3, 753:5, 753:12,
753:14, 753:15, 781:8, 781:10,
781:11, 797:3, 802:18, 802:23,
803:1, 803:9

# M

  **ma'am** [1] - 742:3
  **magazine** [1] - 709:17
  **mail** [12] - 685:25, 687:16,
687:17, 756:11, 757:4, 757:10,
757:18, 757:20, 758:12, 769:3,
795:25, 796:14
  **mails** [1] - 685:16
  **main** [3] - 758:3, 758:4, 758:15
  **maintain** [4] - 716:4, 723:15,
723:17, 723:19
  **major** [1] - 756:22
  **majority** [1] - 695:12
  **man** [2] - 716:2, 784:8
  **Man** [1] - 716:25
  **manager** [2] - 716:2, 759:17
  **Marando** [2] - 675:14, 677:9
  **March** [15] - 713:4, 713:9,
714:18, 715:8, 715:12, 721:9,
721:17, 723:5, 724:5, 725:20,
725:25, 765:11, 765:16, 766:22,

796:10
  **Margaret** [10] - 683:22, 683:24,
728:18, 728:19, 728:21, 729:20,
743:24, 751:2, 757:13, 757:15
  **marked** [1] - 689:6
  **Martin** [1] - 763:8
  **martinis** [2] - 716:5, 734:19
  **Marty** [1] - 745:19
  **material** [2] - 719:15, 791:13
  **matter** [5] - 712:14, 718:1,
750:19, 779:23, 798:17
  **matter-of-fact** [1] - 750:19
  **matters** [6] - 677:19, 678:7,
686:14, 686:16, 710:22, 727:22
  **mean** [20] - 690:2, 690:18,
690:25, 692:16, 701:16, 701:17,
740:10, 755:7, 759:14, 761:11,
762:9, 775:20, 779:19, 784:1,
791:15, 793:1, 795:13, 795:25,
796:15, 796:16
  **means** [2] - 680:23, 703:12
  **meant** [4] - 727:12, 753:25,
759:25, 760:8
  **meantime** [2] - 784:24, 784:25
  **media** [2] - 678:21, 739:21
  **medication** [1] - 700:21
  **meet** [11] - 679:5, 682:23,
698:6, 755:9, 765:21, 767:5,
767:7, 767:19, 768:3, 768:11,
770:9
  **meeting** [2] - 697:12, 730:11
  **meetings** [2] - 697:6, 789:16
  **melber** [1] - 768:16
  **Melber** [6] - 722:5, 767:14,
767:16, 770:2, 770:7, 788:9
  **Melber's** [1] - 788:21
  **melber's** [1] - 768:4
  **members** [4] - 678:9, 678:19,
679:1, 802:18
  **memory** [2] - 728:12, 742:13
  **mention** [2] - 721:23, 774:8
  **mentioned** [2] - 689:16, 725:13
  **mere** [1] - 770:23
  **message** [66] - 685:19, 689:6,
689:8, 689:19, 689:23, 692:2,
692:12, 692:14, 698:24, 699:3,
700:18, 700:20, 700:23, 701:12,
702:16, 703:20, 703:23, 707:20,
711:12, 711:16, 712:1, 713:4,
714:17, 714:24, 715:7, 716:6,
716:9, 717:20, 717:22, 719:2,
719:20, 721:4, 722:11, 722:16,
723:2, 724:19, 724:23, 725:8,
728:6, 730:15, 735:1, 738:7,
738:8, 738:14, 739:1, 739:2,
750:7, 750:19, 753:21, 765:14,
767:13, 767:14, 768:2, 768:23,
770:3, 771:5, 771:14, 772:20,
773:5, 793:16, 795:14, 798:8,
799:3, 801:19, 801:22

816

**messages** [35] - 684:2, 687:21, 687:24, 689:3, 689:22, 690:9, 690:11, 691:24, 693:12, 693:18, 693:21, 694:14, 695:18, 696:1, 696:4, 697:7, 698:16, 698:20, 701:18, 701:25, 712:24, 713:1, 720:18, 724:25, 731:1, 732:4, 732:8, 738:20, 738:22, 764:12, 766:19, 766:21, 769:17, 769:23, 785:12

**messaging** [1] - 784:5

**met** [13] - 696:12, 696:14, 696:15, 696:22, 696:23, 696:24, 697:9, 710:25, 733:14, 765:17, 767:1, 769:5, 795:6

**metropolitan** [1] - 759:22

**MI5** [1] - 759:22

**MI6** [1] - 759:22

**Miami** [1] - 717:11

**Michael** [6] - 675:14, 677:9, 690:7, 690:10, 744:3, 789:10

**michael.marando@usdoj.gov** [1] - 675:19

**mid** [5] - 719:14, 719:22, 720:1, 731:7, 783:18

**mid-July** [3] - 719:14, 719:22, 720:1

**mid-morning** [1] - 731:7

**mid-November** [1] - 783:18

**middle** [2] - 786:12, 788:20

**midtown** [1] - 723:12

**might** [3] - 694:11, 695:23, 775:15

**miles** [1] - 765:25

**million** [1] - 740:15

**mind** [1] - 789:16

**mine** [2] - 684:9, 745:12

**minus** [1] - 735:6

**minute** [1] - 797:10

**Miranda** [5] - 742:7, 743:2, 743:3, 743:12

**mischaracterization** [1] - 771:2

**mislead** [2] - 770:17, 771:3

**misquoted** [1] - 724:7

**Miss** [3] - 684:1, 684:2, 684:3

**miss** [1] - 724:17

**misspeaks** [1] - 704:7

**moment** [5] - 686:7, 688:10, 691:16, 696:13, 798:6

**moments** [1] - 776:1

**Monday** [2] - 681:8, 725:19

**money** [1] - 734:4

**month** [1] - 767:15

**months** [5] - 747:13, 756:20, 767:1, 774:14, 790:15

**Morano** [2] - 702:18, 794:5

**Morgan** [3] - 702:19, 702:20, 702:21

**MORNING** [1] - 675:5

**morning** [26] - 677:1, 677:2,

677:7, 677:12, 677:13, 677:23, 680:13, 681:17, 681:18, 716:24, 717:20, 731:7, 731:25, 732:1, 732:2, 732:24, 733:3, 733:4, 733:5, 737:10, 746:2, 746:11, 778:3, 793:23, 799:22

**Morningside** [1] - 792:20

**Moses** [1] - 733:14

**most** [9] - 686:13, 687:2, 718:6, 740:25, 752:7, 771:4, 776:14, 785:12, 793:17

**mostly** [1] - 774:19

**Mothers** [3] - 686:24, 733:17, 733:20

**motivation** [1] - 776:18

**motive** [1] - 758:11

**mouth** [2] - 726:14, 728:17

**move** [41] - 683:10, 686:5, 686:19, 691:5, 691:6, 691:14, 692:22, 693:11, 694:13, 695:16, 697:16, 699:14, 701:9, 701:21, 702:25, 703:14, 704:25, 706:19, 707:12, 707:18, 708:2, 709:8, 709:25, 710:16, 711:9, 713:15, 713:25, 714:13, 715:16, 715:20, 718:12, 719:9, 720:7, 720:21, 721:7, 722:23, 723:25, 773:8, 784:14, 798:20, 800:4

**movie** [3] - 690:8, 702:21, 783:16

**Moving** [1] - 726:6

**moving** [9] - 710:7, 711:21, 711:24, 725:23, 727:19, 728:2, 729:25, 752:7, 797:18

**MR** [245] - 677:7, 677:13, 677:20, 677:21, 679:12, 679:23, 681:14, 681:16, 681:19, 681:21, 681:24, 682:12, 682:13, 684:24, 685:2, 685:18, 685:20, 686:5, 686:6, 686:19, 686:22, 688:8, 688:16, 688:19, 688:22, 688:24, 689:2, 689:5, 691:5, 691:8, 691:14, 691:19, 691:23, 692:1, 692:22, 692:24, 693:11, 693:13, 694:13, 694:15, 695:16, 695:17, 696:1, 696:3, 697:16, 697:17, 699:14, 699:16, 700:13, 700:14, 701:9, 701:11, 701:21, 701:24, 702:8, 702:11, 702:14, 702:15, 703:14, 703:17, 703:19, 704:10, 704:12, 704:25, 705:1, 706:1, 706:3, 706:19, 706:22, 707:12, 707:14, 707:18, 707:19, 709:8, 709:10, 709:25, 710:1, 710:7, 710:8, 710:10, 710:12, 710:16, 710:18, 711:9, 711:10, 713:15, 713:18, 713:25, 714:4, 714:13, 714:16, 715:5, 715:6, 715:20, 715:23, 716:14, 716:21, 718:12, 718:25, 719:1, 721:7, 721:8,

721:12, 721:15, 722:6, 722:10, 723:2, 723:4, 723:25, 724:1, 725:7, 725:12, 725:23, 725:24, 726:6, 726:7, 727:19, 727:20, 728:2, 728:3, 729:25, 730:2, 731:4, 731:21, 731:24, 737:3, 737:8, 737:25, 738:1, 741:12, 741:23, 741:24, 742:3, 742:5, 742:10, 742:20, 742:23, 743:13, 744:13, 746:12, 747:1, 751:8, 751:19, 751:24, 753:2, 753:11, 754:12, 754:17, 755:18, 755:21, 755:22, 758:19, 758:20, 759:1, 760:21, 760:25, 761:3, 762:15, 762:20, 763:1, 763:2, 764:23, 765:4, 766:12, 768:14, 768:18, 770:2, 770:5, 770:11, 771:22, 773:8, 773:10, 774:3, 774:4, 775:6, 776:22, 777:3, 777:5, 777:17, 777:22, 779:1, 779:3, 779:6, 779:17, 779:19, 779:23, 780:7, 780:9, 780:11, 780:13, 780:18, 781:3, 781:6, 781:10, 781:15, 781:22, 781:24, 783:5, 783:7, 783:10, 784:15, 784:18, 784:19, 784:21, 784:23, 785:8, 785:9, 786:18, 787:3, 787:17, 787:19, 789:2, 789:4, 790:24, 791:14, 791:19, 791:22, 791:25, 792:11, 792:13, 793:11, 794:11, 795:3, 796:4, 796:9, 796:23, 797:1, 797:5, 797:11, 797:16, 797:19, 797:22, 797:25, 798:2, 798:4, 798:5, 798:19, 798:22, 798:24, 799:2, 800:6, 800:7, 801:8, 801:10, 802:15

**MSNBC** [1] - 721:25

**Mueller** [9] - 712:2, 712:3, 712:4, 712:5, 712:6, 712:19, 712:22, 736:12

**mutual** [1] - 734:16

## N

**N.W** [1] - 804:13

**name** [15] - 684:6, 684:11, 684:21, 705:6, 772:15, 774:6, 774:8, 785:19, 785:20, 786:21, 786:23, 787:1, 787:18, 797:20

**named** [5] - 704:20, 725:15, 763:8, 785:24, 788:11

**naming** [1] - 785:21

**Nancy** [2] - 749:4, 749:17

**napkin** [1] - 702:5

**Napolitano** [1] - 729:3

**narrative** [1] - 688:5

**nasty** [2] - 716:25, 724:25

**National** [3] - 743:22, 748:8, 748:13

**NE** [1] - 675:21

**near** [1] - 781:1
**need** [17] - 678:19, 679:19, 682:21, 686:8, 707:3, 728:11, 737:22, 751:6, 751:20, 769:13, 772:4, 773:14, 773:17, 781:12, 792:7, 792:10, 797:20
**needed** [2] - 680:7, 729:4
**negative** [2] - 718:7, 724:25
**network** [1] - 687:8
**neutralize** [2] - 723:18, 757:2
**neutralized** [1] - 723:22
**never** [20] - 698:4, 707:8, 713:11, 729:11, 753:22, 753:25, 755:20, 759:19, 760:4, 760:6, 761:14, 762:22, 769:5, 769:17, 769:21, 770:20, 773:4, 796:2, 801:3
**New** [5] - 733:17, 733:20, 733:24, 752:1, 757:9
**news** [3] - 749:11, 761:7, 768:5
**News** [2] - 717:15, 765:23
**NewsPunch.com** [1] - 799:18
**newsroom** [1] - 749:5
**Newsweek** [1] - 744:20
**next** [31] - 681:9, 686:5, 691:6, 691:18, 694:13, 699:14, 702:25, 704:23, 706:1, 714:13, 715:16, 718:24, 720:21, 730:8, 730:10, 734:18, 743:10, 755:25, 759:23, 760:21, 764:22, 765:3, 772:4, 775:4, 776:25, 777:21, 783:8, 792:10, 793:8, 794:24, 802:22
**Nickelodeon** [1] - 752:4
**night** [1] - 716:23
**Nixon** [1] - 692:11
**nobody** [3] - 745:18, 749:10, 767:4
**nominee** [1] - 775:12
**none** [1] - 798:22
**nonresponsive** [1] - 783:7
**nonsense** [1] - 796:11
**note** [3] - 677:16, 700:12, 803:3
**noted** [1] - 716:17
**notes** [2] - 767:13, 804:6
**nothing** [11] - 697:22, 703:12, 708:11, 713:5, 713:10, 728:16, 747:13, 796:11, 796:19, 796:20, 796:21
**notify** [1] - 693:3
**noting** [1] - 677:23
**November** [16] - 675:6, 689:9, 691:10, 691:22, 692:2, 693:6, 695:19, 696:23, 699:6, 702:10, 763:25, 783:17, 783:18, 789:15, 804:8
**Number** [2] - 677:2, 731:17
**number** [8] - 717:18, 717:19, 779:8, 780:5, 784:16, 793:23, 793:24, 797:20
**NW** [2] - 675:16, 676:15

**NY1** [1] - 743:4

## O

**o'clock** [4] - 716:24, 717:20, 725:19, 793:23
**oath** [3] - 681:12, 720:17, 720:23
**object** [4] - 746:20, 769:9, 794:21, 803:4
**objecting** [2] - 773:16, 794:12
**objection** [18] - 716:14, 716:17, 737:3, 762:20, 764:23, 770:13, 776:21, 779:1, 783:5, 783:7, 786:18, 787:17, 789:2, 791:14, 794:11, 797:16, 798:1, 798:21
**observe** [2] - 678:3, 678:18
**obviously** [2] - 692:19, 721:5
**occasion** [1] - 719:6
**occasions** [1] - 769:23
**occupying** [1] - 680:25
**occurs** [1] - 680:22
**ocean** [2] - 773:23, 773:24
**October** [8] - 685:10, 697:22, 697:23, 698:2, 730:13, 735:5, 736:17, 801:19
**OF** [6] - 675:1, 675:8, 675:16, 675:21, 676:9, 804:2
**offer** [1] - 768:15
**Office** [5] - 677:10, 735:9, 736:5, 738:2, 764:4
**OFFICE** [3] - 675:15, 675:21, 676:9
**office** [7] - 767:12, 767:22, 767:24, 768:10, 770:6
**OFFICIAL** [1] - 804:2
**Official** [2] - 676:14, 804:12
**often** [1] - 780:21
**oil** [2] - 709:13, 709:20
**Olas** [2] - 676:6, 676:10
**Old** [1] - 716:25
**older** [1] - 684:10
**olive** [2] - 709:13, 709:20
**omit** [1] - 706:7
**Once** [1] - 712:14
**once** [6] - 687:20, 708:12, 736:11, 764:7, 773:21, 788:12
**one** [72] - 680:3, 680:18, 697:12, 698:14, 707:10, 708:14, 708:17, 710:16, 713:6, 714:11, 714:20, 717:16, 718:7, 718:21, 719:6, 719:8, 724:13, 730:5, 730:21, 732:15, 734:23, 735:20, 736:13, 736:15, 739:12, 739:25, 740:21, 740:24, 743:24, 744:3, 744:24, 744:8, 748:7, 749:3, 749:25, 753:18, 756:22, 757:12, 757:14, 760:3, 767:18, 769:18, 769:20, 772:16, 773:15, 774:15, 777:3, 778:10, 779:8, 779:10,

779:23, 782:5, 782:19, 784:4, 786:19, 788:9, 789:19, 789:22, 790:2, 790:6, 790:11, 791:5, 791:9, 792:24, 794:5, 797:22, 798:8, 801:25
**One** [1] - 676:2
**one-upping** [2] - 748:2, 748:7
**one-way** [1] - 739:12
**ongoing** [5] - 681:4, 710:14, 772:12, 783:24, 784:1
**online** [1] - 709:17
**op** [1] - 744:20
**op-ed** [1] - 744:20
**open** [5] - 689:1, 706:17, 773:11, 781:23, 792:12
**opened** [1] - 728:10
**operating** [1] - 720:14
**opportunity** [3] - 679:5, 679:6, 680:4
**opposed** [2] - 781:14, 787:5
**opposite** [1] - 749:6
**oppressive** [1] - 733:25
**option** [3] - 778:11, 778:13, 778:14
**options** [2] - 778:10, 789:22
**order** [1] - 708:3
**ordered** [1] - 678:23
**ordinarily** [1] - 680:24
**organization** [2] - 733:18, 733:19
**originally** [1] - 738:2
**otherwise** [2] - 782:22, 792:9
**out-of-work** [1] - 720:25
**outside** [8] - 748:11, 748:20, 748:22, 749:7, 759:10, 759:22, 760:13, 761:6
**overall** [1] - 736:3
**overgeneralizations** [1] - 771:17
**overstatement** [1] - 769:17
**own** [2] - 678:18, 748:4

## P

**P.A** [3] - 675:21, 676:2, 676:6
**p.m** [1] - 714:18
**pa.com** [1] - 676:5
**page** [29] - 689:4, 691:6, 691:18, 691:25, 692:23, 694:14, 695:16, 697:16, 699:25, 700:13, 701:9, 701:21, 704:25, 706:1, 707:13, 709:9, 709:25, 710:10, 710:16, 711:9, 712:23, 713:15, 713:25, 715:16, 715:20, 719:9, 720:7, 754:13, 760:21
**paid** [4] - 683:5, 683:6, 735:14, 736:20
**Paige** [1] - 676:9
**Palm** [2] - 791:6
**Pantagele** [1] - 707:17

**Pantangela** [1] - 726:2
**Pantsgele** [1] - 704:24
**paragraph** [15] - 685:7, 685:11, 685:19, 686:5, 686:7, 686:12, 686:21, 687:2, 688:6, 715:21, 715:24, 719:10, 719:12, 720:7, 720:21
**paraphrase** [1] - 772:11
**paraphrasing** [3] - 746:6, 746:15, 772:5
**pardon** [1] - 729:3
**part** [11] - 709:6, 713:24, 721:13, 726:10, 744:12, 754:16, 754:24, 754:25, 755:2, 755:5, 755:19
**participant** [1] - 750:22
**participate** [1] - 735:16
**particular** [5] - 698:24, 708:24, 738:24, 756:6, 788:23
**particularly** [1] - 678:5
**parties** [1] - 677:5
**party** [1] - 773:21
**Pasadena** [1] - 766:1
**pass** [1] - 680:24
**passed** [1] - 771:6
**past** [5] - 679:2, 681:4, 714:25, 718:8, 732:19
**patsy** [6] - 714:21, 714:25, 715:2, 719:3, 729:22, 729:24
**Paul** [5] - 755:4, 755:19, 756:8, 758:6, 760:5
**pause** [1] - 686:10
**paying** [1] - 719:17
**peace** [1] - 760:6
**Pelosi** [2] - 749:4, 749:17
**pending** [1] - 687:9
**Pentangeli** [11] - 689:12, 689:15, 689:20, 689:25, 690:5, 690:10, 690:12, 690:15, 690:25, 725:22, 726:2
**Pentangeli's** [1] - 709:23
**people** [39] - 678:14, 678:18, 679:6, 680:20, 693:9, 707:23, 712:15, 727:13, 739:3, 740:18, 744:12, 745:1, 745:18, 748:24, 749:1, 749:16, 749:23, 759:8, 759:9, 759:24, 760:15, 767:25, 768:23, 768:24, 775:15, 776:7, 776:12, 778:2, 779:12, 780:5, 782:9, 782:13, 782:21, 783:3, 789:7, 792:23, 794:21, 795:22
**perceived** [1] - 776:2
**perception** [1] - 789:8
**perfect** [1] - 723:3
**perfectly** [2] - 697:12, 720:13
**perhaps** [1] - 720:25
**period** [12] - 697:3, 707:15, 727:21, 729:8, 743:21, 755:23, 769:1, 771:13, 773:7, 777:2, 784:5, 792:8

**perjured** [1] - 713:14
**perjury** [8] - 698:14, 705:25, 706:17, 707:10, 724:12, 724:18, 724:21, 728:10
**permission** [1] - 684:21
**perpetuated** [1] - 749:15
**person** [12] - 682:7, 740:21, 740:25, 741:14, 749:3, 757:15, 766:7, 782:20, 783:11, 792:9, 793:22, 801:6
**personal** [2] - 744:10, 751:17
**phone** [13] - 716:19, 716:22, 716:23, 716:25, 717:2, 717:5, 717:17, 738:6, 739:7, 748:24, 784:16, 786:3
**photos** [2] - 690:10, 690:11
**phrasing** [1] - 746:17
**picture** [6] - 700:1, 759:21, 760:13, 760:15, 760:17, 761:6
**piece** [1] - 726:17
**pieces** [2] - 744:20, 790:16
**pin** [1] - 773:2
**place** [2] - 690:9, 704:16
**Plaintiff** [2] - 675:4, 675:13
**plan** [1] - 692:9
**plane** [1] - 783:23
**planning** [3] - 695:23, 755:9, 755:14
**plausible** [2] - 724:15, 725:5
**play** [6] - 693:8, 764:10, 764:16, 794:9, 794:10
**played** [5] - 693:9, 762:19, 763:5, 763:6, 764:8
**playing** [3] - 764:8, 771:7, 771:9
**plays** [1] - 788:14
**Plaza** [1] - 676:2
**pleads** [1] - 692:8
**pleasant** [2] - 680:14, 803:1
**pleased** [1] - 721:6
**pocket** [1] - 748:24
**point** [30] - 679:9, 680:2, 681:7, 694:6, 695:23, 696:14, 705:11, 708:20, 708:25, 712:8, 713:12, 714:23, 725:3, 725:13, 729:24, 745:14, 751:1, 752:1, 756:6, 756:10, 759:16, 761:25, 762:13, 765:10, 768:22, 769:5, 772:2, 788:23, 797:21
**pointed** [2] - 740:4, 778:18
**police** [1] - 759:22
**politicians** [1] - 748:16
**Pomona** [1] - 766:1
**portion** [1] - 758:10
**position** [1] - 726:21
**possible** [1] - 781:8
**possibly** [2] - 678:15, 762:6
**posts** [2] - 797:7, 797:10
**potential** [2] - 770:16, 771:2
**pounding** [1] - 757:1, 757:4

**practice** [1] - 737:2
**practiced** [1] - 736:25
**practicing** [1] - 707:17
**predicate** [2] - 768:25, 772:3
**preliminary** [1] - 677:18
**prepare** [1] - 737:2
**prepared** [4] - 685:23, 736:25, 737:6, 737:7
**present** [4] - 677:3, 677:17, 680:12, 680:14
**presented** [1] - 798:9
**presidential** [1] - 734:6
**Press** [2] - 748:8, 748:13
**press** [6] - 678:19, 684:13, 700:1, 706:9, 717:1, 748:16
**pretend** [2] - 761:8, 773:22
**pretty** [2] - 768:6, 795:17
**previous** [4] - 704:5, 723:23, 727:17, 774:13
**previously** [2] - 760:12, 797:14
**prison** [2] - 703:7, 703:9
**prisoner** [1] - 717:13
**privilege** [2] - 779:11, 779:20
**problem** [5] - 690:8, 706:8, 769:10, 780:7, 795:21
**problems** [1] - 708:11
**proceed** [3] - 681:13, 731:20, 774:2
**proceedings** [7] - 678:18, 679:2, 679:5, 681:9, 745:15, 752:19, 804:7
**process** [3] - 708:19, 736:19, 736:23
**proclaiming** [1] - 721:9
**producer** [1] - 702:21
**productive** [2] - 684:12, 684:13
**professionally** [1] - 678:2
**Professor** [1] - 752:4
**profile** [1] - 788:17
**promos** [1] - 682:23
**promotional** [1] - 683:2
**pronounce** [1] - 706:6
**proper** [2] - 773:17, 773:18
**Prosecutor** [1] - 697:1
**prosecutors** [2] - 733:4, 733:7
**protect** [2] - 700:1, 708:21
**protection** [1] - 699:20
**prove** [5] - 683:24, 683:25, 711:1, 726:17, 794:8
**provided** [3] - 678:20, 797:23, 800:17
**public** [11] - 678:9, 678:17, 679:1, 697:14, 719:14, 719:23, 750:17, 762:7, 798:14, 799:7, 799:17
**publications** [2] - 687:9, 756:4
**publicity** [1] - 717:25
**publicly** [9] - 720:4, 721:9, 771:13, 771:15, 774:8, 782:5,

782:15, 787:21, 793:19
**publish** [3] - 697:14, 719:16, 798:24
**publisher** [4] - 719:15, 719:22, 719:23, 747:9
**pull** [1] - 721:12
**pulled** [1] - 774:11
**punctuate** [1] - 688:12
**purge** [3] - 713:12, 713:13
**purple** [1] - 713:1
**purpose** [3] - 724:17, 750:14, 750:15
**pushing** [1] - 774:12
**put** [31] - 681:19, 726:21, 728:22, 729:9, 734:4, 746:4, 750:6, 758:7, 759:21, 759:23, 760:3, 760:16, 760:17, 760:19, 770:13, 775:17, 782:24, 784:10, 784:12, 786:4, 786:22, 786:23, 787:1, 787:7, 787:9, 787:13, 790:21, 793:24, 801:8, 801:13
**puts** [2] - 678:13, 786:12
**putting** [2] - 743:19, 790:16

## Q

**questions** [21] - 680:3, 680:4, 680:5, 680:9, 731:14, 737:23, 746:21, 764:20, 768:22, 769:25, 773:17, 779:22, 781:14, 792:4, 793:12, 794:17, 797:7, 800:9, 802:15, 803:7
**quiet** [1] - 684:12
**quite** [2] - 771:18, 772:13
**quoted** [1] - 705:6
**quoting** [1] - 772:4

## R

**race** [3] - 735:9, 735:17, 750:12
**Racial** [1] - 733:15
**racist** [1] - 734:1
**radio** [20] - 690:12, 709:18, 709:19, 721:2, 738:12, 747:11, 747:13, 747:16, 747:20, 748:19, 748:20, 748:25, 755:16, 782:19, 788:1, 788:2, 789:22
**raise** [1] - 770:15
**randolph** [1] - 676:20
**Randy** [10] - 682:21, 682:23, 685:15, 687:10, 716:1, 719:10, 719:13, 719:21, 721:21, 763:18
**ranking** [1] - 695:10
**rant** [1] - 716:5
**rat** [3] - 726:10, 726:13, 787:16
**rate** [4] - 696:9, 696:10, 700:18, 700:21
**rather** [1] - 787:15
**Ratner** [2] - 728:21, 744:3
**re** [3] - 741:7, 743:19, 799:17

**re-ask** [1] - 741:7
**re-Tweet** [1] - 799:17
**re-Tweeting** [1] - 743:19
**read** [34] - 682:16, 686:7, 686:8, 687:3, 687:4, 689:8, 695:18, 700:20, 702:17, 703:1, 704:15, 704:23, 705:5, 706:4, 715:24, 719:12, 720:11, 720:22, 721:3, 726:12, 730:4, 730:8, 730:10, 740:14, 740:15, 740:16, 742:8, 754:8, 757:2, 757:22, 758:10, 787:10, 794:6
**reading** [5] - 686:9, 696:4, 705:7, 724:14, 726:12
**ready** [2] - 677:18, 679:10
**real** [4] - 678:19, 692:19, 692:20, 703:13
**real-time** [1] - 678:19
**reality** [1] - 747:10
**realize** [2] - 688:12, 750:14
**really** [14] - 683:8, 690:20, 712:11, 720:25, 723:20, 734:8, 735:22, 737:19, 744:23, 745:13, 757:19, 778:17, 789:21
**reason** [6] - 678:10, 681:5, 708:13, 709:6, 775:3, 779:9
**reasoning** [1] - 778:25
**reasons** [8] - 708:14, 708:15, 708:17, 760:3, 774:15, 778:3, 778:5, 782:5
**rebuff** [2] - 690:20, 757:1
**rebuffs** [1] - 733:9
**rebutting** [1] - 795:19
**recalling** [1] - 731:16
**receive** [4] - 691:9, 707:23, 757:20, 757:21
**received** [2] - 685:25, 694:9
**recent** [1] - 771:4
**recess** [1] - 731:15
**Recess** [1] - 803:10
**reciprocation** [4] - 739:8, 755:3, 755:6, 756:9
**recognize** [1] - 712:24
**recollection** [2] - 742:2, 758:11
**record** [5] - 677:6, 677:16, 716:16, 725:14, 801:4
**recruited** [1] - 735:8
**redirect** [6] - 781:3, 797:2, 797:4, 803:5, 803:8
**Redirect** [1] - 676:22
**refer** [3] - 689:23, 701:16, 784:6
**reference** [9] - 689:13, 709:20, 709:22, 709:23, 711:15, 716:9, 726:23, 731:1, 795:14
**referenced** [2] - 735:2, 801:13
**references** [2] - 802:2, 802:3
**referencing** [4] - 689:14, 711:16, 711:18, 719:7
**referred** [6] - 711:18, 712:3, 719:2, 730:5, 774:11, 801:6

**referring** [10] - 697:6, 704:2, 716:13, 728:20, 757:13, 757:19, 772:16, 791:20, 800:24, 801:16
**reflect** [1] - 772:18
**reform** [1] - 704:9
**refresh** [3] - 742:1, 742:13, 758:11
**regarding** [7] - 706:13, 720:13, 720:24, 722:11, 722:17, 723:23, 793:12
**rehab** [1] - 728:12
**related** [2] - 687:8, 722:12
**relation** [1] - 717:5
**relationship** [15] - 733:10, 734:13, 737:9, 745:8, 745:10, 754:1, 754:5, 755:8, 759:15, 760:1, 760:2, 761:11, 761:21, 770:20, 770:21
**relatively** [1] - 680:24
**relax** [1] - 756:25
**released** [1] - 764:13
**relevance** [1] - 773:6
**relevant** [1] - 769:22
**reluctance** [1] - 686:1
**reluctantly** [1] - 685:23
**remainder** [2] - 729:13, 729:15
**remember** [32] - 682:2, 683:7, 683:11, 689:21, 689:22, 690:6, 698:13, 699:3, 700:22, 701:5, 717:10, 717:12, 719:4, 721:5, 738:11, 738:13, 740:2, 742:14, 742:22, 746:13, 748:8, 748:11, 752:10, 752:20, 754:18, 758:3, 783:20, 783:21, 783:22, 783:23, 784:11, 797:8
**remind** [1] - 681:11
**reminder** [2] - 678:17, 722:18
**repealed** [1] - 733:21
**repeat** [1] - 698:17
**repeatedly** [6] - 705:4, 714:7, 792:4, 800:23, 801:5, 802:6
**repercussions** [1] - 783:2
**replied** [2] - 767:10, 776:16
**reporter** [3] - 741:1, 763:11, 763:12
**Reporter** [3] - 676:14, 676:14, 804:12
**REPORTER** [1] - 804:2
**reporting** [1] - 678:4
**reports** [1] - 717:1
**represent** [2] - 771:13, 771:15
**representative** [1] - 744:22
**represented** [1] - 766:8
**represents** [1] - 766:1
**repressive** [1] - 734:1
**republican** [1] - 694:23
**reputation** [2] - 708:23, 709:4
**request** [4] - 689:25, 691:12, 767:8
**requested** [2] - 680:8, 691:21

**rescues** [1] - 795:8
**research** [1] - 680:16
**reserved** [1] - 678:20
**respect** [2] - 678:7, 678:25
**respective** [1] - 678:1
**respond** [19] - 692:7, 692:12, 694:2, 695:2, 695:11, 697:10, 697:18, 698:3, 698:12, 699:3, 703:8, 703:11, 706:5, 706:16, 706:25, 712:7, 712:18, 728:13
**responded** [3] - 698:5, 706:23, 750:20
**response** [8] - 703:2, 704:4, 706:7, 707:6, 711:5, 738:16, 777:9, 780:2
**rest** [1] - 722:8
**restaurant** [2] - 723:11, 723:12
**resume** [4] - 680:2, 731:9, 731:13, 802:21
**retainer** [1] - 745:19
**retroactively** [1] - 774:12
**return** [1] - 802:21
**revealing** [1] - 684:6
**reviewed** [2] - 799:22, 801:12
**Rggi** [1] - 756:25
**Richard** [1] - 692:11
**ridiculous** [1] - 776:14
**riff** [1] - 682:21
**rights** [6] - 694:8, 700:10, 706:11, 707:9, 720:16, 789:12
**rile** [2] - 726:5, 788:13
**riled** [1] - 795:17
**rip** [1] - 726:14
**risk** [1] - 678:15
**RMR** [1] - 676:14
**road** [1] - 786:15
**Robert** [4] - 676:1, 677:13, 712:5, 712:6
**Rockefeller** [3] - 686:24, 717:13, 733:21
**Roger** [113] - 675:6, 677:3, 677:15, 682:18, 683:11, 685:13, 690:14, 691:3, 695:19, 702:22, 703:25, 704:8, 704:18, 709:1, 709:14, 709:21, 712:7, 712:10, 712:18, 713:4, 714:25, 715:9, 717:16, 720:18, 721:19, 722:16, 724:9, 731:17, 732:4, 732:9, 732:12, 732:14, 732:19, 733:6, 733:11, 734:2, 734:3, 735:8, 735:25, 737:9, 738:4, 747:3, 747:15, 747:24, 749:2, 749:13, 749:24, 750:3, 750:8, 750:15, 752:23, 753:1, 753:3, 753:20, 753:25, 754:25, 755:24, 756:3, 759:5, 759:10, 759:14, 760:8, 760:14, 760:15, 760:20, 761:7, 761:20, 762:16, 763:5, 763:6, 763:16, 764:8, 764:9, 764:15, 769:19, 772:8, 774:5, 775:13,

776:15, 777:6, 778:7, 783:12, 783:22, 783:25, 784:6, 784:25, 785:25, 786:7, 788:5, 790:3, 790:8, 793:20, 793:22, 794:4, 794:7, 795:4, 796:10, 799:9, 799:11, 799:20, 799:24, 800:2, 800:14, 800:17, 800:20, 800:23, 801:1, 801:13, 802:6
**Rogow** [2] - 675:20, 677:14
**ROGOW** [1] - 675:21
**rohde** [2] - 689:3, 714:15
**Rohde** [10] - 677:10, 701:23, 706:21, 710:17, 714:2, 721:13, 722:8, 723:3, 725:8, 725:10
**role** [4] - 693:8, 693:9, 743:25, 744:1
**room** [5] - 678:20, 679:21, 749:5, 753:18, 773:14
**Room** [2] - 676:15, 804:13
**rope** [1] - 761:17
**Routman** [2] - 676:9, 677:14
**ROUTMAN** [1] - 676:9
**routmanc@gmail.com** [1] - 676:12
**rows** [1] - 679:6
**rude** [2] - 680:21, 681:2
**rules** [1] - 680:22
**run** [3] - 709:17, 726:13, 770:23
**running** [1] - 728:17

**S**

**S-H-I-T** [2] - 726:17, 728:16
**S.E** [1] - 676:3
**sabotaging** [1] - 760:6
**sacrifice** [1] - 708:22
**sadly** [1] - 720:23
**safety** [1] - 678:13
**Sanders** [4] - 775:11, 775:12, 776:10, 776:11
**Sarah** [2] - 744:18, 762:10
**sarcastic** [1] - 692:21
**sat** [1] - 729:5
**satisfy** [3] - 757:17, 760:4, 762:13
**save** [1] - 692:8
**saw** [5] - 689:10, 697:3, 719:2, 789:10, 801:11
**Scahill** [2] - 709:18, 740:4
**scene** [1] - 784:3
**Schiff** [27] - 695:7, 695:9, 698:13, 749:17, 765:6, 765:17, 765:21, 766:6, 766:9, 766:16, 766:23, 767:2, 767:5, 767:10, 767:11, 767:19, 767:21, 768:1, 768:3, 768:11, 770:3, 770:8, 771:6, 771:14, 773:5
**Schiff's** [2] - 767:22, 770:6
**school** [1] - 721:1
**scope** [1] - 720:14

**screed** [1] - 787:9
**screen** [3] - 681:20, 746:4, 758:16
**screens** [1] - 797:12
**script** [1] - 794:6
**scroll** [1] - 714:2
**seated** [1] - 679:16
**second** [8] - 684:25, 736:7, 758:16, 765:10, 776:18, 779:7, 799:3, 799:4
**seconds** [1] - 768:15
**secretary** [1] - 698:9
**section** [2] - 730:4, 730:10
**see** [65] - 680:13, 680:20, 682:20, 682:24, 685:3, 685:21, 686:20, 689:6, 692:6, 694:16, 696:16, 699:22, 699:24, 700:15, 702:16, 703:20, 703:21, 704:13, 706:10, 709:11, 711:11, 711:13, 711:24, 713:20, 714:17, 716:10, 717:11, 718:17, 723:5, 723:7, 724:10, 726:10, 727:1, 728:14, 728:15, 730:3, 730:23, 736:6, 736:7, 738:17, 741:13, 742:11, 743:16, 746:23, 749:22, 750:4, 750:5, 754:21, 755:1, 755:15, 755:16, 755:19, 757:3, 758:7, 758:21, 759:19, 768:1, 777:11, 784:9, 784:12, 787:11, 789:17, 794:9
**seeing** [1] - 762:10
**seek** [1] - 684:21
**seeking** [1] - 800:2
**Select** [1] - 720:12
**selected** [1] - 778:14
**selection** [1] - 678:6
**semi** [1] - 716:25
**semi-threatening** [1] - 716:25
**send** [13] - 679:23, 689:11, 692:2, 694:23, 701:12, 713:1, 713:4, 715:8, 722:14, 724:23, 726:8, 730:15, 740:11
**sending** [3] - 694:17, 762:9, 799:23
**sense** [3] - 690:14, 690:21, 690:23
**sent** [39] - 682:1, 682:14, 683:1, 687:16, 687:17, 689:8, 692:14, 693:18, 695:18, 698:22, 698:24, 703:20, 713:9, 714:10, 714:11, 722:11, 723:23, 724:4, 724:19, 730:6, 730:13, 738:6, 738:14, 739:2, 739:14, 750:7, 757:4, 757:10, 757:21, 758:12, 759:23, 760:7, 760:20, 762:13, 769:17, 770:5, 775:22, 781:19, 799:9
**sentence** [2] - 703:1, 714:17
**September** [21] - 683:10, 683:12, 696:15, 696:18, 705:20, 710:25, 711:22, 730:6, 730:9,

735:5, 738:5, 738:12, 739:6, 747:22, 754:25, 755:23, 760:16, 762:11, 785:1, 789:14, 801:17
**series** [1] - 801:12
**serious** [2] - 679:4, 692:16
**seriously** [2] - 692:16, 771:22
**serve** [1] - 769:12
**Services** [1] - 697:2
**set** [4] - 694:13, 725:14, 766:25, 801:4
**setting** [1] - 769:15
**several** [5] - 677:23, 679:2, 722:5, 760:12, 767:17
**Sharpton** [3] - 734:8, 734:10, 734:11
**Sharpton's** [1] - 734:6
**Sheriff's** [2] - 735:9, 735:17
**shocked** [1] - 779:8
**shop** [1] - 792:18
**short** [1] - 781:4
**shortly** [1] - 711:11
**show** [59] - 698:11, 699:8, 702:18, 702:21, 709:18, 709:19, 721:2, 721:25, 732:25, 736:1, 738:12, 738:15, 739:4, 739:13, 745:4, 745:13, 746:9, 746:14, 746:17, 747:11, 747:13, 747:16, 747:20, 747:21, 747:23, 748:7, 748:19, 748:20, 748:25, 749:14, 749:22, 752:4, 752:22, 752:24, 753:8, 753:21, 755:4, 755:16, 756:19, 760:19, 764:11, 768:4, 773:5, 782:19, 788:2, 788:3, 788:10, 788:21, 789:22, 790:17, 790:20, 791:1, 791:10, 792:17, 792:19, 798:3, 798:23
**showed** [1] - 786:10
**showing** [3] - 742:1, 787:8, 787:13
**shown** [4] - 795:15, 799:4, 799:15
**shows** [8] - 690:12, 722:5, 788:1, 788:2, 788:6, 788:8, 788:20, 791:5
**shreds** [1] - 726:14
**sic** [7] - 697:15, 703:4, 703:9, 707:8, 713:10, 713:12, 726:15
**sic]** [2] - 704:24, 707:17
**side** [2] - 680:8, 786:15
**sides** [3] - 677:18, 678:1, 678:14
**signals** [1] - 688:17
**significant** [1] - 719:15
**Silky** [1] - 750:12
**Simcha** [1] - 675:15
**simply** [1] - 751:25
**simultaneously** [1] - 787:13
**single** [1] - 769:3
**sister** [2] - 727:11
**sit** [2] - 773:13, 773:19

**six** [3] - 706:17, 747:13, 756:20
**sleep** [1] - 703:13
**slide** [1] - 714:14
**slip** [2] - 770:23, 779:25
**smart** [1] - 711:7
**smear** [1] - 725:2
**Smith** [2] - 676:5, 677:14
**smoking** [1] - 734:16
**smoothly** [1] - 680:6
**so-called** [3] - 696:11, 790:7, 790:10
**social** [1] - 739:20
**someone** [8] - 679:23, 680:24, 725:15, 744:25, 751:7, 768:9, 775:16, 788:16
**sometime** [7] - 716:20, 729:1, 735:5, 740:5, 763:25, 765:16, 766:23
**sometimes** [4] - 765:18, 771:24, 773:14, 780:16
**somewhere** [2] - 723:12, 783:19
**son's** [1] - 716:7
**soon** [1] - 716:7
**sordid** [1] - 716:25
**sorry** [19] - 686:20, 687:16, 691:16, 698:17, 703:17, 704:5, 706:20, 710:15, 711:23, 712:6, 713:8, 728:6, 741:5, 741:11, 746:19, 751:13, 758:21, 794:19, 794:25
**sought** [3] - 720:8, 720:12, 733:21
**sound** [1] - 773:23
**sounds** [1] - 773:24
**source** [3] - 685:23, 686:2, 704:7
**Sparks** [2] - 723:8, 723:10
**sparks** [1] - 723:11
**speaking** [2] - 699:17, 757:18
**Special** [7] - 677:11, 712:5, 712:6, 712:19, 736:4, 738:2, 764:4
**special** [10] - 754:1, 754:5, 755:8, 759:14, 759:25, 760:2, 761:11, 770:20
**specific** [8] - 737:23, 740:21, 777:1, 791:2, 791:17, 792:4, 792:8
**specifically** [4] - 678:20, 680:23, 701:7, 733:2
**specify** [1] - 777:1
**spectator** [9] - 750:21, 750:22, 750:23, 750:24, 750:25, 751:1, 756:6, 759:15, 775:16
**spectators** [1] - 775:21
**speculate** [1] - 783:4
**speculating** [1] - 756:7
**speculation** [1] - 786:18
**spend** [1] - 703:9

**spending** [1] - 752:3
**spent** [1] - 686:16
**Spitzer** [4] - 716:25, 719:6, 793:13, 793:20
**Spitzer's** [6] - 716:6, 716:10, 716:20, 717:17, 735:1
**split** [1] - 738:24
**spoken** [3] - 729:2, 764:4, 764:7
**spoofed** [3] - 717:18, 717:19, 793:23
**spoofing** [2] - 717:19, 793:24
**squabbles** [3] - 718:9, 718:10, 718:15
**staff** [1] - 767:2
**stand** [1] - 713:24
**standing** [1] - 748:11
**Starbucks** [1] - 792:19
**start** [10] - 677:22, 696:7, 707:17, 728:6, 733:10, 737:20, 741:6, 755:16, 781:17, 802:22
**started** [2] - 790:15, 790:16
**starts** [1] - 787:16
**state** [1] - 733:24
**statement** [4] - 711:6, 754:9, 771:7, 776:23
**statements** [1] - 750:17
**STATES** [2] - 675:1, 675:10
**States** [6] - 675:3, 676:15, 677:2, 677:8, 731:17, 768:24
**status** [1] - 696:11
**stay** [1] - 752:2
**steak** [2] - 723:11
**steal** [2] - 795:12, 795:16
**stenographic** [1] - 804:6
**step** [1] - 802:17
**Steyer** [1] - 749:13
**Steyer's** [1] - 749:7
**still** [13] - 681:12, 705:15, 705:16, 722:20, 727:11, 741:7, 755:2, 759:13, 759:15, 760:9, 761:10, 761:13, 781:6
**stink** [1] - 695:8
**Stolar** [1] - 745:19
**Stone** [223] - 675:6, 677:3, 677:15, 680:3, 682:7, 682:10, 682:18, 683:2, 683:11, 684:5, 684:20, 685:13, 685:22, 686:1, 686:21, 687:6, 687:13, 687:16, 687:17, 687:18, 687:22, 689:9, 689:19, 689:25, 690:14, 691:3, 692:3, 692:7, 692:14, 693:9, 693:18, 693:25, 694:5, 694:16, 694:22, 695:2, 695:11, 695:19, 697:10, 697:18, 698:3, 698:12, 698:16, 698:25, 699:3, 699:10, 700:7, 701:12, 702:12, 702:22, 703:1, 703:8, 703:11, 703:25, 704:4, 704:8, 704:18, 705:2, 705:14, 705:17, 705:21, 706:4, 706:13, 706:16, 707:2, 707:6,

707:15, 707:20, 708:13, 709:1, 710:14, 710:22, 710:24, 711:2, 711:5, 711:18, 712:1, 712:7, 712:10, 712:18, 713:4, 713:22, 714:5, 714:8, 715:8, 715:9, 715:17, 716:12, 716:19, 717:1, 717:4, 718:8, 720:3, 720:18, 721:19, 721:22, 722:12, 722:16, 722:21, 722:25, 723:7, 723:14, 724:20, 724:23, 725:25, 726:3, 726:5, 726:8, 726:19, 727:12, 727:22, 727:24, 728:4, 728:13, 728:22, 729:9, 729:14, 729:18, 730:22, 731:17, 732:4, 732:9, 732:12, 732:14, 732:19, 733:6, 733:11, 734:2, 734:3, 735:8, 735:25, 737:9, 738:4, 740:12, 745:21, 747:3, 747:15, 747:24, 749:13, 750:3, 750:8, 750:15, 750:21, 752:23, 753:3, 753:20, 753:25, 754:7, 754:25, 755:8, 755:24, 756:3, 757:7, 758:17, 759:5, 759:10, 759:14, 759:24, 759:25, 760:8, 760:14, 760:15, 760:20, 761:7, 761:20, 761:24, 762:13, 762:16, 763:5, 763:6, 763:16, 764:8, 764:9, 764:15, 769:3, 769:19, 772:8, 772:15, 772:19, 774:5, 775:13, 776:15, 777:6, 778:7, 783:12, 783:22, 783:25, 784:6, 784:25, 785:25, 786:7, 788:5, 790:3, 790:9, 791:10, 792:19, 792:22, 793:10, 793:20, 793:22, 794:4, 794:7, 795:4, 796:10, 798:17, 799:9, 799:11, 799:20, 799:24, 800:2, 800:14, 800:17, 800:20, 800:23, 801:1, 801:4, 802:7

**stone** [2] - 690:5, 725:21
**stone's** [1] - 762:24
**Stone's** [13] - 683:14, 693:7, 709:14, 709:21, 714:25, 719:3, 720:1, 749:2, 749:24, 792:17, 801:13, 802:2, 802:6
**stonewall** [2] - 690:5, 692:8
**stoolie** [1] - 726:13
**stop** [4] - 696:13, 751:10, 769:24, 780:22
**stopped** [2] - 771:20, 792:18
**stories** [1] - 724:25
**story** [2] - 713:23, 764:13
**straight** [3] - 725:14, 728:12, 801:4
**straighten** [1] - 739:18
**STRATEGYSMITH** [1] - 676:6
**Street** [2] - 675:16, 751:3
**stuck** [2] - 708:5, 712:12
**stuff** [10] - 686:13, 696:5, 697:23, 740:11, 755:19, 756:7, 757:2, 758:6, 775:21, 790:16

**stupid** [1] - 707:11
**subject** [3] - 685:3, 685:6, 724:6
**submitted** [1] - 714:12
**subpoena** [17] - 693:23, 694:4, 694:10, 694:17, 694:20, 694:23, 695:12, 695:20, 702:3, 702:12, 707:1, 712:2, 712:8, 712:19, 785:23, 785:24, 787:6
**subpoenaed** [5] - 693:16, 695:15, 702:1, 786:16, 787:15
**subset** [1] - 733:19
**substance** [1] - 779:11
**substantive** [1] - 742:25
**suggest** [1] - 769:7
**suggested** [2] - 779:10, 792:3
**Suite** [4] - 675:22, 676:3, 676:7, 676:10
**Sullivan** [1] - 750:12
**summarize** [1] - 771:16
**supported** [1] - 776:8
**supporter** [1] - 775:11
**supporters** [2] - 775:7, 775:9
**supposed** [6] - 692:18, 701:19, 731:1, 734:9, 768:1, 774:1
**surrounding** [1] - 718:1
**suspicious** [1] - 782:25
**sustained** [1] - 762:21
**sworn** [1] - 706:18

## T

**table** [1] - 677:9
**tag** [1] - 683:2
**talents** [2] - 715:22, 715:25
**talks** [1] - 760:6
**tape** [3] - 682:23, 683:1, 772:25
**taped** [1] - 790:9
**Tara** [2] - 676:1, 677:14
**team** [1] - 744:12
**Telesur** [1] - 763:12
**television** [5] - 752:3, 787:21, 788:4, 788:19, 789:5
**temperament** [1] - 716:3
**ten** [1] - 768:5
**testified** [16] - 684:20, 708:7, 710:19, 720:16, 734:22, 736:16, 738:2, 754:7, 754:8, 758:14, 764:19, 784:25, 785:14, 786:1, 786:10, 798:16
**testify** [8] - 707:3, 707:7, 707:11, 708:3, 708:8, 746:10, 778:1, 786:9
**testifying** [1] - 688:21
**testimony** [30] - 683:14, 689:16, 706:18, 707:3, 709:23, 709:24, 720:23, 736:3, 738:23, 753:22, 753:24, 755:7, 759:13, 761:10, 761:18, 764:25, 770:18, 770:22, 771:2, 771:17, 771:20, 771:25, 772:5, 773:1, 773:2, 798:9,

799:15, 801:5, 802:9, 802:12
**text** [37] - 684:2, 687:21, 687:24, 689:22, 690:9, 690:11, 694:13, 698:16, 698:20, 698:24, 701:18, 702:16, 712:24, 722:9, 724:25, 725:9, 738:6, 738:8, 738:14, 738:20, 738:22, 739:1, 739:2, 750:7, 750:19, 753:21, 754:18, 761:24, 764:12, 765:14, 769:3, 777:1, 783:12, 784:5, 795:14, 798:8, 799:3
**texted** [4] - 687:23, 759:5, 759:8, 785:11
**texts** [2] - 738:23, 772:8
**Thanksgiving** [1] - 764:1
**that's..** [1] - 770:10
**THE** [187] - 675:1, 675:1, 675:9, 675:15, 677:1, 677:12, 677:16, 677:22, 679:13, 679:15, 679:17, 679:18, 679:20, 679:21, 679:22, 679:25, 680:12, 680:13, 681:23, 688:9, 688:12, 688:17, 688:20, 690:22, 691:1, 702:7, 702:9, 716:16, 718:13, 718:14, 718:15, 718:16, 718:19, 718:20, 718:22, 731:6, 731:12, 731:16, 731:18, 731:20, 737:5, 737:22, 740:24, 741:2, 741:3, 741:5, 741:6, 741:11, 742:1, 742:4, 742:6, 742:7, 742:8, 742:9, 742:15, 742:17, 742:18, 742:21, 742:22, 742:25, 743:1, 743:6, 743:7, 743:8, 743:9, 743:10, 743:11, 744:8, 744:9, 744:10, 744:11, 746:3, 746:5, 746:8, 746:18, 746:19, 746:20, 746:22, 746:24, 751:6, 751:9, 751:10, 751:11, 751:12, 751:13, 751:14, 751:16, 751:17, 751:20, 751:22, 752:25, 753:9, 758:14, 758:22, 758:24, 761:15, 761:16, 761:17, 761:23, 761:24, 761:25, 762:3, 762:5, 762:21, 762:22, 762:23, 764:24, 765:2, 765:3, 766:10, 766:11, 768:17, 768:19, 768:21, 770:4, 771:12, 771:24, 773:9, 773:12, 774:25, 775:2, 775:4, 776:20, 776:24, 777:16, 777:18, 777:19, 777:20, 777:21, 779:2, 779:4, 779:7, 779:18, 779:21, 780:5, 780:8, 780:12, 780:15, 780:19, 781:5, 781:7, 781:11, 781:17, 783:6, 783:8, 784:20, 784:22, 786:19, 786:21, 789:3, 790:19, 790:21, 791:16, 791:21, 791:24, 792:1, 792:3, 793:3, 793:5, 793:6, 793:7, 793:8, 793:9, 794:12, 794:16, 794:17, 794:19, 794:20, 794:23, 794:24, 794:25, 795:1, 796:25, 797:2, 797:14,

797:18, 797:20, 797:24, 798:1, 798:3, 798:21, 798:23, 799:1, 800:4, 800:5, 802:16, 803:3

**theater** [3] - 717:7, 748:11, 793:25

**themselves** [1] - 677:25

**thereafter** [1] - 711:11

**they've** [3] - 679:9, 800:5, 800:6

**thinking** [3] - 735:18, 743:3, 762:6

**Third** [1] - 676:3

**third** [1] - 799:14

**thousand** [1] - 708:15

**threat** [1] - 792:5

**threaten** [6] - 790:14, 790:17, 791:1, 791:3, 793:1

**threatened** [4] - 790:12, 790:17, 790:20, 791:2

**threatening** [2] - 716:25, 780:24

**three** [9] - 696:12, 696:22, 697:2, 718:17, 758:4, 759:19, 762:6, 795:6, 799:22

**throughout** [7] - 736:18, 736:23, 737:9, 737:11, 737:12, 737:14, 749:16

**throw** [1] - 690:17

**thrown** [1] - 786:22

**throws** [1] - 788:15

**thumbs** [2] - 758:22, 758:24

**Thursday** [1] - 685:10

**tick** [1] - 688:14

**tight** [2] - 680:24, 779:22

**tightrope** [1] - 708:20

**today** [4] - 692:6, 736:3, 789:11, 801:13

**today's** [1] - 681:9

**together** [4] - 677:24, 704:9, 732:17, 778:21

**Tom** [4] - 716:1, 716:2, 749:7, 749:13

**ton** [1] - 690:11

**tongue** [1] - 780:1

**tonight** [2] - 703:13, 705:6

**took** [16] - 708:14, 708:16, 709:6, 710:19, 712:12, 734:10, 734:12, 753:14, 759:21, 760:13, 760:15, 760:17, 771:5, 782:25, 788:24, 793:9

**top** [16] - 682:16, 682:22, 685:8, 686:20, 689:4, 693:12, 693:21, 696:7, 704:13, 713:6, 719:20, 777:13, 796:5, 796:6, 801:16

**totally** [3] - 724:16, 765:15, 791:9

**touch** [2] - 728:22, 729:9

**touched** [1] - 796:2

**touting** [1] - 774:13

**towards** [1] - 736:8

**transcript** [3] - 769:14, 804:5, 804:6

**TRANSCRIPT** [1] - 675:8

**transcripts** [1] - 678:22

**transpired** [3] - 678:5, 691:4, 720:25

**TRIAL** [2] - 675:4, 675:8

**trial** [6] - 680:20, 681:4, 695:21, 696:16, 696:25

**tried** [4] - 771:16, 772:8, 772:19, 786:23

**Tromp** [1] - 707:7

**trouble** [1] - 714:22

**true** [26] - 678:11, 686:12, 686:13, 687:11, 688:4, 700:23, 719:24, 720:2, 724:20, 724:22, 732:9, 733:15, 734:7, 734:8, 736:1, 737:1, 740:8, 741:13, 769:5, 772:19, 783:11, 785:25, 789:13, 789:25, 804:5, 804:6

**Trump** [13] - 707:7, 708:6, 708:22, 713:6, 713:24, 750:12, 774:16, 774:20, 775:2, 775:19, 775:24, 776:5, 776:13

**Trump's** [2] - 775:14, 776:2

**trust** [1] - 680:15

**truth** [5] - 705:18, 705:23, 705:24, 722:3, 802:5

**try** [12] - 698:14, 705:2, 713:11, 769:6, 772:11, 773:2, 781:7, 788:20, 789:7, 794:5, 794:14, 801:4

**trying** [21] - 688:12, 695:3, 722:11, 723:22, 724:17, 748:6, 749:7, 749:9, 756:21, 757:2, 761:17, 761:20, 761:22, 773:21, 780:22, 780:23, 786:2, 789:1, 789:8, 795:2, 802:5

**Tuesday** [2] - 680:19, 681:10

**turn** [10] - 682:12, 684:24, 685:18, 688:8, 689:2, 704:10, 706:1, 712:23, 779:13, 800:8

**turned** [2] - 705:11, 706:14

**turning** [1] - 725:7

**tuxedo** [1] - 748:23

**TV** [3] - 769:19, 772:16, 773:4

**Tweet** [8] - 741:18, 742:18, 743:6, 798:14, 799:4, 799:7, 799:14, 799:17

**Tweeted** [3] - 740:2, 741:16, 741:21

**Tweeting** [1] - 743:19

**Tweets** [9] - 697:19, 697:22, 697:23, 697:24, 698:1, 724:16, 798:9, 799:22, 800:1

**twice** [2] - 696:24, 697:3

**twisted** [1] - 690:21

**Twitter** [8] - 719:19, 739:20, 740:13, 740:17, 740:19, 741:13, 746:1, 797:7

**two** [9] - 685:15, 689:3, 734:13, 739:24, 743:14, 767:1, 772:21,

774:13, 781:18

**type** [3] - 708:19, 741:3, 753:25

## U

**U.S** [3] - 675:15, 677:10, 744:22

**ultimately** [3] - 684:15, 692:25, 710:2

**under** [4] - 681:12, 720:17, 720:23, 780:20

**under-oath** [1] - 720:23

**underscore** [1] - 679:4

**understood** [2] - 688:19, 781:20

**unfortunately** [1] - 678:8

**unhappy** [1] - 723:14

**uninformed** [1] - 678:8

**UNITED** [2] - 675:1, 675:10

**United** [6] - 675:3, 676:15, 677:2, 677:8, 731:17, 768:24

**unless** [1] - 704:16

**unlike** [1] - 684:13

**unrelated** [1] - 789:19

**untrue** [1] - 795:19

**unwanted** [1] - 717:25

**up** [43] - 677:19, 680:5, 686:8, 690:13, 706:17, 708:8, 708:9, 717:9, 717:17, 717:20, 719:17, 721:12, 728:10, 729:2, 735:19, 749:17, 754:6, 758:22, 758:24, 760:12, 765:25, 766:25, 767:11, 767:15, 769:15, 777:4, 783:12, 783:14, 783:15, 784:10, 784:12, 786:10, 787:7, 790:9, 792:17, 792:19, 792:22, 793:9, 793:22, 794:1, 795:17, 801:8

**upper** [1] - 723:11

**upping** [2] - 748:2, 748:7

**upset** [5] - 678:10, 725:1, 756:8, 786:7

**upwards** [1] - 786:1

**urged** [1] - 720:19

**user** [1] - 741:13

## V

**verbal** [1] - 688:14

**verbally** [1] - 791:3

**versions** [2] - 728:11, 782:16

**veteran** [1] - 720:15

**Veterans** [1] - 681:8

**victim** [1] - 725:2

**video** [9] - 750:4, 750:5, 764:10, 764:11, 764:17, 768:14, 771:9, 794:3

**views** [1] - 678:16

**vile** [1] - 716:24

**visit** [1] - 703:6

**voice** [4] - 716:5, 716:9, 793:20, 794:10

**voicemail** [2] - 735:1, 793:15
**voiceover** [1] - 735:9
**voluntarily** [5] - 754:8, 786:8, 786:9, 787:5, 787:7
**voluntary** [1] - 786:6
**volunteered** [2] - 786:5, 787:15
**volunteers** [1] - 787:18
**vote** [1] - 695:12
**vs** [1] - 675:5

# W

**wait** [6] - 730:9, 736:7, 747:12, 765:10, 776:18, 798:6
**waited** [1] - 741:8
**waiting** [1] - 792:19
**waives** [1] - 779:10
**walk** [1] - 681:4
**walking** [3] - 708:19, 708:20, 708:24
**Wallenda** [1] - 708:19
**Wallenda-type** [1] - 708:19
**wants** [1] - 692:6
**warning** [1] - 716:6
**Washington** [5] - 675:6, 675:17, 676:16, 748:17, 804:14
**waste** [1] - 712:20
**watch** [7] - 697:19, 697:21, 697:23, 703:24, 704:2, 704:3, 749:22
**watched** [1] - 703:25
**watching** [5] - 750:20, 750:23, 750:25, 752:4, 783:23
**ways** [2] - 740:15, 780:24
**WBAI** [1] - 759:17
**weak** [1] - 726:16
**wearing** [2] - 679:18, 748:23
**weasel** [2] - 713:19, 713:23
**website** [1] - 715:18
**Wednesday** [2] - 724:5, 761:7
**week** [8] - 698:10, 699:6, 699:12, 738:15, 739:4, 762:9, 768:4, 777:14
**West** [2] - 752:3, 791:6
**White** [3] - 765:17, 765:22, 766:24
**whoa** [2] - 754:14, 762:18
**whole** [12] - 704:16, 706:10, 749:16, 749:19, 750:4, 759:16, 760:5, 761:17, 764:16, 764:17, 786:5, 796:11
**wife** [1] - 727:9
**WikiLeaks** [23] - 701:14, 719:18, 732:11, 741:16, 741:21, 742:18, 743:6, 743:11, 744:1, 744:16, 744:17, 745:3, 745:21, 747:6, 747:8, 747:9, 747:25, 756:4, 762:19, 763:16, 771:5, 800:18
**WikiLeaks'** [2] - 719:14, 719:23

**WikiLeaks's** [1] - 743:24
**William** [1] - 733:14
**willing** [3] - 766:9, 767:19, 770:9
**win** [1] - 708:6
**wingers** [2] - 774:19, 774:20
**wink** [6] - 749:3, 749:24, 750:1, 750:2, 790:7
**wipe** [1] - 702:5
**witch** [2] - 697:15, 782:7
**witness** [8] - 679:14, 679:21, 731:12, 742:6, 780:11, 790:23, 802:17, 802:22
**WITNESS** [48] - 679:17, 679:20, 679:22, 691:1, 702:9, 718:14, 718:16, 718:20, 741:2, 741:5, 741:11, 742:7, 742:9, 742:17, 742:22, 743:1, 743:7, 743:9, 743:11, 744:9, 744:11, 746:5, 746:19, 746:22, 751:9, 751:11, 751:13, 751:16, 751:22, 761:16, 761:23, 761:25, 762:5, 762:22, 765:2, 766:11, 775:2, 777:18, 777:20, 783:6, 786:21, 793:5, 793:7, 793:9, 794:16, 794:19, 794:23, 794:25
**witness's** [2] - 770:17, 770:22
**witnesses** [1] - 751:14
**woman** [3] - 684:10, 717:11, 763:8
**Woodruff** [1] - 782:10
**word** [4] - 694:9, 713:13, 741:20, 743:6
**wording** [1] - 745:25
**words** [3] - 706:6, 745:24, 791:18
**works** [1] - 765:20
**world** [2] - 726:17, 760:23
**worth** [2] - 677:23, 794:1
**worthless** [1] - 704:16
**write** [19] - 692:5, 695:4, 699:17, 700:5, 700:7, 700:15, 700:25, 701:1, 704:4, 707:20, 710:24, 713:19, 721:22, 728:4, 761:7, 777:13, 779:20, 782:1, 796:10
**writes** [1] - 723:7
**writing** [2] - 783:22, 790:15
**written** [2] - 715:17, 793:2
**wrote** [13] - 692:15, 699:24, 701:7, 703:2, 706:4, 712:1, 714:24, 716:13, 744:20, 755:24, 777:19, 796:13, 796:15

# Y

**Yahoo** [2] - 749:5, 765:23
**year** [21] - 683:23, 696:19, 697:5, 700:22, 705:20, 710:25, 730:21, 736:7, 752:7, 753:23,

754:2, 754:4, 754:5, 763:24, 763:25, 764:2, 766:18, 769:6, 787:16, 790:15, 792:15
**yearly** [2] - 748:14, 748:16
**years** [18] - 718:6, 718:16, 718:17, 718:21, 727:17, 733:2, 735:4, 735:7, 737:9, 737:11, 737:12, 737:14, 762:6, 771:6, 776:17, 777:6, 777:11, 784:3
**yes-and-no** [1] - 781:14
**yes-or-no** [2] - 773:3, 774:25
**yesterday** [5] - 679:19, 681:25, 689:17, 698:18, 754:21
**York** [5] - 733:17, 733:20, 733:24, 752:1, 757:9
**young** [1] - 716:2
**yourself** [15] - 677:6, 706:17, 711:16, 713:12, 713:13, 713:14, 728:10, 731:2, 742:8, 749:1, 757:3, 758:21, 760:13, 763:20, 802:3
**yourselves** [2] - 679:7, 802:25
**YouTube** [6] - 787:7, 787:9, 787:13, 793:19, 794:3, 794:10

# Z

**ZELINSKY** [155] - 677:20, 679:12, 679:23, 681:14, 681:16, 681:19, 681:21, 681:24, 682:12, 682:13, 684:24, 685:2, 685:18, 685:20, 686:5, 686:6, 686:19, 686:22, 688:8, 688:16, 688:19, 688:22, 689:2, 689:5, 691:5, 691:8, 691:14, 691:19, 691:23, 692:1, 692:22, 692:24, 693:11, 693:13, 694:13, 694:15, 695:16, 695:17, 696:1, 696:3, 697:16, 697:17, 699:14, 699:16, 700:13, 700:14, 701:9, 701:11, 701:21, 701:24, 702:8, 702:11, 702:14, 702:15, 703:14, 703:17, 703:19, 704:10, 704:12, 704:25, 705:1, 706:1, 706:3, 706:19, 706:22, 707:12, 707:14, 707:18, 707:19, 709:8, 709:10, 709:25, 710:1, 710:7, 710:8, 710:10, 710:12, 710:16, 710:18, 711:9, 711:10, 713:15, 713:18, 713:25, 714:4, 714:13, 714:16, 715:5, 715:6, 715:20, 715:23, 716:21, 718:12, 718:25, 719:1, 721:7, 721:8, 721:12, 721:15, 722:6, 722:10, 723:2, 723:4, 723:25, 724:1, 725:7, 725:12, 725:23, 725:24, 726:6, 726:7, 727:19, 727:20, 728:2, 728:3, 729:25, 730:2, 731:4, 737:3, 762:20, 764:23, 768:18, 770:11, 776:22, 779:1, 779:3, 779:6, 779:23, 780:7,

780:9, 781:3, 783:5, 786:18,
787:17, 789:2, 791:14, 791:25,
794:11, 797:1, 797:5, 797:11,
797:16, 797:19, 797:22, 797:25,
798:4, 798:5, 798:19, 798:24,
799:2, 800:6, 800:7, 801:8,
801:10, 802:15

**Zelinsky** [9] - 675:15, 677:9,
679:10, 680:2, 680:4, 688:9,
769:8, 771:20, 803:3

**Zelinsky.........** [1] - 676:21

**Zelinsky...............** [1] - 676:22