```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 19-CR-018
4                   Plaintiff,      )
                                    ) JURY TRIAL
5    vs.                            ) Day 5 - Morning Session
                                    )
6    Roger Jason Stone, Jr.,        ) Washington, DC
                                    ) Date:  November 12, 2109
7                   Defendant       ) Time:  9:30 a.m.
     _____
8
                     TRANSCRIPT OF JURY TRIAL
9                         HELD BEFORE
            THE HONORABLE JUDGE AMY BERMAN JACKSON
10               UNITED STATES DISTRICT JUDGE
     _____
11

12               A P P E A R A N C E S

13

     For the Plaintiff:      Jonathan Ian Kravis
14                           Michael John Marando
                             Adam Jed
15                           Aaron Simcha Jon Zelinsky
                             U.S. ATTORNEY'S OFFICE FOR THE
16                             DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
17                           Washington, DC 20530
                             (202) 252-7068
18                           e-mail:  Jonathan.kravis3@usdoj.gov
                             e-mail:  Asjz@usdoj.gov
19                           e-mail:  Michael.marando@usdoj.gov

20

     For the Defendant:      Bruce S. Rogow
21                           LAW OFFICE OF BRUCE S. ROGOW, P.A.
                             100 NE 3rd Avenue
22                           Suite 1000
                             Fort Lauderdale, FL 33301
23                           (954) 767-8909
                             e-mail:  Brogow@rogowlaw.com
24

25
```

```
 1    For the Defendant:        Robert C. Buschel
                                Tara A. Campion
 2                              BUSCHEL & GIBBONS, P.A.
                                One Financial Plaza
 3                              100 S.E. Third Avenue
                                Suite 1300
 4                              Ft. Lauderdale, FL 33394
                                (954) 530-5301
 5                              e-mail: Buschel@bglaw-pa.com
                                Grant J. Smith
 6                              STRATEGYSMITH, P.A.
                                401 East Las Olas Boulevard
 7                              Suite 130-120
                                Fort Lauderdale, FL 33301
 8                              (954) 328-9064
                                e-mail: Gsmith@strategysmith.com
 9                              Chandler Paige Routman
                                LAW OFFICE OF CHANDLER P. ROUTMAN
10                              501 East Las Olas Blvd.
                                Suite #331
11                              Ft. Lauderdale, FL 33316
                                (954) 235-8259
12                              e-mail: Routmanc@gmail.com

13    _____

14    Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                                Official Court Reporter
15                              United States Courthouse, Room 6523
                                333 Constitution Avenue, NW
16                              Washington, DC  20001
                                202-354-3267
17                              e-mail: JaniceDickmanDCD@gmail.com

18                                  *   *   *

19

20

21

22

23

24

25
```

1                               INDEX

2     Witnesses:

3          Richard Gates
                Direct Examination By Mr. Zelinsky............908
4               Cross-Examination By Mr. Rogow................947
                Redirect Examination By Mr. Zelinsky..........967
5
           Michelle Taylor (Recalled)
6               Direct Examination By Mr. Kravis..............969
                Cross-Examination By Mr. Rogow................974
7

8     Exhibits:
           Government Exhibit 6-B.............................972
9          Government Exhibit 209.............................977
           Government Exhibit 201.............................977
10         Government Exhibit 202.............................977
           Government Exhibit 214.............................974
11

12    Plaintiff Rests.......................................979

13                          *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURTROOM DEPUTY:  Good morning, Your Honor.
 2   This morning we have Criminal Case Number 19-18, United States
 3   of America v. Roger Stone.  Mr. Stone is present in the
 4   courtroom.
 5              Counsel, please, approach the lectern, identify
 6   yourself for the record.
 7              MR. KRAVIS:  Good morning, Your Honor.
 8   Jonathan Kravis for the United States.  With me at counsel
 9   table are Aaron Zelinsky, Michael Marando, Adam Jed, and
10   Amanda Rohde, all from the D.C. Attorney's Office, and
11   Christopher Keefe from the FBI.
12              THE COURT:  All right.  Good morning.
13              MR. BUSCHEL:  Good morning, Judge.  Robert Buschel,
14   Tara Campion, Grant Smith, Bruce Rogow, and Chandler Routman on
15   behalf of Mr. Stone.
16              THE COURT:  Do we have any preliminary matters?
17              MR. KRAVIS:  At the conclusion of the government's
18   case, which I expect will likely be this morning, we were
19   intending to recall Ms. Taylor to admit a few more exhibits
20   that we did not get to the first time around.
21              One of the exhibits that we would like to admit is
22   the transcript of the relevant scene of The Godfather II.  I
23   think the Court, in its ruling denying our motion in limine on
24   this subject, ruled that we could admit the transcripts.  We
25   just want to confirm that we're permitted to do that before we
```

1   recall Ms. Taylor.

2        THE COURT:  All right.  And how is it going to be

3   authenticated?

4        MR. KRAVIS:  Well, Ms. Taylor has seen the movie

5   several times, including very recently.  She has watched the

6   movie with a copy of the transcript in front of her, and she

7   can confirm that the transcript is fair and accurate.  We've

8   also sent the transcript we propose to use to defense counsel,

9   I think three times over the last few weeks.  I haven't heard

10  any objection from them.

11       THE COURT:  All right.  Mr. Buschel, I know your

12  objection to its admission on relevance grounds and prejudice

13  grounds is noted, and I've overruled it.

14       Do you have any objection to the accuracy of the

15  transcription.

16       MR. BUSCHEL:  We don't have an objection to the

17  accuracy of the transcription.  There are some descriptors in

18  there that we object to, like, what is going on, It's a

19  smoke-filled room.  I think noting our objection, the Court has

20  noted it.

21       I just want to draw the Court's attention, we found

22  in the transcript, on page 690, that Mr. Credico explained what

23  he felt the movie -- or, what the comment of Frank Pentangeli

24  meant to him, and we believe that's the only relevance.

25       That being said, I think if the government were to

```
1    remove the descriptors and just put in the words, the
2    transcript of that scene itself, it would be less
3    objectionable.
4              THE COURT:  All right.  Why don't we do this:  Why
5    don't we have her identify the transcript -- the exhibit as a
6    transcript, which she has compared to the scene, and it
7    accurately reflects the words said in the scene, without then
8    publishing it or having it -- read it to the jury at that time.
9    It will then be in evidence, and they'll have it.
10             She's already described the scene anyway, as has
11   Credico, and then I will have an opportunity to look at it and
12   suggest any redactions based on this objection.  But I don't
13   think we have to resolve them right now.  We can resolve it
14   before we send it back to the jury room.
15             Does that make sense?
16             MR. KRAVIS:  That makes sense.  Thank you, Your
17   Honor.
18             THE COURT:  Okay.  So I'll take a look at it with
19   that in mind.
20             All right.  Anything before we bring in -- is it
21   Mr. Gates is next?
22             MR. KRAVIS:  Mr. Gates is next.  Thank you.
23             Nothing further.  Thank you, Your Honor.
24             THE COURT:  All right.  So, let's bring in the jury,
25   then.
```

```
 1                    (Jurors enter the courtroom.)
 2              THE COURT:  All right.  Good morning.  I'm glad to
 3    see that all the jurors are present.  And I know that everyone
 4    was on time, again, this morning.  It has been a long weekend,
 5    and I hope you had a pleasant weekend.  Some of it was sunny.
 6              But I guess I just want to confirm that none of you
 7    has been approached by anyone to discuss the case, none of you
 8    have discussed the case or done any research or have any issues
 9    that you need to bring to my attention before we proceed.
10              I'm going to assume, since everyone is either shaking
11    their head or nodding their head and no one has raised their
12    hand to speak to me, that your answer to my question is that
13    you have not discussed the case or done any research.
14              And, therefore, I will call on the government to call
15    its next witness.
16              MR. ZELINSKY:  The United States calls Rick Gates,
17    Your Honor.
18                    RICHARD WILLIAMS GATES, III,
19    was called as a witness and, having been first duly sworn, was
20    examined and testified as follows:
21                       DIRECT EXAMINATION
22    BY MR. ZELINSKY:
23    Q.  Good morning, sir.
24    A.  Good morning.
25    Q.  Could you state and spell your name for the record, please?
```

```
1    A.   Yes.  Richard Williams Gates, III.  R-I-C-H-A-R-D,

2    W-I-L-L-I-A-M, G-A-T-E-S.

3    Q.   Mr. Gates, how old are you?

4    A.   47 years old.

5    Q.   Where do you live?

6    A.   I live in Richmond, Virginia.

7    Q.   What's your educational background?

8    A.   I received a bachelor of arts from the College of William &

9    Mary, and then a master of arts from George Washington

10   University.

11   Q.   And since graduation, what field have you worked in?

12   A.   Largely, political consulting.

13   Q.   Can you briefly describe the jobs that you've held?

14   A.   Yes.  My first job out of college was with a political

15   consulting firm called Black, Manafort, Stone and Kelly.

16         I then went to work for one of their clients for a

17   number of years called Gtech Corporation.

18         Following that, I came back to work with a business

19   partner in a firm called Business Strategies and Insight.

20         And then worked for another company called Scientific

21   Games.

22         And then in 2006, came to work for a firm called

23   Davis Manafort Partners.

24   Q.   At the beginning of your employment history, you mentioned

25   a firm named Black, Manafort and Stone; is that right?
```

```
 1    A.   Yes.

 2    Q.   Who was the "Stone" in Black, Manafort and Stone?

 3    A.   Mr. Roger Stone.

 4    Q.   Is that the defendant in this case?

 5    A.   It is.

 6    Q.   Did you interact with Mr. Stone when you were employed by

 7    Black, Manafort and Stone?

 8    A.   I did not.

 9    Q.   And you also mentioned another name there, Manafort.

10    A.   Mr. Paul Manafort.  He was another one of the primary

11    partners at the firm.

12    Q.   You mentioned another firm that you went to work at in 2006

13    called Davis Manafort; is that right?

14    A.   That's correct.

15    Q.   Who is the "Manafort" in Davis Manafort that you went to

16    work at in 2006?

17    A.   It's the same, Mr. Paul Manafort.

18    Q.   I want to turn your attention now to January of 2016, sir.

19            In January of 2016, what was your job?

20    A.   At the time, I was still employed by Davis Manafort

21    Partners.

22    Q.   What was Paul Manafort's job?

23    A.   At the time, he was still the primary partner in Davis

24    Manafort Partners.

25    Q.   And what kind of work did Davis Manafort Partners do at
```

1    that time?

2    A.  At that time, it was largely international political

3    elections, and Mr. Manafort was responsible for building

4    political parties in different foreign countries.

5    Q.  Did there come a time when you became involved with the

6    Trump campaign on a volunteer basis?

7    A.  Yes.

8    Q.  When did you first become involved with the Trump campaign

9    on a volunteer basis?

10   A.  I started working for the campaign at the end of March of

11   2016.

12   Q.  In March of 2016, what was your role on the campaign?

13   A.  At the time, it was deputy convention manager.

14   Q.  Who was the convention manager?

15   A.  It was Mr. Paul Manafort.

16   Q.  And you mentioned a convention.  What convention is that?

17   A.  In the political world, in a presidential election, each

18   party has its respective convention.  Our part was the

19   Republican National Convention, which was held in July of 2016.

20   Q.  Did Mr. Manafort eventually become the chairman of the

21   Trump campaign?

22   A.  He did.

23   Q.  Around when was that?

24   A.  I believe that was June of 2016.

25   Q.  Did you get a promotion when Mr. Manafort became the

1   campaign's chairman?

2   A.  I did.

3   Q.  What was your job?

4   A.  I was deputy campaign manager at that time.

5   Q.  Before joining the Trump campaign, did you commit crimes

6   with Paul Manafort?

7   A.  I did.

8   Q.  And were you indicted for some of those crimes?

9   A.  I was.

10  Q.  Were you arrested?

11  A.  Yes.

12  Q.  And did you make a decision about how to resolve those

13  charges?

14  A.  I did.

15  Q.  What was your decision?

16  A.  I pled to those charges.

17  Q.  When did you plead guilty?

18  A.  I pled in February of 2018.

19  Q.  As part of your guilty plea, did you enter into a written

20  agreement with the government?

21  A.  I did.

22  Q.  And does that document contain all the terms of your

23  agreement with the government?

24  A.  It does.

25          MR. ZELINSKY:  Could we turn now to Exhibit 162.

1    It's been previously admitted.

2    BY MR. ZELINSKY:

3    Q.  Sir, do you recognize this document?

4    A.  Yes.

5    Q.  And what is it?

6    A.  It is my plea agreement with the United States government.

7            MR. ZELINSKY:  I would like to turn to the last page

8    of this exhibit, page 12.

9    BY MR. ZELINSKY:

10   Q.  Do you see a signature there that says, "Richard W. Gates,

11   III"?

12   A.  Yes.

13   Q.  Did you sign the plea agreement?

14   A.  I did.

15   Q.  Did your lawyer sign the plea agreement?

16   A.  He did.

17   Q.  Turning to the previous page, page 11, did the

18   United States government also sign the plea agreement?

19   A.  Yes, it did.

20           MR. ZELINSKY:  I want to turn now to the first page

21   of this exhibit.

22   BY MR. ZELINSKY:

23   Q.  Do you see a section there, sir, called "Charges and

24   Statutory Penalties"?

25   A.  Yes.

1    Q.   How many charges were you required to plead to?

2    A.   I pled to two charges.

3    Q.   And are they listed there in the paragraph under Charges

4    and Statutory Penalties?

5    A.   They are.

6              MR. ZELINSKY:  Ms. Rohde, if we could enlarge that

7    paragraph, please.

8    BY MR. ZELINSKY:

9    Q.   With respect to paragraph 1.(a), what were you charged

10   with?

11   A.   I was charged with a conspiracy against United States.

12   Q.   And with respect to 1.(b), the second count, what were you

13   charged with?

14   A.   I was charged with making a false statement to a federal

15   government official.

16   Q.   Moving now to 1(a), the conspiracy against the

17   United States.

18              With whom did you conspire?

19   A.   Mr. Manafort.

20   Q.   And did that conspiracy cover a series of crimes?

21   A.   It did.

22   Q.   What crimes did that conspiracy cover?

23   A.   It was three components:  One was not registering for

24   foreign registrations -- as a foreign registration agent [sic];

25   the second one was helping Mr. Manafort file false tax returns;

1    and the third one was not reporting a foreign bank account.

2    Q.  You also said that you pled guilty to a second charge, of

3    making a false statement.  Can you explain that charge a little

4    bit?

5    A.  Yes.  Prior to my plea agreement, in the course of the

6    interviews that I held with the Special Counsel's Office at the

7    time, I made a statement regarding a meeting that I did not

8    attend.  I did not tell the truth to the government at that

9    time.

10   Q.  Were there consequences to lying to the government?

11   A.  Yes.

12   Q.  And what was the consequence?

13   A.  The consequence, that a second charge was added to my plea

14   agreement.

15   Q.  And what is the impact of that second charge?

16   A.  The second charge could impose an additional penalty of up

17   to five years imprisonment and up to $250,000 fine.

18   Q.  When you pled guilty, did you appear in front of a judge?

19   A.  I did.

20   Q.  And did she explain the maximum potential penalties to you?

21   A.  Yes, she did.

22   Q.  I would like to turn now back to page one of the Exhibit.

23            For Count 1, Conspiracy against the United States,

24   what are the maximum penalties for the charge?

25   A.  The maximum penalty is up to five years imprisonment and up

1    to $250,000 fine.

2    Q.  And for Count 2 that you pled guilty to, what are the

3    maximum possible penalties?

4    A.  It is the same, up to five years imprisonment and up to

5    $250,000 fine.

6    Q.  So what is the total amount of time, maximum, that you

7    could be facing?

8    A.  Up to ten years.

9    Q.  As part of your written agreement with the government, did

10   you make promises?

11   A.  I did.

12   Q.  And what did you promise?

13   A.  To the government, I promised to tell the truth, I promised

14   to assist them in any investigation that they were conducting,

15   and I promised to provide them with emails and documents from

16   my records.

17           MR. ZELINSKY:  Let's turn to page 6 of this Exhibit.

18   BY MR. ZELINSKY:

19   Q.  As part of the written plea agreement, did the government

20   also make promises?

21   A.  Yes, it did.

22   Q.  And what promises did the government make?

23   A.  The government promised to drop additional charges from a

24   separate indictment.  It promised not to oppose my attorney's

25   idea of submitting probation as a potential punishment.  And

1    then it also agreed to write a 5K1 letter, if I fully

2    cooperated and lived up to the terms of the agreement.

3    Q.  I want to go through that a little more in detail.

4         You mentioned that the government agreed to dismiss a

5    second indictment; is that right?

6    A.  That's correct.

7    Q.  What was that second indictment?

8    A.  The second indictment was in another jurisdiction, in the

9    Eastern District of Virginia, and it related to additional

10   financial crimes that were put into indictment against myself

11   and Mr. Manafort.

12   Q.  Has the government dismissed those charges in the Eastern

13   District of Virginia?

14   A.  It has.

15   Q.  Could they be brought again, sir?

16   A.  They could.

17   Q.  Under what circumstances?

18   A.  If I do not fulfil the terms of my plea agreement, then

19   that plea agreement could be revoked by the government, and I

20   would be facing additional charges.

21   Q.  If you lie during your testimony today, would that violate

22   your plea agreement?

23   A.  Yes, it would.

24   Q.  And what would be the impact of a lie today?

25   A.  I would end up facing a greater list of punishments.

1   Q.  And you mentioned earlier that the government agreed to

2   write a 5K letter for you?

3   A.  Yes, that's correct.

4   Q.  What is a 5K letter?

5   A.  A 5K letter is a description of the things that I've done

6   on behalf of the government, or for the government, and it

7   details the cooperation that I provided.  That letter is

8   submitted to the judge, and the judge can use that letter for

9   purposes of the sentencing guidelines.

10  Q.  And you mentioned earlier that if you fulfilled your plea

11  agreement, the government would not oppose a sentence of

12  probation; is that right?

13  A.  That is correct.

14  Q.  Who ultimately decides on your sentence?

15  A.  Ultimately, the judge decides the sentence.

16  Q.  And what judge ultimately decides that sentence?

17  A.  Judge Jackson, in my case.

18  Q.  Moving on to your testimony today.

19          Prior to your testimony here, did you also testify in

20  other proceedings?

21  A.  I did.

22  Q.  And did you meet with the government to prepare for those

23  other proceedings?

24  A.  Yes.

25  Q.  Did you review documents and other materials?

1    A.  I did.

2    Q.  Approximately how many times did you meet with the

3    government to prepare for those other proceedings?

4    A.  Over 50 times in the other two proceedings.

5    Q.  And did you also meet with the government to prepare for

6    this proceeding?

7    A.  I did.

8    Q.  And how many times did you meet with the government to

9    prepare for this proceeding?

10   A.  Two times for this proceeding.

11   Q.  Let's turn now to the spring of 2016.

12            In May of 2016, what was your role on the Trump

13   campaign?

14   A.  In May of 2016, I was promoted to deputy campaign manager.

15   And I was responsible for a lot of the logistical aspects of

16   the campaign at that time.

17   Q.  And what was Mr. Manafort's role on the Trump campaign?

18   A.  Mr. Manafort had -- was progressing.  He was leading both

19   the convention and the head of delegates, and was very shortly

20   after promoted to the campaign chair.

21   Q.  Did you interact with Mr. Stone in May of 2016, while you

22   were working for the campaign?

23   A.  I did.

24   Q.  And how did you interact with him?

25   A.  Primarily by phone, via voice conversation, and some texts.

1   Q.  Do you know if Roger Stone had worked for the Trump

2   campaign in the past?

3   A.  Yes.  It was my understanding that Mr. Stone served as an

4   adviser to Mr. Trump prior to me and Mr. Manafort joining the

5   campaign.

6   Q.  In May 2016, what was your understanding of Mr. Stone's

7   formal role on the campaign?

8   A.  At that time, it was my understanding he did not have a

9   formal role with the campaign.

10   Q.  What was your understanding of Mr. Stone's informal role on

11   the campaign?

12   A.  Mr. Stone still had people that he knew on the campaign and

13   had the ability to access those people.

14   Q.  What was your understanding of Mr. Stone's relationship to

15   then-candidate Trump?

16   A.  At that point in time, it was my understanding that it was

17   somewhat tense, based on that Mr. Stone had worked for the

18   campaign and then had left the campaign.  But, they had had a

19   30-plus year relationship, based on what I was told.

20   Q.  Who were Stone's main points of contact on the campaign?

21   A.  For the one that I was aware of, was primarily

22   Mr. Manafort.

23   Q.  And were you also a point of contact?

24   A.  Yes.

25   Q.  And when Mr. Bannon joined the campaign, was he a point of

1    contact to Mr. Stone?

2    A.  Yes, he was.

3    Q.  I want to continue talking with you about May of 2016 for a

4    moment.

5          In May of 2016, did you and Roger Stone talk about

6    Julian Assange?

7    A.  We talked about WikiLeaks, yes.

8    Q.  What did Mr. Stone tell you about WikiLeaks?

9    A.  Mr. Stone indicated that he had information that would be

10   coming out at some point, although a date was never given.  And

11   that was the information that he had passed along.

12         THE COURT:  When you said, "He said he had

13   information," who were the "he's" in that?

14         THE WITNESS:  Sorry.  Mr. Stone had indicated that he

15   had information that WikiLeaks would be submitting or dropping

16   information, but no information on dates or anything of that

17   nature.

18   BY MR. ZELINSKY:

19   Q.  Who was the campaign's primary person regarding WikiLeaks's

20   information at that time?

21   A.  The only person that I'm aware of that had information at

22   that time was Mr. Stone.

23   Q.  I want to talk now, for a moment, about June 12th, 2016.

24         Do you remember Julian Assange's announcement on

25   June 12th, 2016 that WikiLeaks had information related to

1    then-candidate Clinton, and that the information would be

2    released?

3    A.  I do.

4    Q.  What was the attitude within the campaign to

5    Julian Assange's announcement?

6              MR. ROGOW:  Your Honor, I object.

7              THE COURT:  On what grounds?

8              MR. ROGOW:  The attitude of the campaign.  He can't

9    speak for the attitude of the campaign.

10             THE COURT:  All right.  Can you just come to the

11   bench for a second?

12             (Bench discussion:)

13             THE COURT:  So your objection is lack of foundation

14   to his personal knowledge, not the relevance?

15             MR. ROGOW:  Yes.  Well, personal knowledge.  No

16   personal knowledge.  Calls for speculation in terms of what the

17   attitude of the campaign was.

18             THE COURT:  Okay.  He's just testified that he was

19   the deputy chief of the campaign.

20             MR. ROGOW:  So he can testify as to what his feeling

21   was.  But, the whole campaign, has hundreds of people on the

22   campaign.

23             MR. ZELINSKY:  Your Honor, I'm happy to modify it to,

24   What was the leadership of the campaign's attitude at that

25   point?  Mr. Gates clearly observed what the attitude of the

1    leadership of the campaign was.  As he said, he's the deputy

2    chairman of the campaign.  I don't think --

3            THE COURT:  Well, I guess, are you including the

4    candidate, or are you just talking about Manafort and Gates?

5    Who is that question supposed to refer to?

6            MR. ZELINSKY:  It will refer to Mr. Manafort.  It

7    will refer to Mr. Gates.  It will refer to other senior

8    campaign leadership, like Mr. Miller, Mr. Kushner.  I can go

9    through in detail the names.

10           THE COURT:  All right.  Well, I think what you can

11   ask is, you know, At the time, was it discussed within senior

12   levels of the campaign?  And then ask him, What was the

13   reaction?  But, I think you need to be careful not to -- you

14   don't want to be eliciting hearsay.

15           But, I think he can, as the number two person on the

16   campaign, speak for the campaign.  He's not saying the

17   candidate and he's not saying 100 percent of the people on the

18   campaign.  But, I think from his position as deputy chief, what

19   was their reaction, I think he has established a basis to

20   answer.

21           MR. ROGOW:  You know, it's like if the dean of the

22   law school is asked a question, How did the law school -- how

23   did all the professors feel about it, I don't think the dean

24   can answer that question.

25           THE COURT:  Well, that's a different question, "How

1    did all the professors feel about it?"  He didn't say, How did

2    everybody; he said the campaign.  And then I think he needs to

3    know what to -- what was the reaction of the -- you know, Was

4    this discussed at the senior level of the campaign?

5           And he can say yes.

6           And, you know, Between you and Manafort?

7           Yes.

8           And then without -- then he needs to say, Without

9    announcing what anybody else said to you, what was the reaction

10    of the senior level of the campaign?

11           I mean --

12           MR. ROGOW:  Then we get into the hearsay, What was

13    said to you?  And his answers are based upon hearsay.

14           THE COURT:  Well, I don't -- I think he was part of

15    the conversations.  And it's not for the truth of the matter

16    asserted.  He's asking what the reaction was.  Were they

17    interested?  Were they not interested?  Were they dismissive?

18    I think he can testify to that as being at the top of the -- he

19    was the deputy chief of the campaign.

20           MR. ROGOW:  He was.  But, what is the relevance?  I

21    object on relevance grounds.  So, what's the relevance of

22    the --

23           THE COURT:  Okay.

24           MR. ROGOW:  -- of the campaign's feelings about it?

25    If something happened, it happened.  If actions were taken, it

1    was taken.  But, the relevance of the campaign's feeling about

2    this --

3              THE COURT:  All right.  So what's --

4              MR. ZELINSKY:  Your Honor, an essential element of

5    the government's case is that Mr. Stone's motive for lying to

6    the House Intelligence Committee was to cover up his

7    relationship with the campaign and his role as the WikiLeaks

8    person, that he had an important role on the campaign, and that

9    the campaign was both receptive to and interested in the

10   WikiLeaks matters.

11             The campaign's response to the Wikileaks's -- to

12   Julian Assange's announcement is critical to explaining to the

13   jury what Mr. Stone's motive for lying is.  Mr. Gates has

14   already said that he and Mr. Stone were in discussion about

15   that prior to the announcement by Mr. Assange.  And how the

16   campaign responded to this information is critical to

17   understanding Mr. Stone's motive for subsequently covering up

18   that activity.

19             THE COURT:  Are you anticipating an answer to this

20   question?

21             MR. ZELINSKY:  "Euphoric," Your Honor.

22             MR. ROGOW:  The campaign is not on trial.

23             THE COURT:  It's illegal for them to --

24             MR. ROGOW:  I understand.

25             THE COURT:  He is laying the background for, number

1    one, why these questions were important to the House

2    investigation.  They were investigating the campaign's interest

3    in the hacked information.  And he's investigating what

4    Mr. Stone said or didn't say to other people, and whether that

5    comports with what he told Congress he said or didn't say to

6    other people.

7            So, I think that background, without going into more

8    detail, is relevant.  I don't think that he's trying to prove

9    that he had had influence with Wikileaks.  But, he professed to

10   have, to the campaign and publicly, communications and

11   information and connections, which he denied professing when he

12   went before Congress.

13           So, I think that goes to the heart of whether the

14   particular statements that they're trying to say were true or

15   untrue, were true or untrue.  So, you can add one more

16   foundational question about whether he was present at

17   discussions at senior levels of the campaign, and then say, you

18   know, Without going into what he said, what was the general

19   reaction at the top of the campaign when this happened?  And

20   then go on to the next question, and get to Mr. Stone.

21           MR. ROGOW:  Thank you, Your Honor.

22           (Open court:)

23   BY MR. ZELINSKY:

24   Q.  Mr. Gates, we were just discussing Julian Assange's

25   June 12th, 2016 announcement that he had information about

1    Hillary Clinton that was pending publication; is that right?

2    A.  Correct.

3    Q.  After that announcement, did you either discuss or were you

4    present for discussions with senior leadership of the campaign

5    about the announcement?

6    A.  Yes.

7    Q.  And what was the reaction -- without getting into the

8    specifics of what anyone said, what was the reaction of the

9    campaign to Julian Assange's announcement?

10   A.  It was twofold.  One, it was one of -- of happiness.  A

11   competing campaign was going to have some information.  It was,

12   in a way, a gift that we had not sought, but was coming out.

13              And the other piece is, we were kind of in disbelief,

14   to be honest.  We had heard for so long that the information

15   would be coming out as early as April, but it still had never

16   come out.  And even though the announcement was an indication

17   that Mr. Assange had the emails, we still had no proof or

18   evidence that the information had actually been leaked at that

19   time.

20   Q.  Mr. Gates, you said you'd heard since April that the

21   information would be coming out.  Who had you heard that

22   information from?

23   A.  Mr. Stone.

24   Q.  What was Mr. Stone's reaction to the June 12th

25   announcement?

1     A.  He was happy.  From my recollection, it was an indication

2     that the information he had provided earlier would, in fact,

3     you know, potentially become true, that information would be

4     leaked out.

5                MR. ZELINSKY:  Let's turn now to Exhibit 21.

6                If we could enlarge the e-mail at the bottom.

7     BY MR. ZELINSKY:

8     Q.  Who is this e-mail -- all the way at the bottom, the one

9     that begins on June 13, 2016, at 18:17, who is that e-mail

10    from?

11    A.  The e-mail is from Mr. Stone.

12    Q.  What did Mr. Stone write?

13    A.  "Need guidance on many things.  Call me."

14    Q.  Who was this e-mail to?

15    A.  The e-mail was sent to me.

16    Q.  What is the date this e-mail was sent?

17    A.  June 13th.

18    Q.  And that's one day after the June 12th announcement we just

19    discussed, correct?

20    A.  Correct.

21    Q.  Could you -- you just read what Mr. Stone said.

22                And then you responded to Mr. Stone; is that right?

23    A.  I did.

24    Q.  And what did you say?

25    A.  "Barely.  Will call in about an hour."

1    Q.  You just read that Mr. Stone wrote that he needed guidance

2    on many things.  Did you understand Wikileaks to be one of the

3    things that Mr. Stone needed guidance on?

4    A.  It was one of many things in the conversation, yes.

5    Q.  I want to turn now to June 14th, 2016.

6             Do you recall, sir, that on June 14th, 2016, the

7    Democratic National Committee announced that it had been hacked

8    by the Russian government?

9    A.  Yes, I do.

10   Q.  And did you have conversations with senior leadership of

11   the campaign regarding the Democratic National Committee's

12   announcement?

13   A.  We did.

14   Q.  Without getting into the substance of what anyone said,

15   what was the campaign's attitude toward the Democratic National

16   Committee's announcement that he had been hacked by the Russian

17   government?

18   A.  Again, we were kind of in disbelief.  We believed, again,

19   that if information were to come out, that based on what we

20   were told that information might be about, there were a number

21   of us that felt that it would give our campaign a leg up.

22   Q.  After the announcement, did you speak with Mr. Stone?

23   A.  I did.

24             MR. ZELINSKY:  Let's turn now to Exhibit 20, page 4.

25             If we could enlarge the messages, Ms. Rohde, on

1    June 15, 2016.

2    BY MR. ZELINSKY:

3    Q.  These messages are sent June 15th, 2016.  Do you see that,

4    sir?

5    A.  I do.

6    Q.  And that's one day after the events we just spoke about; is

7    that correct?

8    A.  That's correct.

9    Q.  And what did Roger Stone text to you?

10   A.  "Call me.  Important."

11   Q.  And what did you write back?

12   A.  "On con call, but will call right after.  Thanks."

13   Q.  What did Mr. Stone respond?

14   A.  "Please."

15   Q.  And then?

16   A.  "Awake?"

17   Q.  And you wrote back?

18   A.  "Yep."

19   Q.  And Mr. Stone wrote?

20   A.  "Call me."

21   Q.  Did you subsequently speak with Mr. Stone?

22   A.  I did.

23   Q.  Did you discuss the Democratic National Committee's

24   announcement that it had been hacked by the Russian government?

25   A.  Yes.  We discussed that information would be potentially

```
 1   forthcoming.
 2   Q.  What did Mr. Stone tell you regarding the Democratic
 3   National Committee's announcement?
 4   A.  At that point, he said that more information would be
 5   coming out of the DNC hack.
 6   Q.  Did Mr. Stone tell you that he wanted to get in touch with
 7   anyone else at the campaign about these matters?
 8   A.  He did.
 9           MR. ZELINSKY:  We're turning now to Exhibit 22.  If
10   we can enlarge the bottom e-mail, please.
11   BY MR. ZELINSKY:
12   Q.  Who is the e-mail from?
13   A.  From Mr. Stone.
14   Q.  Who is the e-mail to?
15   A.  It is to me.
16   Q.  What is the date?
17   A.  The date is June 15th.
18   Q.  That's the day after the Democratic National Committee's
19   announcement; is that correct?
20   A.  That's correct.
21   Q.  It's the same day as the text messages we were just going
22   over; is that correct?
23   A.  Yes.
24   Q.  Could you read what Mr. Stone wrote you, please?
25   A.  "I need contact for Murphy.  I need contact information for
```

1    Jared."

2    Q.  Who's Jared?

3    A.  Jared is Jared Kushner.

4    Q.  What was Mr. Kushner's role in the Trump campaign at that

5    point?

6    A.  At that time, he was a senior advisor to the campaign.

7    Q.  Was Mr. Kushner also related to then-candidate Trump?

8    A.  Yes, he was.

9    Q.  How was Mr. Kushner related to then-candidate Trump?

10   A.  Mr. Kushner is Mr. Trump's son-in-law.

11   Q.  Did you know why Mr. Stone was asking you for Mr. Kushner's

12   contact information at that time?

13   A.  Mr. Stone indicated that he wanted to reach out to

14   Mr. Kushner and Mr. Murphy to debrief them on the developments

15   of the DNC announcement.

16   Q.  During the balance of June -- we're still in June of

17   2016 -- did you continue to discuss WikiLeaks with Mr. Stone?

18   A.  Yes, off and on.

19   Q.  Why did you continue, in June, to continue to discuss

20   WikiLeaks with Mr. Stone?

21   A.  Because at that point, both myself and Mr. Manafort didn't

22   believe the information was coming because it still hadn't come

23   out.  And Mr. Manafort had asked me from time to time to check

24   with Mr. Stone to see if the information was still real and

25   viable.

1    Q.  And when you say the "information," you mean releases from

2    WikiLeaks; is that correct?

3    A.  That's correct.

4    Q.  I want to talk now about July of 2016.

5              Do you recall that on July 22nd, 2016, WikiLeaks

6    released a large amount of emails related to the Democratic

7    National Committee?

8    A.  Yes.

9    Q.  I want to talk to you for a moment about the period in

10   July, before the release of those emails.

11   A.  Um-hum.

12   Q.  Let's speak for a moment now about July 22nd, 2016, prior

13   to the DNC release.

14              What did Roger Stone tell you in July 2016 prior to

15   the DNC release, about WikiLeaks?

16   A.  He had indicated that information was still forthcoming,

17   although, again, nothing had come out at that point.  So we

18   were -- or, I was and Mr. Manafort were in -- were -- you know,

19   did not believe the information was coming out.

20   Q.  Did Mr. Stone indicate if his information, that he knew

21   WikiLeaks would be releasing things, if that was public or

22   private?

23   A.  It was not public information.

24   Q.  I'm sorry, sir.  It was not public --

25   A.  Not public information.

1    Q.  In response to Mr. Stone's nonpublic information, did the

2    campaign do anything?

3    A.  At that point, nothing had come out.  So, the campaign did

4    nothing prior to July 22nd.

5    Q.  On July -- were there any brainstorming sessions held at

6    that point?

7    A.  Oh, yeah.  Prior to July, there were brainstorming sessions

8    on the idea of if the information was leaked, what would the

9    campaign say and respond?  But, again, up to that point,

10   nothing had materialized, so there was no action to be taken.

11   Q.  Without saying what they said, who was involved in those

12   brainstorming sessions about what to do if information was

13   leaked?

14   A.  Sure.  It was Mr. Manafort; myself; Mr. Jason Miller, who

15   was our director of communications; and Mr. Stephen Miller, who

16   was our director of policy at the time.

17   Q.  And were those brainstorming sessions based, in part, on

18   Mr. Stone's predictions?

19   A.  It was based, in part, on, yes, the Assange release --

20   press release and Mr. Stone's predictions.

21   Q.  I want to turn now to July 22nd, 2016.

22           Do you recall the release of the Democratic National

23   Committee emails by WikiLeaks on July 22nd, 2016?

24   A.  Yes.

25   Q.  I want to talk briefly now about the time period

1    immediately following that July 22nd, 2016 release.

2            Did you have discussions with senior campaign

3    leadership about the campaign's attitude toward the release?

4    A.  Yes.

5    Q.  What was the campaign's attitude toward the release?

6    A.  The fact that the information had come out, the campaign

7    was in a state of happiness.  This was, again, information that

8    had come out on our competitor.  It had come out through, you

9    know, channels not related to us.

10            Anytime you're in a campaign and damaging information

11   comes out against, you know, your competitor, it's helpful.  I

12   mean, it's the -- similar to the example when the Access

13   Hollywood tape came out, you know, on Mr. Trump.  I mean, it

14   was information that hurt him.  But, at the time, the other

15   side had that information.

16   Q.  Did you discuss the release of the Democratic National

17   Committee emails with Mr. Manafort?

18   A.  I did.

19   Q.  What was Mr. Manafort's reaction?

20   A.  Mr. Manafort's --

21            MR. ROGOW:  Objection.  Speculation, Your Honor.

22            THE COURT:  Sustained.

23   BY MR. ZELINSKY:

24   Q.  Let's move on to shortly after the WikiLeaks release.

25            Did you overhear a conversation between Mr. Manafort

1     and Mr. Stone?

2     A.  Yes.

3     Q.  I want to talk to you now about that conversation.

4             Was that conversation on the phone?

5     A.  It was.

6     Q.  And how did you come to overhear that conversation between

7     Mr. Manafort and Mr. Stone?

8     A.  Mr. Manafort had put the phone on speaker phone.

9     Q.  And, sir, can you recognize Mr. Stone's voice?

10    A.  Yes.

11    Q.  And did you hear it on that phone call?

12    A.  I did.

13    Q.  And what did Mr. Stone say to Mr. Manafort on that call?

14    A.  Mr. Stone, at that point, had indicated that the

15    information had come out, and that additional information would

16    be coming out down the road.

17    Q.  And what did Mr. Manafort reply to Mr. Stone?

18    A.  Mr. Manafort thought that would be great, that it was

19    coming out.  He was quite surprised because Mr. Stone had

20    indicated for so long that the information would come out, but

21    nothing had come out to that point.  Mr. Manafort was, you

22    know, really uncertain how much of the information that was

23    still going to come out was actually going to come out.

24    Q.  After that call, did you also have a direct conversation

25    with Mr. Stone about the information that had come out?

1    A.  Yes.

2    Q.  And what did Mr. Stone say?

3    A.  Mr. Stone had indicated that additional information would

4    be coming, but that this was the start of information that had

5    finally come out, which he had indicated much earlier.

6    Q.  Did you continue to talk with Mr. Stone about additional

7    information during the summer?

8    A.  Yes.  Less frequently because my role on the campaign

9    changed, but we did have subsequent conversations.

10   Q.  Did you continue to speak with Mr. Manafort?

11   A.  Yes.

12   Q.  Did you perceive Mr. Manafort to be under pressure?

13   A.  Yes.

14   Q.  And what did you perceive Mr. Manafort to be under pressure

15   with respect to?

16   A.  Again, up until July 22nd, for months information had been

17   talked about, rumored that it would be coming out, and nothing

18   had ever come out up until July 22nd.  The first time that the

19   information came out, at that time it was, again, one of

20   disbelief because for so long it had been talked about coming

21   out and, finally, it had finally come out.

22   Q.  And to be clear, sir, when you say "for so long it had been

23   talked about," who was talking about it?

24   A.  Initially, Mr. Stone.  And then, obviously, it gained

25   attention in the public domain as well.

1    Q.  Did Mr. Manafort instruct you to do anything in this time

2    related to Mr. Stone?

3    A.  Yes.  He asked me to follow up with Mr. Stone on occasion

4    to find out when the additional information might be coming

5    out.

6    Q.  And did Mr. Manafort tell you what he intended to do with

7    the information that you would provide from Mr. Stone?

8    A.  Yes.

9    Q.  What did Mr. Manafort tell you he intended to do?

10   A.  He indicated that he would be updating other people on the

11   campaign, including the candidate.

12   Q.  And the "candidate," that's Mr. Trump; is that correct?

13   A.  Correct.

14   Q.  So, Mr. Manafort indicated to you that he would be updating

15   the candidate on the information you got; is that right?

16   A.  Among others, yes.

17   Q.  I want to move now to the period, again, shortly after the

18   July 22nd, 2016 release of information.

19          Did there come a time when you heard another phone

20   call with Mr. Stone?

21   A.  Yes.

22   Q.  I want to talk for a moment about that phone call.

23          Do you remember approximately when that phone call

24   took place?

25   A.  It took -- the latter part of July.

1    Q.  Was it after the July 22nd release of emails?

2    A.  It was.

3    Q.  After the July 22nd release of DNC emails, what time of

4    day, if you remember, was that phone call?

5    A.  It was during the evening.

6    Q.  And how did you know that Mr. Stone was on the phone?

7    A.  I saw his cell phone number on the caller ID display on the

8    phone.

9    Q.  Could you hear Mr. Stone's voice at all?

10   A.  I could hear the voice.  I could not hear the conversation.

11   Q.  So you could hear that it was his voice, but you couldn't

12   make out the content; is that correct?

13   A.  Correct.

14   Q.  Who else was on that phone call?

15   A.  At that time it was the candidate, Mr. Trump.

16   Q.  Immediately after the call with Mr. Stone ended, did

17   Mr. Trump say anything to you?

18   A.  Yes.  He had made a remark in regards to the call.

19   Q.  And what did Mr. --

20                MR. ROGOW:  Your Honor, objection.

21                THE COURT:  All right.  Ask the question.

22                Don't answer the question.

23                Just ask the question.

24                And then you can object to the question, then we'll

25   discuss it.  But, I want to get the record clear as to what

1    you're about to ask.

2              MR. ZELINSKY:  Thank you, Your Honor.

3    BY MR. ZELINSKY:

4    Q.  Immediately after the phone call with Mr. Stone ended, what

5    did Mr. Trump say to you?

6              THE COURT:  All right.  Don't answer the question.

7              Come to the bench.

8              Do you object?

9              MR. ROGOW:  Yes.

10             THE COURT:  You can tell me why.

11             (Bench discussion:)

12             MR. ROGOW:  Because it's hearsay, Your Honor.

13             MR. ZELINSKY:  Your Honor, it's not being put in for

14   the truth of the matter asserted.  We anticipate that the

15   witness will answer that Mr. Trump told him there would be

16   additional dumps of information coming out.  It's a prediction,

17   therefore, it's not hearsay.  He isn't saying Mr. Stone told

18   him that.  He's just making a statement that additional dumps

19   of information would be coming out.  That's all that we plan to

20   elicit from this witness.

21             THE COURT:  Okay.  So, I think if the statement had

22   been, Roger just told me that additional documents were going

23   to be coming out, that I would sustain the objection, because

24   it asserts a fact that Mr. Stone had just told him that.  This

25   also is assuming the fact that it's asserting a fact that

1    they're not seeking to introduce for the truth of the matter

2    asserted; they're seeking to introduce for the fact that he

3    said it, which is ascribed to be inference that that's what

4    Mr. Stone said to him.  But, they're not making a huge thing,

5    use of the statement.

6            So, why is it objectionable under the hearsay rule?

7            MR. ROGOW:  Because the only conclusion to be drawn

8    from the statement is this is what was said.  The connection

9    between the timing in the telephone call and what they're

10   seeking to get from Mr. Gates is, I think, classic hearsay for

11   the truth of it.  For them to say it's not being offered for

12   the truth, I think, is being willfully blind to what it is

13   being offered for.

14           THE COURT:  Well, you can admit statement --

15   out-of-court statements just for the fact that they are said,

16   if it's relevant.  I understand that it's prejudicial, but

17   that's not -- just the fact that it's evidence against someone

18   doesn't mean it's not admissible.  They're saying that -- did

19   Mr. Trump say anything?  So what did Mr. Trump say at that

20   point?  In other words, what was his state of mind?  What did

21   he say?

22           And, so, it's immediately after he gets off the call.

23   It does give rise to the inference that that's what he learned

24   from your client.  But, I don't understand how that's covered

25   under the definition of hearsay.  Hearsay is a statement that

1    is being introduced for the truth of the matter asserted, not

2    for the fact that it was said.

3              They're not -- the matter asserted in the statement

4    was, There will be more releases.  So, they're only introducing

5    it for the fact that it was said at that time and in that

6    context; yes, it's true.  But, I don't see how that's

7    prohibited by the rule against hearsay because I don't see how

8    it's hearsay.

9              MR. ROGOW:  Well, certainly -- I mean, I start with

10   it's being offered for the purpose of the truth of the Stone

11   statement without any basis for what Stone said, because the

12   inference they're trying to draw is that after that

13   conversation, when Mr. Trump says something, there's going to

14   be more coming or whatever it is he's going to say, is being

15   offered to make the connection to Stone based on a statement

16   that has no content at all.

17             I mean, this is -- when he's relating what Mr. Trump

18   said, he is relating the statement of another.  And I think

19   what the issue is -- for me is, there's no question he's

20   offering it for the truth and the inference from the truth.

21             THE COURT:  Well, he's offering it for the --

22             MR. ROGOW:  Yes.

23             THE COURT:  -- inference that he learned it from

24   Stone, no question.  But, I guess what I'm saying is, he's not

25   offering the words that came out of the president's mouth for

```
1    the truth of the words that came out of the president's mouth,
2    which takes it outside of hearsay.
3              And then the question is, why would it be
4    inadmissible that he hung up the phone and said that?  He said
5    it.  And it's just the fact that it was said that they're
6    trying to bring out.
7              Now, it seems to me, on cross, you can say, You
8    didn't hear what Stone told him.  You don't know what Stone
9    told him.
10             MR. ROGOW:  Of course.
11             THE COURT:  You don't know if he was just making his
12   prediction, do you?
13             So, I think the inference may not be as strong as
14   they put it out to be.  They can argue later that he said that
15   that's what Stone told him.  I mean, all we know is that he
16   called the president, and when the president hung up, the
17   president was talking about more releases.  And what Mr. Stone
18   told the committee is, I didn't talk to anybody in the campaign
19   about any releases.
20             So, this tends to go to the truth or falsity.  It
21   doesn't prove it outright, but it's evidence that bears on it.
22   So, it certainly seems relevant.  I don't think it's as strong
23   as the government wants it to be.
24             But, he wouldn't be able to say, Roger Stone just
25   told me X.  But, I don't see why they can't -- why X is going
```

1    to happen with the jury being instructed that that's only

2    admissible for the fact that Mr. Stone said it and not the

3    truth of it.

4            I don't know how it meets the definition of hearsay.

5    If it doesn't meet the definition of hearsay, it's not excluded

6    by the hearsay rules.  I mean, I understand what you're trying

7    to tell me, but I think that all goes to the weight of it and

8    not the admissibility of it, and those are relevance issues and

9    not hearsay issues.

10           I mean, this is a serious objection.  I'm taking it

11   seriously.

12           MR. ROGOW:  I understand.  And I understand Your

13   Honor's --

14           THE COURT:  It's hearsay to just say, Oh, man, dah,

15   dah, dah.  Whatever he said after he got off the phone, if he's

16   not making a statement of fact that they are trying to

17   introduce for the truth of the fact, then it's not hearsay.

18   It's outside the hearsay rules.  All the hearsay exceptions,

19   first you have to start with hearsay.

20           MR. ROGOW:  I understand.  I mean, I made my

21   objection.  I understand where Your Honor is coming from to

22   that extent.

23           THE COURT:  Okay.  All right.  All right.  I think --

24   and you're sure he's not going to say --

25           MR. ZELINSKY:  Yes, Your Honor.

1          THE COURT:  -- President told me --

2          MR. ZELINSKY:  I've been very careful about this.  I

3    am 100 percent confident.

4          THE COURT:  Okay.

5          MR. ZELINSKY:  One other thing I just want to make

6    the record clear, Your Honor had noted that it might not be as

7    strong as the government contended it was.  Just for the record

8    to be clear, there's been no prior conversation at all with the

9    Court regarding this statement and what the government does or

10   does not intend this statement to mean.  We just mean it for

11   the facts; that is, we're putting it in for the fact that the

12   statement was made after that call.

13         THE COURT:  Okay.  Well, at some point --

14         MR. ZELINSKY:  And we will argue it at some point,

15   yes, Your Honor.

16         THE COURT:  -- you'll argue to the jury that he was

17   asked, when he was before Congress, if he communicated with the

18   campaign about WikiLeaks.  And if you're not planning to point

19   to this, then I don't know why you're bringing it up.  So,

20   assuming that you're going to you point to this.

21         MR. ZELINSKY:  Yes, Your Honor, that is correct.

22         THE COURT:  All right.  Okay.

23         MR. ZELINSKY:  Thank you.

24         THE COURT:  Okay.  Thank you.

25         (Open court:)

1   BY MR. ZELINSKY:

2   Q.  Mr. Gates, we had just been discussing a phone call between

3   then-candidate Trump and Mr. Stone; is that correct?

4   A.  Yes.

5   Q.  And you said that you had heard Mr. Stone's voice on the

6   phone, but you couldn't --

7          THE COURT:  All right.  You need to repeat the

8   direct.  Let's go to the question that was asked.

9          MR. ZELINSKY:  Thank you, Your Honor.

10  BY MR. ZELINSKY:

11  Q.  Mr. Gates, after Mr. Trump got off the phone with

12  Mr. Stone, what did then-candidate Trump say?

13  A.  He indicated that more information would be coming.

14  Q.  Do you recall that on October 7th, 2016 WikiLeaks released

15  emails related to John Podesta?

16  A.  Yes.

17  Q.  After WikiLeaks released these emails, did you speak with

18  Roger Stone?

19  A.  Yes, at some point after that date.

20  Q.  And what did Mr. Stone tell you about the release?

21  A.  That he had indicated that the information was out,

22  confirming that it was out.  And that is something that he had

23  mentioned earlier, both, I think, privately and publicly, that

24  the information would be coming.

25  Q.  When you say he had mentioned it earlier, did Mr. Stone say

1    he had predicted the Podesta release?

2    A.  Yes, that there would be more information coming.

3    Q.  We've talked a lot about statements that Mr. Stone was

4    making to you about the material that might be coming.

5              Did you understand Mr. Stone's updates about

6    WikiLeaks to be based on public information?

7    A.  Mr. Stone never indicated where he got the information

8    from.  But, I did not believe that they were public

9    information.

10   Q.  That is, you believed it was nonpublic information?

11   A.  I believe, yeah, he had other sources that he was getting

12   the information from.

13             MR. ZELINSKY:  No further, questions Your Honor.

14             THE COURT:  All right.  Cross-examination?

15                       CROSS-EXAMINATION

16   BY MR. ROGOW:

17   Q.  Mr. Gates, I'm Bruce Rogow, and I'll be asking you some

18   questions this morning.

19   A.  Okay.

20   Q.  You said earlier that you met twice with the government

21   regarding this case, although you said that you'd met 40 or 50

22   times, altogether, with the government regarding other cases;

23   is that right?

24   A.  That is correct.

25   Q.  In those 40 or 50 times, are you saying that you were never

1    questioned about Roger Stone in those other interviews you had

2    with the government?

3    A.  There was a combination of interviews pertaining to my plea

4    agreement, and then there was case preparation for the two

5    cases that I was at trial.  In the interviews, yes, I was

6    questioned on a number of issues related to Mr. Stone.

7    Q.  So it's not accurate to say that the only two times --

8              MR. ZELINSKY:  Objection.

9              THE COURT:  Well, I think the question he was asked

10   on direct is, Did you meet -- how many times did you meet to

11   prepare for this testimony?

12             And he answered, Twice.

13             MR. ROGOW:  And --

14             THE COURT:  So, ask your question.

15   BY MR. ROGOW:

16   Q.  So it is not accurate that you only met with the government

17   twice regarding information about Roger Stone?

18   A.  Well, that wasn't the question.  The question was how many

19   times did I meet to prepare for this trial?  That was two.  If

20   you ask the question differently, how many times did the

21   government ask me about Mr. Stone, it would be -- there would

22   be more interviews, that's correct.

23   Q.  Would it be 20 times?  30 times?  40 times?

24   A.  With respect to just Mr. Stone?

25   Q.  Not just -- in the questioning of you, did they, over this

1   period of time, when you met with them -- I think you said over

2   50 times -- did they ask you during those periods of

3   questioning questions about Roger Stone?  Yes or no?

4   A.  On certain occasions, yes, they did ask me about Mr. Stone.

5   Q.  Did you ever tell the government that Stone never talked

6   about WikiLeaks to Gates, to you, and that you were not aware

7   of Stone talking about WikiLeaks to Manafort?

8   A.  No, I never said that.

9   Q.  Let me show you something.

10              MR. ZELINSKY:  Your Honor, objection.

11              THE COURT:  All right.  Can you approach the bench?

12              (Bench discussion:)

13              THE COURT:  What did you just hand him?

14              MR. ROGOW:  The 302 that says on 1-30 --

15              THE COURT:  Okay.  I think what you need to say, you

16   need to -- he didn't write the 302.  I think you can say to

17   him, Did you meet with this agent on this date, at that time,

18   and did you say the following?  You can -- and he either admits

19   it or denies it.  But, then you complete the impeachment

20   through someone else.  But he didn't write the 302.

21              MR. ROGOW:  I understand.  The question I asked him

22   simply was, did he say -- did you make the statement?

23              THE COURT:  And he denied it.  And now you want to

24   impeach him.  And you're entitled to impeach him, but you can't

25   impeach him with the 302.  What you can say is, Did you -- you

1    can lay the foundation.  Did you meet with an agent on this

2    day?  Was your lawyer there?  Were you here?  Were you there?

3    And did you say the following?  And he'll either admit it or

4    deny it.

5            But, that's it.  Then you can't move the document in

6    through him because it's not his document.  It's like a grand

7    jury transcript.

8            MR. ROGOW:  I'm not moving it, but I'm giving him a

9    chance to look at it.  That's all.  I understand.  I'll do it

10   your way.

11           THE COURT:  That's incorrect to give it to him,

12   because it looks like it's his statement.  So, I think you just

13   need to ask the questions.  You can impeach him with statements

14   made to FBI agents, but it's a different process than if it's

15   his statement.

16           MR. ROGOW:  I understand.

17           MR. ZELINSKY:  Your Honor, to be clear, the

18   government objects to the use of any 302 being handed up to the

19   witness that is not written by the witness.  I just want to be

20   clear with Mr. Rogow about going forward, because he's just

21   handed a document to the witness that is not proper.

22           THE COURT:  Okay.  I think you need to take it back.

23   I think that you asked the appropriate predicate question, Did

24   you ever tell him that Roger Stone did these things?  He said,

25   No.  And now you can direct him to the date and time and who he

1   was talking to and ask him again.

2          But, then you have to decide, in your case in chief,

3   if you want to put the agent on to say that didn't happen.

4   But, you can't move the statement in and you can't use the

5   statement.  I mean, you're not refreshing his recollection;

6   you're impeaching him.  So, why did you give him the statement?

7          MR. ROGOW:  I gave him the statement so he could tell

8   me whether or not, if he said it or didn't say it.  That's all.

9          THE COURT:  Right.  It's not his.

10          MR. ROGOW:  No.  I understand.

11          THE COURT:  So, you can't just hand it off like that.

12   All right.

13          (Open court:)

14   BY MR. ROGOW:

15   Q.  Do you remember being questioned on January 30th, 2018?

16   A.  I don't recall that specific date, but I remember being

17   questioned on a number of dates.

18   Q.  Do you remember being questioned by an FBI agent who asked

19   you questions with regard to you talking to Mr. Stone about

20   WikiLeaks?

21   A.  I don't recall specifically being asked questions that

22   date, but that doesn't mean it didn't happen.

23   Q.  Do you remember being asked that question, putting aside

24   the date?

25   A.  Yes.  On several occasions.

1   Q.  And did you answer that you did not speak to Stone about

2   WikiLeaks?

3   A.  I do not recall answering that way.  In fact, there were a

4   number of occasions where I indicated that he had.  It was a

5   big piece of why he was reaching out to a number of people on

6   the campaign.

7   Q.  You just simply don't remember if you answered the question

8   the way I asked?

9   A.  I don't recall answering the question that Mr. Stone had

10  never indicated anything about WikiLeaks.  I think that is

11  either -- that's not what I recall.

12  Q.  Let me ask you a couple of questions about the telephone

13  call that we were just talking about.

14          Did you hear the content of the telephone call?

15  A.  I did not.

16  Q.  Do you know what Mr. Stone said to Mr. Trump?

17  A.  I do not.

18  Q.  Do you -- you heard his voice; is that right?

19  A.  Correct.

20  Q.  But you could not tell the content of the communication?

21  A.  That is correct.

22  Q.  And where were you when this call took place?

23  A.  In the car with Mr. Trump.

24  Q.  Were you going from Trump Tower to LaGuardia Airport?

25  A.  I believe that's correct, yes.

1    Q.   And how long a ride is that?

2    A.   Roughly, 20 minutes with the motorcade.

3    Q.   And in that car -- what kind of car were you in?

4    A.   It was a Suburban, I believe.

5    Q.   And were you sitting in the back with Mr. Trump?

6    A.   I was sitting diagonal in the back to him, yes.

7    Q.   You say "diagonal in the back to him."  He was in the front

8    seat?

9    A.   Well, he's in the middle seat, and then I was in the far

10   back.

11   Q.   The far back?

12   A.   Correct.

13   Q.   Who else was in the car?

14   A.   I don't recall who else was in the car at that time.

15   Q.   Were there other people in the car?

16   A.   The Secret Service, yes.

17   Q.   How many Secret Service agents were in the car?

18   A.   Two.

19   Q.   And where were they sitting?

20   A.   In the front seat.  One was driving and one was in the

21   front passenger seat.

22   Q.   So this was a three-row Suburban?

23   A.   Two and a half.

24   Q.   And you were in the half?

25   A.   Exactly.

1    Q.   Okay.   The other crimes that were dropped against you in
2    Alexandria, do you recall what they were?
3    A.   Yes.   Most of them pertain to foreign bank accounts and not
4    submitting accurate tax returns.
5    Q.   I'm sorry.   I didn't hear the last part.
6    A.   Not submitting accurate tax returns.
7    Q.   And how inaccurate were the tax returns?
8    A.   There were, I think, at least, before we corrected them,
9    three years of tax returns where income was not fully reported.
10   Q.   And how much income was not fully reported?
11   A.   It varied by year, depending on the year.
12   Q.   Do you have --
13            THE COURT:   Which tax returns are we talking about?
14            THE WITNESS:   My personal tax returns.
15   BY MR. ROGOW:
16   Q.   Do you have any idea about how much was not reported?
17   A.   I don't.
18   Q.   Was it more than 100,000?
19   A.   Yes, it was.
20   Q.   Do you have tax liability now, as a result?
21   A.   I do.
22   Q.   Was a money laundering charge dropped also?
23   A.   It was.
24   Q.   What was that about?
25   A.   That was pertaining to money Mr. Manafort had earned from

1    his foreign political contracts, in terms of not reporting the

2    amount of income he received on his U.S. tax returns.

3    Q.  And you will not be prosecuted for those crimes now that

4    they're dropped, unless you don't answer honestly here?  Is

5    that your understanding?

6    A.  That is correct.

7    Q.  Where there other untruths that you said along the way for

8    which you were not prosecuted?

9    A.  In what regard?

10   Q.  In regard to --

11   A.  The second charge?

12           THE COURT:  Can you just be more clear with the

13   question?  "Along the way," are -- to whom?

14   BY MR. ROGOW:

15   Q.  The charges that were brought against you in Alexandria

16   that were dropped, money laundering charges were dropped; is

17   that correct?

18   A.  That's correct.

19   Q.  Failure to file accurate personal tax returns were dropped;

20   is that correct?

21   A.  Correct.

22   Q.  And have you committed other crimes, besides those crimes,

23   for which you were not prosecuted?

24           MR. ZELINSKY:  Objection.

25           THE COURT:  All right.  I'm sorry to continue with

1    the bench conferences, but these are important matters, and

2    everybody is allowed to be heard.

3              Can you come to bench, please.

4              (Bench discussion:)

5              THE COURT:  What's your objection?

6              MR. ZELINSKY:  Your Honor, it's a completely

7    open-ended question.  You can't impeach a witness by asking if

8    they've ever committed any other crimes for which they haven't

9    been prosecuted.  If Mr. Rogow has a particular thing in mind.

10   But, to ask a witness to declare every criminal act they've

11   ever committed which the government has put on prosecution is

12   not --

13             THE COURT:  You don't even know if --

14             You are allowed to lead this witness, and you are

15   allowed to cross-examine this witness about anything that is

16   subject to this plea agreement, anything that the government is

17   aware of that he has admitted to that he's not going to be

18   prosecuted for.  And you can take him through it line-by-line,

19   as you're well aware has already been done in other cases,

20   because you have transcripts from other cases.

21             MR. ROGOW:  Of course.

22             THE COURT:  But asking him these open-ended

23   questions -- Have you told any other untruths along the way?  I

24   don't even know what that question meant.  Have you committed

25   any other crimes?  That's not the way to do it.

```
 1            You're allowed to get to the subject matter,

 2    absolutely, but I think you have to ask more specific, more

 3    focused questions.  Because it isn't just what he's done; it's

 4    what has the government agreed not to prosecute him for.

 5            MR. ROGOW:  That, we have out already.

 6            THE COURT:  All right.

 7            MR. ZELINSKY:  Thank you, Your Honor.

 8            (Open court:)

 9    BY MR. ROGOW:

10    Q.  The charge of conspiracy with Mr. Manafort filing the false

11    tax returns, how much was involved in that?

12    A.  Approximately $6 million, for Mr. Manafort.

13            THE COURT:  And whose tax returns was that related

14    to?

15            THE WITNESS:  Mr. Manafort's returns.

16    BY MR. ROGOW:

17    Q.  On your tax returns, did you take false expense deductions?

18    A.  Yes, I did.

19    Q.  On your personal return, did you lie about foreign bank

20    accounts?

21    A.  I did.

22    Q.  You had foreign bank accounts --

23    A.  Yes.

24    Q.  -- correct?

25            And there's a question on the tax return as to
```

1    whether or not you have foreign bank accounts, correct?

2    A.  Correct.

3    Q.  And you --

4            THE COURT:  Are we talking about the particular

5    returns that were at issue in the Virginia case?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  What years were those?

8            THE WITNESS:  Those were from 2011 to 2013.

9            THE COURT:  Okay.

10   BY MR. ROGOW:

11   Q.  Did you lie to the tax preparer who prepared your tax

12   returns?

13   A.  I had two.  So, I'm not sure which one you're referring to.

14   Q.  Either one.

15   A.  The first one never asked about foreign bank accounts.  The

16   second one took over my taxes in 2014.  So, the time had -- he

17   was not aware until we went back and redid the tax returns.

18   Q.  And did you have accounts in Cyprus?

19   A.  Yes.  Mr. Man- -- I set up accounts for Mr. Manafort in

20   Cyprus.

21   Q.  Did you take any steps to try to avoid taxes in Cyprus?

22   A.  Actually, in Cyprus, taxes were paid.

23   Q.  Pardon me?

24   A.  I said, actually, in Cyprus, taxes were paid.

25   Q.  Did you take any money from that account in Cyprus or from

1    any account with Mr. Manafort and not tell him?

2    A.  I did.

3    Q.  Did you pay taxes on the money that you took from

4    Mr. Manafort's account?

5    A.  Some of it, not all of it.

6    Q.  Not all of it?

7    A.  Correct.

8    Q.  All right.  Did you tell the truth to banks from whom you

9    were seeking loans during this period of time when you were

10   working with Mr. Manafort?

11   A.  I actually had very little contact with the banks.  The

12   forms that were prepared were prepared by me and Mr. Manafort's

13   accountant, and then those were submitted by Mr. Manafort.

14   Q.  And did the accountants seek any information from you when

15   they were preparing those loan requests?

16   A.  Yes.  They were seeking articles of incorporation from some

17   of the different companies that Mr. Manafort had established.

18   Q.  Did you --

19           THE COURT:  The bank loans that we're talking about

20   here were loans to whom?

21           THE WITNESS:  To Mr. Manafort.

22   BY MR. ROGOW:

23   Q.  How about loans to yourself?

24   A.  I'm not sure what you're -- I don't believe I had any

25   loans.

1    Q.  Did you ever seek loans for yourself from a bank or any

2    financial institution?

3              MR. ZELINSKY:  Objection.

4    A.  A mortgage.

5              THE COURT:  Mr. Rogow, there's an objection.

6              MR. ROGOW:  I don't have another question on that.

7    So, I don't know what --

8              THE COURT:  Okay.  I don't think there was a -- there

9    was a count related to any bank loan to Mr. Gates.

10   BY MR. ROGOW:

11   Q.  Did you alter documents to give to banks to secure loans

12   for yourself or for Mr. Manafort?

13              THE COURT:  You have to ask one or the other.  I

14   think there's only one at issue.

15              You keep saying "your loan," and they weren't

16   necessarily his personal loans.  So, I think you need to be

17   specific with the verbiage of your question.

18   BY MR. ROGOW:

19   Q.  Did you alter any documents in order to secure loans for

20   yourself when you sought loans from the bank?

21   A.  For myself -- for Mr. Manafort, yes.  Not for myself.

22   Q.  Did you --

23              THE COURT:  Okay.  Can you come back to the bench,

24   please?

25              (Bench discussion:)

 1              THE COURT:  Do you have any factual basis to ask him

 2     whether he defrauded banks in connection with loans to himself?

 3              MR. ROGOW:  Yes.  The question was asked before.  And

 4     he answered it, in the *Craig* trial, that he altered documents

 5     for bank loans.

 6              THE COURT:  To himself?

 7              MR. ROGOW:  I don't recall if it was to himself or

 8     not.

 9              THE COURT:  They weren't to himself.  You can't ask

10     questions suggesting facts that are not in evidence for which

11     you have no factual basis.  He was involved in the transmission

12     of the documents that were entered in evidence in the Eastern

13     District of Virginia case involving -- only Manafort was

14     charged with defrauding the banks, but he participated in

15     helping him prepare the documents.

16              MR. ROGOW:  Yes.

17              THE COURT:  You've asked three times about loans to

18     him.  And you're allowed to ask him questions, if you have a

19     factual basis that there's some crime out there that he's not

20     being prosecuted for.  But, you can't just put those -- but,

21     those questions are going to be stricken from the record

22     because you don't have a factual basis for them.

23              If you would like to consult the *Craig* transcript and

24     come back and tell me, No, he did admit to falsifying documents

25     related to himself, then it's totally fair game.  But, I

1    believe that you have to be specific here.  You keep saying

2    "you" when sometimes it's Manafort, sometimes it's Davis

3    Manafort.  And you have to be clear.

4         And I don't believe there's any evidence in the

5    record in any of these cases that he defrauded anyone in

6    connection with the loan to himself.  You've got plenty of

7    other things he committed.  But, you've now suggested twice

8    that he did that with your question, and I don't think you have

9    a factual basis to ask that question.

10        MR. ROGOW:  I hear you.

11        THE COURT:  All right.  Well, do you think you do?

12   Because if you can't tell me what it is, then I'm just going to

13   say questions related to --

14        MR. ROGOW:  Well, I think, from my reading of the

15   *Craig* transcript -- and maybe I didn't read it as carefully as

16   it needed to be read with regard to that -- but, he went

17   through a whole long litany, including lying to Visa for his

18   Visa card.

19        So, isn't that getting credit from a bank?  Because

20   he did lie about that, too.

21        THE COURT:  Mr. Rogow, the more specific you are to

22   questions, the less objectionable they're going to be.  You

23   said, Did you ever apply for a loan?

24        And he said, I applied for one mortgage.  He said, I

25   didn't alter documents in connection with any loan to me.

1          Now, I just think you have to be specific.  You can't

2     just kind of throw stuff up there and see what sticks.  It's

3     not fair to this witness.  It's -- you have to have a basis of

4     fact for your questions.

5          And Mr. Smith is leaving you a note on your lectern.

6     I don't know if you want to get it to see if it relates to this

7     issue.

8          MR. ROGOW:  I will.  But, I'm going to ask him the

9     Visa question, for which I have a basis.

10         THE COURT:  Okay.  Well, just be specific with your

11    questions.  And if you go back to the Eastern District matter

12    or Cyprus bank accounts or anything else, not paying taxes, I

13    just think in your question you have to talk about whether it's

14    his taxes, Manafort's taxes, you know, the partnership's taxes,

15    just so it's clear.  I'm not saying you can't cross-examine

16    him, but you can't just put stuff out there.

17         MR. ZELINSKY:  Thank you, Your Honor.

18         (Open court:)

19         THE COURT:  All right.  The objection to the question

20    about altering documents in connection with a loan for himself

21    is sustained.  And the question will be stricken from the

22    record.

23    BY MR. ROGOW:

24    Q.  Did you lie to Visa to get a better credit card for

25    yourself?

```
1     A.  I misrepresented the amount of income I had on a credit
2     card application, correct.
3     Q.  Did you lie in a deposition to conceal Mr. Manafort's
4     Cyprus bank accounts?
5     A.  Yes.
6     Q.  When will you be sentenced?
7     A.  The date has not been set yet.
8     Q.  You've testified as a government witness in two cases; is
9     that correct?
10    A.  Prior to this, yes, two.
11    Q.  Yes.  And this is the third case?
12    A.  It is, yes.
13    Q.  And what was the outcome --
14              MR. ZELINSKY:  Objection.
15              THE COURT:  Sustained.
16    BY MR. ROGOW:
17    Q.  Is it not true that WikiLeaks made public announcements of
18    its intention to release materials?
19    A.  It did make public announcements, correct.
20    Q.  And were you aware of those public announcements?
21    A.  At the time they were released, yes.
22    Q.  And Mr. Stone never indicated to you, did he, what his
23    alleged source of information was?
24    A.  He did not.
25    Q.  And you don't know whether or not he had a source of
```

1    information, do you?

2    A.  I do not.

3    Q.  How much time elapsed between the telephone call in the car

4    and the statement that you said was made by Mr. Trump later on?

5    A.  Oh, the statement was in the car.  It was within, you know,

6    less than 30 seconds after the call finished.

7    Q.  You were on your way to the airport?

8    A.  I believe that's correct, yes.

9    Q.  Did you arrive at the airport?

10   A.  Yes, we did.

11   Q.  Directly?

12   A.  Yeah, we went straight to the airport.

13   Q.  And who was at the airport waiting for you?

14   A.  There were people in the plane there already there.  I

15   don't recall specifically, other than the pilot and a couple of

16   the Secret Service people.

17   Q.  Did you ever say to any government agent that the statement

18   that you're talking about from Mr. Trump was made on the plane?

19   A.  No.  I don't believe this specific statement was made on

20   the plane.

21   Q.  Do you have any knowledge of WikiLeaks or Julian Assange

22   from any personal knowledge that you've gained with regard to

23   the release of the documents?

24   A.  I do not.

25   Q.  In Exhibit 20 that was shown to you, which were the series

1    of texts, Please call me, was there any mention in those

2    documents, in those e-mail text exchanges, of WikiLeaks or

3    Assange?

4    A.   There were not.

5    Q.   Mr. Stone's role in the campaign dealt with voter

6    registration lists, primarily, didn't it?

7    A.   I didn't know what Mr. Stone was responsible for prior to

8    when I arrived.  When I arrived, Mr. Stone had already left the

9    campaign.

10   Q.   Did Mr. Stone continually ask questions about voter

11   registration lists?

12   A.   He did.

13   Q.   When the campaign received word about the WikiLeaks

14   responses, they received that from public sources, did they

15   not?

16   A.   Which time are you referencing?

17   Q.   In any of the WikiLeaks drops of information.

18   A.   So starting July 22nd, with the first drop --

19   Q.   Yes.

20   A.   -- of information?

21             Yes.  The first instance that myself and

22   Mr. Manafort -- I can't speak to the other people -- heard it

23   was through the TV.

24   Q.   And any other leak of information?

25   A.   The subsequent leak of the Podesta emails, again, I believe

1    it was done through -- we found out via the television, or

2    public media.

3    Q.  So Mr. Stone, before any of this information was released,

4    did not tell you that there would be this specific information

5    released; isn't that correct?

6    A.  That is correct.

7            MR. ROGOW:  Let me check, Your Honor, but I don't

8    think I have anything more.

9            THE COURT:  All right.

10           (Pause.)

11           (Mr. Zelinsky approaching podium.)

12           THE COURT:  Well, he's -- hasn't sat down yet.

13           MR. ROGOW:  Nothing further, Your Honor.

14           THE COURT:  All right.  Any redirect?

15           MR. ZELINSKY:  Thank you, Your Honor.

16                      REDIRECT EXAMINATION

17   BY MR. ZELINSKY:

18   Q.  Mr. Gates, you were just asked a lot of questions on cross-

19   examination about "Mr. Stone had told you"; is that right?

20   A.  Correct.

21   Q.  Prior to the release of information, did Mr. Stone tell you

22   there was more information coming?

23   A.  Yes.

24   Q.  Did he do that on a number of occasions?

25   A.  He did.

1   Q.  And the -- what did you understand to be the source of

2   Mr. Stone's information on those occasions?

3   A.  He didn't reference a specific individual or person.  But,

4   given that the information was coming from WikiLeaks, I assumed

5   it was WikiLeaks.

6   Q.  And did you understand it to be public information?

7   A.  No.  Because the press releases hadn't come out yet.  So,

8   it was information in advance of those releases.

9           MR. ZELINSKY:  Nothing further, Your Honor.

10          THE COURT:  All right.  Can this witness be excused?

11          MR. ZELINSKY:  (Nods head.)

12          THE COURT:  All right.  Sir, you're excused.  Thank

13   you.

14          THE WITNESS:  Thank you.

15          THE COURT:  I think you have another witness; is that

16   correct?

17          MR. ZELINSKY:  Yes, Your Honor, one more.

18          THE COURT:  All right.  So why don't we take our

19   mid-morning break before that happens.

20          Members of the jury, we're going to take the promised

21   break this morning.  We'll resume at 10 after 11.  Please leave

22   your notebooks here.  Please don't discuss the case among

23   yourselves.

24          (Jurors leave the courtroom.)

25          THE COURT:  All right.  We'll resume in approximately

```
 1    10 or 15 minutes.  And let's have the next government witness
 2    waiting outside the door when we come back.
 3              MR. ZELINSKY:  Yes, Your Honor.
 4              THE COURT:  All right.  Thank you.
 5              (Recess.)
 6              THE COURTROOM DEPUTY:  Your Honor, recalling Criminal
 7    Case Number 19-18, United States of America v. Roger Stone.
 8              THE COURT:  All right.  Let's bring in the jury.
 9              (Jurors enter the courtroom.)
10              THE COURT:  Okay.  The government can call its next
11    witness.
12              MR. ZELINSKY:  Your Honor, the government recalls
13    Ms. Michelle Taylor.
14              MR. KRAVIS:  Your Honor, we'll use the Elmo for this.
15    Thank you.
16              THE COURT:  All right.  Ms. Taylor, I just want to
17    remind you that you were sworn to tell the truth, and you
18    remain under oath at this time.
19              THE WITNESS:  Thanks.
20              THE COURT:  All right.
21                        MICHELLE TAYLOR,
22    having been previously sworn, testified as follows:
23                        DIRECT EXAMINATION
24    BY MR. KRAVIS:
25    Q.  Good morning, Ms. Taylor.
```

1    A.   Good morning.

2    Q.   When you first testified last week, do you remember

3    testifying about the release of some emails of the Democratic

4    National Committee by an organization called WikiLeaks on

5    July 22nd, 2016?

6    A.   Yes, I do.

7    Q.   What was the name of the online persona or figure who took

8    credit for hacking or obtaining those documents from the

9    Democratic National Committee?

10   A.   Guccifer 2.0.

11   Q.   During Mr. Stone's testimony before the House Intelligence

12   Committee, was he asked about that persona, Guccifer 2.0, and

13   that alleged hack?

14   A.   Yes, he was.

15          MR. ZELINSKY:   I would like to publish now, please,

16   for the witness and the jury, what's been admitted as

17   Government's Exhibit 1.   This is page 28 of Government's

18   Exhibit 1.

19   BY MR. ZELINSKY:

20   Q.   Ms. Taylor, I want to direct your attention to the portion

21   of -- oh, and, Ms. Taylor, just to remind the jury, what is

22   Government's Exhibit 1?

23   A.   This is a transcript of Mr. Stone's testimony before HPSCI.

24   Q.   I've put on the screen in front of you page 28 of the

25   transcript.

1           Can you read for us, please, the question and answer
2   that I have highlighted there?
3   A.  "MR. SWALWELL:  In 2016, August of 2016, you and the
4   American public are aware, from press reporting, that Russia is
5   accused of hacking democratic emails, is that --
6           "MR. STONE.  Yes."
7   Q.  I want to direct your attention now to page 29, the next
8   page of the same exhibit.
9           Can you read, please, the question and answer that
10  I've highlighted on page 29 of Government's Exhibit 1, the
11  transcript?
12  A.  "MR. SWALWELL:  It took me a while, too.
13          "Were you aware when you wrote that article, the
14  *Breitbart* one, that Guccifer 2.0 was assessed by the
15  Intelligence Community as a cutout for the Russian intelligence
16  services?
17          "MR. STONE:  I was aware of that claim, but I don't
18  subscribe to it.  There's a substantial amount of information
19  you can find online that questions that.  I realize it's an
20  assertion, but as I said in my statement, our intelligence
21  agencies are often wrong."
22  Q.  Finally, Ms. Taylor, I would like to direct your attention
23  to page 113, bottom of 113 to the top of 114 of the same
24  exhibit, the transcript.
25          First, can you read for us, please, the question that

1    starts at the bottom of page 113 of the transcript?

2    A.  "MR. SCHIFF:  Mr. Stone, you've acknowledged that it's the

3    conclusion of the intelligence community that Guccifer 2 is a

4    cutout of the Russian intelligence agencies."

5    Q.  And Mr. Stone's response?

6    A.  "MR. STONE:  They have said that, yes."

7    Q.  Now, did the report prepared by the House Intelligence

8    Committee include any discussion of WikiLeaks?

9    A.  Yes.

10           MR. ZELINSKY:  Could I have this for the witness

11   only, for the moment, please.

12   BY MR. ZELINSKY:

13   Q.  Ms. Taylor, I'm going to show you what has been marked, for

14   the moment, for identification only as Government's Exhibit

15   6-B.

16           Do you recognize Government's Exhibit 6-B?

17   A.  Yes.  It's a page of the HPSCI report.

18           MR. ZELINSKY:  At this time, the government moves

19   Exhibit 6-B into evidence.

20           THE COURT:  Any objection?

21           MR. ROGOW:  It's in evidence.

22           THE COURT:  Yeah.  Do you mean all of the -- all

23   right.  There's no -- is there any objection?

24           MR. ROGOW:  No objection.

25           THE COURT:  All right.  It's in evidence.

1          MR. KRAVIS:  And may I publish it for the jury,

2     please?

3          THE COURT:  Yes.

4     BY MR. KRAVIS:

5     Q.  Ms. Taylor, can you read for us, please, the paragraph that

6     I've highlighted at the bottom of the first column?

7     A.  "WikiLeaks.  WikiLeaks played a key role in Russian's

8     malign influence campaign, and served as a third-party

9     intermediary for Russian intelligence during the period leading

10    up to the 2016 U.S. presidential election."

11    Q.  Finally, Ms. Taylor, I've handed you what's been marked for

12    identification as Government's Exhibit 214.

13          Do you recognize Government's 214?

14    A.  Yes.

15    Q.  What is it?

16    A.  It is a transcript of the Frank Pentangeli testimony scene

17    from *The Godfather II*.

18    Q.  And have you seen *The Godfather, Part II*?

19    A.  Yes, I have.

20    Q.  Once or more than once?

21    A.  More than once.

22    Q.  And this particular scene in the movie *The Godfather, Part

23    II*, have you seen this scene more than once?

24    A.  Definitely more than once.

25    Q.  When was the last time you saw that scene in the movie?

974

1   A.  Last night.

2   Q.  And based on having seen this portion of the movie -- oh,

3   and have you had a chance to review Government's Exhibit 214,

4   the transcript?

5   A.  Yes.

6   Q.  Based on your review of the transcript and your viewing of

7   the movie, is Government's Exhibit 214 a fair and accurate

8   transcript of the Frank Pentangeli congressional testimony

9   scene in the movie?

10  A.  Yes.

11          MR. ZELINSKY:  All right.  Subject to further

12  redaction, the government moves Exhibit 214 into evidence.

13          THE COURT:  All right.  It will be admitted pursuant

14  to the rulings earlier.

15          MR. KRAVIS:  Thank you, Your Honor.

16          Thank you, Ms. Taylor.

17          No further questions.

18          THE COURT:  Any cross-examination with respect to

19  these matters?

20                      CROSS-EXAMINATION

21  BY MR. ROGOW:

22  Q.  Good morning, again, Ms. Taylor.

23  A.  Good morning.

24  Q.  Do you know, independently, whether or not Guccifer is

25  Russian?

```
 1    A.  I don't.

 2    Q.  Did Mr. Stone turn over his communications with Guccifer

 3    that he mentioned in the transcript?

 4    A.  He did.

 5    Q.  Did you find any other communications between Mr. Stone and

 6    Guccifer?

 7    A.  I'm not aware of any.

 8                MR. ROGOW:  Nothing further, Your Honor?

 9                THE COURT:  All right.  Can this witness be excused?

10                MR. KRAVIS:  Yes.  Thank you, Your Honor.

11                THE COURT:  Okay.  Thank you very much.  You can step

12    down.

13                All right.  Does the government have any other

14    witnesses to call?

15                MR. KRAVIS:  No further witnesses.  The government

16    does have some additional exhibits to move into evidence at

17    this time.

18                THE COURT:  All right.  Do we need to do that in the

19    presence of the jury?

20                MR. KRAVIS:  There are two stipulations that have

21    been signed by the defense that we would like to read for the

22    jury.

23                THE COURT:  Okay.  All right.

24                MR. KRAVIS:  Thank you, Your Honor.

25                THE COURT:  Let's do that now.
```

1          MR. KRAVIS:  The first is Government's Exhibit 203,

2     this has been marked and previously admitted.  It's a

3     stipulation regarding the location of the hearing.

4          And may I read it to the jury?

5          THE COURT:  Yes.

6          But, first, I would like to tell you, a stipulation

7     is an agreement between the parties of the facts that are about

8     to be read to you.  And you can consider that as evidence in

9     the case.

10          Go ahead.

11          MR. KRAVIS:  Thank you, Your Honor.  Government's

12     Exhibit 203.

13          The parties stipulate to the following fact:

14     Defendant Roger J. Stone's testimony before the United States

15     House of Representatives Permanent Select Committee on

16     Intelligence on September 26th, 2017 occurred in the District

17     of Columbia.

18          I have one further stipulation to read for the jury.

19     This is Government's Exhibit 210.  It's a stipulation regarding

20     identification that's been signed by the parties.

21          THE COURT:  All right.

22          MR. KRAVIS:  The parties hereby agree and stipulate

23     as follows:  The defendant is the individual named Roger Stone

24     referenced in the trial testimony and the exhibits admitted

25     into evidence in this case.

1          THE COURT:  Are there any other stipulations that

2     you're planning to introduce at this time?

3          MR. KRAVIS:  Your Honor, at this time the government

4     moves into evidence Exhibits 201 and 202, stipulations

5     regarding phone numbers and email.  But I'm not asking to read

6     them to the jury.  I would like to just move them.

7          THE COURT:  All right.  They'll be admitted, and

8     they'll be available.

9          One simply relates to whose phone number is whose of

10    the documents you've reviewed.  And the other identifies whose

11    email address is whose.  And you've been seeing documents

12    identified in that way through the testimony, but you will have

13    the stipulation that the parties have agreed to with respect to

14    those matters.

15         MR. KRAVIS:  And finally, Your Honor, the government

16    moves into evidence the portion of Mr. Bannon's grand jury

17    transcripts referenced in his testimony on Friday, Exhibit 209.

18         THE COURT:  Is it in evidence?  Can you approach the

19    bench about that?

20         MR. KRAVIS:  Yes, Your Honor.

21         (Bench discussion:)

22         THE COURT:  I understand it's a sworn out-of-court

23    statement that was inconsistent with his in-court testimony.

24    But, after you read it to him, didn't he adopt it as his

25    testimony?  Is it necessary to move it in?

 1            MR. KRAVIS:  He did not adopt it as his testimony.

 2     He acknowledged that the words were read correctly.  But I

 3     think that given the state of the record, we're entitled to

 4     move in the prior inconsistent statement.

 5            THE COURT:  All right.  Do you object?

 6            MR. BUSCHEL:  We object.  He certainly, when I tried

 7     to impeach him with his statement that had been made to a

 8     federal agent, or the actual grand jury, he harmonized it and

 9     said, Oh, the access point was -- we considered it an access

10     point for the campaign, and then he harmonized it.

11            THE COURT:  I think it was the frequent, is that the

12     one you want?

13            MR. KRAVIS:  Yes.  And we don't have to resolve this

14     right now, subject to the admission.  But, I believe the rule

15     is that once he's made the inconsistent statement, the prior

16     statement comes into evidence.

17            THE COURT:  If it's sworn, it's admissible under the

18     rules.  I think that's true.  I just -- but, I think it would

19     be helpful for you to give both sides exactly the excerpt that

20     you're planning to introduce, so that we can make a ruling

21     based on that rather than the general statement.  So we'll do

22     that later.

23            MR. KRAVIS:  Certainly.  I was raising it now only to

24     preserve it before we rest.

25            MR. BUSCHEL:  Well -- I'm sorry.

1           THE COURT:  Yeah.  I mean, I want to hear your
2    objection, but I think you should at least see which statement
3    he's intending to introduce before we rule on it.
4           MR. BUSCHEL:  May I?
5           THE COURT:  Yes.
6           MR. BUSCHEL:  I didn't mean to cut off the Court.
7           If the government is resting, we do have a Rule 29 to
8    file and a jury -- proposed jury instruction that we are giving
9    to the government, just for timing-wise.
10          THE COURT:  Well, what I was planning to do is if he
11   says, With that, the government rests, to excuse the jury for
12   lunch, and then to chitchat with you about what's happening
13   next.
14          And if you give me something to read, I want to read
15   it before we discuss it.
16          MR. BUSCHEL:  Right.
17          THE COURT:  And so we'll talk about scheduling after
18   we've excused them from the room.  I think that's the best
19   approach.
20          MR. BUSCHEL:  Okay.
21          THE COURT:  All right.  Thank you.
22          MR. KRAVIS:  Thank you, Your Honor.
23          (Open court:)
24          MR. KRAVIS:  With that, the government rests.
25          THE COURT:  All right.  Before we proceed to what

1    comes next in the trial, there's a number of legal and

2    logistical matters that we need to discuss with the parties

3    that I think it would be better for everyone if we are able to

4    discuss them without your having to listen to the husher.

5            So what I think I'm going to do is excuse you for an

6    early lunch.  It's a little dicey to figure out exactly when I

7    would need you to return.  But, at this point I'm going say

8    until 1:30, that we'll resume at 1:30.  The people here may be

9    here for some or all of that period of time, so that may get

10   revised.  But, at the very least, you all are excused now for

11   two hours, and to be ready, again, at 1:30.

12           While the government has said it rests -- and that

13   means it's not planning to introduce any further exhibits at

14   this time -- that doesn't mean the case has been submitted to

15   you.  You have not yet heard whether there is additional

16   evidence to be introduced.  You have not received the

17   instructions of law from me.  You have not heard the closing

18   arguments of the parties.  And, therefore, you are still not

19   yet at a point where you can discuss the matters among

20   yourselves.

21           So, enjoy your long lunch break and discuss something

22   else.  Thank you.

23           (Jurors leave the courtroom.)

24           THE COURT:  All right.  Mr. Buschel.  Okay.  So I

25   understand that you intend to make the motion at the close of

1    the government's case, but that you have something you would

2    like me to read in connection with that motion?

3              MR. BUSCHEL:  Yes, Judge, under Rule 29.  We'll

4    submit it momentarily.

5              THE COURT:  Okay.  Do you have a copy that you could

6    hand to Mr. Haley?

7              MR. BUSCHEL:  We're making some last minute edits.

8    So, no.

9              THE COURT:  Okay.  And then if I, for example,

10   reserve on the motion, what will transpire thereafter?

11             MR. BUSCHEL:  The defense will move into evidence

12   everything it has agreed; some government exhibits that weren't

13   presented and some defense exhibits that will not be objected

14   to will be moved into evidence.

15             The only request the defense has is that we publish a

16   certain portion of the audio HPSCI testimony that Mr. Stone

17   gave.  It is 50 minutes long.  We just ask to publish it to the

18   jury.  And then after that, the defense will rest.

19             THE COURT:  All right.  Have you -- is it a 50-minute

20   contiguous portion of the transcript, or is it chunks that

21   together make up 50 minutes?

22             MR. BUSCHEL:  There are two portions.  They are

23   relatively contiguous.  The first clip is 7 minutes and 19

24   seconds long.  It is from page 47 to page 52.

25             The second clip is 45 minutes and 17 seconds.  It is

1    from page 84 to page 117.

2          THE COURT:  All right.  And you're going to play the

3    audio?

4          MR. BUSCHEL:  Yes.

5          THE COURT:  Okay.  At that time, is the jury also

6    going to have the transcript to follow along?

7          MR. BUSCHEL:  We just want the jury to listen.

8          THE COURT:  Okay.  All right.  And the audio has

9    already been authenticated as the actual audio?

10          MR. BUSCHEL:  It is in evidence as Government's 1-A.

11          THE COURT:  All right.  And you said you have an

12    additional jury instruction.  I don't know, even if we do all

13    that this afternoon, that we would have time to have the jury

14    instruction conference at the end of that.  So, that would

15    probably be something that we would do first thing in the

16    morning and then have the jurors come.  I don't see why we

17    wouldn't close tomorrow.

18          I don't think I need briefing on any of the issues

19    that are open.  It's largely what I'm going to say about

20    reasonable doubt and a few other little gray snips that you all

21    disagreed about.  And I'm probably going to stick as close to

22    the standard jury instructions as possible.  But, I'm going to

23    look at everything again.

24          One issue that came to my -- I think the verdict form

25    needs to be tinkered with.  I think the defendant's is he

1    guilty of Count 2 in the indictment, Count 3 in the indictment

2    is problematical because I'm not sending the indictment to the

3    jury room because I do think it is unduly prejudicial to send

4    it to the jury room.

5             So, I do believe that the verdict form has to say,

6    With respect to this testimony, do you find that that was a

7    false statement in violation of?

8             So, I think is it has to be more similar to what the

9    government provided than what the defense provided with respect

10   to the false statements.  But, I also think it has to kind of

11   paraphrases this.  And I think I want a verdict form that

12   specifies exactly what it is that they have to consider in each

13   count as being false.

14            So, I think it needs to be redone.  And, perhaps, the

15   government can take the laboring oar on that.

16            My question is with respect to Count 1.  Count 1 in

17   the indictment charged obstruction through a number of

18   different circumstances.  And I haven't seen an instruction

19   that they -- whether they have to be unanimous about what it

20   was that was the obstructive conduct, or if they only have to

21   be unanimous that he obstructed or not.  So, and there may not

22   be an issue with respect to that.  But, it may be something

23   that requires special interrogatories or a special unanimity

24   instruction.

25            So, I want to know what the parties' positions are

1     about that.  And if you think something more is needed than

2     Count 1, up or down, then I need that in writing before

3     tomorrow morning.

4                 MR. BUSCHEL:  (Nods head.)

5                 THE COURT:  Well, I can't tell you when we're going

6     to hear -- I would like to read what you gave me.  And I will

7     give you a chance to argue the Rule 29 motion before I take it

8     up.  So, the sooner you can get it to me the better.  And then

9     maybe we can reconvene at 12:30 or 12:45, or something like

10    that, to talk about it.

11                My other question is, I just want to make sure I

12    understand what is in evidence right now when I'm considering

13    the portions of the House report that could bear on the

14    arguments that you're about to make to me about intent and

15    materiality.

16                His entire testimony is in evidence; is that correct?

17                MR. BUSCHEL:  Yes.

18                THE COURT:  So I could refer to anything in that.

19                MR. BUSCHEL:  Yes.

20                THE COURT:  Okay.  And with respect to the majority

21    report, the original exhibit binder has the whole report.  But,

22    then, I think it was compressed into excerpts; is that correct?

23                MR. KRAVIS:  Yes, Your Honor.

24                THE COURT:  Okay.  So the excerpts that are in

25    evidence are just the ones that were shown to the witness?  Or

1    is it more that was marked as -- as, like, the renewed -- is

2    there a revised version of Government's Exhibit 6?

3            MR. KRAVIS:  At this time, Your Honor, I believe what

4    is in evidence is Government's Exhibit 6-A, which is what I

5    showed Ms. Taylor last week.  I think that's about ten pages,

6    nonconsecutive pages from the report.  And also Government 6-B,

7    which is a single page that I showed to Ms. Taylor this

8    morning.

9            THE COURT:  Okay.

10           MR. KRAVIS:  The defense had on their exhibit list

11   some additional portions of the report that were discussed at

12   the pretrial conference.  I don't think that those have been

13   yet --

14           THE COURT:  Have not been moved in evidence.

15           MR. KRAVIS:  But our position is the position that we

16   stated at the conference with respect to that.

17           THE COURT:  Which is?

18           MR. KRAVIS:  Well, a better way to put this is, the

19   Court ruled on this.

20           THE COURT:  Okay.

21           MR. KRAVIS:  So the portions that the Court ruled are

22   admissible, obviously, the defense can move in in their case.

23   But, I don't think they're yet in evidence.

24           THE COURT:  Some of them I think -- did you ask

25   Ms. Taylor about any portions of the defense exhibits during

1   her testify?

2            MR. KRAVIS:  I -- oh, you're not talking to me.

3            THE COURT:  Mr. Buschel?

4            MR. BUSCHEL:  No, I don't believe so.

5            THE COURT:  All right.  So, would you happen to have

6   handy a copy of 6-A and 6-B?

7            MR. KRAVIS:  I do.

8            THE COURT:  All right.  That would be useful for me.

9            MR. KRAVIS:  Just for the record, I'm showing defense

10  counsel, first, 6-B, the page that we admitted this morning,

11  and I'm handing that up.

12            I'm now showing defense counsel what we, I believe,

13  marked, admitted, and showed to the witness as Government's

14  Exhibit 6-A during Ms. Taylor's testimony last week.  This

15  Exhibit is a total of 18 pages -- they're not consecutive

16  pages -- from the report.

17            THE COURT:  What is your point of view about -- well,

18  wait a minute.  I may not have to ask that question.

19            What is your point of view about whether I can take

20  judicial notice of definitions of terms used in the report that

21  are defined, for example, on pages 2 and 3 of the report?

22            MR. BUSCHEL:  Do you have an example?

23            THE COURT:  Well, on page 2 they talk about active

24  measures taken by the Russians.  And they define that as

25  "multi-facetted leverage cyber attacks, covert platforms,

1    social media, third-party intermediaries," etcetera.  And I

2    think it bears on what they meant when they said they were

3    investigating Russian interference or Russian active measures

4    and materiality.

5            I don't know that that particular excerpt has been

6    moved in evidence.  At one point, the entire report was marked

7    as an exhibit.  But, it is a public document that you're both

8    relying on.

9            So, should I ignore other aspects of it?  Or am I

10   allowed to consider other aspects of it?

11           MR. BUSCHEL:  I think the Court should only consider

12   what is in evidence.

13           THE COURT:  All right.  We'll do that at this point.

14           When are you going to give me the thing you want me

15   to read?

16           MR. BUSCHEL:  We're good to go.

17           THE COURT:  Okay.  But you don't have a printer.  You

18   just have to docket it?  Or can you --

19           MR. BUSCHEL:  We have a thumb drive for Mr. Haley.

20           THE COURT:  Okay.  Or email it to him and he can

21   print it out and bring it to me in chambers, in addition to if

22   you're going to docket it.  I'll get it faster that way.

23           So, why don't we break.  And why don't we resume

24   at -- this is hard because I like to fit in lunch for

25   everybody, too.  The jury is not even getting -- why don't

1    we resume at 12:30.  And then, perhaps, when we're done with

2    this discussion, then we'll take a lunch break, if we haven't

3    had it before.  And we can start the jury a little later with

4    what you plan to introduce.

5              Okay.  I appreciate the update, and I'll wait for

6    this pleading.

7              Thank you.

8              (Recess.)

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 12th day of November, 2019

9

10

11                    _____

12                         Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
13                       Room 6523
                         333 Constitution Avenue, N.W.
14                       Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25

## #

**#331** [1] - 903:10

## $

**$250,000** [3] - 915:17, 916:1, 916:5

## 1

**1** [8] - 915:23, 970:17, 970:18, 970:22, 971:10, 983:16, 984:2
**1(a** [1] - 914:16
**1-30** [1] - 949:14
**1-A** [1] - 982:10
**1.(a** [1] - 914:9
**1.(b** [1] - 914:12
**10** [2] - 968:21, 969:1
**100** [4] - 902:21, 903:3, 923:17, 945:3
**100,000** [1] - 954:18
**1000** [1] - 902:22
**11** [2] - 913:17, 968:21
**113** [3] - 971:23, 972:1
**114** [1] - 971:23
**117** [1] - 982:1
**12** [2] - 902:6, 913:8
**12:30** [2] - 984:9, 988:1
**12:45** [1] - 984:9
**12th** [6] - 921:23, 921:25, 926:25, 927:24, 928:18, 989:8
**13** [1] - 928:9
**130-120** [1] - 903:7
**1300** [1] - 903:3
**13th** [1] - 928:17
**14th** [2] - 929:5, 929:6
**15** [2] - 930:1, 969:1
**15th** [2] - 930:3, 931:17
**162** [1] - 912:25
**17** [1] - 981:25
**18** [1] - 986:15
**18:17** [1] - 928:9
**19** [1] - 981:23
**19-18** [2] - 905:2, 969:7
**19-CR-018** [1] - 902:3
**1:30** [3] - 980:8, 980:11

## 2

**2** [5] - 916:2, 972:3, 983:1, 986:21, 986:23
**2.0** [3] - 970:10, 970:12, 971:14
**20** [4] - 929:24, 948:23, 953:2, 965:25
**20001** [2] - 903:16, 989:14
**2006** [3] - 909:22, 910:12, 910:16
**201** [1] - 977:4
**201.............................977** [1] -

904:9
**2011** [1] - 958:8
**2013** [1] - 958:8
**2014** [1] - 958:16
**2016** [35] - 910:18, 910:19, 911:11, 911:12, 911:19, 911:24, 919:11, 919:12, 919:14, 919:21, 920:6, 921:3, 921:5, 921:23, 921:25, 926:25, 928:9, 929:5, 929:6, 930:1, 930:3, 932:17, 933:4, 933:5, 933:12, 933:14, 934:21, 934:23, 935:1, 938:18, 946:14, 970:5, 971:3, 973:10
**2017** [1] - 976:16
**2018** [2] - 912:18, 951:15
**2019** [1] - 989:8
**202** [2] - 902:17, 977:4
**202-354-3267** [1] - 903:16
**202.............................977** [1] -
904:10
**203** [2] - 976:1, 976:12
**20530** [1] - 902:17
**209** [1] - 977:17
**209.............................977** [1] -
904:9
**21** [1] - 928:5
**210** [1] - 976:19
**2109** [1] - 902:6
**214** [5] - 973:12, 973:13, 974:3, 974:7, 974:12
**214.............................974** [1] -
904:10
**22** [1] - 931:9
**22nd** [13] - 933:5, 933:12, 934:4, 934:21, 934:23, 935:1, 937:16, 937:18, 938:18, 939:1, 939:3, 966:18, 970:5
**235-8259** [1] - 903:11
**252-7068** [1] - 902:17
**26th** [1] - 976:16
**28** [2] - 970:17, 970:24
**29** [5] - 971:7, 971:10, 979:7, 981:3, 984:7

## 3

**3** [2] - 983:1, 986:21
**30** [2] - 948:23, 965:6
**30-plus** [1] - 920:19
**302** [5] - 949:14, 949:16, 949:20, 949:25, 950:18
**30th** [1] - 951:15
**328-9064** [1] - 903:8
**333** [2] - 903:15, 989:13
**33301** [2] - 902:22, 903:7
**33316** [1] - 903:11
**33394** [1] - 903:4
**3rd** [1] - 902:21

## 4

**4** [1] - 929:24
**40** [3] - 947:21, 947:25, 948:23
**401** [1] - 903:6
**45** [1] - 981:25
**47** [2] - 909:4, 981:24

## 5

**5** [1] - 902:5
**50** [6] - 919:4, 947:21, 947:25, 949:2, 981:17, 981:21
**50-minute** [1] - 981:19
**501** [1] - 903:10
**52** [1] - 981:24
**530-5301** [1] - 903:4
**555** [1] - 902:16
**5K** [3] - 918:2, 918:4, 918:5
**5K1** [1] - 917:1

## 6

**6** [3] - 916:17, 957:12, 985:2
**6-A** [3] - 985:4, 986:6, 986:14
**6-B** [6] - 972:15, 972:16, 972:19, 985:6, 986:6, 986:10
**6-B.............................972** [1] -
904:8
**6523** [2] - 903:15, 989:13
**690** [1] - 906:22

## 7

**7** [1] - 981:23
**767-8909** [1] - 902:23
**7th** [1] - 946:14

## 8

**84** [1] - 982:1

## 9

**954** [4] - 902:23, 903:4, 903:8, 903:11
**9:30** [1] - 902:7

## A

**a.m** [1] - 902:7
**Aaron** [2] - 902:15, 905:9
**ability** [2] - 920:13, 989:7
**able** [2] - 943:24, 980:3
**absolutely** [1] - 957:2
**access** [2] - 920:13, 978:9
**Access** [1] - 935:12
**account** [4] - 915:1, 958:25, 959:1, 959:4
**accountant** [1] - 959:13

**accountants** [1] - 959:14
**accounts** [9] - 954:3, 957:20, 957:22, 958:1, 958:15, 958:18, 958:19, 963:12, 964:4
**accuracy** [2] - 906:14, 906:17
**accurate** [8] - 906:7, 948:7, 948:16, 954:4, 954:6, 955:19, 974:7, 989:5
**accurately** [1] - 907:7
**accused** [1] - 971:5
**acknowledged** [2] - 972:2, 978:2
**act** [1] - 956:10
**Action** [1] - 902:3
**action** [1] - 934:10
**actions** [1] - 924:25
**active** [2] - 986:23, 987:3
**activity** [1] - 925:18
**actual** [2] - 978:8, 982:9
**Adam** [2] - 902:14, 905:9
**add** [1] - 926:15
**added** [1] - 915:13
**addition** [1] - 987:21
**additional** [15] - 915:16, 916:23, 917:9, 917:20, 936:15, 937:3, 937:6, 938:4, 940:16, 940:18, 940:22, 975:16, 980:15, 982:12, 985:11
**address** [1] - 977:11
**admissibility** [1] - 944:8
**admissible** [4] - 941:18, 944:2, 978:17, 985:22
**admission** [2] - 906:12, 978:14
**admit** [6] - 905:19, 905:21, 905:24, 941:14, 950:3, 961:24
**admits** [1] - 949:18
**admitted** [9] - 913:1, 956:17, 970:16, 974:13, 976:2, 976:24, 977:7, 986:10, 986:13
**adopt** [2] - 977:24, 978:1
**advance** [1] - 968:8
**adviser** [1] - 920:4
**advisor** [1] - 932:6
**afternoon** [1] - 982:13
**agencies** [2] - 971:21, 972:4
**agent** [7] - 914:24, 949:17, 950:1, 951:3, 951:18, 965:17, 978:8
**agents** [2] - 950:14, 953:17
**agree** [1] - 976:22
**agreed** [6] - 917:1, 917:4, 918:1, 957:4, 977:13, 981:12
**agreement** [18] - 912:20, 912:23, 913:6, 913:13, 913:15, 913:18, 915:5, 915:14, 916:9, 916:19, 917:2, 917:18, 917:19, 917:22, 918:11, 948:4, 956:16, 976:7
**ahead** [1] - 976:10
**airport** [4] - 965:7, 965:9,

965:12, 965:13
**Airport** [1] - 952:24
**Alexandria** [2] - 954:2, 955:15
**alleged** [2] - 964:23, 970:13
**allowed** [6] - 956:2, 956:14, 956:15, 957:1, 961:18, 987:10
**alter** [3] - 960:11, 960:19, 962:25
**altered** [1] - 961:4
**altering** [1] - 963:20
**altogether** [1] - 947:22
**Amanda** [1] - 905:10
**America** [3] - 902:3, 905:3, 969:7
**American** [1] - 971:4
**amount** [5] - 916:6, 933:6, 955:2, 964:1, 971:18
**AMY** [1] - 902:9
**announced** [1] - 929:7
**announcement** [18] - 921:24, 922:5, 925:12, 925:15, 926:25, 927:3, 927:5, 927:9, 927:16, 927:25, 928:18, 929:12, 929:16, 929:22, 930:24, 931:3, 931:19, 932:15
**announcements** [3] - 964:17, 964:19, 964:20
**announcing** [1] - 924:9
**answer** [11] - 908:12, 923:20, 923:24, 925:19, 939:22, 940:6, 940:15, 952:1, 955:4, 971:1, 971:9
**answered** [3] - 948:12, 952:7, 961:4
**answering** [2] - 952:3, 952:9
**answers** [1] - 924:13
**anticipate** [1] - 940:14
**anticipating** [1] - 925:19
**anytime** [1] - 935:10
**anyway** [1] - 907:10
**appear** [1] - 915:18
**application** [1] - 964:2
**applied** [1] - 962:24
**apply** [1] - 962:23
**appreciate** [1] - 988:5
**approach** [4] - 905:5, 949:11, 977:18, 979:19
**approached** [1] - 908:7
**approaching** [1] - 967:11
**appropriate** [1] - 950:23
**April** [2] - 927:15, 927:20
**argue** [4] - 943:14, 945:14, 945:16, 984:7
**arguments** [2] - 980:18, 984:14
**arrested** [1] - 912:10
**arrive** [1] - 965:9
**arrived** [2] - 966:8
**article** [1] - 971:13
**articles** [1] - 959:16

**arts** [2] - 909:8, 909:9
**ascribed** [1] - 941:3
**aside** [1] - 951:23
**asjz@usdoj.gov** [1] - 902:18
**aspects** [3] - 919:15, 987:9, 987:10
**Assange** [6] - 921:6, 925:15, 927:17, 934:19, 965:21, 966:3
**Assange's** [5] - 921:24, 922:5, 925:12, 926:24, 927:9
**asserted** [5] - 924:16, 940:14, 941:2, 942:1, 942:3
**asserting** [1] - 940:25
**assertion** [1] - 971:20
**asserts** [1] - 940:24
**assessed** [1] - 971:14
**assist** [1] - 916:14
**assume** [1] - 908:10
**assumed** [1] - 968:4
**assuming** [2] - 940:25, 945:20
**attacks** [1] - 986:25
**attend** [1] - 915:8
**attention** [7] - 906:21, 908:9, 910:18, 937:25, 970:20, 971:7, 971:22
**attitude** [8] - 922:4, 922:8, 922:9, 922:17, 922:24, 922:25, 929:15, 935:3, 935:5
**Attorney's** [1] - 905:10
**ATTORNEY'S** [1] - 902:15
**attorney's** [1] - 916:24
**audio** [4] - 981:16, 982:3, 982:8, 982:9
**August** [1] - 971:3
**authenticated** [2] - 906:3, 982:9
**available** [1] - 977:8
**Avenue** [4] - 902:21, 903:3, 903:15, 989:13
**avoid** [1] - 958:21
**awake** [1] - 930:16
**aware** [9] - 920:21, 921:21, 949:6, 956:17, 956:19, 958:17, 964:20, 971:4, 971:13, 971:17, 975:7

**B**

**bachelor** [1] - 909:8
**background** [3] - 909:7, 925:25, 926:7
**balance** [1] - 932:16
**bank** [14] - 915:1, 954:3, 957:19, 957:22, 958:1, 958:15, 959:19, 960:1, 960:9, 960:20, 961:5, 962:19, 963:12, 964:4
**banks** [5] - 959:8, 959:11, 960:11, 961:2, 961:14
**bannon** [1] - 920:25
**bannon's** [1] - 977:16
**barely** [1] - 928:25

**based** [12] - 907:12, 920:17, 920:19, 924:13, 929:19, 934:17, 934:19, 942:15, 947:6, 974:2, 974:6, 978:21
**basis** [11] - 911:6, 911:9, 923:19, 942:11, 961:1, 961:11, 961:19, 961:22, 962:9, 963:3, 963:9
**bear** [1] - 984:13
**bears** [2] - 943:21, 987:2
**became** [2] - 911:5, 911:25
**become** [3] - 911:8, 911:20, 928:3
**BEFORE** [1] - 902:9
**beginning** [1] - 909:24
**begins** [1] - 928:9
**behalf** [2] - 905:15, 918:6
**bench** [13] - 922:11, 922:12, 940:7, 940:11, 949:11, 949:12, 956:1, 956:3, 956:4, 960:23, 960:25, 977:19, 977:21
**BERMAN** [1] - 902:9
**best** [2] - 979:18, 989:7
**better** [4] - 963:24, 980:3, 984:8, 985:18
**between** [7] - 935:25, 936:6, 941:9, 946:2, 965:3, 975:5, 976:7
**Between** [1] - 924:6
**big** [1] - 952:5
**binder** [1] - 984:21
**bit** [1] - 915:4
**Black** [4] - 909:15, 909:25, 910:2, 910:7
**blind** [1] - 941:12
**Blvd** [1] - 903:10
**bottom** [6] - 928:6, 928:8, 931:10, 971:23, 972:1, 973:6
**Boulevard** [1] - 903:6
**brainstorming** [4] - 934:5, 934:7, 934:12, 934:17
**break** [5] - 968:19, 968:21, 980:21, 987:23, 988:2
**Breitbart** [1] - 971:14
**briefing** [1] - 982:18
**briefly** [2] - 909:13, 934:25
**bring** [6] - 907:20, 907:24, 908:9, 943:6, 969:8, 987:21
**bringing** [1] - 945:19
**brogow@rogowlaw.com** [1] - 902:23
**brought** [2] - 917:15, 955:15
**Bruce** [3] - 902:20, 905:14, 947:17
**BRUCE** [1] - 902:21
**building** [1] - 911:3
**Buschel** [5] - 903:1, 905:13, 906:11, 980:24, 986:3
**BUSCHEL** [24] - 903:2, 905:13, 906:16, 978:6, 978:25, 979:4,

979:6, 979:16, 979:20, 981:3, 981:7, 981:11, 981:22, 982:4, 982:7, 982:10, 984:4, 984:17, 984:19, 986:4, 986:22, 987:11, 987:16, 987:19
**buschel@bglaw** [1] - 903:5
**buschel@bglaw-pa.com** [1] - 903:5
**business** [1] - 909:18
**Business** [1] - 909:19
**BY** [34] - 908:22, 913:2, 913:9, 913:22, 914:8, 916:18, 921:18, 926:23, 928:7, 930:2, 931:11, 935:23, 940:3, 946:1, 946:10, 947:16, 948:15, 951:14, 954:15, 955:14, 957:9, 957:16, 958:10, 959:22, 960:10, 960:18, 963:23, 964:16, 967:17, 969:24, 970:19, 972:12, 973:4, 974:21

# C

**caller** [1] - 939:7
**campaign** [73] - 911:6, 911:8, 911:10, 911:12, 911:21, 912:4, 912:5, 919:13, 919:14, 919:16, 919:17, 919:20, 919:22, 920:2, 920:5, 920:7, 920:9, 920:11, 920:12, 920:18, 920:20, 920:25, 922:4, 922:8, 922:9, 922:17, 922:19, 922:21, 922:22, 923:1, 923:2, 923:8, 923:12, 923:16, 923:18, 924:2, 924:4, 924:10, 924:19, 925:7, 925:8, 925:9, 925:16, 925:22, 926:10, 926:17, 926:19, 927:4, 927:9, 927:11, 929:11, 929:21, 931:7, 932:4, 932:6, 934:2, 934:3, 934:9, 935:2, 935:6, 935:10, 937:8, 938:11, 943:18, 945:18, 952:6, 966:5, 966:9, 966:13, 973:8, 978:10
**campaign's** [10] - 912:1, 921:19, 922:24, 924:24, 925:1, 925:11, 926:2, 929:15, 935:3, 935:5
**Campion** [2] - 903:1, 905:14
**candidate** [12] - 920:15, 922:1, 923:4, 923:17, 932:7, 932:9, 938:11, 938:12, 938:15, 939:15, 946:3, 946:12
**car** [9] - 952:23, 953:3, 953:13, 953:14, 953:15, 953:17, 965:3, 965:5
**card** [3] - 962:18, 963:24, 964:2
**careful** [2] - 923:13, 945:2
**carefully** [1] - 962:15
**Case** [2] - 905:2, 969:7
**case** [19] - 905:18, 908:7, 908:8, 908:13, 910:4, 918:17, 925:5,

947:21, 948:4, 951:2, 958:5, 961:13, 964:11, 968:22, 976:9, 976:25, 980:14, 981:1, 985:22
**cases** [6] - 947:22, 948:5, 956:19, 956:20, 962:5, 964:8
**CCR** [1] - 989:12
**cell** [1] - 939:7
**certain** [2] - 949:4, 981:16
**certainly** [4] - 942:9, 943:22, 978:6, 978:23
**CERTIFICATE** [1] - 989:2
**certify** [1] - 989:4
**chair** [1] - 919:20
**chairman** [3] - 911:20, 912:1, 923:2
**chambers** [1] - 987:21
**chance** [3] - 950:9, 974:3, 984:7
**Chandler** [2] - 903:9, 905:14
**CHANDLER** [1] - 903:9
**changed** [1] - 937:9
**channels** [1] - 935:9
**charge** [9] - 915:2, 915:3, 915:13, 915:15, 915:16, 915:24, 954:22, 955:11, 957:10
**charged** [6] - 914:9, 914:11, 914:13, 914:14, 961:14, 983:17
**charges** [9] - 912:13, 912:16, 914:1, 914:2, 916:23, 917:12, 917:20, 955:15, 955:16
**Charges** [2] - 913:23, 914:3
**check** [2] - 932:23, 967:7
**chief** [4] - 922:19, 923:18, 924:19, 951:2
**chitchat** [1] - 979:12
**Christopher** [1] - 905:11
**chunks** [1] - 935:9
**circumstances** [2] - 917:17, 983:18
**claim** [1] - 971:17
**classic** [1] - 941:10
**clear** [9] - 937:22, 939:25, 945:6, 945:8, 950:17, 950:20, 955:12, 962:3, 963:15
**clearly** [1] - 922:25
**client** [1] - 941:24
**clients** [1] - 909:16
**Clinton** [2] - 922:1, 927:1
**clip** [2] - 981:23, 981:25
**close** [3] - 980:25, 982:17, 982:21
**closing** [1] - 980:17
**CMR** [1] - 989:12
**College** [1] - 909:8
**college** [1] - 909:14
**COLUMBIA** [2] - 902:1, 902:16
**Columbia** [1] - 976:17
**column** [1] - 973:6
**combination** [1] - 948:3
**coming** [24] - 921:10, 927:12,

927:15, 927:21, 931:5, 932:22, 933:19, 936:16, 936:19, 937:4, 937:17, 937:20, 938:4, 940:16, 940:19, 940:23, 942:14, 944:21, 946:13, 946:24, 947:2, 947:4, 967:22, 968:4
**comment** [1] - 906:23
**commit** [1] - 912:5
**committed** [5] - 955:22, 956:8, 956:11, 956:24, 962:7
**committee** [1] - 943:18
**Committee** [10] - 925:6, 929:7, 933:7, 934:23, 935:17, 970:4, 970:9, 970:12, 972:8, 976:15
**Committee's** [5] - 929:11, 929:16, 930:23, 931:3, 931:18
**communicated** [1] - 945:17
**communication** [1] - 952:20
**communications** [4] - 926:10, 934:15, 975:2, 975:5
**Community** [1] - 971:15
**community** [1] - 972:3
**companies** [1] - 959:17
**company** [1] - 909:20
**compared** [1] - 907:6
**competing** [1] - 927:11
**competitor** [2] - 935:8, 935:11
**complete** [2] - 949:19, 989:6
**completely** [1] - 956:6
**components** [1] - 914:23
**comports** [1] - 926:5
**compressed** [1] - 984:22
**con** [1] - 930:12
**conceal** [1] - 964:3
**conclusion** [3] - 905:17, 941:7, 972:3
**conduct** [1] - 983:20
**conducting** [1] - 916:14
**conference** [3] - 982:14, 985:12, 985:16
**conferences** [1] - 956:1
**confident** [1] - 945:3
**confirm** [3] - 905:25, 906:7, 908:6
**confirming** [1] - 946:22
**Congress** [3] - 926:5, 926:12, 945:17
**congressional** [1] - 974:8
**connection** [7] - 941:8, 942:15, 961:2, 962:6, 962:25, 963:20, 981:2
**connections** [1] - 926:11
**consecutive** [1] - 986:15
**consequence** [2] - 915:12, 915:13
**consequences** [1] - 915:10
**consider** [4] - 976:8, 983:12, 987:10, 987:11
**considered** [1] - 978:9

**considering** [1] - 984:12
**conspiracy** [5] - 914:11, 914:16, 914:20, 914:22, 957:10
**Conspiracy** [1] - 915:23
**conspire** [1] - 914:18
**constitutes** [1] - 989:5
**Constitution** [2] - 903:15, 989:13
**consult** [1] - 961:23
**consulting** [2] - 909:12, 909:15
**contact** [7] - 920:20, 920:23, 921:1, 931:25, 932:12, 959:11
**contain** [1] - 912:22
**contended** [1] - 945:7
**content** [4] - 939:12, 942:16, 952:14, 952:20
**context** [1] - 942:6
**contiguous** [2] - 981:20, 981:23
**continually** [1] - 966:10
**continue** [7] - 921:3, 932:17, 932:19, 937:6, 937:10, 955:25
**contracts** [1] - 955:1
**convention** [6] - 911:13, 911:14, 911:16, 911:18, 919:19
**Convention** [1] - 911:19
**conversation** [10] - 919:25, 929:4, 935:25, 936:3, 936:4, 936:6, 936:24, 939:10, 942:13, 945:8
**conversations** [3] - 924:15, 929:10, 937:9
**cooperated** [1] - 917:2
**cooperation** [1] - 918:7
**copy** [3] - 906:6, 981:5, 986:6
**Corporation** [1] - 909:17
**correct** [45] - 910:14, 917:6, 918:3, 918:13, 927:2, 928:19, 928:20, 930:7, 930:8, 931:19, 931:20, 931:22, 933:2, 933:3, 938:12, 938:13, 939:12, 939:13, 945:21, 946:3, 947:24, 948:22, 952:19, 952:21, 952:25, 953:12, 955:6, 955:17, 955:18, 955:20, 955:21, 957:24, 958:1, 958:2, 959:7, 964:2, 964:9, 964:19, 965:8, 967:5, 967:6, 967:20, 968:16, 984:16, 984:22
**corrected** [1] - 954:8
**correctly** [1] - 978:2
**counsel** [5] - 905:5, 905:8, 906:8, 986:10, 986:12
**Counsel's** [1] - 915:6
**count** [3] - 914:12, 960:9, 983:13
**Count** [7] - 915:23, 916:2, 983:1, 983:16, 984:2
**countries** [1] - 911:4
**couple** [2] - 952:12, 965:15
**course** [3] - 915:5, 943:10, 956:21

**Court** [10] - 903:14, 903:14, 905:23, 906:19, 945:9, 979:6, 985:19, 985:21, 987:11, 989:12
**COURT** [142] - 902:1, 905:12, 905:16, 906:2, 906:11, 907:4, 907:18, 907:24, 908:2, 921:12, 922:7, 922:10, 922:13, 922:18, 923:3, 923:10, 923:25, 924:14, 924:23, 925:3, 925:19, 925:23, 925:25, 935:22, 939:21, 940:6, 940:10, 940:21, 941:14, 942:21, 942:23, 943:11, 944:14, 944:23, 945:1, 945:4, 945:13, 945:16, 945:22, 945:24, 946:7, 947:14, 948:9, 948:14, 949:11, 949:13, 949:15, 949:23, 950:11, 950:22, 951:9, 951:11, 954:13, 955:12, 955:25, 956:5, 956:13, 956:22, 957:6, 957:13, 958:4, 958:7, 958:9, 959:19, 960:5, 960:8, 960:13, 960:23, 961:1, 961:6, 961:9, 961:17, 962:11, 962:21, 963:10, 963:19, 964:15, 967:9, 967:12, 967:14, 968:10, 968:12, 968:15, 968:18, 968:25, 969:4, 969:8, 969:10, 969:16, 969:20, 972:20, 972:22, 972:25, 973:3, 974:13, 974:18, 975:9, 975:11, 975:18, 975:23, 975:25, 976:5, 976:21, 977:1, 977:7, 977:18, 977:22, 978:5, 978:11, 978:17, 979:1, 979:5, 979:10, 979:17, 979:21, 979:25, 980:24, 981:5, 981:9, 981:19, 982:2, 982:5, 982:8, 982:11, 984:5, 984:18, 984:20, 984:24, 985:9, 985:14, 985:17, 985:20, 985:24, 986:3, 986:5, 986:8, 986:17, 986:23, 987:13, 987:17, 987:20, 989:2
**court** [9] - 926:22, 941:15, 945:25, 951:13, 957:8, 963:18, 977:22, 977:23, 979:23
**Court's** [1] - 906:21
**Courthouse** [1] - 903:15
**COURTROOM** [2] - 905:1, 969:6
**courtroom** [5] - 905:4, 908:1, 968:24, 969:9, 980:23
**cover** [3] - 914:20, 914:22, 925:6
**covered** [1] - 941:24
**covering** [1] - 925:17
**covert** [1] - 986:25
**Craig** [3] - 961:4, 961:23, 962:15
**CRC** [1] - 903:14
**Credico** [2] - 906:22, 907:11
**credit** [4] - 962:19, 963:24, 964:1, 970:8
**crime** [1] - 961:19

**crimes** [11] - 912:5, 912:8, 914:20, 914:22, 917:10, 954:1, 955:3, 955:22, 956:8, 956:25
**criminal** [1] - 956:10
**Criminal** [3] - 902:3, 905:2, 969:6
**critical** [2] - 925:12, 925:16
**cross** [6] - 943:7, 947:14, 956:15, 963:15, 967:18, 974:18
**Cross** [2] - 904:4, 904:6
**CROSS** [2] - 947:15, 974:20
**Cross-Examination** [2] - 904:4, 904:6
**cross-examination** [2] - 947:14, 974:18
**CROSS-EXAMINATION** [2] - 947:15, 974:20
**cross-examine** [2] - 956:15, 963:15
**CRR** [2] - 903:14, 989:12
**cut** [1] - 979:6
**cutout** [1] - 971:15, 972:4
**cyber** [1] - 986:25
**Cyprus** [8] - 958:18, 958:20, 958:21, 958:22, 958:24, 958:25, 963:12, 964:4

**D**

**D.C** [2] - 905:10, 989:14
**dah** [3] - 944:14, 944:15
**damaging** [1] - 935:10
**date** [11] - 921:10, 928:16, 931:16, 931:17, 946:19, 949:17, 950:25, 951:16, 951:22, 951:24, 964:7
**Date** [1] - 902:6
**Dated** [1] - 989:8
**dates** [2] - 921:16, 951:17
**Davis** [7] - 909:23, 910:13, 910:15, 910:20, 910:23, 910:25, 962:2
**DC** [3] - 902:6, 902:17, 903:16
**dealt** [1] - 966:5
**dean** [2] - 923:21, 923:23
**debrief** [1] - 932:14
**decide** [1] - 951:2
**decides** [3] - 918:14, 918:15, 918:16
**decision** [2] - 912:12, 912:15
**declare** [1] - 956:10
**deductions** [1] - 957:17
**Defendant** [3] - 902:7, 902:20, 903:1
**defendant** [3] - 910:4, 976:14, 976:23
**defendant's** [1] - 982:25
**defense** [12] - 906:8, 975:21, 981:11, 981:13, 981:15, 981:18, 983:9, 985:10, 985:22, 985:25,

986:9, 986:12
**define** [1] - 986:24
**defined** [1] - 986:21
**definitely** [1] - 973:24
**definition** [3] - 941:25, 944:4, 944:5
**definitions** [1] - 986:20
**defrauded** [2] - 961:2, 962:5
**defrauding** [1] - 961:14
**delegates** [1] - 919:19
**democratic** [1] - 971:5
**Democratic** [11] - 929:7, 929:11, 929:15, 930:23, 931:2, 931:18, 933:6, 934:22, 935:16, 970:3, 970:9
**denied** [2] - 926:11, 949:23
**denies** [1] - 949:19
**deny** [1] - 950:4
**denying** [1] - 905:23
**deposition** [1] - 964:3
**deputy** [7] - 911:13, 912:4, 919:14, 922:19, 923:1, 923:18, 924:19
**DEPUTY** [2] - 905:1, 969:6
**describe** [1] - 909:13
**described** [1] - 907:10
**description** [1] - 918:5
**descriptors** [2] - 906:17, 907:1
**detail** [3] - 917:3, 923:9, 926:8
**details** [1] - 918:7
**developments** [1] - 932:14
**diagonal** [2] - 953:6, 953:7
**dicey** [1] - 980:6
**DICKMAN** [1] - 989:4
**Dickman** [2] - 903:14, 989:12
**different** [5] - 911:4, 923:25, 950:14, 959:17, 983:18
**differently** [1] - 948:20
**DIRECT** [2] - 908:21, 969:23
**Direct** [2] - 904:3, 904:6
**direct** [7] - 936:24, 946:8, 948:10, 950:25, 970:20, 971:7, 971:22
**directly** [1] - 965:11
**director** [2] - 934:15, 934:16
**disagreed** [1] - 982:21
**disbelief** [3] - 927:13, 929:18, 937:20
**discuss** [13] - 908:7, 927:3, 930:23, 932:17, 932:19, 935:16, 939:25, 968:22, 979:15, 980:2, 980:4, 980:19, 980:21
**discussed** [7] - 908:8, 908:13, 923:11, 924:4, 928:19, 930:25, 985:11
**discussing** [2] - 926:24, 946:2
**discussion** [9] - 922:12, 925:14, 940:11, 949:12, 956:4, 960:25, 972:8, 977:21, 988:2

**discussions** [3] - 926:17, 927:4, 935:2
**dismiss** [1] - 917:4
**dismissed** [1] - 917:12
**dismissive** [1] - 924:17
**display** [1] - 939:7
**DISTRICT** [4] - 902:1, 902:1, 902:10, 902:16
**District** [5] - 917:9, 917:13, 961:13, 963:11, 976:16
**DNC** [5] - 931:5, 932:15, 933:13, 933:15, 939:3
**docket** [2] - 987:18, 987:22
**document** [6] - 912:22, 913:3, 950:5, 950:6, 950:21, 987:7
**documents** [16] - 916:15, 918:25, 940:22, 960:11, 960:19, 961:4, 961:12, 961:15, 961:24, 962:25, 963:20, 965:23, 966:2, 970:8, 977:10, 977:11
**domain** [1] - 937:25
**done** [7] - 908:8, 908:13, 918:5, 956:19, 957:3, 967:1, 988:1
**door** [1] - 969:2
**doubt** [1] - 982:20
**down** [4] - 936:16, 967:12, 975:12, 984:2
**draw** [2] - 906:21, 942:12
**drawn** [1] - 941:7
**drive** [1] - 987:19
**driving** [1] - 953:20
**drop** [2] - 916:23, 966:18
**dropped** [6] - 954:1, 954:22, 955:4, 955:16, 955:19
**dropping** [1] - 921:15
**drops** [1] - 966:17
**duly** [1] - 908:19
**dumps** [2] - 940:16, 940:18
**during** [10] - 917:21, 932:16, 937:7, 939:5, 949:2, 959:9, 970:11, 973:9, 985:25, 986:14

**E**

**e-mail** [19] - 902:18, 902:18, 902:19, 902:23, 903:5, 903:8, 903:12, 903:17, 928:6, 928:8, 928:9, 928:11, 928:14, 928:15, 928:16, 931:10, 931:12, 931:14, 966:2
**early** [2] - 927:15, 980:6
**earned** [1] - 954:25
**East** [2] - 903:6, 903:10
**Eastern** [4] - 917:9, 917:12, 961:12, 963:11
**edits** [1] - 981:7
**educational** [1] - 909:7
**either** [6] - 908:10, 927:3, 949:18, 950:3, 952:11, 958:14
**elapsed** [1] - 965:3

**election** [2] - 911:17, 973:10
**elections** [1] - 911:3
**element** [1] - 925:4
**elicit** [1] - 940:20
**eliciting** [1] - 923:14
**Elmo** [1] - 969:14
**email** [3] - 977:5, 977:11, 987:20
**emails** [13] - 916:15, 927:17, 933:6, 933:10, 934:23, 935:17, 939:1, 939:3, 946:15, 946:17, 966:25, 970:3, 971:5
**employed** [2] - 910:6, 910:20
**employment** [1] - 909:24
**end** [3] - 911:10, 917:25, 982:14
**ended** [4] - 939:16, 940:4, 956:7, 956:22
**enjoy** [1] - 980:21
**enlarge** [4] - 914:6, 928:6, 929:25, 931:10
**enter** [3] - 908:1, 912:19, 969:9
**entered** [1] - 961:12
**entire** [2] - 984:16, 987:6
**entitled** [2] - 949:24, 978:3
**essential** [1] - 925:4
**established** [2] - 923:19, 959:17
**etcetera** [1] - 987:1
**euphoric** [1] - 925:21
**evening** [1] - 939:5
**events** [1] - 930:6
**eventually** [1] - 911:20
**evidence** [30] - 907:9, 927:18, 941:17, 943:21, 961:10, 961:12, 962:4, 972:19, 972:21, 972:25, 974:12, 975:16, 976:8, 976:25, 977:4, 977:16, 977:18, 978:16, 980:16, 981:11, 981:14, 982:10, 984:12, 984:16, 984:25, 985:4, 985:14, 985:23, 987:6, 987:12
**exactly** [4] - 953:25, 978:19, 980:6, 983:12
**EXAMINATION** [5] - 908:21, 947:15, 967:16, 969:23, 974:20
**Examination** [5] - 904:3, 904:4, 904:4, 904:6, 904:6
**examination** [3] - 947:14, 967:19, 974:18
**examine** [2] - 956:15, 963:15
**examined** [1] - 908:20
**example** [4] - 935:12, 981:9, 986:21, 986:22
**exceptions** [1] - 944:18
**excerpt** [2] - 978:19, 987:5
**excerpts** [2] - 984:22, 984:24
**exchanges** [1] - 966:2
**excluded** [1] - 944:5
**excuse** [2] - 979:11, 980:5
**excused** [5] - 968:10, 968:12, 975:9, 979:18, 980:10

**Exhibit** [31] - 904:8, 904:9, 904:9, 904:10, 904:10, 912:25, 915:22, 916:17, 928:5, 929:24, 931:9, 965:25, 970:17, 970:18, 970:22, 971:10, 972:14, 972:16, 972:19, 973:12, 974:3, 974:7, 974:12, 976:1, 976:12, 976:19, 977:17, 985:2, 985:4, 986:14, 986:15
**exhibit** [8] - 907:5, 913:8, 913:21, 971:8, 971:24, 984:21, 985:10, 987:7
**exhibits** [8] - 905:19, 905:21, 975:16, 976:24, 980:13, 981:12, 981:13, 985:25
**Exhibits** [2] - 904:8, 977:4
**expect** [1] - 905:18
**expense** [1] - 957:17
**explain** [2] - 915:3, 915:20
**explained** [1] - 906:22
**explaining** [1] - 925:12
**extent** [1] - 944:22

## F

**facetted** [1] - 986:25
**facing** [3] - 916:7, 917:20, 917:25
**fact** [18] - 928:2, 935:6, 940:24, 940:25, 941:2, 941:15, 941:17, 942:2, 942:5, 943:5, 944:2, 944:16, 944:17, 945:11, 952:3, 963:4, 976:13
**facts** [3] - 945:11, 961:10, 976:7
**factual** [5] - 961:1, 961:11, 961:19, 961:22, 962:9
**failure** [1] - 955:19
**fair** [4] - 906:7, 961:25, 963:3, 974:7
**false** [8] - 914:14, 914:25, 915:3, 957:10, 957:17, 983:7, 983:10, 983:13
**falsifying** [1] - 961:24
**falsity** [1] - 943:20
**far** [2] - 953:9, 953:11
**faster** [1] - 987:22
**FBI** [3] - 905:11, 950:14, 951:18
**February** [1] - 912:18
**federal** [2] - 914:14, 978:8
**feelings** [1] - 924:24
**felt** [2] - 906:23, 929:21
**few** [3] - 905:19, 906:9, 982:20
**field** [1] - 909:11
**figure** [2] - 970:7, 980:6
**file** [3] - 914:25, 955:19, 979:8
**filing** [1] - 957:10
**filled** [1] - 906:19
**finally** [6] - 937:5, 937:21, 971:22, 973:11, 977:15
**financial** [2] - 917:10, 960:2

**Financial** [1] - 903:2
**fine** [3] - 915:17, 916:1, 916:5
**finished** [1] - 965:6
**firm** [6] - 909:15, 909:19, 909:22, 909:25, 910:11, 910:12
**first** [18] - 905:20, 908:19, 909:14, 911:8, 913:20, 937:18, 944:19, 958:15, 966:18, 966:21, 970:2, 971:25, 973:6, 976:1, 976:6, 981:23, 982:15, 986:10
**fit** [1] - 987:24
**five** [3] - 915:17, 915:25, 916:4
**FL** [4] - 902:22, 903:4, 903:7, 903:11
**focused** [1] - 957:3
**follow** [2] - 938:3, 982:6
**following** [5] - 909:18, 935:1, 949:18, 950:3, 976:13
**follows** [3] - 908:20, 969:22, 976:23
**FOR** [2] - 902:1, 902:15
**foregoing** [1] - 989:5
**foreign** [10] - 911:4, 914:24, 915:1, 954:3, 955:1, 957:19, 957:22, 958:1, 958:15
**form** [3] - 982:24, 983:5, 983:11
**formal** [2] - 920:7, 920:9
**forms** [1] - 959:12
**Fort** [2] - 902:22, 903:7
**forthcoming** [2] - 931:1, 933:16
**forward** [1] - 950:20
**foundation** [2] - 922:13, 950:1
**foundational** [1] - 926:16
**Fourth** [1] - 902:16
**Frank** [3] - 906:23, 973:16, 974:8
**frequent** [1] - 978:11
**frequently** [1] - 937:8
**Friday** [1] - 977:17
**front** [6] - 906:6, 915:18, 953:7, 953:20, 953:21, 970:24
**Ft** [2] - 903:4, 903:11
**fulfil** [1] - 917:18
**fulfilled** [1] - 918:10
**full** [1] - 989:6
**fully** [3] - 917:1, 954:9, 954:10

## G

**G-A-T-E-S** [1] - 909:2
**gained** [2] - 937:24, 965:22
**game** [1] - 961:25
**Games** [1] - 909:21
**gates** [2] - 907:21, 907:22
**GATES** [1] - 908:18
**Gates** [18] - 904:3, 908:16, 909:1, 909:3, 913:10, 922:25, 923:4, 923:7, 925:13, 926:24, 927:20, 941:10, 946:2, 946:11, 947:17, 949:6, 960:9, 967:18

**general** [2] - 926:18, 978:21
**George** [1] - 909:9
**GIBBONS** [1] - 903:2
**gift** [1] - 927:12
**given** [3] - 921:10, 968:4, 978:3
**glad** [1] - 908:2
**Godfather** [4] - 905:22, 973:17, 973:18, 973:22
**government** [60] - 906:25, 908:14, 912:20, 912:23, 913:6, 913:18, 914:15, 915:8, 915:10, 916:9, 916:13, 916:19, 916:22, 916:23, 917:4, 917:12, 917:19, 918:1, 918:6, 918:11, 918:22, 919:3, 919:5, 919:8, 929:8, 929:17, 930:24, 943:23, 945:7, 945:9, 947:20, 947:22, 948:2, 948:16, 948:21, 949:5, 950:18, 956:11, 956:16, 957:4, 964:8, 965:17, 969:1, 969:10, 969:12, 972:18, 974:12, 975:13, 975:15, 977:3, 977:15, 979:7, 979:9, 979:11, 979:24, 980:12, 981:12, 983:9, 983:15
**Government** [6] - 904:8, 904:9, 904:9, 904:10, 904:10, 985:6
**Government's** [17] - 970:17, 970:22, 971:10, 972:14, 972:16, 973:12, 973:13, 974:3, 974:7, 976:1, 976:11, 976:19, 982:10, 985:2, 985:4, 986:13
**government's** [3] - 905:17, 925:5, 981:1
**graduation** [1] - 909:11
**grand** [3] - 950:6, 977:16, 978:8
**Grant** [2] - 903:5, 905:14
**gray** [1] - 982:20
**great** [1] - 936:18
**greater** [1] - 917:25
**grounds** [4] - 906:12, 906:13, 922:7, 924:21
**gsmith@strategysmith.com** [1] - 903:8
**Gtech** [1] - 909:17
**Guccifer** [7] - 970:10, 970:12, 971:14, 972:3, 974:24, 975:2, 975:6
**guess** [3] - 908:6, 923:3, 942:24
**guidance** [3] - 928:13, 929:1, 929:3
**guidelines** [1] - 918:9
**guilty** [6] - 912:17, 912:19, 915:2, 915:18, 916:2, 983:1

## H

**hack** [2] - 931:5, 970:13
**hacked** [4] - 926:3, 929:7, 929:16, 930:24
**hacking** [2] - 970:8, 971:5

**Haley** [2] - 981:6, 987:19
**half** [2] - 953:23, 953:24
**hand** [4] - 908:12, 949:13, 951:11, 981:6
**handed** [3] - 950:18, 950:21, 973:11
**handing** [1] - 986:11
**handy** [1] - 986:6
**happiness** [2] - 927:10, 935:7
**happy** [2] - 922:23, 928:1
**hard** [1] - 987:24
**harmonized** [2] - 978:8, 978:10
**head** [5] - 908:11, 919:19, 968:11, 984:4
**hear** [11] - 936:11, 939:9, 939:10, 939:11, 943:8, 952:14, 954:5, 962:10, 979:1, 984:6
**heard** [11] - 906:9, 927:14, 927:20, 927:21, 938:19, 946:5, 952:18, 956:2, 966:22, 980:15, 980:17
**hearing** [1] - 976:3
**hearsay** [21] - 923:14, 924:12, 924:13, 940:12, 940:17, 941:6, 941:10, 941:25, 942:7, 942:8, 943:2, 944:4, 944:5, 944:6, 944:9, 944:14, 944:17, 944:18, 944:19
**heart** [1] - 926:13
**HELD** [1] - 902:9
**held** [4] - 909:13, 911:19, 915:6, 934:5
**helpful** [2] - 935:11, 978:19
**helping** [2] - 914:25, 961:15
**hereby** [2] - 976:22, 989:4
**highlighted** [3] - 971:2, 971:10, 973:6
**Hillary** [1] - 927:1
**himself** [7] - 961:2, 961:6, 961:7, 961:9, 961:25, 962:6, 963:20
**history** [1] - 909:24
**Hollywood** [1] - 935:13
**honest** [1] - 927:14
**honestly** [1] - 955:4
**Honor** [47] - 905:1, 905:7, 907:17, 907:23, 908:17, 922:6, 922:23, 925:4, 925:21, 926:21, 935:21, 939:20, 940:2, 940:12, 940:13, 944:21, 944:25, 945:6, 945:15, 945:21, 946:9, 947:13, 949:10, 950:17, 956:6, 957:7, 963:17, 967:7, 967:13, 967:15, 968:9, 968:17, 969:3, 969:6, 969:12, 969:14, 974:15, 975:8, 975:10, 975:24, 976:11, 977:3, 977:15, 977:20, 979:22, 984:23, 985:3
**Honor's** [1] - 944:13
**HONORABLE** [1] - 902:9

**hope** [1] - 908:5
**hour** [1] - 928:25
**hours** [1] - 980:11
**House** [6] - 925:6, 926:1, 970:11, 972:7, 976:15, 984:13
**HPSCI** [3] - 970:23, 972:17, 981:16
**huge** [1] - 941:4
**hum** [1] - 933:11
**hundreds** [1] - 922:21
**hung** [2] - 943:4, 943:16
**hurt** [1] - 935:14
**husher** [1] - 980:4

## I

**Ian** [1] - 902:13
**ID** [1] - 939:7
**idea** [3] - 916:25, 934:8, 954:16
**identification** [3] - 972:14, 973:12, 976:20
**identified** [1] - 977:12
**identifies** [1] - 977:10
**identify** [2] - 905:5, 907:5
**ignore** [1] - 987:9
**II** [4] - 905:22, 973:17, 973:18, 973:23
**III** [3] - 908:18, 909:1, 913:11
**illegal** [1] - 925:23
**immediately** [4] - 935:1, 939:16, 940:4, 941:22
**impact** [2] - 915:15, 917:24
**impeach** [6] - 949:24, 949:25, 950:13, 956:7, 978:7
**impeaching** [1] - 951:6
**impeachment** [1] - 949:19
**important** [4] - 925:8, 926:1, 930:10, 956:1
**impose** [1] - 915:16
**imprisonment** [3] - 915:17, 915:25, 916:4
**IN** [1] - 902:1
**in-court** [1] - 977:23
**inaccurate** [1] - 954:7
**inadmissible** [1] - 943:4
**include** [1] - 972:8
**including** [4] - 906:5, 923:3, 938:11, 962:17
**income** [4] - 954:9, 954:10, 955:2, 964:1
**inconsistent** [3] - 977:23, 978:4, 978:15
**incorporation** [1] - 959:16
**incorrect** [1] - 950:11
**independently** [1] - 974:24
**INDEX** [1] - 904:1
**indicate** [1] - 933:20
**indicated** [16] - 921:9, 921:14, 932:13, 933:16, 936:14, 936:20,

937:3, 937:5, 938:10, 938:14, 946:13, 946:21, 947:7, 952:4, 952:10, 964:22
**indication** [2] - 927:16, 928:1
**indicted** [1] - 912:8
**indictment** [9] - 916:24, 917:5, 917:7, 917:8, 917:10, 983:1, 983:2, 983:17
**individual** [2] - 968:3, 976:23
**inference** [6] - 941:3, 941:23, 942:12, 942:20, 942:23, 943:13
**influence** [2] - 926:9, 973:8
**informal** [1] - 920:10
**information** [84] - 921:9, 921:11, 921:13, 921:15, 921:16, 921:20, 921:21, 921:25, 922:1, 925:16, 926:3, 926:11, 926:25, 927:11, 927:14, 927:18, 927:21, 927:22, 928:2, 928:3, 929:19, 929:20, 930:25, 931:4, 931:25, 932:12, 932:22, 932:24, 933:1, 933:16, 933:19, 933:20, 933:23, 933:25, 934:1, 934:8, 934:12, 935:6, 935:7, 935:10, 935:14, 935:15, 936:15, 936:20, 936:22, 936:25, 937:3, 937:4, 937:7, 937:16, 937:19, 938:4, 938:7, 938:15, 938:18, 940:16, 940:19, 946:13, 946:21, 946:24, 947:2, 947:6, 947:7, 947:9, 947:10, 947:12, 948:17, 959:14, 964:23, 965:1, 966:17, 966:20, 966:24, 967:3, 967:4, 967:21, 967:22, 968:2, 968:4, 968:6, 968:8, 971:18
**Insight** [1] - 909:19
**instance** [1] - 966:21
**institution** [1] - 960:2
**instruct** [1] - 938:1
**instructed** [1] - 944:1
**instruction** [5] - 979:8, 982:12, 982:14, 983:18, 983:24
**instructions** [2] - 980:17, 982:22
**intelligence** [5] - 971:15, 971:20, 972:3, 972:4, 973:9
**Intelligence** [5] - 925:6, 970:11, 971:15, 972:7, 976:16
**intend** [2] - 945:10, 980:25
**intended** [2] - 938:6, 938:9
**intending** [2] - 905:19, 979:3
**intent** [1] - 984:14
**intention** [1] - 964:18
**interact** [3] - 910:6, 919:21, 919:24
**interest** [1] - 926:2
**interested** [3] - 924:17, 925:9
**interference** [1] - 987:3
**intermediaries** [1] - 987:1
**intermediary** [1] - 973:9

**international** [1] - 911:2
**interrogatories** [1] - 983:23
**interviews** [5] - 915:6, 948:1, 948:3, 948:5, 948:22
**introduce** [8] - 941:1, 941:2, 944:17, 977:2, 978:20, 979:3, 980:13, 988:4
**introduced** [2] - 942:1, 980:16
**introducing** [1] - 942:4
**investigating** [3] - 926:2, 926:3, 987:3
**investigation** [2] - 916:14, 926:2
**involved** [5] - 911:5, 911:8, 934:11, 957:11, 961:11
**involving** [1] - 961:13
**issue** [6] - 942:19, 958:5, 960:14, 963:7, 982:24, 983:22
**issues** [5] - 908:8, 944:8, 944:9, 948:6, 982:18
**itself** [1] - 907:2

## J

**JACKSON** [1] - 902:9
**Jackson** [1] - 918:17
**JANICE** [1] - 989:4
**Janice** [2] - 903:14, 989:12
**JaniceDickmanDCD@gmail.com** [1] - 903:17
**January** [3] - 910:18, 910:19, 951:15
**Jared** [4] - 932:1, 932:2, 932:3
**Jason** [2] - 902:6, 934:14
**Jed** [2] - 902:14, 905:9
**job** [4] - 909:14, 910:19, 910:22, 912:3
**jobs** [1] - 909:13
**John** [2] - 902:14, 946:15
**joined** [1] - 920:25
**joining** [2] - 912:5, 920:4
**Jon** [1] - 902:15
**Jonathan** [2] - 902:13, 905:8
**jonathan.kravis3@usdoj.gov** [1] - 902:18
**Jr** [1] - 902:6
**Judge** [3] - 905:13, 918:17, 981:3
**judge** [5] - 915:18, 918:8, 918:15, 918:16
**JUDGE** [2] - 902:9, 902:10
**judicial** [1] - 986:20
**Julian** [7] - 921:6, 921:24, 922:5, 925:12, 926:24, 927:9, 965:21
**July** [20] - 911:19, 933:4, 933:5, 933:10, 933:12, 933:14, 934:4, 934:5, 934:7, 934:21, 934:23, 935:1, 937:16, 937:18, 938:18, 938:25, 939:1, 939:3, 966:18,

970:5
**June** [16] - 911:24, 921:23, 921:25, 926:25, 927:24, 928:9, 928:17, 928:18, 929:5, 929:6, 930:1, 930:3, 931:17, 932:16, 932:19
**jurisdiction** [1] - 917:8
**jurors** [6] - 908:1, 908:3, 968:24, 969:9, 980:23, 982:16
**JURY** [2] - 902:4, 902:8
**jury** [32] - 907:8, 907:14, 907:24, 925:13, 944:1, 945:16, 950:7, 968:20, 969:8, 970:16, 970:21, 973:1, 975:19, 975:22, 976:4, 976:18, 977:6, 977:16, 978:8, 979:8, 979:11, 981:18, 982:5, 982:7, 982:12, 982:13, 982:22, 983:3, 983:4, 987:25, 988:3

## K

**Keefe** [1] - 905:11
**keep** [2] - 960:15, 962:1
**Kelly** [1] - 909:15
**key** [1] - 973:7
**kind** [6] - 910:25, 927:13, 929:18, 953:3, 963:2, 983:10
**knowledge** [5] - 922:14, 922:15, 922:16, 965:21, 965:22
**KRAVIS** [34] - 905:7, 905:17, 906:4, 907:16, 907:22, 969:14, 969:24, 973:1, 973:4, 974:15, 975:10, 975:15, 975:20, 975:24, 976:1, 976:11, 976:22, 977:3, 977:15, 977:20, 978:1, 978:13, 978:23, 979:22, 979:24, 984:23, 985:3, 985:10, 985:15, 985:18, 985:21, 986:2, 986:7, 986:9
**Kravis** [2] - 902:13, 905:8
**kravis...............969** [1] - 904:6
**Kushner** [6] - 923:8, 932:3, 932:7, 932:9, 932:10, 932:14
**Kushner's** [2] - 932:4, 932:11

## L

**laboring** [1] - 983:15
**lack** [1] - 922:13
**LaGuardia** [1] - 952:24
**large** [1] - 933:6
**largely** [3] - 909:12, 911:2, 982:19
**Las** [2] - 903:6, 903:10
**last** [9] - 906:9, 913:7, 954:5, 970:2, 973:25, 974:1, 981:7, 985:5, 986:14
**latter** [1] - 938:25
**Lauderdale** [4] - 902:22, 903:4, 903:7, 903:11

# M

**laundering** [2] - 954:22, 955:16
**law** [4] - 923:22, 932:10, 980:17
**LAW** [2] - 902:21, 903:9
**lawyer** [2] - 913:15, 950:2
**lay** [1] - 950:1
**laying** [1] - 925:25
**lead** [1] - 956:14
**leadership** [6] - 922:24, 923:1, 923:8, 927:4, 929:10, 935:3
**leading** [2] - 919:18, 973:9
**leak** [2] - 966:24, 966:25
**leaked** [4] - 927:18, 928:4, 934:8, 934:13
**learned** [2] - 941:23, 942:23
**least** [3] - 954:8, 979:2, 980:10
**leave** [3] - 968:21, 968:24, 980:23
**leaving** [1] - 963:5
**lectern** [2] - 905:5, 963:5
**left** [2] - 920:18, 966:8
**leg** [1] - 929:21
**legal** [1] - 980:1
**less** [4] - 907:2, 937:8, 962:22, 965:6
**letter** [4] - 917:1, 918:2, 918:4, 918:5, 918:7, 918:8
**level** [2] - 924:4, 924:10
**levels** [2] - 923:12, 926:17
**leverage** [1] - 986:25
**liability** [1] - 954:20
**lie** [7] - 917:21, 917:24, 957:19, 958:11, 962:20, 963:24, 964:3
**likely** [1] - 905:18
**limine** [1] - 905:23
**line** [2] - 956:18
**line-by-line** [1] - 956:18
**list** [2] - 917:25, 985:10
**listed** [1] - 914:3
**listen** [2] - 980:4, 982:7
**lists** [2] - 966:6, 966:11
**litany** [1] - 962:17
**live** [2] - 909:5, 909:6
**lived** [1] - 917:2
**loan** [7] - 959:15, 960:9, 960:15, 962:6, 962:23, 962:25, 963:20
**loans** [13] - 959:9, 959:19, 959:20, 959:23, 959:25, 960:1, 960:11, 960:16, 960:19, 960:20, 961:2, 961:5, 961:17
**location** [1] - 976:3
**logistical** [2] - 919:15, 980:2
**look** [4] - 907:11, 907:18, 950:9, 982:23
**looks** [1] - 950:12
**lunch** [5] - 979:12, 980:6, 980:21, 987:24, 988:2
**lying** [4] - 915:10, 925:5, 925:13, 962:17

**ma'am** [1] - 958:6
**mail** [19] - 902:18, 902:18, 902:19, 902:23, 903:5, 903:8, 903:12, 903:17, 928:6, 928:8, 928:9, 928:11, 928:14, 928:15, 928:16, 931:10, 931:12, 931:14, 966:2
**main** [1] - 920:20
**majority** [1] - 984:20
**malign** [1] - 973:8
**man** [2] - 944:14, 958:19
**Manafort** [60] - 909:15, 909:23, 909:25, 910:2, 910:7, 910:9, 910:10, 910:13, 910:15, 910:17, 910:20, 910:24, 910:25, 911:3, 911:15, 911:20, 912:6, 914:19, 914:25, 917:11, 920:4, 920:22, 923:4, 923:6, 924:6, 932:21, 932:23, 933:18, 934:14, 935:17, 935:25, 936:7, 936:8, 936:13, 936:17, 936:18, 936:21, 937:10, 937:12, 937:14, 938:1, 938:6, 938:9, 938:14, 949:7, 954:25, 957:12, 958:19, 959:1, 959:10, 959:13, 959:17, 959:21, 960:12, 960:21, 961:13, 962:2, 962:3, 966:22
**manafort** [3] - 911:25, 919:18, 957:10
**Manafort's** [6] - 910:22, 935:19, 957:15, 959:12, 963:14, 964:3
**manafort's** [3] - 919:17, 935:20, 959:4
**manager** [4] - 911:13, 911:14, 912:4, 919:14
**Marando** [2] - 902:14, 905:9
**March** [2] - 911:10, 911:12
**marked** [6] - 972:13, 973:11, 976:2, 985:1, 986:13, 987:6
**Mary** [1] - 909:9
**master** [1] - 909:9
**material** [1] - 947:4
**materiality** [2] - 984:15, 987:4
**materialized** [1] - 934:10
**materials** [2] - 918:25, 964:18
**matter** [7] - 924:15, 940:14, 941:1, 942:1, 942:3, 957:1, 963:11
**matters** [8] - 905:16, 925:10, 931:7, 956:1, 974:19, 977:14, 980:2, 980:19
**maximum** [5] - 915:20, 915:24, 915:25, 916:3, 916:6
**mean** [19] - 924:11, 933:1, 935:12, 935:13, 941:18, 942:9, 942:17, 943:15, 944:6, 944:10, 944:20, 945:10, 951:5, 951:22, 972:22, 979:1, 979:6, 980:14

**means** [1] - 980:13
**meant** [3] - 906:24, 956:24, 987:2
**measures** [2] - 986:24, 987:3
**media** [2] - 967:2, 987:1
**meet** [10] - 918:22, 919:2, 919:5, 919:8, 944:5, 948:10, 948:19, 949:17, 950:1
**meeting** [1] - 915:7
**meets** [1] - 944:4
**members** [1] - 968:20
**mention** [1] - 966:1
**mentioned** [10] - 909:24, 910:9, 910:12, 911:16, 917:4, 918:1, 918:10, 946:23, 946:25, 975:3
**messages** [3] - 929:25, 930:3, 931:21
**met** [4] - 947:20, 947:21, 948:16, 949:1
**Michael** [2] - 902:14, 905:9
**michael.marando@usdoj.gov** [1] - 902:19
**Michelle** [2] - 904:5, 969:13
**MICHELLE** [1] - 969:21
**mid** [1] - 968:19
**mid-morning** [1] - 968:19
**middle** [1] - 953:9
**might** [4] - 929:20, 938:4, 945:6, 947:4
**Miller** [3] - 923:8, 934:14, 934:15
**million** [1] - 957:12
**mind** [3] - 907:19, 941:20, 956:9
**minute** [2] - 981:7, 986:18
**minutes** [6] - 953:2, 969:1, 981:17, 981:21, 981:23, 981:25
**misrepresented** [1] - 964:1
**modify** [1] - 922:23
**moment** [7] - 921:4, 921:23, 933:9, 933:12, 938:22, 972:11, 972:14
**momentarily** [1] - 981:4
**money** [5] - 954:22, 954:25, 955:16, 958:25, 959:3
**months** [1] - 937:16
**Morning** [1] - 902:5
**morning** [21] - 905:1, 905:2, 905:7, 905:12, 905:13, 905:18, 908:2, 908:4, 908:23, 908:24, 947:18, 968:19, 968:21, 969:25, 970:1, 974:22, 974:23, 982:16, 984:3, 985:8, 986:10
**mortgage** [2] - 960:4, 962:24
**most** [1] - 954:3
**motion** [5] - 905:23, 980:25, 981:2, 981:10, 984:7
**motive** [3] - 925:5, 925:13, 925:17
**motorcade** [1] - 953:2
**mouth** [2] - 942:25, 943:1

**move** [10] - 935:24, 938:17, 950:5, 951:4, 975:16, 977:6, 977:25, 978:4, 981:11, 985:22
**moved** [3] - 981:14, 985:14, 987:6
**moves** [4] - 972:18, 974:12, 977:4, 977:16
**movie** [8] - 906:4, 906:6, 906:23, 973:22, 973:25, 974:2, 974:7, 974:9
**moving** [3] - 914:16, 918:18, 950:8
**MR** [179] - 905:7, 905:13, 905:17, 906:4, 906:16, 907:16, 907:22, 908:16, 908:22, 912:25, 913:2, 913:7, 913:9, 913:20, 913:22, 914:6, 914:8, 916:17, 916:18, 921:18, 922:6, 922:8, 922:15, 922:20, 922:23, 923:6, 923:21, 924:12, 924:20, 924:24, 925:4, 925:21, 925:22, 925:24, 926:21, 926:23, 928:5, 928:7, 929:24, 930:2, 931:9, 931:11, 935:21, 935:23, 939:20, 940:2, 940:3, 940:9, 940:12, 940:13, 941:7, 942:9, 942:22, 943:10, 944:12, 944:20, 944:25, 945:2, 945:5, 945:14, 945:21, 945:23, 946:1, 946:9, 946:10, 947:13, 947:16, 948:8, 948:13, 948:15, 949:10, 949:14, 949:21, 950:8, 950:16, 950:17, 951:7, 951:10, 951:14, 954:15, 955:14, 955:24, 956:6, 956:21, 957:5, 957:7, 957:9, 957:16, 958:10, 959:22, 960:3, 960:6, 960:10, 960:18, 961:3, 961:7, 961:16, 962:10, 962:14, 963:8, 963:17, 963:23, 964:14, 964:16, 967:7, 967:13, 967:15, 967:17, 968:9, 968:11, 968:17, 969:3, 969:12, 969:14, 969:24, 970:15, 970:19, 971:3, 971:6, 971:12, 971:17, 972:2, 972:6, 972:10, 972:12, 972:18, 972:21, 972:24, 973:1, 973:4, 974:11, 974:15, 974:21, 975:8, 975:10, 975:15, 975:20, 975:24, 976:1, 976:11, 976:22, 977:3, 977:15, 977:20, 978:1, 978:6, 978:13, 978:23, 978:25, 979:4, 979:6, 979:16, 979:20, 979:22, 979:24, 981:3, 981:7, 981:11, 981:22, 982:4, 982:7, 982:10, 984:4, 984:17, 984:19, 984:23, 985:3, 985:10, 985:15, 985:18, 985:21, 986:2, 986:4, 986:7, 986:9, 986:22, 987:11, 987:16, 987:19
**multi** [1] - 986:25
**multi-facetted** [1] - 986:25

**Murphy** [2] - 931:25, 932:14

# N

**N.W** [1] - 989:13
**name** [3] - 908:25, 910:9, 970:7
**named** [2] - 909:25, 976:23
**names** [1] - 923:9
**National** [12] - 911:19, 929:7, 929:11, 929:15, 930:23, 931:3, 931:18, 933:7, 934:22, 935:16, 970:4, 970:9
**nature** [1] - 921:17
**NE** [1] - 902:21
**necessarily** [1] - 960:16
**necessary** [1] - 977:25
**need** [16] - 908:9, 923:13, 928:13, 931:25, 946:7, 949:15, 949:16, 950:13, 950:22, 960:16, 975:18, 980:2, 980:7, 982:18, 984:2
**needed** [4] - 929:1, 929:3, 962:16, 984:1
**needs** [4] - 924:2, 924:8, 982:25, 983:14
**never** [9] - 921:10, 927:15, 947:7, 947:25, 949:5, 949:8, 952:10, 958:15, 964:22
**next** [9] - 907:21, 907:22, 908:15, 926:20, 969:1, 969:10, 971:7, 979:13, 980:1
**night** [1] - 974:1
**nonconsecutive** [1] - 985:6
**none** [2] - 908:6, 908:7
**nonpublic** [2] - 934:1, 947:10
**note** [1] - 963:5
**notebooks** [1] - 968:22
**noted** [3] - 906:13, 906:20, 945:6
**notes** [1] - 989:6
**nothing** [10] - 907:23, 933:17, 934:3, 934:4, 934:10, 936:21, 937:17, 967:13, 968:9, 975:8
**notice** [1] - 986:20
**noting** [1] - 906:19
**November** [2] - 902:6, 989:8
**number** [13] - 909:17, 923:15, 925:25, 929:20, 939:7, 948:6, 951:17, 952:4, 952:5, 967:24, 977:9, 980:1, 983:17
**Number** [2] - 905:2, 969:7
**numbers** [1] - 977:5
**NW** [2] - 902:16, 903:15

# O

**oar** [1] - 983:15
**oath** [1] - 969:18
**object** [7] - 906:18, 922:6, 924:21, 939:24, 940:8, 978:5, 978:6
**objected** [1] - 981:13
**objection** [24] - 906:10, 906:12, 906:14, 906:16, 906:19, 907:12, 922:13, 935:21, 939:20, 940:23, 944:10, 944:21, 948:8, 949:10, 955:24, 956:5, 960:3, 960:5, 963:19, 964:14, 972:20, 972:23, 972:24, 979:2
**objectionable** [3] - 907:3, 941:6, 962:22
**objects** [1] - 950:18
**observed** [1] - 922:25
**obstructed** [1] - 983:21
**obstruction** [1] - 983:17
**obstructive** [1] - 983:20
**obtaining** [1] - 970:8
**obviously** [2] - 937:24, 985:22
**occasion** [1] - 938:3
**occasions** [5] - 949:4, 951:25, 952:4, 967:24, 968:2
**occurred** [1] - 976:16
**October** [1] - 946:14
**OF** [6] - 902:1, 902:8, 902:16, 902:21, 903:9, 989:2
**offered** [4] - 941:11, 941:13, 942:10, 942:15
**offering** [3] - 942:20, 942:21, 942:25
**OFFICE** [3] - 902:15, 902:21, 903:9
**Office** [2] - 905:10, 915:6
**official** [1] - 914:15
**OFFICIAL** [1] - 989:2
**Official** [2] - 903:14, 989:12
**often** [1] - 971:21
**Olas** [2] - 903:6, 903:10
**old** [2] - 909:3, 909:4
**once** [6] - 973:20, 973:21, 973:23, 973:24, 978:15
**one** [36] - 905:21, 908:11, 909:16, 910:10, 914:23, 914:25, 915:1, 915:22, 920:21, 926:1, 926:15, 927:10, 928:8, 928:18, 929:2, 929:4, 930:6, 937:19, 945:5, 953:20, 958:13, 958:14, 958:15, 958:16, 960:13, 960:14, 962:24, 968:17, 971:14, 976:18, 977:9, 978:12, 982:24, 987:6
**One** [1] - 903:2
**ones** [1] - 984:25
**online** [2] - 970:7, 971:19
**open** [9] - 926:22, 945:25, 951:13, 956:7, 956:22, 957:8, 963:18, 979:23, 982:19
**open-ended** [2] - 956:7, 956:22
**opportunity** [1] - 907:11
**oppose** [2] - 916:24, 918:11
**order** [1] - 960:19
**organization** [1] - 970:4

1000

**original** [1] - 984:21
**out-of-court** [2] - 941:15, 977:22
**outcome** [1] - 964:13
**outright** [1] - 943:21
**outside** [3] - 943:2, 944:18, 969:2
**overhear** [2] - 935:25, 936:6
**overruled** [1] - 906:13

## P

**P.A** [3] - 902:21, 903:2, 903:6
**pa.com** [1] - 903:5
**page** [24] - 906:22, 913:7, 913:8, 913:17, 913:20, 915:22, 916:17, 929:24, 970:17, 970:24, 971:7, 971:8, 971:10, 971:23, 972:1, 972:17, 981:24, 982:1, 985:7, 986:10, 986:23
**pages** [5] - 985:5, 985:6, 986:15, 986:16, 986:21
**paid** [2] - 958:22, 958:24
**Paige** [1] - 903:9
**paragraph** [4] - 914:3, 914:7, 914:9, 973:5
**paraphrases** [1] - 983:11
**pardon** [1] - 958:23
**Part** [2] - 973:18, 973:22
**part** [9] - 911:18, 912:19, 916:9, 916:19, 924:14, 934:17, 934:19, 938:25, 954:5
**participated** [1] - 961:14
**particular** [5] - 926:14, 956:9, 958:4, 973:22, 987:5
**parties** [8] - 911:4, 976:7, 976:13, 976:20, 976:22, 977:13, 980:2, 980:18
**parties'** [1] - 983:25
**partner** [2] - 909:19, 910:23
**Partners** [4] - 909:23, 910:21, 910:24, 910:25
**partners** [1] - 910:11
**partnership's** [1] - 963:14
**party** [3] - 911:18, 973:8, 987:1
**passed** [2] - 921:11
**passenger** [1] - 953:21
**past** [1] - 920:2
**Paul** [5] - 910:10, 910:17, 910:22, 911:15, 912:6
**pause** [1] - 967:10
**pay** [1] - 959:3
**paying** [1] - 963:12
**Penalties** [2] - 913:24, 914:4
**penalties** [3] - 915:20, 915:24, 916:3
**penalty** [2] - 915:16, 915:25
**pending** [1] - 927:1
**Pentangeli** [2] - 906:23, 973:16, 974:8

**people** [13] - 920:12, 920:13, 922:21, 923:17, 926:4, 926:6, 938:10, 952:5, 953:15, 965:14, 965:16, 966:22, 980:8
**perceive** [2] - 937:12, 937:14
**percent** [2] - 923:17, 945:3
**perhaps** [2] - 983:14, 988:1
**period** [7] - 933:9, 934:25, 938:17, 949:1, 959:9, 973:9, 980:9
**periods** [1] - 949:2
**Permanent** [1] - 976:15
**permitted** [1] - 905:25
**person** [5] - 921:19, 921:21, 923:15, 925:8, 968:3
**persona** [2] - 970:7, 970:12
**personal** [8] - 922:14, 922:15, 922:16, 954:14, 955:19, 957:19, 960:16, 965:22
**pertain** [1] - 954:3
**pertaining** [2] - 948:3, 954:25
**phone** [21] - 919:25, 936:4, 936:8, 936:11, 938:19, 938:22, 938:23, 939:4, 939:6, 939:7, 939:8, 939:14, 940:4, 943:4, 944:15, 946:2, 946:6, 946:11, 977:5, 977:9
**piece** [2] - 927:13, 952:5
**pilot** [1] - 965:15
**place** [2] - 938:24, 952:22
**Plaintiff** [3] - 902:4, 902:13, 904:12
**plan** [2] - 940:19, 988:4
**plane** [3] - 965:14, 965:18, 965:20
**planning** [5] - 945:18, 977:2, 978:20, 979:10, 980:13
**platforms** [1] - 986:25
**play** [1] - 982:2
**played** [1] - 973:7
**Plaza** [1] - 903:2
**plea** [14] - 912:19, 913:6, 913:13, 913:15, 913:18, 915:5, 915:13, 916:19, 917:18, 917:19, 917:22, 918:10, 948:3, 956:16
**plead** [2] - 912:17, 914:1
**pleading** [1] - 988:6
**pleasant** [1] - 908:5
**pled** [6] - 912:16, 912:18, 914:2, 915:2, 915:18, 916:2
**plenty** [1] - 962:6
**Podesta** [3] - 946:15, 947:1, 966:25
**podium** [1] - 967:11
**point** [28] - 920:16, 920:23, 920:25, 921:10, 922:25, 931:4, 932:5, 932:21, 933:17, 934:3, 934:6, 934:9, 936:14, 936:21, 941:20, 945:13, 945:14, 945:18, 945:20, 946:19, 978:9, 978:10,

980:7, 980:19, 986:17, 986:19, 987:6, 987:13
**points** [1] - 920:20
**policy** [1] - 934:16
**political** [6] - 909:12, 909:14, 911:2, 911:4, 911:17, 955:1
**portion** [5] - 970:20, 974:2, 977:16, 981:16, 981:20
**portions** [5] - 981:22, 984:13, 985:11, 985:21, 985:25
**position** [3] - 923:18, 985:15
**positions** [1] - 983:25
**possible** [2] - 916:3, 982:22
**potential** [2] - 915:20, 916:25
**potentially** [2] - 928:3, 930:25
**predicate** [1] - 950:23
**predicted** [1] - 947:1
**prediction** [2] - 940:16, 943:12
**predictions** [2] - 934:18, 934:20
**prejudice** [1] - 906:12
**prejudicial** [2] - 941:16, 983:3
**preliminary** [1] - 905:16
**preparation** [1] - 948:4
**prepare** [7] - 918:22, 919:3, 919:5, 919:9, 948:11, 948:19, 961:15
**prepared** [4] - 958:11, 959:12, 972:7
**preparer** [1] - 958:11
**preparing** [1] - 959:15
**presence** [1] - 975:19
**present** [4] - 905:3, 908:3, 926:16, 927:4
**presented** [1] - 981:13
**preserve** [1] - 978:24
**president** [3] - 943:16, 943:17
**President** [1] - 945:1
**president's** [2] - 942:25, 943:1
**presidential** [2] - 911:17, 973:10
**press** [3] - 934:20, 968:7, 971:4
**pressure** [2] - 937:12, 937:14
**pretrial** [1] - 985:12
**previous** [1] - 913:17
**previously** [3] - 913:1, 969:22, 976:2
**primarily** [3] - 919:25, 920:21, 966:6
**primary** [3] - 910:10, 910:23, 921:19
**print** [1] - 987:21
**printer** [1] - 987:17
**private** [1] - 933:22
**privately** [1] - 946:23
**probation** [2] - 916:25, 918:12
**problematical** [1] - 983:2
**proceed** [2] - 908:9, 979:25
**proceeding** [3] - 919:6, 919:9, 919:10

**proceedings** [5] - 918:20, 918:23, 919:3, 919:4, 989:7
**process** [1] - 950:14
**professed** [1] - 926:9
**professing** [1] - 926:11
**professors** [2] - 923:23, 924:1
**progressing** [1] - 919:18
**prohibited** [1] - 942:7
**promise** [1] - 916:12
**promised** [6] - 916:13, 916:15, 916:23, 916:24, 968:20
**promises** [3] - 916:10, 916:20, 916:22
**promoted** [2] - 919:14, 919:20
**promotion** [1] - 911:25
**proof** [1] - 927:17
**proper** [1] - 950:21
**propose** [1] - 906:8
**proposed** [1] - 979:8
**prosecute** [1] - 957:4
**prosecuted** [6] - 955:3, 955:8, 955:23, 956:9, 956:18, 961:20
**prosecution** [1] - 956:11
**prove** [2] - 926:8, 943:21
**provide** [2] - 916:15, 938:7
**provided** [4] - 918:7, 928:2, 983:9
**public** [15] - 933:21, 933:23, 933:24, 933:25, 937:25, 947:6, 947:8, 964:17, 964:19, 964:20, 966:14, 967:2, 968:6, 971:4, 987:7
**publication** [1] - 927:1
**publicly** [2] - 926:10, 946:23
**publish** [4] - 970:15, 973:1, 981:15, 981:17
**publishing** [1] - 907:8
**punishment** [1] - 916:25
**punishments** [1] - 917:25
**purpose** [1] - 942:10
**purposes** [1] - 918:9
**pursuant** [1] - 974:13
**put** [11] - 907:1, 917:10, 936:8, 940:13, 943:14, 951:3, 956:11, 961:20, 963:16, 970:24, 985:18
**putting** [2] - 945:11, 951:23

## Q

**questioned** [5] - 948:1, 948:6, 951:15, 951:17, 951:18
**questioning** [2] - 948:25, 949:3
**questions** [21] - 926:1, 947:13, 947:18, 949:3, 950:13, 951:19, 951:21, 952:12, 956:23, 957:3, 961:10, 961:18, 961:21, 962:13, 962:22, 963:4, 963:11, 966:10, 967:18, 971:19, 974:17
  **quite** [1] - 936:19

## R

**raised** [1] - 908:11
**raising** [1] - 978:23
**rather** [1] - 978:21
**reach** [1] - 932:13
**reaching** [1] - 952:5
**reaction** [10] - 923:13, 923:19, 924:3, 924:9, 924:16, 926:19, 927:7, 927:8, 927:24, 935:19
**read** [22] - 907:8, 928:21, 929:1, 931:24, 962:15, 962:16, 971:1, 971:9, 971:25, 973:5, 975:21, 976:4, 976:8, 976:18, 977:5, 977:24, 978:2, 979:14, 981:2, 984:6, 987:15
  **reading** [1] - 962:14
**ready** [1] - 980:11
**real** [1] - 932:24
**realize** [1] - 971:19
**really** [1] - 936:22
**reasonable** [1] - 982:20
**Recalled** [1] - 904:5
**recalling** [1] - 969:6
**received** [3] - 909:8, 955:2, 966:13, 966:14, 980:16
**recently** [1] - 906:5
**receptive** [1] - 925:9
**Recess** [1] - 988:8
**recess** [1] - 969:5
**recognize** [4] - 913:3, 936:9, 972:16, 973:13
**recollection** [2] - 928:1, 951:5
**reconvene** [1] - 984:9
**record** [10] - 905:6, 908:25, 939:25, 945:6, 945:7, 961:21, 962:5, 963:22, 978:3, 986:9
**records** [1] - 916:16
**redaction** [1] - 974:12
**redactions** [1] - 907:12
**redid** [1] - 958:17
**Redirect** [1] - 904:4
**redirect** [1] - 967:14
**REDIRECT** [1] - 967:16
**redone** [1] - 983:14
**refer** [5] - 923:5, 923:6, 923:7, 984:18
  **reference** [1] - 968:3
**referenced** [2] - 976:24, 977:17
**referencing** [1] - 966:16
**referring** [1] - 958:13
**reflects** [1] - 907:7
**refreshing** [1] - 951:5
**regard** [5] - 951:19, 955:9, 955:10, 962:16, 965:22
**regarding** [11] - 915:7, 921:19, 929:11, 931:2, 945:9, 947:21, 947:22, 948:17, 976:3, 976:19, 977:5

**regards** [1] - 939:18
**registering** [1] - 914:23
**registration** [3] - 914:24, 966:6, 966:11
**registrations** [1] - 914:24
**related** [13] - 917:9, 921:25, 932:7, 932:9, 933:6, 935:9, 938:2, 946:15, 948:6, 957:13, 960:9, 961:25, 962:13
**relates** [1] - 963:6, 977:9
**relating** [2] - 942:17, 942:18
**relationship** [3] - 920:14, 920:19, 925:7
**relatively** [1] - 981:23
**release** [20] - 933:10, 933:13, 933:15, 934:19, 934:20, 934:22, 935:1, 935:3, 935:5, 935:16, 935:24, 938:18, 939:1, 939:3, 946:20, 947:1, 964:18, 965:23, 967:21, 970:3
**released** [7] - 922:2, 933:6, 946:14, 946:17, 964:21, 967:3, 967:5
**releases** [6] - 933:1, 942:4, 943:17, 943:19, 968:7, 968:8
**releasing** [1] - 933:21
**relevance** [8] - 906:12, 906:24, 922:14, 924:20, 924:21, 925:1, 944:8
**relevant** [4] - 905:22, 926:8, 941:16, 943:22
**relying** [1] - 987:8
**remain** [1] - 969:18
**remark** [1] - 939:18
**remember** [9] - 921:24, 938:23, 939:4, 951:15, 951:16, 951:18, 951:23, 952:7, 970:2
**remind** [2] - 969:17, 970:21
**remove** [1] - 907:1
**renewed** [1] - 985:1
**repeat** [1] - 946:7
**reply** [1] - 936:17
**report** [11] - 972:7, 972:17, 984:13, 984:21, 985:6, 985:11, 986:16, 986:20, 986:21, 987:6
**reported** [3] - 954:9, 954:10, 954:16
**REPORTER** [1] - 989:2
**Reporter** [3] - 903:14, 903:14, 989:12
**reporting** [3] - 915:1, 955:1, 971:4
**Representatives** [1] - 976:15
**Republican** [1] - 911:19
**request** [1] - 981:15
**requests** [1] - 959:15
**required** [1] - 914:1
**requires** [1] - 983:23
**research** [2] - 908:8, 908:13
**reserve** [1] - 981:10

**resolve** [4] - 907:13, 912:12, 978:13
**respect** [12] - 914:9, 914:12, 937:15, 948:24, 974:18, 977:13, 983:6, 983:9, 983:16, 983:22, 984:20, 985:16
**respective** [1] - 911:18
**respond** [2] - 930:13, 934:9
**responded** [2] - 925:16, 928:22
**response** [3] - 925:11, 934:1, 972:5
**responses** [1] - 966:14
**responsible** [3] - 911:3, 919:15, 966:7
**rest** [2] - 978:24, 981:18
**resting** [1] - 979:7
**rests** [3] - 979:11, 979:24, 980:12
**Rests**.......................................
**.979** [1] - 904:12
**result** [1] - 954:20
**resume** [5] - 968:21, 968:25, 980:8, 987:23, 988:1
**return** [3] - 957:19, 957:25, 980:7
**returns** [16] - 914:25, 954:4, 954:6, 954:7, 954:9, 954:13, 954:14, 955:2, 955:19, 957:11, 957:13, 957:15, 957:17, 958:5, 958:12, 958:17
**review** [3] - 918:25, 974:3, 974:6
**reviewed** [1] - 977:10
**revised** [2] - 980:10, 985:2
**revoked** [1] - 917:19
**Richard** [3] - 904:3, 909:1, 913:10
**RICHARD** [2] - 908:18, 909:1
**Richmond** [1] - 909:6
**Rick** [1] - 908:16
**ride** [1] - 953:1
**rise** [1] - 941:23
**RMR** [1] - 903:14
**road** [1] - 936:16
**Robert** [2] - 903:1, 905:13
**Roger** [17] - 902:6, 905:3, 910:3, 920:1, 921:5, 930:9, 933:14, 940:22, 943:24, 946:18, 948:1, 948:17, 949:3, 950:24, 969:7, 976:14, 976:23
**Rogow** [7] - 902:20, 905:14, 947:17, 950:20, 956:9, 960:5, 962:21
**ROGOW** [57] - 902:21, 922:6, 922:8, 922:15, 922:20, 923:21, 924:12, 924:20, 924:24, 925:22, 925:24, 926:21, 935:21, 939:20, 940:9, 940:12, 941:7, 942:9, 942:22, 943:10, 944:12, 944:20, 947:16, 948:13, 948:15, 949:14,

949:21, 950:8, 950:16, 951:7, 951:10, 951:14, 954:15, 955:14, 956:21, 957:5, 957:9, 957:16, 958:10, 959:22, 960:6, 960:10, 960:18, 961:3, 961:7, 961:16, 962:10, 962:14, 963:8, 963:23, 964:16, 967:7, 967:13, 972:21, 972:24, 974:21, 975:8
**Rogow**.................**947** [1] - 904:4
**Rogow**.................**974** [1] - 904:6
**Rohde** [3] - 905:10, 914:6, 929:25
**role** [12] - 911:12, 919:12, 919:17, 920:7, 920:9, 920:10, 925:7, 925:8, 932:4, 937:8, 966:5, 973:7
**room** [5] - 906:19, 907:14, 979:18, 983:3, 983:4
**Room** [2] - 903:15, 989:13
**roughly** [1] - 953:2
**Routman** [2] - 903:9, 905:14
**ROUTMAN** [1] - 903:9
**routmanc@gmail.com** [1] - 903:12
**row** [1] - 953:22
**rule** [4] - 941:6, 942:7, 978:14, 979:3
**Rule** [3] - 979:7, 981:3, 984:7
**ruled** [3] - 905:24, 985:19, 985:21
**rules** [3] - 944:6, 944:18, 978:18
**ruling** [2] - 905:23, 978:20
**rulings** [1] - 974:14
**rumored** [1] - 937:17
**Russia** [1] - 971:4
**Russian** [9] - 929:8, 929:16, 930:24, 971:15, 972:4, 973:9, 974:25, 987:3
**Russian's** [1] - 973:7
**Russians** [1] - 986:24

**S**

**S.E** [1] - 903:3
**sat** [1] - 967:12
**saw** [2] - 939:7, 973:25
**scene** [10] - 905:22, 907:2, 907:6, 907:7, 907:10, 973:16, 973:22, 973:23, 973:25, 974:9
**scheduling** [1] - 979:17
**SCHIFF** [1] - 972:2
**school** [2] - 923:22
**Scientific** [1] - 909:20
**screen** [1] - 970:24
**seat** [4] - 953:8, 953:9, 953:20, 953:21
**second** [13] - 914:12, 914:25, 915:2, 915:13, 915:15, 915:16,

917:5, 917:7, 917:8, 922:11, 955:11, 958:16, 981:25
**seconds** [3] - 965:6, 981:24, 981:25
**Secret** [2] - 953:16, 953:17, 965:16
**section** [1] - 913:23
**secure** [2] - 960:11, 960:19
**see** [12] - 908:3, 913:10, 913:23, 930:3, 932:24, 942:6, 942:7, 943:25, 963:2, 963:6, 979:2, 982:16
**seeing** [1] - 977:11
**seek** [2] - 959:14, 960:1
**seeking** [5] - 941:1, 941:2, 941:10, 959:9, 959:16
**Select** [1] - 976:15
**send** [2] - 907:14, 983:3
**sending** [1] - 983:2
**senior** [9] - 923:7, 923:11, 924:4, 924:10, 926:17, 927:4, 929:10, 932:6, 935:2
**sense** [2] - 907:15, 907:16
**sent** [4] - 906:8, 928:15, 928:16, 930:3
**sentence** [4] - 918:11, 918:14, 918:15, 918:16
**sentenced** [1] - 964:6
**sentencing** [1] - 918:9
**separate** [1] - 916:24
**September** [1] - 976:16
**series** [2] - 914:20, 965:25
**serious** [1] - 944:10
**seriously** [1] - 944:11
**served** [2] - 920:3, 973:8
**Service** [3] - 953:16, 953:17, 965:16
**services** [1] - 971:16
**Session** [1] - 902:5
**sessions** [4] - 934:5, 934:7, 934:12, 934:17
**set** [2] - 958:19, 964:7
**several** [2] - 906:5, 951:25
**shaking** [1] - 908:10
**shortly** [3] - 919:19, 935:24, 938:17
**show** [2] - 949:9, 972:13
**showed** [3] - 985:5, 985:7, 986:13
**showing** [2] - 986:9, 986:12
**shown** [2] - 965:25, 984:25
**sic** [1] - 914:24
**side** [1] - 935:15
**sides** [1] - 978:19
**sign** [3] - 913:13, 913:15, 913:18
**signature** [1] - 913:10
**signed** [2] - 975:21, 976:20
**Simcha** [1] - 902:15

**similar** [2] - 935:12, 983:8
**simply** [3] - 949:22, 952:7, 977:9
**single** [1] - 985:7
**sitting** [3] - 953:5, 953:6, 953:19
**Smith** [3] - 903:5, 905:14, 963:5
**smoke** [1] - 906:19
**smoke-filled** [1] - 906:19
**snips** [1] - 982:20
**social** [1] - 987:1
**someone** [2] - 941:17, 949:20
**sometimes** [2] - 962:2
**somewhat** [1] - 920:17
**son** [1] - 932:10
**son-in-law** [1] - 932:10
**sooner** [1] - 984:8
**sorry** [5] - 921:14, 933:24, 954:5, 955:25, 978:25
**sought** [2] - 927:12, 960:20
**source** [3] - 964:23, 964:25, 968:1
**sources** [2] - 947:11, 966:14
**speaker** [1] - 936:8
**special** [2] - 983:23
**Special** [1] - 915:6
**specific** [10] - 951:16, 957:2, 960:17, 962:1, 962:21, 963:1, 963:10, 965:19, 967:4, 968:3
**specifically** [2] - 951:21, 965:15
**specifics** [1] - 927:8
**specifies** [1] - 983:12
**speculation** [2] - 922:16, 935:21
**spell** [1] - 908:25
**spring** [1] - 919:11
**standard** [1] - 982:22
**start** [4] - 937:4, 942:9, 944:19, 988:3
**started** [1] - 911:10
**starting** [1] - 966:18
**starts** [1] - 972:1
**state** [4] - 908:25, 935:7, 941:20, 978:3
**statement** [37] - 914:14, 915:3, 915:7, 940:18, 940:21, 941:5, 941:8, 941:14, 941:25, 942:3, 942:11, 942:15, 942:18, 944:16, 945:9, 945:10, 945:12, 949:22, 950:12, 950:15, 951:4, 951:5, 951:6, 951:7, 965:4, 965:5, 965:17, 965:19, 971:20, 977:23, 978:4, 978:7, 978:15, 978:16, 978:21, 979:2, 983:7
**statements** [5] - 926:14, 941:15, 947:3, 950:13, 983:10
**STATES** [2] - 902:1, 902:10
**States** [12] - 902:3, 903:15, 905:2, 905:8, 908:16, 913:6, 913:18, 914:11, 914:17, 915:23,

969:7, 976:14
**Statutory** [2] - 913:24, 914:4
**stenographic** [1] - 989:6
**step** [1] - 975:11
**Stephen** [1] - 934:15
**steps** [1] - 958:21
**stick** [1] - 982:21
**sticks** [1] - 963:2
**still** [11] - 910:20, 910:23, 920:12, 927:15, 927:17, 932:16, 932:22, 932:24, 933:16, 936:23, 980:18
**stipulate** [2] - 976:13, 976:22
**stipulation** [5] - 976:3, 976:6, 976:18, 976:19, 977:13
**stipulations** [3] - 975:20, 977:1, 977:4
**STONE** [3] - 971:6, 971:17, 972:6
**Stone** [112] - 902:6, 905:3, 905:15, 909:15, 909:25, 910:2, 910:3, 910:6, 910:7, 919:21, 920:1, 920:3, 920:12, 920:17, 921:1, 921:5, 921:8, 921:9, 921:14, 921:22, 925:14, 926:4, 926:20, 927:23, 928:11, 928:12, 928:21, 928:22, 929:1, 929:3, 929:22, 930:9, 930:13, 930:19, 930:21, 931:2, 931:6, 931:13, 931:24, 932:11, 932:13, 932:17, 932:20, 932:24, 933:14, 933:20, 936:1, 936:7, 936:13, 936:14, 936:17, 936:19, 936:25, 937:2, 937:3, 937:6, 937:24, 938:2, 938:3, 938:7, 938:20, 939:6, 939:16, 940:4, 940:17, 940:24, 941:4, 942:10, 942:11, 942:15, 942:24, 943:8, 943:15, 943:17, 943:24, 946:3, 946:12, 946:18, 946:20, 946:25, 947:3, 947:7, 948:1, 948:6, 948:17, 948:21, 948:24, 949:3, 949:4, 949:5, 949:7, 950:24, 951:19, 952:1, 952:9, 952:16, 964:22, 966:7, 966:8, 966:10, 967:3, 967:19, 967:21, 969:7, 972:2, 975:2, 975:5, 976:23, 981:16
**stone** [1] - 944:2
**Stone's** [20] - 920:6, 920:10, 920:14, 920:20, 925:5, 925:17, 927:24, 934:1, 934:18, 934:20, 936:9, 939:9, 946:5, 947:5, 966:5, 968:2, 970:11, 970:23, 972:5, 976:14
**stone's** [1] - 925:13
**straight** [1] - 965:12
**Strategies** [1] - 909:19
**STRATEGYSMITH** [1] - 903:6
**Street** [1] - 902:16
**stricken** [2] - 961:21, 963:21

**strong** [3] - 943:13, 943:22, 945:7
**stuff** [2] - 963:2, 963:16
**subject** [5] - 905:24, 956:16, 957:1, 974:11, 978:14
**submit** [1] - 981:4
**submitted** [3] - 918:8, 959:13, 980:14
**submitting** [4] - 916:25, 921:15, 954:4, 954:6
**subscribe** [1] - 971:18
**subsequent** [2] - 937:9, 966:25
**subsequently** [2] - 925:17, 930:21
**substance** [1] - 929:14
**substantial** [1] - 971:18
**Suburban** [2] - 953:4, 953:22
**suggest** [1] - 907:12
**suggested** [1] - 962:7
**suggesting** [1] - 961:10
**Suite** [4] - 902:22, 903:3, 903:7, 903:10
**summer** [1] - 937:7
**sunny** [1] - 908:5
**supposed** [1] - 923:5
**surprised** [1] - 936:19
**sustain** [1] - 940:23
**sustained** [3] - 935:22, 963:21, 964:15
**SWALWELL** [2] - 971:3, 971:12
**sworn** [5] - 908:19, 969:17, 969:22, 977:22, 978:17

## T

**table** [1] - 905:9
**tape** [1] - 935:13
**Tara** [2] - 903:1, 905:14
**tax** [17] - 914:25, 954:4, 954:6, 954:7, 954:9, 954:13, 954:14, 954:20, 955:2, 955:19, 957:11, 957:13, 957:17, 957:25, 958:11, 958:17
**taxes** [9] - 958:16, 958:21, 958:22, 958:24, 959:3, 963:12, 963:14
**Taylor** [13] - 904:5, 906:4, 969:13, 969:16, 969:25, 970:20, 972:13, 973:5, 973:11, 974:16, 974:22, 985:5, 985:25
**TAYLOR** [1] - 969:21
**taylor** [5] - 905:19, 906:1, 970:21, 971:22, 985:7
**Taylor's** [1] - 986:14
**telephone** [4] - 941:9, 952:12, 952:14, 965:3
**television** [1] - 967:1
**ten** [2] - 916:8, 985:5
**tends** [1] - 943:20
**tense** [1] - 920:17

**terms** [6] - 912:22, 917:2, 917:18, 922:16, 955:1, 986:20
**testified** [5] - 908:20, 922:18, 964:8, 969:22, 970:2
**testify** [4] - 918:19, 922:20, 924:18, 986:1
**testifying** [1] - 970:3
**testimony** [19] - 917:21, 918:18, 918:19, 948:11, 970:11, 970:23, 973:16, 974:8, 976:14, 976:24, 977:12, 977:17, 977:23, 977:25, 978:1, 981:16, 983:6, 984:16, 986:14
**text** [3] - 930:9, 931:21, 966:2
**texts** [2] - 919:25, 966:1
**THE** [154] - 902:1, 902:1, 902:9, 902:15, 905:1, 905:12, 905:16, 906:2, 906:11, 907:4, 907:18, 907:24, 908:2, 921:12, 921:14, 922:7, 922:10, 922:13, 922:18, 923:3, 923:10, 923:25, 924:14, 924:23, 925:3, 925:19, 925:23, 925:25, 935:22, 939:21, 940:6, 940:10, 940:21, 941:14, 942:21, 942:23, 943:11, 944:14, 944:23, 945:1, 945:4, 945:13, 945:16, 945:22, 945:24, 946:7, 947:14, 948:9, 948:14, 949:11, 949:13, 949:15, 949:23, 950:11, 950:22, 951:9, 951:11, 954:13, 954:14, 955:12, 955:25, 956:5, 956:13, 956:22, 957:6, 957:13, 957:15, 958:4, 958:6, 958:7, 958:8, 958:9, 959:19, 959:21, 960:5, 960:8, 960:13, 960:23, 961:1, 961:6, 961:9, 961:17, 962:11, 962:21, 963:10, 963:19, 964:15, 967:9, 967:12, 967:14, 968:10, 968:12, 968:14, 968:15, 968:18, 968:25, 969:4, 969:6, 969:8, 969:10, 969:16, 969:19, 969:20, 972:20, 972:22, 972:25, 973:3, 974:13, 974:18, 975:9, 975:11, 975:18, 975:23, 975:25, 976:5, 976:21, 977:1, 977:7, 977:18, 977:22, 978:5, 978:11, 978:17, 979:1, 979:5, 979:10, 979:17, 979:21, 979:25, 980:24, 981:5, 981:9, 981:19, 982:2, 982:5, 982:8, 982:11, 984:5, 984:18, 984:20, 984:24, 985:9, 985:14, 985:17, 985:20, 985:24, 986:3, 986:5, 986:8, 986:17, 986:23, 987:13, 987:17, 987:20
**then-candidate** [6] - 920:15, 922:1, 932:7, 932:9, 946:3, 946:12
**thereafter** [1] - 981:10
**therefore** [3] - 908:14, 940:17, 980:18

**they've** [2] - 956:8, 956:10
**Third** [1] - 903:3
**third** [4] - 915:1, 964:11, 973:8, 987:1
**third-party** [2] - 973:8, 987:1
**three** [5] - 906:9, 914:23, 953:22, 954:9, 961:17
**three-row** [1] - 953:22
**throw** [1] - 963:2
**thumb** [1] - 987:19
**timing** [2] - 941:9, 979:9
**timing-wise** [1] - 979:9
**tinkered** [1] - 982:25
**today** [3] - 917:21, 917:24, 918:18
**together** [1] - 981:21
**tomorrow** [2] - 982:17, 984:3
**took** [7] - 938:24, 938:25, 952:22, 958:16, 959:3, 970:7, 971:12
**top** [3] - 924:18, 926:19, 971:23
**total** [2] - 916:6, 986:15
**totally** [1] - 961:25
**touch** [1] - 931:6
**toward** [3] - 929:15, 935:3, 935:5
**Tower** [1] - 952:24
**TRANSCRIPT** [1] - 902:8
**transcript** [25] - 905:22, 906:6, 906:7, 906:8, 906:22, 907:2, 907:5, 907:6, 950:7, 961:23, 962:15, 970:23, 970:25, 971:11, 971:24, 972:1, 973:16, 974:4, 974:6, 974:8, 975:3, 981:20, 982:6, 989:5, 989:6
**transcription** [2] - 906:15, 906:17
**transcripts** [3] - 905:24, 956:20, 977:17
**transmission** [1] - 961:11
**transpire** [1] - 981:10
**trial** [6] - 925:22, 948:5, 948:19, 961:4, 976:24, 980:1
**TRIAL** [2] - 902:4, 902:8
**tried** [1] - 978:6
**true** [8] - 926:14, 926:15, 928:3, 942:6, 964:17, 978:18, 989:5, 989:6
**Trump** [31] - 911:6, 911:8, 911:21, 912:5, 919:12, 919:17, 920:1, 920:4, 920:15, 932:4, 932:7, 932:9, 935:13, 938:12, 939:15, 939:17, 940:5, 940:15, 941:19, 942:13, 942:17, 946:3, 946:11, 946:12, 952:16, 952:23, 952:24, 953:5, 965:4, 965:18
**Trump's** [1] - 932:10
**truth** [17] - 915:8, 916:13, 924:15, 940:14, 941:1, 941:11, 941:12, 942:1, 942:10, 942:20,

943:1, 943:20, 944:3, 944:17, 959:8, 969:17
**try** [1] - 958:21
**trying** [6] - 926:8, 926:14, 942:12, 943:6, 944:6, 944:16
**turn** [12] - 910:18, 912:25, 913:7, 913:20, 915:22, 916:17, 919:11, 928:5, 929:5, 929:24, 934:21, 975:2
**turning** [2] - 913:17, 931:9
**TV** [1] - 966:23
**twice** [3] - 947:20, 948:17, 962:7
**Twice** [1] - 948:12
**two** [15] - 914:2, 919:4, 919:10, 923:15, 948:4, 948:7, 948:19, 953:18, 953:23, 958:13, 964:8, 964:10, 975:20, 980:11, 981:22
**twofold** [1] - 927:10

## U

**U.S** [3] - 902:15, 955:2, 973:10
**ultimately** [3] - 918:14, 918:15, 918:16
**um-hum** [1] - 933:11
**unanimity** [1] - 983:23
**unanimous** [2] - 983:19, 983:21
**uncertain** [1] - 936:22
**under** [9] - 914:3, 917:17, 937:12, 937:14, 941:6, 941:25, 969:18, 978:17, 981:3
**unduly** [1] - 983:3
**UNITED** [2] - 902:1, 902:10
**United** [12] - 902:3, 903:15, 905:2, 905:8, 908:16, 913:6, 913:18, 914:11, 914:17, 915:23, 969:7, 976:14
**University** [1] - 909:10
**unless** [1] - 955:4
**untrue** [2] - 926:15
**untruths** [2] - 955:7, 956:23
**up** [27] - 915:16, 915:17, 915:25, 916:4, 916:8, 917:2, 917:25, 925:6, 925:17, 929:21, 934:9, 937:16, 937:18, 938:3, 943:4, 943:16, 945:19, 950:18, 958:19, 963:2, 973:10, 981:21, 984:2, 984:8, 986:11
**update** [1] - 988:5
**updates** [1] - 947:5
**updating** [2] - 938:10, 938:14
**useful** [1] - 986:8

## V

**varied** [1] - 954:11
**verbiage** [1] - 960:17
**verdict** [3] - 982:24, 983:5, 983:11

**version** [1] - 985:2
**via** [2] - 919:25, 967:1
**viable** [1] - 932:25
**view** [2] - 986:17, 986:19
**viewing** [1] - 974:6
**violate** [1] - 917:21
**violation** [1] - 983:7
**Virginia** [5] - 909:6, 917:9, 917:13, 958:5, 961:13
**Visa** [4] - 962:17, 962:18, 963:9, 963:24
**voice** [7] - 919:25, 936:9, 939:9, 939:10, 939:11, 946:5, 952:18
**volunteer** [2] - 911:6, 911:9
**voter** [2] - 966:5, 966:10
**vs** [1] - 902:5

## W

**wait** [2] - 986:18, 988:5
**waiting** [2] - 965:13, 969:2
**wants** [1] - 943:23
**Washington** [5] - 902:6, 902:17, 903:16, 909:9, 989:14
**watched** [1] - 906:5
**week** [3] - 970:2, 985:5, 986:14
**weekend** [2] - 908:4, 908:5
**weeks** [1] - 906:9
**weight** [1] - 944:7
**whole** [3] - 922:21, 962:17, 984:21
**Wikileaks** [36] - 921:7, 921:8, 921:15, 921:25, 925:7, 925:10, 926:9, 929:2, 932:17, 932:20, 933:2, 933:5, 933:15, 933:21, 934:23, 935:24, 945:18, 946:14, 946:17, 947:6, 949:6, 949:7, 951:20, 952:2, 952:10, 964:17, 965:21, 966:2, 966:13, 966:17, 968:4, 968:5, 970:4, 972:8, 973:7
**Wikileaks's** [2] - 921:19, 925:11
**willfully** [1] - 941:12
**WILLIAM** [1] - 909:2
**William** [1] - 909:8
**WILLIAMS** [1] - 908:18
**Williams** [1] - 909:1
**wise** [1] - 979:9
**WITNESS** [8] - 921:14, 954:14, 957:15, 958:6, 958:8, 959:21, 968:14, 969:19
**witness** [22] - 908:15, 908:19, 940:15, 940:20, 950:19, 950:21, 956:7, 956:10, 956:14, 956:15, 963:3, 964:8, 968:10, 968:15, 969:1, 969:11, 970:16, 972:10, 975:9, 984:25, 986:13
**witnesses** [3] - 904:2, 975:14, 975:15
**word** [1] - 966:13

**words** [6] - 907:1, 907:7, 941:20, 942:25, 943:1, 978:2
**world** [1] - 911:17
**write** [6] - 917:1, 918:2, 928:12, 930:11, 949:16, 949:20
**writing** [1] - 984:2
**written** [4] - 912:19, 916:9, 916:19, 950:19
**wrote** [5] - 929:1, 930:17, 930:19, 931:24, 971:13

## Y

**year** [3] - 920:19, 954:11
**years** [8] - 909:4, 909:17, 915:17, 915:25, 916:4, 916:8, 954:9, 958:7
**yourself** [6] - 905:6, 959:23, 960:1, 960:12, 960:20, 963:25
**yourselves** [2] - 968:23, 980:20

## Z

**ZELINSKY** [60] - 908:16, 908:22, 912:25, 913:2, 913:7, 913:9, 913:20, 913:22, 914:6, 914:8, 916:17, 916:18, 921:18, 922:23, 923:6, 925:4, 925:21, 926:23, 928:5, 928:7, 929:24, 930:2, 931:9, 931:11, 935:23, 940:2, 940:3, 940:13, 944:25, 945:2, 945:5, 945:14, 945:21, 945:23, 946:1, 946:9, 946:10, 947:13, 948:8, 949:10, 950:17, 955:24, 956:6, 957:7, 960:3, 963:17, 964:14, 967:15, 967:17, 968:9, 968:11, 968:17, 969:3, 969:12, 970:15, 970:19, 972:10, 972:12, 972:18, 974:11
**zelinsky** [1] - 967:11
**Zelinsky** [2] - 902:15, 905:9
**Zelinsky.............908** [1] - 904:3
**Zelinsky...........967** [1] - 904:4