```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,    ) Criminal Action
                                   ) No. 19-CR-018
 4                   Plaintiff,    )
                                   ) SENTENCING
 5    vs.                          )
                                   ) Washington, DC
 6    Roger Jason Stone, Jr.,      ) Date:  February 20, 2020
                                   ) Time:  10:00 a.m.
 7                   Defendant     )
      _____
 8
                     TRANSCRIPT OF SENTENCING
 9                        HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
      _____
11

12               A P P E A R A N C E S

13

14    For Plaintiff:      JOHN D. CRABB
                          J.P. COONEY
15                        U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
16                        555 Fourth Street, NW
                          Washington, DC 20530
17                        (202) 252-1794
                          Email:  John.d.crabb@usdoj.gov
18                        Email:  Joseph.cooney@usdoj.gov

19    For Defendant:      Seth Ginsberg
                          Law Office of Seth Ginsberg
20                        299 Broadway, Suite 1405
                          New York, NY  10007
21                        (212) 227-6655
                          Bruce S. Rogow
22                        LAW OFFICE OF BRUCE S. ROGOW, P.A.
                          100 NE 3rd Avenue
23                        Suite 1000
                          Fort Lauderdale, FL 33301
24                        (954) 767-8909
                          Email:  Brogow@rogowlaw.com
25
```

```
 1    For Defendant:          Robert C. Buschel
                              Tara A. Campion
 2                            BUSCHEL & GIBBONS, P.A.
                              One Financial Plaza
 3                            100 S.E. Third Avenue
                              Suite 1300
 4                            Ft. Lauderdale, FL 33394
                              (954) 530-5301
 5                            Email:  Buschel@bglaw-pa.com
                              Grant J. Smith
 6                            STRATEGYSMITH, P.A.
                              401 East Las Olas Boulevard
 7                            Suite 130-120
                              Fort Lauderdale, FL 33301
 8                            (954) 328-9064
                              Email:  Gsmith@strategysmith.com
 9
     _____
10
      Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
11                            Official Court Reporter
                              United States Courthouse, Room 6523
12                            333 Constitution Avenue, NW
                              Washington, DC  20001
13                            202-354-3267
                              Email:  JaniceDickmanDCD@gmail.com
14
                                  *  *  *
15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

2   This morning we have Criminal Case Number 19-18, United States

3   of America v. Roger J. Stone, Jr.  The defendant is present and

4   in the courtroom, Your Honor.  The probation officer present

5   for these proceedings is Ms. Lustig.

6          Will counsel for the parties please approach the

7   lectern and identify yourself for the record.

8          MR. CRABB:  Good morning, Your Honor.  John Crabb and

9   J.P. Cooney for the United States.

10          THE COURT:  Good morning.

11          MR. SMITH:  Good morning, Your Honor.  Appearing for

12   Mr. Stone, who is at the table.  We have with us Bruce Rogow,

13   Tara Campion, Robert Buschel, and Seth Ginsberg --

14          THE COURT:  All right.  Good morning.

15          MR. SMITH:  -- Your Honor.

16          Thank you.

17          THE COURT:  Thank you.

18          We're here this morning for Mr. Stone's sentencing.

19   This is a public proceeding, and you're all welcome to observe.

20   But this is not the only place where one can view these

21   proceedings in the courthouse.  There's also an overflow

22   courtroom where there's a video and audio monitor.  Anyone who

23   plans to react audibly in these proceedings is welcome to watch

24   in the overflow courtroom and to say whatever you please.  But

25   out of respect for all the parties and their safety, we're

1     going to maintain decorum here.

2              The final presentence report was filed in this matter

3     on February 13th.  Have both the defendant and the defense

4     counsel had an opportunity to read it?

5              MR. GINSBERG:  Yes, Your Honor.

6              THE COURT:  All right.  And the legal objections

7     regarding the application of the various adjustments under the

8     sentencing guidelines will be addressed in a few minutes.

9              But first, I want to ascertain with respect to

10    factual objections to the presentence report.  I know there

11    were objections to the language in a number of the paragraphs

12    regarding the offense that were largely transmitted to the

13    probation office by the U.S. Attorney's Office, such as the use

14    of the word "associate."

15             I think that's a perfectly vague and vanilla term

16    that could fairly include someone who transmitted the number

17    and nature of emails here.  It certainly applies to

18    Mr. Credico, who called himself a long-time friend.

19             I've read all the objections carefully, and I don't

20    believe that there were any that were not already rectified,

21    that require a change.  I think they're an accurate summary of

22    the evidence that was introduced at trial.  To the extent you

23    have concerns that the choice of vocabulary could have some

24    bearing on the defendant's future, your objections are all

25    noted in the presentence report.

1          I'm also not sure that it has any impact on the

2    defendant about the related case designation, and I have

3    already ruled on that issue twice.

4          But are there any facts that were set out that relate

5    to the defendant or his employment history or his medical

6    history or any other information that's incorrect?

7          MR. GINSBERG:  None beyond what we stated in our

8    objections.

9          Should I speak at the lectern?  Or is it okay to

10   speak from here?

11         THE COURT:  I think, just for this point, we can hear

12   you.  Obviously, when we get to hear your allocution, I'm going

13   to want to you at the lectern.

14         MR. GINSBERG:  Understood.  Thank you.

15         THE COURT:  All right.  All right.  So --

16         MR. GINSBERG:  With respect to the related case

17   issues, however, we respect the Court's ruling.  But as stated

18   in our objections, there can be prejudicial impact from that

19   case being maintained in the presentence report.  So we would

20   ask the Court to take that out of the presentence report,

21   regardless of its ruling regarding the applicability of the

22   designation.  We think that it's unduly prejudicial to have it

23   in the presentence report itself.

24         And the only other issue is, we requested that the

25   letter of Mr. Credico become part of the presentence report,

1    and probation has declined to do that.  And we would ask the

2    Court to direct that it become part of the presentence report.

3            THE COURT:  Well, it's part of the docket.  It's part

4    of the record of this case.  So, I can't take one letter and

5    isolate it and make it part of the presentence report.  It's

6    certainly going to be referenced in the proceedings this

7    morning, and it is docketed.

8            With respect to the related case designation, I don't

9    know that you've actually specified any particular prejudice

10    that could flow to the defendant, but in an abundance of

11    caution, I'm happy to have that removed from the presentence

12    report before it goes to the Bureau of Prisons.

13            All right.  And with respect to your other

14    objections, I'm going to overrule those.  I think they're set

15    forth in the presentence report.

16            And with that, I'm going to accept the presentence

17    report, as it's been revised, as findings of fact at

18    sentencing.

19            Other than the guideline calculation and the pending

20    motion for a new trial, which we will take up after the

21    sentencing, are there any other legal disputes that need to be

22    resolved?

23            MR. GINSBERG:  None that I can think of at the

24    moment, Your Honor.

25            THE COURT:  Okay.  All right.

1          In addition to the presentence report, which I've

2     reviewed, I've received and reviewed additional materials

3     concerning the defendant.  Those include the government's

4     sentencing memorandum, Docket 279, submitted to the Court on

5     February 10th by the newly appointed U.S. Attorney for the

6     District of Columbia Timothy Shea and the four assistant United

7     States attorneys and special assistant United States attorneys

8     that tried the case.

9          I also received the government's February 11th

10    supplemental and amended sentencing memorandum, Docket 286,

11    also submitted by U.S. Attorney Shea and the assistant

12    United States attorney for the District of Columbia, who is the

13    acting chief of the criminal division.  I note that the initial

14    memorandum has not been withdrawn.

15         I also received the defendant's sentencing

16    memorandum, Docket 280, with a number of letters and

17    attachments, including letters from defendant's family members:

18    His wife; his stepdaughter; his step-granddaughter, who is an

19    adult; and, his sister-in-law; a letter from Randy Credico, who

20    was a witness in the case.

21         Letters from family, friends, and colleagues, Rolando

22    Conesa, John Morgan.

23         A letter from Jan Webster, the wife of an NFL player

24    who doesn't know the defendant but was aware of his advocacy on

25    behalf of NFL players with brain injuries.

1          A friend, Rabbi Henry Sheinkopf; Christian Josi; an

2     individual named Norm Kent; Pastor Michael Grady of the St.

3     Anthony Catholic Church.

4          Another friend and spiritual brother -- as he

5     describes himself -- Dr. W. Randy Short.

6          Some attorneys who have worked with Mr. Stone are

7     Anthony Rupp, III; Carl Paladino, a former candidate for New

8     York state governor.

9          Other friends or friends of friends, Albert Owler,

10    Sharon Kaplan, Michael Caputo.

11         An attorney, Paul Jensen; colleague, Jane Bennett; a

12    friend and former executive assistant at Black, Manafort, Stone

13    and Kelly, Lynn Conforti.

14         Friends Frank Morano, John B. McGowen.  An individual

15    named Itzhak Bak.

16         Brian David Hill, an individual who turned to

17    Mr. Stone for help seeking a pardon.

18         Other individuals, Gerard Houser, Kathleen M.

19    Coleman.

20         Also, I've received a number of letters from

21    individuals who describe themselves as concerned citizens in

22    the past few days.  I've docketed as many of the letters as I

23    could as part of the docket.

24         I want you to know that I have read and that I

25    appreciate all of the letters and I've considered all of the

1    sentencing materials.

2              In a criminal case, there's a statute that tells me

3    how I'm supposed to go about deciding what the sentence should

4    be, it's 18 U.S. Code Section 3553.  Section A of that statute

5    lists a number of important factors I'm supposed to consider,

6    and the advisory sentencing guidelines are one of the factors

7    that I'm required to consider in determining the appropriate

8    sentence for this offense.

9              I'm required to calculate what the guidelines would

10   recommend in every case.  And the sentencing statute says that

11   the Court shall impose a sentence within the guideline range,

12   unless the Court finds that there exists an aggravating or

13   mitigating circumstance of a kind or to a degree not adequately

14   taken into consideration by the Commission in formulating the

15   guidelines.

16             For those of you who are new to this, or who woke up

17   last week and became persuaded that the guidelines are harsh

18   and, perhaps, sentencing shouldn't be driven by the rigid

19   application of a strict mathematical formula and that

20   individual consideration is, perhaps, required, I can assure

21   you that defense attorneys and many judges have been making

22   that point for a long time, but we don't usually succeed in

23   getting the government to agree, and maybe that will continue.

24             In any event, the Supreme Court has made it quite

25   clear, as both parties have pointed out and as this Court was

1    already well aware, that the guidelines are advisory, not

2    mandatory, and that I have the authority and the duty to craft

3    a sentence that considers all the statutory concerns.

4          Indeed, the Supreme Court has said that the statute

5    requires an individual assessment of all of the factors.  So, I

6    plan to address each of them in some detail at a later point in

7    these proceedings.  But I'm going to begin, as I always do,

8    with the calculation under the sentencing guidelines, and note,

9    as I always do, that that's only one part of the analysis.

10          And the guidelines begin with the offense or offenses

11   of conviction.  Here, Mr. Stone was convicted after a trial by

12   a jury of seven counts.

13          Count 1:  Obstruction of a legal proceeding; that is,

14   a congressional investigation, in violation of 18 U.S. Code

15   Section 1505, and that statute provides for sentence of up to

16   five years imprisonment or a fine of $250,000.

17          If anybody in this room has sunglasses on, unless

18   there's a medical reason, they need to take them off.

19          Counts 2, 3, 4, 5, and 6 are five separate counts of

20   making a false statement to the government, in violation of

21   18 U.S. Code Section 1001.  The statute provides for a sentence

22   of up to five years imprisonment on each count.

23          And Count 7, tampering with a witness, in violation

24   of 18 U.S. Code Section 1512(b)(1), which provides that

25   whoever, separate and apart from lying himself, knowingly uses

1    intimidation, threats, or corruptly persuades another person

2    with the intent to influence, delay, or prevent his testimony

3    in an official proceeding can face a penalty of up to 20 years

4    imprisonment.

5            The jury found -- and I note that the defendant did

6    not even contest this count in his motion for judgment of

7    acquittal at the close of trial, but simply submitted on the

8    evidence -- that the defendant knowingly and intentionally

9    corruptly persuaded or attempted to corruptly persuade Randy

10   Credico with the intent to influence, delay, or prevent his

11   testimony in an official proceeding.

12           There's no mandatory minimum sentence applicable to

13   any count here, and it's entirely up to the Court whether the

14   sentences for each should be consecutive or concurrent.

15           The guidelines, however, group the offenses for

16   calculation purposes.  §3D1.2(b) says:  If there's a common

17   scheme or plan and the same victim, you combine the counts when

18   you figure out which guideline applies.  And, according to that

19   rule, you're supposed to use the guideline that would produce

20   the highest offense level.  And that here is the obstruction of

21   justice guideline.

22           The guidelines provide a base level for each offense,

23   and the base offense level for the offense of obstruction of

24   justice under §2J1.2 puts you at Level 14.  That's where you

25   start.

1       When you calculate the guidelines, the guidelines for

2   any particular offense also recognizes certain specific offense

3   characteristics, and the presence of those can increase or

4   decrease the offense level from there.

5       Under the obstruction of justice guideline, there is

6   a specific offense characteristic, §2J1.2(b)(1)(B), that says:

7   If the offense involved causing or threatening to cause

8   physical injury to a person or property damage in order to

9   obstruct the administration of justice, you add eight levels.

10      The applicability of this guideline to this case is

11  disputed.  The defense opposed adding this enhancement in its

12  memorandum, which I've read.  But if there's anything you wish

13  to say about the guideline in particular, you're welcome to do

14  so now.

15      MR. GINSBERG:  Thank you, Your Honor, for the

16  opportunity to address this issue.

17      There are situations in which a person's reputation

18  is such that words, even though on their face they may not be

19  threatening, the law imputes a threat to those words.  And this

20  sometimes comes up in extortion cases.

21      Here, we submit that this is the exact opposite.

22  Even though the words, on their face, could be read as

23  threatening, in the context of the dialogue between Mr. Credico

24  and Mr. Stone, it's our position that these words -- it's not

25  that they weren't a serious enough threat to trigger the

 1    guidelines, as the government suggests in the cases that it has

 2    cited, but, rather, that the words themselves did not

 3    constitute a threat at all.

 4         Mr. Stone is known for using rough, provocative,

 5    hyperbolic language.  Mr. Credico knew that.  They have a long,

 6    20-year relationship.  And in the context of that private

 7    conversation, Mr. Credico understood that it was just Stone

 8    being Stone; he's all bark, no bite.  And, therefore, it's our

 9    position that those words do not trigger the guideline offense

10    level increase because there's no threat at all.

11         Now, there's been some talk about Mr. Credico being

12    concerned that these words could become a threat if they were

13    communicated to the public.  But the keyword there is "if."

14    Mr. Stone did not threaten to communicate these words to the

15    public.  There's no indication of that in the context of their

16    communications or otherwise in the record.

17         So, given Mr. Credico's subjective understanding,

18    based on their longstanding relationship, the words themselves,

19    though threatening on their face, in this context do not

20    trigger the guideline because they are not threatening at all.

21         THE COURT:  Do you have a case that says that the

22    victim's subjective understanding is the linchpin of the

23    analysis?

24         MR. GINSBERG:  I do not have a case that says that

25    the victim's subjective understanding is the linchpin.

 1    However, the cases on which the government relies all involve

 2    situations where the victim did understand the communication to

 3    be a threat.

 4              In *United States Versus Plumley* the words in that

 5    situation were:  I will kick your asses.

 6              The case involved underlying violence.  There was no

 7    violence underlying this case.  And the dispute there wasn't

 8    that the words didn't constitute a threat.  First, the

 9    defendant said:  I never said that.  And then he said:  Well,

10    but if I said it, it wasn't serious enough.  It's not a serious

11    level threat.

12              But the victim understood it to be a threat.

13              THE COURT:  What is your position about whether I can

14    consider the grand jury testimony that was filed from

15    Mr. Credico that's on the docket in this case in connection

16    with this issue?

17              MR. GINSBERG:  Well, the Supreme Court says that Your

18    Honor can consider almost anything.  But I think what we have

19    here is trial testimony where he said he didn't feel

20    threatened.

21              And we have a letter where not only does he say he

22    didn't feel threatened, he says:  If I -- most notably was

23    after Mr. Stone's defense attorney asked if I had ever thought

24    Mr. Stone was going to steal or harm my dog Bianca.  My answer

25    was an emphatic No.  At the time, I was hoping he would follow

1   that question with another, asking if I had ever personally

2   felt threatened by Mr. Stone.  The answer would have been the

3   same.  I never in any way felt that Stone himself posed a

4   direct physical threat to me or my dog.  I chalk this up to

5   bellicose tirades, to Stone being Stone; all bark, no bite.

6          So, that is what Mr. Credico wants the Court to

7   consider.  The Court is, of course, free to consider anything

8   that it deems relevant, but I think the trial testimony and the

9   submission to the Court in the context of sentencing should be

10  the most impactful.

11         The other cases that the government cites, similarly,

12  involve threats that were understood by the victim to be

13  threatening.  In *United States versus Bahkairi* there were

14  photos sent to the victim and to -- with -- depicting the

15  victim's family members, indicating that he intended to harm

16  them.  The defendant -- the defendant displayed a rifle,

17  suggesting that he had the means and the willingness to carry

18  out the threats.

19         In *United States versus Smith*, a defendant said:  I'm

20  going to kick her ass.

21         But what was the context there?  The context was she

22  burst into someone's home uninvited, unannounced, and said:

23  Your daughter is pressing charges against my son.  He's going

24  to be in jail because of what your daughter is saying.  I'm

25  going to kick her ass.

1          In all of those cases, the victims felt threatened.

2     So, no, I do not have a case that says that the subjective

3     understanding of the victim is controlling.  But, I also don't

4     have any other cases where the subjective understanding of the

5     victim was such that he knew it wasn't a threat.  And in this

6     instance, this eight -- it's an eight-level increase, as the

7     Court is aware.  That's a very blunt instrument.  You know --

8          THE COURT:  I have the authority to deal with that

9     when we get to variances, wouldn't you say?

10          MR. GINSBERG:  Yes.  And I'm hoping you will.

11          But in the first instance, I do believe that the

12    correct application of the guidelines is important, because the

13    degree of variance is going to be based, I would assume, in

14    part, on where we start.  And ratcheting up the offense level

15    here eight levels based on a statement that was made in

16    private, there was no threat of publication, and the victim

17    himself said he didn't -- he never viewed it as a threat, and

18    the nature of the relationship.  It's a 20-year relationship.

19          THE COURT:  All right.  I think I understand your

20    argument.

21          Thank you.

22          MR. GINSBERG:  Thank you, Judge.

23          THE COURT:  Mr. Crabb, the initial memorandum filed

24    by the government included this enhancement in its calculation.

25    The second memo doesn't actually contest the applicability of

1   the guideline.  It says only that it's been disputed by

2   Mr. Credico, who asserts that he didn't perceive a genuine

3   threat.  Although, it then acknowledges, quote, Mr. Credico's

4   subjective beliefs are not dispositive as to this enhancement.

5           Are you prepared to address this or any other

6   guideline provision this morning?

7           MR. CRABB:  Yes, Your Honor, I am.

8           THE COURT:  All right.  The memo says that the total

9   offense level is, quote:  Arguably, 29.

10          And the enhancements, the second ones, are, quote:

11  Perhaps technically applicable, close quote.

12          What exactly are you trying to tell me here?

13          MR. CRABB:  Your Honor, our position here is that

14  this enhancement applies, and we ask the Court to apply it, the

15  eight-level enhancement for threats, pursuant to 2J1.2(b)(1).

16  As the Court's indicated through its questions, there's no

17  subjectiveness requirement for this enhancement to apply.

18          In fact, the cases that the government has previously

19  cited, and we stand by, make it clear that there's no

20  requirement of seriousness with respect to the threat.  And the

21  fact is that the defendant threatened both Mr. Credico's

22  personal safety and his pet.  And we believe this enhancement

23  applies, and we ask the Court to impose it in calculating the

24  appropriate guideline range here.

25          THE COURT:  All right.  Thank you.

1    I conclude that the adjustment does apply, and so

2    adding eight levels to where we started, at Level 14, we're now

3    up to Level 22.

4    The evidence included numerous written

5    communications, including emails and texts in which the

6    defendant repeatedly urged Mr. Credico to assert his Fifth

7    Amendment privilege against self-incrimination, to claim a

8    failure of recollection, to do a Frank Pentangeli, a shared

9    reference to *The Godfather* that Credico immediately understood

10   to mean feign a lack of knowledge, or to straight out lie, all

11   to support the false narrative advanced by Stone, that Credico

12   had been an intermediary between Stone and Julian Assange, to

13   whom Stone publicly referred in early August of 2016.

14   This effort began in the fall of 2017, when the

15   committee sought Credico's testimony, and it continued when

16   Stone and Credico became of interest to the Office of Special

17   Counsel investigation.

18   On April 9, 2018, as Credico continued to balk and he

19   continued to insist, as he had before Stone even testified,

20   that Stone knew full well that Credico didn't even know

21   Julian Assange at the time Stone made his public statements,

22   defendant Stone emailed him and threatened:  I'm going to take

23   that dog away from you.  Not a fucking thing you can do about

24   it either because you are a weak, broke piece of shit.  I will

25   prove to the world that you are a liar, close quote.

1          Mr. Credico, who had no wife or children, was

2     extremely close to his dog of 12 years, and Roger Stone knew

3     that well.  Later, on the same day, defendant Stone also wrote

4     to Mr. Credico, quote:  I am so ready.  Let's get it on.

5     Prepare to die, cocksucker.

6          Defendant's memorandum refers to this as banter,

7     which it hardly is.  But the defendant also emphasizes that

8     Credico testified that he was not actually scared that Stone

9     would hurt his dog, and that Credico has since said that he

10     didn't think that Stone posed a physical threat to him.

11          I note, since the defense has informed me that I can

12     consider this material, that that is not consistent with his

13     grand jury testimony, which was closer in time to the actual

14     threats, at which time he said he was hiding and wearing a

15     disguise and not living at home because he was worried, if not

16     about Trump, about his -- about Stone, but about his friends.

17     So, I think his level of concern may have changed over time.

18          The law makes it clear that §2J1.2(b)(1)(B) of the

19     guidelines, quote, Does not impose an additional seriousness

20     requirement beyond the fact of a violent threat, close quote.

21     That's the *United States versus Bahkairi*, 714 F.3d 1057 at

22     1061, from the Eighth Circuit, quoting *United States versus*

23     *Plumley*, 207 F.3d 1086.

24          The subjective affect of a threat on a recipient or

25     whether the threatened injury or damage was attempted or

1   carried out is not the triggering event.  Application of the

2   enhancement turns on whether the defendant made a threat, and

3   that's all.  That's *United States versus Bender*, 927 F.3d 1031

4   at 1033, Eighth Circuit, at -- from 2019:  The enhancement does

5   not require that Bender's acts caused some type of harm, such

6   as death, injury, or even an apprehension of retaliation.  The

7   defense asserted in its pleadings that the enhancement doesn't

8   apply to lesser threats, but none of the cases it cites stands

9   for the proposition that the seriousness of a threat determines

10  the application of the enhancement.

11          In *United States versus Sanchez*, the Eighth Circuit,

12  again, 676 F.3d 627, rejected arguments that the enhancement

13  didn't apply given that the defendant didn't mean for her

14  statements to be threatening or to be communicated to the

15  witness because neither argument addresses whether the threats

16  made were, in fact, threats.

17          The guideline plainly applies.  Even if one considers

18  the threat to the dog to be property damage, that's covered

19  too.  Application Note 5 explains that the guideline includes

20  threats of property loss or damage, quote, Threatened as a

21  means of witness intimidation.

22          But as the second government's memorandum appears to

23  be suggesting, as the defense has argued, the vague nature of

24  the threat concerning any physical harm and its actual impact

25  on Mr. Credico can be considered when I determine whether this

1    sentence should fall within the guideline range or not, and

2    they will.

3            So we're still at Level 22 so far, and we're still

4    calculating the guidelines.

5            Returning to the guidelines for obstruction of

6    justice, the offense of conviction, we're still under the

7    offense level and trying to figure that out.  There is another

8    specific offense characteristic which could apply, which is

9    §2J1.2(b)(2).  If the offense resulted in substantial

10   interference with the administration of justice, you add three

11   levels.

12           The defense says, well, I've already been sentenced

13   for the obstruction of justice in Count 1.  But that's not a

14   proper objection to a specific offense characteristic for

15   obstruction of justice.  The way the guidelines work is they

16   say an obstruction of justice, you start at Level 14, but then

17   there's other factors that could take it up from there.  One

18   was the threats.  Another one is the substantial interference.

19           The government includes this enhancement in its

20   memorandum No 1.  It didn't take it back in Memorandum No. 2.

21           Do you wish to address it's applicability here?

22           MR. CRABB:  Yes, Your Honor.

23           We believe this enhancement, 2J1.2(b)(2), applies, as

24   we set forth in both of our memoranda.  And we ask the Court to

25   consider, most specifically, the appropriate basis for this

1    application is the offense of conviction does not address

2    whether or not the obstruction was successful.  This

3    enhancement specifically addresses that, the successfulness of

4    the obstruction.

5         Here, the defendant's obstructive behavior was

6    successful and we ask the Court to impose this enhancement.

7         THE COURT:  All right.

8         The defense, again, I believe, provided me a

9    memorandum on this subject.  But, if you would like to

10   emphasize points between the argument, I'll give you the

11   opportunity to do that.

12        MR. GINSBERG:  As indicated in our memorandum, the

13   only case that we have found that addresses the applicability

14   of this guideline offense level increase in the context of

15   congressional testimony found that it does not apply in that

16   context, unless there is a showing that there was an

17   unnecessary substantial expenditure of governmental or judicial

18   resources.

19        The government has not offered any evidence that that

20   is the case.  Probation has not indicated any evidence that

21   that is the case.  And our view is that, therefore, because

22   this obstructive conduct of which Mr. Stone stands convicted

23   did not occur in the context of a criminal investigation or

24   judicial proceeding, the guideline does not apply based on the

25   commentary to the guideline 2J1.2, Comment 1.  And that case is

1    *United States versus Weissman*, 22 F.Supp. 2nd 187, in the

2    Southern District of New York, from 1998.

3          The Court said there:  Because Weissman's conduct

4    occurred within the context of a congressional inquiry rather

5    than a criminal investigation or a judicial proceeding, the

6    only circumstance specified in the application notes pertinent

7    to the case at bar is the, quote, unnecessary expenditure of

8    substantial governmental or court resources.

9          There's been no showing of that here.  So our first

10   part of this is that the guideline simply doesn't apply because

11   the congressional testimony and other conduct related to the

12   congressional investigation doesn't trigger the guideline.

13         Even were the Court to find that the guideline is

14   applicable, however, the government takes a fairly myopic view

15   of the impact of Mr. Stone's conduct.  The government's

16   argument is, essentially, the House Committee that investigated

17   these issues was denied access to Mr. Credico and was denied

18   access to Mr. Corsi and various documents, mostly the

19   communications between the two gentlemen and Mr. Stone.

20         In making that argument, however, the government

21   ignores the broader context, which is that there were other

22   investigations simultaneously going on in which this same

23   conduct was investigated.  Specifically, the Special Counsel's

24   Office also investigated these same things.

25         THE COURT:  Well, Mr. Stone tried to get Mr. Credico

24

1      not to testify before them also; isn't that correct?

2              MR. GINSBERG:  Mr. Stone does not stand convicted of

3      interfering with Mr. Credico's testimony in any other

4      proceeding but before the House.  And, in fact, the Special

5      Counsel's Office did speak to Mr. Credico.

6              They not only spoke to Mr. Credico, Mr. Credico

7      provided them his computers, backup hard drives, access to old

8      versions of all of his documents, his cell phones, his private

9      communications, both text messages, email communications,

10     communications over encrypted applications.  They had an

11     unusually large amount of material from Mr. Credico.  They also

12     spoke with Mr. Corsi, at length, numerous times.

13             And, effectively, the Special Counsel's Office came

14     to the same conclusion that the House came to, which is that

15     there was no evidence of any coordination, collusion, or

16     conspiracy between any member of the Trump campaign and any

17     agent of the Russian government involving the obtaining and

18     dissemination of emails from the Democratic National Committee

19     and others.

20             So --

21             THE COURT:  Well, I think there were certainly some

22     indications that, perhaps, the witnesses had not been entirely

23     forthcoming, also.  But, that's neither here nor there.  I

24     don't think that's the decisive issue here.

25             MR. GINSBERG:  Agreed.  And the -- whether they were

1    entirely forthcoming before the Special Counsel's Office or

2    not, one can assume that they would have been similarly

3    forthcoming before the House Committee, had they testified

4    there.

5         The bottom line is, at the end of the day, the

6    so-called denial of Mr. Credico and Mr. Corsi and their various

7    communications to the House Committee, based on the outcome of

8    the Special Counsel's Office, indicates that, in effect,

9    Mr. Stone deprived the House of information that was,

10   ultimately, of no investigative value, of any materiality.

11        And I note that the guideline requires not just some

12   interference, but substantial interference.  That's the

13   increase that we're talking about, whether the conduct had

14   substantial interference with the administration of justice.

15        So, you have a situation where we have a perfect

16   example of what would have happened if they had Corsi and

17   Credico and their communications.  Ultimately, the

18   conclusion's, essentially, the same.  And so I think the myopic

19   view of just looking at the House Committee report and saying:

20   Well, it made these conclusions and it didn't have these

21   people, therefore, there was an impact, that ignores the big

22   picture.

23        And, again --

24        THE COURT:  Well, didn't you and I try to talk about

25   the bigger picture and his threats to Credico to not testify

1    and not talk to the FBI and not talk to Office of Special

2    Counsel?  Didn't you just tell me I'm not supposed to think

3    about that, and I'm only supposed to look at what happened with

4    the House, because that's all he's been convicted of?

5              MR. GINSBERG:  I didn't say that you're not supposed

6    to think about that.  I said that the impact of his conduct

7    with respect to this guideline is how did it impact the

8    administration of justice?

9              THE COURT:  All right.  And you're saying that the --

10             MR. GINSBERG:  The government --

11             THE COURT:  -- lack of impact, when they actually got

12   the information at the end of the day in the other

13   investigation, bears on the answer to that question.

14             MR. GINSBERG:  I think it's dispositive.  And I think

15   that the government's focus, the evidence that the government

16   points out, is that the way that you determine the impact is by

17   saying the House didn't have Corsi, Credico, or their

18   communications.  But, we know when the Special Counsel's Office

19   had Corsi, Credico and their communications, they didn't reach

20   a different result.

21             So it's very hard, I think, to conclude that the

22   denial of those three things to the House Committee had a

23   substantial impact.  Perhaps the report would have been

24   somewhat different, but there can't be any material or

25   substantial difference in their report as compared to the

1      Special Counsel's Office report.

2                  THE COURT:  All right.

3                  Anything else?

4                  MR. GINSBERG:  Not on this point.  But, if I just may

5      briefly correct one thing.

6                  I apologize, but I've done my very best to become as

7      familiar with the record as I have been able in the time that

8      I've been involved with this case.

9                  But, it was brought to my attention that -- I don't

10     know that this will change Your Honor's ruling in any way, but

11     it was brought to my attention that Mr. Credico's grand jury

12     testimony was not part of the record of these proceedings in

13     any way, shape, or form, and the government hasn't offered it

14     in support of the threat level --

15                 THE COURT:  It was an exhibit that's on the docket.

16     It was sealed, but it existed.

17                 MR. GINSBERG:  Okay.

18                 THE COURT:  I forget who gave it to me at this point,

19     but it's on the docket.  I don't have the number in front of

20     me.  But --

21                 MR. GINSBERG:  I take Your Honor's word.

22                 THE COURT:  Otherwise, I would have never had the

23     opportunity to see it.

24                 MR. GINSBERG:  Then I stand by my prior position.

25                 THE COURT:  All right.

1          I'm going to rule that the guideline applies.  Adding

2     the additional three levels, we get to Level 25.

3          Substantial interference with the administration of

4     justice, as defined by the guideline, includes a premature or

5     improper termination of a felony investigation, an indictment,

6     verdict, or any judicial determination based on perjury, false

7     testimony, or other false evidence, or the unnecessary

8     expenditure of substantial governmental or court resources.

9          Obviously, if the offense of obstruction of justice

10     can specifically apply to a congressional investigation, then,

11     I believe, the specific offender characteristics that relate to

12     obstruction of justice can apply to a congressional

13     investigation.  And I do believe that the record supports the

14     notion that governmental resources were unnecessarily expended.

15          Mr. Stone lied, and he said he had no documents, no

16     emails or texts with his claimed intermediary with

17     Julian Assange; no emails or texts with people associated with

18     the campaign concerning his contacts with WikiLeaks.  So the

19     committee did not issue a subpoena for the trove of material

20     Stone had in his possession and lost that opportunity to

21     consider them and to delve further.

22          They spent considerable resources and they wasted

23     them going after Credico as the supposed intermediary.  They

24     lost the benefit of his testimony when he acceded to pressure

25     from Stone not to testify, and they didn't hear from Corsi, who

1    wasn't identified by Stone at all.

2         This obstruction lead the committee to reach

3    incorrect conclusions about the lack of evidence that would

4    contradict Stone's claims.

5         The defense argument that, well, eventually, the

6    Office of Special Counsel got the information and none of it

7    proved anything is completely beside the point, and it is

8    highly speculative.  He misdirected the committee by denying

9    the existence of evidence of communications, trying to pass

10   information to and from Julian Assange, and evidence reflecting

11   his reports on those communications to the campaign and it led

12   to an inaccurate, incorrect, incomplete report.

13        The defendant's arguments about his relative

14   insignificance to the matters under investigation, again, go to

15   the question of a variance and not the applicability of the

16   guideline.

17        So, we're now at Level 25 for the offense itself, but

18   the guidelines say we're not finished yet.  The guidelines also

19   have adjustments that apply to the offender, and they can take

20   the calculation up or down based on the presence or absence of

21   various aggravating and mitigating factors.

22        The presentence report did not include an adjustment

23   for the defendant's role in the offense.  However, the

24   government's memorandum did.  And it asked me to add two points

25   under §2B1.2(b)(3)(c) for an aggravating role, because his

1    criminal activity was otherwise extensive.  I think they meant

2    §2B1.1(c), which says:  If the defendant was an organizer,

3    leader, manager, or supervisor in any criminal activity that

4    involved five or more participants or was otherwise extensive.

5              Does the government want to address this enhancement?

6              MR. CRABB:  Yes, Your Honor.

7              THE COURT:  All right.

8              MR. CRABB:  And first, if I may, Your Honor, I

9    believe we did have a typographical error.  We were referring

10   to 2J1.1(b)(3)(C), is, I believe, what we had intended to

11   reference with respect to the extensive of scope, planning and

12   preparation of the obstruction.  I apologize if there's a

13   typographical error in our filing.

14             THE COURT:  All right.  Well, I wasn't -- I haven't

15   even looked at that because you said 2B1, which is role in the

16   offense, and, I think, you called it role in the offense, and

17   that's what the defense responded to.  And that relates to the

18   number of participants involved in the scheme, and so I don't

19   think it applies here because there's really no indication that

20   anybody was involved in this other than Mr. Stone,

21   notwithstanding his attempt to get Mr. Credico involved.

22             So, what are you pointing me to now?

23             MR. CRABB:  Again, I apologize for our mistake there,

24   but, we're asking the Court to consider 2J1.1(b)(3)(C).

25             MR. GINSBERG:  Your Honor, it's actually 2B1.2.

1          MR. CRABB:  Excuse me, again.

2          Your Honor, this particular adjustment to the

3    guidelines applies if the obstructive conduct was extensive in

4    scope, planning, or preparation.  It's our position, based on

5    the record before the Court, that there was extensive scope in

6    the obstructive behavior here.

7          As the Court is well aware, there were a series of

8    lies made to the committee.  There were false letters submitted

9    to the committee.  There was the obstructive behavior with

10   respect to Mr. Credico.

11         Based on those facts, we believe this enhancement

12   applies, showing that the obstructive behavior was extensive in

13   scope.

14         THE COURT:  All right.  Has the defense been advised,

15   before this minute, that this is what we're talking about?

16         MR. GINSBERG:  Yes, Your Honor.

17         THE COURT:  All right.  Someone might have mentioned

18   it to me.  But, I'll give you an opportunity to address it.

19   And if somebody has a copy of the guidelines and would like to

20   hand them up and let me look at it, that would be useful also.

21         MR. GINSBERG:  I have them.

22         THE COURT:  So, it says:  If the offense, A, involved

23   the destruction, alteration, or fabrication of a substantial

24   number of records, documents, or tangible objects; B, involved

25   the selection of any essential or especially probative record,

1    document, or tangible object to destroy or alter; or C, was

2    otherwise extensive in scope, planning, or preparation.

3           And I think C is somewhat -- is part of a series, and

4    it derives some meaning for the two that came before, increase

5    by two levels.

6           All right.  Go ahead.

7           MR. GINSBERG:  It's our view that this does not

8    apply.  The cases that address this, in particular, the two

9    that the government cited, involve much more extensive conduct.

10   Here, essentially, all you have is five false statements in the

11   context of very lengthy testimony, and, yes, a long stream of

12   text messages.  But, basically, that's what it is, is a stream

13   of text messages between two people.

14          The conduct here does not fall outside the normal

15   realm of the guideline such that it is extensive in scope.  It

16   was fairly focused in its scope.  It wasn't extensive in its

17   planning.  I think there was very little evidence of planning

18   or preparation.

19          The case that the government relies on is

20   *United States versus Petruk*, 836 F.3d 974, from the Eighth

21   Circuit in 2016.  And the Court in that case found that the

22   defendant had concocted an elaborate plan to manufacture false

23   evidence of a confession.  And in doing that, the defendant,

24   who was incarcerated, enlisted someone on the outside to find a

25   third party to pretend to be someone who was involved in the

1    offense.  The defendant drafted multiple versions of a script

2    that he wanted the supposed person involved in this conduct to

3    read.  He sent that information to his would-be coconspirator

4    under the name of another inmate to avoid detection.

5         He used coded language in doing it so that if it were

6    intercepted, it would not be understood.  And he created a

7    system where he had this person prepared to read this false

8    script in order to exculpate himself, with the idea that it

9    would be overheard on the prison telephones by the prison

10   authorities and then be brought to the attention of the Court

11   and introduced as false evidence in a trial.

12        That is certainly a lot more planning and preparation

13   than anything that went on here.

14        THE COURT:  All right.  The probation office did not

15   find this enhancement to be applicable and neither do I.  I

16   don't think that we're looking at extensive scope or planning.

17   As is contemplated by that guideline, I don't think it applies

18   to these facts.  So, I'm not going to add two more levels at

19   this point for that.  So, we're still at Level 25.

20        Now, however, we do go on to other sections of the

21   guidelines that look to other aggravating and mitigating

22   factors, and both the presentence report and the government's

23   memorandum point to §3C1.1, obstructing or impeding the

24   administration of justice.  And that is this prosecution now

25   we're talking about, not the House investigation, that adds two

1    levels.

2         And the guideline says:  If the defendant willfully

3    obstructed or impeded or attempted to obstruct or impede the

4    administration of justice with respect to the investigation,

5    prosecution, or sentencing of the instant offense of

6    conviction, and the obstructive conduct related to his offense

7    of conviction and any relevant conduct or a closely related

8    offense, you increase by two levels.

9         And the government's memorandum, the first one, said

10   it applies.  It detailed in five pages the defendant's

11   post-indictment attempts to stoke public sentiment against the

12   prosecution and the Court, and to bring media attention to the

13   case, all in violation of Court orders, and this series of

14   inaccuracies, contradictions, and omissions in his

15   representations to the Court.

16        The supplemental memorandum says:  Well, this

17   enhancement overlaps, to a degree, with the offense conduct in

18   this case.

19        I'm not sure I understand that assertion.  As

20   proposed, the guideline is not meant to cover any

21   pre-indictment conduct at all.  And, yes, the guideline says it

22   doesn't apply if obstruction of justice is the charge of

23   conviction; but, that's not true, say the guidelines, if there

24   is further obstruction during the prosecution.

25        The government also said in its supplemental memo:

 1     It's unclear to what extent the defendant's obstructive conduct

 2     actually prejudiced the government at trial.

 3          But that isn't the test.  Obstruction is an attempt;

 4     it doesn't have to be successful.  And the administration of

 5     justice is a little bit more than whether they got in the

 6     prosecution's way.

 7          So, what is the government's position today on

 8     whether this applies or doesn't apply?

 9          MR. CRABB:  Your Honor, the government's position is

10     that the guideline's enhancement set forth in 3C1.1 applies

11     here for the reasons set forth in the original sentencing

12     memorandum.

13          THE COURT:  All right.  Is there anything further you

14     want to say about it?

15          MR. CRABB:  Not unless the Court has questions for

16     me.

17          THE COURT:  Okay.  Fine.

18          The defense says:  Well, these issues ceased well

19     before the trial began.

20          And that, unfortunately, does not appear to be true,

21     given the reporting by Alex Jones of Mr. Stone's reaching out

22     to him while the trial was ongoing.

23          The defense also says, quote:  As was made plain

24     during the relevant proceedings, the conduct in question

25     resulted, in large measure, from the exacerbation of a

1    longstanding battle with anxiety that was heightened during the

2    pendency of this action, close quote.

3            I'm not sure that was established with evidence at

4    any point in the proceeding.  I'm certainly willing to grant

5    that being a criminal defendant did increase Mr. Stone's

6    anxiety, but the conduct is exactly the sort of provocative

7    public statement, not necessarily grounded in truth, that the

8    defendant has been trading in for years, as the evidence at

9    trial established, and as I was just told with respect to the

10   first enhancement.

11           Even after he first denied and then acknowledged

12   personally selecting the crosshairs photo, he sat there telling

13   me:  Yes, I'm going to follow any restrictions on talking about

14   the investigation; but, forgetting to mention that he had a

15   book on the subject wending its way to publishers as we spoke.

16   I certainly haven't seen anything that would attribute that to

17   mere anxiety.

18           The defense also says his conduct, quote:  Didn't

19   cause significant further obstruction of the prosecution of the

20   case, close quote.

21           And, so, I would like the -- to hear the defense on

22   this.  But, first, I would like to know where you get that test

23   from.  Do I have to find significant further obstruction of the

24   prosecution of the case for this guideline to apply?

25           MR. GINSBERG:  One moment, Your Honor.

1            (Pause.)

2            MR. GINSBERG:  With respect to the test, Your Honor,

3    the -- such an adjustment, quote:  Is not to be applied to the

4    offense level for obstruction of justice, except if a

5    significant further instruction occurred during the

6    prosecution.

7            And that's United States sentencing guideline §3C1.1,

8    Note 7.

9            THE COURT:  All right.  During the prosecution, yes.

10   Further obstruction of the administration of justice during the

11   prosecution.

12           MR. GINSBERG:  Significant further obstruction.

13           THE COURT:  Okay.

14           MR. GINSBERG:  So, that's where the test comes from.

15           THE COURT:  Okay.  Thank you.

16           MR. GINSBERG:  Beyond that, we stand on our papers

17   and leave it to the Court to decide.

18           THE COURT:  All right.  I think the place to look for

19   guidance about what the adjustment is supposed to cover is the

20   guideline itself.  Application Note 3 says that obstructive

21   conduct can vary widely in nature, degree of planning, and

22   seriousness.

23           And it says, Application Note 4 will set forth

24   examples of the types of conduct to which it applies.  And 5

25   sets forth examples of less serious forms of conduct to which

 1      it's not intended to apply.

 2            It also says:  Although the conduct to which this

 3      adjustment applies is not subject to precise definition, if you

 4      compare what's in 4 and 5, that should assist the Court in

 5      determining whether application of this adjustment is warranted

 6      in any particular case.

 7            So, if you look at what's in Note 5, the list of

 8      things to which the adjustment doesn't apply, none of them are

 9      analogous.  They're all things like giving the police the wrong

10      name when they stop you, making false statements after you've

11      been arrested.

12            Application Note 4 contains what is supposed to be a

13      non-exhaustive list of examples of the type of conduct to which

14      this should apply.  A. is threatening, intimidating, or

15      otherwise unlawfully influencing a codefendant, witness, or

16      juror directly or indirectly, or attempting to do so;

17            B. has to do with suborning perjury;

18            C., producing or attempting to produce false or

19      altered documents;

20            D., destroying or concealing evidence or getting

21      someone else to do it;

22            E., escaping or attempting to escape from custody or

23      willfully failing to appear;

24            F., providing materially false information to a judge

25      or magistrate judge;

1          G., providing a materially false statement to a law

2     enforcement officer that obstructs the investigation;

3          H., providing materially false information to a

4     probation officer in a presentence investigation;

5          I., other conduct prohibited by the obstruction of

6     justice provisions in Title 18;

7          J., failing to comply with a restraining order or

8     injunction issued;

9          K., threatening the victim of the offense in an

10    attempt to prevent the victim from reporting the conduct.

11          None of them are 100 percent on point.  But,

12    certainly, A., threatening or intimidating a juror or a

13    factfinder in the case; F., providing false information to a

14    judge; and J., not complying with the restraining order.  While

15    the orders here are not the ones specifically mentioned in the

16    list, it's not necessary that there's an exact fit.  The list

17    is supposed to be illustrative.

18          And given the similarity of the conduct in this case

19    to what's listed in A., F., and J., I find that the guideline

20    applies.  The defendant engaged in threatening and intimidating

21    conduct towards the Court, and later, participants in the

22    National Security and Office of Special Counsel investigations

23    that could and did impede the administration of justice.

24          I suppose I could say:  Oh, I don't know that I

25    believe that Roger Stone was actually going to hurt me, or that

1    he intended to hurt me.  It's just classic bad judgment.

2            But, the D.C. Circuit has made it clear that such

3    conduct satisfied the test.  They said:  To the extent our

4    precedent holds that a §3C1.1 enhancement is only appropriate

5    where the defendant acts with the intent to obstruct justice, a

6    requirement that flows logically from the definition of the

7    word "willful" requires that the defendant consciously act with

8    the purpose of obstructing justice.

9            However, where the defendant willfully engages in

10   behavior that is inherently obstructive, that is, behavior that

11   a rational person would expect to obstruct justice, this Court

12   has not required a separate finding of the specific intent to

13   obstruct justice.

14           Here, the defendant willfully engaged in behavior

15   that a rational person would find to be inherently obstructive.

16   It's important to note that he didn't just fire off a few

17   intemperate emails.  He used the tools of social media to

18   achieve the broadest dissemination possible.  It wasn't

19   accidental.  He had a staff that helped him do it.

20           As the defendant emphasized in emails introduced into

21   evidence in this case, using the new social media is his "sweet

22   spot."  It's his area of expertise.  And even the letters

23   submitted on his behalf by his friends emphasized that

24   incendiary activity is precisely what he is specifically known

25   for.  He knew exactly what he was doing.  And by choosing

Instagram and Twitter as his platforms, he understood that he
was multiplying the number of people who would hear his
message.

By deliberately stoking public opinion against
prosecution and the Court in this matter, he willfully
increased the risk that someone else, with even poorer judgment
than he has, would act on his behalf.  This is intolerable to
the administration of justice, and the Court cannot sit idly
by, shrug its shoulder and say:  Oh, that's just Roger being
Roger, or it wouldn't have grounds to act the next time someone
tries it.

The behavior was designed to disrupt and divert the
proceedings, and the impact was compounded by the defendant's
disingenuousness.  As the opinion in *Henry* pointed out in *U.S.
versus Maccado*, 225 F.3d 766, at 772, the D.C. Circuit even
upheld a §3C1.1 enhancement for failure to provide a
handwriting example because such failure, quote, Clearly has
the potential to weaken the government's case, prolong the
pendency of the charges, and encumber the Court's docket.

And the record didn't show a lack of such intent.
The defendant's conduct here certainly imposed an undue burden
on the Court's docket and court personnel, as we had to waste
considerable time convening hearing after hearing to get the
defendant to finally be straight about the facts, to get the
defendant to comply with court orders that were clear as day,

1    and to ensure that the public and that people who come and go

2    from this building every day were safe.  Therefore, I'm going

3    to add the two levels, and we are now at a Level 27.

4          So, now what?  Now, what do the guidelines do?  The

5    guidelines have a sentencing table.  It's a grid.  The offense

6    level goes down the left side and your criminal history

7    category goes across the top and then you compare the two to

8    find out where is the recommended sentencing guideline range

9    for this case.

10         The defendant has no prior criminal history.  That

11   puts him in Criminal History Category Roman numeral I.  This

12   means that his lack of any prior criminal history, which both

13   the defendant and the government exhorted me to consider, is

14   actually already baked into the guidelines to some extent.  The

15   advisory sentencing guideline range that applies to Level 27 is

16   70 to 87 months, or 5.8 to 7.25 years, and a fine of $25,000 to

17   $250,000.

18         Without it, without the last two levels, if we'd been

19   at Level 25, the guideline range would have been 57 to 71

20   months, or 4 3/4 to almost 6 years, and a fine of $20,000 to

21   $200,000.

22         I note that the initial government guideline

23   calculation at Level 29, or 87 to 109 months, came out to a

24   7 1/4 to a 9-year range.  And the government's supplemental

25   brief points out, if I had calculated as it had asked me to

1    with respect to all the other enhancements, but he didn't

2    receive the eight-level enhancement for threats at all, even

3    that would have resulted in an advisory sentencing guideline

4    range of 37 to 46 months.

5           Once I determine what the applicable guideline range

6    is, I have to consider whether there are any motions within the

7    guidelines for a downward departure.  The defense mentioned

8    several guidelines that could bear on this issue, but I just

9    want to know right now whether you are seeking a formal

10   departure, or you're simply asking me to take into

11   consideration his age and his health?  And I believe you've

12   also argued his diminished capacity at the time he committed

13   the offense.

14          MR. GINSBERG:  We're not seeking a departure.  We

15   have 3553 arguments, but no guideline departure arguments.

16          THE COURT:  Okay.  All right.  Thank you.

17          So, now the guideline has been calculated.  But, as I

18   said at the beginning, that's just the starting point.  The

19   parties have put their views in writing, but now is the time

20   that they also get to speak.

21          Would the government like an opportunity to speak

22   regarding the appropriate sentence in this case?

23          Mr. Crabb, I'm happy to hear from you.  And as I

24   understand it, you're representing United States of America in

25   the case of the *United States of America versus Roger Stone*.  I

 1     fear that you know less about the case, saw less of the

 2     testimony and the exhibits than just about every other person

 3     in this courtroom, with the possible exception of the defense

 4     attorney who just joined the team.

 5             So, before we get to your allocution, is there

 6     anything you would like to say about why you're the one

 7     standing here today?

 8             MR. CRABB:  Your Honor, I have four points that I

 9     would like to briefly address, which I think will incorporate

10     that.  May I do that?

11             THE COURT:  All right.

12             MR. CRABB:  Thank you.

13             First, Your Honor, I want to apologize to the Court

14     for the confusion that the government has caused with respect

15     to this sentencing and the difficulties surrounding that.  I

16     want to make clear to the Court that this confusion was not

17     caused by the original trial team.  The original trial team had

18     authorization at the U.S. Attorney's Office to file this

19     sentencing memorandum that they submitted to the Court Monday

20     before last.

21             THE COURT:  Let me just follow up on that.

22             So they -- the trial team wrote it?

23             MR. CRABB:  Yes, Your Honor.

24             THE COURT:  But someone higher up than them had to

25     approve it?

```
 1              MR. CRABB:  Correct, Your Honor.
 2              THE COURT:  Does that include you?
 3              MR. CRABB:  I was part of the process, Your Honor.
 4              THE COURT:  All right.  Did it go all the way to the
 5    U.S. Attorney?
 6              MR. CRABB:  Yes, the U.S. Attorney reviewed it, Your
 7    Honor.
 8              THE COURT:  Did he approve it?
 9              MR. CRABB:  Yes, Your Honor.
10              THE COURT:  And did the U.S. Attorney's Office for
11    the District of Columbia then have to get approval from Main
12    Justice before it was filed?
13              MR. CRABB:  I don't know the exact requirements.  I
14    know that there was consultation between the United States
15    Attorney's Office and Main Justice.
16              THE COURT:  Did they receive the approval from Main
17    Justice before they filed it?
18              MR. CRABB:  No, Your Honor.  My understanding is
19    based on what the Attorney General has stated, is there was a
20    miscommunication between the Attorney General and the
21    United States Attorney for the District of Columbia as to the
22    authorization and the expectations that the Attorney General
23    had.
24              THE COURT:  But, it was approved by everyone whose
25    name was on it, including the U.S. Attorney?
```

```
 1                    MR. CRABB:  Yes, Your Honor.

 2                    THE COURT:  Well, did your office have to wait for

 3       Main Justice to get back to you before you could file it?

 4                    MR. CRABB:  I'm not sure if I understand the Court's

 5       question.  What I understand is that there was a

 6       miscommunication before it was filed between the Attorney

 7       General and the United States Attorney as to what the

 8       expectations were from the Attorney General and what the

 9       appropriate filing would be.

10                    THE COURT:  Well, can you elaborate?  Do you have any

11       personal knowledge about what the nature of that

12       miscommunication was?

13                    MR. CRABB:  No, Your Honor, I don't.

14                    THE COURT:  You're not suggesting now that anything

15       that was in the first filing about the nature of the offenses

16       or the calculation of the guidelines or the evidence in the

17       case was incorrect, are you?

18                    MR. CRABB:  I'm not, Your Honor.

19                    THE COURT:  All right.  Continue with what you were

20       about to tell me.

21                    MR. CRABB:  Thank you, Your Honor.

22                    The second point I would like to briefly address is I

23       want to state, and I would like to emphasize this, that the

24       original sentencing memorandum filed by the trial team was done

25       in good faith.  Sentencing is not an exact science.  Reasonable
```

1    minds can differ as to what an appropriate sentence may be.

2    But, as the Court has alluded to earlier in this proceeding, it

3    is generally the policy of the United States Department of

4    Justice to request guideline sentences.  And there was nothing

5    in bad faith about what was done by the original trial team

6    here.

7                THE COURT:  Well, it's not just a question of whether

8    it was good faith.  It was fully consistent with current DOJ

9    policy; isn't that true?

10               MR. CRABB:  Yes, Your Honor.  If I may add one point

11   to that.

12               As I've said, it's consistent with the Department of

13   Justice policy to request a sentence within the guidelines.

14   But, it's also the Department of Justice policy, as set

15   together in the Justice Manual, that there should be a

16   particularized review of any case applying the law to the facts

17   and circumstances of any defendant's case before --

18               THE COURT:  The current policy of this Department of

19   Justice is to charge and prosecute the most serious offense

20   available in order to get the highest level guideline; is that

21   correct?

22               MR. CRABB:  That's the general policy, Your Honor.

23   If I --

24               THE COURT:  And I've been told by assistants standing

25   before me that they aren't even allowed to recommend or agree

1     to a sentence below the guideline range without supervisory

2     approval in your office; is that correct?

3              MR. CRABB:  That's true, Your Honor.

4              THE COURT:  All right.  Continue.

5              MR. CRABB:  Thank you, Your Honor.

6              The third point I would like to briefly address, Your

7     Honor, is the Department of Justice and United States

8     Attorney's Office is committed to enforcing the law without

9     fear, favor, or political influence.  This prosecution was and

10    this prosecution is righteous.  The defendant was found guilty

11    by a jury of his peers of committing serious crimes:

12    Obstructing justice, lying to Congress, and witness tampering.

13             We believe that based on those crimes of conviction,

14    the Court should impose a substantial period of incarceration.

15             THE COURT:  All right.  Now, with respect to the

16    second filing, your name is on it and you're the one that

17    signed it, physically signed it.  So does that mean that you

18    wrote it?

19             MR. CRABB:  Your Honor, I'm not at liberty to discuss

20    the internal deliberations and how materials are prepared

21    within the United States Attorney's Office or the Department of

22    Justice.  But, the Court's right, I signed that document and

23    submitted it.

24             THE COURT:  Well, were you directed to write it by

25    someone else?

```
 1           MR. CRABB:  Your Honor, I apologize.  I cannot engage

 2   in those discussions of internal deliberations.

 3           THE COURT:  All right.  Is there anything else you

 4   want to tell me about why I should impose a substantial period

 5   of incarceration in this case?

 6           MR. CRABB:  Nothing more than to reiterate that this

 7   is a righteous prosecution and the offenses of conviction are

 8   serious and has been set forth in more detail in the original

 9   sentencing memorandum as to the nature and circumstances of the

10   offense, which, as the Court has pointed out to me, the Court

11   knows better than I do.

12           THE COURT:  All right.  Well, are you making a

13   recommendation as to what the sentences should be?  Other

14   offices, I think, that's standard operating procedure, to not

15   make a recommendation and just defer to the Court.  But, the

16   usual U.S. Attorney's Office of the District of Columbia's

17   practice is to stand here and advocate for a particular

18   outcome.

19           So, are you not planning to do that today?

20           MR. CRABB:  Your Honor, that brings me to the last

21   and final point I wanted to make for the Court.

22           May I address that now?

23           THE COURT:  Yes.

24           MR. CRABB:  Your Honor, the last point I would like

25   to make is that under the unique facts and circumstances
```

1    presented in this matter, it is particularly appropriate for

2    the government to defer to the Court with respect to what the

3    specific sentence would be in this case.

4            We understand that, as happens in all sentencings

5    that are adjudicated in this courthouse, that the Court will

6    consider the entire record in this matter, that the Court will

7    consider the guidelines and the appropriate sentencing factors,

8    and that the Court will consider the submissions of the

9    parties, which the Court has already referred to, and the

10   submission of the probation office.  And, most importantly, the

11   Court will rely on its own sound judgment and experience.

12           To add to that, Your Honor, given this Court's unique

13   experience with related cases before this Court, and this

14   Court's record of thoughtful analysis and fair sentences

15   imposed in those cases, the government has the utmost

16   confidence that we defer to the Court, and we have confidence

17   that the Court will impose a just and fair sentence in this

18   matter.

19           THE COURT:  All right.  Thank you.

20           MR. CRABB:  Thank you, Your Honor.

21           THE COURT:  Would defense counsel like to speak on

22   the defendant's behalf?

23           MR. GINSBERG:  Yes, Your Honor.

24           THE COURT:  All right.

25           MR. GINSBERG:  Having reviewed the record in this

1    case, Your Honor, it's clear that the Court, throughout these

2    proceedings, has endeavored to make rulings designed to keep

3    these proceedings focused on the evidence in this courtroom,

4    and on this case and this case alone.

5            And now, as the Court is about to sentence Mr. Stone,

6    we believe that it is critically important that the Court

7    continue to do just that, and not to focus on all of the many

8    things that are going on outside of this courtroom, for the

9    sentence that the Court is going to impose today is a sentence

10   that is going to be imposed on a real person; not a media

11   figure, not a political character, but a real person.

12           And I'm sure the Court is accustomed to defense

13   lawyers standing before it and talking about the impact that a

14   sentence has on a defendant's family.  But, in this case, given

15   Mr. Stone's larger-than-life persona, I think it's particularly

16   important to remind the Court that Mr. Stone is, in fact, not

17   simply that public persona, but a human being.  A person with a

18   wife, who is here today; children, who are also here with us;

19   grandchildren, others who support and care for him.  And he's

20   also soon to be a great grandfather.

21           And it is with these things in mind that I ask the

22   Court to consider the full scope of the person who stands

23   before you for sentencing, and to step back and evaluate this

24   case not in the hyperbolic terms that were uttered during the

25   height of battle in the course of litigation in a trial, but

1      from a more objective perspective that places this case in the

2      broader scheme of cases of a similar nature, with defendants

3      similarly situated, generally speaking, but also considering

4      sentences imposed on defendants in cases that emanated from

5      this investigation and related investigations in order to

6      avoid, as the law requires, any unwarranted disparities.

7              And as the Court noted, we do want the Court to

8      realize that Mr. Stone, at 67 years old, stands before Your

9      Honor with no criminal record.  It's true that's factored into

10     the guidelines to some extent.  But, there's significant

11     evidence that people who are first-time offenders at

12     Mr. Stone's age have, effectively, no likelihood of recidivism.

13     And that is something that, I think, should weigh into the

14     Court's calculation, because it is one of the factors that

15     3553(a) states is an important goal of sentencing, the specific

16     deterrence.

17             THE COURT:  Yes, there's a difference being in

18     Category I when you're 21 and being in Category I when you're

19     67.

20             MR. GINSBERG:  Yes.  We've all had experience with

21     that.

22             And as outlined in the letters that the Court has

23     received and detailed on the record, Mr. Stone has many

24     admirable qualities.  The Court received letters from people

25     Mr. Stone knows quite well who are very close to him, and

1    people who he hardly knows or doesn't know at all.

2            He's devoted himself to worthwhile causes, and

3    critically, not just through monetary contributions, like many.

4    And not to disparage that, but there's something different when

5    a person gives of his own time and his own efforts to try to

6    help people, to try to support causes.  It's different than

7    just writing a check.  We're thankful for all who do that, but

8    there's something, I think, that it speaks to someone's

9    character when they go out of their way to give of themselves.

10           He's devoted himself, for example, to causes that

11   benefit veterans.  He also devotes considerable time to the

12   welfare of animals.  And he, in that regard, has offered his

13   services, pro bono, to a lobbying group that has successfully

14   fought to end certain cruel testing on animals.

15           He's also done a great deal of work to assist NFL

16   players who have suffered from traumatic brain injuries.  In

17   fact, that work caused a person, the wife of a retired NFL

18   player who doesn't know Mr. Stone, to write to Your Honor and

19   say this man, who has, really, no particular connection to me

20   or my husband or any of these other NFL players who have

21   suffered these horrible injuries, has done such tremendous work

22   that he's had a direct personal impact on our lives.

23           That's something that, I think, takes Mr. Stone

24   outside of the norm.

25           He's also, as reflected in the letters, a spiritual

1  person, and a person who has worked with groups to help bridge

2  racial divides in this country.

3        And on a less grand scale, the Court also received a

4  letter which, I think, is particularly telling.  It's a letter

5  from one of Mr. Stone's former employees, and it describes

6  Mr. Stone in very, very personal terms, as a mentor, as someone

7  who is kind, generous with his time, helpful.  And, I think,

8  this letter is telling, because grand public gestures aside, as

9  worthwhile as they may be, I think you can judge a person's

10  character best by the way he treats those closest to him,

11  particularly people in a subordinate role.

12        And that letter, I think, is important in

13  understanding who Mr. Stone really is, not the larger-than-life

14  political persona that he plays on TV, but the real person, who

15  goes home every day to his wife and his family, and who works

16  day to day with people who respect him, who care for him, and

17  who have stood up to tell the Court as much.

18        Now, of course, as I noted earlier, he does have a

19  family and he is devoted to them and they will suffer

20  tremendously if he is incarcerated.  And, indeed, they've

21  already suffered quite a bit, beginning with the horrific

22  circumstances under which he was arrested, horrifying

23  circumstances that, really, had quite an impactful negative

24  experience for them.

25        And so in some sense, with -- although I said we

1    should focus only on what's in the courtroom, with the intense

2    public scrutiny that this case has engendered and the

3    particular stresses of this case, both for Mr. Stone and his

4    family, the process, really, to some extent, has already been

5    the punishment.

6         Now, I recognize that the jury has found that

7    Mr. Stone violated our laws and that the Court must impose

8    sentence on him.  But, as the law also states, that sentence

9    should be sufficient but not greater than necessary to achieve

10   the aims in the statute.  And one of those aims is to promote

11   respect for the law.

12        And in this proceeding, as in any proceeding, there

13   is always an awareness that what is done in our courtrooms

14   sends a message to the broader public.  And here, as in every

15   case, the most important message that can be sent is one of

16   fairness of the judicial system and justice for all who come

17   before it, because it is that message that will promote the

18   greatest respect for the law.

19        Now, as the government pointed out in its

20   supplemental sentencing submission, the guidelines in this case

21   disproportionately escalate Mr. Stone's sentencing exposure to

22   a level more typical of cases not of obstruction of justice,

23   but of armed robbery.  In fact, the government indicated, as

24   Your Honor is aware, that a sentence far less than 87 to 108

25   months would be appropriate here.  Far less.

```
 1              And so for all of these reasons, including, most

 2     importantly, Mr. Stone's age, his health, and his lack of

 3     criminal history, we respectfully submit that a

 4     non-incarceratory sentence is appropriate here.

 5              THE COURT:  All right.  Thank you.

 6              Mr. Stone, you have the opportunity now to say

 7     anything that you would like me to consider before I impose

 8     sentence.  I do understand that you went to trial, you asserted

 9     your innocence, and you're likely going to be filing an appeal.

10     So you and your team may have decided that you should not

11     speak, and I respect that completely and won't hold it against

12     you if you don't, but just want to let you know that this is

13     your opportunity.

14              THE DEFENDANT:  Your Honor, I choose not to speak at

15     this time.

16              Thank you very much.

17              THE COURT:  All right.  Thank you.

18              At this point I want to take a short break, and then

19     we'll return.  Once again, the clock on the wall and the watch

20     on my arm are in somewhat different time zones.  So I believe

21     it's approximately 11:20, and we'll resume in about 10 or 15

22     minutes.

23              Thank you.

24              (Recess.)

25              THE COURTROOM DEPUTY:  Your Honor, recalling Criminal
```

1    Case Number 19-18, the United States of America v. Roger Stone.

2    Mr. Stone is present in the courtroom.

3              For the government we have Mr. Crabb and Mr. Cooney.

4              For defense we have Mr. Ginsberg, Mr. Rogow,

5    Mr. Buschel, Mr. Smith, and Ms. Campion.

6              THE COURT:  All right.  Unsurprisingly, I have a lot

7    to say.  Ordinarily, the defendant and counsel stand at the

8    lectern while I go through my remarks, so I'm going to ask you

9    to step up now.

10             All of you?  All right.

11             MR. ROGOW:  We're the ones --

12             THE COURT:  You may want to rethink that.

13             MR. BUSCHEL:  Just us, Judge.

14             THE COURT:  All right.

15             The best tool I have for structuring my thinking

16   about the task that falls to me today is the statute, which I

17   always find to be thorough and a helpful listing of all the

18   relevant consideration.  So what I'm going to do now is what I

19   always do, which is go through every single factor.  Following

20   that process ensures that I handle every case in the same

21   manner as the ones that came before.

22             The first factor that the statute tells me I must

23   consider is the nature and circumstances of the offense, which

24   is where you have to start before you can assess what sentence

25   would be proportionate or just.

1          One letter writer wrote to me:  In politics, the

2     successful person doing all the right things for all the right

3     reasons can be, and will be, vilified and maligned in a

4     high-profile way by adversaries to get political advantage.

5     That is what happened and what is happening to Roger Stone.

6     People that he confronted with his talents, rightfully placed,

7     sought to derogate him, call him names, and accuse him of

8     political advantage.

9          That is most certainly not what happened here.  Those

10    are not the circumstances of this offense.  He has not been

11    prosecuted by his adversary or anyone else's adversary, and he

12    was not prosecuted to enable anyone to gain political

13    advantage.

14          This case did not arise because Roger Stone was being

15    pursued by his political enemies.  It arose because Roger

16    Stone, characteristically, injected himself smack into the

17    center of one of the most significant issues of the day.  Let

18    me give that some context.

19          In June 2016, during the run-up to the last

20    presidential election, the head of WikiLeaks, Julian Assange,

21    publically announced that WikiLeaks had information concerning

22    the democratic candidate Hillary Clinton that was awaiting

23    publication.  Shortly thereafter, the Democratic National

24    Committee announced that its server had been hacked by the

25    Russians.  On, approximately July 22nd WikiLeaks began

1    releasing thousands of DNC emails.

2         Three days later, the evidence showed Mr. Stone

3    emailed a person he knew named Jerome Corsi, RE:  Get to

4    Assange.

5         Stone encouraged Corsi to get to Assange in the

6    Ecuadorian embassy in London, and he suggested that the pending

7    WikiLeaks emails, allegedly, dealt with the Clinton Foundation.

8         There were other emails between the two, including

9    one on August 2nd from Corsi to Stone:  Word is, our friend at

10   embassy plans two more dumps.  One shortly after I'm back,

11   second in October.  Impact planned to be very damaging.  Time

12   to let more than Podesta be exposed as in bed with the enemy if

13   they're not ready to drop HRC.  That appears to be the game

14   hackers are now about.  Would not hurt to start suggesting HRC

15   old, memory bad, had stroke -- neither he nor she will.  I

16   expect that to be much of the next dump focus, setting the

17   stage for foundation debacle.

18        On August 3rd, Stone reaches out to the campaign

19   manager, Paul Manafort:  I have an idea -- in his words -- to

20   save Trump's ass.

21        Just a few days later, after that, Stone began making

22   a series of public statements, at least five between August 8th

23   and August 16th, announcing that he was in communication with

24   Assange, and suggesting that he knew what was coming.

25   Initially, he stated that he had communicated with Assange.  He

1    then back-peddled and clarified that he had communicated, but

2    through an intermediary.  He referred to the intermediary as a

3    "back channel," a "trusted mutual friend."

4            During the same time period Stone was communicating

5    with senior members of the Trump campaign, including deputy

6    campaign chair Richard Gates, and CEO Steve Bannon about

7    WikiLeaks plans.

8            On August 18 he emailed Mr. Bannon:  Trump can win,

9    but time is running out.  I do know how to win this, but it

10   ain't pretty.  Campaign has never been good at playing the new

11   media.

12           Bannon responds with:  Let's talk ASAP.

13           Later, in August, Stone learned that a friend and

14   radio personality named Randy Credico had managed to set up an

15   interview with Assange.  So beginning in September 2017, Stone

16   started emailing Credico, asking him to relay a request to

17   Assange concerning which additional emails would or should be

18   released.  This went on in September and October, and when

19   Credico would indicate that he had information -- although,

20   apparently, he didn't -- Stone would turn around and pass it

21   along to Bannon, etcetera.

22           From the start, though, Credico consistently reminded

23   Stone that he could not possibly have been the intermediary

24   Stone had spoken about in early August because he hadn't even

25   met Assange as of the time Stone was proudly making

1      announcements about his contact.

2              Thereafter, in January 2017, the United States House

3      of Representatives Permanent Select Committee on Intelligence

4      announced an investigation into allegations of Russian

5      interference in the 2016 presidential election.

6              As part of that investigation, the House Intelligence

7      Committee was also looking into whether Russia was involved in

8      obtaining and transmitting stolen documents that were

9      eventually released by Wiki, and whether there were any leaks

10     between any of that and the Trump campaign.

11             In the public version of its parameters for Russia

12     investigation, dated March 1, 2017, the committee said that the

13     investigation would seek to answer four questions, including

14     what Russian cyber activities and other active measures were

15     directed against the United States and its allies, and did the

16     Russian active measures include links between Russia and

17     individuals associated with political campaigns or any other

18     U.S. persons.

19             The announcement went on, quote:  Chairman Nunes said

20     the Intelligence Committee has been investigating Russia for

21     years and warning about the Putin regime's hostile

22     international actions, its aggressions in cyberspace, and its

23     influential international propaganda campaign.  The committee

24     is determined to continue and expand its inquiries into these

25     areas, including Russian activities related to the 2016 U.S.

1    elections.  On a bipartisan basis, we will fully investigate

2    all the evidence we collect and follow the evidence wherever it

3    leads.

4           Stone let the committee know he would volunteer to

5    testify and, unsurprisingly, the committee asked him to come to

6    talk about what he had publicly stated.

7           Stone, of course, knew that his claimed contacts with

8    Assange would be a subject of the testimony.  His own opening

9    statement to the committee reveals his understanding that his

10   contacts with or transmittal of messages or requests to

11   WikiLeaks or Assange, either directly or through a middleman,

12   would be a subject of the committee's inquiry.

13          And, sure enough, the transcript of the September 26

14   hearings include multiple questions to Stone about Assange and

15   WikiLeaks, as well as statements by members of the committee of

16   both parties made to him while he was testifying, emphasizing

17   the importance of any communications with WikiLeaks to their

18   inquiries.

19          The importance of the subject matter was born out by

20   the report written by the republican majority on the committee.

21   Matters investigated by the committee, they said, include

22   allegations pertaining to involvement in or knowledge about the

23   publication of stolen emails.

24          They also wrote:  Particularly in light of Candidate

25   Trump's expressed enthusiasm for WikiLeaks, the committee

1    examined the relationship between his associates and the stolen

2    emails.

3           It added:  During his testimony to the committee,

4    Stone addressed three public statements suggesting he might

5    have important information about and potentially advance

6    knowledge of disclosures during the 2016 campaign, including an

7    August 2016 public speech about purported contacts with

8    Julian Assange.

9           Stone did testify before the committee on

10   September 26, 2017.  He claimed he had only one intermediary.

11   Then and after, the members repeatedly exhorted him to identify

12   this supposed intermediary.  He let the committee know it was

13   Randy Credico.  But, he said he had no emails or texts that

14   would shed any light on the issue.  It was all false.

15          And afterwards, he endeavored mightily to make sure

16   the person he had falsely named didn't tell the truth and mess

17   up the story.  That is why he was indicted; not for his

18   political activities.

19          In fact, the record shows that when the Department of

20   Justice formally asked the committee for the hearing transcript

21   and other materials about the defendant, on December 20th, 2018

22   the then chair of the committee, Republican Congressman Devin

23   Nunes, transmitted the information to the department, quote:

24   Pursuant to a committee vote, close quote.

25          And, quote:  With no restrictions on use by the

1    Special Counsel's Office of other components of the Department

2    of Justice, close quote.

3         The notion that this case rises and falls with

4    whether Russian interference has been proven, or whether Russia

5    was actually behind the hack of the DNC computers is also

6    false.  This defendant was not charged with or convicted of

7    having any role in conspiring with the Russians.  He was not

8    even charged with or convicted of lying about Russian collusion

9    or about who was behind the hack.

10        So, let's review what the case is about and what he's

11   being sentenced for.

12        In Counts 2 through 6, he was convicted of knowingly

13   and willfully making material false statements to the House

14   Committee on September 26, 2017.

15        Count 2, the evidence established that he testified

16   falsely that, quote:  He did not have emails with third parties

17   about the head of WikiLeaks and that he did not have any

18   documents, emails, or text messages that refer to

19   Julian Assange.

20        That was his testimony.

21        At the hearing, the defendant was asked how he

22   communicated with the individual he had publicly described on

23   August 8th as his go-between, mutual friend, or intermediary.

24   He was asked:  Did you have any?

25        And he said:  Over the phone.

1            Question:  Did you have any other means of

2       communicating with the intermediary?

3            Answer:  No.

4            No text messages not on the list?

5            No.

6            Another question:  So you have no emails to anyone

7       concerning any discussions you've had with third parties about

8       Julian Assange?  You have no emails, no text, no documents

9       whatsoever, any kind of that nature?

10            Answer:  That's correct, not to my knowledge.

11            So you never communicated with your intermediary in

12       writing in any way?

13            No.

14            Never emailed him or texted him?

15            He's not an email guy.

16            So all your conversations with him were in person or

17       over the phone?

18            Answer:  Correct.

19            This is not mere equivocation.  This is not the

20       product of confusion.  The exhibits alone establish that these

21       answers were plainly false with respect to both Corsi and

22       Credico, with whom he carried on a lively, lengthy, and often

23       quite profane correspondence.

24            In Count 3, he was convicted of testifying falsely

25       that, quote:  His August 2016 references to being in contact

1    with Julian Assange were references to communications with a

2    single go-between, mutual friend, and intermediary, who he

3    identified as Randy Credico.

4         During his testimony Stone made it clear that there

5    was only one source, and it was clear from his testimony that

6    he was talking about Credico.  He said it was a journalist who

7    had interviewed Assange, who had been to the embassy.

8         After the testimony, Stone supplied Credico's name in

9    a letter.  This was well established to be false, since the

10   text and emails showed that Credico and Stone had never talked

11   about Assange until after Stone decided to inform the public

12   that he had been talking to Assange through an intermediary.

13        This count also demonstrated how carefully the jury

14   worked to consider the evidence in light of the instructions

15   and elements of each offense.  It sent back several thoughtful

16   notes asking for clarification and guidance.

17        In Count 4, Mr. Stone was convicted of testifying

18   falsely that he did not ask the person he referred to as his

19   go-between, mutual friend, or intermediary to communicate

20   anything to Assange, and did not ask the intermediary to do

21   anything on his behalf.  Documents establish that this answer

22   was plainly false with respect to both Corsi and Credico.

23        Count 5, he testified falsely that he and the person

24   he referred to as his go-between, mutual friend, and

25   intermediary did not communicate via text message or email

1    about WikiLeaks.  Again, this was a flat-out lie.  There were

2    1500 emails and texts with Credico alone.

3           Count 6, the written record and testimony of both

4    Steve Bannon and Richard Gates established that he testified

5    falsely before the committee when he said that he never

6    discussed his conversations with the person he referred to as

7    his intermediary with anyone involved in the Trump campaign.

8           Both witnesses acknowledge getting updates from

9    Mr. Stone.  They took him seriously, and they welcomed his

10   particular brand of political assistance at a time the campaign

11   needed all the help he could get.

12          Mr. Bannon was asked:  When Mr. Stone wrote to you,

13   'I do know how to win this, but it ain't pretty,' what, in your

14   mind, did you understand that to mean?

15          Answer:  Well, Roger is an agent provocateur.  He's

16   an expert in opposition research.  He's an expert in the

17   tougher side of politics.  And when you're this far behind, you

18   have to use every tool in the toolbox.

19          Question:  What do you mean by that?

20          Answer:  Well, opposition research.  Dirty tricks.

21   The types of things that campaigns use when they've got to make

22   up some ground.

23          Bannon also testified that he viewed Stone as the

24   campaign's contact point with Assange.  So this was yet another

25   lie that shut off important avenues for the committee to

1     investigate.

2            This count is also important because it showed -- the

3     evidence showed that Stone was not just communicating with

4     campaign personnel, but he talked to the candidate himself.

5     Part of the evidence that supplied the basis for the conviction

6     on this count was from Rick Gates, who was in the car when then

7     Candidate Trump was talking to Mr. Stone on the phone.  And

8     who, as soon as the call was over, made a statement to Gates

9     about what Assange was about to do.

10           Count 7, tampering with a witness.  The evidence

11    established that the defendant knowingly and intentionally,

12    corruptly persuaded or attempted to corruptly persuade

13    Randy Credico with the intent to influence, delay, or prevent

14    his testimony in an official proceeding.

15           The evidence includes the numerous written

16    communications, including emails and texts in which the

17    defendant urged Credico, over and over again, to assert his

18    Fifth Amendment privilege against self-incrimination, to claim

19    a failure of recollection, to do a Frank Pentangeli, and/or to

20    advance a false narrative, that Credico had been the

21    intermediary between Stone and Julian Assange, to whom Stone

22    publicly referred in early August 2016.

23           This went on for months, as Stone urged Credico to

24    stonewall Congress and then the FBI and the Office of Special

25    Counsel.

1          Stone went so far as to doctor a copy of a letter his

2     lawyer sent to the committee falsely identifying Credico as the

3     intermediary, adding a number of flattering details about

4     Credico that were never provided to the committee at all, but

5     were intended to assuage Credico and have him be unconcerned

6     about the letter.

7          In a telling exchange, Stone also revealed his own

8     motivation to shield the President from evidence that could

9     reflect badly on him.  On December 1st, 2017, he testified --

10    he texted to Credico:  If you testify, you're a fool.  Because

11    of Trump, I could never get away with asserting my Fifth

12    Amendment rights, but you can.

13         Stone knew that some would view it as incriminating

14    for both him and the campaign if he asserted his right to

15    testify and said nothing.  So he lied instead.  And then he

16    tried to make sure that the lie was not exposed.

17         Whether Stone was ever actually in communication with

18    Assange or not, he understood full well that it could reflect

19    badly on the President if someone learned that he'd exchanged

20    emails with Corsi and Credico about what Assange was about to

21    do or that he'd sent messages trying to get Assange to release

22    emails on a particular topic on a particular schedule, or that

23    there were emails between himself and Bannon, Gates, and

24    Manafort as he reported in on all of this to the campaign.

25         Stone also put pressure on Credico by intimating that

1   he would involve one of Credico's close friends, a widow whose

2   husband he'd been close to, in the matter if Credico tried to

3   deny that he was the intermediary.  Randy Credico testified

4   that Stone said he had an email that would prove that

5   Margaret Kunstler would be involved.  That he could prove it

6   through her that I was the back channel.  That he would use

7   that, and he would use the text messages that I had that

8   Ms. Kunstler involved.

9           Credico was asked:  Well, did it concern you that

10   Mr. Stone was talking about revealing Ms. Kunstler's name?

11          Answer:  Yes.  She's a very close friend of mine.

12   And, you know, she's an older woman, and I didn't want to drag

13   her through this.  You know, I didn't want to drag her name

14   through this.  And then all of that culminated in the threats

15   to the dog and the prepare to die."

16          I really did appreciate the sensitivity and the

17   concern that went into Randy Credico's letter about the damage

18   caused to individuals and families by incarceration, as well as

19   his trial testimony, repeated in his letter, that he didn't

20   believe Stone, a dog lover -- which is a good thing -- would

21   actually harm his dog, and his later assertion that he doesn't

22   believe that Stone would have harmed him.

23          It's nice that Mr. Credico has forgiven Stone not

24   only for that, but for his conduct that was testimony about --

25   in the case, apparently in New York, many years ago, when he

1   publicly blamed Credico for something else nefarious he'd done,

2   threatening an elderly man over the phone.  And he published

3   embarrassing accusations about drug use to keep Mr. Credico

4   from defending himself and saying it was Stone and not him.

5         But, all that says more about Mr. Credico than Stone.

6   And the record does indicate that these events may well have

7   struck him differently at the time.

8         He also appeared on the stand to be a highly nervous

9   individual.  And it may well be that, even today, he just

10  doesn't want to be known as the reason behind a tough sentence.

11        But, even if you acknowledge, as I have to here, that

12  the evidence of actual physical threats was not strong, and

13  that the person involved is asking for lenience, both indicate

14  that one needn't be too harsh in sentencing the defendant for

15  the threat aspect of Count 7; it doesn't do anything to negate

16  or minimize the corrupt, unlawful campaign to influence

17  Credico's testimony.  And for that fact alone, he was guilty of

18  tampering with a witness.

19        Finally, there was Count 1.  Given all this evidence

20  that led to the convictions on Counts 2, 3, 4, 5, 6, and 7, the

21  evidence also showed that the defendant corruptly influenced,

22  obstructed, or impeded, or tried to corruptly influence,

23  obstruct, or impede the due and proper exercise of the power of

24  inquiry under which an investigation was being undertaken by a

25  committee of the United States of the House of Representatives

1  when he testified falsely and misleadingly on September 26th,

2  when he lied about the existence of responsive records in

3  response to their requests, when he attempted to have

4  Randy Credico testify falsely, or to prevent him from

5  testifying, and when he submitted or caused to be submitted a

6  letter that falsely and misleadingly described his

7  communications with Credico.

8          This effort to obstruct the investigation was

9  deliberate, planned, not one isolated incident, and conducted

10  over a considerable period of time.  And Stone lied and sought

11  to impede production of information to whom?  Not to some

12  secret anti-Trump cabal, but to Congress.  To the elected

13  representatives of both parties who were confronted with a

14  matter of grave national importance.

15          At that time, both the Senate and the House,

16  including the House Committee that asked him to provide

17  documents and to answer questions, were controlled by the

18  Republican Party.  The chair of the House Committee that asked

19  the defendant to answer questions and provide documents was a

20  republican, Devin Nunes.

21          In the statement that he issued, along with the

22  ranking minority member of the committee, entitled Intelligence

23  Committee Chairman Ranking Member Establish Parameters for

24  Russia Investigation, that Chairman Nunes said:  This committee

25  will seek access to and custody of all relevant information.

1    This investigation is a national security necessity, and

2    anything less than a full accounting of all the facts will be

3    insufficient to protect the country and meet the expectations

4    of the American people.

5          So that's what the defendant did.  That's the nature

6    and circumstances of the offense.

7          But, the statute also requires me to look at the

8    history and characteristics of the defendant, who the defendant

9    is.  Certain themes emerged, even from the people who submitted

10   letters on his behalf attached to his memo.  There are letters

11   that tell me he cultivated a career image of a bare-knuckled

12   brawler in politics.

13         One friend and letter writer wrote:  He's a

14   provocateur who enjoyed, even relished, the spotlight.

15         They called him a dirty trickster, a political hit

16   man.  These are the people who wrote on his behalf.

17         But those friends, along with his family, have also

18   painted a portrait of the personal side of Mr. Stone; loving,

19   caring, funny.  Quote:  A good man, close quote.

20         Several letters report that when he got married, he

21   treated his stepdaughter and her daughter as his own.

22   Supported them through times of crisis and transition, and

23   through good times as well.  The granddaughter, who's now

24   grown, wrote a beautiful letter of her own, attesting to the

25   bond that they share.

1          I've learned about the lengths he went to to support

2     his in-laws when they were struggling with the devastating

3     effects of Alzheimer's disease.

4          He has not just been caring and generous within his

5     family.  He provided housing and support for an elderly friend

6     who was no longer able to live alone on his boat.  He assisted

7     another disabled woman when she was homeless.  He's rescued

8     countless dogs and listened and came to the aid of many

9     friends.

10          It's consistent with the letters from others who

11     aren't related, who shared friendships even across the

12     political divide, and who have come together with Mr. Stone on

13     issues such as medical marijuana and the strict drug laws that

14     used to apply in New York City.

15          He added his voice, his political acumen to important

16     causes such as animal rights, ending inhumane treatment and

17     medical experimentations, same-sex marriage, criminal justice

18     reform, product safety standards, compensation for retired

19     football players with brain injuries, and encouraging the

20     Republican Party to take a hard look at issues facing people of

21     color in America.  The letters are compelling and they are

22     sincere and it's all part of the picture before me.

23          It's important to note today, though, to the people

24     who emphasized this side of the defendant, that I am not

25     passing judgment on Roger Stone as a man.  That falls to a

1    higher authority.  If, as his friend John Morgan said, There is

2    good in his life, and good yet to give, he will have ample

3    opportunity to continue to do just that.

4           It falls to me to sentence him just for the conduct

5    for which he was found guilty by a jury based on sworn

6    testimony in this courtroom, and based, most of all, on his own

7    voluminous Tweets and emails in this case.

8           The defense, in its allocution, talked about not

9    paying too much attention to his persona, but the defendant

10   chose it and cultivated it.  And I was told that the publicity

11   and attention swirling around this case has already caused

12   considerable stress for the defense and his family, but he was

13   at the heart of a great deal of it.  Through his press

14   conferences and social media posts, he made the choice to stoke

15   it.

16          I've been asked to consider the impact of a sentence

17   on his family.  And it's worth noting that sentencing can have

18   a devastating impact on family members, and courts in this

19   country are called upon to put that aside every day when they

20   have to incarcerate or deport people who have children who

21   depend on them, elderly parents who depend on them.  So, it's

22   something that we always have to think about.

23          But, it's also important to note that the

24   responsibility for that hardship does not lie with the

25   prosecutors, and it doesn't lie with the Court.  It flows from

1      the defendant's conduct.

2              I think there's probably a lot of truth to

3      Mr. Credico's characterization when he said:  Stone enjoys

4      playing adolescent mind games and pulling off juvenile stunts,

5      gags, pranks.  He shamelessly invents and promotes outlandish

6      and invidious conspiracy tails.  But the bottom line is, Mr.

7      Stone, at his core, is an insecure person who craves and

8      recklessly pursues attention.

9              The problem is that nothing about this case was a

10     joke; it wasn't funny, it wasn't a stunt, and it wasn't a

11     prank.  Stone's conduct displayed flagrant disrespect for the

12     institution of government established by the Constitution,

13     including Congress and this Court.  And I'll venture to say

14     that even many adolescents know the difference.

15             The sentencing statute also provides that I am

16     required to impose a sentence that is sufficient but not

17     greater than necessary to accomplish the purposes that are set

18     out in the statute.  Therefore, another factor I must consider

19     is the need for the sentence imposed, number one, to reflect

20     the seriousness of the offense, to promote respect for the law,

21     and to provide just punishment for the offense.

22             Two, to afford adequate deterrence to criminal

23     conduct, to protect the public from further crimes of the

24     defendant, to provide the defendant with needed educational or

25     vocational training or medical care or correctional treatment

1    in the most effective manner.  And I'm supposed to think about

2    the kinds of sentences available.

3         The guidelines are supposed to be the starting point

4    of that analysis.  And I agree totally with Mr. Ginsberg that

5    they're a blunt instrument.  The guidelines, though, and the

6    sentencing commission and the appellate courts require district

7    courts to explain why, if they're going to vary from the

8    guidelines.  And the Department of Justice's own manual calls

9    for advocacy for guideline sentences in most situations.

10        The government's initial memorandum was thorough,

11   well researched, and supported.  It was true to the record.  It

12   was in accordance with the law and with DOJ policy, and it was

13   submitted with the same level of evenhanded judgment and

14   professionalism that they exhibited throughout the trial.  Any

15   suggestion that the prosecutors in this case did anything

16   untoward, unethical, or improper is incorrect.

17        But I am concerned that seven to nine years, or even

18   the 70 to 87 months, as I calculated the guideline range, would

19   be greater than necessary.  I sincerely doubt that I would have

20   sentenced him within that range, even if the sentencing had

21   simply proceeded in its typical fashion, without any of the

22   extraneous commentary or the unprecedented actions of the

23   Department of Justice within the past week.

24        I agree with the defense and with the government's

25   second memorandum, that the eight-level enhancement for

 1   threats, while applicable, tends to inflate the guideline level

 2   beyond where it fairly reflects the actual conduct involved.

 3   However, the defendant's request for probation -- although the

 4   memo is also a professional product of appropriately zealous

 5   advocacy and based on the record -- is simply not sufficient.

 6          The defendant has pointed me to certain provisions

 7   within the guidelines that would permit the Court to depart or

 8   vary.  One is his age.  And guidelines there in §5H1.1 say:

 9   Age may be a reason to depart downward in a case in which the

10   defendant is elderly and infirm, or where this characteristic

11   is present to an unusual degree, and distinguishes the case

12   from the typical cases covered by the guideline.

13          So, clearly, this is not a situation where a

14   departure is warranted, and the defense did not ask for one,

15   but it is a factor that I need to take into consideration when

16   I sentence the defendant.

17          They also pointed to §5H1.4, his health.  The

18   guidelines say there:  Physical condition or appearance,

19   including physique, may be relevant in determining whether a

20   departure is warranted, if the condition or appearance,

21   individually or in combination with other characteristics,

22   again, is present to an unusual degree, and distinguished the

23   case from typical cases covered by the guideline.  An

24   extraordinary physical impairment may be a reason to depart

25   downward in the case of a seriously infirm defendant.

1          Defendant has not pointed to any evidence that would

2     show that he has a condition that's not managed with

3     medication, or the kind of issue that would warrant a

4     departure, and he keeps himself physically fit.

5          Paragraphs 103 and 106 through 108 detail any medical

6     information, and I've taken them into consideration.

7          But, it's important to note that in the year since

8     the case has been before me, in addition to traveling here for

9     court appearances, he's filed nine motions to travel elsewhere,

10    with most trips including multiple stops.  He's not only been

11    all over Florida, but he's been to the Western District of

12    Tennessee, the Northern District of Illinois, Michigan,

13    Buffalo, Los Angeles, and several other cities in California,

14    as well as Rochester, New York.

15         And all that is on top of the fact that his

16    conditions of release permitted him to travel to the Southern

17    District of Florida, the Southern District of New York, the

18    Eastern District of New York, D.C., and the Eastern District of

19    Virginia without any court order at all.  So, I have no idea

20    how many trips he's taken during that period to conduct the

21    business that he said he needed to conduct.

22         The purpose of the trips described to me were to earn

23    a living.  Public appearances or private gatherings have not

24    appeared to be compromised by his health.

25         Also, this record of travel belies the narrative

1    being disseminated that I silenced him or took away his ability

2    to speak or to earn a living.  When the case began, there were

3    no restrictions on Mr. Stone at all.  After he posted an

4    incendiary, threatening post regarding the Court, I took the

5    suggestion of the defendant's own First Amendment lawyer and

6    barred him from making comments about this case, but that was

7    all.

8              Couldn't obey that either.  When he was still on

9    bond, he continued to post about others involved in the

10   investigation, and that led to the requirement that he not

11   Tweet or post or use Instagram.  He withdrew his own appeal of

12   that condition, and he didn't even ask to be relieved of it

13   pending sentence.  But there has never been a prohibition on

14   his writing, giving a speech and getting paid for it, or any

15   other means of earning a living.

16             The defense, in its memorandum, also points to the

17   guideline for diminished capacity, §5K2.13.  And there the

18   commission says:  A departure may be warranted if the defendant

19   committed the offense while suffering from a significantly

20   reduced mental capacity, and the significantly reduced mental

21   capacity contributed substantially to the commission of the

22   offense.

23             Well, granted, there are some medical issues;

24   granted, there is some anxiety.  But there has been no evidence

25   that any of it substantially reduced his mental capacity, or

1   even reduced it at all.  He's still writing and speaking.  And

2   there's no evidence that any physical or psychiatric condition

3   made a substantial contribution to his conduct.  There's been

4   no evidence of any contribution, and no evidence presented

5   related to the relevant time period.  And it's totally

6   inconsistent with every public statement made by the defendant

7   at the time and since.

8            So I don't believe that that section even is a factor

9   that would support a variance.  Although, I will take his age

10  and his health into account.

11           It falls to me, then, given the disparity between the

12  two recommendations I have in front of me and the inflated

13  nature of the guidelines, to assess what sentence is

14  appropriate with the benefit of all the submissions, but, also,

15  my own judgment, and the benefit of the judgment of my

16  colleagues which have been expressed in the range of cases that

17  have come before this court in the past.  It is not an exact

18  science.

19           What sentence is sufficient to recognize the

20  seriousness of this offense and to punish someone who feels

21  justified and proud to act with impunity and outside the law?

22  So when do you cross the line into greater than necessary for a

23  defendant who's 67 years old and never spent a day in jail

24  before?  And is the answer the same if you're trying, as

25  Congress says you must, to promote respect for the law more

1    broadly, and to convey a message and deter others?

2          The only people who think this is easy are the ones

3    who don't have to make the decision.  Many people weighed in,

4    formally through letters, informally by calling chambers,

5    pontificating on cable TV, and in blogs, op-eds, and Tweets.

6          One letter writer, in a letter submitted by the

7    defense, said:  I've taken note that you're about to sentence

8    Roger Stone with respect to his plea to a criminal charge

9    having to do with political activity.

10          There's no reason for concern for that.  The charge

11    had nothing to do with political activity.  And if you watched

12    the trial, you know there was very little evidence about his

13    political activity that was part of the record in the case.

14    He's not being sentenced for what Credico described as his

15    shameless promotion of conspiracy theories.

16          I received a letter submitted by the defense from

17    Mr. Stone's federal election law attorney in Florida.  He said:

18    There is no gain saying that Mr. Stone has made a career taking

19    full advantage of the First Amendment in pursuing his client's

20    electoral aims.  In so doing, Mr. Stone has engendered many

21    enemies.  These efforts are despised because they are

22    effective.  Therefore, I submit that you should not hold

23    against Mr. Stone the fact that his career has pushed the

24    bounds of political license, because however distasteful some

25    have found Mr. Stone's work to be, it is fully protected by our

1    Constitution.

2          I have received letters urging me not to silence an

3    important voice in the public arena, but that will not be an

4    element of this sentence in any way.  I expect he will keep

5    talking.  And as you've just heard when I went through the

6    elements of the offense, he was not convicted and is not being

7    sentenced for exercising his First Amendment rights, his

8    support of the President's campaign or his policies.  He was

9    not prosecuted, as some have complained, for standing up for

10   the President.  He was prosecuted for covering up for the

11   President.

12         One of the defendant's friends wrote to me and said:

13   I believe, sincerely, I've never seen or heard any credible

14   first account -- firsthand account of Roger doing anything

15   illegal -- I'm sorry.  The friend wrote, and I believe he wrote

16   sincerely, to say, quote:  I've never seen or heard any

17   credible firsthand evidence of Roger doing anything illegal,

18   close quote.

19         To that I have to say, I've just gone through all the

20   evidence.  All of this underscores the fact that it is for good

21   reason that the criminal justice system assigns the

22   responsibility for sentencing to someone who is actually aware

23   of what the charges are and what the evidence was that was

24   introduced in the courtroom.

25         This case also exemplifies why it is that this

1    system, for good reason, demands that the responsibility falls

2    to someone neutral.  Someone whose job may involve issuing

3    opinions in favor of and against the same administration in the

4    same week, and not someone who has a longstanding friendship

5    with the defendant.  Not someone whose political career was

6    aided by the defendant.  And surely not someone who has

7    personal involvement in the events underlying the case.

8            The Court cannot be influenced by those comments.

9    They were entirely inappropriate, but I will not hold them

10   against the defendant either.  It would be equally improper to

11   be buffeted by the winds blowing from the left, the

12   enthusiastic callers who object to what the defendant stands

13   for.  I cannot and will not sentence him for the behavior of

14   those he supports.  Sentencing is personal, and it's based on

15   the evidence.

16           Roger Stone will not be sentenced for who his friends

17   are or for who his enemies are.  He's not going to be sentenced

18   for his reputation or his personality or his work.  The record

19   doesn't begin to enable me to figure out which supposed dirty

20   tricks he actually committed and which he just took credit for,

21   and it doesn't matter.

22           The touchstone in this case is the offense.  And even

23   the government's supplemental memorandum, which helpfully

24   acknowledges the harshness of a strict guideline outcome, says,

25   quote:  It remains the position of the United States that a

1    sentence of incarceration is warranted here, close quote.

2         And I believe Mr. Crabb said substantial period of

3    incarceration in his allocution.

4         Why is that?  It's because the defendant lied about a

5    matter of great national and international significance.  This

6    is not campaign high jinks.  This is not Roger just being

7    Roger.  He lied to Congress.  He lied to our elected

8    representatives.

9         The sentence is not just about punishing him, but

10   also deterring others and upholding the law.  It has to send

11   the message that witnesses do not get to decide for themselves

12   whether Congress is entitled to the facts based on what they

13   think about the topic being investigated, or who they fear

14   could be embarrassed by the topic being investigated.  There

15   was nothing unfair, phony, or disgraceful about the

16   investigation or the prosecution.

17        The House Committee, which, at the time, Stone

18   testified was under the control of the Republican Majority, the

19   Senate Intelligence Committee, which remains under the control

20   of the Republican Majority, the Special Counsel, who was

21   appointed by and serving under the supervision of the acting

22   attorney general of this administration, and the current

23   inspector general of the current Department of Justice all

24   investigated the circumstances surrounding the election.

25        And all have concluded, like the multiple agencies

1    charged with protecting the United States' national security,

2    that the fact that there was a Russian attempt to interfere in

3    the election was beyond debate.  It's a matter of enormous

4    public concern.  And, therefore, the House Committee had

5    legitimate grounds, indeed, a duty to inquire how materials

6    belonging to the DNC ended up in the hands of WikiLeaks, and

7    whether Russia played any role in that.

8         The committee had legitimate grounds, indeed, a duty

9    to inquire whether there was any involvement, encouragement,

10   collaboration on the part of the campaign.  The legitimacy of

11   the inquiry is an entirely separate question from whether

12   anyone found enough evidence to draw a conclusion at the end of

13   the day.

14        Roger Stone took it upon himself to lie, to impede,

15   to obstruct before the investigation was complete.  And he

16   endeavored to influence the result.  How could the committee do

17   its job and reach the correct conclusion under those

18   circumstances?

19        And what is the response of the defense to it?  How

20   does it view the evidence?

21        At trial, the defense appropriately questioned

22   Randy Credico's credibility and Rick Gates's credibility, but

23   it was largely Stone's own emails and his own texts that proved

24   the allegations beyond a reasonable doubt.

25        So what did the defense say to the jury on his

1   behalf?

2             So what.  So what?

3             Of all the circumstances in this case, that may be

4   the most pernicious.  The truth still exists.  The truth still

5   matters.  Roger Stone's insistence that it doesn't, his

6   belligerence, his pride in his own lies are a threat to our

7   most fundamental institutions, to the very foundation of our

8   democracy.

9             And if it goes unpunished, it will not be a victory

10  for one party or another.  Everyone looses because everyone

11  depends on the representatives they elect to make the right

12  decisions on a myriad of issues -- many of which are

13  politically charged but many of which aren't -- based on the

14  facts.

15            Everyone depends on our elected representatives to

16  protect our elections from foreign interference based on the

17  facts.  No one knows where the threat is going to come from

18  next time or whose side they're going to be on, and for that

19  reason the dismay and disgust at the defendant's belligerence

20  should transcend party.

21            The dismay and the disgust at the attempts by others

22  to defend his actions as just business as usual in our

23  polarized climate should transcend party.  The dismay and the

24  disgust with any attempts to interfere with the efforts of

25  prosecutors and members of the judiciary to fulfil their duty

1    should transcend party.

2              Sure, the defense is free to say:  So what?  Who

3    cares?

4              But, I'll say this:  Congress cared.  The

5    United States Department of Justice and the United States

6    Attorney's Office for the District of Columbia that prosecuted

7    the case and is still prosecuting the case cared.  The jurors

8    who served with integrity under difficult circumstances cared.

9    The American people cared.  And I care.

10             Finally, the sentencing statute says that I must

11   consider the need to avoid unwarranted sentencing disparities

12   among defendants with similar records who have been found

13   guilty of similar conduct.  The guidelines are supposed to

14   fulfil that purpose, and I concluded that the guideline Level

15   27 points to 80 to 87 months.

16             For comparison purposes, the government's

17   supplemental brief points out that if I calculated, as it asks

18   me to with respect to all the other enhancements, but he didn't

19   get the eight-level of enhancements for threats at all, that

20   would have been Level 21, or a range of 37 to 46 months.  But,

21   I disagreed with their two-level enhancement for role in the

22   offense.  So, if I didn't take the threat into account at all,

23   I would have been at Level 19, which is 30 to 37 months.

24             These considerations suggest that even the guideline

25   I calculated is greater than necessary.  But I can't ignore the

1    circumstances involving Mr. Credico entirely.  They have to

2    factor into the analysis.  A sentencing range that would give

3    no consideration to his threatening conduct wouldn't fairly

4    address the seriousness of the offense.

5           And even if you put the offense aside -- the threat

6    aside, on top of his own lying, we have a pressure campaign to

7    get someone else to lie, and we have the utter disrespect that

8    he exhibited towards these proceedings.

9           At the end of the day, once you leave the math and

10   you get back to the business of judging, the statute requires

11   that the sentence must be proportionate, and that also weighs

12   heavily on my thinking.  This may be one of the strongest

13   factors that points to a downward variance.

14          There were very few comparable cases.  Generally,

15   they involve some period of incarceration, but, also,

16   generally, lower than the guideline range.  The government

17   pointed to Rita Lavelle, who got a six months sentence;

18   Congressman Hansen, 12 months.  But those cases involve more

19   personal matters.  There were no threats involved.  Still,

20   there was some jail time to be served.

21          The government points to the *Solofa* case.  Defendant

22   got 37 months for tampering with a witness and obstruction of

23   justice.  It was an OIG, FBI, grand jury investigation into

24   bribes and kickbacks into the sale of school bus parts to the

25   Department of Education in American Samoa.  And this defendant

1    instructed an undercover officer how to lie and hide documents,

2    although there were no violent threats involved.

3           The most analogous case is probably the prosecution

4    of Scooter Libby, who received 30 months for his false

5    testimony before the grand jury, which also related to national

6    security issues.  And the falsehoods were the basis for an

7    obstruction of justice count alone.  There was no witness

8    tampering component, much less a threat component.

9           The defendant points to some of the false statement

10   cases and other Office of Special Counsel cases as comparators,

11   but, largely, they're not analogous.  Cases involving a single

12   lie to the FBI or investigators, particularly those involving

13   people who then pled or cooperated are not at all analogous.

14          Mr. Manafort was sentenced for 13 months for the

15   witness tampering and obstruction of justice offense alone.

16   That simply involved getting one's story together, and no

17   threat to do bodily harm.  And even if you leave the threat

18   out, the defendant's persistence in getting Credico to tell the

19   story he wanted him to tell was worse than what was involved

20   with Manafort.  But, that's still a benchmark for a witness

21   tampering offense that wasn't included in the sentence that

22   Scooter Libby got.

23          Therefore, in an exercise of my discretion, after

24   consideration of all the statutory factors, the sentence that I

25   find to be imposed that is sufficient but not greater than

1    necessary is as follows:

2              It's the judgement of the Court that you,

3    Roger J. Stone, Jr., are hereby committed to the custody of the

4    Bureau of Prisons for a term of 40 months on Count 1.

5              On Counts 2 through 6 you will be sentenced to 12

6    months on each count, to run concurrently with the sentence on

7    Count 1.

8              Count 7, you'll be sentenced to a term of 18 months,

9    to run concurrently with Count 1.

10             This would have been my sentence with or without the

11   three-point adjustment under §2J1.2(b)(2) for substantial

12   interference.

13             Under Section 18 U.S. Code Section 3143(a)(2), I find

14   by clear and convincing evidence you're not likely to flee or

15   pose a danger to any other person or the community, and you

16   will be permitted to voluntarily surrender on a date no earlier

17   than two weeks after the Court has ruled on your pending motion

18   for a new trial.

19             I recommend that you be designated to serve your

20   sentence at a facility as close as possible to your family in

21   Fort Lauderdale, Florida.

22             You're further sentenced to pay a $20,000 fine.  The

23   Court will waive the imposition of interest or penalties that

24   may accrue on the balance.

25             You are also required by law to pay a $100 special

1    assessment on each count, for a total of $700.  The special

2    assessment is immediately payable to the Clerk of the Court for

3    the U.S. District Court for the District of Columbia.

4         If you change your address, within 30 days of any

5    change you have to notify the Clerk of the Court of any change

6    until such time as this obligation is paid in full.  While

7    you're incarcerated you can make payments on the special

8    assessment through your participation in the Bureau of Prisons

9    Inmate Financial Responsibility Program.

10         You are further sentenced to serve a 24-month term of

11    supervised release on each count, to run concurrently.

12         Within 72 hours of your release from custody you

13    shall report in person to the probation office in the district

14    to which you are released.

15         While on supervision you shall not possess a firearm

16    or other dangerous weapon, you shall not use or posses an

17    illegal controlled substance, and you shall not commit another

18    federal, state, or local crime.  You must also abide by the

19    general conditions of supervision adopted by the U.S.

20    Probation Office, as well as the following special conditions:

21         First of all, according to 42 U.S. Code Section

22    14135a, as for all felony offenses, you must submit to the

23    collection and use of DNA information while you're incarcerated

24    at the Bureau of Prisons, or at the direction of the U.S.

25    Probation Office.

1          You must submit to substance abuse testing within 15

2     days of placement on supervision, and periodically thereafter,

3     including random testing, without notice to you, at the

4     direction of the probation office.  And if substance abuse

5     treatment is indicated, you shall participate in any program

6     approved and directed by the probation office.

7          You must complete 250 hours of hands-on community

8     service.  This obligation may not be satisfied with mere

9     fundraising or advocacy, as laudable as they are, or with

10    attendance at religious service, although the service may be in

11    connection with your place of worship.

12         The probation office will supervise your completion

13    of this condition by approving the program.  You must provide

14    written verification of completed hours to the probation

15    office.

16         You must begin to make payments on the financial

17    penalty within 60 days after you're released from imprisonment

18    in the amount of at least $1,000 per month.  You must provide

19    the probation office with access to any requested financial

20    information, and authorize the release of any requested

21    financial information, which the probation office may share

22    with the U. S. Attorney's Office.

23         You shall provide the probation office with your

24    income tax returns, authorization for release of credit

25    information, and information about any business or finances in

1      which you have a control or interest until all -- until the

2      penalty has been satisfied.

3             I'm going to transfer supervision of your supervised

4      release to the Southern District of Florida, but not

5      jurisdiction.

6             The U.S. Probation Office in that district must

7      submit a progress report to the Court within 60 days of the

8      commencement of supervision.  Upon receipt of the progress

9      report I'll determine if your appearance is required at a

10     reentry progress hearing.

11            The probation office is directed to release the

12     presentence report to all appropriate agencies in order to

13     execute the sentence of the Court.  Any treatment agencies must

14     return it to the probation office upon the defendant's

15     completion or termination from treatment.

16            Mr. Stone, you have a right to appeal your conviction

17     and the sentence imposed by the Court.  The rules require that

18     if you choose to appeal, you must file any appeal within 14

19     days after the Court enters judgment.  But, I will extend that

20     time and order that you must file any appeal within 14 days

21     after the Court has ruled on the pending motion for new trial.

22            If you're unable to afford the cost of appeal, you

23     may request permission from the Court to file an appeal without

24     cost to you.

25            Is there anything further I need to take up right now

1    on behalf of the United States?

2              MR. CRABB:  No, Your Honor.

3              THE COURT:  Anything further on behalf of the

4    defendant?

5              MR. GINSBERG:  Your Honor, if I understood -- is the

6    Court going to hold the judgment in abeyance, or is the Court

7    intending to file the judgment?

8              THE COURT:  Well, the judgment -- I can simply not

9    sign the judgment.  But, the judgment specifies that he cannot

10   be designated until two weeks after I have ruled on the motion.

11   So, I believe that there's no impediment to my entering the

12   judgment and having it be a matter of public record.

13             MR. GINSBERG:  In an abundance of caution, it would

14   be our preference if the Court didn't enter the judgment until

15   after the new trial motion is decided, both for appellate

16   reasons -- but, I think Your Honor is correct, you've covered

17   us on that.  But --

18             THE COURT:  Well, if I don't enter the judgment, then

19   I'm going to withdraw the language about when he can be

20   designated because at that point the judgment is not going to

21   be entered until after the order has been issued.

22             MR. GINSBERG:  Well, that gets to my second concern,

23   which is, as I understood what the Court said, he does not have

24   to surrender until two weeks following the --

25             THE COURT:  No earlier than two weeks following.

1          MR. GINSBERG:  So the Court would be amenable to

2    extending the date of surrender until he's actually designated?

3          THE COURT:  Well, that's what voluntary surrender is.

4          MR. GINSBERG:  Right.  But sometimes the defendant's

5    surrender date shows up -- appears before the designation

6    occurs, and then there are issues.

7          THE COURT:  All right.  What I am going to order is

8    that he can voluntarily surrender.  That's my order.  Now, if I

9    don't sign this, then all that's going to be in the order is

10   that he's entitled to voluntarily surrender, and they'll let

11   him know where to go, and he has to go.

12         If we keep -- if I enter it today, then it has the

13   language in there that he would not have to surrender until two

14   weeks after, at the earliest, my order.

15         MR. GINSBERG:  Right.  I think Your Honor's

16   suggestion is probably the better way to go.

17         May I confer with my counsel for one moment?

18         THE COURT:  Yes.

19         (Off-the-record discussion between defense counsel.)

20         MR. GINSBERG:  We'll go with the Court's approach.

21         THE COURT:  All right.

22         MR. GINSBERG:  Thank you, Your Honor.

23         THE COURT:  All right.  Thank you very much.

24                         *   *   *

25

1

2                CERTIFICATE OF OFFICIAL COURT REPORTER

3

4       I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                        Dated this 20th day of February, 2019

9

10

11                    _____

12                        Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
13                       Room 6523
                         333 Constitution Avenue, N.W.
14                       Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25