```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                           FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,          .
                                         .  Case Number 19-cr-18
 4              Plaintiff,               .
                                         .
 5        vs.                            .
                                         .  Washington, D.C.
 6    ROGER JASON STONE, JR.,            .  February 25, 2020
                                         .  1:30 p.m.
 7              Defendant.               .
      - - - - - - - - - - - - - - - - -

 8

 9                    PUBLIC TRANSCRIPT OF MOTION HEARING
                         (SEALED PORTIONS REDACTED)
10              BEFORE THE HONORABLE AMY BERMAN JACKSON
                      UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12

13    For the Government:          JOHN D. CRABB, AUSA
                                   J.P. COONEY, AUSA
14                                 United States Attorney's Office
                                   555 Fourth Street Northwest
15                                 Washington, D.C. 20530

16    For the Defendant:           ROBERT BUSCHEL, ESQ.
                                   Buschel Gibbons, P.A.
17                                 100 S.E. Third Avenue
                                   Suite 1300
18                                 Fort Lauderdale, Florida 33394

19                                 BRUCE ROGOW, ESQ.
                                   TARA CAMPION, ESQ.
20                                 Bruce S. Rogow, P.A.
                                   100 N.E. Third Avenue
21                                 Suite 1000
                                   Fort Lauderdale, Florida 33301

22                                 SETH GINSBERG, ESQ.
                                   299 Broadway
23                                 Suite 1405
                                   New York, New York 10007

24

25
                                -- continued --
```

1    APPEARANCES (CONTINUED):

2                              GRANT J. SMITH, ESQ.
                             StrategySmith, P.A.
3                            401 East Las Olas Boulevard
                             Suite 130-120
4                            Fort Lauderdale, Florida 33301

5

6

7    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
8                                U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
9                                202-354-3284

10

     Proceedings recorded by stenotype shorthand.
11   Transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              THE COURTROOM DEPUTY:  Good afternoon, Your Honor,

 4     Your Honor.  This afternoon, we have Criminal Case Number 19-18,

 5     United States of America v. Roger Stone, Jr.  The defendant is

 6     present and in the courtroom, Your Honor.

 7          Will counsel for the parties please approach the lectern

 8     and identify yourself for the record.

 9              MR. COONEY:  Good afternoon, Your Honor.  J.P. Cooney,

10     along with my colleague, John Crabb, for the United States.

11              THE COURT:  All right.  Good afternoon.

12              MR. ROGOW:  And for the defendant, Mr. Stone, Bruce

13     Rogow, Tara Campion, Robert Buschel, Seth Ginsberg, and Grant

14     Smith.

15              THE COURT:  Okay.  Thank you.  Good afternoon.  I will

16     note the defendant is present as well.

17          Who is this gentleman who is trying to enter the well of

18     the courtroom?

19              MR. MISHKIN:  Pardon me, Your Honor.  I am here on

20     behalf of the Coalition of Press Intervenors seeking access to

21     the 2:00 p.m. hearing.  Your Honor received a motion --

22              THE COURT:  Yes, I did, and I granted leave to file

23     it.  And I am about to rule on the motion to unseal the hearing,

24     and so you will have an opportunity to hear that.

25              MR. MISHKIN:  Thank you.
```

1        THE COURT:  I want to note for the record first that

2   there was some question at the time of sentencing about whether

3   Randy Credico's grand jury testimony was on the docket.  It's

4   docket 74.  It was supplied to the Court by the defendant,

5   referred to in the defendant's selective prosecution motion,

6   which is docket 73.

7        The next thing I want to take up is what I said I would

8   take up at 1:30 in a public hearing, which is docket 332, the

9   motion to unseal the hearing which is now scheduled to be sealed

10  at 2:00 p.m.  I have read the defendant's motion, the

11  government's opposition, which is docket 335, and its

12  supplemental opposition, which is docket 336.  There is a sealed

13  exhibit to the government's opposition, docket 335-1, which is a

14  part of the record for the motion.

15       I agree 100 percent with the general principles set forth

16  by the defendant that the Sixth Amendment accords him the

17  constitutional right to be tried in public.  The First Amendment

18  also supports the public's right to be informed.  I'm not sure

19  if it applies to a motion filed by the defendant.

20       Does either side have a point of view about that?

21           MR. ROGOW:  We do, Your Honor.

22           THE COURT:  All right.  In any event, there is now a

23  pleading on the docket filed by the press organization.  So it

24  probably doesn't matter.  But you are welcome to put on the

25  record whether you think the defendant has standing to raise the

1     First Amendment, as well as the Sixth.

2             MR. ROGOW:  Well, the First Amendment, the Fifth

3     Amendment, the Sixth Amendment we all think are implicated in

4     terms of a public hearing.  As Your Honor has properly stated,

5     the fundamental principle, the beginning point, is the

6     presumption that court proceedings will be open.

7             THE COURT:  All right.  I didn't ask you to argue the

8     motion.  I just wanted to know if he had standing to raise the

9     First Amendment.  Is that your position that he does?

10            MR. ROGOW:  You know, I don't think that -- he has

11    indirect standing, yes.  He wouldn't have the same standing that

12    the press has, but the whole concept here is the public standing

13    and the public's interest in knowing.  So to that extent, he

14    would.

15            THE COURT:  I guess I'm asking, can he assert that

16    right in addition to his right under the Sixth Amendment?

17            MR. ROGOW:  Yes.

18            THE COURT:  All right.  In any event -- I will let you

19    sit down -- the standards are largely similar.

20         I have a lot to say.  So you can sit down.

21            MR. ROGOW:  Okay.

22            THE COURT:  In *Waller v. Georgia*, the Supreme Court

23    determined that the district court erred in closing a

24    suppression hearing over the objection of the defendant under

25    the Sixth and 14th Amendments.  That's 467 U.S. 39 at page 48

from 1984.

The prosecutor who had moved to close the hearing expressed concern about personal information derived from wire taps that were at issue, but he didn't specify whose privacy interests might be infringed, how they would be infringed, what portions of the case might infringe them, and what portion of the evidence consisted of the tapes.

So the Court found that the trial court's determination to seal the hearing was too broad and too general and didn't purport to justify the closure of the entire hearing.  The Court also had a problem with the fact that the trial court did not consider alternatives to the closure of the entire hearing.

In *Presley v. Georgia*, 558 U.S. 209 at 215 from 2010, though, the Supreme Court held that while there is a Sixth Amendment right to have an open voir dire process, quote, there are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire.  But in those cases, the particular interest and the threat to that interest must, quote, be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

The Supreme Court said that in *Presley*, and it quoted *Press Enterprise Company v. Superior Court of California, Riverside County*, 464 U.S. 501 at 504, referred to as *Press Enterprise 1*,

the 1984 *Press Enterprise* case.

The fact that *Presley* cites *Press Enterprise* highlights the overlap between the Sixth and the First Amendment jurisprudence in the area.  The First Amendment case law relies on similar principles:  In *Press Enterprise 2*, which is *Press Enterprise Company v. Superior Court of California*, 478 U.S. 1 from 1986, the Supreme Court held that the Fifth Amendment -- First Amendment right to access to a criminal proceeding extends to a preliminary hearing, and it set out two complementary considerations referred to as the experience and logic test for determining whether a First Amendment right of access attaches to a proceeding.

The first prong is whether the place and the process has historically been open to the press and the general public, and two, whether public access plays a significant positive role in the functioning of the particular process in question.  It went on to rule, quote, although the First Amendment right of access is not absolute, once the right to access attaches, the presumption of openness can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.

These principles have been specifically applied to a hearing on potential juror taint, although in *United States v. Edwards*, it was a mid-trial hearing.  The Fifth Circuit held that there was, quote, no First Amendment violation in the

closure of proceedings in which empaneled jurors were questioned about potential misconduct.  823 F.2d 111 at pages 112 to 113, Fifth Circuit 1987.

Notwithstanding the teachings of *Press Enterprise*, the Court of Appeals held that the trial judge was accorded broad discretion based on law and his own common experience over aspects of the trial concerning the handling of jurors, including sequestration, juror access to information, and harassment of jurors.  That's *Edwards* at 823 F.2d at 116.

It reasoned that even though, quote, the issue of potential juror misconduct goes to the very heart of public confidence in the fairness or appearance of fairness in judicial proceedings, closed quote, the potential for juror taint was high enough to seal the mid-trial questioning of jurors from the public. That's *Edwards* at 117.  Finally, it held that the district court should not delay in making the sealed portions public once the trial concluded.

In *The United States v. Simone*, 14 F.3d 833, the Third Circuit said in 1994 specifically that the First Amendment right of access attaches to post-trial hearings to investigate jury misconduct.

So the First Amendment test, like the Sixth Amendment test, requires a specific countervailing interest that is strong enough to override the public interest in an open hearing and an order that is narrowly tailored to serve that interest.

1    In addition, this court's local Rule 57.7(c) provides that

2    in widely publicized or sensational cases, criminal cases, this

3    court, on motion of either party or its own motion, may issue a

4    special order governing such matters as extrajudicial statements

5    by parties, witnesses, and attorneys, the seating and conduct in

6    the courtroom of spectators and news media representatives, the

7    management and sequestration of jurors and witnesses, and any

8    other matters which the court may deem appropriate for inclusion

9    in such an order.

10    This is indisputably a widely publicized case.  Most

11    important for purposes of the instant motion, the particular

12    issues related to the composition of the jury have also been

13    widely publicized.  For example, the President of the United

14    States used his Twitter platform to disseminate a point of view

15    about a juror.  "Now it looks like the foreperson in the jury in

16    the Roger Stone case has significant bias."  And that was

17    printed in The Washington Post on February 13, 2020.  He also

18    repeated at a televised rally, according to newsweek.com, that

19    the foreperson was jumping up and down at the guilty verdict.

20    Also, to the best of what the Court has been able to

21    discern based on publicly available sources, on February 14th,

22    2020, Tucker Carlson, a commentator on FOX News, one of the

23    most-watched news networks in the country, accused the

24    foreperson of the jury of being an anti-Trump zealot and

25    broadcast on the screen her Twitter handle and other personal

information while stating, quote, during the jury selection
process at Roger Stone's trial, lawyers asked the eventual
foreman of the jury if there was anything that would affect her
ability to judge Stone fairly.  No, she claimed, she hadn't paid
much attention to the Russia probe.  That turned out to be a lie
and a stupid one at that, closed quote.

Mr. Carlson added, quote, she's an anti-Trump zealot who
closely followed the Mueller investigation.  This is not a
neutral person.  This is not someone capable of judging this
trial fairly.  This is a partisan who lied about who she was,
closed quote.  He concluded, Roger Stone is facing life in
prison because an Obama-appointed judge, Amy Berman Jackson,
allowed this woman to run the jury.  And that's available at
foxnews.com/opinions/tucker-carlson-why-the-roger-stone-case-
should-horrify-you-whether-you-are-republican-or-democrat.

February 14 wasn't the first time the commentator went
after the jury.  He began reporting about the composition of the
jury on November 5th, when all that had taken place was voir
dire.  And told his many viewers incorrectly, despite the fact
that the proceedings were open to the public and a transcript
was available, that the Court was installing officials in the
Obama Administration in the jury box.

Moreover, it's also a matter of public record, and I will
include docket 278, the government's sentencing memorandum at
page 15 and the mediamatters.org cites on that page as a part of

the record for this hearing, that the host of InfoWars, Alex
Jones, also began publishing incendiary and false information
about the composition of the jury beginning on November 5th, the
first day of voir dire.

A guest, Jacob Engels, who had been an author of posts on
the defendant's blog or Web site, StoneColdTruth, stated on the
program, quote, all I can say is from what happened in the
courtroom today, there is a well-known Obama communications
asset that was allowed to be a juror.  We did not select the
jury that day.  He added that, quote, her husband is a member of
the deep state intelligence community, closed quote.  This later
evolved into another incorrect report that a member of the
cabinet was on the jury -- and that's available at
www.salon.com/2019/11/7 -- We've Got Her Name:  Alex Jones
Claims to Out Potential Roger Stone Juror, and gets it wrong.

I think it's without question, then, that this is a highly
publicized case and that in a highly polarized political climate
in which the President himself has shone a spotlight on the jury
through his use of social media, which doesn't just reach those
who follow him on Twitter but also gets reported in the news
media, the risk of harassment and intimidation of any jurors who
may testify in the hearing scheduled for later today or in juror
misconduct is extremely high and that individuals who may be
angry about Mr. Stone's conviction or other developments in the
news may choose to take it out on them personally.  These

concerns are further supported by the government's two

oppositions to the motion to unseal.

Does the government wish to say anything more about those

matters at the bench at this time?

MR. COONEY:  No, I do not believe that is necessary,

Your Honor.

THE COURT:  All right.  So we have what you put on the

record on the record.

I need to state this clearly, even though it's not a matter

of debate, that any attempts to invade the privacy of the jurors

or to harass and intimidate them is completely antithetical to

our entire system of justice in which the accused has a

constitutional right to a trial by jury.  And members of the

public are called upon to give that right effect by showing up

for jury selection and by serving if selected.

While judges may volunteer for their positions and any

public attention that comes along with them, jurors are not

volunteers.  They are deserving of the public's respect, and

they deserve to have their privacy protected, and attempts to

disregard that for personal or political gain can have a

significant chilling effect on the willingness of other members

of the public to show up when they're summoned in the future.

This hurts everyone who may depend on his or her right to a jury

trial some day.  It's also particularly problematic in this case

given the fact that jurors have now become potential witnesses.

1   But any decision by the Court to take action with respect

2   to public access to these proceedings must be supported by the

3   record.  In connection with that, I'm going to receive

4   additional information under seal at this time.  I think

5   circumstances would justify receiving it ex parte, but I will

6   permit one lawyer from each side to come to the bench, along

7   with the individual we are going to hear from.  We will not use

8   the earphones for anyone else, and information that is received

9   at the bench may not be disseminated further, even to other

10  members of the legal team.

11      So Marshal Ruffin, could you approach the bench, and one

12  lawyer from each side can approach the bench.  And we are going

13  to turn the husher on, and that should cut off the audio to the

14  media room and to the overflow courtroom.

15      (Sealed bench conference.)







11   (End of sealed bench conference.)

12          THE COURT:  With that colloquy now having been made a

13   part of the record, the defendant's motion will be granted in

14   part and denied in part.

15          *Waller v. Georgia*, which I cited before, 467 U.S. 39,

16   establishes the standard for closing a courtroom in accordance

17   with the Sixth Amendment.  First, the party seeking to close the

18   courtroom must advance an overriding interest that it is likely

19   to be prejudiced.  Second, the closure must be no broader than

20   necessary to protect that interest.  Third, the trial court must

21   consider sua sponte reasonable alternatives to closing the

22   proceeding.  And fourth, it must make findings adequate to

23   support the closing.  That's 467 U.S. at page 45.

24          I find, pursuant to that standard, that there is a specific

25   and significant interest in juror safety and freedom from

harassment and intimidation that overrides the defendant's interest and the public interest in an entirely open proceeding, and that would be prejudiced by having no restrictions at all.

Making the jurors' names or physical appearance known to the public this afternoon would put them at substantial risk of harm. I make that finding based on docket 279, the sealed exhibit submitted by the government at docket 355-1, and the information that was made a part of the record this morning under seal, as well as the statements I detailed earlier being made publicly by prominent individuals concerning the jurors in this case individually and collectively.

It began, as I noted earlier, during voir dire when certain news outlets published false accounts that the Court was deliberately seating members of the Obama administration on the jury and in advance of sentencing when certain jurors commented, as they were fully permitted to do at that time, about the withdrawal of the trial team from the case. The number of comments increased. The intimidating nature of them intensified, and the jury has even been publicly criticized by the President of the United States.

And while prior to yesterday afternoon I would have been comfortable proceeding by simply using juror numbers, given the information provided in the government's supplemental sealed pleading at docket 335, there is reason to believe that even the publication of a juror number could be linked to private

information in a manner that is invasive of juror privacy,
intimidating, and potentially threatening.

But it is essential to make sure that any restrictions are
as narrowly tailored as possible.  And therefore, the rules I am
about to announce have been crafted sua sponte, as *Waller* and
*Press Enterprise 2* suggest, to meet that standard.

First, pursuant to those cases, this court's jury plan and
local Criminal Rule 57.7(c), the parties and their attorneys are
hereby specifically prohibited, upon punishment of contempt,
from using any juror's name or number during the remainder of
these proceedings.  During voir dire, which the defense has
suggested should be the template for these proceedings anyway,
we didn't refer to them by name but, instead, only used their
juror numbers.  But the parties and their attorneys will also be
specifically prohibited from using any juror's number during
these proceedings.  I will provide specific direction about how
to refer to any juror if and when the time comes.

Similarly, when referring to any Facebook posts or Twitter
posts, the parties may not refer to the account name or profile
name.  They will be identified by exhibit number only.

I recognize that two jurors made public statements after
the trial when they were fully permitted to do so, and they
included their names.  But given the extraordinary events that
have transpired since they did so and the number and derogatory
and intimidating nature of the statements that have been

1   published about them since then and the information made a part

2   of the record today, it is incumbent upon the Court to ensure

3   that neither it nor the parties in this case disseminate the

4   information further.

5        Second, the pleadings will remain sealed for now, but the

6   Court has already solicited the parties' proposals for what can

7   be unsealed, and it will direct the parties to file redacted

8   versions that it finds satisfactory that omit any identifying

9   information, including names, photos, Facebook and Twitter

10  account or profile names from the pleadings and from all the

11  exhibits, and they will be publicly docketed as soon as that is

12  possible.

13       Third, the hearing which was originally scheduled to be

14  sealed since the motion was sealed at the defendant's request

15  will be open to the public in part, subject to narrowly tailored

16  restrictions designed to protect the safety and privacy of the

17  jurors and to shield them from harassment and intimidation.

18       The procedures to be followed pursuant to *Waller* will be as

19  follows:  First of all, the audio portion of these proceedings

20  will be broadcast to the media room in accordance with the

21  Court's standard procedure in cases with great public interest

22  in realtime.  The overflow courtroom will be open, and the audio

23  portion of these proceedings will be broadcast there in realtime

24  so that members of the public at large and not just individuals

25  with press credentials will have the opportunity to hear every

1    single word that is said.

2         The transcript of these proceedings will not be sealed

3    unless there are sealed bench conferences during them, but they

4    may be redacted before being made available to the public in the

5    event any personal identifying information is inadvertently

6    mentioned.

7         But this courtroom will be closed, and there will be no

8    video feed from this courtroom to either the overflow room or

9    the media room and no courtroom artists.  In other words, every

10   single aspect of this proceeding will be public, with a very

11   limited exception of what any testifying jurors look like and

12   what their names, online account names are, and their juror

13   numbers are.

14        Pursuant to that order, then, every person, including the

15   courtroom artists, must leave the courtroom other than counsel

16   for the government and counsel for the defense, the defendant

17   and his wife, and any attorney representing any juror.  The

18   overflow courtroom is courtroom number 5, and it will be

19   available for everyone else.

20        Before we break so that we can clear the courtroom, I had

21   asked both parties to bring copies of any exhibits to court

22   today.  So if you have them, could you please give them to

23   Mr. Haley so he can give them to me so I have the numbers.  I

24   think I asked for two sets from each of you.

25             MR. COONEY:  Your Honor, if I may, I think I

understand Your Honor's order with respect to that, but the

exact exhibits we might use might depend upon what happens

during the hearing.  So if you would like copies of

everything -- we will be ready to go.  I'm not necessarily

suggesting if I hand up a lot of things to you that I

necessarily think that all of them will be pertinent to the

hearing.

THE COURT:  Okay.  That's fine.  But for instance, if

I want to talk about the jury questionnaire or this or that

thing, if I know what exhibit number it already has on it, it

will speed things up.  So I'm not holding you to introducing any

of them later.  I just want to have what you have.  I

particularly want, if there's going to be posts involved, so

that I can be looking at them and I can give them to any witness

if there is a witness if I want them to talk about them.

MR. COONEY:  I understand that.  Could we have just

five minutes to make sure we are fully organized?

THE COURT:  Yes.  That would be great.

And do you have anything for me, Mr. Buschel?

MR. BUSCHEL:  Yes, ma'am.

THE COURT:  All right.  Is this two sets or one set?

MR. BUSCHEL:  Two.  You asked for two.

THE COURT:  All right.  Thank you.

(Proceedings adjourned at 2:04 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    February 26, 2020

SIGNATURE OF COURT REPORTER        DATE