```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 19-cr-18
 4            Plaintiff,              .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   ROGER JASON STONE, JR.,          .  February 25, 2020
                                      .  2:25 p.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - -

 8

 9              PUBLIC TRANSCRIPT OF MOTION HEARING
                    (SEALED PORTIONS REDACTED)
10           BEFORE THE HONORABLE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   For the Government:         JOHN D. CRABB, AUSA
                                 J.P. COONEY, AUSA
                                 United States Attorney's Office
14                               555 Fourth Street Northwest
                                 Washington, D.C. 20530
15

16   For the Defendant:          ROBERT BUSCHEL, ESQ.
                                 Buschel Gibbons, P.A.
                                 100 S.E. Third Avenue
17                               Suite 1300
                                 Fort Lauderdale, Florida 33394
18
                                 BRUCE ROGOW, ESQ.
19                               TARA CAMPION, ESQ.
                                 Bruce S. Rogow, P.A.
20                               100 N.E. Third Avenue
                                 Suite 1000
21                               Fort Lauderdale, Florida 33301

22                               SETH GINSBERG, ESQ.
                                 299 Broadway
23                               Suite 1405
                                 New York, New York 10007

24

25                        -- continued --
```

1    APPEARANCES (CONTINUED):

2                                    GRANT J. SMITH, ESQ.
                                     StrategySmith, P.A.
3                                    401 East Las Olas Boulevard
                                     Suite 130-120
4                                    Fort Lauderdale, Florida 33301

5

6

7    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
8                                 U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
9                                 202-354-3284

10

     Proceedings recorded by stenotype shorthand.
11   Transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C O N T E N T S

WITNESSES:

MICHAEL MARANDO ....................................... 17

JUROR A ............................................... 72

JUROR B ............................................... 78

JURY FOREPERSON ....................................... 86

P R O C E E D I N G S

(Call to order of the court.)

THE COURTROOM DEPUTY:  Your Honor, recalling Criminal Case Number 19-18, United States of America v. Roger J. Stone, Jr.  The defendant is present.

Counsel present in the courtroom, please approach the lectern and introduce yourself and colleagues for the record.

MR. COONEY:  Good afternoon, again, Your Honor. J.P. Cooney and John Crabb for the United States.

THE COURT:  All right.  Good afternoon.

MR. ROGOW:  For the defendant, Bruce Rogow, Tara Campion, Seth Ginsberg, Robert Buschel, and Grant Smith.

THE COURT:  All right.  And Mr. Stone is present.

MR. ROGOW:  Yes.

THE COURT:  All right.  I have a number of questions concerning certain issues that have to be decided in connection with the motion.  The parties' positions have been set out in a great deal of detail.  I understand the arguments.  I don't expect that I am going to need to hear much argument beyond the answer to a number of questions.

One dispute to be resolved that I want to take up first concerns what information was available to the defendant and when.  Is the government just going to make representations about this, or is there a person with personal knowledge who is no longer counsel of record who you plan to call as a witness?

1    MR. COONEY:  We do not intend to call a witness, Your

2    Honor.  However, we have two things:  First, I do have personal

3    knowledge of this transmission.  I did not do it myself.

4    However, I was the supervisor on this case.  And second, I have

5    objective evidence of when the transmission occurred, what was

6    transmitted, and when the defense downloaded it.

7    THE COURT:  All right.  If you could then please

8    describe what the arrangements were for copying the jury -- have

9    you given the defense a copy of the exhibits that you have given

10   to me?

11   MR. COONEY:  I have, Your Honor.

12   THE COURT:  All right.  So can you describe what the

13   arrangements were for copying the jury questionnaires of

14   September 12th and what happened?

15   MR. COONEY:  I certainly can.  First, Your Honor, this

16   court ordered the government to, once the juror questionnaires

17   were prepared and available, to come pick them up from the

18   courthouse.  Specifically, I believe, it's my recollection that

19   it was from Mr. Haley, to pick them up, return them back to the

20   U.S. Attorney's Office, copy them, and make arrangements for

21   them to be delivered to the defense.  We made arrangements for

22   them to be scanned and for them to be delivered electronically

23   to the defense.

24   So specifically, on September 12, 2019, Mr. Kravis received

25   either a phone call or an e-mail from Mr. Haley.  I was unable

1    to determine whether it was an e-mail or a phone call.  I

2    happened to be with Mr. Kravis, however, when he received that.

3         And just for context, to ensure that we're clear on my

4    recollection and how I have personal knowledge of these things,

5    I was supervising the case, and candidly, we were all waiting

6    that day for the questionnaires, because the team was anxious to

7    get them and to begin work on them.

8         Once Mr. Kravis was informed that they were available, he

9    actually went to the courthouse himself, picked them up in a

10   box, and returned them to the U.S. Attorney's Office.

11        The paralegals in the Fraud and Public Corruption Section

12   were then deployed to copy them and to scan them.  All of those

13   documents, all of the questionnaires were scanned individually

14   by juror number onto a drive that we have at the U.S. Attorney's

15   Office.

16        Once they were all scanned, Mr. Kravis uploaded each of the

17   juror questionnaires to a program called USA File Exchange.

18   This is a server through which the U.S. Attorney's Office shares

19   discovery and other documents with defense counsel and other

20   individuals.  It is a secure network.  Those juror

21   questionnaires were uploaded to USAFX.  Notification was

22   provided to counsel for the defense.  And that all occurred on

23   September 12th, and on September 13th, the defense downloaded

24   those questionnaires.

25        If I can have -- oh, I'm sorry.

1          THE COURT:  The .pdfs that you created through the

2     scanning process which were uploaded, did they include the

3     signature page that had the juror's name in addition to the

4     juror number?

5          MR. COONEY:  Yes, they did.

6          THE COURT:  Okay.  Do you want to just go through each

7     of your exhibits and tell me what they are for the record?

8          MR. COONEY:  May I please do that?

9          THE COURT:  Yes.

10          MR. COONEY:  May I have just a moment to return to

11     counsel table?

12          THE COURT:  Yes.

13          MR. COONEY:  Thank you.

14       First, Your Honor, let's start with Exhibit 1, which is an

15     exhibit I think you're familiar with.  That is the questionnaire

16     for juror -- I apologize, Your Honor, for the juror at issue.

17          THE COURT:  Okay.

18          MR. COONEY:  And I think if you turn to the back of

19     that, you will see that the signature page is there.  That

20     questionnaire was printed from the shared drive that I referred

21     to a moment ago.

22          THE COURT:  Counsel for the defense, you handed me a

23     potential defense exhibit that appears to be identical to the

24     20-page Government Exhibit 1.  I don't think yours has a defense

25     exhibit number on it.  But do you agree that Government

1   Exhibit 1 is the jury questionnaire utilized by the foreperson

2   that is the subject of your motion for a new trial?

3           MR. GINSBERG:  We do, Your Honor, and we don't contest

4   the timing of the delivery as set out by Mr. Cooney.

5           THE COURT:  All right.  And you don't contest that you

6   received the signature page with not only her signature but her

7   name printed legibly on page 20?

8           MR. GINSBERG:  That's correct, Your Honor.

9           THE COURT:  Okay.  Go ahead.

10          MR. COONEY:  And I apologize, Your Honor, because I am

11  going to jump around in order of the exhibits.

12          THE COURT:  Okay.  That has never happened in this

13  courtroom before.

14          MR. COONEY:  Exhibit 7, Your Honor, it is a four-page

15  exhibit.  I'm holding it up if it helps for you.

16          THE COURT:  All right.

17          MR. COONEY:  This is a snapshot of the shared drive

18  where the juror questionnaires were uploaded.  They were

19  uploaded as -- scanned in as .pdfs.  And on page 1, if you scan

20  down to about a third of the way down the page, you will see the

21  juror number that is at issue.

22          THE COURT:  All right.  So just for convention,

23  each .pdf, it's a four-digit number slash something.pdf.  Some

24  are slash 1, some are not, but the four-digit number is the

25  juror number to which the .pdf pertains?

1          MR. COONEY:  Exactly.

2          THE COURT:  All right.

3          MR. COONEY:  And if you just continue along that row,

4     you will see it was uploaded to that shared drive on

5     September 12, 2019, at 2:28 p.m. in the afternoon.

6        Unless you have any questions about that, that's all I have

7     for that exhibit.

8          THE COURT:  I don't.

9          MR. COONEY:  Now, if you turn to Exhibit 5, it is

10    labeled at the top "discovery report."

11         THE COURT:  Yes.

12         MR. COONEY:  So Exhibit 5 is a three-page document.

13    However, you may see in the bottom right-hand corner, that's my

14    handwriting, because in its totality, this is a 216-page

15    document.  What it reflects is these -- this is the trail of

16    documents that were uploaded by Jonathan Kravis for actually a

17    longer period of time.  Some of the things here do not relate to

18    the trial.  I've shaved down to three pages the relevant pages.

19       The first page is simply to authenticate what it is.  You

20    will see identifying information for Mr. Kravis at the top of

21    the discovery report.  If you go to the second page of the

22    exhibit, which is actually page 202 of this 216-page document,

23    and if you go down to the very bottom, you will see the number

24    of the juror at issue along with a .pdf note.  That signifies

25    that that .pdf with that juror number, so the questionnaire at

1    issue, was uploaded to USA File Exchange.

2         And then actually, if you turn the page, you will see at

3    the very top Jonathan Kravis's name, and you will see, if you

4    continue across in the row, you will see the word "uploaded."

5    That signifies that he uploaded that document, the

6    questionnaire, and then continue along, on September 12, 2019,

7    at 9:43 p.m.

8         If you go back to the second page of the exhibit, we are

9    working upwards.  You will see that Grant Smith, counsel for the

10   defendant, downloaded it on September 13, 2019, at 1:02 p.m.

11   And if you continue up to the last row, USA File Exchange

12   maintains documents that are uploaded to it for a period of 60

13   days, and then they are automatically deleted.  So the next up

14   in the column, "unknown user," that is actually an

15   administrator, deleted; it was automatically deleted

16   November 11, 2019, 60 days after it was uploaded.

17             THE COURT:  All right.  So did you make paper copies

18   for your own use in addition to the .pdfs?

19             MR. COONEY:  Yes.

20             THE COURT:  Okay.  And --

21             MR. COONEY:  Excuse me.  I apologize, Your Honor.

22             THE COURT:  You, the government.

23             MR. COONEY:  We, the government.  We right now have

24   one paper copy of all the juror questionnaires.  I do not know

25   if -- or excuse me.  I believe that other paper copies were made

1    during the process of evaluating the jury questionnaires,

2    preparing for jury selection, and then, of course, jury

3    selection here in the courtroom.  At this moment, we possess

4    that I am aware of one copy.

5          THE COURT:  All right.  After they were copied, what

6    did you do with the originals?

7          MR. COONEY:  I do not know if we obtained -- I do not

8    know personally if we obtained original copies from Mr. Haley --

9    pardon me.  I do know.

10         THE COURT:  That was the whole point.

11         MR. COONEY:  Right.  We obtained the original copies.

12   We made copies and scanned them, and then we returned the

13   originals to Mr. Haley.

14         THE COURT:  And what's the name of the file-sharing

15   program?

16         MR. COONEY:  USA File Exchange.

17         THE COURT:  And who had authorization to utilize that

18   program when these materials were available on it?

19         MR. COONEY:  So USA File Exchange, as a general

20   principle, is available to all Assistant United States Attorneys

21   at the U.S. Attorney's Office.  However, we each have our own

22   USA File Exchange.

23      So for example, if I upload documents to USA File Exchange,

24   Mr. Crabb cannot access the documents that I upload.  Similarly,

25   Mr. Kravis's account would have been his account for USA File

1   Exchange.

2           THE COURT:  All right.  And who from outside the U.S.

3   Attorney's Office was able to access this particular account to

4   which the jury questionnaires were uploaded?

5           MR. COONEY:  Grant Smith.

6           THE COURT:  All right.  And what was your

7   understanding of the rules governing the confidentiality of the

8   jury questionnaires when you received them?

9           MR. COONEY:  They were sealed, which is to say -- and

10  sealed with our understanding that they could be shared with

11  members of the prosecution team, to include paralegals

12  supporting the prosecution team and supervisors working on the

13  case as well.

14          THE COURT:  At that time, as I understand it, are you

15  aware of whether the jury panel list that was used in the

16  courtroom on September 12th, in the ceremonial courtroom, was

17  retrieved by the deputy clerk at the end of the proceedings on

18  September 12th?

19          MR. COONEY:  I do not have personal knowledge of that.

20  I can tell you what knowledge I do have, but it is not personal

21  knowledge of the juror panel list.

22          THE COURT:  Well, are you aware about whether the

23  government and/or the defense made arrangements to get a revised

24  jury panel list in advance of trial?

25          MR. COONEY:  I do not.  I am sorry.  However, I do

1   have a member of the team available, not in the courtroom now

2   because he is not a counsel of record, Michael Marando, who may

3   have knowledge of it.  I do not know.

4           THE COURT:  He's here?

5           MR. COONEY:  He is here, yes.

6           THE COURT:  We may need to elicit some very brief

7   testimony from him when you are finished with this presentation.

8       Okay.  So you have a few more exhibits.  Would you like to

9   tell me what they are?

10          MR. COONEY:  Certainly.  I think the last exhibit

11  related to -- perhaps not the last exhibit, but to specifically

12  what we were talking about, which is the transmission of the

13  questionnaires to the defense.  It's simply to complete the

14  record.

15      Exhibit Number 6, this is an e-mail with redactions.  And

16  this e-mail exchange is between Mr. Kravis and the defense team

17  for Mr. Stone.  On September 12th at 5:43 p.m., Mr. Kravis wrote

18  an e-mail to the Stone defense team stating, Electronic copies

19  are being uploaded to USAFX right now."  Mr. Smith replied

20  within five minutes stating, "I will download them tonight and

21  distribute to our team.  Thank you very much for taking care of

22  this," essentially consistent with what the USA File Exchange

23  records show is that they were downloaded by Mr. Smith the next

24  day, September 13th.

25          THE COURT:  All right.  Rather than interrupting your

1    presentation to bring in Mr. Marando, do you just want to go

2    through what your other exhibits are?

3              MR. COONEY:   Certainly.  Exhibit Number 4 is a copy of

4    the jury panel sheet.  It has a date of October 4, 2019, at the

5    bottom.  My understanding of that jury panel sheet is -- and

6    this may -- well, I don't mean to -- this may be what your

7    questions were directed at, but my understanding of that jury

8    panel sheet is that it was actually provided to the team on the

9    first day of jury selection, November 5, 2019.

10             THE COURT:  All right.

11             MR. COONEY:  And then I do have other exhibits that I

12   marked --

13             THE COURT:  You're not saying -- that's your

14   assumption because that's when trial started?

15             MR. COONEY:  That is based on a conversation that I

16   had with Mr. Marando yesterday.

17        I just want to caveat it by saying, some of the questions

18   that you asked about what occurred on September 12 here at the

19   courthouse potentially about filling out of questionnaires is

20   not information within my personal knowledge, and so I didn't

21   ask questions about that.  So whether that might change his

22   recollection, I don't know.

23             THE COURT:  All right.  And what are 2 and 3, just for

24   the record?

25             MR. COONEY:  2 and 3 -- Exhibit Number 2 is simply the

composite exhibit that's attached to the defendant's amended

motion for new trial.  I marked that as an exhibit in the event

that I needed to ask any questions about social media posts.

Exhibit 3 is, not to confuse matters, but Exhibit 1

attached to the government's opposition to that motion, which

are the -- a table outlining the tweets that were sent by the

juror at issue between November 6 and November 15.  That would

be during the course of trial.  None of which relate to this

case.

THE COURT:  So Exhibit 2 at this point is just marked

for identification in the event you need to use this in

connection with cross-examining a witness.  Are you seeking to

introduce Exhibit 3, which is just a copy of the exhibit that

has already been filed in support of your opposition?

MR. COONEY:  In my view, it is a part of the record.

It is something that is important for the government to be a

part of the record of this -- of the litigation of this motion.

So if that is necessary for purposes of Your Honor's deciding

the motion, then yes, I would move it in here.

THE COURT:  All right.  So these are all the tweets

that were available when you went to find them that were from

the period of November 6th to November 15th on the particular

Twitter handle that we've been talking about?

MR. COONEY:  That is exactly right.  And to put a very

fine point on how we did this, myself and another Assistant U.S.

1    Attorney at my office and I went to them electronically,

2    reviewed them.  We retyped them, checked them to verify them.

3         And since we have done that, I have gone back to that

4    handle, and some of the tweets were -- in particular, the links

5    are gone.

6              THE COURT:  Did you do this at approximately the time

7    you filed your motion, your opposition to the defendant's

8    motion?

9              MR. COONEY:  Yes.  It would have been -- I believe

10   that the motion was filed on a Friday, and we filed our

11   opposition on a Tuesday.  It happened in between that time

12   period, on either Sunday or Monday.

13             THE COURT:  Okay.  All right.  Just to -- I will

14   receive Government's Exhibit 3 as a part of the record for the

15   hearing today, even though it is already a part of the record on

16   the motion.

17        I think to complete the circle, it would be useful if you

18   would summon Mr. Marando, please.

19             MR. COONEY:  Certainly.  May I just say one other

20   thing about that exhibit?

21             THE COURT:  Yes.

22             MR. COONEY:  Exhibit 3 for this motion, exhibit 1 to

23   the opposition pleading, in the exhibit, it makes clear or

24   states that these were the tweets that were available for public

25   viewing on February 17, 2020.

```
 1              THE COURT:  Okay.  Thank you.
 2              MR. COONEY:  Thank you.  May I be excused to --
 3              THE COURT:  Yes.
 4              MR. COONEY:  Thank you.
 5          (Pause.)
 6              THE COURT:  All right.  Mr. Marando, I understand
 7      that -- I know you are still an officer of the court, but
 8      because right now I'm asking you to be here in your capacity as
 9      a witness, I'm going to ask you to take the witness stand and be
10      sworn.
11              MR. COONEY:  Your Honor, not to interrupt the
12      swearing, but may I just disclose one thing?
13              THE COURT:  Yes.
14              MR. COONEY:  I just want to make sure that I've
15      apprised the Court that when I went to get Mr. Marando, I did
16      tell him that you had a question about the jury panel sheet and
17      that's why I was getting him.
18              THE COURT:  That's fine.
19          (Michael Marando sworn.)
20              THE COURT:  Sir, can you state your full name for the
21      record, please.
22              MR. MARANDO:  Michael Marando.
23              THE COURT:  And where are you employed?
24              MR. MARANDO:  The U.S. Attorney's Office for the
25      District of Columbia.
```

1          THE COURT:  Were you an Assistant United States

2     Attorney for the District of Columbia in 2019?

3          MR. MARANDO:  I was.

4          THE COURT:  Were you a member of the prosecution team

5     involved in the case of United States v. Roger Stone?

6          MR. MARANDO:  Yes.

7          THE COURT:  And were you a member of the team on or

8     about October 31st, between the time of the execution of the

9     jury questionnaires and the start of the trial in 2019?

10          MR. MARANDO:  Yes.

11          THE COURT:  All right.  Do you know what a jury panel

12     sheet is?

13          MR. MARANDO:  Yes.

14          THE COURT:  Okay.  A jury panel sheet lists the names

15     of the jurors who are in the venire for possible jury selection,

16     not in the order of their juror numbers, but in a random order

17     established by the jury office; is that correct?

18          MR. MARANDO:  Yes.

19          THE COURT:  Okay.  And were you aware, as a member of

20     my trial team, that according -- as a member of the trial team,

21     that I had given both sides instructions about how I was going

22     to go about picking the jury in this courtroom?

23          MR. MARANDO:  Yes.

24          THE COURT:  Okay.  And those instructions indicated to

25     both sides that I was going to seat the jurors in the order that

1     they appear on the jury panel sheet; is that correct?

2             MR. MARANDO:  Yes.

3             THE COURT:  So that meant that the one at the top of

4     the jury sheet would be the first ones put in the jury box

5     unless someone struck them; is that correct?

6             MR. MARANDO:  Yes.

7             THE COURT:  All right.  So do you recall the parties

8     have any interest in getting that piece of paper before the

9     actual start of the trial?

10            MR. MARANDO:  Yes, I do.  It's coming back to me now.

11    A lot has happened.  It pieces together.

12      I remember, after Your Honor struck the jurors for cause,

13    the initial strikes, Jonathan Kravis asked Mr. Haley or the

14    Court or chambers to get the order that the jurors would be

15    called in, and I wrote that on a piece of paper, a piece of

16    lined paper.

17            THE COURT:  All right.

18            MR. MARANDO:  And I remember that now.  And that

19    was -- then we asked Mr. Haley where they would all be seated,

20    and that way, we knew who would be where.  And then we shared

21    that list with defense counsel.

22            THE COURT:  All right.  Because originally, we started

23    with about 120 jurors, and nobody knew if the next time around

24    they were going to be in the same order they were in on

25    September 12th; is that right?

1          MR. MARANDO:  That's right.

2          THE COURT:  Okay.  So Mr. Haley, if you could give a

3   copy of this to the defense and one to the witness.  I have two

4   for the defense.  Actually, why don't you keep one, because it

5   might be an exhibit.

6      All right.  I've marked it just for identification as

7   Exhibit 8, because we have looked at seven exhibits at this

8   point.

9      Do you recognize Exhibit 8 as a redacted version of an

10  e-mail sent to you and the other members of the trial team and

11  the members of the defense trial team on October 31st, 2019,

12  from my courtroom deputy, John Haley?

13         MR. MARANDO:  Yes, Your Honor.

14         THE COURT:  All right.  So does this indicate whether

15  or not the Court was going to make available to you on

16  October 31st, even before November 5th, the jury panel sheet

17  that showed the order in which the jurors would be called?

18         MR. MARANDO:  Yes, Your Honor.  You were letting us go

19  in approximately a week before, six days, five days before to

20  get the order of the jurors.

21         THE COURT:  Okay.  So this e-mail says -- and it is

22  sent to Michael Marando, Aaron Zelinsky, Jonathan Kravis, Adam

23  Jed from the U.S. Attorney's Office of the District of Columbia,

24  Bruce Rogow, Mr. Buschel, Tara Campion, Chandler Routman, who I

25  believe were members of the trial team at the time.  It says,

"Review of the jury panel sheet before November 5th, 2019.
Counsel, in response to an e-mail from Jonathan Kravis, Judge
Jackson will allow counsel for the parties to review the jury
panel sheet before selection begins on Tuesday, November 5th,
2019.  The list will contain the names and four-digit jury
numbers of those jurors who remain and were not struck for cause
after the completion of the questionnaire and counsels'
submission of their proposed for-cause strikes.  Counsel will be
allowed to view the document in chambers.  Please contact
chambers directly to arrange a date and time if you wish to see
the list before court convenes on Tuesday."

Do you recall if you or any member of your team availed
yourself of that opportunity?

MR. MARANDO:  Yes.  Jonathan Kravis went and got the
list from, I believe, Mr. Haley or chambers.

THE COURT:  All right.  And then did you -- do you
know whether the defense availed themselves of the opportunity,
or did you separately just provide them with the numbers in
order once you all figured out what they were?

MR. MARANDO:  Jonathan relayed the list to defense
counsel in the order that it was provided.

THE COURT:  All right.  I don't have any more
questions for you on that issue.

Does anyone else?

MR. COONEY:  I do, Your Honor.  May I mark another

exhibit?

THE COURT:  Yes.

MR. COONEY:  Did you just take Number 8?  Are we now doing government and defense?  I thought I heard that.

THE COURT:  I made this 8.  Make yours 9.

MR. COONEY:  I just want to make sure I'm on the right track.  Thank you.

May I approach the witness?

THE COURT:  Yes.  Can you show to the defense what you have?

MR. COONEY:  Yes.  To be fair, they provided me a copy of this today, but it's something that I saw back at our office the other day myself.  I apologize.  I do not have a copy for you right now, Your Honor, but if I could have the witness identify it, and then we will hand it up to you?

THE COURT:  Okay.  I will take a look at it.  That would be great.

MR. COONEY:  Can I have Mr. Marando identify it first?

THE COURT:  Yes.

MR. GINSBERG:  Your Honor, we have an additional copy.

THE COURT:  Great.  Why don't you give it to Mr. Haley.

MR. COONEY:  Mr. Marando, I've handed you a one-page document marked Exhibit Number 9.  Do you recognize that?

MR. MARANDO:  Yes.

```
1              MR. COONEY:  What is that?

2              MR. MARANDO:  So this is the list that Jonathan Kravis

3    took of the order of the jurors that Mr. Haley or chambers

4    provided to him.  So this is the order that they were going to

5    be called and then subsequently seated in the courtroom.  I

6    remember that this is Jonathan, because I see his finger in the

7    upper left-hand corner, and I remember noticing that when he

8    gave this to me, and I thought this is pretty low tech.

9              THE COURT:  Okay.  So this handwritten list

10   corresponds, however, to the jury panel sheet, Government

11   Exhibit 4, in terms of the order of the numbers; is that

12   correct?  Mr. Smith is nodding his head.  So the defense agrees

13   with that as well?

14             MR. GINSBERG:  Yes, Your Honor.

15             THE COURT:  All right.  And so what did you do?  Fax

16   this or .pdf it or something to the defense?  Someone did?

17             MR. MARANDO:  I don't know personally, Your Honor, but

18   I know that it was -- Jonathan got it to the defense somehow,

19   and I don't know if he .pdf'ed it.  He probably .pdf'ed it.

20             THE COURT:  All right.

21             MR. MARANDO:  But we had an agreement beforehand

22   that -- because we were the only ones that were going to go over

23   there to get the list.  Obviously, defense counsel was not in

24   the District.  So we contacted them and said, Look, if you just

25   let us go there, we will write down the list for you, and you
```

don't have to come up and get it from chambers, we will give it
to you.

THE COURT:  All right.  I recall that throughout, in
terms of copying the jury questionnaires and to the last day of
trial, the parties worked together with a lot of professionalism
and civility to share information and make sure everybody had
what they needed.  All right.

Do you have any more questions about these issues?

MR. COONEY:  I do not.

THE COURT:  Okay.  Do you have any questions for this
witness about any of these issues?

MR. GINSBERG:  Just one.  It may have been answered.
I may have been distracted, Your Honor.

THE COURT:  Just for the record, I don't know that
you've talked yet today.  Can you put your name on the record.

MR. GINSBERG:  Seth Ginsberg, appearing for Roger
Stone.

THE COURT:  Okay.

MR. GINSBERG:  Do you recall the date on which it was
transmitted to the defense?

MR. MARANDO:  No, but it would have been close in
time.  My feeling, just going back and remembering, it was very
close in time.

MR. GINSBERG:  And the date that you said that
Mr. Kravis went and created the list was what date?

1            MR. MARANDO:  I don't know the exact date, but it

2    would have been shortened time to after we were invited to go

3    and copy it down, and then we would have gotten the list and

4    sent it over.

5            MR. GINSBERG:  And you were notified on or about

6    October 31st, 2019, that the list was available?

7            MR. MARANDO:  That's what the e-mail says.

8            THE COURT:  Yes, it says they were notified at

9    5:24 p.m. on October 31st.  So it would be my guess that you did

10   not come on October 31st.  I don't know that we would have kept

11   chambers open for that, but that you could come at any point

12   between -- the next day was a Friday, and then Monday was the

13   return of the pretrial conference; is that correct?

14           MR. MARANDO:  Exactly; that's right.

15           MR. GINSBERG:  And jury selection was on the 5th?

16           MR. MARANDO:  Yes.

17           THE COURT:  It began on the 5th, correct.

18           MR. GINSBERG:  So it was somewhere between

19   November 1st and November 5th?

20           MR. MARANDO:  Yes, but more likely it would have been

21   November 1st.  It would have been right after that.  We wouldn't

22   have -- because then November 2nd would have been a Saturday.

23   November 3rd would have been a Sunday.  We wouldn't have waited

24   until November 4th to get this.  I'm assuming we would have just

25   hopped on it the next day.

1          MR. GINSBERG:  Understood.  No further questions.

2          THE COURT:  All right.  Thank you.  You can step down.

3    Thank you.

4          MR. COONEY:  May Mr. Marando be excused?

5          THE COURT:  Yes, he can be excused.

6      Right now for purposes of the hearing, does the defense

7    have any objection to the admission of Government Exhibit 1 -- 2

8    is not being offered; they just marked it as an exhibit -- 3, 4,

9    5, 6, 7, and now what's been marked as 8 and 9?

10         MR. GINSBERG:  No objection, Your Honor.  With respect

11   to Exhibit 1, which is the table printout of the tweets of the

12   juror at issue, I just want to clarify, if I may, that --

13         THE COURT:  I'm sorry.  It's their Exhibit 3.  It was

14   Exhibit 1 to their opposition.  That's the one you're talking

15   about?

16         MR. GINSBERG:  Yes, Your Honor, their Exhibit 3.  My

17   reading of it indicates that the government obtained these

18   tweets on or about February 17th, 2020.  Is that accurate?

19         THE COURT:  That's what they said.  So they're not

20   making a representation that they're there now or how long they

21   were there before that.  You're just saying they were there on

22   that date; correct?

23         MR. COONEY:  Yes.  Whether we obtained them,

24   meaning -- what I can definitely represent is these were never

25   obtained until after the defense filed its motion.  I believe

1    the defense filed its motion on February 14th.  We may have seen

2    them before February 17th, some time between the 14th of

3    February and the 17th of February, but the exhibit was prepared,

4    based on tweets that we were looking at, on February 17, 2020.

5          THE COURT:  All right.  Thank you.  Who on the defense

6    team has personal knowledge of this period of time who I can ask

7    some questions to?

8          MR. BUSCHEL:  Yes, Judge.

9          THE COURT:  All right.  Mr. Buschel, I think the

10   defense has already acknowledged that it did, in fact, receive

11   an electronic copy of the foreperson's jury questionnaire,

12   including the signature page, through the mechanism that was

13   just described by the government; is that correct?

14         MR. BUSCHEL:  Correct.

15         THE COURT:  All right.  And you also agree that you

16   received the order of the number of the jurors on the panel

17   sheet before you got to court on November 5th and got the actual

18   panel sheet; is that correct?

19         MR. BUSCHEL:  Got it before?  I'm trying to figure out

20   what date I specifically received the file.  I have it on my

21   computer now.  I provided it to the government.  I can't say was

22   it the 31st or the 1st or when it was, but it was before

23   November 5th.

24         THE COURT:  All right.  And in any event, no later

25   than November 5th, you had a jury panel sheet that listed the

1   jurors in order?

2          MR. BUSCHEL:  That's right.

3          THE COURT:  And you know at some point even before

4   that, you had a list of the numbers in order?

5          MR. BUSCHEL:  That's right.

6          THE COURT:  And you understood the significance of the

7   order from the document that I had given attorneys for both

8   sides about my criminal voir dire procedures where I explained

9   that the jurors were going to be seated in the courtroom in the

10  order of their jury numbers; isn't that right?

11         MR. BUSCHEL:  That's right.

12         THE COURT:  And that's why both you and the government

13  wanted to get the panel list before the trial if you could?

14         MR. BUSCHEL:  Right.

15         THE COURT:  Okay.  Now, when you received the

16  electronic copies of the jury questionnaires, did you also make

17  paper copies of them?

18         MR. BUSCHEL:  A paper copy was made in the District of

19  Columbia here so we would have paper, a master set of

20  questionnaires during jury selection.

21         THE COURT:  So you worked electronically on them until

22  you came for trial and then had a paper set?

23         MR. BUSCHEL:  Yes.  We were able to -- as you can see,

24  each .pdf is broken down juror by juror.  So if you're looking

25  for 12345, you could just pull up 12345 .pdf.

THE COURT:  So who had access to the .pdfs?

MR. BUSCHEL:  Everyone on the defense team, lawyers, Mr. Stone.  And do we -- and there are a couple of lawyers that did not file appearances in this case.  Do you want to know their names?

THE COURT:  Well, yes.  I seem to remember they were seated here at the beginning of trial, and then we didn't have space for them inside the well of the court, and they had to step out.

MR. BUSCHEL:  Right.

THE COURT:  But yes, if there were additional attorneys who had electronic access to the information --

MR. BUSCHEL:  For a period of time electronically, Bryan Lloyd, Tyler Nixon.

THE COURT:  As of September 12th, had the jury consultant been retained?

MR. BUSCHEL:  Yes.

THE COURT:  And what was his name?

MR. BUSCHEL:  It was a woman, Amy Singer.  I spoke to her on October 31st at 10:00 a.m.  There was -- and I'm anticipating the Court's question, as it was in the minute order.  She was not present during jury selection.

THE COURT:  There was not a gentleman at counsel table who was a jury consultant as a part of the team during jury selection?

1          MR. BUSCHEL:  I want to see if someone can help me

2     help the Court figure out who you might be referring to.

3          THE COURT:  Okay.

4       (Defense counsel conferred.)

5          THE COURT:  I had two high-profile cases back to back

6     with reams and teams of lawyers, and I can see a certain

7     gentleman seated about where Mr. Ginsberg is now seated.  So I'm

8     just asking, as you recall, whether there was a jury -- because

9     I believe permission was asked to have them sit at the table.

10          MR. BUSCHEL:  We asked permission.  Mr. Haley said no

11     lawyers who have not filed a notice of appearance is permitted

12     in the well of the courtroom.

13          THE COURT:  That was for the two gentlemen you just

14     named.

15          MR. BUSCHEL:  I just named them.  They were not jury

16     consultants in the sense of what the Court might consider that.

17     They may have given their thoughts and comments, but not in that

18     capacity.

19          THE COURT:  Okay.  But the defense did retain a jury

20     consultant named Amy Singer?

21          MR. BUSCHEL:  Yes.

22          THE COURT:  And did she have access to the jury

23     questionnaires?

24          MR. BUSCHEL:  She did, and she works --

25          THE COURT:  Did or did not?

1          MR. BUSCHEL:  Did.

2          THE COURT:  Okay.  And you were --

3          MR. BUSCHEL:  She works closely with her daughter.

4     Her name is Danielle.  Is it also Singer?  I'm sorry.  I believe

5     she's married.

6          THE COURT:  All right.  And what tasks were they

7     supposed to perform?

8          MR. BUSCHEL:  They were to review the jury

9     questionnaire and give us their thoughts about which jurors

10    would be favorable to the defense.

11         THE COURT:  And did they have access to the Internet

12    as a part of their duties as your jury consultants giving you

13    their advice?

14         MR. BUSCHEL:  I assume so.

15         THE COURT:  Was that a part of their charter, to

16    Google the people?

17         MR. BUSCHEL:  No; no.  Unfortunately, they could

18    not -- they did not do that in this circumstance.

19         THE COURT:  And do you know that from your own

20    personal knowledge that they did not do that?

21         MR. BUSCHEL:  Yes.

22         THE COURT:  Did you ask them not to do that?

23         MR. BUSCHEL:  There were costs associated and

24    logistics associated with it.  They don't particularly do it

25    themselves, and it just didn't happen.

1          THE COURT:  All right.  Is it fair to say that

2     everyone else you named who had access to the jury

3     questionnaires, all of the lawyers, the two lawyers who were not

4     counsel of record in the case, and the defendant, had access to

5     the Internet?

6          MR. BUSCHEL:  Sure.  I mean, if I can also -- as well

7     as the government had access to the Internet.  We all did.

8          THE COURT:  Correct.  I mean, I think it's a regular

9     practice by trial lawyers these days to Google individuals on

10    the jury panel list, wouldn't you agree?

11         MR. BUSCHEL:  It is.  I also -- I will tell you that I

12    wanted to make sure that I didn't run afoul of any local rules,

13    and I couldn't find any.

14         THE COURT:  That prohibited it?

15         MR. BUSCHEL:  Right.

16         THE COURT:  All right.  And is it also a fair

17    statement that every attorney on the matter fully understood the

18    obligation to keep the jury questionnaires confidential?

19         MR. BUSCHEL:  Yes, ma'am.

20         THE COURT:  And Mr. Stone did as well?

21         MR. BUSCHEL:  Yes.

22         THE COURT:  Do you know if he engaged any other

23    individuals other than lawyers, just volunteers or employees or

24    other people who assisted him with other matters, in gathering

25    information or helping to review the jury questionnaires?

1          MR. BUSCHEL:  I don't know.  And I am answering that

2    question directly.  I don't know.

3          THE COURT:  And at the close -- November 4th, we had a

4    continuation of the pretrial conference, that Monday.

5          MR. BUSCHEL:  Yes, we did.

6          THE COURT:  And then on November 5th, Tuesday, we

7    completed the individual voir dire with respect to enough jurors

8    to qualify to begin the jury selection process and the exercise

9    of peremptories on the morning of the 5th; is that correct, to

10   your recollection?

11         MR. BUSCHEL:  I am looking at a calendar.  That's why

12   I keep looking down as well.  I agree.

13         THE COURT:  I believe the transcript from November 6th

14   reflects that.  And the transcript from November 5th shows that

15   we broke at 5:50 p.m. after voir dire but before the exercise of

16   peremptories.

17       So at that point, is it fair to say, you knew exactly who

18   was left and in what order they would be seated?

19         MR. BUSCHEL:  Yes, ma'am.

20         THE COURT:  Okay.  And did you have Internet access

21   that evening?

22         MR. BUSCHEL:  I did.

23         THE COURT:  All right.  That's all I have on that

24   particular subject matter.  I do have some questions about the

25   allegations in the motion.  So if that's Mr. Ginsberg, you can

1    switch places.

2       Yes, sir?  Would you like to say anything?

3          MR. COONEY:  I would.  May I just -- if it is already

4    in the record and it -- I wanted to make clear that the way I

5    understood this -- the questions to be answered by Mr. Buschel,

6    is that the decision not to do Internet research of the jurors

7    was not based on a prohibition imposed by this Court but,

8    rather, was a cost and/or strategic decision.  That is the way I

9    understood that.

10          THE COURT:  There was no order by this Court

11   prohibiting anyone from looking up anything about the jurors.

12          MR. COONEY:  Thank you.

13          THE COURT:  All right.  Mr. Ginsberg, I want to say

14   first that there's a lot about the motion that's important that

15   I need to take into consideration.  There's a lot about the

16   motion that's highly conclusory.  Also like the motion for

17   recusal, it's marked by a tone that I haven't seen previously in

18   the pleadings in this case and a particularly heavy reliance on

19   adjectives.  But I can separate the wheat from the chaff, and I

20   understand that under all the hyperbole, you are raising two

21   issues.

22       The first is whether as of the time of the execution of the

23   questionnaire and/or the voir dire, the person who ended up

24   serving as the foreperson answered questions falsely and thereby

25   understated or concealed bias that would have been important to

1    the exercise of motions to strike for cause.

2         I would like to state right now that all parties and

3    lawyers are specifically ordered to refer to that juror in no

4    other manner than as "the foreperson" for the remainder of these

5    proceedings.

6         There are predicate questions that are a part of that

7    inquiry, including whether what you believe demonstrated bias is

8    newly discovered for purposes of the Federal Rules of Criminal

9    Procedure and also whether the answers were, in fact, false.

10   But that's issue number 1.

11        Issue number 2 is whether there was misconduct or a failure

12   to follow instructions during the pendency of the case and the

13   deliberations.

14        So I have here composite exhibits.  I put page numbers on

15   it to help me get through it.  But I first want to just start

16   with whether you agree that at the conclusion of the trial, the

17   jurors were excused from any requirement not to talk about the

18   case after the verdict was returned?

19             MR. GINSBERG:  Yes, and that's reflected in the

20   record, Your Honor.

21             THE COURT:  Okay.  So you don't contend that the

22   public statement on the first page of your composite, the

23   statement of February 12th on Facebook by the foreperson, or any

24   public statement before that by any other juror contravened the

25   Court's instructions?

1              MR. GINSBERG:  No, we do not contend that.

2              THE COURT:  Okay.  Then what I would like to do is

3    take the jury questionnaire, which has been marked as

4    Government's Exhibit 1 -- it's also your exhibit, and I have my

5    own copy here.  And it just looks like that mark "1" in the

6    upper right-hand corner is a stray mark and not an exhibit mark,

7    because we all seem to have it on our copies.  And I would like

8    you in order to go through and tell me the question -- each

9    question, we will stop at each one -- that you contend the

10   answer was false, and then with respect to each, I will ask you

11   to point to the specific exhibit that you maintain establishes

12   its falsity.

13        So starting with question 1 on the jury questionnaire, can

14   you tell me the first question we get to that you believe the

15   answer -- you claim the answer was false?

16             MR. GINSBERG:  Yes, Your Honor.

17        Question 15, "Do you have any opinions or beliefs

18   concerning law enforcement organizations in general, including

19   the Federal Bureau of Investigation (FBI) or the Department of

20   Justice or the Special Counsel's Office within the Department of

21   Justice that would affect your ability to evaluate the evidence

22   fairly and impartially?"  Answer, "No."

23        Going right along with that question, because they're very

24   similar, Your Honor, question 16, "In this case, the United

25   States is represented by the United States Attorney's Office for

1    the District of Columbia.  The investigation that led to the

2    charges in this case was conducted by Special Counsel Robert S.

3    Mueller III.  The U.S. Attorney's Office is and the Special

4    Counsel's Office was a part of the U.S. Department of Justice.

5    Is there anything about the fact that the Special Counsel's

6    Office, the U.S. Attorney's Office, or the Justice Department is

7    or was involved in this case that affect your ability to be fair

8    and impartial in this case and base your decision solely on the

9    evidence presented and the Court's instructions on the law?"

10              THE COURT:  Did you put in your pleading that you

11   thought that those answers were false?

12              MR. GINSBERG:  We did not, Your Honor.

13              THE COURT:  Okay.  But now you're telling me they are?

14              MR. GINSBERG:  Yes, Your Honor.

15              THE COURT:  All right.

16              MR. GINSBERG:  And --

17              THE COURT:  And?

18              MR. GINSBERG:  -- if I may, because I think these

19   three questions really --

20              THE COURT:  What's the third one?

21              MR. GINSBERG:  -- go together.  Question 23, "Have you

22   written or posted anything" --

23              THE COURT:  Well, that is a factual question.

24              MR. GINSBERG:  Okay.  I think that the answer to that

25   question, combined with some of the information we've learned

from the foreperson's social media posts, ties together with the

prior two questions.

THE COURT:  All right.  I guess my question to you is,

do you think 15 and 16 are statements of fact?  They're

statements of her personal belief, and you do not believe that

15 and 16 accurately set forth her belief at the time, is that

correct, based on all the other evidence?

MR. GINSBERG:  Based on the evidence that we have

regarding her social media posts, it does not appear that those

answers are, in fact, truthful.

It may be that she believed them to be truthful, but she

concealed evidence regarding her views, which would have been

important for the Court and the parties to understand her bias.

THE COURT:  I don't want the argument.  I'm still

trying to just get through what the allegations are.  So 15 and

16, are you saying that she deliberately lied when she

wrote "no"?

You're saying that you think she's more biased than she

says, but that's different.  Are you saying that 15 and 16, she

lied?

MR. GINSBERG:  I'm saying at best, she gave

misleading --

THE COURT:  She may have believed it when she wrote

it.  So I want to know what's your contention.

MR. GINSBERG:  The answers are, at best, misleading.

1           THE COURT:  All right.  Intentionally misleading?

2           MR. GINSBERG:  At this stage, I don't know.

3           THE COURT:  All right.  So you're not pointing to any

4    facts at this point that make you say they're intentionally

5    misleading?

6           MR. GINSBERG:  Based on the social media posts, it

7    appears to me that they are misleading intentionally.

8           THE COURT:  Okay.  You are not contending that the

9    answers to 21 or 22 are false; is that correct?

10          MR. GINSBERG:  I am not.

11          THE COURT:  Okay.  And with respect to number 23, the

12   question was sort of a three-part question.  "Have you written

13   or posted anything for public consumption about the defendant;

14   second, the House Permanent Select Committee on Intelligence

15   investigation into Russian interference in the 2016 presidential

16   election; or third, the investigation conducted by Special

17   Counsel Robert Mueller?  Public consumption includes blog posts,

18   articles, posts on Internet sites that are accessible to the

19   general public."

20       She did not check either yes or no, but she wrote, "I can't

21   remember if I did, but I may have shared an article on Facebook.

22   Honestly not sure."

23       So do you contend that she posted for public consumption

24   material -- let's start with the first prong -- about the

25   defendant?

1          MR. GINSBERG:  Yes.

2          THE COURT:  All right.  And which are you pointing to

3    in particular prior to September 12th?

4          MR. GINSBERG:  Well, on January 25th, 2019, there is a

5    post with a caption, "Brought to you by the lock her up peanut

6    gallery," and it posts an article that says, "All the charges to

7    emerge from Robert Mueller's investigation, President Trump has

8    called the Russia investigation a witch hunt, but nearly three

9    dozen individuals have been charged.  Many of those," and then

10   the text runs out.

11      There is an article attached to that link which we have

12   provided to the Court as an exhibit.  That article references

13   Mr. Stone.

14         THE COURT:  All right.  Where is the article that was

15   attached to the link as an exhibit?

16         MR. GINSBERG:  It was handed up to Mr. Haley earlier

17   today as one of the exhibits.

18         THE COURT:  Is it a part of the composite?

19         MR. GINSBERG:  No.

20         THE COURT:  Oh, all right.  These don't have numbers.

21   So this document that seems to be 25 pages long is the NPR

22   article which was attached to that link; is that correct?

23         MR. GINSBERG:  Yes, Your Honor.

24         THE COURT:  Okay.  And somewhere in the 25 pages among

25   the information is information concerning the Stone

1    investigation, which began -- publicly announced on that day?

2            MR. GINSBERG:  Yes.

3            THE COURT:  Where?

4            MR. GINSBERG:  On page 3, it says, "Roger Stone,

5    long-time informal advisor to President Trump and

6    self-proclaimed dirty trickster, was arrested by FBI agents at

7    his home in Florida and charged with seven counts.  The Special

8    Counsel's indictment alleges that Stone was in regular contact

9    with WikiLeaks, the Trump campaign, Democratic -- stolen e-mails

10   from the Democratic National Committee."  I'm summarizing.

11           THE COURT:  All right.  And so --

12           MR. GINSBERG:  That is --

13           THE COURT:  This is a posting --

14           MR. GINSBERG:  On January 25th, 2019, the date of the

15   arrest.

16           THE COURT:  Okay.  So this is an article that someone

17   else wrote that she posted that includes information both about

18   the first being the defendant and, third, the investigation

19   being conducted by Special Counsel Robert Mueller; is that

20   correct?

21           MR. GINSBERG:  Yes, with the additional information

22   that she posted it with her own caption that says, "Brought to

23   you by the lock her up peanut gallery."

24           THE COURT:  Okay.  Anything else about the defendant?

25           MR. GINSBERG:  Well, yes.  On January 30th --

1          THE COURT:  I'm not saying whether it's significant or

2    insignificant.  I just want to make sure I know which ones

3    you're talking about.

4          MR. GINSBERG:  I appreciate that, Your Honor, and I

5    appreciate the opportunity to do this.

6       And if I may just briefly, the motions that were filed were

7    in no way intended to disparage the Court personally.  We're

8    merely trying to assert the rights of our client and protect his

9    interests.  There was --

10         THE COURT:  I didn't feel personally insulted.  I

11   think that -- and you are not the first lawyer I have ever said

12   this to you -- that when lawyers use very accusative, harsh

13   tones, lots of adjectives, sometimes it undercuts instead of

14   enhances the force of their argument because the argument now

15   has to marry up with the force.  And it's distracting.  It

16   doesn't make it more persuasive.  It makes it less persuasive.

17      So think about that in the future.  It may be New York

18   style, and there are plenty of lawyers in D.C. who write like

19   that.  Your colleagues have not previously, and they have

20   certainly been passionate and zealous in their advocacy for

21   their client at every step of the proceeding so far.

22      So that was just an observation about the style.  I have

23   filed motions in private practice seeking the recusal of judges.

24   So I don't see that there is anything wrong with that

25   necessarily.  It's a question about whether they're supported by

the law.  That's another issue.  But I've ruled on that, and I
don't bear any ill will towards you or anyone else in the room
for filing it.

MR. GINSBERG:  I wouldn't expect that you would, and I
appreciate the counsel, and will take it under advisement in the
future.  Although I practice in New York, I'm from New Jersey.
Maybe that's the reason.

THE COURT:  What else do you want to direct my
attention to specifically that belies "I can't remember if I
did, but I may have shared an article on Facebook.  Honestly not
sure"?

MR. GINSBERG:  Yes.  On January 30th, 2019, the
foreperson posted a tweet by Bakari Sellers that says, "Roger
Stone has you all talking about reviewing use of force
guidelines.  Not Alton Sterling.  Not Eric Gardner.  Not Walter
Scott.  Not Sandra Bland.  Not Keith Lamont Scott.  Not Philando
Castile.  Not Terence Crutcher.  Not Dontre Hamilton.  But Roger
Stone.  Think about that."  Roger Stone with three exclamation
points following his name.

That was a retweet by the foreperson of a post by Bakari
Sellers, who is an activist lawyer and CNN contributor.

THE COURT:  And it was about complaining about
excessive force in the execution of a search warrant; correct?
It wasn't about the underlying merits of the case or him
personally?

1          MR. GINSBERG:  There is nothing in the post that talks

2     about the underlying merits of the case, but it is about

3     Mr. Stone.

4          THE COURT:  Well, all right.

5          MR. GINSBERG:  The question is, "Have you written or

6     posted anything for public consumption about the defendant" --

7          THE COURT:  It says what it says.  You're going to

8     read it.  I'm going to read it.  I'm going to have to decide.

9     But I just want to make sure I know what else -- is there

10    anything else that belies the question -- the answer to the

11    question posting about the defendant?  Because then we can go on

12    to whether there's anything about HPSCI or this investigation.

13         MR. GINSBERG:  Your Honor, one moment.

14      On August 2nd, 2019 -- I apologize for pausing, but I keep

15    seeing the name and then having to mentally replace it with "the

16    foreperson."

17         THE COURT:  I appreciate the effort.

18         MR. GINSBERG:  The foreperson posted on August 2nd,

19    2019, an image with someone holding up a T-shirt that says,

20    "Trump and Republicans are not racist."  And the caption that

21    the foreperson inserted says, "Then stop being racists.

22    Co-signing and defending a racist and his racist rhetoric makes

23    you racist.  Point blank."

24      And that post, given that Mr. Stone is more than simply a

25    Trump supporter but known as an integral part of --

1          THE COURT:  Known to whom?

2          MR. GINSBERG:  To the public, I think.

3          THE COURT:  Really?  What date was this?

4          MR. GINSBERG:  August 2nd, 2019.

5          THE COURT:  Okay.  And what evidence do you have that

6   the public on August 2nd, 2019, knew who Roger Stone was?

7          MR. GINSBERG:  Well, this particular person had

8   already posted two other articles -- or one article and one

9   tweet about Mr. Stone.

10          THE COURT:  But you were about to tell me that he's an

11   integral part of the Trump apparatus and the Trump support --

12          MR. GINSBERG:  No, I wasn't about to tell you that.

13          THE COURT:  Do you know that she knew that?  She

14   doesn't.

15      You think the one about Republicans and racism and Trump,

16   which happened and has to be considered in connection with many

17   of the things you've argued, I just want to know if you're

18   saying that that is a tweet or something she wrote for public

19   consumption about the defendant.  Is that your position?

20          MR. GINSBERG:  Yes.

21          THE COURT:  Because he was known -- finish your

22   sentence.

23          MR. GINSBERG:  To her as a supporter of Donald Trump.

24          THE COURT:  All right.  Anything else that she wrote

25   or posted for public consumption about the defendant?

1          MR. GINSBERG:  Just a moment.  I'm making sure I'm not

2     missing anything.

3          There are other posts that relate to Mr. Trump that I think

4     by virtue of the post that we just discussed imply an attitude

5     towards the defendant, but --

6          THE COURT:  That's not the question.

7          MR. GINSBERG:  Well --

8          THE COURT:  That goes to some other points you might

9     want to make.

10          MR. GINSBERG:  Okay.  So nothing specific about the --

11          THE COURT:  I asked you the specific question, what

12     posts belie the answer to "have you written or posted anything

13     for public consumption about the defendant?"  And I want to make

14     sure I know the full scope of that.  And you're saying by

15     implication, anything about Trump may betray bias about the

16     defendant, but that's different than anything she posted about

17     Trump being about the defendant, don't you think?

18          MR. GINSBERG:  I think that the two posts, the

19     January 25th, 2019 post, "brought to you by the lock her up

20     peanut gallery," with an article about Mr. Stone's arrest on the

21     day of his arrest relating to the Trump campaign, Russia,

22     WikiLeaks, and the other information contained in the article,

23     combined with the January 30th, 2019, tweet regarding the use of

24     force and a list of people who presumably were the subject of

25     excessive force about whom, in the poster's mind, the public was

not concerned, or at least the public who is troubled by the use of force in Mr. Stone's case, in that person's view was not concerned, those posts are specifically about Mr. Stone.

The other post, the August 2nd, 2019, post in which the foreperson equated being a supporter of Trump with being a racist, I think, also incorporates Mr. Stone directly.

And yes, by virtue of that post, it is our view that other posts about Mr. Trump in connection with particularly the Special Counsel's investigation do imply a bias against Mr. Stone.

THE COURT:  All right.  And do you have any statistical information, any surveys, or anything you've done that would indicate what members of the public or even active members of the Democratic Party knew about Roger Stone in particular prior to the trial and all the evidence came out, other than the fact that he had been indicted?

MR. GINSBERG:  No, I have no information about that. I know what I know from the social media posts of the foreperson what she knew.

THE COURT:  Well, all you knew is what the posts say. The post attaches an article.  And so are you -- and the article says what he was charged with.  Does the article say what role he played in the Trump campaign, and are you -- you're assuming that she read every word of the 36 pages that you just gave me as an attachment?

1          MR. GINSBERG:  It says, "Roger Stone, a long-time

2     informal advisor to President Trump and self-proclaimed dirty

3     trickster, was arrested by FBI agents at his home in Florida and

4     charged with seven counts, including obstruction, witness

5     tampering, and making false statements in relation to Russian

6     interference in the 2016 election.  The Special Counsel's

7     indictment alleges that Stone was in regular contact with

8     WikiLeaks."

9          THE COURT:  Yes, that's what the article says.

10          MR. GINSBERG:  Your Honor just asked about the article

11     and what it said --

12          THE COURT:  No, I was asking about what she knew.  So

13     you're saying she forwarded this article and that was in there

14     and she certainly had the opportunity to read it before she

15     retweeted it; is that correct?

16          MR. GINSBERG:  Yes.

17          THE COURT:  She might have just liked the headline.

18     Who knows.

19          MR. GINSBERG:  I think that's an unfair

20     characterization, Your Honor --

21          THE COURT:  Okay.

22          MR. GINSBERG:  -- because every time the Court

23     references this article, it leaves out the "brought to you by

24     the lock her up peanut gallery."

25          THE COURT:  She said that.

1          MR. GINSBERG:  That's an integral part of the post.

2     That shows that she had a specific view of this and indicates a

3     likelihood that she did more than simply read the headline and

4     just pass it along because she thought it was a cute headline.

5          THE COURT:  All right.  Are there any posts that

6     you're pointing to about HPSCI?

7          MR. GINSBERG:  If I may, Your Honor.  I am happy to

8     answer Your Honor's question, but if I could just have an

9     opportunity to briefly run through a series of the posts, just

10    take a moment, and I think it will help clarify the issue.

11         THE COURT:  I understand the issue.  It's in all of

12    your papers.  It's in the first motion, and it's in the second

13    motion.  The problem is, you lump them all together, and I'm

14    trying to break them up because it's not a question of just what

15    does she write, what does she think, what does she feel.  It's a

16    question about, did she lie.  And so I want to tie -- I want to

17    know what you're saying says she lied.

18         MR. GINSBERG:  Okay.

19         THE COURT:  Not that she is a dyed-in-the-wool

20    Democrat and probably wouldn't like Roger Stone if she met him.

21    I want to know, what did she lie about in this questionnaire?

22    Then we will get to the other questions.  I'm still stuck there.

23         MR. GINSBERG:  Okay.  Beginning on January 25, 2019,

24    we have the "brought to you by the lock her up peanut gallery"

25    post.

1     On January 30, 2019, we have the use-of-force post.

2     On February 28th, 2019, we have a post regarding President

3  Trump making a statement about Michael Cohen and the Russian

4  collusion.  That's related to the Special Counsel's

5  investigation.

6     On March 24th, 2019, she posted, "Ignoring the numerous

7  indictments, guilty pleas, and convictions of people in 45's

8  inner circle, some Republicans are asserting that the Mueller

9  investigation was a waste of time."  That's related to the

10  Russia investigation and Mueller.

11     On May 16th, 2019, she posted, "Flynn told Mueller people

12  tied to Trump and Congress tried to obstruct probe.  Flynn told

13  Mueller."

14     Again, Mueller, Russia.

15     On May 29th, 2019, she posted, and this is her

16  quote, "After that investigation, if we had confidence that the

17  President" -- she's quoting, excuse me, Mr. Mueller.  "After

18  that investigation, if we had confidence that the President

19  clearly did not commit a crime, we would have said that, Mueller

20  said.  Mueller:  Charging the President with a crime was not an

21  option we could," and then the text ends.  That relates,

22  obviously, to Mr. Mueller, to the Russia investigation.

23     On June 13th, 2019, "Republican blocks bill requiring

24  campaigns to alert FBI to foreign offers of assistance."  I

25  think that's fairly related to the Russia investigation.

Reasonable minds could differ, but it's certainly connected topically to this issue.

On August 2nd, we have the "stop being racists" post.

On August 25th, 2019 -- now, this is just three weeks before the jury questionnaire was filled out.  She posts, "Will the MAGA crowd denounce or condone this affiliation?"  And there's a reference to a Ku Klux Klan rally.

There are posts earlier.  I started with the date --

THE COURT:  And that relates to Stone because it relates to Trump?

MR. GINSBERG:  And racism, which she equated with being a supporter of President Trump.

There's an earlier post from her, just bearing on the racism issue.  August 19th, 2017 -- granted, this is further away in time.  "Quick question for the #Klanpresident and the 64 percent of Republicans who agree with his remarks and behavior." This --

THE COURT:  All right.  Well, that's even before Roger Stone got arrested and got to the article that you say is the basis for her knowledge that he was a Trump supporter.  You don't contest that something she wrote in 2017 indicates that she thinks Roger Stone is a racist?

MR. GINSBERG:  Correct.  She also posted back as early as 2016, December 16th, "FBI agrees with CIA assessment that Russia wanted to help Trump win."

1          THE COURT:  That's not about the Special Counsel's

2     investigation.  That's about -- all right.  I've got them all.

3     I really was trying to get into the specifics of what belied

4     that particular answer.

5          MR. GINSBERG:  I think if you look at the posts that

6     we just went through from January 25th, 2019, the date of the

7     arrest of Roger Stone, until August 25th, 2019, just three weeks

8     before jury selection, if that, her answer in response to the

9     question Your Honor read, "I can't remember if I did, but I may

10    have shared an article on Facebook.  Honestly not sure," I think

11    that that is demonstratively false.  I think any person --

12         THE COURT:  Okay.  I asked you why you thought she was

13    false.  I really, really don't want to spend the afternoon.

14    We've got jurors cooling their heels in the room.  We're arguing

15    what you wrote down.  I'm just trying to zero in on making sure

16    that I don't miss any posts that you want me to talk about or

17    any question you want me to talk about.

18         MR. GINSBERG:  I appreciate that, and I just wanted to

19    compile them in a way that I thought would be useful.

20         THE COURT:  Thank you.

21         Question 27, "Have you read or heard anything about

22    defendant Roger Stone, about any statements made by or

23    attributed to Stone or about this case?"  She answered that

24    question, "Yes."

25         You don't contend that that was false, do you?

1          MR. GINSBERG:  No.  I think question 34, Your Honor,

2     jumping ahead.

3          THE COURT:  I want to talk about 29 and 30 first.

4          MR. GINSBERG:  Let me get to the question.

5          THE COURT:  29 says, "These are the names of people

6     who may be witnesses in the case and who may be discussed during

7     the trial."  There's a list of 31.  31st is Donald Trump.  It

8     asks, "Do you know any of them personally?"  She says, "Not

9     applicable."

10         Question 30, "Please indicate if you already have an

11    opinion about any of these individuals or if the fact that they

12    may be involved in this case would make it difficult for you to

13    be fair and impartial to both sides."  And she answered, "I do

14    have opinions about some of the officials/people on the list."

15         Now, would Donald Trump be an official on the list?

16         MR. GINSBERG:  He's on a list.

17         THE COURT:  Is there anyone else who leaps out at you

18    other than possibly Hillary Clinton as an official on the list?

19         MR. GINSBERG:  An official?  Steve Bannon might

20    qualify as an official.  I'm not sure if you would qualify

21    Richard Gates as an official or not.  At the time of this

22    questionnaire, I would say Paul Manafort was not an official.

23    John Podesta could be qualified as an official in some people's

24    minds, I suppose.  Those are the only ones.

25         THE COURT:  So question 30, she answered, "I do have

opinions about some of the officials/people on the list."  And
that would be supported by the posts that you've indicated, is
that correct, that she has opinions?

MR. GINSBERG:  Yes.

THE COURT:  But you dispute her assertion that they
don't make it difficult for her to be fair?

MR. GINSBERG:  Correct.  And I think it's problematic
that she failed to disclose all of those posts in response to
the prior question, because I think that deprived the Court and
the parties of important information that would have supported a
valid cause challenge.

THE COURT:  And question number 31, "Have you or a
close friend or family member ever been employed or had an
association with Congress or a congressional committee?"

As far as you know, she answered truthfully when she said
she ran for Congress in 2012?

MR. GINSBERG:  That's correct.  And a general
political affiliation was not something that was the issue.  The
majority of the pool of jurors were probably affiliated --

THE COURT:  Ran for Congress?

MR. GINSBERG:  Well, no, but --

THE COURT:  Okay.

MR. GINSBERG:  -- Democrats.

THE COURT:  All right.  Is there any other answer that
you are saying was false?

1          MR. GINSBERG:  Question 34, "Have you formed or

2     expressed any opinion about Mr. Stone, the charges in this case,

3     or about his guilt or innocence in this case?"  I think the

4     posts render her answer of "no" as likely false.  She seems to

5     have expressed an opinion.

6          THE COURT:  Okay.  Any others?

7          MR. GINSBERG:  One moment.

8       I am not claiming at this time that question 51 is false,

9     but it's certainly something that I think would be worth

10    exploring in a hearing.  "Do you have any personal reason that

11    makes you want to serve as a juror in this case, or do you have

12    any personal interest in the outcome of this case?"

13      I think it could be inferred that her extremely strong

14    views, combined with her failure to disclose them, could lead to

15    a bias and a personal interest.

16      Question 56, "Is there anything about this case, the

17    issues, or the people involved in this case or any other reason

18    that has not been asked about in any other question that leads

19    you to believe that you could not be completely fair to both the

20    defendant Roger Stone and the U.S. government in this case?"

21      I think that was an opportunity, if she felt that she had

22    not been asked the right question, to disclose the information

23    that we've discussed.  She didn't share it with the Court.  I

24    take issue with that response.

25          THE COURT:  All right.  Now, you talked a lot in your

1    pleading about bias, and you've indicated to me all the posts

2    that you think reflect that.  It's certainly -- and the primary

3    argument that you've written on paper is that she's an

4    opinionated Democrat who is opposed to the President, who is not

5    on trial.

6              MR. GINSBERG:  I take issue with that

7    characterization, Your Honor.  I think the primary argument we

8    make in our papers is that she failed to disclose evidence

9    regarding her strong views of Mr. Stone and the political issues

10   in this case.

11             THE COURT:  You always link them together, because

12   there's only two about Mr. Stone and the rest is about Mueller

13   or Republicans or primarily about the President.  And you always

14   say the President or the defendant, the President and the

15   defendant.

16       And my question is -- because you talk a lot about implied

17   bias.  You said in extreme situations, a relationship between a

18   juror and some aspect of the litigation is of such that it is

19   highly unlikely that they could remain impartial.

20       So I want to know if you are arguing that her bias or

21   opinions about the President meant that she was biased against

22   Roger Stone.

23             MR. GINSBERG:  Yes, I believe that the -- there's

24   nuance to it, Your Honor.  First, the failure to disclose the

25   information in and of itself suggests bias.  There was ample

 1    opportunity throughout the questionnaire and in voir dire, which

 2    I am sure we will get to.

 3          THE COURT:  The questionnaire said straight out, I

 4    have opinions about officials involved in this case.  So she

 5    didn't hide the fact that she had opinions about people on the

 6    list.

 7       My question is --

 8          MR. GINSBERG:  That's true, Your Honor, but she said

 9    that --

10          THE COURT:  I understand that you think her answer to

11    question 23 understated the number of posts.

12          MR. GINSBERG:  Yeah, but it's more than that, Your

13    Honor.

14          THE COURT:  But I'm trying to find out whether you

15    think there is a legal or factual basis that if what I find that

16    these posts show is an anti-President opinion, that that means

17    that she was necessarily explicitly or implicitly biased toward

18    Roger Stone.

19          MR. GINSBERG:  I think there's basis to find both.

20    But I would also like to point out to the Court that during voir

21    dire, these issues were followed up on.  It's not simply that

22    everything was known in the questionnaire and everybody dropped

23    the ball and nobody did anything.  The Court actually questioned

24    this juror with some degree of specificity.

25          THE COURT:  And then I threw it open to Mr. Buschel

1    and never stopped him.

2              MR. GINSBERG:  Well, that's actually --

3              THE COURT:  That is true, Mr. Ginsberg.

4              MR. GINSBERG:  You never stopped him, but --

5              THE COURT:  He asked a question.  The government

6    objected to it.  I rephrased it.  The witness answered it.  And

7    he said "thank you" and sat down.

8              MR. GINSBERG:  That's correct, Your Honor.

9              THE COURT:  He did not ask any more questions.  I did

10   not stop him.

11             MR. GINSBERG:  That's correct.  I misspoke.

12             THE COURT:  Thank you.

13             MR. GINSBERG:  That was my mistake.  I apologize.

14        But you asked this juror at page 93:  "You've also

15   indicated a fair amount of paying attention to news and social

16   media, including about political things?

17        "Answer:  Yes.

18        "Question:  And when we asked you what you read or heard

19   about the defendant, you do understand that he was involved in

20   Mr. Trump's campaign in some way?

21        "Answer:  Yes.

22        "Question:  Is there anything about that that affects your

23   ability to judge him fairly and impartially sitting here right

24   now in this courtroom?

25        "Answer:  Absolutely not."

1          THE COURT:  So she said that.

2          MR. GINSBERG:  Right.

3          THE COURT:  And my question is --

4          MR. GINSBERG:  The next question:  "What is it that

5     you have read or heard about him?"  "So nothing that I can

6     recall specifically.  I do watch sometimes paying attention but

7     sometimes in the background CNN, so I recall just hearing about

8     him being a part of the campaign and some belief or reporting

9     around interaction with the Russian probe and interaction with

10    him and people in the country, but I don't have a whole lot of

11    details.  I don't pay close attention or watch C-SPAN."

12         I think that the list of social media posts that she has

13    regarding not only this case and Mr. Stone but the entire probe

14    that Mr. Mueller investigated belies the truth of that answer.

15    She paid close attention.

16         THE COURT:  Do you want to answer my question, or do

17    you just not have an answer to my question?

18         I understand that you're saying based on the entire record

19    her statements concerning her knowledge of the case and her

20    opinion of Mr. Stone were understated.  Let's put that over

21    here.

22         Let's get back to the theme of your motion, which is that

23    her views about the President infected her with bias against

24    Mr. Stone.  That is at least in part one of the themes of your

25    argument, and I want to know what facts -- you've given me the

1   facts.  What is the legal support for why that counts?

2          MR. GINSBERG:  Your Honor's correctly identified that

3   as an issue in the motion.  And as I indicated earlier, that is

4   our view.  Her strong political bias places her in a category

5   where you can infer bias against the defendant, particularly --

6          THE COURT:  Do you have a case that says that?

7          MR. GINSBERG:  Yes.  The case is cited in our

8   memorandum regarding inferred bias.

9          THE COURT:  You cited the *Chapin* case where the Court

10  specifically distinguished between public sentiment about

11  President Nixon and one of his actual White House staffers and

12  said that couldn't be transferred, can't assume a Democrat can't

13  be fair.

14      Judge Ellis in the Eastern District of Virginia in the

15  *Manafort* case rejected Manafort's suggestion that potential

16  jurors who are more likely aligned with the Democratic Party

17  couldn't be fair because political leanings are not by

18  themselves evidence that they can't fairly and impartially

19  consider the evidence.

20      So what is your best case -- I know there is such a thing

21  as implied bias, and you gave me a good definition of it, which

22  is an extreme situation where it's highly unlikely that they

23  could remain impartial.

24      So I want to know, what is your best case for the fact that

25  her views about the President constitute the kind of implied

1    bias that means she couldn't serve?

2              MR. GINSBERG:  The cases that we cited in our

3    memorandum, Your Honor.

4              THE COURT:  Do you want to tell me which one's the

5    best one?  Okay.  I will figure it out.

6              MR. GINSBERG:  One moment.  I will identify the cases.

7              THE COURT:  I just wondered if there is one in

8    particular that you thought was strong on that point.

9              MR. GINSBERG:  I think they're all strong on that

10   point, Your Honor.

11             THE COURT:  Okay.  I will read them all.  I was going

12   to read them all anyway, but I was hoping you would direct me to

13   the one that you thought was the best.  All right.

14             MR. GINSBERG:  I would be happy to provide a

15   supplemental memo identifying the one that we think is the best,

16   if that would be helpful.

17             THE COURT:  No, that's not necessary.

18        I'm not going to make a finding right now as to whether

19   you've established falsity or newly discovered evidence at this

20   time.  But given the ambiguity of some of the posts, I am going

21   to grant your request for limited hearing on this issue and

22   permit some questioning of the witness, of the juror, but I want

23   to take up another issue first before we do that.

24        And that is the second issue about misconduct, because

25   there's a second issue that you raise, which is whether she

abided by the instructions of this Court and whether jurors were
exposed to prejudicial extra-record information.

Which posts do you say are in violation of my instructions?

MR. GINSBERG:  We don't say that any posts are in
violation of your instructions, Your Honor.

THE COURT:  Okay.  You said, then, that there are
reasonable grounds for investigation into misconduct if there's
clear, strong, substantial, and incontrovertible evidence that a
specific, nonspeculative impropriety has occurred which could
have prejudiced the trial defendant, citing *United States v.
Vitale*, 459 F.3d 190 from the Second Circuit.

Do you believe that the D.C. Circuit's standard is
essentially the same?

MR. GINSBERG:  I think the D.C. Circuit standard is
actually more permissive.  But the --

THE COURT:  All right.  So other than the post on the
morning the verdict was returned -- and we will discuss whether
that relates to the case at all -- are you alleging that the
foreperson disobeyed the instruction -- and I think you just
said you weren't -- that she wasn't supposed to read, write,
blog, or post about the case?

MR. GINSBERG:  I said that we do not contend that she
wrote or blogged about the case.  Based on her access to social
media, the sources that she identified as having regularly
watched, it seems likely that she came across information about

the case through her social media feed during the trial.  Given

the fact that she failed to disclose to the Court the numerous

posts that she made about the defendant and about the other

matters referenced in that question, didn't disclose any of that

to the Court, I think it gives rise to a concern that she may

not have been adherent to the remainder of the Court's rules

throughout the case.

THE COURT:  So what is the clear, strong, substantial,

and incontrovertible evidence that she read things she wasn't

supposed to read during deliberations?  What I heard is, That's

what I assume.

MR. GINSBERG:  The evidence that warrants a hearing is

that she failed to disclose material information to the Court

and the parties during voir dire and in the questionnaire.  Her

failure to disclose that information to the Court, which was

under oath, by order of the Court, gives rise to a concern that

she may not have followed other instructions of the Court.

THE COURT:  Okay.  Is that the same thing as clear,

strong, substantial, and incontrovertible evidence of a specific

impropriety?

MR. GINSBERG:  We believe it meets the standard, Your

Honor.

THE COURT:  All right.  Well, you argued in your

memorandum, "Her political posts demonstrate that she was

actively reading news related to Trump and political politics

1    during the trial."

2          Was there any prohibition on jurors reading news relating

3    to Trump and Presidential politics during the trial?

4                MR. GINSBERG:  No.

5                THE COURT:  Okay.  And you said, "And she almost

6    undoubtedly also read about Stone.  And given her failure to

7    follow the Court's instructions in voir dire, a presumption

8    arises that she failed to follow the Court's instruction in

9    other instances."

10         Then you say, "Her Twitter account indicates that she

11   follows Morning Joe, Huffington Post, Washington Post, New York

12   Times, CNN.  And those news outlets were busy during the trial

13   period.  So you say she may well have been following the Stone

14   trial in the media.  So if she was scrolling through her feed,

15   the likelihood is great that she was because she was tweeting,

16   she was exposed, and so you assumed that she read them, and then

17   you assumed that she told the jury about them.

18         So where in that link of causation is a fact as opposed to

19   an assumption other than at the beginning that you're saying she

20   understated her posts prior to filling out the questionnaire?

21               MR. GINSBERG:  That's the fact, Your Honor.

22               THE COURT:  Okay.  But you don't have any facts to

23   indicate that she was reading things she wasn't supposed to read

24   during the trial; correct?

25               MR. GINSBERG:  Correct.

1          THE COURT:  Tweeting things she wasn't supposed to

2     tweet during the trial?

3          MR. GINSBERG:  Correct.

4          THE COURT:  Or showing any of it to the jury?

5          MR. GINSBERG:  Correct.  Nor did we say we did.

6          THE COURT:  Well, you most certainly did.  You moved

7     for a new trial based on that as your secondary basis.

8          MR. GINSBERG:  We said that there's the possibility

9     that that occurred based on the failure to disclose the other

10    information.

11         THE COURT:  Am I supposed to grant a new trial -- am I

12    supposed to even grant a hearing based on a possibility?

13         MR. GINSBERG:  I think that based on the list of

14    social media posts that we've reviewed today, combined with her

15    answer to question 23, as well as the other questions that we've

16    identified, there is no doubt that if that information had been

17    provided to the defense, to the government, and to the Court at

18    the time of voir dire and --

19         THE COURT:  That's issue 1.  I'm talking about issue

20    2.

21         MR. GINSBERG:  Well, you asked --

22         THE COURT:  Issue 2, you said because she was on

23    Twitter and because Twitter was busy talking about Stone -- and

24    I take it that you would agree that CNN, the Huffington Post,

25    and all of these other outlets were tweeting about a lot of

other stuff between November 5th and November 15th?

MR. GINSBERG:  I'm sure that's true.

THE COURT:  Okay.  So because she was on Twitter, because she may have seen something, that means she read it and showed it to the other jurors?  That's issue 2.  That's the second prong of your motion; is that correct?

MR. GINSBERG:  Yes.

THE COURT:  All right.  And you gave me this *Vitale* kind of high standard for when I should grant a hearing.

MR. GINSBERG:  We also gave you another case.

THE COURT:  In your supplemental memo, now you've got some D.C. case law.

MR. GINSBERG:  In our reply.

THE COURT:  Okay.  I don't think you have come forward with any facts that would supply me grounds for inquiring into whether extraneous prejudicial information was improperly brought to the jury's attention.  The jury was free to discuss this case with you or anyone else it desired after the trial.  But I don't see any information or affidavits provided by any juror that supports your claim that something untoward occurred.  So I don't believe you've actually made the showing that would warrant an evidentiary hearing on issue number 2.  Usually, they're granted when there are affidavits, when there's facts.  It's all speculation.  It's all assumption.

However, there are unique circumstances here.  They are

unprecedented, including a very public, ongoing effort to

discredit not just the prosecution but the jurors themselves.

And as counsel was informed on Friday, so they could be

prepared, I invited the entire jury to be here.  On Friday, I

issued a minute order advising you to be prepared in the event

they were called to testify.  The foreperson was directed to be

here, and she is.

    And then the deputy clerk called each of the others who

deliberated and advised them as follows:  "There will be a

hearing on Tuesday concerning allegations related to the jury.

It is not yet clear whether we will need to hear from any of

you, but the Court would appreciate it if you could be present."

    They have not been provided with any additional

information.  I have not spoken to them.  I believe one had

travel plans.  One was ill.  There are 11 people in the jury

room.  I will inform you at a sealed bench conference in a

moment which jurors are present in the jury room.  I have not

spoken to them at all this afternoon, but Mr. Haley has made a

list of who is here.

    They did ask and he told them that they would not be

referred to by their name or number when they come out.  So in

an abundance of caution and given the unprecedented and unique

nature of this situation, I am going to ask questions to a few

jurors on the subject before we get back to the issue of the

juror's truthfulness on her questionnaire.  We're going to start

by asking a limited series of questions to jurors other than the foreperson.  I will not choose them myself.  Once I inform you who is here, each side may identify one juror other than the foreperson that it wants to hear from on the question of whether there was improper influence or extrajudicial information in the jury room.

But I'm not going to let you engage in a fishing expedition or ask follow-up questions unless my questions reveal any basis to go further.  We will not go more than these two jurors unless that inquiry provides a basis to go further.

And after I've advised you who is present, then you will have an opportunity to all confer, and then you will give me the juror number here at the bench under seal, and the government will do the same.  When they are called to testify, you are hereby ordered that they're going to be referred to as juror A and juror B.  Any violation of that order will be summarily punished with contempt.

I underscore that the defense has made no allegations of bias or failure to follow the Court's instructions by any of the other jurors.  So questioning them about their views or their questionnaires will not be permitted.  You had that opportunity before the trial began.  Nor may anyone, me or any of you, question the jurors about the substance of their deliberations.

So at this time you can have headphones or whatever you need, but we are going to turn on the husher, and I need counsel

1    for both sides to come to the bench so that we can inform you

2    who is here.

3         (Sealed bench conference.)







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25          (End of sealed bench conference.)

1        THE COURT:  All right.  We will take a quick break.

2     (Recess taken from 4:09 p.m. to 4:27 p.m.)

3        THE COURTROOM DEPUTY:  Your Honor, recalling Criminal

4  Case 19-18, United States v. Roger Stone.  Mr. Stone is present.

5        THE COURT:  All right.  Counsel, come to the bench.

6  We will put the husher back on, and you can tell me the jurors

7  that you want to summon for this purpose.

8     (Sealed bench conference.)

9     ████████████████████████████████████

10    ██████████████████████████████████████

11   ███████████

12    ██████████████████████████████████████

13   ████████████████████████████

14     ████████████████████████████████████

15   ████████████████████████████████████████

16   ██████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   █████████████████████████████████████████

20   ████████████

21     ████████████████

22    (End of sealed bench conference.)

23        THE COURT:  Mr. Haley, can you bring in juror A.

24        THE COURTROOM DEPUTY:  Your Honor, this is juror A.

25        THE COURT:  All right.  For the safety and privacy of

the jury, sir, we have a rule in place that we are not going to
refer to any juror by name or number in the courtroom.  You may
call the foreperson "the foreperson."  And if I ask any question
about whether any juror did X or Y and the answer is yes, simply
say "yes," and then I will give you a chance to name that person
under seal with the husher on so that it's a part of the record
but it's not being recorded or heard outside -- there is an
audio feed of your testimony that's leaving the courtroom, but
anything said at the bench with the husher on is not going to be
broadcast.

So do you understand that much?  We're not calling anybody
by their names.

JUROR A:  I understand.

THE COURT:  Okay.  Sir, prior to this case being
submitted to you for deliberation, were there any occasions when
anyone, including a fellow juror, tried to discuss the case with
you?

JUROR A:  No.

THE COURT:  Were there any occasions after you were
selected but prior to the case being submitted to you when
anyone, including a fellow juror, brought a news account or a
social media post about the case or the participants in the case
to your attention?

JUROR A:  No.

THE COURT:  Did that occur at any point during

deliberations?

JUROR A:  No.

THE COURT:  At any point in deliberations did any juror discuss information outside of the record with you or, to your knowledge, with any other juror?

JUROR A:  I'm not sure what you mean "outside of the record."

THE COURT:  Okay.  During deliberations, did anybody talk about something they had read or heard on social media or the news as opposed to an exhibit in the case?

JUROR A:  I understand.  No.

THE COURT:  Okay.  When it came time to select a foreperson, without using any names or telling me who voted for whom, can you generally describe the process that you used?

JUROR A:  Sure.  We solicited volunteers.  One person put their hand up to volunteer.  There was several seconds of silence.  I put my hand up to volunteer, just so we would have some discussion and choice in the matter.  Another juror nominated a third person.  A third person nominated a fourth person.  And so we had four candidates.  We took a secret ballot, and the foreperson was chosen as a result of that secret ballot.

THE COURT:  All right.  Did the judge, me, did I play any role in the selection process?

JUROR A:  You did not.

```
1          THE COURT:  All right.  Now, it's been a long day, and

2     we forgot to swear you in before you started.  So I'm going to

3     ask Mr. Haley to do that now.

4          (Juror A sworn.)

5          THE COURT:  Without telling me the substance of your

6     deliberations or how you were divided at any point, can you

7     generally describe how the foreperson went about the process of

8     organizing or facilitating your discussions?

9          JUROR A:  Sure.  We established a process or the

10    foreperson quickly established a process where we looked at each

11    element of each charge in isolation.

12         Actually, I will go back.  The first thing we did was take

13    a secret poll just to sort of get a pulse of the room, where

14    each person indicated whether they were leaning towards guilty,

15    towards not guilty, or not sure on each charge.

16         After that -- just so we could understand where we needed

17    to focus.  After that, we went through each element of each

18    charge in order, and we decided on each charge or each element

19    and reached unanimity on each element before we moved on to the

20    next one.

21         THE COURT:  All right.  So you considered not only

22    each count individually, but you also considered each element in

23    each count individually?

24         JUROR A:  That's right, Your Honor.

25         THE COURT:  Did the foreperson encourage civility and
```

1 respect among the jurors?

2         JUROR A:  She absolutely did.

3         THE COURT:  Was every juror invited or permitted to

4 speak up concerning his or her views?

5         JUROR A:  Yes, absolutely.  In fact, on at least one

6 occasion, maybe two occasions I can recall, we went around the

7 room and, you know, gave everybody a very explicit opportunity

8 to speak their mind.

9         THE COURT:  What concerns did you have, if any, about

10 whether the foreperson was attempting to impose her views on

11 others or dominate or control the outcome in any way?

12         JUROR A:  I never had any feeling that she was

13 attempting any of that.

14         THE COURT:  What concerns did you have, if any, at the

15 time you rendered your verdict that you or the jury had not

16 engaged in a full and fair consideration of the evidence?

17         JUROR A:  No concerns.

18         THE COURT:  Did you ever feel that you were being

19 pressed by any juror to return a verdict that was anything other

20 than your own considered judgment based on the evidence and the

21 law as I instructed you?

22         JUROR A:  No, I did not.

23         THE COURT:  Now, the jury included people of different

24 ages, educational background, race, ethnicity, gender.

25     How did you get along?

1          JUROR A:  We got along well.

2          THE COURT:  Did anyone attempt to dominate or

3   intimidate the others?

4          JUROR A:  No.

5          THE COURT:  Was there anyone who pressed for speed or

6   tried to essentially bulldoze the others?

7          JUROR A:  No.  There was a little bit of impatience a

8   couple of times during deliberations.  But as a group, we were

9   able to sort of slow ourselves down.

10          THE COURT:  Was anyone a voice for taking your time or

11  being sure to apply the presumption of innocence and hold the

12  government to its burden of proof?

13          JUROR A:  Yes.

14          THE COURT:  And is that someone that you need to name

15  with a name?

16          JUROR A:  I would say that several people were,

17  including the forewoman.

18          THE COURT:  All right.  Did any juror at any time say

19  anything to you that would indicate that he or she was basing

20  his or her verdict on anything other than the evidence in the

21  case?

22          JUROR A:  No.

23          THE COURT:  Did any juror at any time say anything to

24  you that would indicate that he or she thought that you should

25  base your verdict on anything other than the evidence in the

1    case?

2                JUROR A:  No.

3                THE COURT:  All right.  Do the parties have any

4    questions that they would like me to ask?

5                MR. COONEY:  No.

6                MR. GINSBERG:  No, Your Honor.

7                THE COURT:  All right.  Thank you very much, sir.

8    You're excused to return to the jury room.

9                JUROR A:  Thank you.

10               THE COURT:  Now we will have juror B.

11               THE COURTROOM DEPUTY:  Your Honor, this is juror B.

12               THE COURT:  All right.  Ma'am, good afternoon.

13               JUROR B:  Hello.

14               THE COURT:  For the safety and privacy of the jurors,

15   we have a rule in place in the courtroom right now that we are

16   not going to refer to any juror by name or even by their juror

17   number in the courtroom.  So you are juror B.  You may call the

18   foreperson "the foreperson" in answer to a question.  But if I

19   ask a question about whether any juror did X or Y and the answer

20   is yes, then just say "yes," and I will give you a chance to say

21   who it was with the husher on so that that information -- right

22   now, the audio of this is being broadcast to the reporters that

23   take down what's going on and to the -- there's an overflow

24   courtroom.  But if we speak at the husher with the husher on,

25   then they can't hear what you're saying.  So if there's a

question where you have to name somebody, then just say yes, a

juror did that, and then I will bring you to the bench with the

husher on, and you can say who it is.

Do you understand that much?

JUROR B:  Yes.

THE COURT:  Okay.  Thank you.  And now Mr. Haley is

going to swear you in.

(Juror B sworn.)

THE COURT:  All right.  Juror B, prior to when the

case was submitted to you for deliberation to decide, were there

any occasions when anyone, including a fellow juror, tried to

discuss the case with you?

JUROR B:  No.

THE COURT:  Were there any occasions after you were

selected but before the case was submitted to you to decide in

the jury room when anyone, including a fellow juror, brought a

news account or a social media post about the case or the people

in the case to your attention?

JUROR B:  No.

THE COURT:  Did that occur at any point during

deliberations?

JUROR B:  No.

THE COURT:  At any point during deliberations, did any

juror discuss any information from social media or the news with

you or, to your knowledge, with other jurors?

1          THE DEFENDANT:  No.

2          THE COURT:  When it came time to select a foreperson,

3     without using any names, can you tell me -- and without telling

4     me who voted for who, can you just tell me the process that you

5     used?

6          JUROR B:  We used a secret ballot, like just feeling

7     out who we want to select.

8          THE COURT:  And did anybody, the judge or anybody

9     other than the jurors play any role in your selection of the

10    foreperson?

11         JUROR B:  No.

12         THE COURT:  Now, I'm not going to ask you to tell me

13    about the substance of your deliberations.  I don't want you to

14    tell me how you were divided ever at any point.  But can you

15    generally describe how the foreperson went about the process of

16    organizing or facilitating your discussions?

17         JUROR B:  We went step by step with each count and

18    looked over the evidence and discussed the evidence, and each

19    person gave their answer of whether, you know, he was innocent

20    or guilty.

21         THE COURT:  All right.  I'm sorry.  Go ahead.

22         JUROR B:  Yeah, we just went step by step with each.

23         THE COURT:  And did you talk about each count

24    separately?

25         JUROR B:  We all talked together.  You know, like, I

may talk about it and say what I felt about it.  Each person
just say what they had to say about each count.

THE COURT:  Okay.  Was every juror invited or
permitted to give their views?

JUROR B:  Yes.

THE COURT:  Did you have any concerns about whether
the foreperson was attempting to impose her views on other
people or control the outcome in any way?

JUROR B:  No.

THE COURT:  Did you have any concerns at the time you
rendered your verdict about whether you and the jury had engaged
in a full and fair consideration of the evidence?

JUROR B:  We had a problem with -- well -- I don't
know how to say this.  We all agreed on -- most of us agreed on
our answer.  We already said that, you know, he was guilty.  But
it was the foreman -- I don't know whether I can say that.  But
it was the foreman that insisted that we examine question 3,
examine charge 3 a little more.

THE COURT:  Okay.  There was a count that you sent out
some notes about.  Is that the one that the foreperson asked you
to be more careful?

JUROR B:  Yes, that's the one.  We needed to examine
that a little more and read the transcript, you know, find out
more evidence.

THE COURT:  So it was the foreperson who insisted that

1    that level of attention be paid to that count, even though some

2    of you were ready already to decide?

3             JUROR B:  Yes.

4             THE COURT:  Did you ever feel that you were being

5    pressed by any juror to return a verdict that was anything

6    different from your own considered judgment based on the

7    evidence and the law?

8             JUROR B:  No.

9             THE COURT:  The jury included people of different

10   ages, educational background, race, ethnicity, gender.

11      How did you all get along?

12            JUROR B:  We get along -- we got along fine.

13            THE COURT:  Did anybody attempt to dominate or

14   intimidate the other people?

15            JUROR B:  No.

16            THE COURT:  Did any juror at any time say anything to

17   you that would indicate that he or she was basing his or her

18   verdict on anything other than the evidence in the case?

19            JUROR B:  No.

20            THE COURT:  Did anybody suggest that you should base

21   your verdict on anything other than the evidence in the case?

22            JUROR B:  No.

23            THE COURT:  Do you have any questions for the juror?

24            MR. COONEY:  No, Your Honor.

25            THE COURT:  Do you have any questions for the juror?

1          MR. GINSBERG:  No, Your Honor.

2          THE COURT:  Okay.  Thank you very much, ma'am.  You

3    may step back out into the jury room.

4          Given the evidence presented by the defense and the limited

5    hearing that I permitted us to have on this issue, I don't

6    believe there is any point in calling any other jurors to

7    testify about this matter.  I don't believe there's a factual

8    basis to obtain any more evidence on the question, the second

9    question raised in the motion about misconduct during

10   deliberations.

11         So my plan now is to return to the first issue.  The

12   allegation -- does anyone object to that finding with respect to

13   the second issue, or do you just rest on the record, or what

14   would you like to say about it?

15         MR. COONEY:  No, Your Honor.  We agree.

16         THE COURT:  You agreed before.

17         MR. GINSBERG:  We will rest on the record.

18         THE COURT:  All right.  Returning to issue number 1,

19   the allegation is that the juror provided false answers on her

20   questionnaire during voir dire.  I am going to permit some

21   limited questioning to get to the bottom of some of the issues

22   that need clarification, in particular the ambiguous posts.

23         I want to remind you of the rules concerning how to address

24   her and how to refer to the exhibits.  So if you ask a question,

25   take your time and make sure that you are not going to call her

1    by her name, you are not going to use her Twitter handle when

2    you talk about an exhibit.

3        I have not yet decided whether at the end of this I will

4    let you do the questioning or ask you to give me the questions,

5    but I'm going to bring her in now and in response to the

6    defendant's request for a hearing on this issue.

7          MR. COONEY:  Your Honor, may I ask for a point of

8    clarification?

9          THE COURT:  Yes.

10        MR. COONEY:  I do want to make sure that I understand

11    the scope of the questioning.

12        The way I understand what happened earlier this afternoon

13    is that we are essentially down to question 23 and whether the

14    foreperson's response to question number 23 was true or false.

15        I suppose derivatively, the defense claims that these other

16    broader questions are false based on these other social media --

17    based on other social media evidence out there.  But I thought I

18    heard you say that you were going to ask about some particular

19    tweets.  I want to make sure I understand exactly what it is

20    that we are endeavoring to determine here.

21        Are we down to 23, or are we doing something else?

22          THE COURT:  I think their argument is that given the

23    answer to 23 and given the state of the public record about her

24    comments on a number of matters, that one could find that her

25    answers with respect to "I'm not biased, I'm not biased, I can

1   be fair, I can be impartial," are misleading, if not

2   deliberately false.

3       And so therefore, I think some of the posts that support

4   some of those arguments, it's not clear what she's posting

5   about.  So I want to give an opportunity to try to get to the

6   bottom of some of those allegations.  And I think you will see

7   where I'm going, and there will be some limited opportunity to

8   question the juror.  But I don't think there's any basis to get

9   into how she conducted herself as the foreperson.

10          MR. COONEY:  I understand.  And please understand, I'm

11  not attempting to relitigate the issue.  I just want to make

12  sure it's clear that it's the government's view that we are

13  essentially engaged in voir dire that was available at the time

14  that the juror was presented.  That is what I am very concerned

15  about, is making sure that we are not engaged in redoing voir

16  dire from pretrial.

17      So I just make that statement as my overall view.

18          THE COURT:  I appreciate that.  I also appreciate the

19  government's view, which I think was well-taken, that on neither

20  issue there is a basis for a hearing.  I think with respect to

21  this issue, it's a closer call.  And therefore, in an abundance

22  of caution, I want to make sure that the Court of Appeals has a

23  full record.

24      So we are going to go forward, and we are going to ask this

25  foreperson some questions in a professional and

1    nonconfrontational way to ascertain if there are facts that need

2    to be elicited that go to the motion that I need to decide.

3            MR. COONEY:  I understand.

4            THE COURT:  And your position is clear, and the

5    defendant's position is clear.  We're going to give this a try.

6            MR. COONEY:  Thank you.

7            THE COURT:  Given the hour and the fact that no other

8    juror is going to be providing testimony, I am going to let

9    Mr. Haley let them know that they are permitted to depart if

10   they choose to.

11       All right.  Let's bring her in.

12       Good afternoon.

13           JURY FOREPERSON:  Good afternoon.

14       (Jury foreperson sworn.)

15           THE COURT:  For the safety and privacy of the jurors,

16   we have a rule in place in this courtroom that we are not going

17   to refer to any juror by name or jury number.  The lawyers and I

18   are going to call you "the foreperson."  If I ask you a question

19   about other jurors and the answer to the question is -- did

20   another juror do this or that and the answer is yes, just say

21   "yes."  Then I will have you come to the bench and turn on the

22   husher and ask you what that person's name is.

23       We have sealed the courtroom so no one can come in and see

24   who is testifying.  But there is an audio feed of what's going

25   on in the courtroom that is being broadcast to the overflow

```
 1    courtroom and the media room.  But if we come to the bench and

 2    the husher's on, then they can't hear that.

 3        Do you understand all of that?

 4              JURY FOREPERSON:  Yes, I do.

 5              THE COURT:  All right.  And for the record, were you,

 6    in fact, the foreperson of the jury?

 7              JURY FOREPERSON:  Yes.

 8              THE COURT:  And did you, at least prior to

 9    February 14th of this year, have a presence on Facebook?

10              JURY FOREPERSON:  Yes.

11              THE COURT:  How long have you been on Facebook?

12              JURY FOREPERSON:  I think 2008, I think, since 2008.

13              THE COURT:  Did you receive Facebook posts from any

14    news organizations?

15              JURY FOREPERSON:  Facebook posts?

16              THE COURT:  I guess there are news organizations that

17    you can follow or like on Facebook.  Did you get posts on your

18    Facebook pages from news organizations?

19              JURY FOREPERSON:  May I ask for a clarifying?

20              THE COURT:  Sure.  Maybe I'm not -- you got some on

21    Twitter; correct?  Did your Twitter feed include tweets from

22    news organizations?

23              JURY FOREPERSON:  So I think so.  I don't -- I haven't

24    paid attention to a lot on Twitter.  News media on Facebook?

25    I'm actually not sure if I got news media on Facebook.
```

1          THE COURT:  Okay.  What were your -- prior to

2     February 12th -- on February 12th, did you post a post on

3     Facebook after the prosecutors had withdrawn in this case

4     speaking about the prosecutors?

5          JURY FOREPERSON:  Yes.

6          THE COURT:  Prior to that time and at that time, what

7     were your privacy settings on Facebook?  Do you know?

8          JURY FOREPERSON:  At that time my privacy settings

9     were friends only.  And that was since November 15 -- well,

10    since around -- I'm sorry, around Thanksgiving, my settings

11    changed.  So can I answer --

12         THE COURT:  Let's divide it up.  What was it like

13    before the trial?  As of September 12th when you came to court

14    and filled out your jury questionnaire, what were your privacy

15    settings?

16         JURY FOREPERSON:  It was open.  My settings were

17    mostly public on Facebook and on Twitter.

18         THE COURT:  And then when did you change it to be

19    friends only on Facebook?

20         JURY FOREPERSON:  So November 15th, after the trial, I

21    shut down all of my social media.  They were shut down for two

22    weeks.  When I came back on to Facebook, then it was friends

23    only.  So around Thanksgiving of 2019, when I came back online,

24    it was moved to friends only.

25         THE COURT:  Did you -- what was your Twitter setting

1   when you reopened it?

2          JURY FOREPERSON:  So prior to November 15, 2019, my

3   Twitter feed fed from my Facebook feed.  So if I post on

4   Facebook, then it also posts on Twitter.

5          On November 15 when I shut down -- so I didn't just go

6   private on November 15.  I actually disconnected.  I had no

7   social media presence.  When I came back online for social media

8   around Thanksgiving, my Twitter and my Facebook were no longer

9   connected.  So most of my Twitter was coming from Facebook.  So

10  after Thanksgiving, around Thanksgiving, that was no longer the

11  case, I think because I had disconnected, and so it was no

12  longer connected.

13         So my last Twitter, I think, was the day of -- like the day

14  of the verdict, but that's because Facebook was still feeding

15  into Twitter up until that date.

16         THE COURT:  Well, it appears from news accounts and

17  the pleadings that the parties have submitted that after you

18  posted on Facebook on February 12th of this year, some of your

19  Twitter and Facebook posts were available online.

20         JURY FOREPERSON:  After?

21         THE COURT:  This February.

22         JURY FOREPERSON:  So the changes to my social media

23  were made around Thanksgiving 2019.  I have made no changes

24  since then.

25         THE COURT:  So if there's anything that somebody was

surfing the Web and they were able to find this February, was
that there back in September of 2019 also?

JURY FOREPERSON:  September -- so my Facebook became
friends only November 2019, after the trial.  So September 2019,
it was public.

THE COURT:  Okay.  So prior to September 12, 2019, you
didn't -- did you delete any Facebook --

JURY FOREPERSON:  No, I haven't deleted any Facebook
posts.  I haven't deleted anything on social media.  It's just
that the setting changed after the trial and after I came back
online.

THE COURT:  And between September 12th when you filled
out the questionnaire and November 5th when you came in and we
did this voir dire and you sat there, did you delete or take
down any Facebook or Twitter posts?

JURY FOREPERSON:  Absolutely not.

THE COURT:  On the day of the verdict in this case at,
it looks like, approximately 3:00 in the morning, there was a
Facebook post, I think, that came out on your Twitter feed.  I'm
going to show you page 26 of what is the composite exhibit and
ask you to take a look at it.

Mr. Haley, can you just give her the whole set?

Look at the 26th page.  On page 26, it has your name, your
Twitter handle, and then two hearts and two fists like a fist
bump at 3:14 a.m. on November 15, 2019, and a Facebook link that

1    isn't complete.

2              JURY FOREPERSON:  Yes.

3              THE COURT:  Is it fair to say that the two hearts and

4    the two fists are indicating something that you're pleased

5    about?

6              JURY FOREPERSON:  Yeah, that's normally how I would

7    do.

8              THE COURT:  Do you remember what you were pleased

9    about at 3:14 in the morning on November 15, 2019?

10             JURY FOREPERSON:  I have no idea.

11             THE COURT:  If you look at page 27 --

12             JURY FOREPERSON:  I don't have a 27.

13             THE COURT:  Yours are numbered differently.  Look at

14   the page that starts with the two hearts at the top and has a

15   number of --

16             JURY FOREPERSON:  I was looking at that when you said

17   26.

18             THE COURT:  All right.  So 26 is just your tweet at

19   3:14 a.m., and then 27 is a series of tweets.

20             JURY FOREPERSON:  Okay.  So can I say that this is 25

21   for me?

22             THE COURT:  All right.  The person who numbered one

23   set didn't number the other set, and I'm probably the one who

24   made the mistake.

25        At any rate, I want you to look at the page that you have

1   as 26 that has a series of tweets.

2          JURY FOREPERSON:  Yes.

3          THE COURT:  Looking at the one from the early morning

4   hours of November 15, does it have anything to do with the one

5   below it?

6          JURY FOREPERSON:  I really don't remember.

7          THE COURT:  That's fine.

8          JURY FOREPERSON:  The one on the 15th that's at the

9   top of that page?  I really do not remember what that one is

10  about.

11         THE COURT:  Were you celebrating the verdict that had

12  yet to be decided in the Roger Stone case?

13         JURY FOREPERSON:  Oh, absolutely not.

14         THE COURT:  Now, your profile on Twitter reportedly

15  says, "I heart Memphis.  Fighting for equality and excellence in

16  education for low-income and children of color is my life.

17  Tweets are my own.  Retweets don't equal agreement."

18     Is that what your profile said on Twitter?

19         JURY FOREPERSON:  Yes.

20         THE COURT:  So what does "tweets are my own.  Retreats

21  don't equal agreement" mean?

22         JURY FOREPERSON:  So when I created that years ago, it

23  was always to state that I'm not speaking for my employer.  I've

24  worked always in somewhat spokesperson for companies I've worked

25  for on some level.  So I'm just making clear that I'm not

speaking for my employer, that I am only speaking for me, and
that just because I retweet something does not mean that I am
stating agreement with it or opposition to it.

THE COURT:  All right.  So what makes you retweet
things?

JURY FOREPERSON:  Usually, it's something I find
interesting, something I learned something from and just sharing
it with people who follow me on Twitter.

THE COURT:  Do you have any idea how many people
follow you on Twitter?

JURY FOREPERSON:  Maybe about 2,500, maybe, 3,000,
something like that.  I don't know.

THE COURT:  Do you receive tweets from news
organizations such as The Washington Post, The New York Times,
or CNN?

JURY FOREPERSON:  I do recall having outreach, I
think, on Twitter; I do think that I had outreach on Twitter.
It's just that Twitter is not the thing I pay a lot of attention
to.  So I'm not exactly sure.  But I've certainly had outreach
from media and other forums as well.

THE COURT:  All right.  So did you subscribe to any
news feeds?

JURY FOREPERSON:  I have for a while subscribed to
news feeds -- I'm sorry.  On Twitter?

THE COURT:  On the Internet at all.

1          JURY FOREPERSON:  I have news subscriptions.  Yes, I

2     have some news alerts that come, like morning editions, things

3     like that.

4          THE COURT:  So during the trial, what did you do in

5     order to comply with the instruction to not read information

6     about the trial during the trial?

7          JURY FOREPERSON:  So if I saw anything, if it came to

8     my feed during the trial, I certainly ignored it.  I didn't pay

9     any attention to anything connected to this trial.  I didn't

10    read anything.  I didn't -- if it was on the news, I turned the

11    TV off.  I didn't have a lot of that, I will be honest, but I

12    did not read anything, did not pay attention to anything

13    connected to this trial.

14         THE COURT:  So how often -- you're saying if you

15    posted something on Facebook, that's how it got sent out through

16    your Twitter account; is that correct?

17         JURY FOREPERSON:  Yes.

18         THE COURT:  And so information that you read that you

19    received came to you through Twitter or through Facebook?

20         JURY FOREPERSON:  Anything I read about the trial?

21         THE COURT:  Just anything you read about anything

22    where you -- give me on an average day, did you look at Facebook

23    on your phone or on your computer or did you look at Twitter on

24    your phone or your computer?

25         JURY FOREPERSON:  During the trial?

1        THE COURT:  Let's just start with your general

2   practice prior to the trial.

3        JURY FOREPERSON:  So I would normally look at

4   Facebook.  It's usually where my activity comes.  Usually, if I

5   go to Twitter, someone has posted something about something on

6   Twitter, and then I go read it.  I have been on Twitter and

7   posted, you know, tweeted on Twitter disconnected from Facebook.

8   But most of my Twitter feed is -- has always been for years

9   connected to Facebook.

10       So if you were seeing something I tweeted, it's most likely

11   generated from my Facebook.  And so if you open it, then it will

12   try to take you to Facebook, because that's where Twitter was

13   reading that from.

14       THE COURT:  So during the trial, you weren't looking

15   at Twitter every day and seeing what had been posted about the

16   trial?

17       JURY FOREPERSON:  Oh, no, absolutely not.

18       THE COURT:  All right.  Now, you came to court, and

19   you filled out a jury questionnaire on September 12th, 2019.  At

20   that point were you -- there's some people who sometimes try to

21   get out of jury service.  There's sometimes some people who are

22   sort of intrigued and want to be -- want to serve.

23       Were you trying to end up one place or the other, making an

24   effort either way?

25       JURY FOREPERSON:  No.

1          THE COURT:  Looking back, you were asked a question,

2     question number 23, "Have you written or posted anything for

3     public consumption about the defendant, the House Permanent

4     Select Committee on Intelligence investigation into Russian

5     interference in the 2016 Presidential election, or the

6     investigation conducted by Special Counsel Robert Mueller?"

7          Let me say for purposes of this question, "for public

8     consumption" includes blog posts, articles or posts on Internet

9     sites that are accessible to the general public.

10          And you didn't check yes or no, but you said, "I can't

11     remember if I did, but I may have shared an article on Facebook.

12     Honestly not sure."

13          So going back to that composite document you have in front

14     of you, look at -- I don't know whether it's page 14 or

15     immediately before or after that, but there's a post with a

16     photograph of Robert Mueller, and it's an article from npr.org

17     that appears in your Twitter feed on January 25th, 2019, with

18     the comment "brought to you by the lock her up peanut gallery."

19          Do you have that?

20          JURY FOREPERSON:  Yes.  That's page 13 for me.

21          THE COURT:  All right.  What made this appear in your

22     Twitter feed?  Because you did something with it on Facebook?

23          JURY FOREPERSON:  So no, this one would -- so I would

24     have posted this on Twitter because you don't see the Facebook

25     link, very likely.

1          THE COURT:  All right.  Now, when you posted this

2      article, do you know if you had read the whole thing before you

3      posted it?

4          JURY FOREPERSON:  I don't remember.  Probably, though.

5          THE COURT:  And the comment, "Brought to you by the

6      lock her up peanut gallery," did you type that?

7          JURY FOREPERSON:  Yes.

8          THE COURT:  And then in approximately -- on the next

9      page, there's something that looks like a retweet from

10     January 30, 2019, about -- it says, "Roger Stone has y'all

11     talking about reviewing use of force guidelines."

12         So it's about the search of Mr. Stone's residence; is that

13     correct?

14         JURY FOREPERSON:  I don't know if it was about the

15     search, but it is correct that I retweeted this.

16         THE COURT:  Okay.  Well, what were the -- the

17     individuals that you listed below, who are they?

18         JURY FOREPERSON:  So this is a retweet.  So I didn't

19     originate the tweet.  I was just retweeting.  So this is the

20     person's name there.  That's his tweet.  I just retweeted it

21     without commentary.  So I just reshared it.

22         THE COURT:  Okay.  Now -- and I think it's fair to

23     say, if you go through -- and you can take your time -- in the

24     document you have in front of you, there are Facebook posts

25     about Michael Cohen, about Mueller, about the Special Counsel's

investigation.

Were you aware that you had sent those when you filled out the questionnaire on September 12th?

JURY FOREPERSON:  So, I wasn't -- so in that question, I was zeroed in about Roger Stone in response to that question. But I still didn't remember.  I posted a lot.  That's why I'm not sure.  I was not comfortable saying yes or no, because I really wasn't sure.  That's why I said I'm not sure, but it could have happened, because I do post things like that.

So no, in that moment, sitting there September 12th, I couldn't remember if I had posted that or not.  The reason I didn't check yes or no was because I was trying to be honest, because I honestly didn't know whether I had done it.

THE COURT:  Were you making any effort to downplay your activity on social media with respect to the investigation?

JURY FOREPERSON:  No, absolutely not, which is why I answered the way I did.  Again, I was trying to be honest that I was not sure.  I post and tweet a lot of stuff.  And so I absolutely was not trying to downplay anything.

THE COURT:  All right.  Mr. Ginsberg, I will let you ask questions.  Please be careful about following the rules.

MR. GINSBERG:  I understand, Your Honor.

THE COURT:  Thank you.  And obviously, if we get to the point where the questioning is too argumentative, the Federal Rules of Evidence are going to apply here.  With respect

1    to both of you, the questions need to be properly formed and

2    asked in an appropriate fashion.

3              MR. GINSBERG:  Good morning, Ms. Foreperson.

4              JURY FOREPERSON:  Good evening.

5              MR. GINSBERG:  Good evening.  Sorry.  It's been a long

6    day.  My name is Seth Ginsberg, and I represent Roger Stone.

7         Do you have the composite exhibit before you that the Court

8    was just identifying?

9              JURY FOREPERSON:  Yes.

10             MR. GINSBERG:  If you look on page 3, there is a post

11   there that relates to Russian involvement in the 2016 campaign

12   on behalf of President Trump; is that correct?

13             THE COURT:  Can you say the dates?

14             MR. GINSBERG:  Thank you, Your Honor.  December 16,

15   2016.

16             THE COURT:  2016?

17             MR. GINSBERG:  Correct.  And then on the next page, on

18   March 2nd, 2017, there's another post regarding "if HRC had won

19   and the Russians had hacked the RNC."

20        Do you see that post?

21             JURY FOREPERSON:  Yes.

22             MR. COONEY:  I apologize.  Can we please just identify

23   them by the date?  My page numbers are not matching up.

24             THE COURT:  What we got was not provided to us with

25   page numbers.  So yes, I think you need say on the post the date

1   and time.  I also think that the date and time are extremely

2   relevant.

3           MR. GINSBERG:  Agreed.  May I confer with the

4   government for a moment, Your Honor?

5           THE COURT:  All right.

6       (Government counsel and defense counsel conferred.)

7           MR. GINSBERG:  Thank you, Your Honor.

8       Turning to page 5, on March 3rd, 2017, there was a post,

9   "Trump, Putin, and the new Cold War:  What lay behind Russia's

10  interference in the 2016 election?"

11      Did you post that?

12          JURY FOREPERSON:  It appears I did, yes.

13          THE COURT:  And on the next page, on August 13th,

14  2017, there's a post, "Marched by 45's hotel, and the crowd went

15  boo and then yelled shame, shame, shame as we walked by."

16      Is that your post?

17          JURY FOREPERSON:  It appears to be.

18          MR. GINSBERG:  And on the bottom of that page, on

19  November 2nd, 2018, there's a post that says, "Why do they stick

20  with Trump, Wong asked during the panel.  Because Trump's

21  immigration agenda is the white Evangelical immigration agenda.

22  I think that that has become very clear.  #chuckdtriedtotellus.

23  #fearoftheblackplanet.  #fightthepower."

24      Is that your post?

25          JURY FOREPERSON:  So that post is quoting an article,

1    it appears, but yes, that's my post.

2              THE COURT:  You're posting something that someone else

3    posted?  Is this a repost?  A retweet?

4              JURY FOREPERSON:  It's not a retweet, but that

5    language within the post is quoting some article.  Now, the

6    hashtags are mine.

7              MR. GINSBERG:  The hashtags are yours?

8              JURY FOREPERSON:  Yes.

9              MR. GINSBERG:  And "Chuck D tried to tell us."

10   Chuck D, that's from the rap group Public Enemy?

11             JURY FOREPERSON:  Yes.

12             THE COURT:  Fair to say he's an activist?

13             JURY FOREPERSON:  I don't know.

14             MR. GINSBERG:  What does "Chuck D tried to tell us"

15   mean to you?

16             MR. COONEY:  Objection.

17             THE COURT:  What's the basis?

18             MR. COONEY:  This is not pertinent to the purpose of

19   the inquiry that Your Honor authorized here.  It was narrow with

20   respect to a specific question that Your Honor is trying to

21   determine the answer to.

22             THE COURT:  I think the question --

23             MR. COONEY:  I'm happy to say more.  It's just I

24   understand there's a witness in the box.

25             THE COURT:  I'm going to give you a little leeway

here, but I said over and over and over again that posts about
the President of the United States or retweets about the
President of the United States do not in and of themselves
reflect bias towards the defendant.

You made the argument that as of the date of his arrest,
she was aware that he had some association with the President
because there was an article that associated him with the
President that she retweeted.

This is before that ever happened.  This does not bear on
any bias towards Roger Stone other than your general assumption
that a person that has problems with policies and immigration or
climate or dealing with white supremacists, that she has an
opinion about that.  But having an opinion about the President
and some or any all of his policies does not mean that she
cannot fairly and impartially judge the evidence against Roger
Stone.

So I think to the extent you are focusing on this, I don't
believe there's been any dispute that any of these are hers, so
they're all in the record, but I don't think we need to go into
in great detail what she meant by every tweet.

MR. GINSBERG:  But the hashtag is hers.  And in the
context of the entirety of the postings that we've found, I
think it does paint a certain picture, and I would just like to
explore that.  I don't intend to dwell on it.  I'm moving
through them, I think, fairly quickly.  I'm not dwelling on

1    them.

2              THE COURT:  It paints a picture that she cares about

3    immigration, she cares about racial justice.  That voice comes

4    through.

5              MR. GINSBERG:  I'm not characterizing it.  I'm just

6    asking questions.

7              THE COURT:  All right.  Well, ask your next question.

8              MR. GINSBERG:  What does "Chuck D. tried to tell us"

9    mean to you?

10             JURY FOREPERSON:  Well, so the next hashtag, "Forever

11   Black Planet," that's a song or lyric, and it is talking about

12   the very thing -- the quote that I reposted about that, the lack

13   of racial justice.

14             MR. GINSBERG:  And on page 8 -- I will skip ahead.

15             THE COURT:  Let me just ask you -- we just went past

16   one on -- I don't know what page.  I've got 9.  November 11,

17   2017, 1:22 p.m., you quoted something.

18             MR. GINSBERG:  It's page 9.

19             THE COURT:  That says, "An incomplete list:  Mueller

20   lying, Comey lying, Obama lying, Clinton lying, federal judges

21   lying..." and there's a Facebook site.

22        So you posted that also?

23             JURY FOREPERSON:  Yes.  The start of that post with a

24   quotation means I am quoting someone.  It's not my words.  That

25   came from someone.  And so --

```
 1              THE COURT:  So you quoted the fact that someone said

 2     all those people were lying?

 3              JURY FOREPERSON:  Right.

 4              THE COURT:  Next question.

 5              JURY FOREPERSON:  That's exactly right.

 6              MR. GINSBERG:  Do you recall who it was that said

 7     those people were lying?

 8              JURY FOREPERSON:  I have no idea.  It was likely an

 9     article, that I was posting an article and then taking a quote

10     from the article.

11              MR. GINSBERG:  Looking at it now, do you think it

12     might have referred to President Trump saying that those people

13     were lying?

14              JURY FOREPERSON:  I have no idea.

15              MR. GINSBERG:  Okay.  In the interest of time and in

16     keeping with the Court's direction, moving to page 13, the post

17     from January 25th, 2019, the caption, "Brought to you by the

18     lock her up peanut gallery," that caption, you inserted; is that

19     correct?

20              JURY FOREPERSON:  Yes.

21              MR. GINSBERG:  And on the following page, the

22     January 30th, 2019, retweet from Bakari Sellers, you

23     understand -- well, do you understand that that was talking

24     about use of force against Roger Stone as compared with use of

25     force against a series of other individuals?
```

1          JURY FOREPERSON:  I don't recall.

2          THE COURT:  On page 15, on February 28th, 2019,

3     there's a post that says, "In his press conference, 45 said

4     M. Cohen lied a lot during his testimony but told the truth when

5     he said he had no knowledge/evidence that 45 colluded with

6     Russia."

7        Is that your post?

8          JURY FOREPERSON:  Yes.

9          THE COURT:  And on page 16, on March 24th, 2019, you

10    posted -- well, did you post "ignoring the numerous indictments,

11    guilty pleas, and convictions of people in 45's inner circle,

12    some Republicans are asserting that the Mueller investigation

13    was a waste of time because he hasn't found evidence."

14          JURY FOREPERSON:  Yes.

15          MR. GINSBERG:  On page 17, on May 16th, 2019, you

16    posted, "Flynn told Mueller people tied to Trump and Congress

17    tried to obstruct probe."

18        Is that your post as well?

19          JURY FOREPERSON:  It appears to be, yes.

20          MR. GINSBERG:  And that caption above the picture, did

21    you write that?  Do you know?

22          JURY FOREPERSON:  I don't recall.  I will say for the

23    record, generally, if I'm quoting someone, I put it in quotes to

24    signify that's not me saying.  So without the quotes, I would

25    say that I authored that.

1          THE COURT:  Let me ask you a question.  How many posts

2     did you post on Facebook a day, do you think?

3          JURY FOREPERSON:  It depends.  Sometimes very active,

4     sometimes not.  I wouldn't know a number.  But quite a bit

5     sometimes.

6          THE COURT:  And efforts have been made to gather posts

7     that you posted on these topics.  What were other topics that

8     you posted about?

9          JURY FOREPERSON:  Sometimes work, sometimes just

10    friends, sometimes my bus rides in the morning, various things.

11         THE COURT:  And can you give me an average per week,

12    if you can't per day, of how many posts you would post?

13         JURY FOREPERSON:  It really is hard to do.  I really

14    don't know.  I don't think of it in that way.  I hadn't thought

15    about it in that way.  Again, sometimes pretty active.  A lot of

16    times, it is a news article that I may post and share, sometimes

17    with captions, sometimes without captions.

18       But I don't know.  I would say I'm active enough, though,

19    on social media.

20         THE COURT:  All right.  Go ahead.

21         MR. GINSBERG:  On page 18, on May 29th, 2019, there's

22    a post, "After that investigation, if we had confidence that the

23    President clearly did not commit a crime, we would have said

24    that, Mueller said."

25       That's your post?

1          JURY FOREPERSON:  Yes, but the quotes indicate it's

2     not my language.

3          MR. GINSBERG:  Understood.

4        And then on page 19, on June 13, 2019, you posted,

5     "Republican blocks bill requiring campaigns to alert FBI to

6     foreign offers of assistance"; correct?

7          JURY FOREPERSON:  Yes.

8          MR. GINSBERG:  And on page 20, on August 2nd, 2019,

9     without quotes, there is the language, "Then stop being racists.

10    Cosigning and defending a racist and his racist rhetoric makes

11    you racist, point blank."

12       Is that your language?

13         JURY FOREPERSON:  Yes.

14         MR. COONEY:  Objection.

15         THE COURT:  She wrote it.

16       You wrote it?

17         JURY FOREPERSON:  I wrote it.

18         MR. GINSBERG:  And you put the post up?

19         JURY FOREPERSON:  Yes.

20         MR. GINSBERG:  And on August 25th, 2019, on page 21 --

21         THE COURT:  Was this a comment about Roger Stone?

22         JURY FOREPERSON:  No.

23         MR. GINSBERG:  Did you understand Roger Stone to be an

24    associate of President Trump on August 2nd, 2019?

25         JURY FOREPERSON:  Yeah.

1      MR. GINSBERG:  And you knew that he was arrested in

2  connection with activity claimed to be related to President

3  Trump; correct?

4      JURY FOREPERSON:  So I don't know that -- so I was

5  aware, but it's not something -- this had nothing to do with

6  that, if that's what you're asking.  This August 2019 post had

7  nothing to do with the arrest.

8      I literally didn't know when -- September 12th, I'm trying

9  to say, I didn't recall much about what was going on with Roger

10  Stone.

11      This post is not about Roger Stone, though, if that's what

12  you're asking.

13      MR. GINSBERG:  What I'm asking is, you've answered

14  that Roger Stone, you would consider an associate of President

15  Trump; right?

16      JURY FOREPERSON:  Prior to the trial, I don't know

17  that I would consider him an associate of President Trump.

18      MR. GINSBERG:  Well, you posted an article on

19  January 25, 2019, the date on which he was arrested, which you

20  said you read or you probably read, with the caption "brought to

21  you by the lock her up peanut gallery," and in that article, it

22  talks about his connections with President Trump and the charges

23  against him brought in connection with his actions on behalf of

24  President Trump.

25      JURY FOREPERSON:  I don't recall what that article was

1    about.

2            THE COURT:  Prior to the trial, did you have -- did

3    you know who Roger Stone was?

4            JURY FOREPERSON:  Yes.

5            THE COURT:  And who did you know him to be prior to

6    the trial?

7            JURY FOREPERSON:  Prior to the trial, my thinking was

8    that he was arrested because he had been connected with the

9    Russia probe and helping President Trump, but I knew nothing

10   about him other than that.

11       I did retweet in January when he was arrested.  That was

12   certainly more about President Trump than about anything.  But

13   it wasn't a target of, I am trying to talk specifically about

14   Roger Stone.

15           THE COURT:  But did you know before the trial how long

16   they had known each other or what role, if any, he played in the

17   campaign?

18           JURY FOREPERSON:  No.

19           THE COURT:  Go ahead.

20           MR. GINSBERG:  But you knew he was connected to

21   President Trump, and that was why he was -- well, you knew he

22   was connected to President Trump?

23           JURY FOREPERSON:  I knew he was arrested because of

24   connections with the 2016 Russia probe around campaign

25   interference, election interference.

1          MR. GINSBERG:  And on August 2nd, 2019, you posted

2     language in which you equate support and defense of President

3     Trump with racism; is that correct?

4          THE COURT:  Let's not characterize.  It says what it

5     says.

6          MR. GINSBERG:  It says --

7          THE COURT:  There's someone with a T-shirt saying

8     something, and she responded to it.

9       I think you need to ask your next question.  I think you're

10     getting very argumentative.

11          MR. GINSBERG:  On August 25th, 2019, on page 21, you

12     posted, "Will MAGA crowd denounce or condone this affiliation,"

13     with a picture of a Klan rally; is that correct?

14          JURY FOREPERSON:  Yes.

15          MR. GINSBERG:  Do you recall posting things with the

16     hashtag "Klan president"?

17          JURY FOREPERSON:  I don't.

18          MR. GINSBERG:  On page 22, did you post something

19     where you're quoting, on August 19, 2017, "Quick question for

20     the Klan president"?  Is that your post?

21          THE WITNESS:  Again, the quotations suggest it was

22     someone else's language.  That's not my language.

23          MR. GINSBERG:  Okay.  And on page 23, on

24     November 10th, 2019, you posted something about the impeachment

25     that was going on at the time; right?

1          JURY FOREPERSON:  Yes, about the use of the word "quid

2     pro quo."

3          MR. GINSBERG:  Relating to the impeachment?

4          JURY FOREPERSON:  Yes.

5          MR. GINSBERG:  And that was during the trial, correct,

6     this trial?

7          JURY FOREPERSON:  Yes.

8          MR. GINSBERG:  On page 25, this post with the two

9     hearts and the one fist up and the one fist clenched -- I'm

10    characterizing them as best I can.  Is that a fair

11    characterization of those two fists, one is up and one is

12    forward?

13         JURY FOREPERSON:  Yes.

14         MR. GINSBERG:  What do those signify to you?

15         JURY FOREPERSON:  Two fists, one forward and one up.

16         MR. GINSBERG:  Do they have some meaning?  The heart

17    means love; right?  What do the fists mean?

18         JURY FOREPERSON:  So I would -- I don't know what this

19    was in reference to.  So I don't know the answer to that

20    question.  I don't know what that post was.

21         THE COURT:  Are the two fists a fist bump, sort of

22    like a high five but it's with a fist?

23         JURY FOREPERSON:  Yes.  So that one is a fist bump,

24    and then the one up, so solidarity.

25         MR. GINSBERG:  Solidarity, protests?

1          JURY FOREPERSON:  Solidarity.

2          MR. GINSBERG:  One moment, Your Honor, if I consult my

3     notes.

4      When you wrote "brought to you by the lock her up peanut

5     gallery" on January 25th, 2019, and the post connected to the

6     article regarding Mr. Stone's arrest, what did that caption that

7     you wrote mean to you?

8          MR. COONEY:  Objection.

9          THE COURT:  Overruled.

10          JURY FOREPERSON:  So again, not specifically

11     remembering what's in that article, it was in reference to the

12     many rallies where supporters of the -- of Trump would

13     yell "lock her up," suggesting that Hillary Clinton and others

14     should be jailed.

15      And so that article was about arrests, as you said.  And so

16     it's, you know, the irony of people saying others should be

17     jailed and they themselves being arrested.

18          MR. GINSBERG:  Your Facebook account is now private;

19     is that right?

20          JURY FOREPERSON:  Yes, since November -- since around

21     Thanksgiving 2019.

22          MR. GINSBERG:  So the links that are available on

23     Twitter, these links and these posts, we can't follow them?

24          JURY FOREPERSON:  Not since around Thanksgiving 2019.

25          MR. GINSBERG:  Now --

1              THE COURT:  After the trial was over?

2              JURY FOREPERSON:  After the trial was over and in

3     response to some early reachout about the trial.

4              MR. GINSBERG:  So we just covered a series of posts

5     that you've made from January 25th, 2019, until approximately

6     August 25th, 2019, which was just a couple of weeks before you

7     filled out the jury questionnaire on September 12th, 2019.

8         Are you with me?

9              JURY FOREPERSON:  Yes.

10             MR. GINSBERG:  And in question 23, you were asked --

11             THE COURT:  Not all those posts were responsive to

12    that question.  Some of them were; some of them weren't.

13        But go ahead and ask your question.

14             MR. COONEY:  Your Honor, may I just ask, the witness

15    should be given an opportunity to see -- I observe that the

16    witness is looking at an exhibit which is not the exhibit

17    Mr. Ginsberg is using.  I think if the foreperson is going to be

18    asked about the foreperson's questionnaire, the foreperson

19    should have an opportunity to look at it.

20             THE COURT:  All right.  I will give her a copy.

21        Mr. Haley, do you have a copy to hand her?  Here.  I've got

22    several of them up here.

23             MR. GINSBERG:  It's on page 9, but feel free to look

24    through as much of it as you would like.

25        So question 23 asks, "Have you written or posted anything

1    for public consumption about the defendant, the House Permanent

2    Select Committee on Intelligence investigation into Russian

3    interference in the 2016 presidential election, or the

4    investigation conducted by Special Counsel Robert Mueller?"

5         Right?  That's the question.

6              JURY FOREPERSON:  Yes.

7              MR. GINSBERG:  And your answer is, "I can't remember

8    if I did, but I may have shared an article on Facebook.

9    Honestly not sure."

10        That was your answer?

11             JURY FOREPERSON:  Yeah.

12             MR. GINSBERG:  Do you think it's fair to say, based on

13   the posts that we have just reviewed, that you did more than

14   share an article?

15             JURY FOREPERSON:  So as I said --

16             MR. COONEY:  That mischaracterizes her response.  That

17   is a mischaracterization of her response and an argumentative

18   question as well.

19             THE COURT:  I think it is very argumentative.

20             MR. GINSBERG:  I will rephrase the question.

21        In your answer, you don't mention Twitter.  Is there a

22   reason for that?

23             THE COURT:  Which answer?

24             MR. GINSBERG:  The answer to question 23.

25             JURY FOREPERSON:  Well, so that's why I start with "I

can't remember."  And as I sat there on September 12th that day,
I actually could not remember if I had shared.  When I
say "shared an article on Facebook," that was not meant to say
one article.  And because my Facebook -- my Twitter is mostly
from my Facebook feed, even -- we would have to check.  Most of
those still are likely.  I don't know the answer to that.

But I said I'm honestly not sure, and that was the honest
answer on September 12th.  It is why I didn't check yes or no,
because I did not want to appear to be deceptive, and I was
giving the best answer I could at the time.  And as I sat there,
I really did not remember if I shared.

And if I may add, when I read number 23, I read all of that
to mean about Roger Stone.  So even in my reading of that, even
as you just read it, when I read that, I meant -- about the
defendant, all of that, I was thinking in terms of Roger Stone.

MR. GINSBERG:  For clarification, on page 13, the
January 25th, 2019, post, I'm not a Twitter expert, but that
doesn't appear to have come from Facebook.  Can you tell whether
it came from Facebook or not?

JURY FOREPERSON:  I cannot, but that doesn't mean that
it did not.

MR. GINSBERG:  What about the one on page 14, the
January 30th, 2019, one?

JURY FOREPERSON:  That was a retweet.  No, that was a
retweet on Twitter.  But I also didn't remember that retweet.  I

don't know -- I don't have in memory every tweet or share that
I've done, which is why I said I can't remember.  I didn't say
"no, I did not."  I just said "I can't remember," which was the
honest answer at that time.

       MR. GINSBERG:  I understand, and I appreciate your
answer.

       THE COURT:  You don't need to comment on her
testimony.  Just ask your next question.  If you don't have any
more questions, you can stop.

       MR. GINSBERG:  On page 17, the May 16th, 2019, post,
that's not from Facebook either, is it?

       JURY FOREPERSON:  I don't know.

       MR. GINSBERG:  It doesn't indicate it's from Facebook,
does it?

       JURY FOREPERSON:  It doesn't, but also, there is a
time where Twitter had a smaller number of words that can fit on
Twitter.  And if the full Facebook post could fully show on
Twitter, then it doesn't necessarily show, because there's no
need to link back to Facebook.

   So the chances of me sharing a full article on Twitter were
small, but I don't know the answer to that question.  That very
well could have still been from my Facebook feed.

       MR. GINSBERG:  Do you recall appearing in court for
voir dire where you were questioned by the judge and by the
lawyers for the parties?

 1              JURY FOREPERSON:  Yes.

 2              MR. GINSBERG:  And that was on November 5th, I

 3    believe, 2019?  Does that sound about right?

 4              JURY FOREPERSON:  About right, yes.

 5              MR. GINSBERG:  Do you recall being asked by the Court

 6    the following question:  "And when we asked what you read or

 7    heard about the defendant, you do understand that he was

 8    involved in Mr. Trump's campaign in some way?"  Do you remember

 9    that question?

10              JURY FOREPERSON:  Yes.

11              MR. GINSBERG:  And you answered "yes"?

12              THE COURT:  If you're reading to her from the

13    transcript, maybe you ought to give it to her.  I have a copy.

14              MR. GINSBERG:  Thank you, Your Honor.

15              THE COURT:  Now you really have to read it accurately,

16    because I don't have it in front of me anymore.

17              MR. GINSBERG:  Scout's honor.

18              MR. COONEY:  Do you need a copy, Your Honor?  It's in

19    our motion word for word, if you want to look at it that way.  I

20    have an extra copy of it.

21              THE COURT:  Okay.  I have it somewhere.  I have your

22    motion.  Thank you.

23              MR. SMITH:  Perhaps we can use the ELMO.

24              THE COURT:  I've got it.

25              MR. COONEY:  It starts on page 4.

1          MR. GINSBERG:  Thank you, Mr. Cooney.

2          THE COURT:  All right.  Go ahead.

3          MR. GINSBERG:  You answered yes; correct?

4          JURY FOREPERSON:  I'm not sure where you are.

5          MR. GINSBERG:  About two-thirds of the way down

6     page 93, the Court asked you, "You've also indicated a fair

7     amount of paying attention to news and social media, including

8     about political things."

9          You answered "yes"; correct?

10         JURY FOREPERSON:  Yes.

11         MR. GINSBERG:  And then the Court asked, "And when we

12    asked what you read or heard about the defendant, you do

13    understand that he was involved in Mr. Trump's campaign in some

14    way?"

15         And you answered "yes"; right?

16         JURY FOREPERSON:  Yes.

17         MR. GINSBERG:  And the Court asked, "Is there anything

18    about that that affects your ability to judge him fairly and

19    impartially sitting here right now in this courtroom?"

20         And you answered "absolutely not."  Right?

21         JURY FOREPERSON:  Right.

22         MR. GINSBERG:  And then the Court asked you this:

23    "What is it that you have read or heard about him?"

24         And your answer was, "So nothing that I can recall

25    specifically.  I do watch, sometimes paying attention but

1   sometimes in the background, CNN.  So I recall just hearing

2   about him being a part of the campaign and some belief or

3   reporting around interaction with the Russian probe and

4   interaction with him and people in the country, but I don't have

5   a whole lot of details.  I don't pay that close attention or

6   watch C-SPAN."

7      Is that correct?

8         JURY FOREPERSON:  Yes.

9         MR. GINSBERG:  Do you maintain that you at that time

10   you were not paying very close attention to the issues regarding

11   Roger Stone and the Russian probe and this case?

12         THE COURT:  That wasn't what she said.

13         MR. GINSBERG:  She said, "I don't pay that close

14   attention."

15         THE COURT:  She was asked about what is it she read or

16   heard about him.

17      Is there anything about that answer that was incorrect?

18         JURY FOREPERSON:  No.  Again, my whole response to

19   this was about Roger Stone.  And so what did I have or read

20   about him, I still stand by that, that it was about what I said

21   it was about.  I recall him being a part of the campaign and

22   some reporting around interaction with the Russian probe.

23         MR. GINSBERG:  May I have a moment, Your Honor?

24         THE COURT:  Yes.

25      (Defense counsel conferred.)

1          MR. GINSBERG:  Nothing further at this time, Your

2     Honor.

3          THE COURT:  All right.  Thank you.

4       Does the government have any questions it wants to ask this

5     witness?

6          MR. COONEY:  I do not have any questions.  Thank you.

7          THE COURT:  All right.  You're excused.  Thank you

8     very much.

9          JURY FOREPERSON:  Thank you.

10          THE COURT:  All right.  Does the defense have any

11     other evidence it would like to introduce at the hearing?

12          MR. GINSBERG:  No, Your Honor.

13          THE COURT:  Does the government have any other

14     evidence it would like to introduce at this hearing?

15          MR. COONEY:  No, Your Honor.

16          THE COURT:  All right.  I will take the matter under

17     advisement.

18       Thank you, everybody, for staying.

19       (Proceedings adjourned at 5:46 p.m.)

20

21

22

23

24

25

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Sara A. Wick, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8

9  /s/ Sara A. Wick                February 26, 2020

10  SIGNATURE OF COURT REPORTER        DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25