**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 19-cr-18-ABJ** |
| **ROGER J. STONE, JR.,** | **(Filed Under Seal)** |
| **Defendant.** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT ROGER J. STONE'S
AMENDED SEALED MOTION FOR NEW TRIAL ALLEGING JUROR MISCONDUCT**

The defendant, Roger J. Stone, claims that he was denied a fair trial based on juror misconduct that deprived him of the right to be tried by an impartial jury. His claim is rooted in the improper assumption that a person's political affiliation and viewpoints automatically render impartiality impossible in a case with political undercurrents, such as this one. But impartiality for jury service is not and should not be measured by politics or partisanship; impartiality is measured by a person's willingness and ability to set politics and partisanship aside to faithfully evaluate evidence, dispassionately apply the law, and independently reach a verdict. The defendant musters no evidence suggesting that the verdict against him was the product of anything but the jury's dutiful adherence to those obligations.

Specifically, the defendant alleges that recently obtained social media posts that appear attributable to Juror ███—one among the 12-citizen jury that unanimously found him guilty of each and every count in the Indictment—show that she concealed details about her political affiliation and social media use that the defense would have used to seek a for-cause strike or exercise a preemptory strike. Not so. As a result of this Court's thorough voir dire, consisting of a written questionnaire and individualized questioning, the defense was well aware of Juror ███'s political affiliation, her knowledge of the allegations against the defendant, and that she used social

media.  Moreover, the defense was given and took the opportunity to explore whether Juror █████

was actually biased against the defendant and elected not to ask the Court to strike her for cause.

The social media posts about which the defense now complains are consistent with Juror ████'s

disclosures during voir dire—they do not impeach her candor, reveal new information about her

political affiliation or viewpoint, or suggest that she failed to fulfill her obligation of impartiality.

The defense motion should be denied.

## I.   BACKGROUND

### A.   Voir Dire

This Court conducted a thorough voir dire, during which prospective jurors, including Juror

████, were called upon to complete a 56-question form and to answer individualized questions

posed by the Court, Government, and defense.  That process elicited detailed and specific

information concerning Juror ████'s political affiliation, career history and aspirations, news and

social media sources, and knowledge of the allegations against the defendant.

Juror ████ disclosed the following pertinent information on the written questionnaire:

- That Juror ████ possessed a law degree (p. 3, Question 4) and practiced law in
  Tennessee between September 20██ and December 20██ (p.5, Question 13);

- That Juror ████ was a Senior Program Officer at the ████████████████
  Foundation (p. 3, Question 6);

- That Juror ████'s primary sources for local and national news and information were
  newspapers (including online), TV/cable, blogs/websites, social media, news
  magazines, and word of mouth/conversation (p. 9, Question 21);

- That the names of the primary sources from which Juror ████ obtained news and
  information are *The Washington Post*, Apple News Service, Twitter, Facebook, *The
  New York Times*, CNN; *Politico*, *The Hill*, and CBS News (p. 9, Question 21);

- That Juror ████ listened to political commentators on TV or talk radio—but "not
  regularly"—including, CNN's Anderson Cooper and MSBC's Rachel Maddow and
  Chris Hayes (p. 9, Question 22);

- That Juror ▇▇ could not remember whether she had written or posted anything for public consumption about the defendant, the House Permanent Select Committee on Intelligence (HPSCI) investigation into Russian interference in the 2016 presidential election, or the Special Counsel Office's (SCO) investigation, writing: "I can't remember if I did, but I may have shared an article on Facebook. Honestly not sure" (p. 9, Question 23);

- That Juror ▇▇ served on the elected school board in Memphis, Tennessee between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ran unsuccessfully in the ▇▇ Democratic primary for one of Tennessee's seats in the U.S. House of Representatives (p. 10, Question 24), and had two friends who once worked for a Democratic Congressman from Tennessee (p. 13, Question 31);

- That Juror ▇▇ followed media reports relating to investigations into Russian interference in the 2016 election "Somewhat Closely" (p. 10, Question 25);

- That Juror ▇▇, prior to being called for jury service, was aware that "Mr. Stone is accused of inappropriate contact (sic) Russian officials in the effort of helping Mr. Trump's campaign for President" (p. 11, Question 27); and

- That Juror ▇▇ had "opinions about some of the official people" on a list of 31 individuals on the questionnaire—which included Donald Trump, Paul Manafort, Hillary Clinton, and Julian Assange, among others—but that those opinions "do not make it difficult for [her] to be fair" (p. 13, Question 30).

In addition to these extensive disclosures, on the questionnaire Juror ▇▇ certified:

- That holding political office had not caused Juror ▇▇ "to form an opinion about the defendant's guilt or innocence in this case or affect [her] ability to be fair to both sides" (p. 10, Question 24);

- That, "[t]o assure that the decision of the jury in this case is not based upon influences outside the courtroom," Juror ▇▇ would be able to follow instructions to "avoid reading about the case in the newspapers or listening to any radio or television reports concerning this case including news coverage or communications on the internet or social media" and to "not discuss or communicate about this case . . . on the internet or social media" (p. 10, Question 26);

- That nothing "about this case, the issues, or the people involved in this case, or any other reason that has not been asked about in any other question" led Juror ▇▇ "to believe that [she] could not be completely fair to both the defendant, Roger Stone, and the U.S. Government in this case" (p. 19, Question 56); and

- That, "under penalty of perjury," Juror ▆'s answers to all the questions on the written questionnaire were "true and correct to the best of [her] knowledge and belief" (p. 20).

The defense had access to all of this information nearly two months before trial and individualized voir dire.  Moreover, contrary to the defense's insinuation to the contrary, Juror ▆'s name was disclosed to it by virtue of her signature affirming the truth of her responses (p. 20).  Had the defense felt it necessary to learn more information about Juror ▆'s political affiliation or the strength of her political views from publicly available information, the defense could have sought leave of Court to do just that.

On November 5, 2019, Juror ▆ was questioned by the Court and defense counsel, including being questioned about her social media habits, political affiliation, and her ability to serve impartially as a juror.  The Court began the pertinent inquiry:

| | |
|---|---|
| THE COURT: | You've also indicated a fair amount of paying attention to news and social media including about political things? |
| JUROR ▆ | Yes. |
| THE COURT: | And when we asked what you read or heard about the defendant, you do understand that he was involved in Mr. Trump's campaign in some way? |
| JUROR ▆: | Yes. |
| THE COURT: | Is there anything about that that affects your ability to judge him fairly and impartially sitting here right now in this courtroom? |
| JUROR ▆ | Absolutely not. |
| THE COURT: | What is it that you have read or heard about him? |
| JUROR ▆ | So nothing that I can recall specifically.  I do watch sometimes paying attention but sometimes in the background CNN.  So I recall just hearing about him being part of the campaign and some belief or reporting around interaction with the Russian probe and interaction with him and people in the country, but I don't have a |

whole lot of details.  I don't pay that close attention or watch C-SPAN.

| | |
|---|---|
| THE COURT: | Can you kind of wipe the slate clean and learn what you need to learn in this case from the evidence presented in the courtroom and no other source? |
| JUROR ■ | Yes. |
| THE COURT: | You've actually had some interest in Congress yourself? |
| JUROR ■ | Yes. |
| THE COURT: | Does the fact that this case involves allegations of not being truthful to Congress, is that something that you think that the nature of the allegations alone would make it hard for you to be fair? |
| JUROR ■ | No. |

11/5/2019 (Afternoon) Tr. 93-94.

Following the Court's questioning, with the benefit of Juror ■'s disclosures on the written questionnaire, the defense undertook its own questioning of Juror ■ aimed squarely at the concern the defense now expresses—whether Juror ■'s political affiliation and knowledge of the allegations against the defendant unfairly biased her against him:

| | |
|---|---|
| DEFENSE: | Did you ever work for anyone in Congress? |
| JUROR ■ | No. |
| DEFENSE: | You've worked on campaigns for Congress (sic) people running for Congress? |
| JUROR ■ | I ran for Congress. |
| DEFENSE: | You ran for Congress? |
| JUROR ■ | I worked on my own campaign. |
| DEFENSE: | And you have friends who worked for other congressmen? |
| JUROR ■ | Yes. |
| DEFENSE: | Do you have any political aspirations now? |

| | |
|---|---|
| JUROR ▮ | I don't know, not federal. |
| DEFENSE: | What might they be? |
| JUROR ▮ | My home state in Tennessee.  No local. |
| DEFENSE: | Just recognize that, there might be some media—what are your aspirations? |
| JUROR ▮ | I served, can I just say I served in political office in Memphis in a local office on the school board.  So I, one day I wake up and say I run for, you know, office again in Memphis to impact education. One day I wake up and say no way in the world would I do that.  So I don't have an immediate plan to run for office. |
| DEFENSE: | The fact that you run for an office, you're affiliated with a political party.  Roger Stone is affiliated with the Republican party, Donald Trump.  You understand what I'm saying and getting at? |
| JUROR ▮ | I do. |
| DEFENSE: | How do you feel about that? |
| GOVERNMENT: | Objection. |
| THE COURT: | Can you make that question a little bit more crisp?  Is there anything about his affiliation with the Trump campaign and the Republican party in general that gives you any reason to pause or hesitate or think that you couldn't fairly evaluate the evidence against him? |
| JUROR ▮ | No. |
| DEFENSE: | Thank you, ma'am. |

11/5/2019 (Afternoon) Tr. 95-96.  The defense asked no further questions and did not move to strike Juror ▮ for cause.

On November 6, 2019, Juror ▮ was empaneled and, along with the other members of the jury, was duly sworn.  11/6/2019 (Morning) Tr. 243, 247.

**B.     Juor ▉'s Social Media Posts[1]**

On or about February 12, 2020, the day after the Department of Justice revised the sentencing recommendation of the trial team in this case, Juror ▉ posted a Facebook message expressing support for the four career prosecutors who withdrew their representation. *See* Ex. 1 to Def. Mot. for New Trial, ECF No. 299-3.  This prompted the defense to go back in time and identify nine specific social media posts that it claims in its amended pleading (at 7-14) undermine Juror ▉'s claims of impartiality.  Those nine social media posts highlighted by the defense, none of which impeach Juror ▉'s answers to questions in voir dire or her certification that she could be fair and impartial to the defendant, can be grouped into three categories.

The first category is social media posts that relate to political issues and the President, but do not involve witnesses or specific subjects or topics having anything at all to do with this case:

- A tweet from 2008—more than 10 years ago—containing a photograph of Juror ▉ with Donna Brazile, a political consultant and commentator affiliated with the Democratic Party—*who played no role in this case*;

- A tweet from August 19, 2017—more than two years before trial began—seeming to question whether Republicans endorsed certain of the President's remarks regarding race—*a subject that has nothing to do with this case*;

- A re-tweet from January 3, 2018, of an article about a word projected onto the Trump Hotel in Washington, D.C.—*a subject that has nothing to do with this case*;

- A tweet from July 2, 2019, expressing pride for the organizations that advocated against including a citizenship question on the 2020 census[2]—*an issue that has nothing to do with this case*; and

---

[1] The social media posts highlighted in the defense motion for new trial purport to be from Juror ▉  For purposes of evaluating the defense motion on the papers, the Government is prepared to stipulate that the social media posts are attributable to Juror ▉  However, the Government has not independently endeavored to verify that the social media posts the defense highlights are in fact attributable to Juror ▉

[2] Juror ▉ disclosed on her written questionnaire that she is employed by the ▉ ▉ Foundation, which, on information and belief, engaged in research and/or advocacy

- A re-tweet from August 25, 2019, asking whether "the MAGA crowd" would denounce its affiliation with a Ku Klux Klan rally, at which a banner saying "help make America great again" was apparently displayed—*a subject having nothing to do with this case*.

These social media posts are consistent with Juror ▉▉▉'s disclosure that she has "opinions about some of the official people" identified on the questionnaire, including the President, and her certification that those opinions would "not make it difficult for [her] to be fair" (p. 13, Question 30).

The second category involves social media posts related to the SCO investigation and/or the defendant, of which there are three:

- A tweet from January 25, 2019, the same day the defendant was arrested, of a National Public Radio article regarding the SCO investigation;

- A re-tweet from January 30, 2019, of commentary drawing attention to public reaction to law enforcement use of force guidelines following the defendant's arrest, as compared to the reaction prompted by prominent law enforcement interactions with people of color; and

- A tweet from March 14, 2019, sharing a Facebook post about the SCO's work.

These social media posts are consistent with Juror ▉▉▉'s disclosure that she may have written or posted something for public consumption about Russian interference in the 2016 presidential election or the SCO investigation, about which she wrote on the questionnaire: "I can't remember if I did, but I may have shared an article on Facebook.  Honestly not sure" (p. 9, Question 23).  It is also consistent with Juror ▉▉▉'s disclosure that she followed media reports relating to investigations into Russian interference in the 2016 election "Somewhat Closely" (p. 10, Question 25).  And it is consistent with Juror ▉▉▉'s disclosure that, prior to voir dire, she was aware that

---

regarding the impact that a citizenship question would have on the results of the 2020 census. *See, e.g.*, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (last viewed February 18, 2020).

"Mr. Stone [was] accused of inappropriate contact (sic) Russian officials in the effort of helping Mr. Trump's campaign for President" (p. 11, Question 27).

The final category of social media posts is a single tweet from which the defense attempts to launch a conspiracy theory. The defense points to a tweet on the morning of November 15, 2019, the day the verdict was returned in this case, of a Facebook post that is no longer available. The defense claims that this single tweet is evidence that Juror ███ tweeted about the case during trial and exacted a political agenda on the jury. There is no evidence to support that allegation. In fact, the available evidence indicates just the opposite: a review of Juror ███'s available social media posts during the trial reveal fidelity to this Court's order that jurors not use social media (or any other medium) to communicate about the case. As demonstrated in Exhibit 1 to this pleading, a perusal of Juror ███'s tweets between November 6—the date that the jury was sworn—and November 15, 2019—the date of the verdict—reveals that Juror ███ sent 12 tweets, none of which appear to reference the defendant or relate to the case.[3]

---

[3] Jurors were not prohibited from using social media during the trial; they were prohibited from using social media to communicate or read about the case. Specifically, the Court instructed:

> And when I tell you that you can't discuss the case, that also means that you must not use electronic devices, such as phones or computers, to communicate or talk about the case. You may not send an email or an instant message or text about it or write or Tweet about the case electronically through any blog, posting, chat room, instant message, or other communication, including social networking sites, such as Facebook, Twitter, LinkedIn, Instragram, Snapchat, YouTube, or anything that's been invented that I haven't heard of yet until you have delivered your verdict and the case is over.

11/6/2019 (Morning) Tr. 255.

## II.    ARGUMENT

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The D.C. Circuit has explained that "granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)).  A new trial motion based on any ground other than newly discovered evidence is time barred if not filed within 14 days after the verdict.  Fed. R. Crim. P. 33(b)(2).  When seeking relief based on newly discovered evidence—as the defense does here— the defendant "bears a weighty burden" to establish that a new trial is warranted.  *United States v. Garcia-Pastrana*, 584 F.3d 351, 390 (1st Cir. 2009).

The defendant's motion should be denied for two reasons.  First, the motion is time barred, because Juror ███'s social media posts do not reveal new evidence about her political affiliation, nor do they impeach her candor during voir dire.  The defense possessed all the information it needed to thoroughly question Juror ███ regarding potential bias and to exercise whatever steps it deemed necessary, to include seeking a for-cause strike or using a preemptory strike.  Second, even if the motion were not time barred it should be denied on the merits, because nothing about Juror ███'s social media posts undermine this Court's determination that she was qualified for jury service or indicate that she acted improperly during the trial or jury deliberations.  The defense's complaints to the contrary are unsupported by the factual record and its request for relief, either in the form of a new trial or evidentiary hearing, rests on the improper supposition that political partisanship automatically renders impartiality in jury service impossible.

**A.     Juror ▮▮▮'s social media posts are consistent with her disclosures during voir dire and do not reveal new information about her political affiliation or other relevant factors.**

As explained above, through her responses to the questionnaire and during voir dire, Juror ▮▮▮ was forthright about the fact that she likely held political viewpoints different from the President and therefore from the defendant.  These disclosures included that she held elected office in the past; that she had run in a Democratic primary for Congress; that she used social media and might have shared an article on Facebook related to the investigation of Russian interference into the 2016 election; that she followed reports related to the investigation of Russian interference into the 2016 election somewhat closely; that she paid a fair amount of attention to news and social media about politics; that she listened to commentators such as Rachel Maddow, Chris Hayes, and Anderson Cooper, who are widely regarded as espousing views different from the President; that she held opinions about some of the people identified on the questionnaire, including the President; and that she had heard an allegation that the defendant had inappropriate contact with Russian officials in an effort to help the President's 2016 campaign.  All of this information was available to the defense for further scrutiny, and indeed, the defense's questioning of Juror ▮▮▮ makes clear that it was concerned over the potential that Juror ▮▮▮ might be biased against the defendant: "The fact that you run for an office, you're affiliated with a political party.  Roger Stone is affiliated with the Republican party, Donald Trump.  You understand what I'm saying and getting at?" 11/5/2019 (Afternoon) Tr. 96.  Juror ▮▮▮ validated the defense team's inference that her political viewpoints diverged from the Republican Party and the President, responding: "I do."  *Id.*

The social media posts obtained by the defense in an effort to impeach Juror ▮▮▮'s impartiality contain information that was plainly obvious to the defense at the time it had the opportunity to question her during voir dire: Juror ▮▮▮'s political affiliation and viewpoints are

different from the President and the defendant.  While the specifics of Juror ███'s social media history may lend some additional insight into her views on specific topics, none of those topics involve the issues about which the jury was charged to decide or that would be the proper subject of specific voir dire beyond the question the defense asked and that the Court drilled down on— namely, whether Juror ███'s political affiliation would cause her to be unfairly biased against the defendant when evaluating the evidence in the case.  *See United States v. Chapin*, 515 F.2d 1274, 1289-90 (D.C. Cir. 1975) (observing that the key issue to probe in cases touching upon political issues is whether a juror's political surroundings might influence his or her verdict, rather than probing specific political affiliation).  Notably, nowhere in its motion does the defense identify a single question it would have asked of Juror ███ had it possessed her social media posts at the time of voir dire.  Moreover, had the defense wanted to probe not just the impact that Juror ███'s political affiliation might have on her ability to be a fair and impartial juror, but also the scope and extent of her social media usage, they were armed with the necessary information to do so by virtue of Juror ███'s disclosure that she used social media and the sources from which she obtained news and information.

In addition, Juror ███'s social media posts do not reveal any new information about her candor or ability to follow this Court's instructions regarding communication about the case during the trial.  As illustrated above, all of Juror ███'s social media posts are consistent with her disclosures during voir dire.  And, as explained above and addressed more in Section II.C below, the defense's claim that Juror ███ tweeted about the case during trial is based on speculation and innuendo—that claim has no foothold in the available evidence.

Juror ███'s social media posts do not constitute newly discovered evidence supporting a new trial motion after the 14-day deadline imposed by Federal Rule of Criminal Procedure 33. The defense motion should be denied on that ground alone.

**B.      Juror ███'s social media posts do not impugn this Court's determination that she was qualified for jury service.**

Even if this motion were not time-barred for failing to rest on newly discovered evidence, it should be denied on the merits.  Nothing about Juror ███'s social media posts undermine this Court's implicit determination—implicit because the defense did not even lodge an objection for cause—that Juror ███ could serve as an impartial juror and was therefore qualified for service. Nor do the social media posts indicate that Juror ███ failed to serve impartially or, as explained above, somehow misled the Court in her responses on the written questionnaire or in response to questions such that her affirmation of impartiality should now be doubted.

The Sixth Amendment assures criminal defendants the right to an impartial jury. "Impartiality is not a technical conception.  It is a state of mind.  For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."  *United States v. Wood*, 299 U.S. 123, 145-46 (1936).  Accordingly, "[a] trial court's findings of juror impartiality may be overturned only for manifest error."  *Mu'min v. Virginia*, 500 U.S. 415, 428 (1991) (internal citations and quotation marks omitted).

Here, the Court conducted an exceedingly thorough voir dire of all potential jurors, including Juror ███  The Court's use of a 56-question form and individualized questioning of every juror far exceeded the steps taken to select an impartial jury in most cases and were entirely appropriate given the attention surrounding the case.  Indeed, the procedure adopted by this Court is consistent with that used in other high-profile cases, such as *Skilling v. United States*, 561 U.S.

358, 386-98 (2010) (affirming integrity of trial court's implicit and explicit impartiality determinations based on the use of a questionnaire and individualized questioning) and surpasses the steps taken in others. *See, e.g.*, *Mu'min*, 500 U.S. at 431 (affirming murder conviction where trial court refused to ask venire questions about specific instances of pretrial publicity, but conducted a voir dire consisting of "four separate questions about the effect on [potential jurors] of pretrial publicity or information about the case obtained by other means" and then questioned jurors in panels of four, asking specific follow ups when potential jurors indicated that they may have formed an opinion about the case).

None of the social media posts attributable to Juror ▮ identified in the defense motion express personal animus or bias against the defendant himself or betray an undisclosed political viewpoint. In the light most favorable to the defense, Juror ▮'s social media posts betray disagreement with and some hostility towards the President. But as this Court correctly observed in the context of another for-cause strike involving a potential juror who expressed a negative view of the President, the defendant was "not charged with supporting Donald Trump for president. That is a lawful thing to do." 11/5/2019 (Morning) Tr. 33 (involving Juror ▮ Similarly, this Court correctly denied a motion to strike for cause another potential juror, Juror ▮ who disclosed the following information on his questionnaire: "Supported Hillary Clinton in 2016, Deeply opposed to everything Donald Trump stands for" (Juror ▮ Questionnaire, p. 13, Question 30), and who then disclosed during individualized questioning that he had "certain strong feelings about the current political climate" but that he would "try [his] best" to be fair and impartial." 11/5/2019 (Afternoon) Tr. 182. This Court explained its decision not to strike the juror for cause:

> I don't think this [potential juror] ever wavered from having an opinion about the
> President to having an opinion about Roger Stone. So what I think we saw with

> him and with the juror before is what happens when you get really intelligent people with a lot of integrity trying very hard to be as honest as possible, but I don't believe he said anything that indicates to me that he walks into this courtroom biased against Roger Stone in the charges in this case while he may disagree with his political activities.

*Id.* at 183-84.  This Court added, correctly, that: "I don't believe as I said from the beginning the mere fact that someone is opposed to the President automatically disqualifies them from serving as a juror in this case."  *Id.* at 184; *see also id.* at 74 (observing on a separate for-cause strike that "I don't necessarily think that everyone who says they have a negative opinion of the President is automatically excludable for cause . . . .").

Juror ███'s responses in voir dire, under penalty of perjury, like the other jurors discussed above, confirm that Juror ███ could set aside her personal political views to fairly and impartially evaluate the evidence and apply the law—and were therefore sufficient for this Court to qualify Juror ███ for service.  Juror ███'s social media posts, including her tweet extolling the professionalism of the four prosecutors who withdrew from this case, simply do not impugn her intent to serve impartially or suggest that she failed to do so.  *See United States v. Gabriel*, 365 F.3d 29, 31 (D.C. Cir. 2004) (explaining that the determination of impartiality is "focused on the intent of the juror, finding impartiality sufficiently established if the potential juror expresses a clear intent to *try* to be open-minded") (internal citations omitted; emphasis in original), *vacated and remanded on other grounds*, 543 U.S. 1101 (2005) (citations omitted).

The defense contends (at 13) that "there can be little doubt that, if the juror had disclosed the extent of her political zealousness, she would not have been permitted to be a juror."  Not so. First, Juror ███'s political affiliation and viewpoint were disclosed.  In any event, political zealousness does not preclude impartiality.  The defense's request for a new trial rests on the dangerous premise that political affiliation and viewpoint are a basis for disqualifying a juror for

implied bias—a notion inconsistent with the First Amendment and Supreme Court precedent in this area. *E.g.*, *Smith v. Phillips*, 455 U.S. 209, 215 (1981) ("A holding of implied bias to disqualify jurors because of their relationship with the Government is no longer permissible.") (internal citations and quotation marks omitted). Holding a political viewpoint, even a strong one, does not disqualify a person from fairly and impartially evaluating evidence that may relate to or touch upon those viewpoints. *See Skilling*, 561 U.S. at 398-99 (emphasizing that jurors in a criminal trial "need not enter the box with empty heads in order to determine the facts impartially. It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court") (internal citation, quotation marks, and syntax edits omitted).

As explained above, the defense had all the information it needed to explore Juror ███'s potential bias during voir dire and was given (and took) the opportunity to do so—just as the law affords. *Smith*, 455 U.S. at 215 ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.") (internal citations and quotation marks omitted); *see also United States v. Orenuga*, 430 F.3d 1158, 1162, 1163 (D.C. Cir. 2005) ("The defense always must be given a full and fair opportunity to expose bias or prejudice on the part of the veniremen.") (internal citations and quotation marks omitted); 11/5/2019 (Morning) Tr. 23 (observing in the context of a motion to strike for cause, that, "And even those who indicated they'd heard something about the defendant or the case, that alone wasn't enough for me to automatically assume they need to be struck for cause. Again, I think it's grist for follow-up questions.") Having had the opportunity to ask follow-up questions, and in light of the fact that none of the information contained in Juror ███'s social media posts are inconsistent with the candid disclosures she made on the written questionnaire and in response to direct questions from the Court and defense, there

is no basis now to doubt the sincerity of Juror ███'s affirmation that she could be impartial or to impugn this Court's determination that she qualified for jury service.[4]

### C.    There is no reasonable ground for an evidentiary hearing.

The defense alternatively requests (at 16-18) an evidentiary hearing to explore Juror ███'s lack of candor and whether she exacted a political agenda on the jury. There is no prima facie evidence supporting a hearing on these grounds.

First, as explained above, Juror ███'s social media posts are consistent with her disclosures during voir dire and do not indicate any lack of candor with the Court.

Second, there is no evidence or reason to suspect that Juror ███ exacted a political agenda on the jury in this case. The defense theory on this point rests on the baseless claim (at 14) that "Juror ███ posted about the Stone trial while deliberations were ongoing." But there is no such post. The defense assumes that Juror ███'s November 15, 2019, tweet containing a Facebook link, which cannot be retrieved, must relate to the case because it occurred on the morning of the verdict and because Juror ███ holds a different political affiliation and viewpoint than the President. That is far too speculative an assumption—and an improper one—on which to call for an evidentiary hearing. Moreover, as noted above, Juror ███'s Twitter account reveals that she posted to social media during the trial about topics having nothing to do with the trial of this case,

---

[4] As explained at length, Juror ███'s social media posts do not betray any lack of candor to the Court and are consistent with the disclosures she made during voir dire. But assuming for the sake of argument that Juror ███ understated the zealousness of her political viewpoints, as the defense alleges, that would not be a basis for granting a new trial. A juror's failure to disclose information in voir dire entitles a defendant to reversal on appeal only if he can show that the juror failed to answer honestly a material question and that a correct response would have supported a for-cause strike. *United States v. Williams-Davis*, 90 F.3d 490, 503 (D.C. Cir. 1996). Because the zealousness of a political viewpoint is not in and of itself dispositive as to the question of impartiality for jury service, a new trial would not be warranted even if Juror ███ had understated the strength of her views—which she did not.

leading to the natural conclusion that this particular post also had nothing to do with the trial.  The

defense has cherry picked one tweet with a broken link in an effort to question Juror ██ 's fidelity

to this Court's social media order and impeach the fairness and impartiality of the jury's verdict.

There is no specific test for when a district court in this jurisdiction should hold an

evidentiary hearing to explore post-verdict claims of juror bias in particular.  *See generally United*

*States v. Boney*, 977 F.2d 624, 634 (D.C. Cir. 1992) (holding that "[l]ying about a factor as

important (and as easy to verify through public records) as felon status raises at least the inference

that the juror had an undue desire to participate in a specific case, perhaps because of partiality,"

but setting forth no specific factors for consideration).  In the Second Circuit, as the defense notes

(at 16-17), "a trial court is required to hold a post-trial jury hearing only when reasonable grounds

for investigation exist.  Reasonable grounds are present when there is clear, strong, substantial and

incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could

have prejudiced the trial of a defendant."  *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234

(2d Cir. 1983) (internal citation omitted).  The defense conspiracy theory, rooted in a decade-old

picture of Juror ██ with a Democratic political consultant, Juror ██ 's social media posts on

political subjects having nothing to do with this case, Juror ██ 's holding of a political affiliation

and viewpoint opposite that of the President, and a single tweet with a broken link on the morning

of the verdict, are not reasonable grounds for an evidentiary hearing.  Indeed, yielding to the

defense request for an evidentiary hearing on the grounds suggested by the defense risks the

precarious precedent that a person's political affiliation and viewpoint will become the post-hoc

basis for questioning the integrity of an entire jury's verdict in cases with a political backdrop.

This Court should heed the Second Circuit's "hesit[ance] to haul jurors in after they have reached

a verdict in order to probe for potential instances of bias, misconduct or extraneous influences,"
*id.*, and reject the defense's request for an evidentiary hearing.[5]

## III.    CONCLUSION

The defense falls far short of its weighty burden to establish that the jury's unanimous verdict on each and every count in the Indictment constitutes a miscarriage of justice based Juror ███'s social media posts.  This Court should deny the defendant's motion for a new trial or, in the alternative, for an evidentiary hearing.

Respectfully submitted,

TIMOTHY J. SHEA
D.C. Bar No. 437437
United States Attorney for the
District of Columbia


By: */s/ J.P. Cooney*
    J.P. COONEY, D.C. Bar No. 494026
    Assistant United States Attorney
    Chief, Fraud & Public Corruption Section

    JOHN CRABB, JR. N.Y. Bar No. 2367670
    Assistant United States Attorney
    Acting Chief, Criminal Division

---

[5] The Second Circuit's reluctance for post-trial evidentiary hearings regarding claims of jury bias is consistent with the broad discretion afforded trial courts in this jurisdiction over the manner and scope of any post-trial inquiry of jurors.  *See Williams-Davis*, 90 F.3d at 498-99 (describing that broad discretion and nothing that trial courts may "properly consider, among the factors militating against extending the inquiry, the risk that massive examination and cross-examination would in fact amount to juror harassment") (internal citation and quotation marks omitted).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing sealed pleading was served via email to counsel for the

defendant, Roger J. Stone, on February 18, 2020.


*/s/ J.P. Cooney*
J.P. COONEY, D.C. Bar No. 494026
Assistant United States Attorney
Chief, Fraud & Public Corruption Section

## EXHIBIT 1
### (Filed Under Seal)

The below table summarizes tweets sent from Juror ▮▮▮▮'s Twitter handle between November 6—the date the jury was sworn—and November 15, 2019—the date the jury returned its verdict.  The tweets listed in the table were available for public viewing on February 17, 2020.  The Government is unable to make representations regarding whether the tweets available for viewing on February 17, 2020, are exhaustive of all the tweets Juror ▮▮▮▮ sent in the relevant period.  None of the articles to which there are links in the tweets identified in the table mention the defendant.

Note: Juror ▮▮▮▮'s Twitter handle is ▮▮▮▮▮▮▮▮▮▮▮▮▮ and contains the following profile description: "I [heart emoji] Memphis.  Fighting for equity & excellence in ed for low-income & children of color is my life.  Tweets are my own; retweets don't equal agreement."

| Date/Time (EST) | Content |
| --- | --- |
| 11/6/19, 9:19 a.m., (Wednesday) | Writes, "The state needs to meet with ▮▮▮▮▮▮▮▮▮▮ ASAP!" and links to an article on chalkbeat.org about Tennessee's efforts to educate the "whole child."  No mention of Stone in the article.  [Note: Google suggests that ▮▮▮▮▮▮▮▮▮ is a Tennessee resident who is the executive director of a nonprofit called ▮▮▮▮▮▮▮▮▮▮▮▮.] |
| 11/9/19, 11:18 p.m. (Saturday) | Writes, "So POTUS goes to the Bama game, gets a standing ovation from the home crowd, and Tide gets Rolled in their first loss of the season.  [thinking emoji].  Correlation doesn't equal causation, but I'm just saying…" No link. |
| 11/10/19, 12:01 a.m. (Sunday) | Writes, "A fancy night out!"  No link.  [Note: It appears from the tweet at 3:10 p.m. that day, below, that she was referencing wedding she had just attended.] |
| 11/10/19, 10:35 a.m. (Sunday) | Quotes and links to a Nov. 8, 2019, letter-to-the-editor in the New York Times in which the authors ask the Times to stop using the phrase "quid pro quo" and start using "bribery" and "extortion" regarding the President's conversation with Ukrainian President Zelensky.  No mention of Stone in letter-to-the-editor. |
| 11/10/19, 3:10 p.m. (Sunday) | Writes, "Last night I had the honor of witnessing the beautiful, elegant, intimate, and joyous wedding of ▮▮▮▮▮▮ and ▮▮▮▮▮▮. Themed on faith, justice, and love, their wedding was one of the most joyful…" and then links to a Facebook post that cannot be retrieved. |
| 11/11/19, 9:20 p.m. (Monday, Federal Holiday) | Link to Facebook post that cannot be retrieved. |

| Date/Time (EST) | Content |
|---|---|
| 11/12/19, 5:30 p.m. (Tuesday) | Quotes headline and links to Politico article that Hillary Clinton "says she is being urged by 'many, many, many people' to run in 2020." No mention of Stone in article. |
| 11/13/19, 8:31 p.m. (Wednesday) | Quotes headlines and links to chalkbeat.org article, "Tennessee inks $2.5 million contract with Florida company to manage voucher payments." No mention of Stone in article. |
| 11/13/19, 8:32 p.m. (Wednesday) | Link to Facebook post that cannot be retrieved. |
| 11/14/19, 6:10 p.m. (Thursday) | Writes, "Had my head down and missed this!! Kentucky—go big blue—and I'm not talking about your raggedy SEC school!" Links to Politico article, "Matt Bevin concedes Kentucky governor's race." No mention of Stone in article. |
| 11/14/19, 9:43 p.m. (Thursday) | Writes, "Congratulations to Memphis City Councilwomen-elect Rhonda Logan and Michalyn Easter-Thomas for City Council District 7! Thank you Districts 1 and 7 for trusting Black Women!!" No link. |
| 11/15/19, 6:14 a.m. (Friday) | Emoji (heart, heart, fist bump, power fist) and link to Facebook post that cannot be retrieved. |