## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                                    )
UNITED STATES OF AMERICA,        )
                                                    )
        v.                                          )        Crim. Action No. 19-0018 (ABJ)
                                                    )
ROGER J. STONE, JR.,                   )
                                                    )
                        Defendant.        )
———————————————————— )

## <u>MEMORANDUM OPINION</u>

### INTRODUCTION

On November 15, 2019, the jury returned a unanimous verdict in the case of *United States v. Roger J. Stone*. It found the defendant guilty of seven crimes: one count of obstructing a Congressional investigation, in violation of 18 U.S.C. § 1505; five separate counts of making a false statement to the government in violation of 18 U.S.C. § 1001; and tampering with a witness, in violation of 18 U.S.C. § 1512(b)(1).

Once the verdict had been returned, the jurors were officially released from the prohibition against discussing the case that had been in effect during the trial. A week later, one of the jurors published a column in the *Washington Post* describing his experience.

> Like jurors everywhere, none of us asked for this responsibility but each of us accepted it willingly. We served the proposition that everyone is entitled to a fair trial and that everyone is innocent until proven guilty.

> *        *        *

> The evidence in this case was substantial and almost entirely uncontested. . . . We listened carefully to the testimony of a series of witnesses and carefully examined every element of every charge and its defense, and we unanimously agreed that each had been proved beyond a reasonable doubt.

> *        *        *

> I am proud of our democratic institutions; their value was reaffirmed for me because of the process we went through and the respect we accorded it.  I am proud that a defendant is innocent until proven guilty.  I am proud that we took Roger Stone's rights seriously and that we treated the government's assertions skeptically.  I am proud of my fellow jurors for respecting each other and for challenging each other until we were all convinced beyond a reasonable doubt.[1]

Approximately two months after the verdict was returned, the U.S. Probation Office completed the presentence investigation, and shortly after that, the parties' sentencing submissions were due.  On February 10, 2020, the United States, represented by Timothy Shea, the United States Attorney for the District of Columbia, filed a sentencing memorandum.  It bore the names of the four Assistant United States Attorneys and Special Assistant United States Attorneys who prosecuted the case, and it was approved by their supervisors, up to and including the newly appointed U.S. Attorney himself.[2]  The memorandum, in accordance with existing Department of Justice policy, advocated in favor of a sentence within the advisory U.S. Sentencing Guidelines range, which was seven to nine years.[3]

That evening, the President of the United States commented on Twitter:  "This is a horrible and very unfair situation.  The real crimes were on the other side, as nothing happens to them.  Cannot allow this miscarriage of justice!"[4]  The next day, reportedly at the direction of the Attorney General of the United States,[5] the United States Attorney filed a "Supplemental and Amended Sentencing Memorandum," advancing the position that a Guidelines sentence "could be considered excessive and unwarranted," and that a sentence of incarceration "far less" than the Guidelines range would be reasonable under the circumstances.  The pleading was signed by the Acting Chief of the Criminal Division of the U.S. Attorney's office; each of the members of the trial team had either withdrawn from the case or resigned from the Office altogether.  The President

---

1       The Washington Post (Nov. 22, 2019, 3:42 PM) https://www.washingtonpost.com/opinions/i-was-a-juror-in-roger-stones-trial-we-took-his-rights-seriously/2019/11/22/234d7df0-0d46-11ea-97ac-a7ccc8dd1ebc_story.html.

2       Tr. of Sentencing Proceedings, Feb. 20, 2020 [Dkt. # 334] ("Feb. 20 Sent. Tr.") at 44–46.

3       Feb. 20 Sent. Tr. at 47.

4       Donald Trump (@realDonaldTrump), Twitter (Feb. 10, 2020, 10:48 PM) https://twitter.com/realDonaldTrump/status/1227122206783811585.

5       *See, e.g.*, ABC News (Feb. 14, 2020, 10:21 AM), https://abcnews.go.com/Politics/timeline-extraordinary-turn-events-roger-stone-case/story?id=68921601.

continued to criticize the prosecutors in a series of additional public statements and tweets as the day went on.[6]

In the wake of those extraordinary developments, another juror spoke out. She expressed her respect and support for the prosecution team on Facebook, and she attached a copy of the first juror's opinion piece as well. The juror identified herself as the foreperson, and she released her post, along with her name, to the public. This prompted numerous people to search the internet for publicly available information about the author. It didn't take long: they came across several Facebook and Twitter posts that mentioned the Special Counsel's investigation and several that included negative comments about President Trump, and two days later, the defendant filed this motion.

Defendant contends that he is entitled to a new trial because this "newly discovered evidence" reveals that the foreperson answered questions falsely on her written juror questionnaire and when she was questioned in the courtroom, and that by doing so, she concealed the fact that she harbored bias against him. He also seeks a new trial based on an allegation that the juror engaged in misconduct during deliberations, tainting the verdict.

It is important to emphasize that the question before the Court is not whether the defense would have taken a different approach towards the juror if had it seen the posts earlier. The trial is over, and a verdict – which was based largely on the defendant's own texts and emails, and was amply supported by this undisputed evidence – has been returned. At this point, it is incumbent upon the defendant to demonstrate that the juror *lied*, and that a truthful answer would have supplied grounds for the Court to strike her for cause. Also, a defendant seeking a new trial must establish that the information presented in his motion could not have been discovered earlier through the exercise of due diligence. Only if those criteria are met would one then assess whether the lack of the newly discovered evidence affected the conviction.

The defendant has not shown that the juror lied; nor has he shown that the supposedly disqualifying evidence could not have been found through the exercise of due diligence at the time the jury was selected. Moreover, while the social media communications may suggest that the

---

6       *See, e.g.*, The White House (Feb. 11, 2020, 4:13 PM), https://www.whitehouse. gov/briefings-statements/remarks-president-trump-signing-ceremony-s-153-supporting-veterans- stem-careers-act/ ("They ought to be ashamed of themselves . . . . I think it's a disgrace."); Donald Trump (@realDonaldTrump), Twitter (Feb. 11, 2020, 6:45 PM), https://twitter.com/realdonald trump/status/1227423392078409728?lang=en ("Who are the four prosecutors (Mueller people?) who cut and ran after being exposed for recommending a ridiculous 9 year prison sentence to a man that got caught up in an investigation that was illegal, the Mueller Scam, and shouldn't ever even started?  13 Angry Democrats?"); *id.*, Twitter (Feb. 11, 2020, 10:58 PM) ("Prosecutorial Misconduct?");    *id.*,    Twitter    (Feb.    12,    2020    4:06    AM),    https://twitter.com/ realDonaldTrump/status/1227564604177469441 ("Two months in jail for a Swamp Creature, yet 9 years recommended for Roger Stone (who was not even working for the Trump Campaign). Gee, that sounds very fair! Rogue prosecutors maybe?  The Swamp!").

juror has strong opinions about certain people or issues, they do not reveal that she had an opinion about Roger Stone, which is the opinion that matters.

The assumption underlying the motion – that one can infer from the juror's opinions about the President that she could not fairly consider the evidence against the defendant – is not supported by any facts or data and it is contrary to controlling legal precedent.  The motion is a tower of indignation, but at the end of the day, there is little of substance holding it up.  Therefore, the request for a new trial will be denied based on the facts and the case law set out in detail in the body of this opinion, and which are summarized briefly here.

Given the publicity that surrounded this prosecution, 120 citizens of the District of Columbia were summoned to the courthouse almost two months before the trial was scheduled to begin.  They were asked to complete a nineteen-page written questionnaire that the prosecutors and defense attorneys had drafted together.  It called for basic information about employment, legal training, and prior involvement in court proceedings.  It also included a series of questions designed to uncover any knowledge or opinions about the allegations and the participants in the case, and to explore whether the jurors could be fair and impartial to both sides.

Defendant complains in his motion that we "now know" a great deal about the juror, but much of it – beginning with the juror's name – was plain on the face of the written questionnaire that was in his lawyers' hands as of September 12, 2019.

Indeed, at the hearing on the motion for new trial, counsel for the defendant revealed that there was very little that even he would contend was false about the foreperson's answers.  When pressed to identify a specific lie, Stone's attorney pointed only to those answers in which the juror expressed her subjective belief that she could be fair to the defendant, and to one other question: the one concerning public commentary on certain topics.

> 23.  Have you written or posted anything for public consumption about the defendant, the House Permanent Select Committee on Intelligence investigation into Russian interference in the 2016 presidential election, or the investigation conducted by Special Counsel Robert Mueller?
>
> [For purposes of this question, writing "for public consumption" includes blog posts, articles, or posts on internet sites that are accessible to the general public.]
>
> Yes ___   No ___
>
> If yes, please describe when and where you did so and the subject of your comments:
> I can't remember if I did, but I may have shared an article on Facebook. Honestly not sure.

The defendant has not shown that this answer was false.  Notably, the juror did not check either "yes" or "no," and she acknowledged the possibility that she may have shared an article in a Facebook post.  So what the defense has to prove is that she lied when she said she was "not sure."

Defendant has gathered a collection of social media messages into a composite exhibit in support of his motion, but only a small number of them bear on the juror's answer to Question 23. With respect to the first part of the question, whether the juror had commented publicly about the defendant, Stone's motion points to exactly two social media entries from the eight-month period between Stone's arrest and the completion of the questionnaire – or any time before – that relate to the defendant in any way.  On January 25, 2019, nine months before she was summoned to the courthouse, the foreperson posted a link to a lengthy news article published by National Public Radio.  It summarized all of the criminal cases that had been brought by the Office of Special Counsel against a large number of people, and it included a straightforward summary of the indictment of Roger Stone, which had been unsealed that morning.  And on January 30, 2019, the foreperson retweeted a post written by someone else, who found it ironic that it was the arrest of Roger Stone, and not eight African-Americans whose cases had also received news coverage, that prompted discussion about "reviewing use of force guidelines."

These facts are not at all inconsistent with the juror's written answer in September 2019 that she "may have shared" an article publicly.  While the NPR article was transmitted along with a wry comment, neither post expresses any opinion about Stone or the merits of the charges against him.

Defendant's motion identifies only one social media post about the second topic in the question:  the House Permanent Select Committee investigation into Russian interference.  It was dated March 22, 2018, a year and a half before the completion of the questionnaire, and it forwarded a report that the committee had closed its investigation.

Defendant supplies four other posts or retweets that touch upon the Special Counsel's investigation in general. But the juror did not deny sharing observations online.  In light of that, and given her sincere and credible sworn testimony that at the time, she understood the question to be focused on the investigation of Roger Stone in particular, the defense has not shown that her "maybe" answer was intentionally false.

The defendant's composite exhibit also includes a number of posts between December 2008 and the completion of  the juror questionnaire in 2019 that reflect opinions about Donald Trump or the actions of his administration.  Two include or re-publish comments about possible racism on the part of the President or his supporters for failing to disavow those expressing extreme views at his rallies.  These do not prove that the juror's statement that she could not remember what she had shared was false, because Question 23 did not inquire about posts about the President.

The posts do not contradict the juror's answers to any other questions either.  During the individual questioning of potential jurors on November 5, the Court asked the juror what she had read or heard about the defendant.  She responded:

> So nothing that I can recall specifically.  I do watch sometimes paying attention but sometimes in the background CNN.  So I recall just hearing about him being part of the campaign and some belief or reporting around interaction with the Russian probe and interaction with him and people in the country, but I don't have a whole lot of details.  I don't pay that close attention or watch C-SPAN.

The defense complains that the juror's description of her level of interest in the last sentence of this answer was disingenuous, but there is nothing about the evidence showing that the juror periodically issued political posts, or about any particular post, that indicates that she was not being truthful about her state of mind.

More important, none of the social media posts establish that the juror's assessment of whether she believed she could judge Roger Stone fairly were false. Other than the January 2019 post forwarding the article that includes information about Stone, and the retweet concerning the public reaction to the circumstances surrounding his arrest, the posts in the composite exhibit do not even mention Stone, and neither of those posts expresses any point of view about his guilt or innocence.

Defendant insists, though, that the posts that relate to the President imply that the juror had a negative attitude towards Roger Stone, and that those communications, combined with the posts about the Special Counsel's investigation, demonstrate that she knew she could not be impartial in his case, and she lied when she said she could be fair.

Stone's suggestion that posts expressing opposition to President Trump betray a bias against *him* is not supported by any evidence or by the case law. There is no evidence in the record that the general public, democrats in general, or this juror in particular knew any details about Roger Stone – what he had done before, what role he played in the campaign, or what his views were on any particular issue. The juror simply knew that he'd been charged.

In addition, even if an opinion about the President should be, as Stone claims, automatically applicable to him by extension, the foreperson's views were certainly not hidden at the time of jury selection. The juror's personal affiliation with Democratic politics was set forth in her written answers. She said straight out that she had opinions about the "officials" on the list of people who might be mentioned in the case, and Donald Trump was the most prominent, if not the only, "official" named. So the exhibits introduced by the defendant are consistent with, and do not discredit, the juror's responses on the questionnaire. This case does not present the extreme situation where a prospective juror has a personal relationship to some aspect of the litigation, or to a participant in the case, that would make it highly unlikely that she could remain impartial. For these reasons, the evidence falls far short of defendant's sensational rhetoric, and the defense has not shown that the foreperson's answers during jury selection were false.

There is a second reason why Stone's motion fails: to the extent one could consider any of the social media posts to be inconsistent with the juror's questionnaire, they do not warrant a new trial because they do not meet the legal test for something that has been "newly discovered." The information in the motion could have easily been found with the exercise of due diligence: by posing a few pointed follow-up questions in person, or by using the same search engines that quickly brought the public social media posts to light the day the juror identified herself to the rest of the world. The evidence the defense claims was critical was never "concealed" – it was a few clicks of a mouse away.

At the time of the trial, though, the defense made a strategic choice not to look for social media information. None of the seven lawyers or the two jury consultants on the defense team performed the rudimentary Googling that located this set of Facebook and Twitter posts: not

during the two months they were in possession of the entire set of jury questionnaires with the jurors' names on them; not during the four to five days before trial when they knew the exact order in which the members of the jury panel would be questioned and seated as jurors; not during the two days of jury selection; and not overnight after the twelve jurors and two alternates had been picked and instructed to return the next morning to be sworn.

Plus, the defendant did not ask the juror about her use of social media when he had the chance. The foreperson's questionnaire put the defense on notice of the particular media outlets from which she received news and information, the commentators she favored, her personal participation in electoral Democratic politics as a Democrat, the fact that she received information from Facebook and Twitter, and – significantly – the fact that she "shared" on those platforms herself. She candidly set forth the fact that she followed the Mueller investigation "somewhat closely," that she had read or heard something about the case, and that she indeed had opinions about the "officials" on the list of names that might come up during the trial. The Court stated on the morning the jurors returned to court that opinions about the administration expressed in the written answers would not be automatically disqualifying. But it specifically advised the lawyers that those opinions were perfectly appropriate topics for individual follow-up, and that motions to strike for cause could be renewed after the jurors had been questioned in person in the phase of the trial called voir dire. The Court did not limit the lawyers' questioning of the jurors in any way, and Stone's lawyers had a full and fair opportunity to explore every juror's potential bias. Yet the defendant asked the juror who later was selected by the jury to be their foreperson very few questions about any of these issues, and he cannot be heard to complain now that the information about her views was not or could not have been obtained before.

During the individual voir dire on November 5, the juror answered questions posed by both the Court and the lawyers, and she was warm, open, and frank. The Court found her to be extremely credible, and the defense attorneys who had the opportunity to assess her demeanor and friendly presence in the courtroom chose to ask her only a handful of additional questions. Based on what they had read and what they observed, they did not move to strike the juror for cause, and they did not use a peremptory challenge to strike her from the jury pool. All of this suggests that they too found her to be believable, or that they had identified some other information in her questionnaire that made her an attractive juror for the defense, and they made a strategic decision to forego asking her more questions about Facebook or her opinions about Donald Trump.

As for the second basis for the motion for new trial – juror misconduct – defendant contends that the juror did not comply with the Court's instructions because her social media posts reveal that during the period between the completion of the questionnaire and the verdict, she was aware of some developments in the news concerning the President or politics. But there was no prohibition against reading or discussing news in general or even news about the President: the jurors were told to turn away from any publicity concerning the *case.* For that reason, the defense conceded at the hearing that the juror did not transmit any posts during the trial in violation of the Court's instructions not to communicate about the case.

The defense posits, though, that since the juror was active on social media in general, she must have been exposed to news accounts of the trial during her jury service. And according to the defendant, since one can conclude that she has been untruthful, one can also assume that she "undoubtedly" read these news accounts, and shared the information she obtained with the other

jurors, all in violation of the Court's instructions.  The defendant points to absolutely no evidence – not one affidavit from one juror or one social media post – that supports this speculative accusation, and it was questionable whether he had come forward with enough evidence to warrant a hearing on this issue.  But given the unique circumstances of the case, and in an abundance of caution, the Court decided to permit the defendant to question several jurors, over the government's objection.

The hearing, as the defense predicted, was clarifying.

The Court permitted each side to choose one juror to testify, and Juror B, the one handpicked by the defense lawyers and the defendant after they were given the opportunity to confer, testified as follows:

> THE COURT:  Did you have any concerns at the time you rendered your verdict about whether you and the jury had engaged in a full and fair consideration of the evidence?
>
> JUROR B:  We had a problem with – well – I don't know how to say this.  We all agreed on – most of us agreed on our answer.  We already said that, you know, he was guilty.  But it was the foreman . . . it was the foreman that insisted that we examine question 3, examine charge 3 a little more.
>
> THE COURT: Okay.  There was a count that you sent out some notes about.  Is that the one that the foreperson asked you to be more careful?
>
> JUROR B:  Yes, that's the one.  We needed to examine that a little more and read the transcript, you know, find out more evidence.
>
> THE COURT:  So it was the foreperson who insisted that that level of attention be paid to that count, even though some of you were ready already to decide?
>
> JUROR B:  Yes.[7]

While it was the defendant who requested a hearing on this issue, the defense declined to ask Juror B – or Juror A – any questions at all.  The jurors' accounts stand uncontested, and they were consistent with the record in the case, which includes two notes, signed by the foreperson,

---

[7]    Tr. of Mot. Hr'g, Feb. 25, 2020 [Dkt. # 347] (PUBLIC) ("Mot. Hr'g Tr.") at 81–82.  Juror A, selected from the group by the government, similarly identified the foreperson as one of the voices in the jury room for taking their time and being attentive to the government's burden of proof.  Mot. Hr'g Tr. at 77.

asking careful questions about the intricacies of the counts.  So the portion of the motion for a new trial based on misconduct will be denied because there is no evidence of any misconduct.

During jury selection, the defense made a decision that it would not *ask* to strike the juror for cause, and that it would choose to seat her on the jury by foregoing the use of one of its peremptory strikes.  The other jurors' testimony at the hearing supports a conclusion that any judgment made by the defense at the time – based on all of the information in the jury questionnaire, the jury consultants' input, the combined experience and instincts of all of the members of the trial team, and the foreperson's answers and sincere demeanor at voir dire – was prescient and sound.  The foreperson held the government to its burden of proof, and the foreperson ensured that the jury took its time and considered each count individually in light of the evidence in the case, the jury instructions, and the presumption of innocence.

For all of these reasons, then, as explained further below, the motion for a new trial will be denied.

## PROCEDURAL HISTORY

I.    **Jury Selection**

A.    **Jury Selection**

1.    **Juror Questionnaires**

On January 24, 2019, the grand jury returned an indictment charging defendant with obstructing an investigation conducted by the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), giving false testimony, and tampering with a witness in that investigation.  Indictment [Dkt. # 1].  At that time, the matter was being prosecuted by the Office of the Special Counsel ("OSC"), led by Robert S. Mueller III.  Given the possibility that members of the jury pool might have already received information or formed opinions about the proceedings before HPSCI, the OSC, the defendant, or the charges in this case, the Court decided, with the concurrence of the parties, to utilize a written jury questionnaire to supplement and facilitate the jury selection process.  *See* Scheduling Order [Dkt. # 65] at 1–2.  Counsel for both sides worked together to submit a joint proposal, *see* Notice of Filing of Proposed Written Jury

Questionnaire [Dkt. # 184],[8] and the Court based the final questionnaire on the parties' submission.

*See* Juror Questionnaire.

On September 12, 2019, 120 potential jurors, including the juror who later became the foreperson, were summoned to the courthouse to complete the questionnaire. *See* Tr. of Jury Questionnaire Proceedings, Sept. 12, 2019 [Dkt. # 356] ("JQ Proceedings Tr.") at 6–9. They were told that the questionnaire would aid in selecting a jury for the trial in *United States v. Roger Stone*, which was set for November. *Id*. at 9. They were asked to stand, raise their right hands, and swear or affirm that the answers they were about to give would be true and accurate to the best of their knowledge. *Id*. at 12.

The jurors were instructed by the Court:

> During the trial your contact with other people will not be restricted. But beginning now and continuing until you have been excused from further service by the Court, you will not be permitted to talk about the case with anyone or to read, watch or listen to any press coverage the case might receive . . . . [F]rom this day forward, you may not talk or communicate about this case or your potential jury service with anyone else, including your own family . . . . The need to have a fair trial also means that from this point onward you must not read anything whatsoever about this case. Please do not go home and search the internet or consult newspapers or magazines or any other news or social media source to find out what it's all about or who these people are. And you should try to avoid receiving any information about the case from news media. If it comes to your attention inadvertently, which it may, please click on something else or ignore the headline . . . .

---

8       The Notice stated that there was only one question about which the parties disagreed. The defense proposed to ask the jurors which candidate they voted for in the 2016 presidential election, the government objected, and the question was not included in the questionnaire. *See* Proposed Juror Questionnaire [Dkt. # 184-1] at 22. The final questionnaire jointly proposed by the parties, *see id*. at 14, and approved by the Court did ask if the jurors worked or volunteered for any 2016 presidential campaign, *see* Juror Questionnaire [Dkt. # 247] at 13; the parties did not ask whether potential jurors ever made financial contributions to any political candidate. *See generally* Proposed Juror Questionnaire; Juror Questionnaire.

JQ Proceedings Tr. at 7–11.  The written instructions appended to the questionnaire included a similar admonition:

> From this day forward, until you have been formally excused from service, you are instructed not to communicate in person, in writing, or electronically about this case or the questionnaire with anyone, including your family and fellow jurors.  Also, you should not go online or look at any source to learn more about the charges, the defendant, or any participant in the case.

Juror Questionnaire at 1.

The potential jurors completed the questionnaires in the courtroom.  It covered the jurors' personal backgrounds, experience with the law and with law enforcement, and their familiarity with the case and the individuals involved.  *See* Juror Questionnaire.  Its purpose was "to determine whether prospective jurors can decide this case fairly, based solely on the evidence presented at trial and the instructions on the law given by the judge," *id*. at 1, and it posed a number of questions specifically designed to probe potential bias.  *See id.*, questions 29–30, 34, 48–51, 56.

### (a) The Foreperson's Questionnaire Responses

The questionnaire began with questions calling for personal information such as the juror's age, marital status, educational level, and employment.  The foreperson's completed questionnaire disclosed that she is a senior program officer for a charitable foundation where, as of that time, she had worked for approximately three years.  *See* Foreperson's Juror Questionnaire ("JQ") (Attachment A) 5–6 (REDACTED).[9]  She stated that she has a "JD/Law" degree, JQ 4, and is licensed to practice law in Tennessee, where she "served as an attorney Sept 20[  ]–Dec 20[  ]." JQ 13.

---

9      The numbers cited after "JQ" refer to the question numbers, not page numbers.

Question 14 asked, "[h]ave you or a close friend or family member ever applied for employment with, was employed by, or received training by any local, state, or federal law enforcement agency, . . ." and it listed as examples nineteen federal, state, and local law enforcement or intelligence organizations.  JQ 14.  The juror responded by identifying one person who currently works for the FBI in Tennessee and another who formerly worked for the U.S. Attorney's Office in Tennessee.  JQ 14.

Question 18 asked:

> Are you currently, or have you ever been, a member or regular participant in any civic, social, union, professional, business, fraternal, recreational or other community group or charitable organizations?

The juror checked "Yes" and listed:

- [Historically Black] sorority [_____] – present member of the sorority
- Black MBA Association [_____], member of Atlanta chapter
- Member Urban League Young Professionals; Civic Engagement Chair [_____]

JQ 18.

While the juror had never served as a juror in a trial before, she had been the foreperson of a federal grand jury that sat for twenty-four months.  JQ 19.

Question 21 asked about the jurors' sources of news and information, and the foreperson completed it as follows:

21.  If you follow local or national news, what are your primary sources for local and national news and information? (Check all that apply)

I do not follow local or national news  ____

Newspapers (including online)  __X__    TV/cable  __X__    Blogs/websites  __X__

Social Media  __X__    Radio  ____    News magazines  __X__

Word of mouth/conversations  __X__    Other sources (specify)  _____

Please identify by names your primary sources of news and information:

*Washington Post; Apple News Service; Twitter; Facebook; New York Times; CNN; Politico; The Hill; CBS News*

The juror answered "Yes" to the next question, asking whether she "listen[s] to political commentators on TV or talk radio," adding, "not regularly but CNN shows (Anderson Cooper); MSMBC – Rachel Maddow/Chris Hayes."  JQ 22.

The questionnaire also asked what the jurors had published on certain topics:

> Have you written or posted anything for public consumption about the defendant, the House Permanent Select Committee on Intelligence investigation into Russian interference in the 2016 presidential election, or the investigation conducted by Special Counsel Robert Mueller?
>
> [For purposes of this question, writing "for public consumption" includes blog posts, articles, or posts on internet sites that are accessible to the general public.][10]

JQ 23.  The foreperson did not check "Yes" or "No."  In the space provided for elaboration, she wrote, "I can't remember if I did, but I may have shared an article on Facebook.  Honestly not sure."  JQ 23.

---

[10]   Question 23 did not ask about Facebook, Twitter, or other social media accounts specifically.

In response to the question asking the juror whether she or any close friend or family member had "ever run for or held a political office in the federal, state, or local government," she responded "Yes," explaining: "I served on the elected school board in Memphis [for eight years]. I ran in the democratic primary for Dist 9 (TN) for the US House of Rep in [_____]." JQ 24.

The next question asked the jurors how closely they followed media reports relating to investigations into Russian interference in the 2016 election, and they were given four options: "Very Closely," "Somewhat Closely," "Not too closely," and "Not at all." JQ 25. The foreperson checked "Somewhat Closely." JQ 25.

Question 26 asked whether potential jurors would be able to avoid reading about or listening to media reports about the case, including online, and if they could refrain from discussing the case with fellow jurors or with anyone else through any medium, including online, until the end of the trial. The foreperson answered "Yes." JQ 26.

The questionnaire included a number of questions related to the jurors' knowledge of the participants in the trial or the case in general. When asked, "[h]ave you read or heard anything about the defendant Roger Stone, about any statements made by or attributed to Mr. Stone, or about this case," the foreperson wrote: "Yes. Mr. Stone is accused of inappropriate contact [with] Russian officials in the effort of helping Mr. Trump's campaign for President." JQ 27.

The juror indicated that neither she nor anyone close to her had "any connections" to the Court, the attorneys involved in the case, or the defendant; nor did she know personally any of the thirty-one individuals included in a list of "people who may be witnesses in the case or who may be discussed during the trial." JQ 28–29. The list included, among others, Julian Assange, Steve Bannon, Hillary Clinton, Paul Manafort, Richard Gates, and the President, Donald Trump. JQ 29.

The next question asked, "[p]lease indicate if you already have an opinion about any of those individuals, or if the fact that they may be involved in the case would make it difficult for you to be fair and impartial to both sides." JQ 30. The juror wrote, "I do have opinions about some of the officials/people on the list, but they do not make it difficult for me to be fair." JQ 30. She also checked "No" in response to whether she had "formed or expressed any opinion about Mr. Stone, the charges in this case, or about his guilt or innocence in this case." JQ 34.

When asked, "[h]ave you or a close friend or family member ever been employed or had any association or connection with Congress or a congressional committee," the foreperson checked "Yes," explaining: "I ran for Congress in [_____]." JQ 31. She also identified two friends by name who had worked for a former democratic congressman from Tennessee. JQ 31. The juror stated she had not worked or volunteered for any 2016 presidential campaign, JQ 32, and that neither she nor any close friend or family member participated in, or had any connection to, a group that participated in "any investigation or inquiry into the circumstances surrounding Russian interference in the 2016 presidential election." JQ 33.

The questionnaire also inquired about the jurors' experience with the court and criminal process. When asked, "[w]ithin the past ten years, have you or a close friend or family member been the victim of a crime" the juror answered "Yes." JQ 36. The next question called for more detail on that subject, and she wrote: "homicide – [a relative] was the victim in [_____] – no arrests were made," and "assault – [a relative] was accused of assault in [_____];" she was arrested and has been on probation. JQ 37. The foreperson indicated that she felt these family members were treated fairly by the government agency involved. JQ 38. She also responded that neither she nor any close friend or family member had been a witness to a crime, or testified in any court proceeding in the past ten years. JQ 39–40. Question 41 asked, "[w]ithin the past ten years, have

you or a close friend or family member been arrested for, charged with, prosecuted for, or convicted of any crime other than a traffic ticket?"  She said yes and explained, "My [relative] was charged and arrested for assault at work."  JQ 41.  The relative had been on probation.  JQ 41. Another relative "may have been arrested for drug possession during this time."  JQ 41.  When asked whether she had ever been involved in any legal proceeding in any capacity, the juror checked "Yes," explaining that she practiced law for four years more than ten years ago.  JQ 45–46.  "I appeared for motions and other legal proceedings."  JQ 46.

The juror answered "No" to all of the following questions:

> 15.  Do you have any opinions or beliefs concerning law enforcement organizations in general, including the Federal Bureau of Investigation (FBI) or the Department of Justice, or the Special Counsel's Office within the Department of Justice, that would affect your ability to evaluate the evidence fairly and impartially?

> 16.  In this case, the United States is represented by the U.S. Attorney's Office for the District of Columbia.  The investigation that led to the charges in this case was conducted by Special Counsel Robert S. Mueller, III.  The U.S. Attorney's Office is, and the Special Counsel's Office was, a part of the U.S. Department of Justice.  Is there anything about the fact that the Special Counsel's Office, the U.S. Attorney's Office, or the Justice Department is or was involved in this case that affect your ability to be fair and impartial in this case and base your decision solely on the evidence presented and the Court's instructions on the law?

> 48.  The judge will instruct you that the charges in this case include: obstruction of an official proceeding, making false statements, and witness tampering.  Is there anything about the nature of the charges alone that would affect your ability to be fair?

> 49.  Jurors are the sole judges of the facts.  However, the jury must follow the principles of law as instructed by the judge.  The jury may not follow some rules of law and ignore others.  Even if the jury disagrees or dislikes the rules of law or does not understand the reasons for some of the rules, it is their duty to follow them.  Do you have any personal beliefs that would make it difficult to follow the Court's legal instructions, whatever they may be?

> 51.  Do you have any personal reason that makes you want to serve as a juror in this case, or do you have any personal interest in the outcome of the case?

JQ 15, 16, 48, 49, 51.

The final questions related to the criminal justice system and legal principles.  The jurors were asked:

> If, during the course of jury deliberations, a fellow juror should suggest that you disregard the law or the evidence and decide the case on other grounds, would you, as a juror, be able to reject that suggestion and abide by your oath to this court to decide the case solely on the evidence and law . . . ?

JQ 50.  The foreperson answered "Yes."  JQ 50.  The questionnaire concluded:

> Is there anything about this case, the issues, or the people involved in this case, or any other reason that has not be been asked about in any other question, that leads you to believe that you could not be completely fair to both the defendant, Roger Stone, and the U.S. Government in this case?

JQ 56.  The juror answered "No."  JQ 56.

Each juror was required to attest to the truth of his or her answers on the last page.

> By signing below, I hereby declare under penalty of perjury that all of the answers to the above questions are true and correct to the best of my knowledge and belief.  I have not discussed my answers with others or received assistance in completing the questionnaire.  I have answered all of the above questions myself.

Questionnaire at 20.  This "certification" page included a line for a handwritten signature, a line with the instruction, "[p]rint your full name here," and a line for the date.  *Id.*  The foreperson's questionnaire bears her signature and the September 12, 2019 date, and the printed name is entirely legible.  *See id.*

### (b)  Transmission of the Completed Juror Questionnaires to Counsel

After the potential jurors had finished writing, they handed the forms to the Deputy Courtroom Clerk.  One of the Assistant U.S. Attorneys on the prosecution team picked up the completed questionnaires from the Deputy.  Mot. Hr'g Tr. at 5–6.  The government made copies

of the questionnaires that day and returned the originals to the Deputy Courtroom Clerk. *Id.* at 11. Pursuant to an arrangement agreed to by the lawyers, the government then transmitted the questionnaires to defense counsel electronically. *Id.* at 6, 10.

The completed questionnaires, which included the signature pages, were scanned as individual PDF files and saved by juror number onto a secure share drive maintained by the U.S. Attorney's Office. Mot. Hr'g Tr. at 6–7. Each file was then uploaded to a program used by the office to share discovery and other documents with counsel in its cases, and counsel for the defendant was notified that day that the questionnaires were available to retrieve. *Id.* at 6–7, 9–10; Gov't Hr'g Ex. 6 (Sept. 12, 2019 email from Assistant U.S. Attorney Kravis to defense attorney Grant Smith confirming the availability of the files).[11]

Smith downloaded the questionnaires the following day, September 13, 2019, including the foreperson's completed juror questionnaire. Mot. Hr'g Tr. at 10. With that, the defense team had her answers and her full name. *See id.* at 8 ("THE COURT:  And you don't contest that you received the signature page with not only her signature but her name printed legibly on page 20? [DEFENSE COUNSEL]:  That's correct, Your Honor."); *see id.* at 10, 12.

Everyone on the defense team – the six attorneys who had entered appearances in the case, at least two additional attorneys who had not entered appearances, two jury consultants who had been retained by that time, and Stone himself – had access to the questionnaires. *See* Mot. Hr'g Tr. at 29. The jury consultants were tasked with reviewing the completed questionnaires and providing their thoughts about "which jurors would be favorable to the defense." *See id.* at 29, 31.

---

[11]   A list of the exhibits presented by the parties at the February 25, 2020 motions hearing appears on the docket.   *See* Exhibit Lists [Dkt. # 353].

Although defense counsel assumed the jury consultants had internet access, they were not specifically directed to conduct internet research on the potential jurors. *Id.* at 31 ("[DEFENSE COUNSEL]:  There were costs associated and logistics associated with it.  They don't particularly do it themselves, and it just didn't happen.").

## 2.   Requests to Strike Jurors for Cause

The parties were given the opportunity to move to strike prospective jurors for cause before trial based solely upon their written answers to the questionnaire. *See* Scheduling Order at 2; Gov't "For Cause" Juror Strikes [Dkt. # 208] (SEALED); Def.'s "For Cause" Juror Strikes [Dkt. # 209] (SEALED) ("Def.'s Strike List").   In accordance with the scheduling order, the defendant identified fifty-four jurors on September 17, 2019, and the foreperson was not included on his list. *See* Def.'s Strike List.

On September 18, 2019, upon consideration of the parties' motions and its own review of the written responses, the Court struck thirty-eight of the potential jurors for cause, all of whom had been among those identified by the defendant. *Compare* Order [Dkt. # 211] (SEALED) ("Sept. 18 Order") *with* Def.'s Strike List.[12]  Neither party had asked that the foreperson be removed, and the Court saw nothing in her completed juror questionnaire that warranted her removal, so she was not included in the order. *See* Sept. 18 Order.

On November 4, 2019, the day before the start of individual voir dire, the defense moved the Court to reconsider its rulings with respect to nine of the jurors who were permitted to remain in the jury pool, and it renewed its request that those jurors be removed for cause. *See* Def.'s Mem.

---

12     Sixteen potential jurors survived defendant's motion to strike and remained in the jury pool, but none of them ended up serving as either jurors or alternates.

on Jury Selection [Dkt. # 249] (SEALED).[13]   The defendant did not include the foreperson or move to strike her this time either. *See id.*

### 3.   The Jury Panel Sheet

Trial was scheduled to begin on November 5, 2019, and by virtue of the strikes for cause, the list of potential jurors had been reduced to eighty-two names.   Since the jurors had already completed written questionnaires, there was no need to pose the usual set of voir dire questions to the group as a whole.   Instead, the procedure to be followed was that the prospective jurors would receive some preliminary instructions, be sworn, and then be excused from the courtroom to be brought back one at a time in for follow-up questioning.   Counsel had been advised previously that the Court would seat the potential jurors in the courtroom and question them individually in the order they appeared on a document prepared by the Jury Office called a Jury Panel Sheet.[14] Counsel, therefore, understood that the potential jurors appearing at the top of the list were more likely to be seated on the jury than those appearing at the end of the list unless they were struck for cause. *See* Mot. Hr'g Tr. at 18–19.[15]

---

13   The Court later granted the motion as to two of the nine jurors, Tr. of Jury Trial, Nov. 5, 2019, Morning Session [Dkt. # 294] ("Nov. 5 A.M. Tr.") at 24–25, and none of the other seven who remained on the panel served as jurors during the trial.

14   The Jury Panel Sheet does not list potential jurors alphabetically or sequentially by juror number; they appear in a random order.  Mot. Hr'g Tr. at 18–19; *see* Gov't Hr'g Ex. 4 (Jury Panel Sheet).

15   *See also* Mot. Hr'g Tr. at 28 ("THE COURT:  And you understood the significance of the order from the document that I had given attorneys for both sides about my criminal voir dire procedures where I explained that the jurors were going to be seated in the courtroom in the order of their jury numbers; isn't that right?  [DEFENSE COUNSEL]:  That's right.  THE COURT: And that's why both you and the government wanted to get the panel list before the trial if you could?  [DEFENSE COUNSEL]:  Right.").

On the afternoon of October 31, 2019, in response to a request from the lawyers, the Court agreed to make the order established by the Jury Panel Sheet available to counsel.  *See* Mot. Hr'g Tr. at 20.  They could not photocopy the list, but they were permitted to view it and write down the jurors' numbers in the order in which they would appear.  *Id.* at 19–21; *see* Hr'g Ex. 8 (Oct. 31, 2019 email from Deputy Courtroom Clerk to counsel for the parties).  Between that date and November 5, by agreement of the parties, an attorney for the government came to the courthouse to view the Jury Panel Sheet, and he transmitted a handwritten list of the juror numbers in order to defense counsel.  *Id.* at 21–24; *id.* at 27; *see* Gov't Hr'g Ex. 9 (handwritten list of potential jurors in order presented on the Jury Panel Sheet).  The foreperson appeared on the first page of the three-page list, and she was the fourteenth of the eighty-two potential jurors listed.  *See* Jury Panel Sheet at 1.

## B.    Individual Voir Dire

On November 5, 2019, the jurors and the parties appeared in court for individual voir dire, and counsel received paper copies of the Jury Panel Sheet.  Mot. Hr'g Tr. at 14, 27–28.  Before questioning began, the Court granted defendant's motion for reconsideration in part and struck two of the jurors identified in his November 4 memorandum, leaving eighty potential jurors.  *See* Nov. 5 A.M. Tr. at 23–24.

The Court then explained why it denied defendant's motions to strike other prospective jurors based on their written questionnaire responses alone.

> I've reviewed the first set of requests of strikes very carefully.
>
> I struck those individuals who expressed the fact that they had an opinion about the defendant or the charges.  The mere fact that someone expressed an opinion about the president alone is not a basis, to me, to assume that they could not be fair, particularly if they indicated that they could be, although it certainly [is] grist for follow-up questions.

And even those who indicated they'd heard something about the defendant or the case, that alone wasn't enough for me to automatically assume they needed to be struck for cause.  Again, I think it's grist for follow-up questions. . . .

I believe that the defense has assumed bias that has not yet been shown on the part of all those people, and that more information and more follow-up questions are needed before we can determine that these people should be excused for cause.

So, the fact that some people haven't, based on their questionnaires, is without prejudice to any motion you may file after we've had an opportunity to explore potential bias in the courtroom and hear what they have to say.

Nov. 5 A.M. Tr. at 23–24.  The Court underscored the importance of the exercise the lawyers were about to undertake and reiterated that it would remain open to renewed motions after more questions had been asked.  *Id.* at 25 ("THE COURT:  I don't believe working for the government, having an opinion about the president, or having heard something about the case, in and of itself, means that the person is biased against this defendant on these charges, and we will ask them follow-up questions and we will see.").

At that point, individual voir dire commenced, with the Court and counsel for the parties asking potential jurors questions in open court but outside of the presence of the rest of the panel.[16] *See generally id.*; Tr. of Jury Trial, Nov. 5, 2019, Afternoon Session [Dkt. # 295] ("Nov. 5 P.M. Tr.").

### 1.  The Court's Questioning of the Foreperson

As with all of the potential jurors, the Court began the individual voir dire of the foreperson by asking its own questions.

---

16      The jury consultants were not present in the courtroom for the individual voir dire.  In addition to the defense attorneys of record, there were two lawyers present who had not entered appearances in the case.  According to counsel for Stone, they "may have given their thoughts and comments" to the defense team at that time.  Mot. Hr'g Tr. at 30.

THE COURT:  We've had the opportunity to review your questionnaire but I do have a few follow up questions.

PROSPECTIVE JUROR:  Okay.

THE COURT:  I understand that you do have a law degree; is that correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are you practicing law now?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you ever practiced criminal law?

PROSPECTIVE JUROR:  No, not criminal law.

THE COURT:  You did once serve I believe as the foreperson of a federal grand jury; is that correct?

PROSPECTIVE JUROR:  Yes, yes, Your Honor.

THE COURT:  So that was a pretty long assignment as I understand it.

PROSPECTIVE JUROR:  Two years.

THE COURT:  When you came and went was it in this federal courthouse or --

PROSPECTIVE JUROR:  No, it was in Western District of Tennessee.

THE COURT:  At that time as you know, you only heard from one side. You heard the government's side of the case.  And you were only asked to determine whether there was probable cause to believe whether a crime had been committed and the defendant had committed it.

You understand that that will not be the standard that applies in this case and the government is going to have to prove its case beyond a reasonable doubt here?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You've also indicated a fair amount of paying attention to news and social media including about political things?

PROSPECTIVE JUROR:  Yes.

THE COURT:   And when we asked what you read or heard about the defendant, you do understand that he was involved in Mr. Trump's campaign in some way?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything about that that affects your ability to judge him fairly and impartially sitting here right now in this courtroom?

PROSPECTIVE JUROR:  Absolutely not.

THE COURT:  What is it that you have read or heard about him?

PROSPECTIVE JUROR:  So nothing that I can recall specifically.  I do watch sometimes paying attention but sometimes in the background CNN. So I recall just hearing about him being part of the campaign and some belief or reporting around interaction with the Russian probe and interaction with him and people in the country, but I don't have a whole lot of details. I don't pay that close attention or watch C-SPAN.

THE COURT:  Can you kind of wipe the slate clean and learn what you need to learn in this case from the evidence presented in the courtroom and no other source?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You actually have had some interest in Congress yourself?

PROSPECTIVE JUROR:  Yes.

THE COURT: Does the fact that this case involves allegations of not being truthful to Congress, is that something that you think that the nature of the allegations alone would make it hard for you to be fair?

PROSPECTIVE JUROR:  No.

Nov. 5 P.M. Tr. at 92–94.[17]

The Court then asked if the government had any questions for the juror.  It did not.  *See id.* at 95.

---

17    This excerpt includes all of the Court's questions to the juror.

## 2.  Defendant's Questioning of the Foreperson

The defense was then given an opportunity to question the juror:

[DEFENSE COUNSEL]:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

[DEFENSE COUNSEL]:  Did you ever work for anyone in Congress?

PROSPECTIVE JUROR:  No.

[DEFENSE COUNSEL]:  You've worked on campaigns for Congress people running for Congress?

PROSPECTIVE JUROR:  I ran for Congress.

[DEFENSE COUNSEL]:  You ran for Congress?

PROSPECTIVE JUROR:  I worked on my own campaign.

[DEFENSE COUNSEL]:  And you have friends who worked for other congressmen?

PROSPECTIVE JUROR:  Yes.

[DEFENSE COUNSEL]:  Do you have any political aspirations now?

PROSPECTIVE JUROR:  I don't know, not federal.

[DEFENSE COUNSEL]:  What might they be?

PROSPECTIVE JUROR:  My home state in Tennessee.  No local.

[DEFENSE COUNSEL]:  Just recognize that there might be some media -- What are your aspirations?

PROSPECTIVE JUROR:  I served, can I just say I served in political office in Memphis in a local office on the school board.  So I, one day I wake up and say I run for, you know, office again in Memphis to impact education. One day I wake up and say no way in the world would I do that.  So I don't have an immediate plan to run for office.

[DEFENSE COUNSEL]:  The fact that you run for an office, you're affiliated with a political party. Roger Stone is affiliated with the Republican party, Donald Trump. You understand what I'm saying and getting at?

PROSPECTIVE JUROR:  I do.

[DEFENSE COUNSEL]:  How do you feel about that?

[GOVERNMENT COUNSEL]:  Objection.

THE COURT:  Can you make that question a little bit more crisp?  Is there anything about his affiliation with the Trump campaign and the Republican party in general that gives you any reason to pause or hesitate or think that you couldn't fairly evaluate the evidence against him?

PROSPECTIVE JUROR:  No.

Counsel for the defendant then chose not to ask any additional questions.

[DEFENSE COUNSEL]:  Thank you, ma'am.

THE COURT:  All right, you can step out.

(Prospective juror leaves courtroom.)

THE COURT:  [Defense counsel], you have a motion?

[DEFENSE COUNSEL]:  No.

Nov. 5 P.M. Tr. at 95–96.[18]

The Court and counsel questioned the potential jurors in the order they appeared on the jury panel sheet, and by the end of the day on November 5, thirty-four had been qualified, and the remainder were excused.[19]  Based on motions by the parties or its own motion, the Court struck an additional eighteen potential jurors from the venire that day, but neither side moved to strike the foreperson for cause.  The parties were advised before the Court adjourned for the evening that

---

18    This excerpt sets forth the defendant's questioning of the juror in its entirety.

19    Pursuant to Federal Rule of Criminal Procedure 24(b)(2), the defense was able to exercise ten peremptory challenges, the government had six, and each side could strike one alternate.  For that reason, the Court sought to qualify thirty-four jurors before excusing the rest; that would supply the number needed for the twelve jurors and two alternates, the eighteen strikes, and a few extras in the event any became unavailable overnight.  *See* Nov. 5 P.M. Tr. at 58, 200–01, 223.

the qualified jurors would be seated the next day in the order they appeared on the Jury Panel Sheet.[20]   By that point, the juror who became the foreperson had moved up to tenth on the list.

### C.   Peremptory Strikes

On November 6, 2019, the thirty-four qualified potential jurors returned to court, and the parties exercised their peremptory strikes.   Tr. of Jury Trial, Nov. 6, 2019, Morning Session [Dkt. # 296] ("Nov. 6 A.M. Tr.") at 239–242.[21]   Neither side struck the juror who is the subject of this motion, and she was seated on the jury.   *See id.*

## II.   Trial

After the jury was selected on November 6, the Court gave the jury panel preliminary instructions, each side made an opening statement, the government introduced its witnesses and exhibits, and the defense followed.   *See generally* Nov. 6. A.M. Tr. at 248–98; Tr. of Jury Trial, Nov. 6, 2019, Afternoon Session [Dkt. # 297] ("Nov. 6 P.M. Tr.") at 304–92.   On November 12, each side rested its case.   Tr. of Jury Trial, Nov. 12, 2019 [Dkt. # 304] at 1052.   On the morning of November 14, the Court instructed the jury about the applicable law and how to conduct its deliberations.   *See* Tr. of Jury Trial, Nov. 14, 2020 [Dkt. # 307] ("Nov. 14 Tr.") at 1228–55.

---

20      *See* Nov. 5 P.M. Tr. at 223–24 ("THE COURT: According to my calculations we have 34 qualified jurors, we need 32. . . .   Tomorrow morning they all have to report to the jury room. . . . [The Deputy Courtroom Clerk] will bring them down, seat them in the order in which they're listed on the jury list in the courtroom, and we will exercise [per]emptory strikes as described in the memorandum that I gave you.   When everyone has exercised their strikes or has passed and then, and we've selected the alternates, at that point 14 people will be seated in the box.").   The Court elaborated on these instructions in response to questions asked by the defense.   *Id.* at 224–25; *see also* Mot. Hr'g Tr. at 33.

21      Neither side lodged any challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to any strike exercised by the other.

Regarding selection of a foreperson, the Court instructed the panel as follows:

> When you return to the jury room, you should first select a foreperson to preside over your deliberations and be your spokesperson here in court. There are no specific rules about how you should go about selecting a foreperson; that's up to you. However, as you go about the task, be mindful of your mission, to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, and who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

*Id.* at 1252.  With no input from either the Court or the parties, the jury selected a juror to serve as the foreperson.  *See* Mot. Hr'g Tr. at 74, 80 (explaining that the jurors used a secret ballot to select the foreperson).

At 2:07 p.m. on November 14, the jury submitted a note to the Court with a question about an exhibit.  Public Note from Jury 1 [Dkt. # 256] (PUBLIC); *see also* Nov. 14 Tr. at 1257.  The note included the foreperson's signature, and this was the first time the name of the juror selected to serve as the foreperson was revealed to the Court.  *See* Note from Jury 1 [Dkt. # 257] (SEALED).  After conferring with counsel, the Court answered the jury's question.  *See* Note from Jury 1; Nov. 14 Tr. at 1257–65.

At 3:23 p.m. on November 14, the jury submitted a second note with a question about Count Three.  Public Note from Jury 2 [Dkt. # 256]; *see also* Nov. 14 Tr. at 1266.  This note was also signed by the foreperson.  *See* Note from Jury 2 [Dkt. # 257] (SEALED).  After conferring with counsel, the Court answered the jury's question.  *See* Nov. 14 Tr. at 1266–74.

The jury's deliberations continued to the following day, and at 11:11 a.m. on November 15, the jury informed the Court it had reached a verdict.  Note from Jury [Dkt. # 258] (PUBLIC). It found the defendant guilty on all seven counts.  Verdict Form [Dkt. # 260]; *see also* Tr. of Jury Trial, Nov. 15, 2020 [Dkt. # 308] ("Nov. 15 Tr.") at 5–7.

The Court then excused the jurors and told them that they were released from their obligation not to discuss the trial:

> Before I release you back to the jury room to retrieve your belongings, I also want to now release you from the instructions that I have been giving you on a daily basis since the trial began. You are now free, although you are not required, to discuss this case with anyone you choose. You're free to read about it, to talk about it. All of the instructions that I have been giving you on a regular basis are hereby – you're relieved of them.

Nov. 15 Tr. at 9.

## III.   Post-Verdict Events

On February 10, 2020, the parties file their memoranda in aid of sentencing. Gov't Sentencing Mem. [Dkt. # 279]; Def.'s Sentencing Mem. & Mot. for Variance from Advisory Guidelines [Dkt. # 280]. The next day, the government filed a Supplemental and Amended Sentencing Memorandum, and the prosecutors in the case withdrew from the matter or resigned from their jobs entirely. Gov't Suppl. & Amended Sentencing Mem. [Dkt. # 286]; Notices of Withdrawal [Dkt. ## 282, 283, 285, & 287]. On February 12, 2020, following significant media coverage of the prosecutors' actions, the foreperson posted a message on her Facebook page, publicly identifying herself as the jury foreperson and expressing her support for the prosecutors.[22] This prompted various people to search for more information about her online.

Two days later, on February 14, 2020, defendant filed a motion for a new trial based on social media posts that had been uncovered in the wake of the juror's public statement. Def.'s Mot. for New Trial [Dkt. # 312]; Ex. 1 [Dkt. # 312-1] ("composite Exhibit" of social media posts). On February 18, he filed an amended motion, Def.'s Am. Mot. for New Trial [Dkt. # 313] ("Am.

---

[22]   *See* Shimon Prokupecz & Ashley Fantz, *Stone juror says she 'stands with' the prosecutors*, CNN, Feb. 12, 2020 (7:03 p.m.), Ex. 1 to Am. Mot. for New Trial [Dkt. # 312-1] (SEALED) ("Comp. Ex.") at 1.

Mot."),[23] and the government filed its opposition the same day.  Gov't Opp. to Am. Mot. [Dkt. # 314] ("Gov't Opp.").  On February 24, defendant filed a reply brief.  Def.'s Reply in Supp. of Am. Mot. [Dkt. # 338] ("Reply").  Defendant also requested a hearing on his motion.  Def.'s Mot. to Open the Hr'g in Supp. of Am. Mot. for New Trial [Dkt. # 332].

On February 21, 2020, the Court set a hearing date, and it issued a minute order giving the parties more information.

> The Court has not yet determined what testimony, if any, will be required, and if so, with respect to what issues.  However, in an abundance of caution, it will summon the foreperson and other members of the jury to the courthouse at that time.  It would be the Court[']s intention to follow the same process utilized during voir dire:  the Court would initiate any questioning and the parties would have an opportunity to ask appropriate follow up questions, so the parties should be prepared for that possibility.  The Court notes that this order does not constitute a ruling on the question of whether the defense has or has not come forward with a sufficient factual basis to warrant a hearing. . . .

Min. Order of Feb. 21, 2020 (SEALED); Min. Order of Feb. 27, 2020 (PUBLIC) (reissuing redacted version of Min. Order of Feb. 21).[24]

---

23    The composite exhibit attached to defendant's original Motion for New Trial (Juror Misconduct) [Dkt. # 312] (SEALED) was not attached to his amended motion [Dkt. # 313], but the amended motion refers to the exhibit.  *See* Am. Mot. at 16.  Accordingly, the Court will deem the exhibit, which the defendant also referred to at the hearing, to be incorporated in the amended motion.  The Court will use the page numbers at the top of the exhibit appearing in the header of the docketed PDF [Dkt. # 312-3] when it refers to specific pages within it.

24    Before the hearing, the Deputy Court Clerk contacted the thirteen jurors who had attended the trial in its entirety – one juror had been excused mid-trial due to illness – and advised them that there would be a hearing regarding allegations related to the jury, and that the Court may need to hear from them.  *See* Mot. Hr'g Tr. at 67.  The Court invited, but did not summon, the jurors to be present, and eleven of the thirteen came to the courthouse voluntarily.  *Id.*  One juror was unavailable due to travel, and another was ill.  *Id.*

IV.     **The February 25 Hearing**

On February 25, 2020, the Court held an evidentiary hearing on defendant's motion for a new trial.[25]   *See* Min. Entry of Feb. 25, 2020; Mot. Hr'g Tr.   The Court heard from counsel for both sides about how and when the completed jury questionnaires and Jury Panel Sheet were provided to the defense,[26] and the defense answered some questions concerning its use of jury consultants.[27]

The Court granted the defendant's request to question the foreperson.  Mot. Hr'g Tr. at 67–68.  It also informed counsel which of the other jurors had made themselves available.  *Id*. at 69–71 (REDACTED).  It announced that "each side may identify one juror other than the foreperson that it wants to hear from on the question of whether there was improper influence or extrajudicial information in the jury room."  *Id*. at 68.  The Court stated that it would begin the questioning, that counsel would be permitted to ask follow-up questions if any of the answers revealed a basis to go further, and that additional jurors would be questioned if the interrogation of the first two elicited information that would warrant further inquiry.  *Id*. at 67–68.  After each team was given an opportunity to confer, there was a sealed bench conference in which the government selected

---

25     Prior to the filing of the instant motion, the Court had set the sentencing hearing for February 20, 2020.  After defendant filed his motion, the Court held a scheduling conference to hear the parties' views on the effect of the motion on whether the Court could proceed with sentencing.  *See* Min. Entry of Feb. 18, 2020.  Neither the Court nor counsel had identified any legal requirement that the sentencing must be postponed, *see* Tr. of Scheduling Conf., Feb. 18, 2020 [Dkt. # 315] at 5, and the Court proceeded with sentencing on February 20.  In its discretion, though, it extended the date for the filing of a Notice of Appeal and stayed execution of the sentence pending resolution of the motion.  *See* Judgment [Dkt. # 328] at 2.

26     *See supra* section I.A.1(b) & section I.A.3.

27     *See supra* section I.A.1(b) & section I.B.

Juror A, and the defense picked Juror B.  *Id*. at 72.[28]  The two selected jurors testified, *id.* at 72–

83, followed by the foreperson.  *Id*. at 86–120.

Juror A was summoned to the courtroom first and was sworn.  Mot. Hr'g Tr. at 72, 75.

After being instructed not to identify any juror by name on the public record, Juror A was asked a

series of questions.  *Id*. at 72–78.  Juror A described the procedure the jury used to select a

foreperson.

> We solicited volunteers.  One person put their hand up to volunteer.  There
> was several seconds of silence.  I put my hand up to volunteer, just so we
> would have some discussion and choice in the matter.  Another juror
> nominated a third person.  A third person nominated a fourth person.  And
> so we had four candidates.  We took a secret ballot, and the foreperson was
> chosen as a result of that secret ballot.

*Id*. at 74.  The juror testified that the judge played no role in selecting a foreperson.  *Id*.

Juror A then explained how the foreperson went about the process of organizing or

facilitating the jury's discussions.

> JUROR A:   . . .  We established a process or the foreperson quickly
> established a process where we looked at each element of each charge in
> isolation.  Actually, I will go back.  The first thing we did was take a secret
> poll just to sort of get a pulse of the room, where each person indicated
> whether they were leaning towards guilty, towards not guilty, or not sure on
> each charge.  After that -- just so we could understand where we needed to
> focus.  After that, we went through each element of each charge in order,
> and we decided on each charge or each element and reached unanimity on
> each element before we moved on to the next one.
>
> THE COURT:    All right. So you considered not only each count
> individually, but you also considered each element in each count
> individually?
>
> JUROR A:  That's right, Your Honor.

---

28     The jurors' names and juror numbers were stated on the record under seal, and the Court
and counsel referred to them using these monikers to protect their identities.  *See* Mot. Hr'g Tr.
at 68, 72.

THE COURT:  Did the foreperson encourage civility and respect among the jurors?

JUROR A:  She absolutely did.

THE COURT:  Was every juror invited or permitted to speak up concerning his or her views?

JUROR A:  Yes, absolutely.  In fact, on at least one occasion, maybe two occasions I can recall, we went around the room and, you know, gave everybody a very explicit opportunity to speak their mind.

*     *     *

THE COURT:  Now, the jury included people of different ages, educational background, race, ethnicity, gender.  How did you get along?

JUROR A:  We got along well.

THE COURT:  Did anyone attempt to dominate or intimidate the others?

JUROR A:  No.

THE COURT:  Was there anyone who pressed for speed or tried to essentially bulldoze the others?

JUROR A:  No.  There was a little bit of impatience a couple of times during deliberations.  But as a group, we were able to sort of slow ourselves down.

THE COURT:  Was anyone a voice for taking your time or being sure to apply the presumption of innocence and hold the government to its burden of proof?

JUROR A:  Yes.

THE COURT:  And is that someone that you need to name with a name?

JUROR A:  I would say that several people were, including the forewoman.

Mot. Hr'g Tr. at 75–77.

After Juror A was excused, Juror B was seated on the witness stand and sworn.  She confirmed that the jury used a secret ballot to select a foreperson, and that no one other than the jurors themselves were involved in the decision.  Mot. Hr'g Tr. at 80.  This juror was also asked

to describe how the foreperson went about the process of organizing or facilitating the jury's discussions.

> JUROR B:  We went step by step with each count and looked over the evidence and discussed the evidence, and each person gave their answer of whether, you know, he was innocent or guilty.

*Id*.  Juror B testified that all of the jurors were invited or permitted to give their views.  *Id*. at 81.

The foreperson was the final witness.  First, the juror confirmed for the record that she had served as the foreperson of the jury, Mot. Hr'g Tr. at 87, and that she was the one who posted a statement of support on Facebook on February 12 after the prosecutors withdrew from the case. *Id*. at 88.

In response to questions from the Court, the juror described her use of social media.  Mot. Hr'g Tr. at 87–90.  She testified that she has used both Facebook and Twitter, and that she has posted on both platforms separately.  But she explained:

> [M]ost of my Twitter feed is – has always been for years connected to Facebook.  So if you were seeing something I tweeted, it's most likely generated from my Facebook.  And so if you open it, then it will try to take you to Facebook, because that's where Twitter was reading that from.

Mot. Hr'g Tr. at 95; *see also id.* at 89.  She testified that she posts on Facebook about a range of topics, "[s]ometimes work, sometimes just friends, sometimes my bus rides in the morning, various things."  *Id*. at 106.  But she could not quantify how often she uses the site to communicate:  "It depends. Sometimes very active, sometimes not.  I wouldn't know a number. But quite a bit sometimes."  *Id*.

The foreperson was asked about the statement in her Twitter profile:  "I ♥ Memphis. Fighting for equality and excellence in education for low-income and children of color is my life. Tweets are my own.  Retweets don't equal agreement."  Mot. Hr'g Tr. at 92.  She explained that "tweets are my own" meant that Twitter entries were posted on her own behalf and not on behalf

of her employer, *id*. at 92–93, and that "retweets don't equal agreement" meant:  "just because I retweet something does not mean that I am stating agreement with it or opposition to it." *Id*. at 93. When asked what prompted her to retweet things, she responded, "[u]sually, it's something I find interesting, something I learned something from and just sharing it with people who follow me on Twitter."  *Id*. at 93.  She explained that her usual practice was to put quotation marks around comments by others:  "generally, if I'm quoting someone, I put it in quotes to signify that's not me saying [it]."  *Id*. at 105.  She testified that she receives news through internet news subscriptions and alerts, *see id.* at 93–94, but does not pay "attention to a lot on Twitter." *Id*. at 87, 93.

The juror explained that at the time she completed the questionnaire, and before the November 15, 2019 verdict in the Stone trial, the comments she posted on Facebook were public.

> THE COURT: . . . As of September 12th when you came to court and filled out your jury questionnaire, what were your privacy settings?
>
> JURY FOREPERSON:  It was open.  My settings were mostly public on Facebook and on Twitter.

Mot. Hr'g Tr. at 88.

She said that on November 15, 2019, after the trial, she shut down her social media accounts for approximately two weeks.  Mot. Hr'g Tr. at 88–89.  She returned to social media around Thanksgiving, and at that time, she changed her Facebook privacy setting to "friends only." *Id*. at 88–89.  Also, when she returned to social media, she set up her accounts so that her Facebook posts would no longer automatically appear in her Twitter feed.  *Id*. at 89.  Although she changed the privacy settings of her accounts moving forward, she did not delete any Facebook or Twitter entries that had been posted on the internet at the time the accounts were public.  *Id*. at 90.

Counsel for the parties were then given an opportunity to question the juror.  The government declined, and the juror was questioned extensively by counsel for the defense.  *See id.*

at 99–120.  The Court did not restrict or cut off the questioning; at the end of the cross examination,

with the Court's permission, the attorney handling the hearing paused to consult with the rest of

the team, and then he announced that he had no further questions.  *Id*. at 119–20.

## ANALYSIS

Defendant has filed a motion asking the Court to grant him a new trial pursuant to Federal

Rule of Criminal Procedure 33(b)(1).  Rule 33 authorizes a court to vacate a judgment and grant a

new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[G]ranting a new trial

motion is warranted only in those limited circumstances where 'a serious miscarriage of justice

may have occurred.'"  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014), quoting

*United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990).  A new trial based on "newly

discovered evidence" must "be filed within 3 years after the verdict or finding of guilty," Fed. R.

Crim. P. 33(b), and defendant Stone's motion is timely.

To obtain a new trial grounded in newly discovered evidence, a defendant must satisfy five

requirements:

> (1) the evidence must have been discovered since the trial; (2) the party
> seeking the new trial must show diligence in the attempt to procure the
> newly discovered evidence; (3) the evidence relied on must not be merely
> cumulative or impeaching; (4) it must be material to the issues involved;
> and (5) [it must be] of such nature that in a new trial it would probably
> produce an acquittal.

*United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008) (alteration in original), quoting

*United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993).  A defendant "bears a 'weighty

burden'" to establish that a new trial is warranted.  *United States v. Garcia-Pastrana*, 584 F.3d 351,

390 (1st Cir. 2009), quoting *United States v. Del–Valle*, 566 F.3d 31, 38 (1st Cir. 2009).

Here, defendant seeks a new trial on two grounds.  First, he presents a collection of the

foreperson's social media postings, and he argues that this "newly discovered evidence" reveals

that the juror's answers to the written jury questionnaire and during voir dire were false.  *See, e.g.*, Am. Mot. at 1 ("The jury's foreperson concealed her explicit and implicit bias by failing to disclose her active anti-Stone and anti-Trump sentiment, evidenced by her multiple social media postings that directly reference her strong political bias and knowledge of the Stone prosecution in direct contradiction of her responses during voir dire."); *see also id.* at 2 ("A comparison of her social media posts, on the one hand, and her responses to the jury questionnaire and the Court's questioning of her political disposition and its affect upon her ability to enable Stone to have a fair trial, on the other, makes it immediately apparent that [the juror] was not candid; rather, she misled the Court and Stone with plainly disingenuous answers.").

Second, defendant posits that the juror failed to follow the Court's instructions during the trial, and that this alleged misconduct undermined the integrity of the verdict and warrants a new trial.  Am. Mot. at 15 ("[G]iven her obvious failure to follow the Court's instructions in voir dire, a presumption arises that she failed to follow the Court's instructions in other instances, which would further undermine the integrity of the trial.").

A motion for new trial is committed to the trial court's discretion.  As the D.C. Circuit has emphasized, trials courts are "obviously . . . the tribunal best qualified to weigh the relevant factors" relating to allegations of juror misconduct, *United States v. Williams*, 822 F.2d 1174, 1189 (D.C. Cir. 1987), and their factual determinations are given "great weight."  *United States v. White*, 116 F.3d 903, 929–30 (D.C. Cir. 1997) (per curium), quoting *Hobson v. Wilson*, 737 F.2d 1, 49 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985).  When considering allegations of juror misconduct, trial courts have broad discretion to fashion the methodology of the inquiry.  *United States v. Williams-Davis*, 90 F.3d 490, 498–99 (D.C. Cir. 1996).  Courts may allow jurors to be individually questioned, but they must also take care to guard against juror harassment.  *Id.*  Here,

the Court held an evidentiary hearing, and it permitted the defendant to examine the foreperson and two other jurors.

**I.   The record does not demonstrate that the foreperson lied in voir dire.**

According to the defendant, "we now know" that the foreperson's "answers were equivocal, misleading, deceptive, evasive, and fallacious." Am. Mot. at 3. But the evidence does not support his parade of adjectives.

**A.   The Social Media Posts**

To address the defendant's contention, it is necessary to catalogue the social media posts upon which the motion is based.

Defendant has supported his motion with forty-two separate social media posts from the period of December 4, 2008 to November 15, 2019. An index of the posts arranged in chronological order is attached to this opinion. Index (Attachment B) (REDACTED).[29] While most of the posts appear in defendant's composite exhibit, he highlighted nine of them by pasting copies into the motion itself.[30]

---

29   For ease of reference, the Court will cite to the posts by the number assigned to each in the Index.

30   The composite exhibit includes all of the social media posts except for two, which only appear in the motion. Post 1 (Dec. 4, 2008); Post 33 (Jul. 2, 2019). While the composite exhibit – which is not organized chronologically or in accordance with any other discernible methodology – is comprised of fifty-four images of posts, nine of them appear multiple times within the exhibit. *See, e.g.*, Post 2 (Comp. Ex. at 4, 15); Post 5 (Comp. Ex. at 4, 10); Post 14 (Comp. Ex. at 2, 6, 8); Post 16 (Comp. Ex. at 12, 13); Post 25 (Comp. Ex. at 18, 23, 28); Post 26 (Comp. Ex. at 17, 22); Post 27 (Comp. Ex. at 11, 21); Post 28 (Comp. Ex. at 2, 21); Post 42 (Comp. Ex. at 25, 27).

The oldest post in the collection depicts the foreperson posing in a photograph in 2008 with Donna Brazile, a democratic strategist and campaign manager – more than ten years ago. Post 1 (Dec. 4, 2008).[31]

There are twenty-three posts from the roughly two-year time period between December 16, 2016 up to the date of Roger Stone's arrest, January 25, 2019. *See* Posts 2–24. Eight of those make some mention of Russian interference in the election or ongoing investigations into that issue. *See* Posts 2–7, 14, 19. Others related to the President or his administration.

There are a total of eleven posts from the almost eight-month period that begins with the date of Stone's arrest in January 2019 through September 12, 2019, the date the potential jurors were summoned to complete the written questionnaire. *See* Posts 25–35. Five of these mention the Special Counsel. *See* Posts 25, 28–31.

Defendant has not supplied the Court with any posts between September 12 and the date the jurors returned for individual voir dire on November 5, 2019. *See* Index at 13.

There are seven posts dated during the time period the trial was underway: November 10 through November 15, 2019. *See* Posts 36–42. None of these mention the defendant or the trial, *see id.*, and the defense conceded at the hearing on the motion that there is no evidence the juror violated the Court's instruction not to communicate about the case. Mot. Hr'g Tr. at 61–62.

So the question to be determined is whether the thirty-four comments that were posted or retweeted over the two years and nine months between December 2016 and September 2019 – along with the lone post from 2008 – demonstrate that the juror's answers on the written

---

31    Donna Brazile is a former chair of the Democratic National Committee. *See Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 455 (S.D.N.Y. 2018).

questionnaire or her answers in court during voir dire were untruthful.  Approximately fifteen of these relate to the President, and as the defense points out, they generally reflect disapproval of him or disagreement with his policies.  *See* Posts 9–13, 15, 17–18, 21–24, 33–35.  Twelve of the posts from this period mention potential Russian interference in the 2016 election, Posts 2–8, 14, 19–20, 27, 32, and five touch upon the Special Counsel's investigation, Posts 25, 28, 29–31, although some of the posts could arguably fall within more than one category, and one or two address other topics or are too vague to categorize.  *See* Posts 1, 16.  The defense made no effort to produce evidence to show whether these posts comprised a sizable portion or just a small percentage of the juror's total social media output over that period of time.

### B.    The defendant has not shown that the juror's answer to Question 23 was false.

In his motion, the defendant points to the foreperson's social media posts as evidence that she was dishonest in response to Questions 23 in the juror questionnaire.  Am. Mot. at 6–8.

Question 23 asked:

> Have you written or posted anything for public consumption about the defendant, the House Permanent Select Committee on Intelligence investigation into Russian interference in the 2016 presidential election, or the investigation conducted by Special Counsel Robert Mueller?

JQ 23.  It gave jurors the option of checking "Yes" or "No."  JQ 23.  In response, the foreperson checked neither, writing:  "I can't remember if I did, but I may have shared an article on Facebook. Honestly not sure."  JQ 23.

Given that answer, it is not enough for the defense simply to show that the juror did post something about those topics at some time or another; it must show that she lied when she said she did not remember and acknowledged that she "may have."  That is a high hurdle to get over, and the defendant has failed to do it.

The defendant's argument boils down to:  how could she possibly not remember given the "sheer number" of her posts?  Am. Mot. at 6.  But – putting aside the unsubstantiated suggestion that there is something notable about this number of posts – not all of the posts aggregated in defendant's motion are responsive to Question 23.  And the few posts that were related to those topics were spread over the expanse of time between December 16, 2016 and August 25, 2019, while the juror was also using social media to address a myriad of other topics, sometimes "quite a bit."  Mot. Hr'g Tr. at 106.

The question asked whether the juror had written anything for public consumption about three topics:  Stone, the HPSCI investigation into Russian interference in the 2016 election, and the Special Counsel's investigation.

Only two of the posts presented as evidence refer to the defendant in any way, and both were sent eight months before the date the jurors provided their written responses.  On January 25, 2019, the juror sent out a link to a twenty-five-page article that appeared on the National Public Radio website, www.npr.org, detailing the criminal charges that had been brought by the Office of Special Counsel against thirty-four people, including Roger Stone, who had been arrested that morning.  *See* Post 25 (Jan. 25, 2019); Jason Breslow, *All the Criminal Charges to Emerge from Robert Mueller's Investigation*, NPR, Dec. 9, 2018, updated Apr. 12, 2019, Def.'s Hr'g Ex. 2; Mot. Hr'g Tr. at 40–41.  The post was accompanied by a comment:  "Brought to you by the lock

her up peanut gallery."  Post 25 (Jan. 25, 2019).[32]   On January 30, 2019, the juror retweeted

someone else's tweet about the response to the defendant's arrest:

> Roger Stone has y'all taking about reviewing use of force guidelines.
> Not Alton Sterling
> Not Eric Gardner
> Not [six other African-Americans]
> But Roger Stone!!!  Think about that.

Post 26 (Jan. 30, 2019).  The tweet said nothing about the charges against Stone, and the juror

added no comment of her own.  *See id.*

There is only one post in the entire collection that mentions the House Committee.  On

March 22, 2018 – a full year and three months before the juror was asked to complete the

questionnaire – she transmitted a link to an article from Politico that began, "The House

Intelligence Committee on Thursday voted along party lines to formally end its investigation into

Russian interference in the 2016 presidential election . . . " with the comment, "[f]rom the folks

who brought us never ending investigations on Benghazi."  Post 20 (Mar. 22, 2018).

As for posts related to the investigation conducted by the Special Counsel, there was the

one transmitting the NPR article from January 2019, *see* Post 25 (Jan. 25, 2019), and four others

during the eight months leading up to September 2019:

---

32      The juror could not recall when she testified whether she wrote the comment or simply
forwarded someone else's words with the article, but she said that she assumed she wrote it because
she usually put quotation marks around comments by others.  Mot. Hr'g Tr. at 105.  She explained
that the phrase referred "to the many rallies where supporters – of Trump would yell 'lock her up,'
suggesting that Hillary Clinton and others should be jailed.  And so . . . it's, you know, the irony
of people saying others should be jailed and they themselves being arrested."  Mot. Hr'g Tr. at 112.

- A March 24, 2019 tweet publishing a link to a Facebook post of an article that began, "Ignoring the numerous indictments, guilty pleas, and convictions of people in 45's inner-circle, some Republicans are asserting that the Mueller investigation was a waste of time because he hasn't found evidence of . . . " Post 28.[33]

- An April 11, 2019 tweet of an article from thehill.com about the indictment of Gregory Craig, who had served as White House counsel for President Obama, for making false statements to the OSC, with the following words in quotation marks, "The former White House counsel was reportedly investigated by special counsel Robert Mueller before the case was referred to the Southern District of New York and . . . " Post 29.[34]

- A May 16, 2019 tweet of an article from nbcnews.com, with the headline "Flynn told Mueller people tied to Trump and Congress tried to obstruct probe." Post 30.

- A May 29, 2019 tweet with the words in quotation marks, "'After that investigation, if we had confidence that the president clearly did not commit a crime, we would have said that,' Mueller said."  The caption of the article begins, "Mueller:  Charging president with a crime was 'not an option we could . . .  Special counsel Robert Mueller, in his first public comments on his two-year investigation surrounding President Trump and his campaign, said . . . thehill.com." Post 31.

The defense has located no posts related to the investigation between the end of May and the date three and a half months later when the juror was presented with the questionnaire.[35]  *See* Index at 11–13.

---

33     The term "45" as used here refers to President Trump, the 45th President of the United States.

34     *See* Mot. Hr'g Tr. at 105 (explaining that she put generally puts quotation marks around a statement that is not hers).

35     The defense suggested at the hearing that social media posts about the President – even if they did not mention Roger Stone, HSPCI, or the Special Counsel – also bore some relationship to the juror's answer because the defendant was a supporter of the President.  *See* Mot. Hr'g Tr. at 44–47, 51–52.  But – putting aside the question of whether there is evidence that the juror actually knew that at the time – this reasoning is far too attenuated, and the posts about the President are not germane to any of the prongs of Question 23.  Also, the juror expressly rejected the suggestion that she had Roger Stone in mind when she discussed Trump or his associates, and the defense did not do anything to discredit that testimony on cross.  *See* Mot. Hr'g Tr. at 107–09.

This small set of social media comments is hardly inconsistent with the foreperson's answer that she was not sure, and that she "may have shared an article on Facebook."[36]  After all, the questionnaire, with its fifty-six questions, was not a take-home assignment or an open book test; on September 12, months after the posts in question, the potential jurors were confined to a large courtroom and deprived of any access to the internet.[37]

Even though the showing on this issue in the written motion was weak, the Court gave the defendant an opportunity to probe the matter further by questioning the juror in person.  This inquiry did not unearth any additional information to support the request for a new trial.

At the February 25 hearing, the Court drew the foreperson's attention to the two January 2019 posts and asked whether she was aware of them when she answered Question 23.  *See* Mot. Hr'g Tr. at 96–97 (reviewing Posts 25 and 26 with the juror).

---

[36]     The defense tried to make too much out of the juror's use of a singular article in her statement on the questionnaire.  *See, e.g.*, Mot. Hr'g Tr. at 114 ("Question by [COUNSEL]:  Do you think it's fair to say, based on the posts we just reviewed, that you did more than just share an article?") and 52 ([COUNSEL]:  "[H]er answer . . . 'I may have shared an article on Facebook. Honestly not sure,' I think that that is demonstrably false.").  In the context of the incomplete sentence in the questionnaire, as in casual conversation, the use of the word "an" does not necessarily connote that she shared *only* one, and the juror confirmed that was not her intention in her sworn testimony.  Mot. Hr'g Tr. at 115. ("When I say 'shared an article on Facebook,' that was not meant to say one article.").

[37]     The jurors were instructed to turn off their cell phones and not to use them to research or perfect their answers.  *See* JQ Proceedings Tr. at 12. ("[T]he first thing I need to ask you to do is to turn off your cell phones and put them away.  And I mean off.  They should not vibrate or hum, and you certainly should not be consulting them in the courtroom while you're completing the questionnaire.").

THE COURT:  . . . Were you aware that you had sent those when you filled out the questionnaire on September 12th?

JURY FOREPERSON:  . . . [I]n that question, I was zeroed in about Roger Stone in response to that question.  But I still didn't remember.  I posted a lot.  That's why I'm not sure.  I was not comfortable saying yes or no, because I really wasn't sure.  That's why I said I'm not sure, but it could have happened, because I do post things like that.

So no, in that moment, sitting there September 12th, I couldn't remember if I had posted that or not.  The reason I didn't check yes or no was because I was trying to be honest, because I honestly didn't know whether I had done it.

Mot. Hr'g Tr. at 98; *see also id.* at 115–16 (concerning the January 30, 2019 post: "I . . . didn't remember that retweet. . . .  I don't have in memory every tweet or share that I've done, which is why I said I can't remember . . . which was the honest answer at that time.").[38]

Providing more context for her answer, the foreperson also testified in response to questions:  "I post and tweet a lot of stuff" on social media about "various things," "[s]ometimes work, sometimes just friends, sometimes my bus rides in the morning."  Mot. Hr'g Tr. at 98, 106.  She could not quantify with precision the number of times she communicated on Facebook:

---

[38]    The defense asked the juror why she had specifically mentioned Facebook but not Twitter.  Mot. Hr'g Tr. at 114.  She responded:

Well, so that's why I start with "I can't remember."  And I sat there on September 12th that day, I actually could not remember if I had shared . . . . I don't know the answer to that.

But I said I'm honestly not sure, and that was the honest answer on September 12th.  It is why I didn't check yes or no, because I did not want to appear to be deceptive, and I was giving the best answer I could at the time.  And as I sat there, I really did not remember if I shared.

*Id*. at 114–15.

THE COURT:  And can you give me an average per week, if you can't per day, of how many posts you would post?

JURY FOREPERSON:  It really is hard to do.  I really don't know.  I don't think of it in that way.  I hadn't thought about it in that way.  Again, sometimes pretty active.  A lot of times, it is a news article that I may post and share, sometimes with captions, sometimes without captions.  But I don't know.  I would say I'm active enough, though, on social media.

*Id.* at 106.[39]

This testimony was not impeached or undermined in any way, and the juror was frank and believable when she explained her thought processes on September 12 and her efforts to ensure that the questionnaire responses were accurate.  Given the relatively small number of potentially responsive posts, the amount of time that had gone by since they had been posted, the juror's frequent use of social media to exchange observations on a host of other topics, her credible testimony that she was doing her best to focus in on whether she had said anything about Roger Stone in particular, and the fact that there is no evidence that she ever publicly opined about him

---

[39]   Indeed, a post from November 2019 – when the juror's Facebook posts were being automatically included in her Twitter output – indicates that as of that time, the foreperson had posted 13,000 tweets on her Twitter page by that point.  *See* Post 36 (Nov. 10, 2019) ("13K Tweets").

or his guilt or innocence, the record does not support a finding that the juror's answer to

Question 23 – that she may have shared an article, but she honestly did not remember – was false.[40]

### C.   The defense has not shown that the juror's answers about her knowledge of the Stone case was false.

In his pleadings, defendant suggests that the social media posts show that the juror's

answers concerning her knowledge of the case were also false.  *See* Reply at 1 ("The Motion is

based on [the juror's] extremely misleading answers during voir dire that conceal not only her

strong political bias, but her pre-trial knowledge of, and views about, Roger Stone and the charges

against him.").

The Court notes that the juror answered Question 27 – "Have you read or heard anything

about the defendant Roger Stone . . . or about this case?" – in the affirmative:  "*Yes*. Mr. Stone is

accused of inappropriate contact (sic) Russian officials in the effort of helping Mr. Trump's

campaign for President." JQ 27 (emphasis added).   So there is absolutely no support for

---

[40]     Defendant argued in his motion:  "In the months before the trial, [the juror] was a prolific 'tweeter' . . . regarding investigations into Russian interference in the 2016 election and the Special Counsel's investigation.  Consequently, the sheer number of her tweets and other social media posts on topics inextricably intertwined with this case renders utterly incredible her claim during voir dire that she could not remember if she posted on social media about this case or the related investigations."  Am. Mot. at 6.

While the record indicates that the juror was quite active on social media, Mot. Hr'g at 98 (testifying that she posted "a lot"); Post 36 (Nov. 10, 2019) (showing she had 13,000 tweets), the defense does not provide any statistics indicating how the number of the juror's other social media posts that could be found online as of February 12, 2020 compares to the twenty-eight posts in the composite from the twenty-eight month period from when the Special Counsel was appointed in 2017 through the end of August in 2019.  That rate of one political post per month may not be consistent with defendant's portrayal of the juror as an avid political activist, and it is not clear that the "prolific" label fits or the "sheer number" of posts provides anything.  In any event, almost half of the posts from the relevant time period – sixteen of the twenty-eight – related to Trump and not to the topics covered by Question 23.  Thus, the posts the defense has gathered suggest that those related to the investigation were a small fraction of the "various things" she posted about, Mot. Hr'g Tr. at 106, which could have affected her ability to remember the few that were responsive to Question 23 in particular.  Most important, what we *do* know is that the juror made a conscious effort to acknowledge the possibility that she forwarded posts on these topics.  JQ 23.

defendant's accusation that she "concealed" the fact that she had some knowledge of Roger Stone and the charges against him.

Moreover, during the individual voir dire on November 5, when the juror was asked in person what she had read or heard about the defendant, she again responded that she had a general understanding that he was connected with the Russia investigation in some way.

> THE COURT:  What is it that you have read or heard about [the defendant]?
>
> THE JUROR: So nothing that I can recall specifically.  I do watch sometimes paying attention but sometimes in the background CNN.  So I recall just hearing about him being part of the campaign and some belief or reporting around interaction with the Russian probe and interaction with him and people in the country, but I don't have a whole lot of details.  I don't pay that close attention or watch C-SPAN.

Nov. 5 P.M. Tr. at 94.

According to the defendant, the juror's sworn characterization of her own level of understanding and attention was false.  The motion for new trial argues that the January 25, 2019 Facebook post transmitting the NPR article is inconsistent with her testimony:  "The article that the juror posted calls attention with significant detail to the number of indictments, guilty pleas, and convictions of people in President Trump's circle . . . . Plainly the . . . post is irreconcilable with the juror's answers during voir dire regarding her knowledge of the Stone case."  Am. Mot. at 7.  But the juror did not write the article, and its "significant detail" does not shed light on the juror's level of attention.

At the hearing, counsel directed the Court to seven other posts from the seven-month period of February to August 2019 as evidence that the foreperson, in fact, "paid close attention" to the

Russia investigation and the defendant.  Mot. Hr'g Tr. at 50–51, 59.[41]  But the question the juror was answering during voir dire in November of 2019 was, "[w]hat is it that you have read or heard about [the defendant]?"  Nov. 5 P.M. Tr. at 94.  She confirmed at the later hearing on this motion that her answer was directed towards to whether she was paying close attention to news about Roger Stone.  *Id.* at 119.  Not one of these posts relates to the defendant, and three do not even relate to Mueller's work, so they hardly contradict her answer during voir dire.

The juror stated plainly on the questionnaire that she did follow the Special Counsel investigation "[s]omewhat [c]losely," JQ 25, so the posts are consistent with her written submission.  Question 27, by contrast, related to news about the defendant, and the juror confirmed at the hearing that she understood that to be the case.

> Again, my whole response to this was about Roger Stone.  And so what did I have or read about him, I still stand by that, that it was about what I said it was about.  I recall him being a part of the campaign and some reporting around interaction with the Russian probe.

Mot. Hr'g Tr. at 119.

At the hearing, counsel repeatedly invoked the January 25 post and suggested it proved that the juror had understated her familiarity with the Stone case.  *See, e.g.*, Mot. Hr'g Tr. at 39–41, 46–49, 52, 104, 108, 113–15 (referencing Post 25).  The fact that the juror shared one long article about the entire Mueller investigation – among the "various things" she posted – does not begin to prove that she lied when she characterized her own state of mind by stating she did not pay "that close attention" to news about Roger Stone.  She answered "[y]es" to the question asking whether she had heard or read about the defendant, JQ 27, she told the parties that she knew he

---

[41]     Post 27 (Feb. 28, 2019); Post 28 (Mar. 24, 2019); Post 30 (May 16, 2019); Post 31 (May 29, 2019); Post 32 (Jun. 13, 2019); Post 34 (Aug. 2, 2019); Post 35 (Aug. 25, 2019).

was accused of involvement in the Russia matter in some way, and she acknowledged following the Special Counsel investigation "[s]omewhat [c]losely" in the news.  JQ 25.  So defendant has not shown that she was untruthful about this issue either.[42]

### D.   The defendant has not shown that the juror lied when she stated her belief that she could be fair and impartial.

Defendant's motion asserts that the foreperson "concealed her explicit and implicit bias by failing to disclose her active anti-Stone and anti-Trump sentiment, evidenced by her multiple social media postings that directly reference her strong political bias."[43]  Am. Mot. at 1.  The defense maintains that the social media posts demonstrate that the juror's statements that she could be fair and impartial juror were not only mistaken, but deliberately misleading.  *See id.* at 2 ("A comparison of her social media posts, on the one hand, and her responses to the jury questionnaire and the Court's questioning of her political disposition and its affect upon her ability to enable Stone to have a fair trial, on the other, makes it immediately apparent that [the juror] was not candid; rather, she misled the Court and Stone with plainly disingenuous answers."); *see also* Mot. Hr'g Tr. at 36–38, 55–56 (taking issue with her answers to questions 15, 16, 30, and 51).

The first problem with this argument is that the request for a new trial is predicated on concealment, but the juror's political affiliation and her views about the administration are plain

---

[42]    It is telling that the juror's description of the nature of the charges against Stone was not entirely accurate, and this lends credence to her statement that she was not following his case closely when she said, "Mr. Stone is accused of inappropriate contact [with] Russian officials in the effort of helping Mr. Trump's campaign for President."  JQ 27.  He was accused of lying to a Congressional committee and obstructing an inquiry into his claimed communications with Julian Assange of Wikileaks through an intermediary.  *See* Indictment.

[43]    *See also* Am. Mot. at 4 ("The concealment of [the juror's] philosophical and political views are an attack at the heart of impartiality.").

on the face of the questionnaire.  *See* JQ 24 (stating that she ran for Congress as a democrat), JQ 21 (identifying her primary sources of news and information), and JQ 30 ("I do have opinions about some of the officials/people on the list").[44]

The juror stated her belief that those opinions would not make it difficult for her to be fair. JQ 30.  In response to other questions, she indicated that she had not formed or expressed any opinions about the defendant or the charges in the case, JQ 34, and that there was nothing about the charges or the requirement to follow the judge's instructions on the law that would make it difficult for her to decide the case impartially.  JQ 48–50.  She wrote that she had no personal reason to want to serve as a juror, and no personal stake in the outcome of the case.  JQ 51.  And she answered that there was nothing about the case, the issues, or the people involved, "or any other reason that has not been asked about in any other question" that made her believe she could not be "completely fair to both the defendant, Roger Stone, and the U.S. Government in this case." JQ at 56.  During her sworn individual voir dire, she repeated that her political affiliation would not affect her ability to weigh the evidence fairly.  Nov. 5 P.M. Tr. at 96.

The defendant takes issue with these answers.  "Based upon this juror's political advocacy and her deliberate concealment of her strong negative views of Stone as a person connected to the

---

44      Defendant mischaracterized this response when he asserted in his motion that it "strains belief that she had no opinions about the people who might be witnesses in the case. . . ."  *See* Am. Mot. at 8.  The juror plainly disclosed that she *does* have opinions "about some of the officials/ people" on the list.  JQ 30.  Defense counsel conceded at the hearing that her answer concerning whether she had opinions was not false, and he revised his position to argue instead that it was her statement that she could be fair that was untruthful.  *See* Mot. Hr'g Tr. at 53–54.

Trump campaign," he argues, these statements "cannot be true."  Am. Mot. at 9.  But he has not shown that her answers were false.[45]

The answers to the questions express the foreperson's subjective belief about her ability to be impartial.  It is the law in this Circuit that such statements by jurors are "*not* inherently suspect, for a juror is well qualified to say whether he has an unbiased mind in a certain matter."  *United States v. Butler*, 822 F.2d 1191, 1196–97 (D.C. Cir. 1987) (emphasis in original) (internal quotation marks omitted); *Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982) (determinations about juror impartiality frequently turn on the testimony of the juror in question), quoting *Dennis v. United States*, 339 U.S. 162, 171 (1950).

---

[45]   At the hearing, counsel equivocated about whether the juror was just mistaken or she misrepresented her views intentionally:

> THE COURT:  All right.  I guess my question to you is . . . you do not believe that 15 and 16 accurately set forth her belief at the time, is that correct, based on all the other evidence?

> [DEFENSE COUNSEL]:  Based on the evidence that we have regarding her social media posts, it does not appear that those answers are, in fact, truthful.  It may be that she believed them to be truthful, but she concealed evidence regarding her views, which would have been important for the Court and the parties to understand her bias.

> *      *      *

> THE COURT: . . . You're saying that you think she's more biased than she says, but that's different.  Are you saying that 15 and 16, she lied?

> *      *      *

> [DEFENSE COUNSEL]:  The answers are, at best, misleading.

> THE COURT:  All right.  Intentionally misleading?

> [DEFENSE COUNSEL]:  At this stage, I don't know.

Mot. Hr'g Tr. at 38-39.  Eventually, though, he returned to alleging a deliberate falsehood.  Mot. Hr'g Tr. at 39 ("Based on the social media posts, it appears to me that they are misleading intentionally.").

Counsel for Stone told the Court at the hearing that the juror's negative answer to Question 34 – "Have you formed or expressed any opinion about Mr. Stone, the charges in this case, or about his guilt or innocence in this case?" – was "likely false," because "[s]he seems to have expressed an opinion."  Mot. Hr'g Tr. at 55; *see also id.* at 56 (the juror "failed to disclose evidence regarding her strong views about Mr. Stone").  Yet the defense has presented no evidence – not one post – that undermines the juror's answer because it "expressed an opinion" about Roger Stone's guilt or innocence.  There are only two posts that relate to him or his arrest in any fashion: one transmits a lengthy, straightforward National Public Radio piece about all of the Special Counsel's indictments, and the other does not talk about the charges at all.  *See* Posts 25 and 26. Neither belies the juror's stated assessment that she could be fair.

In the absence of any explicit statements of opinion about Stone, the defense casts its arguments about bias in terms of some sort of blend of "anti-Stone and anti-Trump sentiment." Am. Mot. at 1; *see also id.* at 2 (complaining about "this juror's overwhelming explicit bias against him and Donald Trump").[46]  But linking them together in a sentence does not make them one and the same; there is zero evidence of "explicit bias" against Stone, and defendant's attempts to gain a new trial based on implied or inferred bias fail.

---

[46]    The defendant's rhetoric on this point is hardly justified, and it is often unmoored from the facts.  For instance, he describes a photograph of the juror with Donna Brazile, a well-known Democratic political strategist, as an illustration of "the depth of her political alliance with forces opposing Trump."  Am. Mot. at 11.  But the photo was posted in 2008, eleven years before the Stone trial, eight years before there was an Office of Special Counsel, and seven years before Donald Trump had even entered the race to be the 2016 Republican nominee.  Also, the motion went to great lengths to characterize a post from the early morning hours of November 16 as a gleeful response to the verdict, despite the fact that the verdict had yet to be returned, and it was pure speculation to interpret the post in that manner.  Counsel retreated from the accusation completely at the hearing, admitting that the juror had not communicated publicly about the case at any point during her service.  Mot. Hr'g Tr. at 62.

The defense asserts that the foreperson's posts about the President "imply an attitude towards the defendant."  Mot. Hr'g Tr. at 46; *see* Am. Mot. at 6 ("[H]er bias is evidenced throughout her social media postings, and, therefore, . . . the Court can and should infer her bias against Stone.").   It is true that several posts convey a negative view of the President or disagreement with certain policy decisions.[47]  And on two occasions during the years covered in the composite exhibit, the juror – through her own comments or her retweets – drew attention to the presence of white supremacists at political rallies and the absence of any condemnation by the President or his supporters.[48]  But these communications do not demonstrate a bias towards Roger

---

[47]    *See, e.g.*, Post 9 (Aug. 13, 2017) (tweet about crowd yelling "boooo" and "shame" walking by Trump hotel); Post 10 (Aug. 19, 2017) ("Quick question for the #Klan President and the 64% of Republicans who agree with his remarks and behavior over . . . ") (ellipses in original); Post 12 (Oct. 22, 2017) (tweet about "foolishness" from this administration); Post 17 (Jan. 13, 2018) (tweet stating "Gotta love it!" in response to a retweet about a derogatory word being projected onto the wall of the Trump International Hotel in Washington); Post 18 (Jan. 20, 2018) (tweet of opinion piece titled, "Opinion | What's so extremely, uniquely wrong about Trump's presidency"); Post 22 (Jun. 14, 2018) (tweet about "the candidate of the party of family values and Jesus"); Post 23 (Nov. 2, 2018) (tweet of article that "they stick with Trump" because his "immigration agenda is the white evangelical immigration agenda.").
       The juror specifically testified in response to questions from the defense that Post 36 was not about Roger Stone.  Mot. Hr'g Tr. at 107–08.

[48]    *See, e.g.*, Post 34 (Aug. 2, 2019) (tweet of article about Trump supporters stating "We're All Tired of Being Called Racists" with comment from the juror, "Then stop being racists. Co-signing and defending a racist and his racist rhetoric makes you racist. Point blank."); Post 35 (Aug. 25, 2019) (tweet of an article about a ku klux klan rally with participants carrying a banner with the slogan "help make America great again" with comment by the juror, "Will the MAGA crowd denounce or condone this affiliation?").

Stone or an inability to be impartial when considering the particular charges against him.[49]

In *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975), the D.C. Circuit refused to equate views about President Nixon with an inability to be impartial to someone who worked in the White House, an even closer connection than the one here.  The Court upheld a lower court's decision to deny a request to move the trial, and it rejected an argument based on an expert's survey of local opinions about the president because "[the expert's] testimony in no way recognized that there might be a distinction between a potential juror's feelings as to Richard Nixon himself and one of his minor functionaries."  *See id.* at 1287; *see also United States v. Haldeman*, 559 F.2d 31, 61–62 (D.C. Cir. 1976) (upholding the district court's decision not to move Watergate-related trial and finding no reason to conclude "that the population of Washington, D.C. was so aroused against appellants" that they could not decide the case based on the evidence presented at trial); *United States v. Poindexter*, 725 F. Supp. 13, 38 (D.D.C. 1989) (rejecting an argument that negative publicity following the verdict in another case was damaging to the defendant, noting that negative

---

49     In this case, the defendant was charged with obstructing an investigation undertaken by a Congressional committee under the control of a Republican majority.  *See* Gov't Trial Ex. 3, Jan. 25, 2017 Joint Statement on Progress of Bipartisan HPSCI Inquiry into Russian Active Measures ("Today, House Permanent Select Committee on Intelligence Chairman Devin Nunes and Ranking Member Adam Schiff released the following statement:  For many years, one of the House Intelligence Committee's highest priorities has been to oversee the Intelligence Community's activities to counter Russian aggression, including the cyber-attacks directed against the United States in the last year.  As part of this oversight responsibility, the Committee has been undertaking a bipartisan inquiry of these activities and the underlying intelligence used to draft the Intelligence Community Assessment, 'Russian Activities and Intentions in Recent US Elections'. . . . This issue is not about party, but about country.  The Committee will continue to follow the facts wherever they may lead."); *see also* Ex. A to Gov't Opp. to Def.'s Mot. to Dismiss Pursuant to Fed. R. of Crim. Pro. 12(b)(3) [Dkt. # 93-1] (then-Chair Nunes transmits the hearing transcript and other requested information to the Department of Justice "[p]ursuant to a Committee vote" and "with no restrictions on use by the [Special Counsel's Office] or other components of the Department of Justice.").

commentary "appears to have been directed not at this defendant but at President Reagan and others better known to the public than Poindexter").

The fact that the foreperson had some limited knowledge about Stone or that she was following the investigation in general does not give rise to an inference that she had made up her mind about him. "Qualified jurors need not . . . be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 799–801 (1975) (ruling that the petitioner had failed to show that the jury-selection process permitted an inference of actual prejudice even though some jurors had a vague recollection of the crime with which petitioner was charged and each had some knowledge of petitioner's past crimes). Thus even if one were to glean from the posts about the Special Counsel or Russian electoral interference that the juror was of the view that these inquiries were not a waste of time, one cannot presume that she was disingenuous when she voiced her belief that she could still be fair to an individual defendant.

The defendant's own motion recites case law that suggests that bias can only be implied in "extreme situations," such as when a juror has a relationship with one of the parties. Am. Mot. at 5 ("Bias is implied in 'extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'"), quoting *United States v. Sampson*, 820 F. Supp. 2d 151, 164 (D. Mass. 2011). The *Sampson* case and others cited involved close personal associations with a party or a lawyer. Defendant has done nothing to satisfy that standard.

At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too.

While there is no evidence that proves this hypothesis, there is evidence that contradicts it:  the juror testified at the hearing that the 2017 post raising concerns about the President's racism was not a quote from her, but it was someone else's language.  *See* Mot. Hr'g Tr. at 110.  And there is no evidence in the record that she had even heard of Stone at that point.  The defense also confronted her with a retweet from August 2, 2019, in which she asserted that those who defend a "racist and his racist rhetoric" are racists themselves.  Post 34.  This was posted after the juror was aware that Roger Stone had been charged in this case, but it does not draw any explicit connection to Stone and the juror denied under oath that the general comment about some Trump supporters was about the defendant.  *Id.* at 107; *see also id.* at 108 ("This post is not about Roger Stone, though, if that's what you're asking.").  This testimony was not shaken by the cross-examination or contradicted by any evidence; the attempt to impute knowledge of the details of the men's

relationship to the juror based solely upon the NPR article she posted eight months before fell flat.[50]

_____

50      *See* Mot. Hr'g Tr. at 108–09.

> [DEFENSE COUNSEL]:  What I'm asking is, you've answered that Roger Stone, you would consider an associate of President Trump; right?
>
> JURY FOREPERSON:  Prior to the trial, I don't know that I would consider him an associate of President Trump.
>
> [DEFENSE COUNSEL]:  Well, you posted an article on January 25, 2019, the date on which he was arrested, which you said you read or you probably read, with the caption "brought to you by the lock her up peanut gallery," and in that article, it talks about his connections with President Trump and the charges against him brought in connection with his actions on behalf of President Trump.
>
> JURY FOREPERSON:  I don't recall what that article was about.
>
> THE COURT:  Prior to the trial, did you have – did you know who Roger Stone was?
>
> JURY FOREPERSON:  Yes.
>
> THE COURT:  And who did you know him to be prior to the trial?
>
> JURY FOREPERSON:  Prior to the trial, my thinking was that he was arrested because he had been connected with the Russia probe and helping President Trump, but I knew nothing about him other than that.  I did retweet in January when he was arrested.  That was certainly more about President Trump . . . .
>
> THE COURT:  But did you know before the trial how long they had known each other or what role, if any, he played in the campaign?
>
> JURY FOREPERSON:  No. . . .
>
> [DEFENSE COUNSEL]:  But you knew he was connected to President Trump, and that was why he was -- well, you knew he was connected to President Trump?
>
> JURY FOREPERSON:  I knew he was arrested because of connections with the 2016 Russia probe around campaign interference, election interference."

Even the NPR article the defense apparently expected the juror to recall verbatim describes Stone as nothing more specific than "a longtime informal adviser to President Trump."  *See* Def.'s Hr'g Ex. 2, linked in Post 25 (Jan. 25, 2019).

At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. *See* Mot. Hr'g Tr. at 45–46. But there is no basis to conclude that Roger Stone was a household name in either Washington, D.C. or in the foreperson's home state, particularly given his short and informal association with the campaign.[51]

The case law in this Circuit makes it clear that one cannot assume that people in the community – even those who follow the news – have a deep understanding of the facts of a particular case. During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention. *See United States v. Mitchell*, 551 F.2d 1252, 1262 n.46 (D.C. Cir. 1976) ("10 of the 12 jurors selected in that case claimed to have followed Watergate casually, if at all"), rev'd on other grounds sub nom., *Nixon v. Warner Communications*, 435 U.S. 589 (1978); *see also United States v. North*, 713 F. Supp. 1444, 1444 (D.C. Cir. 1989) ("while some of the public becomes thoroughly engrossed in such a story many do not"). As the D.C. Circuit observed in an opinion quoted by the Supreme Court when addressing jury selection in the Enron matter: "[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which

---

51      *See* Nov. 12, 2019 A.M. Tr. at 920 (testimony of Richard Gates that "Mr. Stone served as an adviser to Mr. Trump prior to [Gates] and Mr. Manafort joining the campaign," that in May 2016, "it was [Gates's] understanding [Stone] did not have a formal role with the campaign," but that he "still had people that he knew on the campaign and had the ability to access those people."); *see also* Donald Trump (@realDonaldTrump), Twitter (Feb. 25, 2020, 3:01 PM) ("Roger wasn't even working on my campaign.").

interest them may be less fascinating to the public generally." *Skilling v. United States*, 561 U.S.

358, 391 n.28 (2010), quoting *Haldeman*, 559 F.2d at 62 n.37.

The defendant gathered no statistics that would give any heft to his assumptions about what

members of the public, or even members of the democratic party, thought of him, and there is

nothing in the record that supports his characterization of what was in the juror's mind.[52]  And a

key piece of evidence that is in the record – the foreperson's questionnaire – confirms that she was

*not* particularly focused on the details of Stone's case:  her stated understanding that Stone was

"accused of inappropriate contact [with] Russian officials in the effort of helping Mr. Trump's

campaign for President," JQ 27, is, in fact, inaccurate.

Finally, the D.C. Circuit has held that a district court is in the best position to assess the

credibility of a juror's statement in such circumstances.  *See United States v. Gartmon*, 146 F.3d

1015, 1027–29 (D.C. Cir. 1998) (holding that the district court, having observed the demeanor of

the juror at a hearing about the effect of a law enforcement officer's contact with him during the

trial, is in the best position to determine the credibility of a juror's assurance that the contact would

not influence him); *see also Mu'min v. Virginia*, 500 U.S. 415, 428 (1991) (holding that "a trial

court's findings of juror impartiality may be overturned only for manifest error") (internal citations

and quotation marks omitted).

This Court has now had the opportunity to question the juror on two occasions.  During the

individual voir dire, the foreperson swore in open court – subject to cross-examination – that she

---

52      *See* Mot. Hr'g Tr. at 47 (" THE COURT: . . . [D]o you have any statistical information,
any surveys, or anything you've done that would indicate what members of the public or even
active members of the Democratic Party knew about Roger Stone in particular prior to the trial
and all the evidence came out, other than the fact that he had been indicted?  [COUNSEL]:  No. I
have no information about that.").

could be impartial in deciding the case.  *See* Nov. 5 P.M. Tr. at 94.  The Court found her testimony to be entirely sincere and credible – and from all indications, the defense did too, because it did not even ask to strike the avowed democrat with "opinions" about the President at that time.  *Id.* at 96.  At the hearing on the motion for new trial, the juror described the care she took when answering the questions, and she was frank about what she could not remember and appropriately reluctant to be definitive, even if a flat yes or no answer might have put a matter to rest.  *See, e.g.*, Mot. Hr'g Tr. at 90–91, 98, 105, 111.  Counsel for the defendant cross-examined the juror at length after the Court granted his request for a hearing, but that interrogation uncovered no evidence of hidden bias.  Mot. Hr'g Tr. at 99–120.  Based on the foreperson's testimony and her demeanor during both court appearances, and the lack of anything other than indignation and innuendo to contradict her, the Court finds that her answers about her subjective belief that she could be impartial in deciding the case were sincere and truthful.

## II.    The juror's social media posts are not "newly discovered evidence" that can support a motion for new trial.

The defendant filed his motion to vacate the conviction and grant a new trial under Rule 33(b) – that is, on the grounds that he has presented "newly discovered evidence."  But to obtain a new trial on that basis, a defendant must show, among other things, "diligence in the attempt to procure the newly discovered evidence."  *Johnson*, 519 F.3d at 487.  "Due diligence has not been exercised if the defendant or his counsel could have, without unusual effort, acquired the evidence before or during the trial."  *United States v. DiMattina*, 885 F. Supp. 2d 572, 577 (E.D.N.Y. 2012), citing *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).  In *Johnson*, the D.C. Circuit upheld the trial court's denial of a Rule 33(b) motion because the defense did not act with diligence in an attempt to procure an affidavit from an exculpatory witness prior to trial, when the new witness was the daughter of a woman who had provided testimony by the time of the

pretrial suppression hearing, and the two women lived together at the time of the defendant's arrest. 519 F.3d at 487; *see also United States v. Sheffield*, 832 F.3d 296, 311 (D.C. Cir. 2016) ("[Defendant] could have sought independent testing of the PCP before trial, but he did not.").

Here, defendant's motion asserts that "the evidence meets the requirement that it be newly discovered, as it was not known during the jury selection process or during trial, despite diligent efforts by Stone to uncover any such evidence." Am. Mot. at 4. But there is no evidence that the defense made *any* efforts to under this information, much less, diligent ones.

### A. The defense chose not to conduct internet research on the foreperson despite her disclosure that she used social media.

Defendant states that he became aware of the foreperson's social media comments after the trial, following her February 12, 2020 Facebook post about the prosecutors. Am. Mot. at 2. But the defense could have discovered the posts as early as September 12, 2019, the day counsel received access to the completed juror questionnaires, including the foreperson's, which had her name printed legibly on the signature page. *See* Mot. Hr'g Tr. at 6, 8, 10.

The motions to strike potential jurors for cause based on the questionnaires were due on September 19, Min. Order (Sept. 13, 2019); the defense filed its list on September 17. Def.'s Strike List. The foreperson's questionnaire – which was provided to the parties specifically for their review in connections with that exercise – informed the defendant that:

- the foreperson used social media; in particular, she got news and information from Facebook and Twitter, JQ 21;

- she "shared" items on Facebook, JQ 23;

- she may have posted something about the defendant or the Special Counsel on social media, JQ 23;

- she served on an elected local school board for eight years and ran in a Democratic primary for Congress, JQ 24;

- she followed media reports relating to investigations into Russian interference in the 2016 election "[s]omewhat [c]losely," JQ 25;

- she had read or heard about the defendant, JQ 27; and

- she had opinions about "some of the officials" in the list of names in the questionnaire, which included Donald Trump.  JQ 30.

And by November 4, at the latest, the defense knew the exact order in which the potential jurors would be questioned and seated on the jury if they qualified, and that the foreperson was the fourteenth name on the list.  Jury Panel Sheet at 1.  By the time voir dire was completed at the end of the day on November 5, she was tenth.

Defendant asserted in his motion filed on February 14 that the posts could not have been discovered with the exercise of diligence because prior to February 12, "there appear to have been viewing restrictions (and some remain)" on the juror's social media posts.  Am. Mot. at 3–4.  But he has submitted no evidence on that point.  The posts that have been offered in support of the motion were easily accessible to the public on February 12, 2020, and the defendant made his assertion without pointing to any evidence to show that they were not sitting there the whole time, including on September 12, 2019.  At the hearing, the juror testified that her Facebook and Twitter posts were public at the time the jury was selected, and that she made her settings more private for the first time after the trial.  Mot. Hr'g Tr. at 88.  She did not delete any previous posts at that time, or at any other time.  *Id.* at 90.  So, the problem is not that the material *could not* be discovered; it *was* not discovered.  And it was not discovered because no one was looking for it.

Counsel for defendant informed the Court on the record at the hearing that not one of the five attorneys who comprised the trial team at the time of jury selection was tasked with Googling the jurors.  *See* Mot. Hr'g Tr. at 31–32.  He also explained that the jury consultants were hired "to review the jury questionnaire and give us their thoughts about which jurors would be favorable to

the defense," but that they were not retained to conduct internet searches to discover social media profiles or activity. *Id.* at 31.   Given the wealth of information available on the written questionnaires and the opportunity for follow-up voir dire on an individual basis, the team was free to make a strategic decision concerning the allocation of its time and resources, but that decision precludes any finding that the evidence was "newly discovered."

Defendant contends that counsel should not be obligated to "scour public records to verify the accuracy of a prospective juror's disclosures."   Reply at 3, citing *Williams v. Taylor*, 529 U.S. 420, 443 (2000).[53]   But that pronouncement lifted from a twenty-year old decision provides little guidance in today's world.   An effort to uncover social media activity would not have required the lawyers to pore over dusty family court records in the basement of a county courthouse.   All they had to do was sit and type her name into an internet search engine on a laptop

---

53     In that case, a juror failed to disclose that she had previously been married to the deputy sheriff who was to be the prosecution's first witness, and that one of the prosecutors had represented her in the divorce. *Id.* at 440–43.

– a rudimentary practice that has been an inexpensive and popular arrow in the trial practitioner's

quiver for quite some time.[54]

---

54      During the 2007 trial of accused terrorist Jose Padilla, a juror was dismissed after counsel using their laptops during voir dire discovered information inconsistent with her responses. Tracy J. Jasper & Gordon F. Lull, *Lives of Jurors,* Los Angeles Lawyer, Feb. 2009, at 21, 22; https://supreme.findlaw.com/legal-commentary/ googling-potential-jurors-the-legal-and-ethical-issues-arising-from-the-use-of-the-internet-in-voir-dire.html.

In 2012, the New York City Bar Association addressed the question of ethical issues that could arise in connection with an attorney's use of social media websites to research potential or sitting jurors in a formal opinion issued.  *See* Professional Ethics Committee, New York City Bar Ass'n, Formal Op. 2012-2 - Jury Research and Social Media, The Ass'n of the Bar of the City of New York (2012); *see also* Thaddeous Hoffmeister, *Investigating Jurors in the Digital Age:  One Click at a Time*, 60 U. Kan. L. Rev. 611, 612 (2012) (observing in *2012* that "[t]he speed and ease by which information about jurors is now discovered online has led attorneys to increasingly investigate and research jurors. In fact, the practice has become fairly commonplace, with courts, practitioners, and state bar associations all approving and encouraging its use.") (footnotes omitted).

Other bar associations had already responded to the trend, *see* New York State Bar Ass'n, *Op. 843*, Committee on Professional Ethics (2010) and San Diego Cty. Bar Ass'n., *SDCBA Legal Ethics Opinion 2011-2*, San Diego Cty. Bar Legal Ethics Committee (2011), and the American Bar Association issued its opinion on researching potential jurors online in 2014.  *See* Standing Committee on Ethics and Professional Responsibility, *Formal Op. 466:  Lawyer Reviewing Jurors' Internet Presence*, Am. Bar Ass'n. (2014) (Lawyers may passively review a juror's or potential juror's public internet presence, which may include postings by the juror or potential juror in advance of and during trial, unless limited by court order.).

The D.C. Bar issued its ethics guidance on the subject in 2016. *See* D.C. Bar Ethics Committee, *Ethics Opinion 371:  Social Media II: Use of Social Media in Providing Legal Services*, D.C. Bar, section III(D) (2016) ("Competent and zealous representation under Rules 1.1 and 1.3 may require investigation of relevant information from social media sites of jurors or potential jurors to discover bias or other relevant information for jury selection.  Accessing public social media sites of jurors or potential jurors is not prohibited by Rule 3.5 as long as there is no communication by the lawyer with the juror in violation of Rule 3.5(b), and as long as such access does not violate other applicable Rules of Professional Conduct.") (footnotes omitted). *See generally* Andrew J. Ennis & Catherine A. Green, *A Quick Guide to Social Media and Litigation*, Am. Bar Ass'n. (2020).

Lawyers representing clients in this court cannot possibly complain that they lacked access to the internet; an attorney is not permitted to enter an appearance on this court's docket without it.  *See* Local Criminal Rule 49; *see also* Local Civil Rule 5.4.  There is public wireless internet available throughout the courthouse.  And at the hearing, counsel for the defense acknowledged that all of the attorneys on the case had internet access, including at the locations where they were working or staying in Washington during the trial.  *See* Mot. Hr'g Tr. at 32–33.

Judges – and even appellate judges –  have long been aware of the broad availability of the technology.  Ten years ago, in *Carino v. Muenzen*, a trial judge in New Jersey interrupted voir dire to ask one lawyer, "are you Googling these [potential jurors]?"  2010 WL 3448071, at *4 (N.J. Super. Ct. App. Div. Aug. 30, 2010) (alteration in original).  The lawyer responded, "everyone does it," but the judge made him stop on the grounds that it would be unfair to the lawyer for the other side who did not come to court similarly prepared.  *Id*.  This reasoning was rejected on appeal; the appellate court concluded that the judge "acted unreasonably" when he

---

The practice has been sufficiently widely used to become a subject of treatises.  *See* Nancy Gertner, Judith H. Mizner, & Joshua Dubin, The Law of Juries, Chapter 3 Section 3 at § 3.28, 10th ed. (2018) ("The internet, and in particular social media . . . offers the possibility of a rich source of information about jurors that escapes the constraints of formal voir dire.); § 3.30 ("In a high profile case, counsel may move to obtain the list [of potential jurors] in advance of trial, arguing that they need to determine if the juror has blogged about the case in advance, or posted a Facebook statement that would be publicly available."); and § 3.31 ("At the very minimum, pre-trial investigation of potential jurors . . . can provide counsel with the justification for more probing voir dire questions . . . . And it can provide a direct basis for a cause challenge to a particular juror."), citing John O. Browning, *Voir Dire becomes Voir Google: Ethical Concerns of 21st Century Jury Selection*, Am. Bar Ass'n. (2016).

intervened "in the name of 'fairness' or maintaining 'a level playing field.' The 'playing field' was, in fact, already 'level' because internet access was open to both counsel. . . ." *Id.* at 10.[55]

So the defense was free to avail itself of these publicly available sources. The fact that when it decided to look, it found the posts, identified the ones of interest, and put them together in a memorandum for the court within two days suggests that this was not a task involving "unusual effort." *See DiMattina*, 885 F. Supp. 2d at 577. But the decision not to conduct internet research did not deprive the defendant of his only means to discover the information. Stone also had of a full opportunity to learn more about the foreperson's questionnaire responses during the individual voir dire.

---

55      Other appellate courts have also taken notice of advances in technology. In *Johnson v. McCullough*, 306 S.W.3d 551 (Mo. 2010), a trial judge relied on existing state precedent when it sustained a motion for new trial based on evidence from court records that suggested a juror's answer during voir dire had been incomplete even though the records were available at the time. On appeal, the Missouri Supreme Court held that it could not find reliance on current precedent to be erroneous, but even in 2010, it took the time to observe:

> [T]here was no evidence that it was practicable for the attorneys in this case to have investigated the litigation history of all of the selected jurors prior to the jury being empanelled. Accordingly, there was no error in the trial court's determination that Johnson's juror nondisclosure argument was timely.
>
> However, in light of advances in technology allowing greater access to information . . . , it is appropriate to place a greater burden on the parties to bring such matters to the court's attention at an earlier stage. Litigants should not be allowed to wait until a verdict has been rendered to perform a Case.net search for jurors' prior litigation history when, in many instances, the search also could have been done in the final stages of jury selection or after the jury was selected but prior to the jury being empanelled. Litigants should endeavor to prevent retrials by completing an early investigation.

*Johnson*, 306 S.W.3d at 558–59.

**B.    The defense chose not to ask follow up questions during the individual voir dire about the foreperson's opinions or social media activity despite her disclosures in the questionnaire.**

On November 5, 2019, by which time the defense was in possession of the Jury Panel Sheet and the foreperson's written responses to the questionnaire, the jurors were brought into the courtroom one by one.  This gave each side a second opportunity "to expose bias or prejudice on the part of the veniremen."  *Littlejohn*, 489 F.3d at 1342; *United States v. Orenuga*, 430 F.3d 1158, 1162, 1163 (D.C. Cir. 2005).  Yet the questioning by counsel, which the Court did not limit or cut off in any way, *see* Mot. Hr'g Tr. at 57–58, was relatively abbreviated.

The questionnaire revealed that the juror:  had a law degree; had a close friend or family member in law enforcement; was active in civic organizations; had previously served as a grand jury foreman; received news and information from, and "shared" material on, social media sites; considered the *Washington Post*, *New York Times*, and CNN, among others, to be her "primary sources of news and information[;]" listened to political commentators such as Anderson Cooper and Rachel Maddow on CNN and MSNBC; "may have shared an article" about the defendant or the Special Counsel investigation on Facebook; was elected to serve on a local school board and ran in a primary race for Congress as a democrat; followed media reports related to the investigations into Russian interference in the election "[s]omewhat [c]losely;" had read or heard about the Roger Stone case; and had opinions about "officials/people" who might be discussed during the trial.  JQ 4, 14, 18–19, 21–25, 27, 29–30.  That provided, as the Court had already alerted the parties, plenty of "grist" for further examination.  Nov. 5 A.M. Tr. at 23–24.

Courts have found an absence of due diligence when a party was on notice of pertinent information about a potential juror and failed to take advantage of the opportunity to seek more detail.  For example, in *R.J. Reynolds Tobacco Co. v. Allen for Estate of Allen*, 228 So. 3d 684

(Fla. Dist. Ct. App. 2017), an appeals court in Florida upheld a trial court's denial of the defendant's motion for a new trial. *Id.* at 686–89. The defendant complained about a juror's failure to disclose his bias against tobacco companies, and as in this case, it predicated its motion on social media posts. *Id.* at 686. But the trial court denied the motion because the defense decided not to ask the juror questions to explore what he said about tobacco companies in the questionnaire more deeply, and the court of appeals affirmed.

> [D]ue diligence required follow-up questions to [the juror], a long-time smoker now five years "clean," to examine whether he "harbored no ill-feelings toward tobacco companies." Due diligence is lacking when at best, an ambiguity may exist which was not explored. The trial court noted that it did not impose time limits on the voir dire. The trial court concluded that Appellants' likely strategic decision not to question [the juror] did not satisfy due diligence.

*Id.* at 688 (internal quotation marks and citation omitted) ("Given [the juror's] disclosed personal and family history with cigarette smoking, along with his answers to questions 30 through 32 in the questionnaire, . . . [the juror] should have been asked clear and direct questions during jury selection regarding any bias against tobacco companies").

Here, the defense did not ask any follow up questions about the juror's avowed use of social media, her interest in the Special Counsel's investigation or what she had heard about the defendant. *See* JQ 21, 23, 25, 27; Nov. 5 P.M. Tr. at 95–96.[56] Nor did it inquire further about the opinions she said she had about "some of the officials" listed in the questionnaire, even though

---

56     This would not have been particularly time consuming or burdensome; the defense did ask questions about those topics to other jurors. *See, e.g.*, Nov. 5 P.M. Tr. at 64 (counsel asked a juror, "Are you on any social media?" When the juror identified Instagram, Twitter, and Facebook, he went on: "Do you advocate politically on any of these social media?").

this response clearly signaled that she may have had opinions about the President, the most obvious

"official" on the list.  *See* JQ 29, 30; Nov. 5 P.M. Tr. at 95–96.[57]

The defense did ask the juror about her own political aspirations and political affiliation.

> [DEFENSE COUNSEL]:   You've worked on campaigns for Congress people running for Congress?
>
> PROSPECTIVE JUROR:  I ran for Congress.
>
> [DEFENSE COUNSEL]:  You ran for Congress?
>
> PROSPECTIVE JUROR:  I worked on my own campaign.
>
> [DEFENSE COUNSEL]:   And you have friends who worked for other congressmen?
>
> PROSPECTIVE JUROR:  Yes.
>
> [DEFENSE COUNSEL]:  Do you have any political aspirations now?
>
> PROSPECTIVE JUROR:  I don't know, not federal.
>
> [DEFENSE COUNSEL]:  What might they be?
>
> *            *            *
>
> PROSPECTIVE JUROR: I served, can I just say I served in political office in Memphis in a local office on the school board.  So I, one day I wake up and say I run for, you know, office again in Memphis to impact education. One day I wake up and say no way in the world would I do that.  So I don't have an immediate plan to run for office.

Nov. 5 P.M. Tr. at 95–96.  The juror was also asked about the effect of defendant's political

affiliation on her ability to be impartial.  *See id.* at 96.

---

57     Counsel admitted as much at the hearing.  Mot. Hr'g Tr. at 53; *see* Nov. 5 P.M. Tr. at 181–82 (counsel questioned another juror about his answer to Question 30 stating that he had opinions about Donald Trump).

[DEFENSE COUNSEL]: The fact that you run for an office, you're affiliated with a political party. Roger Stone is affiliated with the Republican party, Donald Trump. You understand what I'm saying and getting at?

PROSPECTIVE JUROR: I do.

[DEFENSE COUNSEL]: How do you feel about that?

*     *     *

THE COURT: Can you make that question a little bit more crisp? Is there anything about his affiliation with the Trump campaign and the Republican party in general that gives you any reason to pause or hesitate or think that you couldn't fairly evaluate the evidence against him?

PROSPECTIVE JUROR: No.

[DEFENSE COUNSEL]: Thank you, ma'am.

Nov. 5 P.M. Tr. at 96.[58]  The defense attorney appeared satisfied with her answers, concluding his questioning on his own without any prompting from the Court, and foregoing the opportunity to ask more questions or move to strike her for cause.  *Id.*  The defense team also chose not to use a preemptory strike in her case, and it permitted the juror to be seated in the box.

The Court had the opportunity to view the juror's demeanor during this inquiry.  She was thoughtful, friendly, and open, and the Court found her to be extremely credible at the time.  The fact that the defendant asked few questions to probe any of the potential areas of interest that were apparent on the face of the questionnaire further suggests that the defense team was similarly struck by her sincerity and warm demeanor.

---

58    One can hardly characterize "you understand what I'm getting at?" or "how do you feel about that?" as questions that were sufficiently specific to call for the information the defense is now claiming was concealed.  *See R.J. Reynolds*, 228 So. 3d at 688 ("[W]e find no abuse of discretion in the trial court determining that [the juror] should have been asked clear and direct questions during jury selection . . . .").

There are a host of considerations that may lead a criminal defense attorney to conclude that a juror is likely to view a case favorably, or to be open to defense arguments or rigorous about the presumption of innocence. Here, defendant had a team of lawyers and jury consultants, and he had multiple opportunities to ask to strike this juror: on September 17 when it submitted its strike list, on November 4 when it filed a motion for reconsideration, on November 5 during individual voir dire, and on November 6 when it exercised its preemptory strikes. The fact that he did not choose to do so at any point suggests that the defense team identified something in her background, her questionnaire responses, or her in-court demeanor that gave it confidence that she could be favorable to the defendant and fair and impartial.[59]

The testimony of the other jurors suggests that any trust reposed in this juror was well-placed. Jurors A and B were unequivocal that the foreperson established a process that required the jurors to consider each element of each charge in isolation, and that she never sought to impose her views on them or control the outcome. *See* Mot. Hr'g Tr. at 75–76, 80–81. Juror A testified that the foreperson was among several jurors who pressed the group to take its time when some jurors were prepared to convict more quickly. *Id.* at 77. And Juror B, whom the defense selected, testified:

---

[59] The record in this case reflects that the defense was not shy about moving to strike jurors who, like the foreperson, were open about the fact that they had opinions about the President on the grounds that they would be biased against the defendant for his association with Trump. *See generally* Def.'s Mem. on Jury Selection [Dkt. # 249] (SEALED).

> JUROR B:  . . . We all agreed on -- most of us agreed on our answer.  We already said that, you know, he was guilty. . . . But it was the foreman that insisted that we examine question 3, examine charge 3 a little more.
>
> THE COURT:  Okay.  There was a count that you sent out some notes about.  Is that the one that the foreperson asked you to be more careful?
>
> JUROR B:  Yes, that's the one.  We needed to examine that a little more and read the transcript, you know, find out more evidence.
>
> THE COURT:  So it was the foreperson who insisted that that level of attention be paid to that count, even though some of you were ready already to decide?
>
> JUROR B:  Yes.

Mot. Hr'g Tr. at 81–82.

Given the defense team's strategic decision not to search the internet for publicly available social media posts, and its selection of questions to ask during individual voir dire, the Court finds that the evidence is not "newly discovered," and it does not supply a basis for a new trial under Rule 33(b).

## III.    There is no basis for a new trial based on any other juror misconduct.

There was no evidence presented to support defendant's speculative assertion that the foreperson must have read about the case online and must have shared what she read with the other jurors.  Throughout the trial, the Court instructed the jurors not to read or listen to any reports about the case and to refrain from conducting any internet research or communicating about the trial or the defendant.

> [A]s I've told you before, you can't use the internet or newspapers to do research about the facts or the law or the people involved in the case. . . . All parties have the right to have the case decided based only on the evidence and the legal rules that they know about and that they have a chance to respond to.  Relying on information you get outside the courtroom is unfair because the parties wouldn't have a chance to refute, correct, or explain it.  And it's also unfair because not all jurors would have the same set of information, and that's very important in a trial. . . .

> In some cases, there may be reports in the newspaper or on the radio or the internet or television concerning the case while the trial is ongoing. In the event there's media coverage in this case, you may be tempted to read it or listen to it or watch it.  But, you must not read or listen to or watch those reports because you must decide this case solely on the evidence presented in the courtroom.
>
> If any publicity about the trial inadvertently comes to your attention during the trial, please don't discuss it with other jurors or anyone else.  Just let me or [the Deputy Court Clerk] know as soon as it happens, and then we can briefly discuss it with you.

Nov. 6 A.M. Tr. at 257–58.  The jurors were never instructed to avoid the news or social media altogether; they were repeatedly instructed to avoid receiving any information about the case.  *See, e.g.*, *id.*; Nov. 6 P.M. Tr. at 392–93 ("This is your first evening that I'm sending you home with the admonition that you're going to hear quite frequently in this case.  This evening, as I noted earlier, you should not discuss this case with anyone.  And you should not do any research or try to learn anything more about the case.  Everything you're going to learn is going to be in this courtroom.  And if any news inadvertently comes to your attention, please turn it off.  Please direct your attention to something else.  And please instruct anyone you live with not to try to bring matters to your attention or to discuss the case with you."); Tr. of Jury Trial, Nov. 8, 2019 [Dkt. # 302] at 878 ("[Y]ou are instructed to put this case out of your mind for the next several days.  Do not discuss it with anyone.  If they bring it up, you tell them you don't want to discuss it with them. If any press information comes to your attention inadvertently, turn the page, click on something else, turn off the TV, leave the room."); Tr. of Jury Trial, Nov. 13, 2019 [Dkt. # 306] at 1194 ("[A]s I tell you every evening, you have not yet received the case.  Notwithstanding the fact that you have heard all of the evidence.  You won't be together this evening, so you may not discuss the case with anyone else or try to supplement the record by looking things up.").

After the case was submitted to the jury, the jurors were finally permitted to discuss the case among themselves.  *See* Nov. 14 Tr. at 1252–53.  After the jury reached its verdict on November 15, it was relieved of the obligation to refrain from public comment.  Nov. 15 Tr. at 9.

Pointing to seven social media posts issued by the foreperson during the pendency of the trial, defendant asserts that because the juror was posting on social media during the trial, she must have seen postings about the trial online, and she must have discussed what she read online with the other jurors.

> Her political posts demonstrate that she was actively reading news relating to Trump and presidential politics during trial, and almost undoubtedly also read about Stone, in violation of the Court's repeated orders.  In addition, given her obvious failure to follow the Court's instructions in voir dire, a presumption arises that she failed to follow the Court's instructions in other instances, which would further undermine the integrity of the trial.

Am. Mot. at 15; *id*. at 18 (calling for the juror to testify about whether she shared extraneous information with the other jurors during trial).

This was and still is an entirely speculative and unsupported allegation.  None of the posts mentioned the trial at all.  Three of the posts relate to events in Tennessee and Kentucky, Posts 39–41; one related to Hillary Clinton, Post 37; one was a tweet of a link to a Facebook post which does not indicate in any way what the post was about, Post 38; and one tweeted a comment about the use of the Latin phrase "quid pro quo" instead of plain English in connection with the news of the day related to the President.  Post 36.

In his motion, defendant placed heavy emphasis on a November 15, 2019 tweet reposting a now dormant Facebook link accompanied by several emojis.  Am. Mot. at 14.  Based on this

alone, he posited that the foreperson was celebrating the jury's verdict in the Stone case before it

was announced.

> [The juror] posted hours before the announced verdict in Stone's case –
> hearts, a fist pump, and fist raised (love, celebratory, and solidarity) emojis
> coupled with a link to Facebook, which demonstrates that, in her mind, she
> was putting up a fight and that she had succeeded in her quest to convict
> Stone.

*Id.*  Defendant acknowledged that the link to the Facebook post "cannot be read," *id.* at 14 n.5, but

insisted nonetheless that it must have been about the verdict.

> In light of the context of the numerous posts sampled in this motion and the
> attached composite Exhibit, it is fair to conclude that the link to a Facebook
> post was about the Stone trial.

*Id.* at 14 n.4.

But this is not a "fair" conclusion in any way – it was an utterly unsupported attack on the

juror's integrity.  The emoji post was time stamped at 3:14 a.m., and it was not until 11:11 a.m.

that the jury sent a note indicating that it had reached a verdict.  Note from Jury [Dkt. # 258].  The

juror was apparently pleased about something, and there were other posts from that time period

related to events in Memphis that were of interest, but the juror could not recall what the post was

about, and she admirably declined to speculate.  *See* Mot. Hr'g Tr. at 90–92, 111.  None of the

other posts in the composite express a view about the Stone case, and he was not mentioned at all

from the time of his arrest through the trial.  Thus, a "fair" review of the composite shows that

from September 12 forward, the juror never deviated from her promise not to discuss the case.

The defendant did not say anything further about the November 15 post in his reply, and

he did not rely on the post at the hearing, so there is no reason to conclude that it bears on the

juror's attitude toward Stone or her obligation not to talk about the defendant's case.  At the

hearing, the defense made that clear: "[w]e don't say that *any* posts are in violation of your instructions, Your Honor."  Mot. Hr'g Tr. at 62 (emphasis added).

As for the other posts during the trial, the defense has correctly acknowledged that none raise concerns. The jurors were not under any obligation not to read or tweet about "Trump and Presidential politics" or other subjects, so the fact that the foreperson was on social media and posted about political races in Kentucky or Memphis or even used the term "quid pro quo" does not show she was violating any of the Court's instructions during deliberations.  There is no basis to assume that she read about the case just because she was online, nor is there any basis to conclude that she shared something she read online with the other jurors.  *See* Am. Mot. at 16.[60]

The defense motion attached no juror affidavits or other documentation to support its bald assertions of misconduct, and it presented no facts to support its allegations.[61]  The government argued that defendant had failed to meet the threshold to even have a hearing on this issue, and its

---

60      Indeed, the jurors were specifically instructed not only to avoid reading outside material themselves, but also to report any efforts to communicate with them improperly and not one raised any concerns.  Nov. 6 A.M. Tr. at 256–57.

61      *See* Mot. Hr'g Tr. at 64–65:

> THE COURT: . . . [Y]ou don't have any facts to indicate that she was reading things she wasn't supposed to read during the trial; correct?
>
> [DEFENSE COUNSEL]:  Correct.
>
> THE COURT:  Tweeting things she wasn't supposed to tweet during the trial?
>
> [DEFENSE COUNSEL]:  Correct.
>
> THE COURT:  Or showing any of it to the jury?
>
> [DEFENSE COUNSEL]:  Correct.

position was well founded.  However, in an abundance of caution, the Court in its discretion gave

the parties an opportunity to hear from a sample of the jurors themselves.[62]

## C.   Testimony of Juror A

At the hearing, Juror A who was selected by the government, Mot. Hr'g Tr. at 72, was

asked whether the jurors had been exposed to news accounts about the trial, the selection of the

foreperson and the jury's deliberations.

> THE COURT:  . . . Sir, prior to this case being submitted to you for deliberation, were there any occasions when anyone, including a fellow juror, tried to discuss the case with you?
>
> JUROR A:  No.
>
> THE COURT:  Were there any occasions after you were selected but prior to the case being submitted to you when anyone, including a fellow juror, brought a news account or a social media post about the case or the participants in the case to your attention?
>
> JUROR A:  No.
>
> THE COURT:  Did that occur at any point during deliberations?
>
> JUROR A:  No.
>
> THE COURT:   At any point in deliberations did any juror discuss information outside of the record with you or, to your knowledge, with any other juror?
>
> JUROR A:  I'm not sure what you mean "outside of the record."
>
> THE COURT:   Okay. During deliberations, did anybody talk about something they had read or heard on social media or the news as opposed to an exhibit in the case?
>
> JUROR A:  I understand. No.

---

62    *See Butler*, 822 F.2d at 1195–97 (stating that trial courts presented with allegations of improper juror contact have broad discretion to set the procedures by which inquiries are put to jurors about the allegations).

\*       \*       \*

THE COURT:  What concerns did you have, if any, about whether the foreperson was attempting to impose her views on others or dominate or control the outcome in any way?

JUROR A: I never had any feeling that she was attempting any of that.

THE COURT:  What concerns did you have, if any, at the time you rendered your verdict that you or the jury had not engaged in a full and fair consideration of the evidence?

JUROR A:  No concerns.

THE COURT: Did you ever feel that you were being pressed by any juror to return a verdict that was anything other than your own considered judgment based on the evidence and the law as I instructed you?

JUROR A: No, I did not.

\*       \*       \*

THE COURT:  All right. Did any juror at any time say anything to you that would indicate that he or she was basing his or her verdict on anything other than the evidence in the case?

JUROR A:  No.

THE COURT:  Did any juror at any time say anything to you that would indicate that he or she thought that you should base your verdict on anything other than the evidence in the case?

JUROR A:  No.

Mot. Hr'g Tr. at 73–78.  The Court then asked the parties if they had any additional questions that they would like the Court to ask, and counsel for both sides said no.  *Id.* at 78.

### D.   Testimony of Juror B

Juror B, who was selected by the defense, Mot. Hr'g Tr. at 72, at was then sworn and seated on the witness stand.  Following the instruction not to identify any juror by name on the public record, Mot. Hr'g Tr. at 78–79, Juror B testified that no person and no fellow juror initiated a discussion about the case before the case was submitted to the jury for deliberation.  *Id.* at 79.

Further, no one brought any news accounts or social media posts about the case or the people in the case to the juror's attention at any time from when the jury was selected through the conclusion of the deliberations. *Id.* at 79. At no point during deliberations did any juror discuss any information from social media or the news with Juror B or, as far as Juror B knew, with any other jurors. *Id.* at 79–80.

The juror had no concerns that the foreperson was attempting to impose her views on the others or to control the outcome in any way. Mot. Hr'g Tr. at 81, 82. Juror B never felt pressed by anyone to return an incorrect verdict, and no one in the jury room ever suggested that the verdict be based on anything other than the evidence in the case. *Id.* at 82. At the end of the Court's inquiry, counsel had no follow up questions. *Id.* at 82–83.

This sworn testimony is the only evidence in the record related to the second issue raised in defendant's motion for new trial. It is undisputed, and it demonstrates that the juror misconduct allegation in the motion was made out of whole cloth.

## CONCLUSION

After consideration of the content of the questionnaire in its entirety, the foreperson's statements and demeanor during voir dire, the posts in defendant's composite exhibit, and the testimony adduced at the February 25 hearing, the Court finds that the foreperson did not answer questions falsely on the questionnaire or during voir dire, she did not engage in misconduct during the trial, and the defendant did not use diligence to discover the information present in his motion. Therefore, the Court concludes in its discretion that the defense has not presented grounds for a new trial under Rule 33, nor has it supplied any reason to believe that there has been "a serious

miscarriage of justice." *Wheeler*, 753 F.3d at 208.[63]   For these reasons, the motion [Dkt. # 313]

will be DENIED.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  April 16, 2020

---

63      *See also Gartmon*, 146 F.3d at 1027–29 ("Finally, as in our assessment of potential prejudice from the prosecution's misstatements in closing argument, we are mindful of the fact that this case was not a close one. Measured against the overwhelming evidence of [defendant's] guilt, we are unable to view this contact as materially contributing to the verdict against him.").